# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

| | |
|---|---|
| **LUMINANT GENERATION COMPANY LLC and LUMINANT MINING COMPANY LLC,** ) | |
| ) | |
| Petitioners, ) | |
| ) | **Case No. _____** |
| v. ) | |
| ) | |
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,** ) | |
| ) | |
| Respondents. ) | |

## PETITION FOR REVIEW

P. Stephen Gidiere III
C. Grady Moore III
Julia B. Barber
BALCH & BINGHAM LLP
1901 6th Ave. N., Ste. 1500
Birmingham, Alabama 35203
205-251-8100
sgidiere@balch.com

Stephanie Z. Moore
Executive Vice President & General Counsel
Daniel J. Kelly
Senior Vice President & Deputy General Counsel
David W. Mitchell
Senior Counsel, Environmental
VISTRA CORP.
6555 Sierra Drive
Irving, Texas 75039

*Counsel for Petitioners Luminant Generation Company LLC and Luminant Mining Company LLC*

## **CERTIFICATE OF INTERESTED PERSONS**

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

- Balch & Bingham LLP (Counsel for Petitioners)

- Barber, Julia B. (Counsel for Petitioners)

- Garland, Merrick B., Attorney General, United States Department of Justice (Counsel for Respondents)

- Gidiere, P. Stephen III (Counsel for Petitioners)

- Gray, David (Acting Regional Administrator for Respondent United States Environmental Protection Agency)

- Hoffer, Melissa (Acting General Counsel for Respondent United States Environmental Protection Agency)

- Kelly, Daniel J. (Counsel for Petitioners and Senior Vice President and Deputy General Counsel for Vistra Corp.)

- Kim, Todd, Assistant Attorney General, Environment and Natural Recourses Division, United States Department of Justice (Counsel for Respondents)

- Luminant Generation Company LLC (Petitioner)

- Luminant Mining Company LLC (Petitioner)

- Mitchell, David W. (Counsel for Petitioners and Senior Counsel, Environmental for Vistra Corp.)

- Moore, C. Grady III (Counsel for Petitioners)

- Moore, Stephanie Zapata (Counsel for Petitioners and Executive Vice President and General Counsel for Vistra Corp.)

- Regan, Michael S., Administrator, United States Environmental Protection Agency (Respondent)

- United States Environmental Protection Agency (Respondent)

- Vistra Asset Company LLC (Parent company of Petitioners)

- Vistra Corp. (Parent company of Petitioners)

- Vistra Intermediate Company LLC (Parent company of Petitioners)

- Vistra Operations Company LLC (Parent company of Petitioners)

Respectfully submitted,

s/ P. Stephen Gidiere III
*Counsel for Petitioners*

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

| | |
|---|---|
| LUMINANT GENERATION COMPANY LLC and LUMINANT MINING COMPANY LLC, )<br><br>Petitioners, )<br><br>v. )<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency, )<br><br>Respondents. ) | Case No. _____ |

## PETITION FOR REVIEW

Pursuant to Federal Rule of Appellate Procedure 15 and Section 307(b) of the Clean Air Act, 42 U.S.C. § 7607(b), Luminant Generation Company LLC and Luminant Mining Company LLC (collectively, "Luminant Petitioners") file this petition for review of the U.S. Environmental Protection Agency's ("EPA") final actions entitled *Air Quality Designations for the 2010 1-Hour SO₂ NAAQS: Responses to Petitions for Reconsideration and Administrative Stay of the Designations for Portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas*, 86 Fed. Reg. 34,141 (June 29, 2021) ("Reconsideration Denial"), and *Error Correction of the Area Designations for the 2010 1-Hour Sulfur Dioxide (SO₂) Primary National Ambient Air Quality Standard (NAAQS) in*

*Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas*, 86 Fed. Reg. 34,187 (June 29, 2021) ("Error Correction Action"). The Error Correction Action was issued as part of EPA's Reconsideration Denial. *See* Attachment A (Enclosure 1 to Letter from Michael S. Regan, EPA Administrator, to Daniel Jude Kelly, Vistra Energy Corp. at 5 (June 10, 2021)). Notices of these final actions were published in the Federal Register on June 29, 2021.

The final actions arose from and are part of EPA's action published in 2016 entitled *Air Quality Designations for the 2010 Sulfur Dioxide (SO₂) Primary National Ambient Air Quality Standard—Supplement to Round 2 for Four Areas in Texas: Freestone and Anderson Counties, Milam County, Rusk and Panola Counties, and Titus County*, 81 Fed. Reg. 89,870 (Dec. 13, 2016) ("Texas Designations"), which was challenged by Luminant Petitioners and others in 2017 in this Court. *See Texas v. EPA*, No. 17-60088 (5th Cir.). That case remains pending before this Court.

Jurisdiction and venue for this petition are proper in this Court under 42 U.S.C. § 7607(b). The applicability and scope of the actions challenged in this petition are coextensive with that of the Texas Designations, which this Court has already determined should be reviewed in this Court. *See Texas v. EPA*, No. 17-60088, 2017 WL 3700989 (5th Cir. Aug. 25, 2017). As with the Texas Designations, the Reconsideration Denial and Error Correction Action apply to areas only in the State of Texas and in no other state and are based on determinations specific to those areas. The actions at issue here are thus locally or regionally applicable final actions of the

EPA Administrator and are not "nationally applicable," nor are they based on a determination of "nationwide scope or effect." 42 U.S.C. § 7607(b). In accordance with 42 U.S.C. § 7607(b), this petition for review is timely filed within 60 days of the date of publication in the Federal Register.

Copies of the final actions are attached in accordance with Fifth Circuit Rule 15.1(b) as Attachments A and B.

Dated: August 25, 2021

Respectfully submitted,

s/ P. Stephen Gidiere III
Counsel for Petitioners

***Counsel for Petitioners***:

P. Stephen Gidiere III
C. Grady Moore III
Julia B. Barber
Balch & Bingham LLP
1901 6th Ave. N., Ste. 1500
Birmingham, Alabama 35203
205-251-8100
sgidiere@balch.com

Stephanie Z. Moore
Executive Vice President & General Counsel
Daniel J. Kelly
Senior Vice President & Deputy General Counsel
David W. Mitchell
Senior Counsel, Environmental
VISTRA CORP.
6555 Sierra Drive
Irving, Texas 75039

# **CERTIFICATE OF SERVICE**

Pursuant to Federal Rule of Appellate Procedure 15(c), I hereby certify that I have this day caused the foregoing documents to be served by certified mail, return receipt requested, on August 25, 2021, upon the following:

Justice Merrick B. Garland
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Todd Kim
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources
Division
RFK DOJ Building, Room 2143
950 Pennsylvania Avenue, NW
Washington, DC 20530

Correspondence Control Unit
Office of General Counsel (2311)
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20460

Michael S. Regan
Administrator
U.S. Environmental Protection Agency
Mail Code 1101A
1200 Pennsylvania Avenue, NW
Washington, DC 20460

David Gray
Acting Regional Administrator
U.S. Environmental Protection Agency,
Region 6
1201 Elm Street
Suite 500
Dallas, Texas 75270

Dated: August 25, 2021

s/ P. Stephen Gidiere III
Counsel for Petitioners

# Attachment A

## EPA Approved Nonregulatory Provisions and Quasi-Regulatory Measures in the Texas SIP

| Name of SIP provision | Applicable geographic or nonattainment area | State submittal/ effective date | EPA approval date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| 2017 Emissions Inventory for the 2015 Ozone NAAQS. | Dallas-Fort Worth, Houston Galveston-Brazoria, and Bexar County Ozone Non-attainment Areas. | June 24, 2020 | June 29, 2021 [Insert Federal Register citation]. | |

*    *    *    *    *

[FR Doc. 2021–13771 Filed 6–28–21; 8:45 am]

BILLING CODE 6560–50–P

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 81

[EPA–HQ–OAR–2014–0464; FRL–10024–27–OAR]

**Air Quality Designations for the 2010 1-Hour SO$_2$ NAAQS: Responses to Petitions for Reconsideration and Administrative Stay of the Designations for Portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notification of actions denying petitions for reconsideration and administrative stay.

**SUMMARY:** The Environmental Protection Agency (EPA) is providing notice that it has responded to petitions for reconsideration and/or administrative stay of a final action under the Clean Air Act (CAA) published in the Federal Register on December 13, 2016, titled, ''Air Quality Designations for the 2010 Sulfur Dioxide (SO$_2$) Primary National Ambient Air Quality Standard—Supplement to Round 2 for Four Areas in Texas: Freestone and Anderson Counties, Milam County, Rusk and Panola Counties, and Titus County.'' The EPA has denied these petitions in letters to the petitioners for the reasons that the EPA explains in those documents.

**DATES:** The Administrator signed the associated notification letters on June 10, 2021.

**FOR FURTHER INFORMATION CONTACT:** Corey Mocka, U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, Air Quality Policy Division, 109 T.W. Alexander Drive, Mail Code C539–04, Research Triangle Park, NC 27711; phone number: (919) 541–5142; email address: mocka.corey@epa.gov.

**SUPPLEMENTARY INFORMATION:**

### I. Background

The EPA is providing notice that it has responded to petitions for reconsideration and/or administrative stay of a final action under the CAA published in the Federal Register on December 13, 2016, titled, ''Air Quality Designations for the 2010 Sulfur Dioxide (SO$_2$) Primary National Ambient Air Quality Standard—Supplement to Round 2 for Four Areas in Texas: Freestone and Anderson Counties, Milam County, Rusk and Panola Counties, and Titus County'' (81 FR 89870). On February 13, 2017, Vistra Energy submitted a petition requesting that the EPA reconsider and stay the effective date of the EPA's nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County. Vistra Energy later supplemented this petition on December 19, 2017. On March 15, 2017, the Texas Commission on Environmental Quality (TCEQ) submitted a request for administrative stay of the effective date for the EPA's final designations for these areas in Texas. The TCEQ also submitted a petition for reconsideration of the nonattainment designations on December 11, 2017. The EPA has denied these petitions in letters to the petitioners for the reasons that the EPA explains in those documents.

### II. Where can I get copies of this document and other related information?

This Federal Register document, the petitions for reconsideration and administrative stay, and the response letters to the petitioners are available in the docket that the EPA established for the rulemaking, under Docket ID NO. EPA–HQ–OAR–2014–0464.

All documents in the docket are listed in the index at http://www.regulations.gov. Although listed in the index, some information may not be publicly available, i.e., Confidential Business Information or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form.

Out of an abundance of caution for members of the public and our staff, the EPA is temporarily suspending the Docket Center and Reading Room for public visitors to reduce the risk of transmitting COVID–19. Our Docket Center staff will continue to provide remote customer service via email, phone, and webform. For further information and updates on EPA Docket Center services, please visit us online at https://www.epa.gov/dockets. The EPA continues to carefully and continuously monitor information from the Centers for Disease Control and Prevention, local area health departments, and our federal partners so we can respond rapidly as conditions change regarding COVID–19.

In addition, the EPA has established a website for SO$_2$ designations rulemakings at: https://www.epa.gov/sulfur-dioxide-designations. This Federal Register notice, the petitions for reconsideration and administrative stay, and the response letters denying the petitions are also available on this website along with other information.

### III. Judicial Review

Section 307(b)(1) of the CAA governs judicial review of final actions by the EPA. This section provides, in part, that petitions for review must be filed in the Court of Appeals for the District of Columbia Circuit: (i) When the agency action consists of ''nationally applicable regulations promulgated, or final actions taken, by the Administrator,'' or (ii) when such action is locally or regionally applicable, if ''such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination.'' For locally or regionally applicable final actions, the CAA reserves to the EPA complete discretion whether to invoke the exception in (ii).

Judicial challenges to the EPA's denials of petitions for reconsideration of CAA actions belong in the same venue as any challenge to the action that such petitions request the agency to reconsider.[1]

The D.C. Circuit is the only appropriate venue for both challenges to the final action titled, ''Air Quality Designations for the 2010 Sulfur Dioxide ($SO_2$) Primary National Ambient Air Quality Standard— Supplement to Round 2 for Four Areas in Texas: Freestone and Anderson Counties, Milam County, Rusk and Panola Counties, and Titus County,'' 81 FR 89870 (December 13, 2016) (''Round 2 Supplement'') and challenges to these actions denying administrative petitions on the Round 2 Supplement. The EPA made a finding in the Round 2 Supplement, that the Round 2 Supplement is based on a determination of ''nationwide scope or effect'' within the meaning of CAA section 307(b)(1). *See* 81 FR at 89874–75. That action is currently being challenged in the Court of Appeals for the Fifth Circuit; however, the EPA maintains that the proper venue for that action is the D.C. Circuit.[2] Thus, judicial challenges to the actions noticed here, denying administrative petitions for reconsideration and/or stay of the Round 2 Supplement, also belong in the D.C. Circuit.

To the extent a court finds these actions denying the administrative petitions on the Round 2 Supplement to be locally or regionally applicable, the Administrator is exercising the complete discretion afforded to him under the CAA to make and publish a finding that each of these actions are based on a determination of ''nationwide scope or effect'' within the

meaning of CAA section 307(b)(1).[3] Both the Round 2 Supplement and these final actions noticed here are finalized pursuant to a common, uniform nationwide analytical method and interpretation of CAA section 107(d). In denying the petitions for reconsideration and administrative stay of the Round 2 Supplement, these final actions apply the same common, uniform nationwide analytical method and interpretation of CAA section 107(d) that the EPA applied across the country in designations for the $SO_2$ Primary National Ambient Air Quality Standard (NAAQS), including the EPA's nationwide approach to and technical evaluation of air quality modeling and monitoring data within the EPA's interpretation of statutory terms under section 107(d)(1) of the CAA.[4] These final actions are based on this same common core of determinations regarding the nationwide analytical method and interpretation of CAA section 107(d), determinations that specific methodologies are appropriate or preferable for assessing sulfur dioxide levels nationwide.[5] More specifically, these final actions are based on a determination by the EPA to evaluate areas nationwide using a common five-factor analysis in determining whether areas are in violation of or contributing to an area in violation of the 2010 $SO_2$ NAAQS at the time of the designations final action. The actions denying the petitions for reconsideration explained, for example, that the EPA's designations and the denials for reconsideration are based on the EPA's determination to consider and assess the technical representativeness of all available information regarding then-current air quality at the time of designations *(e.g.,* to consider third party modeling submitted to the EPA of the then-most recent years of air quality and then-currently available monitoring information, and not to consider projections or intended monitoring of future years' emissions, for $SO_2$ designations under the CAA). For these

reasons, the Administrator is exercising the complete discretion afforded to him by the CAA and hereby finds that each of these final actions is based on a determination of nationwide scope or effect for purposes of CAA section 307(b)(1) and is hereby publishing those findings in the Federal Register.

Under CAA section 307(b), any petition for review of these actions denying the petitions for reconsideration and/or stay must be filed in the Court of Appeals for the District of Columbia Circuit within 60 days from the date this notice is published in the Federal Register. Filing a petition for reconsideration by the Administrator of these final actions does not affect the finality of the actions for the purposes of judicial review, nor does it extend the time within which a petition for judicial review must be filed, and shall not postpone the effectiveness of such actions.

Michael S. Regan,
*Administrator.*

[FR Doc. 2021–13938 Filed 6–28–21; 8:45 am]
BILLING CODE 6560–50–P

---

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Part 180**

[EPA–HQ–OPP–2019–0474; FRL–10025–18]

**Bacillus subtilis Strain RTI477; Exemption From the Requirement of a Tolerance**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** This regulation establishes an exemption from the requirement of a tolerance for residues of *Bacillus subtilis* strain RTI477 in or on all food commodities when used in accordance with label directions and good agricultural practices. FMC Corporation submitted a petition to EPA under the Federal Food, Drug, and Cosmetic Act (FFDCA), requesting an exemption from the requirement of a tolerance. This regulation eliminates the need to establish a maximum permissible level for residues of *Bacillus subtilis* strain RTI477 under FFDCA when used in accordance with this exemption.

**DATES:** This regulation is effective June 29, 2021. Objections and requests for hearings must be received on or before August 30, 2021 and must be filed in accordance with the instructions provided in 40 CFR part 178 (see also Unit I.C. of the SUPPLEMENTARY INFORMATION).

---

[1] *Cf. Natural Res. Def. Council, Inc.* v. *Thomas,* 838 F.2d 1224, 1249 (D.C. Cir. 1988) (the clause in CAA section 307(b) governing ''nationally applicable regulations'' provides jurisdiction over both the direct challenge to the regulations and the petition for reconsideration).

[2] The EPA intends to maintain this position in merits briefing in the 5th Circuit, as the 5th Circuit's venue decision denied the EPA's motion to dismiss or transfer the case to the D.C. Circuit without prejudice to reconsideration of the issue by the merits panel. Texas v. EPA, 706 Fed. Appx. 159, 161, 165 (5th Cir. 2017) (''EPA's motion therefore is denied without prejudice to reconsideration by the merits panel . . . merits briefing will provide greater clarity on what determinations lie at the [Round 2] Supplement's core, by, for example, illuminating that the key determinations in the rule are determinations that specific methodologies are appropriate or preferable for assessing sulfur dioxide levels nationwide, as opposed to fact-specific assessments of sulfur dioxide levels in the four Texas regions. In that case, the merits panel should not be constrained from revisiting the issue.'').

[3] In deciding whether to invoke the exception by making and publishing a finding that this final action is based on a determination of nationwide scope or effect, the Administrator has also taken into account a number of policy considerations, including his judgment balancing the benefit of obtaining the D.C. Circuit's authoritative centralized review versus allowing development of the issue in other contexts and the best use of agency resources.

[4] In the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that the ''nationwide scope or effect'' exception applies would be appropriate for any action that has a scope or effect beyond a single judicial circuit. See H.R. Rep. No. 95–294 at 323, 324, reprinted in 1977 U.S.C.C.A.N. 1402–03.

[5] *See, supra,* n.2.



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

WASHINGTON, O.C. 20460

# JUN 1 0 2021

THE A'OMINISTRATOR

Mr. Daniel Jude Kelly
Vice President and Associate General Counsel
Vistra Energy Corporation
1601 Bryan Street
Dallas, Texas 75201

Dear Mr. Kelly:

1 am hereby denying your February 13, 2017, petition for reconsideration and for administrative stay, which you later supplemented on December 19, 2017, (collectively "2017 petition") on behalf of Vistra Energy Corporation and its subsidiaries concerning the U.S. Environmental Protection Agency's final action titled *Air Quality Designations for the 2010 Sulfur Dioxlde (S0 2) Primary National Ambient Air Quality Standard - Supplement to Ro11nd 2 for Four Areas in Texas: Freestone and Anderson Counties, Milam County, Rusk and Panola Counties. and Titus County.* 81 FR 89870 (December 13, 2016).

In your 2017 petition, Vistra Energy requested that the EPA reconsider the nonattainment designations for the Freestone and Anderson Counties, Rusk and Panola Counties and Titus County areas based on the availability of future ambient monitoring data; emissiorts decreases at Vistra Energy's three facilities, one of which is located in each of the identified nonattairunent areas, and facility retirement announcements; the availability of certain materials after the public comment period; and the inability to comment on the proper venue for judicial review. In your 2017 petition, Vistra Energy also requested that the EPA stay the final rule's effective date.

On September 21, 2017, the EPA initially responded to the 2017 petition by indicating an intent to undertake an administrative action with notice and comment to revisit the nonattainment designations for these three areas. However, as discussed more fully in the enclosures, the EPA concludes that the 2017 petition does not present facts or arguments that warrant a reconsideration process or a stay of the effective date of the EPA's 2016 designations action. Therefore, the EPA denies the 2017 petition.

At the request of the state of Texas, on May 7, 2021, the acting EPA Region 6 Administrator signed a final action titled *Air Plan Approval: Clean Data Determination for the 2010 1-Hour Primary Su/fut Dioxide National Ambient Air Quality Standard; Anderson and Freestone Counties and Titus County Nonatlainment Areas,* which detennined that portions of Freestone and Anderson Counties and Titus County are now attaining the 2010 SO2 Primary National Ambient Air Quality Standard. This determination suspends most attainment planning

requirements under the 2010 S02 NAAQS for these two areas for as long as they continue to attain the NAAQS. As explained in that final action, the primary sources of S02 emissions in these two areas have permanently shut down, and, as a result, the EPA's assessment is that air quality in these two areas is now meeting the 2010 SO2 primary NAAQS.

I appreciate your interest in air-quality standards in Texas and in providing cleaner, healthier air for its residents.

