No. 17-60088

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY L.L.C.; BIG BROWN POWER COMPANY L.L.C.; SANDOW POWER COMPANY L.L.C.; LUMINANT MINING COMPANY L.L.C.,**

Petitioners

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, in His Official Capacity as Administrator of the United States Environmental Protection Agency,**

Respondents

Consolidated with

No. 21-60673

**STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; LUMINANT MINING COMPANY, L.L.C.,**

Petitioners

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,**

Respondents

### On Petition for Review of Final Agency Actions of the United States Environmental Protection Agency

### Record Excerpts of Petitioners

KEN PAXTON
Attorney General of Texas
BRENT WEBSTER
First Assistant Attorney General
GRANT DORFMAN
Deputy First Assistant Attorney General
SHAWN COWLES
Deputy Attorney General for Civil Litigation
PRISCILLA M. HUBENAK
Chief, Environmental Protection Division

**January 3, 2022**

LINDA B. SECORD
Assistant Attorney General
Linda.Secord@oag.texas.gov
JOHN R. HULME
Assistant Attorney General
John.Hulme@oag.texas.gov
OFFICE OF THE ATTORNEY
GENERAL OF TEXAS
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
512-463-2012 (phone)
*Counsel for the State of Texas and Texas Commission on Environmental Quality*

# **TABLE OF CONTENTS**

1.  Final Rule, 81 Fed. Reg. 89,870 (Dec. 13, 2016) ..................................................... 1

2.  Notification of Actions Denying Petitions for Reconsideration
    and Administrative Stays, 86 Fed. Reg. 34,141 (June 29, 2021) ........................... 8

3.  Withdrawal of Proposed Rule, 86 Fed. Reg. 34,187 (June 29, 2021) ................. 10

4.  Petition Denial Letter from Michael S. Regan, EPA Administrator
    to Daniel Jude Kelly, Vice President, Vistra Energy Corporation
    (June 10, 2021) (with enclosures) ........................................................................... 13

5.  Petition Denial Letter from Michael S. Regan, EPA Administrator
    to Toby Baker, Executive Director, Texas Commission on
    Environmental Quality (June 10, 2021) (with enclosures) ................................... 57

6.  Certificate of Service ............................................................................................... 98

TAB 1: FINAL RULE, 81 FED. REG. 89,870 (DEC. 13, 2016)

appropriate, disproportionate human health or environmental effects, using practicable and legally permissible methods, under Executive Order 12898 (59 FR 7629, February 16, 1994).

*B. Submission to Congress and the Comptroller General*

The Congressional Review Act, 5 U.S.C. 801 *et seq.,* as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. EPA will submit a report containing this action and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

In addition, this rulemaking determining that the Delaware County Area has attained the 2012 annual PM$_{2.5}$ NAAQS does not have tribal implications as specified by Executive Order 13175 (65 FR 67249, November 9, 2000), because the SIP is not approved to apply in Indian country located in the state, and EPA notes that it will not impose substantial direct costs on tribal governments or preempt tribal law.

*C. Petitions for Judicial Review*

Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by February 13, 2017. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this action for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed, and shall not postpone the effectiveness of such rule or action. Parties with objections to this direct final rule are encouraged to file a comment in response to the parallel notice of proposed rulemaking for this action published in the proposed rules section of this **Federal Register**, rather than file an immediate petition for judicial review of this direct final rule, so that EPA can withdraw this direct final rule and address the comment in the proposed rulemaking action.

This determination of attainment of the 2012 annual PM$_{2.5}$ NAAQS for the Delaware County nonattainment area may not be challenged later in

proceedings to enforce its requirements. (See section 307(b)(2)).

List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Incorporation by reference, Intergovernmental relations, Particulate matter, Reporting and recordkeeping requirements.

Dated: November 22, 2016.

**Shawn M. Garvin,**

*Regional Administrator, Region III.*

40 CFR part 52 is amended as follows:

PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

Subpart NN—Pennsylvania

■ 2. In § 52.2059, add paragraph (u) to read as follows:

**§ 52.2059  Control strategy: Particulate matter.**

\*    \*    \*    \*    \*

(u) *Determination of attainment.* EPA has determined based on 2013 to 2015 ambient air quality monitoring data, that the Delaware County, Pennsylvania moderate nonattainment area has attained the 2012 annual fine particulate matter (PM$_{2.5}$) primary national ambient air quality standard (NAAQS). This determination, in accordance with 40 CFR 51.1015, suspends the requirements for this area to submit an attainment demonstration, associated reasonably available control measures, a reasonable further progress plan, contingency measures, and other planning state implementation plan revisions related to attainment of the standard for as long as this area continues to meet the 2012 annual PM$_{2.5}$ NAAQS.

[FR Doc. 2016–29751 Filed 12–12–16; 8:45 am]

**BILLING CODE 6560–50–P**

ENVIRONMENTAL PROTECTION AGENCY

40 CFR Part 81

[EPA–HQ–OAR–2014–0464; FRL–9956–10–OAR]

Air Quality Designations for the 2010 Sulfur Dioxide (SO$_2$) Primary National Ambient Air Quality Standard—Supplement to Round 2 for Four Areas in Texas: Freestone and Anderson Counties, Milam County, Rusk and Panola Counties, and Titus County

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** This rule establishes the initial air quality designations for four areas in Texas for the 2010 primary sulfur dioxide (SO$_2$) National Ambient Air Quality Standard (NAAQS). The Environmental Protection Agency (EPA) is designating three of the areas as nonattainment because they do not meet the NAAQS. One area is being designated unclassifiable because it cannot be classified on the basis of available information as meeting or not meeting the NAAQS. The designations are based on the weight of evidence for each area, including available air quality monitoring data and air quality modeling. For the areas designated nonattainment by this rule, the Clean Air Act (CAA) directs the state of Texas to undertake certain planning and pollution control activities to attain the SO$_2$ NAAQS as expeditiously as practicable. This action is a supplement to the final rule addressing the second round of area designations for the 2010 SO$_2$ NAAQS, which the EPA Administrator signed on June 30, 2016.

**DATES:** The effective date of this rule is January 12, 2017.

**ADDRESSES:** The EPA has established a docket for the second round of designations, including this supplemental action, under Docket ID No. EPA–HQ–OAR–2014–0464. All documents in the docket are listed in the *http://www.regulations.gov* Web site. Although listed in the index, some information is not publicly available, *e.g.,* Confidential Business Information or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the Internet and will be publicly available only in hard copy form. Publicly available docket materials are available electronically in *http://www.regulations.gov.*

In addition, the EPA has established a Web site for the 2010 SO$_2$ NAAQS designations rulemakings at: *https://*

*www.epa.gov/sulfur-dioxide-
designations.* The Web site includes the
EPA's final $SO_2$ designations, as well as
state and tribal initial recommendation
letters, the EPA's letters announcing
modifications to those
recommendations, technical support
documents, responses to comments and
other related technical information.

**FOR FURTHER INFORMATION CONTACT:** For
general questions concerning this
supplemental action, please contact Liz
Etchells, U.S. EPA, Office of Air Quality
Planning and Standards, Air Quality
Planning Division, C539–04, Research
Triangle Park, NC 27711, telephone
(919) 541–0253, email at
*etchells.elizabeth@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

*U.S. EPA Regional Office Contacts:*
Region VI—Jim Grady, telephone (214)
665–6745, email at *grady.james@
epa.gov.*

The public may inspect the rule and
area-specific technical support
information at the following location:
Air Planning Section, EPA Region VI,
1445 Ross Avenue, Dallas, TX 75202.

**Table of Contents**

The following is an outline of the
preamble.

I. Preamble Glossary of Terms and Acronyms
II. What is the purpose of this supplemental
action?
III. What is the 2010 $SO_2$ NAAQS and what
are the health concerns that it addresses?
IV. What are the CAA requirements for air
quality designations and what action has
the EPA taken to meet these
requirements?
V. What guidance did the EPA issue and how
did the EPA apply the statutory
requirements and applicable guidance to
determine area designations and
boundaries?
VI. What air quality information has the EPA
used for these designations?
VII. How do the designations supplementing
the Round 2 designations affect Indian
country?
VIII. Where can I find information forming
the basis for this action and exchanges
between the EPA, states and tribes
related to this action?
IX. Environmental Justice Concerns
X. Statutory and Executive Order Reviews
   A. Executive Order 12866: Regulatory
   Planning and Review and Executive
   Order 13563: Improving Regulation and
   Regulatory Review
   B. Paperwork Reduction Act (PRA)
   C. Regulatory Flexibility Act (RFA)
   D. Unfunded Mandates Reform Act
   (URMA)
   E. Executive Order 13132: Federalism
   F. Executive Order 13175: Consultation
   and Coordination With Indian Tribal
   Governments
   G. Executive Order 13045: Protection of
   Children From Environmental Health
   Risks and Safety Risks

H. Executive Order 13211: Actions That
Significantly Affect Energy Supply,
Distribution, or Use
I. National Technology Transfer and
Advancement Act (NTTAA)
J. Executive Order 12898: Federal Actions
To Address Environmental Justice in
Minority Populations and Low-Income
Populations
K. Congressional Review Act (CRA)
L. Judicial Review

**I. Preamble Glossary of Terms and
Acronyms**

The following are abbreviations of
terms used in the preamble.

APA   Administrative Procedure Act
CAA   Clean Air Act
CFR   Code of Federal Regulations
DC   District of Columbia
EO   Executive Order
EPA   Environmental Protection Agency
FR   Federal Register
NAAQS   National Ambient Air Quality
Standards
NTTAA   National Technology Transfer and
Advancement Act
OMB   Office of Management and Budget
$SO_2$   Sulfur Dioxide
$SO_X$   Sulfur Oxides
RFA   Regulatory Flexibility Act
UMRA   Unfunded Mandate Reform Act of
1995
TAR   Tribal Authority Rule
TAD   Technical Assistance Document
TSD   Technical Support Document
US   United States

**II. What is the purpose of this
supplemental action?**

The purpose of this final action is to
announce and promulgate initial air
quality designations for four areas in
Texas for the 2010 primary $SO_2$
NAAQS, in accordance with the
requirements of the CAA. The EPA is
designating three of these areas as
nonattainment, and one area as
unclassifiable. As discussed in Section
IV of this document, the EPA is
designating areas for the 2010 $SO_2$
NAAQS in multiple rounds under a
court-ordered schedule pursuant to a
consent decree. The EPA completed the
first round of $SO_2$ designations in an
action signed by the Administrator on
July 25, 2013 (78 FR 47191; August 5,
2013). In that action, the EPA
designated 29 areas in 16 states as
nonattainment, based on air quality
monitoring data.

The court order required the EPA
Administrator to sign a notice
designating areas in a second round that
contained sources meeting certain
criteria no later than July 2, 2016. *See
Sierra Club and NRDC* v. *McCarthy,* No.
3:13–cv–3953–SI (N.D. Cal.) (March 2,
2015). The four areas in Texas covered
by this action met those criteria, and the
EPA responded to state
recommendations for Round 2

designations, including Texas'
recommendations for these four areas,
on February 11, 2016 (Letter from Ron
Curry, EPA Region 6 Administrator, to
Governor of Texas, Honorable Greg
Abbott). In the second round of $SO_2$
designations signed on June 30, 2016,
the EPA designated 61 areas in 24 states
(including eight other areas in Texas):
four nonattainment areas, 41
unclassifiable/attainment areas and 16
unclassifiable areas (81 FR 45039; July
12, 2016). However, by a series of
stipulations of the parties in *Sierra Club
and NRDC* v. *McCarthy* and orders of
the Court, the deadline to promulgate
designations was extended to November
29, 2016, for the four areas in Texas that
are the subject of this supplemental
action. This action to designate four
Texas areas further discharges the EPA's
duty to issue the second round of $SO_2$
designations, and uses the same
administrative record as supported by
the action signed on June 30, 2016, that
addressed eight other Texas areas and
other areas in the United States, as
supplemented by additional materials
further addressing these four Texas
areas.

In this supplementary designation
action, the list of areas being designated
in Texas and the boundaries of each
area appear in the tables within the
regulatory text at the end of this notice.
These designations are based on the
EPA's technical assessment of and
conclusions regarding the weight of
evidence for each area, including but
not limited to available air quality
monitoring data or air quality modeling.
With respect to air quality monitoring
data, the EPA considered data from the
most recent calendar years 2012–2015.
In the modeling runs conducted by
industry and members of the public, the
air quality impacts of the actual
emissions for the 3-year periods 2012–
2014 or 2013–2015 were assessed.

For the areas being designated
nonattainment, the CAA directs states to
develop and submit to the EPA State
Implementation Plans within 18 months
of the effective date of this final rule
that meet the requirements of sections
172(c) and 191–192 of the CAA and
provide for attainment of the NAAQS as
expeditiously as practicable, but not
later than 5 years from the effective date
of this final rule. We also note that
under the EPA's $SO_2$ Data Requirements
Rule in 40 CFR part 51, subpart BB (80
FR 51052; August 21, 2015), the EPA
expects to receive additional air quality
characterization for the one area in
Milam County, Texas, designated
unclassifiable in this action, and the
agency will consider such data, as
appropriate, in future actions.

Case: 21-60673    Document: 52-1    Page: 6    Date Filed: 12/15/2021

## III. What is the 2010 SO₂ NAAQS and what are the health concerns that it addresses?

The Administrator signed a final rule revising the primary SO₂ NAAQS on June 2, 2010. The rule was published in the **Federal Register** on June 22, 2010 (75 FR 35520) and became effective on August 23, 2010. Based on the Administrator's review of the air quality criteria for oxides of sulfur and the primary NAAQS for oxides of sulfur as measured by SO₂, the EPA revised the primary SO₂ NAAQS to provide requisite protection of public health with an adequate margin of safety. Specifically, the EPA established a new 1-hour SO₂ standard at a level of 75 parts per billion (ppb), which is met at an ambient air quality monitoring site when the 3-year average of the annual 99th percentile of 1-hour daily maximum concentrations is less than or equal to 75 ppb, as determined in accordance with Appendix T of 40 CFR part 50. 40 CFR 50.17(a)–(b). The EPA also established provisions to revoke both the existing 24-hour and annual primary SO₂ standards, subject to certain conditions. 40 CFR 50.4(e).

Additional information regarding the current scientific evidence on the health impacts of short-term exposures to SO₂ is provided in the **Federal Register** notice containing the final rule for the second round of SO₂ designations for other areas that was signed on June 30, 2016. *See* 81 FR 45041.

## IV. What are the CAA requirements for air quality designations and what action has the EPA taken to meet these requirements?

After the EPA promulgates a new or revised NAAQS, the EPA is required to designate all areas of the country as either "nonattainment," "attainment," or "unclassifiable," for that NAAQS pursuant to section 107(d)(1) of the CAA. Section 107(d)(1)(A)(i) of the CAA defines a nonattainment area as "any area that does not meet (or that contributes to ambient air quality in a nearby area that does not meet) the national primary or secondary ambient air quality standard for the pollutant." If an area meets either prong of this definition, then the EPA is obligated to designate the area as "nonattainment." This provision also defines an attainment area as any area other than a nonattainment area that meets the NAAQS and an unclassifiable area as any area that cannot be classified on the basis of available information as meeting or not meeting the NAAQS.

Additional information regarding the process for designating areas following promulgation of a new or revised NAAQS pursuant to section 107(d) of the CAA and how the EPA is applying this process to the designation of areas under the 2010 SO₂ NAAQS is provided in the final rule addressing the second round of SO₂ designations for other areas signed on June 30, 2016. *See* 81 FR 45041. For this supplemental action, the EPA reiterates that CAA section 107(d) provides the agency with discretion to determine how best to interpret the terms in the definition of a nonattainment area (*e.g.,* "contributes to" and "nearby") for a new or revised NAAQS, given considerations such as the nature of a specific pollutant, the types of sources that may contribute to violations, the form of the standards for the pollutant, and other relevant information. In particular, the EPA's position is that the statute does not require the agency to establish bright line tests or thresholds for what constitutes "contribution" or "nearby" for purposes of designations.[1]

Similarly, the EPA's position is that the statute permits the EPA to evaluate the appropriate application of the term "area" to include geographic areas based upon full or partial county boundaries, as may be appropriate for a particular NAAQS. For example, CAA section 107(d)(1)(B)(ii) explicitly provides that the EPA can make modifications to designation recommendations for an area "or portions thereof," and under CAA section 107(d)(1)(B)(iv) a designation remains in effect for an area "or portion thereof" until the EPA redesignates it.

As explained in more detail in the final rule addressing the second round of SO₂ designations for other areas, the EPA completed the first round of SO₂ designations for 29 areas on July 25, 2013 (78 FR 47191), and intends to complete up to three more rounds of designations to address all remaining areas pursuant to a schedule contained in a consent decree and enforceable order entered by the U.S. District Court for the Northern District of California on March 2, 2015. *See* 81 FR 45042.

The court order specifies that in this second round of SO₂ designations the EPA must designate two groups of areas: (1) Areas that have newly monitored violations of the 2010 SO₂ NAAQS and (2) areas that contain any stationary sources that had not been announced as of March 2, 2015, for retirement and that, according to the EPA's Air Markets Database, emitted in 2012 either (i) more than 16,000 tons of SO₂, or (ii) more than 2,600 tons of SO₂ with an annual

average emission rate of at least 0.45 pounds of SO₂ per one million British thermal units (lbs SO₂/mmBTU).

On March 20, 2015, the EPA sent letters to Governors notifying them of the schedule for completing the remaining designations for the 2010 1-hour SO₂ NAAQS. The EPA offered states, including Texas, the opportunity to submit updated recommendations and supporting information for the EPA to consider for the affected areas. The EPA also notified states that the agency had updated its March 24, 2011, SO₂ designations guidance to support analysis of designations and boundaries for the next rounds of designations. All of the states, including Texas, with affected areas submitted updated designation recommendations.

In a letter dated February 11, 2016, the EPA notified Texas of its intended designation of twelve Round 2 areas, including the four areas in Texas addressed in this final notice, as either nonattainment, unclassifiable/attainment, or unclassifiable for the SO₂ NAAQS. Texas then had the opportunity to demonstrate why they believed the EPA's intended modification of their updated recommendations may be inappropriate. Although not required, as the EPA had done for the first round of SO₂ designations, the EPA also provided an opportunity for members of the public to comment on the EPA's February 2016 response letters. The EPA published a notice of availability and public comment period for the intended designation on March 1, 2016 (81 FR 10563). The public comment period closed on March 31, 2016. The updated recommendations, the EPA's February 2016 responses to those letters, any modifications, and the subsequent state and public comment letters, are in the docket for the Round 2 SO₂ designations at Docket ID No. EPA–HQ–OAR–2014–0464 and are available on the SO₂ designations Web site.

Before taking final action, however, the parties to *Sierra Club and NRDC v. McCarthy* filed the first in a series of joint stipulations extending the deadline for these four areas in Texas, out to November 29, 2016.[2] In the final rule signed on June 30, 2016, the EPA promulgated designations for the Round 2 areas for which no extensions in the deadline had been obtained (including the eight other Texas areas) and explained the ongoing process for completing SO₂ designations for all

---

[1] This view was confirmed in *Catawba County* v. *EPA,* 571 F.3d 20 (D.C. Cir. 2009).

[2] The parties to *Sierra Club and NRDC* v. *McCarthy* also filed a joint stipulation extending the Round 2 designation deadline for the Muskogee County Area in Oklahoma out to December 31, 2016.

areas of the country by December 31, 2020 (*see generally* 81 FR 45042–43).

In these supplemental Round 2 designations, and consistent with the extended deadline under the consent decree, the EPA must designate the four areas in Texas associated with the following sources by November 29, 2016: The Big Brown Steam Electric Station in the Freestone and Anderson Counties Area, the Sandow Power Station in the Milam County Area, the Martin Lake Electrical Station in the Rusk and Panola Counties Area, and the Monticello Steam Electric Station in the Titus County Area.

## V. What guidance did the EPA issue and how did the EPA apply the statutory requirements and applicable guidance to determine area designations and boundaries?

Following entry of the March 2, 2015, court order, the EPA issued updated designations guidance through a March 20, 2015, memorandum from Stephen D. Page, Director, U.S. EPA, Office of Air Quality Planning and Standards, to Air Division Directors, U.S. EPA Regions 1–10 titled, ''Updated Guidance for Area Designations for the 2010 Primary Sulfur Dioxide National Ambient Air Quality Standard.'' As explained in the final rule addressing the second round of $SO_2$ designations for other areas signed on June 30, 2016, this guidance contains the factors the EPA intends to evaluate in determining the appropriate designations and associated boundaries for all remaining areas in the country, including: (1) Air quality characterization via ambient monitoring or dispersion modeling results; (2) emissions-related data; (3) meteorology; (4) geography and topography; and (5) jurisdictional boundaries. *See* 81 FR at 45043. Additional information regarding relevant guidance relied upon in designating the other second round areas and that is also used in this supplemental action is available in the previously issued final rule. *See id.*

## VI. What air quality information has the EPA used for these designations?

To inform designations for the $SO_2$ NAAQS, air agencies have the flexibility to characterize air quality using either appropriately sited ambient air quality monitors or using modeling of actual or allowable source emissions. The EPA's non-binding Monitoring Technical Assistance Document (TAD) and Modeling TAD contain scientifically sound recommendations on how air agencies should conduct such monitoring or modeling. For the $SO_2$ designations of the four Texas areas addressed in this supplemental action,

the EPA is using the same approach taken for a number of areas designated in the final rule signed on June 30, 2016, and considering available air quality monitoring data from calendar years 2012–2015, and modeling submitted by the affected emissions sources and a public interest group. *See* 81 FR 45043. In the modeling runs, the impacts of the actual emissions for the 3-year periods 2012–2014 or 2013–2015 were considered. The 1-hour primary $SO_2$ standard is violated at an ambient air quality monitoring site (or in the case of dispersion modeling, at an ambient air quality receptor location) when the 3-year average of the annual 99th percentile of the daily maximum 1-hour average concentrations exceeds 75 ppb, as determined in accordance with appendix T of 40 CFR part 50. The EPA has concluded that dispersion modeling shows that three Round 2 areas in Texas (portions of Freestone and Anderson Counties, portions of Rusk and Panola Counties, and portions of Titus County) are not meeting the 1-hour primary $SO_2$ standard and we are, therefore, designating these areas as nonattainment. Based on available information, the EPA has also concluded that it cannot determine whether one Round 2 area in Texas (Milam County) is or is not meeting the 1-hour primary $SO_2$ standard and whether the area contributes to a violation in a nearby area. Therefore, we are designating this area as unclassifiable. Details about the available information can be found in the supplemental technical support document in the docket for the Round 2 $SO_2$ designations at Docket ID No. EPA–HQ–OAR–2014–0464.

## VII. How do the designations supplementing the Round 2 designations affect Indian country?

For the designations in four areas of Texas for the 2010 primary $SO_2$ NAAQS supplementing the Round 2 designations, the EPA is designating 3 state areas as nonattainment and 1 state area as unclassifiable. No areas of Indian country are being designated as part of this action.

## VIII. Where can I find information forming the basis for this action and exchanges between the EPA, states and tribes related to this action?

Information providing the basis for this action can be found in several technical support documents (TSDs), a response to comments document (RTC) and other information in the docket. The TSDs, RTC, applicable EPA guidance memoranda and copies of correspondence regarding this process

between the EPA and the states, tribes and other parties, are available for review at the EPA Docket Center listed above in the **ADDRESSES** section of this document and on the agency's $SO_2$ Designations Web site at *https://www.epa.gov/sulfur-dioxide-designations.* Area-specific questions can be addressed by the EPA Regional office (*see* contact information provided at the beginning of this notice).

## IX. Environmental Justice Concerns

When the EPA establishes a new or revised NAAQS, the CAA requires the EPA to designate all areas of the U.S. as either nonattainment, attainment, or unclassifiable. This final action addresses designation determinations for four areas in Texas for the 2010 primary $SO_2$ NAAQS. Area designations address environmental justice concerns by ensuring that the public is properly informed about the air quality in an area. In locations where air quality does not meet the NAAQS, the CAA requires relevant state authorities to initiate appropriate air quality management actions to ensure that all those residing, working, attending school, or otherwise present in those areas are protected, regardless of minority and economic status.

## X. Statutory and Executive Order Reviews

Upon promulgation of a new or revised NAAQS, the CAA requires the EPA to designate areas as attaining or not attaining the NAAQS. The CAA then specifies requirements for areas based on whether such areas are attaining or not attaining the NAAQS. In this final rule, the EPA assigns designations to selected areas as required.

### A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review

This action is exempted from the Office of Management and Budget because it responds to the CAA requirement to promulgate air quality designations after promulgation of a new or revised NAAQS.

### B. Paperwork Reduction Act (PRA)

This action does not impose an information collection burden under the PRA. This action responds to the requirement to promulgate air quality designations after promulgation of a new or revised NAAQS. This requirement is prescribed in the CAA section 107 of title 1. This action does not contain any information collection activities.

## C. Regulatory Flexibility Act (RFA)

This final rule is not subject to the RFA. The RFA applies only to rules subject to notice-and-comment rulemaking requirements under the Administrative Procedure Act (APA), 5 U.S.C. 553, or any other statute. This rule is not subject to notice-and-comment requirements under the APA but is subject to the CAA section 107(d)(2)(B) which does not require a notice-and-comment rulemaking to take this action.

## D. Unfunded Mandates Reform Act (UMRA)

This action does not contain any unfunded mandates as described by URM, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. The action imposes no enforceable duty on any state, local or tribal governments or the private sector.

## E. Executive Order 13132: Federalism

This final rule does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states or on the distribution of power and responsibilities among the various levels of government.

## F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

This action does not have tribal implications, as specified in Executive Order 13175. This action concerns the designation of certain areas in the U.S. for the 2010 primary $SO_2$ NAAQS. The CAA provides for states and eligible tribes to develop plans to regulate emissions of air pollutants within their areas, as necessary, based on the designations. The Tribal Authority Rule (TAR) provides tribes the opportunity to apply for eligibility to develop and implement CAA programs, such as programs to attain and maintain the $SO_2$ NAAQS, but it leaves to the discretion of the tribe the decision of whether to apply to develop these programs and which programs, or appropriate elements of a program, the tribe will seek to adopt. This rule does not have a substantial direct effect on one or more Indian tribes. It does not create any additional requirements beyond those of the $SO_2$ NAAQS. This rule establishes the designations for certain areas of the country for the $SO_2$ NAAQS, but no areas of Indian country are being designated in this action. Furthermore, this rule does not affect the relationship or distribution of power and responsibilities between the federal government and Indian tribes. The CAA

and the TAR establish the relationship of the federal government and tribes in developing plans to attain the NAAQS, and this rule does nothing to modify that relationship. Thus, Executive Order 13175 does not apply.

Although Executive Order 13175 does not apply to this rule, after the EPA promulgated the 2010 primary $SO_2$ NAAQS, the EPA communicated with tribal leaders and environmental staff regarding the designations process. The EPA also sent individualized letters to all federally recognized tribes to explain the designation process for the 2010 primary $SO_2$ NAAQS, to provide the EPA designations guidance, and to offer consultation with the EPA. The EPA provided further information to tribes through presentations at the National Tribal Forum and through participation in National Tribal Air Association conference calls. The EPA also sent individualized letters to all federally recognized tribes that submitted recommendations to the EPA about the EPA's intended designations for the $SO_2$ standard and offered tribal leaders the opportunity for consultation. These communications provided opportunities for tribes to voice concerns to the EPA about the general designations process for the 2010 primary $SO_2$ NAAQS, as well as concerns specific to a tribe, and informed the EPA about key tribal concerns regarding designations as the rule was under development. For this supplemental round of $SO_2$ designations action, the EPA sent additional letters to tribes that could potentially be affected and offered additional opportunities for participation in the designations process. The communication letters to the tribes are provided in the dockets for Round 1 designations (Docket ID No. EPA–HQ–OAR–2012–0233) and Round 2 designations (Docket ID No. EPA–HQ–OAR–2014–0464).

## G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks

The action is not subject to Executive Order 13045 because it is not an economically significant regulatory action as defined in Executive Order 12866. While not subject to the Executive Order, this final action may be especially important for asthmatics, including asthmatic children, living in $SO_2$ nonattainment areas because respiratory effects in asthmatics are among the most sensitive health endpoints for $SO_2$ exposure. Because asthmatic children are considered a sensitive population, the EPA evaluated the potential health effects of exposure to $SO_2$ pollution among asthmatic children as part of the EPA's prior

action establishing the 2010 primary $SO_2$ NAAQS. These effects and the size of the population affected are summarized in the EPA's final $SO_2$ NAAQS rules. *See http://www3.epa.gov/ttn/naaqs/standards/so2/fr/20100622.pdf.*

## H. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution, or Use

This action is not subject to Executive Order 13211, because it is not a significant regulatory action under Executive Order 12866.

## I. National Technology Transfer and Advancement Act (NTTAA)

This action does not involve technical standards.

## J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

The EPA believes this action does not have disproportionately high and adverse human health or environmental effects on minority populations, low-income populations and or indigenous peoples, as specified Executive Order 12898 (59 FR 7629, February 16, 1994). The documentation for this decision is contained in Section IX of this document.

## K. Congressional Review Act (CRA)

The CRA, 5 U.S.C. 801 *et seq.,* as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the U.S. The EPA will submit a report containing this action and other required information to the U.S. Senate, the U.S. House of Representatives and the Comptroller General of the U.S. prior to publication of the rule in the **Federal Register**. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2). This rule will be effective January 12, 2017.

## L. Judicial Review

Section 307 (b) (1) of the CAA indicates which Federal Courts of Appeal have venue for petitions for review of final actions by the EPA. This section provides, in part, that petitions for review must be filed in the Court of Appeals for the District of Columbia Circuit: (i) When the agency action consists of ''nationally applicable

regulations promulgated, or final actions taken, by the Administrator,'' or (ii) when such action is locally or regionally applicable, if ''such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination.''

This final action designating areas for the 2010 primary $SO_2$ NAAQS is ''nationally applicable'' within the meaning of section 307(b)(1). As explained in the preamble, this final action supplements the June 30, 2016 final action taken by the EPA to issue a second round of designations for areas across the U.S. for the 2010 primary $SO_2$ NAAQS. EPA determined the June 30, 2016 final action was ''nationally applicable'' within the meaning of section 307(b)(1). 81 FR 45045. The rulemaking docket, EPA–HQ–OAR–2014–0464, is the same docket for both the June 30, 2016 action and for this supplemental action, with the relevant difference being that in addition to the materials it contained regarding these four Texas areas generated through June 30, 2016—the date that action was signed by the Administrator—it now also contains the final technical support documents and responses to comments related to these four areas. Both the June 30, 2016 action and this supplemental action were proposed in a single March 1, 2016, notice announcing the EPA's intended Round 2 designations and were taken to discharge a duty under the court order to issue a round of designations of areas with sources meeting common criteria in the court order. As explained in the June 30, 2016 final rule, at the core of that final action and this supplemental final action is the EPA's interpretation of the definitions of nonattainment, attainment and unclassifiable under section 107(d)(1) of the CAA, and its application of that interpretation to areas across the country. *Id.* Accordingly, the Administrator has determined that this supplemental final action, which results from the same proposed action as the June 30, 2016 final action, is nationally applicable and is hereby publishing that finding in the **Federal Register**.

For the same reasons, the Administrator also is finding that this supplemental final action is based on a determination of nationwide scope and effect for the purposes of section 307(b)(1). As previously explained in the June 30, 2016 final action, in the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that an action is of ''nationwide scope or effect'' would be appropriate for any action that has a scope or effect beyond a single judicial circuit. H.R. Rep. No. 95–294 at 323, 324, *reprinted in* 1977 U.S.C.C.A.N. 1402–03. 81 FR 45045. Here, the June 30, 2016 final action and this supplemental final action combined issue designations in 65 areas in 24 states and extend to numerous judicial circuits. In these circumstances, section 307(b)(1) and its legislative history calls for the Administrator to find the action to be of ''nationwide scope or effect'' and for venue to be in the D.C. Circuit. Therefore, like the June 30, 2016 final

action it supplements, *see* 81 FR at 45045, this final action is based on a determination by the Administrator of nationwide scope or effect, and the Administrator is hereby publishing that finding in the **Federal Register**.

Thus, any petitions for review of these final designations must be filed in the Court of Appeals for the District of Columbia Circuit within 60 days from the date final action is published in the **Federal Register**.

## List of Subjects in 40 CFR Part 81

Environmental protection, Air pollution control, National parks, Wilderness areas.

Dated: November 29, 2016.

**Gina McCarthy,**

*Administrator.*

For the reasons set forth in the preamble, 40 CFR part 81 is amended as follows:

## PART 81—DESIGNATIONS OF AREAS FOR AIR QUALITY PLANNING PURPOSES

■ 1. The authority citation for part 81 continues to read as follows:

**Authority:** 42 U.S.C. 7401, *et seq.*

## Subpart C—Section 107 Attainment Status Designations

■ 2. Section 81.344 is amended by revising the table titled ''Texas—2010 Sulfur Dioxide NAAQS (Primary)'' to read as follows:

### § 81.344  Texas.

\* \* \* \* \*

TEXAS—2010 SULFUR DIOXIDE NAAQS (PRIMARY)

| Designated area | Designation | |
| --- | --- | --- |
| | Date | Type |
| Freestone and Anderson Counties, TX [1] ........................................................<br>  Freestone County (part) and Anderson County (part)<br>    Those portions of Freestone and Anderson Counties encompassed by the rectangle with the vertices using Universal Traverse Mercator (UTM) coordinates in UTM zone 14 with datum NAD83 as follows:<br>      (1) Vertices—UTM Easting (m) 766752.69, UTM Northing (m) 3536333.0,<br>      (2) vertices—UTM Easting (m) 784752.69, UTM Northing (m) 3536333.0,<br>      (3) vertices—UTM Easting (m) 784752.69, UTM Northing (m) 3512333.0,<br>      (4) vertices—UTM Easting (m) 766752.69, UTM Northing (m) 3512333.0 | 1/12/17 | Nonattainment. |
| Rusk and Panola Counties, TX [1] ........................................................<br>  Rusk County (part) and Panola County (part)<br>    Those portions of Rusk and Panola Counties encompassed by the rectangle with the vertices using Universal Traverse Mercator (UTM) coordinates in UTM zone 15 with datum NAD83 as follows:<br>      (1) Vertices—UTM Easting (m) 340067.31, UTM Northing (m) 3575814.75<br>      (2) vertices—UTM Easting (m) 356767.31, UTM Northing (m) 3575814.75<br>      (3) vertices—UTM Easting (m) 356767.31, UTM Northing (m) 3564314.75<br>      (4) vertices—UTM Easting (m) 340067.31, UTM Northing (m) 3564314.75 | 1/12/17 | Nonattainment. |
| Titus County, TX [1] ........................................................<br>  Titus County (part)<br>    That portion of Titus County encompassed by the rectangle with the vertices using Universal Traverse Mercator (UTM) coordinates in UTM zone 15 with datum NAD83 as follows: | 1/12/17 | Nonattainment. |

TEXAS—2010 SULFUR DIOXIDE NAAQS (PRIMARY)—Continued

| Designated area | Designation | |
| --- | --- | --- |
| | Date | Type |
| (1) Vertices—UTM Easting (m) 304329.030, UTM Northing (m) 3666971.0, (2) vertices—UTM Easting (m) 311629.030, UTM Northing (m) 3666971.0, (3) vertices—UTM Easting (m) 311629.03, UTM Northing (m) 3661870.5, (4) vertices—UTM Easting (m) 304329.03, UTM Northing (m) 3661870.5 | | |
| Milam County, TX [1] | 1/12/17 | Unclassifiable. |
| Milam County, TX | | |
| Potter County, TX [1] | 9/12/16 | Unclassifiable. |
| Potter County, TX | | |
| Atascosa County, TX [1] | 9/12/16 | Unclassifiable/Attainment. |
| Atascosa County, TX | | |
| Fort Bend County, TX [1] | 9/12/16 | Unclassifiable/Attainment. |
| Fort Bend County | | |
| Goliad County, TX [1] | 9/12/16 | Unclassifiable/Attainment. |
| Goliad County | | |
| Lamb County, TX [1] | 9/12/16 | Unclassifiable/Attainment. |
| Lamb County | | |
| Limestone County, TX [2] | 9/12/16 | Unclassifiable/Attainment. |
| Limestone County | | |
| McLennan County, TX [2] | 9/12/16 | Unclassifiable/Attainment. |
| McLennan County, TX | | |
| Robertson County, TX [2] | 9/12/16 | Unclassifiable/Attainment. |
| Robertson County | | |

[1] Excludes Indian country located in each area, if any, unless otherwise specified.
[2] Includes Indian country located in each area, if any, unless otherwise specified.

\* \* \* \* \*

[FR Doc. 2016–29561 Filed 12–12–16; 8:45 am]

**BILLING CODE 6560–50–P**

## DEPARTMENT OF COMMERCE

### National Oceanic and Atmospheric Administration

### 50 CFR Part 622

[Docket No. 130312235–3658–02]

RIN 0648–XF058

### Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Re-Opening of the Commercial Sector for South Atlantic Vermilion Snapper

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Temporary rule; re-opening.

**SUMMARY:** NMFS announces the re-opening of the commercial sector for vermilion snapper in the exclusive economic zone (EEZ) of the South Atlantic through this temporary rule. The most recent commercial landing data for vermilion snapper indicate the commercial annual catch limit (ACL) for the July through December 2016 fishing season has not yet been reached. Therefore, NMFS re-opens the commercial sector for vermilion snapper in the South Atlantic EEZ for 2 days to allow the commercial ACL to be caught, while minimizing the risk of the commercial ACL being exceeded.

**DATES:** This rule is effective 12:01 a.m., local time, December 14, 2016, until 12:01 a.m., local time, December 16, 2016.

**FOR FURTHER INFORMATION CONTACT:** Mary Vara, NMFS Southeast Regional Office, telephone: 727–824–5305, email: *mary.vara@noaa.gov*.

**SUPPLEMENTARY INFORMATION:** The snapper-grouper fishery of the South Atlantic includes vermilion snapper and is managed under the Fishery Management Plan for the Snapper-Grouper Fishery of the South Atlantic Region (FMP). The FMP was prepared by the South Atlantic Fishery Management Council and is implemented by NMFS under the authority of the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act) by regulations at 50 CFR part 622.

