**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

## Case No. 17-60088

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL
QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; BIG BROWN
POWER COMPANY, L.L.C.; SANDOW POWER COMPANY, L.L.C.,
LUMINANT MINING COMPANY, L.L.C.

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S.
REGAN, in his Official Capacity as Administrator of the United States
Environmental Protection Agency,

Respondents.

---

## Consolidated with Case No. 21-60673

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL
QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; LUMINANT
MINING COMPANY, L.L.C.,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S.
REGAN, Administrator, United States Environmental Protection Agency,

Respondents.

---

Petition for Review of Final Administrative Action
of the United States Environmental Protection Agency

---

**BRIEF OF RESPONDENTS**

---

OF COUNSEL:

ANDREA CARILLO
MIKE THRIFT
AARON VARGAS
U.S. Environmental Protection Agency
Office of General Counsel
William Jefferson Clinton Building
1200 Pennsylvania Ave., NW
Mail Code 2344A
Washington, D.C. 20460

DATE: February 23, 2022

TODD KIM
Assistant Attorney General

PERRY M. ROSEN
United States Department of Justice
Environment & Natural Resources Div.
Environmental Defense Section
P.O. Box 7611
Washington D.C. 20044

*Counsel for Respondents*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to Fed. R. App. P. 26.1 and Fifth Circuit Rule 26.1, Respondent

Environmental Protection Agency ("EPA") is a governmental entity and

Respondent Michael Regan is sued in his official capacity as Administrator of

EPA, and as such a corporate disclosure statement and certificate of interested

persons is not required.

So certified this 23rd day of February, 2022 by

/s/   *Perry M. Rosen*
Perry M. Rosen
Counsel for Respondents

## STATEMENT REGARDING ORAL ARGUMENT

Respondents, the Environmental Protection Agency and its Administrator, Michael Regan (collectively "EPA"), agree with Petitioners that oral argument is appropriate and would be helpful to the Court.  This case involves the application of important provisions of the Clean Air Act administered by EPA.  This case further involves highly technical determinations EPA made which may warrant further explanation that oral argument can elucidate.

## RECORD REFERENCES

Petitioners describe their citation to documents in the Administrative Record at Petitioners' Brief ("Pet. Br.") at 1, n.1.  For the sake of consistency, Respondents follow the same convention.  Accordingly, Respondents use "R.####," using the last four digits of the document as listed in the Certified Index to the administrative record (Dkt. 00516043406, 00515931904) to refer to each record document cited.  Like Petitioners, EPA typically includes the title of the document the first time it is referenced.  As Petitioners report, pursuant to Fifth Circuit Rule 30.2(a), Petitioners will file a Joint Appendix containing the documents from the Administrative Record cited by all parties.  Pet. Br. at 1, n.1.

# <u>GLOSSARY</u>

**CAA**          Clean Air Act

**DRR**          Data Requirements Rule

**EPA**          Environmental Protection Agency

**NAAQS**          National Ambient Air Quality Standard

**ppb**          Parts per Billion

**RTC**          Response to Comments

**SIP**          State Implementation Plan

**TCEQ**          Texas Commission on Environmental Quality

**TSD**          Technical Support Document

**tpy**          Tons Per Year

## <u>LABELS FOR THE CHALLENGED RULEMAKINGS</u>

**Final Designation --** "Air Quality Designations for the 2010 Sulfur Dioxide ($SO_2$) Primary National Ambient Air Quality Standard—Supplement to Round 2 for Four Areas in Texas: Freestone and Anderson Counties, Milam County, Rusk and Panola Counties, and Titus County," 81 Fed. Reg. 89,870 (Dec. 13, 2016)

**Error Correction Withdrawal --** Withdrawal of the "Error Correction of the Area Designations for the 2010 1-Hour Sulfur Dioxide ($SO_2$) Primary National Ambient Air Quality Standard (NAAQS) in Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas," 86 Fed. Reg. 34,147 (June 29, 2021)

**Reconsideration Denials** -- "Air Quality Designations for the 2010 1-Hour $SO_2$ NAAQS: Responses to Petitions for Reconsideration and Administrative Stay of the Designations for Portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas," 86 Fed. Reg. 34,141 (June 29, 2011).

# **TABLE OF CONTENTS**

JURISDICTION....................................................................................1

STATEMENT OF THE ISSUES .........................................................2

INTRODUCTION ...............................................................................2

STATEMENT OF THE CASE.............................................................8

I.    STATUTORY FRAMEWORK ................................................8

II.   REGULATORY BACKGROUND ........................................10

    A.    Development of the 2010 $SO_2$ NAAQS.........................10

    B.    The Process for Issuing Area Designations for the 2010 $SO_2$ NAAQS......................................................................11

    C.    Pre-Designation Actions Taken by EPA........................12

    D.    The Final Designation at Issue .....................................15

    E.    Petitioners' Requests for Reconsideration ....................16

    F.    EPA's Subsequent Actions............................................18

        1.    Clean Data Determination..................................18

        2.    EPA's Response to the Reconsideration Petitions.................18

SUMMARY OF ARGUMENT .........................................................19

STANDARD OF REVIEW................................................................22

ARGUMENT......................................................................................23

I.    EPA'S NONATTAINMENT DESIGNATION FOR RUSK/PANOLA
      COUNTIES IS WHOLLY CONISTENT WITH THE CLEAN AIR
      ACT AND IS NEITHER ARBITRARY NOR CAPRICIOUS ................. 23

      A.    EPA Did Not Ignore Monitoring Data or Deny Texas the Right to
            Collect Monitoring Data ............................................................ 25

            1.    EPA Did Not Ignore Monitoring Data ................................ 25

            2.    EPA Was Not Required to Designate Rusk/Panola Counties as
                  Unclassifiable While Awaiting Texas's Collection of Three
                  Years of Data From a Monitor Not Even Installed Until a Year
                  After the Designation Deadline ........................................... 27

      B.    EPA Did Not Refuse to Consider Luminant's Modeling and in Fact
            Considered it in Detail ............................................................... 34

      C.    EPA Did Not Conclude that Sierra Club's Modeling Contained
            Substantial Errors ...................................................................... 38

      D.    EPA's Reliance on Sierra Club's Modeling is Wholly Consistent with
            the Clean Air Act ........................................................................ 49

II.   EPA'S DESIGNATIONS IN SEVERAL OTHER COUNTIES AROUND
      THE COUNTRY HAVE NO BEARING ON WHETHER THE
      DESIGNATION FOR RUSK/PANOLA COUNTIES IS CONSISTENT
      WITH THE CLEAN AIR ACT ......................................................... 53

      A.    Petitioners' Argument is Barred as it Was Not Properly Submitted to
            EPA for Consideration During the Administrative Process ............. 54

      B.    EPA Did Not Treat Like Situations Differently ............................. 55

CONCLUSION .......................................................................................... 63

# TABLE OF AUTHORITIES

## Cases

*Am. Lung Ass'n v. EPA*,
  134 F.3d 388 (D.C. Cir. 1988) ...................................................8

*Am. Petroleum Inst. v. EPA*,
  661 F.2d 340 (5th Cir. 1981) ....................................................46

*Appalachian Power Co. v. EPA*,
  135 F.3d 791 (D.C. Cir. 1998) ..................................................40

*ATK Launch Sys. Inc. v. EPA*,
  669 F.3d 330 (D.C. Cir. 2012) .............................................47, 57

*\*BCCA Appeal Grp. v. EPA*,
  355 F.3d 817 (5th Cir. 2003) ..................................8, 10, 23, 42, 46, 48, 52, 55

*Camp v. Pitts*,
  411 U.S. 138 (1973) ..................................................................24

*\*Catawba Cnty. v. EPA*,
  571 F.3d 20 (D.C. Cir. 2009)............................30, 44, 47, 51, 56, 57

*Cavallini v. State Farm Mut. Auto Ins. Co.*,
  44 F.3d 256 (5th Cir. 1995) ......................................................28

*Chevron U.S.A., Inc. v. NRDC*,
  467 U.S. 837 (1984) ..................................................................23

*Clean Water Action v. EPA*,
  936 F.3d 308 (5th Cir. 2019) ....................................................46

*Coastal Conservation Ass'n v. Dep't of Com.*,
  846 F.3d 99 (5th Cir. 2017) ......................................................63

*Columbia Falls Aluminum Co. v. EPA,*
  139 F.3d 914 (D.C. Cir. 1988) ...................................................40

*EME Homer City Generation, L.P. v. EPA,*
  795 F.3d 118 (D.C. Cir. 2015) ...................................................42

*Entergy Corp. v. Riverkeeper, Inc.,*
  556 U.S. 208 (2009) .................................................................52

*Galveston-Houston Ass'n for Smog Prevention v. EPA,*
  289 F. App'x 745 (5th Cir. 2008) ..............................................47

*Gulf Restoration Network v. McCarthy,*
  783 F.3d 227 (5th Cir. 2015) .....................................................22

*Howard Hughes Co., LLC v. CIR,*
  805 F.3d 175 (5th Cir. 2015) .....................................................46

*La. Env't Action Network v. EPA,*
  382 F.3d 575 (5th Cir. 2004) .....................................................55

*La. Pub. Serv. Comm'n v. FERC,*
  761 F.3d 540 (5th Cir. 2014) .....................................................22

*Luminant Generation Co. LLC v. EPA,*
  714 F.3d 841 (5th Cir. 2013) .....................................................24

*Masias v. EPA,*
  906 F.3d 1069 (D.C. Cir. 2018) ...................................... 55, 56, 57

*Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.,*
  602 F.3d 687 (5th Cir. 2010) ................................................46, 47

*Miss. Comm'n v. EPA*
  790 F.3d 138 (D.C. Cir. 2015) ........................21, 22, 29, 30, 47, 51, 56, 57, 58

*Mississippi v. EPA*,
   744 F.3d 1334 (D.C. Cir. 2013)....................................................................8

*Mossville Env't Action Now v. EPA*,
   370 F.3d 1232 (D.C. Cir. 2004)..................................................................55

*Nat'l Ass'n of Clean Air Agencies v. EPA*,
   489 F.3d 1221 (D.C. Cir. 2007)..................................................................55

*Palm Valley Health Care, Inc. v. Azar*,
   947 F.3d 321 (5th Cir. 2020) .....................................................................55

*FCC v. Prometheus Radio Project*,
   141 S. Ct. 1150 (2021)...............................................................................46

*Rhea Lana, Inc. v. U.S.*,
   925 F.3d 521 (D.C. Cir. 2019) ..................................................................45

*S. Coast Air Quality Mgmt. Dist. v. EPA*,
   472 F.3d 882 (D.C. Cir. 2006) ..................................................................55

*Sebelius* v. *Auburn Reg'l Med. Ctr.*,
   568 U.S. 145 (2013)...................................................................................52

*Sierra Club v. EPA*,
   939 F.3d 649 (5th Cir. 2019) .....................................................................47

*Sierra Club v. McCarthy*,
   No. 3:13–cv–3953–SI, 2015 WL 889142 (N.D. Cal. Mar. 2, 2015)............11, 34

*Sierra Club v. North Dakota*,
   868 F.3d 1062 (9th Cir. 2017)...................................................................12

*Sims v. Apfel*,
   530 U.S. 103 (2002) ..................................................................................54

*St. Luke's Hosp. v. Sebelius*,
  611 F.3d 900 (D.C. Cir. 2010) ................................................................ 52

*Texas Oil & Gas Ass'n v. EPA*,
  161 F.3d 923 (5th Cir 1998) ................................................................ 47

*Texas v. EPA*,
  706 F. App'x 159 (5th Cir. 2017) .......................................................... 59

*\*Texas v. EPA*,
  983 F.3d 826 (5th Cir. 2020) ........................................ 9, 29, 32, 35, 46, 47, 57

*Treasury State Res. Indus. Ass'n v. EPA*,
  805 F.3d 300 (D.C. Cir. 2015) ............................................................ 30

