# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

## Case No. 17-60088

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL
QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; BIG
BROWN POWER COMPANY, L.L.C.; SANDOW POWER COMPANY,
L.L.C.; LUMINANT MINING COMPANY, L.L.C.,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
MICHAEL S. REGAN, in his Official Capacity as Administrator of the
United States Environmental Protection Agency,

*Respondents.*

## Consolidated with Case No. 21-60673

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL
QUALITY; LUMINANT GENERATION COMPANY, L.L.C.;
LUMINANT MINING COMPANY, L.L.C.,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
MICHAEL S. REGAN, Administrator,
United States Environmental Protection Agency,

*Respondents.*

Petition for Review of Final Administrative Action
of the United States Environmental Protection Agency

## BRIEF OF RESPONDENT-INTERVENOR SIERRA CLUB

Lisa K. Perfetto
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(212) 845-7388
lperfetto@earthjustice.org

Joshua D. Smith
Sierra Club
2101 Webster Street
Oakland, CA 94612
(415) 977-5560 (phone)
(510) 208-3140 (facsimile)
joshua.smith@sierraclub.org

*Counsel for Sierra Club*

Filed: March 16, 2022

## CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. <u>Petitioners</u>: State of Texas, Texas Commission on Environmental Quality, Luminant Generation Company, L.L.C., Big Brown Power Company, L.L.C., Sandow Power Company, L.L.C., and Luminant Mining Company, LLC.

2. <u>Parent Companies of Petitioners</u>: Vistra Asset Company, L.L.C.; Vistra Corp.; Vistra Intermediate Company, L.L.C.; Vistra Operations Company, L.L.C.

3. <u>Counsel for Petitioners State of Texas and Texas Commission on Environmental Quality</u>: Ken Paxton, Attorney General of Texas; Brent Webster, First Assistant Attorney General of Texas; Grant Dorfman, Deputy First Assistant Attorney General; Shawn Cowles, Deputy Attorney General for Civil Litigation; Priscilla M. Hubenak, Chief, Environmental Protection Division; Linda B. Secord, Assistant Attorney General; John R. Hulme, Assistant Attorney General.

4. <u>Counsel for Petitioners Luminant Generation Company LLC and Luminant Mining Company LLC</u>: P. Stephen Gidiere III, C. Grady Moore III, and Julia B. Barber with Balch & Bingham, LLP; Stephanie Z. Moore, Daniel J. Kelly, and David W. Mitchell with Vistra Corp.

5. <u>Respondents</u>: United States Environmental Protection Agency; Michael S. Regan, Administrator, U.S.

Environmental Protection Agency; David Gray, Acting Regional Administrator, Region 6, U.S. Environmental Protection Agency.

6. <u>Counsel for Respondents United States Environmental Protection Agency and Michael S. Regan</u>: Andrea Carillo, Mike Thrift, and Aaron Vargas, U.S. Environmental Protection Agency, Office of General Counsel; Todd Kim, Assistant Attorney General; Perry M. Rosen, U.S. Department of Justice, Environment & Natural Resources Division.

7. <u>Intervenor</u>: Sierra Club is a non-profit organization that maintains an open membership invitation to organizations, businesses, individuals, and the public in general. Accordingly, Sierra Club consists of many individual members.

   Sierra Club does not have any parent companies, and no publicly-held company owns a 10% or greater interest in Sierra Club.

8. <u>Counsel for Intervenor</u>: Lisa Perfetto with Earthjustice; Joshua Smith with Sierra Club.

Respectfully submitted,

*/s/ Lisa K. Perfetto*
Lisa K. Perfetto
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(212) 845-7388
lperfetto@earthjustice.org

## STATEMENT REGARDING ORAL ARGUMENT

Respondent-Intervenor Sierra Club agrees with Respondents and Petitioners that oral argument is appropriate and would be helpful to the court.

## RECORD REFERENCES

Intervenors follow the convention of Petitioners and Respondents and use "R.####," using the last four digits (minus leading zeros) of the document as listed in the Certified Index to the administrative record. Doc. 00515931904, 00516043406.

## <u>GLOSSARY</u>

| | |
|---|---|
| **EPA** | Environmental Protection Agency |
| **NAAQS** | National Ambient Air Quality Standards |
| **SIP** | State Implementation Plan |
| **SO$_2$** | Sulfur dioxide |
| **TAD** | Technical Assistance Document |
| **TSD** | Technical Support Document |

v

# TABLE OF CONTENTS

STATEMENT OF ISSUES............................................................1

STATEMENT OF THE CASE ...............................................1

I.   THE NAAQS AND HUMAN HEALTH ..................................1

II.  COAL BURNING POWER PLANTS ARE THE PRIMARY
     SOURCE OF SO$_2$ POLLUTION ............................................2

III. IMPLEMENTATION OF THE SO$_2$ NAAQS..........................2

IV.  EPA'S NONATTAINMENT DESIGNATIONS ......................4

V.   PETITIONERS' CHALLENGES AND SUBSEQUENT EPA
     ACTION...............................................................................6

VI.  SIERRA CLUB'S STANDING ...............................................9

SUMMARY OF ARGUMENT .................................................10

ARGUMENT .........................................................................13

I.   ALL AVAILABLE INFORMATION CLEARLY
     DEMONSTRATED NONATTAINMENT.............................13

     A.  EPA Considered Available Monitoring Information...13

     B.  EPA Considered Luminant's Modeling Analysis, and
         Found It Flawed and "Not Acceptable." ......................16

     C.  EPA Found Sierra Club's Modeling Reliably
         Demonstrated Nonattainment....................................23

     D.  EPA Did Not Err In Declining to Defer to Texas's Vague
         Desire to Install a Monitor and Wait Three Years to
         Confirm Nonattainment. ...........................................28

II.  EPA TREATED LIKE CASES ALIKE. ................................34

     A.  EPA Applied the Same Multi-Factor Analysis in Each
         Area. ..........................................................................34

     B.  The Areas Identified In Petitioners' Brief Are
         Distinguishable. .........................................................35

CONCLUSION ........................................................................................ 40

# TABLE OF AUTHORITIES

## Cases

*Am. Iron and Steel Inst. v. EPA,*
   115 F.3d 979 (D.C. Cir. 1997) ........................................................... 20

*Bethlehem Steel Corp. v. EPA,*
   723 F.2d 1303 (7th Cir. 1983) ......................................................... 30

*Mississippi Comm'n on Env't Quality v. EPA,*
   790 F.3d 138 (D.C. Cir. 2015) ......................................................... 35

*Mont. Sulphur & Chem. Co. v. EPA,*
   666 F.3d 1174 (9th Cir. 2012) ........................................................... 5

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.
Ins. Co.,* 463 U.S. 29 (1983) ................................................................ 25

*Scofield v. Lewis,*
   251 F.2d 128 (5th Cir. 1958) ........................................................... 31

