No. 17-60088

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY L.L.C.; BIG BROWN POWER COMPANY L.L.C.; SANDOW POWER COMPANY L.L.C.; LUMINANT MINING COMPANY L.L.C.,**
Petitioners

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, in His Official Capacity as Administrator of the United States Environmental Protection Agency,**
Respondents

Consolidated with

No. 21-60673

**STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; LUMINANT MINING COMPANY, L.L.C.,**
Petitioners

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,**
Respondents

On Petition for Review of Final Agency Actions of the United States Environmental Protection Agency

### Reply Brief of Petitioners

KEN PAXTON
Attorney General of Texas
BRENT WEBSTER
First Assistant Attorney General
GRANT DORFMAN
Deputy First Assistant Attorney General
SHAWN COWLES
Deputy Attorney General for Civil Litigation
PRISCILLA M. HUBENAK
Chief, Environmental Protection Division

**March 30, 2022**

LINDA B. SECORD
Assistant Attorney General
Linda.Secord@oag.texas.gov
JOHN R. HULME
Assistant Attorney General
John.Hulme@oag.texas.gov
OFFICE OF THE ATTORNEY
GENERAL OF TEXAS
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
512-463-2012 (phone)
*Counsel for the State of Texas and Texas Commission on Environmental Quality*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................i

TABLE OF AUTHORITIES .........................................................................ii

INTRODUCTION ........................................................................................ 1

ARGUMENT ............................................................................................... 4

I.      EPA's Designation for Rusk and Panola Counties Is Unlawful Because Available Information Did Not Clearly Demonstrate Nonattainment ............... 4

        A.     EPA's Disregard of Available Monitoring Data Requires Vacatur ........... 4

        B.     EPA's Failure to Follow Its Own Modeling Regulations Requires Vacatur ...................................................................... 6

        C.     EPA's Reliance on Sierra Club's Flawed Modeling Was Unlawful ........ 10

        D.     EPA's Disregard of Available Information Violated the Plain Statutory Language .................................................... 15

II.     EPA's Designation for Rusk and Panola Counties Is Unlawful Because EPA Did Not Treat Like Cases Alike ................................................. 18

        A.     Petitioners Raised the Issue of EPA's Disparate Treatment During the Public Comment Period ........................................ 18

        B.     The Nonattainment Designation Must Be Vacated Because EPA Failed to Justify Its Disparate Treatment of Rusk and Panola Counties ................................................................. 19

        C.     The Government Is Wrong That EPA Treated Like Cases Alike .......... 21

III.    The Government Concedes EPA's Mistake of Law ............................. 25

CONCLUSION .......................................................................................... 26

CERTIFICATE OF SERVICE ................................................................... 29

CERTIFICATE OF COMPLIANCE .......................................................... 30

# TABLE OF AUTHORITIES

**Cases**                                                                                 **Page(s)**

*BCCA Appeal Group v. EPA,*
    355 F.3d 817 (5th Cir. 2003) ................................................................. 5, 6, 11

*Cent. Power & Light Co. v. United States,*
    634 F.2d 137 (5th Cir. 1980) ........................................................................ 20

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
    140 S. Ct. 1891 (2020) ................................................................................. 12

*Gulf States Mfrs., Inc. v. NLRB,*
    579 F.2d 1298 (5th Cir. 1978) ........................................................................ 7

*Huawei Techs. USA, Inc. v. FCC,*
    2 F.4th 421 (5th Cir. 2021) .......................................................................... 20

*LeMoyne-Owen College v. NLRB,*
    357 F.3d 55 (D.C. Cir. 2004) ........................................................................ 22

*Luminant Generation Co. v. EPA,*
    675 F.3d 917 (5th Cir. 2012) ........................................................................ 12

*Medina Cty. Envtl. Action Ass'n v. Surface Transp. Bd.,*
    602 F.3d 687 (5th Cir. 2010) ........................................................................ 24

*Palm Valley Health Care, Inc. v. Azar,*
    947 F.3d 321 (5th Cir. 2020) ........................................................................ 19

*Rhea Lana, Inc. v. U.S. Dept. of Labor,*
    925 F.3d 521 (D.C. Cir. 2019) ...................................................................... 15

*Sierra Club v. EPA,*
    939 F.3d 649 (5th Cir. 2019) .................................................................. 10, 11

*Sims v. Apfel,*
    530 U.S. 103 (2000) ................................................................ 19

*Texas v. Biden,*
    10 F.4th 538 (5th Cir. 2021) ...............................................6, 16, 20, 21

*Texas v. EPA,*
    983 F.3d 826 (5th Cir. 2020) ............................................... 23

*Tex. Oil & Gas Ass'n v. EPA,*
    161 F.3d 923 (5th Cir. 1998) ................................................. 4

*United States v. Garner,*
    767 F.2d 104 (5th Cir. 1985) ............................................... 20

*Univ. of Texas M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health and Human*
    *Servs.,* 985 F.3d 472 (5th Cir. 2021)........................... 20, 22, 23, 25

## Federal Statutes

42 U.S.C. §7407(d)(1)(A)(iii)................................................ 15

42 U.S.C. §7607(d)(7)(B).............................................. 13, 19

## Federal Regulations

40 C.F.R. §51.166(l)(2) ...................................................... 8

40 C.F.R. Part 51, App. W §3.2.1 ..................................... 7, 8

40 C.F.R. Part 51, App. W §3.2.2 ....................................... 7

40 C.F.R. Part 51, App. W §3.3 ........................................... 7

## Federal Register

80 Fed. Reg. 51,052 (Aug. 21, 2015) .................................. 17

81 Fed. Reg. 45,039 (July 12, 2016) .................................................. 16, 24

81 Fed. Reg. 89,870 (Dec. 13, 2016) ................................................. 16, 24

84 Fed. Reg. 43,757 (Aug. 22, 2019) ............................................ 5, 10, 19

85 Fed. Reg. 48,111 (Aug. 10, 2020) ...................................................... 2

## **Miscellaneous**

EPA, *Model Clearinghouse: Operational Plan*, EPA-454/B-16-008 (Dec. 2016) .................. 8

Fed. R. App. P. 16(b) ............................................................................. 24

# **INTRODUCTION**

This case is not about whether Martin Lake Power Plant emits "enormous amounts of $SO_2$" or is the "single largest emitter of $SO_2$," as the government asserts (Resp.Br. at 7, 48). In point of fact, for the time period that defined EPA's "Round 2" designations, *other* power plants in *other* States had similar or *more* $SO_2$ emissions. Yet, for those areas, EPA followed the statute and designated the areas as unclassifiable, not nonattainment.