Sincerely yours,

Michael S. Regan

Enclosures

**Enclosure 1**

**The U.S. Environmental Protection Agency's Basis for Denying Vistra Energy's Petition
for Reconsideration and Administrativ ·Stay**

**l.      Statutory and Regulatory Background**

*A_     Revisions lo the S0 2 NAAQS*

The Administrator of the U.S. Environmental Protection Agency signed a final rule revising the
primary sulfur dioxide (SO2) National Ambient Air Quality Standard on June 2. 2010. The EPA
published this rule in the *Federal Register* on June 22, 2010 (75 FR 35520 , codified at 40 CFR
50.17). and it became effective on August 23, 20 l0.[1] Based on the Administrator's review of the
air quality criteria for oxides of sulfur (SOx) and the primary NAAQS for SOx as measured by
the indicator compound SO2, the EPA revised the primary *S0 2* NAAQS to provide requisite
protection of pubLic health withan adequate margin of safety. Specifieafly, the EPA established a
new one-hour SO2standard at a level of75 parts per billion, which is met wl1en the three-year
average of the annual 99th percentile of daily maximum one-hour average concentrations is less
than or equal to 75 ppb, as determined in accordance with Appendix T of 40 CFR part 50.40
CPR 50. l?(a) and (b). The EPA a1so established provisions to revoke both the existing 24-hour
and annual primary SO2 standards, subject to certain conditions. *See* 40 CFR S0.4(e).

*B.     Multiple Roundr, nf Designations.for the 2010 SO2NAAQS*

The process for designating areas following promulgation of a new or revised NAAQS is
contained in Clean Air Act section l07(d). After promulgation of a new or revised NAAQS .
each governor or tribal leader is required to re commend air quality designations, including,
the appropriate boundaries for nonattainment areas, to the EPA. The EPA considers these
recommendations when fulfilling its duty to promulgate all initial area designations and
boundaries for the new or revised NAAQS. By no later than 120 days prior to promulgating
designations, the EPA is required to notify states, territo ries and tribes, as appropriate, of any
intended modifications to an area designation or boundary recommendation that the EPA
deems necessary. During that period, states may demonstrate why they believe the EPA's
proposed modifications are inappropriate. Nearly all states, including Texas, submitted
timely designation recommendations for the 2010 SO2 NAAQS to the EPA.

After invoking a one-year extension of the deadJine to designate areas, as provided for in
section l07(d)(1)(B)(i) of the CAA, the EPA published an initial round of SO2 designations
for certain areas of the country on AugUst 5, 2013 (referred to as "Round 1") (78 FR 47191).
The Freestone and Anderson Counties, Rusk and Panola Counties and Titus County areas in
Texas were not included in that first round of designations, as those areas did not have
existing monitor'ing data showing a violation of the 20IO S O2 NAAQS.

---

[1] Furthenn ore, as req uired by the *Clean Air Act,* the EPA cohducted a periodic review of the SO2 NAAQS, and on
March 18, 20 19 , the agency published a decision to retairt the 20 IO one-hour primary standard. *See* 84 FR 9866.

Following Round I designations, three lawsuits were filed against the EPA in different United States District Courts, alleging the agency had failed to perfonn a nondiscretionary duty under the CAA by not designating all portions of the country by the extended deadlihe. The s tate of Texas was a plaintiff or plaintiff-intervenor in two of those cases. In one of those cases. the U.S. District Court for the Northern District of California entered an order on March 2, 20 15, for the EPA to complete the area designations by three specific deadlines.[2] 8.y the first deadline in the court order (July 2, 2016), the EPA was required to d esignate areas containing SO2 emissions sources meeting certain criteria (referred to as "Round2) As shown in Table I. each area subject to this petition included a facility owned by Vistra Energy meeting the criteria for a Round 2 designation.

**Tab le 1.** Texas SO2 Emissions Sources Addressed in the EDREPA's Round 2 Designations and V l stra E nem:v s P e tltJ ons

| Ana | fadllty |
|---|---|
| Freestone and Anderson Counties | Big Brown Steam Electric Station |
| Rusk and Panola Counties | Martin Lake Electrical Station |
| Titus County | Monticello Steam Electric Station |

On March 20. 2015, the EPA provided additional guidance on designations for the 2010 S(h NAAQS and solicited updated state recommendations for Round 2 areas by September t8. 2015.[3] Texas provided its updated Round 2 SO2 designation recommendations to the EPA on September 18, 2015 , which recommended that the EPA designate areas in Texas without monitoring data as unclassifiable/attainment, including Freestone, Anderson, Rusk, Panola and Titus Counties. Texas also noted that the constrained time frame did not allow it to complete detailed analyses, determine model input refinements, or develop detailed graphics.[4] fn the same letter, Texas cited its "disagreement with any use of modeled ptedictions to determine attainment status."

*C.     The EPA ·s Data Requirements Rule*

On August 2 t, 2015, the EPA separately promulgated a *rule* requiring s1,ates to undertake air quality characterization for areas with SO2 sources meeting certain criteria. called the Data Requirements RuJe.[5] The ORR required state air agencies to provide additional monitoring or modeling foformation to char:acterize SO2 air quality in areas contafoing SO2 emissions sources either meeting certain criteria or that have otherwise been Iisted under the ORR by the EPA or state air agencies. In lieu of the SO2 air quality characterization required under the ORR, state air agencies could demonstrate that the listed so urces restricted their annual SO2 emi ssions to less than 2,000 tons per year through federally enforceable and in effect emissions limits, or provide documentation that the sources had been shut down, by January 13, 2017. Thus. for the purpose of meeting the ORR obligations, states were provided options on how to characterize the'ir air

[2] *SierraClub v. McCarthy,* No. 3-13-cv -3953 {SI) (N.D. Cal. Mar. 2, 20 IS).

[3] *See* " UpdatedGuidance for Area Designations for the 2010 Primary Sulfur Dioxide Natiooal Am bient Air Quality Standard," memorandum to Regional Air Division Directors, Region s I. IO. from Stephen D. Page dated March 20. 2015, available at *https://wwwepa.govsiteslproduction{es/2016-04documents/20I50J20soldesigna1ions.p1!f.*

[4] *htrps:f/www.epa guvlsites!production/.files/2016-0l/documimtsx rec-r2.p4f:*

*'See* 80 FR 51052 (August 21, 2015), codified at 40 CFR part 51 subpart BB.

quality, including the option of setting up and beginning operation of new EPA approved SOi monitoring networks by January 2017. States were required to notify the EPA by July 1, 2016, of which characteriza ti0n option they had selected for each listed DRR source. The DRR *did* not, however, relieve EPA of its obligation under the court order to designate Round 2 areas meeting the order's criteria no later than July 2, 2016. *See* 80 FR 51052 at 51056.

Ln a letter dated January J5 , 20 16, the Texas Commission on Environmental Quality identified 25 facirities in Texas with 2014 SO2 emissions exceeding 2,000 tons, including Martin Lake, Big Brown, and MonticeUn. [6] ln a subsequent letter dated June 29, 2016, TCEQ identified the source characterization pathways *(i.e. ,* modeling or monitoring) for most of the previously identified DRR sources.[1] At that time, TCEQ asserted that, notwithstanding the requirements of the ORR, there was no need to provide future air-quality characterization plans for the Martin Lake, Big Brown and Monticello facility areas because the EPA was required to designate those areas by the Round 2, July 2, 20l6, deadline. TCEQ noted, however, that it would characterize these source areas th.rough monitoring if the EPA designated any of the areas as unclassifiable.[8]

## D.    *Background on lhe Designations for Portions of Freestone and Anderson CounJie s, Rusk and Panola Counties and Titus County in Texas*

In September and December 2015, Sierra Club submjtted air quality modeling for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County. Neither Texas nor Vistra Energy provided any other representative monitoring, modeling or technical information prior to the EPA's notification to the Governor of its intended designations.[9] ln a letter dated February 11, 2016. the EPA notified Texas of the EPA•s intended modifications to the state's September 18, 2015, recommendation for Round 2 designations for the 2010 SO2 N AAQS. Specifically, the EPA's letter informed Texas of its intended nonattainment designations for three separate areas covering portions of Freestone and Anderson Coun ties. Rusk and Panola Counties and Titus County, based on consideration of all available information including the modeling submitted by Sierra Club.[10] This letter was accompanied by the EPA's techrucal support document providing the rationale for this intended designation modifi ation.[11] On March l, 2016, the EPA also published a notice in the *Federal Register* solici ting pubfic comments on the intended Round 2 designations. *See* 8l FR 10563.

During the public comment period associated with the intended designations , in Marc h 20 16. the EPA received comments from citizenss Sierra Club, Luminant (a subsidiary of Vistra Energy), TCEQ, and the Governor of the state of Texas regarding its intended nonattainment designations for these three areas. As discussed further in Section Ill, as part of their

---

[6] *h!lps:l/wwwepa.govlsteslproductionljies/2016-06/documenl-llt.pdf.*

[1] *h!lps:l/wwwepa.govlsiteslproductionffiles/2016-07ldocwnentSter:a' So l'rce _characteri zation.pd[,*

[8] Contrary to TCEQ s June 29, 20 16, DRR pathway letter, the 2016 Texas Ambient Monitoring Network Plan stated that TCE Q would characttetize the Martin Lake, Big Brown or Mon1icello areas through monitodng if the BPA designated the areas as nonattainment by the court-ordered J uly 2, 2016, deadline. *See*
*hllpsi /www.epa.gov/siteslproductid'llflles/2017-0Y/documensl txplon2016pdf*
.,*See* Docket ID Nos. BPA•HQ·O AR-20 14-0464-0084 and EPA-HQ-OA R-20 14-0464 -0082,

[10] *//lllps:l/ww w.epa.go V/sitesl productinn/files/20f6-UJ/dod llllelt s l tx- t!pa-r sp-r2.pd},*

[11] *https://Wlliw ep(l.govlslleslprodutinn/files/20l6-03/doamensl tx-epa-lsd-r2.pdf*

comments. Luminant submitted air dispersion modeling for all three areas, and the Sierra Club sub mitted revised versions of the modeling previousJy submitted.[12] Texas did not submit mod,;ling but maintained its position that air-quality monitoring data is the proper method for designating th.ese areas , even though at that time it had no such monitoring data nor had it installed monitors in any of the three areas. Conc.eming the Sierra Club modeling, Texas claimed tbat this modeling " has errors and clearly overestimates actual S02 concentrations." [13] Summaries of the comments received can be fow1d in the *Responses to Significant Comments on the Designation Recommendatlonsjor the 2010 Su!fur Dioxide National Ambient Air Qualfty Standards (NAAQS) - Supplement tor Four Areas in Texas Nol Addressed in June JO, 2016. Version,* dated November 29, 2016. [4]

Before the JuJy 20 16, Round 2 designatio ns deadlin>e the EPA and plaintitls to the court order agreed to extensions for a limited number of the subject areas, including portions of the Freestone and Anderson, Rusk and Panola and Titus Counties. The deadline for signing the final designations for the Texas areas was extended unti1 November29. 2016. On July 12. 2 016, the EPA published designations for all other areas containing S02 emissions sources meeting the Round 2 criteria, in accordance with the court-ordered deadline. *See* 81 FR 45039.

In developing the final designations for the three Texas areas, the EPA reviewed all available information. The EPA determined that the modeling submitted by Luminant was not representative of current air quality in these areas for several reasons, as further explained in the EPA's final designations TSD.[15] For example, Luminant's modeling used a non-EPA preprocessor model, AERLIFT, to increase the observed temperatures and velocities of the plumes exiting from the stacks, which the EPA determined was not adequately justified. and thus, couJd not be relied upon in the designations decision-making process. The EPA determined that the Sierra Club' s revised March 2016 modeling used the latest model version availa b le at the time, and was in accordance with the general recommendations on modeling provided by th e EPA.[16] Regarding monitoring data, the EPA maintained our historic approach regarding the importance of considering all available modeling and monitoring data for S02 designations and noted that there were not monitoring data available to characteFize air qua lity in these areas, onJy modeling data, and since these designations were subject to the court ' s order to designate.certain areas by November 29, 2016, the agency did not have the discretion to awart the results of future monitoring.[17] The final Round 2 designations for portions of the Freestone and Anderson, Rusk and Panola and Titus Counties were based on the EPA's assessment of all available information, including the Sierra Club ' s revised March

---

[11] *See* Docket ID No. EPA-HQ-OAR-2014-0464-0328 for Luminant's comment and Docket ID No. EPA-I-IQ-bAR-2014-0464-0332 for Sierra Club's comment..

[1] *S<!e* Dock et ID No, EPA-HQ-O AR-2014-0464 -0294.

[14] *h1tps:/\w!lw.epo.gov\si ls/prodiction(/iles1 0\ 6-1\l/documen\s/rl,; so2_comments\recefved_document_4_tx_sources_Jina/_U.pdj:*

[15] *https\l\www.epa.guvls,tesl prodution/ files/20J6-1ll dvcuments\texa.[_4_dej!rred luminanf_tsd_final_dQckmpd/*
[1]*See* the S02 NAAQS Designations Sourc-e Oriente d Monitoring Technical Assistance Document at
*hup.vl:fwww.tpa.gov/sltesl prod11c rionl_files/20l6-U6!docu mel1ts/l;ol moni1oringtad.pdf.* and the S0 2 **NAAQ**S Designations Modeling Technical Assistance Document at *https\l\www.epa.gov/si\esl praducllll!ljlles\2 0 /6 -0 6/doc-ume n1s\sol modelingtad.pdJ:*
[11]*Id.*

2016 modeling that continued to demonstrate violations of the 2010 SO2 NAAQS. On November 29, 2016, the EPA Administrator signed the final action designating portions of Freeston and Anderson Countfos, Rusk and Panola Counties and Titus County as nonatt{linment for the 2010 S02 NMQS, and the action was published in the *Federal Register* on December 13, 2016. *See* 81 FR 89870 ("Round 2 Supplement").

On February 13, 2017, the state of Texas, TCEQ, and Yistra Energy and its subsidiary companies filed petitions for judicial review of the Round 2 Supplement in the Fifth Circuit Court-of Appeals.[18] On that same day, Vistra Energy sent the EPA a petition for reconsideration, purportedly pursuant to CAA section 307(d)(7)(8) and the *Adminlstrarive Procedure Act 5* U.S.C. §553(e), and for administrativestay of the EPA's nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County. On March 15, 2017, TCEQ also submitted a request for an administrative stay of the Round 2 Supplement final designations for these areas in Texas. On September 21, 2017, the EPA responded to Vistra Energy's February 2017 petition for reconsideration by indicating an intent to undertake an administrative action with notice and comment to revisit the nonattainment designations for the three areas, but expl ined that pending completion of such action the nonattainment designations remained in effect. [19] On October 12, 2017, the Fifth Circuit Court of Appeals granted the EPA' s motion to place the consolidated challenges to the Round 2 Supplement in abeyance on this basis. Additionally TCEQ submitted a petition for reconsideration on December 11, 20I7. On December 19, 2017, Vistra Energy provjded additional information regarding facility retirements and the deployment of additional SO2 monitors to support its February 2017 petition for reconsideratfon and administrative stay.

On August 22, 2019, the EPA proposed an error correction under CAA section 110(k)(6) in response to Vistra Energy's petition for reconsideration and administrative stay. *See* 84 FR 43757. The proposed error correction, if finalized, would have revised the nonattainment designations to unclassifiable for portions of Freestone and Anderson Cou nties, Rusk and Panola Counties, and Titus County. The EPA published the proposed error correction seeki1g public comment on whether the EPA erred by not giving greater weight to Texas' preference to characterize air quality through monitoring and steps undertaken by Texas towards siting monitors with the in'tention to begin monitoring in these three areas, when considering all available information; relying on available air quality modeling analyses in making the initial designations that the EPA recognized included certain limitations; or a combination of these two issues. Conc urrently with issuing this response to the reconsideration petition, the EPA will publish in the *Pederal Register* its withdrawal of the proposed error correc6on as explained in that notice.

[ıᴿ] Sierra Club additionally filed a petition for judicial review of this action in the D.C. Circuit Court of Appeals, whkh wus transferred to the Fifth Circuit on November 2, 2017, and consolidated with the pending petition. Note, the EPA is not addressing sec tion l.b. of Vistra's petition for reco nsideratio n, which involves a venue issue, in this response. Tbe EPA _has addressed its position on venue for the consolidated case challenging the Round 2 Supplement in tilings fo the 5ᵗʰ Circuit.
[1] *'Iltp://www.epa.govl.sites/productionlfi/es/2018-09documents/3143_signed_respome.p<!f:*

## U.    Criteria for Evaluating a Petition for Reconsideration of the Round 2 Supplement

The APA at 5 U.S.C. section 553(e) states that ..[e]ach agency sha U give an interested person I.he rig ht t.o pe titio n for Lhe iss uance, am endment , or repeal of a rule." The *APA* does not prov ide any criteria that an agency must consider in responding to such a petition, nor include a requirement that such a petition must be granted in certain express circumstances. Section 307(d)(7)(B) of the CAA governs petitions for reconsideration of final action s that are subject to section 307(d). However, CAA section 307(d) does not apply to the E PA' s Round 2 Supplement designations action that is the subject of Vistra Energy"s petition.[20] The EPA, thus, must simply appl y reas o ned deci s ion making in evaluating a petition for reconsideration of the Round 2 Supplement. However, given that CAA section 307(d)(7)( B) provides clear criteria for evaluating reconsiderat ion petitions, the EPA has chosen to evaluate the merits of this petition for reconsideration under the CAA section .307(d)(7)(B) criteria. The EPA's evaluation of the petition using these criteria provide a reasoned basis **for** deciding whether to reconsider a final action in response to a petition ande r APA section 553(e). ln doing so, the EPA in no way waives its objection to the applicabili ty of CAA sect jon 307( d) to thi s final action. Relevant to the EPA' s evaluation of this petition using these criteria, EPA notes that even though the EPA was not required to p rovide public notice and comment in promulgating the Round 2 Supplement pursuant to CAA section I0 7(d )(2)( 8 ), the EPA nevertheless provided stakeholders, such as Vistra Energy, the opportunity to provide comments prior to final EPA action _and    de s pite   in fact availing itself of this opportunity, Vistra Energy in its petition requests reconsideration under CAA sectio n 307(d)(7)(B) and asserts in part that the EPA should grant reconsideration because of inadequate notice and comment.

Under CAA section 307(d)(7)(B), judicial review of final actions taken under CAA section 307(d) is only available with respect to issues raised "with reasonable specificity'" duri ng th e rulemaking' s comment period. Furthennore, the EPA must convene a proceeding to reconsider a CAA section 307(d) ruleif the person raising an objection can demortstra te to the Administrator both that it was impracticable to raise the objection during the comment period or that the grounds for such objection arose after the comment period but within the time specified for judicial review *(i.e.,* within 60 days after publication of the final rulemaking notice in the *Federal Register,* see CAA sect ion 307(b)(1)); and that the objection is of central releva nce to the o utcom e of the rule. In other words, CAA section 307(d)(7)( B) does not provide for required reconsideration of issues that have already been raised or could have been raised to the EPA in a CAA section 307(d) rulemaking. Furthermore, the second criterioo must also be me t for c o mmencement of a reconsideration process under CAA section 307(d)(7)(B), Art objec tion is of central relevance to the outcome of the rule if it provides substan tial support for the argument that the promulgated regulation should be revised.2[1] It is not s ufficient that the objection be of ce ntral relevance to lbe issues invo lved in th e ru lemakin g that would not alter the final outcome. If the EPA denies a

---

[10] Designations are not one of the types of actions listed in CAA section J07(d)(1) as being automatically subject to CAA section 307(d); and the EPA did not exercise its discretion to subject the Round 2 Supple me nt to CAA section 307(d) under section 307(d)(I)(V).

[11] *Coa/ilion for Re.spon.l'ible Regulation* v. *EPA,* 684 F.3d 102, 12 5 (DCCir. 2012).

petition for reconsideration, the person raising the objection can seek judicial review of the EPA's refusal to do so.

## OJ.    EPA's Evaluation of th Petition for RcconsideratiQn

In fts February 20l 7 petition and December 2017 additional information letter, Vistra Energy raises objections regarding five main topics: preference for ambient air monitoring, state designation recommendations, actual S0 2 e miss ions , facility retirement announcements and the ability to provide public commenL Each of these issues is addressed in this section. In general. other than the claims relating to the unavailability of materials after the March 2016 public comment period and future facility retirements, Vistra Energy's petition for reconsideration includes objections *(i.e. ,* the claim s involving f-uture ambient monitoring data and S02emissions decreases) that either repeats comments aJready submitted to the EPA during the public comment period for the intended designations or reflects new objections without including any rationale to demonstrate that they were impracticable to raise during the public comment period or that the grounds for them arose after the end of the period for public comment but within the 60-day period for fi ling a petition for judicial review of the finaJ designations. Regarding the claims relating to the unavailability of materials after the March 2016 public comment period and future facility retirements, Vista Energy also fails to demonstrate that the objections were impracticable to raise during the public comment period or that the grollnds for the objections arose after the end of the period for public comment but within the 60-day period for filing a petition for judicial review of the final designations. These claimed bases for reconsideration can be and are denied under the first criterion irrespective of consideration of the information artd arguments presented for these objections in the petition. Nevertheless, the EPA also is providing an evaluation of the su bstan ce of Vistra Energy's comments and other infonnation provided in the petition for these objections under the second criterion. Although a full review of these comments and this information is not warranted because Vistra Energy does not satisfy the first criterion for reconsideration, for the reasons explained in this section, the EPA al.so concludes that the petition does not meet the second criterion for reconsideration because the petition does not ra ise objections that are of central rele vanceto the outcome of the rule since the objections do not prov'ide substantial support for the argument that the designations should be. revised. The following subsection s include an analysis of the petition for reconsideration' s shortcomings with respect to both the first and second criteria.