The commercial ACL (equal to the commercial quota) for vermilion snapper in the South Atlantic is divided into separate quotas for two 6-month time periods each year, January through June and July through December. For the July through December 2016 period, the commercial quota is 388,703 lb (176,313 kg, gutted weight, 431,460 lb (195,707 kg), round weight), as specified in 50 CFR 622.190(a)(4)(ii)(D).

On July 1, 2016, the commercial fishing season opened for the second period of July through December for this fishing year. Under 50 CFR 622.191(a)(6)(ii), NMFS is required to reduce the commercial trip limit for vermilion snapper from 1,000 lb (454 kg), gutted weight, 1,110 lb (503 kg), round weight, when 75 percent of the respective fishing season commercial quota is reached or projected to be reached. Accordingly, on August 25, 2016 (81 FR 58411), NMFS published a temporary rule in the **Federal Register** to reduce the commercial trip limit for vermilion snapper in or from the EEZ of the South Atlantic for the July through December 2016 period to 500 lb (227 kg), gutted weight. The commercial trip limit reduction was effective at 12:01 a.m., local time, August 28, 2016.

Under 50 CFR 622.193(f)(1), NMFS is required to close the commercial sector for vermilion snapper when the

7

**TAB 2: NOTIFICATION OF ACTIONS DENYING PETITIONS FOR RECONSIDERATION AND ADMINISTRATIVE STAYS, 86 FED. REG. 34,141 (JUNE 29, 2021)**

**Federal Register** / Vol. 86, No. 122 / Tuesday, June 29, 2021 / Rules and Regulations 34141

EPA APPROVED NONREGULATORY PROVISIONS AND QUASI-REGULATORY MEASURES IN THE TEXAS SIP

| Name of SIP provision | Applicable geographic or nonattainment area | State submittal/ effective date | EPA approval date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| 2017 Emissions Inventory for the 2015 Ozone NAAQS. | Dallas-Fort Worth, Houston Galveston-Brazoria, and Bexar County Ozone Non-attainment Areas. | June 24, 2020 | June 29, 2021 [Insert **Federal Register** citation]. | * |

*   *   *   *   *

[FR Doc. 2021–13771 Filed 6–28–21; 8:45 am]

BILLING CODE 6560–50–P

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 81

[EPA–HQ–OAR–2014–0464; FRL–10024–27–OAR]

### Air Quality Designations for the 2010 1-Hour SO₂ NAAQS: Responses to Petitions for Reconsideration and Administrative Stay of the Designations for Portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notification of actions denying petitions for reconsideration and administrative stay.

---

**SUMMARY:** The Environmental Protection Agency (EPA) is providing notice that it has responded to petitions for reconsideration and/or administrative stay of a final action under the Clean Air Act (CAA) published in the **Federal Register** on December 13, 2016, titled, "Air Quality Designations for the 2010 Sulfur Dioxide (SO₂) Primary National Ambient Air Quality Standard— Supplement to Round 2 for Four Areas in Texas: Freestone and Anderson Counties, Milam County, Rusk and Panola Counties, and Titus County." The EPA has denied these petitions in letters to the petitioners for the reasons that the EPA explains in those documents.

**DATES:** The Administrator signed the associated notification letters on June 10, 2021.

**FOR FURTHER INFORMATION CONTACT:** Corey Mocka, U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, Air Quality Policy Division, 109 T.W. Alexander Drive, Mail Code C539–04, Research Triangle Park, NC 27711; phone

number: (919) 541–5142; email address: *mocka.corey@epa.gov*.

**SUPPLEMENTARY INFORMATION:**

### I. Background

The EPA is providing notice that it has responded to petitions for reconsideration and/or administrative stay of a final action under the CAA published in the **Federal Register** on December 13, 2016, titled, "Air Quality Designations for the 2010 Sulfur Dioxide (SO₂) Primary National Ambient Air Quality Standard— Supplement to Round 2 for Four Areas in Texas: Freestone and Anderson Counties, Milam County, Rusk and Panola Counties, and Titus County" (81 FR 89870). On February 13, 2017, Vistra Energy submitted a petition requesting that the EPA reconsider and stay the effective date of the EPA's nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County. Vistra Energy later supplemented this petition on December 19, 2017. On March 15, 2017, the Texas Commission on Environmental Quality (TCEQ) submitted a request for administrative stay of the effective date for the EPA's final designations for these areas in Texas. The TCEQ also submitted a petition for reconsideration of the nonattainment designations on December 11, 2017. The EPA has denied these petitions in letters to the petitioners for the reasons that the EPA explains in those documents.

### II. Where can I get copies of this document and other related information?

This **Federal Register** document, the petitions for reconsideration and administrative stay, and the response letters to the petitioners are available in the docket that the EPA established for the rulemaking, under Docket ID NO. EPA–HQ–OAR–2014–0464.

All documents in the docket are listed in the index at *http:// www.regulations.gov*. Although listed in the index, some information may not be publicly available, *i.e.*, Confidential

Business Information or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form.

Out of an abundance of caution for members of the public and our staff, the EPA is temporarily suspending the Docket Center and Reading Room for public visitors to reduce the risk of transmitting COVID–19. Our Docket Center staff will continue to provide remote customer service via email, phone, and webform. For further information and updates on EPA Docket Center services, please visit us online at *https://www.epa.gov/dockets*. The EPA continues to carefully and continuously monitor information from the Centers for Disease Control and Prevention, local area health departments, and our federal partners so we can respond rapidly as conditions change regarding COVID–19.

In addition, the EPA has established a website for SO₂ designations rulemakings at: *https://www.epa.gov/ sulfur-dioxide-designations*. This **Federal Register** notice, the petitions for reconsideration and administrative stay, and the response letters denying the petitions are also available on this website along with other information.

### III. Judicial Review

Section 307(b)(1) of the CAA governs judicial review of final actions by the EPA. This section provides, in part, that petitions for review must be filed in the Court of Appeals for the District of Columbia Circuit: (i) When the agency action consists of "nationally applicable regulations promulgated, or final actions taken, by the Administrator," or (ii) when such action is locally or regionally applicable, if "such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." For locally or regionally applicable final actions, the CAA reserves to the EPA complete discretion whether to invoke the exception in (ii).

Judicial challenges to the EPA's denials of petitions for reconsideration of CAA actions belong in the same venue as any challenge to the action that such petitions request the agency to reconsider.[1]

The D.C. Circuit is the only appropriate venue for both challenges to the final action titled, "Air Quality Designations for the 2010 Sulfur Dioxide ($SO_2$) Primary National Ambient Air Quality Standard—Supplement to Round 2 for Four Areas in Texas: Freestone and Anderson Counties, Milam County, Rusk and Panola Counties, and Titus County," 81 FR 89870 (December 13, 2016) ("Round 2 Supplement") and challenges to these actions denying administrative petitions on the Round 2 Supplement. The EPA made a finding in the Round 2 Supplement, that the Round 2 Supplement is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1). *See* 81 FR at 89874–75. That action is currently being challenged in the Court of Appeals for the Fifth Circuit; however, the EPA maintains that the proper venue for that action is the D.C. Circuit.[2] Thus, judicial challenges to the actions noticed here, denying administrative petitions for reconsideration and/or stay of the Round 2 Supplement, also belong in the D.C. Circuit.

To the extent a court finds these actions denying the administrative petitions on the Round 2 Supplement to be locally or regionally applicable, the Administrator is exercising the complete discretion afforded to him under the CAA to make and publish a finding that each of these actions are based on a determination of "nationwide scope or effect" within the

meaning of CAA section 307(b)(1).[3] Both the Round 2 Supplement and these final actions noticed here are finalized pursuant to a common, uniform nationwide analytical method and interpretation of CAA section 107(d). In denying the petitions for reconsideration and administrative stay of the Round 2 Supplement, these final actions apply the same common, uniform nationwide analytical method and interpretation of CAA section 107(d) that the EPA applied across the country in designations for the $SO_2$ Primary National Ambient Air Quality Standard (NAAQS), including the EPA's nationwide approach to and technical evaluation of air quality modeling and monitoring data within the EPA's interpretation of statutory terms under section 107(d)(1) of the CAA.[4] These final actions are based on this same common core of determinations regarding the nationwide analytical method and interpretation of CAA section 107(d), determinations that specific methodologies are appropriate or preferable for assessing sulfur dioxide levels nationwide.[5] More specifically, these final actions are based on a determination by the EPA to evaluate areas nationwide using a common five-factor analysis in determining whether areas are in violation of or contributing to an area in violation of the 2010 $SO_2$ NAAQS at the time of the designations final action. The actions denying the petitions for reconsideration explained, for example, that the EPA's designations and the denials for reconsideration are based on the EPA's determination to consider and assess the technical representativeness of all available information regarding then-current air quality at the time of designations *(e.g.,* to consider third party modeling submitted to the EPA of the then-most recent years of air quality and then-currently available monitoring information, and not to consider projections or intended monitoring of future years' emissions, for $SO_2$ designations under the CAA). For these

reasons, the Administrator is exercising the complete discretion afforded to him by the CAA and hereby finds that each of these final actions is based on a determination of nationwide scope or effect for purposes of CAA section 307(b)(1) and is hereby publishing those findings in the **Federal Register**.

Under CAA section 307(b), any petition for review of these actions denying the petitions for reconsideration and/or stay must be filed in the Court of Appeals for the District of Columbia Circuit within 60 days from the date this notice is published in the **Federal Register**. Filing a petition for reconsideration by the Administrator of these final actions does not affect the finality of the actions for the purposes of judicial review, nor does it extend the time within which a petition for judicial review must be filed, and shall not postpone the effectiveness of such actions.

**Michael S. Regan,**
*Administrator.*
[FR Doc. 2021–13938 Filed 6–28–21; 8:45 am]
**BILLING CODE 6560–50–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 180**

**[EPA–HQ–OPP–2019–0474; FRL–10025–18]**

**Bacillus subtilis Strain RTI477; Exemption From the Requirement of a Tolerance**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** This regulation establishes an exemption from the requirement of a tolerance for residues of *Bacillus subtilis* strain RTI477 in or on all food commodities when used in accordance with label directions and good agricultural practices. FMC Corporation submitted a petition to EPA under the Federal Food, Drug, and Cosmetic Act (FFDCA), requesting an exemption from the requirement of a tolerance. This regulation eliminates the need to establish a maximum permissible level for residues of *Bacillus subtilis* strain RTI477 under FFDCA when used in accordance with this exemption.

**DATES:** This regulation is effective June 29, 2021. Objections and requests for hearings must be received on or before August 30, 2021 and must be filed in accordance with the instructions provided in 40 CFR part 178 (see also Unit I.C. of the **SUPPLEMENTARY INFORMATION**).

---

[1] *Cf. Natural Res. Def. Council, Inc.* v. *Thomas,* 838 F.2d 1224, 1249 (D.C. Cir. 1988) (the clause in CAA section 307(b) governing "nationally applicable regulations" provides jurisdiction over both the direct challenge to the regulations and the petition for reconsideration).

[2] The EPA intends to maintain this position in merits briefing in the 5th Circuit, as the 5th Circuit's venue decision denied the EPA's motion to dismiss or transfer the case to the D.C. Circuit without prejudice to reconsideration of the issue by the merits panel. Texas v. EPA, 706 Fed. Appx. 159, 161, 165 (5th Cir. 2017) ("EPA's motion therefore is denied without prejudice to reconsideration by the merits panel . . . merits briefing will provide greater clarity on what determinations lie at the [Round 2] Supplement's core, by, for example, illuminating that the key determinations in the rule are determinations that specific methodologies are appropriate or preferable for assessing sulfur dioxide levels nationwide, as opposed to fact-specific assessments of sulfur dioxide levels in the four Texas regions. In that case, the merits panel should not be constrained from revisiting the issue.").

[3] In deciding whether to invoke the exception by making and publishing a finding that this final action is based on a determination of nationwide scope or effect, the Administrator has also taken into account a number of policy considerations, including his judgment balancing the benefit of obtaining the D.C. Circuit's authoritative centralized review versus allowing development of the issue in other contexts and the best use of agency resources.

[4] In the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that the "nationwide scope or effect" exception applies would be appropriate for any action that has a scope or effect beyond a single judicial circuit. See H.R. Rep. No. 95–294 at 323, 324, reprinted in 1977 U.S.C.C.A.N. 1402–03.

[5] *See, supra,* n.2.

**TAB 3: WITHDRAWAL OF PROPOSED RULE, 86 FED. REG. 34,187 (JUNE 29, 2021)**

*    *    *    *    *

[FR Doc. 2021–13693 Filed 6–28–21; 8:45 am]

**BILLING CODE 6560–50–P**

---

# ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Part 81

**[EPA–HQ–OAR–2014–0464; FRL–10024–28–OAR]**

**Error Correction of the Area Designations for the 2010 1-Hour Sulfur Dioxide (SO₂) Primary National Ambient Air Quality Standard (NAAQS) in Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule; withdrawal.

**SUMMARY:** The Environmental Protection Agency (EPA) is withdrawing its August 22, 2019, proposed rule, which proposed both to determine that the EPA made an error in the area designations for the 2010 Sulfur Dioxide (SO₂) Primary National Ambient Air Quality Standard (NAAQS) for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas, and to correct the proposed error by modifying the designations of those areas to unclassifiable. The EPA is withdrawing the proposed rule because the EPA, informed in part by technical information received during the public comment period on the proposed rule that further supports the EPA's initial designations of these areas, no longer believes the bases identified in the proposed error correction support the proposed conclusion that an error correction is appropriate.

**DATES:** As of June 29, 2021, the proposed rule published at 84 FR 43757 on August 22, 2019, is withdrawn.

**FOR FURTHER INFORMATION CONTACT:** Corey Mocka, U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, Air Quality Policy Division, 109 T.W. Alexander Drive, Mail Code C539–04, Research Triangle Park, NC 27711; phone number: (919) 541–5142; email address: *mocka.corey@epa.gov*.

**SUPPLEMENTARY INFORMATION:**

## I. Background

On December 13, 2016, the EPA designated portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas as nonattainment for the 2010 1-hour primary SO₂ NAAQS (81 FR 89870,

codified at 40 CFR 81.344) ("Round 2 Supplement"). On February 13, 2017, Vistra Energy, which owns SO₂ emissions sources in each of the three areas, sent the EPA a petition for reconsideration, purportedly pursuant to Clean Air Act (CAA) section 307(d)(7)(B) and the Administrative Procedure Act 5 U.S.C. 553(e), and for administrative stay of the EPA's nonattainment designations for portions of Freestone and Anderson Counties ("Big Brown Steam Electric Station area"), Rusk and Panola Counties ("Martin Lake Electrical Station area"), and Titus County ("Monticello Steam Electric Station area"). On March 15, 2017, the Texas Commission on Environmental Quality (TCEQ) also submitted a request for an administrative stay of the Round 2 Supplement final designations for these areas in Texas.[1] On September 21, 2017, the EPA initially responded to Vistra Energy's February 2017 petition for reconsideration by indicating an intent to undertake an administrative action with notice and comment to revisit the nonattainment designations for the three areas, but explained that pending completion of such action, the nonattainment designations remained in effect.[2][3]

The EPA published a proposed rule in the **Federal Register** on August 22, 2019, titled "Error Correction of the Area Designations for the 2010 1-Hour Sulfur Dioxide (SO₂) Primary National Ambient Air Quality Standard (NAAQS) in Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas" (84 FR 43757) ("Proposed Error Correction"). Under the EPA's CAA authority at section 110(k)(6) to correct errors in acting on state implementation plans (SIPs) or in issuing designations, redesignations, classifications or reclassifications, the EPA proposed that in designating these areas as nonattainment under CAA sections 107(d)(1)(A)(i), (d)(1)(B)(ii), and (d)(2)(A), it erred in not giving greater weight to Texas's preference to characterize air quality through monitoring, and to steps undertaken by

Texas to begin monitoring in these three areas, when considering all available information; in relying on available air quality analyses in making the initial designations that the EPA recognized included certain limitations; or a combination of these two issues. Therefore, to correct these proposed errors, the EPA also proposed that the previously designated nonattainment areas in Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas each be revised to reflect an unclassifiable designation under CAA section 107(d)(1)(A)(iii). The EPA has not finalized the Proposed Error Correction and is not doing so in this action. Instead, the EPA is now withdrawing the Proposed Error Correction.[4]

## II. Reasons for Withdrawing the Proposed Error Correction

### A. Additional Air Quality Modeling

In the Proposed Error Correction, the EPA proposed that it erred in relying on available air quality modeling submitted by Sierra Club in making the initial nonattainment designations for these three areas. The EPA explained in the proposed action that the modeling submitted by Sierra Club ("December 2015" and "March 2016" modeling), which purported to show nonattainment, was developed in accordance with the general recommendations on modeling provided by the EPA but stated that the modeling contained "key limitations and uncertainties." We made this statement in the Proposed Error Correction despite also acknowledging that we had explained in the record for the Round 2 Supplement that individually these key limitations and uncertainties would not significantly change modeled results or, in many cases, could result in underestimation of SO₂ concentrations. In the Proposed Error Correction, the EPA also stated that given the possible collective significance of these issues and, in the case of the areas around the Martin Lake and Monticello facilities, given that the maximum modeled concentrations are within about 10 percent of the 2010 SO₂ NAAQS, we were less confident in our prior statements that potential adjustments to the Sierra Club modeling would not result in modeled values near

---

[1] Additionally, TCEQ submitted a petition for reconsideration on December 11, 2017, and on December 19, 2017, Vistra Energy provided additional information regarding facility retirements and the deployment of additional SO₂ monitors to support its February 2017 petition for reconsideration and administrative stay.

[2] *https://www.epa.gov/sites/production/files/2018-09/documents/3143_signed_response.pdf*.

[3] The EPA recently found that Texas has failed to submit State Implementation Plans to satisfy certain nonattainment planning requirements of the CAA for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County. *See* 85 FR 48111.

[4] Additionally, as detailed in a separate document published elsewhere in this issue of the **Federal Register** that has been signed concurrently along with this withdrawal notice, the EPA is also now denying the administrative petitions from Vistra Energy and TCEQ. *See https://www.regulations.gov* under Docket ID No. EPA–HQ–OAR–2014–0464.

or below the NAAQS.[5] Additionally, the EPA stated in the Proposed Error Correction that while individually these deficiencies are not dispositive, collectively they are a sufficient basis for the EPA to propose that we erred in relying on the Sierra Club modeling in making the initial nonattainment designations for the three Texas areas.

The EPA received several comments on the Proposed Error Correction. Sierra Club submitted a comment on the Proposed Error Correction that included updated modeling ("September 2019 modeling"). Sierra Club's updated September 2019 modeling addressed all aspects of the March 2016 modeling that the EPA had identified in the Proposed Error Correction as a limitation or uncertainty. The September 2019 modeling purported to demonstrate that the Martin Lake Electrical Station area did not meet the 2010 $SO_2$ NAAQS at the time of designation in the Round 2 Supplement (i.e., December 2016), and also currently does not meet the 2010 $SO_2$ NAAQS based on more recent data. Sierra Club did not submit updated modeling for the Big Brown and Monticello areas as part of its September 2019 comment submission, but rather asserted that the EPA's previously identified limitations (individually or collectively) have no material effect on the model results for those areas in the same way as they demonstrated with the Martin Lake area's modeling.

The EPA also notes, upon re-review of the Proposed Error Correction and Round 2 Supplement, that we did not acknowledge in the Proposed Error Correction that we actually considered the collective impact of all these same aspects of the modeling in the record for the Round 2 Supplement (to the extent those aspects remained in the March 2016 modeling relied on in the Round 2 Supplement).[6] In the Proposed Error Correction, we also did not explain any change in our thinking from our assessment of the collective impact in the Round 2 Supplement's record.

As explained further in the technical support document for this withdrawal, the EPA has assessed Sierra Club's September 2019 modeling submitted during the Proposed Error Correction

public comment period.[7] This assessment supports the EPA's previous reliance on the March 2016 modeling as the basis for its final nonattainment designation for the Martin Lake area in the Round 2 Supplement. Based on consideration of that information submitted by commenters and on further consideration of the entirety of our record for the Round 2 Supplement, the EPA now has concerns with the accuracy of the Proposed Error Correction's characterization of the March 2016 modeling and no longer believes that this proposed basis supports the proposed conclusion that an error correction is appropriate or that reliance on such information for the nonattainment designation was in error. The refined modeling submitted on the Proposed Error Correction demonstrates that the EPA's Round 2 Supplement assessment of the impact of further refining the March 2016 modeling was reasonable and correct, that such refinement would not alter the conclusion that the Martin Lake area was not attaining the NAAQS at the time of the Round 2 Supplement. Overall, the EPA's assessment of the information and of our record for the Round 2 Supplement for all three areas is that refinement of the aspects of the modeling the EPA identified in the Proposed Error Correction would not alter the EPA's nonattainment designations for any of the three nonattainment area designations in the Round 2 Supplement, and that the submitted information further confirms our Round 2 Supplement analysis of then-available data.

*B. Comments on Texas's Monitoring Preference*

In the Proposed Error Correction, the EPA also proposed that when we considered all available information at the time of designation, we erred in failing to give "greater" weight to the State of Texas' preference to use ambient air monitors to characterize $SO_2$ air quality in their state for purposes of the designation. We proposed this despite also acknowledging in the proposal that because these areas (around certain $SO_2$ emissions sources) were subject to the Round 2 deadline of July 2, 2016, these areas were required to be designated at that time based on the EPA's assessment of available information even though the State of Texas stated a preference to later characterize the areas based on future monitoring data and its intention to install monitors for these areas.

In addition to the modeling submitted during the public comment period for the Proposed Error Correction, the Sierra Club also commented that the EPA was required to designate the three areas in Texas by the court-ordered deadline based on the information available at that time (i.e., Sierra Club's December 2015 and March 2016 modeling). Because monitoring information was not available in 2016 for the Martin Lake, Big Brown, or Monticello areas, the Sierra Club stated that monitoring data consequently could not inform the EPA's designations decisions. The Environmental Protection Network (EPN) submitted a similar comment claiming that the EPA did not have the discretion to delay designations for these three areas in Texas under the applicable court-ordered deadline and that the EPA was required to designate the areas based on the best available data at the time of the designations. Additionally, EPN asserted that Texas's preference for future air quality monitoring did not undermine the available modeling data demonstrating that the areas were violating the 2010 $SO_2$ NAAQS.

In light of the comments submitted on the Proposed Error Correction, and the absence of a clearly identified error in the Round 2 Supplement, the EPA no longer believes that this proposed basis supports the proposed conclusion that an error correction is appropriate and no longer believes that we failed to give the appropriate weight to the State's preference for future monitoring information when we considered all available information at the time of the Round 2 Supplement. For the reasons discussed below, the EPA has concerns with the prior proposed assertion that the EPA was in error for not giving greater weight to the state's preference for *future* monitoring information in the absence of any available monitoring data at that time, let alone over reliance on *then-available* air quality modeling to assess $SO_2$ air quality. Given that the Proposed Error Correction's basis was predicated on the EPA relying on or weighing more heavily a preference for information that was not available at the time the EPA was required to finalize the Round 2 Supplement, the EPA no longer believes such a basis provides substantial support for the argument that the Round 2 Supplement should be revised.

CAA section 107(d) specifies that the EPA make designations based on the air quality at the time of final designations (i.e., determining at the time of signature whether the area meets the NAAQS) and consider all available information on air quality at that time. In other words, the

---

[5] As explained in the EPA's final designations Technical Support Document (TSD), the modeled 99th percentile daily maximum 1-hour $SO_2$ concentrations for the Martin Lake and Monticello facilities are 14 percent and 8 percent above the 2010 $SO_2$ NAAQS, respectively.

[6] See pages 27–29, 48–50, and 75–77 of the EPA's final designations TSD, available in the public docket and at *https://www.epa.gov/sites/production/files/2016-11/documents/texas_4_deferred_luminant_tsd_final_docket.pdf.*

[7] See *https://www.regulations.gov* under Docket ID No. EPA–HQ–OAR–2014–0464.

EPA does not interpret the statute as allowing the EPA to consider future air quality in the initial designations process, and the D.C. Circuit has upheld this interpretation as reasonable.[8] The record for the Round 2 Supplement explains, and the EPA maintains, that both air quality modeling and ambient monitoring are appropriate tools for characterizing ambient air quality for purposes of informing decisions to implement the $SO_2$ NAAQS, including designation determinations.[9] The EPA's reliance on modeling to assess $SO_2$ air quality, even in the face of conflicting monitoring, where appropriate, has been judicially affirmed. *See, e.g., Montana Sulphur & Chemical Company* v. *EPA,* 666 F.3d 1174, 1185 (9th Cir. 2012).

In the Round 2 Supplement for these three areas, the EPA considered Texas's recommendations but appropriately modified the recommendations, per CAA section 107(d)(1)(B)(2), because they were not supported by currently available information. Specifically, the EPA's assessment of Sierra Club's modeling was that currently available information showed violations of the 2010 $SO_2$ NAAQS. At the time of the EPA's final nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County, although Texas preferred that the EPA designate the areas based on proposed future monitoring data rather than on existing submitted modeling, there were no representative monitoring data [10] or other reliable modeling demonstrations available to refute Sierra Club's information demonstrating violations of the 2010 $SO_2$ NAAQS, as explained in the EPA's final designations TSD.[11] The absence of available monitoring data at that time did not relieve the EPA of its obligation to issue designations for these areas by the court-ordered deadline. Furthermore, at the time of the final designations, the Agency did not have the discretion to await the results of 3 years of ambient air monitoring data (*i.e.,* 2018–2020) from Texas's proposed (but not yet established) monitoring sites before taking final action due to the court's order to designate certain areas in Texas. There was, however, as explained previously and in the EPA's final designations TSD, valid modeling submitted by the Sierra Club based on the then-most recent actual emissions demonstrating that the areas were violating the 2010 $SO_2$ NAAQS. As explained earlier, the EPA no longer believes there were errors in our Round 2 Supplement's analysis that Sierra Club submitted valid, representative modeling (based on the then-most recent actual $SO_2$ emissions) that demonstrated that the areas were violating the 2010 $SO_2$ NAAQS, or that further refining the modeling would result in modeled values near or below the standard. Therefore, even though the EPA considered Texas's preference for monitoring, given that the statute requires that the EPA consider available information, Texas's preference for reliance on monitoring information when there were no such monitoring data available at the time of the EPA's final designations in December 2016 did not and could not rebut Sierra Club's modeling showing violations of the 2010 $SO_2$ NAAQS.[12]

### III. Purpose of This Action

In the 2019 Proposed Error Correction, the EPA proposed that our relying on the Sierra Club modeling *along with* our not giving greater weight to Texas' preference for monitoring, represented an insufficient basis for the EPA's initial nonattainment designations. For the reasons discussed previously, the EPA no longer believes it has a basis under these reasons individually or collectively to propose to or conclude that we made errors in our nonattainment designations of these areas, and, therefore, no longer believes that we have a basis to conclude that the EPA could not determine, based on available information at the time of issuing the designation, whether the three Texas areas that are the subject of this proposed action were meeting or not meeting the 2010 $SO_2$ NAAQS (*i.e.,* the conclusion necessary to correct the designations to unclassifiable). Therefore, the EPA is withdrawing the Proposed Error Correction.

### IV. Statutory and Executive Order Reviews

This withdrawal of a proposed rule does not establish new regulatory requirements. Hence, the requirements of other regulatory statutes and Executive Orders that generally apply to rulemakings (*e.g.,* the Regulatory Flexibility Act) do not apply to this action.

### List of Subjects in 40 CFR Part 81

Environmental protection, Air pollution control, Sulfur dioxide.

**Michael S. Regan,**
*Administrator.*

[FR Doc. 2021–13696 Filed 6–28–21; 8:45 am]

**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Parts 1036 and 1037

**[EPA–HQ–OAR–2019–0307; FRL–10018–51–OAR]**

### Improvements for Heavy-Duty Engine and Vehicle Test Procedures

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** This notice of proposed rulemaking includes corrections, clarifications, additional flexibilities, and adjustment factors to improve the Greenhouse gas Emissions Model (GEM) compliance tool for heavy-duty vehicles while more closely matching the outputs produced by the original GEM version 3.0 that was used to establish the $CO_2$ standards for Model Years 2021 and later in the 2016 Heavy-duty Phase 2 final rule. This document supplements the proposed rule published on May 12, 2020, which included a larger set of proposed revisions to modify and improve GEM. Most of the proposed revisions from that notice of proposed rulemaking are addressed in a final rulemaking published elsewhere in the Final Rules section of this issue of the **Federal Register**. Given the nature of this proposal, there will be neither

---

[8] *See Miss. Comm'n on Envtl. Quality* v. *EPA,* 790 F.3d 138, 156 (D.C. Cir. 2015); *Catawba County* v. *EPA,* 571 F.3d 20, 43–44 (D.C. Cir. 2009). The 2015 decision upheld the EPA's designations issued just days before new certified air quality data became available showing more areas violating the 2008 ozone NAAQS than the EPA designated as nonattainment. *See also State of Texas* v. *EPA,* 983 F.3d 826, 837–838 (5th Cir. 2020) (holding that the EPA's nonattainment designation, which modified the state's recommendation, was not arbitrary and capricious because the county was not compliant with the ozone NAAQS when the EPA promulgated its designation and the CAA uses concrete terms such that a county either does or does not meet the NAAQS).

[9] Round 2 Supplement Reponses to Comments, Page 13. Available in the public docket and at *https://www.epa.gov/sites/production/files/2016-11/documents/rtc_so2_comments_received_document_4_tx_sources_final_0.pdf.*

[10] As explained in the EPA's intended and final designations TSDs and the responses to comments document that accompanied the Round 2 Supplement, at the time of the EPA's final designations on December 13, 2016, there were no $SO_2$ monitors sited in the areas of maximum concentration to properly characterize the air quality around the Martin Lake, Big Brown, or Monticello areas, nor were there $SO_2$ monitors in the same counties as the facilities.

[11] The EPA received a comment from the Utility Air Regulatory Group on the Round 2 Supplement suggesting that the EPA wait for the future completion of three years of monitoring before designating certain Round 2 areas. In the Round 2 Supplement Responses to Comments (page 14), the EPA responded that the Agency does not have the discretion to await the results of future monitoring because of the court order to designate certain areas by the July 2, 2016, deadline.

[12] *See State of Texas* v. *EPA,* 983 F.3d 826, 836–838 (5th Cir. 2020).

**TAB 4: PETITION DENIAL LETTER FROM MICHAEL S. REGAN, EPA ADMINISTRATOR TO DANIEL JUDE KELLY, VICE PRESIDENT, VISTRA ENERGY CORPORATION (JUNE 10, 2021) (WITH ENCLOSURES)**



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

WASHINGTON, D.C. 20460

**JUN 1 0 2021**

THE ADMINISTRATOR

Mr. Daniel Jude Kelly
Vice President and Associate General Counsel
Vistra Energy Corporation
1601 Bryan Street
Dallas, Texas 75201

Dear Mr. Kelly:

I am hereby denying your February 13, 2017, petition for reconsideration and for administrative stay, which you later supplemented on December 19, 2017, (collectively "2017 petition") on behalf of Vistra Energy Corporation and its subsidiaries concerning the U.S. Environmental Protection Agency's final action titled *Air Quality Designations for the 2010 Sulfur Dioxide (SO₂) Primary National Ambient Air Quality Standard – Supplement to Round 2 for Four Areas in Texas: Freestone and Anderson Counties, Milam County, Rusk and Panola Counties, and Titus County*. 81 FR 89870 (December 13, 2016).

In your 2017 petition, Vistra Energy requested that the EPA reconsider the nonattainment designations for the Freestone and Anderson Counties, Rusk and Panola Counties and Titus County areas based on the availability of future ambient monitoring data; emissions decreases at Vistra Energy's three facilities, one of which is located in each of the identified nonattainment areas, and facility retirement announcements; the availability of certain materials after the public comment period; and the inability to comment on the proper venue for judicial review. In your 2017 petition, Vistra Energy also requested that the EPA stay the final rule's effective date.

On September 21, 2017, the EPA initially responded to the 2017 petition by indicating an intent to undertake an administrative action with notice and comment to revisit the nonattainment designations for these three areas. However, as discussed more fully in the enclosures, the EPA concludes that the 2017 petition does not present facts or arguments that warrant a reconsideration process or a stay of the effective date of the EPA's 2016 designations action. Therefore, the EPA denies the 2017 petition.

At the request of the state of Texas, on May 7, 2021, the acting EPA Region 6 Administrator signed a final action titled *Air Plan Approval; Clean Data Determination for the 2010 1-Hour Primary Sulfur Dioxide National Ambient Air Quality Standard; Anderson and Freestone Counties and Titus County Nonattainment Areas*, which determined that portions of Freestone and Anderson Counties and Titus County are now attaining the 2010 SO₂ Primary National Ambient Air Quality Standard. This determination suspends most attainment planning

requirements under the 2010 $SO_2$ NAAQS for these two areas for as long as they continue to attain the NAAQS. As explained in that final action, the primary sources of $SO_2$ emissions in these two areas have permanently shut down, and, as a result, the EPA's assessment is that air quality in these two areas is now meeting the 2010 $SO_2$ primary NAAQS.

I appreciate your interest in air-quality standards in Texas and in providing cleaner, healthier air for its residents.

Sincerely yours,

Michael S. Regan

Enclosures

Enclosure 1

**The U.S. Environmental Protection Agency's Basis for Denying Vistra Energy's Petition for Reconsideration and Administrative Stay**

## I.     Statutory and Regulatory Background

*A.     Revisions to the $SO_2$ NAAQS*

The Administrator of the U.S. Environmental Protection Agency signed a final rule revising the primary sulfur dioxide ($SO_2$) National Ambient Air Quality Standard on June 2, 2010. The EPA published this rule in the *Federal Register* on June 22, 2010 (75 FR 35520, codified at 40 CFR 50.17), and it became effective on August 23, 2010.[1] Based on the Administrator's review of the air quality criteria for oxides of sulfur ($SO_x$) and the primary NAAQS for $SO_x$ as measured by the indicator compound $SO_2$, the EPA revised the primary $SO_2$ NAAQS to provide requisite protection of public health with an adequate margin of safety. Specifically, the EPA established a new one-hour $SO_2$ standard at a level of 75 parts per billion, which is met when the three-year average of the annual 99[th] percentile of daily maximum one-hour average concentrations is less than or equal to 75 ppb, as determined in accordance with Appendix T of 40 CFR part 50.40 CFR 50.17(a) and (b). The EPA also established provisions to revoke both the existing 24-hour and annual primary $SO_2$ standards, subject to certain conditions. *See* 40 CFR 50.4(e).

*B.     Multiple Rounds of Designations for the 2010 $SO_2$ NAAQS*

The process for designating areas following promulgation of a new or revised NAAQS is contained in Clean Air Act section 107(d). After promulgation of a new or revised NAAQS, each governor or tribal leader is required to recommend air quality designations, including the appropriate boundaries for nonattainment areas, to the EPA. The EPA considers these recommendations when fulfilling its duty to promulgate all initial area designations and boundaries for the new or revised NAAQS. By no later than 120 days prior to promulgating designations, the EPA is required to notify states, territories and tribes, as appropriate, of any intended modifications to an area designation or boundary recommendation that the EPA deems necessary. During that period, states may demonstrate why they believe the EPA's proposed modifications are inappropriate. Nearly all states, including Texas, submitted timely designation recommendations for the 2010 $SO_2$ NAAQS to the EPA.

After invoking a one-year extension of the deadline to designate areas, as provided for in section 107(d)(1)(B)(i) of the CAA, the EPA published an initial round of $SO_2$ designations for certain areas of the country on August 5, 2013 (referred to as "Round 1") (78 FR 47191). The Freestone and Anderson Counties, Rusk and Panola Counties and Titus County areas in Texas were not included in that first round of designations, as those areas did not have existing monitoring data showing a violation of the 2010 $SO_2$ NAAQS.

---

[1] Furthermore, as required by the *Clean Air Act*, the EPA conducted a periodic review of the $SO_2$ NAAQS, and on March 18, 2019, the agency published a decision to retain the 2010 one-hour primary standard. *See* 84 FR 9866.

1

Following Round I designations, three lawsuits were filed against the EPA in different United States District Courts, alleging the agency had failed to perform a nondiscretionary duty under the CAA by not designating all portions of the country by the extended deadline. The state of Texas was a plaintiff or plaintiff-intervenor in two of those cases. In one of those cases, the U.S. District Court for the Northern District of California entered an order on March 2, 2015, for the EPA to complete the area designations by three specific deadlines.[2] By the first deadline in the court order (July 2, 2016), the EPA was required to designate areas containing $SO_2$ emissions sources meeting certain criteria (referred to as "Round 2"). As shown in Table 1, each area subject to this petition included a facility owned by Vistra Energy meeting the criteria for a Round 2 designation.

**Table 1.** Texas $SO_2$ Emissions Sources Addressed in the EDREPA's Round 2 Designations and Vistra Energy's Petitions

| Area | Facility |
|------|----------|
| Freestone and Anderson Counties | Big Brown Steam Electric Station |
| Rusk and Panola Counties | Martin Lake Electrical Station |
| Titus County | Monticello Steam Electric Station |

On March 20, 2015, the EPA provided additional guidance on designations for the 2010 $SO_2$ NAAQS and solicited updated state recommendations for Round 2 areas by September 18, 2015.[3] Texas provided its updated Round 2 $SO_2$ designation recommendations to the EPA on September 18, 2015, which recommended that the EPA designate areas in Texas without monitoring data as unclassifiable/attainment, including Freestone, Anderson, Rusk, Panola and Titus Counties. Texas also noted that the constrained time frame did not allow it to complete detailed analyses, determine model input refinements, or develop detailed graphics.[4] In the same letter, Texas cited its "disagreement with any use of modeled predictions to determine attainment status."

## C.    The EPA's Data Requirements Rule

On August 21, 2015, the EPA separately promulgated a rule requiring states to undertake air quality characterization for areas with $SO_2$ sources meeting certain criteria, called the Data Requirements Rule.[5] The DRR required state air agencies to provide additional monitoring or modeling information to characterize $SO_2$ air quality in areas containing $SO_2$ emissions sources either meeting certain criteria or that have otherwise been listed under the DRR by the EPA or state air agencies. In lieu of the $SO_2$ air quality characterization required under the DRR, state air agencies could demonstrate that the listed sources restricted their annual $SO_2$ emissions to less than 2,000 tons per year through federally enforceable and in effect emissions limits, or provide documentation that the sources had been shut down, by January 13, 2017. Thus, for the purpose of meeting the DRR obligations, states were provided options on how to characterize their air

---

[2] *Sierra Club v. McCarthy*, No. 3-13-cv-3953 (SI) (N.D. Cal. Mar. 2, 2015).