*United States v. Hodge*,
  933 F.3d 468 (5th Cir. 2019) ............................................................. 33

*Wilson v. U.S. Dep't of Agric.*,
  991 F.2d 1211 (5th Cir. 1993) ............................................................ 13

*Zero Zone, Inc. v. U.S. Dep't of Energy*,
  832 F.3d 654 (7th Cir. 2016) ............................................................. 40

**Statutes**

5 U.S.C. § 706(2)(A) ......................................................................... 22

42 U.S.C. §§ 7401-7671q ...................................................................... 1

42 U.S.C. § 7401(b)(1) ........................................................................ 8

42 U.S.C. §§ 7407-7410 ....................................................................... 2

42 U.S.C. § 7407(a) .......................................................................... 10

42 U.S.C. § 7407(d) ............................................................. 2, 3, 28, 31

42 U.S.C. § 7407(d)(1)(A) ................................................................. 9, 28

42 U.S.C. § 7407(d)(1)(A)(i) ............................................................. 9, 19

42 U.S.C. § 7407(d)(1)(A)(iii) ........................................................... 9, 53

42 U.S.C. § 7407(d)(1)(B) ................................................................. 9, 11

42 U.S.C. §§ 7407(d)(1)(B)(i)-(iii) .........................................................9

42 U.S.C. § 7407(d)(1)(B)(i) ............................................................10, 31

42 U.S.C. §§ 7407(d)(1)(B)(ii) ...............................................................9

42 U.S.C. § 7407(d)(2)(A) ....................................................................11

42 U.S.C. § 7407(d)(3) ...........................................................................6

42 U.S.C. § 7409 ...................................................................................8

42 U.S.C. § 7409(d) ...............................................................................8

42 U.S.C. § 7410 .................................................................................10

42 U.S.C. § 7410(a)(i) .........................................................................10

42 U.S.C. § 7410(a)(2)(A) ...................................................................10

42 U.S.C. § 7410(k)(6) .........................................................................17

42 U.S.C. § 7502 .................................................................................10

42 U.S.C. §§ 7502(c)(1)-(9) ................................................................10

42 U.S.C. § 7505a ..................................................................................6

42 U.S.C. §§ 7514-7514a .....................................................................10

42 U.S.C. § 7607(b)(1) .................................................................1

**Rules**

5th Cir. Rule 25.2.1 ...............................................................65

5th Cir. Rule 25.2.13 .............................................................65

5th Cir. Rule 26.1 ....................................................................ii

5th Cir. Rule 32 ......................................................................65

Fed. R. App. P. 26.1 .................................................................ii

Fed. R. App. P. 32 ..................................................................65

Fed. R. App. P. 32(a)(5) .........................................................65

Fed. R. App. P. 32(a)(6) .........................................................65

Fed. R. App. P. 32(a)(7)(B)(iii) .............................................65

**Code of Federal Regulations**

40 C.F.R. Part 50 ....................................................................12

40 C.F.R. Part 58 ....................................................................12

40 C.F.R. § 50.17 ....................................................................10

40 C.F.R. § 50.17(b) ...............................................................31

40 C.F.R. Part 51 App. W .......................................................39

40 C.F.R. Part 51 App. W § 1.0.e............................................34

40 C.F.R. Part 51 App. W § 3..................................................36

40 C.F.R. Part 51 App. W § 3.2 ...................................................................13

40 C.F.R. Part 51 App. W § 3.2.1b...............................................................35

40 C.F.R. Part 51 App. W § 3.3 ...................................................................35

40 C.F.R. Part 51 App. W § 4.......................................................................36

40 C.F.R. Part 51 App. W § 4.2.2.1 .............................................................39

40 C.F.R. § 58.15(a)......................................................................................31

**Federal Registers**

70 Fed. Reg. 68,218 (Nov. 9, 2005)..............................................................39

75 Fed. Reg. 35,520 (June 22, 2010) .......................................................10, 11

77 Fed. Reg. 46,295 (Aug. 12, 2012) ...........................................................10

80 Fed. Reg. 51,052 (Aug. 21, 2015).....................................13, 14, 15, 33, 34

81 Fed. Reg. 10,563 (Mar. 1, 2016)..............................................................15

81 Fed. Reg. 89,870 (Dec. 13, 2016) .....................................................1, 3, 56

84 Fed. Reg. 43,757 (Aug. 22, 2019)................................................17, 18, 59

86 Fed. Reg. 26,401 (May 14, 2021) .............................................................18

86 Fed. Reg. 34,141 (June 29, 2021) ........................................................1, 19

86 Fed. Reg. 34,187 (June 29, 2021) ........................................................1, 19

## JURISDICTION

Petitioners, the State of Texas and the Texas Commission on Environmental Quality (collectively "Texas" or the "State"), and Luminant Generation Co. LLC and its related companies (collectively "Luminant"), challenge three regulatory actions promulgated by Respondent United States Environmental Protection Agency ("EPA") under the Clean Air Act, 42 U.S.C. §§7401-7671q ("CAA" or "Act"):

(1)  The 2016 designation of portions of Rusk and Panola Counties, Texas as nonattainment under the 2010 Primary sulfur dioxide ("$SO_2$") National Ambient Air Quality Standard ("NAAQS"), 81 Fed. Reg. 89,870 (Dec. 13, 2016) ("Final Designation");

(2)  Withdrawal of a proposed Error Correction for the Final Designation, 86 Fed. Reg. 34,187 (June 29, 2021) ("Error Correction Withdrawal"); and

(3)  Denial of Petitioners' administrative petitions to reconsider the Final Designation, 86 Fed. Reg. 34,141 (June 29, 2021) ("Reconsideration Denials").

The Court has jurisdiction under 42 U.S.C. §7607(b)(1).  EPA asserted that venue for Petitioners' challenge lies exclusively in the D.C. Circuit Court of Appeals.  The Motions Panel ruled otherwise (Doc. 00514131834) and EPA does not reinstitute that argument here.

## STATEMENT OF THE ISSUES

Did EPA act in a non-arbitrary manner and in accordance with the CAA when, after considering all data and information available at the time it was required to act, it designated a portion of Rusk and Panola Counties, Texas as nonattainment under the 2010 $SO_2$ NAAQS?

## INTRODUCTION

Congress tasked EPA with establishing ceilings on the concentration in the ambient air of specified pollutants that affect human health, in the form of National Ambient Air Quality Standards ("NAAQS"). 42 U.S.C. §§7407-7410. In 2010, EPA set the allowable concentration for one of these pollutants, $SO_2$, at 75 parts per billion ("ppb") ("2010 $SO_2$ NAAQS").

EPA was then required by statute to assess the air quality in all areas of the United States and designate whether each area is: (a) meeting the NAAQS (attainment); (b) not meeting the NAAQS or contributing to air quality in an area that does not meet the NAAQS (nonattainment); or (c) unclassifiable based on available information being insufficient to classify the area as attainment or nonattainment. 42 U.S.C. §7407(d) (titled "Designations"). Where the data and information demonstrates that an area violates the NAAQS for a regulated

2

pollutant, it must be designated nonattainment. *Id.*; 81 Fed. Reg. 89,870, 89,872/1 (Dec. 13, 2016) (R.433).

In December 2016, EPA promulgated 2010 $SO_2$ NAAQS designations for four multi-county areas in east Texas ("Texas Areas"), including an area encompassed by parts of Rusk and Panola Counties ("Designated Area" or "Rusk/Panola Counties"). *Id.* Because there was no meaningful air quality monitoring representative of maximum $SO_2$ concentrations for Rusk/Panola Counties, EPA relied primarily on air dispersion modeling, as it often has in making $SO_2$ NAAQS designations. EPA determined that three of the four Texas Areas addressed in the Final Designation, including Rusk/Panola Counties, were not meeting the 2010 $SO_2$ NAAQS and designated them nonattainment.

Questioning EPA's analysis of the modeling, and promising to install a new monitor, Petitioners sought reconsideration of EPA's nonattainment designations ("Reconsideration Petitions"). R.477 (Texas Petition); R.478, 475 (Luminant Petition). EPA agreed to undertake a notice and comment process to reassess its determination, initiating that process through a Proposed Error Correction. After a thorough review, EPA confirmed its nonattainment designation for Rusk/Panola Counties based on the Final Designation record, finding that information received

during the notice and comment process supported and reaffirmed the Final

Designation.  EPA thus denied the Reconsideration Petitions (R.471

"Reconsideration Denial Notice"), detailed its reasoning for the denials (R.472

"Texas Denial," R.473 "Luminant Denial"), and withdrew the Proposed Error

Correction (R.469 "Error Correction Withdrawal").

Petitioners challenge the Final Designation for Rusk/Panola Counties,

asserting that because Luminant submitted its own air quality modeling (using a

model not approved for regulatory purposes and highly questionable

methodologies) that came to a different conclusion than other modeling considered

by EPA, the Agency was *required* to designate the area "unclassifiable."  But

Petitioners misconstrue both the facts and the law.  The CAA requires EPA to

analyze the data, exercise its technical expertise, and issue the designation that

matches the resulting technical determination of what that data shows regarding air

quality at the time of the designation.  It does not permit EPA to instead designate

an area unclassifiable because an interested party submits its own competing

unrepresentative modeling.

EPA gave Petitioners ample opportunity to provide reliable, acceptable

modeling and data for consideration.  Petitioners failed to do so during the Final

Designation, in Petitioners' Reconsideration Petitions, or in comments during the subsequent notice and comment process.  That reconsideration process was not, as Petitioners imply, a tacit admission of error in the 2016 Final Designation.  It exhibited, instead, EPA conscientiously responding to the State's request that EPA take another look at its conclusion and the information underlying it.  After analyzing the original information again, EPA concluded that its original 2016 designation was correct and that the concerns it had expressed in the Proposed Error Correction regarding certain modeling inputs were unwarranted.

In the six years between EPA's promulgation of the 2010 $SO_2$ NAAQS and the 2016 designations, Petitioners were free to install new appropriately-sited $SO_2$ monitors, demonstrate sufficiently to EPA the technical appropriateness of their alternative model, or take other steps to timely demonstrate that Rusk/Panola Counties were not violating the NAAQS.  Having failed to do so, Petitioners may not instead obtain a designation of unclassifiable on the promise of establishing future new monitoring sites or by subjectively concluding that there are competing views of the data and declaring that such "conflict" *requires* EPA to designate the area unclassifiable.

There are several administrative paths Petitioners may pursue if they believe Rusk/Panola Counties are now attaining the NAAQS. Petitioners may seek to have Rusk/Panola Counties redesignated based upon up-to-date data evidencing $SO_2$ concentrations at or below 75 ppb and a demonstration that the other statutory criteria for redesignation are met. 42 U.S.C. §§7407(d)(3), 7505a; Pet. Br. at 3. Alternatively, if they can demonstrate that the Designated Area is currently attaining the NAAQS, Petitioners can ask EPA to issue a Clean Data Determination, which would suspend most of the State's affirmative requirements to address the nonattainment, assuming attainment continues. Indeed, EPA has already issued Clean Data Determinations for the other two Texas Areas that EPA designated nonattainment in the Final Designation, as representative information showed that $SO_2$ emissions reductions since 2016 resulted in those areas attaining the NAAQS.

Of course, application of these alternatives would require Petitioners to present representative data establishing that Rusk/Panola Counties are, in fact, attaining the NAAQS. It is not surprising that no such data has been presented. In 2018, the emissions from Martin Lake Power Station, the main $SO_2$ source in Rusk/Panola Counties, *doubled* compared to emissions in 2016 when the Final

6

Designation was issued, and Martin Lake is now the single largest emitter of $SO_2$ in the United States.  R.472 Enclosure 1 at 14-15; R.473 Enclosure 1 at 17-18. Moreover, the very air quality monitoring that Petitioners argue EPA was required to await before issuing any designation other than unclassifiable, showed the preliminary design value for $SO_2$ concentrations in 2018 to 2020 to be 103 ppb in Rusk/Panola Counties, well above the 75ppb NAAQS ceiling.  R.472 Enclosure 1 at 16; R.473 Enclosure 1 at 18-19.