*Texas v. EPA,*
   983 F.3d 826 (5th Cir. 2020) ..................................... 17, 18, 22, 30, 35

*Texas Oil & Gas Ass'n v. EPA,*
   161 F.3d 923 (5th Cir. 1998) ........................................................... 20

*Texans United for a Safe Econ. Educ. Fund v. Crown Cent.
Petroleum Corp.,* 207 F.3d 789 (5th Cir. 2000) ................................... 9

*Town of Chester, N.Y. v. Laroe Estates, Inc.,*
   137 S.Ct. 1645 (2017) ......................................................................... 9

*Watkins Motor Lines, Inc. v. ICC,*
   641 F.2d 1183 (5th Cir. 1981) ......................................................... 13

## Statutes

42 U.S.C § 7407 ....................................1, 3, 4, 11, 13, 29, 30, 39

42 U.S.C. § 7409 ................................................................... 1, 9

42 U.S.C. § 7410 ............................................................................ 7

42 U.S.C. § 7502 ....................................................................... 4, 9

42 U.S.C. § 7503 ............................................................................ 4

42 U.S.C. § 7514 ............................................................................ 4

42 U.S.C. § 7514a .......................................................................... 4

42 U.S.C. § 7471 ............................................................................ 4

**Rules**

Federal Rule of Appellate Procedure 28 ...................................... 1

**Code of Federal Regulations**

40 C.F.R. § 50.17 ......................................................................... 31

40 C.F.R. § Pt. 51, App. W........................................................... 20

40 C.F.R. § 51.1203 ................................................................ 33, 34

**Federal Register**

75 Fed. Reg. 35,520 (June 22, 2010) ............................ 1, 2, 4, 14, 19, 29

80 Fed. Reg. 51,052 (Aug. 21, 2015)........................................... 31

81 Fed. Reg. 10,563 (Mar. 1, 2016) .............................................. 5

81 Fed. Reg. 89,870 (Dec. 13, 2016) ..................................... 6, 34

84 Fed. Reg. 43,757 (Aug. 22, 2019).................................... 7, 30

86 Fed. Reg. 34,141 (June 29, 2021) ............................................ 8

86 Fed. Reg. 34,187 (June 29, 2021) ............................................ 8

## STATEMENT OF ISSUES

Whether EPA reasonably designated portions of Rusk and Panola Counties, Texas as being in nonattainment under the Clean Air Act, 42 U.S.C. § 7407, when EPA considered all available information in determining that the area did not meet national air quality standards at the court-mandated deadline.

## STATEMENT OF THE CASE

Under Federal Rule of Appellate Procedure 28(i), Sierra Club adopts the United States' Jurisdictional Statement, Statement of the Case, and Standard of Review, EPA Br. at 1, 8-22, with the following additions:

## I.   THE NAAQS AND HUMAN HEALTH.

Exposure to sulfur dioxide ($SO_2$), even for just a few minutes, can have significant human health impacts, including the aggravation of asthma attacks, cardiovascular and respiratory failure, and premature death. 75 Fed. Reg. 35,520, 35,525-26 (June 22, 2010). Children and adults with asthma are particularly at risk. *Id.* To address these significant health threats, in 2010, EPA issued a one-hour $SO_2$ national standard "requisite to protect public health," 42 U.S.C. § 7409(b)(1). 75

1

Fed. Reg. at 35,521. In finalizing the revised standard, EPA estimated that implementation would prevent 2,300 to 5,900 premature deaths and 54,000 asthma attacks each year, *see* R.466 (Sept. 2019 Sierra Club Comments and Modeling) at 3, saving as much as $36 billion in avoided public health costs and lost productivity. *Id.*; 75 Fed. Reg. at 35,588.

## II.    COAL BURNING POWER PLANTS ARE THE PRIMARY SOURCE OF $SO_2$ POLLUTION.

Nearly all $SO_2$ pollution in the United States comes from a handful of very large coal-fired power plants. R.420 (Mar. 2016 Sierra Club Comments and Modeling) at 3. Historically, Martin Lake has been among the largest sources of $SO_2$ in the United States. R.466 at 4, n.8. That is not because it is the largest power plant, but because it lacks modern, cost-effective pollution controls commonly used throughout the industry. *Id.* at 4. A 2017 public health analysis showed that $SO_2$ emissions from Martin Lake alone contribute to premature death, asthma attacks, thousands of lost work and school days, and more than $1 billion in public health impacts and lost productivity *each year* across the central United States. R.466, Ex. 3 at 19 & App. Tbls.

## III.    IMPLEMENTATION OF THE $SO_2$ NAAQS.

EPA's promulgation of the revised SO$_2$ NAAQS triggered a statutory obligation for EPA to "designate" all areas of the country as being in nonattainment, attainment, or unclassifiable "as expeditiously as practicable, but in no case later than 2 years from the date of promulgation of the new or revised [NAAQS]." 42 U.S.C. § 7407(d)(1)(B).[1] As an initial step, states may submit initial designation recommendations, and then EPA may make any modifications it "deems necessary." *Id.* § 7407(c), (d)(B)(ii). EPA is then required, "on the basis of available information," to issue the designation that it deems appropriate for any area. *Id.* § 7407(d)(1)(A)(iii), (B)(ii).

Because EPA failed to issue timely final designations for most of the country, including the area surrounding Martin Lake, Sierra Club filed suit to compel the agency to fulfill its statutory duty. *Sierra Club v. McCarthy*, No. 3:13-cv-3953-SI (N.D. Cal. filed Aug. 26, 2013). The resulting consent decree required EPA, *inter alia*, to issue final

---

[1] A nonattainment area is "any area that does not meet" the NAAQS, 42 U.S.C. § 7407(d)(1)(A)(i); an attainment area is "any area . . . that meets" the standard, *id.* § 7407(d)(1)(A)(ii); and an unclassifiable area is "any area that cannot be classified on the basis of available information as meeting or not meeting the [NAAQS] for the pollutant." *Id.* § 7407(d)(1)(A)(iii).

designations for areas with the largest sources of $SO_2$, including the area around Martin Lake, by July 2, 2016. *See id.*, Consent Decree ¶ 3 (N.D. Cal. filed Mar. 2, 2015), ECF No. 163.

Under the Clean Air Act, EPA's designations govern the stringency of the state implementation plans ("SIPs") required from each state to ensure achievement of the NAAQS. *See* 42 U.S.C. § 7407(a). If an area is designated "nonattainment," the state must submit a SIP that requires existing sources to adopt all "reasonably available control measures" and technologies to ensure attainment of the NAAQS as "expeditiously as practicable." 42 U.S.C. §§ 7502, 7503, 7514-7514a. For areas that are designated unclassifiable or attainment, states are required only to prevent significant deterioration of air quality. *Id.* § 7471.