If actual data were so important, EPA should have used it. But EPA ignored the actual data from the monitor nearest Martin Lake showing attainment and refused to use that data to truth-check Sierra Club's modeling that decided EPA's designation. And despite the government's repeated invocation of EPA's "technical expertise," EPA did not actually perform any air quality modeling itself and refused to engage with EPA's Model Clearinghouse in the technical modeling review required by the regulations. Because it did not do the work, EPA had to admit that "we don't know" what Sierra Club's modeling really showed.

Even as a judge of other people's work, EPA was not neutral. In other Round 2 areas with conflicting information, EPA recognized that the correct designation under the statute was unclassifiable and that actual data should be collected under the agency's Data Requirements Rule, an option that EPA denied Texas. The government's response now, like EPA's then, is to ignore the inconsistency. The government asks this Court to disregard records from EPA's files that show EPA treated Sierra Club's

modeling differently for Rusk and Panola Counties and that EPA's different treatment, not the individual facts, produced the different outcomes. The Court can consider these agency records and may direct supplementation of the record at any time. But even on the record as filed by EPA, it is undisputed that EPA knew of the disparate treatment at the time but did not try to correct or explain it. The law and this Court's precedent require more.

EPA's errors are consequential and can only be remedied by vacatur of the nonattainment designation. The "administrative paths" suggested by the government (Resp.Br. at 6) would not provide timely relief from EPA's unlawful designation. In securing a stay from this Court, EPA promised "to provide clarity" on the designation "*before* the state or regulated entity expend resources investing in regulatory obligations." Doc. 00514179751, Ex. 1 at 1 (emphasis added). But EPA engaged in misdirection and delay for four years to avoid judicial review of its Texas designations. It now claims that its own delay ran out the clock on Texas and Luminant and authorizes EPA to issue a Federal Implementation Plan for Martin Lake. 85 Fed. Reg. 48,111, 48,112 (Aug. 10, 2020). The Court should not endorse these tactics.

Martin Lake is indeed a large—and critical—power plant. It can generate enough electricity to power about 1.125 million homes in normal conditions and 450,000 homes in periods of peak demand. It is the second largest non-nuclear power station in Texas, which itself would be the ninth largest economy in the world. It represents around 4% of the thermal generation capacity in the Electric Reliability Council of Texas (ERCOT)

market.  Its future should not be determined by the shoddy decision-making done by EPA in 2016.  If recent monitoring data and Sierra Club's new modeling from 2019 would, as the government's brief now claims, clearly support a nonattainment designation, then EPA is free to propose a new designation based on a new record *after* this Court vacates the 2016 nonattainment designation.   But new data and new modeling—not before EPA in 2016—cannot support EPA's prior action and should not be used to federalize the operation of Martin Lake.  Because EPA's Rusk and Panola Counties nonattainment designation was unlawful, the designation must be vacated.

## ARGUMENT

### I.    EPA's Designation for Rusk and Panola Counties Is Unlawful Because Available Information Did Not Clearly Demonstrate Nonattainment

#### A.    EPA's Disregard of Available Monitoring Data Requires Vacatur

The government concedes that EPA did not take into account the actual monitoring data from the EPA-certified monitor located nearest Martin Lake, and it defends EPA's position that the data—which showed attainment—could not "be of *any* use." Resp.Br. at 25-26 (emphasis added). But the Longview data could have served an important use, as the State of Texas explained in its comments to EPA—it showed that Sierra Club's modeling "has errors and clearly overestimates actual $SO_2$ concentrations[.]" R.294 at 2. Yet EPA failed to test Sierra Club's modeling against these real world data, even though the data and Sierra Club's modeling predictions overlapped and there was a significant discrepancy between them. Pet.Br. at 28. Because EPA "failed to consider an important aspect of the problem"—squarely presented to it at the time—the nonattainment designation must be vacated. *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998).

The government does not dispute that EPA failed to conduct an analysis of Sierra Club's modeling in comparison to the real-world monitoring data. It does not contest that one version of Sierra Club's modeling predicted $SO_2$ concentrations as

much as double the actual monitored value at the same location.  Pet.Br. at 10-11.[1]

Instead, the government argues that such a comparison would be "meaningless" and

not "probative."  Resp.Br. at 26-27.  But this Court has held otherwise—finding a

model-to-monitor comparison to be meaningful and probative in the NAAQS context.

*See BCCA Appeal Group v. EPA*, 355 F.3d 817, 831 (5th Cir. 2003) (upholding EPA

approval of Texas NAAQS modeling where "Texas validated the model by performing

a test run . . . *that compared the model's predictions with actual air quality data*" (emphasis

added)).