## A.    *Preference for Ambient Air Monitoring*

Vistra Energy's petition claims that the EPA should reconsider the final designations based on " monitoring data to be collected by TCEQ in the areas at issue," based on its view that the monitoring data. rather than modeling, will provide a more reliable and accurate representation of air quafity in the relevant areas.

This objection does not meet the first criterion because it repeats comments aJready submitted to the EPA duting the public comment period for the intended designations. Luntlnant, a subsidiary of Vistra Energy. submitted similar comments on the EPA's 'intended Round 2 designations during the public comment period, which the EPA considered .and responded to in the Round 2 Supplement In its March 2016 publ.ic comment, Luminant advocated that the EPA should not

finalize the proposed designations based on modeling because the agency has "co nsistently supponed monitoring over modeling for NAAQS designations purposes and its appmach here was ineonsistehtwith the statute, regulations and the EPA's prior practice." In the responses to commentsdocument that accompanied tl1e Round 2 Supplement, the EPA previously provided a response to this claim:

> The EPA maintains our previou·s position for the reasons delineated in the preamble to the final 20lO SO2 NAAQS rulemaking, the February 2013 Strategy Paper, the proposed Wld final SO2 Data Requirements Rule, and in tbe June 30, 2016, version of the Response to Comments document for why both air quality modeling and ambient monitoring are appropriate tools for characterizi ng ambient air quality for purposes of informing decisions to implement the SOi NMQS, includin_g designation determinations. The EPA·s reliance on modeling to assess SO2 air quality, even in the face of conflicting monitoring, where appropriate, has beenjudicially affirmed, *See, e.g*. *Monrana Sulphur & Chemical Company v. EPA,* 666 F.3d 1174, 1185 (9th Cir. 2012). Moreover, it bas long been the EPA's practice to rely upon appropriate modeling when issuing designations under the SO2 NAAQS. *See, e.g.,* 43 FR 8962 (March 3, 1978), 43 FR 40416 (September 11, 1978). 43 FR 40502 (September 12, 1978 ).[22]

This objection also does not meet the"centralrelevance" second criterion, as the objection does not substantiate why the EPA' s reliance on available air quality mgdeling to assess SO2 air quality in the *absence* of any avaih1ble monitoring data at that time provides substantial support for the argument that the promulgated 2016 action should be revised. For thosesame reasons cited to and articulated in the Round 2 Supplement, the EPA reaffirms our previous statements that both air quality modeling aod ambient monitoring are appropriate tools for characterizing ambientair quall y for purposes of informing decisions to implement the 2010 SO2 NAAQS, inclucling designation determinations. For the reasons explained in the EPA's final designations TSD, incorporated here by reference, the EPA's analysis is thatSierra Club submitted valid, representativemodeling based on the then-most recent actual SO2 emissions demonstrating that the areas were violating the 2010 SO2 NAAQS. The EPA concluded both that the Sierra Club's 2016 modeling mostly followed EPA guidance and that correcting the deviationsin the modeling to be more consistent with the guidance would not have resulted in modeled values near or below the standard. As also explained in the EPA's intended and final designationsTSDs and the responses to comments document that accompanied the Round 2 Supplement, at the time of the EPA's final designations on December 13, 2016, there were no SO2 monitors sited in the areas of maximum concentrationto properly characterize the a'ir quality around Martin Lake, Big Brown or Monticello, nor were there SO2 monitors in the same counties as the facilities. The EPA properly considered these modeling data to establish·a designation of nonattainment for these areas and properly determined that there were not any available monitoring data that could properly characterize air quality in any of theareas at that time.

The petition next attempts to·support its position that monitoring dataare necessary for NAAQS designationsby cHing the EJ>A's February 6, 20n, strategy paper which stated,*"EPA* believes the startingpoint for future SO2 designations should be, as with other NAAQS, a monitoring network to adequately characterize air quality in the areas of concern.."

---

[12] Round2 SupplementReponses lo Comments, Page 13.

This objection does not meet the first criterion because it repeats comments already submitted tu the EPA durihg the public comment period for the intended designations, as Lmninant and TCEQ made similar claims during the public comment period. This objection also does not meet the second criterion for several reasons. First, the strategy paper never claims that NAAQS designations need to be based solely on monitoring data. Rather, the strategy paper explains that modeling can be a "surrogate for ambient air monitoring" to characterize the air quality around a SO2 emissions source. This objection is, therefore, not of central relevance to the outcome of the 2016 action since it miscbaracterizes the strategy paper and does not alter the EPA·s assessment that the Round 2 Supplement properly relied on the available information for each area, includ,ng modeling data, for the reasons previously articulated. Additionally. in the 2010 *S01* NAAQS rulemaking, the EPA affirmed the use of dispersion modeling to infonn designation decisions. *See15* FR 35520 at 35552. Moreover, in the ORR final rulemaking, the EPA noted that more than 30 state and industry commenters support modeling to "effectively serve as a surrogate for comprehensive ambient monitoring results." *See* 80 FR 51052 at 51077. Finally, the EPA considered and responded to similar comments from Lurninanl and TCEQ *in* the responses to comments document that accompanied the Round 2 Supplement:

> The EPA has also explained the importance of using modeling ihfonnation for source-oriented po llutants such as SO2 in cases where existing monitors do not exist or do not adequately characterize peak ambient. concentrations. *See, e.g•.* Memorandum fTom Sh eldon Myers, directo,r EPA Office of Air Quality Planning and Standards, to RegionaJ Office Air Division Directors. ••section107 Designation Policy Summary," April 21. 1983...Ïnstead, where monitors have been shown to be representative of maximum ambient air concentrations, the EPA fully considers the infonnatioa they provide and may base SO.2 NAAQS designations on such data. But not aJl monitors, in areas where they exist at all, are so correctly sited, as the EPA bas consistently observed in establishing and implementing the 2010 SO2 NAAQS. Modeling has proved to be an accurate and reliable tool for remedying the occasional absence or weakness of SO2 monitoring, and in some cases may be the only tool available where there *is* no SO2 monitor in place or other available information to assess air quality.2[3]

Vistra Ertergy's December 19, 2017, letter providing additional information to support its petition for reconsideration inaccurately states that TCEQ was deploying new SO2 monitors "consistent with the EPA's stated des1re to make designations based on monitoring data where it exists, not based on modeling simula tions". Similar to Luminant' s cl'aims during the public comment period, Vistra Energy•s assertions that monitoring data are necessary to support designations under the 2010 SO2 NAAQS in all cases is unfotmded. The EPA continues to agree with the reasoning that the EPA provided in the Round 2 Supplement.

VistraEnergy supports its preference for monitoring over modeling by referencing TCEQ 's plans for deploying new SO2 monitors in the Martin Lake, Big Brown and Monticello areas. The petition states, "there is every reason to believe that the proposed new monitors to be sited near Lwnina.nt's plants- wruch the EPA has refased thus far to approve- will show compliance with the one-hour SO2 NAAQS." This objection does not meet the first criterion, as the petitioner fails to demonstrate in the petition that the objection was impracticable to raise in the public comment

---

period or that the grounds for \be objections arose after the end of the period for public t.'0mment but within the 60-day period for filing a petition for judicial review of the final designations. This objection does not meet the second criterion because, as explained further in Section V of this document, these monitors began operating nearly a year (October or November 2017) after the EPA's court-ordered deadline to designate the areas, and thus the data from these monitors are not reflective of air quality at the time of the EPA's final designations in December 2016 and. therefore. could not have affe.cted the outcome of the rule. In the responses to comments document that accompanied the Round 2 Supplement. the EPA previously provided this response to the Utility Air Regulatory Group's similar claim made during the public comment period

> In response to the commenter's suggestion that designations should await future completion of three years of monitoring, the EPA notes that in the case of the designations subject to the coun·s order to designate certain areas by July 2. 2016 the agency does not have the discretion to await the results of future- monitoring.[24]

These objections also do not meet the second criterion because the EPA is required to consider all available infonnation in making its designations at the time of the final designations under the CAA. Thus. these objections could not have affected the outcome of the rule since they are predicated on the EPA relying on or weighing more heavily information that was not available at the time the EPA was required to finalize the Round 2 Supplement. As explained previously, at the time of EPA's final designations on December 13, 2016, there were no $SO_2$ monitors sited in the areas of maximum concentration to properly characterize the air quality around Martin Lake. Big Brown or Monticello, nor were there $SO_2$ monitors in the same counties as the facilities. The absence of available monjtodng data at that time did not relieve the EPA of its obligation to issue designations for these areas under the court order. CAA section 107(d) specifies that the EPA make designations based on the afr quality at the time of final designations *(i.e.,* determining at the time of signature whether the area meets the NAAQS). Furthennore, at the time of the final designations, the agency did not have the discretion to await the results of three ye s of ambient air monitoring data (i.e., 2018-2020) from Texas's proposed (but not yet established) monitoring sites before taking final action due to the court's order to designate certain areas in Texas. There was, however, as explained previously and in the EPA's final designatio.ns TSO, valid modeling submitted by the Sierra Club based on the then-most recent actual emissions demonstrating that the areas were violating the 2010 $SO_2$ NAAQS. The EPA properly considered these modeling data to establish a designation of nonattainrnent for these areas. Additionally, the EPA does not interpret the statute as allowing the EPA to consider future air quality in the initial designations process. and the D.C. Circuit has upheld this interpretation as reasonable[2].[5]

---

[2] Round 2 Supplement Reponses to Comments, Page 14.

[25] *See Miss. Co mm' n on Envtl. Quality v. EPA.* 790 F.3d 138. 156 (D.C. Cir. 2015); *Catawba County v. EPA.* 571 F.3d 20, 43-44 (D.C. Cir. 2009). The 2015 deci sion upheld lhe EPA' s designations issued just days before new certified air-quality data became available showing more areas violating the 2008 ozone NAAQS than the EPA designated as nonattainmen t. *See a LfoState of Texas v. EPA,* 983 F.3d 826, 837-838 (5th Cir. 2020) (holding that the EPA's nonattainment designation. which modified the state's recommendatio,nwas not arbitrary and capricious because the county was not compliant with the ozone NAAQS when the EPA promulgated its designation and the CAA uses concrete terms such that a county either does or does not meet the NAAQS).

*B.     State Designation Recommendations*

Vistra Energy' s petitton reiterates that TCEQ and the governor of Texas described its designations preference to the EPA in its September 18, 2015, designation recommendations letter and that U1e EPA modified TCEQ 's recommendations, In relation to the previous section, the petitioner asserts that basing the area designations on moni toring data is necessary w:hen making NAAQS designations and would be more consistent with the goals of the CAA, which "'gives great deference to governors' recommendations for areas within their states . . . ." citing *Pennsyl vania Dep't of Envtl. Prof. v. EPA,* 429 F.3d 1125 , 1129 (D.C. Cir. 2005). Furthermore, the petjtioner states that the CAA "gives the EPA the power to  modify a  state's designation only to the extent ' necessary,'  thereby establishing adjfferential standard for EPA disposition of a state choice." *See* 52 FR 49408 at 49410 (December 31, 1987).

The petitioner's objection does not meet the first criterion because it repeats comments already submitted to the EPA during the public comment period for the intended designa tions. In the responses to comments document that accomp an,ied the   Round 2 Supplement, the EPA previou sly provided this response to Luminant's similar claim made during the public comment period:

> The colllIT!enter reads CAA section $107(d)(1)(B)(ii)$ as imposing a burden on the EPA to prove that any modification to a state s designation  recommendation  is  "necessary/ '  but this reads the word out of its larger context within that subsection, which confers broad technical discretion on the EPA in promulgating final designations. *See Catawba Cnty.. N.C. v. EPA,* 571 F.3d 20 (D.C . Cir. 2009). The EPA reasonably and consistently concl ndes that it is clearly "necessary" to modify the designatio n reco mmendation to account for any information regarding the air quality of an area that persuasively suppo rts such modification.[26]

This objection does not meet the second criterion because the petitioner fails to demonstrate that it is of central relevance to the outcome of the rule. For these three areas in Texas, the EPA considered Texas's Wlclass ifiable/attainment designation recommendations but modified them given that they were not supported by currently available infotmation; specifically, the EPA's assessment of Sierra Club's modeling showing violations of the 2010 SO2 NAAQS. At the time of the EPA s final nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County. although Texas preferred that the EPA designate the areas based on proposed future monitoring data rather than modeling, there were no representative monitoring data or other reliable modeling demonstrations available to refute Sierra Club' s information demonstrating violations of the 2010 SO2 NAAQS, as explained in the EPA's final designations TSD.[27] T herefore, even though the EPA considered T exas s preference for monitoring, given that the statute requires that the EPA consider available

---

[20] Round 2 Supplement Reponses to Comments, Page 39,

[27] The  EPA also received a comment from  tbe UARG suggesting that the  EiP A wait for the future completion of three years of monitoring before designating certain Round 2 areas. In the Round 2 Supplement Res ponses to Co mments (page 14), the EPA responded that the agency does I10t h,we the disc re tion to await the results of future monitoring because of the court order to designate certain areas by the July 2, 2016, deadline. This comment from UARG further demonstrat es that the petitioner 's objection does not meet the first criterion beca use it repeats a comment already submi.ned tO the EWA d uring the public comm ent period for the intended designations.

information, Texas's preference for reliance on monitoring information when there were no such monitoring data available at the time of the EPA's final designations in December 2016 did not and could not rebut Sierra Club's modeling showing violations of the 2010 SO2 NAAQS. [28] As explained in Section Ill. A., the EPA reaffinns the reasoning that the EPA provided in the Round 2 Supplement.

C.    *Actual S02 Emissions*

Vistra Energy's petition asserts that the modeling, which the EPA relied on for its final nonattainment designations of these ar:eas in Texas is based on higher S02 emissions data, from either the 2012-2014 or 2013-20153-year periods, and did not reflect more recent SO2 emissions at the facilities (
Table 2). Sierra Club's revised March 2016 modeling used the 2013-2015 actual SO,2 emissions for Big Brown and Martin Lake, and the 2012-2014 actual SO2 emissions for Monticello. The older Sierra Club modeling, which the EPA relied on for the intended designations of the areas, was based on the 2012-2014 actual SO2 emissions for all three facilities. The petitioner states that Big Brown's SO2 emissions decreased from 62,494 tons in 2013 to 49,838 tons in 2015 and 42,470 in 2016. Similarly, Martin Lake's SO2 emissions decreased from 62,735 tons in 2013 to 22,928 tons in 20I 5 and 25,471 tons in 2016.[29]

This objection does not meet the first criterion, as the petitioner fails to demonstrate that it was jmpracticable to raise, in the public comment period for the Round 2 Supplement or that the grounds for the objection arose after the end of the period for public comment but within the 60-day period for filing a petition for judicial review of the Round 2 Supplement.

**Table 2.** Actual SO2 Emissions (tons) for Facilities Addressed in the Round 2 Supplement

| Facility | Modeled Elldulou Period | H12 | JIU | 2114 | 2015 | 2016 |
|---|---|---|---|---|---|---|
| Big Brown | 2013-2015 | 60,681 | 62,494 | 57.460 | 49,884[a] | 42,470 |
| Martin Lake | 2013-2015 | 43,096 | 62,735 | 53,656 | 22,927b | 25.471 |
| Monticello | 2012-2014 | 31,447 | 24,396 | 20,438 | 18,395 | 24,958 |

n The total 2015 emissions were not yet available in the EPA's Air Markets Program Data when Sierra Club retrieved the data for its March 2016 modeling. Sierra Club calculated the 2015 emiss ions from the supplied emissions from the continuous em issions monitor. The final 2015 SO2 em issions were 49.837 tons whiclt is a 47 tpy difference, or a 0.09 percent decrease.

0 The total 2015 emissions were not yet availab le in the EPA·s Clean Air Markets Program Data when Sierra Club retrieved the data for its March 20I6 modeling. Sierra Club calculated the 2015 emissions from the supplied emissions from the CEM. The final 20IS S02 emissions were 22,928 tons which is 1.3 tpy difference, or a 0.0057 percent increase.

This objec tion does not meet the second criterion because as explained in Section Ill.A., the EPA does not interpret the statute as allowing the EPA to consider future air quality in the initial

---

s-i *Se State o/Texas v. EPA* * 983 F.3d 826, 836-838 (5th Cir. 2020).

[19] The petition did not address the more recent SO2 em issions for Monticello, but the EPA notes that Montice llo's SO2 em issions decreased from 31,44 7 tons in 2012 to 18,395 tons in 2015 and then increased to 24,958 tons in 2016.

designatfons process, and the D.C. Circuit has upheld this interpretation as reasonable,[30] and the petitioner foils to demonstrate that use of different emissions m the model woaJd have resulted in a different designations outcome - *i.e.,* attainment of the 20JO SO2 NAAQS - and thereby would have been of central relevance to the outcome of the 2016 rule. At the time the EPA Administrator signed the Round 2 Supplement on November 29. 2016, the lotal S02 emissions were not yet available for calendar year 20I6. and only the total 2012-2014 actual SO2 emissions data were available at the time of the public comment period *in* March 2016. Sierra Club submitted revised modeling on March 31, 2016, during the public comment period based on the most recent annual SO2 emissions data availableat the time (total 2012-2014 actual emjssions) and an estimation of the total 2015 emissions for Big Brown and Martin Lake based on the partial 201·5 emissions data available (Table 2). While Vjstra Energy noted the S0 2 e missions fluctuations in the petition for reconsideration, it did not provide modeling of the more recent 2014-2016 actual SO2 emissions for any of the facilities to refute Sierra Club's modeling nor demonstrate whether the areas were attaining the 2010 SO2 NAAQS at the time of the EPA's final designations in December 2016, The information Vistra Energy provides regarding annllaJ emissions alone does not refute Sierra Club ₃ March 2016 modeling nor demonstrate that the areas were attaining the 2010 S02 NAAQS at the time of EPA's final designations in December 2016 because a decrease in annual emissions does not necessarily result in a lower design value. As1mplied in the EPA's "SO2 NAAQS Designations Source-Oriented Modeling Technical Assistance Document," the temporal distribution of emissions at a facility across emissions sources, tin1e of day, and season of the year as well as meteorological conditions, are factors that affect the nnal design value .

Regardless of the annual SO2 emissions trends the EPA ₃ evaluation of the Sierra Club's March 2016 modeling used for the final designationsindicated that fr may haveactually had a slig ht underestimation bias. For example, as explained in the responses to comments document that accompanied the Round 2 Supplement, the modelingdid not ihclude surrounding S0 2 sources and used a low background concentration. After further consideration for the same reasons explained in Section ULA., the Round 2 Supplement responses to comments document, and the supporting technicalsupport documents, the E PA believes that Sierra Club's March 20J 6 modeling *was* of sufficientquality to determine that the Martin Lake, Bi_g Brown and Monticello facility areas in Texas were violating the 2010 SO2 NAAQS at the time of the EPA's final designations in December 2016. The EPA also notes that this conclusion is consistent with our analysis in Section V of tbjsdocument.

*D.    Facility Retirement Announcements*

Io Vistra Energy's December 19, 2017, letter providing additional information irt support of its petition for reconsideration, the petitioner states that Luminant obtained approval from the. Electric Reliability Council of Texas to decommission and permanently retire the Big Brown and Monticello plants in early 2018, Because of the October 2017 announcement regarding the facility shutdowns, the petitioner claimed that the Big Brown and Monticello areas were designated "in error and should be changed." The petitioner also claims that Sierra Club's March 2016 modeling, which was the basis for the EPA·s nonatta inment designations for the Big

---

[30] *See. supra* . n,25.

Brown and Monticello areas "were based on the assumption that the Monticello Plant and the Big Brown Plant would continue to operate, an assumption that is in error," Finally. Vistra Energy maintains that TCEQ should not needlessly expend resources developing a state implementation plan revision "to address these erroneous designations."

The petitioner fails to and could not demonstrate that these objections meet the first criterion because the facility shutdowns, as detailed further in Section V of this document, occutTed more than 60 days after publication of the Round 2 Supplement in the *Federal Register.* These objections do not meet the second criterion because, as explained in Section Ill.A, the EPA does not interpret the statute as allowing 1he EPA to consider future air quality in the initial designations process, and the D.C. Circuit has upheld this interpretation as reasonable:[31] thus, any impact on air quality from these later-occuring shutdowns are not of central relevance to the outcome of the rule. These objections do not meet the second criterion because the nonattainment designations were not based on an assumption of future air quality, but rather were based on a determination regarding current air quality at the time of the EPA's final designations in December 2016.