[3] *See* "Updated Guidance for Area Designations for the 2010 Primary Sulfur Dioxide National Ambient Air Quality Standard," memorandum to Regional Air Division Directors, Regions 1-10, from Stephen D. Page, dated March 20, 2015, available at *https://www.epa.gov/sites/production/files/2016-04/documents/20150320so2designations.pdf*.

[4] *https://www.epa.gov/sites/production/files/2016-03/documents/tx-rec-r2.pdf*.

[5] *See* 80 FR 51052 (August 21, 2015), codified at 40 CFR part 51 subpart BB.

16

quality, including the option of setting up and beginning operation of new EPA-approved $SO_2$ monitoring networks by January 2017. States were required to notify the EPA by July 1, 2016, of which characterization option they had selected for each listed DRR source. The DRR did not, however, relieve EPA of its obligation under the court order to designate Round 2 areas meeting the order's criteria no later than July 2, 2016. *See* 80 FR 51052 at 51056.

In a letter dated January 15, 2016, the Texas Commission on Environmental Quality identified 25 facilities in Texas with 2014 $SO_2$ emissions exceeding 2,000 tons, including Martin Lake, Big Brown, and Monticello.[6] In a subsequent letter dated June 29, 2016, TCEQ identified the source characterization pathways (*i.e.*, modeling or monitoring) for most of the previously identified DRR sources.[7] At that time, TCEQ asserted that, notwithstanding the requirements of the DRR, there was no need to provide future air-quality characterization plans for the Martin Lake, Big Brown and Monticello facility areas because the EPA was required to designate those areas by the Round 2, July 2, 2016, deadline. TCEQ noted, however, that it would characterize these source areas through monitoring if the EPA designated any of the areas as unclassifiable.[8]

*D.    Background on the Designations for Portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County in Texas*

In September and December 2015, Sierra Club submitted air quality modeling for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County. Neither Texas nor Vistra Energy provided any other representative monitoring, modeling or technical information prior to the EPA's notification to the Governor of its intended designations.[9] In a letter dated February 11, 2016, the EPA notified Texas of the EPA's intended modifications to the state's September 18, 2015, recommendation for Round 2 designations for the 2010 $SO_2$ NAAQS. Specifically, the EPA's letter informed Texas of its intended nonattainment designations for three separate areas covering portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County, based on consideration of all available information including the modeling submitted by Sierra Club.[10] This letter was accompanied by the EPA's technical support document providing the rationale for this intended designation modification.[11] On March 1, 2016, the EPA also published a notice in the *Federal Register* soliciting public comments on the intended Round 2 designations. *See* 81 FR 10563.

During the public comment period associated with the intended designations, in March 2016, the EPA received comments from citizens, Sierra Club, Luminant (a subsidiary of Vistra Energy), TCEQ, and the Governor of the state of Texas regarding its intended nonattainment designations for these three areas. As discussed further in Section III, as part of their

---

[6] *https://www.epa.gov/sites/production/files/2016-06/documents/tx.pdf.*
[7] *https://www.epa.gov/sites/production/files/2016-07/documents/texas_source_characterization.pdf.*
[8] Contrary to TCEQ's June 29, 2016, DRR pathway letter, the 2016 Texas Ambient Monitoring Network Plan stated that TCEQ would characterize the Martin Lake, Big Brown or Monticello areas through monitoring if the EPA designated the areas as nonattainment by the court-ordered July 2, 2016, deadline. *See https://www.epa.gov/sites/production/files/2017-09/documents/txplan2016.pdf.*
[9] *See* Docket ID Nos. EPA-HQ-OAR-2014-0464-0084 and EPA-HQ-OAR-2014-0464-0082.
[10] *https://www.epa.gov/sites/production/files/2016-03/documents/tx-epa-resp-r2.pdf.*
[11] *https://www.epa.gov/sites/production/files/2016-03/documents/tx-epa-tsd-r2.pdf.*

comments, Luminant submitted air dispersion modeling for all three areas, and the Sierra Club submitted revised versions of the modeling previously submitted.[12] Texas did not submit modeling but maintained its position that air-quality monitoring data is the proper method for designating these areas, even though at that time it had no such monitoring data nor had it installed monitors in any of the three areas. Concerning the Sierra Club modeling, Texas claimed that this modeling "has errors and clearly overestimates actual $SO_2$ concentrations."[13] Summaries of the comments received can be found in the *Responses to Significant Comments on the Designation Recommendations for the 2010 Sulfur Dioxide National Ambient Air Quality Standards (NAAQS) – Supplement for Four Areas in Texas Not Addressed in June 30, 2016, Version*, dated November 29, 2016.[14]

Before the July 2, 2016, Round 2 designations deadline, the EPA and plaintiffs to the court order agreed to extensions for a limited number of the subject areas, including portions of the Freestone and Anderson, Rusk and Panola and Titus Counties. The deadline for signing the final designations for the Texas areas was extended until November 29, 2016. On July 12, 2016, the EPA published designations for all other areas containing $SO_2$ emissions sources meeting the Round 2 criteria, in accordance with the court-ordered deadline. *See* 81 FR 45039.

In developing the final designations for the three Texas areas, the EPA reviewed all available information. The EPA determined that the modeling submitted by Luminant was not representative of current air quality in these areas for several reasons, as further explained in the EPA's final designations TSD.[15] For example, Luminant's modeling used a non-EPA preprocessor model, AERLIFT, to increase the observed temperatures and velocities of the plumes exiting from the stacks, which the EPA determined was not adequately justified, and, thus, could not be relied upon in the designations decision-making process. The EPA determined that the Sierra Club's revised March 2016 modeling used the latest model version available at the time, and was in accordance with the general recommendations on modeling provided by the EPA.[16] Regarding monitoring data, the EPA maintained our historic approach regarding the importance of considering all available modeling and monitoring data for $SO_2$ designations and noted that there were not monitoring data available to characterize air quality in these areas, only modeling data, and since these designations were subject to the court's order to designate certain areas by November 29, 2016, the agency did not have the discretion to await the results of future monitoring.[17] The final Round 2 designations for portions of the Freestone and Anderson, Rusk and Panola and Titus Counties were based on the EPA's assessment of all available information, including the Sierra Club's revised March

---

[12] *See* Docket ID No. EPA-HQ-OAR-2014-0464-0328 for Luminant's comment and Docket ID No. EPA-HQ-OAR-2014-0464-0332 for Sierra Club's comment.

[13] *See* Docket ID No. EPA-HQ-OAR-2014-0464-0294.

[14] *https://www.epa.gov/sites/production/files/2016-11/documents/rtc_so2_comments_received_document_4_tx_sources_final_0.pdf.*

[15] *https://www.epa.gov/sites/production/files/2016-11/documents/texas_4_deferred_luminant_tsd_final_docket.pdf.*

[16] *See* the $SO_2$ NAAQS Designations Source-Oriented Monitoring Technical Assistance Document at *https://www.epa.gov/sites/production/files/2016-06/documents/so2monitoringtad.pdf,* and the $SO_2$ NAAQS Designations Modeling Technical Assistance Document at *https://www.epa.gov/sites/production/files/2016-06/documents/so2modelingtad.pdf.*

[17] *Id.*

4

2016 modeling that continued to demonstrate violations of the 2010 $SO_2$ NAAQS. On November 29, 2016, the EPA Administrator signed the final action designating portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County as nonattainment for the 2010 $SO_2$ NAAQS, and the action was published in the *Federal Register* on December 13, 2016. *See* 81 FR 89870 ("Round 2 Supplement").

On February 13, 2017, the state of Texas, TCEQ, and Vistra Energy and its subsidiary companies filed petitions for judicial review of the Round 2 Supplement in the Fifth Circuit Court of Appeals.[18] On that same day, Vistra Energy sent the EPA a petition for reconsideration, purportedly pursuant to CAA section 307(d)(7)(B) and the *Administrative Procedure Act* 5 U.S.C. §553(e), and for administrative stay of the EPA's nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County. On March 15, 2017, TCEQ also submitted a request for an administrative stay of the Round 2 Supplement final designations for these areas in Texas. On September 21, 2017, the EPA responded to Vistra Energy's February 2017 petition for reconsideration by indicating an intent to undertake an administrative action with notice and comment to revisit the nonattainment designations for the three areas, but explained that pending completion of such action the nonattainment designations remained in effect.[19] On October 12, 2017, the Fifth Circuit Court of Appeals granted the EPA's motion to place the consolidated challenges to the Round 2 Supplement in abeyance on this basis. Additionally, TCEQ submitted a petition for reconsideration on December 11, 2017. On December 19, 2017, Vistra Energy provided additional information regarding facility retirements and the deployment of additional $SO_2$ monitors to support its February 2017 petition for reconsideration and administrative stay.

On August 22, 2019, the EPA proposed an error correction under CAA section 110(k)(6) in response to Vistra Energy's petition for reconsideration and administrative stay. *See* 84 FR 43757. The proposed error correction, if finalized, would have revised the nonattainment designations to unclassifiable for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County. The EPA published the proposed error correction seeking public comment on whether the EPA erred by not giving greater weight to Texas' preference to characterize air quality through monitoring and steps undertaken by Texas towards siting monitors with the intention to begin monitoring in these three areas, when considering all available information; relying on available air quality modeling analyses in making the initial designations that the EPA recognized included certain limitations; or a combination of these two issues. Concurrently with issuing this response to the reconsideration petition, the EPA will publish in the *Federal Register* its withdrawal of the proposed error correction as explained in that notice.

---

[18] Sierra Club additionally filed a petition for judicial review of this action in the D.C. Circuit Court of Appeals, which was transferred to the Fifth Circuit on November 2, 2017, and consolidated with the pending petition. Note, the EPA is not addressing section I.b. of Vistra's petition for reconsideration, which involves a venue issue, in this response. The EPA has addressed its position on venue for the consolidated case challenging the Round 2 Supplement in filings in the 5th Circuit.

[19] *https://www.epa.gov/sites/production/files/2018-09/documents/3143_signed_response.pdf.*

## II.    Criteria for Evaluating a Petition for Reconsideration of the Round 2 Supplement

The APA at 5 U.S.C. section 553(e) states that "[e]ach agency shall give an interested person
the right to petition for the issuance, amendment, or repeal of a rule." The APA does not
provide any criteria that an agency must consider in responding to such a petition, nor
include a requirement that such a petition must be granted in certain express circumstances.
Section 307(d)(7)(B) of the CAA governs petitions for reconsideration of final actions that
are subject to section 307(d). However, CAA section 307(d) does not apply to the EPA's
Round 2 Supplement designations action that is the subject of Vistra Energy's petition.[20] The
EPA, thus, must simply apply reasoned decision making in evaluating a petition for
reconsideration of the Round 2 Supplement. However, given that CAA section 307(d)(7)(B)
provides clear criteria for evaluating reconsideration petitions, the EPA has chosen to
evaluate the merits of this petition for reconsideration under the CAA section 307(d)(7)(B)
criteria. The EPA's evaluation of the petition using these criteria provide a reasoned basis for
deciding whether to reconsider a final action in response to a petition under APA section
553(e). In doing so, the EPA in no way waives its objection to the applicability of CAA
section 307(d) to this final action. Relevant to the EPA's evaluation of this petition using
these criteria, EPA notes that even though the EPA was not required to provide public notice
and comment in promulgating the Round 2 Supplement pursuant to CAA section
107(d)(2)(B), the EPA nevertheless provided stakeholders, such as Vistra Energy, the
opportunity to provide comments prior to final EPA action, and despite in fact availing itself
of this opportunity, Vistra Energy in its petition requests reconsideration under CAA section
307(d)(7)(B) and asserts in part that the EPA should grant reconsideration because of
inadequate notice and comment.

Under CAA section 307(d)(7)(B), judicial review of final actions taken under CAA section
307(d) is only available with respect to issues raised "with reasonable specificity" during the
rulemaking's comment period. Furthermore, the EPA must convene a proceeding to
reconsider a CAA section 307(d) rule if the person raising an objection can demonstrate to
the Administrator both that it was impracticable to raise the objection during the comment
period or that the grounds for such objection arose after the comment period but within the
time specified for judicial review (*i.e.*, within 60 days after publication of the final
rulemaking notice in the *Federal Register*, see CAA section 307(b)(1)); and that the
objection is of central relevance to the outcome of the rule. In other words, CAA section
307(d)(7)(B) does not provide for required reconsideration of issues that have already been
raised or could have been raised to the EPA in a CAA section 307(d) rulemaking.
Furthermore, the second criterion must also be met for commencement of a reconsideration
process under CAA section 307(d)(7)(B). An objection is of central relevance to the outcome
of the rule if it provides substantial support for the argument that the promulgated regulation
should be revised.[21] It is not sufficient that the objection be of central relevance to the issues
involved in the rulemaking that would not alter the final outcome. If the EPA denies a

---

[20] Designations are not one of the types of actions listed in CAA section 307(d)(1) as being automatically subject to
CAA section 307(d), and the EPA did not exercise its discretion to subject the Round 2 Supplement to CAA section
307(d) under section 307(d)(1)(V).
[21] *Coalition for Responsible Regulation v. EPA*, 684 F.3d 102, 125 (DC Cir. 2012).

petition for reconsideration, the person raising the objection can seek judicial review of the EPA's refusal to do so.

### III.    EPA's Evaluation of the Petition for Reconsideration

In its February 2017 petition and December 2017 additional information letter, Vistra Energy raises objections regarding five main topics: preference for ambient air monitoring, state designation recommendations, actual $SO_2$ emissions, facility retirement announcements and the ability to provide public comment. Each of these issues is addressed in this section. In general, other than the claims relating to the unavailability of materials after the March 2016 public comment period and future facility retirements, Vistra Energy's petition for reconsideration includes objections (*i.e.*, the claims involving future ambient monitoring data and $SO_2$ emissions decreases) that either repeats comments already submitted to the EPA during the public comment period for the intended designations or reflects new objections without including any rationale to demonstrate that they were impracticable to raise during the public comment period or that the grounds for them arose after the end of the period for public comment but within the 60-day period for filing a petition for judicial review of the final designations. Regarding the claims relating to the unavailability of materials after the March 2016 public comment period and future facility retirements, Vista Energy also fails to demonstrate that the objections were impracticable to raise during the public comment period or that the grounds for the objections arose after the end of the period for public comment but within the 60-day period for filing a petition for judicial review of the final designations. These claimed bases for reconsideration can be and are denied under the first criterion irrespective of consideration of the information and arguments presented for these objections in the petition. Nevertheless, the EPA also is providing an evaluation of the substance of Vistra Energy's comments and other information provided in the petition for these objections under the second criterion. Although a full review of these comments and this information is not warranted because Vistra Energy does not satisfy the first criterion for reconsideration, for the reasons explained in this section, the EPA also concludes that the petition does not meet the second criterion for reconsideration because the petition does not raise objections that are of central relevance to the outcome of the rule since the objections do not provide substantial support for the argument that the designations should be revised. The following subsections include an analysis of the petition for reconsideration's shortcomings with respect to both the first and second criteria.

### A.    *Preference for Ambient Air Monitoring*

Vistra Energy's petition claims that the EPA should reconsider the final designations based on "monitoring data to be collected by TCEQ in the areas at issue," based on its view that the monitoring data, rather than modeling, will provide a more reliable and accurate representation of air quality in the relevant areas.

This objection does not meet the first criterion because it repeats comments already submitted to the EPA during the public comment period for the intended designations. Luminant, a subsidiary of Vistra Energy, submitted similar comments on the EPA's intended Round 2 designations during the public comment period, which the EPA considered and responded to in the Round 2 Supplement. In its March 2016 public comment, Luminant advocated that the EPA should not

finalize the proposed designations based on modeling because the agency has "consistently supported monitoring over modeling for NAAQS designations purposes and its approach here was inconsistent with the statute, regulations and the EPA's prior practice." In the responses to comments document that accompanied the Round 2 Supplement, the EPA previously provided a response to this claim:

> The EPA maintains our previous position for the reasons delineated in the preamble to the final 2010 $SO_2$ NAAQS rulemaking, the February 2013 Strategy Paper, the proposed and final $SO_2$ Data Requirements Rule, and in the June 30, 2016, version of the Response to Comments document for why both air quality modeling and ambient monitoring are appropriate tools for characterizing ambient air quality for purposes of informing decisions to implement the $SO_2$ NAAQS, including designation determinations. The EPA's reliance on modeling to assess $SO_2$ air quality, even in the face of conflicting monitoring, where appropriate, has been judicially affirmed. *See, e.g., Montana Sulphur & Chemical Company v. EPA,* 666 F.3d 1174, 1185 (9th Cir. 2012). Moreover, it has long been the EPA's practice to rely upon appropriate modeling when issuing designations under the $SO_2$ NAAQS. *See, e.g.,* 43 FR 8962 (March 3, 1978), 43 FR 40416 (September 11, 1978), 43 FR 40502 (September 12, 1978).[22]

This objection also does not meet the "central relevance" second criterion, as the objection does not substantiate why the EPA's reliance on available air quality modeling to assess $SO_2$ air quality in the *absence* of any available monitoring data at that time provides substantial support for the argument that the promulgated 2016 action should be revised. For those same reasons cited to and articulated in the Round 2 Supplement, the EPA reaffirms our previous statements that both air quality modeling and ambient monitoring are appropriate tools for characterizing ambient air quality for purposes of informing decisions to implement the 2010 $SO_2$ NAAQS, including designation determinations. For the reasons explained in the EPA's final designations TSD, incorporated here by reference, the EPA's analysis is that Sierra Club submitted valid, representative modeling based on the then-most recent actual $SO_2$ emissions demonstrating that the areas were violating the 2010 $SO_2$ NAAQS. The EPA concluded both that the Sierra Club's 2016 modeling mostly followed EPA guidance and that correcting the deviations in the modeling to be more consistent with the guidance would not have resulted in modeled values near or below the standard. As also explained in the EPA's intended and final designations TSDs and the responses to comments document that accompanied the Round 2 Supplement, at the time of the EPA's final designations on December 13, 2016, there were no $SO_2$ monitors sited in the areas of maximum concentration to properly characterize the air quality around Martin Lake, Big Brown or Monticello, nor were there $SO_2$ monitors in the same counties as the facilities. The EPA properly considered these modeling data to establish a designation of nonattainment for these areas and properly determined that there were not any available monitoring data that could properly characterize air quality in any of the areas at that time.

The petition next attempts to support its position that monitoring data are necessary for NAAQS designations by citing the EPA's February 6, 2013, strategy paper which stated, "EPA believes the starting point for future $SO_2$ designations should be, as with other NAAQS, a monitoring network to adequately characterize air quality in the areas of concern."

---

[22] Round 2 Supplement Reponses to Comments, Page 13.

This objection does not meet the first criterion because it repeats comments already submitted to the EPA during the public comment period for the intended designations, as Luminant and TCEQ made similar claims during the public comment period. This objection also does not meet the second criterion for several reasons. First, the strategy paper never claims that NAAQS designations need to be based solely on monitoring data. Rather, the strategy paper explains that modeling can be a "surrogate for ambient air monitoring" to characterize the air quality around a $SO_2$ emissions source. This objection is, therefore, not of central relevance to the outcome of the 2016 action since it mischaracterizes the strategy paper and does not alter the EPA's assessment that the Round 2 Supplement properly relied on the available information for each area, including modeling data, for the reasons previously articulated. Additionally, in the 2010 $SO_2$ NAAQS rulemaking, the EPA affirmed the use of dispersion modeling to inform designation decisions. *See* 75 FR 35520 at 35552. Moreover, in the DRR final rulemaking, the EPA noted that more than 30 state and industry commenters support modeling to "effectively serve as a surrogate for comprehensive ambient monitoring results." *See* 80 FR 51052 at 51077. Finally, the EPA considered and responded to similar comments from Luminant and TCEQ in the responses to comments document that accompanied the Round 2 Supplement:

> The EPA has also explained the importance of using modeling information for source-oriented pollutants such as $SO_2$ in cases where existing monitors do not exist or do not adequately characterize peak ambient concentrations. *See, e.g.*, Memorandum from Sheldon Myers, director, EPA Office of Air Quality Planning and Standards, to Regional Office Air Division Directors, "Section 107 Designation Policy Summary," April 21, 1983…Instead, where monitors have been shown to be representative of maximum ambient air concentrations, the EPA fully considers the information they provide and may base $SO_2$ NAAQS designations on such data. But not all monitors, in areas where they exist at all, are so correctly sited, as the EPA has consistently observed in establishing and implementing the 2010 $SO_2$ NAAQS. Modeling has proved to be an accurate and reliable tool for remedying the occasional absence or weakness of $SO_2$ monitoring, and in some cases may be the only tool available where there is no $SO_2$ monitor in place or other available information to assess air quality.[23]

Vistra Energy's December 19, 2017, letter providing additional information to support its petition for reconsideration inaccurately states that TCEQ was deploying new $SO_2$ monitors "consistent with the EPA's stated desire to make designations based on monitoring data where it exists, not based on modeling simulations." Similar to Luminant's claims during the public comment period, Vistra Energy's assertions that monitoring data are necessary to support designations under the 2010 $SO_2$ NAAQS in all cases is unfounded. The EPA continues to agree with the reasoning that the EPA provided in the Round 2 Supplement.

Vistra Energy supports its preference for monitoring over modeling by referencing TCEQ's plans for deploying new $SO_2$ monitors in the Martin Lake, Big Brown and Monticello areas. The petition states, "there is every reason to believe that the proposed new monitors to be sited near Luminant's plants – which the EPA has refused thus far to approve – will show compliance with the one-hour $SO_2$ NAAQS." This objection does not meet the first criterion, as the petitioner fails to demonstrate in the petition that the objection was impracticable to raise in the public comment

---

[23] Round 2 Supplement Reponses to Comments, Page 13.

period or that the grounds for the objections arose after the end of the period for public comment but within the 60-day period for filing a petition for judicial review of the final designations. This objection does not meet the second criterion because, as explained further in Section V of this document, these monitors began operating nearly a year (October or November 2017) after the EPA's court-ordered deadline to designate the areas, and thus the data from these monitors are not reflective of air quality at the time of the EPA's final designations in December 2016 and, therefore, could not have affected the outcome of the rule. In the responses to comments document that accompanied the Round 2 Supplement, the EPA previously provided this response to the Utility Air Regulatory Group's similar claim made during the public comment period:

> In response to the commenter's suggestion that designations should await future completion of three years of monitoring, the EPA notes that in the case of the designations subject to the court's order to designate certain areas by July 2, 2016, the agency does not have the discretion to await the results of future monitoring.[24]

These objections also do not meet the second criterion because the EPA is required to consider all available information in making its designations at the time of the final designations under the CAA. Thus, these objections could not have affected the outcome of the rule since they are predicated on the EPA relying on or weighing more heavily information that was not available at the time the EPA was required to finalize the Round 2 Supplement. As explained previously, at the time of EPA's final designations on December 13, 2016, there were no $SO_2$ monitors sited in the areas of maximum concentration to properly characterize the air quality around Martin Lake, Big Brown or Monticello, nor were there $SO_2$ monitors in the same counties as the facilities. The absence of available monitoring data at that time did not relieve the EPA of its obligation to issue designations for these areas under the court order. CAA section 107(d) specifies that the EPA make designations based on the air quality at the time of final designations (*i.e.*, determining at the time of signature whether the area meets the NAAQS). Furthermore, at the time of the final designations, the agency did not have the discretion to await the results of three years of ambient air monitoring data (*i.e.*, 2018-2020) from Texas's proposed (but not yet established) monitoring sites before taking final action due to the court's order to designate certain areas in Texas. There was, however, as explained previously and in the EPA's final designations TSD, valid modeling submitted by the Sierra Club based on the then-most recent actual emissions demonstrating that the areas were violating the 2010 $SO_2$ NAAQS. The EPA properly considered these modeling data to establish a designation of nonattainment for these areas. Additionally, the EPA does not interpret the statute as allowing the EPA to consider future air quality in the initial designations process, and the D.C. Circuit has upheld this interpretation as reasonable.[25]

---

[24] Round 2 Supplement Reponses to Comments, Page 14.

[25] *See Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 156 (D.C. Cir. 2015); *Catawba County v. EPA*, 571 F.3d 20, 43-44 (D.C. Cir. 2009). The 2015 decision upheld the EPA's designations issued just days before new certified air-quality data became available showing more areas violating the 2008 ozone NAAQS than the EPA designated as nonattainment. *See also State of Texas v. EPA*, 983 F.3d 826, 837-838 (5th Cir. 2020) (holding that the EPA's nonattainment designation, which modified the state's recommendation, was not arbitrary and capricious because the county was not compliant with the ozone NAAQS when the EPA promulgated its designation and the CAA uses concrete terms such that a county either does or does not meet the NAAQS).

## B.    State Designation Recommendations

Vistra Energy's petition reiterates that TCEQ and the governor of Texas described its designations preference to the EPA in its September 18, 2015, designation recommendations letter and that the EPA modified TCEQ's recommendations. In relation to the previous section, the petitioner asserts that basing the area designations on monitoring data is necessary when making NAAQS designations and would be more consistent with the goals of the CAA, which "gives great deference to governors' recommendations for areas within their states . . . ." citing *Pennsylvania Dep't of Envtl. Prot. v. EPA*, 429 F.3d 1125, 1129 (D.C. Cir. 2005). Furthermore, the petitioner states that the CAA "gives the EPA the power to modify a state's designation only to the extent 'necessary,' thereby establishing a differential standard for EPA disposition of a state choice." *See* 52 FR 49408 at 49410 (December 31, 1987).

The petitioner's objection does not meet the first criterion because it repeats comments already submitted to the EPA during the public comment period for the intended designations. In the responses to comments document that accompanied the Round 2 Supplement, the EPA previously provided this response to Luminant's similar claim made during the public comment period:

> The commenter reads CAA section 107(d)(1)(B)(ii) as imposing a burden on the EPA to prove that any modification to a state's designation recommendation is "necessary," but this reads the word out of its larger context within that subsection, which confers broad technical discretion on the EPA in promulgating final designations. *See Catawba Cnty., N.C. v. EPA*, 571 F.3d 20 (D.C. Cir. 2009). The EPA reasonably and consistently concludes that it is clearly "necessary" to modify the designation recommendation to account for any information regarding the air quality of an area that persuasively supports such modification.[26]

This objection does not meet the second criterion because the petitioner fails to demonstrate that it is of central relevance to the outcome of the rule. For these three areas in Texas, the EPA considered Texas's unclassifiable/attainment designation recommendations but modified them given that they were not supported by currently available information; specifically, the EPA's assessment of Sierra Club's modeling showing violations of the 2010 $SO_2$ NAAQS. At the time of the EPA's final nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County, although Texas preferred that the EPA designate the areas based on proposed future monitoring data rather than modeling, there were no representative monitoring data or other reliable modeling demonstrations available to refute Sierra Club's information demonstrating violations of the 2010 $SO_2$ NAAQS, as explained in the EPA's final designations TSD.[27] Therefore, even though the EPA considered Texas's preference for monitoring, given that the statute requires that the EPA consider available

---

[26] Round 2 Supplement Reponses to Comments, Page 39.

[27] The EPA also received a comment from the UARG suggesting that the EPA wait for the future completion of three years of monitoring before designating certain Round 2 areas. In the Round 2 Supplement Responses to Comments (page 14), the EPA responded that the agency does not have the discretion to await the results of future monitoring because of the court order to designate certain areas by the July 2, 2016, deadline. This comment from UARG further demonstrates that the petitioner's objection does not meet the first criterion because it repeats a comment already submitted to the EPA during the public comment period for the intended designations.

information, Texas's preference for reliance on monitoring information when there were no such monitoring data available at the time of the EPA's final designations in December 2016 did not and could not rebut Sierra Club's modeling showing violations of the 2010 $SO_2$ NAAQS.[28] As explained in Section III.A., the EPA reaffirms the reasoning that the EPA provided in the Round 2 Supplement.

## C.    *Actual $SO_2$ Emissions*

Vistra Energy's petition asserts that the modeling, which the EPA relied on for its final nonattainment designations of these areas in Texas is based on higher $SO_2$ emissions data, from either the 2012-2014 or 2013-2015 3-year periods, and did not reflect more recent $SO_2$ emissions at the facilities (
Table **2**). Sierra Club's revised March 2016 modeling used the 2013-2015 actual $SO_2$ emissions for Big Brown and Martin Lake, and the 2012-2014 actual $SO_2$ emissions for Monticello. The older Sierra Club modeling, which the EPA relied on for the intended designations of the areas, was based on the 2012-2014 actual $SO_2$ emissions for all three facilities. The petitioner states that Big Brown's $SO_2$ emissions decreased from 62,494 tons in 2013 to 49,838 tons in 2015 and 42,470 in 2016. Similarly, Martin Lake's $SO_2$ emissions decreased from 62,735 tons in 2013 to 22,928 tons in 2015 and 25,471 tons in 2016.[29]

This objection does not meet the first criterion, as the petitioner fails to demonstrate that it was impracticable to raise in the public comment period for the Round 2 Supplement or that the grounds for the objection arose after the end of the period for public comment but within the 60-day period for filing a petition for judicial review of the Round 2 Supplement.

**Table 2.** Actual $SO_2$ Emissions (tons) for Facilities Addressed in the Round 2 Supplement

| Facility | Modeled Emissions Period | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|
| Big Brown | 2013-2015 | 60,681 | 62,494 | 57,460 | 49,884[a] | 42,470 |
| Martin Lake | 2013-2015 | 43,096 | 62,735 | 53,656 | 22,927[b] | 25,471 |
| Monticello | 2012-2014 | 31,447 | 24,396 | 20,438 | 18,395 | 24,958 |

[a] The total 2015 emissions were not yet available in the EPA's Air Markets Program Data when Sierra Club retrieved the data for its March 2016 modeling. Sierra Club calculated the 2015 emissions from the supplied emissions from the continuous emissions monitor. The final 2015 $SO_2$ emissions were 49,837 tons which is a 47 tpy difference, or a 0.09 percent decrease.
[b] The total 2015 emissions were not yet available in the EPA's Clean Air Markets Program Data when Sierra Club retrieved the data for its March 2016 modeling. Sierra Club calculated the 2015 emissions from the supplied emissions from the CEM. The final 2015 $SO_2$ emissions were 22,928 tons which is 1.3 tpy difference, or a 0.0057 percent increase.

This objection does not meet the second criterion because as explained in Section III.A., the EPA does not interpret the statute as allowing the EPA to consider future air quality in the initial

---

[28] *See State of Texas v. EPA*, 983 F.3d 826, 836-838 (5th Cir. 2020).
[29] The petition did not address the more recent $SO_2$ emissions for Monticello, but the EPA notes that Monticello's $SO_2$ emissions decreased from 31,447 tons in 2012 to 18,395 tons in 2015 and then increased to 24,958 tons in 2016.

designations process, and the D.C. Circuit has upheld this interpretation as reasonable,[30] and the petitioner fails to demonstrate that use of different emissions in the model would have resulted in a different designations outcome – *i.e.*, attainment of the 2010 $SO_2$ NAAQS – and thereby would have been of central relevance to the outcome of the 2016 rule. At the time the EPA Administrator signed the Round 2 Supplement on November 29, 2016, the total $SO_2$ emissions were not yet available for calendar year 2016, and only the total 2012-2014 actual $SO_2$ emissions data were available at the time of the public comment period in March 2016. Sierra Club submitted revised modeling on March 31, 2016, during the public comment period, based on the most recent annual $SO_2$ emissions data available at the time (total 2012-2014 actual emissions) and an estimation of the total 2015 emissions for Big Brown and Martin Lake based on the partial 2015 emissions data available (Table 2). While Vistra Energy noted the $SO_2$ emissions fluctuations in the petition for reconsideration, it did not provide modeling of the more recent 2014-2016 actual $SO_2$ emissions for any of the facilities to refute Sierra Club's modeling nor demonstrate whether the areas were attaining the 2010 $SO_2$ NAAQS at the time of the EPA's final designations in December 2016. The information Vistra Energy provides regarding annual emissions alone does not refute Sierra Club's March 2016 modeling nor demonstrate that the areas were attaining the 2010 $SO_2$ NAAQS at the time of EPA's final designations in December 2016 because a decrease in annual emissions does not necessarily result in a lower design value. As implied in the EPA's "$SO_2$ NAAQS Designations Source-Oriented Modeling Technical Assistance Document," the temporal distribution of emissions at a facility across emissions sources, time of day, and season of the year, as well as meteorological conditions, are factors that affect the final design value.

Regardless of the annual $SO_2$ emissions trends, the EPA's evaluation of the Sierra Club's March 2016 modeling used for the final designations indicated that it may have actually had a slight underestimation bias. For example, as explained in the responses to comments document that accompanied the Round 2 Supplement, the modeling did not include surrounding $SO_2$ sources and used a low background concentration. After further consideration, for the same reasons explained in Section III.A., the Round 2 Supplement responses to comments document, and the supporting technical support documents, the EPA believes that Sierra Club's March 2016 modeling was of sufficient quality to determine that the Martin Lake, Big Brown and Monticello facility areas in Texas were violating the 2010 $SO_2$ NAAQS at the time of the EPA's final designations in December 2016. The EPA also notes that this conclusion is consistent with our analysis in Section V of this document.

### *D.    Facility Retirement Announcements*

In Vistra Energy's December 19, 2017, letter providing additional information in support of its petition for reconsideration, the petitioner states that Luminant obtained approval from the Electric Reliability Council of Texas to decommission and permanently retire the Big Brown and Monticello plants in early 2018. Because of the October 2017 announcement regarding the facility shutdowns, the petitioner claimed that the Big Brown and Monticello areas were designated "in error and should be changed." The petitioner also claims that Sierra Club's March 2016 modeling, which was the basis for the EPA's nonattainment designations for the Big

---

[30] *See, supra,* n.25.

Brown and Monticello areas "were based on the assumption that the Monticello Plant and the Big Brown Plant would continue to operate, an assumption that is in error." Finally, Vistra Energy maintains that TCEQ should not needlessly expend resources developing a state implementation plan revision "to address these erroneous designations."

The petitioner fails to and could not demonstrate that these objections meet the first criterion because the facility shutdowns, as detailed further in Section V of this document, occurred more than 60 days after publication of the Round 2 Supplement in the *Federal Register*. These objections do not meet the second criterion because, as explained in Section III.A, the EPA does not interpret the statute as allowing the EPA to consider future air quality in the initial designations process, and the D.C. Circuit has upheld this interpretation as reasonable;[31] thus, any impact on air quality from these later-occuring shutdowns are not of central relevance to the outcome of the rule. These objections do not meet the second criterion because the nonattainment designations were not based on an assumption of future air quality, but rather were based on a determination regarding current air quality at the time of the EPA's final designations in December 2016.

As shown previously in Table 2, Sierra Club modeled the 2013-2015 actual emissions for Big Brown and the 2012-2014 actual emissions for Monticello. This modeling was based on neither future emissions nor the assumption that the two plants would continue to operate into the future. The petitioner's objection regarding the modeled emissions used for final designations does not meet the second criterion because the facility shutdowns occurred after the EPA's court-ordered deadline to designate the areas and are not reflective of or of central relevance to air quality at the time of the EPA's final designations in December 2016, and, therefore, could not have affected the outcome of the 2016 rule. For the same reasons explained in the Round 2 Supplement and Section III.A., the EPA believes that that Sierra Club's March 2016 modeling properly demonstrated that the Big Brown and Monticello areas were violating the 2010 $SO_2$ NAAQS at the time of the EPA's final designations in December 2016. This conclusion is consistent with our analysis in Section V of this document. The EPA also notes, regarding Texas's planning obligations, that these designations have remained in continuous effect (*i.e.*, the planning obligations were triggered by the nonattainment designations and were never stayed or altered), and the time and resources that TCEQ is required by the CAA to expend to meet these obligations are not relevant to the factual determinations the EPA made regarding air quality in 2016.[32]

### E.    *Ability to Provide Public Comment*

Vistra Energy's petition asserts that the EPA relied on modeling that was not subject to public comment for the December 2016 final nonattainment designations for portions of Freestone and

---

[31] *See, supra,* n.25.

[32] Subsequent to TCEQ's petition, more recently at the request of Texas, the EPA finalized a determination that the Big Brown and Monticello areas are now attaining the 2010 SO2 NAAQS per the EPA's Clean Data Policy. *See https://www.regulations.gov* under Docket ID No. EPA-R06-OAR-2020-0434. This determination suspends most attainment planning requirements under the 2010 $SO_2$ NAAQS for these two areas for as long as the areas continue to attain the NAAQS.

Anderson Counties, Rusk and Panola Counties and Titus County. The petition states that the EPA relied on Sierra Club's modeling that "was submitted on the last day of the public comment period (March 21, 2016)" and claims that the modeling "was not even posted by the EPA to the electronic docket." Vistra Energy further contends that neither they nor the State had the opportunity to comment on that modeling, which was used as the basis for the EPA's final nonattainment designations for the three areas in Texas.

The EPA's intended nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County were based on Sierra Club's September and December 2015 modeling that demonstrated violations of the 2010 $SO_2$ NAAQS. The EPA docket office posted both the September 17, 2015, modeling analysis (Docket ID No. EPA-HQ-OAR-2014-0464-0084) and the December 14, 2015, modeling analysis (Docket ID No. EPA-HQ-OAR-2014-0464-0082) to the public docket on March 1, 2016, the same day that the EPA's intended Round 2 designations were published in the *Federal Register*.

As explained in the EPA's intended designations TSD, the EPA identified aspects of Sierra Club's 2015 modeling that were not as refined as possible. The modeling did not include building downwash or variable stack temperature and velocity, since Sierra Club did not have access to information needed to support such inclusion (including building downwash will generally, though not always, increase the predicted maximum modeled concentrations). Sierra Club's 2015 modeling used stack velocity and temperatures consistent with 100 percent load. This, coupled with actual hourly emissions rates, underestimated actual concentrations because higher temperatures and velocities of 100 percent load, when paired with lower emissions of less than 100 percent load, should provide an overestimation of the dispersion and thus an underestimation of maximum ambient concentrations at ground level. Because the inclusion of building downwash and variable stack parameters would likely not result in values near or below the 2010 $SO_2$ NAAQS, EPA concluded that the Sierra Club's 2015 modeling was an adequate basis for the intended nonattainment designations for the areas containing Martin Lake, Big Brown and Monticello.