Both in 2016 and through further administrative process, EPA's technical experts considered the information specific to Rusk/Panola Counties by applying the same court-sanctioned, multi-factor analysis it has historically applied. Through that process, EPA issued designations that are fully consistent with the CAA.  Rusk/Panola County was not unfairly assessed, as Petitioners assert; it simply cannot escape the reality that its air quality is meaningfully impacted by hosting the single largest emitter of $SO_2$ in the United States.  While Petitioners may disagree, their subjective and unsubstantiated criticisms of EPA's highly technical and data-driven designation does not render it arbitrary, capricious or beyond EPA's statutory authority.

## STATEMENT OF THE CASE

## I.    STATUTORY FRAMEWORK

The CAA establishes a comprehensive program to protect and enhance the Nation's air quality.   42 U.S.C. §7401(b)(1); *BCCA Appeal Group v. EPA*, 355 F.3d 817 (5th Cir. 2003).   Central to this program is the establishment of the NAAQS, which entails a comprehensive system to regulate emissions of specific ("criteria") health-threatening air pollutants.   *Am. Lung Ass'n v. EPA*, 134 F.3d 388, 389 (D.C. Cir. 1988).

One such pollutant is $SO_2$, a colorless gas that "derives primarily from fossil fuel combustion."   *Id.*   In addition to causing acid rain, $SO_2$ directly affects lung function, particularly in children, the elderly, and those with comprised conditions, such as asthma.   *Id.*; R.30 at 1 ("2015 Guidance").   Regulation of $SO_2$ and other criteria pollutants occurs through a three-step process.   In Step One, EPA establishes NAAQS for criteria pollutants, the attainment and maintenance of which will provide requisite protection of the public health and welfare.   42 U.S.C. §7409.   EPA periodically reviews and, if appropriate, revises the NAAQS for each criteria pollutant based on the latest scientific evidence.   42 U.S.C. §7409(d); *Mississippi v. EPA*, 744 F.3d 1334, 1339 (D.C. Cir. 2013).

In Step Two (the designation process at issue here), EPA promulgates designations for each area in the country. An area is designated "nonattainment" if it "does not meet ... the [NAAQS] for the pollutant." 42 U.S.C. §7407(d)(1)(A)(i). An "unclassifiable" area is one that "cannot be classified on the basis of available information as meeting or not meeting the [NAAQS]," i.e., an area that is incapable of being classified attainment or nonattainment. 42 U.S.C. §7407(d)(1)(A)(iii).

State Governors submit to EPA initial designations. *Id*. at §7407(d)(1)(A). These serve as recommendations, as it is EPA that promulgates the actual designation for each area. *Id*. at §7407(d)(1)(B)(i)-(iii), (d)(2)(A). *See also Texas v. EPA*, 983 F.3d 826, 836 (5th Cir. 2020) ("EPA, not the state, has the primary responsibility for promulgating attainment designations under the Clean Air Act."). Thus, in reviewing a state's recommendation, "the Administrator may make such modifications as the Administrator deems necessary to the designations of the areas." *Id*. at 831 citing §7407(d)(1)(B)(ii).

EPA is required to promulgate designations in response to the states' recommendations within two years after EPA revises a NAAQS. *Id.*

9

§7407(d)(1)(B).  EPA can extend this deadline up to one year, *id.*

§7407(d)(1)(B)(i), which it did here.  77 Fed. Reg. 46,295 (Aug. 12, 2012).

Congress assigned to states the primary responsibility to implement the

NAAQS, which is Step Three of the NAAQS process.  42 U.S.C. §7407(a), 7410,

7502, 7514-7514a.  States fulfill this responsibility primarily through developing

State Implementation Plans ("SIPs").  *Id*. §§7410, 7502; Pet. Br. at 3.  All SIPs

must include enforceable emission limitations and other control measures to ensure

that a nonattainment area comes into attainment.  42 U.S.C. §§7410(a)(1),

(a)(2)(A), 7502(c)(1)-(9); *BCCA Appeal Group*, 355 F.3d at 830-32.

## II.    REGULATORY BACKGROUND

### A.    Development of the 2010 $SO_2$ NAAQS

In 2010, EPA established a revised $SO_2$ standard at a concentration of

75 ppb, which is met when the 3-year average of the annual 99th percentile of

daily maximum 1-hour average concentrations is less than or equal to 75 ppb.  75

Fed. Reg. 35,520 (June 22, 2010); 40 C.F.R. §50.17.  Evaluation of attainment thus

requires three years of $SO_2$ concentration data.  In that same rulemaking, EPA

explained that the $SO_2$ monitoring network is limited and that it "intend[ed] to use

a hybrid analytic approach [to designations] that would combine the use of monitoring and modeling." 75 Fed. Reg. at 35,551.

## B. The Process for Issuing Area Designations for the 2010 SO₂ NAAQS

EPA is required to complete the process for designating all areas in the country within three years of the promulgation of the new NAAQS (with the one-year extension), which in this case was June 2, 2013. R.434 at 4 (Final Technical Support Document ("Final TSD")). With EPA having failed to meet the deadline, interested parties sued, seeking to require EPA to complete the designation process as statutorily required. *Id.* at 4; *Sierra Club v. McCarthy*, No. 3:13–cv–3953–SI 2015 WL 889142, at *4 (N.D. Cal. March 2, 2015) ("*McCarthy*").

In 2015, the Court in *McCarthy* found EPA in violation of its nondiscretionary duty to promulgate designations under 42 U.S.C. §7407(d)(1)(B), (d)(2)(A) and approved a consent decree ("Order") establishing a schedule for EPA to designate the remaining areas. As the Court explained, the Order "set a binding schedule for the EPA to make all remaining designations…." *McCarthy*, 2015 WL 889142 at *1. The Order required EPA to issue final designations by July 2, 2016 for areas in the country containing the largest sources of SO₂, including the Martin Lake facility in Rusk/Panola Counties. This deadline was extended by stipulation

11

to November 29, 2016.  R.434 at 5.  In an unsuccessful appeal of the Order by, among others, Texas, the Ninth Circuit stated the obvious: "EPA can be held in contempt for failure to comply with the Consent Decree's terms," the central term being the November 29, 2016, deadline.  *Sierra Club v. North Dakota*, 868 F.3d 1062, 1067 (9th Cir. 2017).

### C.    Pre-Designation Actions Taken by EPA

EPA generated several documents to assist in the designation process.  On March 20, 2015, EPA issued a non-binding guidance to help EPA regions address their designation responsibilities.  R.30 at 1.  This 2015 Guidance informed states that notwithstanding the original 2013 deadline, they could submit updated information.  *Id*. at 2-3.  Thus, if more recent, representative information showed $SO_2$ concentrations meeting the NAAQS, EPA would consider such information when making its designations.

EPA further explained that since, under 40 C.F.R. Parts 50, 58, there must be three consecutive calendar years of data to support a designation, the required 2016 designations would likely be based on modeling, given that the monitoring network was limited and any newly established monitors could not generate the necessary three calendar years of quality-assured data by the court-ordered

deadline. R.30 at 3-4. EPA also confirmed the utility of air dispersion modeling for informing SO$_2$ designations and recommended use of the AERMOD dispersion model that was already approved for regulatory purposes such as the SO$_2$ designation process. *Id*. at 5.

EPA also issued Technical Assistance Documents ("TADs") to aid in the analysis of modeling and monitoring. R.434 at 5. These documents detail recommendations on how a state air agency or others might model and/or monitor ambient air in proximity to an SO$_2$ emission source. R.203 (February 2016 Modeling TAD); R.204 (February 2016 Monitoring TAD). EPA explained that: (a) AERMOD was promulgated in 2005 as EPA's preferred near-field dispersion modeling for a wide range of regulatory applications in all types of terrain based on extensive developmental and performance evaluation; and (b) AERMOD should be used to generate reliable modeling information for designations under the 2010 SO$_2$ NAAQS, unless use of an alternative model could be justified under 40 CFR part 51 App. W §3.2. R.203 at 5-6.

Finally, EPA issued the Data Requirements Rule ("DRR"), requiring air agencies to assess SO$_2$ concentrations around certain sources. 80 Fed. Reg. 51,052 (Aug. 21, 2015). The DRR, among other things:

13

(1) Emphasized the importance of characterizing $SO_2$ ambient concentrations based on "air quality in the vicinity of large sources of $SO_2$" (p. 51,053);

(2) Reiterated that characterizations of $SO_2$ air quality could be made "either through air quality modeling or by conducting ambient monitoring" (*id.*);

(3) Cited the long history of using air dispersion modeling for making $SO_2$ NAAQS designations (p. 51,057);

(4) Explained that "ambient $SO_2$ concentrations are not the result of complex chemical reactions (unlike ozone or $PM_{2.5}$) [and] they can be modeled accurately using well understood air quality modeling tools, especially in areas where one or only a few sources exist," which is the case in Rusk/Panola Counties. (p. 51,057/3); and

(5) Explained that the AERMOD model, which was used for Rusk/Panola Counties by Sierra Club, has been evaluated using 17 field studies and is EPA's preferred air dispersion model, as it "has been demonstrated to be a reliable predictor of $SO_2$ air quality." (p. 51,076/1).

Regarding the relationship between the DRR and the 2016 designations, EPA explained that the 2016 designations were required to be completed by court

order *before* the DRR's implementation deadlines and so it would not be awaiting information submitted under the DRR in completing the 2016 designations. *Id*. at 51,056/1.

**D.     The Final Designation at Issue**

In September 2015, during the designation process, Sierra Club submitted air quality modeling for the Rusk/Panola Counties. R.144 at 150-162 (Initial TSD). Neither Texas nor Luminant included any modeling *or* monitoring to support the State's recommended designations of unclassifiable/attainment for Rusk and Panola Counties, which it submitted on September 18, 2015. R.80. On February 11, 2016, EPA notified Texas of its intended designations accompanied by EPA's initial Technical Support Document (R.144) and solicited public comment on the intended designations. 81 Fed. Reg. 10,563 (March 1, 2016) (R.0001).

During the 2016 public comment period Luminant submitted modeling and Sierra Club submitted updated modeling. R.434 at 54; R.472 Enclosure 1 at 4; R.473 Enclosure 1 at 4. Texas again submitted no independent modeling. *Id*. Instead, Texas asserted that EPA should base nonattainment designations solely on monitoring, even though there was no monitor located in Rusk/Panola Counties.

15

R.438 at 12-13; R.472 Enclosure 1 at 4; R.473 Enclosure 1 at 4.  Commenters

asserted that EPA should designate areas unclassifiable that had no monitors but

intended to install one in the future.  R.438 at 13-14.

EPA conducted the designation process for the four Texas Areas pursuant to

its multi-factor "weight-of-the-evidence" analysis.  Those factors include: (1) air

quality data; (2) emissions data (including locations of key sources like power

plants); (3) meteorology (weather and air transport patterns); (4)

geography/topography; and (5) jurisdictional boundaries.  R.30 at Attachment 2.

On December 13, 2016, EPA published its designations for the four Texas Areas,

meeting the court-ordered deadline.  81 Fed. Reg. 89,870 (the Final Designation)

(R.433).

### E.    Petitioners' Requests for Reconsideration

In February, 2017, Luminant submitted its Reconsideration Petition,

asserting in part that Sierra Club submitted revised modeling on the last day of

public comment thereby leaving Petitioners no opportunity to consider that

modeling.  R.478 at 4.  On September 21, 2017, EPA responded, explaining its

intent "to undertake an administrative action with notice and comment to revisit"

the three nonattainment designations. R.454. EPA clarified that during this process the nonattainment designations remained effective. *Id.*

In December, 2017, Texas submitted its own Reconsideration Petition and Luminant submitted additional information to support its Petition. R.477; R.475. Petitioners informed EPA that Luminant intended to close the power plants in two of the Texas Areas designated nonattainment, Titus and Freestone/Anderson Counties. R.477 at 4-5; R.475 at 2. Petitioners expressed no intent (then or now) to close the Martin Lake Electric Station in Rusk/Panola Counties. Petitioners also announced that they had installed a monitor 2.2 km from the Martin Lake Station and proposed that EPA change Rusk/Panola Counties' designation from nonattainment to unclassifiable and wait three years for collection of data from the new monitor for any further action. R.477 at 6; R.475 at 3.