## IV.  EPA'S NONATTAINMENT DESIGNATIONS.

In issuing the 2010 NAAQS, consistent with past practice, EPA informed states and regulated entities that it planned to base its $SO_2$ area designations on all available data, including air dispersion modeling and representative air quality monitoring where available. 75 Fed. Reg. at 35,551; R.466, Ex. 6; R.472 (EPA Denial of TCEQ Petition),

Encl. 1 at 3-4; *Mont. Sulphur & Chem. Co. v. EPA*, 666 F.3d 1174, 1181-82 (9th Cir. 2012) (approving EPA's use of modeling to predict NAAQS compliance). In 2012, EPA encouraged states to promptly deploy monitors near the largest sources of $SO_2$, because determining attainment—whether with monitoring or modeling—would require three full years of actual emissions or monitoring data. R.466, Ex. 6 at 8. Nonetheless, Texas declined to install a monitor near Martin Lake.

In March 2016, in accordance with the court deadline, EPA proposed and invited public comment on air quality designations for those areas containing the largest sources of $SO_2$ pollution, including the area surrounding Martin Lake. 81 Fed. Reg. 10,563 (Mar. 1, 2016). Because Texas still had not installed an $SO_2$ monitor near Martin Lake, Sierra Club timely submitted extensive legal comments and multiple independent modeling reports—each using EPA's approved AERMOD modeling platform and the three most recent years of actual emissions and meteorological data available—demonstrating that $SO_2$ emissions from Martin Lake violated the NAAQS. *See, e.g.*, R.332 (Apr. 2016 Sierra Club Comments and Modeling); R.420; R.466; R.434 (Round 2 Supplement Final TSD) at 51-81.

On December 13, 2016, EPA designated the area around Martin Lake in Rusk and Panola Counties as being in "nonattainment"—*i.e.*, failing to meet the health-based 2010 $SO_2$ NAAQS. 81 Fed. Reg. 89,870 (Dec. 13, 2016). In doing so, EPA evaluated "all available data," including the modeling analyses submitted by both Sierra Club and the Luminant Petitioners. R.434 at 6. After careful review, EPA concluded that Sierra Club's modeling followed EPA guidance, used generally conservative assumptions, and reliably demonstrated nonattainment. *Id.* at 75. Conversely, EPA found Luminant's modeling unreliable because it assumed hypothetical reductions in plant emissions and utilized an unapproved alternate modeling protocol. *Id.* at 55-58. Because Texas still had not installed air quality monitors at Martin Lake, there was no relevant monitoring data to review at the time EPA issued the statutorily-required designations. R.438 (EPA Round 2 Supplement Response to Comments) at 17-18.

## V.   PETITIONERS' CHALLENGES AND SUBSEQUENT EPA ACTION.

On February 13, 2017, Texas and Luminant sought judicial review of EPA's nonattainment designations. *See* No. 17-60088. On March 23, 2017, the Court granted Sierra Club's motion to intervene. Doc.

6

00513923547. Also on February 13, 2017, Petitioner Luminant submitted a request for administrative reconsideration of the Martin Lake nonattainment designation. R.478 (Vistra Petition for Reconsideration).[2] On September 21, 2017, in response to that request, EPA announced it would conduct additional rulemaking to "revisit" the nonattainment designation. R.454 (EPA Response to Vistra Petition). Based on those developments, the Court granted EPA's request to hold Case No. 17-60088 in abeyance. Doc. 00514194243. In the interim, the Martin Lake nonattainment designation remained effective.

On August 22, 2019, EPA proposed an "Error Correction," which would have determined under 42 U.S.C. Section 7410(k)(6) that EPA erred in designating Martin Lake, and would have effectively redesignated the area as "unclassifiable." 84 Fed. Reg. 43,757 (Aug. 22, 2019). In response, Sierra Club submitted additional, updated modeling addressing each purported error in turn. Even adjusting the modeling inputs to address Petitioners' concerns, Sierra Club's 2019 modeling demonstrated that Martin Lake was (and is) violating the NAAQS.

---

[2] Texas submitted its own Petition for Reconsideration on December 11, 2017. R.452 (TCEQ Petition for Reconsideration).

Meanwhile, in November 2017, nearly a year after EPA's final nonattainment designation, Texas finally installed an air quality monitor at Martin Lake. By 2019, Texas's own monitoring data—the same data Petitioners insist EPA should have waited on—confirmed that Martin Lake was in fact violating the NAAQS. R.466 at 34-35; R.472, Encl. 1 at 16.

On June 29, 2021, EPA denied Petitioners' requests for reconsideration and withdrew the proposed Error Correction. 86 Fed. Reg. 34,141 (June 29, 2021); 86 Fed. Reg. 34,187 (June 29, 2021). In doing so, EPA concluded that Sierra Club's 2019 modeling addressed "all" purported "limitation[s] or uncertaint[ies]" and "confirm[ed]" that Martin Lake is violating the NAAQS. 86 Fed. Reg. at 34,188. EPA again concluded that Sierra Club's 2016 modeling followed applicable technical guidance, was reliable, and that the agency's 2016 nonattainment designations were correct. *Id.* at 34,189.

On August 25 and 26, 2021, Texas and Luminant, respectively, filed appeals challenging EPA's Reconsideration and Error Correction Denials. On September 28, 2021, the Court granted Sierra Club's motion to intervene in defense of those final actions.

8

## VI.   SIERRA CLUB'S STANDING.

An intervenor need not show Article III standing where, as here, they do not seek relief different than the relief sought by a party with standing. *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S.Ct. 1645, 1651 (2017).

Regardless, Sierra Club satisfies Article III's requirement. $SO_2$ pollution from Martin Lake exceeds the standards EPA has deemed "requisite to protect" public health. 42 U.S.C. § 7409(b)(1). As reflected in the declarations accompanying Sierra Club's Motions to Intervene,[3] that pollution injures Sierra Club members who live, recreate, work, and breathe the air around the plant. *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir. 2000). As a result of EPA's nonattainment designation, the Martin Lake plant must reduce $SO_2$ emissions "as expeditiously as practicable." 42 U.S.C. § 7502(c)(1). Thus, Sierra Club's members' injuries would be redressed, in part, by an order upholding the nonattainment designations.

---

[3] *See* Doc. 00516029780; Doc. 00513914702. Sierra Club's members' health, recreational, and aesthetic interests are germane to the organization's purposes. *Id*.

9

## SUMMARY OF ARGUMENT

Despite Petitioners' attempt to obfuscate, the analysis and outcome of this case should be straightforward. Luminant's Martin Lake plant is the largest emitter of $SO_2$ in the country. In 2016, when EPA issued the rule at issue, and still today, air quality around the plant did not, and does not, meet the $SO_2$ NAAQS. EPA was therefore compelled to designate the area as nonattainment.