The government would excuse EPA's failure with this Court's statement in

*BCCA Appeal Group* that "EPA does not expect comparisons between model

predictions and monitor observations to exactly match."  Resp.Br. at 42 n.6.  But that

puts the cart before the horse—EPA did not perform the analysis, so it cannot say

whether the modeling was close enough or not.  Nothing in *BCCA Appeal Group*

---

[1] The government says EPA "did not rely on this one version of Sierra Club's modeling."  Resp.Br. at 39 n.3.  But neither the government nor Sierra Club argues that the *other* version of Sierra Club's modeling did not *also* overstate $SO_2$ concentrations at the Longview monitor.  Sierra Club says this other modeling did not show "violations" of the NAAQS at the monitor (Int.Br. at 15-16), but that is beside the point—a comparison can still be made.  Tellingly, Sierra Club *does not* assert that its predictions at the monitor—even if below 196 $\mu g/m^3$—were within an acceptable range of the actual monitoring data.  Either Sierra Club (like EPA) has not bothered to look, or it does not like the answer.  Even a small adjustment to the modeling would be meaningful—Sierra Club's modeling only predicted the Martin Lake area "about 10%" over the NAAQS.  84 Fed. Reg. 43,757, 43,761 (Aug. 22, 2019).

excuses EPA from conducting the comparison.[2]  Instead, this Court upheld EPA's approval of Texas's modeling because "Texas validated the model" "with actual air quality data," which EPA did not do here. *BCCA Appeal Group*, 355 F.3d at 831. Because it did not, its designation is unlawful. *Texas v. Biden*, 10 F.4th 538, 556 (5th Cir. 2021) ("[A]n agency's 'experience and expertise' presumably enable the agency to provide the required explanation, but they do not substitute for the explanation[.]") (internal citation omitted)).

### B.    EPA's Failure to Follow Its Own Modeling Regulations Requires Vacatur

The government does not dispute that EPA failed to review the validity of AECOM's modeling analysis under EPA's regulations (Appendix W), which are designed for this very purpose.  Resp.Br. at 36-37.  AECOM's modeling analysis—using *current* emissions from the relevant time period—demonstrated that site-specific adjustments to the model showed Rusk and Panola Counties in attainment.  R.328 at 42-44 & Att. 2 at 4-1.  Yet EPA, while conceding there was good reason for AECOM's approach (R.438 at 36), refused to initiate or complete the internal agency review process required by its own regulations.  *Id.* ("This process was not initiated or completed in the modeling of the three Texas Luminant plants.").

---

[2] The 2016 Modeling Technical Assistance Document cited by the government, Resp.Br. at 27 (citing R.203 at 5-6), does not address the usefulness of a model-to-monitor comparison, or say that a monitor within the modeling grid and as close as 19 km cannot be the basis for comparison.

EPA's protocol is designed to provide for "objective decision-making on the acceptability of an alternative model for a given regulatory application."  40 C.F.R. Part 51, App. W §3.2.1.a ("App.W").  Because it did not follow its protocol, EPA candidly conceded at the time—and the government does not dispute now—that EPA did **"not know[]"** whether AECOM's analysis was correct.  R.438 at 36.  Even now, the government claims that EPA's "reasonable basis for not relying upon" AECOM's analysis was EPA's refusal to follow its review protocol.  Resp.Br. at 36-37 (citing R.438 at 4-9).  EPA cannot stick its head in the sand, refusing to follow its protocols for "objective decision-making," and expect this Court to sign off on its decision.  *Gulf States Mfrs., Inc. v. NLRB*, 579 F.2d 1298, 1308 (5th Cir. 1978) ("[T]he failure of an agency to follow its regulations renders its decision invalid.").

The government attempts to shift the burden to Luminant to comply with EPA's review process (Resp.Br. at 36), but the regulations are clear that the "[d]etermination of acceptability of an alternative model *is an EPA Regional Office responsibility*[.]" App.W §3.2.2.a (emphasis added).  The applicable regulations require *internal* consultation among various EPA offices, *id.* §§3.2.1.b, 3.3, and there are no obligations placed on

outside parties.[3]  The government suggests that Luminant was required to "submit a statistical performance evaluation" for EPA's review.  Resp.Br. at 36.  But the government points to nothing in the regulations that requires a third party to make such a submission, *id.*, and there is none.  Indeed, the only situation in which EPA's regulations require a third party to actively request EPA "approval" for use of an alternative model is in the specific case of a Prevention of Significant Deterioration ("PSD") permit, which is not the situation here.  App.W §3.2.1.b; 40 C.F.R. §51.166(l)(2).[4]  Here, where the regulatory application is *EPA's designation* of Rusk and Panola Counties under the 2010 $SO_2$ NAAQS, it is EPA's responsibility to perform the evaluation, including any appropriate statistical analyses, and only then use "the best model" for its decision.  App.W §3.2.1.a.  Because EPA did not do so, it cannot permissibly conclude that Sierra Club's modeling is best and Luminant's must be rejected.

---

[3] EPA's Operational Plan for its Model Clearinghouse ("MCH") states that "the MCH is an internal service within the EPA," and "[t]he MCH does not interact directly with co-regulating agencies or with industrial stakeholders on case-specific situations[.]" EPA, *Model Clearinghouse: Operational Plan*, EPA-454/B-16-008, at 21 (Dec. 2016), https://www.epa.gov/sites/default/files/2020-10/documents/mch_operational_plan-2016_version.pdf.

[4] Nor is this a situation where the State had prepared a SIP revision under its own authority in the Clean Air Act, in which case EPA's review is narrowly-cabined to ensuring that the SIP meets the *statutory* requirements.  Here, according to EPA itself, "it is EPA that promulgates the actual designation for each area." Resp.Br. at 9.

In any case, even though not required, AECOM's highly sophisticated analysis did include the technical basis for the modeling refinements. R.328, Att. 2, App. F at 3-9, App. E at 61-65. AECOM also provided peer-reviewed published research with supporting statistical performance evaluations to support its proposed modeling approach. *Id.*, Att. 2, App. B at 1346-50, App. D at 11-12, App. E. EPA did not engage with this detailed information, despite acknowledging there was "evidence for the phenomena the technique attempts to simulate." R.438 at 36. With these submissions from AECOM, Luminant more than met any obligation to demonstrate that the overprediction in Sierra Club's modeling could be addressed through these well-known techniques and to trigger EPA's review obligation.[5] If EPA needed additional information, it should have asked.