As shown previously in Table 2, Sierra Club modeled the 2013-2015 actual emissions for Big Brown and the 2012-2014 actual emissions for Monticello. This modeling was based on neither future emissions nor the assumption that the two plants would continue to operate into the future. The petitioner's objection regarding the modeled emissions used for final designations does not meet the second criterion because the facility shutdowns occurred after the EPA's court-ordered deadline to designate the areas and are not reflective of or of central relevance to air quality at the time of the EPA's final designations in December 2016, and, therefore, could not have affocted the outcome of the 2016 rule. For the same reasons explained in the Round 2 Supplement and Section fll.A., the EPA believes that that Sierra Club's March 2016 mod eling properly demonstrated that the Big Brown and Monticello areas were violating the 2010 S02 NAAQS at the time of the EPA's final designations in December 2016. This conclusion is consistent with out analysis in Section V of this document. The EPA also notes, regarding Texas's planning obligations; that these designations have remained in continuous effect *(i.e.,* the planning obligations were triggered by the nonattainment designations and were never stayed or altered), and the time and resources that TCEQ is required by the CAA to expend to meet these obligations are not relevant to the factual determinations the EPA made regarding air quality in 2016.[32]

E.    *Abllity lo Provide Public Commenl*

Vistra Energy's petition asserts that the EPA relied on modeling that was not subject to public comment for the December 2016 final nonattainment designations for portions of Freestone and

---

[31] *S,ee supru,* n.25,

[32] Subsequent to TCEQ's petition. more recently at the request of Texas, the EPA finalized a determination that the Big Brown and Monticello areas are now anaining the 2010 S02 NAAQS per the EPA·s Clean Data Policy. *See h1lps:llwww.regula1ions .gov* under Docket lD No. EPA-R06-0AR-2020-0434. This determination suspends most attainment planning requirements under the 20lO S0 2 NAAQS for these two areas for as long as the areas continue to attain the NAAQS.

Anderson Counties, Rusk and Panola Counties and Titus County. The petition states that the EPA relied on Sierra Club's modeling that "was submitted on the last day of the public comment period (March 21, 2016)" and claims that the modeling "was not even posted by the EPA to the electronic docket." Vistra Energy further contends that neither they nor the State had the opportunity to comment on that modeling, which was used as the basis for the EPA's final nonattainment designations for the three areas in Texas.

The EPA's intended nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County were based on Sierra Club's September and December 2015 modeling that demonstrated violations of the 2010 SO2 NAAQS. The EPA docket office posted both the September 17, 201.5, modeling analysis (Docket ID No. EPA-HQ-OAR-2014-0464 -0084) and the December 14. 2015, modeling analysis (Docket ID No. EPA-HQ-OAR-2014-0464-0082) to the public docket on March 1, 2016, the same day that the EPA's intended Round 2 designations were published in the *Federal Register.*

As explained in the EPA's intended designations TSO, the EPA identified aspects of Sierra Club's 2015 modeling that were not as refined as possible. The modeling did not include building downwash or variable stack temperature and velocity, since Sierra Club did not have access to information needed to support such inclusion (including building downwash will generally, though not always, increase the predicted maximum modeled concentrations). Sierra Club's 2015 modeling used stack velocity and temperatures consistent with 100 percent load. This, coupled with actual hourly emissions rates, underestimated actual concentrations because higher temperatures and velocities of 100 percent load, when paired with lower emissions of less than 100 percent load, should provide an overestimation of the dispersion and thus an underestimation of maximum ambient concentrations at ground level. Because the inclusion of building downwash and variable stack parameters would likely not result in values near or below the 2010 SO2 NAAQS, EPA concluded that the Sierra Club's 2015 modeling was an adequate basis for the intended nonattainrnent designations for the areas containing Martin Lake, Big Brown and Monticello.

Sierra Club submitted its comment {Docket ID No. EPA-HQ-OAR-2014-0464-0332) on the EPA*'s intended Round 2 designatiollsonMarch.31, 2016, and the submission was posted publicly on April 7, 2016, before th.e end of the 120-day period for Texas to demonstrate why it believed the EPA's proposed designation modifications were inappropriate. Sierra Club's March 2016 comment consisted of a cover letter , exhibits, attachments, and modeling files submitted on a CD-ROM. Due to the file size, the EPA Docket Office could not post the modeling files from the CD-ROM media on *www.regulations.gov.* Instead, the EPA Docket Office included a placeholder document in the public docket that had directions for requesting a copy of the materials either in-person or via phone, fax or email. The notice of availability (81 FR I0563) and U1e electronic docket also included the contact information for the EPA staff who were available to answer questions about the designations action and related materials.

The petitioner's objection does not meet the first criterion as the adn1inistrative record for the Round 2 Supplement clearly demonstrates that the public had ample opportunity to offer meaningful comments on the air-quality information considered and relied on, and the EPA's designaito ns of these three areas as nonattainment in the Round 2 Supplement was a logical outgrowth of the noticed intended designations. SieITa Club's revised March 2016 modeling generally addressed the

co hcems that either the EPA identified in its intended designations TSD or that Luminant identified in its public comment. While the EPA's final nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County were further supported by the Sierra Club's revised March 2016 modeling, Sierra Club's 2015 modeling was publicly available for the entire 30-day public comment period, as was the EPA's evaluation of Sierra Club·s 20J5 modeling in the intended designations TSD that Sierra Club's revised March 2016 modeling responded to.³

The petitioner's objection does not meet the second criterion because it does not demonstrate that the alleged inability to comment on the differences between Sie rra Club's 2015 and 2016 modeling, differences that improved the quality of the modeling and addressed concerns previously raised, proVides substantial support for the argument that the promulgated 2016 action should be revised. In other words, the petitioner does not show that comments it would have provided on Sierra Club's 2016 modeling would have provided substantial support for a designation other than nonattainment and t1lereby affected the outcome of the 2016 rule. For the same reasons explained in the Round 2 Supplement and Section ill .A., tbe EPA believes that that Sierra Club·s March 2016 modeling properly demonstrated that the three areas were violating the 2010 S02 NAAQS at the time of the EPA s final designations in December 2016. This conclusion is also consistent with our analysis in Section V of this document Furthermore. the CAA explicitly does not require that designations include public notice and comment.³⁴

## IV.    The EPA's Evaluation of the Petition for Administrative Stay

As part of Vistra Energy' s February 13, 2 01 7 , petition for reconsideration, the petitioner also asks the EPA to administratively stay the effective date of the final nonattainrnent designations for port'ions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County pursuant to APA section 705 and CAA section 307(d)(7)(8 ). The EPA conc ludes that an admini strative stay of the Round 2 Supplement for these three areas' designation is neither appropriate nor warranted.

APA section 705 authorizes an agency to postpone the effective date of an agency action pending judicial review when the agency finds that justice so requires. In this case, the Round 2 Supplement became effective January 12, 2017. The petitioner submitted its request for an administrative stay relying upon APA section 705 by petition on February 13, 2017, 32 days after the Round 2 Supplement became effective. Even if the EPA beHeved that an administrative stay was warranted bere, which it does not, an APA section 705 stay is not appropriate once the effective date of the agency action has passed because postponing an effective date necessitates action before the effective date arrives. *See, e.g., NRDC v. US. Dep'I of Energy* 362 F. Supp. 3d 126, 151 (S.D.N.Y. 2019) ("Section 705 only allows an agency to · postpone the effective date of action taken by it.' *S* U.S.C. § 705. It does not allow agencies to suspend a rule that has already taken effect."); *see also Safety--Kleen Corp. v. EPA,* 1996 U.S. App. LEXIS 2324, *2-3 (D.C. Cir. Jan. 1.9, 1996) *Becerra* v. *U.S Deparlment of I,nterior,* 276 F.Supp.3d 953 (N.D. Cal. 2017); *Calijnrnlu v. Unlt<!d Slate s BLM,* 277 F.Supp,3d 1106 (N.D. Cal. 2017). The EPA stated in its

_____

J ³ EPA also notes that it is not required under CAA section 107(d) to seek pubUc comment during the NAAQS designations process, though EPA el ected to provide public notice and comment for the Round 2 designat1ons.

September 21, 2017 letter to Vistra Energy that the December 2016 final nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County remain in effect while the EPA's intended notice and comment rulemaking action is pending *(i.e.,* the August 2019 proposed error correction).

Even assuming that the EPA has authority to grant an administrative stay here under APA section 705 at this time, an administrative stay is not warranted for the same reasons that the EPA is denying the petition to reconsider, including that the objections raised did not provide substantial support for the argument that the Round 2 Supplement should be revised. The EPA has determined that the petitioner does not make a showing on the merits that reconsideration or stay is warranted after consideration of the petitioner's claims. including claims of emissions declines and predictions regarding, then-future monitoring data, as well as acknowledgment of the currently available monitoring and review of the currently available modeling data discussed in Section V.

When acting under CAA section 307(d)(7)(B), the EPA has authority to issue a stay for up to 3 months if the criteria for mandatory reconsideration of a CAA section 307(d) rule are met. *See Clean Air Council v. Pruitt,* 862 F.3d 1, 8 (D.C. Circuit 2017); *see also Air Alliance Houston v, EPA.* 906 F.3d 1049 (D.C. Cir. 2018).. As explained io Section n, the Round 2 Supplement is not a CAA section 307(d) rule and the mandatory reconsideration criteria under CAA section 307(d)(7)(B) do not apply to it, and thus the corresponding authority to issue an administrative stay under that provision, when met, also does not apply. Furthermore, as explained above in denying the petition to reconsider, even if the criteria for mandatory reconsideration did apply, the criteria are not met here and, thus , the EPA would not have authority to issue a stay under CAA section 307(d)(7)(B).

## V.    Additional Information

*A.    Recent SOz Emissions Data*

As shown in Table 3, Martin Lake's SO2 emissions have more than doubled from 25,472 tons in 2016 to 56,198 tons in 2018, making Martin Lake the largest emitter of SO:i in the United States.[35] Big Brown's SO2 emissions decreased from 42,470 tons in 2016 to 6,659 tons in 2018, and Monticello's emissions decreased from 24,961 tons in 2016 to O tons in 2018. As explained in additional detail below, both the Big Brown and MonticeUo facilities permanently and enforceably shut down 'in 2018 *(i.e.,* the facilities surrendered their operating pennits and must obtain all required air quality peonits from TCEQ prior to future operation).

**Table 3.** Comparison of Recent SO2 Emissions (tons)

| Fadlity | 2116 | 2011 | 2018 |
|---------|------|------|------|
| Martin Lake | 25,472 | 36,441 | 56 .198 |
| Big Brown | 42,470 | 47,632 | 6,659 |
| Monticello | 24,961 | 29,412 | 0 |

---

,) *See hltps://l ampd.ep11.govl a1npdl..*

Regarding the Anderson and Freestone Counties area, Vistra Energy permanently retired the Big Brown coal-fired steam electric generating Units 1 and 2 on February 1 2, 2018. Vistra Energy filed to void the Big Brown Title V permit, FOP 065, on May 24, 2018, and TCEQ voided this permit on August 29, 2018. Vistra Energy submitted a letter to TCEQ on March 27, 2018, requesting that the <lgency void Big Brown's individual new source review pennjts (17891, 1874 4, 45420, 53205, 54810, 56445, 56447, 83646, 83647, 85296, 94619, 95214 ﹐ ﹐ 7, 99050, 106862, 108990. 112207 and 148918). On March 29, 2018, TCEQ cancelled all NSR aurhorizatjons for Big Brown Units 1 and 2 and certain other faciliti es, as requested by Vistra Energy.[36] Vistra Energy will retain the remaining pennits (17891, J8744, 56447, 10686 2 and 1 I2207) addressing material handling operations for coal piles, silos and conveyors, until all facility closure activities are completed.

Regarding the Titus County area. Vistra Energy permanently retired the Monticello coal-fir d steam electric generating Units 1, 2, and 3 otl December 31, 2017. Vistra Energy 6 led to void the Montice llo Title V pem1 it. FOP 64, on May-23, 2018 , and TCEQ voided this penbit on August 3, 2018. Vistra Energy submitted .a letter to TCEQ on February 9, 2018, requesting that the agency void individual NSR perm.its (2401. 26740, 45432, 54808, 56384, 71238, 85294, 95215, 104897, 1057 38, 146220, 83645 and 83640). On February 14, 2018, TCEQ cancelled all NSR authorizations for Monticello Units 1, 2, and 3 and certain other faciljties, as requested by Vistra Energy.[37] [38] Vistra Energy will retain the remaining permjts (146278, 2399, 140265, 137864, 56387. 54408 and I042 10) addressing material handling operations for coal piles, silos and conveyors. until all facility closure activities are completed.

AlthoLI;gh the Big Brown and Monticello facilities permanently and enforceably shut down ln 2018, the shutdowns have no bearing on whether the areas were attaining the 2010 S02 NAAQS at the time the EPA designated the areas in December 2016. Additionally, the facility shutdowns do not rebut the modeling information relied upon by EPA for designating the Big Brown and Mon ticello areas at the time of the Round 2 Supplement.

*B.*     *Re,·e111 S02 Monitoring Data*

In its 20 1 7 annual monitoring network plan, TCEQ proposed new S02 monitoring sites in the Freestone and Anderson Counties, Rusk and Panola Counties and Titus County areas to assess air quality in the new S02 nonattainment areas involving the Vistra Energy facilities. Texas l'eferred to the 2016 Sierra Club modeling analysis, among other information, to inform its proposed siting of the nt:w monitor s.[39] The EPA approved TCEQ's 2016 Texas Ambient Monitoring Network Plan on October 3, 2017.[40] ln October and November 2017, almost a year after the EPA designated the three areas in Texas as nonattainment for the 20 10 S02 NAAQS•

---

.1<> *See* Docket ID No. EPA-HQ-OAR-20!4-0464-0455 for a list of Big Brown's voided NSR pennits. Big Brown's voided operating pennit is also located 1n Docket EPA-HQ- C>A R-2014-0464.

n *See* Docket ID No. EPA-HQ-OAR-20 14-0464-0456 for a list of voided NSR pe rmits, and docket Item number E PA- HQ-OAR-20 14-0464-0457 for the voided operating permit.

[18] Any remain'ing NSR or material handling permits for Big Brown and Monticello will only be maintained w hi le the facilities complete d os ure activi ties related to coal piles, s ilos conveyors , aQd other shutdown tasks.

ᵣ   *https:l l www.tceq. texas. gov/asse(s/puhlc/compllance/monops/airlanmwl_reviewlhisrorical/ l2017-AMNP.pdf*

ᵢ   *https:!l www.(ceq,te;rasgov/asts/publlc/corp{/anelmonops!1.fir /ann1al_re'1lew/hist0ri cal/EPtl2017Atvf]'lP.pd/*

Texas began operating the new SO2 monitoring networks to characterize the air quality around the Martin Lake and Big Brown facilities.[41]

On November 1, 2017, Texas began operating an SO2 monitor (AQS ID# 48-401- 1082) in the Rusk and Panola Counties area to characterize the air quality around the Martin Lake facility. From that time through May 2020, there have been 22 daily maximum one-hour average concentrations that exceeded the 2010 SO:? NAAQS. The 2018, 2019 and 2020 99th percentile daily maximum one-hour average concentrations are l09.1 ppb, 1 14.7 ppb and 83.8 ppb (preliminary), respectively. Although a valid and quality assured three-year design value is not yet available (pending certification of 2020 air quality data), the EPA estimates that the 2018-2020 design value is 103 ppb based on data submitted to the EPA through December 2020, which would violate the 2010 SO2N AAQS. It is important to recognize that the 2017-2020 monitoring data do not provide a demonstration of air quality at the time of the EPA's co urt-ordered deadline to designate the Martin Lake area in December 2016. As such, the monitoring data neither directly co rroborate nor rebut the EPA's basis for designating the area as nonattainmenl at the time of the Round 2 Supplement. The newer monitoring data do, however, indicate that there are likely current, and potentially ongoing, violations of the 20 IO SO2 NAAQS in this area. Additiona lly, despite the petitioner's predictions to the contrary, the newer monitoring data neither suggest that the Martin Lake area is now attaining the 20IO SO 2 NAAQS. nor do the data appear to support the claim that the previously established requiren,ent for Texas to undertake air quality planning efforts to bring the area into NAAQS attainment should be suspended or terminated.

On October 30, 20 I 7, Texas began operating an SO2 monitor (AQS ID 48-161-1084) in the Freestone and Anderson Counties area to characterize the air quality around the Big Brown facility. From this time through May 2020. there was only a single daily maximum one-hour average concentration that exceeded the 20IO SO 2 NAAQS, which occurred prior to Big Brown shutting down. The 2018 and 2019 99th percentile daily maximumone-hour average cortcen trations are 39.4 ppb and 5.8 ppb, respectively, and the recent monitoring data indkate that there have not been ongoing exceedances of lhe 2010 SO2 NAAQS since Big Browt1 shut down . However, given that the 2017-2020 monitoring data do not providea demonstration of ajr quality at the time of the EPA's court ordered deadline to designate the Big Brown area in December 201'6, the tnohitoring data neither directly corroborates nor rebuts the EPA's basis for designating the area as nonaltainment at the time of the Round 2 Supplement. The 2017-2020 monitoring data are unable to demonstrate whether the area was attaining the 2010 SO2 NAAQS by the EPA's court-ordered deadline to designate the area in December 2016, while the facility was still operating, and, therefore, do not rebut the EPA's nonattainment determination made in the Round 2 Supplement.

## C.   Recent S01 Modeling Data

The EPA received several comments on its August 22. 2019, CAA section 110(k)(6) proposed error correction action proposing to revise the designations to unclassifiable for portions of

---

[41] Texas did not install and 0perate the S01 monitor planned near the Monticello facility once the facility retirement was announced in 2017.

Freestone and Anderson Countjes, Rusk and Panola Counties and Titus County.[42] Specifically. on September 23, 2019, Sierra Club submitted a comment that included updated modeling purporting to demonstrate that the Martin Lake area did not meet the 2010 SO2 NAAQS at the time of designation and currently does not meet the 2010 SO2 NAAQS based on more recent data. even when the EPA's potential modeling limitations are appropriately addressed.[43] As explained further in Enclosure 2, the EPA's assessment of Sierra Club's September 2019 modeling concludes that there were not errors in the March 2016 modeling, which the EPA used as the basis for its fmal nonattainment desjgnations in the Round 2 Supplement, that would have resulted in designations other than nonattainment. Although Sierra Club did not submjt updated modeling for the Big Brown and Montice11o areas as part of the September 2019 submission, it claims that the EPA's previously identified limitations (individually or collectively) have no material effect on the model results for those areas. Overall, the EPA believes that Sierra Club s September 2019 modeling, as it addresses air quality that e sted at the time of the 2016 designations, further confirms our analysis of then-available data and the final December 13, 2016, nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County.

## VI.    Conclusion

For the aforementioned reasons, t:he EPA is denying Vistra Energy's February 13, 2017, petition for reconsideration and has determined that a stay of the EPA,s final nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County is not appropriate or warranted. The 2010 SO2 NAAQS nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County, which the EPA published in the *Federal Register* on December 13, 20 16. continue to remain in effect. The EPA notes, however. that it recently finalized a separate administrative action *(i.e.,* a clean-data determination) that suspends most attainment planning requirements for the freestone and Anderson Counties and Titus County areas for so long as the areas remain in attainment with the 2010 SO2 NA AQS.[44]

---

[42] *See* Docket ID No. EPA-HQ-OAR-20 14,.0464.

[43] *See* Docket I D No. EPA-HQ-OAR-20  14-0464-0466  .

[44] *See, supra ,* n.32.