Sierra Club submitted its comment (Docket ID No. EPA-HQ-OAR-2014-0464-0332) on the EPA's intended Round 2 designations on March 31, 2016, and the submission was posted publicly on April 7, 2016, before the end of the 120-day period for Texas to demonstrate why it believed the EPA's proposed designation modifications were inappropriate. Sierra Club's March 2016 comment consisted of a cover letter, exhibits, attachments, and modeling files submitted on a CD-ROM. Due to the file size, the EPA Docket Office could not post the modeling files from the CD-ROM media on *www.regulations.gov*. Instead, the EPA Docket Office included a placeholder document in the public docket that had directions for requesting a copy of the materials either in-person or via phone, fax or email. The notice of availability (81 FR 10563) and the electronic docket also included the contact information for the EPA staff who were available to answer questions about the designations action and related materials.

The petitioner's objection does not meet the first criterion as the administrative record for the Round 2 Supplement clearly demonstrates that the public had ample opportunity to offer meaningful comments on the air-quality information considered and relied on, and the EPA's designations of these three areas as nonattainment in the Round 2 Supplement was a logical outgrowth of the noticed intended designations. Sierra Club's revised March 2016 modeling generally addressed the

concerns that either the EPA identified in its intended designations TSD or that Luminant identified in its public comment. While the EPA's final nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County were further supported by the Sierra Club's revised March 2016 modeling, Sierra Club's 2015 modeling was publicly available for the entire 30-day public comment period, as was the EPA's evaluation of Sierra Club's 2015 modeling in the intended designations TSD that Sierra Club's revised March 2016 modeling responded to.[33]

The petitioner's objection does not meet the second criterion because it does not demonstrate that the alleged inability to comment on the differences between Sierra Club's 2015 and 2016 modeling, differences that improved the quality of the modeling and addressed concerns previously raised, provides substantial support for the argument that the promulgated 2016 action should be revised. In other words, the petitioner does not show that comments it would have provided on Sierra Club's 2016 modeling would have provided substantial support for a designation other than nonattainment and thereby affected the outcome of the 2016 rule. For the same reasons explained in the Round 2 Supplement and Section III.A., the EPA believes that that Sierra Club's March 2016 modeling properly demonstrated that the three areas were violating the 2010 $SO_2$ NAAQS at the time of the EPA's final designations in December 2016. This conclusion is also consistent with our analysis in Section V of this document. Furthermore, the CAA explicitly does not require that designations include public notice and comment.[34]

## IV. The EPA's Evaluation of the Petition for Administrative Stay

As part of Vistra Energy's February 13, 2017, petition for reconsideration, the petitioner also asks the EPA to administratively stay the effective date of the final nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County pursuant to APA section 705 and CAA section 307(d)(7)(B). The EPA concludes that an administrative stay of the Round 2 Supplement for these three areas' designations is neither appropriate nor warranted.

APA section 705 authorizes an agency to postpone the effective date of an agency action pending judicial review when the agency finds that justice so requires. In this case, the Round 2 Supplement became effective January 12, 2017. The petitioner submitted its request for an administrative stay relying upon APA section 705 by petition on February 13, 2017, 32 days after the Round 2 Supplement became effective. Even if the EPA believed that an administrative stay was warranted here, which it does not, an APA section 705 stay is not appropriate once the effective date of the agency action has passed because postponing an effective date necessitates action before the effective date arrives. *See, e.g., NRDC v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 151 (S.D.N.Y. 2019) ("Section 705 only allows an agency to 'postpone the effective date of action taken by it.' 5 U.S.C. § 705. It does not allow agencies to suspend a rule that has already taken effect."); *see also Safety-Kleen Corp. v. EPA*, 1996 U.S. App. LEXIS 2324, *2-3 (D.C. Cir. Jan. 19, 1996); *Becerra v. U.S. Department of Interior*, 276 F.Supp.3d 953 (N.D. Cal. 2017); *California v. United States BLM*, 277 F.Supp.3d 1106 (N.D. Cal. 2017). The EPA stated in its

---

[33] EPA also notes that it is not required under CAA section 107(d) to seek public comment during the NAAQS designations process, though EPA elected to provide public notice and comment for the Round 2 designations.

September 21, 2017, letter to Vistra Energy that the December 2016 final nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County remain in effect while the EPA's intended notice and comment rulemaking action is pending (*i.e.*, the August 2019 proposed error correction).

Even assuming that the EPA has authority to grant an administrative stay here under APA section 705 at this time, an administrative stay is not warranted for the same reasons that the EPA is denying the petition to reconsider, including that the objections raised did not provide substantial support for the argument that the Round 2 Supplement should be revised. The EPA has determined that the petitioner does not make a showing on the merits that reconsideration or stay is warranted after consideration of the petitioner's claims, including claims of emissions declines and predictions regarding then-future monitoring data, as well as acknowledgment of the currently available monitoring and review of the currently available modeling data discussed in Section V.

When acting under CAA section 307(d)(7)(B), the EPA has authority to issue a stay for up to 3 months if the criteria for mandatory reconsideration of a CAA section 307(d) rule are met. *See Clean Air Council v. Pruitt*, 862 F.3d 1, 8 (D.C. Circuit 2017); *see also Air Alliance Houston v. EPA*, 906 F.3d 1049 (D.C. Cir. 2018). As explained in Section II, the Round 2 Supplement is not a CAA section 307(d) rule and the mandatory reconsideration criteria under CAA section 307(d)(7)(B) do not apply to it, and thus the corresponding authority to issue an administrative stay under that provision, when met, also does not apply. Furthermore, as explained above in denying the petition to reconsider, even if the criteria for mandatory reconsideration did apply, the criteria are not met here and, thus, the EPA would not have authority to issue a stay under CAA section 307(d)(7)(B).

## V.    Additional Information

### A.    Recent $SO_2$ Emissions Data

As shown in Table 3, Martin Lake's $SO_2$ emissions have more than doubled from 25,472 tons in 2016 to 56,198 tons in 2018, making Martin Lake the largest emitter of $SO_2$ in the United States.[35] Big Brown's $SO_2$ emissions decreased from 42,470 tons in 2016 to 6,659 tons in 2018, and Monticello's emissions decreased from 24,961 tons in 2016 to 0 tons in 2018. As explained in additional detail below, both the Big Brown and Monticello facilities permanently and enforceably shut down in 2018 (*i.e.*, the facilities surrendered their operating permits and must obtain all required air quality permits from TCEQ prior to future operation).

**Table 3.** Comparison of Recent $SO_2$ Emissions (tons)

| Facility | 2016 | 2017 | 2018 |
|---|---|---|---|
| Martin Lake | 25,472 | 36,441 | 56,198 |
| Big Brown | 42,470 | 47,632 | 6,659 |
| Monticello | 24,961 | 29,412 | 0 |

---

[35] *See https://ampd.epa.gov/ampd/.*

Regarding the Anderson and Freestone Counties area, Vistra Energy permanently retired the Big Brown coal-fired steam electric generating Units 1 and 2 on February 12, 2018. Vistra Energy filed to void the Big Brown Title V permit, FOP 065, on May 24, 2018, and TCEQ voided this permit on August 29, 2018. Vistra Energy submitted a letter to TCEQ on March 27, 2018, requesting that the agency void Big Brown's individual new source review permits (17891, 18744, 45420, 53205, 54810, 56445, 56447, 83646, 83647, 85296, 94619, 95214, 96276, 99047, 99050, 106862, 108990, 112207 and 148918). On March 29, 2018, TCEQ cancelled all NSR authorizations for Big Brown Units 1 and 2 and certain other facilities, as requested by Vistra Energy.[36] Vistra Energy will retain the remaining permits (17891, 18744, 56447, 106862 and 112207) addressing material handling operations for coal piles, silos and conveyors, until all facility closure activities are completed.

Regarding the Titus County area, Vistra Energy permanently retired the Monticello coal-fired steam electric generating Units 1, 2, and 3 on December 31, 2017. Vistra Energy filed to void the Monticello Title V permit, FOP 64, on May 23, 2018, and TCEQ voided this permit on August 3, 2018. Vistra Energy submitted a letter to TCEQ on February 9, 2018, requesting that the agency void individual NSR permits (2401, 26740, 45432, 54808, 56384, 71238, 85294, 95215, 104897, 105738, 146220, 83645 and 83640). On February 14, 2018, TCEQ cancelled all NSR authorizations for Monticello Units 1, 2, and 3 and certain other facilities, as requested by Vistra Energy.[37,38] Vistra Energy will retain the remaining permits (146278, 2399, 140265, 137864, 56387, 54408 and 104210) addressing material handling operations for coal piles, silos and conveyors, until all facility closure activities are completed.

Although the Big Brown and Monticello facilities permanently and enforceably shut down in 2018, the shutdowns have no bearing on whether the areas were attaining the 2010 $SO_2$ NAAQS at the time the EPA designated the areas in December 2016. Additionally, the facility shutdowns do not rebut the modeling information relied upon by EPA for designating the Big Brown and Monticello areas at the time of the Round 2 Supplement.

### B.    Recent $SO_2$ Monitoring Data

In its 2017 annual monitoring network plan, TCEQ proposed new $SO_2$ monitoring sites in the Freestone and Anderson Counties, Rusk and Panola Counties and Titus County areas to assess air quality in the new $SO_2$ nonattainment areas involving the Vistra Energy facilities. Texas referred to the 2016 Sierra Club modeling analysis, among other information, to inform its proposed siting of the new monitors.[39] The EPA approved TCEQ's 2016 Texas Ambient Monitoring Network Plan on October 3, 2017.[40] In October and November 2017, almost a year after the EPA designated the three areas in Texas as nonattainment for the 2010 $SO_2$ NAAQS,

---

[36] *See* Docket ID No. EPA-HQ-OAR-2014-0464-0455 for a list of Big Brown's voided NSR permits. Big Brown's voided operating permit is also located in Docket EPA-HQ-OAR-2014-0464.
[37] *See* Docket ID No. EPA-HQ-OAR-2014-0464-0456 for a list of voided NSR permits, and docket item number EPA-HQ-OAR-2014-0464-0457 for the voided operating permit.
[38] Any remaining NSR or material handling permits for Big Brown and Monticello will only be maintained while the facilities complete closure activities related to coal piles, silos conveyors, and other shutdown tasks.
[39] *https://www.tceq.texas.gov/assets/public/compliance/monops/air/annual_review/historical/2017-AMNP.pdf*
[40] *https://www.tceq.texas.gov/assets/public/compliance/monops/air/annual_review/historical/EPA2017AMNP.pdf*

Texas began operating the new $SO_2$ monitoring networks to characterize the air quality around the Martin Lake and Big Brown facilities.[41]

On November 1, 2017, Texas began operating an $SO_2$ monitor (AQS ID# 48-401-1082) in the Rusk and Panola Counties area to characterize the air quality around the Martin Lake facility. From that time through May 2020, there have been 22 daily maximum one-hour average concentrations that exceeded the 2010 $SO_2$ NAAQS. The 2018, 2019 and 2020 99th percentile daily maximum one-hour average concentrations are 109.1 ppb, 114.7 ppb and 83.8 ppb (preliminary), respectively. Although a valid and quality assured three-year design value is not yet available (pending certification of 2020 air quality data), the EPA estimates that the 2018-2020 design value is 103 ppb based on data submitted to the EPA through December 2020, which would violate the 2010 $SO_2$ NAAQS. It is important to recognize that the 2017-2020 monitoring data do not provide a demonstration of air quality at the time of the EPA's court-ordered deadline to designate the Martin Lake area in December 2016. As such, the monitoring data neither directly corroborate nor rebut the EPA's basis for designating the area as nonattainment at the time of the Round 2 Supplement. The newer monitoring data do, however, indicate that there are likely current, and potentially ongoing, violations of the 2010 $SO_2$ NAAQS in this area. Additionally, despite the petitioner's predictions to the contrary, the newer monitoring data neither suggest that the Martin Lake area is now attaining the 2010 $SO_2$ NAAQS, nor do the data appear to support the claim that the previously established requirement for Texas to undertake air quality planning efforts to bring the area into NAAQS attainment should be suspended or terminated.

On October 30, 2017, Texas began operating an $SO_2$ monitor (AQS ID 48-161-1084) in the Freestone and Anderson Counties area to characterize the air quality around the Big Brown facility. From this time through May 2020, there was only a single daily maximum one-hour average concentration that exceeded the 2010 $SO_2$ NAAQS, which occurred prior to Big Brown shutting down. The 2018 and 2019 99th percentile daily maximum one-hour average concentrations are 39.4 ppb and 5.8 ppb, respectively, and the recent monitoring data indicate that there have not been ongoing exceedances of the 2010 $SO_2$ NAAQS since Big Brown shut down. However, given that the 2017-2020 monitoring data do not provide a demonstration of air quality at the time of the EPA's court-ordered deadline to designate the Big Brown area in December 2016, the monitoring data neither directly corroborates nor rebuts the EPA's basis for designating the area as nonattainment at the time of the Round 2 Supplement. The 2017-2020 monitoring data are unable to demonstrate whether the area was attaining the 2010 $SO_2$ NAAQS by the EPA's court-ordered deadline to designate the area in December 2016, while the facility was still operating, and, therefore, do not rebut the EPA's nonattainment determination made in the Round 2 Supplement.

### C.   Recent $SO_2$ Modeling Data

The EPA received several comments on its August 22, 2019, CAA section 110(k)(6) proposed error correction action proposing to revise the designations to unclassifiable for portions of

---

[41] Texas did not install and operate the $SO_2$ monitor planned near the Monticello facility once the facility retirement was announced in 2017.

Freestone and Anderson Counties, Rusk and Panola Counties and Titus County.[42] Specifically, on September 23, 2019, Sierra Club submitted a comment that included updated modeling purporting to demonstrate that the Martin Lake area did not meet the 2010 $SO_2$ NAAQS at the time of designation and currently does not meet the 2010 $SO_2$ NAAQS based on more recent data, even when the EPA's potential modeling limitations are appropriately addressed.[43] As explained further in Enclosure 2, the EPA's assessment of Sierra Club's September 2019 modeling concludes that there were not errors in the March 2016 modeling, which the EPA used as the basis for its final nonattainment designations in the Round 2 Supplement, that would have resulted in designations other than nonattainment. Although Sierra Club did not submit updated modeling for the Big Brown and Monticello areas as part of the September 2019 submission, it claims that the EPA's previously identified limitations (individually or collectively) have no material effect on the model results for those areas. Overall, the EPA believes that Sierra Club's September 2019 modeling, as it addresses air quality that existed at the time of the 2016 designations, further confirms our analysis of then-available data and the final December 13, 2016, nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County.

## VI. Conclusion

For the aforementioned reasons, the EPA is denying Vistra Energy's February 13, 2017, petition for reconsideration and has determined that a stay of the EPA's final nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County is not appropriate or warranted. The 2010 $SO_2$ NAAQS nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County, which the EPA published in the *Federal Register* on December 13, 2016, continue to remain in effect. The EPA notes, however, that it recently finalized a separate administrative action (*i.e.*, a clean-data determination) that suspends most attainment planning requirements for the Freestone and Anderson Counties and Titus County areas for so long as the areas remain in attainment with the 2010 $SO_2$ NAAQS.[44]

---

[42] *See* Docket ID No. EPA-HQ-OAR-2014-0464.

[43] *See* Docket ID No. EPA-HQ-OAR-2014-0464-0466.

[44] *See*, *supra*, n.32.

## Enclosure 2

## The U.S. Environmental Protection Agency's Assessment of Sierra Club's September 2019 Modeling

### I.    Executive Summary

The U.S. Environmental Protection Agency received several comments on its August 22, 2019, Clean Air Act section 110(k)(6) proposed error correction action proposing to revise the nonattainment designations to unclassifiable for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County, Texas ("Proposed Error Correction," 84 FR 43757).[1] Specifically, on September 23, 2019, Sierra Club submitted a comment that included updated modeling purporting to demonstrate that the area around the Martin Lake Electric Station (*i.e.,* Rusk and Panola Counties) did not meet the 2010 Sulfur Dioxide ($SO_2$) Primary National Ambient Air Quality Standard at the time of initial designations in December of 2016 and, at the time of the comment submission, did not meet the 2010 $SO_2$ NAAQS based on more recent data (*i.e.,* 2016-2018 data), even when potential modeling limitations (as characterized in the Proposed Error Correction) are appropriately addressed.[2]

As explained further in this document, the EPA's assessment of Sierra Club's September 2019 modeling concludes that this modeling confirms the EPA's initial assessment of the Sierra Club's March 2016 modeling for all three areas, which EPA used as the basis for its final nonattainment designations in the Round 2 Supplement (81 FR 89870). More specifically, Sierra Club's 2019 modeling confirms the EPA's initial assessment that any further refinements to the modeling inputs used in the March 2016 modeling would not have resulted in designations other than nonattainment for these three areas. The EPA's assessment of the March 2016 modeling in the record for the Round 2 Supplement, which is consistent with the EPA's assessment in this document of Sierra Club's September 2019 modeling, concludes that there were not material errors in the March 2016 modeling for these three areas. Furthermore, the EPA concludes that Sierra Club's September 2019 updated modeling further demonstrates that the individual and collective alleged limitations of the March 2016 modeling, as characterized in the EPA's Proposed Error Correction, were not in fact limitations that undermined the EPA's reasonable reliance on the March 2016 modeling to determine the areas were then violating the 2010 $SO_2$ NAAQS and designate them as nonattainment. In fact, the EPA no longer believes that the bases identified in the Proposed Error Correction (*e.g.,* that those alleged limitations in the March 2016 modeling support action under CAA section 110(k)(6) to revise the designations) support the proposed conclusion that an error correction is appropriate. Overall, the EPA believes that Sierra Club's September 2019 modeling, as it addresses air quality that existed at the time of the 2016 designations, further confirms our analysis and final December 13, 2016, nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County.

---

[1] *See* Docket ID No. EPA-HQ-OAR-2014-0464.

[2] *See* Docket ID No. EPA-HQ-OAR-2014-0464-0466. Although Sierra Club did not submit updated modeling for the Big Brown and Monticello areas as part of the September 2019 submission, it also claims that the EPA's proposed limitations (individually or collectively) have no material effect on the model results for those areas.

## II. Background

*A. Final Round 2 Supplement to 2010 SO₂ NAAQS Designations for Four Areas in Texas*

On December 13, 2016, the EPA designated portions of Freestone and Anderson Counties (Big Brown Steam Electric Station), Rusk and Panola Counties (Martin Lake Electric Station) and Titus County (Monticello Steam Electric Station) as nonattainment for the 2010 $SO_2$ NAAQS based on the EPA's assessment of all available information, including the Sierra Club's March 2016 modeling that demonstrated violations of the 2010 $SO_2$ NAAQS. *See* 81 FR 89870 ("Round 2 Supplement"). Vistra Energy's subsidiary Luminant owned all three power plants in 2016.

In finalizing the designations for the three Texas areas in 2016, the EPA reviewed all available information and determined that Sierra Club's March 2016 modeling used the latest model version available at the time, used the default regulatory options, and was conducted in accordance with the general recommendations on modeling provided by the EPA in its "$SO_2$ NAAQS Designations Modeling Technical Assistance Document" ("$SO_2$ NAAQS Designations Modeling TAD").[3] Sierra Club's March 2016 modeling provided to the EPA was inherently subject to the constraints of the data available to Sierra Club, specifically the level of refinement reflected the modeling inputs. The Sierra Club's March 2016 modeling made adjustments and corrections to its previously submitted December 2015 and September 2015 modeling (collectively referred to as 2015 modeling) in response to the EPA's assessment of the 2015 modeling in its February 2016 Intended Designations Technical Support Document. In the March 2016 modeling these adjustments and corrections included updating the model version used, updating to the most recent three years (2013-2015) of actual emissions for Martin Lake and Big Brown, inclusion of only the principle source in each area, and correction of switched stack locations at the Big Brown facility.[4] There were several aspects of the Sierra Club's March 2016 modeling that the EPA discussed in the Final Designations Supplement TSD[5] regarding potential deviation from or lack of refinement where information was not publicly available under the $SO_2$ NAAQS Designations Modeling TAD:

1. Exclusion of variable stack exit temperature (information not publicly available; used fixed values)
2. Exclusion of building downwash (information not publicly available)
3. Elevation of flagpole receptors (1.5 meters)
4. Use of older land use data at the surface meteorological station
5. Exclusion of fenceline or omission of receptors from certain locations (Luminant claimed certain locations were not feasible to place a monitor in receptor grid)

---

[3] *See* the $SO_2$ NAAQS Designations Modeling Technical Assistance Document ("$SO_2$ NAAQS Designations Modeling TAD") at *https://www.epa.gov/sites/production/files/2016-06/documents/so2modelingtad.pdf*.

[4] Technical Support Document Texas Area Designations for the 2010 $SO_2$ Primary National Ambient Air Quality Standard ("Intended Designations TSD"), available at *https://www.epa.gov/sites/production/files/2016-03/documents/tx-epa-tsd-r2.pdf*.

[5] Technical Support Document for the Designation Recommendations for the 2010 Sulfur Dioxide National Ambient Air Quality Standards (NAAQS) – Supplement for Four Areas in Texas Not Addressed in June 30, 2016 ("2016 Final Designations Supplement TSD"), available at *https://www.epa.gov/sites/production/files/2016-11/documents/texas_4_deferred_luminant_tsd_final_docket.pdf*.

36

6. Use of the lowest monitored background concentration in Texas

However, the EPA also analyzed the impact of these potential issues in the 2016 Final Designations Supplement TSD and determined that they did not undermine the use of the Sierra Club's March 2016 modeling for the purpose of designating the areas. The EPA's analysis concluded that inclusion of such refinements or changes would not be expected to result in a change to the modeled concentrations to the degree that would alter the conclusion that the areas did not meet the 2010 $SO_2$ NAAQS. In the 2016 Final Designations Supplement TSD, the EPA also noted that we received comments from Luminant. Luminant's comments included modeling, which did not conform with the $SO_2$ NAAQS Modeling TAD, but which provided some useful information regarding modeling inputs not previously available to the public.[6] For the area around the Martin Lake facility, the EPA concluded the following in the 2016 Final Designations Supplement TSD:

1. Regarding stack temperature, the EPA concluded that the constant temperature used by Sierra Club for the stacks (449.3K) was, on average, 21 percent higher than the continuous emissions monitor temperatures furnished by Luminant as part of their 2016 modeling analysis, which for near full load (filtered for stack velocity > 25 m/s), has an average of 356K and ranged between 338-478K. The EPA concluded that the increased temperature used by Sierra Club would increase the modeled buoyancy of the plume and tend to reduce modeled concentrations, and that the amount of reduction was dependent on meteorological conditions. The EPA determined that the use of the Sierra Club's higher-than-actual constant temperature would likely underestimate the actual concentrations.[7]

2. Regarding building downwash, the EPA concluded that, while we did not agree with the Sierra Club's assertion that exclusion of downwash is conservative in all cases, in our evaluation, the inclusion of building information and associated downwash in this analysis would not change our recommended designation of nonattainment. We noted that Luminant's modeling report (which Texas also included in their response to the EPA's intended designations) indicated that they expected that the modeling results were not extremely sensitive to this issue because the stack heights are well above the buildings and there is considerable momentum and buoyancy rise for the stack plumes. The EPA concluded that the modeling values were sufficiently above the standard and inclusion of downwash often leads to higher concentrations closer to the source but – even in situations we have seen where this did not occur – any decreases in maximum modeled values from inclusion of downwash were relatively small and not expected to be enough of a decrease to resolve all modeled exceedance values near Martin Lake.[8]

3. Regarding use of flagpole receptors, we stated that we would expect only a very slight change in the modeled numbers and the area of exceedances and magnitude of the values would be basically equivalent, and, therefore, not change our final action. We based this conclusion on analysis of sensitivity modeling conducted by the Sierra Club for another source, which found decreases in modeled $SO_2$ between almost 0 and 0.2 percent when removing the flagpole receptors and estimating concentrations at ground level. Since the

---

[6] *See* Docket ID No. EPA-HQ-OAR-2014-0464-0328.
[7] 2016 Final Designations Supplement TSD, p. 61.
[8] 2016 Final Designations Supplement TSD, pp. 61-62.

Sierra Club's March 2016 maximum modeled design concentration (in ambient air) at Martin Lake was at least 14 percent above the standard, the EPA concluded that the change due to flagpole receptor heights would not decrease the value to below the standard.[9]

4.  Regarding use of land surface data from 1992, the EPA indicated based on Sierra Club's 2016 modeling, which included a sensitivity analysis for updated surface data/characteristics, that a small decrease (*i.e.*, approximately 3.6 percent) in maximum modeled design concentrations would be expected from updated surface characteristics.[10]

5.  Regarding inclusion of contested receptors, the EPA only evaluated concentrations in Sierra Club's March 2016 modeling at receptors that represented areas where it was clear to the EPA based on available information that it would also be feasible to place a monitor and record ambient air impacts. Luminant's 2016 modeling included areas that it considered to be non-ambient, but the EPA did not have sufficient information to evaluate and conclude that all the areas Luminant was claiming as non-ambient were in fact non-ambient areas. Without sufficient data to support Luminant's non-ambient area claims, the EPA evaluated Sierra Club's March 2016 modeling results for the areas that Luminant did not claim as non-ambient, which we referred to as the "uncontested area." the EPA's assessment included evaluating concentrations at only uncontested receptors and separately also evaluating concentrations at areas that clearly were erroneously claimed as unfeasible by Luminant. The EPA also noted concerns that Luminant had contested receptors (excluded in Luminant's modeling) in more areas than were appropriate and that the maximum values in the uncontested area in Sierra Club's March 2016 modeling were as high as 239.1 micrograms per cubic meter ($\mu g/m^3$) near the Luminant excluded area.[11] For the EPA's analysis, we explained that we used 224 $\mu g/m^3$ (highest concentration at an uncontested receptor) to evaluate the modeling, but the analysis could also be done based on the 239.1 $\mu g/m^3$ value, which would further support a nonattainment designation for the area around Martin Lake.[12]

6.  Regarding background, the EPA concluded that many of the $SO_2$ monitors in Texas are in urban areas and/or near a $SO_2$ point source, so there were limited data for background values. In addition, the EPA concluded that using the El Paso monitor, which was the lowest design value in the state of Texas during this period, was an underestimation. Given the mass of $SO_2$ emissions in East Texas compared to the El Paso area, the EPA explained that this assumption likely leads to an underestimation in the concentrations around these facilities (*i.e.*, if background monitoring data existed for East Texas it would be expected to be a higher value than the El Paso monitor data and would result in an increase in the modeled concentrations around the Martin Lake facility) but was within the framework of the $SO_2$ NAAQS Designations Modeling TAD's options for inclusion of background monitoring data.[13]

---

[9] 2016 Final Designations Supplement TSD, pp. 58-60.

[10] 2016 Final Designations Supplement TSD, pp. 28, 76.

[11] 2016 Final Designations Supplement TSD, pp. 65-72. Note the captions for Figures 22 and 23 in the 2016 Final Designations Supplement TSD indicate the Maximum value of 229.1 $\mu g/m^3$ but that is a typographical error and should have been 239.1 $\mu g/m^3$.

[12] 2016 Final Designations Supplement TSD, pp. 60, 66-72.

[13] 2016 Final Designations Supplement TSD, p. 65.

4

Based on the modeling available at the time, the EPA also explained in the 2016 Final Designations Supplement TSD that inclusion of only the principle source in the modeling was an acceptable choice in this area's circumstances, as we maintained that Martin Lake was likely contributing nearly 100 percent of the impact for the values above the 2010 $SO_2$ NAAQS. Sierra Club's modeling, by not including the nearby Pirkey Power Plant, was potentially slightly under-estimating approach to determining whether the area is attaining and to identifying the boundaries of such area, as inclusion of this source should result in either similar maximum impacts and boundaries or slightly increased impacts and possibly slightly larger boundaries, but should not result in decreased impacts or "shrinking" of boundaries from those modeled.[14]

In the 2016 Final Designations Supplement TSD, the EPA concluded that the Sierra Club's March 2016 modeling followed the appropriate the EPA modeling guidance based on the information that was available to Sierra Club at the time, and specifically concluded that several techniques (*i.e.*, not including building downwash, not using variable stack temperature, not including other $SO_2$ emissions sources, and using the lowest monitored background concentration) generally would tend to reduce/underestimate modeled design concentrations.[15] The EPA also evaluated the combination of all these aspects (potential positive and negative impacts on concentrations) of the modeling through a comparison analysis, using 224 $\mu g/m^3$ as the maximum value based on the subset of uncontested receptors.[16] The EPA's assessment of the available information ultimately concluded that the collective differences/changes to the Sierra Club modeling would not result in modeled values near or below the standard.[17] The EPA reached this conclusion after considering that Sierra Club's modeled concentrations (with a low background and no nearby $SO_2$ emissions sources) were 14 percent above the standard using 224 $\mu g/m^3$ and 22 percent above the standard using 239.1 $\mu g/m^3$ as the maximum modeled design concentrations. The EPA evaluated the factors listed previously and concluded that these would result in Sierra Club's 2016 modeling under-estimating impacts and that any differences/changes to Sierra Club's modeling would not result in modeled values near or below the standard. Instead, the EPA concluded that any adjustments to these factors would actually result in higher modeled concentrations. Therefore, the EPA considered the final Sierra Club modeling submitted March 2016 to be relevant information that must be considered in our designation decision and found that the modeling was a sufficient basis for a nonattainment designation because it clearly demonstrated the area around Martin Lake was violating the 2010 $SO_2$ NAAQS.[18]

In addition to the March 2016 updated Sierra Club modeling, the EPA reviewed modeling submitted by Luminant during the public comment period in 2016.[19] The Luminant modeling did not conform to the guidance of the $SO_2$ Designations Modeling TAD nor the 40 CFR Part 51 Appendix W – Guideline on Air Quality Models. Furthermore, the EPA determined that Luminant's modeling was not representative of current air quality in these areas for several

[14] 2016 Final Designations Supplement TSD, pp. 60-62.
[15] 2016 Final Designations Supplement TSD, p. 75.
[16] 2016 Final Designations Supplement TSD, p. 76.
[17] 2016 Final Designations Supplement TSD, pp. 75-77.
[18] 2016 Final Designations Supplement TSD, p. 75-77.
[19] *See* Docket ID No. EPA-HQ-OAR-2014-0464-0328.

reasons, as further explained in the EPA's 2016 Final Designations Supplement TSD. Some examples of the issues the EPA identified with Luminant's modeling were:

- Luminant applied non-EPA preprocessor models, AERLIFT and AERMOIST, to the CEM data to increase the observed temperatures and (in the case of AERLIFT) velocities of the plumes exiting from the stacks. The EPA reviewed these proposed processors and supplied information, and then analyzed some of the significant changes that these processers were making to modeled stack parameters and buoyancy flux calculation. The lack of supporting documentation and the EPA's review of the changes the processors were making resulted in the EPA determining that AERLIFT and AERMOIST were not adequately justified and, thus, model results using these processors could not be relied upon in the designations decision-making process.[20]

- Luminant's March 2016 report included a then-future emissions estimate scenario (2017-2019 estimated $SO_2$ emissions). Luminant asserted that Martin Lake will not cause or contribute to nonattainment near the plant when modeled with Luminant's then-projected future emissions because the maximum modeled design concentration was 192.1 $\mu g/m^3$. These projected emissions were associated with potentially improving scrubber efficiency, fuel switches, and potentially collateral benefits with reductions of $SO_2$ from the facility complying with the Mercury Air Toxics Rule. In the 2017-2019 future estimated emissions modeling scenario, Luminant projected future emissions rates in 2017-2019 that were lower than recent actual emissions at the time based in part on future non-enforceable, voluntary operational changes at Martin Lake.[21] However, for the purpose of determining whether the area is currently meeting the 2010 $SO_2$ NAAQS and designating the area, either actual emissions or currently enforceable allowable emissions limits should be modeled. The EPA provided the following explanation in the 2016 Final Designations Supplement TSD:

> Neither the efficiency improvements in operation of existing scrubbers nor fuel switches were reflected in a permanently enforceable situation. This means that they could change, and are not a certain or effective limitation on either current or future emissions…In this case the intended switching of fuel and increases in scrubber efficiency, whether they have occurred or not, are not yet enforceable through any mechanism provided by Luminant - such as a permit limit - and Luminant would be free to either not switch or, if it does switch, change back to a higher sulfur content coal in the future, depending on circumstances.[22]

Without permanent and federally-enforceable emissions limits, the facility could make operational modifications (e.g., change the fuel type, alter the volume of process exhaust bypassing the scrubber, etc.), which may not be protective of future air quality.[23]

---

[20] The EPA also compared the difference between the pre-processors assumptions and impacts and the stack temperatures used in Sierra Club's March 2016 modeling. See, e.g., 2016 Final Designations Supplement TSD at pp. 55-61.

[21] As discussed elsewhere, actual emissions for this time period were higher than Luminant predicted and similar to the actual 2013-2015 emissions that were modeled to inform designations.

[22] 2016 Final Designations Supplement TSD, p. 55-56.

[23] 2016 Final Designations Supplement TSD, p. 55-56.

- Luminant's modeling used Beta options LOWWIND3 and ADJ_U* which had not been approved by the EPA for regulatory use and, among other conditions, required consultation and pre-approval from the EPA for regulatory applications as an alternative model. This process was not initiated or completed in the modeling of these three areas and thus, the modeling based on their use was determined by the EPA to not be acceptable for this regulatory use.[24]

B.    *Proposed Error Correction of 2010 SO₂ NAAQS Designations for Three Areas in Texas*

On August 22, 2019, the EPA proposed to determine it had made an error in the 2010 $SO_2$ NAAQS nonattainment area designations for three Texas areas and to revise the designations to unclassifiable for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County. *See* 84 FR 43757. The EPA proposed that it erred in not giving greater weight to Texas' preference to characterize air quality through monitoring, and steps undertaken by Texas towards siting monitors with the intention to begin monitoring in these three areas, when considering all available information; in relying on available air quality modeling analyses in making the initial designations that the EPA recognized included certain limitations and uncertainties; or a combination of these two issues.

Regarding the limitations and uncertainties with the Sierra Club 2015 and March 2016 modeling, the EPA stated in the Proposed Error Correction that given the possible collective significance of these issues and, in the case of the areas around the Martin Lake and Monticello power plants, given that the maximum modeled concentrations are within about 10 percent of the primary $SO_2$ NAAQS, we were less confident in our prior statements that potential adjustments to the Sierra Club modeling would not result in modeled values near or below the $SO_2$ NAAQS.[25] In the Proposed Error Correction, the EPA stated that limitations and uncertainties with the Sierra Club modeling identified in the Intended Designations TSD and the Final Designations Supplement TSD for the 2016 $SO_2$ designations included:

1. Absence of variable stack conditions and representation of 100 percent load stack parameters. the EPA stated that commenters on the EPA's proposed designations noted this issue is particularly pronounced as the Electric Reliability Council of Texas market is competitive with plant dispatch based on variable cost and falling natural gas prices and renewable capacity resulting in these units running in variable operations. The EPA also noted that the EPA stated in the technical support document for the 2016 designations in Indiana that use of hourly stack parameters more accurately characterizes plume characteristics, which will provide greater reliability both in the estimated concentration and in the geographical distribution of concentrations.
2. Treatment of building downwash (failure to include), surface meteorology, hourly wind inputs, potential to emit/allowable emissions, variable stack temperature and velocity.
3. Inappropriate elevation of flagpole receptors.

---

[24] 2016 Final Designations Supplement TSD, p. 58.

[25] As explained in the 2016 Final Designations Supplement TSD, the modeled 99th percentile daily maximum 1-hour $SO_2$ concentrations for the Martin Lake and Monticello facilities are 14 percent and 8 percent above the 2010 $SO_2$ NAAQS, respectively. The Martin Lake figure is based on the approach of looking only at uncontested receptors.

4. Use of an older version of AERMOD (Note: This refers to modeling in the EPA's Intended Designations TSD but not in modeling for the 2016 Final Designations Supplement TSD).

5. Representation of recent emissions, including controls after the 2011 National Emissions Inventory.

6. Use of a larger receptor grid than recommended.

7. Approach to estimation of background concentrations.

8. Failure to include fenceline receptors or source contribution in the modeling analysis.

The EPA stated that "while individually these deficiencies are not dispositive, collectively they are a sufficient basis for the EPA to propose that we erred in relying on the Sierra Club modeling in making the initial nonattainment designations for the three Texas areas." *See* 84 FR at 43761.

## III.   Sierra Club Modeling Submitted in Response to EPA's September 2019 Proposed Error Correction

The EPA received several comments on its August 22, 2019, Proposed Error Correction action proposing to revise the designations to unclassifiable for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County.[26] Specifically relevant to this technical support document, on September 23, 2019, Sierra Club submitted a comment including new modeling that addressed the limitations identified in the Proposed Error Correction regarding the Sierra Club's previous modeling,[27] both individually and collectively. The Sierra Club's September 2019 modeling purportedly demonstrated the area around Martin Lake was violating the 2010 $SO_2$ NAAQS based on modeling of 2013-2015 period with actual emissions for Martin Lake. The remainder of this document analyzes Sierra Club's September 2019 modeling for the 2013-2015 period and compares that modeling with the Sierra Club's March 2016 modeling used for the EPA's final nonattainment designation of the Martin Lake area. The Sierra Club's September 2019 is modeling was conducted to characterize air quality in that area using the most recent three years of actual emissions then-available at the time of the Round 2 Supplement. The following assessment focuses on Sierra Club's September 2019 modeling of the 2013-2015 period, which collectively addressed all the issues raised in the EPA's Proposed Error Correction; however, the EPA also reviewed and agrees with the analyses of the individual factors as detailed in the Sierra Club's modeling report for the same reasons stated therein.

### A.   *Sierra Club's 2019 Updated Modeling for the 2013-2015 Period*

To address the issues the EPA identified in its Proposed Error Correction, the September 2019 Sierra Club modeling for the 2013-2015 period utilizes modeling inputs from Luminant's March 2016 modeling analysis except where noted. Since the remainder of the updated modeling was unchanged, refer to the 2016 Final Designations Supplement TSD for the Round 2 Supplement for a discussion of the individual, unchanged elements.

---

[26] *See* Docket ID No. EPA-HQ-OAR-2014-0464.

[27] This refers to Sierra Club's 2015 modeling used in the Intended Designation TSD and Sierra Club's March 2016 modeling used in the 2016 Final Designations Supplement TSD.