For EPA to take a final action to revise an "area designation" under 42 U.S.C. §7410(k)(6), it is required to determine that the designation is "in error," hence EPA's reference to such actions as error corrections. 84 Fed. Reg. 43,757, 43,758/2. (Aug. 22, 2019) ("Proposed Error Correction"). As EPA explained, "[t]he purpose of this [Proposed Error Correction] is to solicit input from the public…." *Id.* at 43,762/2. After noting the retirement of the power plants in two

of the three Texas Areas designated nonattainment, EPA sought comments on two potential errors suggested by petitioners: (a) whether EPA erred in failing to give greater weight to Texas's preference to base required $SO_2$ designations on future monitoring; and (b) whether EPA erred in relying on air quality modeling submitted by Sierra Club. *Id.* at 43,759/2, 43,761/1.

## F.    EPA's Subsequent Actions

### 1.    Clean Data Determination

On May 7, 2021, EPA issued Clean Data Determinations for two of the Texas Areas designated nonattainment, Freestone/Anderson and Titus Counties, finding that due to the retirement of the power plants in those Texas Areas, each was now attaining the 2010 $SO_2$ NAAQS.  86 Fed. Reg. 26,401.  EPA explained, "[t]his clean data determination suspends the requirements for these areas to submit an attainment demonstration."  *Id.* at 26,406.  *See also* Pet. Br. at 14, n.19. Accordingly, Petitioners are challenging only the nonattainment designation for Rusk/Panola Counties from the 2016 Final Designation.  *Id.*

### 2.    EPA's Response to the Reconsideration Petitions

On June 10, 2021, EPA denied Petitioners' Reconsideration Petitions. R.472, 473.  On June 29, 2021, EPA published notice of its Reconsideration

Denials, 86 Fed. Reg. 34,141 (R.471) and notice withdrawing its Proposed Error Correction.  86 Fed. Reg. 34,187 (R.469).  EPA determined that the bases Petitioners presented in support of their Reconsideration Petitions were or could have been raised in their comments on the proposed designation and should be rejected on that basis.  R.472 Enclosure 1 at 7-13; R.473 Enclosure 1 at 7-16.  EPA alternatively denied the Reconsideration Petitions on their substance, detailing its technical analysis and reasoning.  *See* discussion *infra*.

## SUMMARY OF ARGUMENT

The CAA, 42 U.S.C. §7407(d)(1)(A)(i), unambiguously declares that an area must be designated "nonattainment" if it "does not meet ... the national primary or secondary ambient air quality standard [NAAQS] for the pollutant."  The purpose of this provision, as it applies to $SO_2$, is literally to help people breathe.

Petitioners do not dispute EPA's authority to designate whether an area is meeting the $SO_2$ NAAQS.  Instead, they contend that the act of submitting a "conflicting" modeling projection required EPA to designate Rusk/Panola Counties unclassifiable.  This position contravenes the statute, which requires EPA to assess all available information and apply an unclassifiable designation only when EPA lacks the information to make a reasoned technical determination

19

regarding air quality status at that time.  EPA considered every party's

submissions, gave Petitioners an opportunity to submit additional data, and made a

considered technical decision that carries out the precise mandate of the statute.

Specifically, EPA examined all aspects of Sierra Club's modeling, which

utilized the approved AERMOD model, and concluded that it adequately

established that Rusk/Panola Counties exceeded the NAAQS.  EPA also

thoroughly analyzed Luminant's modeling, even though it used a model that had

not been approved for regulatory purposes or had otherwise been sufficiently

demonstrated to EPA to be technically appropriate for Rusk/Panola Counties.  EPA

noted significant flaws in Luminant's modeling and determined that it was of

insufficient quality to be adequately representative of $SO_2$ air quality in the

Designated Area.

Petitioners' argument is not assisted by reference to a few other counties

around the country where so-called "conflicting" modeling led to an unclassifiable

designation.  First, Petitioners never adequately presented this "county

comparison" argument before EPA and the "issue exhaustion" doctrine precludes

Petitioners from raising it before the Court.  In any event, the three other counties

identified by Petitioners were designated unclassifiable based on EPA's same

multi-factor examination of location-specific information applied in the Final

Designation.  Petitioners' simplistic assertion that EPA designated those other

counties as unclassifiable because conflicting modeling was submitted, ignores

both the facts of each designation and EPA's multi-criteria approach to weighting

of location-specific information for designations.  Indeed, courts have

characterized Texas's past attempts to have a designation revised based on

designations from other counties as "inappropriate or even illogical." *Mississippi*

*Comm'n v. EPA*, 790 F.3d 138, 169 (D.C. Cir. 2015) (internal quotations omitted).

Petitioners alternatively argue that EPA was required to ignore information

on current air quality (e.g., representative modeling) available at the time of the

court-ordered deadline for issuing the Final Designation, and instead allow Texas

to first install a new monitor (in late 2017), and then wait three years for its data

output (which only confirmed that Rusk/Panola Counties are violating the

NAAQS), designating Rusk/Panola Counties unclassifiable during this four-year

waiting period.  Nothing in the statute gives EPA authority to ignore a court-

ordered deadline (based on failing to meet a statutory deadline) and available

information regarding current air quality in issuing required designations, all on a

promise of future monitoring, and certainly nothing *requires* EPA to do so.

Ultimately, EPA exercised its technical expertise in considering the full weight of the evidence, using court-sanctioned, multi-factor criteria and available representative modeling information. In doing so it fulfilled its statutory responsibility in a manner wholly consistent with Congress's express directives and the approach that EPA has historically applied throughout the country when promulgating designations for $SO_2$ NAAQS.

## STANDARD OF REVIEW

"A NAAQS designation by the EPA [may be set aside] only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Miss. Comm'n*, 790 F.3d at 150; 5 U.S.C. §706(2)(A). "[R]eview under the arbitrary-and-capricious standard is 'extremely limited and highly deferential.'" *Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 243 (5th Cir. 2015) (internal quotations omitted). In considering the agency's determination, "there is a presumption that the agency's decision is valid." *La. Pub. Serv. Comm'n v. FERC*, 761 F.3d 540, 558 (5th Cir. 2014). The challenged agency determination "need only have a rational basis" and its determination is arbitrary and capricious "only when it is so implausible that it could not be ascribed to a difference in view or the

product of agency expertise." *Wilson v. U.S. Dep't of Agric.*, 991 F.2d 1211, 1215 (5th Cir. 1993).

To the extent EPA has interpreted statutory terms, the Court first inquires whether Congress "has directly spoken to the precise question at issue," in which case the Court "must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842-43 (1984). If the statute is "silent or ambiguous with respect to the specific issue," the Court must defer to the agency's interpretation so long as it is "based on a permissible construction of the statute." *Id.* "If the agency's interpretation is reasonable, it will be upheld," even if the court might have come to a different judgment. *BCCA Appeal Group*, 355 F.3d at 824-25.

## ARGUMENT

## I.    EPA'S NONATTAINMENT DESIGNATION FOR RUSK/PANOLA COUNTIES IS WHOLLY CONISTENT WITH THE CLEAN AIR ACT AND IS NEITHER ARBITRARY NOR CAPRICIOUS

Petitioners assert that EPA's determination was arbitrary and capricious because EPA purportedly: (a) ignored monitoring data and denied Texas the option to collect alternative monitoring data over the ensuing three years; (b) refused to consider Luminant's modeling; and (c) based its designation on Sierra Club's

modeling that EPA found had substantial errors.  Pet. Br. at 26.  Along the way,

Petitioners assert that EPA misapplied unidentified language in the CAA.  Each of

these assertions is factually incorrect as well as legally infirm and none comprises

a basis for vacating EPA's nonattainment designation for Rusk/Panola Counties.[1]

---

[1]  This action must be based on the record of the challenged decisions submitted to the Court by EPA, not on extra-record evidence.  *Camp v. Pitts,* 411 U.S. 138, 142 (1973); *Luminant Generation Co. LLC v. EPA*, 714 F3d. 841, 850 (5th Cir. 2013). Nevertheless, Petitioners rely on documents that are not in the Administrative Record.  Petitioners had an opportunity to seek to supplement the record but failed to do so.  Even more concerning, Petitioners' extra-record citations are irrelevant and misleading.  For example, Petitioners cite to a statement from a 2011 EPA memo saying that EPA anticipates that most areas of the country will be designated unclassifiable due to lack of monitoring and modeling data.  Pet. Br. at 4.  To the extent Petitioners imply that EPA was required to issue an unclassifiable designation because of a lack of data available at the original deadline date, Plaintiffs have made no such argument and may not do so in its reply brief.  *See* cases cited at p.28, *infra*.  Additionally, the memo Petitioners cite makes clear that: (a) EPA was referring to designation *recommendations* from *states* due *10 days* from then, not to EPA's ultimate designations; and (b) EPA itself planned to rely on monitoring (if available) and modeling for designations, which would likely be generated over the ensuing years before a designation was required. Accordingly, the Court should ignore all references in Petitioners' brief to extra-record documents, which are discussed in the following footnotes and accompanying text: FN 4, 5, 6, 7, 8, 23, 24, 25.

24

### A.    EPA Did Not Ignore Monitoring Data or Deny Texas the Right to Collect Monitoring Data

#### 1.    EPA Did Not Ignore Monitoring Data

Within Rusk County and on the edge of Panola County lies the Martin Lake Electrical Station.  At the time EPA did its analysis for the Final Designation, the most recent data showed that this facility had averaged 46,439 tpy of $SO_2$ emissions over the preceding three years.  R.434 at 62.  Texas nevertheless recommended that Rusk and Panola Counties each be separately designated as unclassifiable/attainment.  R.80, Attachment A.  Texas neither provided modeling nor cited data from monitors located within Rusk or Panola Counties to support this recommendation.  *Id.*; R.434 at 51; R.144 at 145.

Instead, Petitioners submitted comments citing to monitoring from *another* county ("Longview monitor" in Gregg County), which they now assert EPA failed to consider.  Pet. Br. at 27-28.  But EPA did not ignore this monitoring data.  As Petitioners report, EPA explained that the Longview monitor, located 19 kilometers ("km") away, "was too far from Martin Lake to be of any use" in assessing Rusk/Panola Counties.  *Id.* (citing EPA's statement at R.438 at 17-18).

25

*See also* Pet. Br. at 8, 10.[2]  Specifically, EPA explained in the Final Designation that the Longview monitor was not in a location expected to receive the highest impact and be representative of $SO_2$ emissions from the Martin Lake facility. R.438 at 17-18.

In the face of this determination, Petitioners make no argument that a monitor 19 km away is probative of the concentrations of $SO_2$ in the Designated Area, let alone that such monitoring data is conclusive on this point.  To the contrary, Petitioners conceded that "[Texas] does not have $SO_2$ monitors located in the area surrounding Martin Lake that would be expected to characterize the highest $SO_2$ concentrations from this facility."  R.478 Ex. C at 7.  Supporting that point, about a year *after* the Final Designation was issued, Texas installed a monitor for the purpose of characterizing air quality in Rusk/Panola Counties, locating it 2.2 km from Martin Lake Electrical Station.  R.477 at 6; R.475 at 3.