Under the Clean Air Act and by court order, EPA was required, by 2016, to determine whether the area surrounding the Martin Lake (i.e., Rusk and Panola counties) "meets" the health-protective 2010 $SO_2$ standard. Although the standard had been effective for six years, Texas failed to install any nearby monitor to measure $SO_2$ levels. Consistent with the NAAQS and past practice, EPA sought modeling data conducted with EPA-approved technical methods. During the public comment period, EPA received modeling from both Luminant and Sierra Club. EPA determined Luminant's modeling was unreliable because it, *inter alia*, used unapproved modeling options that artificially lowered $SO_2$ concentrations, and impermissibly assumed hypothetical emission reductions. In contrast, EPA determined that Sierra Club's

modeling reliably demonstrated nonattainment because that modeling showed nonattainment using conservative assumptions that underestimated $SO_2$ concentrations. EPA looked at available monitoring, but determined that the closest monitor was too distant to be representative of localized $SO_2$ concentrations. Based on this record, EPA reasonably and necessarily designated portions of Rusk and Panola counties surrounding the plant as nonattainment. *See* 42 U.S.C. § 7407(d)(1)(A).

Texas and Luminant both petitioned for reconsideration. Leaving the nonattainment designation in place, EPA agreed to review its analysis and later solicited public comment. In response, Sierra Club submitted additional modeling and analysis addressing Petitioners' complaints about the 2016 modeling. After reconsidering all available information, EPA again determined that the modeling reliably demonstrated that air quality around Martin Lake did not meet the NAAQS, and confirmed the 2016 nonattainment determination.

Separately, seven years after issuance of the 2010 standard, Texas finally installed a $SO_2$ monitor near Martin Lake hoping it would show attainment. But Martin Lake's emissions had *doubled,* and Luminant's

11

hypothetical emissions reductions never materialized, and the monitor showed NAAQS violations *even worse* than what Sierra Club's modeling projected. Accordingly, EPA reasonably denied the petitions for reconsideration.

Petitioners claim EPA's decisions were arbitrary. Yet both in 2016 and 2021, EPA made the only decision it could have made based on the record before it: air quality around Martin Lake does not meet the NAAQS.

Although Petitioners claim EPA arbitrarily treated other similar areas differently, EPA conducted the same court-sanctioned, multi-factor analysis of site-specific information for each designation. And after carefully reviewing the multiple iterations of site-specific data at issue here, EPA concluded that Petitioners' adjustments to Sierra Club's modeling would not alter the nonattainment designation. Meanwhile, the site-specific modeling flaws in other states prevented EPA from making such a determination. EPA therefore appropriately designated the Martin Lake area as nonattainment and the three other areas as unclassifiable.

Nor could EPA have delayed its nonattainment finding to await three years of data from a yet-to-be-installed monitor, as Petitioners suggest. EPA was subject to a court-ordered obligation to designate the Martin Lake area by late 2016. To meet that deadline, EPA examined all available information and determined it reliably demonstrated that the area *did not* meet the NAAQS. Consequently, EPA had no authority to designate the area unclassifiable. *See* 42 U.S.C. § 7407(d)(1)(A).

ARGUMENT

## I. ALL AVAILABLE INFORMATION CLEARLY DEMONSTRATED NONATTAINMENT.

### A. EPA Considered Available Monitoring Information.

Contrary to Petitioners' argument, Pet. Br. at 27-29, EPA plainly considered available monitoring information from the Gregg County monitor before concluding it was too distant from Martin Lake to be of any use in determining attainment status near the plant. *Cf. Watkins Motor Lines, Inc. v. ICC*, 641 F.2d 1183, 1188 (5th Cir. 1981) ("If the agency considers the relevant factors and articulates a rational connection between the facts found and the choice made, the decision is not arbitrary or capricious." (citing *Bowman Transp., Inc. v. Arkansas Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).

13

Petitioners' argument revolves around the Longview monitor located 19 kilometers away and one county over from Martin Lake. Pet. Br. at 27; *see also* <u>75 Fed. Reg. at 35,523</u> ($SO_2$ is "localized" and "site-specific" to the source (quoting *Am. Lung Ass'n v. EPA*, <u>134 F.3d 388, 392</u> (D.C. Cir. 1998)). That so distant a monitor did not register violations has no bearing whatsoever on whether violations of the NAAQS were occurring close to the plant. As EPA explained, the Longview monitor in Gregg County was "not representative" of air quality at Martin Lake because it "is not located in an area expected to receive the highest impact of $SO_2$ emissions as it is approximately 19 km from Martin Lake." R.438 at 17-18, 20; *see also* R.144 (Texas Intended TSD) at 147. At most, the monitor is relevant to whether *Gregg County* attains the NAAQS. But EPA did not designate any portion of Gregg County as nonattainment, so there is no discrepancy between the distant monitor and EPA's nonattainment designation for the area around Martin Lake. *See* R.434 at 73-74; R.438 at 18.

Lacking any real argument that the monitor is relevant to assessing attainment in the vicinity of Martin Lake, Petitioners instead claim the monitor nevertheless should have been used to "validate or

14

refute" Sierra Club's modeling. Pet. Br. at 27. To buttress a bad
argument, Petitioners point to "one version" of Sierra Club's modeling
showing $SO_2$ concentrations in excess of monitored values. *Id.* at 28
(citing R.84 (Sept. 2015 Sierra Club Comments and Modeling), Att. 4 at
6 (Figure 1)). However, Petitioners reference Sierra Club's September
2015 modeling when EPA relied on Sierra Club's March 2016 modeling
in making its final nonattainment determination. R.434 at 74.

Worse still, Petitioners reference a depiction of allowable
emissions, which are not expected to match actual emissions and
therefore monitored concentrations. "Allowable" refers to the maximum
approved emissions under a plant's operating permit. *See* R.84, Att. 4 at
3. Sierra Club's 2015 modeling also assessed actual emissions, which is
the evaluation EPA relied on in determining its intended designation.
R.144 at 159-61. That assessment showed significant violations near
Martin Lake, but none in the vicinity of the Longview monitor:



*Figure 2 - Regional View of Impacts Based on Actual Emissions from All Sources for the 2012-14 Period*

R.84, Att. 4 at 7 (fig. 2).[4] Given the "localized" impacts of $SO_2$, <u>75 Fed. Reg. at 35,551</u>, and that the Martin Lake nonattainment area does *not* include Longview, there is no discrepancy between Sierra Club's modeling and the monitored concentrations at Longview. *See* R.434 at 73 (Figure 25, final nonattainment area excluding Longview).

### B.    EPA Considered Luminant's Modeling Analysis, and Found It Flawed and "Not Acceptable."

---

[4] The Longview monitor is located at the East Texas Regional Airport in the top left corner of the map.

Petitioners assert that EPA departed from its regulations by "refus[ing] to even consider" Luminant's "alternative" modeling analysis. Pet. Br. at 26, 29-30. That is simply untrue. The record makes clear that EPA carefully considered and reasonably concluded that Petitioners' modeling analysis was "not acceptable." R.434 at 56.