Finally, the government claims that EPA did review AECOM's modeling analysis and found four shortcomings (Resp.Br. at 37), but that contention is not supported by the record. As to the first two, the government says EPA rejected AECOM's analysis because it involved "forecasted" "future" emissions. Resp.Br. at 37. That is a red herring. AECOM proposed *two* approaches for more refined modeling of Rusk and Panola Counties, one of which used the same *current* emissions as the Sierra Club

---

[5] EPA has previously found that one of the refinements—AERLIFT—does not need Appendix W review at all. R.427 at Ex. 27, App. B. (AERLIFT "is a source characterization procedure . . . [that] is not subject to the Appendix W, Section 3.2.2 alternative model evaluation criteria.").

modeling that EPA adopted (2013-2015). *Compare* R.328, Att. 2 at 4-1, *with* R.434 at 58. EPA had all the information it needed to evaluate AECOM's approach with current emissions. The last two alleged shortcomings—the use of "unapproved model pre-processors" and "unapproved" "beta options" (at 37-38)—are simply the result of EPA's failure to follow its internal review protocols. Even now, the best the government can say is that the pre-processors "*likely* resulted in large unsubstantiated changes in modeled concentrations." Resp.Br. at 37 (emphasis added). But as the government has conceded, EPA **did not look** and thus did **"not know[]"** if AECOM's analysis was accurate and did not know the extent of Sierra Club's overpredicton. R.438 at 36 (emphasis added).

### C.    EPA's Reliance on Sierra Club's Flawed Modeling Was Unlawful

The government does not dispute that Sierra Club's modeling was EPA's basis for the Rusk and Panola Counties nonattainment designation. Resp.Br. at 39 n.3; R.434 at 77. It also does not contest that *EPA itself* found that Sierra Club's modeling contained "key limitations and uncertainties," although it did not act on that finding. 84 Fed. Reg. at 43,761. Nor does the government dispute that the only information that EPA reviewed *at the time of its designation* to conclude that the "key limitations and uncertainties" were not material was "sensitivity modeling" for *a completely different power plant. Id.*; R.434 at 75-76. And it does not dispute that, at the time, EPA conceded that "we don't know the exact impact" of these shortcomings because EPA did not conduct "a direct analysis" of them. R.434 at 75-76. These concessions alone require vacatur.

*Sierra Club v. EPA*, 939 F.3d 649, 664 (5th Cir. 2019) ("The agency must 'articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" (internal citations omitted)).

Nevertheless, the government defends EPA's nonattainment designation. In doing so, the government disavows the regulatory standard that EPA itself announced—that EPA would issue an unclassifiable designation in the absence of "information clearly demonstrating" nonattainment or attainment. R.30 at 5. Instead, the government argues its case here under a "[n]o modeling is perfect" standard and requests an "extraordinary level of deference" from the Court citing *BCCA Appeal Group*. Resp.Br. at 40, 48.

Petitioners agree that an *extraordinary* level of deference would be needed to approve of EPA's reliance on Sierra Club's modeling as the sole basis for the designation. But, in contrast to the record in *BCCA Appeal Group*, there is nothing in the record here to indicate that the Court should give EPA *any* deference, much less extraordinary deference. In *BCCA Appeal Group*, this Court relied heavily on EPA's "rational explanation for its reliance on the model despite the model's inability to exactly replicate Houston–Galveston's unique meteorological conditions," noting specifically that the State's "model nevertheless performed well on the full battery of validation tests." 355 F.3d at 833-34. The validation involved "compar[ing] the model's predictions with actual air quality data for a chosen time period" and "appl[ying] a battery of tests and analyses set forth in EPA guidance[.]" *Id.* at 831.

11

None of this was done by EPA or Sierra Club here. These indicia of reasonable decisionmaking simply are not present. Here, actual monitoring data from the area, well within the modeling grid, showed that Sierra Club's modeling "has errors and clearly overestimates actual $SO_2$ concentrations[.]" R.294 at 2; R.328, Att. 2 at 4-1. The government does not dispute this. Neither EPA nor Sierra Club performed *any* validation of the modeling against these available real world data. Far from performing a "battery" of validation tests, as Texas did in *BCCA Appeal Group*, Sierra Club submitted only a sensitivity analysis for a completely different power plant (the Big Brown Plant), which EPA nonetheless accepted for Martin Lake. R.434 at 75-76. Judged against the standard this Court set in *BCCA Appeal Group*, EPA's review of Sierra Club's modeling falls far short of reasoned decisionmaking.

In truth, the government is asking this Court to uphold EPA's 2016 nonattainment designation based on EPA's assessment *in 2021* of modeling that Sierra Club submitted to EPA *in 2019*, which it claims fixed the errors in Sierra Club's 2016 modeling. Resp.Br. at 43-44. But EPA's decision must be judged "solely on the basis of the agency's stated rationale at the time of its decision," and the Court "must disregard any *post hoc* rationalizations of EPA's action." *Luminant Generation Co. v. EPA*, 675 F.3d 917, 925 (5th Cir. 2012); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) ("It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" (internal citation omitted)). Thus, EPA's recent assessment

in 2021 of new modeling created in 2019 cannot support EPA's nonattainment designation in 2016.  If EPA wants to issue a *new designation* based on Sierra Club's *new modeling*, it may do so on *a new record* that EPA creates after the Court vacates the 2016 designation.[6]

The government tries to end-run this well-established rule by pointing to the "reconsideration process that [Petitioners] themselves requested," suggesting that Petitioners invited EPA to supplement the record to justify EPA's original nonattainment designation.  Resp.Br. at 44-45.  But the government cites no authority for its argument that a reconsideration process provides the agency an opportunity to add reasons for its own original action.  Nor is that argument consistent with EPA's position here that reconsideration is limited to new matters that *could not* have been raised at the time of decision.  R.472, Encl. 1 at 6 (citing 42 U.S.C. §7607(d)(7)(B)).  Indeed, EPA denied Petitioners' reconsideration petitions as a threshold matter because EPA concluded they raised only issues that were raised or could have been raised before and thus were *outside the scope* of reconsideration. *Id.* at 7; R.473, Encl. 1 at 7.  It is the government that is trying to have it both ways, not Petitioners.