Enclosure2

**The U.S. Environmental Protection Agency's Assessment of Sierra Club's September 2019 Modeling**

## I.     Executive Summary

The U.S. Environmental Protection Agency received several comments on its August 22, 2019, Clean Air Act section 110(k)(6) proposed error correction action proposjng to revise the nonattainment designations to unclassifiable for portions of Freestone and Anderson Counties, Rusk and  Panola Counties and Titus County, Texas ("Proposed Error Correction," 84  FR 43757) .[1] Specifically, on September 23, 2019, Sierra Club submitted a comment that included updated modeling purporting to demonstrate that the area around the Martin Lak,e Electric Station *(I.e.,* Rusk and Panola Counties) wd not meet the 2010 Sulfur Dioxide (S02) Primary National Ambient Air QuaJity Standard at the timeof initial designations in December of 2016 and, at the time of the comment submission, did not meet the 2010 S0 2 NAAQS based on more recent data *(i.e..* 2016-20 I8 data), even when potential modeling fonitations (as characterized in the Proposed Error Correction) are appropriately addressed.[2]

As explained further in this document, the EPA's assessment of Sierra Club's September 2019 modeling concludes that this modeling confirms the EPA's initial assessment of the Sierra Club's March 2016 modeling for all three areas, which EPA used as the basis for its final nonattainment designatio ns in the Round 2 Supplement (81 FR 89870), More specifical1y, Sierra Club's 2019 modeling confirms the EPA's initial assessment that any further refinements to the modeling inputs used in the March 2016 modeling would <u>not</u> have resuJted in designations other thannonattainment for these three areas. The EPA's  assessment  of  the  March  2016 modeling  in the record for the Round 2 Supplement, which is consistent with the EPA s assessment 'in this document of Sierra Club's September  2019  modeling , concludes  that  there were not  material errors in the March 2016  modeling  for  these  three areas. Furtherrnor  the  EPA concludes  that Sierra Club' s September 2019 updated modeling further demonstrates that the individuaJ and collective alleged limitations of the March 2016 modeling, &S c haracteri     ze d in the EPA's Proposed Error Correction, were not in fact limitations  that undermined  the  EPA' s  reasonable reliance on the March 2016 modeling to determine the areas were then violating the 2010 S02. NAAQS and designate them as nonattainment. In fact; the EPA no longer believes that the bases identified in th e Proposed Error Correction (e.g., that those alleged limitations in the March 2016 modeling support action under CAA section 11 O(k)(6) to revise the designations) suppo rt the proposed conclusion that an error correction is appropriate. Overall, the EPA believes that Sierra Club's September 2019 modeling, as it addresses air quality that existed at the time of the 2016 designations, further confirms our anaJysis and final December 13, 20L6, nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County.

---

[1] *Sett* Docket JO No. EPA-HQ-OAR -2014-046 4.

[2] *See* Docket 10 No. EPA-HQ·O AR-2014-04 64-0466. Although Sierra Clo.bdid not submit updated modeling for the Big Brown and Monticello areas as part of the September 2019 submission, it also claims that the EPA s proposed limitations (individually or co.llectively) have no material effect on the model resuJts for .those areas.

## IJ.     Background

*A.     Final Round 2 Supplement to 201() S02 NAAQS Designations for Four Areas in Texas*

On December 13, 2016, the EPA designated portions of Freestone and Anderson Counties (Big Brown Steam Electric Station), Rusk and Panola Counties (Martin Lake Electric Station) and Titus County (Monticello Steam Electric Station) as nonattainment for the 2010 SO2 NAAQS based on tl1e E PA's assessment of all available information, including the Sierra Club's March 2016 modeling that demonstrated violations of the 2010 SO2 NAAQS. *See* 81 FR 89870 (;·Round 2 Supplement"). Vistra Energy's subsidiary Luminant owned all three power plants in 2016.

In tlnalizing the designations for the three Texas areas in 20J6 , the EPA reviewed all available information and determined that Sierra Club's March 2016 modeling used the latest model version available at the time, used the default regulatory options, and was conducted in accordance with the general recommendations on modeling provided by the EPA in its '·SO2 NAAQS Designations Modeling Technical Assistance Docwnent" (4'SO2 NAAQS Designations Modeling TAD" ).[3] Sierra Club's March 2016 modeling provided to the EPA was inherently subject to the constraints of the data available to Sierra Club, specifically the level of refinement reflected the modelihg inputs. The Sierra Club's March 2016 modeling made adjustments and corrections to its previously submitted December 2015 and September 2015 modeling (coHecti ve ly referred to as 2015 modeling) in response to the EPA' s assessment of the 20l5 modeling in its February 2016 lntended Designations Technical Support Document. In the March 2016 modeling these adjustments and corrections included updating the model version used, updatihg to the most recent three years (2013-2015) of actual emissions for Martin Lake and Big Brown, inclusion of only the principle source in each area, and correction of switched stack locations at the Big Brown facility.[4] There were several aspects of the Sierra Club ₁ March 2016 modeling that the EPA discussed in the Final Designations Supplement TSD[5] regarding potential deviation from or Jac k of refinement where information was not publicly available under the SO2 NAAQS Designations Modeling TAD:

1. Exclusion of variable stack exit temperature (information not publicly availab le; used fixed values)
2. Exclusion of building downwash (information not publicly availabl e)
3. Elevation of flagpole receptors (1.5 meters)
4. Use of older land use data at the surface meteorological station
5. Exclusion of fenceline or omission of receptors from certain locations (Luminant claimed certain locations were not feasible to place a monitor in receptor grid)

---

*See the SO₁ NAAQS Designations Modeling Technical Assistance Document ("S0 2. NAAQS Designations Modeling TA D") at https:llwww,epa.govlsites/produc1ionl flles/20l6-06/doe11mentslso2mode/ingtad,pdj;*

[4] Technical Support Document Texas Area Designations for the 2010 S02 Primary National Ambient Aif Quality Standard (" Intended Designations TSD"), available at hl lps://www.epagov/s1es/prud lcti o nl fllesl20l 6-U J/Jucu111e n tsltx-epa-tsd-r2.pdJ:

[5] Technical Suppon Document for the Designation Recommendations for the 20IO Sul*fut* Dioxide National Ambient Air Quality Standards (NAAQS) - Supplement for Four Areas in Texas Not Addressed in June 30, 2016 (" 2016 Final Designations Supplement TSO"), available at https;//www.epa.gov/siles/productionlfiles/2016 / lluu <*umentsltexas_4_deferred_luminanl_rsdJi na/_dockerpd[.*

2

6.   Use of the lowest monitored background concentration in Texas

Howeve r, the EPA also analyzed the impact of these potential issues in the 2016 Final Designations Supplement TSD and determined that they did not undermine the use of the Sierra Club' s March 2016 modeling for the purpose of designating the areas. The EPA' s analysis concluded that inclusion of such refinements or changes would not be expected to result ih a change to the modeled concentrations to the degree that would alter the conclusion that the areas did not meet the 2010 S0 2 NAAQS. In the 2016 Final Designations Supplement TSD, the EPA also noted that we received comments from Lurninant. Luminant' s comments included modeling, which di'd not conform with the S0 2 NAAQS Modeling TAD, but which provided some useful information regarding modeling inputs not previously available to the pubHc . [6] For the area around the Martin Lake TSO facility, the EPA concluded the following in the 2016 Pinal Designations Supplement TSO:

1.  Regarding stack temperature, the EPA concluded that the constant temperature used by Sierra Club for the stacks (449.3K) was, on average. 21 percent higher than the continuous emissions monitor temperatures furnished by Luminant as part of their 2016 modeling analysis·, which for near full load (filtered for stack velocity > 25 mis), has an average of356K and ranged between 338-478K. The EPA concluded that the increased temperature used by Sierra Clu b would increase the modeled buoyancy of tbe plume and tend to reduce modeled concentrations, and that the amount of reduction was dependent on meteorological condjtions. The EPA determined that the use of the Sierra Club's higher-than-actual constant temperature would likely underestimate the actual concentrations.[7]

2.  Regarding building downwash, the EPA concluded that, while we did not agree with the Sierra Club's assertion that exelusion of downwash is conservative in all cases, in our evaluation. the inclusion of building information and associated downwash in this analysis would not change our recommended designation of nonattainment. We noted that Luminant's modeling report (which Texas also in.e luded in thei r response to the EPA's intended designations) indicated that they expected that the modeling results were not extremely sensitive to this issue because the stack heights are well above the buildings and there is considerable momentum and buoyancy rise for the stack plumes. The EPA concluded that the modeling values were sufficiently above the standard and inclusion of downwash often leads to higher concentrations closer to the source but-even in situations we have·seen where this did notoccur-  any decreases in maximwn modeled.values from inclu sion of downwash were relatively small and not expected to be enough of a decrease to resolve all modeled exceedance values near Martin Lake.[8]

3,  Regarding use of flagpole receptors, we stated that we would expect only a very sJ ight change in the modeled numbers and the area of exceedances and magnitude of the values would be basically eq uiva lent, and, therefore, not change our final action. We based this conclusfon on analysis of sensitiv ity modeli ng conducted by the Sierra Club for another source, which found decreases in modeled S02 between almost O and 0.2 percent wben removing the flagpole receptors and estimating concentrations at ground level. Since the

_See_ Docket ID No. EPA-HQ-OAR-20 14-0464-0 328.
[7].2016 Final Designations Supplement TSD , p. 6 l.
ft 2016 final Designations Supp le ment TSD, pp. 61-62.

Sierra Club·s March 2016 maximum modeled design concentration (in ambient air) at Martin Lake was at least 14 percent above the standard, the EPA concluded that the change due to flagpole receptor heights would not decrease the value to below the standard[9]

4. Regarding use of land surface data from 1992, the EPA indicated based on Sierra Club ' s 2016 modeling, which included a sensitivity analysis for updated surface data/characteritsics, that a small decrease *(i.e. ,* approximately 3.6 percent) in maximum modeled design concentrations would be expected from updated surface cbaracteristics[10]

5. Regarding inclusion of contested receptors, the EPA only evaluated concentrations in Sierra Club's March 2016 modeling at receptors that represented areas where it was clear to the EPA based on available information that it would also be feasible to place a monitor and record ambient air impacts. Luminant's 2016 modeling included areas that it considered to be non-ambient, butdie EPA did not bave sufficient information to evaluate and conclude that all the areas Luminant was claiming as non-ambient were in fact non-ambient areas. Without sufficient data to support LuminanCs non-ambient area cla'ims. the EPA evaluated Sierra Club's March 2016 modeling results for the areas that Luminant did not clai m as non-ambient, which we referred to as the "unconte sted area." the EPA's assessment included evaluating concentrations at only uncontested receptors and separately also evaluating concentrations at areas that clearly were erroneously claimed as unfeasible by Luminant. The EPA also noted concerns that Luminant had contested receptors (excluded in Luminant's modeling) in more areas than were appropriate and that the maximum values in the uncontested area in Sierra Club's March 2016 modeling were as high as 239.1 micrograms per cubic meter ($\mu g/m^3$) near the Luminant excluded area.[4] For the EPA's analysis, we explained that we used 224 $\mu g/m^3$ (highest concentration at an uncontested receptor) to evaluate the modeling, but the analysis could also be done based on the 239.l µg/m:, value , which would further support a nonattainrrent designation for the area around Martin Lake.[12]

6. Regarding background, the EPA concluded that many of the SO2 monitors in Texas are in urban areas and/or near a SO2 point source, so there were limited data for background values. In addition, the EPA concluded that using the El Paso monitor, which was the lowest design value in the state of Texas during this petiod, was an underestimation. Given the mass of SO2 emissions in East Texas compared to the El Paso area, the EPA explained that this assumption likely leads to an underestimation in the concentrations around these facilities *(i.e.,* if background monitoring data existed for East Tex.as 11 would be expected to be a higher value than the El Paso monitor data and would result in an increase in the modeled concentrations around the Martin Lake facility) but was within the framework of the SO2 NAAQS Designations ModeliQg T AD's options for in,clusion of backgrmmd monitoring data.[13]

" 2016 Final Oesjgnations Supplement TSO. pp. 58-60.

[10] 2016 Final Designations Supplement TSO, pp. 28, 76.

[11] 2016 Final Designations Supplement TSO, pp. 65-72. Note the captions for Figures 22 and 23 in the 2016 Final Designations Supplement TSO indicate the Maximum value of 229. I $\mu g/m^3$ bul that is a typographi'cal error and should have been 239, f µg/m'.l.

[12] 2016 Final Designations Supplemell T S0 , p p. 60, 66-72

[1] 2016 Final Designations Supp lement TSD, p. 65,

Based on the modeling available at the time, the EPA also explained in the 2016 Final Designations Supplement TSO that inclusion of only the principle source in the modeling was an acceptable choice in this area's circumstances. as we maintained that Martin Lake was likely contributing nearly 100 petcent of the impact for the values above the 2010 SO2 NAAQS. Sierra Club's modeling, by not including the nearby Pirkey Power Plant, was potentially slightly lmder-estimating approach to determining whether the area is attaining and to identifying the boundaries of such area, as inclusion of this source should result in either similar maximum impacts and boundaries or slightly increased impacts and possibly slightly larger boundaries. but should not result in decreased impacts or "shrinking" of boundaries from those modeled.[14]

In the 2016 Final Designations Supplement TSO, the EPA concluded that the Sierra Club's March 2016 modeling followed the appropriate the EPA modeling guidance based on the information that was available to Sierra Club at the time, and specifically concluded that several techniques (i.e.. not including building downwash, not using variable stack temperature, not including other SO2 emissions sources, and using the lowest monitored background concentration) generally would tend to reduce/underestimate modeled design concentrations.[15] The EPA also evaluated the combination of all these aspects (potential positive and negative impacts on concentrations) of the modeling through a comparison analysis, using 224 $\mu g/m^3$ as the maximum value based on the subset of uncontested receptors.[16] The EPA 's assessment of the available information ultimately concluded that the collective differences/changes to the Sierra Club modeling would not result in modeled values near or below the standard.[17] The EPA reached this conclusion after considering that Sierra Club' s modeled concentrations (with a low background and no nearby SO2 emissions soUrces) were 14 percent above the standard using 224 $\mu g/m^3$ and 22 percent above the standardusing 239.1 $\mu g/m^3$ as the maximum modeled design concentrations. The EPA evaluated the factors listed previously and concluded that these would result in Sierra Club' s 2016 modeling under-estimating impacts and that any differences/changes to Sierra Club' s modeling would not result in modeled values near or below the standard. Instead, the EPA concluded that any adjustments to these factors would actually result in higher modeled concentrations. Therefore, the EPA considered the final Sierra Club modeling submitted March 2016 t0 be relevant infonnation that must be considered in our designation decision and found that the modeling was a sufficient basis for a nonattainment designation because it clearly demonstrated the area around Martin Lake was -vio lating the 2010 SO2 NAAQS.[18]

In addition to the March 2016 updated Sierra Club modeling, the EPA reviewed modeling submitted by Luminant during the public comment period in 2016.[19] The Luminant modeling did not confonn to the guidance of the SO2 Designations Modeling TAD nor the 40 CFR Part 51 Appendix W - Guideline on Air Quality Models. Furthermore, the EPA determined that Luminant's modeling was not representative of current air quality in these areas for several

---

i 2016 Final Designations Supplement TSD, pp. 60-62.

[15] 20 J6 Final Designations Supplement TSD, p. 75.

[1] 2016 Final Designations Supp le ment TSO, p. 76.

[11] 2016 Final Designations Supplement TSO, pp. 75-77.

[18] 2016 Final Designations Supplement TSO, p. 75-77..

[19] See Docket ID No. EPA-HQ-OAR-2014-0464-0328.

reasons, as further explained in the EPA's 2016 Final Designations Supplement TSD. Some examples of the issues the EPA identified with Luminant's modeling were:

- Luminant applied non-EPA preprocessor models, AERLIFT and AERMOIST, to the CEM data to increase the observed temperatures and (in the case of AERLIFT) velocities of the plumes exiting from the stacks. The EPA reviewed these proposed processors and supplied infonnation. and then analyzed some of the significant changes that these l)rocessers were making to modeled stack parameters and buoyancy flux calculation . The lac k of supporting documentation and the EPA's review of the changes the processors were making resulted in the EPA determining that AERLIFT and AERMOIST were not adeqt1ately justified and. thus, model results using these processors could not be relied upon in the designations decision-making process.[20]

- Luminant's March 2016 repott included a then-future emissions estimate scenario (2017-2019 estimated SO2 emiss ions) . Lwni nan t asserted that Martin Lake will not cause or contribute to nonattainment near the plant when modeled With Luminant>s then-projected future emissions because the maximum modeled design concentration was 192.1 µg/m' . These projected emissions were associated with potentially improving scrubber efficiency, fuel switches, and potentially collateral benefits with reductions of SO2 from the facility complying with the Mercury Air Toxics Rule. In the 20 17-20 J9 future estimated emissions modeling scenario, Luminant projected future emissions rates in 20 17-201 9 that were lower than recent actual emissions at the time based in part on future non-enforceable, v oluntary opera tional changes at Martin Lake.[21] However. for the purpose of detennining whether the area is currently meeting the 20 1 0 SO2 N AAQS and designating the area, either actual emissions or currently enforceable allowable emissions limits should be modeled. The EPA provided the following explanation in the 2016 Final Designations Supplement TSO:

> Neither the efficiency improvements in operation of existing scrubbers nor fuel switches were reflected in a permanently enforceable situation. This means that they could change, and are not a certain or effective limitation on either current or future emissions…In this case the intended switching of fuel ancl increases in scrubber efficiency, whethet they have occurred or not, are not yet enforceable through any mechanism provided by Luminant - such as a permit limit - and Luminant would be free to either not switch or, if it does switch, change back to a higher sulfur content coal in the future, depending on c ircu mstances.[22]

Without permanent and federally-enforceable emissions limits, the facility could make operational modifications (e.g•. change the fuel type. alter the volume of process exhaust bypassing the scrubber, etc.), which may not be protective of future air quality,[21]

---

w The EPA also compared the difference between the pre-processors assumptions and Impacts and the stack temperatures used in Sierra Club' s March 2016 modeling. *See, e.g.,* 2016 Final Designations Supplement TSD at pp. 55-61.

I J As discussed elsewhere, actual emissions for this tiine period were higher than Lumlnant predicted and similar to the actual 2013-20 15 emiss ions I.hatwere modeledto infonn designations,

[12] 2016 Final Designations Supplement TSO. p. 55•56.

I 3 2016 Final Designations Supplement TSO, p. *S5-56.*

- Lwninant's modeling used Beta options LOWWIND3 and ADJ U* which had not been approved by the. EPA for regulatory use and, among other conditions, required consultation and pre-approval from the EPA for regulatory applications as an alternative model. This process was not initiated or completed in the modeling of these three areas and thus. the modeling based on their use was determined by the EPA to not be acceptable for this regulatory use.[24]

*B.      Proposed Error Correction of 2010 S02 NAAQS Designations for Three Areas In Texas*

On August 22. 2019, the EPA proposed to detennine it had made an error in the 2010 S02 NAAQS nonattainment area designations for three Texas areas and to revisethe designations to unclassifiable for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County. *See* 84 FR 43757. Tiie EPA proposed that it.erred in not giving greater weight to Texas' preference to characterize air quality through monitoring, and steps undertaken by Texas towards siting monitors with the intention to begin monitoring in these three areas, when considering all available information; in relying on available air quality modeling analyses in making the initial designations that the EPA recognized included certain limitations and uncertainties; or a combination of these two issues.

Regarding the limitations and uncertainties with the Sierra Club 2015 and March 2016 modeling, the EPA stated in the Proposed Error Correction that given the possible collective significance of these issue s and , in the case of the areas around the Martin Lake and Monticello power plant s, .given that the maximum modeled concentrations are within about 10 percent of the primary S02 NAAQS, we were less confident in our prior statements that potential  adjustments to the SieJTa C lub modeling would not result in modeled values near or below the S0 2 NM QS.[25] In the Proposed Error Correction the EPA stated that limitations and uncertainties with the Sierra Club mode1ing identified in the Intended Designations TSD and the Final Designations Supplement TSD for the 2016 S02 designations included:

1. Absence of variable stack conditions and representation of I00 percent load stack parameters. *the* EPA stated that commenters on the EPA' s proposed designations noted this issue is particularly pronounced as the Electric Reliability Council of Texas market is competitive with plant dispatch based on variable cost and falling natural gas prices and renewable capacity resulting in these Wlits running in variable operations. The EPA also noted Lhat the EPA stated in the technical support document for the 2016 designations in Indiana that use of hourly stack parameters more accurately characterizes plume characteristics, which will provide greater reliability both in the estimated concentration and in the geographical distributi,m of concentrations.
2. Treatment of building downwasb (failure to include). surface meteorology , hourly wind inputs, potential to em it/allowable emissions, variable stack temperature and velocity.
3. lnappropriate elevation of flagpole receptors.

Li 2016 Final Designations S upplement TS O, p. 58.

[15] As explained in the 2016 Pinal Desi.gnations Supplement TSD, the modeled 99d, percentile daily maximum I-hour SO2concentrations for t11e 'Martin Lake and Monticello facilities are 14 percent and 8 percent above the 20IO *SO!* NAAQS, respective ly. The Martin Lake figure is based on the approach of looking only al unco nteste d recepto rs,

4. Use of an older version of AERMOO (Note: This refers to modeling in the EPA's Intended Designations TSO but not in modeling for the 2016 Final Designations Supplement TSO).