1. The most current version of the AERMOD modeling system, version 18081, was used for the analysis. Note, as explained by EPA in the 2016 Final Designations TSD, the Sierra Club's March 2016 modeling analysis used the most recently available version (version 15181) of AERMOD at that time, which was an updated version of AERMOD compared to the previous Sierra Club modeling (using AERMOD version 14134) that the EPA reviewed in the Intended Designations TSD.

2. Refinements of the March 2016 modeling inputs for stack parameters, building dimensions and locations, emissions rates, and receptor grid were obtained directly from Luminant's March 2016 modeling analysis. The Sierra Club's updated modeling (2019) used Luminant's March 2016 report as a basis since the Luminant analysis contained more refined modeling inputs based on data available to the facility owner, such as CEM measured stack and emission/temperature/flow/velocity parameters, and stack and building location and dimensions.[28] Specifically, the following was updated:
   a. Stack location, height and diameters.
   b. Specific building locations and dimensions allowing for evaluation of downwash.
   c. Updated hourly emissions rates, stack temperatures and stack exit velocities. The Sierra Club March 2016 modeling analysis had used a constant temperature obtained from a prior regional haze modeling study. While the facility's continuous emissions monitoring system records temperatures, these data are not reported to the EPA's Clean Air Markets Division.[29] The updated Sierra Club analysis used Luminant's hourly CEM temperature measurements during 2013-2015.

3. Updated meteorological data were obtained from the surface station at the Longview Texas Regional Airport. To address potential concerns expressed during the Round 2 Supplement about recent changes in land use surrounding the airport, the beta version of AERSURFACE v. 19039 was run with 2011 National Land Cover Database, an update from the previous 1992 NLCD data.

4. To address the EPA's concerns regarding the Sierra Club's March 2016 modeling's use of a 1.5-meter flagpole receptor height to reflect a representative inhalation level, the updated analysis does not use an elevated flagpole height.

5. To address the EPA's concerns about the size of the receptor grid in Sierra Club's March 2016 modeling, Sierra Club used a 25-kilometer grid for both of the two modeling receptor grids. Receptor Grid #1 includes all locations around the Martin Lake Generating Station accessible by the general public. Receptor Grid #2 was obtained from Luminant's 2016 modeling analysis that excluded locations that Luminant claimed was

---

[28] Sierra Club is using data (including stack location and parameters, emissions rates, actual varying stack temperatures, and stack velocities) provided by Luminant that is available to Luminant but not reported to the EPA's CAMD database or normally available to the public. This data that Sierra Club used was not adjusted by the processors AERLIFT and AERMOIST that the EPA determined invalidated the results of Luminant's 2016 modeling. The EPA has reviewed the information/values that Sierra Club is using in its September 2019 updated modeling from Luminant's March 2016 modeling analysis, and the EPA considers these to be acceptable because they comport with the $SO_2$ Designations Modeling TAD.

[29] *https://ampd.epa.gov/ampd/.*

not feasible for placement of a monitor and/or which were claimed as Luminant's property that the public does not have access.[30]

### B. Modeling for the 2016 - 2018 Period

Sierra Club also submitted modeling for the more recent 2016-2018 3-year period. The additional years modeled in other scenarios are intended to address the identified limitation that the 2013-2015 years might not be representative of future emissions. Actual hourly emissions rates were obtained from the EPA's CAMD database for 2016 through 2018. The Sierra Club attempted to derive representative stack temperatures and hourly-varying exit velocities for the 2016-2018 period. Since the full CEMS data were not publicly available for modeling the 2016-2018 period the 2013-2015 CEMS data were used to characterize the individual unit stack parameters. An average stack outlet temperature for each of the three units for 2013-2015 was calculated. Exit velocities for 2013-2015 from the CEM measurements were combined with concurrent heat input obtained from CAMD to derive a relationship between exhaust gas flow rate and heat input for the three units. The relationship was applied to the hourly heat input for each unit from CAMD during the 2016-2018 period to estimate hourly exit velocities during 2016-2018.

The background concentration was updated to the 99th percentile concentration in Travis County, Texas, the lowest design value measured at ambient monitors in the State of Texas, for the 2016-2018 period. Sierra Club indicated that this monitor was used because it is nearer to Martin Lake and because the monitor which previously had the lowest state value (El Paso UTEP) was decommissioned on December 31, 2017. The updated background concentration from the Austin Northwest monitor (AQS ID# 48-453-0014) is 7.8 µg/m³ (3 ppb), which is 2.7 µg/m³ (51 percent) higher than the background value of 5.1 µg/m³ used in Sierra Club's March 2016 modeling.

### C. Scenarios Examined

The Sierra Club modeling analysis covered several scenarios relevant to assessing whether to revisit the initial designations for the three Texas areas, including our Proposed Error Correction. This modeling analysis provides new information that the EPA did not have at the time of our Proposed Error Correction. One of the central issues that EPA had based our error correction proposal on was that the EPA did not have enough information at the time of the Round 2 Supplement to assess a combination of issues in Sierra Club's March 2016 modeling, to the extent that the March 2016 modeling should not have been relied upon to determine whether the area around Martin Lake was not attaining the 2010 SO₂ NAAQS. Sierra Club's September 2019 updated modeling confirms the EPA's initial analysis of Sierra Club's March 2016 modeling, which included both individual and collective analysis of such issues, and further demonstrates that the individual and collective alleged limitations of the March 2016 modeling, as characterized in the EPA's Proposed Error Correction, were not limitations that undermined the

---

[30] The EPA has not determined whether the areas that Luminant claimed as non-ambient and they excluded receptors from is substantiated or not, but Sierra Club's Receptor Grid #2 estimates the air quality in the modeled area based on areas that Luminant identified in their March 2016 modeling analysis as ambient (uncontested receptors) with modeled DVs above the NAAQS (2016 Final Designations Supplement TSD, pp. 66-72).

The EPA's reasonable reliance on the March 2016 modeling to determine the areas were then violating the 2010 $SO_2$ NAAQS and designate them nonattainment. In fact, the EPA no longer believes that the bases identified in the Proposed Error Correction support the proposed conclusion that an error correction is appropriate. The results of the relevant modeling scenarios are discussed in the remainder of this section.

The key modeling scenario in Sierra Club's September 2019 modeling analyses, for comparison to the March 2016 modeling analysis, which the EPA relied on in the Round 2 Supplement, are the modeling files contained in the file "MLsx1315b.zip," which Sierra Club submitted during the public comment period, but hereinafter referred to the MLsc1315b scenario.[31] This MLsc1315b scenario is assessed in the next section and includes all the inputs and updates explained in the September 2019 modeling for the 2013-2015 Period, including Receptor Grid #2. The EPA is focusing our comparison analysis on this specific modeling scenario that includes Receptor Grid #2, as this modeling analysis is for the same meteorological and emissions period (2013-2015) that was relied upon in the 2016 Final Designations Supplement TSD and also potentially underestimates the $SO_2$ air quality at the time of the Round 2 Supplement because it includes only uncontested modeling grid receptors.

Sierra Club's 2019 updated modeling reported results for four 3-year meteorological/emissions periods: 2013-2015, 2014-2016, 2015-2017 and 2016-2018. As discussed previously, the stack parameters for the years 2013, 2014 and 2015 were from the CEMS while for the other years were estimated based on relationships derived from the 2013-2015 period because Sierra Club did not have access to varying stack temperature and velocity for the other years (2016-2018). The September 2019 modeling for the 2013-2015 period is most accurate because it uses information from Luminant on stack parameters (velocity and temperature) not publicly available for 2016-2018 period and noted as either actual or estimated in Table 2. Table 2 includes a summary of all the Modeling Scenarios provided by Sierra Club in their 2019 modeling analysis and their March 2016 modeling analysis including the maximum design concentration and background used.

---

[31] Air dispersion modeling input and output files are too large to post in the docket or on the EPA's website and must be requested from the EPA Docket Center, Corey Mocka (*mocka.corey@epa.gov*), or Erik Snyder (*snyder.erik@epa.gov*).

11

**Table 2.** Results for Select Scenarios from the Sierra Club's 2019 Modeling Analysis for the Martin Lake Area

| Modeling Analysis | Modeling Scenario ID | SO$_2$ Emissions Type | Receptor Grid | Stack Parameters | 99th Percentile 1-hour Daily Maximum ($\mu g/m^3$) | Background ($\mu g/m^3$) | Total ($\mu g/m^3$) |
|---|---|---|---|---|---|---|---|
| March 2016 | Not Applicable | Actual | Grid #1[a] | Fixed Velocity & Temperature | 239.0 | 5.1 | 244.1[b] |
| September 2019 | MLsc1315a | Actual 2013-15 | Grid #1 | Actual[c] | 393.8 | 7.8 | 401.6 |
| | MLsc1315b | Actual 2013-15 | Grid #2 | Actual[c] | 388.7 | 7.8 | 396.5 |
| | MLsc1416b | Actual 2014-16 | Grid #2 | Estimated | 311.0 | 7.8 | 318.8 |
| | MLsc1517b | Actual 2015-17 | Grid #2 | Estimated | 209.2 | 7.8 | 217.0 |
| | MLsc1618b | Actual 2016-18 | Grid #2 | Estimated | 238.4 | 7.8 | 246.2 |

[a] March 2016 Grid #1 extends to 50 km while the September 2019 Grid #1 extends to 25 km.
[b] **Bold** concentrations are above the 2010 SO$_2$ NAAQS (196.4 $\mu g/m^3$).
[c] Actual Stack Parameters - Variable stack velocity and temperature were used from Luminant data included in Luminant's 2016 modeling analysis. These values were measured or calculated from measured data and are not impacted by the processors that Luminant used (AERLIFT or AERMOIST) and are, therefore, acceptable. These values are more refined than the estimated values previously used by Sierra Club in their March 2016 modeling analysis.

## IV. Comparison of Sierra Club's March 2016 and September 2019 Modeling for the 2013-2015 Period

The MLsc1315b modeling scenario provides modeling that addresses previously identified concerns in the Proposed Error Correction and refines the modeling analysis in strict accordance with the SO$_2$ NAAQS Designations Modeling TAD for the 2013-2015 modeling period. Sierra Club's September 2019 modeling for the 2013-2015 period has directly addressed all the modeling inputs that EPA identified in our Proposed Error Correction and/or the Round 2 Supplement. The EPA has reviewed the September 2019 modeling, and the modeling strictly follows the SO$_2$ NAAQS Designations Modeling TAD, which the EPA provided in advance of the Round 2 designations. Sierra Club made several refinements to the model input data, which became publicly available at the end of the Round 2 designations public comment period as part of Luminant's March 2016 comments, and these data and other updated components of the AERMOD modeling system were used in this September 2019 modeling. The changes, as detailed in the Section III of this document, are refinements to the model inputs, based on more detailed data, and more rigidly adhere to the EPA's modeling guidance regarding when such refinements are available.

12

As explained in more detail later in this document, because the technical aspects of Sierra Club's March 2016 modeling identified by the EPA in the Proposed Error Correction have been addressed in Sierra Club's September 2019 modeling of the 2013-2015 meteorology and emissions, the 2019 modeling effectively demonstrates whether the EPA was correct in estimating the impact of any uncertainty from lack of refinement of inputs or deviation from the $SO_2$ NAAQS Designations Modeling TAD in the March 2016 modeling. In sum, the September 2019 modeling demonstrates that our initial designation of nonattainment for the area around Martin Lake, and by extension our initial designations for the areas around Big Brown and Monticello, were also valid. By comparing the key modeling scenario, MLsc1315b, for Sierra Club's September 2019 modeling analysis to Sierra Club's March 2016 modeling analysis, the EPA can assess the overall combined impact of the issues identified and compare to the initial analysis the EPA relied upon in the Round 2 Supplement. This assessment confirms the EPA's conclusions and designations for all three areas in the Round 2 Supplement.

The EPA notes that in the Proposed Error Correction we did not separate technical aspects that EPA analyzed in the Intended Designations TSD from those the EPA analyzed in the 2016 Final Designations Supplement TSD. Additionally, the EPA notes that Sierra Club's March 2016 modeling, which was relied on in the 2016 Final Designations Supplement TSD, included updates to Sierra Club's older 2015 modeling that addressed some technical aspects the EPA identified in the Intended Designations TSD. The following technical aspects that potentially created uncertainties the EPA identified in the Proposed Error Correction were only in the Sierra Club's older 2015 modeling in the Intended TSD and were updated in the Sierra Club's March 2016 modeling, which the EPA relied on in the Final Designations Supplement TSD, to be strictly in accordance with the $SO_2$ NAAQS Designations Modeling TAD: 1) use of an older version of AERMOD (most recent version available at that time was used in the March 2016 modeling), and 2) representation of recent emissions, including controls after the 2011 National Emissions Inventory (the March 2016 modeling used the most recent three years (2013-2015) of actual emissions that were available at the time for Martin Lake and Big Brown as 2016 calendar year was still ongoing). Additionally, regarding the failure to include source contribution in the modeling analysis that the EPA listed in the Proposed Error Correction, the EPA notes that the older Sierra Club modeling included other sources to assess contribution, while the March 2016 modeling included only the principle source in each area in response to the EPA's analysis in the Intended Designations TSD.

One of the technical aspects that potentially created uncertainties that the EPA identified in the March 2016 modeling in the Proposed Error Correction was the absence of variable stack conditions and representation of 100 percent load stack parameters (variable stack temperature and velocity). The EPA also identified the treatment of building downwash (failure to include), use of a larger receptor grid than recommended, and failure to include fenceline receptors as limitations or uncertainties in the Proposed Error Correction. In the 2016 Final Designations Supplement TSD, the EPA explained that, when compared to the actual measured CEM temperatures furnished by Luminant as part of their modeling analysis, the Sierra Club's temperature was on the average 21 percent higher – the average temperature in the CEM data for near full load (filtered for stack velocity > 25 m/s) was 356K, ranging between 338-478K. The EPA explained that this increase in buoyancy would tend to reduce modeled concentrations, the amount depending on meteorological conditions; therefore, the EPA determined that the use of

13

the Sierra Club's higher-than-actual constant temperature likely underestimates the actual concentrations. More specifically, the EPA explained that this temperature difference would cause on the average a 196 percent increase in buoyancy flux versus using the CEM temperature when operating near full load, and that the buoyancy flux is used by the plume rise algorithm in AERMOD to calculate buoyant plume rise.

The EPA further explained that higher values of buoyancy flux yield higher plume rise, affecting the transport and dispersion of the plume, and that, typically, higher plume rise reduces peak ground-level concentrations and tends to move the maximum impacts further away from the source. The EPA noted that because the 2010 $SO_2$ NAAQS is a one-hour standard, the buoyancy enhancements for critical hours would be a controlling factor in the modeled concentrations on which the maximum modeled design concentration is based, and that the use of Sierra Club's higher-than-actual constant temperature, judged without other factors, would most likely underestimate the actual maximum concentrations (*i.e.*, the use of higher temperatures in the Sierra Club's March 2016 modeling would lead to lower modeled concentrations than if the actual measured temperatures from Luminant would have been used, which would likely result in higher 99th percentile one-hour daily maximum concentration). The increase in buoyancy over the actual buoyancy would increase plume rise and alter the geographic distribution of concentrations. The 2019 Sierra Club modeling scenario MLsc1315b includes variable stack temperature and variable stack velocity, eliminating this identified limitation. Sierra Club's September 2019 modeling for the 2013-2015 period also included a sensitivity run using the stack velocity and stack temperatures from the March 2016 modeling analysis to determine the impacts of using the estimated stack velocity and temperature on the maximum modeled design concentration. In this sensitivity run, Sierra Club only changed these specific inputs; all other inputs were unchanged from the MLsc1315b scenario. This sensitivity run indicates that using the estimated stack parameters in the March 2016 modeling resulted in a maximum modeled design concentration that was 40 percent lower than the maximum modeled design concentration when CEM based hourly varying temperature and velocity were used in the September 2019 modeling (232.6 μg/m$^3$ vs. 393.8 μg/m$^3$). In other words, the 224 μg/m$^3$ and 239 μg/m$^3$ maximum modeled design concentrations cited in the 2016 Final Designations Supplement TSD, increased on the order of 69 percent (232.6 μg/m$^3$ vs. 393.8 μg/m$^3$) when these refined data were used in the September 2019 modeling. This confirms EPA's assessment in the 2016 Final Designations Supplement TSD that Sierra Club's March 2016 maximum modeled design concentration was underestimated because of these technical aspects.

One of the technical aspects of Sierra Club's March 2016 modeling that the EPA identified in the Proposed Error Correction as creating uncertainty was the absence of including building downwash. Regarding building downwash, in the 2016 Final Designations Supplement TSD, the EPA concluded that, while we did not agree with Sierra Club's assertion that exclusion of downwash would underestimate the maximum modeled design concentration in all cases, in our evaluation the inclusion of building information and associated downwash in this analysis would not change our recommended designation of nonattainment. We noted that Luminant's 2016 modeling report (which Texas also included in their response) indicated that they expected that the modeling results were not extremely sensitive to this issue because the stack heights are well above the buildings and there is considerable momentum and buoyancy rise for the stack plumes. The EPA concluded that the modeling values were sufficiently above the standard and inclusion

of downwash often leads to higher concentrations closer to the source but, even in situations we have seen where this did not occur, any decreases in maximum modeled values from inclusion of downwash were relatively small and not expected to be enough of a decrease to resolve all modeled exceedance values near Martin Lake. The 2019 Sierra Club modeling scenario MLsc1315b includes building downwash, eliminating this identified limitation. Sierra Club's September 2019 modeling for the 2013-2015 period also included a sensitivity run where they removed the building information and downwash processing to determine what the impacts of including building downwash was on the maximum modeled design concentration. In this sensitivity run, Sierra Club only changed these specific inputs and all other inputs were unchanged from the MLsc1315b scenario. This sensitivity run indicates that the maximum modeled design concentration without including building was unchanged compared to the maximum modeled design concentration when downwash was included (393.8 $\mu g/m^3$ vs. 393.8 $\mu g/m^3$). This confirms the EPA's assessment in the 2016 Final Designations Supplement TSD that including downwash in Sierra Club's March 2016 modeling analysis would not be expected to resolve all modeled exceedance values in the area because any changes in concentration or shift in location of the maximum concentration would be expected to be relatively minimal and may result in higher impacts closer to the facility.

Another technical aspect that the EPA identified in the Proposed Error Correction as creating uncertainty was the elevation of flagpole receptors in Sierra Club's March 2016 modeling. In the 2016 Final Designations Supplement TSD, the EPA stated that we would expect only a very slight change in the modeled concentrations and the area of exceedances and magnitude of the values would be basically equivalent, and, therefore, not change our final action. We based this conclusion on analysis of sensitivity modeling conducted by the Sierra Club for another source, which found decreases in modeled $SO_2$ between almost 0 and 0.2 percent when removing the flagpole receptors and estimating concentrations at ground level. Since Sierra Club's 2016 modeled maximum modeled designation concentration (in ambient air) at Martin Lake is at least 14 percent above the 2010 $SO_2$ NAAQS, the EPA concluded that the change due to flagpole receptor heights would not decrease the value to below the standard. Sierra Club's September 2019 modeling scenario MLsc1315b does not use elevated flagpole receptors, eliminating this identified limitation. Sierra Club's September 2019 modeling for the 2013-2015 period also included a sensitivity run where they changed the receptor heights to flagpole receptor heights to evaluate potential impacts on the modeled results. In this sensitivity run, Sierra Club only changed these specific inputs and all other inputs were unchanged from the MLsc1315b scenario. This sensitivity run indicates that the maximum modeled design concentration from using flagpole receptor heights resulted in maximum modeled design concentration that was 0.05 percent higher compared to the maximum modeled design concentration using normal receptor height (394.0 $\mu g/m^3$ vs. 393.8 $\mu g/m^3$). This confirms the EPA's assessment in the 2016 Final Designations Supplement TSD that using flagpole receptor height in Sierra Club's March 2016 modeling analysis may result in a very small increase in the maximum modeled design concentration, which would not have had an impact on our decision because maximum modeled concentrations were at least 14 percent above the 2010 $SO_2$ NAAQS.

Another technical aspect that the EPA identified in the Proposed Error Correction as creating uncertainty was treatment of surface meteorology and hourly wind inputs. Regarding use of land surface data from 1992, EPA indicated based on Sierra Club's March 2016 modeling, which included a sensitivity analysis for updated surface data/characteristics, that only a small decrease

in maximum modeled design concentrations of 3.6 percent was expected from using updated surface characteristics. As explained previously, in Sierra Club's September 2019 modeling, the meteorology was reprocessed with the EPA's updated AERSURFACE program and with updated land use and land cover information around the meteorological site, resolving this identified limitation. Sierra Club's September 2019 modeling for the 2013-2015 period also included a sensitivity run where they used the older surface characteristics (Land Use Land Cover from 1992 – LULC1992) instead of the new surface characteristics in processing the winds and AERMOD inputs to assess the use of the older surface characteristics on the maximum modeled design concentration. In this sensitivity run, Sierra Club only changed these specific inputs; all other inputs were unchanged from the MLsc1315b scenario. This sensitivity run indicates that the maximum modeled design concentration from the older surface characteristics resulted in a maximum modeled design concentration that was 1 percent higher compared to the maximum modeled design concentration using the newer surface characteristics ($399.4.0 \mu g/m^3$ vs. $393.8 \mu g/m^3$). This confirms the EPA's assessment in the 2016 Final Designations Supplement TSD that using the newer surface characteristics data instead of the data from 1992 in Sierra Club's March 2016 modeling analysis may result in a small decrease in the maximum modeled design concentration and when considered would only result in slightly lower maximum modeled design concentrations. The Sierra Club's September 2019 sensitivity modeling indicates that, in the 2016 Final Designations Supplement TSD, the EPA actually overestimated the decrease of the maximum modeled design concentration that may occur from using newer surface characteristics (3.6 percent); the 2019 sensitivity indicates that the actual decrease was only 1 percent.

Another technical aspect that the EPA identified in the Proposed Error Correction as creating uncertainty was use of a larger receptor grid than recommended and failure to include fenceline receptors. As discussed previously, Sierra Club's 2015 and March 2016 modeling used a large grid and did not include fenceline receptors or restrict receptors from parts of Luminant's property that could be non-ambient air. In the 2016 Final Designations Supplement TSD, the EPA only evaluated concentrations in Sierra Club's March 2016 modeling at receptors that represented areas where it would also be feasible to place a monitor and record ambient air impacts. Luminant's 2016 modeling included areas that they considered to be non-ambient, but the EPA did not have sufficient information to evaluate and concluded that all the areas Luminant was claiming as non-ambient were actually non-ambient areas. Without sufficient data to support Luminant's non-ambient area claims, the EPA took the approach of only evaluating Sierra Club's March 2016 modeling results for the areas that Luminant did not claim as non-ambient, which we referred to as the uncontested area. This included evaluating concentrations at only uncontested receptors, and separately also evaluating concentrations at areas that clearly were erroneously claimed as unfeasible by Luminant. The EPA also noted that we had concerns that Luminant had contested receptors (excluded in Luminant's modeling) in more areas than were appropriate and that the maximum values in the uncontested area in Sierra Club's March 2016 modeling were actually as high as $239.1 \mu g/m^3$ near the Luminant excluded area. The EPA's analysis explained that we conservatively used $224 \mu g/m^3$ (highest at uncontested receptor) to evaluate the modeling, but the analysis could also be done based on the $239.1 \mu g/m^3$ value, which would even more clearly demonstrate the area around Martin Lake was violating the 2010 $SO_2$ NAAQS. The 2019 Sierra Club modeling scenario MLsc1315b used the Luminant 2016 property descriptions in their location of receptors, so their new analysis only looked at

receptors that Luminant considered to be ambient (*i.e.*, the uncontested area). Sierra Club did not place receptors on areas that Luminant considered non-ambient thus, eliminating the potential concern about fenceline receptors. Sierra Club's September 2019 modeling and modeling report indicates multiple areas above 300 $\mu g/m^3$ that are clearly outside the areas that Luminant considered in 2016 as their boundary for non-ambient air (Figure 1).[32] Therefore, Sierra Club's September 2019 modeling clearly demonstrates that this is not a technical limitation; the only uncertainty is that Luminant claimed large areas as non-ambient in their 2016 modeling and some of these areas could be ambient, but this uncertainty does not impact the conclusion that the area is violating the 2010 $SO_2$ NAAQS.

**Figure 1.** Figure Showing Maximum Modeled Design Concentrations from Sierra Club's September 2019 Modeling (Scenario MLsc1315b)



1-hour average SO2 concentrations (ug per cubic meter) - All colored areas exeed the NAAQS.

196        300        350

---

[32] Figure 2 from Sierra Clubs 2019 Modeling Report ("Martin Lake Generating Station TX – Evaluation of Compliance with the 1-hour NAAQS for SO2 – Final – 23Sep19.pdf").

17

Another technical aspect and potential uncertainty that the EPA identified in the Proposed Error Correction was use of an older version of AERMOD. As noted previously, this uncertainty was only identified in the Sierra Club 2015 modeling, which the EPA used for the basis of its intended designation, not the March 2016 modeling that the EPA relied on for the final designation. Sierra Club also used the most recent version of AERMOD in their September 2019 modeling. Therefore, the EPA concludes that this was not a technical aspect or potential uncertainty in the March 2016 modeling and, therefore, could not be a part of a basis for concluding that relying on that March 2016 modeling used in the final designation was in error.

Another technical aspect and potential uncertainty the EPA identified in Sierra Club's modeling for the Round 2 Supplement in the Proposed Error Correction was the representation of "recent emissions, including controls after the 2011 National Emissions Inventory" and "potential to emit/allowable emissions." *See* 84 FR at 43761. As noted previously, Sierra Club's March 2016 modeling used the most recent three years of actual emissions available at that time. Sierra Club's September 2019 MLsc1315b modeling scenario also used 2013-2015 actual emissions. The use of the 2013-2015 actual emissions is strictly in accordance with the $SO_2$ Designations Modeling TAD and consistent with assessing the air quality at the time of the Round 2 Supplement. The EPA provided the following assessment in the 2016 Final Designations Supplement TSD in response to Luminant's 2016 comments about controls in 2016, after the 2011 National Emissions Inventory, and how these might impact the potential to emit/allowable emissions:

> In the 2017-2019 emission modeling submission, Luminant projected future reduced emission rates were used that were based in part on future non-enforceable, voluntary operational changes at Martin Lake. However, for the purpose of determining whether the area is currently meeting the NAAQS and designating the area either actual emissions or a currently enforceable reduction in actual emissions should be used. Neither the efficiency improvements in operation of existing scrubbers or fuel switches were reflected in a permanently enforceable situation. This means that they could change and are not a certain and effective limitation on either current or future emissions. Compliance with MATS does allow for using $SO_2$ limits as surrogates for other pollutants, but how a facility meets the MATS requirements can be changed by fuel switching/blending and testing directly for the MATS pollutants. In this case the intended switching of fuel and increases in scrubber efficiency, whether they have occurred or not, are not yet enforceable through any mechanism provided by Luminant - such as a permit limit - and Luminant would be free to either not switch or, if it does switch, change back to a higher sulfur content coal in the future, depending on circumstances. Thus the modeling based on possible future changes at the facility, rather than on actual emissions, is not acceptable for this regulatory use.[33]

The $SO_2$ Designations Modeling TAD recommends using the most recent three years of actuals or using a more recent federally enforceable and in effect allowable emissions limit, which could reflect new and lower continuing emissions that may not be reflected in modeling historical actual emissions. In the case of the Texas areas, there were not any more recent lower federally enforceable allowable limits that might have better represented recent and continuing $SO_2$

---

[33] 2016 Final Designations Supplement TSD, p. 55-56.

emissions performance. Therefore, use of actual recent $SO_2$ emissions was not a limitation or uncertainty in Sierra Club's March 2016 modeling and, therefore, could not be a part of a basis for concluding that relying on that March 2016 modeling was in error. Additionally, the EPA has also reviewed the annual emissions since 2013. Figure 2, produced by the EPA using CAMD data, shows that the annual emissions and the average $SO_2$ emissions rate varied considerably from year to year at Martin Lake during the 2013-2019 period. The lowest emissions and emissions rates were recorded for the years 2015-2017 with the years 2018 and 2019 returning to about the previous higher emissions recorded in 2013-2014. The $SO_2$ emissions rate in 2015 dropped 48 percent from the highest rate that was recorded in 2013. Figure 2 does not demonstrate a trend toward lower emissions from the Martin Lake Power Plant with time. In fact, the lowest annual $SO_2$ emissions during the entire period was recorded in 2015, which was included in the Sierra Club's March 2016 modeling. The emissions in 2015 were only 37 percent of those recorded in the highest year, 2013. Since 2015, the facility's emissions trended up through 2018. The three-year average emissions for 2017-2019 are almost identical to the three-year average emissions for the modeling period for the designation, 2013-2015 (0.1 percent smaller). Luminant's March 2016 comments on the EPA's intended designation projected a 30-40 percent decrease in actual emissions for the 2017-2019 period compared to the 2014-2015 period, due solely to voluntary and non-enforceable scrubber optimization and anticipated fuel blending changes. In the 2016 Final Designations Supplement TSD, the EPA noted that these limits were not permanently enforceable and, therefore, could not be relied upon for designations decisions. We note that Luminant's prediction did not actually occur, as reflected in the 2017-2019 actual emissions that are basically the same (0.1 percent smaller) as 2013-2015 actual emissions.

**Figure 2.** 2013-2019 Annual $SO_2$ Emissions (tpy) and Emissions Rate (lb/MMBTU) from the Martin Lake Power Plant



Martin Lake Annual SO2 Emissions and Emission Rate

Another technical aspect and potential uncertainty that the EPA identified in the Proposed Error Correction was the March 2016 modeling's approach for the estimation of background concentrations. As explained in the 2016 Final Designations Supplement TSD, the lowest monitored background concentration (the El Paso monitor) was used in the March 2016 modeling. The EPA stated "Given the amount of $SO_2$ emissions in East Texas compared to El Paso area this assumption likely leads to a slight underestimation in concentrations around these facilities but is within the framework of the TAD's options for inclusion of background monitoring data."[34] Therefore, the EPA concludes that this was not a limitation or uncertainty in the March 2016 modeling and could not be a part of a basis for concluding that relying on that March 2016 modeling was in error. Additionally, as explained previously, the September 2019 modeling included a new background concentration, the 99th percentile design value concentration in Travis County, Texas, which is the lowest value measured at $SO_2$ ambient monitors in the State of Texas for the 2016-2018 period. This monitor was used by Sierra Club because it is nearer to Martin Lake and because the monitor that previously had the lowest state value (El Paso in the 2013-2015 period) was decommissioned in 2017. The updated background concentration is 7.8 $\mu g/m^3$, 2.6 $\mu g/m^3$ (51 percent) higher than the background value of 5.1 $\mu g/m^3$ used in Sierra Club's March 2016 modeling and 2019 updated modeling of 2013-2015 period. Regardless of the background concentration, the maximum modeled design concentration for the September 2019 updated modeling is well above the 2010 $SO_2$ NAAQS, for this 2019 assessment of 2013-2015 period it is 388.7 $\mu g/m^3$, before any background is added.

The final technical aspect and potential uncertainty that the EPA identified in the Proposed Error Correction was the failure to include source contribution in the March 2016 modeling analysis. As explained previously, the Sierra Club's 2015 modeling relied upon for the EPA's intended designations included such contribution from other sources. As explained in the Intended Designations TSD, the modeling indicated that the contribution to the maximum modeled design concentration from the Pirkey Power Plant only added 0.1 $\mu g/m^3$ to increase the maximum modeled design concentration from 339.8 $\mu g/m^3$ to 339.9 $\mu g/m^3$.[35] Based on the modeling information available at the time, the EPA explained in the 2016 Final Designations Supplement TSD that inclusion of only the principle $SO_2$ emissions source in the modeling was an acceptable choice in this area's circumstances, as we maintained that Martin Lake was likely contributing almost if not equal to 100 percent of the impact for the values above the 2010 $SO_2$ NAAQS. The EPA also explained that Sierra Club's 2016 modeling, by not including Pirkey Power Plant, was a conservative approach (*i.e.*, potentially under-estimating the maximum modeled design concentration) to determining whether the area was violating the 2010 $SO_2$ NAAQS and to identifying the geographical boundaries of such exceedances. The EPA suggested that inclusion of Pirkey Power Plant should result in either similar impacts and boundaries or slightly increased impacts and possibly slightly larger boundaries, but inclusion of Pirkey Power Plant should not result in decreased impacts or "shrinking" of boundaries from those modeled.[36] Based on the information available at the time of the EPA's final nonattainment designation in 2016, the EPA continues to find that it was a reasonable decision at the time based on its prior assessment of the data available from Sierra Club's modeling of the area for the 2012-2014 (December 2015

[34] 2016 Final Designations Supplement TSD, p. 65.
[35] 2016 Final Designations Supplement TSD, pp.51-52.
[36] 2016 Final Designations Supplement TSD, pp. 60-62.

modeling) and 2013-2015 (March 2016 modeling) periods; therefore, the EPA concludes that this was not a limitation or uncertainty in the March 2016 modeling and could not be a part of a basis for concluding that relying on that March 2016 modeling was in error.[37]

After further assessment, the EPA agrees with the analyses in the 2016 Final Designations Supplement TSD referenced previously for the same reasons explained in the Round 2 Supplement. Regardless, as explained previously, Sierra Club's September 2019 modeling included refinements of their March 2016 modeling inputs for stack parameters, building dimensions and locations, and receptor grid (25 km and only uncontested receptors), which were obtained directly from Luminant's March 2016 modeling analysis. Sierra Club's September 2019 modeling analyses used these aspects of Luminant's March 2016 report since the Luminant analysis contained more refined modeling inputs based on data available to the facility owner, such as CEM measured stack and emissions parameters, and stack and building location and dimensions. These updates resolved the identified technical aspects and uncertainties in the Proposed Error Correction because they reflected the most refined information for these inputs and the strictest application of the $SO_2$ NAAQS Designations Modeling TAD while still considering only uncontested receptors where modeled concentrations were not the highest. As shown in Table 2, the maximum modeled concentration was higher in Grid #1 than Grid #2 in Sierra Club's September 2019 modeling, but both receptor grids resulted in values that violated the 2010 $SO_2$ NAAQS. The Sierra Club's 2019 modeling for the 2013-2015 period utilized more refined and accurate data for stack parameters (variable temperature and velocity) and included model inputs for building downwash, but it did not include any of the novel and unapproved modeling preprocessors (AERLIFT and AERMOIST) that Luminant had utilized in 2016, which previously concerned the EPA in the designations process.

In the Proposed Error Correction, the EPA stated that "while individually these deficiencies are not dispositive, collectively they are a sufficient basis for the EPA to propose that we erred in relying on the Sierra Club modeling in making the initial nonattainment designations for the three Texas areas." *See* 84 FR at 43761. However, the EPA acknowledges that, in the 2016 Final Designations Supplement TSD, the EPA also evaluated the combination of all the identified aspects of the March 2016 modeling (including all potential increasing and decreasing impacts on concentrations) through a comparison analysis, using the conservative approach of 224 µg/m³ as the maximum value.[38] In the 2016 Final Designations Supplement TSD regarding the area around Martin Lake, the EPA ultimately concluded that, given that Sierra Club's modeled concentrations (with a low background and no nearby sources) were 14 percent above the standard using 224 µg/m³ and 22 percent above the standard using 239.1 µg/m³ as the maximum and that several factors were deliberately conservative in under-estimating impacts and would tend to reduce the modeled concentrations (and actual modeled concentrations with appropriate background would be higher), our technical assessment of the available information was that the differences/changes to the Sierra Club modeling when combined overall would not result in

---

[37] The EPA's assessment does not prevent the Pirkey Power Plant from being included in any *future* modeling (*e.g.*, state implementation plan demonstrations) for the Martin Lake area as a potentially contributing $SO_2$ emissions source; this will be dependent upon whether the Pirkey Power Plant is adequately represented by the background monitoring value added to the modeled concentrations, and/or on whether the state chooses to impose any new $SO_2$ emissions limits on the Pirkey Power Plant to be credited in the Martin Lake attainment demonstration.

[38] 2016 Final Designations Supplement TSD, p. 76.

modeled values near or below the standard.[39] Therefore, in the 2016 Final Designations Supplement TSD, the EPA concluded that we considered the final Sierra Club modeling submitted March 2016 to be relevant information that must be considered in our designation decision and found that the modeling was a sufficient basis for a determination of nonattainment and clearly demonstrated the area around Martin Lake was nonattainment.[40]

After further assessment of each individual aspect of the modeling and review of our previous analysis of the impact of the combined impact from the 2016 Final Designations Supplement TSD, the EPA agrees with the assessment of the combination of all the identified aspects of the modeling explained in the 2016 Final Designations Supplement TSD for those same reasons. Regardless, as shown in Table 2, the results of this updated modeling demonstrate that use of more refined inputs for the 2013-2015 period for the aspects of the March 2016 modeling that the EPA identified in the Proposed Error Correction as creating uncertainty increased the maximum modeled design concentration, before adding in background concentrations, for Martin Lake from 224 $\mu g/m^3$ (or 239.0 $\mu g/m^3$) to 388.7 $\mu g/m^3$, a 73 percent (or 63 percent) increase. This result provides the combined impact of the changes in the September 2019 updated modeling (as compared to the March 2016 modeling), and corroborates the EPA's assessment of Sierra Club's March 2016 modeling for the area around Martin Lake in the Round 2 Supplement and by extension for the areas around Big Brown and Monticello, which were modeled similarly and properly assessed by the EPA in the 2016 Final Designations Supplement TSD. Furthermore, Sierra Club's September 2019 modeling demonstrates that the March 2016 modeling underestimated the maximum modeled design concentrations and that more refined inputs addressing the identified limitations resulted in higher modeled concentrations, which the EPA predicted in the 2016 Final Designations Supplement TSD.

## V.    Conclusion

Sierra Club's September 2019 modeling addressed the uncertainties in the modeling that the EPA relied on in the Round 2 Supplement, which the EPA identified in the Proposed Error Correction. The Sierra Club's September 2019 modeling of the area around the Martin Lake Power Plant corroborates that the EPA's reliance on the Sierra Club's March 2016 modeling in the Round 2 Supplement was appropriate. The EPA agrees with our previous assessment of the technical aspects and potential uncertainties related to the Sierra Club's March 2016 modeling as explained in the Round 2 Supplement. Sierra Club's September 2019 modeling further confirms that the cumulative technical aspects and identified limitations with Sierra Club's March 2016 modeling that the EPA identified in the Proposed Error Correction were not merited.