Notwithstanding these concessions and actions, Petitioners argue that the distant Longview monitor was "well within the radius of the *modeling* submitted

---

[2] The Final Designation covers a relatively small portion of Rusk and Panola Counties and does not include any portion of Gregg County, where the Longview monitor is located.  R.434 at 52 (designation is "limited to the immediate area surrounding Martin Lake station.").  *Compare* p. 63 (Map of Longview monitor) with p. 73 (Map of the Designation Area).

by Sierra Club, which extended out 50 km." Pet. Br. at 27 (emphasis added). This
is a meaningless statement in this context. Models often operate to assess air
emissions and concentrations up to 50 km from a source, as Luminant's own
modeling did. R.434 at 65. This just represents the reach of a given *model*. It has
nothing to do with the ability of a single *monitor* to assess maximum $SO_2$
concentrations near a source that is 19 km away from the monitor's physical
location. Indeed, because $SO_2$ concentrations result from direct emissions from
combustion sources, concentrations are highest relatively close to sources and are
much lower at greater distances due to dispersion, which the AERMOD model is
adept at assessing. R.203 at 5-6. EPA's technical determination to not base its
designation of Rusk/Panola Counties on a monitor 19 km away is entitled to
deference and Petitioners have presented no basis to conclude that EPA's
determination is arbitrary or capricious.

### 2.    EPA Was Not Required to Designate Rusk/Panola Counties as Unclassifiable While Awaiting Texas's Collection of Three Years of Data From a Monitor Not Even Installed Until a Year After the Designation Deadline

Lacking any probative monitoring at the court-ordered deadline for
designating Rusk/Panola Counties, Petitioners argue that EPA should have ignored
the air quality information (modeling) EPA possessed. Petitioners argue that EPA

should have instead waited for Texas's new monitor, installed one year after the

designation deadline, and then further waited the required three calendar years for

Texas to collect certified monitoring data, all while designating Rusk/Panola

Counties as unclassifiable in the interim.  In support of this position, Petitioners

contend that EPA's statement that it "does not have the discretion to await the

results of future monitoring" is an "erroneous view of the law."  Pet. Br. at 46-49.

Petitioners cite to no statutory authority that allows EPA to violate a statute

with an express deadline and a court order requiring EPA to issue a designation for

Rusk/Panola Counties by the end of 2016.  Petitioners similarly cite to no statutory

language that EPA erroneously misinterpreted.  Absent any such references in their

brief, Petitioners' argument that the Final Designation is "based on an erroneous

view of the law" cannot be considered and Petitioners may not cure this defect in

their Reply Brief.  *United States v. Hodge*, 933 F.3d 468, 481, n.5 (5th Cir. 2019),

citing *Cavallini v. State Farm Mut. Auto Ins. Co.*, 44 F.3d 256, 260 n.9 (5th Cir.

1995).

In any case, the law is clear.  Designations are governed by 42 U.S.C.

§7407(d).  As EPA explained, 42 U.S.C. §7407(d)(1)(A) requires EPA to

determine

whether an area currently "does not meet" or "meets" a NAAQS or currently "cannot be classified … as meeting or not meeting" the NAAQS. The statutory language is stated in the present tense, not the future conditional, and therefore a designations decision is not based on whether EPA predicts that an area would meet or would not meet a NAAQS at some distant point in the future….

R.438 at 39.

Petitioners point to no specific statutory terms that are ambiguous, but to the extent they are, EPA's interpretation must be upheld. *Miss. Comm'n,* 790 F.3d at 154 (the statutory requirement for EPA to make designations "on the basis of available information" is ambiguous and "EPA therefore may interpret the statutory language as it sees fit, as long as its interpretation is reasonable."). And this Court has already found that EPA's interpretation of this provision is reasonable. *Texas* v. *EPA,* 983 F.3d at 838 ("Context makes it clear in this case that the designation process considers only the present tense" and thus designation cannot be based on future events or predictions.).

Moreover, the statute allows EPA to set a cut-off for submission of data to be considered in the designation process, which in this case EPA geared to the court-ordered deadline. For instance, in *Miss. Comm'n*, Sierra Club argued that EPA erred because, if it had included not-yet-certified monitoring data from the most recent calendar year, it would have found that additional counties were in

29

nonattainment.  790 F.3d at 156-58.  The court rejected this argument, finding that "EPA could reasonably conclude that the [designations] process must end at some point" and "the agency did not act arbitrarily in ending it here."  *Id.* at 158.  *See also Catawba Cty. v. EPA,* 571 F.3d 20, 43-44 (D.C. Cir. 2009); *Treasure State Resource Industry Assn v. EPA*, 805 F.3d 300, 306 (D.C. Cir. 2015) (rejecting reconsideration request based on newer monitoring data, explaining that: (a) the data was not complete or certified at the time of the designation; (b) EPA reasonably issued $SO_2$ designations in accordance with deadlines and without considering later-occurring data; and (c) and the state is not without recourse, such as seeking redesignation).  EPA was required to issue a designation under a court ordered deadline and it had no statutory authority to await promises of monitoring data that *might* alter its otherwise well-supported nonattainment designation.

Even if EPA had authority to await additional data, it certainly was not arbitrary for EPA to refrain from doing so here.  Texas did not install a monitor in Rusk/Panola Counties until late 2017.  EPA would have to wait at least three full calendar years after that point and additional time for the monitoring data to be certified by Texas (by May 1 of the following calendar year, 2021).  Pet. Br. at 6-7; R.30 at 4-5; 40 CFR §§50.17(b), 58.15(a).  Waiting until late 2021, five years after

the designation was required by court order, and deeming the area unclassifiable in the interim, hardly reflects Congress' mandate to designate areas through an assessment of whether available information demonstrates an area is meeting or is not meeting the NAAQS.  42 U.S.C. §7407(d).  And that is aptly evidenced in this case.

Here, Luminant predicted that there would be a 30%-40% reduction in emissions from Martin Lake Power Station in 2018-2019 when compared to 2014-2015.  R.328 at 51, 173; R.473 Enclosure 2 at 19; R.472 Enclosure 2 at 19.  Yet, 2018-2019 emissions were approximately 50% *greater* than 2014-2015 emissions.  R.472 Enclosure 1 at 14-15; R.473 Enclosure 1 at 17.  And that is just emissions levels.  The actual monitoring data Petitioners argue should have delayed a nonattainment designation shows that Rusk/Panola Counties continue to have $SO_2$ concentrations well above the 75 ppb NAAQS, with a 2018-2020 preliminary $SO_2$ concentration design value of 103 ppb.  R.472 Enclosure 1 at 16; R.473 Enclosure 1 at 19.

Congress directed EPA to issue designations "as expeditiously as practicable."  42 U.S.C. §7407(d)(1)(B)(i).  As this Court explained "[t]he statute uses concrete terms: either a county does or does not meet the NAAQS" and Texas

cannot rely on uncertain "future events and future attainment." *Texas v. EPA*, 983

F.3d at 838.  Quite clearly, EPA was not required in 2016, when the Final

Designation was due, to instead rely on "future events" (collection of three

calendar years of data from a still uninstalled monitor) to avoid issuing the

nonattainment designation sufficiently supported by the data and information

already in hand.

Pursuing an alternative route, Petitioners argue that the Data Requirements

Rule ("DRR") overrides EPA's statutory requirements and the court-ordered

deadline, and required EPA to issue an unclassifiable designation in 2016.  Pet. Br.

at 46-48.  But EPA does not have authority to issue regulations that ignore a

statutory duty to issue final designations by the required deadline.  Adopting

Petitioners' argument would grant EPA grand new powers to ignore statutory

deadlines *and* court orders, and override the statutory criteria for issuing

designations.

Furthermore, the DRR simply sets out a process for states to conduct

assessments of $SO_2$ air quality status in areas with sources emitting over a specified

level of $SO_2$.  It provides two options for this assessment (modeling or monitoring),

without prejudging any future determination that could rely upon such

assessments.  R.438 at 15; 80 Fed. Reg. at 51,053/3, 51,057/1.  While Petitioners

assert that EPA was required by the DRR to await three years of monitoring even

in the face of adequate representative modeling that already showed NAAQS

violations, the DRR does not set requirements for designations, let alone require a

State or EPA to utilize monitoring for the designation process.  80 Fed. Reg. at

51064; R.438 at 43 ("[N]othing in the agency's Data Requirements Rule modifies

EPA's duty or discretion in making designations determinations based on available

information").  *See also* pp. 13-15 *supra* (describing the DRR).

Moreover, nothing in the DRR implies that EPA would – or can – issue an

unclassifiable designation because alternative data may be available years in the

future when information already available supported a nonattainment designation.

To the contrary, EPA declared that the DRR was "not establishing or modifying

any area designation requirements provided for in [42 U.S.C. §7407], nor does any

aspect of this final rule conflict with any provision of [§7407] that directs states

and the EPA to take timely action to issue designations."  80 Fed. Reg. at 51,055/3.

In fact, EPA explained that the air quality assessments under the timeline set forth

in the DRR would generally be *inapplicable* for the 2010 $SO_2$ NAAQS

designations required in 2016 because those designations were due well before the

DRR could be implemented. *Id*. at 51,056/1-2. *See also* R.459 (Proposed Error Correction) at 43,759/1-2. Finally, Petitioners' view also is inconsistent with those expressed in *Sierra Club v. McCarthy*, which explained that the deadlines set forth in the Order are wholly independent of the DRR. 2015 WL 889142 at *1. Thus, neither the statute nor any regulation required EPA to ignore statutory and court-ordered deadlines to issue a designation and instead "kick the can down the road" to await future monitoring data rather than assess currently available information.

## B. EPA Did Not Refuse to Consider Luminant's Modeling and in Fact Considered it in Detail

As Petitioners acknowledge, EPA's regulations provide that "in all cases, the model or technique applied to a given situation should be the one that provides the most accurate representation of atmospheric transport, dispersion, and chemical transformation in the area of interest." Pet. Br. 29-30, quoting 40 C.F.R. Part 51, App. W §1.0.e. EPA applied this principle in finding that Sierra Club's use of the AERMOD approved model with the then-most recent three calendar years (2013-2015) of actual emissions data, provided "the most accurate representation" of all these factors. R.434 at 55-77. *See also* R.30 at 4-5; R.203 at 5-6 (AERMOD is preferred air dispersion model since 2005).

Petitioners complain that Luminant's modeling was ignored by EPA. Pet. Br. at 29-31. That assertion is inaccurate on several levels. First, Petitioners fault EPA's review of the alternative model Luminant used (i.e., AERLIFT and AERMOIST pre-processors) but fail to acknowledge EPA's various bases for rejecting Luminant's modeling, such as its use of unenforceable predictions of much lower future year emissions. Pet. Br. at 29-31; R.434 at 55-58. Petitioners could not rely on uncertain future events for designations, *Texas v. EPA*, 983 F.3d at 838, and EPA reasonably determined that such use of future emissions predictions made Luminant's modeling insufficient, among many other reasons discussed *infra*.

Second, Petitioners' "explanation" of how and when unapproved modeling is to be approved by EPA to qualify for use in specific designations, Pet. Br. 29-30, wholly mischaracterizes the regulatory provisions that Petitioners assert EPA failed to follow. Petitioners admit that there is an alternative model approval process, which is to be used for 2010 $SO_2$ NAAQS designations modeling submittals. Pet. Br. at 30 (citing 40 C.F.R. Part 51, App. W §§3.2.1.b, 3.3, for the fact that EPA's Model Clearinghouse must concur with EPA regional office decision to "approve [ ] the use of alternative models"). *See also* R.203 at 5-6. This is not a rubber-

stamp process.  Instead, 40 C.F.R. Part 51, App. W §§3, 4 details the technical

procedure required to justify use of an alternative model for EPA's approval for

regulatory purposes.  R.438 at 5-7, 25; R.203 at 5-6.