***First***, even if Petitioners had satisfied the regulatory requirements for using an alternative model (which, as discussed below, they did not), EPA correctly rejected Luminant's modeling for an independent reason: The modeling was predicated on an *unenforceable* and *hypothetical* 30-40% reduction in Martin Lake's $SO_2$ emissions, and was therefore "not acceptable" for determining whether the area currently meets the NAAQS. R.434 at 56; R.438 at 39-40 As this Court has made clear, "the designation process considers *only the present tense* . . . either a county does or does not meet the NAAQS." *Texas v. EPA*, 983 F.3d 826, 838 (5th Cir. 2020) (emphasis added). Thus, Luminant's modeling, which purported to show—based on "possible" and "non-enforceable" future pollution reductions—that Martin Lake might someday attain the NAAQS, is ultimately irrelevant in determining current attainment. R.434 at 55-56.

17

Given the uncertainty of Luminant's hypothetical, future pollution reductions, it was reasonable for EPA to reject the Company's modeling on that basis alone. As EPA explained in rejecting Luminant's modeling, without an "effective and presently enforceable limit . . . in place," there is no guarantee that Luminant's predicted pollution reductions will come to pass. R.438 at 39-40. And in fact, rather than reducing emissions by 30-40%, Martin Lake's emissions have *doubled*, and Martin Lake is now the largest emitter of $SO_2$ in the country. R.472 at 14-15; R.473 (EPA Denial of Vistra Petition) at 17-18. Because Luminant's alternative modeling analysis was "based not on fact, but on supposition," *Texas v. EPA*, 983 F.3d at 838, EPA reasonably concluded that it did not provide a reliable basis for determining attainment. R.438 at 39-40.

***Second***, Petitioners mischaracterize EPA's regulatory process for obtaining approval of an alternative modeling platform. It is not EPA's responsibility to satisfy the regulatory prerequisites for using an alternative model. Instead, "the *user*" of any alternative model "*must . . . follow procedures in section 3.2.2*" of Appendix W, including, among other requirements, consulting with EPA and vetting the performance

of any alternative "*before* it is selected for use." 40 C.F.R. pt. 51, App. W §§ 3.2.1a, 3.2.2b (emphases added). Consistent with those regulations, EPA made clear, as early as May 2013, the "necessity" of completing the Appendix W process and obtaining approval for any use of an alternative to AERMOD for modeling $SO_2$ impacts. R.438 at 4-5.

Here, Petitioners effectively concede that they had "not initiated or completed" that Appendix W process. Pet. Br. at 30. Instead, they plowed ahead (at their own risk) with an unapproved modeling approach that "had not been substantiated" or adequately supported, R.438 at 25, 37; R.434 at 57, and that resulted in "erratic and sizeable changes in modeled" $SO_2$ concentrations relative to EPA's preferred model. R.438 at 38. Consistent with its rejection of similar modeling alternatives submitted by Luminant's consultant, AECOM, in other states,[5] EPA reasonably concluded that Luminant's alternative

---

[5] *See, e.g.*, R.389 (EPA Round 2 Response to Comments) at 41 (Response to Comment document for Round 2 designations other than the four supplemental Texas designations; rejecting AECOM's alternative modeling for Marion County, Illinois, in part, because the modeling used the same unapproved modeling adjustments—*e.g.*, LOWWIND and AERMOIST—Luminant used here); *id.* at 71-74 (rejecting AECOM's similar alternative modeling adjustments for Anne Arundel and Baltimore Counties, Maryland).

modeling was "not acceptable," in part, because Luminant failed to comply with the necessary review process to obtain approval for any such alternative.

*Finally*, contrary to Petitioners' argument, Pet. Br. at 26, EPA carefully considered and rejected Luminant's hypothesis that EPA-approved AERMOD modeling "vastly overstated $SO_2$ concentrations." Pet. Br. at 26. In fact, EPA devoted nearly 20 pages of its Response to Comments and TSDs to providing a detailed, highly technical response to Luminant's arguments. *See* R.438 at 24-37, 48-49; R.434 at 55-58. In doing so, EPA acknowledged that there was some evidence to support Luminant's theory that AERMOD overestimated $SO_2$ concentrations during periods of low wind speeds and for certain hourly stack temperatures and exit velocities. R. 438 at 36-37. But an agency's choice to proceed with "imperfect" information is not arbitrary unless there is "simply no rational relationship" between the model chosen and the "reality it purports to represent." *Am. Iron and Steel Inst. v. EPA*, 115 F.3d 979, 1004-5 (D.C. Cir. 1997); *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 935 (5th Cir. 1998). Here, EPA reasonably concluded that Luminant failed to "substantiate[]" its unapproved modeling

20

adjustments (i.e., AERLIFT and AERMOIST), especially given the resulting "erratic" and "drastic" changes in $SO_2$ concentrations relative to the approved AERMOD model. R.438 at 38, R.434 at 57. Luminant provided "no support" for applying its unapproved model adjustments, which significantly reduced modeled $SO_2$ concentrations during all operating conditions, even when wind speeds and temperatures would not have resulted in Luminant's "theorized" plume phenomena. R.434 at 55-56; R.438 at 24-39.

Conversely, EPA concluded that Sierra Club's modeling, which was conducted using EPA's approved AERMOD modeling platform, complied with EPA's modeling requirements, was "representative and reliable," and "accurately" demonstrated air quality around Martin Lake does not meet the NAAQS. R.438 at 33-34, 40; R.434 at 74-75.

EPA also carefully considered Luminant's "alternate" design value analysis, *id.* at 39, purportedly correcting AERMOD's overprediction phenomena by essentially applying an across-the-board, 50% reduction in modeled $SO_2$ concentrations to reduce Martin Lake's maximum impact from 312 μg/m$^3$ (nonattainment) to 156 μg/m$^3$ (attainment). R.438 at 27. EPA reasonably found, however, that Luminant's discount

21

factor was "not appropriate," *id.*, and "not well documented," R.434 at

55, in part, because (as with the proposed modeling adjustments)

Luminant applied its blanket 50% reduction even to periods of time

(e.g., temperatures, wind speeds, and meteorological conditions) where

Luminant's theorized overprediction phenomena would not be expected

to occur.[6]

   In sum, EPA carefully considered Luminant's alternative

modeling, and provided detailed, technical, and site-specific

explanations for concluding that the Company's modeling was "not

acceptable" for determining whether actual emissions from Martin Lake

are "currently meeting the NAAQS," R.434 at 55-56. Those factual and

technical findings are entitled to deference. *Texas v. EPA*, 983 F.3d 826,

838 (5th Cir. 2020) (This Court's "review is most deferential to the

EPA's fact findings, particularly where those findings relate to the

EPA's evaluation of scientific data for which the Agency possesses

---

[6] EPA's rejection of Luminant's across-the-board 50% reduction is
notably consistent with the agency's rejection of Ohio's similarly flat
38% reduction of background concentrations in Gallia County. R.405 at
17.

technical expertise." (quoting *Texas v. EPA*, <u>690 F.3d 670, 677</u> (5th Cir. 2012)).