---

[6] Similarly, if EPA had affirmatively changed the designation to unclassifiable, as EPA previously indicated that it would, that *new action* would be based on a *new record* that would form that basis for review of that *new action* in this Court by Sierra Club or others. Contrary to the government's suggestion (at 45), that would in no way be inconsistent with limiting review of EPA's 2016 action to the record before EPA in 2016.

Even if the reconsideration record could backfill EPA's original decision, the government's brief misstates that record. Contrary to the government's contention (at Resp.Br. 45), EPA's 2021 assessment of Sierra Club's 2019 modeling ***was not*** the basis for EPA's denial of Petitioners' reconsideration petitions. In truth, EPA issued its assessment of Sierra Club's new modeling as so-called "Additional Information" ***not*** as "EPA's Evaluation of the Petition for Reconsideration." R.473, Encl. 1 at 7, 17-20. EPA's substantive response to Petitioners' reconsideration petitions was merely to repeat EPA's on-again, off-again "belie[f] that Sierra Club's March 2016 modeling was of sufficient quality to determine that the Martin Lake … facility area[] in Texas [was] violating the 2010 $SO_2$ NAAQS at the time of the EPA's final designations in December 2016." *Id.* at 13. Thus, even were the Court to consider EPA's decision on the reconsideration petitions as "illuminat[ing] the reasons that are [already] implicit in the original decision," as the government requests (at 45), that reconsideration process does

*not* include EPA's gratuitous post hoc discussion of Sierra Club's 2019 modeling under the heading "Additional Information."[7]

### D.     EPA's Disregard of Available Information Violated the Plain Statutory Language

The Clean Air Act defines an "unclassifiable" area as "any area that cannot be classified on the basis of *available information* as meeting or not meeting the [NAAQS]." 42 U.S.C. §7407(d)(1)(A)(iii) (emphasis added).  The government claims that EPA met this statutory standard through a "multiple-factor weight-of-the-evidence test" using "all available information to determine whether the area was meeting the NAAQS." Resp.Br. at 56.

But the "multiple-factor" test cited in the government's brief is not even relevant here (nor did EPA employ it).  Those multiple factors are used, according to EPA, to determine the *boundaries* of a nonattainment area (for example, an entire county or "only a portion of a county"), not to determine the initial question of whether the area is in

---

[7] The government cites no decision *of this Court* that would allow EPA to "illuminate" the reasons for its prior decision in a post hoc issuance five years later.  The government's attempt here falls short under *Rhea Lana, Inc. v. U.S. Dept. of Labor*, 925 F.3d 521, 524 (D.C. Cir. 2019).  There, the D.C. Circuit considered a declaration "from the same official who issued the Department's final determination," concluding that "the particular circumstances of this case provide adequate assurances that the Declaration accurately reflects *the contemporaneous reasoning of the Department*." *Id.* (emphasis added).  Here, Sierra Club's 2019 modeling was not even before EPA in 2016, so EPA's assessment of that new modeling in 2021 cannot illuminate EPA's decision in 2016.  EPA's assessment of that new modeling was "Additional Information," not an explanation of EPA's prior decision.  R.473, Encl. 1 at 17-20.

nonattainment.  R.30 at 5-6 & Att. 2 at 2-3 ("The purpose of evaluating these factors is to determine *the appropriate boundaries* encompassing the area meeting the CAA's definitions.") (emphasis added); 81 Fed. Reg. 89,870, 89,873 (Dec. 13, 2016) (citing R.30 & 81 Fed. Reg. 45,039, 45,043 (July 12, 2016)).  The *boundaries* of EPA's Rusk and Panola Counties designation are not at issue here.  Instead, at issue is EPA's threshold determination of nonattainment.  For that determination (what EPA calls its "analytical starting point"), EPA's guidance sets out a different test—"In the absence of information clearly demonstrating a designation of 'attainment' or 'nonattainment,' the EPA intends to designate the area as 'unclassifiable.'"  R.30 at 5 & Att. 2 at 3.  Under that standard, EPA's Rusk and Panola Counties designation falls far short.  EPA may have recited this standard (R.438 at 21), but it did not explain how the available information "clearly demonstrat[ed]" nonattainment when the available monitoring data showed attainment and EPA had to concede that "we don't know" what Sierra Club's modeling actually showed (R.434 at 76).  *See Texas*, 10 F.4th at 556 ("We do not defer to the agency's conclusory or unsupported suppositions." (internal quotation and citation omitted)).

In any case, contrary to the government's contention, EPA *did not* actually apply a "multiple-factor weight-of-the-evidence test" or consider "all available information." The *only* information that EPA cited as demonstrating nonattainment was Sierra Club's modeling.  R.434 at 74 ("Our final designation is based on Sierra Club's updated (March 2016) modeling[.]").  There was no other information cited by EPA as indicating

16

nonattainment. All of the so-called other "factors" cited in the government's brief (at 56 (citing R.434 at 50-71)) were simply aspects of Sierra Club's modeling and not factors or information that EPA independently determined showed nonattainment. R.434 at 62 ("Modeling Parameter: Emissions"); at 61 ("Modeling Parameter: Source Characterization"); at 59 ("Modeling Parameter: Rural or Urban Dispersion"); at 64 ("Modeling Parameter: Geography and Terrain"); at 62 ("Modeling Parameter: Meteorology and Surface Characteristics"); at 64 ("Modeling Parameter: Background Concentrations of $SO_2$").[8] If EPA had based its decision on all "available information," it necessarily would have designated Rusk and Panola Counties as "unclassifiable" because *all* of the other information indicated *attainment*. Because EPA did not base its designation on the "available information," the nonattainment designation is contrary to the statute and must be vacated.