5. Representation of recent emissions, including controls after the 2011 National Emissions fnventory.

6. Use of a larger receptor grid than recommended.

7. Approach to estimation of background concentrations.

8. Failure to include fenceline receptors or source contribution in the modeling analysis.

The EPA stated that "while individually these deficiencies are not dispositive. collectively they are a sufficient basis for the EPA to propose that we erred in relying on the Sierra Club modeling in making the initial nonattainment designations for the thtee Texas areas." *See* 84 FR al 43761.

**Ill.    Sierra Club Modeling Submitted in Response to EPA's September 2019 Proposed Error Correction**

The EPA received several conunents on its August 22, 2019, Proposed Error Co rrection action proposing to revise the designations to unclassifiable for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titu s County.[26] Specifically relevant to this technical support document.. on September 23, 2019, Sierra Club submi tted a comment including new modeling that addressed the limitations identified in the Proposed Error Correction regarding the Sierra Club' s previous modeling.[27] both individually and collectively. The Sierra Club's September 2019 modeling purportedly demonstrated the area around Martin Lake was violating the 2010 SO2 NAAQS based on modeling of 2013-2015 period with actual emissions for Martin Lake. The remainder of this document analyzes Sierra Club's September 2019 modeling for the 2013-2015 period and compares that modeling with the Sierra Club's March 2016 modeling used for the EPA's final nonattrunment designation of the Martin Lake area. The Sierra Club's September 2019 is modeling was conducted to characterize air quality in that area using the most recent three years of actual emissions then-availableat the time of the Round 2 Supplement. The following assessment focuses on Sierra Club's September 2019 modeling of the 2013-2015 period, which collectively addressed all the issues raised in the EPA's Proposed Error Correction; however, the EPA also reviewed and agrees with the analyses of the individual factors as detailed in the Sierra Club s modeling report for the same reasons stated therein.

*A,    Sierra Club's 2019 Updated ModeUngfor the 2013-20/5 Period*

To address the issues the EPA identified in its Proposed Error Correction, the September 2019 Sierra Club modeling for the 2013-2015 period utilizes modeling inputs from Luminant's March 2016 modeling analysis except where noted. Since the remainder of the updated modeling was wichanged, refer to the 2016 Final Designations Supplement TSO for the Round 2 Supplement for a discussion of the individual, unchanged elements.

---

[16] *See* Docket ID No. EPA-t!Q-OAR-20 14-0464 .

[27] This refers to Sierra Club's 2015 modeling used in the Intended Designation TSD and Sierra C lub's March 20 16 modeling used in the 20 16 Pinal Designations SupplemenTSD.

I. The most current version of the AERMOD modeling system, version l 8081. was used for the analysis. Note, as explained by EPA in the 2016 Final Designations TSO, the Sierra Club' s March 2016 modeling analysis used the most recently available version (versio n 1518 1) of AERMOD at that time, which was an updated version of AERMOD compared to the previous Sierra Club modeling (using AERMOD version 14134) that the EPA reviewed in the Intended Designations TSD.

2. Refinements of the March 2016 rnodeling inputs for stack parameters, building dimensions and locations, emissions rates, and receptor grid were obtained directly from Luminant s March 2016 modeling analysis. The Sierra Club's updated modeling (2019) used Luminant's March 2016 report as a basis since the Luminant analysis contained more refined modeling ·inp uts basedon data available to the facility owner, suchas CBM measured stack and emission/temperature/flow/velocity parameters, and stack and buildin·g  location and dimensions.[28] Specifically, the following was updated:

   a.   Stack location, height and diameters.
   b.   Specific building locations and dimensions allowing for evaluation of downwash.
   c.   Updated hourly emissions rates, stack temperatures and stack exit velocities. The Sierra Club March 2016 modeling analysis had used a constant temperature obtained from a prior regional haze modeling study. While the facility' s co ntinuous emissions monitoring system records temperatures, these data are not reported to the EPA's Clean Air Markets Division.[29] *The* updated Sierra Club analysis used Luminant 's hourly CEM temperature measurements during 2013-2015.

3. Updated meteorological data were obtained from the surface station at the Longview Texas Regional Airport. To address potential concerns expressed during the Round 2 Supplement about recent changes in land use surrounding the airport, the beta version of AERSURFACE Y. 19039 was run with 2011 National Land Cover Database, an update from the previous 1992 NLCD data.

4. To address the EPA's concerns regarding the Sierra Club' s March 2016 modeling's use of a 1.5-meter flagpole receptor height to reflect a representative inhala tion leve l, the updated analysts does noi use an elevated flagpole height.

5. To address the EPA' s concerns about the size of the receptor grid in Sierra Club's March 2016 modeling, Sierra Club used a 25 kilometer grid for both of tbe two modeling receptor grids. Receptor Grid #1 includes aJl locations around the Martin Lake Genetating Station accessible by the general public. Receptor Grid #2 was obtained from Luminant's 2016 modeling analysis that excluded locations that Luminant claimed was

---

[28] Sie rra C lub is using data·(including stack location and parameters, emissions rates, actual varying stack temperatures, and stack veloc itie s) pro vided by Luminant that is available to Luminant but not reported to the EPA's CAMD database or nonnally ava ilable to the public, This data that Sierra Club used was not adjusted by che p rocessors AERUFT and AERMOIST that the EPA detennined invalidated the  res ults  of Luminant's 1016 modeling. Tbe EPA has reviewed the infonn atio n/vafues th at Sierra Club is using in its September 2019 Updated rnodelfng, from Luminant' s March 20 l6 modeling analysis, and the EPA considers these to be acceptable because they comport with the SOz Designations Mode ling TAD.

[29] *hllp s;//lampd epa.govlampdl*

not feasible for placement of a monitor and/or which were claimed as.Luminant"s property that the public does not have access.[30]

## B.    *Modelingfor lhe 2016 - 2018 Period*

Sierra Club also submitted modeling for the more recent 2016-2018 3-year period. The additiona1 years modeled in other scenarios are intended to address the identified limitation that the 2013-2015 years might not be representative of future emissions. Actual hourly emissions rates were obtained frotn the EPA's CAMD database for 2016 through 2018. The Sierra Club attempted to derive representative stack temperatures and hourly-varying exit velocities for the 2016-2018 period. Since the full CEMS data were not publicly available for modeling the 2016-2018 period the 2013-20 I 5 CEMS data were used to characterize the individual unit stack parameters. An average stack outlet temperature for each of the three units for 2013-2015 was ca1culated. Exit velocities for 2013-2015 from the CEM measurements were combined with concurrent heat input obtained from CAMD to derive a relat1onship between exhaust gas flow rateand heat input for the three units. The relationship was applied to the hourly heat input for each unit from CAMD during the 2016-2018 period to estimate bourly exit velocities during 2016-2018..

The background concentration was updated to the 99lh percen tile concentration in Travis County, Texas, the lowest design value measured at ambient monitors in the State of Texas, for the 2016-2018 period. Sierra Club indicated that this monitor was used because it is nearer to Martin Lake and because th.e monitor which previously had the lowest state value (El Paso UTEP) was decommissioned on December 31, 2017. The updated background concentration from the Austin Northwest monitor (AQS ID# 48-453-0014) is 7.8 $\mu g/m^3$ (3 ppb), which is 2.7 $\mu g/m^3$ (51 percent) higher than the background value of 5.1 $\mu g/m^3$ used in Sierra Club's March 2016 modeli ng.

## C.    *Scenarios Ex rnined*

The Sierra Club modeling analysis covered several scenarios relevant to assessing whether to revisit the initial designations for the three Texas areas, including our Proposed Error Correction. This modeling analysis provides new infonnation that the EPA did not have at the time of our Proposed Error Correction. One of the central issues that EPA had based our error correction proposal on was that the EPA did not have enough information at the time of the Round 2 Supplement to assess a combination ofissues in Sierra Club's March 2016 modeling, to the extent that the March 2016 modeling should not have been relied upon to determine whether the area around Martin Lake was not attaining the 2010 SO2 NAAQS. Sierra Club's September 2019 updated modeling confirms the EPA's initial analysis of Sierra Club's March 2016 modeling, which ihcluded both individual and collective analysis of such issues, and fw1her demons trates that the individual and collective alleged limitations of the. March 2016 modeling, as characterized in the EPA's Proposed Error Correction, were not limitations that undermined the

⬦ The EPA has not determined whether the areas that Luminant claimed as non-ambient and they excluded receptors from is substantiated or not. bl.It Sierra Club's Receptor Grid #2 estimates the air quulity in the modeled area based on areas that Luminant identified in their March 20 16 modeling analysisas ambient (uncontested receptosr) with modeled DVs above the NAAQS (20l6 Final DesignationsSupplement TSO, pp. 66-72),

The EPA's reasonable reliance on the March 2016 modeling to detennine the areas were then violating the 2010 SO$_2$ NAAQS and designate them nonattainment. {n fact, the EPA no longer believes that the bases identified in the Proposed Error Correction support the proposed conclusion that an error correction is appropriate. The results of the relevant modeling scenarios are discussed in the remainder of this section.

The key modeling scenario in Sierra Club's September 2019 modeling analyses, for comparison to the March 2016 modeling analysis, which the EPA relied on in the Round 2 Supplement, are the modeling files contained in the file"MLsxl 3l 5b.zip," which Sierra Club submitted during the public comment period, but hereinafter referred to the MLsc1315b scenario.[31] This MLscl 315b scenario is assessed in the next section and includes all the inputs and updates explained in the September 2019 modeling for the 2013-2015 Period, including Receptor Grid #2. The EPA is focusing our comparison analysis on this specific modeling scenario that includes Receptor Grid #2, as this modeling analysis is for the same meteorological and emissions period (2013-2015) that was relied upon in the 2016 Final Designations Supplement TSD and also potentially underestimates the SO$_2$ air quality at the time of the Round 2 Supplement because it includes only uncontested modeling grid receptors.

Sierra Club's 2019 updated modeling reported results for four 3-year meteorological /emissions periods; 2013-2015, 2014-2016, 2015-2017 and 2016-2018. As discussed previously, the stack parameters for the years 2013, 2014 and 2015 we11e from the CEMS while for the other years were estimated based on relationships derived from the 2013-2015 period because Sierra Club did not have access to varying stack temperature and velocity for the other years (2016-2018). The September 2019 modeling for the 2013-2015 period is most accurate because it uses information from Luminant on stack parameters (velocity and temperature) not publicly available for 2016-2018 period and noted as either actual or estimated in Table 2. Table 2 includes a summary of all the Mode1ing Scenarios provided by Sierra Club in their 2019 modeling ahalysis and their March 2016 modeling analysis including the maximum design concentration and background used.

---

[31] Air dispersion modeling input and output files are too large to post in the docket or on the EPA's website and must be requested from the EPA Docket Center, Corey Mocka *(mocka.cor ey@epa.gov )*, or Erik Snyder *(snyder.erikfijj}.epa .gov )*.

**Table 2.** Results for Select Scenarios from the ˑs ierra Club's 2019 Modeling Analysis for the Martin Lake Area

| Modelhag Analysis | Modeliac SeeaarioD | 'Type | Grid | | J9tll ‚eneadBel-laOllrDaily MninalM ■ ˑ ᵘʸ | Baeqr-oaad (fLWml) | Total (Jig/ml) |
|---|---|---|---|---|---|---|---|
| **March 2016** | Not Applicable | Actual | Grid #ʰ | Fixed Velocity & Temperature | 239.0 | 5.1 | **244.lli** |
| **September 2019** | MLsc1315a | Actual 2013-15 | Grid #1 | Actualᶜ | 391.8 | 7.8 | **401.6** |
| | MLscl315b | Actual 2013-15 | Grid #2 | Actuaet | 388.7 | 7.8 | **396.5** |
| | MLsc1416b | Actual 2014-16 | Grid #2 | Estimated | 311.0 | 7.8 | **318.8** |
| | MLsc1517b | Actual 2015-17 | Grid #2 | Estimated | 209.2 | 7.8 | **217.0** |
| | MLsc1618b | Actual 2016-18 | Grid#2 | Estimated | 238.4 | 7.8 | **246.2** |

ₐ March 2016 Gtid #1 extends to 50 km while the September 2019 Grid #l extends to 25 km.

ₕ **Bold** concentrations are above the 2010 SO2 NAAQS (196.4µg/m3).

ᵤ Actual Stack Parameters - Variable stack velocity and temperature were used from Luminant data included in Luminant's 2016 modeling analysis. These values were measured or calculated from measured data and are not impacted by the processors that Luminant used (AERLIFT or AERMOIST) and are, therefore, acceptable. These values are more refined than the estimated values ptieviously used by Sierra Club in their March 2016 modeling analysis.

## IV.   Comparison of Sierra Club's March 2016 and September 2019 Modeling for the 2013-2015 Period

The MLsc131Sb modeling scenario provides modeling that addresses previously identified concerns in the Proposed Error Correction and refines the modeling analysis in strict accordance with the SO2 NAAQS Designations Modeling TAD for the 2013-2015 modeling period. Sierra Club·s September 2019 modeling for the 2013-2015 period has directly addressed all the modeling inputs that EPA identified in our Proposed Error Correction and/or the Round 2 Supplement. The EPA has reviewed the September 2019 modeling, and the modeling strictly follows the SO2 NAAQS Designations Modeling TAD, which the EPA provided in advance of the Round 2 designations. Sierra Club made several refinements to the model input data, which became publicly available at the end of the Round 2 designations public comment period as part of Luminant's March 2016 comments, and these data and other updated components of the AERMOD modeling system were used in this September 2019 modeling. The changes, as detailed in the Section Ill of this docume‚nt are refinements to the model inputs, basedon more detailed data, and more rigidly adhere to the EPA' s modeling guidance regarding when such refinements are available.

As explained in more detail lare.r in this document. because the technical aspects of Sierra Club' s March 2016 modeling identified by the EPA in the Proposed Error Correction ]lave bee11 addressed in Sierra Club·s September 2019 modeling of the 0 I3 -2015meteorology and emiss fons, the 20 1 9 modeling effectively demonstrates ,-vhether the EPA was corТeot an estimating the impact of-any uncertainty from lac k of refinement of inputs or deviation from the SO:! NAAQS DesignationsModeling TAD in the March 2016 modelin_g. Jn sutn, the September 2019 modeJ ingdemonstrates that our initial desig_nation of nonanairuilent for the area Qround Martin Lake, and by extension our initial designations for the areasaround Big Brown.and Monticel,lo were also valid. By comparing the key modeling scenario, MLsc13 15b , for Sierra Club·s September 2019 modelin_g analysis U> Sierra C1ub's March 2016 modeling analysis, the EPA can assess the overaJI combined impaet of the issues identified and compare to theinitial analysis the EPA relied upon in the Round 2 Supplement. This assessment confinns the EPA's conc lusions and desig nations for aU three ar-eas in the Round 2 Supplement.

The EPA notes that in the Proposed Error Correction wedid not separate technical aspects that EPA analyzed in the Intended Designations TSDfrom those the E:PA analyzed in the 2016 Final Designations Supplement TSO. Additionally, the SPA notes that Sierra Club 's March 2016 modeling, which was relied on in the2016 FinaJ Designation Supplement TSO included Updates to SierraClub'solde-r2015 modeling th&t r:iddressed some teaonfoal aspects the EPA identified in the Intended Designations TSO. The following technical aspects that potentially created uncertainties the EPA identified in the- Proposed error Correction were only in the Sierra Club· s older 2015 modeling in the Intended TSO and were updated in the Sierra Club s March 2016 modeling. which the EPA relied on in the Fmal Designations Supplement TSO, to be strictrly in accord.ance with the 80 2 NAAQS Designations Modeling TAD: I) use Of an older ve rsion of AERMOD (most recent version available at that time was used in the March 2016 modeling), and 2) representation of recent emjssions, including con trols after the 2011 National Emissions lnventory (the March 2016 modeling used the most recent three years (2013-2015) of actual emissions that wereavailable at the time for Martin Lake and Big Brown 2016calendar year was still o ngoing). Addit io nally, regarding the failure to include soruce contribution in tbe modeling anaJys]s that th.e EPA listed in the Proposed Error Correction. the EPA notes that the older Sieml Club tnodeling included other sources to assess contribution, while Che Marcll 2016 modeling includedonly the-p rinciple source in e®h area ib response co the EPA's analysis in tl1e Intended Designations TSO.

One of the technical aspecș that potentially created uncertainties that the EPA identified in the March 2016 modeling in the Proposed Error Correction was tbe absence of variable stack. condi1fons and representationof 100 percent load stack parameters(..variable stack temperature aud veloci1)'). Tne EPA also identified the treatment of building downwaSh (failure to iocJude). use of a largerreceptor grid than recommend ed, and (ailure to include fenceline receptors as. Iimitations or uncertainties Гⁿ the ProJ)t)sed ErrorCorrection. ln the 2016 Final Designations Supplemem TSD, the EPA explained that, when compared to tne actual measured CE!!vt temperatures fu rnished by Lmninant as part of the-it modeling analysis, the Sierra Club' s temperature was on the average 21 percent higher- the average temperaturein the CEM data tor near full load ( filtered for sfack velocity > 25 mis) was 356K, ranging between 338-47 K. The EPA explained that this increase in buoyancy wouJd (end to re<luc.e modeled conce ntrations. the amount depending on meteorologic ! conditions; therefore, the EPA detenn1ned that the use of

the Sierra Club's higher-than-actual constan t temperature likely underestimates the actual concentrations. More specifically, the EPA explained that this temperature difference would c use on \be avera.ge a 196 percent increase in buoyancy flux verstts usihg the CEM temperature when operating near full load. and that the buoyancy tlt1, is used by the plume rise algorithm m AERMOD to calculate buoyant plume rise.

The EPA further explained that higher values of b\t0yancy Ouxy ield higher plume- rise , affec ting the transport and dispersion of the ph,nne, and trni .ty pi Jly , higher plume rise reduces peak groutd- le"Vel co ncentrationsand tends to move the ma.-umum impacts further away from the source. The EPA note.d that because lhe 2010 $SOi$ NAAQS is a cme-hourstandard,Ule buoyancy enhancements for critical hours would be a controUing fac or ih the modeled concentrations on · 'hich the maximum modeled design concentration is based and that the use of Sic mi Clu,b's higher thao-actual constant temperature, jndged 1thoutotJ1er factors, would most likely underestimate the actual maximum concentrations *(i.e.,* the use of higher temperatures *in* the Sierra Cl ub's March 2016 modeling would lead to lower mode led concentrations than if1he actual measured temperatures from Lt.uninant would have been used, which would likely resuft in hi gher 99'h percettile ohe-bour daily 01aximum concentra(ion). The increase in buoyancy over the act\1 1 bu oy ocy would irwrease plume rise and lter the geographic distributiqn of concentrations. The 2019 SieJTa C lu bmodeling scenario MLsc1315b in cludes·variable stack tt:mperatureand variable stack velocity, eliminating this identified limitation. Sierra Club's September 2019 modeLiag for the 2013-201 S period also included a sensiti vity run using the s tack velocity and stack temperatures from the Mart h 2016 modelinga nalysis o determine Jhe iml)ac-,s of using the estimated stack veJocity and temperature on the maximum modeled design concentration. fn this sensitivity run., Sierra Club only changed ihese sped fie inputs; all o ther inputs were unchanged from the MLsc1315b scenario. Tb]s sensitivitv run indicates that us ing the estimated stack parameters in the March 10 1 6 model ing resulted in a tna.ximum mode led design concenttation that was 40 percent lower than the maximum modeled design conccotr.ation when CE M based hout ly varying temperatureand velocity were used in the September 2019 modeling (232 .6 μg/m$^3$ vs. 393 .8 μ g/m$^1$). In other words, the 224 μg/mJ and 239 μg/ml mrc<imum modeled design concentrations cited in the 2016 Final Designattons Supple ment TSD, increased on the order of 69 percent (232.6 μg/m$^1$ vs. 393.$8$ μg/m$^3$) when these refined data were used jn the September 2019 modeling. This confinns EPA s assessment in the 2016 Final Designations Supplement TSD that Sierra Clu b\s March 2016 maximum modeled design t:OOL ntration was undere stimated because- of these tecb.nica1 aspects.