---

[39] 2016 Final Designations Supplement TSD, pp. 76-77.
[40] 2016 Final Designations Supplement TSD, p. 77.

**TAB 5: PETITION DENIAL LETTER FROM MICHAEL S. REGAN, EPA ADMINISTRATOR TO TOBY BAKER, EXECUTIVE DIRECTOR, TEXAS COMMISSION ON ENVIRONMENTAL QUALITY (JUNE 10, 2021) (WITH ENCLOSURES)**



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

WASHINGTON, D.C. 20460

**JUN 1 0 2021**

THE ADMINISTRATOR

Mr. Toby Baker
Executive Director
Texas Commission on Environmental Quality
P.O. Box 13087
Austin, Texas 78711

Dear Mr. Baker:

I am hereby denying your March 15, 2017, and December 11, 2017, letters in which the Texas Commission on Environmental Quality submitted a request for administrative stay and a petition for reconsideration, (collectively "2017 requests") concerning the U.S. Environmental Protection Agency's final action titled *Air Quality Designations for the 2010 Sulfur Dioxide (SO₂) Primary National Ambient Air Quality Standard – Supplement to Round 2 for Four Areas in Texas: Freestone and Anderson Counties, Milam County, Rusk and Panola Counties, and Titus County.* 81 FR 89870 (December 13, 2016).

In the December 11, 2017, petition for reconsideration, TCEQ requested that the EPA reconsider the nonattainment designations for the Freestone and Anderson Counties, Rusk and Panola Counties and Titus County areas based on SO₂ emissions facility retirements, limited state resources to develop state implementation plans, the deployment of new ambient air monitors, reliance on third-party modeling and consent decree obligations. In the March 15, 2017, letter, TCEQ requested that the EPA stay the final rule's effective date.

However, as discussed more fully in the enclosures, the EPA concludes that the 2017 requests do not present facts or arguments that warrant a reconsideration process or a stay of the effective date of the EPA's 2016 designations action. Therefore, the EPA denies the petition for reconsideration and the request to stay the final rule's effective date.

At the request of the state of Texas, on May 7, 2021, the acting EPA Region 6 Administrator signed a final action titled *Air Plan Approval; Clean Data Determination for the 2010 1-Hour Primary Sulfur Dioxide National Ambient Air Quality Standard; Anderson and Freestone Counties and Titus County Nonattainment Areas*, which determined that portions of Freestone and Anderson Counties and Titus County are now attaining the 2010 SO₂ Primary National Ambient Air Quality Standard. This determination suspends most attainment planning requirements under the 2010 SO₂ NAAQS for these two areas for as long as they continue to attain the NAAQS. As explained in that final action, the primary sources of SO₂ emissions in

these two areas have permanently shut down, and, as a result, the EPA's assessment is that air quality in these two areas is now meeting the 2010 $SO_2$ primary NAAQS.

I appreciate your interest in air-quality standards in Texas and in providing cleaner, healthier air for its residents.

Sincerely yours,

Michael S. Regan

Enclosures

Enclosure 1

**The Environmental Protection Agency's Basis for Denying Texas Commission on
Environmental Quality's Petition for Reconsideration and Request for Administrative Stay**

## I.    Statutory and Regulatory Background

*A.    Revisions to the $SO_2$ NAAQS*

The Administrator of the U.S. Environmental Protection Agency signed a final rule revising the
primary sulfur dioxide ($SO_2$) National Ambient Air Quality Standard on June 2, 2010. The EPA
published this rule in the *Federal Register* on June 22, 2010 (75 FR 35520, codified at 40 CFR
50.17), and it became effective on August 23, 2010.[1] Based on the Administrator's review of the
air quality criteria for oxides of sulfur ($SO_x$) and the primary NAAQS for $SO_x$ as measured by
the indicator compound $SO_2$, the EPA revised the primary $SO_2$ NAAQS to provide requisite
protection of public health with an adequate margin of safety. Specifically, the EPA established a
new one-hour $SO_2$ standard at a level of 75 parts per billion (ppb), which is met when the three-
year average of the annual 99th percentile of daily maximum one-hour average concentrations is
less than or equal to 75 ppb, as determined in accordance with Appendix T of 40 CFR part 50.40
CFR 50.17(a) and (b). The EPA also established provisions to revoke both the existing 24-hour
and annual primary $SO_2$ standards, subject to certain conditions. *See* 40 CFR 50.4(e).

*B.    Multiple Rounds of Designations for the 2010 $SO_2$ NAAQS*

The process for designating areas following promulgation of a new or revised NAAQS is
contained in Clean Air Act section 107(d). After promulgation of a new or revised NAAQS,
each governor or tribal leader is required to recommend air-quality designations, including
the appropriate boundaries for nonattainment areas, to the EPA. The EPA considers these
recommendations when fulfilling its duty to promulgate all initial area designations and
boundaries for the new or revised NAAQS. By no later than 120 days prior to promulgating
designations, the EPA is required to notify states, territories and tribes, as appropriate, of any
intended modifications to an area designation or boundary recommendation that the EPA
deems necessary. During that period, states may demonstrate why they believe the EPA's
proposed modifications are inappropriate. Nearly all states, including Texas, submitted
timely designation recommendations for the 2010 $SO_2$ NAAQS to the EPA.

After invoking a one-year extension of the deadline to designate areas, as provided for in
section 107(d)(1)(B)(i) of the CAA, the EPA published an initial round of $SO_2$ designations
for certain areas of the country on August 5, 2013 (referred to as "Round 1") (78 FR 47191).
The Freestone and Anderson Counties, Rusk and Panola Counties and Titus County areas in
Texas were not included in that first round of designations, as those areas did not have
existing monitoring data showing a violation of the 2010 $SO_2$ NAAQS.

---

[1] Furthermore, as required by the *Clean Air Act*, the EPA conducted a periodic review of the $SO_2$ NAAQS, and on
March 18, 2019, the agency published a decision to retain the 2010 one-hour primary standard. *See* 84 FR 9866.

Following Round 1 designations, three lawsuits were filed against the EPA in different United States District Courts, alleging the agency had failed to perform a nondiscretionary duty under the CAA by not designating all portions of the country by the extended deadline. The state of Texas was a plaintiff or plaintiff-intervenor in two of those cases. In one of those cases, the U.S. District Court for the Northern District of California entered an order on March 2, 2015, for the EPA to complete the area designations by three specific deadlines.[2] By the first deadline in the court order (July 2, 2016), the EPA was required to designate areas containing $SO_2$ emissions sources meeting certain criteria (referred to as "Round 2"). As shown in Table 1, each area subject to this petition included a facility owned by Vistra Energy meeting the criteria for a Round 2 designation.

**Table 1.** Texas $SO_2$ Emissions Sources Addressed in EPA's Round 2 Designations and in Texas's Petition

| Area | Facility |
|------|----------|
| Freestone and Anderson Counties | Big Brown Steam Electric Station |
| Rusk and Panola Counties | Martin Lake Electrical Station |
| Titus County | Monticello Steam Electric Station |

On March 20, 2015, the EPA provided additional guidance on designations for the 2010 $SO_2$ NAAQS and solicited updated state recommendations for Round 2 areas by September 18, 2015.[3] Texas provided its updated Round 2 $SO_2$ designation recommendations to the EPA on September 18, 2015, which recommended that the EPA designate areas in Texas without monitoring data as unclassifiable/attainment, including Freestone, Anderson, Rusk, Panola and Titus Counties. Texas also noted that the constrained time frame did not allow it to complete detailed analyses, determine model input refinements or develop detailed graphics.[4] In the same letter, Texas cited its "disagreement with any use of modeled predictions to determine attainment status."

## C.     EPA's Data Requirements Rule

On August 21, 2015, the EPA separately promulgated a rule requiring states to undertake air-quality characterization for areas with $SO_2$ sources meeting certain criteria, called the Data Requirements Rule.[5] The DRR required state air agencies to provide additional monitoring or modeling information to characterize $SO_2$ air quality in areas containing $SO_2$ emissions sources either meeting certain criteria or that have otherwise been listed under the DRR by the EPA or state air agencies. In lieu of the $SO_2$ air-quality characterization required under the DRR, state air agencies could demonstrate that the listed sources restricted their annual $SO_2$ emissions to less than 2,000 tons per year (tpy) through federally enforceable and in effect emissions limits, or provide documentation that the sources had been shut down, by January 13, 2017. Thus, for the purpose of meeting the DRR obligations, states were provided options on how to characterize

---

[2] *Sierra Club v. McCarthy*, No. 3-13-cv-3953 (SI) (N.D. Cal. Mar. 2, 2015).

[3] *See* "Updated Guidance for Area Designations for the 2010 Primary Sulfur Dioxide National Ambient Air Quality Standard," memorandum to Regional Air Division Directors, Regions 1-10, from Stephen D. Page, dated March 20, 2015, available at *https://www.epa.gov/sites/production/files/2016-04/documents/20150320so2designations.pdf.*

[4] *https://www.epa.gov/sites/production/files/2016-03/documents/tx-rec-r2.pdf.*

[5] *See* 80 FR 51052 (August 21, 2015), codified at 40 CFR part 51 subpart BB.

their air quality, including the option of setting up and beginning operation of new EPA-approved $SO_2$ monitoring networks by January 2017. States were required to notify the EPA by July 1, 2016, of which characterization option they had selected for each listed DRR source. The DRR did not, however, relieve the EPA of its obligation under the court order to designate Round 2 areas meeting the order's criteria no later than July 2, 2016. *See* 80 FR 51052 at 51056.

In a letter dated January 15, 2016, the Texas Commission on Environmental Quality identified 25 facilities in Texas with 2014 $SO_2$ emissions exceeding 2,000 tons, including Martin Lake, Big Brown and Monticello.[6] In a subsequent letter dated June 29, 2016, TCEQ identified the source characterization pathways (*i.e.*, modeling or monitoring) for most of the previously identified DRR sources.[7] At that time, TCEQ asserted that, notwithstanding the requirements of the DRR, there was no need to provide future air quality characterization plans for the Martin Lake, Big Brown and Monticello facility areas because the EPA was required to designate those areas by the Round 2, July 2, 2016, deadline. TCEQ noted, however, that it would characterize these source areas through monitoring if the EPA designated any of the areas as unclassifiable.[8]

*D.*     *Background on the Designations for Portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas*

In September and December 2015, Sierra Club submitted air-quality modeling for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County. Neither Texas nor Vistra Energy provided any other representative monitoring, modeling or technical information prior to the EPA's notification to the governor of its intended designations.[9] In a letter dated February 11, 2016, the EPA notified Texas of the EPA's intended modifications to the state's September 18, 2015, recommendation for Round 2 designations for the 2010 $SO_2$ NAAQS. Specifically, the EPA's letter informed Texas of its intended nonattainment designations for three separate areas covering portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County, based on consideration of all available information including the modeling submitted by Sierra Club.[10] This letter was accompanied by the EPA's technical support document providing the rationale for this intended designation modification.[11] On March 1, 2016, the EPA also published a notice in the *Federal Register* soliciting public comments on the intended Round 2 designations. *See* 81 FR 10563.

During the public comment period associated with the intended designations, in March 2016, the EPA received comments from citizens, Sierra Club, Luminant (a subsidiary of Vistra Energy), TCEQ and the governor of the state of Texas regarding its intended nonattainment designations for these three areas. As discussed further in Section III, as part of their

---

[6] *https://www.epa.gov/sites/production/files/2016-06/documents/tx.pdf.*

[7] *https://www.epa.gov/sites/production/files/2016-07/documents/texas_source_characterization.pdf.*

[8] Contrary to TCEQ's June 29, 2016, DRR pathway letter, the 2016 Texas Ambient Monitoring Network Plan stated that TCEQ would characterize the Martin Lake, Big Brown or Monticello areas through monitoring if the EPA designated the areas as nonattainment by the court-ordered July 2, 2016, deadline. *See https://www.epa.gov/sites/production/files/2017-09/documents/txplan2016.pdf.*

[9] *See* Docket ID Nos. EPA-HQ-OAR-2014-0464-0084 and EPA-HQ-OAR-2014-0464-0082.

[10] *https://www.epa.gov/sites/production/files/2016-03/documents/tx-epa-resp-r2.pdf.*

[11] *https://www.epa.gov/sites/production/files/2016-03/documents/tx-epa-tsd-r2.pdf.*

comments, Luminant submitted air dispersion modeling for all three areas, and the Sierra Club submitted revised versions of the modeling previously submitted.[12] Texas did not submit modeling but maintained its position that air-quality monitoring data is the proper method for designating these areas, even though at that time it had no such monitoring data nor had it installed monitors in any of the three areas. Concerning the Sierra Club modeling, Texas claimed that this modeling "has errors and clearly overestimates actual $SO_2$ concentrations."[13] Summaries of the comments received can be found in the *Responses to Significant Comments on the Designation Recommendations for the 2010 Sulfur Dioxide National Ambient Air Quality Standards (NAAQS) – Supplement for Four Areas in Texas Not Addressed in June 30, 2016, Version*, dated November 29, 2016.[14]

Before the July 2, 2016, Round 2 designations deadline, the EPA and plaintiffs to the court order agreed to extensions for a limited number of the subject areas, including portions of the Freestone and Anderson, Rusk and Panola and Titus Counties. The deadline for signing the final designations for the Texas areas was extended until November 29, 2016. On July 12, 2016, the EPA published designations for all other areas containing $SO_2$ emissions sources meeting the Round 2 criteria, in accordance with the court-ordered deadline. *See* 81 FR 45039.

In developing the final designations for the three Texas areas, the EPA reviewed all available information. The EPA determined that the modeling submitted by Luminant was not representative of current air quality in these areas for several reasons, as further explained in the EPA's final designations TSD.[15] For example, Luminant's modeling used a non-EPA preprocessor model, AERLIFT, to increase the observed temperatures and velocities of the plumes exiting from the stacks, which the EPA determined was not adequately justified, and, thus, could not be relied upon in the designations decision-making process. The EPA determined that the Sierra Club's revised March 2016 modeling used the latest model version available at the time, and was in accordance with the general recommendations on modeling provided by the EPA.[16] Regarding monitoring data, the EPA maintained our historic approach regarding the importance of considering all available modeling and monitoring data for $SO_2$ designations and noted that there were not monitoring data available to characterize air quality in these areas, only modeling data, and since these designations were subject to the court's order to designate certain areas by November 29, 2016, the agency did not have the discretion to await the results of future monitoring.[17] The final Round 2 designations for portions of the Freestone and Anderson, Rusk and Panola and Titus Counties were based on the EPA's assessment of all available information, including the Sierra Club's revised March

[12] *See* Docket ID No. EPA-HQ-OAR-2014-0464-0328 for Luminant's comment and Docket ID No. EPA-HQ-OAR-2014-0464-0332 for Sierra Club's comment.
[13] *See* Docket ID No. EPA-HQ-OAR-2014-0464-0294.
[14] *https://www.epa.gov/sites/production/files/2016-11/documents/rtc_so2_comments_received_document_4_tx_sources_final_0.pdf.*
[15] *https://www.epa.gov/sites/production/files/2016-11/documents/texas_4_deferred_luminant_tsd_final_docket.pdf.*
[16] *See* the $SO_2$ NAAQS Designations Source-Oriented Monitoring Technical Assistance Document at *https://www.epa.gov/sites/production/files/2016-06/documents/so2monitoringtad.pdf,* and the $SO_2$ NAAQS Designations Modeling Technical Assistance Document at *https://www.epa.gov/sites/production/files/2016-06/documents/so2modelingtad.pdf.*
[17] *Id.*

4

2016 modeling that continued to demonstrate violations of the 2010 $SO_2$ NAAQS. On November 29, 2016, the EPA Administrator signed the final action designating portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County as nonattainment for the 2010 $SO_2$ NAAQS, and the action was published in the *Federal Register* on December 13, 2016. *See* 81 FR 89870 ("Round 2 Supplement").

On February 13, 2017, the state of Texas, TCEQ, and Vistra Energy and its subsidiary companies filed petitions for judicial review of the Round 2 Supplement in the Fifth Circuit Court of Appeals.[18] On that same day, Vistra Energy sent the EPA a petition for reconsideration, purportedly pursuant to CAA section 307(d)(7)(B) and the *Administrative Procedure Act* 5 U.S.C. §553(e), and for administrative stay of the EPA's nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County. On March 15, 2017, TCEQ also submitted a request for an administrative stay of the Round 2 Supplement final designations for these areas in Texas. On September 21, 2017, the EPA responded to Vistra Energy's February 2017 petition for reconsideration by indicating an intent to undertake an administrative action with notice and comment to revisit the nonattainment designations for the three areas, but explained that pending completion of such action the nonattainment designations remained in effect.[19] On October 12, 2017, the Fifth Circuit Court of Appeals granted the EPA's motion to place the consolidated challenges to the Round 2 Supplement in abeyance on this basis. Additionally, TCEQ submitted a petition for reconsideration on December 11, 2017. On December 19, 2017, Vistra Energy provided additional information regarding facility retirements and the deployment of additional $SO_2$ monitors to support its February 2017 petition for reconsideration and administrative stay.

On August 22, 2019, the EPA proposed an error correction under CAA section 110(k)(6) in response to Vistra Energy's petition for reconsideration and administrative stay. *See* 84 FR 43757. The proposed error correction, if finalized, would have revised the nonattainment designations to unclassifiable for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County. The EPA published the proposed error correction seeking public comment on whether the EPA erred by not giving greater weight to Texas' preference to characterize air quality through monitoring and steps undertaken by Texas towards siting monitors with the intention to begin monitoring in these three areas, when considering all available information, relying on available air quality modeling analyses in making the initial designations that recognized included certain limitations or a combination of these two issues. Concurrently with issuing this response to the reconsideration petition, the EPA will publish in the *Federal Register* its withdrawal of the proposed error correction as explained in that notice.

---

[18] Sierra Club additionally filed a petition for judicial review of this action in the D.C. Circuit Court of Appeals, which was transferred to the Fifth Circuit on November 2, 2017, and consolidated with the pending petition. Note, the EPA is not addressing section I.b. of Vistra's petition for reconsideration, which involves a venue issue, in this response. The EPA has addressed its position on venue for the consolidated case challenging the Round 2 Supplement in filings in the 5th Circuit.

[19] *https://www.epa.gov/sites/production/files/2018-09/documents/3143_signed_response.pdf.*

## II.      Criteria for Evaluating a Petition for Reconsideration of the Round 2 Supplement

The APA at 5 U.S.C. section 553(e) states that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." The APA does not provide any criteria that an agency must consider in responding to such a petition, nor include a requirement that such a petition must be granted in certain express circumstances. Section 307(d)(7)(B) of the CAA governs petitions for reconsideration of final actions that are subject to section 307(d). However, CAA section 307(d) does not apply to the EPA's Round 2 Supplement designations action that is the subject of TCEQ's petition.[20] The EPA thus must simply apply reasoned decision making in evaluating a petition for reconsideration of the Round 2 Supplement. However, given that CAA section 307(d)(7)(B) provides clear criteria for evaluating reconsideration petitions, the EPA has chosen to evaluate the merits of this petition for reconsideration under the CAA section 307(d)(7)(B) criteria. The EPA's evaluation of the petition using these criteria provide a reasoned basis for deciding whether to reconsider a final action in response to a petition under APA section 553(e). In doing so, the EPA in no way waives its objection to the applicability of CAA section 307(d) to this final action. Relevant to the EPA's evaluation of this petition using these criteria, the EPA notes that even though the EPA was not required to provide public notice and comment in promulgating the Round 2 Supplement pursuant to CAA section 107(d)(2)(B), the EPA nevertheless provided stakeholders the opportunity to provide comments prior to final EPA action, and while TCEQ provided comment during and after[21] the public comment period prior to final EPA action, in its petition TCEQ requests reconsideration under CAA section 307(d)(7)(B) and asserts in part that it was impossible for TCEQ to raise certain objections of central relevance to the outcome of the Round 2 Supplement during the public comment period.

Under CAA section 307(d)(7)(B), judicial review of final actions taken under CAA section 307(d) is only available with respect to issues raised "with reasonable specificity" during the rulemaking's comment period. Furthermore, the EPA must convene a proceeding to reconsider a CAA section 307(d) rule if the person raising an objection can demonstrate to the Administrator both that it was impracticable to raise the objection during the comment period or that the grounds for such objection arose after the comment period but within the time specified for judicial review (*i.e.*, within 60 days after publication of the final rulemaking notice in the *Federal Register*, see CAA section 307(b)(1)) and that the objection is of central relevance to the outcome of the rule. In other words, CAA section 307(d)(7)(B) does not provide for required reconsideration of issues that have already been raised or could have been raised to the EPA in a CAA section 307(d) rulemaking. Furthermore, the second criterion must also be met for commencement of a reconsideration process under CAA section 307(d)(7)(B). An objection is of central relevance to the outcome of the rule if it provides substantial support for the argument that the promulgated regulation should be

---

[20] Designations are not one of the types of actions listed in CAA section 307(d)(1) as being automatically subject to CAA section 307(d), and the EPA did not exercise its discretion to subject the Round 2 Supplement to CAA section 307(d) under section 307(d)(1)(V).

[21] Under CAA section 107(d), whenever the Administrator intends to make a modification to a state's submitted designation recommendation, the Administrator must notify the state no later than 120 days before the date the Administrator promulgates the designation and provide such state with an opportunity to demonstrate why any proposed modification is inappropriate.

revised.[22] It is not sufficient that the objection be of central relevance to the issues involved in the rulemaking that would not alter the final outcome. If the EPA denies a petition for reconsideration, the person raising the objection can seek judicial review of the EPA's refusal to do so.

## III. The EPA's Evaluation of the Petition for Reconsideration

In its December 11, 2017, petition for reconsideration, TCEQ raises objections regarding five main topics: facility retirement announcements, limited resources to develop state implementation plans, the deployment of new ambient air monitors, the EPA's reliance on Sierra Club's modeling for designation determinations and compliance with the March 2015 designations consent decree. Each of these issues is addressed in this section. In general, other than the claims relating to future facility retirements, TCEQ's petition for reconsideration includes objections that either repeats comments already submitted to the EPA during the public comment period for the intended designations or reflects new objections without including any rationale to demonstrate that they were impracticable to raise during the public comment period or that the grounds for them arose after the end of the period for public comment but within the 60-day period for filing a petition for judicial review of the final designations. Regarding the claim relating to future facility retirements, TCEQ also fails to demonstrate that the objections were impracticable to raise during the public comment period or that the grounds for the objections arose after the end of the period for public comment but within the 60-day period for filing a petition for judicial review of the final designations. These claimed bases for reconsideration can be and are denied under the first criterion irrespective of consideration of the information and arguments presented for these objections in the petition. Nevertheless, the EPA also is providing an evaluation of the substance of TCEQ's comments and other information provided in the petition for these objections under the second criterion. Although a full review of these comments and this information is not warranted because TCEQ does not satisfy the first criterion for reconsideration, for the reasons explained in this section, the EPA also concludes that the petition does not meet the second criterion for reconsideration because the petition does not raise objections that are of central relevance to the outcome of the rule since the objections do not provide substantial support for the argument that the designations should be revised. The following subsections include an analysis of the petition for reconsideration's shortcomings with respect to both the first and second criteria.

### A.    *Facility Retirement Announcements and Resources for State Implementation Plans*

While the petitioner asserts that the facility retirements of the Monticello and Big Brown plants that Vistra Energy's subsidiary, Luminant, announced could not have been known or anticipated by TCEQ, the petitioner also admits that the announcements occurred in October 2017 and forecasted planned closings in early 2018, "well past the close of the comment on [sic] or publication of the final rule" and more than 60 days after publication of the final rulemaking notice in the *Federal Register*. As a result of the facility closures, the petitioner claims that the majority of the $SO_2$ emissions in the areas designated as nonattainment will be eliminated, and the "basis" for the EPA's final nonattainment designations for the Monticello and Big Brown

---

[22] *Coalition for Responsible Regulation v. EPA*, 684 F.3d 102, 125 (DC Cir. 2012).

areas "will no longer exist." The petitioner asserts that TCEQ will expend significant time and resources to develop unnecessary attainment and maintenance plans for the Big Brown and Monticello plants, which were scheduled for closure at the time the petition was submitted, if the nonattainment designations remain in effect. The petitioner also asserts that the maintenance obligations will continue for 20 years for these areas "with no foreseeable SO₂ emissions." Finally, the petitioner states that "in the interest of administrative economy" the EPA should "redesignate" these areas now "before the planning requirements are triggered."

The petitioner fails to and does not demonstrate that these objections meet the first criterion because the facility shutdowns, as detailed further in Section V of this document, occurred more than 60 days after publication of the Round 2 Supplement in the *Federal Register*. These objections do not meet the second criterion because the EPA does not interpret the statute as allowing the EPA to consider future air quality in the initial designations process, and the D.C. Circuit has upheld this interpretation as reasonable;[23] thus, any impact on air quality from these later-occuring shutdowns are not of central relevance to the outcome of the rule. These objections also do not meet the second criterion because the nonattainment designations were not based on an assumption of future air quality, but rather were based on a determination regarding current air quality at the time of the EPA's final designations in December 2016, which is the determination from which any planning obligations and redesignation requirements under the CAA must flow.

The EPA based its final nonattainment designation on the Sierra Club's modeling of the 2013-2015 actual emissions for Big Brown and the 2012-2014 actual emissions for Monticello. This modeling was based on neither future emissions nor the assumption that the two plants would continue to operate into the future. For the same reasons explained in the Round 2 Supplement and Section III.C., the EPA believes that that Sierra Club's March 2016 modeling properly demonstrated that the Big Brown and Monticello areas were violating the 2010 SO₂ NAAQS at the time of the EPA's final designations in December 2016. This conclusion is consistent with our analysis in Section V of this document. The EPA also notes, regarding Texas's planning obligations, that these designations have remained in continuous effect (*i.e.*, the planning obligations were triggered by the nonattainment designations and were never stayed or altered), and the time and resources that Texas is required by the CAA to expend to meet these obligations are not relevant to the factual determinations the EPA made regarding air quality in 2016.[24]

---

[23] *See Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 156 (D.C. Cir. 2015); *Catawba County v. EPA*, 571 F.3d 20, 43-44 (D.C. Cir. 2009). The 2015 decision upheld the EPA's designations issued just days before new certified air quality data became available showing more areas violating the 2008 ozone NAAQS than the EPA designated as nonattainment. *See also State of Texas v. EPA*, 983 F.3d 826, 837-838 (5th Cir. 2020) (holding that the EPA's nonattainment designation, which modified the state's recommendation, was not arbitrary and capricious because the county was not compliant with the ozone NAAQS when the EPA promulgated its designation and the CAA uses concrete terms such that a county either does or does not meet the NAAQS).

[24] Subsequent to TCEQ's petition, more recently at the request of Texas, the EPA finalized a determination that the Big Brown and Monticello areas are now attaining the 2010 SO₂ NAAQS per the EPA's Clean Data Policy. *See https://www.regulations.gov* under Docket ID No. EPA-R06-OAR-2020-0434. This determination suspends most attainment planning requirements under the 2010 SO₂ NAAQS for these two areas for as long as the areas continue to attain the NAAQS.

## B. Deployment of New Ambient Air Monitors

The petitioner claims that the EPA should reconsider the final designations using monitoring data to be collected by TCEQ in two of the three areas at issue, based on its view that the monitoring data, rather than modeling data, are the "only reliable data for making designation determinations." The petitioner also states that a reconsideration of the final nonattainment designations would allow TCEQ "time to collect actual, verifiable air-quality data on the attainment status of this area."

This objection does not meet the first criterion because it repeats comments already submitted to the EPA during the public comment period for the intended designations. In its April 2016 comment, TCEQ advocated that the EPA should not finalize the proposed designations based on modeling because nonattainment designations "should be based only on real world, monitored data, and not predicted values subject to the limitations and flaws of a model." Luminant, a subsidiary of Vistra Energy, submitted similar comments on the EPA's intended Round 2 designations during the public comment period, which the EPA considered and responded to in the Round 2 Supplement. In its March 2016 public comment, Luminant advocates that the EPA should not finalize the proposed designations based on modeling because the agency has "consistently supported monitoring over modeling for NAAQS designations purposes and its approach here was inconsistent with the statute, regulations and the EPA's prior practice." In the responses to comments document that accompanied the Round 2 Supplement, the EPA previously provided a response to this claim:

> The EPA maintains our previous position for the reasons delineated in the preamble to the final 2010 $SO_2$ NAAQS rulemaking, the February 2013 Strategy Paper, the proposed and final $SO_2$ Data Requirements Rule, and in the June 30, 2016, version of the Response to Comments document for why both air quality modeling and ambient monitoring are appropriate tools for characterizing ambient air quality for purposes of informing decisions to implement the $SO_2$ NAAQS, including designation determinations. The EPA's reliance on modeling to assess $SO_2$ air quality, even in the face of conflicting monitoring, where appropriate, has been judicially affirmed. *See, e.g., Montana Sulphur & Chemical Company v. EPA*, 666 F.3d 1174, 1185 (9th Cir. 2012). Moreover, it has long been the EPA's practice to rely upon appropriate modeling when issuing designations under the $SO_2$ NAAQS. *See, e.g.*, 43 FR 8962 (March 3, 1978), 43 FR 40416 (September 11, 1978), 43 FR 40502 (September 12, 1978).[25]

Given that the EPA fully considered this same objection in the Round 2 Supplement and rejected that only monitoring data may be relied upon for $SO_2$ designations under the CAA, this objection also does not meet the "central relevance" second criterion as it does not provide substantial support for the argument that the promulgated 2016 action should be revised. The EPA may rely on representative modeling to assess $SO_2$ air quality for area designations under the CAA and did rely on available air quality modeling to assess $SO_2$ air quality in the absence of any available monitoring data at that time. For those same reasons cited to and articulated in the Round 2 Supplement, the EPA reaffirms our previous statements that both air quality modeling and ambient monitoring are appropriate tools for characterizing ambient air quality for purposes of

---

[25] Round 2 Supplement Reponses to Comments, Page 13.

informing decisions to implement the 2010 $SO_2$ NAAQS, including designation determinations. For the reasons explained in the EPA's final designations TSD, incorporated here by reference, the EPA's analysis is that Sierra Club submitted valid, representative modeling based on the then-most recent actual $SO_2$ emissions demonstrating that the areas were violating the 2010 $SO_2$ NAAQS. The EPA concluded both that the Sierra Club's 2016 modeling mostly followed EPA guidance and that correcting the deviations in the modeling to be more consistent with the guidance would not have resulted in modeled values near or below the standard. As also explained in the EPA's intended and final designations TSDs and the responses to comments document that accompanied the Round 2 Supplement, at the time of the EPA's final designations on December 13, 2016, there were no $SO_2$ monitors sited in the areas of maximum concentration to properly characterize the air quality around Martin Lake, Big Brown, or Monticello, nor were there $SO_2$ monitors in the same counties as the facilities. The EPA properly considered these modeling data to establish a designation of nonattainment for these areas and properly determined that there were not any available monitoring data that could properly characterize air quality in any of the areas at that time. Finally, as explained Section III.A. of this document, the EPA properly designated the areas based on the available information regarding $SO_2$ air quality at the time and properly did not consider the gathering of any future air-quality monitoring data.

The Petitioner also claims that it announced plans to deploy additional $SO_2$ monitors near Martin Lake, Big Brown and Monticello "in light of the Final Rule's nonattainment designations." Furthermore, the petitioner suggests that the EPA should designate the areas as unclassifiable in the absence of monitoring data and later redesignate the areas once the monitoring data are collected.

This objection does not meet the first criterion, as the petitioner fails to demonstrate that the objection was impracticable to raise in the public comment period or that the grounds for the objections arose after the end of the period for public comment but within the 60-day period for filing a petition for judicial review of the final designations. This objection does not meet the second criterion because, as explained further in Section V of this document, these monitors began operating nearly a year (October or November 2017) after the EPA's court-ordered deadline to designate the areas, and thus the data from these monitors are not reflective of air quality at the time of the EPA's final designations in December 2016 and, therefore, could not have affected the outcome of the rule. In the responses to comments document that accompanied the Round 2 Supplement, the EPA previously provided this response to the Utility Air Regulatory Group's similar claim made during the public comment period:

> In response to the commenter's suggestion that designations should await future completion of three years of monitoring, the EPA notes that in the case of the designations subject to the court's order to designate certain areas by July 2, 2016, the agency does not have the discretion to await the results of future monitoring.[26]

These objections also do not meet the second criterion because the EPA is required to consider all available information in making its designations at the time of the final designations under the CAA. Thus, these objections could not have affected the outcome of the rule since they are predicated on the EPA relying on or weighing more heavily information that was not available at

---

[26] Round 2 Supplement Reponses to Comments, Page 14.

68

the time the EPA was required to finalize the Round 2 Supplement. As explained previously, at the time of the EPA's final designations on December 13, 2016, there were no $SO_2$ monitors sited in the areas of maximum concentration to properly characterize the air quality around Martin Lake, Big Brown or Monticello, nor were there $SO_2$ monitors in the same counties as the facilities. The absence of available monitoring data at that time did not relieve the EPA of its obligation to issue designations for these areas under the court order. CAA section 107(d) specifies that the EPA make designations based on the air quality at the time of final designations (*i.e.*, determining at the time of signature whether the area meets the NAAQS).[27] Furthermore, at the time of the final designations, the agency did not have the discretion to await the results of 3 years of ambient air monitoring data (*i.e.*, 2018-2020) from Texas's proposed (but not yet established) monitoring sites before taking final action due to the court's order to designate certain areas in Texas. There was, however, as explained previously and in the EPA's final designations TSD, valid modeling submitted by the Sierra Club based on the then-most recent actual emissions demonstrating that the areas were violating the 2010 $SO_2$ NAAQS, which also did not support and unclassifiable designation. The EPA properly considered these modeling data to establish a designation of nonattainment for these areas. Additionally, as explained in Section III.A., the EPA does not interpret the statute as allowing the EPA to consider future air quality in the initial designations process, and the D.C. Circuit has upheld this interpretation as reasonable.[28]

## C. Reliance on the Sierra Club's Modeling

The petitioner asserts that the EPA relied on the Sierra Club's modeling to make nonattainment designation determinations for the three areas in Texas even though "the EPA did not agree with some of Sierra Club's assertions" regarding important aspects of the modeling. Specifically, TCEQ stated that the EPA "conceded that the modeling was not peer reviewed, used an old version of the model, and only generally meets the requirements of the EPA's modeling guidance." The petitioner also references Vistra Energy's modeling, submitted to the EPA during the comment period, that "in many ways contradicts the conclusions of Sierra Club's modeling as to these areas" and asserts that the EPA did not fully consider the competing information. The Petitioner thus asserts that the areas should be designated unclassifiable.

This objection, as well as the reference to Vistra Energy's modeling submitted during the comment period, does not meet the first criterion because it repeats comments already submitted to the EPA during the public comment period for the intended designations. The EPA's intended nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County were based on Sierra Club's September and December 2015 modeling that demonstrated violations of the 2010 $SO_2$ NAAQS. As explained in the EPA's intended designations TSD, the EPA identified aspects of Sierra Club's 2015 modeling that were not as refined as possible. The modeling did not include building downwash or variable stack temperature and velocity, since Sierra Club did not have access to information needed to support such inclusion (including building downwash will generally, though not always, increase the predicted maximum modeled concentrations). Sierra Club's 2015 modeling used stack velocity and temperatures consistent with 100 percent load. This, coupled with actual hourly emissions

---

[27] *See, supra,* n.23.

[28] *See, supra,* n.23.

11

rates, underestimated actual concentrations because higher temperatures and velocities of 100 percent load, when paired with lower emissions of less than 100 percent load, should provide an overestimation of the dispersion and thus an underestimation of maximum ambient concentrations at ground level. Because the inclusion of building downwash and variable stack parameters would likely not result in values near or below the 2010 $SO_2$ NAAQS, the EPA concluded that the Sierra Club's 2015 modeling was an adequate basis for the intended nonattainment designations for the areas containing Martin Lake, Big Brown, and Monticello. In its March 2016 comment, TCEQ claims that the nonattainment designations were based on third-party, non-peer reviewed modeling that has errors and overestimates the actual $SO_2$ concentrations. In the responses to comments document that accompanied the Round 2 Supplement, the EPA previously provided a response to this claim:

> The EPA disagrees with the commenter's claim that the modeling supporting the nonattainment designations is erroneous and overestimates $SO_2$ concentrations in these areas. Although it is true that the modeling was provided by a party other than TCEQ and was not peer reviewed, neither of these facts is relevant to whether the modeling accurately, reliably, and persuasively shows the areas to be violating the NAAQS...During the comment period, we received additional modeling. The newest Sierra Club modeling includes refined inputs for stack and emissions data and several sensitivity runs that further inform our final decision. In our TSDs for our proposal and supplement for this action we explain that we have reviewed the modeling data and concluded that the modeling was of sufficient quality to make a decision regarding whether the area evaluated meets or does not meet the SO2 NAAQS.[29]

This objection also does not meet the "central relevance" second criterion, as the objection does not provide any additional information to that previously submitted in the public comment period (and fully considered by the EPA in taking the final action) to provide substantial support for the argument that the promulgated 2016 action should be revised. For the reasons explained in the EPA's final designations TSD, incorporated here by reference, the EPA assessed and considered all available information, including but not limited to Texas' recommendation and comments, modeling submitted by Vistra Energy and modeling submitted by Sierra Club. The EPA's analysis was that Sierra Club submitted valid, representative modeling based on the then-most recent actual $SO_2$ emissions demonstrating that the areas were violating the 2010 $SO_2$ NAAQS. The EPA, thus, did not have a basis to conclude that each of the areas could not be classified on the basis of available information to designate them unclassifiable. The EPA specifically disagrees with the petitioner's assertion that the EPA did not fully consider competing information; the EPA fully analyzed and considered Vistra Energy's modeling in the final designations TSD and determined that, in brief, the modeling for the Martin Lake, Big Brown and Monticello facility areas was not representative. The EPA concluded both that the Sierra Club's 2016 modeling mostly followed EPA guidance and that correcting the deviations in the modeling to be more consistent with the guidance would not have resulted in modeled values near or below the standard. The EPA, thus, also disagrees with the petitioner's characterization of these aspects of Sierra Club's modeling and fully explained this technical assessment in the record for the Round 2 Supplement.