Petitioners never submitted their alternative AERLIFT and AERMOIST pre-

processors for EPA pre-approval.  Nor did Petitioners submit a statistical

performance evaluation comparing it to the preferred model and indicating that the

alternative model performed as well or better in assessing air quality in

Rusk/Panola Counties than the AERMOD model.  R.434 at 55-58; R.438 at 4-9,

24-29, 36-37.  These steps were particularly necessary for the modeling presented

by Luminant, which also included unapproved beta options.  R.434 at 58.  *See also*

R.438 at 22-25, 36-39, (describing other characteristics of this model in need of

review and approval).  Thus, as EPA explained:

> There is no information to support that Luminant's modeling results
> with the AERLIFT and AERMOIST processors meet the requirements
> for models used in a regulatory decision.  It is premature to use
> AERMOIST and AERLIFT in this context for informing our
> designation decisions…. [A]ny model enhancements are required to
> go through standard EPA model evaluation, review, and approval
> before being used in regulatory applications as required by 40 CFR
> Part 51 Appendix W (Guideline on Air Quality Models).

R.434 at 57-58. *See also* R.438 at 4-9 (describing the alternative model process and explaining that EPA had a reasonable basis for not relying upon the beta options Luminant used).

Nevertheless, EPA *did* analyze the modeling and information submitted by Luminant in considering the Rusk/Panola Counties designation. EPA found Luminant's modeling flawed because, *inter alia*, it: (a) improperly relied on unenforceable forecasted lower emissions, such as improving scrubber efficiency and fuel switches, instead of current actual higher emissions; (b) improperly assumed collateral reductions of $SO_2$ that Petitioners predicted would result from future restrictions on mercury emissions; (c) used unapproved model pre-processors AERLIFT and AERMOIST to adjust the measured stack temperatures and velocities to greatly enhance plume rise, even for instances when Luminant's phenomena theory indicated no adjustments should have been made and without demonstrating that such adjustments were appropriate at this facility, all of which likely resulted in large unsubstantiated changes in modeled concentrations compared to use of the measured data with the regulatory version of the model; and (d) misapplied meteorological dispersion and used unsubstantiated adjustments to wind speeds and direction (using unapproved and insufficiently supported beta

options) that impacts air transport and generally lowers concentrations.  R.434 at 51-58; R.438 at 4, 24-42.

Luminant provided an additional analysis that was not modeling but just as unreliable.  For instance, Luminant used a crude scaling of 2012 emissions to estimate 2015 emissions, to attempt to scale Sierra Club's 2015 modeling results (which used 2012-2014 emissions) to a 2013-2015 timeframe.  It then applied a 50% reduction based on Luminant's unsupported assertion that AERMOD over-predicts $SO_2$ concentrations.  EPA found that Luminant's scaling and 50% reduction analysis were not well documented and inaccurate.  R.434 at 54-55 and n.6; R.438 at 27.  Thus, EPA most assuredly did analyze Luminant's modeling and other analysis and found that they did not provide a basis to determine whether Rusk/Panola Counties was meeting the NAAQS.

## C.    EPA Did Not Conclude that Sierra Club's Modeling Contained Substantial Errors

Petitioners assert that EPA's nonattainment designation for Rusk/Panola Counties is arbitrary and capricious because EPA relied on "Sierra Club modeling that EPA itself found was flawed."  Pet. Br. 31 (heading).  Petitioners are incorrect.

In contrast to Luminant's modeling, Sierra Club's 2016 modeling relied upon in the Final Designation mostly followed EPA's guidance in the Modeling

TAD and utilized the most recent version of AERMOD approved for regulatory purposes. R.438 at 33-34; R.434 at 60-61.[3] As outlined, *supra*, the AERMOD model has been scrutinized and long-approved for regulatory purposes and EPA found it particularly useful for $SO_2$ designations, as it has been shown in field studies to effectively model impacts of emissions from tall stacks, like those at the Martin Lake facility. R.434 at 58. Sierra Club's AERMOD modeling was also based on the most recent data, 2013-15 actual emission rates and stack velocities. R.438 at 33-34; R.434 at 60-62.[4]

---

[3] Petitioners reference "one version" of Sierra Club's 2015 modeling set that used allowable emission rates for comparison with the Gregg County monitor, which would not be expected to match or necessarily be close to monitored concentrations where, as here, allowable emission rates were much higher than actual emissions. Pet. Br. at 8, 10, 28. EPA did not rely on this one version of Sierra Club's modeling. EPA relied on Sierra Club's 2015 modeling of actual emissions for the intended designation and Sierra Club's 2016 modeling of more recent actual emissions in the Final Designation. R.144, 434.

[4] Petitioners complain that the application of the AERMOD modeling here was not peer reviewed. Pet. Br. at 12. But it is the *model* that is reviewed and approved for regulatory purposes, not the application of an already-approved model to a specific area. 40 CFR part 51 Appendix W; R.438 at 17-18. The AERMOD model has been thoroughly peer-reviewed, tested and approved by EPA. 70 Fed. Reg. 68,218 (Nov. 9, 2005). See also Appendix W at 4.2.2.1. It is, instead, Luminant's alternative model that has not been approved by EPA through the Appendix W alternative model process. *See* pp. 35-36, *supra*.

No modeling is perfect, given that models are dependent on various inputs, but that is not a basis "to remand agency decisions based upon it." *Zero Zone, Inc. v. U.S. Dep't of Energy*, 832 F.3d 654, 674 (7th Cir. 2016) (quotation omitted). "To invalidate a model simply because it does not perfectly fit every data point 'would be to defeat the purpose of using a model.'" *Appalachian Power Co v. EPA*, 135 F.3d 791, 805 (D.C. Cir. 1998) (quotation omitted). Instead, remand is permitted "only if the model 'bears no relationship to the reality it purports to represent' or if the agency fails to 'provide a full analytical defense' when the model is challenged." *Zero Zone,* 832 F.3d at 674, quoting *Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914, 923 (D.C. Cir. 1988).

As one would hope from a "full analytic" review, EPA identified where Sierra Club's modeling could have adjusted inputs or approach. R.434 at 60-61, 75-77. After review of both Sierra Club's 2015 and 2016 modeling and Luminant's modeling, EPA explained that while Sierra Club did not have access to data on building downwash or variable stack parameters, if available such information would generally increase the $SO_2$ concentrations in the modeling, thus finding Sierra Club to have provided conservative (i.e., lower) estimates of $SO_2$ concentrations. *Id.* (summarizing the ways in which Sierra Club's modeling

40

overall was "deliberately conservative in an underestimating sense."). And this was generally confirmed in Luminant's modeling. R.438 at 29-30.

Regarding flagpole receptors (which attempt to model concentrations at face-height instead of ground level), EPA reported that the Modeling TAD explains that flagpole receptors are not necessary and Appendix W implies that receptors are placed near ground level for comparison to the NAAQS. R.334 at 58. EPA analyzed the potential impact of using flagpole receptors and concluded that it expected only a very slight change (up to 0.2%) in the modeled concentrations if adjusted to ground level and that scope and magnitude of concentrations would be basically equivalent.[5] EPA thus concluded that changes regarding these receptors would not change EPA's determination that the Designated Area was not meeting the NAAQS. R.434 at 58, 75-77.

Accordingly, EPA concluded that altering the parameters and inputs that EPA identified for potential adjustment would make no material change to the conclusion that $SO_2$ concentrations in Rusk/Panola Counties violated the $SO_2$

---

[5] Sierra Club's 2019 modeling submitted in response to the Proposed Error Correction showed that the use of flagpole receptors resulted in a change in modeled value of even less for Rusk/Panola Counties, only 0.05 percent. R.470 at 15; R.472 Enclosure 2 at 15; R.473 Enclosure 2 at 15.

NAAQS.  R.434 at 75-77.  *See also* R.472 (describing EPA's 2016 analysis).  In doing so, EPA thoroughly considered the aspects of Sierra Club's modeling that Petitioners asserted were inadequate, detailing why such criticisms were misplaced and how Sierra Club's modeling likely underestimated concentrations and was adequate to demonstrate that the $SO_2$ concentrations in Rusk/Panola Counties were not meeting the $SO_2$ NAAQS.  R.434 at 75-77; R.438 at 29-33, 40-46.  Ultimately, EPA found Sierra Club's modeling sound and generally "in accordance with the best practices outlined in the Modeling TAD," which was not the case with Luminant's modeling.  R.434 at 61; R.438 at 36.  It is not surprising then that in proposing to install the monitor eventually placed 2.2 km from the Martin Lake Station, Texas relied on Sierra Club's 2016 modeling to assess optimum monitor location.  R.472 Enclosure at 16; R.473 Enclosure at 18.[6]

---

[6] Petitioners also argue that the modeling EPA relied on was not tested against the actual monitoring values shown at the Longview monitor.  Pet. Br. p. 11.  Because modeling averages concentrations over grid cells, "EPA does not expect comparisons between model predictions and monitor observations to exactly match."  *BCCA Appeal Group*, 355 F.3d at 832 (upholding EPA's reliance on Texas' modeling even though it did not match up with monitoring).  *See also EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 135 (D.C. Cir. 2015) (Kavanaugh, J.) ("We will not invalidate EPA's predictions solely because there might be discrepancies between those predictions and the real world.").

In addition to the 2016 analysis outlined above, in 2021 EPA performed separate technical analyses of Sierra Club's modeling, both the 2016 modeling that formed the basis for the Final Designation and new (2019) modeling of 2013-2015 actual emissions submitted in response to the Proposed Error Correction. R.470, 472, 473. EPA found, *inter alia*:

(1) "Sierra Club's September 2019 modeling, as it addresses air quality that existed at the time of the 2016 designations, further confirms our analysis of then-available data and the final December 13, 2016, nonattainment designations…." R.473 Enclosure 1 at 20;

(2) "[M]odeling of the area around the Martin Lake Power Plant corroborates that the EPA's reliance on the Sierra Club's March 2016 modeling in the Round 2 Supplement was appropriate … [and] further confirms that the cumulative technical aspects and identified limitations with Sierra Club's March 2016 modeling that the EPA identified in the Proposed Error Correction were not merited." R.473 Enclosure 2 at 22; and

(3) The "2019 modeling demonstrates that the March 2016 modeling underestimated the maximum modeled [$SO_2$] design concentrations and that more refined inputs addressing the identified limitations resulted in higher modeled

concentrations," which the EPA's technical evaluation accurately indicated in the Final Designations. *Id.* at 1, 9-10, 22.

Petitioners deride Sierra Club's updated 2019 modeling by declaring that "ironically" its update "utilize[d] modeling inputs from Luminant's March 2016 modeling analysis." Pet. Br. at 17. Petitioners have a strange sense of irony. The entire Reconsideration/Proposed Error Correction exercise was to analyze the concerns raised by Petitioners. Sierra Club did that by accepting Petitioners' alternative inputs (e.g. stack velocity and temperature unadjusted by pre-processors) and using them in the version of AERMOD approved for regulatory purposes. *See, e.g.*, *id.* at 9, and n.28. The results showed that even using Luminant's alternative inputs did not alter the conclusion that Rusk/Panola Counties violated the $SO_2$ NAAQS. *See, e.g.*, R.473 Enclosure 2 at 13-17, 22. This approach permissibly reassessed the issues raised by Petitioners. *Catawba Cty.*, 571 F.3d at 45 ("EPA dealt with newly acquired evidence in a reasonable fashion by explaining why it would not have changed the challenged designations.").

Alternatively, Petitioners seek to avoid the results of the reconsideration process that they themselves requested, by asserting that the Final Designation

must be judged on the record before the Agency at the time.  EPA performed the

thorough analysis required of a reconsideration process and in this case it served to

"illuminate [] the reasons that are [already] implicit in the original decision," which

is perfectly permissible, particularly as part of a requested reconsideration.  *Rhea*

*Lana, Inc. v. United States Dep't of Labor.*, 925 F.3d 521, 524 (D.C. Cir. 2019).  If

EPA had concluded the opposite, Petitioners certainly would not argue that EPA's

findings could not be used as a basis to reverse its 2016 determination.  In any

event, Petitioners may not avoid the results of the reconsideration process they

explicitly requested, as they are challenging those results (set forth the

Reconsideration Denials and Error Correction Withdrawal) in this proceeding.