### C.    EPA Found Sierra Club's Modeling Reliably Demonstrated Nonattainment.

Unlike Luminant's modeling, EPA found Sierra Club's 2016 modeling "was performed in accordance with appropriate EPA modeling guidance and us[ed] generally conservative assumptions." R.434 at 75; *see id.* at 63-64. EPA explained that the modeling was "deliberately conservative (in an under-estimating sense) and included several techniques which generally would tend to reduce/underestimate design value concentrations from the model." *Id* at 75. It omitted building downwash, which "will generally, though not always, increase the predicted maximum concentrations"; "did not include variable stack temperature," which would "also yield smaller [design values]"; "used a very low estimate of background $SO_2$ based on the lowest monitor in the State of Texas," such that a more representative background would increase concentrations; and excluded nearby emission sources, "which could potentially contribute to $SO_2$ concentrations in the modeled area." *Id.*

EPA considered comments from Luminant asserting defects in Sierra Club's modeling, but ultimately determined that altering Sierra Club's modeling in response would only increase concentrations even further above the nonattainment threshold. *Id.* at 76. Petitioners claim EPA's nonattainment decision was arbitrary because EPA "did not attempt to correct the [purported] errors" and "d[id]n't know" the *precise* concentrations that would result. Pet. Br. at 32. This completely ignores EPA's conclusion that the precise concentrations *did not matter* because "the net difference . . . would be an overall increase to the exceedance values." R.434 at 76. Since Sierra Club's modeling *already* demonstrated nonattainment, the effect of "fixing" the purported errors would simply be *greater* nonattainment.

In sum, EPA found Sierra Club's 2016 modeling reliably demonstrated nonattainment because it comported with EPA guidance and showed significant NAAQS violations despite including several factors tending to underestimate concentrations. *Id.* at 75-77. In designating Rusk & Panola Counties nonattainment on that basis, EPA "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the

facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

The subsequent Reconsideration and Error Correction process confirmed EPA's original findings. At Petitioners' behest, EPA again reviewed several purported errors in Sierra Club's 2016 modeling and sought public comment. Sierra Club submitted additional modeling, including yet another sensitivity analysis isolating the effect of each so-called error. *See* R.466, Ex. 1 at 12-13; *see also* R.438 at 44-46. EPA again reviewed each purported error and found that none of the refinements materially altered its 2016 nonattainment designation:

**Failure to use variable stack parameters**: After reviewing the new sensitivity modeling, EPA concluded that Sierra Club's use of estimated stack parameters in 2016 had led to a 40% reduction (underestimate) of the maximum modeled design concentration. R.470 (TSD for Withdrawal of Proposed Error Correction) at 13-14. This confirmed EPA's 2016 finding that Sierra Club's use of a constant stack temperature and exit velocity actually increased plume buoyancy, thereby yielding *lower* design values and confirming EPA's 2016

25

conclusion that the modeling was "deliberately conservative" in favor of Luminant. R.434 at 75.

**Failure to include building downwash:** In 2016, EPA found that including downwash would generally, but not always, increase concentrations, and regardless would not change EPA's designation given the extent of modeled exceedances. *Id.* at 61-62, 76. Based on the 2021 sensitivity modeling, EPA determined that downwash had had zero effect on the modeling results, thus confirming its 2016 assessment. R.470 at 14-15.

**Use of 1.5m flagpole receptor height:** Based on the new modeling, EPA determined that use of flagpole receptors 1.5m above the ground (where the average person breathes) increased concentrations by just 0.05%—thus confirming EPA's 2016 assessment that flagpole receptors made no material difference, given that modeled exceedances were at least 14% above the standard. R.470 at 15; R.434 at 58-59, 76.

**Use of older land surface data:** Again, based on the new modeling, EPA determined that use of older surface characteristics increased $SO_2$ concentrations by only 1%—compared to the 3.6% EPA predicted in 2016—meaning that "EPA actually overestimated the

26

decrease of the maximum modeled design concentration that may occur from using newer surface characteristics." R.470 at 16; R.434 at 76.

**Use of disputed receptor locations:** In 2016, Luminant objected to Sierra Club's use of receptors to measure $SO_2$ concentrations over the adjacent public lake, but receptor measurements over uncontested areas still showed nonattainment. *Id.* at 67. Regardless, the 2021 updated modeling confirmed multiple areas well above the NAAQS, even after omitting all contested receptors. R.470 at 16-17.

Finally, EPA found that four remaining so-called "errors"—Sierra Club's use of an older AERMOD version, representation of recent emissions, approach to background levels, and omission of additional source contributions—were either not actually applicable to the 2016 modeling or did not undermine the modeling. EPA found that the 2016 Sierra Club modeling *had* used the newest version of AERMOD and the most recent three years of actual emissions data, consistent with EPA guidance. *Id.* at 18. And EPA found that neither Sierra Club's use of a very low estimate of background $SO_2$, nor its omission of emissions from the nearby Pirkey plant could possibly affect the nonattainment finding since inclusion of a higher background or Pirkey emissions could only

27

serve to *increase*, not *decrease*, the degree of nonattainment. *Id*. at 20-21.

After rejecting each so-called error, EPA denied the petitions for reconsideration and withdrew the proposed "Error Correction," explaining "Sierra Club's September 2019 modeling, as it addresses air quality that existed at the time of the 2016 designations, *further confirms* our analysis of then-available data and the final December 13, 2016, nonattainment designations." R.472, Encl. 1 at 17 (emphasis added); *see also* R.473, Encl. 1 at 20; R.470 at 1.

Petitioners alternately argue that EPA's 2021 findings are an impermissible *post hoc* rationalization that cannot justify the 2016 decision. Pet. Br. at 33. But the 2016 nonattainment designation required no buttressing. And, in any event, Petitioners cannot evade the record on reconsideration when they are challenging those denials in this very proceeding.

### D. EPA Did Not Err In Declining to Defer to Texas's Vague Desire to Install a Monitor and Wait Three Years to Confirm Nonattainment.

Petitioners concede EPA had "statutory, regulatory, and judicial obligations" to determine, by 2016, whether the area around Martin

28

Lake "[meets]" the NAAQS. *Id.* at 47-48. They contend, however, that EPA could have satisfied that obligation by designating the area as unclassifiable, based on Texas's purported election under the Data Requirements Rule ("DRR") to install a monitor and wait another three years before "determ[ining] whether the area was in attainment or nonattainment." *Id.* at 23.[7] Petitioners are wrong.