---

[8] The government's brief cites the preamble to the Data Requirements Rule as evidence "that these and other factors" were considered by EPA for Rusk and Panola Counties. Resp.Br. at 56-57 (citing 80 Fed. Reg. 51,052, 51,057/3 (Aug. 21, 2015)). But EPA *denied* Texas the opportunity to utilize the Data Requirements Rule (Pet.Br. at 6-7), and the government's own brief argues that "[n]othing in the agency's Data Requirements Rule modifies EPA's duty or discretion in making designations determinations based on available information." Resp.Br. at 33.

II.    **EPA's Designation for Rusk and Panola Counties Is Unlawful Because EPA Did Not Treat Like Cases Alike**

   A.    **Petitioners Raised the Issue of EPA's Disparate Treatment During the Public Comment Period**

The government's waiver argument is meritless.  The issue of EPA's disparate treatment of Rusk and Panola Counties was clearly raised in comments on EPA's proposal.  In the body of its comments, Luminant highlighted the "recurring errors with Sierra Club's modeling" and explained that "EPA rejected Sierra Club's modeling *for other areas* for one or more of these errors."  R.328 at 24-25 (emphasis added).  The comments provided specific examples of EPA's inconsistent treatment (*id.* at 25 n.96; *see also id.* at 25-26), including for the same counties that Petitioners cite here:  "[W]hen faced with conflicting modeling results from Sierra Club and the state for other areas, including around Sheldon Station in Nebraska, and Gavin Power Plant in Ohio, EPA proposed an unclassifiable designation for the area."  *Id.* at 47 n.172 and accompanying text.  These were not isolated comments—a significant portion of Luminant's comments focused on the argument that, in the face of conflicting information, as EPA

had for the Texas areas, EPA should issue an unclassifiable designation.  *See, e.g.*, *id.* at

1, 2, 3, 15, 16, 17, 46, 47.[9]

Clearly, EPA was alerted to the issue.  When proposing to correct the Rusk and

Panola Counties nonattainment designation, EPA itself identified Gallia County, Ohio,

and Lancaster County, Nebraska, as other Round 2 areas where EPA had previously

found that "where conflicting sets of model results exist, the appropriate designation

may be 'unclassifiable[.]'" 84 Fed. Reg. at 43,762, 43,762 n.29, n.30.  EPA had more

than adequate opportunity to address the issue, but it never did.  The government's

waiver argument should be rejected.

## B.    The Nonattainment Designation Must Be Vacated Because EPA Failed to Justify Its Disparate Treatment of Rusk and Panola Counties

The government does not dispute that EPA failed to consider whether its

nonattainment designation for Rusk and Panola Counties was inconsistent with its

---

[9] The government's brief does not establish that issue exhaustion was even required here.  Its brief cites no statute or regulation that required parties to present specific issues to the agency, nor does it claim that the comment process here resembled adversarial litigation. *Cf. Palm Valley Health Care, Inc. v. Azar*, 947 F.3d 321, 327 n.6 (5th Cir. 2020) (explaining that "[w]hen a court decides whether to impose an 'issue exhaustion requirement even in the absence of a statute or regulation,' it considers how much the administrative proceeding resembles 'normal adversarial litigation.'") (quoting *Sims v. Apfel*, 530 U.S. 103, 108-09 (2000)).  In fact, EPA itself does not think that the Clean Air Act provision requiring issue exhaustion applies in this case.  R.472, Encl. 1 at 6 (asserting that 42 U.S.C. §7607(d)(7)(B) "does not apply").  Regardless, because the issue was squarely presented to EPA in comments, the Court need not decide whether issue exhaustion applies to the EPA administrative process here.

unclassifiable designations for other Round 2 counties where EPA was also presented with a conflict between Sierra Club's modeling and other available information. For this reason, the nonattainment designation is arbitrary and capricious and must be vacated. As this Court has recognized, an "agency violates the arbitrary-and-capricious standard 'if it fails to respond to significant points and consider all relevant factors raised by the public comments.'" *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 449 (5th Cir. 2021) (internal citations omitted). Under this Court's precedent (which the government's brief wholly ignores), the issue of consistency was significant and relevant. *Univ. of Texas v. U.S. Dep't of Health and Human Servs.*, 985 F.3d 472, 479 (5th Cir. 2021) ("It is a bedrock principle of administrative law that an agency must 'treat like cases alike.'" (internal citation omitted)); *Cent. Power & Light Co. v. United States*, 634 F.2d 137, 150 (5th Cir. 1980) ("[A]n agency must either conform itself to its prior norms and decisions or explain the reason for its departure."). And the issue was outcome determinative and "would [have] require[d] a change in [EPA's] rule"—had EPA treated like cases alike, Rusk and Panola Counties would be unclassifiable. *Huawei*, 2 F.4th at 449 (internal quotation and citation omitted).