One of the technicalas pects of Sierra Club·s March 2016 modeling that the EPA iden itied in the P.toposed Error Corirectioo as creating uncertainty was the absence of incl1.1ding building downwash. Regarding bujlding dowrtwash. in the 2016 Final Designations S upplement TSO. lh\l EPA concludedthat. while we did not agree with Sierra Club>s a ss e rtion that exclusion t>f do wnwas h would underest hmate the maximum modeled design concent ra,ion i n l,lll case s, iu our evaluation th_e inclusion ofbuildiag information and associated dowowash in this analysis would not change our recommended designation of nonattainment. We noted Lbat Luminant"$s$ 2016 modeling repon (wWch Texas also inc luded in their response) ihdlcated that they expecled that the mocle)jng results were aot extremely sensitive to thls issue because Lhe slack he.ights a re well bove the buildings and there is co ns iderable momentum.and buoyancy rise for the stack plumes. The EPA cond udedthat the modeling values were .su0i cien1ly above-the Slandardand inclusion

ofdownwash often leads to higher concentrations closer to the source but. even in situations we have seen where this did no l occur, any **decti** ma.'timUm modeled values from inolus,011 of down.wash were relatfvelysm,aH and not ex ted to be enough of a deoreaseto resolve all modeled exceedance values near Martin Lake. The 2019 Sierra Club modeling scenario Mlscl3I5b includes building downwash. elimina ting this identified limitation, Sierra Cl ub >s September 2019 modeling for the 20l3-2015 period also included a sens itivity run where t,he_y removed the building information and downwash processing to determihe wh the impacts of including building downwasb was oh the maximum modeled design concentration. In this sensitivity run. Sierra Club only changed these specific inputs and all other inputs were unchanged from the MLsc1315b scenario. This-sensitivity run indicate.s that (he maximum modeled design concentration without including building was ltllchanged compared to the m xumun modeled design concentration when downwash was included ($393.8 \mu g/m^3$ vs, 393.8' $\mu g/m^3$). T his.<:onfinns the EPA's assessment in the 2016 Final Designations Supplement TSO that includfng downwash in Sierra Club·s March 2016 modetittg n Jysis wo uld not be expected to resolve all modeled exceedance values in the area because any changes in concentration or shift in location of the maximum concentration would be expeated to be relatively minimal and may result in higher im pacts closer to the facility.

Ano ther technical aspect that the EPA identified in the Proposed Error Correction as cre-ating UJ\Ce inty was the elevation of flagpole receptors in Sierra Club's March 2016 modeling. In the 2016 Final O'esignations Supplement TSO, the EPA stated that we would expect only a very sligbt c hangein the modeled concentrations and the <lreil of exce.edances and magnitude of the alue.s would be basically eqnivalent and, therefore, not change our final action. We base.d thfs conclusion on analys¢ of sensit1vity modeling conducted by o,e SierTa Club for another source, which found decreases. in modeled SO 2 between almos10 and 0.2 percent w:hen removin,g (he-tlagpole receptors and estlmating concentrations at ground level. Since Sierra Cl,ubs 2016 modeled mrucimum mode-led designation concentration (in ambient air) at M.artin Lake is a t lea st 14 percent above the 2010 SOi NAAQS, the EPA concluded lhat uie ch ge due to flagpole receptor heights would not decrease the val\le to below the standard. Sierra Club·s Se ptem ber 2019 modeling scenario MLsc13**I5b** does not use elevated flagpole receptor-s, e )iminafing I.his iden ti fied limitation. Sierra Club's September 2019 modeling for the 2013-20 15 period aJso i.llcll,|ded a sensiuvJiy run where they changed the cecep or h ights to tl gpole receptor heights to evaluate potential im pacts on1he modeled results. In this sensitivity run. Sierra Club only changed fhese-specific inputs and all other inputs were unchanged from the ML.sc1315 bs nario. This sensitivity run indica tes that the maximum modeled design concelltt3tion from using flagpole recet,tor beigbts resulted iom jmummodeled design conc¢ntr tion iha1 was 0.05 percent higher compared to the ma.ximom modeled designconcentration usi ng nonnaJ receptor hdght ($394.0 \mu g/m^3$ vs. 39J.8 $\mu g/m$)). Tl\is confirms the Ef>A·s assessment in the 20l6 Final Designations Supplement TSO that usmg flagpole receplar height in Si erra d ub's March 2016 modeling aoatys is- tn y result in a very small increase in the maximum modeled design concentration. which would not b ve had M impact on our deeision because maximum modeled concentrations were at least 14 percent above the 2010 *SOz* NAAQS.
Another te-chnical aspect that the EPA identified in tile Proposed Error Correction as creating uncertaintywas treatment of surface meteorology and "ho urly wind inputs. Regarding use of land surface data from 1992. EPA indicated based on Sierra Club's March 2016 modeling, which irtcJuded & sensitivity lysis fot updated surface d.ata/characterisHc's that only a small decrease

in maximum modeled design concentrationsof 3.6 percent was expected from using updated surface charac-teristics. As explained previouslyin Sierra Club's September 2019 modeHng the meteorofogy was reprocessed v.titb the EPA's updated AERSURFACE program and with updated land l.lseand land cover information i;troun.d tbe meteorological site. resolving this identifo:.,d limitation. Sierra Club' s September 2019 modeling foi: he 2013-2015 period also included a sensitivity run where they used the o} der surfacecharacteristics(Lahd Use Lapd Cove.r from I99Z-LULC1992) instead of the new surface-cbaracteristics inprocessing the ,v.inds and AERMOO inputs to assess the use of the olders\lrface characteristicson the maximum modeled design concentration. In this sensjtivity run, Sierra Clubonly changed t.he se s pecific 1opl,lts ; all other inputs were unchanged from the MLscl 315b scenario. Tllis sensitivity run indicates that the maximum modeled design conce:ntration from the older surface-characteristics resulte-0 in a mflXimum modeled design conce11trationU1a1was I percent higher eompared tothema>dmummodeled design concentration usingthenewersurfacecharacteristics ( 399.4 -.0 µg /m$^1$ vs. 393.8 µg/m$^3$). Thisconflnns the EPA' s assessment in the 2016 Final Desi.gnations Supplement TS:0 that using the newer su.rfaee characteristics data instead of the data from 1992 in Sierra Club•s March 2016 modeling analysis *may* result in a small **deer** in therna..xin:ium modeleddesign concentration and when considered would only result in slightly lower ma.ximu:m modeled design concentrations, The Sierra Club's September 2019 sensitivity modeling indicates.thats io the 2016 FinaJ Designations Supplement TSD, the EPA actually overestimated the decreaseofthemaximummodeled design conc.entrntion that may occur from using newer surface characteristics (3.6 percent); the 20I9 sensitivity indicates thatthe actuaJ decrease was only I percent.

Anothertechnical aspect tJ.1at the EPA identtfied in the Proposed ErrorCorrection as cr ting uncertainty was use ofa larger receptorgrid than recommended and failure to include fenceline receptors. Asdisc1,1Ssed previously, SierraClub·s2015 and Marcb 2016 modeling useda large grid and did not include fenceline receptors or restrio receptors from f)arts of Lum.inan·t s property that could be non-ambientair.1n the 20I6 Final Designations Supplement TSO. J\e EPA only e, ,aluatedconcentrations inSierra Club's.March 2016 modeling at receptors th.al r presented areas where it would also be feasible to place a monitor and record .ambient .air impacts. Luminant s 2016 modeHng included areas that they considered to be oon-ambit.-.nt. but the EPA did not have.sufficient information to e,ialuate and concluded th4". aJI the areas Lumina.nt was claiming as non-ambient were actually non-ambient areas. Without s-uffic-i-nL da4i tosupport Luminant's non-ambient areaclaimS-i the EPA took the approach of only evaluating. Sierra Club•s March 2016 modeling results for the areas that Luminant did not claim as non-amblent, whichwerefo.rredtoasthe uncontested area.Thisincluded evaJuating concentrationsat only uncontested receptors. !Uld **tely** also evaluating conoentratioosat areas that clearly were erroneously claimed as unfeasible by Luminartt, The EPA also noted that we had concerns that Luminant had contested receptors(ex.eludedin Luminanl's modeling) in more **areas** than we appm_priateand that themaximum valuesin the uncontested area **m** Sierra Club's March 2016modeling were actuaJJyas high *as* 239.1 µg/m$^3$ near the Luminant excluded area. The EPA's anaJysis explained that weconservat1vel,y used 224µg/m$^3$(highestat uncontested receptor) to evaluate the modelibg, bu the anaJysis could also be done based on the 239.1 µg/m$^3$ value. which\'vould even moreclearly demonstra1e the-area around Martin Lakewas viol0ng the 20IOS02 NAAQS.The2019SierraClubmodeling scenarioMLsc131 Sbused theLuminan, 2016 property descriptions in their locarion of recep1ors, sotheir new anaJysis only looked at

receptors that Luminant considered to be ambient *(i.e.,* the uncontested area). Sierra Club did not place receptors on areas that Luminant considered non-ambient thus, eliminating the potential concern about fenceline receptors. Sierra Club's September 2019 modeling and modeling report indicates multiple areas above 300 μg/m$^3$ that are clearly outside the areas that Luminant considered in 2016 as their boundary for non-ambient air (Figure 1).[32] Therefore, Sierra Club's September 2019 modeling clearly demonstrates that this is not a technical limitation; the only uncertainty is that Luminant claimed large areas as non-ambient in their 2016 modeling and some of these areas could be ambient, but this uncertainty does not impact the conclusion that the area is violating the 2010 SO2 NAAQS.

**Figure l.** Figure Showing Maximum Modeled Design Concentrations from Sierra Club' s September 2019 Modeling (Scenario MLscl3l 5b)



1-hour average SO2 concentrations (**ug** per cubic meter) - All colored areas exee<f the NAAOS.

196                          300                          350

---

[12] Figure 2 from SierraClubs 2019 Modeling Report ("Martin Lake Generating Station TX- Evaluation of Compliance with the I- hour NAAQS for SO2 - Final - 23Sep19. pdf').

Another technical aspect and potential uncertainty that the EPA identified in the Proposed Error Correction was use of an older version of AERMOD. As noted previously, this uncertainty was only identified in the Sierra Club 2015 modeling, which the EPA used for the basis of its intended designation, not the March 2016 modeling that the EPA relied on for the final designatioh. Sierra Club also used the most recent version of AERMOD in their September 2019 modeling. Therefore, the EPA concludes that this was not a technical aspect or potential uncertainty in the March 2016 modeling and, therefore could not be a part of a basis for concluding that relying on that March 2016 modeling used in the final designation was in error.

Another technical aspect and potential uncertainty the EPA identified in Sierra Club's modeling for the Round 2 Supplement in the Proposed Error Correction was the representation of '·recent emissions, including controls after the 2011 National Emissions Inventory" and " potential to emit/allowable emiss'ions." *See* 84 FR at 43761. As noted previously, Sierra Club's March 2016 modeling used the most recent three years of actual emissions available at that time. Sierra Club's September 2019 MLsc13 t5b modelihg scenario also used 2013-2015 actual emissions. The use of the 2013 2015 actual emissions is strictly in accordance with the S02 Designations Modeling TAD and consistent with assessing the air quality at the time of the Round 2 Supplement. The EPA provided the following assessment in the 2016 Final Designations Supplement TSO in response to Luminant's 2016 comments about controls in 2016, after the 2011 National Emissions Inventory, and how these might impact the potential to emit/allowable ern1ss1ons:

> 1n the 2017-2019 emission modeling submission, Luminant projected future reduced emission rates were used that were based in part on future non-enforceable ·voluntary operational changes at Martin Lake. However. for the parpose of determining whether the area is currently meeting the NAAQS and designating the area either actual emissions or a currently enforceable reduction in actual emissions should be used. Neither the efficiency improvements in operation of existing scrubbers or fuel switches were reflected in a pem1anently enforceable situation. This means that they could change and are not a certain and effective limitation on either current or future emissions. Compliance with MATS dQes allow for using S0 2 limits as suJ110g a te s for other pollutants, but how a faciUty meets the MATS requirements can be changed by fuel switching/blending and testing directly for the MATS pollutants. fn this ·case the intended switching of fuel and increases in scrubber efficiencyw hether they have occurred or not, are not yet enforce-able through any mechanism provided by Laminant - such as a pennit limit - and Luminant would be free to either not switch or, if it does switch, change back to a higher sulfur content coal in the future, depending on circumstances. Thus the modeling based on possible future changes at the facility, rather than on actual emissions, is not acceptable for this regulatory use.[33]

The S0 2 Designations Modeling TAD recommends using the most recent three years of actuals or using a more recent federally enforceable and in effect allowable emissions limit, which could reflect new and lower continuing emissions that may not be reflected in modeling historical actual emissions. In the case of the Texas areas, there were not any more recent lower federally enforceable allowable limits that might have better represented recent and continuing S0 2

, 2 0 I6 f ina l Designations Supplement TSD, p. *55-56.*

emissions perfonnance. Therefore, use of actual recent SO2 emissions was not a limitation or uncertainty in Sierra Club's March 2016 modeling and, therefore, could not be a part of a basis for concluding that relying on that March 2016 modeling was in error. Additionally, the EPA has aJso rev iewed the annual emissions since 2013. Figure 2, produced by the EPA using CAMD data, shows that the annual emissions and the average S0 2 emissions rate varied considerably from year to year at Martin Lakeduring the 2013-2019 period. The lowest emissions and emissions rates were recorded for the years 2015-2017 with the years 2018 and 2019 returning to about the previous higher emissions recorded in 2013-2014. The SO2 emissions rate in 2015 dropped 48 percent from the highest rate that was recorded in 2013. Figure 2 does not demonstrate a trend toward lower emissions from the Martin Lake Power Plant with time. In fact, the lowest annuaJ SO 2 emissions during the entire period was recorded in 2015, which was included in the Sierra Club's March 2016 modeling. The emissions in 2015 were only 37 percent of those recorded in the highest year, 2013. Since 2015, the facility's emissions trended up through 2018. The three-year average emissions for 2017-2019 are almost identical to the three-year average emissions for the modeling period for the designation, 2013-2015 (0.1 percent smaller). Luminant's March 2016 comments on the EPA's intended designation projected a 30-40 percent decrease in actual emissions for the 2017-2019 period compared to the 2014-2015 period, due solely to voluntary and non-enforceable scrubber optimization and at1ticipated fuel blending changes. In the 2016 Final Designations Supplement TSO, the EPA noted that these limits were not permanently enforceable and, therefore, could not be relied upon for designations decisions. We note that Luminant's prediction did not actually occur, as reflected in the 2017-2019 actual emissions that are basically the same (0.1 percent smaller) as 2013-2015 actual em1ss1ons.

**Figure 2.** 2013-2019 Annual S0 2 Emissions (tpy) and Emissions Rate (lb/MMBTU) from the Martin Lake Power Plant

Another technical aspect and potential uncertainty that the EPA identified in the Proposed Error Correction was the March 2016 modeling's approach for the estimation of background concentrations. As explained in the 2016 Final Designations Supplement TSD, the lowest monitored background concentration (the, El Paso monitor) was used in the March 2016 modeling. The EPA stated "Given the amount of SO2 emissions in East Texas compared to El Paso area this assumption likely leads to a slight underestimation in concentrations around these facilitjes but is within the framework of the TAD's options for inclusion of background monitoring data."[34] Therefore, the EPA concludes that this was not a limji&tion or uncertainty in the March 2016 modeling and could not be a part of a basis for concluding that relying on tha1 March 2016 modeling was in error. Additionally, as explained previously, the September 2019 modeling included a new background concentration, the 99°1 percentile design value concentraflon in Travis County, Tex.as, which is the lowest value measured at SO2 ambient monitors in the State of Texas for the 2016-20 18 period. This monitor was used by Sierra Club because it is nearer lo Martin Lake and because the monitor that previously had the lowest state value (El Paso in the 2013-2015 period) was decommissioned in 2017. The updated background concentration is 7.8 µg/m , 2.6 µg/m$^3$ (51 percent) higher than the background value of 5.1 tg/m$^3$ used in Sie1Ta C lub s March 2016 modeling and 2019 updated modeling of 2013-2015 period. Regardless of the background concen tration, the maximum modeled design concentration for the Septe mber 2019 updated modeling is well above the 2010 SO2 NAAQS, for this 2019 assessment of 2013-2015 period it is 388.7 µg/m3, before any background is added.

The final technical aspect and potehtial uncertainty that the EPA identified in the Proposed Error Correction was the failure to include, source contribution in the March 2016 modeling analysis. As exp lained previously, the Sierra Club's 2015 modeling relied upon for the EPA' s intended designations included such contribution from other sources. As explained in the Intended Designations TSO, the modeling indicated that the contribution to the maximum modeled design concentration from the Pirkey Power Plant only added 0.1 µg/m $^3$ to increase the maximum modeled design concentration from 339.8 µg/m$^1$ to 339.9 µg/m.$^3$ [35] Based on the modeling infom1ation available at the time, the EPA explained in the 2016 Final Designations Supplement TSO that inclusion of only the principle S02 emissions source:in the modeling was an accepta ble choice in this area's circumstances, as we maintained that Martin Lake was likely contributing almost if not eq ual to I00 percent of the impact for the values above the 20 l0 SO2 NAAQS. The EPA also explained that Sierra Club's 2016 modeling, by not including Pirkey Power Plant, was a conservative approach *(i.e.,* potentially under-estimatfog the maximum modeled design concentration) to determining whether the area was violating the 2010 SO2 NAAQS and to identifying the geographical boundaries of such exceedaaces. The EPAs uggested that inclusion of Pirkey Power Plant should result ln either similar impacts and boundaries or slightly increased impacts and possibly slightly larger boundaries, but incJusion of Pirkey Power Plant s hould not resull in decreased impacts or "shrinking" of boundaries from those modeled.[36] Based on the information avaHable at the time of the EPA's final nooattairunent designation in 2016, the EPA contin ues to fmd that it was a reasonable decision at the time based on its prior assessment of the data available from Sierra Club' s modeling of the area for the 2012-2014 (December 2015

---

[3] 2016 Final DesignationsSupple ment TSO, p. 65.
' 2016 Final Designations Supplement TSO. pp.51-52.
' 2016 Final Designations Supplement TSO, pp. 60-62.

modeling) and 2013-2015 (March 2016 modeling) periods; therefore, the EPA concludes that this was not a limitation or w1certainty in the Mar,ch 20 I6 modeling and could not be a part of a basis for concluding that relying on that March 2016 modeling was in error.[37]

After further assessment, the EPA agrees with the analyses in the 2016 Final Designatioas Supplement TSO referenced previously for the same reasons explained in the Round 2 Supplement. Regardless , as explained previously. Sierra Club's September 2019 modeling included refinements of their March 2016 modeling inputs for stack parameters, bwlding dimensions and locations, and receptor grid (25 km and only uncontested receptors ), which were obtained directly from Luminant's March 2016 modeling analysis. Sierra Club's September 2019 modeling analyses used these aspects of Luminant's March 2016 report since the Luminant analysis contained more refined modeling inputs based on data available to the facility owner. such as CEM measured stack and emissions parameters, and stack and building locat io n and dimensions. These updates resolved the identified technical aspects and uncertainties in the Proposed Error Correction because they reflected the most refined ihformatfon for these inputs and the strictest application of the S02 NAAQS Designations Modeling TAD while still considering only uncontested receptors where modeled concentrations were not the highest. As shown in Tab le 2, the maximum modeled concentration was higher in Grid #1 than Grid #-2 in Sierra Club's September 2019 modeling, but both receptor grids resu1'ted in values that violated the 2010 S02 Clu b's 2019 modeling for the 2013-2015 period utilized more refined and accurate data for stack parameters (variable temperature and velocity) and included model inputs for building downwash, but it did not include any of the novel and unapproved modeling preprocessors (AERLIFT and AERMOIST) that Luminant had utilized in 20 t 6, which previously concerned the EPA in the designations process.

In the Proposed Error Correction, the EPA stated that" while individually these deficiencies are not dispositive, collectively they are a sufficient basis for the EPA to propose that we erred in relying on the Sierra Club modeling in making the initial nonattainment designations for the three Texas areas." *See* 84 FR at 43761. However. the EPA acknowledges that. in the 2016 Final Designations Supplement TSD, the EPA also evaluated the combination of all the identified aspects of the March 2016 modeling (including all potential increasing and decreasing impacts on concentrations) through a comparison analysis. using the conservative approach of224 tg/m-' as the maximum value.[38] In the 2016 Final Designations Supplement TSD regarding the area around Martin Lake. the EPA ultimately concluded that, give n that Sierra Club' s modeJed concentrations (with a low background and no nearby sources) were 14 percent above the standard using 224 µg/m$^3$ and'22 percent above the standard using239.1 µg/m$^3$ as the maximum and that several factors were deliberately conservative in under-estimating impacts and would tend to reduce the modeled concentrations (and actual modeled concentrations with appropriate background would be higher), our technical assessment ef the available infonnation was that the differences/changes to the Sierra Club modeling When combined overall would not result in

_____

n Tbe EPA's assessment does not prevent the Pirkey Power Plant from being included ill *anyfuwre* modeling (e.g.. state implementation plan demonstrations) for the Martin Lake area as a potentially contributing so emissions source; this w.ill be depende,nt upon whether the Pirkey Power Plant is adequately represented by the backgrour,d morritorlng value added to the modeled concentrations, and/or on wnether thestate chooses to impose any new S0 2 emissions limits on the Pirkey Power Plant to be credited in the Martin Lake attainment demonstration.
,k 2016 Final Designations Supplement TSD, p. 76.

modeled values rtear or below the standard.[39] Therefore, in the 2016 Final Designations Supple ment TSO, the EPA concluded that we considered the final Sierra Club modeling submitted March 2016 to be relevant information that must be considered in our designation decision and found that the modeling was a sufficient basis for a determination of nonattainment and clearly demonstrated the area around Martin Lake was nonattainment.[40]

After further assessment of each individual aspect of the modeling and review of our previous analysis of the impact of the combined impact from the 2016 Final Designations Supplement TSO, the EPA agrees with the assessment of the combination of all the identified aspects of the modeling explained in the 2016 Final Designations Supplement TSO for those same reasons. Regardless, as shown in Table 2, the results of this updated modeling demonstrate that use of more refined inputs for the 2013-2015 period for the aspects of the March 2016 modeling that the EPA identified in the Proposed Error Correction as creating uncertainty increased the maximum modeled design concentration, before adding in background conce ntrations, for Martin Lake from 224 $\mu g/m^3$ (or 239.0 $\mu g/rn^3$) to 388.7 $\mu g/m^3$, a 73 percent (or 63 percent) increase, This result provides the combined impact of the changes in the September 2019 updated modeling (as compared to the March 2016 modeling) al combo r a ts te EPA ' s assessment of Sierra Club's March  2016 modeling  for the area around  Martin Lake in  the  Round 2 Supplement and by extension for tbe areas around Big Brown and Monticello,  which were modeled similarly and properly assessed by the EPA in the 2016 Final Designations Supplement TSD. Furthermore, Sierra Club's September 2019 modeling demonstrates that the March 2016 modeling underestimated the maximum modeled design concentrations and that more  refined inputs addressing the identified limhations resulted in higher modeled concentrations, which the EPA predicted in the 2016 Final Designations Supplement TSO.