---

[29] Round 2 Supplement Responses to Comments, Page 17.

70

Additionally, the EPA's evaluation of the Sierra Club's March 2016 modeling used for the final designations indicated that it may have actually had a slight underestimation bias. For example, as explained in the responses to comments document that accompanied the Round 2 Supplement, the modeling did not include surrounding $SO_2$ sources and used a low background concentration. After further consideration, for the same reasons explained in the Round 2 Supplement response to comment document, and supporting technical support documents, and as further supported by our analysis in Section V of this document, the EPA believes that Sierra Club's March 2016 modeling was of sufficient quality to determine that the Martin Lake, Big Brown and Monticello facility areas in Texas were violating the 2010 $SO_2$ NAAQS at the time of the EPA's final designations in December 2016.

## D.    Consent Decree Obligations

The petitioner states that reconsideration and redesignation does not violate the terms of the March 2015 consent decree, which required the EPA to designate the Martin Lake, Big Brown and Monticello areas. The petitioner claims that with the shut-down of Big Brown and Monticello, the areas will no longer contain stationary sources with $SO_2$ emissions over the thresholds established in the consent decree that triggered the designations.

These objections do not meet the first criterion, as the petitioner fails to demonstrate that it was impracticable to raise in the public comment period for the Round 2 Supplement or that the grounds for the objection arose after the end of the period for public comment but within the 60-day period for filing a petition for judicial review of the Round 2 Supplement.

While the EPA agrees that the consent decree does not (nor could it) prohibit subsequent redesignations and reconsiderations of areas designated by the governing deadlines under the court order, these objections do not meet the second criterion because, as explained in Section III.A., the EPA does not interpret the statute as allowing the EPA to consider future air quality in the initial designations process, and the D.C. Circuit has upheld this interpretation as reasonable;[30] thus, any impact on air quality from these later-occuring shutdowns are not of central relevance to the outcome of the rule. These objections do not meet the second criterion because the nonattainment designations were not based on an assumption of future air quality, but rather were based on a determination regarding current air quality at the time of the EPA's final designations in December 2016, the EPA's deadline established in the court order for issuing the designations for the areas. The court order required the EPA to designate the Martin Lake, Big Brown and Monticello areas in Round 2 because (a) they had not been announced for retirement by March 2, 2015; and (b) in 2012 they had either (i) emitted more than 16,000 tons of $SO_2$ or (ii) emitted more than 2,600 tons of $SO_2$ and had an annual average emissions rate of 0.45 lbs/$SO_2$/MMBTU or higher. Moreover, the existence of the EPA's statutory authority in CAA section 107(d)(3) to subsequently redesignate areas that have been previously designated is of no relevance at all to the factual determinations the EPA previously made in 2016, as that authority exists no matter what decision the EPA might have made in 2016 and as the statutory authority in CAA section 107(d)(1)-(2) governing initial designations is not circumscribed by the redesignation authority.

---

[30] See, supra, n.23.

## IV.    The EPA's Evaluation of the Request for Administrative Stay

In TCEQ's March 15, 2017, request for administrative stay, the petitioner also asks the EPA to administratively stay the effective date of the final nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County pursuant to APA section 705. the EPA concludes that an administrative stay of the Round 2 Supplement for these three areas' designations is neither appropriate nor warranted.

APA section 705 authorizes an agency to postpone the effective date of an agency action pending judicial review when the agency finds that justice so requires. In this case, the Round 2 Supplement became effective January 12, 2017. The petitioner submitted its request for an administrative stay relying upon APA section 705 by petition on March 15, 2017, 62 days after the Round 2 Supplement became effective. Even if the EPA believed that an administrative stay was warranted here, which it does not, an APA section 705 stay is not appropriate once the effective date of the agency action has passed because postponing an effective date necessitates action before the effective date arrives. *See, e.g., NRDC v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 151 (S.D.N.Y. 2019) ("Section 705 only allows an agency to 'postpone the effective date of action taken by it.' 5 U.S.C. § 705. It does not allow agencies to suspend a rule that has already taken effect."); *see also Safety-Kleen Corp. v. EPA*, 1996 U.S. App. LEXIS 2324, *2-3 (D.C. Cir. Jan. 19, 1996); *Becerra v. U.S. Department of Interior*, 276 F.Supp.3d 953 (N.D. Cal. 2017); *California v. United States BLM*, 277 F.Supp.3d 1106 (N.D. Cal. 2017). As cited in TCEQ's petition for reconsideration, the EPA stated in its September 21, 2017, letter to Vistra Energy that the December 2016 final nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County remain in effect while the EPA's intended notice and comment rulemaking action is pending (*i.e.*, the August 2019 proposed error correction).

Even assuming that the EPA has authority to grant an administrative stay here under APA section 705 at this time, an administrative stay is not warranted for the same reasons that the EPA is denying the petition to reconsider, including that the objections raised did not provide substantial support for the argument that the Round 2 Supplement should be revised. The EPA has determined that the petitioner has not made a showing on the merits that reconsideration or stay is warranted after consideration of petitioner's claims, including claims of emissions declines and predictions regarding then-future monitoring data, as well as acknowledgment of the currently available monitoring and review of the currently available modeling data discussed in Section V.

## V.    Additional Information

### A.    *Recent SO₂ Emissions Data*

As shown in Table 2, Martin Lake's $SO_2$ emissions have more than doubled from 25,472 tons in 2016 to 56,198 tons in 2018, making Martin Lake the largest emitter of $SO_2$ in the United States.[31] Big Brown's $SO_2$ emissions decreased from 42,470 tons in 2016 to 6,659 tons in 2018, and Monticello's emissions decreased from 24,961 tons in 2016 to 0 tons in 2018. As explained

---

[31] *See https://ampd.epa.gov/ampd/.*

in additional detail below, both the Big Brown and Monticello facilities permanently and enforceably shut down in 2018 (*i.e.*, the facilities surrendered their operating permits and must obtain all required air-quality permits from TCEQ prior to future operation).

**Table 2.** Comparison of Recent SO₂ Emissions (tons)

| Facility | 2016 | 2017 | 2018 |
|---|---|---|---|
| Martin Lake | 25,472 | 36,441 | 56,198 |
| Big Brown | 42,470 | 47,632 | 6,659 |
| Monticello | 24,961 | 29,412 | 0 |

Regarding the Anderson and Freestone Counties area, Vistra Energy permanently retired the Big Brown coal-fired steam electric generating Units 1 and 2 on February 12, 2018. Vistra Energy filed to void the Big Brown Title V permit, FOP 065, on May 24, 2018, and TCEQ voided this permit on August 29, 2018. Vistra Energy submitted a letter to TCEQ on March 27, 2018, requesting that the agency void Big Brown's individual new source review permits (17891, 18744, 45420, 53205, 54810, 56445, 56447, 83646, 83647, 85296, 94619, 95214, 96276, 99047, 99050, 106862, 108990, 112207, and 148918). On March 29, 2018, TCEQ cancelled all NSR authorizations for Big Brown Units 1 and 2 and certain other facilities, as requested by Vistra Energy.[32] Vistra Energy will retain the remaining permits (17891, 18744, 56447, 106862 and 112207) addressing material handling operations for coal piles, silos and conveyors, until all facility closure activities are completed.

Regarding the Titus County area, Vistra Energy permanently retired the Monticello coal-fired steam electric generating Units 1, 2, and 3 on December 31, 2017. Vistra Energy filed to void the Monticello Title V permit, FOP 64, on May 23, 2018, and TCEQ voided this permit on August 3, 2018. Vistra Energy submitted a letter to TCEQ requesting that the agency void individual NSR permits (2401, 26740, 45432, 54808, 56384, 71238, 85294, 95215, 104897, 105738, 146220, 83645, and 83640) on February 9, 2018. On February 14, 2018, TCEQ cancelled all NSR authorizations for Monticello Units 1, 2, and 3 and certain other facilities, as requested by Vistra Energy.[33,34] Vistra Energy will retain the remaining permits (146278, 2399, 140265, 137864, 56387, 54408 and 104210) addressing material handling operations for coal piles, silos and conveyors, until all facility closure activities are completed.

Although the Big Brown and Monticello facilities permanently and enforceably shut down in 2018, the shutdowns have no bearing on whether the areas were attaining the 2010 SO₂ NAAQS at the time the EPA designated the areas in December 2016. Additionally, the facility shutdowns do not rebut the modeling information relied upon by the EPA for designating the Big Brown and Monticello areas at the time of the Round 2 Supplement.

---

[32] *See* Docket ID No. EPA-HQ-OAR-2014-0464-0455 for a list of Big Brown's voided NSR permits. Big Brown's voided operating permit is also located in Docket EPA-HQ-OAR-2014-0464.

[33] *See* Docket ID No. EPA-HQ-OAR-2014-0464-0456 for a list of voided NSR permits, and docket item number EPA-HQ-OAR-2014-0464-0457 for the voided operating permit.

[34] Any remaining NSR or material handling permits for Big Brown and Monticello will only be maintained while the facilities complete closure activities related to coal piles, silos, conveyors and other shutdown tasks.

*B.    Recent SO₂ Monitoring Data*

In its 2017 annual monitoring network plan, TCEQ proposed new SO₂ monitoring sites in the Freestone and Anderson Counties, Rusk and Panola Counties and Titus County areas to assess air quality in the new SO₂ nonattainment areas involving the Vistra Energy facilities. Texas referred to the 2016 Sierra Club modeling analysis, among other information, to inform its proposed siting of the new monitors.[35] The EPA approved TCEQ's 2016 Texas Ambient Monitoring Network Plan on October 3, 2017.[36] In October and November 2017, almost a year after the EPA designated the three areas in Texas as nonattainment for the 2010 SO₂ NAAQS, Texas began operating the new SO₂ monitoring networks to characterize the air quality around the Martin Lake and Big Brown facilities.[37]

On November 1, 2017, Texas began operating an SO₂ monitor (AQS ID# 48-401-1082) in the Rusk and Panola Counties area to characterize the air quality around the Martin Lake facility. From that time through May 2020, there have been 22 daily maximum one-hour average concentrations that exceeded the 2010 SO₂ NAAQS. The 2018, 2019 and 2020 99th percentile daily maximum one-hour average concentrations are 109.1 ppb, 114.7 ppb, and 83.8 ppb (preliminary), respectively. Although a valid and quality assured three-year design value is not yet available (pending certification of 2020 air quality data), the EPA estimates that the 2018-2020 design value is 103 ppb based on data submitted to the EPA through December 2020, which would violate the 2010 SO₂ NAAQS. It is important to recognize that the 2017-2020 monitoring data do not provide a demonstration of air quality at the time of the EPA's court-ordered deadline to designate the Martin Lake area in December 2016. As such, the monitoring data neither directly corroborate nor rebut the EPA's basis for designating the area as nonattainment at the time of the Round 2 Supplement. The newer monitoring data do, however, indicate that there are likely current, and potentially ongoing, violations of the 2010 SO₂ NAAQS in this area. Additionally, despite the petitioner's predictions to the contrary, the newer monitoring data neither suggest that the Martin Lake area is now attaining the 2010 SO₂ NAAQS, nor do the data appear to support the claim that the previously established requirement for Texas to undertake air quality planning efforts to bring the area into NAAQS attainment should be suspended or terminated.

On October 30, 2017, Texas began operating an SO₂ monitor (AQS ID 48-161-1084) in the Freestone and Anderson Counties area to characterize the air quality around the Big Brown facility. From this time through May 2020, there was only a single daily maximum one-hour average concentration that exceeded the 2010 SO₂ NAAQS, which occurred prior to Big Brown shutting down. The 2018 and 2019 99th percentile daily maximum one-hour average concentrations are 39.4 ppb and 5.8 ppb, respectively, and the recent monitoring data indicate that there have not been ongoing exceedances of the 2010 SO₂ NAAQS since Big Brown shut down. However, given that the 2017-2020 monitoring data do not provide a demonstration of air quality at the time of the EPA's court-ordered deadline to designate the Big Brown area in December 2016, the monitoring data neither directly corroborates nor rebuts the EPA's basis for

---

[35] *https://www.tceq.texas.gov/assets/public/compliance/monops/air/annual_review/historical/2017-AMNP.pdf.*
[36] *https://www.tceq.texas.gov/assets/public/compliance/monops/air/annual_review/historical/EPA2017AMNP.pdf.*
[37] Texas did not install and operate the SO₂ monitor planned near the Monticello facility once the facility retirement was announced in 2017.

designating the area as nonattainment at the time of the Round 2 Supplement. The 2017-2020 monitoring data are unable to demonstrate whether the area was attaining the 2010 $SO_2$ NAAQS by the EPA's court-ordered deadline to designate the area in December 2016, while the facility was still operating, and therefore do not rebut the EPA's nonattainment determination made in the Round 2 Supplement.

## C. Recent SO₂ Modeling Data

The EPA received several comments on its August 22, 2019, CAA section 110(k)(6) proposed error correction action proposing to revise the designations to unclassifiable for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County.[38] Specifically, on September 23, 2019, Sierra Club submitted a comment that included updated modeling purporting to demonstrate that the Martin Lake area did not meet the 2010 $SO_2$ NAAQS at the time of designation and currently does not meet the 2010 $SO_2$ NAAQS based on more recent data, even when the EPA's potential modeling limitations are appropriately addressed.[39] As explained further in Enclosure 2, the EPA's assessment of Sierra Club's September 2019 modeling concludes that there were not errors in the March 2016 modeling, which the EPA used as the basis for its final nonattainment designations in the Round 2 Supplement, that would have resulted in designations other than nonattainment. Although Sierra Club did not submit updated modeling for the Big Brown and Monticello areas as part of the September 2019 submission, it claims that the EPA's previously identified limitations (individually or collectively) have no material effect on the model results for those areas. Overall, the EPA believes that Sierra Club's September 2019 modeling, as it addresses air quality that existed at the time of the 2016 designations, further confirms our analysis of then-available data and the final December 13, 2016, nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County.

## VI. Conclusion

For the aforementioned reasons, the EPA is denying TCEQ's December 11, 2017, petition for reconsideration and has determined that a stay of the EPA's final nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County is not appropriate or warranted. The 2010 $SO_2$ NAAQS nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County, which the EPA published in the *Federal Register* on December 13, 2016, continue to remain in effect. The EPA notes, however, that it recently finalized a separate administrative action (*i.e.*, a clean data determination) that suspends most attainment planning requirements for the Freestone and Anderson Counties and Titus County areas for so long as the areas remain in attainment with the 2010 $SO_2$ NAAQS.[40]

---

[38] *See* Docket ID No. EPA-HQ-OAR-2014-0464.

[39] *See* Docket ID No. EPA-HQ-OAR-2014-0464-0466.

[40] *See, supra*, n.24.

**Enclosure 2**

**The U.S. Environmental Protection Agency's Assessment of Sierra Club's September 2019 Modeling**

## I.    Executive Summary

The U.S. Environmental Protection Agency received several comments on its August 22, 2019, Clean Air Act section 110(k)(6) proposed error correction action proposing to revise the nonattainment designations to unclassifiable for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County, Texas ("Proposed Error Correction," 84 FR 43757).[1] Specifically, on September 23, 2019, Sierra Club submitted a comment that included updated modeling purporting to demonstrate that the area around the Martin Lake Electric Station (*i.e.*, Rusk and Panola Counties) did not meet the 2010 Sulfur Dioxide ($SO_2$) Primary National Ambient Air Quality Standard at the time of initial designations in December of 2016 and, at the time of the comment submission, did not meet the 2010 $SO_2$ NAAQS based on more recent data (*i.e.*, 2016-2018 data), even when potential modeling limitations (as characterized in the Proposed Error Correction) are appropriately addressed.[2]

As explained further in this document, the EPA's assessment of Sierra Club's September 2019 modeling concludes that this modeling confirms the EPA's initial assessment of the Sierra Club's March 2016 modeling for all three areas, which the EPA used as the basis for its final nonattainment designations in the Round 2 Supplement (81 FR 89870). More specifically, Sierra Club's 2019 modeling confirms the EPA's initial assessment that any further refinements to the modeling inputs used in the March 2016 modeling would not have resulted in designations other than nonattainment for these three areas. the EPA's assessment of the March 2016 modeling in the record for the Round 2 Supplement, which is consistent with the EPA's assessment in this document of Sierra Club's September 2019 modeling, concludes that there were not material errors in the March 2016 modeling for these three areas. Furthermore, the EPA concludes that Sierra Club's September 2019 updated modeling further demonstrates that the individual and collective alleged limitations of the March 2016 modeling, as characterized in the EPA's Proposed Error Correction, were not in fact limitations that undermined the EPA's reasonable reliance on the March 2016 modeling to determine the areas were then violating the 2010 $SO_2$ NAAQS and designate them as nonattainment. In fact, the EPA no longer believes that the bases identified in the Proposed Error Correction (*e.g.*, that those alleged limitations in the March 2016 modeling support action under CAA section 110(k)(6) to revise the designations) support the proposed conclusion that an error correction is appropriate. Overall, the EPA believes that Sierra Club's September 2019 modeling, as it addresses air quality that existed at the time of the 2016 designations, further confirms our analysis and final December 13, 2016, nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County.

---

[1] *See* Docket ID No. EPA-HQ-OAR-2014-0464.

[2] *See* Docket ID No. EPA-HQ-OAR-2014-0464-0466. Although Sierra Club did not submit updated modeling for the Big Brown and Monticello areas as part of the September 2019 submission, it also claims that the EPA's proposed limitations (individually or collectively) have no material effect on the model results for those areas.

1

## II. Background

### A. Final Round 2 Supplement to 2010 SO₂ NAAQS Designations for Four Areas in Texas

On December 13, 2016, the EPA designated portions of Freestone and Anderson Counties (Big Brown Steam Electric Station), Rusk and Panola Counties (Martin Lake Electric Station) and Titus County (Monticello Steam Electric Station) as nonattainment for the 2010 $SO_2$ NAAQS based on the EPA's assessment of all available information, including the Sierra Club's March 2016 modeling that demonstrated violations of the 2010 $SO_2$ NAAQS. *See* 81 FR 89870 ("Round 2 Supplement"). Vistra Energy's subsidiary Luminant owned all three power plants in 2016.

In finalizing the designations for the three Texas areas in 2016, the EPA reviewed all available information and determined that Sierra Club's March 2016 modeling used the latest model version available at the time, used the default regulatory options, and was conducted in accordance with the general recommendations on modeling provided by the EPA in its "$SO_2$ NAAQS Designations Modeling Technical Assistance Document" ("$SO_2$ NAAQS Designations Modeling TAD").[3] Sierra Club's March 2016 modeling provided to the EPA was inherently subject to the constraints of the data available to Sierra Club, specifically the level of refinement reflected the modeling inputs. The Sierra Club's March 2016 modeling made adjustments and corrections to its previously submitted December 2015 and September 2015 modeling (collectively referred to as 2015 modeling) in response to the EPA's assessment of the 2015 modeling in its February 2016 Intended Designations Technical Support Document (TSD). In the March 2016 modeling these adjustments and corrections included updating the model version used, updating to the most recent 3 years (2013-2015) of actual emissions for Martin Lake and Big Brown, inclusion of only the principle source in each area, and correction of switched stack locations at the Big Brown facility.[4] There were several aspects of the Sierra Club's March 2016 modeling that the EPA discussed in the Final Designations Supplement TSD[5] regarding potential deviation from or lack of refinement where information was not publicly available under the $SO_2$ NAAQS Designations Modeling TAD:

1. Exclusion of variable stack exit temperature (information not publicly available; used fixed values)
2. Exclusion of building downwash (information not publicly available)
3. Elevation of flagpole receptors (1.5 meters)
4. Use of older land use data at the surface meteorological station
5. Exclusion of fenceline or omission of receptors from certain locations (Luminant claimed certain locations were not feasible to place a monitor in receptor grid)

---

[3] *See* the SO₂ NAAQS Designations Modeling Technical Assistance Document ("SO₂ NAAQS Designations Modeling TAD") at *https://www.epa.gov/sites/production/files/2016-06/documents/so2modelingtad.pdf*.

[4] Technical Support Document Texas Area Designations for the 2010 SO₂ Primary National Ambient Air Quality Standard ("Intended Designations TSD"), available at *https://www.epa.gov/sites/production/files/2016-03/documents/tx-epa-tsd-r2.pdf*.

[5] Technical Support Document for the Designation Recommendations for the 2010 Sulfur Dioxide National Ambient Air Quality Standards (NAAQS) – Supplement for Four Areas in Texas Not Addressed in June 30, 2016 ("2016 Final Designations Supplement TSD"), available at *https://www.epa.gov/sites/production/files/2016-11/documents/texas_4_deferred_luminant_tsd_final_docket.pdf*.

77

6. Use of the lowest monitored background concentration in Texas

However, the EPA also analyzed the impact of these potential issues in the 2016 Final Designations Supplement TSD and determined that they did not undermine the use of the Sierra Club's March 2016 modeling for the purpose of designating the areas. The EPA's analysis concluded that inclusion of such refinements or changes would not be expected to result in a change to the modeled concentrations to the degree that would alter the conclusion that the areas did not meet the 2010 $SO_2$ NAAQS. In the 2016 Final Designations Supplement TSD, the EPA also noted that we received comments from Luminant. Luminant's comments included modeling, which did not conform with the $SO_2$ NAAQS Modeling TAD, but which provided some useful information regarding modeling inputs not previously available to the public.[6] For the area around the Martin Lake facility, the EPA concluded the following in the 2016 Final Designations Supplement TSD:

1. Regarding stack temperature, the EPA concluded that the constant temperature used by Sierra Club for the stacks (449.3K) was, on average, 21 percent higher than the continuous emissions monitor temperatures furnished by Luminant as part of their 2016 modeling analysis, which for near full load (filtered for stack velocity > 25 m/s), has an average of 356K and ranged between 338-478K. the EPA concluded that the increased temperature used by Sierra Club would increase the modeled buoyancy of the plume and tend to reduce modeled concentrations, and that the amount of reduction was dependent on meteorological conditions. The EPA determined that the use of the Sierra Club's higher-than-actual constant temperature would likely underestimate the actual concentrations.[7]

2. Regarding building downwash, the EPA concluded that, while we did not agree with the Sierra Club's assertion that exclusion of downwash is conservative in all cases, in our evaluation, the inclusion of building information and associated downwash in this analysis would not change our recommended designation of nonattainment. We noted that Luminant's modeling report (which Texas also included in their response to the EPA's intended designations) indicated that they expected that the modeling results were not extremely sensitive to this issue because the stack heights are well above the buildings and there is considerable momentum and buoyancy rise for the stack plumes. The EPA concluded that the modeling values were sufficiently above the standard and inclusion of downwash often leads to higher concentrations closer to the source but – even in situations we have seen where this did not occur – any decreases in maximum modeled values from inclusion of downwash were relatively small and not expected to be enough of a decrease to resolve all modeled exceedance values near Martin Lake.[8]

3. Regarding use of flagpole receptors, we stated that we would expect only a very slight change in the modeled numbers and the area of exceedances and magnitude of the values would be basically equivalent, and, therefore, not change our final action. We based this conclusion on analysis of sensitivity modeling conducted by the Sierra Club for another source, which found decreases in modeled $SO_2$ between almost 0 and 0.2 percent when removing the flagpole receptors and estimating concentrations at ground level. Since the

[6] *See* Docket ID No. EPA-HQ-OAR-2014-0464-0328.
[7] 2016 Final Designations Supplement TSD, p. 61.
[8] 2016 Final Designations Supplement TSD, pp. 61-62.

Sierra Club's March 2016 maximum modeled design concentration (in ambient air) at Martin Lake was at least 14 percent above the standard, the EPA concluded that the change due to flagpole receptor heights would not decrease the value to below the standard.[9]

4. Regarding use of land surface data from 1992, the EPA indicated based on Sierra Club's 2016 modeling, which included a sensitivity analysis for updated surface data/characteristics, that a small decrease (*i.e.*, approximately 3.6 percent) in maximum modeled design concentrations would be expected from updated surface characteristics.[10]

5. Regarding inclusion of contested receptors, the EPA only evaluated concentrations in Sierra Club's March 2016 modeling at receptors that represented areas where it was clear to the EPA based on available information that it would also be feasible to place a monitor and record ambient air impacts. Luminant's 2016 modeling included areas that it considered to be non-ambient, but the EPA did not have sufficient information to evaluate and conclude that all the areas Luminant was claiming as non-ambient were in fact non-ambient areas. Without sufficient data to support Luminant's non-ambient area claims, the EPA evaluated Sierra Club's March 2016 modeling results for the areas that Luminant did not claim as non-ambient, which we referred to as the "uncontested area." the EPA's assessment included evaluating concentrations at only uncontested receptors and separately also evaluating concentrations at areas that clearly were erroneously claimed as unfeasible by Luminant. The EPA also noted concerns that Luminant had contested receptors (excluded in Luminant's modeling) in more areas than were appropriate and that the maximum values in the uncontested area in Sierra Club's March 2016 modeling were as high as 239.1 micrograms per cubic meter ($\mu g/m^3$) near the Luminant excluded area.[11] For the EPA's analysis, we explained that we used 224 $\mu g/m^3$ (highest concentration at an uncontested receptor) to evaluate the modeling, but the analysis could also be done based on the 239.1 $\mu g/m^3$ value, which would further support a nonattainment designation for the area around Martin Lake.[12]

6. Regarding background, the EPA concluded that many of the $SO_2$ monitors in Texas are in urban areas and/or near a $SO_2$ point source, so there were limited data for background values. In addition, the EPA concluded that using the El Paso monitor, which was the lowest design value in the state of Texas during this period, was an underestimation. Given the mass of $SO_2$ emissions in East Texas compared to the El Paso area, the EPA explained that this assumption likely leads to an underestimation in the concentrations around these facilities (*i.e.*, if background monitoring data existed for East Texas it would be expected to be a higher value than the El Paso monitor data and would result in an increase in the modeled concentrations around the Martin Lake facility) but was within the framework of the $SO_2$ NAAQS Designations Modeling TAD's options for inclusion of background monitoring data.[13]

---

[9] 2016 Final Designations Supplement TSD, pp. 58-60.

[10] 2016 Final Designations Supplement TSD, pp. 28, 76.

[11] 2016 Final Designations Supplement TSD, pp. 65-72. Note the captions for Figures 22 and 23 in the 2016 Final Designations Supplement TSD indicate the Maximum value of 229.1 $\mu g/m^3$ but that is a typographical error and should have been 239.1 $\mu g/m^3$.

[12] 2016 Final Designations Supplement TSD, pp. 60, 66-72.

[13] 2016 Final Designations Supplement TSD, p. 65.

4

Based on the modeling available at the time, the EPA also explained in the 2016 Final Designations Supplement TSD that inclusion of only the principle source in the modeling was an acceptable choice in this area's circumstances, as we maintained that Martin Lake was likely contributing nearly 100 percent of the impact for the values above the 2010 $SO_2$ NAAQS. Sierra Club's modeling, by not including the nearby Pirkey Power Plant, was potentially slightly under-estimating approach to determining whether the area is attaining and to identifying the boundaries of such area, as inclusion of this source should result in either similar maximum impacts and boundaries or slightly increased impacts and possibly slightly larger boundaries, but should not result in decreased impacts or "shrinking" of boundaries from those modeled.[14]

In the 2016 Final Designations Supplement TSD, the EPA concluded that the Sierra Club's March 2016 modeling followed the appropriate the EPA modeling guidance based on the information that was available to Sierra Club at the time, and specifically concluded that several techniques (*i.e.*, not including building downwash, not using variable stack temperature, not including other $SO_2$ emissions sources, and using the lowest monitored background concentration) generally would tend to reduce/underestimate modeled design concentrations.[15] The EPA also evaluated the combination of all these aspects (potential positive and negative impacts on concentrations) of the modeling through a comparison analysis, using 224 $\mu g/m^3$ as the maximum value based on the subset of uncontested receptors.[16] The EPA's assessment of the available information ultimately concluded that the collective differences/changes to the Sierra Club modeling would not result in modeled values near or below the standard.[17] The EPA reached this conclusion after considering that Sierra Club's modeled concentrations (with a low background and no nearby $SO_2$ emissions sources) were 14 percent above the standard using 224 $\mu g/m^3$ and 22 percent above the standard using 239.1 $\mu g/m^3$ as the maximum modeled design concentrations. The EPA evaluated the factors listed previously and concluded that these would result in Sierra Club's 2016 modeling under-estimating impacts and that any differences/changes to Sierra Club's modeling would not result in modeled values near or below the standard. Instead, the EPA concluded that any adjustments to these factors would actually result in higher modeled concentrations. Therefore, the EPA considered the final Sierra Club modeling submitted March 2016 to be relevant information that must be considered in our designation decision and found that the modeling was a sufficient basis for a nonattainment designation because it clearly demonstrated the area around Martin Lake was violating the 2010 $SO_2$ NAAQS.[18]

In addition to the March 2016 updated Sierra Club modeling, the EPA reviewed modeling submitted by Luminant during the public comment period in 2016.[19] The Luminant modeling did not conform to the guidance of the $SO_2$ Designations Modeling TAD nor the 40 CFR Part 51 Appendix W – Guideline on Air Quality Models. Furthermore, the EPA determined that Luminant's modeling was not representative of current air quality in these areas for several

---

[14] 2016 Final Designations Supplement TSD, pp. 60-62.

[15] 2016 Final Designations Supplement TSD, p. 75.

[16] 2016 Final Designations Supplement TSD, p. 76.

[17] 2016 Final Designations Supplement TSD, pp. 75-77.

[18] 2016 Final Designations Supplement TSD, p. 75-77.

[19] *See* Docket ID No. EPA-HQ-OAR-2014-0464-0328.

80

reasons, as further explained in the EPA's 2016 Final Designations Supplement TSD. Some examples of the issues the EPA identified with Luminant's modeling were:

- Luminant applied non-EPA preprocessor models, AERLIFT and AERMOIST, to the CEM data to increase the observed temperatures and (in the case of AERLIFT) velocities of the plumes exiting from the stacks. The EPA reviewed these proposed processors and supplied information, and then analyzed some of the significant changes that these processers were making to modeled stack parameters and buoyancy flux calculation. The lack of supporting documentation and the EPA's review of the changes the processors were making resulted in the EPA determining that AERLIFT and AERMOIST were not adequately justified and, thus, model results using these processors could not be relied upon in the designations decision-making process.[20]

- Luminant's March 2016 report included a then-future emissions estimate scenario (2017-2019 estimated $SO_2$ emissions). Luminant asserted that Martin Lake will not cause or contribute to nonattainment near the plant when modeled with Luminant's then-projected future emissions because the maximum modeled design concentration was 192.1 $\mu g/m^3$. These projected emissions were associated with potentially improving scrubber efficiency, fuel switches and potentially collateral benefits with reductions of $SO_2$ from the facility complying with the Mercury Air Toxics Rule. In the 2017-2019 future estimated emissions modeling scenario, Luminant projected future emissions rates in 2017-2019 that were lower than recent actual emissions at the time based in part on future non-enforceable, voluntary operational changes at Martin Lake.[21] However, for the purpose of determining whether the area is currently meeting the 2010 $SO_2$ NAAQS and designating the area, either actual emissions or currently enforceable allowable emissions limits should be modeled. The EPA provided the following explanation in the 2016 Final Designations Supplement TSD:

> Neither the efficiency improvements in operation of existing scrubbers nor fuel switches were reflected in a permanently enforceable situation. This means that they could change, and are not a certain or effective limitation on either current or future emissions...In this case the intended switching of fuel and increases in scrubber efficiency, whether they have occurred or not, are not yet enforceable through any mechanism provided by Luminant - such as a permit limit - and Luminant would be free to either not switch or, if it does switch, change back to a higher sulfur content coal in the future, depending on circumstances.[22]

Without permanent and federally enforceable emissions limits, the facility could make operational modifications (*e.g.*, change the fuel type, alter the volume of process exhaust bypassing the scrubber, etc.), which may not be protective of future air quality.[23]

---

[20] The EPA also compared the difference between the pre-processors assumptions and impacts and the stack temperatures used in Sierra Club's March 2016 modeling. *See, e.g.*, 2016 Final Designations Supplement TSD at pp. 55-61.

[21] As discussed elsewhere, actual emissions for this time period were higher than Luminant predicted and similar to the actual 2013-2015 emissions that were modeled to inform designations.

[22] 2016 Final Designations Supplement TSD, p. 55-56.

[23] 2016 Final Designations Supplement TSD, p. 55-56.

6

- Luminant's modeling used Beta options LOWWIND3 and ADJ_U* which had not been approved by the EPA for regulatory use and, among other conditions, required consultation and pre-approval from the EPA for regulatory applications as an alternative model. This process was not initiated or completed in the modeling of these three areas and thus, the modeling based on their use was determined by the EPA to not be acceptable for this regulatory use.[24]

B.    *Proposed Error Correction of 2010 SO₂ NAAQS Designations for Three Areas in Texas*

On August 22, 2019, the EPA proposed to determine it had made an error in the 2010 $SO_2$ NAAQS nonattainment area designations for three Texas areas and to revise the designations to unclassifiable for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County. *See* 84 FR 43757. The EPA proposed that it erred in not giving greater weight to Texas' preference to characterize air quality through monitoring and steps undertaken by Texas towards siting monitors with the intention to begin monitoring in these three areas, when considering all available information; in relying on available air-quality modeling analyses in making the initial designations that the EPA recognized included certain limitations and uncertainties; or a combination of these two issues.

Regarding the limitations and uncertainties with the Sierra Club 2015 and March 2016 modeling, the EPA stated in the Proposed Error Correction that given the possible collective significance of these issues and, in the case of the areas around the Martin Lake and Monticello power plants, given that the maximum modeled concentrations are within about 10 percent of the primary $SO_2$ NAAQS, we were less confident in our prior statements that potential adjustments to the Sierra Club modeling would not result in modeled values near or below the $SO_2$ NAAQS.[25] In the Proposed Error Correction, the EPA stated that limitations and uncertainties with the Sierra Club modeling identified in the Intended Designations TSD and the Final Designations Supplement TSD for the 2016 $SO_2$ designations included:

1. Absence of variable stack conditions and representation of 100 percent load stack parameters. The EPA stated that commenters on the EPA's proposed designations noted this issue is particularly pronounced as the Electric Reliability Council of Texas market is competitive with plant dispatch based on variable cost and falling natural gas prices and renewable capacity resulting in these units running in variable operations. The EPA also noted that the EPA stated in the technical support document for the 2016 designations in Indiana that use of hourly stack parameters more accurately characterizes plume characteristics, which will provide greater reliability both in the estimated concentration and in the geographical distribution of concentrations.
2. Treatment of building downwash (failure to include), surface meteorology, hourly wind inputs, potential to emit/allowable emissions, variable stack temperature and velocity.

---

[24] 2016 Final Designations Supplement TSD, p. 58.

[25] As explained in the 2016 Final Designations Supplement TSD, the modeled 99th percentile daily maximum one-hour $SO_2$ concentrations for the Martin Lake and Monticello facilities are 14 percent and 8 percent above the 2010 $SO_2$ NAAQS, respectively. The Martin Lake figure is based on the approach of looking only at uncontested receptors.

3. Inappropriate elevation of flagpole receptors.
4. Use of an older version of AERMOD (Note: This refers to modeling in the EPA's Intended Designations TSD but not in modeling for the 2016 Final Designations Supplement TSD).
5. Representation of recent emissions, including controls after the 2011 National Emissions Inventory.
6. Use of a larger receptor grid than recommended.
7. Approach to estimation of background concentrations.
8. Failure to include fenceline receptors or source contribution in the modeling analysis.

The EPA stated that "while individually these deficiencies are not dispositive, collectively they are a sufficient basis for the EPA to propose that we erred in relying on the Sierra Club modeling in making the initial nonattainment designations for the three Texas areas." *See* 84 FR at 43761.

### III. Sierra Club Modeling Submitted in Response to the EPA's September 2019 Proposed Error Correction

The EPA received several comments on its August 22, 2019, Proposed Error Correction action proposing to revise the designations to unclassifiable for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County.[26] Specifically relevant to this technical support document, on September 23, 2019, Sierra Club submitted a comment including new modeling that addressed the limitations identified in the Proposed Error Correction regarding the Sierra Club's previous modeling,[27] both individually and collectively. The Sierra Club's September 2019 modeling purportedly demonstrated the area around Martin Lake was violating the 2010 $SO_2$ NAAQS based on modeling of 2013-2015 period with actual emissions for Martin Lake. The remainder of this document analyzes Sierra Club's September 2019 modeling for the 2013-2015 period and compares that modeling with the Sierra Club's March 2016 modeling used for the EPA's final nonattainment designation of the Martin Lake area. The Sierra Club's September 2019 is modeling was conducted to characterize air quality in that area using the most recent three years of actual emissions then-available at the time of the Round 2 Supplement. The following assessment focuses on Sierra Club's September 2019 modeling of the 2013-2015 period, which collectively addressed all the issues raised in the EPA's Proposed Error Correction; however, the EPA also reviewed and agrees with the analyses of the individual factors as detailed in the Sierra Club's modeling report for the same reasons stated therein.

### A. *Sierra Club's 2019 Updated Modeling for the 2013 -2015 Period*

To address the issues the EPA identified in its Proposed Error Correction, the September 2019 Sierra Club modeling for the 2013-2015 period utilizes modeling inputs from Luminant's March 2016 modeling analysis except where noted. Since the remainder of the updated modeling was unchanged, refer to the 2016 Final Designations Supplement TSD for the Round 2 Supplement for a discussion of the individual, unchanged elements.

---

[26] *See* Docket ID No. EPA-HQ-OAR-2014-0464.
[27] This refers to Sierra Club's 2015 modeling used in the Intended Designation TSD and Sierra Club's March 2016 modeling used in the 2016 Final Designations Supplement TSD.

1. The most current version of the AERMOD modeling system, version 18081, was used for the analysis. Note, as explained by the EPA in the 2016 Final Designations TSD, the Sierra Club's March 2016 modeling analysis used the most recently available version (version 15181) of AERMOD at that time, which was an updated version of AERMOD compared to the previous Sierra Club modeling (using AERMOD version 14134) that the EPA reviewed in the Intended Designations TSD.