This case is ultimately about the validity of the modeling EPA relied upon in

formulating its 2016 nonattainment designation, and the Reconsideration Denials

contains EPA's methodical analysis of every one of Petitioners' criticisms of the

2016 modeling and EPA's Final Designation, providing technical explanations on

each point. R.472 Enclosure 2 at 1-22; R.473 Enclosure 2 at 1-22.

　　At bottom, Petitioners rely primarily on the mere fact that EPA issued a

Proposed Error Correction.  But that document is no different than other proposed

regulations; sometimes proposed changes are adopted and sometimes, based on

comments received and additional analysis, they are rejected. It is well settled that proposed rules have no legal effect unless adopted. *Howard Hughes Co., LLC v. CIR*, 805 F.3d 175, 185 (5th Cir. 2015). And even if the Proposed Error Correction *was* seen as something more than a proposed rule, "nothing in the Administrative Procedure Act prohibits an agency from changing its mind." *Am. Petroleum Inst. v. EPA*, 661 F.2d 340, 355 (5th Cir. 1981). EPA must explain its change of view, which it did here in detailed technical documents. R.469, 470, 471, 472, 473.

In assessing whether an agency's determination is arbitrary and capricious, the Court is governed by "a narrow and highly deferential standard." *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010). A court may not "substitute [its] judgment for that of the agency," *Clean Water Action v. EPA*, 936 F.3d 308, 316 (5th Cir. 2019), and instead "simply ensures that the agency has acted within a zone of reasonableness." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

Such review is at its "most deferential" where, as here, the agency's decision is "based upon its evaluation of complex scientific data within its technical expertise." *BCCA Appeal Grp*, 355 F.3d at 824. *See also Texas v. EPA*, 983 F.3d

at 841. In such situations, "EPA's decision 'is entitled to a presumption of regularity.'" *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 934 (5th Cir 1998). *See also Medina Cnty. Envl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010).

This level of deference applies specifically to EPA's designations under the NAAQS program. *Texas v. EPA*, 983 F.3d at 841; *ATK Launch Sys., Inc. v. EPA*, 669 F.3d 330, 336 (D.C. Cir. 2012); *Catawba Cty.*, 571 F.3d at 41. Even more specifically, such deference is to be applied in EPA's analysis of air dispersion modeling and selection of the best modeling. *Sierra Club v. EPA*, 939 F.3d 649, 653 (5th Cir. 2019) ("We afford 'significant deference' to agency decisions involving analysis of scientific data within the agency's technical expertise. The EPA's selection of a model to measure air pollution levels is precisely that type of decision."); *Miss. Comm'n*, 790 F.3d at 168 ("extreme" deference given to EPA consideration of air quality modeling); *Galveston-Houston Ass'n for Smog Prevention v. EPA*, 289 Fed. App'x. 745, 749 (5th Cir. 2008) ("This court has previously acknowledged that photochemical grid modeling is a complex scientific determination … [and t]here is a presumption of regularity to the EPA's choice of

analytical methodology, so challenging parties must overcome a 'considerable burden.'").

Under this extraordinary level of deference, the question for this Court is "whether the EPA's projections [of $SO_2$ concentrations] represent arbitrary or capricious exercises of its authority, not whether they are accurate." *BCCA Appeal Grp*, 355 F.3d at 832. Here, the evidence before EPA was that: (a) the Martin Lake Station was emitting enormous amounts of $SO_2$; (b) modeling using the approved AERMOD model demonstrated $SO_2$ concentrations in Rusk/Panola Counties over 14% above the 75 ppb NAAQS; (c) there was no monitoring data or other modeling that cast meaningful doubt on this demonstration; (d) to the extent different parameters could be applied, it would not alter the designation of nonattainment; (e) EPA further analyzed Petitioners' concerns and considered additional data and modeling in reassessing its own determination; (f) EPA utilized its expertise in analyzing the technical data; and (g) EPA set out its analysis and findings in considerable detail. R.433, 434, 438, 469, 470, 471, 472, 473. While Petitioners may disagree with EPA's conclusions, that does not make EPA's ultimate designation of Rusk/Panola Counties arbitrary and capricious.

48

**D.    EPA's Reliance on Sierra Club's Modeling is Wholly Consistent with the Clean Air Act**

Ignoring the multiple bases that EPA determined made Luminant's modeling unreliable for assessing then-current air quality, Petitioners argue that the unclassifiable designation *must* be applied any time EPA is presented with conflicting information as to whether an area is meeting the NAAQS. Pet. Br. at 33-35. According to Petitioners, EPA must throw up its hands and designate the area unclassifiable because the very source of the high $SO_2$ concentrations (Luminant) has submitted alternative modeling, however unreliable that modeling might be.

Petitioners misread the statute. It does not prohibit EPA from making judgments based on EPA's technical assessment of the information presented, it does the opposite; it requires EPA to do just that. As Petitioners admit, the unclassifiable designation is reserved for those areas that "cannot be classified due to a lack of clear information." Pet. Br. at 3. EPA had a wealth of information from which to make its judgment, and the statute permits EPA's evaluation of the relative soundness of the information presented. Contrary to Petitioners' claim (Pet. Br. at 46), EPA did not believe that it was compelled to select one modeling approach over another simply because it did not have discretion to await future

49

monitoring data.  Instead, EPA reasonably interpreted the statute to not allow EPA to ignore available information about current air quality that EPA found was adequately representative and established nonattainment.

EPA is tasked with making designations so as to protect public health, by identifying areas that violate the NAAQS so that actions can be taken to achieve attainment.  The unclassifiable designation – which triggers no requirement for a State to take action to address $SO_2$ pollution and its effects on its citizens – is not an escape valve triggered by presenting "conflicting information," especially when that data is demonstrably inferior to the data EPA relies upon for its designation. R.438 at 42.

Citing no statutory or regulatory basis to support its position, Petitioners fall back on two words in a non-binding guidance document.  Petitioners report that EPA explained that "in the absence of information *clearly demonstrating* a designation of 'attainment' or 'nonattainment,' the EPA intends to designate the area as 'unclassifiable'[FN]."  Pet. Br. at 25 citing R.30 at 5 (emphasis added by Petitioners).  Petitioners argue that the words "clearly demonstrating" establish a new, more stringent standard that EPA must apply before an area may be designated nonattainment (or attainment).

First, EPA *did* find that a "clearly demonstrated" standard was met, reciting its findings in direct response to a claim that "the modeling [relied upon by EPA] does not 'clearly demonstrate' nonattainment." R.438 at 21, 40.

Second, Petitioners omit the footnote that is included after the word "unclassifiable" in the sentence they rely upon. That footnote reads: "The EPA expects to reserve the category 'unclassifiable' for areas where the EPA cannot determine based on available information whether the area is meeting or not meeting the NAAQS." R.30 at 5, n.7. *See also id*. at Attachment 2 at 1, n.1. This footnote makes clear that the unclassifiable designation is reserved for areas where, after consideration of all the data and information, "conflicting" or not, EPA is unable to assess whether a given area is or is not meeting the NAAQS.

Third, the phrase "clearly demonstrated" does not alter or heighten EPA's standard for assessing attainment, as it comes from a guidance document. As EPA explained, "the guidance contained herein is not binding on the states, tribes, the public or the EPA." R.30 at 6. Courts have regularly rejected arguments that violations of statutory or regulatory requirements occur when there is less than literal adherence to guidance documents covering NAAQS implementation. *Miss. Comm'n,* 790 F.3d at 161; *Catawba Cnty.*, 571 F.3d at 33-34.

51

Petitioners' hyperbolic declaration that EPA's comprehensive approach to considering and weighing the available data "completely read[s] out of the statute the 'unclassifiable' category and renders it meaningless," Pet. Br. at 26, 33-35, is facially inaccurate. The very rulemaking at issue covered four Texas Areas and EPA designated one of them, Milam County, as unclassifiable. It did so because it received no modeling, no monitoring, and no other data regarding $SO_2$ concentrations in that county. R.438 at 18.

When an agency determines what is required under a statute, "[a] court must uphold the [agency's] judgment as long as it is a permissible construction of the statute…." *Sebelius* v. *Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 158 (2013) (citation omitted). *See also Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009). "Our 'broad deference is all the more warranted when, as here, the regulation [being challenged] concerns 'a complex and highly technical regulatory program.'" *St. Luke's Hosp. v. Sebelius*, 611 F.3d 900, 9005 (D.C. Cir. 2010). Thus, "Federal courts accord 'great deference' to the EPA's construction of the Clean Air Act." *BCCA Appeal Group*, 355 F.3d at 825.

Section 7407(d) directs EPA to designate an area as unclassifiable only if, on "the basis of available information," the area "cannot be classified … as meeting or

not meeting the [NAAQS]." 42 U.S.C. §7407(d)(1)(A)(iii). EPA reasonably

interpreted this provision not to apply the unclassifiable designation as a default,

but rather to be applied only where, after exercising due diligence in analyzing all

"available information," EPA cannot classify an area as meeting or not meeting the

NAAQS. Petitioners cite no statutory language, no legislative history, and no

cases that shed any doubt on EPA's interpretation. Given the deference to be

accorded EPA, and the effect on the Designated Area (and on polluted areas

throughout the country) if Petitioners' simplistic interpretation were applied, the

Final Designation should be upheld.

## II. EPA'S DESIGNATIONS IN SEVERAL OTHER COUNTIES AROUND THE COUNTRY HAVE NO BEARING ON WHETHER THE DESIGNATION FOR RUSK/PANOLA COUNTIES IS CONSISTENT WITH THE CLEAN AIR ACT

Petitioners carry their argument that mere conflicting modeling *requires* an

unclassifiable designation to an extreme when pointing to designations made in a

few other counties throughout the United States. Petitioners state that when faced

with "conflicting" modeling in counties in Ohio, Nebraska, and Arkansas, EPA

designated the areas unclassifiable. Pet. Br. at 35-46. Asserting that EPA treated

Rusk/Panola Counties differently than these other areas, Petitioners contend that

the nonattainment designation for Rusk/Panola Counties must be vacated, not on

the basis of similarity of specific facts in each case, but on the basis that there is "conflicting" modeling.

## A.    Petitioners' Argument is Barred as it Was Not Properly Submitted to EPA for Consideration During the Administrative Process

While Petitioners devote eleven pages of their brief to this argument, they devoted little more than a footnote to it in their comments, and even then with no detail or discussion.  R.328 at 47, n.172.  *See also id*. at 25, n.96.  What makes Petitioners' new-found reliance on this argument here particularly troubling is that they attempt to use their failure to raise specific claims to their advantage, relying on materials that are outside the administrative record while disparaging EPA for not including those materials in the record.  *See, e.g.*, Pet. Br. at 39, n.23, 48, n.25, citing extra-record materials.

Even when, as here, it is not expressly required by statute, arguments not raised before the agency during the administrative process may not be the subject of appellate review ("issue exhaustion" doctrine).  *Sims v. Apfel*, 530 U.S. 103, 112 (2002) (O'Connor, J., concurring) ("In most cases, an issue not presented to an administrative decisionmaker cannot be argued for the first time in federal court. On this underlying principle of administrative law, the Court is unanimous.");

*Palm Valley Health Care, Inc. v. Azar*, 947 F.3d 321, 327 (5ᵗʰ Cir. 2020);

*Louisiana Env't Action Network v. EPA*, 382 F.3d 575, 584 (5ᵗʰ Cir. 2004);  *BCCA*

*Appeal Group*, 355 F.3d at 828; *S. Coast Air Quality Mgmt. Dist.*, 472 F.3d 882,

891-92 (D.C. Cir. 2006); *Masias v. EPA*, 906 F.3d 1069, 1075 (D.C. Cir. 2018)

(dismissing claims challenging $SO_2$ NAAQS designations because they were not

raised with specificity before EPA).