The issuance of the 2010 $SO_2$ NAAQS triggered EPA's statutory obligation, within three years, to "designate[]" as nonattainment all areas of the country failing to comply with the standard. 42 U.S.C. § 7407(d)(1)(B). When EPA failed to meet that deadline, Sierra Club sued to compel the agency to act. The resulting federal court order required EPA to designate areas surrounding the nation's largest sources of $SO_2$ (including Martin Lake) by July 2, 2016. *Sierra Club v. McCarthy*, No.

---

[7] The $SO_2$ NAAQS is determined based on the three-year average of the annual 99th percentile of daily maximum one-hour average concentrations. 75 Fed. Reg. 35,520; 40 C.F.R. § 50.17(b). Thus, evaluation of attainment—whether by monitoring or modeling—requires three years of $SO_2$ actual emissions or monitoring data.

3:13-cv-3953-SI (N.D. Cal. Mar. 2, 2015 Order), ECF No. 163; *see* 84

Fed. Reg. at 43,760-61.[8]

Under the Clean Air Act, EPA is required to designate as

"nonattainment" any area that currently "does not meet . . . the

[NAAQS]." 42 U.S.C. § 7407(d)(1)(A)(i); *Texas v. EPA*, 983 F.3d at 838

("the designation process considers only the present tense").

Importantly, EPA may only designate as "unclassifiable" an area that

"cannot be classified *on the basis of available information* as meeting or

not meeting the [NAAQS]." 42 U.S.C. § 7407(d)(1)(A)(iii) (emphasis

added); *see also Bethlehem Steel Corp. v. EPA*, 723 F.2d 1303, 1307 (7th

Cir. 1983) ("[T]he only situation in which designation of an area as

unclassifiable would be proper" is "if [] data [does] not exist"). Thus,

EPA was required, by 2016, to designate air quality around Martin

Lake based on the information available *at that time*, including Sierra

Club modeling.  After carefully considering all relevant, available

information, EPA reasonably designated the area around Martin Lake

in nonattainment. As discussed in detail above, EPA found that Sierra

---

[8] The court extended EPA's deadline to issue the Martin Lake
designation until November 29, 2016. *Sierra Club v. McCarthy*, No.
3:13-cv-3953-SI (N.D. Cal. Oct. 28, 2016), ECF No. 180.

Club's modeling reliably demonstrated, based on Martin Lake's current emissions, that the area around the plant violated the NAAQS. EPA further determined that Luminant's contrary modeling was "not acceptable" for evaluating whether the area "meets" the NAAQS because the modeling was based on unenforceable, future emissions. In light of those findings, EPA had no authority to wait on Texas's vague intention to someday install a monitor and then wait three years to collect data that *might* alter EPA's carefully-considered nonattainment designation.

The DRR Rule did not, and could not, "modif[y] EPA's duty or discretion in making designations determinations based on available information." R.438 at 43; *see* 80 Fed. Reg. at 51,055, 51,064 (Aug. 21, 2015); *Scofield v. Lewis*, 251 F.2d 128, 132 (5th Cir. 1958) (Regulations "must, by their terms and in their application, be in harmony with the statute"). But even if it could, Petitioners are simply wrong in claiming that Texas "timely met the deadline" to select the monitoring pathway. Pet. Br. at 47. To do so, Texas needed to submit to EPA, by July 1, 2016, detailed, technical information about the location and operation of any proposed monitors. 40 C.F.R. § 51.1203(b)-(c). Moreover, if the state's

new monitors were not approved *and* operational by January 1, 2017,

the state was required to demonstrate attainment with air dispersion

modeling. *Id.* § 51.1203(c)(2).

Although Texas submitted a DRR Rule letter on June 29, 2016,

addressing *other* Texas sources, the letter did not include the required

detailed monitoring plan for Martin Lake. R.466, Ex. 5. In fact, Texas'

purported "election" asserted that because EPA was already required to

designate the Martin Lake area by July 2, 2016, there is "no need to

provide any future air quality characterization plans" for the facility. *Id.*

at 2. Although the letter asserts that Texas planned to characterize the

area with monitoring "*should*" EPA designate it as "unclassifiable,"

EPA never did so, meaning the letter cannot serve as a timely election

for monitoring. And even if it could be interpreted as timely, Texas

failed to meet the January 1, 2017 deadline for installing and operating

the monitor. 40 C.F.R. § 51.1203(c)(2). Indeed, Texas did not install and

begin operating the Martin Lake monitor until November 2017.

Because Texas failed to comply with the DRR Rule, EPA had no

authority (and certainly no obligation) to defer designating the Martin

Lake area based on the state's vague intention to someday install a monitor.

If Texas had wanted to use monitoring, it could and should have installed a monitor immediately following EPA's issuance of the 2010 $SO_2$ NAAQS. EPA specifically encouraged timely deployment of monitors near sources emitting more than 5,000 tons per year. R.466, Ex. 6 at 8. Although Martin Lake's annual $SO_2$ emissions far exceed that threshold, R.434 at 62; R.466 at 3, Texas ignored EPA's advice and instead waited seven years after the issuance of the NAAQS—and more than a year after the DRR deadline to install a monitor at Martin Lake—in a desperate attempt to demonstrate attainment. That same monitor now demonstrates that the area around Martin Lake violates the NAAQS. R.472, Encl. 1 at 16; R.473 Encl. 1 at 19.

In short, neither the Clean Air Act nor any regulation authorized EPA to ignore a court-ordered deadline and substantial, available evidence of nonattainment, based only on Petitioners' vague (in fact, unspoken) desire to someday install a monitor. Petitioners' belated preference for a monitoring do-over does not warrant vacatur of EPA's well-supported nonattainment designation.

33

## II.   EPA TREATED LIKE CASES ALIKE.

Petitioners argue that EPA unlawfully treated Rusk and Panola Counties differently from other states when presented with "dueling models." Pet. Br. at 35. But as discussed, because Luminant's alternative modeling was "not acceptable," EPA reasonably concluded there were "not inconsistent acceptable modeling results at issue." R.438 at 40. And EPA did not simply "reject one side and adopt the other," as Petitioner claims, but instead thoroughly reviewed all information and concluded it formed a sufficient basis for finding nonattainment.

### A.   EPA Applied the Same Multi-Factor Analysis in Each Area.

Contrary to Petitioners' claims, EPA did in fact treat like areas alike. Indeed, EPA applied the same court-sanctioned, multi-factor analysis for designating all areas of the country. Specifically, EPA conducted a careful analysis of site-specific, existing air quality data, emissions data, meteorology, geography/topography, and jurisdictional boundaries. *See* R.434 at 50-71; 81 Fed. Reg. at 89,873/1 (R.433 (Final Designation)). This Court has recognized that such "multi-factor

34

analys[e]s will necessarily lead to different counties receiving different designations based on their individual circumstances." *Texas v. EPA*, 983 F.3d at 840.