For the first time in its brief, the government attempts to provide a technical defense to EPA's disparate treatment. Resp.Br. at 60-63. But that explanation "cannot be regarded as anything more than unacceptable post hoc rationalizations." *United States v. Garner*, 767 F.2d 104, 123 (5th Cir. 1985). Because these reasons were not "articulated by the agency itself," EPA's designation for the Rusk and Panola Counties area is

arbitrary and capricious and due to be vacated.  *See Texas*, 10 F.4th at 552 (internal

quotation and citation omitted).[10]

### C.    The Government Is Wrong That EPA Treated Like Cases Alike

Even though EPA did not address the issue, the government claims that EPA

did not treat like situations differently.  Resp.Br. at 55-56.  But the government's

argument is based on a false premise—namely, that EPA applied a "multiple-factor

weight-of-the-evidence test" and thus all areas were subject to the same basic analysis

even though there were different outcomes.  *Id.* at 56-58.  Despite the government's

after-the-fact characterization, EPA did not rely on or perform a "multiple-factor"

analysis for its Rusk and Panola designations. *See supra* at 15-17.  For Rusk and Panola

Counties, EPA based its designation only on Sierra Club's modeling (R.434 at 74)—

even though there was other available information—and it did not "weigh" any other

---

[10] Even the government's post hoc arguments are unpersuasive.  The government does
not adequately address the common errors that existed in Sierra Club's modeling for
the Texas areas and the other areas.  For example, EPA faulted Sierra Club's modeling
for the other areas for failing to include variable stack conditions and failing to use
building downwash, but it excused these same errors in Sierra Club's modeling for
Texas.  Pet.Br. at 41-42, 44.

"factors" as the government now argues.[11]  *Supra* at 16-17.  In contrast, in the areas outside Texas, EPA found Sierra Club's same modeling "not . . . to provide a reliable assessment" (R.405 at 20-21), and it credited other conflicting modeling showing attainment even though it "had serious flaws" (to use EPA's words).  Pet.Br. at 38-39 (quoting Respondent EPA's Final Brief at 33, *Samuel Masias v. EPA*, No. 16-1314 (D.C. Cir. May 15, 2018)).  Thus, outside Texas, the tie went to the runner; but in Texas, EPA disqualified the batter before she made it to the plate.

Here, even the other team agrees that EPA is not calling the game fairly.  Sierra Club itself—which produced the modeling that EPA used—has confirmed that these were not simply cases of different modeling inputs producing different results.  In the Gallia County Round 2 proceeding, Sierra Club explained that EPA's nonattainment designation for Rusk and Panola Counties was "based on modeling submitted by the Sierra Club that is based on *substantially similar protocols by the same air dispersion modelers as*

---

[11] Even if EPA had engaged in a "multi-factor" fact-specific analysis, that only heightens, not diminishes, EPA's obligation to explain the distinctions.  As one court has explained, "[t]he need for an explanation is particularly acute when an agency is applying a multi-factor test through case-by-case adjudication" "to allow 'relevant distinctions between different factual configurations to emerge,' and because 'appellate courts depend on it for the performance of their assigned task of review.'"  *LeMoyne-Owen College v. NLRB*, 357 F.3d 55, 61 (D.C. Cir. 2004) (internal citation omitted).  "In the absence of an explanation, the 'totality of the circumstances' can become simply a cloak for agency whim—*or worse.*"  *Id.* (emphasis added).  In other words, as this Court has succinctly said, an "agency cannot hide behind the fact-intensive nature of [its actions] to ignore irrational distinctions between like cases."  *Univ. of Tex.*, 985 F.3d at 480.

*the Sierra Club's Ohio modeling.*"[12]   Sierra Club further explained that the different outcomes in the cases were not due to differences in Sierra Club's modeling—they were due to differences *in EPA's analysis* of that modeling:  "EPA's *evaluation* of Sierra Club's modeling for Texas differed significantly from *its approach* in Ohio."[13]   And it went so far as to say that "[i]f EPA were to employ the same rationale it used in the Texas Four Areas Rule in the Gallia County Designation Rule, then EPA likely would designate Gallia County as nonattainment."[14]   Thus, by Sierra Club's own admissions (which Sierra Club does not even attempt to explain away), this is decidedly *not* a case where "[t]he contested counties have received identical treatment."  *Texas v. EPA*, 983 F.3d 826, 840 (5th Cir. 2020).

The government's response is to ignore this Court's precedent and to ask the Court to ignore these facts.  The government's brief refuses to acknowledge this Court's rule that "an agency must 'treat like cases alike.'"  *Univ. of Texas*, 985 F.3d at 479 (internal citation omitted).  And it asks the Court to ignore Sierra Club's candid admission that EPA acted inconsistently here.  Resp.Br. at 24 n.1.  Neither the government nor Sierra

---

[12] *See* Sierra Club, Petition for Reconsideration of Air Quality Designation for Gallia County, Ohio for the 2010 Sulfur Dioxide (SO2) Primary National Ambient Air Quality Standard—Round 2, EPA-HQ-OAR-2014-0464-0445, at 4 (Jan. 6, 2017), https://www.regulations.gov/document/EPA-HQ-OAR-2014-0464-0445 (emphasis added).

[13] *Id.* (emphasis added).

[14] *Id.* at 2.

Club disputes the authenticity of Sierra Club's Ohio petition for reconsideration, nor do they dispute Petitioners' characterization of it. Instead, the government asks the Court to ignore it because EPA did not include it on the certified list that it filed with the Court. *Id.* But the Court can "direct" that the record be supplemented "at any time," Fed.R.App.P. 16(b), and it is appropriate to do so "with 'background information' in order to determine whether the agency considered all of the relevant factors," *Medina Cty. Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010) (internal citation omitted), which is Petitioners' argument here. Regardless, the documents that the government did include on the certified list are more than adequate to demonstrate that EPA took a demonstrably different approach for Texas.[15]