## V.     Conclusion

Sierra Club's September 2019 modeling addressed  the uncertaintfos in the modeling that the EPA relied on in the Round 2 Supplement, which the EPA identified in the Proposed Error Correction. The Sierra Club's September 2019 modeling of the area around the Martin Lake Power Plant corroborates that the EPA's relianceon the Sierra Club's March 2016 modeling  in the Rotmd 2 Supplement was appropriate. The EPA agrees with our previous assessment of the technical aspects and potential uncertainties related to the Sierra Club's March 2016 modeling as explained in the Round 2 Supplement. Sierra Club's September 2019 modeling further confirms that the cumulative technical aspects and identified limitations with Sierra Club's March 2016 modelin,g that the EPA identified in the Proposed Error Correction were not merited.

---

[3] 20 (6 t lnal Designations Supplement TSO, pp. 76-77 _
[10] 2016 Final Designations Supplement TSO, p. 77.

# Attachment B

*    *    *    *    *

[FR Doc. 2021–13693 Filed 6–28–21; 8:45 am]

BILLING CODE 6560–50–P

---

## ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Part 81

[EPA–HQ–OAR–2014–0464; FRL–10024–28–OAR]

Error Correction of the Area Designations for the 2010 1-Hour Sulfur Dioxide (SO₂) Primary National Ambient Air Quality Standard (NAAQS) in Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule; withdrawal.

**SUMMARY:** The Environmental Protection Agency (EPA) is withdrawing its August 22, 2019, proposed rule, which proposed both to determine that the EPA made an error in the area designations for the 2010 Sulfur Dioxide (SO₂) Primary National Ambient Air Quality Standard (NAAQS) for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas, and to correct the proposed error by modifying the designations of those areas to unclassifiable. The EPA is withdrawing the proposed rule because the EPA, informed in part by technical information received during the public comment period on the proposed rule that further supports the EPA's initial designations of these areas, no longer believes the bases identified in the proposed error correction support the proposed conclusion that an error correction is appropriate.

**DATES:** As of June 29, 2021, the proposed rule published at 84 FR 43757 on August 22, 2019, is withdrawn.

**FOR FURTHER INFORMATION CONTACT:** Corey Mocka, U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, Air Quality Policy Division, 109 T.W. Alexander Drive, Mail Code C539–04, Research Triangle Park, NC 27711; phone number: (919) 541–5142; email address: *mocka.corey@epa.gov*.

**SUPPLEMENTARY INFORMATION:**

## I. Background

On December 13, 2016, the EPA designated portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas as nonattainment for the 2010 1-hour primary SO₂ NAAQS (81 FR 89870,

codified at 40 CFR 81.344) (''Round 2 Supplement''). On February 13, 2017, Vistra Energy, which owns SO₂ emissions sources in each of the three areas, sent the EPA a petition for reconsideration, purportedly pursuant to Clean Air Act (CAA) section 307(d)(7)(B) and the Administrative Procedure Act 5 U.S.C. 553(e), and for administrative stay of the EPA's nonattainment designations for portions of Freestone and Anderson Counties (''Big Brown Steam Electric Station area''), Rusk and Panola Counties (''Martin Lake Electrical Station area''), and Titus County (''Monticello Steam Electric Station area''). On March 15, 2017, the Texas Commission on Environmental Quality (TCEQ) also submitted a request for an administrative stay of the Round 2 Supplement final designations for these areas in Texas.[1] On September 21, 2017, the EPA initially responded to Vistra Energy's February 2017 petition for reconsideration by indicating an intent to undertake an administrative action with notice and comment to revisit the nonattainment designations for the three areas, but explained that pending completion of such action, the nonattainment designations remained in effect.[2][3]

The EPA published a proposed rule in the Federal Register on August 22, 2019, titled ''Error Correction of the Area Designations for the 2010 1-Hour Sulfur Dioxide (SO₂) Primary National Ambient Air Quality Standard (NAAQS) in Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas'' (84 FR 43757) (''Proposed Error Correction''). Under the EPA's CAA authority at section 110(k)(6) to correct errors in acting on state implementation plans (SIPs) or in issuing designations, redesignations, classifications or reclassifications, the EPA proposed that in designating these areas as nonattainment under CAA sections 107(d)(1)(A)(i), (d)(1)(B)(ii), and (d)(2)(A), it erred in not giving greater weight to Texas's preference to characterize air quality through monitoring, and to steps undertaken by

Texas to begin monitoring in these three areas, when considering all available information; in relying on available air quality analyses in making the initial designations that the EPA recognized included certain limitations; or a combination of these two issues. Therefore, to correct these proposed errors, the EPA also proposed that the previously designated nonattainment areas in Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas each be revised to reflect an unclassifiable designation under CAA section 107(d)(1)(A)(iii). The EPA has not finalized the Proposed Error Correction and is not doing so in this action. Instead, the EPA is now withdrawing the Proposed Error Correction.[4]

## II. Reasons for Withdrawing the Proposed Error Correction

### A. Additional Air Quality Modeling

In the Proposed Error Correction, the EPA proposed that it erred in relying on available air quality modeling submitted by Sierra Club in making the initial nonattainment designations for these three areas. The EPA explained in the proposed action that the modeling submitted by Sierra Club (''December 2015'' and ''March 2016'' modeling), which purported to show nonattainment, was developed in accordance with the general recommendations on modeling provided by the EPA but stated that the modeling contained ''key limitations and uncertainties.'' We made this statement in the Proposed Error Correction despite also acknowledging that we had explained in the record for the Round 2 Supplement that individually these key limitations and uncertainties would not significantly change modeled results or, in many cases, could result in underestimation of SO₂ concentrations. In the Proposed Error Correction, the EPA also stated that given the possible collective significance of these issues and, in the case of the areas around the Martin Lake and Monticello facilities, given that the maximum modeled concentrations are within about 10 percent of the 2010 SO₂ NAAQS, we were less confident in our prior statements that potential adjustments to the Sierra Club modeling would not result in modeled values near

---

[1] Additionally, TCEQ submitted a petition for reconsideration on December 11, 2017, and on December 19, 2017, Vistra Energy provided additional information regarding facility retirements and the deployment of additional SO₂ monitors to support its February 2017 petition for reconsideration and administrative stay.

[2] *https://www.epa.gov/sites/production/files/2018-09/documents/3143□signed□response.pdf*.

[3] The EPA recently found that Texas has failed to submit State Implementation Plans to satisfy certain nonattainment planning requirements of the CAA for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County. *See* 85 FR 48111.

[4] Additionally, as detailed in a separate document published elsewhere in this issue of the Federal Register that has been signed concurrently along with this withdrawal notice, the EPA is also now denying the administrative petitions from Vistra Energy and TCEQ. *See https://www.regulations.gov* under Docket ID No. EPA–HQ–OAR–2014–0464.

or below the NAAQS.[5] Additionally, the EPA stated in the Proposed Error Correction that while individually these deficiencies are not dispositive, collectively they are a sufficient basis for the EPA to propose that we erred in relying on the Sierra Club modeling in making the initial nonattainment designations for the three Texas areas.

The EPA received several comments on the Proposed Error Correction. Sierra Club submitted a comment on the Proposed Error Correction that included updated modeling (''September 2019 modeling''). Sierra Club's updated September 2019 modeling addressed all aspects of the March 2016 modeling that the EPA had identified in the Proposed Error Correction as a limitation or uncertainty. The September 2019 modeling purported to demonstrate that the Martin Lake Electrical Station area did not meet the 2010 $SO_2$ NAAQS at the time of designation in the Round 2 Supplement (*i.e.,* December 2016), and also currently does not meet the 2010 $SO_2$ NAAQS based on more recent data. Sierra Club did not submit updated modeling for the Big Brown and Monticello areas as part of its September 2019 comment submission, but rather asserted that the EPA's previously identified limitations (individually or collectively) have no material effect on the model results for those areas in the same way as they demonstrated with the Martin Lake area's modeling.

The EPA also notes, upon re-review of the Proposed Error Correction and Round 2 Supplement, that we did not acknowledge in the Proposed Error Correction that we actually considered the collective impact of all these same aspects of the modeling in the record for the Round 2 Supplement (to the extent those aspects remained in the March 2016 modeling relied on in the Round 2 Supplement). In the Proposed Error Correction, we also did not explain any change in our thinking from our assessment of the collective impact in the Round 2 Supplement's record.

As explained further in the technical support document for this withdrawal, the EPA has assessed Sierra Club's September 2019 modeling submitted during the Proposed Error Correction public comment period.[7] This assessment supports the EPA's previous reliance on the March 2016 modeling as the basis for its final nonattainment designation for the Martin Lake area in the Round 2 Supplement. Based on consideration of that information submitted by commenters and on further consideration of the entirety of our record for the Round 2 Supplement, the EPA now has concerns with the accuracy of the Proposed Error Correction's characterization of the March 2016 modeling and no longer believes that this proposed basis supports the proposed conclusion that an error correction is appropriate or that reliance on such information for the nonattainment designation was in error. The refined modeling submitted on the Proposed Error Correction demonstrates that the EPA's Round 2 Supplement assessment of the impact of further refining the March 2016 modeling was reasonable and correct, that such refinement would not alter the conclusion that the Martin Lake area was not attaining the NAAQS at the time of the Round 2 Supplement. Overall, the EPA's assessment of the information and of our record for the Round 2 Supplement for all three areas is that refinement of the aspects of the modeling the EPA identified in the Proposed Error Correction would not alter the EPA's nonattainment designations for any of the three nonattainment area designations in the Round 2 Supplement, and that the submitted information further confirms our Round 2 Supplement analysis of then-available data.

*B. Comments on Texas's Monitoring Preference*

In the Proposed Error Correction, the EPA also proposed that when we considered all available information at the time of designation, we erred in failing to give ''greater'' weight to the State of Texas' preference to use ambient air monitors to characterize $SO_2$ air quality in their state for purposes of the designation. We proposed this despite also acknowledging in the proposal that because these areas (around certain $SO_2$ emissions sources) were subject to the Round 2 deadline of July 2, 2016, these areas were required to be designated at that time based on the EPA's assessment of available information even though the State of Texas stated a preference to later characterize the areas based on future monitoring data and its intention to install monitors for these areas.

In addition to the modeling submitted during the public comment period for the Proposed Error Correction, the Sierra Club also commented that the EPA was required to designate the three areas in Texas by the court-ordered deadline based on the information available at that time (*i.e.,* Sierra Club's December 2015 and March 2016 modeling). Because monitoring information was not available in 2016 for the Martin Lake, Big Brown, or Monticello areas, the Sierra Club stated that monitoring data consequently could not inform the EPA's designations decisions. The Environmental Protection Network (EPN) submitted a similar comment claiming that the EPA did not have the discretion to delay designations for these three areas in Texas under the applicable court-ordered deadline and that the EPA was required to designate the areas based on the best available data at the time of the designations. Additionally, EPN asserted that Texas's preference for future air quality monitoring did not undermine the available modeling data demonstrating that the areas were violating the 2010 $SO_2$ NAAQS.

In light of the comments submitted on the Proposed Error Correction, and the absence of a clearly identified error in the Round 2 Supplement, the EPA no longer believes that this proposed basis supports the proposed conclusion that an error correction is appropriate and no longer believes that we failed to give the appropriate weight to the State's preference for future monitoring information when we considered all available information at the time of the Round 2 Supplement. For the reasons discussed below, the EPA has concerns with the prior proposed assertion that the EPA was in error for not giving greater weight to the state's preference for *future* monitoring information in the absence of any available monitoring data at that time, let alone over reliance on *then-available* air quality modeling to assess $SO_2$ air quality. Given that the Proposed Error Correction's basis was predicated on the EPA relying on or weighing more heavily a preference for information that was not available at the time the EPA was required to finalize the Round 2 Supplement, the EPA no longer believes such a basis provides substantial support for the argument that the Round 2 Supplement should be revised.

CAA section 107(d) specifies that the EPA make designations based on the air quality at the time of final designations (*i.e.,* determining at the time of signature whether the area meets the NAAQS) and consider all available information on air quality at that time. In other words, the

---

[5] As explained in the EPA's final designations Technical Support Document (TSD), the modeled 99th percentile daily maximum 1-hour $SO_2$ concentrations for the Martin Lake and Monticello facilities are 14 percent and 8 percent above the 2010 $SO_2$ NAAQS, respectively.

[6] *See* pages 27–29, 48–50, and 75–77 of the EPA's final designations TSD, available in the public docket and at *https://www.epa.gov/sites/ production/files/2016-11/documents/texas_4_ deferred_luminant_tsd_final_docket.pdf.*

[7] *See https://www.regulations.gov* under Docket ID No. EPA–HQ–OAR–2014–0464.

EPA does not interpret the statute as allowing the EPA to consider future air quality in the initial designations process, and the D.C. Circuit has upheld this interpretation as reasonable.[8] The record for the Round 2 Supplement explains, and the EPA maintains, that both air quality modeling and ambient monitoring are appropriate tools for characterizing ambient air quality for purposes of informing decisions to implement the $SO_2$ NAAQS, including designation determinations.[9] The EPA's reliance on modeling to assess $SO_2$ air quality, even in the face of conflicting monitoring, where appropriate, has been judicially affirmed. *See, e.g., Montana Sulphur & Chemical Company* v. *EPA*, 666 F.3d 1174, 1185 (9th Cir. 2012).

In the Round 2 Supplement for these three areas, the EPA considered Texas's recommendations but appropriately modified the recommendations, per CAA section 107(d)(1)(B)(2), because they were not supported by currently available information. Specifically, the EPA's assessment of Sierra Club's modeling was that currently available information showed violations of the 2010 $SO_2$ NAAQS. At the time of the EPA's final nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County, although Texas preferred that the EPA designate the areas based on proposed future monitoring data rather than on existing submitted modeling, there were no representative monitoring data[10] or other reliable modeling demonstrations available to refute Sierra Club's information demonstrating violations of the 2010 $SO_2$ NAAQS, as explained in

the EPA's final designations TSD.[11] The absence of available monitoring data at that time did not relieve the EPA of its obligation to issue designations for these areas by the court-ordered deadline. Furthermore, at the time of the final designations, the Agency did not have the discretion to await the results of 3 years of ambient air monitoring data (*i.e.,* 2018–2020) from Texas's proposed (but not yet established) monitoring sites before taking final action due to the court's order to designate certain areas in Texas. There was, however, as explained previously and in the EPA's final designations TSD, valid modeling submitted by the Sierra Club based on the then-most recent actual emissions demonstrating that the areas were violating the 2010 $SO_2$ NAAQS. As explained earlier, the EPA no longer believes there were errors in our Round 2 Supplement's analysis that Sierra Club submitted valid, representative modeling (based on the then-most recent actual $SO_2$ emissions) that demonstrated that the areas were violating the 2010 $SO_2$ NAAQS, or that further refining the modeling would result in modeled values near or below the standard. Therefore, even though the EPA considered Texas's preference for monitoring, given that the statute requires that the EPA consider available information, Texas's preference for reliance on monitoring information when there were no such monitoring data available at the time of the EPA's final designations in December 2016 did not and could not rebut Sierra Club's modeling showing violations of the 2010 $SO_2$ NAAQS. [12]

### III. Purpose of This Action

In the 2019 Proposed Error Correction, the EPA proposed that our relying on the Sierra Club modeling *along with* our not giving greater weight to Texas' preference for monitoring, represented an insufficient basis for the EPA's initial nonattainment designations. For the reasons discussed previously, the EPA no longer believes it has a basis under these reasons individually or collectively to propose to or conclude that we made errors in our nonattainment designations of these areas, and, therefore, no longer believes

that we have a basis to conclude that the EPA could not determine, based on available information at the time of issuing the designation, whether the three Texas areas that are the subject of this proposed action were meeting or not meeting the 2010 $SO_2$ NAAQS (*i.e.,* the conclusion necessary to correct the designations to unclassifiable). Therefore, the EPA is withdrawing the Proposed Error Correction.

### IV. Statutory and Executive Order Reviews

This withdrawal of a proposed rule does not establish new regulatory requirements. Hence, the requirements of other regulatory statutes and Executive Orders that generally apply to rulemakings (*e.g.,* the Regulatory Flexibility Act) do not apply to this action.

### List of Subjects in 40 CFR Part 81

Environmental protection, Air pollution control, Sulfur dioxide.

Michael S. Regan,
*Administrator.*
[FR Doc. 2021–13696 Filed 6–28–21; 8:45 am]
BILLING CODE 6560–50–P

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Parts 1036 and 1037

[EPA–HQ–OAR–2019–0307; FRL–10018–51–OAR]

### Improvements for Heavy-Duty Engine and Vehicle Test Procedures

AGENCY: Environmental Protection Agency (EPA).

ACTION: Notice of proposed rulemaking.

SUMMARY: This notice of proposed rulemaking includes corrections, clarifications, additional flexibilities, and adjustment factors to improve the Greenhouse gas Emissions Model (GEM) compliance tool for heavy-duty vehicles while more closely matching the outputs developed by the original GEM version 3.0 that was used to establish the $CO_2$ standards for Model Years 2021 and later in the 2016 Heavy-duty Phase 2 final rule. This document supplements the proposed rule published on May 12, 2020, which included a larger set of proposed revisions to modify and improve GEM. Most of the proposed revisions from that notice of proposed rulemaking are addressed in a final rulemaking published elsewhere in the Final Rules section of this issue of the Federal Register. Given the nature of this proposal, there will be neither

---

[8] *See Miss. Comm'n on Envtl. Quality* v. *EPA*, 790 F.3d 138, 156 (D.C. Cir. 2015); *Catawba County* v. *EPA*, 571 F.3d 20, 43–44 (D.C. Cir. 2009). The 2015 decision upheld the EPA's designations issued just days before new certified air quality data became available showing more areas violating the 2008 ozone NAAQS than the EPA designated as nonattainment. *See also State of Texas* v. *EPA*, 983 F.3d 826, 837–838 (5th Cir. 2020) (holding that the EPA's nonattainment designation, which modified the state's recommendation, was not arbitrary and capricious because the county was not compliant with the ozone NAAQS when the EPA promulgated its designation and the CAA uses concrete terms such that a county either does or does not meet the NAAQS).

[9] Round 2 Supplement Responses to Comments, Page 13. Available in the public docket and at *https://www.epa.gov/sites/production/files/2016-11/documents/rtc_so2_comments_received_document_4_tx_sources_final_0.pdf*.

[10] As explained in the EPA's intended and final designations TSDs and the responses to comments document that accompanied the Round 2 Supplement, at the time of the EPA's final designations on December 13, 2016, there were no $SO_2$ monitors sited in the areas of maximum concentration to properly characterize the air quality around the Martin Lake, Big Brown, or Monticello areas, nor were there $SO_2$ monitors in the same counties as the facilities.

[11] The EPA received a comment from the Utility Air Regulatory Group on the Round 2 Supplement suggesting that the EPA wait for the future completion of three years of monitoring before designating certain Round 2 areas. In the Round 2 Supplement Responses to Comments (page 14), the EPA responded that the Agency does not have the discretion to await the results of future monitoring because of the court order to designate certain areas by July 2, 2016, deadline.

[12] *See State of Texas* v. *EPA*, 983 F.3d 826, 836–838 (5th Cir. 2020).