2. Refinements of the March 2016 modeling inputs for stack parameters, building dimensions and locations, emissions rates and receptor grid were obtained directly from Luminant's March 2016 modeling analysis. The Sierra Club's updated modeling (2019) used Luminant's March 2016 report as a basis since the Luminant analysis contained more refined modeling inputs based on data available to the facility owner, such as CEM measured stack and emission/temperature/flow/velocity parameters, and stack and building location and dimensions.[28] Specifically, the following was updated:

   a. Stack location, height and diameters.
   b. Specific building locations and dimensions allowing for evaluation of downwash.
   c. Updated hourly emissions rates, stack temperatures and stack exit velocities. The Sierra Club March 2016 modeling analysis had used a constant temperature obtained from a prior regional haze modeling study. While the facility's continuous emissions monitoring system records temperatures, these data are not reported to the EPA's Clean Air Markets Division.[29] The updated Sierra Club analysis used Luminant's hourly CEM temperature measurements during 2013-2015.

3. Updated meteorological data were obtained from the surface station at the Longview Texas Regional Airport. To address potential concerns expressed during the Round 2 Supplement about recent changes in land use surrounding the airport, the beta version of AERSURFACE v. 19039 was run with 2011 National Land Cover Database, an update from the previous 1992 NLCD data.

4. To address the EPA's concerns regarding the Sierra Club's March 2016 modeling's use of a 1.5-meter flagpole receptor height to reflect a representative inhalation level, the updated analysis does not use an elevated flagpole height.

5. To address the EPA's concerns about the size of the receptor grid in Sierra Club's March 2016 modeling, Sierra Club used a 25-kilometer grid for both of the two modeling receptor grids. Receptor Grid #1 includes all locations around the Martin Lake Generating Station accessible by the general public. Receptor Grid #2 was obtained from Luminant's 2016 modeling analysis that excluded locations that Luminant claimed was

---

[28] Sierra Club is using data (including stack location and parameters, emissions rates, actual varying stack temperatures and stack velocities) provided by Luminant that is available to Luminant but not reported to the EPA's CAMD database or normally available to the public. This data that Sierra Club used was not adjusted by the processors AERLIFT and AERMOIST that the EPA determined invalidated the results of Luminant's 2016 modeling. The EPA has reviewed the information/values that Sierra Club is using in its September 2019 updated modeling from Luminant's March 2016 modeling analysis, and the EPA considers these to be acceptable because they comport with the $SO_2$ Designations Modeling TAD.

[29] *https://ampd.epa.gov/ampd/*.

9

not feasible for placement of a monitor and/or which were claimed as Luminant's property that the public does not have access.[30]

## B.    Modeling for the 2016 - 2018 Period

Sierra Club also submitted modeling for the more recent 2016-2018 3-year period. The additional years modeled in other scenarios are intended to address the identified limitation that the 2013-2015 years might not be representative of future emissions. Actual hourly emissions rates were obtained from the EPA's CAMD database for 2016 through 2018. The Sierra Club attempted to derive representative stack temperatures and hourly-varying exit velocities for the 2016-2018 period. Since the full CEMS data were not publicly available for modeling the 2016-2018 period the 2013-2015 CEMS data were used to characterize the individual unit stack parameters. An average stack outlet temperature for each of the three units for 2013-2015 was calculated. Exit velocities for 2013-2015 from the CEM measurements were combined with concurrent heat input obtained from CAMD to derive a relationship between exhaust gas flow rate and heat input for the three units. The relationship was applied to the hourly heat input for each unit from CAMD during the 2016-2018 period to estimate hourly exit velocities during 2016-2018.

The background concentration was updated to the 99th percentile concentration in Travis County, Texas, the lowest design value measured at ambient monitors in the state of Texas, for the 2016-2018 period. Sierra Club indicated that this monitor was used because it is nearer to Martin Lake and because the monitor which previously had the lowest state value (El Paso UTEP) was decommissioned on December 31, 2017. The updated background concentration from the Austin Northwest monitor (AQS ID# 48-453-0014) is 7.8 $\mu g/m^3$ (3 ppb), which is 2.7 $\mu g/m^3$ (51 percent) higher than the background value of 5.1 $\mu g/m^3$ used in Sierra Club's March 2016 modeling.

## C.    Scenarios Examined

The Sierra Club modeling analysis covered several scenarios relevant to assessing whether to revisit the initial designations for the three Texas areas, including our Proposed Error Correction. This modeling analysis provides new information that the EPA did not have at the time of our Proposed Error Correction. One of the central issues that the EPA had based our error correction proposal on was that the EPA did not have enough information at the time of the Round 2 Supplement to assess a combination of issues in Sierra Club's March 2016 modeling, to the extent that the March 2016 modeling should not have been relied upon to determine whether the area around Martin Lake was not attaining the 2010 $SO_2$ NAAQS. Sierra Club's September 2019 updated modeling confirms the EPA's initial analysis of Sierra Club's March 2016 modeling, which included both individual and collective analysis of such issues, and further demonstrates that the individual and collective alleged limitations of the March 2016 modeling, as characterized in the EPA's Proposed Error Correction, were not limitations that undermined the

---

[30] The EPA has not determined whether the areas that Luminant claimed as non-ambient and they excluded receptors from is substantiated or not, but Sierra Club's Receptor Grid #2 estimates the air quality in the modeled area based on areas that Luminant identified in their March 2016 modeling analysis as ambient (uncontested receptors) with modeled DVs above the NAAQS (2016 Final Designations Supplement TSD, pp. 66-72).

EPA's reasonable reliance on the March 2016 modeling to determine the areas were then violating the 2010 $SO_2$ NAAQS and designate them nonattainment. In fact, the EPA no longer believes that the bases identified in the Proposed Error Correction support the proposed conclusion that an error correction is appropriate. The results of the relevant modeling scenarios are discussed in the remainder of this section.

The key modeling scenario in Sierra Club's September 2019 modeling analyses, for comparison to the March 2016 modeling analysis, which the EPA relied on in the Round 2 Supplement, are the modeling files contained in the file "MLsx1315b.zip," which Sierra Club submitted during the public comment period, but hereinafter referred to the MLsc1315b scenario.[31] This MLsc1315b scenario is assessed in the next section and includes all the inputs and updates explained in the September 2019 modeling for the 2013-2015 Period, including Receptor Grid #2. The EPA is focusing our comparison analysis on this specific modeling scenario that includes Receptor Grid #2, as this modeling analysis is for the same meteorological and emissions period (2013-2015) that was relied upon in the 2016 Final Designations Supplement TSD and also potentially underestimates the $SO_2$ air quality at the time of the Round 2 Supplement because it includes only uncontested modeling grid receptors.

Sierra Club's 2019 updated modeling reported results for four three-year meteorological/emissions periods: 2013-2015, 2014-2016, 2015-2017 and 2016-2018. As discussed previously, the stack parameters for the years 2013, 2014, and 2015 were from the CEMS while for the other years were estimated based on relationships derived from the 2013-2015 period because Sierra Club did not have access to varying stack temperature and velocity for the other years (2016-2018). The September 2019 modeling for the 2013-2015 period is most accurate because it uses information from Luminant on stack parameters (velocity and temperature) not publicly available for 2016-2018 period and noted as either actual or estimated in Table 2. Table 2 includes a summary of all the Modeling Scenarios provided by Sierra Club in their 2019 modeling analysis and their March 2016 modeling analysis including the maximum design concentration and background used.

---

[31] Air dispersion modeling input and output files are too large to post in the docket or on the EPA's website and must be requested from the EPA Docket Center, Corey Mocka (*mocka.corey@epa.gov*), or Erik Snyder (*snyder.erik@epa.gov*).

**Table 2.** Results for Select Scenarios from the Sierra Club's 2019 Modeling Analysis for the Martin Lake Area

| Modeling Analysis | Modeling Scenario ID | SO₂ Emissions Type | Receptor Grid | Stack Parameters | 99th Percentile 1-hour Daily Maximum ($\mu g/m^3$) | Backgr-ound ($\mu g/m^3$) | Total ($\mu g/m^3$) |
|---|---|---|---|---|---|---|---|
| **March 2016** | Not Applicable | Actual | Grid #1[a] | Fixed Velocity & Temperature | 239.0 | 5.1 | **244.1**[b] |
| **September 2019** | MLsc1315a | Actual 2013-15 | Grid #1 | Actual[c] | 393.8 | 7.8 | **401.6** |
| | MLsc1315b | Actual 2013-15 | Grid #2 | Actual[c] | 388.7 | 7.8 | **396.5** |
| | MLsc1416b | Actual 2014-16 | Grid #2 | Estimated | 311.0 | 7.8 | **318.8** |
| | MLsc1517b | Actual 2015-17 | Grid #2 | Estimated | 209.2 | 7.8 | **217.0** |
| | MLsc1618b | Actual 2016-18 | Grid #2 | Estimated | 238.4 | 7.8 | **246.2** |

[a] March 2016 Grid #1 extends to 50 km while the September 2019 Grid #1 extends to 25 km.
[b] **Bold** concentrations are above the 2010 SO₂ NAAQS (196.4 $\mu g/m^3$).
[c] Actual Stack Parameters - Variable stack velocity and temperature were used from Luminant data included in Luminant's 2016 modeling analysis. These values were measured or calculated from measured data and are not impacted by the processors that Luminant used (AERLIFT or AERMOIST) and are, therefore, acceptable. These values are more refined than the estimated values previously used by Sierra Club in their March 2016 modeling analysis.

## IV.    Comparison of Sierra Club's March 2016 and September 2019 Modeling for the 2013-2015 Period

The MLsc1315b modeling scenario provides modeling that addresses previously identified concerns in the Proposed Error Correction and refines the modeling analysis in strict accordance with the SO₂ NAAQS Designations Modeling TAD for the 2013-2015 modeling period. Sierra Club's September 2019 modeling for the 2013-2015 period has directly addressed all the modeling inputs that the EPA identified in our Proposed Error Correction and/or the Round 2 Supplement. The EPA has reviewed the September 2019 modeling, and the modeling strictly follows the SO₂ NAAQS Designations Modeling TAD, which the EPA provided in advance of the Round 2 designations. Sierra Club made several refinements to the model input data, which became publicly available at the end of the Round 2 designations public comment period as part of Luminant's March 2016 comments, and these data and other updated components of the AERMOD modeling system were used in this September 2019 modeling. The changes, as detailed in the Section III of this document, are refinements to the model inputs, based on more detailed data, and more rigidly adhere to the EPA's modeling guidance regarding when such refinements are available.

As explained in more detail later in this document, because the technical aspects of Sierra Club's March 2016 modeling identified by the EPA in the Proposed Error Correction have been addressed in Sierra Club's September 2019 modeling of the 2013-2015 meteorology and emissions, the 2019 modeling effectively demonstrates whether the EPA was correct in estimating the impact of any uncertainty from lack of refinement of inputs or deviation from the $SO_2$ NAAQS Designations Modeling TAD in the March 2016 modeling. In sum, the September 2019 modeling demonstrates that our initial designation of nonattainment for the area around Martin Lake, and by extension our initial designations for the areas around Big Brown and Monticello, were also valid. By comparing the key modeling scenario, MLsc1315b, for Sierra Club's September 2019 modeling analysis to Sierra Club's March 2016 modeling analysis, the EPA can assess the overall combined impact of the issues identified and compare to the initial analysis the EPA relied upon in the Round 2 Supplement. This assessment confirms the EPA's conclusions and designations for all three areas in the Round 2 Supplement.

The EPA notes that in the Proposed Error Correction we did not separate technical aspects that the EPA analyzed in the Intended Designations TSD from those the EPA analyzed in the 2016 Final Designations Supplement TSD. Additionally, the EPA notes that Sierra Club's March 2016 modeling, which was relied on in the 2016 Final Designations Supplement TSD, included updates to Sierra Club's older 2015 modeling that addressed some technical aspects the EPA identified in the Intended Designations TSD. The following technical aspects that potentially created uncertainties the EPA identified in the Proposed Error Correction were only in the Sierra Club's older 2015 modeling in the Intended TSD and were updated in the Sierra Club's March 2016 modeling, which the EPA relied on in the Final Designations Supplement TSD, to be strictly in accordance with the $SO_2$ NAAQS Designations Modeling TAD: 1) use of an older version of AERMOD (most recent version available at that time was used in the March 2016 modeling), and 2) representation of recent emissions, including controls after the 2011 National Emissions Inventory (the March 2016 modeling used the most recent three years (2013-2015) of actual emissions that were available at the time for Martin Lake and Big Brown as 2016 calendar year was still ongoing). Additionally, regarding the failure to include source contribution in the modeling analysis that the EPA listed in the Proposed Error Correction, the EPA notes that the older Sierra Club modeling included other sources to assess contribution, while the March 2016 modeling included only the principle source in each area in response to the EPA's analysis in the Intended Designations TSD.

One of the technical aspects that potentially created uncertainties that the EPA identified in the March 2016 modeling in the Proposed Error Correction was the absence of variable stack conditions and representation of 100 percent load stack parameters (variable stack temperature and velocity). The EPA also identified the treatment of building downwash (failure to include), use of a larger receptor grid than recommended, and failure to include fenceline receptors as limitations or uncertainties in the Proposed Error Correction. In the 2016 Final Designations Supplement TSD, the EPA explained that, when compared to the actual measured CEM temperatures furnished by Luminant as part of their modeling analysis, the Sierra Club's temperature was on the average 21 percent higher – the average temperature in the CEM data for near full load (filtered for stack velocity > 25 m/s) was 356K, ranging between 338-478K. The EPA explained that this increase in buoyancy would tend to reduce modeled concentrations, the amount depending on meteorological conditions; therefore, the EPA determined that the use of

13

the Sierra Club's higher-than-actual constant temperature likely underestimates the actual concentrations. More specifically, the EPA explained that this temperature difference would cause on the average a 196 percent increase in buoyancy flux versus using the CEM temperature when operating near full load, and that the buoyancy flux is used by the plume rise algorithm in AERMOD to calculate buoyant plume rise.

The EPA further explained that higher values of buoyancy flux yield higher plume rise, affecting the transport and dispersion of the plume, and that, typically, higher plume rise reduces peak ground-level concentrations and tends to move the maximum impacts further away from the source. The EPA noted that because the 2010 $SO_2$ NAAQS is a one-hour standard, the buoyancy enhancements for critical hours would be a controlling factor in the modeled concentrations on which the maximum modeled design concentration is based, and that the use of Sierra Club's higher-than-actual constant temperature, judged without other factors, would most likely underestimate the actual maximum concentrations (*i.e.*, the use of higher temperatures in the Sierra Club's March 2016 modeling would lead to lower modeled concentrations than if the actual measured temperatures from Luminant would have been used, which would likely result in higher 99th percentile one-hour daily maximum concentration). The increase in buoyancy over the actual buoyancy would increase plume rise and alter the geographic distribution of concentrations. The 2019 Sierra Club modeling scenario MLsc1315b includes variable stack temperature and variable stack velocity, eliminating this identified limitation. Sierra Club's September 2019 modeling for the 2013-2015 period also included a sensitivity run using the stack velocity and stack temperatures from the March 2016 modeling analysis to determine the impacts of using the estimated stack velocity and temperature on the maximum modeled design concentration. In this sensitivity run, Sierra Club only changed these specific inputs; all other inputs were unchanged from the MLsc1315b scenario. This sensitivity run indicates that using the estimated stack parameters in the March 2016 modeling resulted in a maximum modeled design concentration that was 40 percent lower than the maximum modeled design concentration when CEM based hourly varying temperature and velocity were used in the September 2019 modeling (232.6 $\mu g/m^3$ vs. 393.8 $\mu g/m^3$). In other words, the 224 $\mu g/m^3$ and 239 $\mu g/m^3$ maximum modeled design concentrations cited in the 2016 Final Designations Supplement TSD, increased on the order of 69 percent (232.6 $\mu g/m^3$ vs. 393.8 $\mu g/m^3$) when these refined data were used in the September 2019 modeling. This confirms the EPA's assessment in the 2016 Final Designations Supplement TSD that Sierra Club's March 2016 maximum modeled design concentration was underestimated because of these technical aspects.

One of the technical aspects of Sierra Club's March 2016 modeling that the EPA identified in the Proposed Error Correction as creating uncertainty was the absence of including building downwash. Regarding building downwash, in the 2016 Final Designations Supplement TSD, the EPA concluded that, while we did not agree with Sierra Club's assertion that exclusion of downwash would underestimate the maximum modeled design concentration in all cases, in our evaluation the inclusion of building information and associated downwash in this analysis would not change our recommended designation of nonattainment. We noted that Luminant's 2016 modeling report (which Texas also included in their response) indicated that they expected that the modeling results were not extremely sensitive to this issue because the stack heights are well above the buildings and there is considerable momentum and buoyancy rise for the stack plumes. The EPA concluded that the modeling values were sufficiently above the standard and inclusion

of downwash often leads to higher concentrations closer to the source but, even in situations we have seen where this did not occur, any decreases in maximum modeled values from inclusion of downwash were relatively small and not expected to be enough of a decrease to resolve all modeled exceedance values near Martin Lake. The 2019 Sierra Club modeling scenario MLsc1315b includes building downwash, eliminating this identified limitation. Sierra Club's September 2019 modeling for the 2013-2015 period also included a sensitivity run where they removed the building information and downwash processing to determine what the impacts of including building downwash was on the maximum modeled design concentration. In this sensitivity run, Sierra Club only changed these specific inputs and all other inputs were unchanged from the MLsc1315b scenario. This sensitivity run indicates that the maximum modeled design concentration without including building was unchanged compared to the maximum modeled design concentration when downwash was included (393.8 $\mu g/m^3$ vs. 393.8 $\mu g/m^3$). This confirms the EPA's assessment in the 2016 Final Designations Supplement TSD that including downwash in Sierra Club's March 2016 modeling analysis would not be expected to resolve all modeled exceedance values in the area because any changes in concentration or shift in location of the maximum concentration would be expected to be relatively minimal and may result in higher impacts closer to the facility.

Another technical aspect that the EPA identified in the Proposed Error Correction as creating uncertainty was the elevation of flagpole receptors in Sierra Club's March 2016 modeling. In the 2016 Final Designations Supplement TSD, the EPA stated that we would expect only a very slight change in the modeled concentrations and the area of exceedances and magnitude of the values would be basically equivalent, and, therefore, not change our final action. We based this conclusion on analysis of sensitivity modeling conducted by the Sierra Club for another source, which found decreases in modeled $SO_2$ between almost 0 and 0.2 percent when removing the flagpole receptors and estimating concentrations at ground level. Since Sierra Club's 2016 modeled maximum modeled designation concentration (in ambient air) at Martin Lake is at least 14 percent above the 2010 $SO_2$ NAAQS, the EPA concluded that the change due to flagpole receptor heights would not decrease the value to below the standard. Sierra Club's September 2019 modeling scenario MLsc1315b does not use elevated flagpole receptors, eliminating this identified limitation. Sierra Club's September 2019 modeling for the 2013-2015 period also included a sensitivity run where they changed the receptor heights to flagpole receptor heights to evaluate potential impacts on the modeled results. In this sensitivity run, Sierra Club only changed these specific inputs and all other inputs were unchanged from the MLsc1315b scenario. This sensitivity run indicates that the maximum modeled design concentration from using flagpole receptor heights resulted in maximum modeled design concentration that was 0.05 percent higher compared to the maximum modeled design concentration using normal receptor height (394.0 $\mu g/m^3$ vs. 393.8 $\mu g/m^3$). This confirms the EPA's assessment in the 2016 Final Designations Supplement TSD that using flagpole receptor height in Sierra Club's March 2016 modeling analysis may result in a very small increase in the maximum modeled design concentration, which would not have had an impact on our decision because maximum modeled concentrations were at least 14 percent above the 2010 $SO_2$ NAAQS.

Another technical aspect that the EPA identified in the Proposed Error Correction as creating uncertainty was treatment of surface meteorology and hourly wind inputs. Regarding use of land surface data from 1992, the EPA indicated based on Sierra Club's March 2016 modeling, which included a sensitivity analysis for updated surface data/characteristics, that only a small decrease

15

in maximum modeled design concentrations of 3.6 percent was expected from using updated surface characteristics. As explained previously, in Sierra Club's September 2019 modeling, the meteorology was reprocessed with the EPA's updated AERSURFACE program and with updated land use and land cover information around the meteorological site, resolving this identified limitation. Sierra Club's September 2019 modeling for the 2013-2015 period also included a sensitivity run where they used the older surface characteristics (Land Use Land Cover from 1992 – LULC1992) instead of the new surface characteristics in processing the winds and AERMOD inputs to assess the use of the older surface characteristics on the maximum modeled design concentration. In this sensitivity run, Sierra Club only changed these specific inputs; all other inputs were unchanged from the MLsc1315b scenario. This sensitivity run indicates that the maximum modeled design concentration from the older surface characteristics resulted in a maximum modeled design concentration that was 1 percent higher compared to the maximum modeled design concentration using the newer surface characteristics ($399.4.0 \, \mu g/m^3$ vs. $393.8 \, \mu g/m^3$). This confirms the EPA's assessment in the 2016 Final Designations Supplement TSD that using the newer surface characteristics data instead of the data from 1992 in Sierra Club's March 2016 modeling analysis may result in a small decrease in the maximum modeled design concentration and when considered would only result in slightly lower maximum modeled design concentrations. The Sierra Club's September 2019 sensitivity modeling indicates that, in the 2016 Final Designations Supplement TSD, the EPA actually overestimated the decrease of the maximum modeled design concentration that may occur from using newer surface characteristics (3.6 percent); the 2019 sensitivity indicates that the actual decrease was only 1 percent.

Another technical aspect that the EPA identified in the Proposed Error Correction as creating uncertainty was use of a larger receptor grid than recommended and failure to include fenceline receptors. As discussed previously, Sierra Club's 2015 and March 2016 modeling used a large grid and did not include fenceline receptors or restrict receptors from parts of Luminant's property that could be non-ambient air. In the 2016 Final Designations Supplement TSD, the EPA only evaluated concentrations in Sierra Club's March 2016 modeling at receptors that represented areas where it would also be feasible to place a monitor and record ambient air impacts. Luminant's 2016 modeling included areas that they considered to be non-ambient, but the EPA did not have sufficient information to evaluate and concluded that all the areas Luminant was claiming as non-ambient were actually non-ambient areas. Without sufficient data to support Luminant's non-ambient area claims, the EPA took the approach of only evaluating Sierra Club's March 2016 modeling results for the areas that Luminant did not claim as non-ambient, which we referred to as the uncontested area. This included evaluating concentrations at only uncontested receptors, and separately also evaluating concentrations at areas that clearly were erroneously claimed as unfeasible by Luminant. The EPA also noted that we had concerns that Luminant had contested receptors (excluded in Luminant's modeling) in more areas than were appropriate and that the maximum values in the uncontested area in Sierra Club's March 2016 modeling were actually as high as $239.1 \, \mu g/m^3$ near the Luminant excluded area. The EPA's analysis explained that we conservatively used $224 \, \mu g/m^3$ (highest at uncontested receptor) to evaluate the modeling, but the analysis could also be done based on the $239.1 \, \mu g/m^3$ value, which would even more clearly demonstrate the area around Martin Lake was violating the 2010 $SO_2$ NAAQS. The 2019 Sierra Club modeling scenario MLsc1315b used the Luminant 2016 property descriptions in their location of receptors, so their new analysis only looked at

receptors that Luminant considered to be ambient (*i.e.*, the uncontested area). Sierra Club did not place receptors on areas that Luminant considered non-ambient thus, eliminating the potential concern about fenceline receptors. Sierra Club's September 2019 modeling and modeling report indicates multiple areas above 300 µg/m³ that are clearly outside the areas that Luminant considered in 2016 as their boundary for non-ambient air (Figure 1).[32] Therefore, Sierra Club's September 2019 modeling clearly demonstrates that this is not a technical limitation; the only uncertainty is that Luminant claimed large areas as non-ambient in their 2016 modeling and some of these areas could be ambient, but this uncertainty does not impact the conclusion that the area is violating the 2010 SO₂ NAAQS.

**Figure 1.** Figure Showing Maximum Modeled Design Concentrations from Sierra Club's September 2019 Modeling (Scenario MLsc1315b)



1-hour average SO2 concentrations (ug per cubic meter) - All colored areas exeed the NAAQS.

196          300          350

---

[32] Figure 2 from Sierra Clubs 2019 Modeling Report ("Martin Lake Generating Station TX – Evaluation of Compliance with the 1-hour NAAQS for SO2 – Final – 23Sep19.pdf").

17

Another technical aspect and potential uncertainty that the EPA identified in the Proposed Error Correction was use of an older version of AERMOD. As noted previously, this uncertainty was only identified in the Sierra Club 2015 modeling, which the EPA used for the basis of its intended designation, not the March 2016 modeling that the EPA relied on for the final designation. Sierra Club also used the most recent version of AERMOD in their September 2019 modeling. Therefore, the EPA concludes that this was not a technical aspect or potential uncertainty in the March 2016 modeling and, therefore, could not be a part of a basis for concluding that relying on that March 2016 modeling used in the final designation was in error.

Another technical aspect and potential uncertainty the EPA identified in Sierra Club's modeling for the Round 2 Supplement in the Proposed Error Correction was the representation of "recent emissions, including controls after the 2011 National Emissions Inventory" and "potential to emit/allowable emissions." *See* 84 FR at 43761. As noted previously, Sierra Club's March 2016 modeling used the most recent three years of actual emissions available at that time. Sierra Club's September 2019 MLsc1315b modeling scenario also used 2013-2015 actual emissions. The use of the 2013-2015 actual emissions is strictly in accordance with the $SO_2$ Designations Modeling TAD and consistent with assessing the air quality at the time of the Round 2 Supplement. The EPA provided the following assessment in the 2016 Final Designations Supplement TSD in response to Luminant's 2016 comments about controls in 2016, after the 2011 National Emissions Inventory, and how these might impact the potential to emit/allowable emissions:

> In the 2017-2019 emission modeling submission, Luminant projected future reduced emission rates were used that were based in part on future non-enforceable, voluntary operational changes at Martin Lake. However, for the purpose of determining whether the area is currently meeting the NAAQS and designating the area either actual emissions or a currently enforceable reduction in actual emissions should be used. Neither the efficiency improvements in operation of existing scrubbers or fuel switches were reflected in a permanently enforceable situation. This means that they could change and are not a certain and effective limitation on either current or future emissions. Compliance with MATS does allow for using $SO_2$ limits as surrogates for other pollutants, but how a facility meets the MATS requirements can be changed by fuel switching/blending and testing directly for the MATS pollutants. In this case the intended switching of fuel and increases in scrubber efficiency, whether they have occurred or not, are not yet enforceable through any mechanism provided by Luminant - such as a permit limit - and Luminant would be free to either not switch or, if it does switch, change back to a higher sulfur content coal in the future, depending on circumstances. Thus the modeling based on possible future changes at the facility, rather than on actual emissions, is not acceptable for this regulatory use.[33]

The $SO_2$ Designations Modeling TAD recommends using the most recent three years of actuals or using a more recent federally enforceable and in effect allowable emissions limit, which could reflect new and lower continuing emissions that may not be reflected in modeling historical actual emissions. In the case of the Texas areas, there were not any more recent lower federally enforceable allowable limits that might have better represented recent and continuing $SO_2$

---

[33] 2016 Final Designations Supplement TSD, p. 55-56.

emissions performance. Therefore, use of actual recent $SO_2$ emissions was not a limitation or uncertainty in Sierra Club's March 2016 modeling and, therefore, could not be a part of a basis for concluding that relying on that March 2016 modeling was in error. Additionally, the EPA has also reviewed the annual emissions since 2013. Figure 2, produced by the EPA using CAMD data, shows that the annual emissions and the average $SO_2$ emissions rate varied considerably from year to year at Martin Lake during the 2013-2019 period. The lowest emissions and emissions rates were recorded for the years 2015-2017 with the years 2018 and 2019 returning to about the previous higher emissions recorded in 2013-2014. The $SO_2$ emissions rate in 2015 dropped 48 percent from the highest rate that was recorded in 2013. Figure 2 does not demonstrate a trend toward lower emissions from the Martin Lake Power Plant with time. In fact, the lowest annual $SO_2$ emissions over the entire period was recorded in 2015, which was included in the Sierra Club's March 2016 modeling. The emissions in 2015 were only 37 percent of those recorded in the highest year, 2013. Since 2015, the facility's emissions trended up through 2018. The 3-year average emissions for 2017-2019 are almost identical to the 3-year average emissions for the modeling period for the designation, 2013-2015 (0.1 percent smaller). Luminant's March 2016 comments on the EPA's intended designation projected a 30-40 percent decrease in actual emissions for the 2017-2019 period compared to the 2014-2015 period, due solely to voluntary and non-enforceable scrubber optimization and anticipated fuel blending changes. In the 2016 Final Designations Supplement TSD, the EPA noted that these limits were not permanently enforceable and, therefore, could not be relied upon for designations decisions. We note that Luminant's prediction did not actually occur, as reflected in the 2017-2019 actual emissions that are basically the same (0.1 percent smaller) as 2013-2015 actual emissions.

**Figure 2.** 2013-2019 Annual $SO_2$ Emissions (tpy) and Emissions Rate (lb/MMBTU) from the Martin Lake Power Plant



Martin Lake Annual SO2 Emissions and Emission Rate

94

Another technical aspect and potential uncertainty that the EPA identified in the Proposed Error Correction was the March 2016 modeling's approach for the estimation of background concentrations. As explained in the 2016 Final Designations Supplement TSD, the lowest monitored background concentration (the El Paso monitor) was used in the March 2016 modeling. The EPA stated "Given the amount of $SO_2$ emissions in East Texas compared to El Paso area this assumption likely leads to a slight underestimation in concentrations around these facilities but is within the framework of the TAD's options for inclusion of background monitoring data."[34] Therefore, the EPA concludes that this was not a limitation or uncertainty in the March 2016 modeling and could not be a part of a basis for concluding that relying on that March 2016 modeling was in error. Additionally, as explained previously, the September 2019 modeling included a new background concentration, the 99th percentile design value concentration in Travis County, Texas, which is the lowest value measured at $SO_2$ ambient monitors in the State of Texas for the 2016-2018 period. This monitor was used by Sierra Club because it is nearer to Martin Lake and because the monitor that previously had the lowest state value (El Paso in the 2013-2015 period) was decommissioned in 2017. The updated background concentration is 7.8 $\mu g/m^3$, 2.6 $\mu g/m^3$ (51 percent) higher than the background value of 5.1 $\mu g/m^3$ used in Sierra Club's March 2016 modeling and 2019 updated modeling of 2013-2015 period. Regardless of the background concentration, the maximum modeled design concentration for the September 2019 updated modeling is well above the 2010 $SO_2$ NAAQS, for this 2019 assessment of 2013-2015 period it is 388.7 $\mu g/m^3$, before any background is added.

The final technical aspect and potential uncertainty that the EPA identified in the Proposed Error Correction was the failure to include source contribution in the March 2016 modeling analysis. As explained previously, the Sierra Club's 2015 modeling relied upon for the EPA's intended designations included such contribution from other sources. As explained in the Intended Designations TSD, the modeling indicated that the contribution to the maximum modeled design concentration from the Pirkey Power Plant only added 0.1 $\mu g/m^3$ to increase the maximum modeled design concentration from 339.8 $\mu g/m^3$ to 339.9 $\mu g/m^3$.[35] Based on the modeling information available at the time, the EPA explained in the 2016 Final Designations Supplement TSD that inclusion of only the principle $SO_2$ emissions source in the modeling was an acceptable choice in this area's circumstances, as we maintained that Martin Lake was likely contributing almost if not equal to 100 percent of the impact for the values above the 2010 $SO_2$ NAAQS. The EPA also explained that Sierra Club's 2016 modeling, by not including Pirkey Power Plant, was a conservative approach (*i.e.*, potentially under-estimating the maximum modeled design concentration) to determining whether the area was violating the 2010 $SO_2$ NAAQS and to identifying the geographical boundaries of such exceedances. The EPA suggested that inclusion of Pirkey Power Plant should result in either similar impacts and boundaries or slightly increased impacts and possibly slightly larger boundaries, but inclusion of Pirkey Power Plant should not result in decreased impacts or "shrinking" of boundaries from those modeled.[36] Based on the information available at the time of the EPA's final nonattainment designation in 2016, the EPA continues to find that it was a reasonable decision at the time based on its prior assessment of the data available from Sierra Club's modeling of the area for the 2012-2014 (December 2015 modeling) and 2013-2015 (March 2016 modeling) periods; therefore, the EPA concludes that

---

[34] 2016 Final Designations Supplement TSD, p. 65.
[35] 2016 Final Designations Supplement TSD, pp.51-52.
[36] 2016 Final Designations Supplement TSD, pp. 60-62.

this was not a limitation or uncertainty in the March 2016 modeling and could not be a part of a basis for concluding that relying on that March 2016 modeling was in error.[37]

After further assessment, the EPA agrees with the analyses in the 2016 Final Designations Supplement TSD referenced previously for the same reasons explained in the Round 2 Supplement. Regardless, as explained previously, Sierra Club's September 2019 modeling included refinements of their March 2016 modeling inputs for stack parameters, building dimensions and locations, and receptor grid (25 km and only uncontested receptors), which were obtained directly from Luminant's March 2016 modeling analysis. Sierra Club's September 2019 modeling analyses used these aspects of Luminant's March 2016 report since the Luminant analysis contained more refined modeling inputs based on data available to the facility owner, such as CEM measured stack and emissions parameters, and stack and building location and dimensions. These updates resolved the identified technical aspects and uncertainties in the Proposed Error Correction because they reflected the most refined information for these inputs and the strictest application of the $SO_2$ NAAQS Designations Modeling TAD while still considering only uncontested receptors where modeled concentrations were not the highest. As shown in Table 2, the maximum modeled concentration was higher in Grid #1 than Grid #2 in Sierra Club's September 2019 modeling, but both receptor grids resulted in values that violated the 2010 $SO_2$ NAAQS. The Sierra Club's 2019 modeling for the 2013-2015 period utilized more refined and accurate data for stack parameters (variable temperature and velocity) and included model inputs for building downwash, but it did not include any of the novel and unapproved modeling preprocessors (AERLIFT and AERMOIST) that Luminant had utilized in 2016, which previously concerned the EPA in the designations process.

In the Proposed Error Correction, the EPA stated that "while individually these deficiencies are not dispositive, collectively they are a sufficient basis for the EPA to propose that we erred in relying on the Sierra Club modeling in making the initial nonattainment designations for the three Texas areas." *See* 84 FR at 43761. However, the EPA acknowledges that, in the 2016 Final Designations Supplement TSD, the EPA also evaluated the combination of all the identified aspects of the March 2016 modeling (including all potential increasing and decreasing impacts on concentrations) through a comparison analysis, using the conservative approach of 224 $\mu g/m^3$ as the maximum value.[38] In the 2016 Final Designations Supplement TSD regarding the area around Martin Lake, the EPA ultimately concluded that, given that Sierra Club's modeled concentrations (with a low background and no nearby sources) were 14 percent above the standard using 224 $\mu g/m^3$ and 22 percent above the standard using 239.1 $\mu g/m^3$ as the maximum and that several factors were deliberately conservative in under-estimating impacts and would tend to reduce the modeled concentrations (and actual modeled concentrations with appropriate background would be higher), our technical assessment of the available information was that the differences/changes to the Sierra Club modeling when combined overall would not result in modeled values near or below the standard.[39] Therefore, in the 2016 Final Designations

---

[37] The EPA's assessment does not prevent the Pirkey Power Plant from being included in any *future* modeling (*e.g.*, state implementation plan demonstrations) for the Martin Lake area as a potentially contributing $SO_2$ emissions source; this will be dependent upon whether the Pirkey Power Plant is adequately represented by the background monitoring value added to the modeled concentrations, and/or on whether the state chooses to impose any new $SO_2$ emissions limits on the Pirkey Power Plant to be credited in the Martin Lake attainment demonstration.

[38] 2016 Final Designations Supplement TSD, p. 76.

[39] 2016 Final Designations Supplement TSD, pp. 76-77.

Supplement TSD, the EPA concluded that we considered the final Sierra Club modeling submitted March 2016 to be relevant information that must be considered in our designation decision and found that the modeling was a sufficient basis for a determination of nonattainment and clearly demonstrated the area around Martin Lake was nonattainment.[40]

After further assessment of each individual aspect of the modeling and review of our previous analysis of the impact of the combined impact from the 2016 Final Designations Supplement TSD, the EPA agrees with the assessment of the combination of all the identified aspects of the modeling explained in the 2016 Final Designations Supplement TSD for those same reasons. Regardless, as shown in Table 2, the results of this updated modeling demonstrate that use of more refined inputs for the 2013-2015 period for the aspects of the March 2016 modeling that the EPA identified in the Proposed Error Correction as creating uncertainty increased the maximum modeled design concentration, before adding in background concentrations, for Martin Lake from 224 $\mu g/m^3$ (or 239.0 $\mu g/m^3$) to 388.7 $\mu g/m^3$, a 73 percent (or 63 percent) increase. This result provides the combined impact of the changes in the September 2019 updated modeling (as compared to the March 2016 modeling), and corroborates the EPA's assessment of Sierra Club's March 2016 modeling for the area around Martin Lake in the Round 2 Supplement and by extension for the areas around Big Brown and Monticello, which were modeled similarly and properly assessed by the EPA in the 2016 Final Designations Supplement TSD. Furthermore, Sierra Club's September 2019 modeling demonstrates that the March 2016 modeling underestimated the maximum modeled design concentrations and that more refined inputs addressing the identified limitations resulted in higher modeled concentrations, which the EPA predicted in the 2016 Final Designations Supplement TSD.

## V.   Conclusion

Sierra Club's September 2019 modeling addressed the uncertainties in the modeling that the EPA relied on in the Round 2 Supplement, which the EPA identified in the Proposed Error Correction. The Sierra Club's September 2019 modeling of the area around the Martin Lake Power Plant corroborates that the EPA's reliance on the Sierra Club's March 2016 modeling in the Round 2 Supplement was appropriate. The EPA agrees with our previous assessment of the technical aspects and potential uncertainties related to the Sierra Club's March 2016 modeling as explained in the Round 2 Supplement. Sierra Club's September 2019 modeling further confirms that the cumulative technical aspects and identified limitations with Sierra Club's March 2016 modeling that the EPA identified in the Proposed Error Correction were not merited.

---

[40] 2016 Final Designations Supplement TSD, p. 77.

**TAB 6: CERTIFICATE OF SERVICE**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on this 3rd day of January, 2022.

/s/ P. Stephen Gidiere III
*Counsel for Luminant Petitioners*