Under this doctrine, "[o]bjections must be prominent and clear enough to

place the agency 'on notice,' for EPA is not required 'to cull through all the letters

it receives and answer all the possible implied arguments.'" *Nat'l Ass'n of Clean*

*Air Agencies v. EPA*, 489 F.3d 1221, 1231 (D.C. Cir. 2007), quoting *Mossville*

*Envtl. Action Now v. EPA*, 370 F.3d 1232, 1240 (D.C. Cir. 2004).  Petitioners

never argued in its comments that EPA is required to designate all counties with

"conflicting" modeling as unclassifiable, and it should not be permitted to do so

here.

**B.    EPA Did Not Treat Like Situations Differently**

Even if the Court considers Petitioners' argument, EPA's unclassifiable

designation of three counties in other states provides no basis to vacate the

Rusk/Panola Designation. Petitioners' overly-simplistic view ignores the manner in which designations are determined.

EPA's Final Designation and the designations for those other counties used the same multiple-factor weight-of-the-evidence test, analyzing each factor for the respective areas. 81 Fed. Reg. at 89873/1 (R.433). Courts "have repeatedly upheld [EPA's] multi-factor contribution analysis as consistent with the Act's designation process under [42 U.S.C. §7407]." *Miss. Comm'n*, 790 F.3d at 159. *See also Catawba Cty.*, 571 F.3d at 39; *Masias v. EPA*, 906 F.3d at 1080.

Here, EPA applied the multi-factor analysis by considering all available information to determine whether the area was meeting the NAAQS. In making that determination, EPA considered available information regarding: (a) the specific level of emissions from the Martin Lake Station; (b) the nature and structure of that specific facility; (c) its location in relation to populated areas; (d) the terrain, including elevation data; (e) the winds and meteorological conditions in the immediate area, as gathered hourly from specific meteorological stations; (f) background concentrations of $SO_2$ in the area (in this case a very low concentration of 2 ppb was used); and (f) the urban or rural nature of the area. R.434 at 50-71. *C.f.* 80 Fed. Reg. at 51,057/3 (explaining that these and other factors, like specific

sulfur content, "influence the observed $SO_2$ concentrations around emissions sources.").

Comparisons with conclusions reached in other counties, as Petitioners put forth, ignore that EPA applies a "holistic, multi-factor, totality of the circumstances test for making NAAQS determinations." *Miss. Comm'n v. EPA*, 790 F.3d at 169. Indeed, "we have twice iterated that, when using the multi-factor test, 'discrete data points' are *not* determinative because isolating any one discrete consideration ignores the very nature of the ... test, which is designed to analyze a wide variety of data on a case-by-case basis." *Id.* (emphasis in original, citations omitted). *See also Masias v. EPA*, 906 F.3d at 1080; *ATK Launch Sys.*, 669 F.3d at 336; *Catawba Cty.*, 571 F.3d at 46; *Texas v. EPA*, 983 F.3d at 840 ("A multifactor analysis [for NAAQS area designations] will necessarily lead to different counties receiving different designations based on their individual circumstances.").

Petitioners' comparison of conclusions reached in other counties ignores not only the specific data differences between them, but also the differing context in each case, such as the inputs to such modeling. "Given 'significant' differences among counties, 'a direct one-to-one comparison of the data,'…could be 'inappropriate' or even 'illogical.'" *Miss. Comm'n v. EPA*, 790 F.3d at 169

57

(rejecting Texas's attempt to compare NAAQS modeling from another county).

*See also id.* at 171:

> The dispositive principle that the Texas Petitioners try to, but
> ultimately cannot, avoid is that under the EPA's holistic analysis,
> "discrete data points" like the data from HYSPLIT modeling "are not
> determinative, because elevating them ignore[s] the very nature of the
> [holistic] test, which is designed to analyze a wide variety of data on a
> case-by-case basis." [citation omitted].

EPA performed a detailed analysis of each of the weight-of-the-evidence

factors in analyzing the $SO_2$ concentrations within Rusk/Panola Counties, as EPA

did for the other identified counties, and "EPA reached different conclusions for

different areas based on the available evidence for each area after evaluating the

information." R.438 at 36. *See also* R.434 at 55-77 (setting out the detailed

multi-factor analysis over 22 pages). Petitioners omit any comparison of this

analysis to those conducted in the other identified counties. They cite nothing in

the records relating to factors considered in those counties -- neither the nature nor

levels of emissions from specific utilities, the meteorology, the wind direction, the

topography, nor other factors in those counties. Differences in these factors are

what "make a direct one-to-one comparison of the data underlying the analyses

[for different counties] inappropriate." *Miss. Comm'n*, 790 F.3d at 170. Thus,

contrary to Petitioners' claim, EPA did not concede disparate treatment of like

areas; EPA's statement cited by Petitioners (Pet. Br. at 16-17, 36-37) explained that more than the presence of conflicting information is needed for the unclassifiable designation to be appropriate, as it depends on the specific facts of the area.  84 Fed. Reg. at 43,762/1.

Petitioners' effort to vacate the Final Designation for Rusk/Panola Counties based on application of the statute in other areas around the United States in fact conflicts with Petitioners' position in *this case*, which the Motions Panel adopted. In arguing that venue in this case is proper only in this Court, Petitioners explained that "'[t]he designations are based on the *weight of evidence for each area*, including available air quality monitoring data and air quality modeling,' an inquiry Petitioners maintain *is highly fact specific and particularized*." *Texas v. EPA*, 706 F. App'x. 159, 165 (5th Cir. 2017) (emphasis added), quoting Petitioners' brief, Doc. 00513952278 at 12-13, 17-18 (further describing the Final Designation as an "intensely factual determination" that applies only to the four Texas Areas that are the subject of the Designation and that "these determinations are all related to the particularities of the emissions sources in Texas.").  Having won its venue motion on this basis, Petitioners may not now reverse course and argue that, in fact, all areas with "conflicting" modeling must be lumped together

into one national category of "unclassifiable," or that these designations are not, in fact, "highly fact specific and particularized."

In any event, Petitioners' attempt to compare designations of other counties with Rusk/Panola Counties fails based on a simple examination of the facts. In Gallia County, Ohio, which contains the Gavin facility, EPA found the State had improperly reduced background concentrations, making the modeling unreliable for showing NAAQS attainment. Pet. Br. at 37-38; R.405 (Ohio final TSD) at 17-19. EPA then found monitoring systems were apparently down for extensive periods at the Gavin facility and that Ohio had addressed this issue in a more refined approach to emissions estimates during those periods than Sierra Club's modeling (almost 4,000 tons/year lower than Sierra Club's). R.405 at 14-15, 19-20. Specifically, Sierra Club's modeling included emissions substitutions for zero or blank values (2,655 data points). R.405 at 19-20. Given the refined information Ohio provided and the large amount of monitoring system downtime at issue, EPA was concerned that Sierra Club's modeling overestimated actual emissions. R.405 at 20-21. EPA found that this concern coupled with the potential impact of a higher background concentration than was representative for most hours made Sierra Club's modeling likely to over-predict $SO_2$ concentrations. R.405 at 14-20.

Thus, in that case, EPA lacked enough reliable data from any source to make a designation of either attainment or nonattainment. *Id*. at 20-21.

Here, in contrast: (a) EPA determined that Sierra Club used emissions data that substantially matched the most recent calendar years (2013-2015) of EPA's Clean Air Market's Division actual emissions data; (b) neither Petitioner raised any concern with extended periods of emissions monitoring system downtime at Martin Lake or emissions substitutions used in modeling; and (c) Sierra Club did not use higher than representative background concentrations. R.434 at 62-65. Furthermore, EPA found Sierra Club's inputs in this case, and hence modeling results, to be conservative (under-predicting) with regard to $SO_2$ concentrations, finding, for instance, that because Sierra Club's modeling of background $SO_2$ was based on the lowest monitor in Texas, the concentration values for Rusk/Panola Counties would increase if more representative monitoring data were used. R.434 at 75.

Petitioners next cite Lancaster County, Nebraska. Sierra Club's modeling there used a background monitor value of 33.9 ppb (45% of the NAAQS) from an area with two large $SO_2$ sources that EPA determined was an inappropriate background value for Lancaster County and would make a significant difference in

61

determining whether the area was meeting the NAAQS. R.152 at 48-51 (Nebraska initial TSD); R.392 (Nebraska final TSD) at 12-24. Such was not present in Rusk/Panola Counties, where EPA instead found Sierra Club's inputs, including the background concentration of 2 ppb, and hence modeling results, to be conservative in predicting $SO_2$ concentrations. R.434 at 75.

Finally, in Independence County, Arkansas, both Sierra Club's modeling and Industry's modeling included emissions from the Future Fuels facility, a source 12 km away from Independence Electric Station, using annual $SO_2$ emissions averaged evenly throughout the year for Future Fuels. R.138 (Arkansas initial TSD) at 35; R.410 at 5-8 (Arkansas final TSD). EPA was concerned that this approach, rather than a comprehensive emission profile using actual variable emissions that would result from the use of coal with variable sulfur content at that facility, led to uncertainty about the accuracy of the location and timing of the modeled violations. R.138 at 35-36; R.410 5-8. Given this, as well as other differences and potential inconsistencies with the Modeling TAD, EPA concluded that the extent and temporal pattern of potential NAAQS violations around the Future Fuels facility had not been adequately characterized and so it was unclear if the area around Independence Station had violations or was contributing to

violations nearby. *Id.* Again, none of those infirmities about emissions inputs that fundamentally called into question whether Independence County, Arkansas should be designated nonattainment were present in Sierra Club's modeling of Rusk/Panola Counties, which used emissions data that matched the most recent calendar years (2013-2015) of EPA's Clean Air Market's Division actual emissions data. R.434 at 62.

Comparing the records for the designations for the three identified counties proves two things: (a) EPA scrutinizes modeling from Sierra Club the same as it scrutinizes all modeling, and rejects it where it is not adequately representative; and (b) EPA assessed each county based on the very specific circumstances locally present. So long as EPA describes a "rational connection between the facts found and the choice made," its conclusion is to be upheld. *Coastal Conservation Ass'n v. Dep't of Commerce*, 846 F.3d 99, 111 (5th Cir. 2017). As outlined above and in its detailed technical documents cited herein, EPA did exactly that for Rusk/Panola Counties.

## **CONCLUSION**

For the foregoing reasons, all Petitions for Review should be denied. Respectfully submitted,

February 23, 2022

OF COUNSEL:

ANDREA CARILLO
MIKE THRIFT
AARON VARGAS
U.S. Environmental Protection Agency
Office of General Counsel
William Jefferson Clinton Building
1200 Pennsylvania Ave., NW
Mail Code 2344A
Washington, D.C. 20460

TODD KIM
Assistant Attorney General

*/s/ Perry M. Rosen*
PERRY M. ROSEN
United States Department of Justice
Environment & Natural Resources Div.
Environmental Defense Section
P.O. Box 7611
Washington D.C. 20044

*Counsel for Respondents*

## <u>CERTIFICATE OF COMPLIANCE WITH FILING REQUIREMENTS</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32 (a)(7)(B) and the Order of this Court because this brief contains 12,928 words, excluding the parts of the brief exempt under Fed. R. App. P. 32 (a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typeface style requirements of Fed. R. App. P. 32(a)(6) because the brief was prepared in proportionally spaced typeface using Microsoft Word 14 point Times New Roman type. As such, this brief also complies with Fifth Circuit Rule 32.

It is hereby certified that: (a) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (b) the electronic submission is an exact copy of the paper version, as required under Fifth Circuit rule 25.2.1; and (c) the document has been scanned by software maintained by the Department of Justice and is free from viruses.

So certified this 23rd day of February, 2022 by

/s/ *Perry M. Rosen*
Perry M. Rosen
Counsel for Respondents

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Brief of Respondents was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of said filing to the attorneys of record for Petitioners and all other parties, who have registered with the Court's CM/ECF system.

Date: February 23, 2022        /s/ *Perry M. Rosen*
                                      Perry M. Rosen
                                      Counsel for Respondents