EPA was not required to blindly designate as unclassifiable every county with purportedly "conflicting" modeling, but rather was required to evaluate all available information to determine the appropriate designation for the area under review. *See Mississippi Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 150 (D.C. Cir. 2015). That is exactly what EPA did here.

### B.    The Areas Identified In Petitioners' Brief Are Distinguishable.

Petitioners mischaracterize Sierra Club's modeling as containing "significant limitations and uncertainties," Pet. Br. at 31-32, but EPA examined each of these purported deficiencies and determined that, for example, by excluding downwash and modeling constant stack temperature and exit velocities, Sierra Club's modeling actually *underestimated* maximum, ground-level $SO_2$ impacts. R.434 at 58-59, 76. In other words, Sierra Club's modeling was "deliberately conservative" in Luminant's favor. *Id*. at 75. And because the modeling showed Martin Lake causing significant nonattainment at least 14%

35

above the standard, Petitioners' adjustments would not alter EPA's final designation. R.434 at 58-59, 76. Conversely, for the supposedly similar Nebraska, Arkansas, and Ohio counties, EPA determined the available modeling could not reliably inform a conclusion about whether the area was or was not meeting the NAAQS, and accordingly designated these areas as unclassifiable. R.392 (Nebraska Final TSD) at 24; R.410 (Arkansas Final TSD) at 5; R.405 (Ohio Final TSD) at 21.

First, for Lancaster County, Nebraska's modeling used actual emissions but assumed future changes in operation (stack height modifications) that were not yet in place. R.392 at 15, 24. As with Luminant's modeling here, EPA rejected Nebraska's modeling as relying on speculative emission reductions. R.392 at 24; R.434 at 55. Meanwhile, EPA rejected Sierra Club's Lancaster modeling after finding it used unrepresentative background values from a more urban monitoring location and thus significantly *overestimated* $SO_2$ concentrations in rural Lancaster, leaving it unclear whether the area was meeting the NAAQS. R.392 at 24. Conversely, Sierra Club's Martin Lake modeling used an appropriate background concentration that EPA

36

found *underestimated*, rather than overestimated, background emissions. R.434 at 65.[9]

Second, for Independence County, Arkansas, EPA could not determine whether the area was meeting the NAAQS because the state's modeling excluded emissions from nearby sources that could have contributed to nonattainment; meanwhile, Sierra Club's modeling included emissions from nearby sources but used annualized emissions rather than actual hourly emissions. Thus, EPA did not have sufficiently "comprehensive emissions" information to determine whether the area was meeting the one-hour standard. R.410 at 5-8. A key difference here is that Sierra Club's modeling for Rusk and Panola deliberately omitted emissions from nearby sources to show that the area around Martin Lake was in nonattainment *even without* consideration of other potential sources. R.434 at 61. And in contrast to Independence County, EPA found Sierra Club's Martin Lake modeling followed EPA guidance, and took a "deliberately conservative" under-

---

[9] Petitioners suggest EPA rejected Sierra Club's Lancaster modeling because it omitted building downwash, but while EPA notes the omission, it did not cite it as a significant issue when making its determination. R.152 (Nebraska Intended TSD) at 47.

estimation approach such that Petitioners' "corrections" would not yield concentrations near or below the standard, and thus would not alter the finding of nonattainment. *Id.* at 61, 75, 77.[10]

Finally, for Gallia County, EPA found Ohio's modeling inappropriately reduced background concentrations by 38%, while Sierra Club's modeling used emissions from one database to replace missing data in another, resulting in an overestimation of actual emissions. R.405 at 20. Thus, EPA determined that the two modeling sets—even in combination—could not reliably demonstrate whether the area was meeting the NAAQS. *Id.* Petitioners argue Sierra Club's Martin Lake modeling also had "errors" including "incorrect hourly emissions and stack parameter information" rendering it equally unreliable. Pet. Br. at 38 (quoting R.134 (Ohio Intended TSD) at 31). Not so. In Ohio, there was insufficient evidence to determine the net effects of any corrections to Ohio's modeling. R.405 at 20. Here, in

---

[10] Although Sierra Club's modeling for Independence and Martin Lake did not include variable stack velocity and temperatures because that information was not publicly available, EPA explained that for the Martin Lake modeling, Sierra Club used actual hourly emissions and stack and velocity temperatures that provided for an overestimation of plume dispersion and thus an underestimation of maximum ambient emission concentrations. R.434 at 61, 76.

contrast, EPA determined that adjustments to the Martin Lake area modeling would have little effect and would not change their nonattainment finding. R.434 at 58, 60, 77.

Because Sierra Club's Martin Lake modeling was deliberately conservative and underestimated $SO_2$ concentrations, *id*. at 75, EPA reasonably concluded that Petitioners' adjustments would not materially reduce modeled $SO_2$ concentrations or demonstrate attainment. *Id*. at 77. In contrast, in Nebraska, Arkansas, and Ohio, EPA could not determine whether corrections would yield attainment or nonattainment. R.392 at 23; R.410 at 8; R.405 at 21. As such, EPA appropriately designated Rusk and Panola nonattainment and the other three counties unclassifiable. 42 U.S.C § 7407(d)(1)(A)(i),(iii).

## CONCLUSION

The Petitions for Review should be denied.

Dated: March 16, 2022                    Respectfully submitted,

                                         */s/ Lisa K. Perfetto*
                                         Lisa K. Perfetto
                                         Earthjustice
                                         48 Wall Street, 15th Floor
                                         New York, NY 10005
                                         (212) 845-7388
                                         lperfetto@earthjustice.org

                                         Joshua Smith
                                         Sierra Club
                                         2101 Webster Street, Suite 1300
                                         Oakland, CA 94612
                                         (415) 977-5560 (phone)
                                         joshua.smith@sierraclub.org

                                         *Counsel for Sierra Club*

## CERTIFICATE OF SERVICE

On this 18th day of March, 2022 a true and correct copy of the

foregoing Brief of Respondent-Intervenor Sierra Club was filed with the

electronic case filing (ECF) system of the U.S. Court of Appeals for the

Fifth Circuit, which will provide electronic notice to counsel of record.

*/s/ Lisa K. Perfetto*

Lisa K. Perfetto
Counsel for Sierra Club

## CERTIFICATE OF COMPLIANCE WITH FILING REQUIREMENTS

The undersigned counsel states that this motion complies with Fed. R. App. P. 32(a)(7)(B) and the Order of this Court because it contains 6,976 words, excluding the parts of the brief that are exempt under Fed. R. App. P. 32(f), as counted by a word processing system and, therefore, is within the word limit. This motion also complies with typeface requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Century Schoolbook font.

Dated: March 16, 2022

*/s/ Lisa K. Perfetto*
Lisa K. Perfetto
Counsel for Sierra Club