Were there any doubt of the disparate treatment, it is dispelled by the government's failure to cite *even one* example of another area, other than the areas in the Texas rule here, where EPA was presented with conflicting modeling information and designated the area as nonattainment. EPA's so-called "Round 2" $SO_2$ designations included 65 areas in 24 States. *See* 81 Fed. Reg. at 45,040-41; 81 Fed. Reg. at 89,871. All of them included what EPA has characterized as "the largest sources of $SO_2$." Reply in Support of Consent Order, *Sierra Club v. McCarthy*, 3:13-cv-03953, Doc. 132 at 1 (N.D. Cal. Aug. 29, 2014). Yet the government cannot cite to a single other Round 2 area where EPA was presented with conflicting modeling information and designated

---

[15] *See, e.g.*, R.134, 138, 152, 392, 405, 410.

the area as nonattainment—much less such an area where the available monitoring data

showed attainment, as here.  The government's silence speaks volumes.  And its claim

that Martin Lake is the "largest emitter of $SO_2$" with "enormous" emissions (Resp.Br.

at 6-7, 48) is beside the point—other power plants in the Round 2 group had similar or

*more* $SO_2$ emissions in the defining time period than Martin Lake did, and those areas

were still designated as unclassifiable.[16]  The record here is undisputed that EPA failed

to "treat like cases alike" and instead "g[a]ve free passes to its friends and hammer[ed]

its enemies."  *Univ. of Texas*, 985 F.3d at 479-480.

## III.    The Government Concedes EPA's Mistake of Law

The government mischaracterizes Petitioners' mistake-of-law argument and

replaces it with a strawman.  Petitioners did not suggest that EPA should violate the

statutory deadline for $SO_2$ designations—EPA did that on its own.  *See* Pet.Br. at 5-6 &

n.10.  Had EPA acted by the statutory deadline of June 3, 2013, there would be no

doubt that Rusk and Panola Counties must be unclassifiable because Sierra Club did

not submit *any* modeling by that deadline and the only available data was monitoring

data showing attainment.  It was only EPA's settlement with Sierra Club that provided

---

[16] EPA used 2012 emissions to determine the "Round 2" areas.  *See* Consent Decree, *Sierra Club*, No. 3:13-cv-03953, Doc. 163 at 4 (N.D. Cal. Mar. 2, 2015).  In 2012, Rockport Electric Generating Facility in Spencer County, Indiana, and the Labadie Energy Center in Franklin-St. Charles Counties, Missouri, emitted similar or more $SO_2$ than Martin Lake.  *Compare* R.434 a 51, *with* R.403 at 27 (Indiana Final TSD), and R.386 at 7 (Missouri Final TSD).   EPA designated these other counties as unclassifiable/attainment and unclassifiable, respectively.  *Id.*

a carefully-tailored window for Sierra Club to submit modeling, while denying Texas the benefit of the Data Requirements Rule.

Petitioners *do* contend that EPA *was wrong* when it said that it did not have the authority to "designate the areas as unclassifiable in the absence of monitoring data and later redesignate the areas once the monitoring data are collected." R.472, Encl. 1 at 10; R.438 at 13-14. On this point, the government agrees with Petitioners. The government now says that "the statute *allows* EPA to set a cut-off for submission of data to be considered in the designation process, which in this case EPA *geared to* the court-ordered deadline." Resp.Br. at 29 (emphasis added). Thus, contrary to EPA's belief at the time, EPA *did have* the authority to designate Rusk and Panola Counties unclassifiable at the consent decree deadline and then "gear" the collection of additional monitoring data to the deadlines in the Data Requirements Rule. EPA recognized as much in the Error Correction, which it did not finalize, and for other areas outside of Texas, including Gallia County, Ohio. Pet.Br. at 48. Its mistaken belief that it could not do the same for Texas requires vacatur of the Rusk and Panola Counties nonattainment designation.

## CONCLUSION

The Court should vacate the Rusk and Panola Counties nonattainment designation.

Dated: March 30, 2022

Respectfully Submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN COWLES
Deputy Attorney General for Civil Litigation

PRISCILLA M. HUBENAK
Chief, Environmental Protection Division

s/ Linda B. Secord
LINDA B. SECORD
Assistant Attorney General
Linda.Secord@oag.texas.gov

JOHN R. HULME
Assistant Attorney General
John.Hulme@oag.texas.gov

OFFICE OF THE ATTORNEY
GENERAL OF TEXAS
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
512-463-2012 (phone)
512-320-0911 (fax)

*Counsel for Petitioners the State of Texas and Texas
Commission on Environmental Quality*

<u>s/ P. Stephen Gidiere III</u>

P. Stephen Gidiere III
C. Grady Moore III
Julia B. Barber
BALCH & BINGHAM LLP
1901 6th Ave. N., Ste. 1500
Birmingham, Alabama 35203
205-251-8100
sgidiere@balch.com

Stephanie Z. Moore
Executive Vice President & General Counsel
VISTRA CORP.
6555 Sierra Drive
Irving, Texas 75039

Daniel J. Kelly
Senior Vice President & Deputy General
Counsel
VISTRA CORP.
6555 Sierra Drive
Irving, Texas 75039

David W. Mitchell
Senior Counsel, Environmental
VISTRA CORP.
6555 Sierra Drive
Irving, Texas 75039

*Counsel for Petitioners Luminant Generation
Company LLC, Big Brown Power Company LLC,
Sandow Power Company LLC, and Luminant
Mining Company LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on this 30th day of March, 2022.


<u>s/ P. Stephen Gidiere III</u>

*Counsel for Luminant Petitioners*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel states that this reply brief complies with Fed. R. App. P. 32(a)(7)(B) because it contains 6,461 words, excluding the items allowed to be excluded pursuant to Fed. R. App. P. 32(f), as counted by a word processing system and, therefore, is within the word limit.  This brief also complies with typeface requirements of Fed. R. App. P. 32(a)(5) because it has been prepared in a proportionally spaced typeface in 14-point Garamond font.

Dated: March 30, 2022

s/ P. Stephen Gidiere III

*Counsel for Luminant Petitioners*