## No. 17-60088

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

**STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY L.L.C.; BIG BROWN POWER COMPANY L.L.C.; SANDOW POWER COMPANY L.L.C.; LUMINANT MINING COMPANY L.L.C.,**
**Petitioners**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, in His Official Capacity as Administrator of the United States Environmental Protection Agency,**
**Respondents**

**Consolidated with**

## No. 21-60673

**STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; LUMINANT MINING COMPANY, L.L.C.,**
**Petitioners**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,**
**Respondents**

**On Petition for Review of Final Agency Actions of the United States Environmental Protection Agency**

**Rule 30.2(a) Appendix – Volume One of Eight (Tabs 1 - 143)**

KEN PAXTON
Attorney General of Texas
BRENT WEBSTER
First Assistant Attorney General
GRANT DORFMAN
Deputy First Assistant Attorney General
SHAWN COWLES
Deputy Attorney General for Civil Litigation
PRISCILLA M. HUBENAK
Chief, Environmental Protection Division

**March 30, 2022**

LINDA B. SECORD
Assistant Attorney General
Linda.Secord@oag.texas.gov
JOHN R. HULME
Assistant Attorney General
John.Hulme@oag.texas.gov
OFFICE OF THE ATTORNEY
GENERAL OF TEXAS
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
512-463-2012 (phone)
*Counsel for the State of Texas and Texas Commission on Environmental Quality*

# **TABLE OF CONTENTS**
## **Volume One of Eight***

Tab

81 Fed. Reg. 10,563 (Mar. 1, 2016) ........................................................... 1

Updated Guidance for Area Designations for the 2010 Primary Sulfur Dioxide National Ambient Air Quality Standards (Mar. 20, 2015) (with attachments) ................................................................................................ 30

Letter from Greg Abbott, Governor, State of Texas, to Janet G. McCabe, Assistant Administrator, EPA, regarding the Texas's recommendations for the area designations for the 2010 SO₂ NAAQS (Sept. 18, 2015) (with Attachment A) ............................................................................................... 80

Letter from Joshua Smith, Staff Attorney, Sierra Club to Scott Mathias, Associate Director, EPA, regarding Updated Air Dispersion Modeling of Sulfur Dioxide Pollution in Texas and Louisiana (Dec. 14, 2015) (with Attachments 2 & 4) ........................................................................................ 82

Letter from Joshua Smith, Staff Attorney, Sierra Club to Scott Mathias, Associate Director, EPA, regarding Air Dispersion Modeling of Texas Sulfur Dioxide Pollution (Sept. 17, 2015) (with Attachments 2, 4, & 5)...................... 84

Technical Support Document for Ohio Area Designations for the 2010 SO₂ Primary National Ambient Air Quality Standard ........................................... 134

Technical Support Document for Arkansas Area Designations for the 2010 SO₂ Primary National Ambient Air Quality Standard .................................... 138

Letter from Ron Curry, Regional Administrator, EPA Region 6 to Hon. Greg Abbott, Governor of Texas (Feb. 11, 2016) ................................................. 143

*(See other volumes for additional appendix documents)*

---

\* Consistent with how the record material was cited in the briefs, appendix tab numbers correspond to the final four digits (minus leading zeros) of "Document ID" numbers on the certified index of record contents.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this appendix, which includes Volumes One through Eight, via the Court's CM/ECF system on this 30th day of March, 2022. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Trend Micro and is free of viruses.

s/ P. Stephen Gidiere III

*Counsel for Luminant Petitioners*

**Tab 1: 81 Fed. Reg. 10,563 (Mar. 1, 2016)**

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 81

**[EPA–HQ–OAR–2014–0464; FRL–9943–02–OAR]**

**EPA Responses to Certain State Designation Recommendations for the 2010 Sulfur Dioxide National Ambient Air Quality Standard: Notice of Availability and Public Comment Period**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice of availability and public comment period.

**SUMMARY:** Notice is hereby given that the Environmental Protection Agency (EPA) has posted on its Internet Web site responses to certain state designation recommendations for the 2010 Sulfur Dioxide ($SO_2$) National Ambient Air Quality Standard (NAAQS). The EPA invites the public to review and provide input on its responses during the comment period specified in the **DATES** section. The EPA sent its responses directly to the states on or about February 16, 2016. The EPA intends to make final the designation determinations for the areas of the country addressed by these responses no later than July 2, 2016.

**DATES:** Comments must be received on or before March 31, 2016. Please refer to **SUPPLEMENTARY INFORMATION** for additional information on the comment period.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–HQ–OAR–2014–0464, at *http://www.regulations.gov*. Follow the online instructions for submitting comments. Once submitted, comments cannot be edited or removed from Regulations.gov. The EPA may publish any comment received to its public docket. Do not submit electronically any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. The EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.*, on the Web, Cloud, or other file sharing system). For additional submission methods, the full EPA public comment policy, information about CBI or multimedia submissions, and general guidance on making effective comments, please visit *http://www2.epa.gov/dockets/commenting-epa-dockets*.

**FOR FURTHER INFORMATION CONTACT:** For general questions concerning this action, please contact Rhea Jones, U.S. EPA, Office of Air Quality Planning and Standards, Air Quality Planning Division, C539–04, Research Triangle Park, NC 27711, telephone (919) 541–2940, email at *jones.rhea@epa.gov*. For questions regarding areas in EPA Region 1, please contact Leiran Biton, U.S. EPA, telephone (617) 918–1267, email at *biton.leiran@epa.gov*. For questions regarding areas in EPA Region 2, please contact Henry Feingersh, U.S. EPA, telephone (212) 637–3382, email at *feingersh.henry@epa.gov*. For questions regarding areas in EPA Region 3, please contact Irene Shandruk, U.S. EPA, telephone (215) 814–2166, email at *shandruk.irene@epa.gov*. For questions regarding areas in EPA Region 4, please contact Twunjala Bradley, U.S. EPA, telephone (404) 562–9352, email at *bradley.twunjala@epa.gov*. For questions regarding areas in EPA Region 5, please contact John Summerhays, U.S. EPA, telephone (312) 886–6067, email at *summerhays.john@epa.gov*. For questions regarding areas in EPA Region 6, please contact Dayana Medina, U.S. EPA, telephone (214) 665–7241, email at *medina.dayana@epa.gov*. For questions regarding areas in EPA Region 7, please contact David Peter, U.S. EPA, telephone (913) 551–7397, email at *peter.david@epa.gov*. For questions regarding areas in EPA Region 8, please contact Adam Clark, U.S. EPA, telephone (303) 312–7104, email at *clark.adam@epa.gov*. For questions regarding areas in EPA Region 9, please contact Gwen Yoshimura, U.S. EPA, telephone (415) 947–4134, email at *yoshimura.gwen@epa.gov*. For questions regarding areas in EPA Region 10, please contact John Chi, U.S. EPA, telephone (206) 553–1185, email at *chi.john@epa.gov*.

**SUPPLEMENTARY INFORMATION:**

## I. Background and Purpose

On June 2, 2010, the EPA Administrator signed a notice of final rulemaking that revised the primary $SO_2$ NAAQS (75 FR 35520; June 22, 2010) after review of the existing two primary $SO_2$ standards promulgated on April 30, 1971 (36 FR 8187). The EPA established the revised primary $SO_2$ NAAQS at 75 parts per billion (ppb) which is attained when the 3-year average of the annual 99th percentile of 1-hour daily maximum concentrations does not exceed 75 ppb.

The process for designating areas following promulgation of a new or revised NAAQS is contained in the Clean Air Act (CAA) section 107(d) (42 U.S.C. 7407). After promulgation of a new or revised NAAQS, each governor or tribal leader has an opportunity to recommend air quality designations, including the appropriate boundaries for nonattainment areas, to the EPA. The EPA considers these recommendations as part of its duty to promulgate the formal area designations and boundaries for the new or revised NAAQS. By no later than 120 days prior to promulgating designations, the EPA is required to notify states and tribes, as appropriate, of any intended modifications to an area designation or boundary recommendation that the EPA deems necessary.

The EPA completed an initial round of $SO_2$ designations for certain areas of the country on July 25, 2013, designating 29 areas in 16 states as nonattainment. Pursuant to a March 2, 2015, court-ordered schedule,[1] the EPA must complete $SO_2$ designations for the remaining areas of the country by three specific deadlines: July 2, 2016, December 31, 2017, and December 31, 2020. This current second round of designation addresses two groups of areas: (1) Areas that have newly monitored violations of the 2010 $SO_2$ NAAQS, and (2) areas that contain any stationary sources that had not been announced as of March 2, 2015, for retirement and that according to the EPA's Air Markets Database emitted in 2012 either (i) more than 16,000 tons of $SO_2$, or (ii) more than 2,600 tons of $SO_2$ with an annual average emission rate of at least 0.45 pounds of $SO_2$/mmBTU. The EPA has determined that the areas meeting these criteria are associated with 68 stationary sources and the island of Hawaii.

On or about February 16, 2016, the EPA notified affected states of its intended designation of certain specific areas as either nonattainment, unclassifiable/attainment, or unclassifiable for the 2010 $SO_2$ NAAQS. Those states now have an opportunity to demonstrate why they believe an intended modification by the EPA regarding those specified areas may be inappropriate. In 2015, the EPA encouraged these states to provide additional information for the EPA to consider in finalizing designations for these specified areas.

The purpose of this notice of availability is to solicit input from interested parties other than states on

---

[1] *Sierra Club* v. *McCarthy*, No. 3–13–cv–3953 (SI) (N.D. Cal. Mar. 2, 2015).

the EPA's recent responses to the state designation recommendations for the 2010 SO$_2$ NAAQS. These responses, and their supporting technical analyses, can be found on the EPA's Internet Web site at *http://www.epa.gov/so2designations* and also in the public docket for SO$_2$ designations at Docket ID No. EPA–HQ–OAR–2014–0464. The CAA section 107(d) provides a process for air quality designations that involves recommendations by states and tribes to the EPA and responses from the EPA to those parties, prior to the EPA promulgating final area designations and boundaries. The EPA is not required under the CAA section 107(d) to seek public comment during the designation process, but is electing to do so for these areas under the 2010 SO$_2$ NAAQS in order to gather additional information for the EPA to consider before making final designations for the specific areas addressed in the EPA's recent responses to states. The EPA invites public input on its responses to states regarding these areas during the 30-day comment period provided in this notice of availability. In order to receive full consideration, input from the public must be submitted by March 31, 2016. At this time, the EPA is not asking for public comments on other areas for which states and tribes have submitted designation recommendations, beyond those to which the EPA has provided the responses that are the subject of this proposed action. This notice of availability and opportunity for public comment does not affect any rights or obligations of any state, tribe or the EPA which might otherwise exist pursuant to the CAA section 107(d).

Please refer to the **ADDRESSES** section above in this document for specific instructions on submitting comments and locating relevant public documents.

In establishing nonattainment area boundaries for a particular area, the EPA is required to identify both the area that does not meet the standard and any nearby area contributing to the area that does not meet the standard. We are particularly interested in receiving comments, supported by relevant information, if you believe that a specific geographic area that the EPA is proposing to identify as a nonattainment area should not be categorized by the CAA section 107(d) criteria as nonattainment, or if you believe that a specific nearby area not proposed by the EPA to be identified as contributing to a nonattainment area should in fact be categorized as contributing to nonattainment using the CAA section 107(d) criteria. Please be as specific as possible in supporting your views.

• Describe any assumptions and provide any technical information and/or data that you used.

• Provide specific examples to illustrate your concerns, and suggest alternatives.

• Explain your views as clearly as possible.

• Provide your input by the comment period deadline identified.

The EPA intends to complete designations for the areas subject to this round no later than July 2, 2016. The EPA is not yet prepared to respond to state and tribal area designation recommendations, or seek public input thereon, for other areas that are not yet designated for the 2010 SO$_2$ NAAQS. The EPA will address those areas in the last two rounds of designations scheduled for 2017 and 2020. Additional information on the EPA's intended approach for addressing designations for all areas can be found on the EPA's SO$_2$ implementation Web site at *http://www3.epa.gov/airquality/sulfurdioxide/implement.html*. Please be advised that, in this action, the EPA is not proposing as a regulatory action and is not soliciting public comments on the intended approach for these other areas, regarding either designations or implementation.

## II. Instructions for Submitting Public Comments and Internet Web Site for Rulemaking Information

### A. What should I consider as I prepare my comments for the EPA?

1. *Submitting CBI.* Do not submit this information to the EPA through *www.regulations.gov* or email. Clearly mark the part or all of the information that you claim to be CBI. For CBI in a disk or CD ROM that you mail to the EPA, mark the outside of the disk or CD ROM as CBI and then identify electronically within the disk or CD ROM the specific information that is claimed as CBI. In addition to one complete version of the comment that includes information claimed as CBI, a copy of the comment that does not contain the information claimed as CBI must be submitted for inclusion in the public docket. Information so marked will not be disclosed except in accordance with procedures set forth in 40 CFR part 2. Send or deliver information identified as CBI only to the following address: Tiffany Purifoy, OAQPS CBI Officer, U.S. EPA, Office of Air Quality Planning and Standards, Mail Code C404–02, Research Triangle Park, NC 27711, telephone (919) 541–0878, email at *purifoy.tiffany@epa.gov*, Attention Docket ID No. EPA–HQ–OAR–2014–0464.

2. *Tips for Preparing Your Comments.* When submitting comments, remember to:

• Identify the rulemaking by docket number and other identifying information (subject heading, **Federal Register** date and page number).

• Follow directions.

• Explain why you agree or disagree; suggest alternatives and substitute language for your requested changes.

### B. Where can I find additional information for this rulemaking?

The EPA has also established a Web site for this rulemaking at *http://www3.epa.gov/so2designations*. The Web site includes the EPA's state and tribal designation recommendations, information supporting the EPA's preliminary designation decisions, as well as the rulemaking actions and other related information that the public may find useful.

Dated: February 16, 2016.

**Mary E. Henigin,**

*Acting Director, Office of Air Quality Planning and Standards.*

[FR Doc. 2016–04468 Filed 2–29–16; 8:45 am]

**BILLING CODE 6560–50–P**

**Tab 30: Updated Guidance for Area Designations for the 2010 Primary Sulfur Dioxide National Ambient Air Quality Standards (Mar. 20, 2015) (with attachments)**



3

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
RESEARCH TRIANGLE PARK, NC  27711

MAR 2 0 2015

OFFICE OF
AIR QUALITY PLANNING
AND STANDARDS

### MEMORANDUM

**SUBJECT:**  Updated Guidance for Area Designations for the 2010 Primary Sulfur Dioxide National
Ambient Air Quality Standard

**FROM:**  Stephen D. Page
Director

**TO:**  Regional Air Division Directors, Regions 1 – 10

The purpose of this memorandum is to provide information on the schedule and process for designating
areas for the 2010 primary sulfur dioxide ($SO_2$) national ambient air quality standard (NAAQS). In
addition, it identifies factors for determining the boundaries for $SO_2$ areas designated nonattainment,
attainment and unclassifiable. We recommend that states and tribes consider and address these factors
when identifying boundaries for any updated area designation recommendations they choose to submit
for the 2010 $SO_2$ NAAQS. Please share this information with the state and tribal agencies in your
region. As explained below, this guidance updates and replaces the previous designation guidance for
the 2010 $SO_2$ NAAQS, which was issued on March 24, 2011. In assessing the appropriate designation
for a given area, the EPA will consider the state's previous designation recommendations and any
updated recommendations, as well as any additional relevant information that we receive.

On June 2, 2010, then-Administrator Jackson signed the revised primary $SO_2$ NAAQS (75 FR 35520,
June 22, 2010) after review of the existing primary $SO_2$ standards issued in 1971. The EPA established
the revised primary $SO_2$ standard at 75 parts per billion (ppb) which is met at a monitoring site when
the 3-year average of the 99th percentile of daily maximum 1-hour concentrations does not exceed 75
ppb. The Administrator determined that this is the level necessary to provide protection of public
health with an adequate margin of safety, especially for children, the elderly and those with asthma.
These groups are particularly susceptible to the health effects associated with breathing $SO_2$.

On August 5, 2013, the EPA published a notice announcing designations of 29 areas in 16 states as
nonattainment for the 2010 $SO_2$ standard, based on certified ambient air quality monitoring data for the
years 2009 – 2011 that showed these areas were violating the standard (78 FR 47191). However, at that
time the EPA was not yet prepared to issue designations for the remaining areas. With stakeholder input,
the EPA developed and proposed the $SO_2$ Data Requirements Rule (DRR) that would require states to
gather and submit to the EPA additional information characterizing $SO_2$ air quality in areas with larger
sources of $SO_2$ emissions. (79 FR 27445). The EPA intends to use this information to inform the
designations of these areas. In the $SO_2$ DRR, as proposed, air agencies implementing the 1-hour $SO_2$
standard would have the choice to use either monitoring or modeling to characterize $SO_2$ air quality in

the vicinity of priority $SO_2$ sources, and submit the modeling and/or monitoring results to the EPA on the schedule specified in the rule.

Following the initial August 2013 designations, three lawsuits were filed against the EPA in different U.S. District Courts, alleging that the agency had failed to perform a nondiscretionary duty under the Clean Air Act (CAA) by not designating all portions of the country by the June 2013 deadline. In an effort intended to resolve the litigation in one of those cases, plaintiffs Sierra Club and the Natural Resources Defense Council and the EPA filed with the U.S. District Court for the Northern District of California a proposed consent decree that specified a schedule for the EPA to complete the remaining $SO_2$ designations for the rest of country in three additional rounds. On March 2, 2015, the Court entered the consent decree and issued an enforceable order for the EPA to complete the area designations according to the consent decree schedule.

General Approach and Schedule

Pursuant to the court order, the EPA must complete the remaining designations on a schedule that contains three specific deadlines. By no later than July 2, 2016 (16 months from the court's order), the EPA must designate two groups of areas: (1) areas that have newly monitored violations of the 2010 $SO_2$ standard and (2) areas that contain any stationary source that according to the EPA's Air Markets Database either emitted more than 16,000 tons of $SO_2$ in 2012 or emitted more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 lbs $SO_2$/mmBtu[1] in 2012 and that has not been announced (as of March 2, 2015) for retirement.[2] The last two deadlines for completing remaining designations are December 31, 2017, and December 31, 2020. The designations completed by these later deadlines are expected to be informed by information provided by states pursuant to the anticipated $SO_2$ DRR.[3] However, even if the $SO_2$ DRR is not finalized, the EPA must still complete designations pursuant to these deadlines.

In the time since states submitted their original designations recommendations in 2011, they may have obtained additional monitoring and/or modeling information that may be relevant for future designations. The CAA section 107(d) does not require states to submit updated recommendations. However, if states would like to submit updated designation recommendations for the EPA to consider in the next rounds of designations, we will consider such information.

For the round of designations to be completed by July 2, 2016, we request that states provide updated recommendations and supporting information to the EPA by September 18, 2015, to assure that the information can be fully considered by the EPA. If the EPA intends to modify any state's designation recommendation (original or updated), we will notify the state no later than 120 days prior to promulgating the final designations (e.g., no later than March 2, 2016, for designations due to be promulgated on or before July 2, 2016). States will then have an opportunity to comment on the EPA's intended modifications and provide additional information for the EPA to consider. While the language

---

[1] The abbreviation "lbs/mmBtu" means pounds per one million British thermal units.

[2] A stationary source with a coal-fired unit that as of January 1, 2010, had a capacity of over 5 megawatts that otherwise meets the emissions criteria, is excluded from the July 2, 2016, deadline if it had announced by March 2, 2015, that it will cease burning coal at that unit through a company public announcement, public utilities commission filing, consent decree, public legal settlement, final state or federal permit filing or other similar means of communications.

[3] As a legal matter, the deadlines in the court order apply even if the EPA does not finalize the $SO_2$ DRR. However, the general approach described in this memorandum reflects our expectation that the EPA will in fact finalize the $SO_2$ DRR.

in section 107 specifically addresses states, we intend to follow the same process for tribes, pursuant to section 301(d) of the CAA and the Tribal Authority Rule (40 CFR Part 49). Therefore, we intend to designate tribal areas, in consultation with the tribes, on the same schedule as state designations. If a state or tribe does not submit an updated designation recommendation, the EPA will promulgate the designations that it deems appropriate after considering the originally submitted recommendation and any relevant additional information available to the EPA.

The states and tribes that choose to submit updated recommendations should identify areas as attainment, nonattainment or unclassifiable on the basis of currently available information. The EPA intends to send "120-day letters" to selected tribes by January 22, 2016 (and not later than March 2, 2016) notifying them of the EPA's intended designation decisions. If a state or tribe has additional information that it wants the EPA to consider in response to a 120-day letter, we request that such information be submitted by April 8, 2016. This will help ensure that the EPA can fully consider any such information prior to issuing final designations. Also, although not required by statute, in order to consider public input in the designation process, we plan to provide a 30-day public comment period immediately following issuance of the EPA's 120-day letters responding to the recommendations made by states and tribes. Attachment 1 is the anticipated schedule for the round of designations that must be completed by July 2, 2016.

We recognize that the timeline for designations by July 2, 2016, does not provide for establishment and use of data from new ambient monitors. Therefore, we anticipate that in many areas the most reliable information for informing these designations will be based on source modeling. The EPA has issued guidance on the use of source modeling for this purpose in the $SO_2$ NAAQS Designations Modeling Technical Assistance Document (Modeling TAD).[4]

Following this next round, the EPA is also required by the court order to complete designations for remaining areas in up to two additional rounds. According to the court order, the EPA must sign for publication in the *Federal Register* no later than December 31, 2017, designations for remaining undesignated areas in which, by January 1, 2017, states have not installed and begun operating an appropriate $SO_2$ monitoring network meeting the EPA specifications referenced in the EPA's anticipated $SO_2$ DRR. We expect this round to cover most remaining undesignated areas in the nation – those for which states choose to follow the modeling approach under the anticipated $SO_2$ DRR to address impacts from larger $SO_2$ sources, and those which do not contain $SO_2$ sources that would require further characterization under the anticipated $SO_2$ DRR. Finally, by no later than December 31, 2020, the EPA must issue designations for all remaining undesignated areas. This final round would cover areas for which states choose to follow and timely implement the monitoring approach under the anticipated $SO_2$ DRR. We will provide more information regarding the approach and schedule for the remaining rounds of designations in the future.

When considering boundaries for updated area designation recommendations, the EPA recommends that states and tribes analyze and consider the following five factors: ambient air quality data or dispersion modeling, emissions and emissions-related data, meteorology, geography/topography and jurisdictional boundaries. (*See* Attachment 2). In addition, the EPA has provided two TADs to assist states and tribes with assessing modeling and monitoring data when determining if an area is meeting or not meeting the

---

[4] The Modeling TAD is available on the EPA's website at
*http://www.epa.gov/airquality/sulfurdioxide/pdfs/SO2ModelingTAD.pdf.*

1-hour $SO_2$ standard. These documents can be found on the EPA's website at *http://epa.gov/airquality/sulfurdioxide/implement.html*.

Identifying an Area that is in Violation of the $SO_2$ NAAQS

Section 107(d)(1) of the CAA defines an area as "nonattainment" if it is violating the NAAQS or if it is contributing to a violation in a nearby area. Thus, the first step in making designation decisions is to identify areas for which monitoring data or appropriate modeling information indicate a violation of the NAAQS.

*Monitor-based Violations.* In assessing whether monitoring data indicate a violation, the EPA intends to use the most recent three consecutive years of quality-assured, certified ambient air quality data in the EPA Air Quality System (AQS)[5] using data from Federal Reference Method and Federal Equivalent Method monitors that are sited and operated in accordance with 40 CFR Parts 50 and 58. Procedures for using monitored air quality data to determine whether a violation has occurred are given in 40 CFR Part 50 Appendix T, as revised in conjunction with the 2010 $SO_2$ NAAQS. We expect that in providing any updated recommendations to the EPA for the areas to be designated by July 2, 2016, states and tribes would review available $SO_2$ monitoring data from 2012–2014. Prior to the EPA issuing letters to states and tribes concerning any intended modifications to state recommendations, certified $SO_2$ monitoring data from 2015 may become available. If this is the case, the EPA intends to also consider certified 2015 $SO_2$ ambient air quality monitoring data in formulating any intended modifications to state and tribal recommendations.

Ambient air quality monitoring data affected by exceptional events may be excluded from use in identifying a violation if they meet the criteria for exclusion, as specified in the final rule "Treatment of Data Influenced by Exceptional Events" (72 FR 13560; March 22, 2007) codified in 40 CFR parts 50 and 51. In section VII.B of the $SO_2$ NAAQS final rule preamble, we discussed schedules for states and tribes to flag data influenced by exceptional events and submit related documentation specifically for $SO_2$ data used in the initial designations process. As previously noted, the EPA did not designate all areas of the country in August 2013 and, consistent with the court order, intends to complete designations in multiple rounds beginning on or about July 2, 2016, through on or about December 31, 2020. This extended designations schedule introduces additional years of monitoring data in which $SO_2$ concentrations may be influenced by exceptional events. Because the previously promulgated exceptional events data flagging and documentation submittal dates associated with $SO_2$ data that could be considered in the initial area designations process have already passed, the EPA is recommending new submittal dates in this guidance for these future data. State and tribal air agencies who wish the EPA to be able to fully consider excluding exceptional event-affected $SO_2$ data for purposes of designations are asked to flag exceptional event data and submit an initial description in the EPA's AQS, and also submit the associated exceptional event demonstrations no later than 5 months prior to the date of final designation decisions. Additionally, air agencies are asked to notify their reviewing EPA Regional Office as soon as possible about their intent to prepare and submit an exceptional event documentation.

*Model-based Violations.* States and tribes may also use air quality modeling results to indicate a violation of the $SO_2$ NAAQS. The EPA believes that dispersion modeling is an appropriate tool to

---

[5] $SO_2$ air quality data is available from the EPA's website at *www.epa.gov/ttn/airs/airsaqs/*.

4

indicate a violation of the $SO_2$ NAAQS, and it has used dispersion modeling in the past for $SO_2$ designations. The previously mentioned December 2013 Modeling TAD provides further recommendations on developing an appropriate refined dispersion modeling analysis to support designation recommendations. Such modeling could include using the AERMOD dispersion model or other appropriate dispersion model. The Modeling TAD updates the March 24, 2011, Modeling Guidance for $SO_2$ NAAQS Designations in four respects, all to ensure that a modeling approach better simulates a monitoring approach. Specifically, the Modeling TAD recommends:

- using actual emissions as an input for assessing violations to provide results that reflect current actual air quality (i.e., modeling that simulates a monitor);
- using 3 years of modeling results to calculate a simulated design value consistent with the 3-year monitoring period required to develop a design value for comparison to the NAAQS;
- placing receptors only in locations where a monitor could be placed; and
- using actual stack heights rather than following the Good Engineering Practice stack height policy when using actual emissions.

<u>Identifying Attainment Areas</u>

The EPA may designate an area as attainment if it is clear that it meets the $SO_2$ NAAQS and does not contribute to a violation in a nearby area. An area may be demonstrated in attainment if the most recent 3 years of ambient air quality monitoring data indicate no violations and if the monitoring network in the area is sufficient to be compared to the NAAQS per the $SO_2$ NAAQS Designations Monitoring TAD.[6] An area may also be demonstrated in attainment if appropriate modeling analysis indicates no violations of the 2010 $SO_2$ NAAQS. (Using allowable emissions in modeling would be an appropriate approach to support an attainment determination.) In either case, it will also be necessary to show that sources in the area are not contributing to a violation in a nearby area. In the absence of information clearly demonstrating a designation of "attainment" or "nonattainment," the EPA intends to designate the area as "unclassifiable"[7] when it takes action pursuant to the court order.

<u>Determining Nonattainment Area Boundaries</u>

Ambient $SO_2$ is a pollutant that arises from direct emissions, and $SO_2$ concentrations are generally expected to be highest relatively close to the source(s) and lower at farther distances due to dispersion. Thus, $SO_2$ concentration patterns resemble those of other directly emitted pollutants like lead and differ from those of photochemically-formed (secondary) pollutants such as ozone. Accordingly, as explained in the 2011 guidance, we expect to continue to consider county boundaries as the analytical starting point for determining $SO_2$ nonattainment areas.

We believe it is appropriate to evaluate each potential nonattainment area on a case-by-case basis to determine an appropriate boundary that satisfies the statutory conditions. A nonattainment area should contain the area violating the NAAQS (e.g., the area around a violating monitor or encompassing

---

[6] The Monitoring TAD is available on the EPA's website at
*http://www.epa.gov/airquality/sulfurdioxide/pdfs/SO2MonitoringTAD.pdf.*
[7] While states have and may continue to submit designations recommendations identifying areas as "attainment," the EPA expects to continue its traditional approach, where appropriate, of using a designation category of "unclassifiable/attainment" for areas that the EPA determines meet the NAAQS. The EPA expects to reserve the category "unclassifiable" for areas where the EPA cannot determine based on available information whether the area is meeting or not meeting the NAAQS or where the EPA cannot determine whether the area contributes to a violation in a nearby area.

modeled violations), as well as any nearby areas (e.g., counties or portions thereof) that contain emissions sources contributing to the monitored or modeled violations. (*See* CAA section 107(d)(1)(A)(i)). We recommend that states and tribes base their updated boundary recommendations on an evaluation of five factors: 1) air quality data or dispersion modeling results; 2) emissions-related data; 3) meteorology; 4) geography and topography; and 5) jurisdictional boundaries, as well as other available data. These factors are discussed in more detail in Attachment 2. Dispersion modeling, as discussed in the Modeling TAD, can be a helpful tool in this evaluation because it allows the model user to simultaneously assess multiple factors. States and tribes may identify and evaluate other relevant factors or circumstances specific to a particular area.

While the EPA generally believes that in the absence of other relevant information it is appropriate to use county boundaries to define nonattainment areas, we recognize that the five-factor analysis and other information may support a nonattainment area consisting of only a portion of a county. For example, a topographical feature may divide a county into two separate air basins, or contributing sources may be clustered in only a portion of a county.[8] For defining partial county boundaries, the EPA recommends the use of well-defined jurisdictional lines such as township borders or other well-established geopolitical boundaries, and immovable landmarks such as major roadways or other permanent and readily identifiable physical features.

<u>Determining Attainment Area Boundaries</u>

An attainment area cannot contain any area that violates the NAAQS or contributes to a violation of the NAAQS in a nearby area. (*See* CAA section 107(d)(1)(A)(i)). County boundaries may be appropriate for defining attainment areas in the absence of any other relevant information that would help define a more specific boundary around the $SO_2$ source(s) in question. To define more specific boundaries, we recommend an evaluation of the five factors mentioned previously, and, in particular, the use of dispersion modeling, as discussed in the Modeling TAD, to simultaneously assess multiple factors.

While we believe this memorandum provides helpful guidance on how boundaries would be determined for $SO_2$ designations, the guidance contained herein is not binding on states, tribes the public or the EPA. The final basis for determining area boundaries will be addressed in the EPA's regulatory action to designate areas under the 2010 $SO_2$ NAAQS. When the EPA promulgates designations, those determinations will be final and binding on states, tribes, the public and the EPA.

Attachment 1 is a timeline of key dates in the round of designations for the revised 2010 $SO_2$ NAAQS that must be completed by July 2, 2016. Attachment 2 identifies the primary five factors that the EPA plans to consider in evaluating and making decisions on appropriate nonattainment and attainment area boundaries. The EPA recommends that states and tribes also address these factors and follow the Monitoring and Modeling TADs if they choose to submit updated designation recommendations.

---

[8] In the case of a contributing $SO_2$ source located very near a county boundary or state border, it may be appropriate for the corresponding nonattainment area to include portions of multiple counties or multiple states.

Staff members at the EPA's Office of Air Quality Planning and Standards are available for assistance and consultation throughout the designations process. General questions on this guidance may be directed to Andy Chang (919) 541-2416. Modeling-related questions may be directed to James Thurman (919) 541-2703. Monitoring-related questions may be directed to Nealson Watkins (919) 541-5522.

Attachments (2)

**ATTACHMENT 1**

| TIMELINE FOR 2010 PRIMARY SO$_2$ NAAQS DESIGNATION PROCESS – ROUND 2 – AREAS ASSOCIATED WITH JULY 2, 2016, COURT-ORDERED DEADLINE[a] | |
|---|---|
| **Milestone** | **Date[b]** |
| Court Order | March 2, 2015 |
| States flag relevant exceptional event-influenced SO$_2$ monitoring data from 2012 and 2013; provide detailed documentation to support all claims | No later than July 1, 2015 |
| States may submit updated recommendations and supporting information for area designations to the EPA | No later than September 18, 2015 |
| States flag relevant exceptional event-influenced SO$_2$ monitoring data from 2014 and 2015; provide detailed documentation to support all claims | No later than February 2, 2016 |
| The EPA notifies states concerning any intended modifications to their recommendations (120-day letters) | January 22, 2016 (no later than 120 days prior to final designations) |
| The EPA publishes public notice of state recommendations and the EPA's intended modifications and initiates 30-day public comment period | o/a February 3, 2016 |
| End of 30-day public comment period | o/a March 4, 2016 |
| States and tribes submit additional information, if desired, to demonstrate why an EPA modification is inappropriate | o/a April 8, 2016 |
| The EPA signs notice promulgating final SO$_2$ area designations (no later than 16 months from court order) | No later than July 2, 2016 |

[a] Designations for Round 3 must be promulgated by December 31, 2017. Designations for Round 4 must be promulgated by December 31, 2020.

[b] o/a = on or about

1

**ATTACHMENT 2**

Determining Area Designations and Appropriate Area Boundaries for
the 2010 $SO_2$ NAAQS

| Designation Categories | | |
|---|---|---|
| Nonattainment | Attainment[1] | Unclassifiable |
| An area that the EPA has determined violates the 2010 $SO_2$ NAAQS, based on the most recent three years of ambient air quality monitoring data or an appropriate modeling analysis, or that the EPA has determined contributes to a violation in a nearby area. | An area that the EPA has determined meets the 2010 $SO_2$ NAAQS and does not contribute to a violation of the NAAQS in a nearby area based on either: a) the most recent 3 years of ambient air quality monitoring data from a monitoring network in area that is sufficient to be compared to the NAAQS per EPA interpretations in the Monitoring TAD, or b) an appropriate modeling analysis. | An area where the EPA cannot determine based on available information whether the area is or is not meeting the 2010 $SO_2$ NAAQS and whether the area contributes to a violation in a nearby area. |

Nonattainment Area Boundaries. The EPA intends to use the county as the analytical starting point for assessing the appropriate geographic boundaries of a $SO_2$ nonattainment area. The five factors listed below comprise a framework for area-specific analyses to support final boundary determinations. The information addressing these factors could include appropriate air quality dispersion modeling as recommended by the $SO_2$ Designations Modeling TAD[2] or, where available, ambient air quality monitoring data as recommended by the $SO_2$ Designations Monitoring TAD.[3] For modeled violations, the portion of the modeling domain encompassing the modeled violations is an appropriate reference point for determining a nonattainment area boundary.

Attainment Area Boundaries. Areas designated as attainment should be supported by information clearly demonstrating that there are no violations of the $SO_2$ NAAQS inside the area boundary, and that the included portions do not contain emission sources that may contribute to monitored or modeled violations outside the area boundary. County boundaries may be appropriate for defining attainment areas in the absence of any other relevant information that would help define

---

[1] While states have and may continue to submit designations recommendations identifying areas as "attainment," the EPA expects to continue its traditional approach, where appropriate, of using a designation category of "unclassifiable/attainment" for areas that the EPA determines meet the NAAQS. The EPA expects to reserve the category "unclassifiable" for areas where the EPA cannot determine based on available information whether the area is meeting or not meeting the NAAQS or where the EPA cannot determine whether the area contributes to a violation in a nearby area.

[2] The Modeling TAD is available on the EPA's website at
*http://www.epa.gov/airquality/sulfurdioxide/pdfs/SO2ModelingTAD.pdf.*

[3] The Monitoring TAD is available on the EPA's website at
*http://www.epa.gov/airquality/sulfurdioxide/pdfs/SO2MonitoringTAD.pdf.*

a more specific boundary around the $SO_2$ source(s) in question. As recommended in the Modeling TAD, appropriate modeling for establishing attainment area boundaries would include using the AERMOD dispersion model, with actual or allowable source emissions. Where appropriate modeling is conducted, the portion of the modeling domain demonstrated to be free of violations, and free of sources that may contribute to any nearby violations is an appropriate reference point for determining the boundary of an attainment area.

Developing Supporting Information (Factor Analysis). As a framework for area-specific analyses to support final boundary determinations, the EPA intends to evaluate the five factors listed below, as well as other relevant available information. The purpose of evaluating these factors is to determine the appropriate boundaries encompassing the area meeting the CAA's definitions. The guidance in the Modeling TAD discusses how modeling could be used to address several of these factors simultaneously. When considered as a whole, results may support boundaries that are either larger or smaller than the analytical starting point.

1. **Ambient air quality data or dispersion modeling results**. We intend to review $SO_2$ ambient air quality monitoring data, including the design value calculated for each monitor in the area, for the most recent 3-year period. Areas where monitoring data indicate a violation of the 1-hour, 75 ppb primary $SO_2$ standard will be designated as "nonattainment." Source-oriented modeling may also be used to assess air quality in a particular location. The Modeling TAD provides further recommendations on using refined dispersion modeling for this type of air quality assessment. An area may be demonstrated to meet the $SO_2$ NAAQS if appropriate modeling analysis based on either actual or allowable emissions from relevant sources indicates no violations of the $SO_2$ NAAQS. As explained in the Monitoring TAD, data from a properly sited monitoring network may also be sufficient to establish that an area meets the $SO_2$ NAAQS. In either case, to be designated attainment it will be necessary to show that sources in the area are not contributing to a violation in a nearby area.

2. **Emissions-related data** (location of sources and potential contribution to ambient $SO_2$ concentrations). We intend to examine actual emissions of $SO_2$ from sources located in and around the violating area. Significant emissions levels in a nearby area indicate potential for the area to contribute to observed or modeled violations of the NAAQS. We intend to review data from the latest National Emissions Inventory or other relevant sources of the data, such as state inventories or inventories from other federal sources. We would also consider any additional information we receive on federally-enforceable emissions controls that are not reflected in recent inventories but which will require compliance before final designations are issued.

3. **Meteorology** (weather and transport patterns). We intend to evaluate meteorological data to help determine how weather conditions, including wind speed and direction, affect the plume of sources contributing to ambient $SO_2$ concentrations. This factor also can be assessed in the context of source-oriented dispersion modeling as recommended in the Modeling TAD.

4. **Geography and topography** (mountain ranges or other air basin boundaries). We intend to examine the physical features of the land that might affect the distribution of $SO_2$ over an

area. Mountains or other physical features may affect the distribution of emissions, and may help define area boundaries.

5. **Jurisdictional boundaries** (e.g., counties, air districts, pre-existing nonattainment areas, reservations, metropolitan planning organizations). For nonattainment areas, once the geographic area associated with the area violating the $SO_2$ NAAQS and the nearby area contributing to violations are determined, we intend to consider existing jurisdictional boundaries for the purposes of providing a clearly defined legal boundary for carrying out the air quality planning and enforcement functions for the area. If an existing jurisdictional boundary is used to help define the nonattainment area, it should encompass all of the area that has been identified as meeting the nonattainment definition. Where existing jurisdictional boundaries are not adequate to describe the nonattainment area, other clearly defined and permanent landmarks or physical features may be used. In certain cases geographic coordinates may be appropriate, but geopolitical boundaries are preferred. For attainment areas, these same jurisdictional considerations may play a role in determining appropriate boundaries.

The EPA plans to consider these factors, along with any other relevant information, in determining whether to make modifications to the designation and area boundary recommendations made by states and tribes. The factors listed above, while generally comprehensive, are not intended to be exhaustive. States and tribes may submit additional information they believe is relevant for the EPA to consider. Any information provided to support a boundary recommendation for a nonattainment area should show that: 1) violations are not occurring in nearby portions that are excluded from the recommended nonattainment area; and 2) the excluded portions do not contain emission sources that contribute to a monitored or modeled violation. Any information provided to support a boundary recommendation for an attainment area should show that: 1) violations are not occurring in the area; and 2) the included portions do not contain emission sources that may contribute to monitored or modeled violations outside the area boundary. In the absence of information clearly demonstrating that an area and its associated boundary are properly designated "attainment" or "nonattainment," the EPA intends to designate the area as "unclassifiable."

**Tab 80: Letter from Greg Abbott, Governor, State of Texas, to Janet G. McCabe, Assistant Administrator, EPA, regarding the Texas's recommendations for the area designations for the 2010 SO2 NAAQS (Sept. 18, 2015) (with Attachment A)**



September 18, 2015

Date Filed: 03/30/2022

Document: 65-1

Case: 21-60673

Ms. Janet G. McCabe
Assistant Administrator
Office of Air and Radiation
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, D.C. 20760

Dear Ms. McCabe:

Pursuant to Section 107(d) of the Federal Clean Air Act, please find the attached proposed sulfur dioxide designations from Dr. Bryan W. Shaw, Chairman of the Texas Commission on Environmental Quality.

Sincerely,

Greg Abbott
Governor

GA:jzk

Attachment

Bryan W. Shaw, Ph.D., P.E., *Chairman*
Toby Baker, *Commissioner*
Richard A. Hyde, P.E., *Executive Director*



## TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

September 18, 2015

Ms. Janet G. McCabe
Assistant Administrator, Office of Air and Radiation
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20760

Dear Ms. McCabe:

This responds to a letter received by the Texas Commission on Environmental Quality (TCEQ) from the U.S. Environmental Protection Agency (EPA) on March 20, 2015, which requests updates to the state's recommendation of area designations for the 2010 primary National Ambient Air Quality Standard (NAAQS) for sulfur dioxide ($SO_2$) by September 18, 2015. Texas continues to support the use of ambient air monitoring data as the appropriate information for use in making designation decisions. However, since the EPA is now requesting additional information for use in the designation decision process, the TCEQ submits additional information to support the recommended designations. As stated below, I recommend that counties in Texas be designated either attainment based on monitoring data or unclassifiable/attainment where there are no monitors. The recommended designations are consistent with the EPA's updated designations guidance for $SO_2$ dated March 20, 2015, which states that in the absence of information that clearly shows attainment or nonattainment, the EPA intends to designate an area unclassifiable/attainment. Monitoring data is necessary for accurate characterization of actual air quality for attainment and nonattainment designations.

<u>The Latest Monitoring Data Supports Texas' Previous Recommendation</u>

There continue to be no monitored violations in Texas of the 2010 $SO_2$ standard. As recommended by the State of Texas in 2011 and 2012 and reiterated in comments submitted to the EPA in 2013 and 2014, every county with monitoring data that meets quality assurance requirements for the 2010 $SO_2$ NAAQS should be designated attainment based on the actual, observed air quality data from that county. Each of the counties with no monitoring data should be designated unclassifiable/attainment for the 2010 $SO_2$ NAAQS.

Eleven Texas counties have certified monitoring data showing no violations, supporting a designation of attainment for the 2010 $SO_2$ NAAQS. Attachment A: *Recommended Designations for the 2010 One-Hour $SO_2$ Primary NAAQS*, shows the 2012, 2013, and 2014 design values for Dallas, El Paso, Ellis, Galveston, Gregg, Harris, Jefferson, Kaufman, McLennan, Navarro, and Nueces Counties. Texas recommends attainment designations for each of these 11 counties. Texas recommends unclassifiable/attainment designations for the remainder of the state (243 counties).

Ms. Janet G. McCabe
Page 2
September 18, 2015

Additional Evaluation of Counties Containing EPA-identified Sources

As referenced in the EPA's letter, a March 2, 2015 court approved consent decree calls for the EPA to complete designations for the 2010 $SO_2$ NAAQS in three additional rounds from 2016 to 2020. For this first round of additional designations, the EPA named 12 power plants in Texas fitting the consent decree criteria to evaluate for any impacts on attainment of the $SO_2$ NAAQS.

Additional information to support specific designations for the areas where these EPA-identified sources are located, including source modeling, has been requested by the EPA. Notwithstanding our disagreement with any use of modeled predictions to determine attainment status, the TCEQ was able to conduct modeling for three of the 12 power plants identified by the EPA. Modeling was performed according to guidelines in the EPA's *$SO_2$ NAAQS Designations Modeling Technical Assistance Document (TAD)*, using actual emissions information from the Air Markets Program database and the American Meteorological Society/Environmental Protection Agency Regulatory Model (AERMOD) modeling system. The constrained time frame did not allow for the TCEQ's analysis of all 12 EPA-identified $SO_2$ emissions sources, or to conduct in-depth analyses, determine model input refinements, or develop detailed graphics.

Attachment B: *TCEQ's Analyses,* identifies the information that the TCEQ considered in evaluating four of the 12 EPA-identified sources. Those four sources include the three TCEQ-modeled sources - Coleto Creek Power Station, Tolk Generating Station, and Twin Oaks Power Station - along with Sandy Creek Energy Station, which submitted its own modeling and other information for the EPA's consideration. Although Texas continues to recognize AERMOD's shortcomings as a tool for determining NAAQS designations, this modeling information is submitted to further support the unclassifiable/attainment designations recommended for Goliad, Lamb, and Robertson Counties.

Memorandums summarizing the modeling results for Coleto Creek Power Station, Tolk Generating Station, and Twin Oaks Power Station are contained in Attachment B: *TCEQ Analyses,* Part 2: *Modeling Analyses.* The modeling analysis for each of the three facilities indicate there is no significant impact to attainment of the 2010 $SO_2$ NAAQS in the counties where they are located, or in any other county in Texas, from these facilities. The analyses also indicate that compliance with the 2010 $SO_2$ standard in Goliad, Lamb, and Robertson Counties, is not significantly impacted by any other $SO_2$ emission source.

While the TCEQ did not model the Sandy Creek facility, the company's submittal supports Texas' recommendation of attainment for McLennan County based on regulatory $SO_2$ monitoring data. Additional information can be found in Attachment C: *Evaluation* of the Impact of *Sandy Creek Energy Station $SO_2$ Emissions.* Coleto Creek Power, LP submitted information to the TCEQ regarding the Coleto Creek Power Station, one of the facilities modeled by the TCEQ. That submittal is included in Attachment D: *Information Submitted to the TCEQ for the Coleto Creek Power Station.* San Miguel Electric Cooperative, Inc. submitted information to the TCEQ regarding the San Miguel Electric Plant. That submittal is included in Attachment E: *Information Submitted to the TCEQ for the San Miguel Electric Plant.* NRG Texas Power LLC also submitted information to the TCEQ, regarding the Limestone Generating Station and the W A Parish Electric Generating Station, included in Attachment F: *Information Submitted to the TCEQ for the Limestone Generating Station and the W A Parish Electric Generating Station.* These information submittals clearly support a final unclassifiable/attainment designation for Goliad, Atascosa, Limestone, and Fort Bend Counties.

Ms. Janet G. McCabe
Page 3
September 18, 2015

Thank you for your consideration of this submittal.  Please accept our updated recommendation for the 2010 $SO_2$ NAAQS designations for Texas.  If there are any questions concerning this recommendation, please contact Mr. Steve Hagle, P.E., Deputy Director, Office of Air, at 512-239-1295 or Steve.Hagle@tceq.texas.gov.  We look forward to working with the EPA throughout this process.

Sincerely,

Bryan W. Shaw, Ph.D., P.E.
Chairman

Attachments

cc: Richard A. Hyde, P.E., Executive Director, TCEQ
    Steve Hagle, P.E., Deputy Director, TCEQ Office of Air
    Ron Curry, EPA R6 Administrator
    Guy Donaldson, EPA R6

**Attachment A**

***Recommended Designations for the 2010 One-Hour Sulfur Dioxide (SO₂) NAAQS***

Based on 2014 design values, all regulatory $SO_2$ monitors in Texas are below the 2010 one-hour NAAQS of 75 parts per billion (ppb). Based on these design values, the recommended designation for each of the 11 counties listed below is attainment. The recommended designation for each of the remaining 243 counties in Texas is unclassifiable/attainment.

| County | Number of SO₂ Regulatory Monitors | 2012 SO₂ Design Value (ppb) | 2013 SO₂ Design Value (ppb) | 2014 SO₂ Design Value* (ppb) |
|---|---|---|---|---|
| Dallas | 1 | 7 | 6 | 5 |
| El Paso | 2 | 10 | 7 | 10 |
| Ellis | 3 | 14 | 14 | 13 |
| Galveston | 1 | 26 | 16 | 12 |
| Gregg | 1 | 56 | 52 | 50 |
| Harris | 7 | 38 | 31 | 24 |
| Jefferson | 2 | 51 | 29 | 26 |
| Kaufman | 1 | 13 | 13 | 14 |
| McLennan | 1 | 6 | 6 | 6 |
| Navarro | 1 | 40 | 38 | 35 |
| Nueces | 3 | 25 | 12 | 7 |

\* 2014 design values are as of 7-20-15.

All data obtained from EPA's AQS database.

**Tab 82: Letter from Joshua Smith, Staff Attorney, Sierra Club to Scott Mathias, Associate Director, EPA, regarding Updated Air Dispersion Modeling of Sulfur Dioxide Pollution in Texas and Louisiana (Dec. 14, 2015) (with Attachments 2 & 4)**



December 14, 2015

Scott Mathias
Associate Director
Air Quality Policy Division
U.S. Environmental Protection Agency
Research Triangle Park, NC 27711

Re:     Updated Air Dispersion Modeling of Sulfur Dioxide Pollution in Texas and
        Louisiana

Dear Associate Director Mathias:

On September 17, 2014, Sierra Club submitted air dispersion modeling conducted by Wingra Engineering, S.C. that demonstrated that sulfur dioxide ("$SO_2$") emissions from the Big Brown Steam Electric Station, Limestone Electric Generating Station, Monticello Steam Electric Station, and the W.A. Parish Electric Generating Station in Texas have caused downwind $SO_2$ ambient air concentrations to exceed the 75 parts per billion National Ambient Air Quality Standard ("NAAQS"), which translates to 196.2 micrograms per cubic meter ("$\mu g/m^3$"). Sierra Club also submitted modeling demonstrating that emissions from the Dolet Hills Power Station in Louisiana cause downwind $SO_2$ ambient air concentrations to exceed the 2010 standard.

Enclosed, please find the results of updated modeling analyses for the Big Brown, Monticello, W.A. Parish, and Limestone facilities in Texas, the Dolet Hills plant in Louisiana, and the corresponding modeling input and output files for each report. These updates address questions posed by EPA Region 6 Staff. [1]

Using the most recent emissions data for each facility, the modeling shows:

---

[1] Also on September 17, 2015, Sierra Club submitted modeling demonstrating that the Martin Lake Electric Generating Station in Texas and the Big Cajun II Power Plant in Louisiana each cause exceedances of the 2010 $SO_2$ NAAQS, and should therefore be designated as nonattainment. No updates to those reports were necessary, and Sierra Club continues to urge EPA to designate the areas surrounding Martin Lake and Big Cajun II as nonattainment.

Mr. Scott Mathias
September 17, 2015
Page 2

- Big Brown in Texas causes concentrations as high as 387.9 $\mu g/m^3$
- Limestone in Texas causes concentrations as high as 255.1 $\mu g/m^3$
- Monticello in Texas causes concentrations as high as 237.2 $\mu g/m^3$
- W.A. Parish in Texas causes concentrations as high as 231.2 $\mu g/m^3$
- Dolet Hills in Louisiana causes concentrations as high as 218.7 $\mu g/m^3$

The modeling also demonstrates that the exceedances in the areas surrounding these facilities are even greater when nearby sources of $SO_2$ are taken into account. Accordingly, the area surrounding Big Brown, Limestone, Monticello, and W.A. Parish in Texas, and Dolet Hills in Louisiana should each be designated nonattainment under the NAAQS.

We urge EPA to consider this information as it undertakes area designations in Texas and Louisiana for the 2010 revised primary $SO_2$ NAAQS. This information is being provided to both EPA's Office of Air Quality Planning and Standards. In the meantime, please let me know if I can provide any additional information.

Thank you for your attention to and consideration of this matter, and please do not hesitate to contact me if you would like to discuss further.

Sincerely,

Joshua Smith
Staff Attorney
Sierra Club
85 Second St., Second Floor
San Francisco, CA 94108
Phone: (415) 977-5560
Fax: (415) 977-5793
joshua.smith@sierraclub.org

Attachment 2

# Big Brown Steam Electric Station

# Fairfield, Texas

# Evaluation of Compliance with the 1-hour NAAQS for SO$_2$

# December 15, 2015

*Conducted by:*

*Steven Klafka, P.E., BCEE*

*Wingra Engineering, S.C.*

*Madison, Wisconsin*

## 1.    Introduction

Wingra Engineering, S.C. was hired by Sierra Club to conduct an air modeling impact analysis to help the U.S. Environmental Protection Agency (USEPA), state and local air agencies identify facilities that are likely causing exceedances of the 1-hour sulfur dioxide (SO$_2$) national ambient air quality standard (NAAQS). This document describes the results and procedures for an evaluation conducted for the Big Brown Steam Electric Station located in Fairfield, Texas.

To ensure the modeling analysis reflected the cumulative concentration of SO$_2$ emissions, it included emissions from the Limestone Electric Generating Station in Jewett, Texas, which is an additional source of SO$_2$ emissions located within 50 kilometers of the Big Brown Steam Electric Station.

This report updates the modeling results presented in an earlier report dated September 11, 2015. The analysis was updated to include three years of meteorological data.

The dispersion modeling analysis predicted ambient air concentrations for comparison with the 1-hour SO$_2$ NAAQS. The modeling was performed using the most recent version of AERMOD, AERMET, and AERMINUTE, with data provided to Sierra Club by regulatory air agencies or obtained through other publicly-available sources as documented below. The analysis was conducted in adherence to all available USEPA guidance for evaluating source impacts on attainment of the 1-hour SO$_2$ NAAQS via aerial dispersion modeling, including the AERMOD Implementation Guide; USEPA's Applicability of Appendix W Modeling Guidance for the 1-hour SO$_2$ National Ambient Air Quality Standard, August 23, 2010; modeling guidance promulgated by USEPA in Appendix W to 40 CFR Part 51; USEPA's March 2011 Modeling Guidance for SO$_2$ NAAQS Designations;[1] and, USEPA's December 2013 SO$_2$ NAAQS Designations Technical Assistance Document.[2]

It was determined that based on measured actual emissions or current allowable limits, the Big Brown Steam Electric Station is estimated to create SO$_2$ concentrations which exceed the 1-hour NAAQS.

## 2.    Compliance with the 1-hour SO$_2$ NAAQS

### 2.1    1-hour SO$_2$ NAAQS

The 1-hour SO$_2$ NAAQS takes the form of a three-year average of the 99[th]-percentile of the annual distribution of daily maximum 1-hour concentrations, which cannot exceed 75 parts per billion

---

[1] http://www.epa.gov/scram001/so2_modeling_guidance.htm
[2] http://www.epa.gov/oaqps001/sulfurdioxide/pdfs/SO2ModelingTAD.pdf

(ppb).[3]  Compliance with this standard was verified using USEPA's AERMOD air dispersion model, which produces air concentrations in units of $\mu g/m^3$.  The 1-hour $SO_2$ NAAQS of 75 ppb equals 196.2 $\mu g/m^3$, and this is the value used for determining whether modeled impacts exceed the NAAQS.[4]  The 99th-percentile of the annual distribution of daily maximum 1-hour concentrations corresponds to the fourth-highest value at each receptor for a given year.

## 2.2    Modeling Results

Model results for both sources included in the $SO_2$ analysis are summarized in Table 1. Results are provided for each source alone, and for all sources combined.

Modeling results for Big Brown Steam Electric Station and Limestone Electric Generating Station are summarized in Table 1. It was determined that based on either current allowable emissions or measured actual emissions, the Big Brown Steam Electric Station is estimated to create downwind $SO_2$ concentrations which exceed the 1-hour NAAQS.

More specifically, the modeling results presented in Table 1, show exceedances of the NAAQS by the plant's allowable and actual emissions. "Allowable" is the peak emission rate from each unit as approved by the current air quality operation permit for the facility. "Actual" are the measured emissions for each hour between January 1, 2012 and December 31, 2014 as taken from USEPA *Air Markets Program Data*.[5]

In addition, the emissions from Limestone Electric Generating Station significantly contribute to the ambient $SO_2$ concentration in the area impacted by Big Brown Steam Electric Station.

Air quality impacts in Texas are based on a background concentration of 7.8 $\mu g/m^3$. This is the 2011-13 design value for El Paso, Texas—the lowest measured background concentration in the state.  This is the most recently available design value. See Section 5 for further discussion of the background concentrations used for this analysis.

---

[3] USEPA, Applicability of Appendix W Modeling Guidance for the 1-hour $SO_2$ National Ambient Air Quality Standard, August 23, 2010.
[4] The ppb to $\mu g/m^3$ conversion is found in the source code to AERMOD v. 15181, subroutine Modules.  The conversion calculation is 75/0.3823 = 196.2 $\mu g/m^3$.
[5] http://ampd.epa.gov/ampd/

**Table 1 - SO$_2$ Modeling Results for Big Brown Steam Electric Station Modeling Analysis**

| Emission Rates | Averaging Period | 99th Percentile 1-hour Daily Maximum (µg/m$^3$) | | | | Complies with NAAQS? |
|---|---|---|---|---|---|---|
| | | Impact | Background | Total | NAAQS | |
| Allowable | Big Brown | 817.9 | 7.8 | 825.7 | 817.9 | No |
| Actual | | 380.1 | 7.8 | 387.9 | 380.1 | No |
| Allowable | Limestone | 1,396.6 | 7.8 | 1,404.4 | 1,396.6 | No |
| Actual | | 200.5 | 7.8 | 208.3 | 200.5 | No |
| Allowable | Both | 1,398.9 | 7.8 | 1,406.7 | 1,398.9 | No |
| Actual | | 380.3 | 7.8 | 388.1 | 380.3 | No |

The emissions used for the modeling analysis are summarized in Table 2.

**Table 2 - Modeled SO$_2$ Emissions from Big Brown Steam Electric Station** [6]

| Stack ID | Unit ID | Allowable Emissions 3-hour Average (lbs/hr) |
|---|---|---|
| S01 | Unit 1 | 17,790.0 |
| S02 | Unit 2 | 17,790.0 |
| Big Brown | Subtotal | 35,580.0 |
| S01 | Unit 1 | 26,790.0 |
| S02 | Unit 3 | 24,390.0 |
| Limestone | Subtotal | 51,180.0 |
| Both Stations | Total | 86,760.0 |

Based on the modeling results, Table 3 provides the emission reductions from current allowable rates necessary to achieve compliance with the 1-hour NAAQS. This assumes a one-hour averaging period for the emission rate and that the emission rate is binding at all times. However, given the conservative aspects of this modeling protocol, it is extremely likely that this limit is too high to protect the NAAQS. For example, startup or shutdown periods were not evaluated. During these periods, decreased gas velocities and temperatures may lead to greater ambient impacts at ground level. Further, the hypothetical emission limitation in Table 3 would allow Big Brown Steam Electric Station to consume the entire NAAQS, leaving little to no room for any other source of SO$_2$ in the area. No margin of safety has been included in the hypothetical emission limitation.

---

[6] Big Brown allowable emissions are taken from TXCEQ, Federal Operating Permit, No. O65. January 15, 2014. Limestone allowable emissions are taken from TXCEQ, Federal Operating Permit, No. O75, January 24, 2012.

**Table 3 - Required Emission Reductions from Current Allowable Limits for Big Brown Steam Electric Station to Comply with the 1-hour NAAQS for SO$_2$**

| Acceptable Impact (NAAQS - Background) 99th Percentile 1-hour Daily Max ($\mu g/m^3$) | Required Total Facility Reduction Based on Allowable Emissions (%) | Required Total Facility Emission Rate (lbs/hr) | Required Total Facility 1-hour Average Emission Rate (lbs/mmbtu) |
|---|---|---|---|
| 188.4 | 88% | 4,791.8 | 0.40 |

Predicted exceedances of the 1-hour NAAQS for SO$_2$ based on allowable emissions extend throughout the region to a maximum distance of 50 kilometers.

Figure 1 shows the extent of NAAQS violations based on allowable emissions from both sources.

Figure 2 shows the extent of NAAQS violations based on actual hourly emissions from both sources.

## 2.3    Conservative Modeling Assumptions

A dispersion modeling analysis requires the selection of numerous parameters which affect the predicted concentrations. For the enclosed analysis, several parameters were selected which under-predict facility impacts.

Assumptions used in this modeling analysis which likely under-estimate concentrations include the following:

- Allowable emissions are based on a limitation with an averaging period which is greater than the 1-hour average used for the SO$_2$ air quality standard. Emissions and impacts during any 1-hour period may be higher than assumed for the modeling analysis.
- No consideration of facility operation at less than 100% load. Stack parameters such as exit flow rate and temperature are typically lower at less than full load, reducing pollutant dispersion and increasing predicted air quality impacts.
- No consideration of building or structure downwash. These downwash effects typically increase predicted concentrations near the facility.
- Except for Limestone Electric Generating Station, no consideration of off-site sources. These other sources of SO$_2$ will increase the predicted impacts.
- Air quality impacts are based on a background SO$_2$ concentration of 7.8 $\mu g/m^3$, which is the lowest measured background concentration in the state. Given the proximity of the Big Brown facility to other major sources of SO$_2$, the actual background concentration is likely much higher.
- No evaluation has been conducted to determine if the stack height exceeds Good Engineering Practice or GEP height. If the stack height exceeds GEP, the predicted concentrations will increase.

*Evaluation of Compliance with the 1-hour NAAQS for SO₂*
*December 15, 2015*
*Page 6*



1-hour average SO2 concentrations (ug per cubic meter) - All colored areas exceed the NAAQS.

| 196 | 400 | 600 | 800 | 1000 |

*Figure 1 - Regional View of Impacts Based on Allowable Emissions from Both Sources*

*Evaluation of Compliance with the 1-hour NAAQS for SO₂*
*December 15, 2015*
*Page 7*



1-hour average SO2 concentrations (ug per cubic meter) - All colored areas exceed the NAAQS.

*Figure 2 - Regional View of Impacts Based on Actual Emissions for 2012-14 from Both Sources*

## 3.        Modeling Methodology

### 3.1        Air Dispersion Model

The modeling analysis used USEPA's AERMOD program, v. 15181.  AERMOD, as available from the Support Center for Regulatory Atmospheric Modeling (SCRAM) website, was used in conjunction with a third-party modeling software program, *AERMOD View*, sold by Lakes Environmental Software.

### 3.2        Control Options

The AERMOD model was run with the following control options:

- 1-hour average air concentrations
- Regulatory defaults
- Flagpole receptors

To reflect a representative inhalation level, a flagpole height of 1.5 meters was used for all modeled receptors.  This parameter was added to the receptor file when running AERMAP, as described in Section 4.4.

An evaluation was conducted to determine if the modeled facility was located in a rural or urban setting using USEPA's methodology outlined in Section 7.2.3 of the Guideline on Air Quality Models.[7]  For urban sources, the URBANOPT option is used in conjunction with the urban population from an appropriate nearby city and a default surface roughness of 1.0 meter.  Methods described in Section 4.1 were used to determine whether rural or urban dispersion coefficients were appropriate for the modeling analysis.

### 3.3        Output Options

The AERMOD analysis was based on three years of recent meteorological data.  The modeling analyses used one run with three years of sequential meteorological data from 2012-2014. Consistent with USEPA's Modeling Guidance for SO₂ NAAQS Designations, AERMOD provided a table of fourth-high 1-hour SO₂ impacts concentrations consistent with the form of the 1-hour SO₂ NAAQS.[8]

Please refer to Table 1 for the modeling results.

---

[7] USEPA, Revision to the Guideline on Air Quality Models: Adoption of a Preferred General Purpose (Flat and Complex Terrain) Dispersion Model and Other Revisions, Appendix W to 40 CFR Part 51, November 9, 2005.
[8] USEPA, Area Designations for the 2010 Revised Primary Sulfur Dioxide National Ambient Air Quality Standards, Attachment 3, March 24, 2011, pp. 24-26.

## 4.    Model Inputs

### 4.1    Geographical Inputs

The "ground floor" of all air dispersion modeling analyses is establishing a coordinate system for identifying the geographical location of emission sources and receptors. These geographical locations are used to determine local characteristics (such as land use and elevation), and also to ascertain source to receptor distances and relationships.

The Universal Transverse Mercator (UTM) NAD83 coordinate system was used for identifying the easting (x) and northing (y) coordinates of the modeled sources and receptors. Stack locations were obtained from facility permits and prior modeling files provided by the state regulatory agency. The stack locations were then verified using aerial photographs.

The facility was evaluated to determine if it should be modeled using the rural or urban dispersion coefficient option in AERMOD. A Geographic Information System (GIS) was used to determine whether rural or urban dispersion coefficients apply to a site. Land use within a three-kilometer radius circle surrounding the facility was considered. USEPA guidance states that urban dispersion coefficients are used if more than 50% of the area within 3 kilometers has urban land uses. Otherwise, rural dispersion coefficients are appropriate.[9]

USEPA's AERSURFACE v. 13016 was used to develop the meteorological data for the modeling analysis. This model was also used to evaluate surrounding land use within 3 kilometers. Based on the output from the AERSURFACE, approximately 0.8% of surrounding land use around the modeled facility was of urban land use types including Type 21 – Low Intensity Residential, Type 22 – High Intensity Residential and Type 23 – Commercial / Industrial / Transportation.

This is less than the 50% value considered appropriate for the use of urban dispersion coefficients. Based on the AERSURFACE analysis, it was concluded that the rural option would be used for the modeling summarized in this report. Please refer to Section 4.5.3 for a discussion of the AERSURFACE analysis.

---

[9] USEPA, Revision to the Guideline on Air Quality Models: Adoption of a Preferred General Purpose (Flat and Complex Terrain) Dispersion Model and Other Revisions, Appendix W to 40 CFR Part 51, November 9, 2005, Section 7.2.3.

*Evaluation of Compliance with the 1-hour NAAQS for SO₂*
*December 15, 2015*
*Page 10*

## 4.2    Emission Rates and Source Parameters

The modeling analysis considered $SO_2$ emissions from the Big Brown Steam Electric Station and Limestone Electric Generating Station. Other off-site sources were not considered. Concentrations were predicted for the scenarios shown in Tables 1 and 2:

1) allowable emissions based on the current permit issued by the regulatory agency, and

2) actual hourly emissions measured each hour between January 1, 2012 and December 31, 2014 as taken from USEPA *Air Markets Program Data*.[10]

Stack parameters and emissions used for the modeling analysis are summarized in Table 4.

*Table 4 – Facility Stack Parameters and Emissions* [11]

| Facility | Big Brown | | Limestone | |
|---|---|---|---|---|
| Stack | B01 | B02 | L01 | L02 |
| Description | Unit 1 | Unit 2 | Unit 1 | Unit 2 |
| X Coord. [m] | 778731.22 | 778774.22 | 761099 | 761130 |
| Y Coord. [m] | 3524371.07 | 3524295.07 | 3479813 | 3479694 |
| Base Elevation [m] | 98.61 | 98 | 141.35 | 139.17 |
| Release Height [m] | 122 | 122 | 171.6 | 171.6 |
| Gas Exit Temperature [°K] | 459 | 459 | 333.15 | 333.15 |
| Gas Exit Velocity [m/s] | 23.7 | 23.7 | 21.294 | 21.294 |
| Inside Diameter [m] | 6.77 | 6.77 | 8.23 | 8.23 |
| Allowable Emission Rate [g/s] | 2,242 | 2,242 | 3,375 | 3,073 |
| Actual Emission Rate [g/s] | - | - | - | - |

The above stack parameters and emissions were obtained from regulatory agency documents and databases identified in Section 2.2. The analysis was conducted based on 100% operating load using maximum exhaust flow rates and temperatures. Operation at less than full capacity loads was not considered. This assumption tends to under-predict impacts since stack parameters such as exit flow rate and temperature are typically lower at less than full load, reducing pollutant dispersion and increasing predicted air quality impacts. Stack location, height and diameter were verified using aerial photographs, and flue gas flow rate and temperature were verified using combustion calculations.

[10] http://ampd.epa.gov/ampd/
[11] Stack parameters were obtained from the annual survey compiled by the U.S. Energy Information Administration. http://www.eia.gov/electricity/data/eia860/

### 4.3    Building Dimensions

No building dimensions or prior downwash evaluations were available. Therefore this modeling analysis did not address the effects of downwash and this may under-predict impacts.

### 4.4    Receptors

For Big Brown Steam Electric Station, three receptor grids were employed:

1. A 100-meter Cartesian receptor grid centered on Big Brown Steam Electric Station and extending out 5 kilometers.
2. A 500-meter Cartesian receptor grid centered on Big Brown Steam Electric Station and extending out 10 kilometers.
3. A 1,000-meter Cartesian receptor grid centered on Big Brown Steam Electric Station and extending out 50 kilometers. 50 kilometers is the maximum distance accepted by USEPA for the use of the AERMOD dispersion model.[12]

A flagpole height of 1.5 meters was used for all these receptors.

Elevations from stacks and receptors were obtained from National Elevation Dataset (NED) GeoTiff data. GeoTiff is a binary file that includes data descriptors and geo-referencing information necessary for extracting terrain elevations. These elevations were extracted from 1 arc-second (30 meter) resolution NED files. The USEPA software program AERMAP v. 11103 is used for these tasks.

The receptor grids were not changed to remove receptors located on source property or above water bodies. The highest predicted concentrations occurred off facility property so eliminating on-site receptors would not change the modeling results. While USEPA technical guidance suggests receptors should not be placed where ambient monitors cannot be located, such as above water bodies, the concentrations predicted above water bodies still show potential exposure to the general public.

### 4.5    Meteorological Data

To improve the accuracy of the modeling analysis, recent meteorological data for the 2012-2014 period were prepared using the USEPA's program AERMET which creates the model-ready surface and profile data files required by AERMOD.   Required data inputs to AERMET included surface meteorological measurements, twice-daily soundings of upper air measurements, and the

---

[12] USEPA, Revision to the Guideline on Air Quality Models: Adoption of a Preferred General Purpose (Flat and Complex Terrain) Dispersion Model and Other Revisions, Appendix W to 40 CFR Part 51, Section A.1.(1), November 9, 2005.

micrometeorological parameters surface roughness, albedo, and Bowen ratio.  One-minute ASOS data were available so USEPA methods were used to reduce calm and missing hours.[13] The USEPA software program AERMINUTE v. 15272 is used for these tasks. AERMET was used to randomize wind directions for NWS wind data if one-minute ASOS wind speeds were not available for any periods.

This section discusses how the meteorological data was prepared for use in the 1-hour SO$_2$ NAAQS modeling analyses.  The USEPA software program AERMET v. 15181 is used for these tasks.

### 4.5.1    Surface Meteorology

Surface meteorology was obtained for Corsicana Campbell Field located near the Big Brown Steam Electric Station. Integrated Surface Hourly (ISH) data for the 2012-2014 period were obtained from the National Climatic Data Center (NCDC).   The ISH surface data was processed through AERMET Stage 1, which performs data extraction and quality control checks.

### 4.5.2    Upper Air Data

Upper-air data are collected by a "weather balloon" that is released twice per day at selected locations.  As the balloon is released, it rises through the atmosphere, and radios the data back to the surface.  The measuring and transmitting device is known as either a radiosonde, or rawindsonde.  Data collected and radioed back include:  air pressure, height, temperature, dew point, wind speed, and wind direction.  The upper air data were processed through AERMET Stage 1, which performs data extraction and quality control checks.

For Big Brown Steam Electric Station, the concurrent 2012-2014 upper air data from twice-daily radiosonde measurements obtained at the most representative location were used.  This location was the Fort Worth, Texas measurement station. These data are in Forecast Systems Laboratory (FSL) format and were downloaded in ASCII text format from NOAA's FSL website.[14]  All reporting levels were downloaded and processed with AERMET.

### 4.5.3    AERSURFACE

AERSURFACE is a program that extracts surface roughness, albedo, and daytime Bowen ratio for an area surrounding a given location.  AERSURFACE uses land use and land cover (LULC) data in the U.S. Geological Survey's 1992 National Land Cover Dataset to extract the necessary micrometeorological data.  LULC data was used for processing meteorological data sets used as

---

[13] USEPA, Area Designations for the 2010 Revised Primary Sulfur Dioxide National Ambient Air Quality Standards, Attachment 3, March 24, 2011, p. 19.
[14] Available at: http://esrl.noaa.gov/raobs/

input to AERMOD.

AERSURFACE v. 13016 was used to develop surface roughness, albedo, and daytime Bowen ratio values in a region surrounding the meteorological data collection site. AERSURFACE was used to develop surface roughness in a one kilometer radius surrounding the data collection site. Bowen ratio and albedo was developed for a 10 kilometer by 10 kilometer area centered on the meteorological data collection site. These micrometeorological data were processed for seasonal periods using 30-degree sectors. Seasonal moisture conditions were considered average with winter months having no continuous snow cover.

### 4.5.4   Data Review

Missing meteorological data were not filled as the data file met USEPA's 90% data completeness requirement.[15]  The AERMOD output file shows there were 1.63% missing data.

To confirm the representativeness of the airport meteorological data, the surface characteristics of the airport data collection site and the modeled source location were compared. Since the Corsicana Campbell Field is located close to Big Brown Steam Electric Station, this meteorological data set was considered appropriate for this modeling analysis.[16] This weather station provided high quality surface measurements for the most recent 3-year time, and had similar land use, surface characteristics, terrain features and climate.

Finally, TCEQ provides pre-processed meteorological data suitable for modeling for each county.[17] For Freestone County, TCEQ recommends using data from the same surface and upper air stations used for this modeling analysis. The TCEQ data were not used for this project because they were not from the most recent years needed for this analysis and had not been processed using the latest versions of USEPA modeling software.

## 5.      Background SO₂ Concentrations

Background concentrations were determined consistent with USEPA's Modeling Guidance for SO₂ NAAQS Designations.[18, 19]  To preserve the form of the 1-hour SO₂ standard, based on the 99th percentile of the annual distribution of daily maximum 1-hour concentrations averaged across the

---

[15] USEPA, Meteorological Monitoring Guidance for Regulatory Modeling Applications, EPA-454/R-99-05, February 2000, Section 5.3.2, pp. 5-4 to 5-5.
[16] USEPA, AERMOD Implementation Guide, March 19, 2009, pp. 3-4.
[17] Texas Commission on Environmental Quality, Meteorological Data for Refined Screening with AERMOD, http://www.tceq.texas.gov/permitting/air/modeling/aermod-datasets.html, Last updated November 22, 2013.
[18] USEPA, Area Designations for the 2010 Revised Primary Sulfur Dioxide National Ambient Air Quality Standards, Attachment 3, March 24, 2011, pp. 20-23.
[19] USEPA, SO₂ NAAQS Designations Modeling Technical Assistance Document, Dec. 2013, section 8.1, pp 27-28.

number of years modeled, the background fourth-highest daily maximum 1-hour $SO_2$ concentration was added to the modeled fourth-highest daily maximum 1-hour $SO_2$ concentration.[20]  Background concentrations were based on the 2011-13 design value measured by the ambient monitors located in Texas.[21]

## 6.    Reporting

All files from the programs used for this modeling analysis are available to regulatory agencies. These include analyses prepared with AERSURFACE, AERMET, AERMAP, and AERMOD.

---

[20] USEPA, Applicability of Appendix W Modeling Guidance for the 1-hour $SO_2$ National Ambient Air Quality Standard, August 23, 2010, p. 3.
[21] http://www.epa.gov/airtrends/values.html

# Attachment 4

**Monticello Steam Electric Station**

**Mount Pleasant, Texas**

**Evaluation of Compliance with the 1-hour NAAQS for SO$_2$**

**December 15, 2015**

*Conducted by:*

*Steven Klafka, P.E., BCEE*

*Wingra Engineering, S.C.*

*Madison, Wisconsin*

# 1.    Introduction

Wingra Engineering, S.C. was hired by Sierra Club to conduct an air modeling impact analysis to help the U.S. Environmental Protection Agency (USEPA), state and local air agencies identify facilities that are likely causing exceedances of the 1-hour sulfur dioxide (SO$_2$) national ambient air quality standard (NAAQS). This document describes the results and procedures for an evaluation conducted for the Monticello Steam Electric Station located in Mount Pleasant, Texas.

To ensure the modeling analysis reflected the cumulative concentration of SO$_2$ emissions, it included emissions from the Welsh Power Plant in Mount Pleasant, Texas, which is an additional source of SO$_2$ emissions located within 50 kilometers of the Monticello Steam Electric Station.

This report updates the modeling results presented in an earlier report dated September 11, 2015. The analysis was updated to include three years of meteorological data, and correct stack parameters and actual emissions.

The dispersion modeling analysis predicted ambient air concentrations for comparison with the 1-hour SO$_2$ NAAQS. The modeling was performed using the most recent version of AERMOD, AERMET, and AERMINUTE, with data provided to Sierra Club by regulatory air agencies or obtained through other publicly-available sources as documented below. The analysis was conducted in adherence to all available USEPA guidance for evaluating source impacts on attainment of the 1-hour SO$_2$ NAAQS via aerial dispersion modeling, including the AERMOD Implementation Guide; USEPA's Applicability of Appendix W Modeling Guidance for the 1-hour SO$_2$ National Ambient Air Quality Standard, August 23, 2010; modeling guidance promulgated by USEPA in Appendix W to 40 CFR Part 51; USEPA's March 2011 Modeling Guidance for SO$_2$ NAAQS Designations;[1] and, USEPA's December 2013 SO$_2$ NAAQS Designations Technical Assistance Document.[2]

It was determined that based on measured actual emissions or current allowable limits, the Monticello Steam Electric Station is estimated to create SO$_2$ concentrations which exceed the 1-hour NAAQS.

# 2.    Compliance with the 1-hour SO$_2$ NAAQS

## 2.1    1-hour SO$_2$ NAAQS

The 1-hour SO$_2$ NAAQS takes the form of a three-year average of the 99[th]-percentile of the annual

---

[1] http://www.epa.gov/scram001/so2_modeling_guidance.htm
[2] http://www.epa.gov/oaqps001/sulfurdioxide/pdfs/SO2ModelingTAD.pdf

distribution of daily maximum 1-hour concentrations, which cannot exceed 75 parts per billion (ppb).[3]  Compliance with this standard was verified using USEPA's AERMOD air dispersion model, which produces air concentrations in units of µg/m$^3$.  The 1-hour SO$_2$ NAAQS of 75 ppb equals 196.2 µg/m$^3$, and this is the value used for determining whether modeled impacts exceed the NAAQS.[4]  The 99[th]-percentile of the annual distribution of daily maximum 1-hour concentrations corresponds to the fourth-highest value at each receptor for a given year.

## 2.2    Modeling Results

Model results for both sources included in the SO$_2$ analysis are summarized in Table 1. Results are provided for each source alone, and for all sources combined.

Modeling results for Monticello Steam Electric Station and the Welsh Power Plant are summarized in Table 1. It was determined that based on either current allowable emissions or measured actual emissions, the Monticello Steam Electric Station is estimated to create downwind SO$_2$ concentrations which exceed the 1-hour NAAQS.

More specifically, the modeling results presented in Table 1, show exceedances of the NAAQS by the plant's allowable and actual emissions. "Allowable" is the peak emission rate from each unit as approved by the current air quality operation permit for the facility. "Actual" are the measured emissions for each hour between January 1, 2012 and December 31, 2014 as taken from USEPA *Air Markets Program Data*.[5]

In addition, the emissions from Welsh Power Plant significantly contribute to the ambient SO$_2$ concentration in the area impacted by Monticello Steam Electric Station.

Air quality impacts in Texas are based on a background concentration of 7.8 µg/m$^3$. This is the 2011-13 design value for El Paso, Texas—the lowest measured background concentration in the state.  This is the most recently available design value. See Section 5 for further discussion of the background concentrations used for this analysis.

---

[3] USEPA, Applicability of Appendix W Modeling Guidance for the 1-hour SO$_2$ National Ambient Air Quality Standard, August 23, 2010.
[4] The ppb to µg/m$^3$ conversion is found in the source code to AERMOD v. 15181, subroutine Modules.  The conversion calculation is 75/0.3823 = 196.2 µg/m$^3$.
[5] http://ampd.epa.gov/ampd/

**Table 1 - SO$_2$ Modeling Results for Monticello Steam Electric Station Modeling Analysis**

| Emission Rates | Averaging Period | 99th Percentile 1-hour Daily Maximum (µg/m³) | | | | Complies with NAAQS? |
|---|---|---|---|---|---|---|
| | | Impact | Background | Total | NAAQS | |
| Allowable | Monticello | 1,516.3 | 7.8 | 1,524.1 | 196.2 | No |
| Actual | | 229.4 | 7.8 | 237.2 | 196.2 | No |
| Allowable | Welsh | 1,071.4 | 7.8 | 1,079.2 | 196.2 | No |
| Actual | | 124.2 | 7.8 | 132.0 | 196.2 | Yes |
| Allowable | Both | 1,649.3 | 7.8 | 1,657.1 | 196.2 | No |
| Actual | | 229.5 | 7.8 | 237.3 | 196.2 | No |

The emissions used for the modeling analysis are summarized in Table 2.

**Table 2 - Modeled SO$_2$ Emissions [6]**

| Stack ID | Unit ID | Allowable Emissions 3-hour Average (lbs/hr) |
|---|---|---|
| S01 | Boiler 1 | 17,790.0 |
| S02 | Boiler 2 | 17,790.0 |
| S03 | Boiler 3 | 23,790.0 |
| Monticello | Subtotal | 59,370.0 |
| S01 | Unit 1 | 16,740.0 |
| S02 | Unit 3 | 16,740.0 |
| Welsh | Total | 33,480.0 |
| Both Stations | Subtotal | 92,850.0 |

Based on the modeling results, Table 3 provides the emission reductions from current allowable rates necessary to achieve compliance with the 1-hour NAAQS. This assumes a one-hour averaging period for the emission rate and that the emission rate is binding at all times. However, given the conservative aspects of this modeling protocol, it is extremely likely that this limit is too high to protect the NAAQS. For example, startup or shutdown periods were not evaluated. During these periods, decreased gas velocities and temperatures may lead to greater ambient impacts at ground level. Further, the hypothetical emission limitation in Table 3 would allow Monticello Steam Electric Station to consume the entire NAAQS, leaving little to no room for any other source of SO$_2$ in the area. No margin of safety has been included in the hypothetical emission limitation.

---

[6] Monticello allowable emissions are taken from TCEQ, Federal Operating Permit, No. O-00064, June 4, 1999. Welsh allowable emissions are taken from TCEQ, Federal Operating Permit, No. O26, Draft, March 14, 2014.

**Table 3 - Required Emission Reductions from Monticello Steam Electric Station for Comply with the 1-hour NAAQS for SO₂**

| Acceptable Impact (NAAQS - Background) 99th Percentile 1-hour Daily Max ($\mu g/m^3$) | Required Total Facility Reduction Based on Allowable Emissions (%) | Required Total Facility Emission Rate (lbs/hr) | Required Total Facility 1-hour Average Emission Rate (lbs/mmbtu) |
|---|---|---|---|
| 188.4 | 89% | 6,781.9 | 0.34 |

Predicted exceedances of the 1-hour NAAQS for $SO_2$ based on allowable emissions extend throughout the region to a maximum distance of 50 kilometers.

Figure 1 shows the extent of NAAQS violations based on allowable emissions from both sources.

Figure 2 shows the extent of NAAQS violations based on actual hourly emissions from both sources.

## 2.3    Conservative Modeling Assumptions

A dispersion modeling analysis requires the selection of numerous parameters which affect the predicted concentrations. For the enclosed analysis, several parameters were selected which under-predict facility impacts.

Assumptions used in this modeling analysis which likely under-estimate concentrations include the following:

- Allowable emissions are based on a limitation with an averaging period which is greater than the 1-hour average used for the $SO_2$ air quality standard. Emissions and impacts during any 1-hour period may be higher than assumed for the modeling analysis.
- No consideration of facility operation at less than 100% load. Stack parameters such as exit flow rate and temperature are typically lower at less than full load, reducing pollutant dispersion and increasing predicted air quality impacts.
- No consideration of building or structure downwash. These downwash effects typically increase predicted concentrations near the facility.
- Except for the Welsh Power Station, no consideration of off-site sources. These other sources of $SO_2$ will increase the predicted impacts.
- As noted, air quality impacts are based on a background $SO_2$ concentration of 7.8 $\mu g/m^3$, which is the lowest measured background concentration in the state. Given the proximity of the Monticello facility to other sources of $SO_2$, the actual background concentration is likely higher.
- No evaluation has been conducted to determine if the stack height exceeds Good Engineering Practice or GEP height. If the stack height exceeds GEP, the predicted concentrations will increase.

*Evaluation of Compliance with the 1-hour NAAQS for SO₂*
*December 15, 2015*
*Page 6*



1-hour average SO2 concentrations (ug per cubic meter) - All colored areas exceed the NAAQS.

*Figure 1 - Regional View of Impacts Based on Allowable Emissions from Both Sources*

*Evaluation of Compliance with the 1-hour NAAQS for SO₂*
*December 15, 2015*
*Page 7*



1-hour average SO2 concentrations (ug per cubic meter) - All colored areas exceed the NAAQS.

| 196 | 225 | |

*Figure 2 - Regional View of Impacts Due to Actual Emissions for 2012-14 from Both Sources*

## 3.    Modeling Methodology

### 3.1    Air Dispersion Model

The modeling analysis used USEPA's AERMOD program, v. 15181.  AERMOD, as available from the Support Center for Regulatory Atmospheric Modeling (SCRAM) website, was used in conjunction with a third-party modeling software program, *AERMOD View*, sold by Lakes Environmental Software.

### 3.2    Control Options

The AERMOD model was run with the following control options:

- 1-hour average air concentrations
- Regulatory defaults
- Flagpole receptors

To reflect a representative inhalation level, a flagpole height of 1.5 meters was used for all modeled receptors.  This parameter was added to the receptor file when running AERMAP, as described in Section 4.4.

An evaluation was conducted to determine if the modeled facility was located in a rural or urban setting using USEPA's methodology outlined in Section 7.2.3 of the Guideline on Air Quality Models.[7]  For urban sources, the URBANOPT option is used in conjunction with the urban population from an appropriate nearby city and a default surface roughness of 1.0 meter.  Methods described in Section 4.1 were used to determine whether rural or urban dispersion coefficients were appropriate for the modeling analysis.

### 3.3    Output Options

The AERMOD analysis was based on three years of recent meteorological data.  The modeling analyses used one run with three years of sequential meteorological data from 2012-2014. Consistent with USEPA's Modeling Guidance for SO₂ NAAQS Designations, AERMOD provided a table of fourth-high 1-hour SO₂ impacts concentrations consistent with the form of the 1-hour SO₂ NAAQS.[8]

Please refer to Table 1 for the modeling results.

---

[7] USEPA, Revision to the Guideline on Air Quality Models: Adoption of a Preferred General Purpose (Flat and Complex Terrain) Dispersion Model and Other Revisions, Appendix W to 40 CFR Part 51, November 9, 2005.
[8] USEPA, Area Designations for the 2010 Revised Primary Sulfur Dioxide National Ambient Air Quality Standards, Attachment 3, March 24, 2011, pp. 24-26.

## 4. Model Inputs

### 4.1 Geographical Inputs

The "ground floor" of all air dispersion modeling analyses is establishing a coordinate system for identifying the geographical location of emission sources and receptors. These geographical locations are used to determine local characteristics (such as land use and elevation), and also to ascertain source to receptor distances and relationships.

The Universal Transverse Mercator (UTM) NAD83 coordinate system was used for identifying the easting (x) and northing (y) coordinates of the modeled sources and receptors. Stack locations were obtained from facility permits and prior modeling files provided by the state regulatory agency. The stack locations were then verified using aerial photographs.

The facility was evaluated to determine if it should be modeled using the rural or urban dispersion coefficient option in AERMOD. A Geographic Information System (GIS) was used to determine whether rural or urban dispersion coefficients apply to a site. Land use within a three-kilometer radius circle surrounding the facility was considered. USEPA guidance states that urban dispersion coefficients are used if more than 50% of the area within 3 kilometers has urban land uses. Otherwise, rural dispersion coefficients are appropriate.[9]

USEPA's AERSURFACE v. 13016 was used to develop the meteorological data for the modeling analysis. This model was also used to evaluate surrounding land use within 3 kilometers. Based on the output from the AERSURFACE, approximately 0.04% of surrounding land use around the modeled facility was of urban land use types including Type 21 – Low Intensity Residential, Type 22 – High Intensity Residential and Type 23 – Commercial / Industrial / Transportation.

This is less than the 50% value considered appropriate for the use of urban dispersion coefficients. Based on the AERSURFACE analysis, it was concluded that the rural option would be used for the modeling summarized in this report. Please refer to Section 4.5.3 for a discussion of the AERSURFACE analysis.

### 4.2 Emission Rates and Source Parameters

The modeling analysis considered SO₂ emissions from the Monticello and the Welsh Power Plant. Other off-site sources were not considered. Concentrations were predicted for the scenarios shown in Tables 1 and 2:

---

[9] USEPA, Revision to the Guideline on Air Quality Models: Adoption of a Preferred General Purpose (Flat and Complex Terrain) Dispersion Model and Other Revisions, Appendix W to 40 CFR Part 51, November 9, 2005, Section 7.2.3.

1) allowable emissions based on the current permit issued by the regulatory agency, and

2) actual hourly emissions measured each hour between January 1, 2012 and December 31, 2014 as taken from USEPA *Air Markets Program Data*.[10]

Stack parameters and emissions used for the modeling analysis are summarized in Table 4.

***Table 4 – Facility Stack Parameters and Emissions*** [11]

| Facility | Monticello | | | Welsh | |
|---|---|---|---|---|---|
| Stack | M01 | M02 | M03 | W01 | W03 |
| Description | Unit 1 | Unit 2 | Unit 3 | Unit 1 | Unit 3 |
| X Coord. [m] | 309852.08 | 309815 | 309820 | 328178 | 328178 |
| Y Coord. [m] | 3663182.57 | 3663262 | 3663367 | 3658984 | 3658836 |
| Base Elevation [m] | 114.98 | 114.72 | 113.9 | 107.14 | 106.08 |
| Release Height [m] | 121.92 | 121.92 | 140.21 | 91.44 | 91.44 |
| Gas Exit Temperature [°K] | 453.15 | 453.15 | 438.15 | 402.039 | 402.039 |
| Gas Exit Velocity [m/s] | 24.689 | 24.689 | 26.518 | 39.234 | 39.234 |
| Inside Diameter [m] | 6.553 | 6.553 | 7.772 | 5.121 | 5.121 |
| Allowable Emission Rate [g/s] | 2,242 | 2,242 | 2,997 | 2,109 | 2,109 |
| Actual Emission Rate [g/s] | - | - | - | - | - |

The above stack parameters and emissions were obtained from regulatory agency documents and databases identified in Section 2.2. The analysis was conducted based on 100% operating load using maximum exhaust flow rates and temperatures. Operation at less than full capacity loads was not considered. This assumption tends to under-predict impacts since stack parameters such as exit flow rate and temperature are typically lower at less than full load, reducing pollutant dispersion and increasing predicted air quality impacts. Stack location, height and diameter were verified using aerial photographs, and flue gas flow rate and temperature were verified using combustion calculations.

## 4.3     Building Dimensions

No building dimensions or prior downwash evaluations were available. Therefore this modeling analysis did not address the effects of downwash and this may under-predict impacts.

---

[10] http://ampd.epa.gov/ampd/
[11] Stack parameters were obtained from the annual survey compiled by the U.S. Energy Information Administration. http://www.eia.gov/electricity/data/eia860/

## 4.4    Receptors

For Monticello Steam Electric Station, three receptor grids were employed:

1. A 100-meter Cartesian receptor grid centered on Monticello Steam Electric Station and extending out 5 kilometers.
2. A 500-meter Cartesian receptor grid centered on Monticello Steam Electric Station and extending out 10 kilometers.
3. A 1,000-meter Cartesian receptor grid centered on Monticello Steam Electric Station and extending out 50 kilometers. 50 kilometers is the maximum distance accepted by USEPA for the use of the AERMOD dispersion model.[12]

A flagpole height of 1.5 meters was used for all these receptors.

Elevations from stacks and receptors were obtained from National Elevation Dataset (NED) GeoTiff data. GeoTiff is a binary file that includes data descriptors and geo-referencing information necessary for extracting terrain elevations. These elevations were extracted from 1 arc-second (30 meter) resolution NED files. The USEPA software program AERMAP v. 11103 is used for these tasks.

The receptor grids were not changed to remove receptors located on source property or above water bodies. The highest predicted concentrations occurred off facility property so eliminating on-site receptors would not change the modeling results. While USEPA technical guidance suggests receptors should not be placed where ambient monitors cannot be located, such as above water bodies, the concentrations predicted above water bodies still show potential exposure to the general public.

## 4.5    Meteorological Data

To improve the accuracy of the modeling analysis, recent meteorological data for the 2012-2014 period were prepared using the USEPA's program AERMET which creates the model-ready surface and profile data files required by AERMOD.   Required data inputs to AERMET included surface meteorological measurements, twice-daily soundings of upper air measurements, and the micrometeorological parameters surface roughness, albedo, and Bowen ratio.   One-minute ASOS data were available so USEPA methods were used to reduce calm and missing hours.[13] The USEPA software program AERMINUTE v. 15272 is used for these tasks. AERMET was used to randomize

---

[12] USEPA, Revision to the Guideline on Air Quality Models: Adoption of a Preferred General Purpose (Flat and Complex Terrain) Dispersion Model and Other Revisions, Appendix W to 40 CFR Part 51, Section A.1.(1), November 9, 2005.

[13] USEPA, Area Designations for the 2010 Revised Primary Sulfur Dioxide National Ambient Air Quality Standards, Attachment 3, March 24, 2011, p. 19.

wind directions for NWS wind data if one-minute ASOS wind speeds were not available for any periods.

This section discusses how the meteorological data was prepared for use in the 1-hour SO$_2$ NAAQS modeling analyses. The USEPA software program AERMET v. 15181 is used for these tasks.

### 4.5.1    Surface Meteorology

Surface meteorology was obtained for Longview Texas Regional Airport located near the Monticello Steam Electric Station. Integrated Surface Hourly (ISH) data for the 2012-2014 period were obtained from the National Climatic Data Center (NCDC). The ISH surface data was processed through AERMET Stage 1, which performs data extraction and quality control checks.

### 4.5.2    Upper Air Data

Upper-air data are collected by a "weather balloon" that is released twice per day at selected locations. As the balloon is released, it rises through the atmosphere, and radios the data back to the surface. The measuring and transmitting device is known as either a radiosonde, or rawindsonde. Data collected and radioed back include: air pressure, height, temperature, dew point, wind speed, and wind direction. The upper air data were processed through AERMET Stage 1, which performs data extraction and quality control checks.

For Monticello Steam Electric Station, the concurrent 2012-2014 upper air data from twice-daily radiosonde measurements obtained at the most representative location were used. This location was the Schreveport, Louisiana measurement station. These data are in Forecast Systems Laboratory (FSL) format and were downloaded in ASCII text format from NOAA's FSL website.[14] All reporting levels were downloaded and processed with AERMET.

### 4.5.3    AERSURFACE

AERSURFACE is a program that extracts surface roughness, albedo, and daytime Bowen ratio for an area surrounding a given location. AERSURFACE uses land use and land cover (LULC) data in the U.S. Geological Survey's 1992 National Land Cover Dataset to extract the necessary micrometeorological data. LULC data was used for processing meteorological data sets used as input to AERMOD.

AERSURFACE v. 13016 was used to develop surface roughness, albedo, and daytime Bowen ratio values in a region surrounding the meteorological data collection site. AERSURFACE was used to

---

[14] Available at: http://esrl.noaa.gov/raobs/

develop surface roughness in a one kilometer radius surrounding the data collection site. Bowen ratio and albedo was developed for a 10 kilometer by 10 kilometer area centered on the meteorological data collection site. These micrometeorological data were processed for seasonal periods using 30-degree sectors. Seasonal moisture conditions were considered average with winter months having no continuous snow cover.

### 4.5.4   Data Review

Missing meteorological data were not filled as the data file met USEPA's 90% data completeness requirement.[15] The AERMOD output file shows there were 0.99% missing data.

To confirm the representativeness of the airport meteorological data, the surface characteristics of the airport data collection site and the modeled source location were compared. Since the Longview Texas Regional Airport is located close to Monticello Steam Electric Station, this meteorological data set was considered appropriate for this modeling analysis.[16] This weather station provided high quality surface measurements for the most recent 3-year time, and had similar land use, surface characteristics, terrain features and climate.

Finally, TCEQ provides pre-processed meteorological data suitable for modeling for each county.[17] For Titus County, TCEQ recommends using data from the same surface and upper air stations used for this modeling analysis. The TCEQ data were not used for this project because they were not from the most recent years needed for this analysis and had not been processed using the latest versions of USEPA modeling software.

## 5.    Background SO$_2$ Concentrations

Background concentrations were determined consistent with USEPA's Modeling Guidance for SO$_2$ NAAQS Designations.[18, 19] To preserve the form of the 1-hour SO$_2$ standard, based on the 99th percentile of the annual distribution of daily maximum 1-hour concentrations averaged across the number of years modeled, the background fourth-highest daily maximum 1-hour SO$_2$ concentration was added to the modeled fourth-highest daily maximum 1-hour SO$_2$ concentration.[20] Background concentrations were based on the 2011-13 design value measured by the ambient monitors located in

---

[15] USEPA, Meteorological Monitoring Guidance for Regulatory Modeling Applications, EPA-454/R-99-05, February 2000, Section 5.3.2, pp. 5-4 to 5-5.

[16] USEPA, AERMOD Implementation Guide, March 19, 2009, pp. 3-4.

[17] Texas Commission on Environmental Quality, Meteorological Data for Refined Screening with AERMOD, http://www.tceq.texas.gov/permitting/air/modeling/aermod-datasets.html, Last updated November 22, 2013.

[18] USEPA, Area Designations for the 2010 Revised Primary Sulfur Dioxide National Ambient Air Quality Standards, Attachment 3, March 24, 2011, pp. 20-23.

[19] USEPA, SO$_2$ NAAQS Designations Modeling Technical Assistance Document, Dec. 2013, section 8.1, pp 27-28.

[20] USEPA, Applicability of Appendix W Modeling Guidance for the 1-hour SO$_2$ National Ambient Air Quality Standard, August 23, 2010, p. 3.

Texas.[21]

## 6.    Reporting

All files from the programs used for this modeling analysis are available to regulatory agencies. These include analyses prepared with AERSURFACE, AERMET, AERMAP, and AERMOD.

---

[21] http://www.epa.gov/airtrends/values.html

**Tab 84: Letter from Joshua Smith, Staff Attorney, Sierra Club to Scott Mathias, Associate Director, EPA, regarding Air Dispersion Modeling of Texas Sulfur Dioxide Pollution (Sept. 17, 2015) (with Attachments 2, 4, & 5)**



September 17, 2015

Scott Mathias
Associate Director
Air Quality Policy Division
U.S. Environmental Protection Agency
Research Triangle Park, NC 27711

Re:    Air Dispersion Modeling of Texas Sulfur Dioxide Pollution

Dear Associate Director Mathias:

    Air dispersion modeling recently conducted by Wingra Engineering, S.C. on behalf of the Sierra Club demonstrates that sulfur dioxide ("$SO_2$") emissions from the Big Brown Steam Electric Station, Limestone Electric Generating Station, Martin Lake Generating Station, Monticello Steam Electric Station, and the W.A. Parish Electric Generating Station in Texas have each caused downwind $SO_2$ ambient air concentrations to exceed the 75 parts per billion National Ambient Air Quality Standard ("NAAQS"), which translates to 196.2 micrograms per cubic meter ("$\mu g/m^3$").  In particular, using the most recent emissions data for each facility, the modeling shows:

- Big Brown causes concentrations as high as 454 $\mu g/m^3$
- Limestone causes concentrations as high as 249 $\mu g/m^3$
- Martin Lake causes concentrations as high as 347 $\mu g/m^3$
- Monticello causes concentrations as high as 329 $\mu g/m^3$
- W.A. Parish causes concentrations as high as 394 $\mu g/m^3$

    The modeling also demonstrates that the exceedances in the areas surrounding these facilities are even greater when nearby sources of $SO_2$ are taken into account. Accordingly, the area surrounding Big Brown, Limestone, Martin Lake, Monticello, and W.A. Parish should each be designated nonattainment under the NAAQS.

Mr. Scott Mathias
September 17, 2015
Page 2

Enclosed, please find the results of the modeling analysis, along with the corresponding modeling input and output files.

We urge EPA to consider this information as it undertakes area designations in Texas for the 2010 revised primary $SO_2$ NAAQS. This information is being provided to both EPA Region 6 and to appropriate personnel at the Texas Commission on Environmental Quality.

Thank you for your attention to and consideration of this matter, and please do not hesitate to contact me if you would like further information.

Sincerely,

/s/ Joshua Smith
Joshua Smith
Staff Attorney
Sierra Club
85 Second St., Second Floor
San Francisco, CA 94108
Phone: (415) 977-5560
Fax: (415) 977-5793
joshua.smith@sierraclub.org

Attachment 2

**Big Brown Steam Electric Station**

**Fairfield, Texas**

**Evaluation of Compliance with the 1-hour NAAQS for SO$_2$**

**September 11, 2015**

*Conducted by:*

*Steven Klafka, P.E., BCEE*

*Wingra Engineering, S.C.*

*Madison, Wisconsin*

# 1.    Introduction

Wingra Engineering, S.C. was hired by Sierra Club to conduct an air modeling impact analysis to help the U.S. Environmental Protection Agency (USEPA), state and local air agencies identify facilities that are likely causing exceedances of the 1-hour sulfur dioxide (SO$_2$) national ambient air quality standard (NAAQS).  This document describes the results and procedures for an evaluation conducted for the Big Brown Steam Electric Station located in Fairfield, Texas.

To ensure the modeling analysis reflected the cumulative concentration of SO$_2$ emissions, it included emissions from the Limestone Electric Generating Station in Jewett, Texas, which is an additional source of SO$_2$ emissions located within 50 kilometers of the Big Brown Steam Electric Station.

The dispersion modeling analysis predicted ambient air concentrations for comparison with the 1-hour SO$_2$ NAAQS.  The modeling was performed using the most recent version of AERMOD, AERMET, and AERMINUTE, with data provided to Sierra Club by regulatory air agencies or obtained through other publicly-available sources as documented below.  The analysis was conducted in adherence to all available USEPA guidance for evaluating source impacts on attainment of the 1-hour SO$_2$ NAAQS via aerial dispersion modeling, including the AERMOD Implementation Guide; USEPA's Applicability of Appendix W Modeling Guidance for the 1-hour SO$_2$ National Ambient Air Quality Standard, August 23, 2010; modeling guidance promulgated by USEPA in Appendix W to 40 CFR Part 51; USEPA's March 2011 Modeling Guidance for SO$_2$ NAAQS Designations;[1]  and, USEPA's December 2013 SO$_2$ NAAQS Designations Technical Assistance Document.[2]

It was determined that based on measured actual emissions or current allowable limits, the Big Brown Steam Electric Station is estimated to create SO$_2$ concentrations which exceed the 1-hour NAAQS.

# 2.    Compliance with the 1-hour SO$_2$ NAAQS

## 2.1    1-hour SO$_2$ NAAQS

The 1-hour SO$_2$ NAAQS takes the form of a three-year average of the 99[th]-percentile of the annual distribution of daily maximum 1-hour concentrations, which cannot exceed 75 parts per billion (ppb).[3]  Compliance with this standard was verified using USEPA's AERMOD air dispersion model, which produces air concentrations in units of µg/m$^3$.  The 1-hour SO$_2$ NAAQS of 75 ppb equals

---

[1] http://www.epa.gov/scram001/so2_modeling_guidance.htm
[2] http://www.epa.gov/oaqps001/sulfurdioxide/pdfs/SO2ModelingTAD.pdf
[3] USEPA, Applicability of Appendix W Modeling Guidance for the 1-hour SO$_2$ National Ambient Air Quality Standard, August 23, 2010.

196.2 µg/m$^3$, and this is the value used for determining whether modeled impacts exceed the NAAQS.[4]  The 99[th]-percentile of the annual distribution of daily maximum 1-hour concentrations corresponds to the fourth-highest value at each receptor for a given year.

## 2.2    Modeling Results

Model results for both sources included in the SO$_2$ analysis are summarized in Table 1. Results are provided for each source alone, and for all sources combined.

Modeling results for Big Brown Steam Electric Station and Limestone Electric Generating Station are summarized in Table 1. It was determined that based on either current allowable emissions or measured actual emissions, the Big Brown Steam Electric Station is estimated to create downwind SO$_2$ concentrations which exceed the 1-hour NAAQS.

More specifically, the modeling results presented in Table 1, show exceedances of the NAAQS by the plant's allowable and actual emissions. "Allowable" is the peak emission rate from each unit as approved by the current air quality operation permit for the facility. "Actual" are the measured emissions for each hour between January 1, 2012 and December 31, 2014 as taken from USEPA *Air Markets Program Data*.[5]

In addition, the emissions from Limestone Electric Generating Station significantly contribute to the ambient SO$_2$ concentration in the area impacted by Big Brown Steam Electric Station.

Air quality impacts in Texas are based on a background concentration of 7.8 µg/m$^3$. This is the 2011-13 design value for El Paso, Texas - the lowest measured background concentration in the state.  This is the most recently available design value. See Section 5 for further discussion of the background concentrations used for this analysis.

---

[4] The ppb to µg/m$^3$ conversion is found in the source code to AERMOD v. 14134, subroutine Modules.  The conversion calculation is $75/0.3823 = 196.2$ µg/m$^3$.
[5] http://ampd.epa.gov/ampd/

**Table 1 - SO₂ Modeling Results for Big Brown Steam Electric Station Modeling Analysis**

| Emission Rates | Averaging Period | 99th Percentile 1-hour Daily Maximum (µg/m³) | | | | Complies with NAAQS? |
|---|---|---|---|---|---|---|
| | | Impact | Background | Total | NAAQS | |
| Allowable | Big Brown | 950.5 | 7.8 | 958.3 | 196.2 | No |
| Actual | | 446.8 | 7.8 | 454.6 | 196.2 | No |
| Allowable | Limestone | 1,507.9 | 7.8 | 1,515.7 | 196.2 | No |
| Actual | | 192.3 | 7.8 | 200.1 | 196.2 | No |
| Allowable | Both | 1,511.9 | 7.8 | 1,519.7 | 196.2 | No |
| Actual | | 451.6 | 7.8 | 459.4 | 196.2 | No |

The emissions used for the modeling analysis are summarized in Table 2.

**Table 2 - Modeled SO₂ Emissions from Big Brown Steam Electric Station** [6]

| Stack ID | Unit ID | Allowable Emissions 3-hour Average (lbs/hr) |
|---|---|---|
| S01 | Unit 1 | 17,790.0 |
| S02 | Unit 2 | 17,790.0 |
| Big Brown | Subtotal | 35,580.0 |
| S01 | Unit 1 | 26,790.0 |
| S02 | Unit 3 | 24,390.0 |
| Limestone | Subtotal | 51,180.0 |
| Both Stations | Total | 86,760.0 |

Based on the modeling results, Table 3 provides the emission reductions from current allowable rates necessary to achieve compliance with the 1-hour NAAQS. This assumes a one-hour averaging period for the emission rate and that the emission rate is binding at all times. However, given the conservative aspects of this modeling protocol, it is extremely likely that this limit is too high to protect the NAAQS. For example, startup or shutdown periods were not evaluated. During these periods, decreased gas velocities and temperatures may lead to greater ambient impacts at ground level. Further, the hypothetical emission limitation in Table 3 would allow Big Brown Steam Electric Station to consume the entire NAAQS, leaving little to no room for any other source of SO₂ in the area. No margin of safety has been included in the hypothetical emission limitation.

---

[6] Big Brown allowable emissions are taken from TXCEQ, Federal Operating Permit, No. O65. January 15, 2014. Limestone allowable emissions are taken from TXCEQ, Federal Operating Permit, No. O75, January 24, 2012.

**Table 3 - Required Emission Reductions from Current Allowable Limits for Big Brown Steam Electric Station to Comply with the 1-hour NAAQS for SO$_2$**

| Acceptable Impact (NAAQS - Background) 99th Percentile 1-hour Daily Max ($\mu g/m^3$) | Required Total Facility Reduction Based on Allowable Emissions (%) | Required Total Facility Emission Rate (lbs/hr) | Required Total Facility 1-hour Average Emission Rate (lbs/mmbtu) |
|---|---|---|---|
| 188.4 | 88% | 4,433.7 | 0.37 |

Predicted exceedances of the 1-hour NAAQS for SO$_2$ based on allowable emissions extend throughout the region to a maximum distance of 50 kilometers.

Figure 1 shows the extent of NAAQS violations based on allowable emissions from both sources.

Figure 2 shows the extent of NAAQS violations based on actual hourly emissions from both sources.

## 2.3    Conservative Modeling Assumptions

A dispersion modeling analysis requires the selection of numerous parameters which affect the predicted concentrations. For the enclosed analysis, several parameters were selected which under-predict facility impacts.

Assumptions used in this modeling analysis which likely under-estimate concentrations include the following:

- Allowable emissions are based on a limitation with an averaging period which is greater than the 1-hour average used for the SO$_2$ air quality standard. Emissions and impacts during any 1-hour period may be higher than assumed for the modeling analysis.
- No consideration of facility operation at less than 100% load. Stack parameters such as exit flow rate and temperature are typically lower at less than full load, reducing pollutant dispersion and increasing predicted air quality impacts.
- No consideration of building or structure downwash. These downwash effects typically increase predicted concentrations near the facility.
- Except for Limestone Electric Generating Station, no consideration of off-site sources. These other sources of SO$_2$ will increase the predicted impacts.
- Air quality impacts are based on a background SO$_2$ concentration of 7.8 $\mu g/m^3$, which is the lowest measured background concentration in the state. Given the proximity of the Big Brown facility to other major sources of SO$_2$, the actual background concentration is likely much higher.
- No evaluation has been conducted to determine if the stack height exceeds Good Engineering Practice or GEP height. If the stack height exceeds GEP, the predicted concentrations will increase.

*Evaluation of Compliance with the 1-hour NAAQS for SO₂*
*September 11, 2015*
*Page 6*



*Figure 1 - Regional View of Impacts Based on Allowable Emissions from Both Sources*

*Evaluation of Compliance with the 1-hour NAAQS for SO₂*
*September 11, 2015*
*Page 7*



1-hour average SO2 concentrations (ug per cubic meter) - All colored areas exceed the NAAQS.

196          300          400

***Figure 2 - Regional View of Impacts Based on Actual Emissions for 2012-14 from Both Sources***

## 3.    Modeling Methodology

### 3.1    Air Dispersion Model

The modeling analysis used USEPA's AERMOD program, v. 14134.  AERMOD, as available from the Support Center for Regulatory Atmospheric Modeling (SCRAM) website, was used in conjunction with a third-party modeling software program, *AERMOD View*, sold by Lakes Environmental Software.

### 3.2    Control Options

The AERMOD model was run with the following control options:

- 1-hour average air concentrations
- Regulatory defaults
- Flagpole receptors

To reflect a representative inhalation level, a flagpole height of 1.5 meters was used for all modeled receptors.  This parameter was added to the receptor file when running AERMAP, as described in Section 4.4.

An evaluation was conducted to determine if the modeled facility was located in a rural or urban setting using USEPA's methodology outlined in Section 7.2.3 of the Guideline on Air Quality Models.[7]  For urban sources, the URBANOPT option is used in conjunction with the urban population from an appropriate nearby city and a default surface roughness of 1.0 meter.  Methods described in Section 4.1 were used to determine whether rural or urban dispersion coefficients were appropriate for the modeling analysis.

### 3.3    Output Options

The AERMOD analysis was based on three years of recent meteorological data.  The modeling analyses used one run with three years of sequential meteorological data from 2012-2014. Consistent with USEPA's Modeling Guidance for SO₂ NAAQS Designations, AERMOD provided a table of fourth-high 1-hour SO₂ impacts concentrations consistent with the form of the 1-hour SO₂ NAAQS.[8]

Please refer to Table 1 for the modeling results.

---

[7] USEPA, Revision to the Guideline on Air Quality Models: Adoption of a Preferred General Purpose (Flat and Complex Terrain) Dispersion Model and Other Revisions, Appendix W to 40 CFR Part 51, November 9, 2005.
[8] USEPA, Area Designations for the 2010 Revised Primary Sulfur Dioxide National Ambient Air Quality Standards, Attachment 3, March 24, 2011, pp. 24-26.

## 4.    Model Inputs

## 4.1    Geographical Inputs

The "ground floor" of all air dispersion modeling analyses is establishing a coordinate system for identifying the geographical location of emission sources and receptors. These geographical locations are used to determine local characteristics (such as land use and elevation), and also to ascertain source to receptor distances and relationships.

The Universal Transverse Mercator (UTM) NAD83 coordinate system was used for identifying the easting (x) and northing (y) coordinates of the modeled sources and receptors. Stack locations were obtained from facility permits and prior modeling files provided by the state regulatory agency. The stack locations were then verified using aerial photographs.

The facility was evaluated to determine if it should be modeled using the rural or urban dispersion coefficient option in AERMOD. A Geographic Information System (GIS) was used to determine whether rural or urban dispersion coefficients apply to a site. Land use within a three-kilometer radius circle surrounding the facility was considered. USEPA guidance states that urban dispersion coefficients are used if more than 50% of the area within 3 kilometers has urban land uses. Otherwise, rural dispersion coefficients are appropriate.[9]

USEPA's AERSURFACE v. 13016 was used to develop the meteorological data for the modeling analysis. This model was also used to evaluate surrounding land use within 3 kilometers. Based on the output from the AERSURFACE, approximately 0.8% of surrounding land use around the modeled facility was of urban land use types including Type 21 – Low Intensity Residential, Type 22 – High Intensity Residential and Type 23 – Commercial / Industrial / Transportation.

This is less than the 50% value considered appropriate for the use of urban dispersion coefficients. Based on the AERSURFACE analysis, it was concluded that the rural option would be used for the modeling summarized in this report. Please refer to Section 4.5.3 for a discussion of the AERSURFACE analysis.

---

[9] USEPA, Revision to the Guideline on Air Quality Models: Adoption of a Preferred General Purpose (Flat and Complex Terrain) Dispersion Model and Other Revisions, Appendix W to 40 CFR Part 51, November 9, 2005, Section 7.2.3.

*Evaluation of Compliance with the 1-hour NAAQS for SO₂*
*September 11, 2015*
*Page 10*

## 4.2    Emission Rates and Source Parameters

The modeling analysis considered $SO_2$ emissions from the Big Brown Steam Electric Station and Limestone Electric Generating Station. Other off-site sources were not considered. Concentrations were predicted for the scenarios shown in Tables 1 and 2:

> 1) allowable emissions based on the current permit issued by the regulatory agency, and

> 2) actual hourly emissions measured each hour between January 1, 2012 and December 31, 2014 as taken from USEPA *Air Markets Program Data*.[10]

Stack parameters and emissions used for the modeling analysis are summarized in Table 4.

*Table 4 – Facility Stack Parameters and Emissions* [11]

| Facility | Big Brown | | Limestone | |
|---|---|---|---|---|
| Stack | B01 | B02 | L01 | L02 |
| Description | Unit 1 | Unit 2 | Unit 1 | Unit 2 |
| X Coord. [m] | 778731.22 | 778774.22 | 761099 | 761130 |
| Y Coord. [m] | 3524371.07 | 3524295.07 | 3479813 | 3479694 |
| Base Elevation [m] | 98.61 | 98 | 141.35 | 139.17 |
| Release Height [m] | 122 | 122 | 171.6 | 171.6 |
| Gas Exit Temperature [°K] | 459 | 459 | 333.15 | 333.15 |
| Gas Exit Velocity [m/s] | 23.7 | 23.7 | 21.294 | 21.294 |
| Inside Diameter [m] | 6.77 | 6.77 | 8.23 | 8.23 |
| Allowable Emission Rate [g/s] | 2,242 | 2,242 | 3,375 | 3,073 |
| Actual Emission Rate [g/s] | - | - | - | - |

The above stack parameters and emissions were obtained from regulatory agency documents and databases identified in Section 2.2. The analysis was conducted based on 100% operating load using maximum exhaust flow rates and temperatures. Operation at less than full capacity loads was not considered. This assumption tends to under-predict impacts since stack parameters such as exit flow rate and temperature are typically lower at less than full load, reducing pollutant dispersion and increasing predicted air quality impacts. Stack location, height and diameter were verified using aerial photographs, and flue gas flow rate and temperature were verified using combustion calculations.

---

[10] http://ampd.epa.gov/ampd/
[11] Stack parameters were obtained from the annual survey compiled by the U.S. Energy Information Administration. http://www.eia.gov/electricity/data/eia860/

## 4.3 Building Dimensions

No building dimensions or prior downwash evaluations were available. Therefore this modeling analysis did not address the effects of downwash and this may under-predict impacts.

## 4.4 Receptors

For Big Brown Steam Electric Station, three receptor grids were employed:

1. A 100-meter Cartesian receptor grid centered on Big Brown Steam Electric Station and extending out 5 kilometers.
2. A 500-meter Cartesian receptor grid centered on Big Brown Steam Electric Station and extending out 10 kilometers.
3. A 1,000-meter Cartesian receptor grid centered on Big Brown Steam Electric Station and extending out 50 kilometers. 50 kilometers is the maximum distance accepted by USEPA for the use of the AERMOD dispersion model.[12]

A flagpole height of 1.5 meters was used for all these receptors.

Elevations from stacks and receptors were obtained from National Elevation Dataset (NED) GeoTiff data. GeoTiff is a binary file that includes data descriptors and geo-referencing information necessary for extracting terrain elevations. These elevations were extracted from 1 arc-second (30 meter) resolution NED files. The USEPA software program AERMAP v. 11103 is used for these tasks.

## 4.5 Meteorological Data

To improve the accuracy of the modeling analysis, recent meteorological data for the 2012-2014 period were prepared using the USEPA's program AERMET which creates the model-ready surface and profile data files required by AERMOD.   Required data inputs to AERMET included surface meteorological measurements, twice-daily soundings of upper air measurements, and the micrometeorological parameters surface roughness, albedo, and Bowen ratio.  One-minute ASOS data were available so USEPA methods were used to reduce calm and missing hours.[13] The USEPA software program AERMINUTE v. 14237 is used for these tasks.

This section discusses how the meteorological data was prepared for use in the 1-hour SO$_2$ NAAQS

---

[12] USEPA, Revision to the Guideline on Air Quality Models: Adoption of a Preferred General Purpose (Flat and Complex Terrain) Dispersion Model and Other Revisions, Appendix W to 40 CFR Part 51, Section A.1.(1), November 9, 2005.
[13] USEPA, Area Designations for the 2010 Revised Primary Sulfur Dioxide National Ambient Air Quality Standards, Attachment 3, March 24, 2011, p. 19.

modeling analyses.  The USEPA software program AERMET v. 14134 is used for these tasks.

### 4.5.1    Surface Meteorology

Surface meteorology was obtained for Corsicana Campbell Field located near the Big Brown Steam Electric Station. Integrated Surface Hourly (ISH) data for the 2012-2014 period were obtained from the National Climatic Data Center (NCDC).   The ISH surface data was processed through AERMET Stage 1, which performs data extraction and quality control checks.

### 4.5.2    Upper Air Data

Upper-air data are collected by a "weather balloon" that is released twice per day at selected locations.  As the balloon is released, it rises through the atmosphere, and radios the data back to the surface.  The measuring and transmitting device is known as either a radiosonde, or rawindsonde.  Data collected and radioed back include:  air pressure, height, temperature, dew point, wind speed, and wind direction.  The upper air data were processed through AERMET Stage 1, which performs data extraction and quality control checks.

For Big Brown Steam Electric Station, the concurrent 2012-2014 upper air data from twice-daily radiosonde measurements obtained at the most representative location were used.  This location was the Fort Worth, Texas measurement station. These data are in Forecast Systems Laboratory (FSL) format and were downloaded in ASCII text format from NOAA's FSL website.[14]  All reporting levels were downloaded and processed with AERMET.

### 4.5.3    AERSURFACE

AERSURFACE is a program that extracts surface roughness, albedo, and daytime Bowen ratio for an area surrounding a given location.  AERSURFACE uses land use and land cover (LULC) data in the U.S. Geological Survey's 1992 National Land Cover Dataset to extract the necessary micrometeorological data.  LULC data was used for processing meteorological data sets used as input to AERMOD.

AERSURFACE v. 13016 was used to develop surface roughness, albedo, and daytime Bowen ratio values in a region surrounding the meteorological data collection site.  AERSURFACE was used to develop surface roughness in a one kilometer radius surrounding the data collection site.  Bowen ratio and albedo was developed for a 10 kilometer by 10 kilometer area centered on the meteorological data collection site.  These micrometeorological data were processed for seasonal periods using 30-degree sectors. Seasonal moisture conditions were considered average with winter

---

[14] Available at: http://esrl.noaa.gov/raobs/

months having no continuous snow cover.

### 4.5.4   Data Review

Missing meteorological data were not filled as the data file met USEPA's 90% data completeness requirement.[15]  The AERMOD output file shows there were 1.63% missing data.

To confirm the representativeness of the airport meteorological data, the surface characteristics of the airport data collection site and the modeled source location were compared. Since the Corsicana Campbell Field is located close to Big Brown Steam Electric Station, this meteorological data set was considered appropriate for this modeling analysis. [16] This weather station provided high quality surface measurements for the most recent 3-year time, and had similar land use, surface characteristics, terrain features and climate.

Finally, TCEQ provides pre-processed meteorological data suitable for modeling for each county.[17] For Freestone County, TCEQ recommends using data from the same surface and upper air stations used for this modeling analysis. The TCEQ data were not used for this project because they were not from the most recent years needed for this analysis and had not been processed using the latest versions of USEPA modeling software.

### 5.    Background SO₂ Concentrations

Background concentrations were determined consistent with USEPA's Modeling Guidance for SO₂ NAAQS Designations.[18, 19]  To preserve the form of the 1-hour SO₂ standard, based on the 99th percentile of the annual distribution of daily maximum 1-hour concentrations averaged across the number of years modeled, the background fourth-highest daily maximum 1-hour SO₂ concentration was added to the modeled fourth-highest daily maximum 1-hour SO₂ concentration.[20]  Background concentrations were based on the 2011-13 design value measured by the ambient monitors located in Texas.[21]

---

[15] USEPA, Meteorological Monitoring Guidance for Regulatory Modeling Applications, EPA-454/R-99-05, February 2000, Section 5.3.2, pp. 5-4 to 5-5.
[16] USEPA, AERMOD Implementation Guide, March 19, 2009, pp. 3-4.
[17] Texas Commission on Environmental Quality, Meteorological Data for Refined Screening with AERMOD, http://www.tceq.texas.gov/permitting/air/modeling/aermod-datasets.html, Last updated November 22, 2013.
[18] USEPA, Area Designations for the 2010 Revised Primary Sulfur Dioxide National Ambient Air Quality Standards, Attachment 3, March 24, 2011, pp. 20-23.
[19] USEPA, SO₂ NAAQS Designations Modeling Technical Assistance Document, Dec. 2013, section 8.1, pp 27-28.
[20] USEPA, Applicability of Appendix W Modeling Guidance for the 1-hour SO₂ National Ambient Air Quality Standard, August 23, 2010, p. 3.
[21] http://www.epa.gov/airtrends/values.html

## 6.     Reporting

All files from the programs used for this modeling analysis are available to regulatory agencies. These include analyses prepared with AERSURFACE, AERMET, AERMAP, and AERMOD.

Attachment 4

**Martin Lake Generating Station**

**Tatum, Texas**

**Evaluation of Compliance with the 1-hour NAAQS for SO$_2$**

**September 11, 2015**

*Conducted by:*

*Steven Klafka, P.E., BCEE*

*Wingra Engineering, S.C.*

*Madison, Wisconsin*

## 1.    Introduction

Wingra Engineering, S.C. was hired by the Sierra Club to conduct an air modeling impact analysis to help USEPA, state and local air agencies identify facilities that are likely causing exceedences of the 1-hour sulfur dioxide (SO$_2$) national ambient air quality standard (NAAQS). This document describes the results and procedures for an evaluation conducted for the Martin Lake Generating Station located in Tatum, Texas. To improve the accuracy of the modeling analysis, it included the H.W. Pirkey Power Plant in Hallsville, Texas. This is an additional source of SO$_2$ emissions located within 50 kilometers of the Martin Lake Generating Station.

The dispersion modeling analysis predicted ambient air concentrations for comparison with the 1-hour SO$_2$ NAAQS. The modeling was performed using the most recent version of AERMOD, AERMET, and AERMINUTE, with data provided to the Sierra Club by regulatory air agencies and through other publicly-available sources as documented below. The analysis was conducted in adherence to all available USEPA guidance for evaluating source impacts on attainment of the 1-hour SO$_2$ NAAQS via aerial dispersion modeling, including the AERMOD Implementation Guide; USEPA's Applicability of Appendix W Modeling Guidance for the 1-hour SO$_2$ National Ambient Air Quality Standard, August 23, 2010; modeling guidance promulgated by USEPA in Appendix W to 40 CFR Part 51; USEPA's March 2011 Modeling Guidance for SO$_2$ NAAQS Designations;[1] and, USEPA's December 2013 SO$_2$ NAAQS Designations Technical Assistance Document.[2]

It was determined that based on measured actual emissions or current allowable limits, the Martin Lake Generating Station is estimated to create SO$_2$ concentrations which exceed the 1-hour NAAQS.

## 2.    Compliance with the 1-hour SO$_2$ NAAQS

### 2.1    1-hour SO$_2$ NAAQS

The 1-hour SO$_2$ NAAQS takes the form of a three-year average of the 99th percentile of the annual distribution of daily maximum 1-hour concentrations, which cannot exceed 75 ppb.[3] Compliance with this standard was verified using USEPA's AERMOD air dispersion model, which produces air concentrations in units of $\mu g/m^3$. The 1-hour SO$_2$ NAAQS of 75 ppb equals 196.2 $\mu g/m^3$, and this is the value used for determining whether modeled impacts exceed the NAAQS.[4] The 99th percentile of the annual distribution of daily maximum 1-hour concentrations corresponds to the fourth-highest

---

[1] http://www.epa.gov/scram001/so2_modeling_guidance.htm
[2] http://www.epa.gov/oaqps001/sulfurdioxide/pdfs/SO2ModelingTAD.pdf
[3] USEPA, Applicability of Appendix W Modeling Guidance for the 1-hour SO$_2$ National Ambient Air Quality Standard, August 23, 2010.
[4] The ppb to $\mu g/m^3$ conversion is found in the source code to AERMOD v. 14134, subroutine Modules. The conversion calculation is 75/0.3823 = 196.2 $\mu g/m^3$.

value at each receptor for a given year.

## 2.2    Modeling Results

Model results for both sources included in the analysis of SO$_2$ are summarized in Table 1. Results are provided for each source alone, and for both sources combined.

Modeling results for Martin Lake Generating Station are summarized in Table 1. It was determined that based on either current allowable emissions or measured actual emissions, the Martin Lake Generating Station is estimated to create downwind SO$_2$ concentrations which exceed the 1-hour NAAQS.

More specifically, the modeling results presented in Table 1, show exceedences of the NAAQS by the plant's allowable and actual emissions. "Allowable" is the peak emission rate from each unit as approved by the current air quality operation permit for the facility. "Actual" are the measured emissions for each hour between January 1, 2012 and December 31, 2014 as taken from USEPA *Air Markets Program Data*.[5]

Air quality impacts in Texas are based on a background concentration of 7.8 µg/m$^3$. This is the 2011-13 design value for El Paso, Texas - the lowest measured background concentration in the state.  This is the most recently available design value. See Section 5 for further discussion of the background concentrations used for this analysis.

*Table 1 - SO$_2$ Modeling Results for Martin Lake Generating Station Modeling Analysis*

| Emission Rates | Averaging Period | 99th Percentile 1-hour Daily Maximum (µg/m$^3$) | | | | Complies with NAAQS? |
|---|---|---|---|---|---|---|
| | | Impact | Background | Total | NAAQS | |
| Allowable | Martin Lake | 679.6 | 7.8 | 687.4 | 196.2 | No |
| Actual | | 339.8 | 7.8 | 347.6 | 196.2 | No |
| Allowable | Pirkey | 187.5 | 7.8 | 195.3 | 196.2 | No |
| Actual | | 40.9 | 7.8 | 48.7 | 196.2 | Yes |
| Allowable | Both | 682.8 | 7.8 | 690.6 | 196.2 | No |
| Actual | | 339.9 | 7.8 | 347.7 | 196.2 | No |

---

[5] http://ampd.epa.gov/ampd/

The emissions used for the modeling analysis are summarized in Table 2.

**Table 2 - Modeled SO$_2$ Emissions from Martin Lake Generating Station** [6]

| Stack ID | Unit ID | Allowable Emissions 30-day Average (lbs/hr) |
|---|---|---|
| S01 | Unit 1 | 9,516.0 |
| S02 | Unit 2 | 9,516.0 |
| S03 | Unit 3 | 9,516.0 |
| Martin Lake | Total | 28,548.0 |
| Pirkey | Unit 1 | 8,652.0 |
| Both Stations | Total | 37,200.0 |

Based on the modeling results, Table 3 provides the necessary emission reductions from current allowable rates necessary to achieve compliance with the 1-hour NAAQS.

**Table 3 - Required Emission Reductions from Current Allowable Limits to Comply with the 1-hour NAAQS for SO$_2$**

| Acceptable Impact (NAAQS - Background) 99th Percentile 1-hour Daily Max ($\mu g/m^3$) | Required Total Facility Reduction Based on Allowable Emissions (%) | Required Total Facility Emission Rate (lbs/hr) | Required Total Facility 1-hour Average Emission Rate (lbs/mmbtu) |
|---|---|---|---|
| 188.4 | 72% | 7,877.0 | 0.33 |

Predicted exceedences of the 1-hour NAAQS for SO$_2$ based on allowable emissions from both sources extend throughout the region to a maximum distance of 46 kilometers.

Figure 1 shows the extent of NAAQS violations based on allowable emissions from both sources.

Figure 2 shows the extent of NAAQS violations based on actual hourly emissions from both sources.

## 2.3    Conservative Modeling Assumptions

A dispersion modeling analysis requires the selection of numerous parameters which affect the predicted concentrations. For the enclosed analysis, several parameters were selected which under-predict facility impacts.

---

[6] Martin Lake allowable emissions are taken from Federal Operating Permit, No. RL-0020-K, May 19, 1999. Pirkey allowable emissions are taken from Federal Operating Permit, No. O31, July 26, 2010. The applicable SO2 emision limitation for both facilities is 1.2 lbs per million BTU.

Assumptions used in this modeling analysis which likely under-estimate concentrations include the following:

- Allowable emissions are based on a limitation with an averaging period which is greater than the 1-hour average used for the SO$_2$ air quality standard. Emissions and impacts during any 1-hour period may be higher than assumed for the modeling analysis.
- No consideration of facility operation at less than 100% load. Stack parameters such as exit flow rate and temperature are typically lower at less than full load, reducing pollutant dispersion and increasing predicted air quality impacts.
- No consideration of building or structure downwash. These downwash effects typically increase predicted concentrations near the facility.
- No evaluation has been conducted to determine if the stack height exceeds Good Engineering Practice or GEP height. If the stack height exceeds GEP, the predicted concentrations will increase.
- No consideration of off-site sources. These other sources of SO$_2$ will increase the predicted impacts.
- As noted, air quality impacts are based on a background SO$_2$ concentration of 7.8 µg/m$^3$, which is the lowest measured background concentration in the state.  Given the proximity of the Martin Lake facility to other sources of SO$_2$, the actual background concentration is likely higher.
- No evaluation has been conducted to determine if the stack height exceeds Good Engineering Practice or GEP height. If the stack height exceeds GEP, the predicted concentrations will increase.

*Evaluation of Compliance with the 1-hour NAAQS for SO₂*
*September 11, 2015*
*Page 6*



1-hour average SO2 concentrations (ug per cubic meter) - All colored areas exceed the NAAQS.

196            400            600

*Figure 1 - Regional View of Impacts Based on Allowable Emissions from All Sources*



1-hour average SO2 concentrations (ug per cubic meter) - All colored areas exceed the NAAQS.

196    250    300

*Figure 2 - Regional View of Impacts Based on Actual Emissions from All Sources for the 2012-14 Period*

# 3.    Modeling Methodology

## 3.1    Air Dispersion Model

The modeling analysis used USEPA's AERMOD program, v. 14134.  AERMOD, as available from the Support Center for Regulatory Atmospheric Modeling (SCRAM) website, was used in conjunction with a third-party modeling software program, *AERMOD View*, sold by Lakes Environmental Software.

## 3.2    Control Options

The AERMOD model was run with the following control options:

- 1-hour average air concentrations
- Regulatory defaults
- Flagpole receptors

To reflect a representative inhalation level, a flagpole height of 1.5 meters was used for all modeled receptors.  This parameter was added to the receptor file when running AERMAP, as described in Section 4.4.

An evaluation was conducted to determine if the modeled facility was located in a rural or urban setting using USEPA's methodology outlined in Section 7.2.3 of the Guideline on Air Quality Models.[7]  For urban sources, the URBANOPT option is used in conjunction with the urban population from an appropriate nearby city and a default surface roughness of 1.0 meter.  Methods described in Section 4.1 were used to determine whether rural or urban dispersion coefficients were appropriate for the modeling analysis.

## 3.3    Output Options

The AERMOD analysis was based on three years of recent meteorological data.  The modeling analyses used one run with three years of sequential meteorological data from 2012-2014. Consistent with USEPA's Modeling Guidance for SO₂ NAAQS Designations, AERMOD provided a table of fourth-high 1-hour SO₂ impacts concentrations consistent with the form of the 1-hour SO₂ NAAQS.[8]

Please refer to Table 1 for the modeling results.

---

[7] USEPA, Revision to the Guideline on Air Quality Models: Adoption of a Preferred General Purpose (Flat and Complex Terrain) Dispersion Model and Other Revisions, Appendix W to 40 CFR Part 51, November 9, 2005.
[8] USEPA, Area Designations for the 2010 Revised Primary Sulfur Dioxide National Ambient Air Quality Standards, Attachment 3, March 24, 2011, pp. 24-26.

## 4.    Model Inputs

## 4.1    Geographical Inputs

The "ground floor" of all air dispersion modeling analyses is establishing a coordinate system for identifying the geographical location of emission sources and receptors.  These geographical locations are used to determine local characteristics (such as land use and elevation), and also to ascertain source to receptor distances and relationships.

The Universal Transverse Mercator (UTM) NAD83 coordinate system was used for identifying the easting (x) and northing (y) coordinates of the modeled sources and receptors.  Stack locations were obtained from facility permits and prior modeling files provided by the state regulatory agency. The stack locations were then verified using aerial photographs.

The facility was evaluated to determine if it should be modeled using the rural or urban dispersion coefficient option in AERMOD.  A GIS was used to determine whether rural or urban dispersion coefficients apply to a site.  Land use within a three-kilometer radius circle surrounding the facility was considered. USEPA guidance states that urban dispersion coefficients are used if more than 50% of the area within 3 kilometers has urban land uses. Otherwise, rural dispersion coefficients are appropriate.[9]

USEPA's AERSURFACE v. 13016 was used to develop the meteorological data for the modeling analysis. This model was also used to evaluate surrounding land use within 3 kilometers. Based on the output from the AERSURFACE, approximately 6.4% of surrounding land use around the modeled facility was of urban land use types including Type 21 – Low Intensity Residential, Type 22 – High Intensity Residential and Type 23 – Commercial / Industrial / Transportation.

This is less than the 50% value considered appropriate for the use of urban dispersion coefficients. Based on the AERSURFACE analysis, it was concluded that the rural option would be used for the modeling summarized in this report.  Please refer to Section 4.5.3 for a discussion of the AERSURFACE analysis.

---

[9] USEPA, Revision to the Guideline on Air Quality Models: Adoption of a Preferred General Purpose (Flat and Complex Terrain) Dispersion Model and Other Revisions, Appendix W to 40 CFR Part 51, November 9, 2005, Section 7.2.3.

## 4.2    Emission Rates and Source Parameters

The modeling analyses only considered SO$_2$ emissions from the facility. Off-site sources were not considered. Concentrations were predicted for the scenarios shown in Tables 1 and 2:

>  1) allowable emissions based on the current permit issued by the regulatory agency, and

>  2) actual hourly emissions measured each hour between January 1, 2011 and December 31, 2014 as taken from USEPA *Air Markets Program Data*.[10]

Stack parameters and emissions used for the modeling analysis are summarized in Table 4.

*Table 4 – Facility Stack Parameters and Emissions* [11]

| Facility | Martin Lake | | | Pirkey |
|---|---|---|---|---|
| Stack | S01 | S02 | S03 | S01 |
| Description | Unit 1 | Unit 2 | Unit 3 | Unit 1 |
| X Coord. [m] | 352028 | 352066.8 | 352107.1 | 360449 |
| Y Coord. [m] | 3570404.46 | 3570314.64 | 3570224.87 | 3592510 |
| Base Elevation [m] | 95.18 | 94.95 | 94.79 | 109.43 |
| Release Height [m] | 137.77 | 137.77 | 137.8 | 160.02 |
| Gas Exit Temperature [°K] | 449.261 | 449.261 | 449.261 | 414.817 |
| Gas Exit Velocity [m/s] | 27.249 | 28.042 | 28.042 | 25.769 |
| Inside Diameter [m] | 7.01 | 7.01 | 7.01 | 7.62 |
| Allowable Emission Rate [g/s] | 1,199 | 1,199 | 1,199 | 1,090 |
| Actual Emission Rate [g/s] | - | - | - | - |

The above stack parameters and emissions were obtained from regulatory agency documents and databases identified in Section 2.2. The analysis was conducted based on 100% operating load using maximum exhaust flow rates and temperatures. Operation at less than full capacity loads was not considered. This assumption tends to under-predict impacts since stack parameters such as exit flow rate and temperature are typically lower at less than full load, reducing pollutant dispersion and increasing predicted air quality impacts. Stack location, height and diameter were verified using aerial photographs, and flue gas flow rate and temperature were verified using combustion calculations.

---

[10] http://ampd.epa.gov/ampd/
[11] Martin Lake stack parameters obtained from Environ, 2018 Base CaseCAMx Simulation, Texas Haze Evaluation, Appendix A: Stack Parameters of Major Units at the Selected 38 Facilities, September 7, 2013. Stack parameters for the H.W. Pirkey Power Plant were obtained from the U.S. Energy Information Agency, http://www.eia.gov/electricity/data/eia860/, 2013 Form EIA-860 Data - Schedule 6, 'Stack & Flue Data' , 6_2_EnviroEquip_Y2013.xlsx

## 4.3    Building Dimensions and GEP

No building dimensions or prior downwash evaluations were available. Therefore this modeling analysis did not address the effects of downwash and this may under-predict impacts.

## 4.4    Receptors

For Martin Lake Generating Station, three receptor grids were employed:

1. A 100-meter Cartesian receptor grid centered on Martin Lake Generating Station and extending out 5 kilometers.
2. A 500-meter Cartesian receptor grid centered on Martin Lake Generating Station and extending out 10 kilometers.
3. A 1,000-meter Cartesian receptor grid centered on Martin Lake Generating Station and extending out 50 kilometers. 50 kilometers is the maximum distance accepted by USEPA for the use of the AERMOD dispersion model.[12]

A flagpole height of 1.5 meters was used for all these receptors.

Elevations from stacks and receptors were obtained from National Elevation Dataset (NED) GeoTiff data. GeoTiff is a binary file that includes data descriptors and geo-referencing information necessary for extracting terrain elevations. These elevations were extracted from 1 arc-second (30 meter) resolution NED files. The USEPA software program AERMAP v. 11103 is used for these tasks.

## 4.5    Meteorological Data

To improve the accuracy of the modeling analysis, recent meteorological data for the 2012-2014 period were prepared using the USEPA's program AERMET which creates the model-ready surface and profile data files required by AERMOD.   Required data inputs to AERMET included surface meteorological measurements, twice-daily soundings of upper air measurements, and the micrometeorological parameters surface roughness, albedo, and Bowen ratio.  One-minute ASOS data were available so USEPA methods were used to reduce calm and missing hours.[13] The USEPA software program AERMINUTE v. 14237 is used for these tasks.

This section discusses how the meteorological data was prepared for use in the 1-hour SO₂ NAAQS

---

[12] USEPA, Revision to the Guideline on Air Quality Models: Adoption of a Preferred General Purpose (Flat and Complex Terrain) Dispersion Model and Other Revisions, Appendix W to 40 CFR Part 51, Section A.1.(1), November 9, 2005.
[13] USEPA, Area Designations for the 2010 Revised Primary Sulfur Dioxide National Ambient Air Quality Standards, Attachment 3, March 24, 2011, p. 19.

modeling analyses.  The USEPA software program AERMET v. 14134 is used for these tasks.

### 4.5.1   Surface Meteorology

Surface meteorology was obtained for Longview Texas Regional Airport located near the Martin Lake Generating Station. Integrated Surface Hourly (ISH) data for the 2012-2014 period were obtained from the National Climatic Data Center (NCDC).   The ISH surface data was processed through AERMET Stage 1, which performs data extraction and quality control checks.

### 4.5.2   Upper Air Data

Upper-air data are collected by a "weather balloon" that is released twice per day at selected locations.  As the balloon is released, it rises through the atmosphere, and radios the data back to the surface.  The measuring and transmitting device is known as either a radiosonde, or rawindsonde. Data collected and radioed back include:  air pressure, height, temperature, dew point, wind speed, and wind direction.  The upper air data were processed through AERMET Stage 1, which performs data extraction and quality control checks.

For Martin Lake Generating Station, the concurrent 2012-2014 upper air data from twice-daily radiosonde measurements obtained at the most representative location were used.  This location was the Shreveport, Louisiana measurement station. These data are in Forecast Systems Laboratory (FSL) format and were downloaded in ASCII text format from NOAA's FSL website.[14]  All reporting levels were downloaded and processed with AERMET.

### 4.5.3   AERSURFACE

AERSURFACE is a program that extracts surface roughness, albedo, and daytime Bowen ratio for an area surrounding a given location.  AERSURFACE uses land use and land cover (LULC) data in the U.S. Geological Survey's 1992 National Land Cover Dataset to extract the necessary micrometeorological data.  LULC data was used for processing meteorological data sets used as input to AERMOD.

AERSURFACE v. 13016 was used to develop surface roughness, albedo, and daytime Bowen ratio values in a region surrounding the meteorological data collection site.  AERSURFACE was used to develop surface roughness in a one kilometer radius surrounding the data collection site.  Bowen ratio and albedo was developed for a 10 kilometer by 10 kilometer area centered on the meteorological data collection site.  These micrometeorological data were processed for seasonal periods using 30-degree sectors. Seasonal moisture conditions were considered average with winter

---

[14] Available at: http://esrl.noaa.gov/raobs/

months having no continuous snow cover.

### 4.5.4   Data Review

Missing meteorological data were not filled as the data file met USEPA's 90% data completeness requirement.[15]  The AERMOD output file shows there were 0.91% missing data.

To confirm the representativeness of the airport meteorological data, the surface characteristics of the airport data collection site and the modeled source location were compared. Since the Longview Texas Regional Airport is located close to Martin Lake Generating Station, this meteorological data set was considered appropriate for this modeling analysis.[16] Additionally, this weather station provided high quality surface measurements for the most recent 3-year time, and had similar land use, surface characteristics, terrain features and climate.

### 5.       Background SO₂ Concentrations

Background concentrations were determined consistent with USEPA's Modeling Guidance for SO₂ NAAQS Designations.[17,18]  To preserve the form of the 1-hour SO₂ standard, based on the 99th percentile of the annual distribution of daily maximum 1-hour concentrations averaged across the number of years modeled, the <u>background</u> fourth-highest daily maximum 1-hour SO₂ concentration was added to the <u>modeled</u> fourth-highest daily maximum 1-hour SO₂ concentration.[19]  Background concentrations were based on the 2011-13 design value measured by the ambient monitors located in Texas.[20]

### 6.       Reporting

All files from the programs used for this modeling analysis are available to regulatory agencies. These include analyses prepared with AERSURFACE, AERMET, AERMAP, and AERMOD.

---

[15] USEPA, Meteorological Monitoring Guidance for Regulatory Modeling Applications, EPA-454/R-99-05, February 2000, Section 5.3.2, pp. 5-4 to 5-5.
[16] USEPA, AERMOD Implementation Guide, March 19, 2009, pp. 3-4.
[17] USEPA, Area Designations for the 2010 Revised Primary Sulfur Dioxide National Ambient Air Quality Standards, Attachment 3, March 24, 2011, pp. 20-23.
[18] USEPA, SO₂ NAAQS Designations Modeling Technical Assistance Document, Dec. 2013, section 8.1, pp 27-28.
[19] USEPA, Applicability of Appendix W Modeling Guidance for the 1-hour SO₂ National Ambient Air Quality Standard, August 23, 2010, p. 3.
[20] http://www.epa.gov/airtrends/values.html

# Attachment 5

**Monticello Steam Electric Station**

**Mount Pleasant, Texas**

**Evaluation of Compliance with the 1-hour NAAQS for SO$_2$**

**September 11, 2015**

*Conducted by:*

*Steven Klafka, P.E., BCEE*

*Wingra Engineering, S.C.*

*Madison, Wisconsin*

## 1.     Introduction

Wingra Engineering, S.C. was hired by Sierra Club to conduct an air modeling impact analysis to help the U.S. Environmental Protection Agency (USEPA), state and local air agencies identify facilities that are likely causing exceedances of the 1-hour sulfur dioxide (SO$_2$) national ambient air quality standard (NAAQS). This document describes the results and procedures for an evaluation conducted for the Monticello Steam Electric Station located in Mount Pleasant, Texas.

To ensure the modeling analysis reflected the cumulative concentration of SO$_2$ emissions, it included emissions from the Welsh Power Plant in Mount Pleasant, Texas, which is an additional source of SO$_2$ emissions located within 50 kilometers of the Monticello Steam Electric Station.

The dispersion modeling analysis predicted ambient air concentrations for comparison with the 1-hour SO$_2$ NAAQS. The modeling was performed using the most recent version of AERMOD, AERMET, and AERMINUTE, with data provided to Sierra Club by regulatory air agencies or obtained through other publicly-available sources as documented below. The analysis was conducted in adherence to all available USEPA guidance for evaluating source impacts on attainment of the 1-hour SO$_2$ NAAQS via aerial dispersion modeling, including the AERMOD Implementation Guide; USEPA's Applicability of Appendix W Modeling Guidance for the 1-hour SO$_2$ National Ambient Air Quality Standard, August 23, 2010; modeling guidance promulgated by USEPA in Appendix W to 40 CFR Part 51; USEPA's March 2011 Modeling Guidance for SO$_2$ NAAQS Designations;[1] and, USEPA's December 2013 SO$_2$ NAAQS Designations Technical Assistance Document.[2]

It was determined that based on measured actual emissions or current allowable limits, the Monticello Steam Electric Station is estimated to create SO$_2$ concentrations which exceed the 1-hour NAAQS.

## 2.     Compliance with the 1-hour SO$_2$ NAAQS

## 2.1     1-hour SO$_2$ NAAQS

The 1-hour SO$_2$ NAAQS takes the form of a three-year average of the 99[th]-percentile of the annual distribution of daily maximum 1-hour concentrations, which cannot exceed 75 parts per billion (ppb).[3] Compliance with this standard was verified using USEPA's AERMOD air dispersion model, which produces air concentrations in units of μg/m$^3$. The 1-hour SO$_2$ NAAQS of 75 ppb equals

---

[1] http://www.epa.gov/scram001/so2_modeling_guidance.htm
[2] http://www.epa.gov/oaqps001/sulfurdioxide/pdfs/SO2ModelingTAD.pdf
[3] USEPA, Applicability of Appendix W Modeling Guidance for the 1-hour SO$_2$ National Ambient Air Quality Standard, August 23, 2010.

196.2 µg/m$^3$, and this is the value used for determining whether modeled impacts exceed the NAAQS.[4]  The 99[th]-percentile of the annual distribution of daily maximum 1-hour concentrations corresponds to the fourth-highest value at each receptor for a given year.

## 2.2     Modeling Results

Model results for both sources included in the SO$_2$ analysis are summarized in Table 1. Results are provided for each source alone, and for all sources combined.

Modeling results for Monticello Steam Electric Station and the Welsh Power Plant are summarized in Table 1. It was determined that based on either current allowable emissions or measured actual emissions, the Monticello Steam Electric Station is estimated to create downwind SO$_2$ concentrations which exceed the 1-hour NAAQS.

More specifically, the modeling results presented in Table 1, show exceedances of the NAAQS by the plant's allowable and actual emissions. "Allowable" is the peak emission rate from each unit as approved by the current air quality operation permit for the facility. "Actual" are the measured emissions for each hour between January 1, 2012 and December 31, 2014 as taken from USEPA *Air Markets Program Data*.[5]

In addition, the emissions from Welsh Power Plant significantly contribute to the ambient SO$_2$ concentration in the area impacted by Monticello Steam Electric Station.

Air quality impacts in Texas are based on a background concentration of 7.8 µg/m$^3$. This is the 2011-13 design value for El Passo, Texas - the lowest measured background concentration in the state.  This is the most recently available design value. See Section 5 for further discussion of the background concentrations used for this analysis.

---

[4] The ppb to µg/m$^3$ conversion is found in the source code to AERMOD v. 14134, subroutine Modules.  The conversion calculation is $75/0.3823 = 196.2$ µg/m$^3$.
[5] http://ampd.epa.gov/ampd/

**Table 1 - SO₂ Modeling Results for Monticello Steam Electric Station Modeling Analysis**

| Emission Rates | Averaging Period | 99th Percentile 1-hour Daily Maximum (μg/m³) | | | | Complies with NAAQS? |
|---|---|---|---|---|---|---|
| | | Impact | Background | Total | NAAQS | |
| Allowable | Monticello | 1,733.5 | 7.8 | 1,741.3 | 196.2 | No |
| Actual | | 321.5 | 7.8 | 329.3 | 196.2 | No |
| Allowable | Welsh | 1,170.3 | 7.8 | 1,178.1 | 196.2 | No |
| Actual | | 143.5 | 7.8 | 151.3 | 196.2 | Yes |
| Allowable | Both | 1,788.7 | 7.8 | 1,796.5 | 196.2 | No |
| Actual | | 328.6 | 7.8 | 336.4 | 196.2 | No |

The emissions used for the modeling analysis are summarized in Table 2.

**Table 2 - Modeled SO₂ Emissions [6]**

| Stack ID | Unit ID | Allowable Emissions 3-hour Average (lbs/hr) |
|---|---|---|
| S01 | Boiler 1 | 17,790.0 |
| S02 | Boiler 2 | 17,790.0 |
| S03 | Boiler 3 | 23,790.0 |
| Monticello | Subtotal | 59,370.0 |
| S01 | Unit 1 | 16,740.0 |
| S02 | Unit 3 | 16,740.0 |
| Welsh | Total | 33,480.0 |
| Both Stations | Subtotal | 92,850.0 |

Based on the modeling results, Table 3 provides the emission reductions from current allowable rates necessary to achieve compliance with the 1-hour NAAQS. This assumes a one-hour averaging period for the emission rate and that the emission rate is binding at all times. However, given the conservative aspects of this modeling protocol, it is extremely likely that this limit is too high to protect the NAAQS. For example, startup or shutdown periods were not evaluated. During these periods, decreased gas velocities and temperatures may lead to greater ambient impacts at ground level. Further, the hypothetical emission limitation in Table 3 would allow Monticello Steam Electric Station to consume the entire NAAQS, leaving little to no room for any other source of SO₂ in the area. No margin of safety has been included in the hypothetical emission limitation.

---

[6] Monticello allowable emissions are taken from TCEQ, Federal Operating Permit, No. O-00064, June 4, 1999. Welsh allowable emissions are taken from TCEQ, Federal Operating Permit, No. O26, Draft, March 14, 2014.

**Table 3 - Required Emission Reductions from Monticello Steam Electric Station for Comply with the 1-hour NAAQS for SO₂**

| Acceptable Impact (NAAQS - Background) 99th Percentile 1-hour Daily Max ($\mu g/m^3$) | Required Total Facility Reduction Based on Allowable Emissions (%) | Required Total Facility Emission Rate (lbs/hr) | Required Total Facility 1-hour Average Emission Rate (lbs/mmbtu) |
|---|---|---|---|
| 188.4 | 89% | 6,253.3 | 0.32 |

Predicted exceedances of the 1-hour NAAQS for $SO_2$ based on allowable emissions extend throughout the region to a maximum distance of 50 kilometers.

Figure 1 shows the extent of NAAQS violations based on allowable emissions from both sources.

Figure 2 shows the extent of NAAQS violations based on actual hourly emissions from both sources.

## 2.3    Conservative Modeling Assumptions

A dispersion modeling analysis requires the selection of numerous parameters which affect the predicted concentrations. For the enclosed analysis, several parameters were selected which under-predict facility impacts.

Assumptions used in this modeling analysis which likely under-estimate concentrations include the following:

- Allowable emissions are based on a limitation with an averaging period which is greater than the 1-hour average used for the $SO_2$ air quality standard. Emissions and impacts during any 1-hour period may be higher than assumed for the modeling analysis.
- No consideration of facility operation at less than 100% load. Stack parameters such as exit flow rate and temperature are typically lower at less than full load, reducing pollutant dispersion and increasing predicted air quality impacts.
- No consideration of building or structure downwash. These downwash effects typically increase predicted concentrations near the facility.
- Except for the Welsh Power Station, no consideration of off-site sources. These other sources of $SO_2$ will increase the predicted impacts.
- As noted, air quality impacts are based on a background $SO_2$ concentration of 7.8 $\mu g/m^3$, which is the lowest measured background concentration in the state. Given the proximity of the Monticello facility to other sources of $SO_2$, the actual background concentration is likely higher.
- No evaluation has been conducted to determine if the stack height exceeds Good Engineering Practice or GEP height. If the stack height exceeds GEP, the predicted concentrations will increase.



1-hour average SO2 concentrations (ug per cubic meter) - All colored areas exceed the NAAQS.

196    400    600    800    1000

*Figure 1 - Regional View of Impacts Based on Allowable Emissions from Both Sources*

*Evaluation of Compliance with the 1-hour NAAQS for SO$_2$*
*September 11, 2015*
*Page 7*



1-hour average SO2 concentrations (ug per cubic meter) - All colored areas exceed the NAAQS.

196                                         300

***Figure 2 - Regional View of Impacts Due to Actual Emissions for 2012-14 from Both Sources***

## 3.     Modeling Methodology

### 3.1     Air Dispersion Model

The modeling analysis used USEPA's AERMOD program, v. 14134.  AERMOD, as available from the Support Center for Regulatory Atmospheric Modeling (SCRAM) website, was used in conjunction with a third-party modeling software program, *AERMOD View*, sold by Lakes Environmental Software.

### 3.2     Control Options

The AERMOD model was run with the following control options:

- 1-hour average air concentrations
- Regulatory defaults
- Flagpole receptors

To reflect a representative inhalation level, a flagpole height of 1.5 meters was used for all modeled receptors.  This parameter was added to the receptor file when running AERMAP, as described in Section 4.4.

An evaluation was conducted to determine if the modeled facility was located in a rural or urban setting using USEPA's methodology outlined in Section 7.2.3 of the Guideline on Air Quality Models.[7]  For urban sources, the URBANOPT option is used in conjunction with the urban population from an appropriate nearby city and a default surface roughness of 1.0 meter.  Methods described in Section 4.1 were used to determine whether rural or urban dispersion coefficients were appropriate for the modeling analysis.

### 3.3     Output Options

The AERMOD analysis was based on three years of recent meteorological data.  The modeling analyses used one run with three years of sequential meteorological data from 2012-2014. Consistent with USEPA's Modeling Guidance for SO₂ NAAQS Designations, AERMOD provided a table of fourth-high 1-hour SO₂ impacts concentrations consistent with the form of the 1-hour SO₂ NAAQS.[8]

Please refer to Table 1 for the modeling results.

---

[7] USEPA, Revision to the Guideline on Air Quality Models: Adoption of a Preferred General Purpose (Flat and Complex Terrain) Dispersion Model and Other Revisions, Appendix W to 40 CFR Part 51, November 9, 2005.
[8] USEPA, Area Designations for the 2010 Revised Primary Sulfur Dioxide National Ambient Air Quality Standards, Attachment 3, March 24, 2011, pp. 24-26.

## 4.      Model Inputs

## 4.1      Geographical Inputs

The "ground floor" of all air dispersion modeling analyses is establishing a coordinate system for identifying the geographical location of emission sources and receptors.  These geographical locations are used to determine local characteristics (such as land use and elevation), and also to ascertain source to receptor distances and relationships.

The Universal Transverse Mercator (UTM) NAD83 coordinate system was used for identifying the easting (x) and northing (y) coordinates of the modeled sources and receptors.  Stack locations were obtained from facility permits and prior modeling files provided by the state regulatory agency. The stack locations were then verified using aerial photographs.

The facility was evaluated to determine if it should be modeled using the rural or urban dispersion coefficient option in AERMOD.  A Geographic Information System (GIS) was used to determine whether rural or urban dispersion coefficients apply to a site.  Land use within a three-kilometer radius circle surrounding the facility was considered. USEPA guidance states that urban dispersion coefficients are used if more than 50% of the area within 3 kilometers has urban land uses. Otherwise, rural dispersion coefficients are appropriate.[9]

USEPA's AERSURFACE v. 13016 was used to develop the meteorological data for the modeling analysis. This model was also used to evaluate surrounding land use within 3 kilometers. Based on the output from the AERSURFACE, approximately 0.04% of surrounding land use around the modeled facility was of urban land use types including Type 21 – Low Intensity Residential, Type 22 – High Intensity Residential and Type 23 – Commercial / Industrial / Transportation.

This is less than the 50% value considered appropriate for the use of urban dispersion coefficients. Based on the AERSURFACE analysis, it was concluded that the rural option would be used for the modeling summarized in this report.  Please refer to Section 4.5.3 for a discussion of the AERSURFACE analysis.

## 4.2      Emission Rates and Source Parameters

The modeling analysis considered $SO_2$ emissions from the Mount Pleasant and the Welsh Power Plant. Other off-site sources were not considered. Concentrations were predicted for the scenarios shown in Tables 1 and 2:

---

[9] USEPA, Revision to the Guideline on Air Quality Models: Adoption of a Preferred General Purpose (Flat and Complex Terrain) Dispersion Model and Other Revisions, Appendix W to 40 CFR Part 51, November 9, 2005, Section 7.2.3.

1) allowable emissions based on the current permit issued by the regulatory agency, and

2) actual hourly emissions measured each hour between January 1, 2012 and December 31, 2014 as taken from USEPA *Air Markets Program Data*.[10]

Stack parameters and emissions used for the modeling analysis are summarized in Table 4.

**Table 4 – Facility Stack Parameters and Emissions** [11]

| Facility | Monticello | | | Welsh | |
|---|---|---|---|---|---|
| Stack | M01 | M02 | M03 | W01 | W03 |
| Description | Unit 1 | Unit 2 | Unit 3 | Unit 1 | Unit 3 |
| X Coord. [m] | 309852.08 | 309815 | 309820 | 328178 | 328178 |
| Y Coord. [m] | 3663182.57 | 3663262 | 3663367 | 3658984 | 3658836 |
| Base Elevation [m] | 114.98 | 114.72 | 113.9 | 107.14 | 106.08 |
| Release Height [m] | 121.92 | 121.92 | 140.21 | 91.44 | 91.44 |
| Gas Exit Temperature [°K] | 453.15 | 453.15 | 438.15 | 402.039 | 402.039 |
| Gas Exit Velocity [m/s] | 24.689 | 24.689 | 26.518 | 39.234 | 39.234 |
| Inside Diameter [m] | 6.553 | 6.553 | 7.772 | 5.121 | 5.121 |
| Allowable Emission Rate [g/s] | 2,242 | 2,242 | 2,997 | 2,109 | 2,109 |
| Actual Emission Rate [g/s] | - | - | - | - | - |

The above stack parameters and emissions were obtained from regulatory agency documents and databases identified in Section 2.2. The analysis was conducted based on 100% operating load using maximum exhaust flow rates and temperatures. Operation at less than full capacity loads was not considered. This assumption tends to under-predict impacts since stack parameters such as exit flow rate and temperature are typically lower at less than full load, reducing pollutant dispersion and increasing predicted air quality impacts. Stack location, height and diameter were verified using aerial photographs, and flue gas flow rate and temperature were verified using combustion calculations.

## 4.3    Building Dimensions

No building dimensions or prior downwash evaluations were available. Therefore this modeling analysis did not address the effects of downwash and this may under-predict impacts.

---

[10] http://ampd.epa.gov/ampd/
[11] Stack parameters were obtained from the annual survey compiled by the U.S. Energy Information Administration. http://www.eia.gov/electricity/data/eia860/

## 4.4    Receptors

For Monticello Steam Electric Station, three receptor grids were employed:

1. A 100-meter Cartesian receptor grid centered on Monticello Steam Electric Station and extending out 5 kilometers.
2. A 500-meter Cartesian receptor grid centered on Monticello Steam Electric Station and extending out 10 kilometers.
3. A 1,000-meter Cartesian receptor grid centered on Monticello Steam Electric Station and extending out 50 kilometers. 50 kilometers is the maximum distance accepted by USEPA for the use of the AERMOD dispersion model.[12]

A flagpole height of 1.5 meters was used for all these receptors.

Elevations from stacks and receptors were obtained from National Elevation Dataset (NED) GeoTiff data. GeoTiff is a binary file that includes data descriptors and geo-referencing information necessary for extracting terrain elevations. These elevations were extracted from 1 arc-second (30 meter) resolution NED files. The USEPA software program AERMAP v. 11103 is used for these tasks.

## 4.5    Meteorological Data

To improve the accuracy of the modeling analysis, recent meteorological data for the 2012-2014 period were prepared using the USEPA's program AERMET which creates the model-ready surface and profile data files required by AERMOD.   Required data inputs to AERMET included surface meteorological measurements, twice-daily soundings of upper air measurements, and the micrometeorological parameters surface roughness, albedo, and Bowen ratio.  One-minute ASOS data were available so USEPA methods were used to reduce calm and missing hours.[13] The USEPA software program AERMINUTE v. 14237 is used for these tasks.

This section discusses how the meteorological data was prepared for use in the 1-hour SO$_2$ NAAQS modeling analyses.  The USEPA software program AERMET v. 14134 is used for these tasks.

### 4.5.1    Surface Meteorology

Surface meteorology was obtained for Longview Texas Regional Airport located near the Monticello

---

[12] USEPA, Revision to the Guideline on Air Quality Models: Adoption of a Preferred General Purpose (Flat and Complex Terrain) Dispersion Model and Other Revisions, Appendix W to 40 CFR Part 51, Section A.1.(1), November 9, 2005.

[13] USEPA, Area Designations for the 2010 Revised Primary Sulfur Dioxide National Ambient Air Quality Standards, Attachment 3, March 24, 2011, p. 19.

Steam Electric Station. Integrated Surface Hourly (ISH) data for the 2012-2014 period were obtained from the National Climatic Data Center (NCDC). The ISH surface data was processed through AERMET Stage 1, which performs data extraction and quality control checks.

### 4.5.2    Upper Air Data

Upper-air data are collected by a "weather balloon" that is released twice per day at selected locations. As the balloon is released, it rises through the atmosphere, and radios the data back to the surface. The measuring and transmitting device is known as either a radiosonde, or rawindsonde. Data collected and radioed back include: air pressure, height, temperature, dew point, wind speed, and wind direction. The upper air data were processed through AERMET Stage 1, which performs data extraction and quality control checks.

For Monticello Steam Electric Station, the concurrent 2012-2014 upper air data from twice-daily radiosonde measurements obtained at the most representative location were used. This location was the Schreveport, Louisiana measurement station. These data are in Forecast Systems Laboratory (FSL) format and were downloaded in ASCII text format from NOAA's FSL website.[14] All reporting levels were downloaded and processed with AERMET.

### 4.5.3    AERSURFACE

AERSURFACE is a program that extracts surface roughness, albedo, and daytime Bowen ratio for an area surrounding a given location. AERSURFACE uses land use and land cover (LULC) data in the U.S. Geological Survey's 1992 National Land Cover Dataset to extract the necessary micrometeorological data. LULC data was used for processing meteorological data sets used as input to AERMOD.

AERSURFACE v. 13016 was used to develop surface roughness, albedo, and daytime Bowen ratio values in a region surrounding the meteorological data collection site. AERSURFACE was used to develop surface roughness in a one kilometer radius surrounding the data collection site. Bowen ratio and albedo was developed for a 10 kilometer by 10 kilometer area centered on the meteorological data collection site. These micrometeorological data were processed for seasonal periods using 30-degree sectors. Seasonal moisture conditions were considered average with winter months having no continuous snow cover.

### 4.5.4    Data Review

Missing meteorological data were not filled as the data file met USEPA's 90% data completeness

---

[14] Available at: http://esrl.noaa.gov/raobs/

requirement.[15]  The AERMOD output file shows there were 0.99% missing data.

To confirm the representativeness of the airport meteorological data, the surface characteristics of the airport data collection site and the modeled source location were compared. Since the Longview Texas Regional Airport is located close to Monticello Steam Electric Station, this meteorological data set was considered appropriate for this modeling analysis. [16] This weather station provided high quality surface measurements for the most recent 3-year time, and had similar land use, surface characteristics, terrain features and climate.

Finally, TCEQ provides pre-processed meteorological data suitable for modeling for each county.[17] For Titus County, TCEQ recommends using data from the same surface and upper air stations used for this modeling analysis. The TCEQ data were not used for this project because they were not from the most recent years needed for this analysis and had not been processed using the latest versions of USEPA modeling software.

## 5.      Background SO$_2$ Concentrations

Background concentrations were determined consistent with USEPA's Modeling Guidance for SO$_2$ NAAQS Designations.[18, 19]  To preserve the form of the 1-hour SO$_2$ standard, based on the 99th percentile of the annual distribution of daily maximum 1-hour concentrations averaged across the number of years modeled, the background fourth-highest daily maximum 1-hour SO$_2$ concentration was added to the modeled fourth-highest daily maximum 1-hour SO$_2$ concentration.[20]  Background concentrations were based on the 2011-13 design value measured by the ambient monitors located in Texas.[21]

## 6.      Reporting

All files from the programs used for this modeling analysis are available to regulatory agencies. These include analyses prepared with AERSURFACE, AERMET, AERMAP, and AERMOD.

---

[15] USEPA, Meteorological Monitoring Guidance for Regulatory Modeling Applications, EPA-454/R-99-05, February 2000, Section 5.3.2, pp. 5-4 to 5-5.
[16] USEPA, AERMOD Implementation Guide, March 19, 2009, pp. 3-4.
[17] Texas Commission on Environmental Quality, Meteorological Data for Refined Screening with AERMOD, http://www.tceq.texas.gov/permitting/air/modeling/aermod-datasets.html, Last updated November 22, 2013.
[18] USEPA, Area Designations for the 2010 Revised Primary Sulfur Dioxide National Ambient Air Quality Standards, Attachment 3, March 24, 2011, pp. 20-23.
[19] USEPA, SO$_2$ NAAQS Designations Modeling Technical Assistance Document, Dec. 2013, section 8.1, pp 27-28.
[20] USEPA, Applicability of Appendix W Modeling Guidance for the 1-hour SO$_2$ National Ambient Air Quality Standard, August 23, 2010, p. 3.
[21] http://www.epa.gov/airtrends/values.html

**Tab 134: Technical Support Document for Ohio
Area Designations for the 2010 SO2 Primary National
Ambient Air Quality Standard**

<u>Technical Support Document</u>

Ohio
Area Designations for the 2010 SO$_2$ Primary National Ambient Air Quality Standard

<u>Summary</u>

Pursuant to section 107(d) of the Clean Air Act (CAA), the U.S. Environmental Protection Agency (EPA, or the Agency) must designate areas as either "unclassifiable," "attainment," or "nonattainment" for the 2010 one-hour sulfur dioxide (SO$_2$) primary national ambient air quality standard (NAAQS). The CAA defines a nonattainment area as one that does not meet the NAAQS or that contributes to a violation in a nearby area. An attainment area is defined as any area other than a nonattainment area that meets the NAAQS. Unclassifiable areas are defined as those that cannot be classified on the basis of available information as meeting or not meeting the NAAQS.

Ohio submitted updated recommendations on September 16, 2015, ahead of a July 2, 2016, deadline for EPA to designate certain areas established by the U.S. District Court for the Northern District of California. This deadline is the first of three deadlines established by the court for EPA to complete area designations for the 2010 SO$_2$ NAAQS. Table 1 below lists Ohio's recommendations and identifies the counties or portions of counties in Ohio that EPA intends to designate by July 2, 2016 based on an assessment and characterization of air quality through ambient air quality data, air dispersion modeling, and other evidence and supporting information.

Table 1:  Ohio's Recommended and EPA's Intended Designations

| Area | Ohio's Recommended Area Definition | Ohio's Recommended Designation | EPA's Intended Area Definition | EPA's Intended Designation |
|---|---|---|---|---|
| Clermont County, Ohio | Clermont County, excluding Pierce Township | Attainment | Same as State's Recommendation | Unclassifiable/ Attainment |
| Gallia County, Ohio | Gallia County and In Meigs County: Bedford, Columbia, Rutland, Salem, Salisbury, and Scipio Townships | Attainment | Same as State's Recommendation | Unclassifiable |

<u>Background</u>

1

On June 3, 2010, EPA revised the primary (health based) $SO_2$ NAAQS by establishing a new one-hour standard at a level of 75 parts per billion (ppb) which is attained when the three-year average of the 99th percentile of one-hour daily maximum concentrations does not exceed 75 ppb. This NAAQS was published in the Federal Register on June 22, 2010 (75 FR 35520) and is codified at 40 CFR 50.17. EPA determined this is the level necessary to protect public health with an adequate margin of safety, especially for children, the elderly and those with asthma. These groups are particularly susceptible to the health effects associated with breathing $SO_2$. The two prior primary standards of 140 ppb evaluated over 24 hours, and 30 ppb evaluated over an entire year, codified at 40 CFR 50.4, remain applicable.[1] However, EPA is not currently designating areas on the basis of either of these two primary standards. Similarly, the secondary standard for $SO_2$, set at 500 ppb evaluated over 3 hours has not been revised, and EPA is also not currently designating areas on the basis of the secondary standard.

General Approach and Schedule

Section 107(d) of the Clean Air Act requires that not later than one year after promulgation of a new or revised NAAQS, state governors must submit their recommendations for designations and boundaries to EPA. Section 107(d) also requires EPA to provide notification to states no less than 120 days prior to promulgating an initial area designation that is a modification of a state's recommendation. If a state does not submit designation recommendations, EPA will promulgate the designations that it deems appropriate. If a state disagrees with EPA's intended designations, it is given an opportunity within the 120 day period to demonstrate why any proposed modification is inappropriate.

On August 5, 2013, EPA published a final rule establishing air quality designations for 29 areas in the United States for the 2010 $SO_2$ NAAQS, based on recorded air quality monitoring data from 2009 - 2011 showing violations of the NAAQS (78 FR 47191). In that rulemaking, EPA committed to address, in separate future actions, the designations for all other areas for which the Agency was not yet prepared to issue designations.

Following the initial August 5, 2013 designations, three lawsuits were filed against EPA in different U.S. District Courts, alleging the Agency had failed to perform a nondiscretionary duty under the CAA by not designating all portions of the country by the June 2013 deadline. In an effort intended to resolve the litigation in one of those cases, plaintiffs Sierra Club and the Natural Resources Defense Council and EPA filed a proposed consent decree with the U.S. District Court for the Northern District of California. On March 2, 2015, the court entered the consent decree and issued an enforceable order for EPA to complete the area designations according to the court-ordered schedule.

According to the court-ordered schedule, EPA must complete the remaining designations by three specific deadlines. By no later than July 2, 2016 (16 months from the court's order), EPA

---

[1] 40 CFR 50.4(e) provides that the two prior primary NAAQS will no longer apply to an area one year after its designation under the 2010 NAAQS, except that for areas designated nonattainment under the prior NAAQS as of August 22, 2010, and areas not meeting the requirements of a SIP Call under the prior NAAQS, the prior NAAQS will apply until that area submits and EPA approves a SIP providing for attainment of the 2010 NAAQS. Clermont, Gallia, and Meigs Counties are not subject to these exceptions.

2

must designate two groups of areas: (1) areas that have newly monitored violations of the 2010 $SO_2$ NAAQS and (2) areas that contain any stationary sources that had not been announced as of March 2, 2015 for retirement and that according to EPA's Air Markets Database emitted in 2012 either (i) more than 16,000 tons of $SO_2$ or (ii) more than 2,600 tons of $SO_2$ with an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/MMBTU). Specifically, a stationary source with a coal-fired unit that as of January 1, 2010 had a capacity of over 5 megawatts and otherwise meets the emissions criteria, is excluded from the July 2, 2016 deadline if it had announced through a company public announcement, public utilities commission filing, consent decree, public legal settlement, final state or federal permit filing, or other similar means of communication, by March 2, 2015, that it will cease burning coal at that unit.

The last two deadlines for completing remaining designations are December 31, 2017, and December 31, 2020. EPA has separately promulgated requirements for states and other air agencies to provide additional monitoring or modeling information on a timetable consistent with these designation deadlines. We expect this information to become available in time to help inform these subsequent designations. These requirements were promulgated on August 21, 2015 (80 FR 51052), in a rule known as the $SO_2$ Data Requirements Rule (DRR).

Updated designations guidance was issued by EPA through a March 20, 2015 memorandum from Stephen D. Page, Director, U.S. EPA, Office of Air Quality Planning and Standards, to Air Division Directors, U.S. EPA Regions I-X. This memorandum supersedes earlier designation guidance for the 2010 $SO_2$ NAAQS, issued on March 24, 2011, and it identifies factors that EPA intends to evaluate in determining whether areas are in violation of the 2010 $SO_2$ NAAQS. The guidance also contains the factors EPA intends to evaluate in determining the boundaries for all remaining areas in the country, consistent with the court's order and schedule. These factors include: 1) Air quality characterization via ambient monitoring or dispersion modeling results; 2) Emissions-related data; 3) Meteorology; 4) Geography and topography; and 5) Jurisdictional boundaries. This guidance was supplemented by two technical assistance documents intended to assist states and other interested parties in their efforts to characterize air quality through air dispersion modeling or ambient air quality monitoring for sources that emit $SO_2$. Notably, EPA released its most recent versions of documents titled, "$SO_2$ NAAQS Designations Modeling Technical Assistance Document" (Modeling TAD) and "$SO_2$ NAAQS Designations Source-Oriented Monitoring Technical Assistance Document" (Monitoring TAD) in December 2013.

Based on ambient air quality data collected between 2012 and 2014, no violations of the 2010 $SO_2$ NAAQS have been recorded in any undesignated part of the state.[2] However, there are two

---

[2] For designations based on ambient air quality monitoring data that violates the 2010 $SO_2$ NAAQS, the consent decree directs EPA to evaluate data collected between 2013 and 2015. Absent complete, quality assured and certified data for 2015, the analyses of applicable areas for EPA's intended designations will be informed by data collected between 2012 and 2014. States with monitors that have recorded a violation of the 2010 $SO_2$ NAAQS during these years have the option of submitting complete, quality assured and certified data for calendar year 2015 by April 19, 2016 to EPA for evaluation. If after our review, the ambient air quality data for the area indicates that no violation of the NAAQS occurred between 2013 and 2015, the consent decree does not obligate EPA to complete

3

sources in the state meeting the emissions criteria of the consent decree for which EPA must complete designations by July 2, 2016. In this draft technical support document, EPA discusses its review and technical analysis of Ohio's updated recommendations for the areas that we must designate. EPA also discusses any intended modifications from the state's recommendations based on all available data before us.

The following are definitions of important terms used in this document:

1) 2010 $SO_2$ NAAQS – The primary NAAQS for $SO_2$ promulgated in 2010. This NAAQS is 75 ppb, based on the three year average of the 99th percentile of the annual distribution of daily maximum one-hour average concentrations. See 40 CFR 50.17.

2) Design Value - a statistic computed according to the data handling procedures of the NAAQS (in 40 CFR part 50 Appendix T) that, by comparison to the level of the NAAQS, indicates whether the area is violating the NAAQS.

3) Designated nonattainment area – an area which EPA has determined has violated the 2010 $SO_2$ NAAQS or contributed to a violation in a nearby area. A nonattainment designation reflects considerations of state recommendations and all of the information discussed in this document. EPA's decision is based on all available information including the most recent 3 years of air quality monitoring data, available modeling analysis, and any other relevant information.

4) Designated unclassifiable area – an area which EPA cannot determine based on all available information whether or not it meets the 2010 $SO_2$ NAAQS.

5) Designated unclassifiable/attainment area – an area which EPA has determined to have sufficient evidence to find either is attaining or is likely to be attaining the NAAQS. EPA's decision is based on all available information including the most recent 3 years of air quality monitoring data, available modeling analysis, and any other relevant information.

6) Modeled violation – a violation based on air dispersion modeling.

7) Recommended attainment area – an area a state or tribe has recommended that EPA designate as attainment.

8) Recommended nonattainment area – an area a state or tribe has recommended that EPA designate as nonattainment.

9) Recommended unclassifiable area – an area a state or tribe has recommended that EPA designate as unclassifiable.

10) Recommended unclassifiable/attainment area – an area a state or tribe has recommended that EPA designate as unclassifiable/attainment.

11) Violating monitor – an ambient air monitor meeting all methods, quality assurance and siting criteria and requirements whose valid design value exceeds 75 ppb, based on data analysis conducted in accordance with Appendix T of 40 CFR part 50.

---

the designation. Instead, we may designate the area and all other previously undesignated areas in the state on a schedule consistent with the prescribed timing of the court order, i.e., by December 31, 2017, or December 31, 2020.

4

**Technical Analysis for the Clermont County, Ohio Area**

<u>Introduction</u>

Clermont County, Ohio contains a stationary source that according to EPA's Air Markets Database emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/MMBTU). As of March 2, 2015, this stationary source had not met the specific requirements for being "announced for retirement." Specifically, in 2012, the W.H. Zimmer Generating Station (Zimmer) emitted 11,975 tons of $SO_2$, and had an emissions rate of 0.53 lbs $SO_2$/MMBTU. Pursuant to the March 2, 2015 court-ordered schedule, EPA must designate the area surrounding the facility by July 2, 2016.

In its submission, Ohio recommended that the area surrounding Zimmer, specifically all townships in Clermont County with the exception of Pierce Township[3], be designated as attainment based on an assessment and characterization of air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. This assessment and characterization was performed using air dispersion modeling software, i.e., AERMOD, analyzing actual emissions. After careful review of the state's assessment, supporting documentation, and all available data, EPA agrees that the area is attaining the standard, and intends to designate Clermont County (excluding Pierce Township) as unclassifiable/attainment.

As seen in Figure 1 below, Zimmer is located in Moscow, along the Ohio River along the southern border of Clermont County. Clermont County is in southwest Ohio, near Cincinnati. Also included in the figure are nearby emitters of $SO_2$ and EPA's intended designation for the area.

 Figure 1. EPA's intended designation for Clermont County, Ohio

---

[3] Pierce Township, Clermont County, Ohio was designated nonattainment for the 2010 $SO_2$ NAAQS on August 5, 2013 (78 FR 47191).  This township included a major source (Beckjord Generating Stations) that subsequently shut down.  Ohio has addressed this township separately, notably by submitting a redesignation request on August 11, 2015 for this township, and EPA will be addressing this township separately as well.

5



The discussion and analysis that follows below will reference the state's use of the Modeling TAD, EPA's assessment of the state's modeling in accordance with the Modeling TAD, and the factors for evaluation contained in EPA's March 20, 2015 guidance, as appropriate.

Detailed Assessment

*Model Selection and Modeling Components*

EPA's Modeling TAD notes that for area designations under the 2010 SO$_2$ NAAQS, the AERMOD modeling system should be used, unless use of an alternative model can be justified. In some instances the recommended model may be a model other than AERMOD, such as the BLP model for buoyant line sources. The AERMOD modeling system contains the following components:
-   AERMOD: the dispersion model
-   AERMAP: the terrain processor for AERMOD
-   AERMET: the meteorological data processor for AERMOD
-   BPIPPRIME: the building input processor

6

- AERMINUTE: a pre-processor to AERMET incorporating 1-minute automated surface observation system (ASOS) wind data
- AERSURFACE: the surface characteristics processor for AERMET
- AERSCREEN: a screening version of AERMOD

The state used AERMOD version 15181, the most recent regulatory version of the model, and a discussion of the individual components will be referenced in the corresponding discussion that follows, as appropriate.

*Modeling Parameter: Rural or Urban Dispersion*

EPA's recommended procedure for characterizing an area by prevalent land use is based on evaluating the dispersion environment within 3 kilometers (km) of the facility. According to EPA's Guideline on Air Quality Models, rural dispersion coefficients are to be used if more than 50 percent of the area within a 3 km radius of the facility is classified as rural. Conversely, if more than 50 percent of this area is urban, urban dispersion coefficients should be used in the modeling analysis. Using this recommended approach, the state determined that less than 50 percent of the land area within 3 km of Zimmer is industrial, commercial, or dense residential, which indicates that the area is primarily rural. Therefore, the state determined that it was most appropriate to run the model in rural mode.

*Modeling Parameter: Area of Analysis (Receptor Grid)*

EPA believes that a reasonable first step towards characterization of air quality in the area surrounding Zimmer is to determine the extent of the area of analysis, i.e., receptor grid. Considerations presented in the Modeling TAD include but are not limited to: the location of the $SO_2$ emission sources or facilities considered for modeling; the extent of significant concentration gradients of nearby sources; and sufficient receptor coverage and density to adequately capture and resolve the model predicted maximum $SO_2$ concentrations. As AERMOD is recommended for use within 50 km of a given emission source, the state conservatively determined that 50 km was an appropriate distance to adequately characterize air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. For the Clermont County area, the state considered fifteen other emitters of $SO_2$ within 50 km of Zimmer. The state found that none of the sources within 50 km were close enough or large enough to cause a significant concentration gradient in the vicinity of Zimmer. The grid receptor spacing for the area of analysis chosen by the state is as follows:

- 50 meter spacing on the fenceline
- 50 meter spacing to 3 km from the stacks
- 100 meter spacing to 5 km
- 500 meter spacing to 10 km
- 1000 meter spacing to 25 km from the facility
- 1000 meter spacing covering the northern portion of Clermont County

7

- A discrete receptor was placed at the background monitor location.

The receptor network contained 37,702 receptors. For the purposes of this designation effort, the Modeling TAD states that the receptor grid need not include receptors in areas where it would not be feasible to place a monitor and record ambient air impacts, such as bodies of water.  In the Clermont County analysis, receptors were not placed on the Ohio River or within facility fencelines in the receptor grid.  The receptor grid covered the entirety of Clermont County, a portion of Brown and Hamilton Counties in Ohio, and a portion of Campbell, Pendleton, and Bracken Counties in Kentucky.

Figure 2 below shows the area surrounding the Zimmer plant in southern Clermont County and some of the Hamilton County source locations.  The location of the surface NWS station is shown in this figure, in northern Boone County, Kentucky, northwest of Zimmer.

Figure 2: Clermont County, Ohio Area of Analysis



Figure 3, included in the state's recommendation, shows the receptor grid for the area of analysis.  In Figure 3, the area outlined in blue to the northwest of the fine receptor grid is the Campbell-Clermont $SO_2$ nonattainment area, which includes Pierce Township in Clermont County, Ohio, and a portion of Campbell County, Kentucky.  Ohio has submitted a request to redesignate the area to attainment.

8

Figure 3: Receptor Grid for the Clermont County, Ohio Area of Analysis



*Modeling Parameter: Emissions*

EPA's Modeling TAD notes that for the purposes of modeling to characterize air quality for use in designations, the recommended approach is to use the most recent 3 years of actual emissions data and concurrent meteorological data. The Modeling TAD highly encourages the use of the most detailed throughput, operating schedule and emissions information available. Variable emissions, temperature, and flow data can be modeled using AERMOD's hourly varying emissions keyword HOUREMIS or variable emission factor keyword EMISFACT.  EPA believes that continuous emissions monitoring systems (CEMS) data provide valuable historical emissions information, when it is available, and that these data are available for many electric generating units.  However, the TAD does provide for the flexibility of using allowable emissions in the form of a federally enforceable limit on the emissions rate (referred to as PTE or allowable emissions).

9

In certain instances, it may be advantageous or simpler to use PTE rates in designations modeling analyses. Specifically, a facility may have recently adopted a new federally enforceable emissions limit, been subject to a federally enforceable consent decree, or implemented other federally enforceable mechanisms and control technologies to limit $SO_2$ emissions to a level that indicates compliance with the NAAQS. These new limits or conditions may be used in the application of AERMOD. In these cases, the Modeling TAD notes that the existing $SO_2$ emissions inventories used for permitting or SIP planning demonstrations should contain the necessary emissions information for designations-related modeling. In the event that these short-term emissions are not readily available, they may be calculated using the methodology in Table 8-1 of Appendix W to 40 CFR Part 51 titled, "Guideline on Air Quality Models."

As previously noted, the state considered fifteen other $SO_2$ sources of varying size, located within 50 km of Zimmer.   See Table 2.  The state chose that distance to ensure a thorough facility search, out to the maximum distance for which AERMOD is considered to be applicable. However, none of these $SO_2$ sources were determined by the state to have the potential to cause significant concentration gradient impacts within the area of analysis.

Table 2: Actual $SO_2$ Emissions for 2012 – 2014 from Facilities in the Clermont County, Ohio Area of Analysis

| Facility Name | Distance from Zimmer (km) | Actual $SO_2$ Emissions (tons per year) | | |
|---|---|---|---|---|
| | | 2012 | 2013 | 2014 |
| W.H. Zimmer Generating Station | -- | 11,975 | 18,457 | 13,498 |
| Duke Energy Ohio, Beckjord Station (stopped operating 10/2014) | 14.9 | 67,069 | 51,900 | 32,603[A] |
| Miami Fort Power Station, Hamilton Co OH (Unit 6 closed 6/2015) | 57.1 | 26,407 | 31,844 | 28,479 |
| DTE ST. Bernard, LLC, Hamilton Co OH | 41.6 | | | 1,666 |
| Rock-Tenn Converting, Hamilton Co OH | 36.1 | | | 179 |
| Duke Energy Kentucky, East Bend Station, Boone Co KY[A] | 54.5 | 1,497 | 2,198 | 2,103 |
| Spurlock Station, Mason Co KY [B] | 40.9 | 5,131 | 4,469 | 4,689 |
| Carmeuse Lime Pendleton Co KY [C, E] | 3.1 | 614 | 524 | 655 |
| Griffin Industries, Pendleton Co KY [C] | 21.4 | | | 101 |
| KAO Brands | N/A | | | 92 |
| Mill Creek WWTP | N/A | | | 20 |
| University of Cincinnati | N/A | | | 14 |
| TSS Aviation | N/A | | | 10 |
| Emery Oleochemicals | N/A | | | 1 |
| Caraustar Mill | N/A | | | 0.1 |

10

| | | | |
|---|---|---|---|
| Emerald Performance | N/A | | 0.05 |
| Total Emissions From All Facilities in the State's Area of Analysis | | 114,776[D] | 111,475[D] | 84,110 |

[A] Beckjord Station closed its coal-fired units in October 2014 and no longer emits $SO_2$. Therefore its 2012-2014 emissions were not included in the Zimmer modeling analysis.

[B] Emissions from EPA's Air Markets Database. Other 2014 data from Ohio's Fee Emission Reports.

[C] Emissions from 2008 NEI.

[D] Totals assume 2014 emissions for facilities without reported 2012 or 2013 data.

[E] See text.

The Walter C. Beckjord power plant (Beckjord) was not included in the modeling because it shut down its coal-fired units in October 2014, and the closure is permanent and enforceable. Its current $SO_2$ emissions are zero. Therefore, while it would have been contributing significantly to local $SO_2$ concentrations in the time period Ohio modeled (2012-2014), Beckjord's historical emissions do not represent current (or future) conditions, and therefore are not relevant for determining the appropriate $SO_2$ designation for the remainder of Clermont County. The Miami Fort Power Station (Miami Fort) permanently stopped using its Unit 6 in June 2015. Although the plant's other $SO_2$ emitting units still operate, preliminary 2015 data from EPA's Air Markets Database shows that Miami Fort emitted 14,239 tons per year (tpy) in 2015, which is about half of its 2014 emissions. Miami Fort is 57 km from Zimmer and 43 km from the nearest border of Clermont County. With similar $SO_2$ emissions to Miami Fort's, the Zimmer plant's modeled impacts were less than 100 $\mu g/m^3$ further than 5 km from the source. This suggests that Miami Fort's impacts are likely to be well below the NAAQS in Clermont County. In addition, the prevailing winds in the area, as measured at Cincinnati/Northern Kentucky Airport, blow primarily from the south-southwest, which would not bring Miami Fort's emissions into Clermont County. Ohio determined that given its location, Miami Fort is unlikely to provide a significant concentration gradient near Zimmer or anywhere within Clermont County. DTE St. Bernard, LLC in Hamilton County and the remaining emission sources in Hamilton County would be similarly affected by the prevailing south-southwest winds, and given their distance from the Clermont County border and from Zimmer, they are not expected to cause or contribute to an exceedance of the 2010 $SO_2$ NAAQS in Clermont County. The background concentration is expected to account for their impacts in the Zimmer analysis. The two Kentucky power plants are located 40 to 54 km from Zimmer, and they have relatively low emissions, so they are not expected to provide significant concentration gradient in Clermont County. Their emissions are expected to be accounted for by the background concentration.

Carmeuse Lime, in Pendleton, KY, was not discussed in Ohio's September 16, 2015 recommendation submittal. Ohio EPA staff informed EPA on November 17, 2015, that they had been unable to obtain modeling input information from Kentucky in time to include it in the Clermont County analysis. Ohio has previously modeled a similar, but larger, Carmeuse facility in Ohio, which had approximately 7 times the $SO_2$ emissions of the Pendleton, KY facility. By extrapolating from that analysis, Ohio concluded that the Pendleton, KY facility would be unlikely to cause or contribute to modeled concentrations over the standard either in its own vicinity or in Clermont County, nor would the facility have caused or contributed to a modeled exceedance of the NAAQS near Zimmer, had it been included in the Clermont County modeling analysis. Ohio believes that the impacts of the Pendleton facility in Clermont County are adequately covered by the background concentration. EPA agrees that the emissions from this

11

source are sufficiently small and sufficiently distant from Zimmer and other locations in Clermont County that it may reasonably be accounted for as part of the background concentration and judged not to cause air quality significantly different than that found in Ohio's modeling.

*Modeling Parameter: Source Characterization*

The state characterized Zimmer in accordance with the best practices outlined in the Modeling TAD. Specifically, the state used actual stack heights in conjunction with hourly actual emissions, stack temperatures, and stack exit velocities. The state also adequately characterized the source's building layout and location, as well as the stack parameters, e.g., exit temperature, exit velocity, location, and diameter. Where appropriate, the AERMOD component BPIPPRIME was used to assist in addressing building downwash.

*Modeling Parameter: Meteorology and Surface Characteristics*

The most recent 3 years of meteorological data (concurrent with the most recent 3 years of emissions data) should be used in designations efforts. As noted in the Modeling TAD, the selection of data should be based on spatial and climatological (temporal) representativeness. The representativeness of the data are based on: 1) the proximity of the meteorological monitoring site to the area under consideration, 2) the complexity of terrain, 3) the exposure of the meteorological site, and 4) the period of time during which data are collected. Sources of meteorological data include National Weather Service (NWS) stations, site-specific or onsite data, and other sources such as universities, Federal Aviation Administration (FAA), and military stations.

For the Clermont County area of analysis, surface meteorology from Cincinnati/Northern Kentucky Airport in Covington, Kentucky, 43 km northwest of Zimmer, and coincident upper air observations from Wilmington, Ohio 74 km to the northeast, were selected as best representative of meteorological conditions within the area of analysis.

The state used AERSURFACE version 13016 to estimate the surface characteristics of the area of analysis. The state developed surface characteristics for 12 spatial sectors at a seasonal temporal resolution at the Cincinnati NWS site. These surface characteristics are the albedo (the fraction of solar energy reflected from the earth back into space), the Bowen ratio (representing the ratio of sensible heat flux to latent heat flux at the ground level), and the surface roughness (representing the influence of ground features such as buildings and vegetation on surface wind flow).

As part of its recommendation, the state provided the 3-year surface wind rose for Cincinnati, Ohio. In Figure 4, the frequency and magnitude of wind speed and direction are defined in terms of from where the wind is blowing. Winds at the Cincinnati airport are predominantly from the southwest.

12

*Figure 4: Cincinnati, Ohio Cumulative Annual Wind Rose for Years 2012 – 2014*



Meteorological data from the above surface and upper air stations were used in generating AERMOD-ready files with the AERMET processor. The output meteorological data created by the AERMET processor is suitable for being applied with AERMOD input files for AERMOD modeling runs. The state used AERSURFACE to determine appropriate surface characteristics, and followed EPA guidance in the processing of the raw meteorological data into an AERMOD-ready format.  Ohio processed the Cincinnati NWS surface meteorological data using the AERMINUTE preprocessor, which uses one-minute meteorological observations to provide the

most complete and accurate hourly-averaged surface wind data.  Then Ohio used AERMET to combine surface and upper air data into input files required by the AERMOD model.

*Modeling Parameter: Geography and Terrain*

The terrain in the area of analysis is hilly, along the Ohio River valley. The AERMAP terrain program within AERMOD was used to specify elevations for all the receptors. The source of the elevation data incorporated into the model is from the USGS National Elevation Dataset.

*Modeling Parameter: Background Concentrations of $SO_2$*

The Modeling TAD offers two mechanisms for characterizing background concentrations of $SO_2$ that are ultimately added to the modeled design values: 1) a "first tier" approach, based on monitored design values, or 2) a temporally varying approach, based on the 99th percentile monitored concentrations by hour of day and season or month. For the Clermont County area of analysis, the state chose to use the $SO_2$ monitor in northern Campbell County, Kentucky (21-037-3002).  This monitor, which is located approximately 28 km northwest of Zimmer, is the nearest representative $SO_2$ monitor. This monitor is considered to be well representative of other $SO_2$ sources in the Cincinnati area.  It was also impacted by emissions from Beckjord, until the facility permanently shut down its coal-fired boilers in October 2014.  For such situations, the Modeling TAD recommends determining background concentrations based on a data set that excludes "concentrations when the source in question is impacting the monitor."  Ohio analyzed hourly concentrations at this monitor and correlated the data with wind direction data from the Cincinnati NWS site, processed with AERMINUTE, for January 2012 through February 2015. The data was also correlated with hourly emissions from Beckjord and Zimmer.  For the full dataset, maximum concentrations at the monitor appeared to be primarily due to Beckjord.  Ohio also analyzed a dataset of the 10,321 hours when Beckjord's $SO_2$ emissions were zero.  No exceedances of the standard occurred during these hours, and the maximum monitored concentrations for this time period came from the west and southwest of the monitor.  Ohio determined that a background concentration taken from this data set would account well for any currently operating $SO_2$ sources which currently affect the Clermont County area.  In addition, the background is still conservative because it was likely impacted by the emissions of Unit 6 at the Miami Fort power plant east of Cincinnati, which was operating during 2012-2014, but shut down in June 2015, reducing $SO_2$ emissions by over 18,000 tons per year. The background concentration which Ohio used for the Clermont County analysis was determined by the state to be the 99th percentile of the values for which Beckjord had zero emissions and the monitor value was nonzero.  The resulting value was 28.8 micrograms per cubic meter ($\mu g/m^3$), or 11 ppb.[4] This value was incorporated into the final AERMOD results and is expected to account for the impacts of sources not included in the Clermont County analysis.

---

[4] The conversion factor for $SO_2$ (at the standard conditions applied in the ambient $SO_2$ reference method) is 1ppb = approximately $2.62\mu g/m^3$.

Since the $SO_2$ air quality standard reflects the 99th percentile among daily maximum concentrations, the common means of determining a single, "first tier" background value is to determine the 99th percentile among daily maximum background concentrations, i.e. the 99th percentile among a set of daily maximum values in a data set that includes only values that are representative of background concentrations. The common means of determining hourly background concentrations is to determine the 99th percentile among 24 sets of values reflective of background concentrations, where each data set is for a single hour. The average of these 24 hourly 99th percentile background concentrations would be approximately the same as the 99th percentile among the full data set. In this sense, Ohio has applied a single, "first tier" background concentration, but Ohio has determined a level that corresponds approximately to the average of the levels they would have determined had they evaluated hourly background concentrations. In addition, by excluding hours when the monitor recorded zero ppb, Ohio has determined a somewhat conservative approach in determining 99th percentile values. Therefore, Ohio has applied a reasonable background concentration in its analysis, consistent with the recommendations of the Modeling TAD.

*Summary of Modeling Results*

The AERMOD modeling parameters for the Clermont County area of analysis are summarized below in Table 3

Table 3: AERMOD Modeling Parameters for the Clermont County, Ohio Area of Analysis

| Clermont County, Ohio Area of Analysis | |
|---|---|
| AERMOD Version | 15181 |
| Dispersion Characteristics | Rural |
| Modeled Sources | 1 |
| Modeled Stacks | 2 |
| Modeled Structures | 24 |
| Modeled Fencelines | 1 |
| Total receptors | 37,702 |
| Emissions Type | Actual, temporally varying |
| Emissions Years | 2012-2014 |
| Meteorology Years | 2012-2014 |
| Surface Meteorology Station | Cincinnati/Northern Kentucky Airport |
| Upper Air Meteorology Station | Wilmington, Ohio |
| Methodology for Calculating Background $SO_2$ Concentration | 99th percentile of monitored hours without influence from now-closed neighboring power plant |
| Calculated Background $SO_2$ Concentration | 11 ppb/ 28.8 μg/m$^3$ |

15

The results presented below in Table 4 show the magnitude and geographic location of the highest predicted modeled concentration based on actual emissions from Zimmer and background concentrations.

Table 4: Maximum Predicted 99th Percentile 1-Hour $SO_2$
Concentration in the Clermont County, Ohio Area of Analysis Based on Actual Emissions

| | | Receptor Location | | $SO_2$ Concentration (μg/m$^3$) | |
|---|---|---|---|---|---|
| Averaging Period | Data Period | UTM E | UTM N | Modeled (including background) | NAAQS |
| 99th Percentile 1-Hour Average | 2012-2014 | 741200 | 4306850 | 147.0 | 196.4* |

*Equivalent to the 2010 $SO_2$ NAAQS set at 75 ppb

The state's modeling indicates that the predicted 99th percentile 1-hour average concentration within the chosen modeling domain is 147.0 μg/m$^3$, or 56.1 ppb. This modeled concentration included the background concentration of $SO_2$. Figure 5 below was included as part of the state's recommendation, and indicates that the predicted value occurred just to the north of Zimmer.

Figure 5: Maximum Predicted 99th Percentile 1-Hour $SO_2$ Concentrations in the Clermont County, Ohio Area of Analysis Based on Actual Emissions



16

Jurisdictional Boundaries:

Once the geographic area of analysis associated with Zimmer was determined, existing jurisdictional boundaries were considered for the purpose of informing our intended designated area, specifically with respect to clearly defined legal boundaries. Ohio recommended designating all of Clermont County attainment, with the exception of Pierce Township. Pierce Township was designated nonattainment on August 15, 2013. The recommended attainment area for Clermont County consists of the following townships: Batavia, Franklin, Goshen, Jackson, Miami, Monroe, Ohio, Stonelick, Tate, Union, Washington, Wayne, and Williamsburg. This area has clearly defined legal boundaries, and we find this boundary to be a suitably clear basis for defining our intended unclassifiable/attainment area.

Ohio's modeling demonstrated that actual emissions from the Zimmer facility, in addition to background $SO_2$, would not cause or contribute to a violation of the 2010 $SO_2$ NAAQS in Clermont County. There are other $SO_2$-emitting sources located in the Cincinnati area in Hamilton County, which borders Clermont County to the west. Ohio did not model these additional sources to explicitly demonstrate attainment near Clermont County's border with Hamilton County, but EPA believes that the Hamilton County sources are not likely to cause NAAQS violations in Clermont County. The largest $SO_2$ source in Hamilton County is the Miami Fort Generating Station, but this source, in western Hamilton County, is located about 40 km from the Clermont County border, and almost 60 km from Zimmer, and therefore is unlikely to have a significant concentration gradient in Clermont County. The next largest source in Hamilton County is DTE St. Bernard, which emitted 1,666 tpy in 2014. With its moderate emissions and its location approximately 10 km from the western Clermont County border, it is not expected to cause or contribute to a violation of the NAAQS in Clermont County. The remaining $SO_2$-emitting facilities in Hamilton County emit less than 200 tpy and are all 10-20 km from the Clermont County border. Although EPA expects further air quality characterization of the $SO_2$ sources in the Hamilton County area which exceed the DRR threshold of 2,000 tpy, these sources are sufficiently distant, generally 40-50 km from the Clermont County border, that they can be presumed not to be causing or contributing to violations of the NAAQS in Clermont County. In addition, the background monitor Ohio is using for the Clermont County analysis is located near Hamilton County and is expected to be influenced by emissions from Hamilton County $SO_2$ sources.

Other Relevant Information

On September 16, 2015, the Sierra Club submitted a modeling analysis for the area surrounding Zimmer. This analysis indicated a violation of the NAAQS. In a November 17, 2015 letter to EPA, Ohio commented that the Sierra Club analysis used incomplete and incorrect hourly emissions and stack parameter information for Zimmer, and emissions data which was more conservative than the Modeling TAD requires for two additional modeled sources. These errors can have significant effect on model estimates, rendering the Sierra Club modeling a less reliable analysis of air quality in the area than the state's analysis. The Sierra Club analysis did not provide information refuting the appropriateness of Ohio's analysis of Zimmer and Clermont County for this round of $SO_2$ designations, and EPA does not find that the Sierra Club analysis

17

has provided compelling information to designate Clermont County as nonattainment rather than applying the unclassifiable/attainment designation supported by Ohio's analysis.

<u>Conclusion</u>

After careful evaluation of the state's recommendation and supporting information, as well as all available relevant information, EPA intends to designate Ohio's recommended townships in Clermont County, Ohio as unclassifiable/attainment for the 2010 $SO_2$ NAAQS.

EPA does not believe that the designation of Clermont County outside of Pierce Township for the 2010 $SO_2$ NAAQS is affected by the fact that Pierce Township, Clermont County, is currently designated nonattainment for the 2010 $SO_2$ NAAQS. Pierce Township's designation in August 2013 was based on a NAAQS violation recorded in Campbell County, Kentucky, for the time period 2009-2011. The Beckjord plant was presumed to be the primary contributor to this violation, based on the plant's location, emissions level, and local wind trajectory analyses. The Beckjord plant shut down its coal-fired boilers as of October 2014. On August 11, 2015, Ohio formally requested that EPA redesignate Pierce Township to attainment of the 2010 $SO_2$ NAAQS, based on the Beckjord plant's shutdown and the improvement in monitored air quality demonstrated at the monitor. As Ohio recommended, EPA will address Pierce Township through a separate process that focuses on Ohio's request for redesignating that Township to attainment. EPA is not in this separate designation pre-judging that future action, which will be based on the agency's review of that administrative record.

At this time, our intended designations for the state only apply to this area and the other areas presented in this technical support document. Consistent with the conditions in the March 2, 2015 court-ordered schedule, EPA will evaluate and designate all remaining undesignated areas in Ohio by either December 31, 2017, or December 31, 2020.

**Technical Analysis for the Gallia County, Ohio Area**

<u>Introduction</u>

Gallia County in southern Ohio contains a stationary source that according to EPA's Air Markets Database emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 lbs $SO_2$/MMBTU. As of March 2, 2015, this stationary source had not met the specific requirements for being "announced for retirement." Specifically, in 2012, the General James M. Gavin Power Plant (Gavin) emitted 31,269 tons of $SO_2$, and its emissions rate was 0.36 lbs $SO_2$/MMBTU. Pursuant to the March 2, 2015 court-ordered schedule, EPA must designate the area surrounding the facility by July 2, 2016.

In its submission, Ohio recommended that the area surrounding Gavin, specifically Gallia County and a portion of Meigs County which contains the $SO_2$ monitor, be designated as attainment based on an assessment and characterization of air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. This assessment and characterization was performed using air dispersion modeling software, i.e., AERMOD, analyzing actual emissions. After careful review of the state's assessment, supporting documentation, and all available data, EPA finds that due to a discrepancy in the state's analysis, the area cannot be designated attainment at this time, but the evidence does not fully support a designation of nonattainment. Therefore, EPA intends to designate Gallia County and a portion of Meigs County as unclassifiable.

As seen in Figure 6 below, Gavin and the nearby Kyger Creek Station are both located south of the village of Cheshire along the Ohio River in northeast Gallia County. The Gavin facility is located approximately 17 km northeast of the county seat of Gallipolis. Also included in the figure are nearby emitters of $SO_2$, and the boundaries of the state's recommended area.

Figure 6. EPA's intended designation for Gallia County, Ohio



Gallia County, Ohio Area

The discussion and analysis that follows below will reference the state's use of the Modeling TAD, EPA's assessment of the state's modeling in accordance with the Modeling TAD, and the factors for evaluation contained in EPA's March 20, 2015 guidance, as appropriate.

Detailed Assessment

*Monitored Data*

There are five $SO_2$ monitors in the Gallia County area. These monitors and their design values (DV) are listed in Table 5. The Meigs County monitor is located to the northeast of Gavin and Kyger Creek. The other monitors, which were sited to capture impacts from other large $SO_2$ sources, are located approximately 70 km southeast of Gavin and Kyger Creek. The Meigs County monitor was sited to represent impacts from Gavin and Kyger Creek. Its 2012-2014 design value is 30 ppb, well below the 2010 $SO_2$ NAAQS. Ohio cited this data as evidence that Gallia County is currently attaining the 2010 $SO_2$ NAAQS, given the current impacts of Gavin and Kyger Creek, along with the low $SO_2$ concentrations coming into Gallia County from Lawrence and Scioto Counties with the prevailing winds from the southwest. While this monitor

20

appears not to be located where maximum concentrations would be expected, so that the monitoring data do not provide convincing evidence as to the attainment status of the area, the monitored data do provide some support for the state's conclusion that the area is attaining the standard.

Table 5:  Design Values at Monitors Near Gavin Facility

| Monitor ID | County | 2012-2014 DV (ppb) | Distance from Gavin (km) |
|---|---|---|---|
| 39-105-0003 | Meigs | 30 | 13 |
| 39-087-0012 | Lawrence | 17 | 67 |
| 39-145-0013 | Scioto | 9 | 72 |
| 39-145-0020 | Scioto | 27 | 71 |
| 39-145-0022 | Scioto | 19 | 73 |

*Model Selection and Modeling Components*

EPA's Modeling TAD notes that for area designations under the 2010 $SO_2$ NAAQS, the AERMOD modeling system should be used, unless use of an alternative model can be justified. In some instances the recommended model may be a model other than AERMOD, such as the BLP model for buoyant line sources. The AERMOD modeling system contains the following components:
- AERMOD: the dispersion model
- AERMAP: the terrain processor for AERMOD
- AERMET: the meteorological data processor for AERMOD
- BPIPPRIME: the building input processor
- AERMINUTE: a pre-processor to AERMET incorporating 1-minute automated surface observation system (ASOS) wind data
- AERSURFACE: the surface characteristics processor for AERMET
- AERSCREEN: a screening version of AERMOD

In its modeling study to support the Gallia County recommended designation, the state used AERMOD version 15181, the most recent regulatory version of the model.  A discussion of the individual components, most notably a discussion of two beta options used in Ohio's analysis, will be referenced in the corresponding discussion that follows, as appropriate.

*Modeling Parameter: Rural or Urban Dispersion*

When performing the modeling for the area of analysis, the state determined that it was most appropriate to run the model in rural mode.  Although Ohio did not conduct a formal Auer analysis of the area, clearly less than 50 percent of the land use near the two large sources in Gallia County is industrial, commercial, or dense residential.

*Modeling Parameter: Area of Analysis (Receptor Grid)*

EPA believes that a reasonable first step towards characterization of air quality in the area surrounding Gavin is to determine the extent of the area of analysis, i.e., receptor grid. Considerations presented in the Modeling TAD include but are not limited to: the location of the $SO_2$ emission sources or facilities considered for modeling; the extent of significant concentration gradients of nearby sources; and sufficient receptor coverage and density to adequately capture and resolve the model predicted maximum $SO_2$ concentrations. For the Gallia County area, the state considered other emitters of $SO_2$ within 50 km of Gavin. The state determined that this was an appropriate conservative distance in order to adequately characterize air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. The grid receptor spacing for the area of analysis chosen by the state is as follows:

- 50 meter spacing along fencelines and to 2 km from the stacks
- 250 meter spacing to 8 km
- 500 meter spacing to 15 km
- 1000 meter spacing to 25 km
- 2000 meter spacing to 50 km
- Included receptor at monitor location

The receptor network contained 34,225 receptors.  For the purposes of this designation effort, the Modeling TAD states that the receptor grid need not include receptors in areas where it would not be feasible to place a monitor and record ambient air impacts, such as bodies of water.  Ohio did not seek to identify areas where it might be infeasible to place a monitor, and instead conservatively placed receptors according to the above array without respect to feasibility of monitoring.

Figure 7.  Gallia County area of analysis.



Figure 8, included in the state's recommendation, shows the state's receptor grid for the area of analysis.

.

Figure 8: Receptor Grid for the Gallia County, Ohio Area of Analysis



*Modeling Parameter: Source Characterization*

The state characterized the sources within the area of analysis in accordance with the best practices outlined in the Modeling TAD. Specifically, the state used actual stack heights in conjunction with actual emissions. The state also adequately characterized the source's building layout and location, as well as the stack parameters, e.g., exit temperature, exit velocity, location, and diameter. Where appropriate, the AERMOD component BPIPPRIME was used to assist in addressing building downwash.

*Modeling Parameter: Emissions*

EPA's Modeling TAD notes that for the purposes of modeling to characterize air quality for use in designations, the recommended approach is to use the most recent 3 years of actual emissions data and concurrent meteorological data. The Modeling TAD highly encourages the use of the most detailed throughput, operating schedule and emissions information available. Variable emissions, temperature, and flow data can be modeled using AERMOD's hourly varying emissions keyword HOUREMIS or variable emission factor keyword EMISFACT. EPA believes that continuous emissions monitoring systems (CEMS) data provide valuable historical emissions information, when it is available, and that these data are available for many electric generating units. However, the TAD does provide for the flexibility of using allowable emissions in the form of a federally enforceable limit on the emissions rate (referred to as PTE or allowable emissions rate.

As previously noted, the state evaluated other $SO_2$ sources located within 50 km of the area of analysis. The Phillip Sporn power station and the Mountaineer power station in Mason County, WV are located approximately 17 km from Gavin.  The Sporn station closed in June 2015. The predominant winds from the southwest, as measured at Huntington, WV, would disperse the emissions of the Mountaineer plant toward the eastern portion of Meigs County (not included in Ohio's designation recommendation). There are no other significant sources of $SO_2$ in or near Gallia and Meigs Counties. Only Gavin and Kyger Creek were determined by the state to have the potential to cause significant concentration gradient impacts within the area of analysis. The facilities in the area of analysis and their most recently available annual actual $SO_2$ are summarized below.

Table 6: Actual $SO_2$ Emissions Between 2012 – 2014 from Facilities in the Gallia County, Ohio Area of Analysis

| Facility Name | Distance from Gavin (km) | Actual $SO_2$ Emissions (tons per year) | | |
|---|---|---|---|---|
| | | 2012 | 2013 | 2014 |
| AEP General James M. Gavin Plant | -- | 31,269[A] | 27,852 | 36,872 |
| AEP Kyger Creek Station | 2.5 | 4,989 | 9,434 | 13,748 |
| Appalachian Power Mountaineer Plant (Mason Co WV) | 16.7 | 1,151 | 2,903 | 4,411 |
| Appalachian Power Phillip Sporn Plant (Mason Co WV) closed 6/2015 | 17.2 | 8,078 | 9,032 | 10,650 |
| Felman Productions-New Haven (Mason Co WV)[B] | 17.2 | | | 534 |
| | | | | |
| Total Emissions From All Facilities in the State's Area of Analysis | | 46,021[C] | 49,755[C] | 66,215 |

[A] Emissions from EPA's Air Markets Database. Other 2014 data from Ohio's Fee Emission Reports.
[B] Emissions from 2011 NEI.
[C] Assumes 534 tons per year from Felman Productions

*Modeling Parameter: Meteorology and Surface Characteristics*

The most recent 3 years of meteorological data (concurrent with the most recent 3 years of emissions data) should be used in designations efforts. As noted in the Modeling TAD, the selection of data should be based on spatial and climatological (temporal) representativeness. The representativeness of the data are based on: 1) the proximity of the meteorological monitoring site to the area under consideration, 2) the complexity of terrain, 3) the exposure of the meteorological site, and 4) the period of time during which data are collected. Sources of meteorological data include National Weather Service (NWS) stations, site-specific or onsite data, and other sources such as universities, Federal Aviation Administration (FAA), and military stations.

25

For the Gallia County area of analysis, surface meteorology from the Huntington Tri-State Airport in West Virginia, located 65 km south-southeast of Gavin, and coincident upper air observations from the NWS station in Pittsburgh, Pennsylvania, 235 km to the northeast, were selected as best representative of meteorological conditions within the area of analysis.

The state used AERSURFACE version 13016 to estimate the surface characteristics of the area of analysis. The state developed surface characteristics for 12 spatial sectors at a monthly temporal resolution at the Huntington NWS site. These surface characteristics are the albedo (the fraction of solar energy reflected from the earth back into space), the Bowen ratio (representing the ratio of sensible heat flux to latent heat flux at the ground level), and the surface roughness (representing the influence of ground features such as buildings and vegetation on surface wind flow).

As part of its recommendation, the state provided the 3-year surface wind rose for Huntington, WV. In Figure 9, the frequency and magnitude of wind speed and direction are defined in terms of from where the wind is blowing. The winds at Huntington are most frequently from the southwest.

Figure 9: Huntington, WV Cumulative Annual Wind Rose for Years 2012 – 2014

26



Meteorological data from the above surface and upper air stations were used in generating AERMOD-ready files with the AERMET processor. The output meteorological data created by the AERMET processor is suitable for being applied with AERMOD input files for AERMOD modeling runs. The state used AERSURFACE to determine appropriate surface characteristics, and followed EPA guidance in the processing of the raw meteorological data into an AERMOD-

ready format.  Ohio processed the Huntington NWS surface meteorological data using the AERMINUTE preprocessor, which uses one-minute meteorological observations to provide the most complete and accurate hourly-averaged surface wind data.  Then Ohio used AERMET to combine surface and upper air data into input files required by the AERMOD model.

In the Gallia County modeling, Ohio used two AERMET/AERMOD beta options, which are not yet part of the regulatory default option in AERMOD:  Adjusted U-star, and LOWWIND3. These options adjust AERMOD's performance during low wind speed conditions.  Using these options for a regulatory application currently requires EPA approval.  Ohio provided a model performance analysis to support their decision to apply the options.

EPA notes that the use of beta options, such as ADJ_U* and LOWWIND3, in AERMOD for any regulatory applications requires adherence with Appendix W, Section 3.2.2. This is further explained in EPA's December 10, 2015 Memorandum titled, "Clarification on the Approval Process for Regulatory Application of the AERMOD Modeling System Beta Options." Among other conditions, the use of beta options requires consultation with the appropriate EPA Regional Offices. Upon concurrence by EPA's Modeling Clearinghouse, EPA Regional Offices may approve the use of these beta options for regulatory applications as an alternative model. However, Ohio performed air dispersion modeling intended to characterize air quality as a result of $SO_2$ emissions from Gavin and Kyger Creek without prior consultation with and approval from an EPA Regional Office, and therefore has not met the applicable regulatory requirements contained in Appendix W, Section 3.2.2. As a result, EPA does not believe that the air quality modeling results obtained from the use of these beta options can be used as a reliable indicator of attainment status in Gallia County until appropriate alternative model approval is granted or these beta options are promulgated as regulatory options in AERMOD through EPA rulemaking.

Specific to LOWWIND3, this beta option currently has only one reasonable pathway for appropriate EPA Regional Office approval with EPA's Model Clearinghouse concurrence. This pathway, specifically contained as condition number 2 in Appendix W, Section 3.2.2(b), is one in which an application-specific statistical performance evaluation is conducted. In an application-specific statistical performance evaluation, air quality modeling for the particular type of facility in question would have to be evaluated against representative air quality monitors that are appropriately sited for the given application. However, LOWWIND 3 at this time has not yet fully received scientific peer-review (i.e., criterion "i" for condition number 3 of Appendix W, Section 3.2.2(e)), and so this option must meet a more rigorous test for its approval as an alternative model. Through a proposed rulemaking to revise Appendix W and promulgate new regulatory options in AERMOD, we have received a number of public comments specific to the LOWWIND3 beta options and are working to complete our review of those comments and then to finalize appropriate action on the LOWWIND3 option with the necessary peer-reviewed journal articles as part of final Appendix W rulemaking package. Due to the potential changes that may occur prior to finalization of the Appendix W rulemaking package, in conjunction with the fact that, at this time, LOWWIND 3 has not been demonstrated to have statistically improved performance over that of the regulatory default version of AERMOD for the particular type of facility or has not yet fully received scientific peer-review, EPA does not believe that the air

quality modeling results obtained from the use of this beta option can be used at this time as a reliable indicator of attainment status in Gallia County.

*Modeling Parameter: Geography and Terrain*

The terrain in the area of analysis is hilly, along the Ohio River valley.  The AERMAP terrain program within AERMOD was used to specify elevations for all the receptors. The source of the elevation data incorporated into the model is from the USGS National Elevation Dataset.

*Modeling Parameter: Background Concentrations of $SO_2$*

The Modeling TAD offers two mechanisms for characterizing background concentrations of $SO_2$ that are ultimately added to the modeled design values: 1) a "first tier" approach, based on monitored design values, or 2) a temporally varying approach, based on the 99th percentile monitored concentrations by hour of day and season or month. For the Gallia County analysis, the state chose to use 2012-2014 data from the monitor at Pomeroy in Meigs County (39-105-0003) as background.  This monitor, which is located 15 km north-northeast of Gavin, is the nearest representative $SO_2$ monitor. The State eliminated all hours in which the winds came from the 30 degree sector influenced by Gavin and Kyger Creek, then took the 3-year average of the 99th percentile of each year's hourly distribution. The background concentration for the Gallia County analysis was determined by the state to be 26.2 micrograms per cubic meter ($\mu g/m^3$), or 10 ppb.[5]  This value was incorporated into the final AERMOD results.

Since the $SO_2$ air quality standard reflects the 99th percentile among daily maximum concentrations, the common means of determining a single, "first tier" background value is to determine the 99th percentile among daily maximum background concentrations, i.e. the 99th percentile among a set of daily maximum values in a data set that includes only values that are representative of background concentrations.  The common means of determining hourly background concentrations is to determine the 99th percentile among 24 sets of values reflective of background concentrations, where each data set is for a single hour.  The average of these 24 hourly 99th percentile background concentrations would be approximately the same as the 99th percentile among the full data set.  In this sense, Ohio has applied a single, "first tier" background concentration, but Ohio has determined a level that corresponds approximately to the average of the levels they would have determined had they evaluated hourly background concentrations.  Therefore, Ohio has applied a reasonable background concentration in its analysis, consistent with the recommendations of the modeling TAD.

*Summary of Modeling Results*

---

[5] The conversion factor for $SO_2$ (at the standard conditions applied in the ambient $SO_2$ reference method) is 1ppb = approximately $2.62\mu g/m^3$.

The AERMOD modeling parameters for the Gallia County analysis are summarized below in Table 7

Table 7: AERMOD Modeling Parameters for the Gallia County, Ohio Area of Analysis

| Gallia County, Ohio Area of Analysis | |
|---|---|
| AERMOD Version | 15181 |
| Dispersion Characteristics | Rural |
| Modeled Sources | 2 |
| Modeled Stacks | 4 |
| Modeled Structures | 47 |
| Modeled Fencelines | 2 |
| Total receptors | 34,225 |
| Emissions Type | Actual hourly |
| Emissions Years | 2012-2014 |
| Meteorology Years | 2012-2014 |
| Surface Meteorology Station | Huntington, WV |
| Upper Air Meteorology Station | Pittsburgh, PA |
| Methodology for Calculating Background $SO_2$ Concentration | 99th percentile with large facility emissions omitted |
| Calculated Background $SO_2$ Concentration | 10 ppb/ 26.2 $\mu g/m^3$ |

The results presented below in Table 8 show the magnitude and geographic location of the highest predicted modeled concentration based on actual emissions from Gavin, Kyger Creek, and background concentrations.

Table 8: Maximum Predicted 99th Percentile 1-Hour $SO_2$
Concentration in the Gallia County, Ohio Area of Analysis Based on Actual Emissions

| | | Receptor Location | | $SO_2$ Concentration ($\mu g/m^3$) | |
|---|---|---|---|---|---|
| Averaging Period | Data Period | UTM E | UTM N | Modeled (including background) | NAAQS |
| 99th Percentile 1-Hour Average | 2012-2014 | 400900 | 4306700 | 188.3 | 196.5* |

*Equivalent to the 2010 $SO_2$ NAAQS set at 75 ppb

The state's modeling indicates that the predicted 99th percentile 1-hour average concentration within the chosen modeling domain is 188.3 $\mu g/m^3$, or 71.9 ppb. This modeled concentration included the background concentration, and is based on actual emissions from the nearby facilities. Figure 10 below was included as part of the state's recommendation, and indicates that the predicted value occurred 1200 meters from the Kyger Creek fenceline.

30

App. 120

Figure 10: Maximum Predicted 99th Percentile 1-Hour $SO_2$ Concentrations in the Gallia County, Ohio Area of Analysis Based on Actual Emissions



## Other Relevant Information

On September 16, 2015, the Sierra Club submitted a modeling analysis for the area surrounding Gavin. This analysis indicated a violation of the NAAQS.  In a November 17, 2015 letter to EPA, Ohio commented that the Sierra Club analysis used an inaccurate stack configuration for Kyger Creek, with incorrect hourly emissions and stack parameter information for both Gavin and Kyger Creek.  An additional source was modeled with overly conservative emissions data. These errors have the potential to cause significant misrepresentations of the impacts of these sources, such that EPA does not consider the Sierra Club's modeling to provide a reliable assessment of whether the area is violation the NAAQS.  As noted above, EPA also does not consider Ohio's analysis to be a reliable assessment of concentrations in the area.  Since the deficiencies in the two analyses are different, the Sierra Club analysis does not provide a reliable indication, even in combination with the state's analysis, as to whether the area is attaining the NAAQS.

## Jurisdictional Boundaries:

Once the geographic area of analysis associated with Gavin and Kyger Creek is determined, existing jurisdictional boundaries are considered for the purpose of informing our intended designated area, specifically with respect to clearly defined legal boundaries.

Ohio recommended an attainment designation for all of Gallia County and the western half of Meigs County, which includes Bedford, Columbia, Rutland, Salem, Salisbury, and Scipio Townships. This area has clearly defined legal boundaries, and we find this boundary to be a suitably clear basis for defining our intended designated area.

Ohio's modeling demonstrated that the Gavin and Kyger Creek facilities would not cause or contribute to a violation of the 2010 $SO_2$ NAAQS in Gallia or Meigs Counties.  There are other $SO_2$-emitting sources in Mason County, West Virginia, to the east of Gavin and Kyger Creek. Ohio did not model these sources, as they were considered to be too distant, given their moderate emission levels, to have a significant contribution in the vicinity of Gavin. They are closest to the eastern half of Meigs County, and it is expected that their impacts would be most significant in that area, based on their location and the prevailing southwest winds.   There are several sources with $SO_2$ emissions between 1000 and 3000 tpy in counties neighboring Gallia and Meigs County:  one in Athens County (1,338 tpy, 14.5 km from the Meigs County border; two in Washington County (2,993 tpy, 15 km from the Meigs County border, and 2,593 tpy, 21 km from the Meigs County border); and one in Jackson County West Virginia (2,636 tpy, 25 km from the Meigs County border).  Due to their distance from the Meigs County border, these facilities are not expected to cause or contribute to violations of the NAAQS within Meigs County.  The impacts of these sources are reasonably considered to be represented as part of the background concentration included in the analysis.

Due to the use of the AERMOD beta option LOWWIND3, which cannot be approved at this time, EPA does not find Ohio's modeled analysis demonstrating attainment in the Gallia County area to be a reliable assessment of whether the area is attaining the standard.  While EPA also received an independent modeling analysis from Sierra Club demonstrating nonattainment, EPA finds that this analysis contained incorrect source and plume data and emission inputs which were more conservative than the Modeling TAD recommends.  Therefore, EPA finds that this modeling analysis also does not provide a reliable basis on which to determine EPA's designation for this area.  Therefore, EPA intends to designate the area recommended by Ohio as unclassifiable.  EPA believes that our intended unclassifiable area, consisting of Gallia County and the western half of Meigs County, has clearly defined legal boundaries, and we find this boundary to be a suitably clear basis for defining our intended unclassifiable area.

Conclusion

Because the Ohio modeling analysis used a draft model option which cannot be approved by EPA at this time, EPA has determined that the state's recommended designation of attainment does not provide a reliable assessment of whether the area is attaining the NAAQS.  While a monitor that is 13 km from Gavin indicates attainment at its location, this monitor provides little basis for determining whether areas closer to the major facilities in this area are attaining the NAAQS.  EPA has also determined that evidence of nonattainment demonstrated by Sierra Club is unreliable as a result of mischaracterization of source and stack gas characteristics and overly

32

conservative eimission input values. Therefore, EPA does not find that a reliable basis exists for designating the area either as attainment or nonattainment.  Instead, after careful evaluation of available relevant information, EPA intends to designate Gallia County and Bedford, Columbia, Rutland, Salem, Salisbury, and Scipio Townships in Meigs County as unclassifiable for the 2010 $SO_2$ NAAQS.

At this time, our intended designations for the state only apply to this area and the other areas presented in this technical support document. Consistent with the conditions in the March 2, 2015 court-ordered schedule, EPA will evaluate and designate all remaining undesignated areas in Ohio by either December 31, 2017, or December 31, 2020.

**Tab 138: Technical Support Document for Arkansas Area Designations for the 2010 SO2 Primary National Ambient Air Quality Standard**

Technical Support Document
Arkansas

Area Designations for the 2010 $SO_2$ Primary National Ambient Air Quality Standard

Summary

Pursuant to section 107(d) of the Clean Air Act (CAA), the U.S. Environmental Protection Agency (EPA) must designate areas as either "unclassifiable," "attainment," or "nonattainment" for the 2010 one-hour sulfur dioxide ($SO_2$) primary national ambient air quality standard (NAAQS). The CAA defines a nonattainment area as one that does not meet the NAAQS or that contributes to a violation in a nearby area. An attainment area is defined as any area other than a nonattainment area that meets the NAAQS. Unclassifiable areas are defined as those that cannot be classified on the basis of available information as meeting or not meeting the NAAQS.

Arkansas submitted updated recommendations on September 11, 2015, ahead of a July 2, 2016, deadline for the EPA to designate certain areas established by the U.S. District Court for the Northern District of California. This deadline is the first of three deadlines established by the court for the EPA to complete area designations for the 2010 $SO_2$ NAAQS. Table 1 below lists Arkansas's recommendations and identifies the counties or portions of counties in Arkansas that the EPA intends to designate by July 2, 2016 based on an assessment and characterization of air quality through ambient air quality data, air dispersion modeling, other evidence and supporting information, or a combination of the above.

Table 1. Arkansas' Recommended and the EPA's Intended Designations

| Area | Arkansas' Recommended Area Definition | Arkansas' Recommended Designation | EPA's Intended Area Definition | EPA's Intended Designation |
|---|---|---|---|---|
| Independence County, Arkansas | Independence County | Unclassifiable/ Attainment | Same as State's Recommendation | Unclassifiable |
| Jefferson County, Arkansas | Jefferson County | Unclassifiable/ Attainment | Same as State's Recommendation | Same as State's Recommendation |

Background

On June 3, 2010, the EPA revised the primary (health based) $SO_2$ NAAQS by establishing a new one-hour standard at a level of 75 parts per billion (ppb) which is attained when the three-year average of the 99th percentile of one-hour daily maximum concentrations does not exceed 75 ppb. This NAAQS was published in the Federal Register on June 22, 2010 (75 FR 35520) and is codified at 40 CFR 50.17. The EPA determined this is the level necessary to protect public health with an adequate margin of safety, especially for children, the elderly and those with asthma. These groups are particularly susceptible to the health effects associated with breathing $SO_2$. The two prior primary standards of 140 ppb evaluated over 24 hours, and 30 ppb evaluated over an

entire year, codified at 40 CFR 50.4, remain applicable.[1] However, the EPA is not currently designating areas on the basis of either of these two primary standards. Similarly, the secondary standard for $SO_2$ set at 500 ppb evaluated over 3 hours has not been revised, and the EPA is also not currently designating areas on the basis of the secondary standard.

<u>General Approach and Schedule</u>

Section 107(d) of the Clean Air Act requires that not later than one year after promulgation of a new or revised NAAQS, state governors must submit their recommendations for designations and boundaries to EPA. Section 107(d) also requires the EPA to provide notification to states no less than 120 days prior to promulgating an initial area designation that is a modification of a state's recommendation. If a state does not submit designation recommendations, the EPA will promulgate the designations that it deems appropriate. If a state or tribe disagrees with the EPA's intended designations, they are given an opportunity within the 120 day period to demonstrate why any proposed modification is inappropriate.

On August 5, 2013, the EPA published a final rule establishing air quality designations for 29 areas in the United States for the 2010 $SO_2$ NAAQS, based on recorded air quality monitoring data from 2009 - 2011 showing violations of the NAAQS (78 FR 47191). In that rulemaking, the EPA committed to address, in separate future actions, the designations for all other areas for which the Agency was not yet prepared to issue designations.

Following the initial August 5, 2013 designations, three lawsuits were filed against the EPA in different U.S. District Courts, alleging the agency had failed to perform a nondiscretionary duty under the CAA by not designating all portions of the country by the June 2013 deadline. In an effort intended to resolve the litigation in one of those cases, plaintiffs Sierra Club and the Natural Resources Defense Council and the EPA filed a proposed consent decree with the U.S. District Court for the Northern District of California. On March 2, 2015, the court entered the consent decree and issued an enforceable order for the EPA to complete the area designations according to the consent decree schedule.

According to the consent decree, the EPA must complete the remaining designations on a schedule that contains three specific deadlines. By no later than July 2, 2016 (16 months from the court's order), the EPA must designate two groups of areas: (1) areas that have newly monitored violations of the 2010 $SO_2$ NAAQS and (2) areas that contain any stationary sources that had not been announced as of March 2, 2015 for retirement and that according to the EPA's Air Markets Database emitted in 2012 either (i) more than 16,000 tons of $SO_2$ or (ii) more than 2,600 tons of $SO_2$ with an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU).  Specifically, a stationary source with a coal-fired unit that as of January 1, 2010 had a capacity of over 5 megawatts and otherwise meets the emissions criteria, is excluded from the July 2, 2016 deadline if it had announced through a company public announcement, public utilities commission filing, consent decree, public legal settlement, final

---

[1] 40 CFR 50.4(e) provides that the two prior primary NAAQS will no longer apply to an area one year after its designation under the 2010 NAAQS, except that for areas designated nonattainment under the prior NAAQS as of August 22, 2010, and areas not meeting the requirements of a SIP Call under the prior NAAQS, the prior NAAQS will apply until that area submits and EPA approves a SIP providing for attainment of the 2010 NAAQS.

state or federal permit filing, or other similar means of communication, by March 2, 2015, that it will cease burning coal at that unit.

The last two deadlines for completing remaining designations are December 31, 2017, and December 31, 2020. The EPA has separately promulgated requirements for states and other air agencies to provide additional monitoring or modeling information on a timetable consistent with these designation deadlines. We expect this information to become available in time to help inform these subsequent designations. These requirements were promulgated on August 21, 2015 (80 FR 51052), in a rule known as the $SO_2$ Data Requirements Rule (DRR).

Updated designations guidance was issued by the EPA through a March 20, 2015 memorandum from Stephen D. Page, Director, U.S. EPA, Office of Air Quality Planning and Standards, to Air Division Directors, U.S. EPA Regions I-X. This memorandum supersedes earlier designation guidance for the 2010 $SO_2$ NAAQS, issued on March 24, 2011, and it identifies factors that the EPA intends to evaluate in determining whether areas are in violation of the 2010 $SO_2$ NAAQS. The guidance also contains the factors the EPA intends to evaluate in determining the boundaries for all remaining areas in the country, consistent with the court's order and schedule. These factors include: 1) Air quality characterization via ambient monitoring or dispersion modeling results; 2) Emissions-related data; 3) Meteorology; 4) Geography and topography; and 5) Jurisdictional boundaries. This guidance was supplemented by two technical assistance documents intended to assist states and other interested parties in their efforts to characterize air quality through air dispersion modeling or ambient air quality monitoring for sources that emit $SO_2$. Notably, the EPA released its most recent versions of documents titled, "$SO_2$ NAAQS Designations Modeling Technical Assistance Document" (Modeling TAD) and "$SO_2$ NAAQS Designations Source-Oriented Monitoring Technical Assistance Document" (Monitoring TAD) in December 2013.

Based on ambient air quality data collected between 2012 and 2014, no monitored violations of the 2010 $SO_2$ NAAQS have been recorded in any undesignated part of the state of Arkansas.[2] However, there are 2 sources in the state meeting the emissions criteria of the consent decree for which the EPA must complete designations by July 2, 2016. In this technical support document, the EPA discusses its review and technical analysis of Arkansas' updated recommendations for the areas that we must designate. The EPA also discusses any intended modifications from the state's recommendation based on all available data before us.

The following are definitions of important terms used in this document:

---

[2] For designations based on ambient air quality monitoring data that violates the 2010 $SO_2$ NAAQS, the consent decree directs the EPA to evaluate data collected between 2013 and 2015. Absent complete, quality assured and certified data for 2015, the analyses of applicable areas for the EPA's intended designations will be informed by data collected between 2012 and 2014. States with monitors that have recorded a violation of the 2010 $SO_2$ NAAQS during these years have the option of submitting complete, quality assured and certified data for calendar year 2015 by April 19, 2016 to the EPA for evaluation. If after our review, the ambient air quality data for the area indicates that no violation of the NAAQS occurred between 2013 and 2015, the consent decree does not obligate the EPA to complete the designation. Instead, we may designate the area and all other previously undesignated areas in the state on a schedule consistent with the prescribed timing of the consent decree, i.e., by December 31, 2017, or December 31, 2020.

1) 2010 $SO_2$ NAAQS – The primary NAAQS for $SO_2$ promulgated in 2010. This NAAQS is 75 ppb, based on the three-year average of the 99th percentile of the annual distribution of daily maximum one-hour average concentrations. See 40 CFR 50.17.

2) Design Value - a statistic computed according to the data handling procedures of the NAAQS (in 40 CFR part 50 Appendix T) that, by comparison to the level of the NAAQS, indicates whether the area is violating the NAAQS.

3) Designated nonattainment area – an area which the EPA has determined has violated the 2010 $SO_2$ NAAQS or contributed to a violation in a nearby area. A nonattainment designation would reflect considerations of state recommendations and all of the information discussed in this document. The EPA's decision would be based on all available information including the most recent 3 years of air quality monitoring data, available modeling analysis, and any other relevant information.

4) Designated unclassifiable area – an area which the EPA cannot determine based on all available information whether or not it meets the 2010 $SO_2$ NAAQS.

5) Designated unclassifiable/attainment area – an area which the EPA has determined to have sufficient evidence to find either is attaining or is likely to be attaining the NAAQS. The EPA's decision would be based on all available information including the most recent 3 years of air quality monitoring data, available modeling analysis, and any other relevant information.

6) Modeled violation – a violation based on air dispersion modeling.

7) Recommended attainment area – an area a state or tribe has recommended that the EPA designate as attainment.

8) Recommended nonattainment area – an area a state or tribe has recommended that the EPA designate as nonattainment.

9) Recommended unclassifiable area – an area a state or tribe has recommended that the EPA designate as unclassifiable.

10) Recommended unclassifiable/attainment area – an area a state or tribe has recommended that the EPA designate as unclassifiable/attainment.

11) Violating monitor – an ambient air monitor meeting all methods, quality assurance and siting criteria and requirements whose valid design value exceeds 75 ppb, based on data analysis conducted in accordance with Appendix T of 40 CFR part 50.

4

## Technical Analysis for Jefferson County, Arkansas Area

Introduction

The Jefferson County area contains a stationary source that according to the EPA's Air Markets Database emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU). As of March 2, 2015, this stationary source had not met the specific requirements for being "announced for retirement." Specifically, in 2012, the White Bluff Steam Electric Station (White Bluff station) emitted 31,687 tons of $SO_2$, and had an emissions rate of 0.59 lbs $SO_2$/mmBTU. Pursuant to the March 2, 2015 consent decree, the EPA must designate the area surrounding the facility by July 2, 2016.

In its submission, Arkansas recommended that the area surrounding White Bluff station, specifically the entirety of Jefferson County, be designated as unclassifiable/attainment based on an assessment and characterization of air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. This assessment and characterization was performed using air dispersion modeling software, i.e., AERMOD, analyzing actual emissions. After careful review of the state's assessment, supporting documentation, and all available data, the EPA agrees that the area is attaining the standard, and intends to designate Jefferson County as unclassifiable/attainment.

The White Bluff station is located in central Arkansas in the northeastern portion of Jefferson County. The facility is located approximately 38 km south of Little Rock, Arkansas. Included in Figure 1 is the EPA's intended unclassifiable/attainment designation county boundary for the area, which is the same recommended area as the state's unclassified/attainment designation.

Figure 1: The EPA's Intended Area Designation for White Bluff Steam Electric Station



The discussion and analysis that follows below will reference the state's use of the Modeling TAD, the EPA's assessment of the state's modeling in accordance with the Modeling TAD, and the factors for evaluation contained in the EPA's March 20, 2015 guidance, as appropriate.

Detailed Assessment

*Air Quality Data*

There are no $SO_2$ air quality monitors in Jefferson County. There are no $SO_2$ air quality monitors in surrounding counties that are representative of the maximum or higher elevated levels of $SO_2$ around the White Bluff station facility.

*Model Selection and Modeling Components*

The EPA's Modeling TAD notes that for area designations under the 2010 $SO_2$ NAAQS, the AERMOD modeling system should be used, unless use of an alternative model can be justified. In some instances the recommended model may be a model other than AERMOD, such as the BLP model for buoyant line sources. The AERMOD modeling system contains the following components:

6

- AERMOD: the dispersion model
- AERMAP: the terrain processor for AERMOD
- AERMET: the meteorological data processor for AERMOD
- BPIPPRIME: the building input processor
- AERMINUTE: a pre-processor to AERMET incorporating 1-minute automated surface observation system (ASOS) wind data
- AERSURFACE: the surface characteristics processor for AERMET
- AERSCREEN: a screening version of AERMOD

The state used the most recent AERMOD version 15181, and a discussion of the individual components will be referenced in the corresponding discussion that follows, as appropriate.

*Modeling Parameter: Rural or Urban Dispersion*

The EPA's recommended procedure for characterizing an area by prevalent land use is based on evaluating the dispersion environment within 3 km of the facility. According to the EPA's modeling guidelines, urban dispersion coefficients are to be used in the dispersion modeling analysis if more than 50% of the area within a 3 km radius of the facility is classified as urban. Otherwise, the source is considered a rural source. When performing the modeling for the area of analysis, the state ran the model using the rural mode. The submittal did not specifically discuss why the rural mode was chosen. However, based on our review of aerial photography of the area surrounding the facility, the determination to run the model in rural mode appears appropriate.

*Modeling Parameter: Area of Analysis (Receptor Grid)*

The EPA believes that a reasonable first step towards characterization of air quality in the area surrounding the White Bluff station is to determine the extent of the area of analysis, i.e., receptor grid. Considerations presented in the Modeling TAD include but are not limited to: the location of the $SO_2$ emission sources or facilities considered for modeling; the extent of significant concentration gradients of nearby sources; and sufficient receptor coverage and density to adequately capture and resolve the model predicted maximum $SO_2$ concentrations. The Cartesian receptor grid consisted of the following receptor spacing:

- 50-meter spacing along the facility fence line;
- 100-meter spacing extending from the fence line to 5 kilometers;
- 500-meter spacing extending from 5 to 10 kilometers; and
- 1,000-meter spacing extending from 10 to 20 kilometers.

The spacing is appropriate since it captures the gradient changes in the impact contours from the facility, which show approximately 30-40% decreases within in each spacing selection (see Figure 6).

Figure 2 shows the state's chosen area of analysis surrounding the White Bluff station, as well as receptor grid for the area of analysis.

7

Figure 2: White Bluff Steam Electric Station Receptor Grid for the Area of Analysis



The submitted modeling did not exclude any specific areas from receptor placement. Instead, receptors were placed throughout the modeled area, which is a conservative approach and consistent with EPA guidance. The impacts of the area's geography and topography will follow in the appropriate section.

*Modeling Parameter: Source Characterization*

The state characterized the source within the area of analysis in accordance with the best practices outlined in the Modeling TAD. Specifically, the state used actual stack heights in conjunction with actual emissions. The state also characterized the source's building layout and location, as well as the stack parameters, e.g., exit temperature, exit velocity, location, and diameter. Where appropriate, the AERMOD component BPIPPRIME was used to assist in addressing building downwash.

8

*Modeling Parameter: Emissions*

The EPA's Modeling TAD notes that for the purposes of modeling to characterize air quality for use in designations, the recommended approach is to use the most recent 3 years of actual emissions data and concurrent meteorological data. However, the TAD does provide for the flexibility of using allowable emissions in the form of the most recently permitted, (referred to as PTE or allowable) emissions rate.

The EPA believes that continuous emissions monitoring systems (CEMS) data provide acceptable historical emissions information when it is available, and that these data are available for many electric generating units. In the absence of CEMS data, the EPA's Modeling TAD highly encourages the use of AERMOD's hourly varying emissions keyword HOUREMIS, or through the use of AERMOD's variable emissions factors keyword EMISFACT. When choosing one of these methods, the EPA believes that detailed throughput, operating schedules, and emissions information from the impacted source(s) should be used.

In certain instances, states and other interested parties may find that it is more advantageous or simpler to use PTE rates as part of their modeling runs. Specifically, a facility may have recently adopted a new federally enforceable emissions limit, been subject to a federally enforceable consent decree, or implemented other federally enforceable mechanisms and control technologies to limit $SO_2$ emissions to a level that indicates compliance with the NAAQS. These new limits or conditions may be used in the application of AERMOD. In these cases, the Modeling TAD notes that the existing $SO_2$ emissions inventories used for permitting or SIP planning demonstrations should contain the necessary emissions information for designations-related modeling. In the event that these short-term emissions are not readily available, they may be calculated using the methodology in Table 8-1 of Appendix W to 40 CFR Part 51 titled, "Guideline on Air Quality Models."

As previously noted, the state included the White Bluff station and no other emitters of $SO_2$ within 20 km in the area of analysis. Evergreen Packaging is located 30 km southeast from White Bluff station, but the receptor placement is appropriate since it indicates no significant increases in the concentration gradients modeled beyond 20 km. This distance was selected because the state believes that this area of analysis adequately represents the area that could cause or contribute to a NAAQS violation in the vicinity of the affected source. No other sources beyond 20 km were determined by the state to have the potential to cause significant concentration gradient impacts within the area of analysis. The area of analysis and its associated annual actual $SO_2$ emissions between 2012 and 2014 are summarized in Table 2 below. Modeled stack parameters for contributing sources in the area of analysis can be seen in Table 3.

Table 2: Actual $SO_2$ Emissions 2012 – 2014 in the Jefferson County Area of Analysis

| Company ID | Facility Name | $SO_2$ Emissions tpy | | |
|---|---|---|---|---|
| | | 2012 | 2013 | 2014 |
| Entergy | White Bluff Steam Electric Station | 31,687 | 34,196 | 34,223 |

Table 3: Modeled Stack Parameters for Contributing Sources in Area of Analysis

| Description | Model Source | Stack Height | | Exit Temperature | | Exit Velocity | | Stack Diameter | |
|---|---|---|---|---|---|---|---|---|---|
| | | (ft) | (m) | (F) | (K) | (ft/sec) | (m/s) | (ft) | (m) |
| Unit 1 Boiler | SN01 | 1000 | 304.80 | — | — | — | — | 25.7 | 7.83 |
| Unit 2 Boiler | SN02 | 1000 | 304.80 | — | — | — | — | 25.7 | 7.83 |
| Auxiliary Boiler | SN05 | 15 | 4.57 | 475 | 519.25 | 65.0 | 19.81 | 3.0 | 0.91 |
| Emergency Diesel Engine | SN21 | 24 | 7.32 | 963 | 790.54 | — | 0.001 | 0.8 | 0.25 |
| Emergency Fire Pump | SN22 | 14 | 4.27 | 1058 | 843.15 | — | 0.001 | 0.5 | 0.15 |

For White Bluff station in the area of analysis, the state used actual emissions from the most recent 3-year data set, i.e., 2012 – 2014. CEMS data was used to generate hourly emissions files for the affected sources.

There are two boilers in operation at the White Bluff station, Unit 1 and Unit 2. Units 1 and 2 are vented to a common, dual-flue stack. For these main units, three years (2012-2014) of actual hourly emissions, stack temperature, and exhaust flow rate data were input into the model. This emissions data was provided by Entergy from prior submittals to the EPA's Clean Air Markets Database, while temperature and exhaust flow rates were provided by Entergy from the facility CEM system. As per the Modeling TAD, the actual 1000 ft. height of the main stack was represented in each case. The two Units at the facility were modeled as separate sources, each emitting from their own flue.

The auxiliary boiler was also modeled using actual hourly emissions data. For this source, however, exhaust temperature and velocity were not available, so for all hours the exit temperature and velocity were set to the values located in the Arkansas Department of Environmental Quality (ADEQ) source registration tables for the auxiliary boiler.

The Emergency Diesel Generator and Emergency Fire Pump Engine at the facility both have horizontal exhaust releases. This is represented in the modeling by setting the exit velocity of each source to 0.001 meters per second (m/s) to simulate the lack of vertical momentum out of the stack. Emissions data were only available on a monthly total emission basis for each engine. To convert that data into an emission rate for modeling, for each engine the total annual emissions for each year was determined and the highest annual total selected. That total was then divided by 52 to represent that the engines are tested once per week during the year. The resulting emission rate was then used as the lb/hr emission rate in the modeling. Based on information provided by Entergy employees, the emergency generator is typically tested weekly on Wednesdays, while the fire pump is typically tested on Friday evenings. To simulate this standard practice, the emergency generator was set in the modeling using the HRDOW7 emission factor (i.e., variable by hour of day and 7 days per week) to emit during an 8 hour period on Wednesdays from 8 AM to 4 PM, and the fire pump was set to operate on Friday's from 4 PM until Midnight. While this significantly overestimates the total emissions of the emergency engines, because the form of the 1-hour $SO_2$ standard only considers the hour with the highest concentration each day, at least 7 of these hours are "dropped" and thus only one hour worth of emission is potentially included in the maximum daily impacts. We note that if

10

these two emergency engines are operated less than an hour per week that it is likely conservative to add these sources in the modeling as it is unlikely they would impact the maximum modeled values if modeled with a temporally varying emission file.

*Modeling Parameter: Meteorology and Surface Characteristics*

The most recent 3 years of meteorological data (concurrent with the most recent 3 years of emissions data) should be used in designations efforts. As noted in the Modeling TAD, the selection of data should be based on spatial and climatological (temporal) representativeness. The representativeness of the data are based on: 1) the proximity of the meteorological monitoring site to the area under consideration, 2) the complexity of terrain, 3) the exposure of the meteorological site, and 4) the period of time during which data are collected. Sources of meteorological data include National Weather Service (NWS) stations, site-specific or onsite data, and other sources such as universities, Federal Aviation Administration (FAA), and military stations.

Three years (2012-2014) of surface observations from the NWS tower at Adams Field Airport in Little Rock, AR (WBAN No. 13963) and concurrent upper air data from North Little Rock Municipal Airport in North Little Rock, AR (WBAN No. 03952) were processed with the most recent version of AERMET (v.15181) the meteorological preprocessor for AERMOD, along with the two pre-processors to AERMET: AERSURFACE (v.13016) and AERMINUTE (v.14337). AERMET was applied to create the two meteorological data files required for input to AERMOD.

AERMET requires specification of site characteristics including surface roughness ($z_o$), albedo (r), and Bowen ratio ($B_o$). These parameters were developed according to the guidance provided by EPA in the AERMOD Implementation Guide (AIG) (EPA, 2008a) using AERSURFACE. The area within 1 km of the meteorological tower at Adams Field was broken into 12 sectors of 30 degrees each to analyze the surface characteristics in each 30 degree arc around the tower. AERMET uses the surface characteristics in the sector from which the wind approaches the tower as part of the meteorological data processing for each hour.

In AERSURFACE, the various land cover categories are linked to a set of seasonal surface characteristics. As such, AERSURFACE requires specification of the seasonal category for each month of the year. The following five seasonal categories are offered by AERSURFACE:

1. Midsummer with lush vegetation;
2. Autumn with unharvested cropland;
3. Late autumn after frost and harvest, or winter with no snow;
4. Winter with continuous snow on ground; and
5. Transitional spring with partial green coverage or short annuals.

The AERSURFACE run was performed using the seasonal temporal resolution option. The default seasonal distribution was used: December, January, and February were categorized as winter with no snow, March, April, and May as spring, June, July, and August as summer, and

11

September, October, and November as fall. The precipitation was assumed to be average over the 3-year period.

Additionally, 1-minute ASOS wind data, collected at the Adams Field meteorological tower, were processed using the AERMINUTE pre-processor for AERMET. Figure 3 shows the relative location of Adams Field and White Bluff station.

Figure 3: Meteorology Tower Location



The 3-year surface wind rose for Little Rock, Adam's Field, is depicted in Figure 4. In this figure, the frequency and magnitude of wind speed and direction are defined in terms of where the wind is blowing from. The distance from White Bluff station is 21.7 miles and the average wind speed is 3.42 m/s.

12

Figure 4: Little Rock-Adams Field Cumulative Annual Wind Rose for Years 2012 – 2014



*Modeling Parameter: Geography and Terrain*

Terrain elevations from National Elevation Data ("NED") from USGS were processed using the most recent version of AERMAP (v.11103) to develop the receptor terrain elevations required by AERMOD. NED data files contain profiles of terrain elevations, which in conjunction with receptor locations are used to generate receptor height scales. The height scale is the terrain elevation in the vicinity of a receptor that has the greatest influence on dispersion at that location and is used for model computations in complex terrain areas.

*Modeling Parameter: Background Concentrations of SO₂*

The Modeling TAD offers two mechanisms for characterizing background concentrations of $SO_2$ that are ultimately added to the modeled design values: 1) a "first tier" approach, based on monitored design values, or 2) a temporally varying approach, based on the 99th percentile

13

monitored concentrations by hour of day and season or month. For the Jefferson County area of analysis, the state chose the second tier approach and calculated seasonal diurnal background concentrations at the Little Rock monitor (Monitor ID #05-119-0007). The background concentrations for this area of analysis are shown in Table 4, and these values were incorporated into the final AERMOD results. This approach is consistent with the EPA's Modeling TAD and March 1, 2011 memorandum titled, "Additional Clarification Regarding Application of Appendix W Modeling Guidance for the 1-hour $NO_2$ NAAQS." While this memorandum nominally addresses $NO_2$, the document and its recommended approaches also apply to the 1-hour $SO_2$ NAAQS.[3]

Table. 4. Seasonal Diurnal $SO_2$ Concentrations at Little Rock Monitor (µg/m3)

| Hour | Winter | Spring | Summer | Fall |
|---|---|---|---|---|
| 1 | 6.89 | 5.67 | 4.80 | 5.50 |
| 2 | 7.85 | 5.52 | 4.28 | 6.19 |
| 3 | 7.35 | 6.19 | 4.25 | 6.02 |
| 4 | 8.59 | 5.76 | 4.15 | 4.71 |
| 5 | 8.55 | 4.97 | 4.19 | 5.15 |
| 6 | 9.60 | 4.80 | 5.41 | 5.85 |
| 7 | 9.60 | 6.25 | 5.50 | 6.66 |
| 8 | 8.99 | 5.34 | 6.11 | 6.59 |
| 9 | 7.50 | 6.46 | 7.08 | 7.85 |
| 10 | 8.39 | 9.20 | 7.92 | 9.07 |
| 11 | 9.16 | 5.46 | 9.05 | 8.29 |
| 12 | 10.73 | 16.09 | 10.58 | 9.34 |
| 13 | 9.69 | 11.08 | 10.91 | 11.17 |
| 14 | 10.56 | 9.54 | 9.88 | 9.51 |
| 15 | 10.03 | 5.20 | 13.18 | 9.95 |
| 16 | 9.17 | 7.91 | 9.34 | 10.47 |
| 17 | 7.15 | 9.86 | 11.08 | 9.16 |
| 18 | 7.50 | 7.42 | 9.60 | 7.24 |
| 19 | 8.75 | 6.57 | 9.98 | 6.98 |
| 20 | 12.30 | 6.54 | 8.73 | 5.95 |
| 21 | 8.07 | 6.02 | 6.19 | 6.28 |
| 22 | 6.11 | 5.99 | 5.76 | 5.67 |
| 23 | 6.46 | 7.07 | 5.67 | 5.85 |
| 24 | 7.24 | 5.81 | 5.41 | 6.11 |

1. Hours in AERMOD are defined as hour-ending i.e. Hour 1 is the period from midnight through 1 AM, etc

---

[3] See http://www3.epa.gov/scram001/guidance/clarification/Additional_Clarifications_AppendixW_Hourly-NO2-NAAQS_FINAL_03-01-2011.pdf, p 19 - 20

14

*Summary of Modeling Results*

The AERMOD modeling parameters for the Jefferson County area of analysis are summarized below in Table 5:

Table 5: AERMOD Modeling Parameters for the Jefferson County Area of Analysis

| Jefferson County, OK Area of Analysis | |
|---|---|
| AERMOD Version | 15181 |
| Dispersion Characteristics | Rural |
| Modeled Sources | 1 |
| Modeled Stacks | 5 |
| Modeled Structures | Yes |
| Modeled Fence Lines | Yes (see Figure 5) |
| Total receptors | - |
| Emissions Type | Actual |
| Emissions Years | 2012-2014 |
| Meteorology Years | 2012-2014 |
| Surface Meteorology Station | Adams Field in Little Rock |
| Upper Air Meteorology Station | North Little Rock Airport |
| Methodology for Calculating Background $SO_2$ Concentration | 2nd tier monitoring data |
| Calculated Background $SO_2$ Concentrations | See Table 4 |

15

Figure 5: White Bluff Steam Electric Station Modeled Fence Line



The results presented below in Table 6 show the magnitude of the highest predicted modeled concentration based on actual emissions.

Table 6: 2012 – 2014 Max Predicted 99th Percentile 1-Hour $SO_2$ Concentration in the Jefferson County Area of Analysis based on Actual Emissions

| Source | White Bluff Only | White Bluff and Background | 1-hr. $SO_2$ NAAQS | Below NAAQS? |
|---|---|---|---|---|
| White Bluff Station | 153.7 | 162.4 | 196.5 | Yes |

16

The state's modeling indicates that the predicted 99th percentile 1-hour average concentration within the chosen modeling domain is 162.4 μg/m³, or 62.04 ppb. This modeled concentration included the background concentrations of $SO_2$, and is based on actual emissions from the facility. Figure 6 shows the modeled impacts from White Bluff station, including background concentration, with the maximum impact location identified by the blue diamond.

Figure 6: White Bluff Station Modeled Impacts



Jurisdictional Boundaries:

Once the geographic area of analysis associated with the White Bluff station, other nearby sources, and background concentration is determined, existing jurisdictional boundaries are considered for the purpose of informing our intended unclassifiable/attainment area, specifically with respect to clearly defined legal boundaries.

One facility in Jefferson County which was not addressed by the state is located approximately 30 km southeast of the White Bluff station. According to the 2014 state emissions inventory, Evergreen Packaging in Pine Bluff emitted 1,077 tpy of $SO_2$, which is a decrease from the

17

reported 2011 NEI emissions of 1,755 tpy. Based on the distance from White Bluff station (20 miles southeast) and available information, the EPA does not believe that emissions from Evergreen Packaging are likely to cause or contribute to a violation of the NAAQS within the Jefferson County area of analysis. For comparison, the modeled maximum concentration from White Bluff station which attains the NAAQS is less than 5 km from the facility. Based on available information and Evergreen Packaging's decreasing emissions over time when compared to those from White Bluff station which have been modeled to attain the NAAQS, the EPA does not have reason to believe that emissions from Evergreen Packaging are causing or contributing to a violation of the NAAQS elsewhere in Jefferson County.

The EPA believes that our intended unclassifiable/attainment area, consisting of Jefferson County, Arkansas, is comprised of clearly defined legal boundaries, and we find these boundaries to be a suitably clear basis for defining our intended unclassifiable/attainment area.

Other Relevant Information

Additional modeling for the White Bluff facility was received from the Sierra Club. The submitter's modeling results assert that there are impacts in excess of the 1-hour $SO_2$ standard with a maximum-modeled concentration of 233.6 µg/m$^3$. However, our review of Sierra Club's modeling identified multiple errors in stack parameters, as well as less refined modeling approaches as compared with the state's submittal (ex. variable stack velocity and temperature were not included). Stack parameters need to be accurate to calculate the emission rate, plume dispersion effects, and ground level concentration that come from the stacks. The inaccuracy in Sierra Club's modeling of stack parameters appears to result from incorrect units on the stack temperatures. The modeled stack temperature values for the two units at White Bluff station corresponds to stack temperatures in degrees Fahrenheit taken from the facility's operating permit.  Sierra Club did not convert these temperatures to Kelvin prior to running AERMOD resulting in a significantly lower modeled stack temperature and an underestimate in dispersion due to stack conditions (overestimating of off-site impacts).  Sierra Club also did not include the additional refinement of variable stack parameters, as allowed by the modeling TAD, and was not as representative of daily operations when compared with the state's analysis. The state's modeling was determined to follow the modeling TAD more closely, and is more representative of actual operation conditions at White Bluff station. Therefore, our intended unclassifiable/attainment designation for Jefferson County is based on the state's analysis. The Sierra Club's modeling submittal, including modeling files and associated modeling report, are available for review as part of the docket for the $SO_2$ designations action.

Conclusion

After careful evaluation of the state's recommendation and supporting information, as well as all available relevant information, the EPA intends to designate the area around White Bluff station as unclassifiable/attainment for the 2010 $SO_2$ NAAQS. Specifically, the unclassifiable/attainment area is comprised of the entirety of Jefferson County.

When evaluating the modeling submitted by the state, no major issues were identified. The modeling shows attainment, and the modeling closely follows EPA guidance, including the TAD. Our decision to use Jefferson County as the boundary area for this designation is based upon the state's recommendation and its submitted analysis. Additionally, the EPA has confirmed that there are no other sources in Jefferson County or near its borders that based on available information lead us to believe they are likely to cause or contribute to a violation of the NAAQS within Jefferson County.

At this time, our intended designations for Arkansas only apply to this area and the other area presented in this technical support document. Consistent with the conditions in the March 2, 2015 consent decree, the EPA will evaluate and designate all remaining undesignated areas in Arkansas by either December 31, 2017, or December 31, 2020.

**Technical Analysis for the Independence County, Arkansas Area**

<u>Introduction</u>

The Independence County area contains a stationary source that according to the EPA's Clean Air Markets Database emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU). As of March 2, 2015, this stationary source had not met the specific requirements for being "announced for retirement." Specifically, in 2012, the Independence Steam Electric Station (Independence station) emitted 32,974 tons of $SO_2$, and had an emissions rate of 0.59 lbs $SO_2$/mmBTU. Pursuant to the March 2, 2015 consent decree, the EPA must designate the area surrounding the facility by July 2, 2016.

In its submission, Arkansas recommended that the area surrounding the Independence station, specifically the entirety of Independence County, be designated as unclassifiable/attainment based on an assessment and characterization of impacts on air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. This assessment and characterization was performed using air dispersion modeling software, i.e., AERMOD, analyzing actual emissions. After careful review of the state's assessment, supporting documentation, and all available data, the EPA disagrees with the state's recommendation for the area, and intends to designate the area, specifically the entirety of Independence County, as unclassifiable.

The Independence station is located in northeastern Arkansas in the eastern portion of Independence County. The facility is located approximately 5 km southeast of Newark, Arkansas. Included in the figure is the EPA's intended unclassifiable designation county boundary for the area, which is the same recommended area as the state's unclassified/attainment designation.

Figure 1: The EPA's Intended Area Designation for Independence Steam Electric Station



The discussion and analysis that follows below will reference the state's use of the Modeling TAD, the EPA's assessment of the state's modeling in accordance with the Modeling TAD, and the factors for evaluation contained in the EPA's March 20, 2015 guidance, as appropriate.

Detailed Assessment

*Air Quality Data*
There are no $SO_2$ air quality monitors in Independence County. There are no $SO_2$ air quality monitors in surrounding counties that are representative of the maximum or higher elevated levels of $SO_2$ around the Independence station facility

*Model Selection and Modeling Components*

The EPA's Modeling TAD notes that for area designations under the 2010 $SO_2$ NAAQS, the AERMOD modeling system should be used, unless use of an alternative model can be justified. In some instances, the recommended model may be a model other than AERMOD, such as the BLP model for buoyant line sources. The AERMOD modeling system contains the following components:
- AERMOD: the dispersion model
- AERMAP: the terrain processor for AERMOD

21

- AERMET: the meteorological data processor for AERMOD
- BPIPPRIME: the building input processor
- AERMINUTE: a pre-processor to AERMET incorporating 1-minute automated surface observation system (ASOS) wind data
- AERSURFACE: the surface characteristics processor for AERMET
- AERSCREEN: a screening version of AERMOD

The state used the most recent AERMOD version 15181, and a discussion of the individual components will be referenced in the corresponding discussion that follows as appropriate.

*Modeling Parameter: Rural or Urban Dispersion*

The EPA's recommended procedure for characterizing an area by prevalent land use is based on evaluating the dispersion environment with 3 km of the facility. According to the EPA's modeling guidelines, urban dispersion coefficients are to be used in the dispersion modeling analysis if more than 50% of the area within a 3 km radius of the facility is classified as urban. Otherwise, the source is considered a rural source. When performing the modeling for the area of analysis, as indicated in the modeling files, the state used the rural dispersion approach. Based on our review of aerial photography surrounding the facility, rural mode appears appropriate.

*Modeling Parameter: Area of Analysis (Receptor Grid)*

The EPA believes that a reasonable first step towards characterization of air quality in the area surrounding the Independence station is to determine the extent of the area of analysis, i.e., receptor grid. Considerations presented in the Modeling TAD include but are not limited to: the location of the $SO_2$ emission sources or facilities considered for modeling; the extent of significant concentration gradients of nearby sources; and sufficient receptor coverage and density to adequately capture and resolve the model predicted maximum $SO_2$ concentrations. The Cartesian receptor grid consisted of the following receptor spacing:

- 50-meter spacing along the facility fence line;
- 100-meter spacing extending from the fence line to 5 kilometers;
- 500-meter spacing extending from 5 to 10 kilometers; and
- 1,000-meter spacing extending from 10 to 20 kilometers.

Figure 2 shows the state's chosen area of analysis surrounding the Independence station, as well as receptor grid for the area of analysis.

22

Figure 2: Independence Steam Electric Station Receptor Grid for the Area of Analysis



Consistent with the Modeling TAD, receptors for the purposes of this designation effort were placed only in areas where it would also be feasible to place a monitor and record ambient impacts. The impacts of the area's geography and topography will follow in the appropriate section.

*Modeling Parameter: Source Characterization*

The state characterized the source within the area of analysis in accordance with the best practices outlined in the Modeling TAD. Specifically, the state used actual stack heights in conjunction with actual emissions for Independence station. The state also correctly characterized the source's building layout and location, as well as the stack parameters, e.g., exit temperature, exit velocity, location, and diameter. Where appropriate, the AERMOD component BPIPPRIME was used to assist in addressing building downwash.

*Modeling Parameter: Emissions*

The EPA's Modeling TAD notes that for the purposes of modeling to characterize air quality for use in designations, the recommended approach is to use the most recent 3 years of actual emissions data and concurrent meteorological data. However, the TAD does provide for the flexibility of using allowable emissions in the form of the most recently permitted, (referred to as PTE or allowable) emissions rate.

The EPA believes that continuous emissions monitoring systems (CEMS) data provide acceptable historical emissions information when it is available, and that these data are available for many electric generating units. In the absence of CEMS data, the EPA's Modeling TAD highly encourages the use of AERMOD's hourly varying emissions keyword HOUREMIS, or using AERMOD's variable emissions factors keyword EMISFACT. When choosing one of these methods, the EPA believes that detailed throughput, operating schedules, and emissions information from the impacted source(s) should be used.

In certain instances, states and other interested parties may find that it is more advantageous or simpler to use PTE rates as part of their modeling runs. Specifically, a facility may have recently adopted a new federally enforceable emissions limit, been subject to a federally enforceable consent decree, or implemented other federally enforceable mechanisms and control technologies to limit $SO_2$ emissions to a level that indicates compliance with the NAAQS. These new limits or conditions may be used in the application of AERMOD. In these cases, the Modeling TAD notes that the existing $SO_2$ emissions inventories used for permitting or SIP planning demonstrations should contain the necessary emissions information for designations-related modeling. In the event that these short-term emissions are not readily available, they may be calculated using the methodology in Table 8-1 of Appendix W to 40 CFR Part 51 titled, "Guideline on Air Quality Models."

The state did not include any additional off-site emitters of $SO_2$ in its modeling analysis. As shown in Figure 1, Future Fuels is located approximately 11.5 km northwest of Independence station, within the area of analysis included in the modeled receptor grid. Future Fuels emitted 3,421 tpy $SO_2$ in 2012. The area of analysis and its associated annual actual $SO_2$ emissions between 2012 and 2014 are summarized below.

Table 1: Actual $SO_2$ Emissions 2012 – 2014 in the Independence County Area of Analysis

| Company ID | Facility Name | $SO_2$ Emissions tpy | | |
| --- | --- | --- | --- | --- |
| | | 2012 | 2013 | 2014 |
| Entergy | Independence Steam Electric Station | 32,974 | 28,854 | 30,029 |

Table 2: Modeled Stack Parameters for Sources in Area of Analysis

| Description | Model Source | Stack Height | | Exit Temperature | | Exit Velocity | | Stack Diameter | |
|---|---|---|---|---|---|---|---|---|---|
| | | (ft) | (m) | (F) | (K) | (ft/sec) | (m/s) | (ft.) | (m) |
| Unit 1 Boiler[c] | SN01 | 1000 | 304.80 | --- | --- | --- | --- | 25.7 | 7.83 |
| Unit 2 Boiler[c] | SN02 | 1000 | 304.80 | --- | --- | --- | --- | 25.7 | 7.83 |
| Auxiliary Boiler | SN05 | 15 | 4.57 | 475 | 519.26 | 65.0 | 19.81 | 3.0 | 0.91 |
| Emergency Diesel Engine | SN20 | 14 | 4.27 | 963 | 790.54 | --- | 0.001[a] | 0.8 | 0.25 |
| Emergency Fire Pump | SN22 | 14 | 4.27 | 700 | 644.26 | --- | 0.001[a] | 0.4 | 0.13 |

For Independence station, the state used actual emissions from the most recent 3-year data set, i.e., 2012 – 2014. CEMS data was used to generate hourly emissions files for the affected sources.

There are two boilers in operation at the Independence station, Unit 1 and Unit 2. Units 1 and 2 are vented to a common, dual-flue stack. For these main units, three years (2012-2014) of actual hourly emissions, stack temperature, and exhaust flow rate data were input into the model. This emissions data was provided by Entergy from prior submittals to the EPA's Clean Air Markets Database, while temperature and exhaust flow rates were provided by Entergy from the facility CEM system. As per the Modeling TAD, the actual 1000 ft. height of the main stack was represented in each case. The two Units at the facility were modeled as separate sources, each emitting from their own flue. This is a conservative representation because it neglects potentially enhanced buoyancy from a combined plume from both flues.

The auxiliary boiler was also modeled using actual hourly emissions data. For this source, however, exhaust temperature and velocity were not available, so for all hours the exit temperature and velocity were set to the values located in the ADEQ source registration tables for the auxiliary boiler.

The two emergency engines at the facility both have horizontal exhaust releases. This is represented in the modeling by setting the exit velocity of each source to 0.001 m/s to simulate the lack of vertical momentum out of the stack. Emissions data were only available on a month by month total emission basis for each engine. To convert that data into an emission rate for modeling, for each engine the total annual emissions for each year was determined and the highest annual total selected. That total was then divided by 52 to represent that the engines are tested once per week during the year. The resulting emission rate was then used as the lb/hr emission rate in the modeling. Based on information provided by facility staff, the emergency generator is tested weekly on Wednesdays, while the fire pump is tested on Friday evenings. To simulate this standard practice, the emergency generator was set in the modeling using the HRDOW7 emission factor (i.e., variable by hour of day and 7 days per week) to emit during an 8 hour period on Wednesdays from 8 AM to 4 PM, and the fire pump was set to operate on Friday's from 4 PM until Midnight. While this tends to overestimate the total emissions of the emergency engines, because the form of the 1-hour $SO_2$ standard only considers the hour with the highest concentration each day, at least 7 of these hours are "dropped" and thus only one

25

hour worth of emission is potentially included in the maximum daily impacts. We note that if these two emergency engines are operated less than an hour per week that it is likely conservative to add these sources in the modeling as it is unlikely they would impact the maximum modeled values if modeled with a temporally varying emission file.

*Modeling Parameter: Meteorology and Surface Characteristics*

The most recent 3 years of meteorological data (concurrent with the most recent 3 years of emissions data) should be used in designations efforts. As noted in the Modeling TAD, the selection of data should be based on spatial and climatological (temporal) representativeness. The representativeness of the data are based on: 1) the proximity of the meteorological monitoring site to the area under consideration, 2) the complexity of terrain, 3) the exposure of the meteorological site, and 4) the period of time during which data are collected. Sources of meteorological data include National Weather Service (NWS) stations, site-specific or onsite data, and other sources such as universities, Federal Aviation Administration (FAA), and military stations.

Guidance for regulatory air quality modeling recommends the use of one year of on-site meteorological data or five years of representative off-site meteorological data. The $SO_2$ Modeling TAD however, specifies that 3 years of meteorological data concurrent to the actual emissions data being input into the model be used. Since on-site data are not available for the Independence station, meteorological data available from the National Weather Service (NWS) were used in this analysis.

Three years (2012-2014) of surface observations from the NWS tower at Adams Field Airport in Little Rock, Arkansas (WBAN No. 13963) and concurrent upper air data from North Little Rock Municipal Airport in North Little Rock, Arkansas (WBAN No. 03952) were processed with the most recent version of AERMET (v.15181) the meteorological preprocessor for AERMOD, along with the two pre-processors to AERMET: AERSURFACE (v.13016) and AERMINUTE (v.14337). AERMET was applied to create the two meteorological data files required for input to AERMOD.

AERMET requires specification of site characteristics including surface roughness (zo), albedo (r), and Bowen ratio (Bo). These parameters were developed according to the guidance provided by EPA in the AERMOD Implementation Guide (AIG) (EPA, 2008a) using AERSURFACE. The area within 1 km of the meteorological tower at Adams Field was broken into 12 sectors of 30 degrees each to analyze the surface characteristics in each 30 degree arc around the tower. AERMET uses the surface characteristics in the sector from which the wind approaches the tower as part of the meteorological data processing for each hour.

In AERSURFACE, the various land cover categories are linked to a set of seasonal surface characteristics. As such, AERSURFACE requires specification of the seasonal category for each month of the year. The following five seasonal categories are offered by AERSURFACE:
1. Midsummer with lush vegetation;
2. Autumn with unharvested cropland;
3. Late autumn after frost and harvest, or winter with no snow;

26

4. Winter with continuous snow on ground; and

5. Transitional spring with partial green coverage (short annuals).

The AERSURFACE run was performed using the seasonal temporal resolution option. The default seasonal distribution was used: December, January, and February were categorized as winter with no snow, March, April, and May as spring, June, July, and August as summer, and September, October, and November as fall. The precipitation was averaged over the 3-year period.

Additionally, 1-minute ASOS wind data, collected at the Adams Field meteorological tower, were processed using the AERMINUTE pre-processor for AERMET. Figure 3 shows the 3-year wind rose for Adams Field; Figure 4 shows the relative location of Adams Field and Independence station; and the data characteristics of Adams Field are shown in Table 3.

The 3-year surface wind rose for Little Rock, Adam's Field, is depicted in Figure 3. In this figure, the frequency and magnitude of wind speed and direction are defined in terms of where the wind is blowing from. The distance from Independence station is 80.1 miles and the average wind speed is 3.42 m/s.

27

Figure 3: Little Rock-Adams Field Cumulative Annual Wind Rose for Years 2012 – 2014



Figure 4: Meteorology Tower Location



Table 3:  Characteristics of Adams Field Met Station

| Distance from White Bluff Station | 21.7 miles |
|---|---|
| Average Wind Speed | 3.42 m/s |
| Percent Calm Hours | 1.10% |
| Data Completeness | 99.95% |

*Modeling Parameter: Geography and Terrain*

Terrain elevations from National Elevation Data ("NED") from USGS were processed using the most recent version of AERMAP (v.11103) to develop the receptor terrain elevations required by

29

AERMOD. NED data files contain profiles of terrain elevations, which in conjunction with receptor locations are used to generate receptor height scales. The height scale is the terrain elevation in the vicinity of a receptor that has the greatest influence on dispersion at that location and is used for model computations in complex terrain areas.

*Modeling Parameter: Background Concentrations of $SO_2$*

The Modeling TAD offers two mechanisms for characterizing background concentrations of $SO_2$ that are ultimately added to the modeled design values: 1) a "first tier" approach, based on monitored design values, or 2) a temporally varying approach, based on the 99th percentile monitored concentrations by hour of day and season or month. For the Independence County area of analysis, the state chose background concentrations based on the most recent complete years of available monitoring data. A review of the data showed that the most representative monitor for use in the modeling is located in Little Rock (Monitor ID# 05-119-0007). EPA's Modeling TAD and other guidance allows for a temporally varying approach, based on the 99th percentile monitored concentrations by hour of day and season or month. The modeling was performed with a set of seasonal diurnal values developed using the methodology described in the EPA's March 1, 2011 Clarification Memorandum titled, "Additional Clarification Regarding Application of Appendix W Modeling Guidance for the 1-hour $NO_2$ National Ambient Air Quality Standard." While this memorandum nominally addresses $NO_2$, the document and its recommended approaches also apply to the 1-hour $SO_2$ NAAQS.[4]

---

[4] See http://www3.epa.gov/scram001/guidance/clarification/Additional_Clarifications_AppendixW_Hourly-NO2-NAAQS_FINAL_03-01-2011.pdf, p 19 - 20

Table 4: Background Seasonal Diurnal $SO_2$ values for the Area of Analysis

| Hour[1] | Winter | Spring | Summer | Fall |
|---|---|---|---|---|
| 1 | 6.89 | 5.67 | 4.80 | 5.50 |
| 2 | 7.85 | 5.32 | 4.28 | 6.19 |
| 3 | 7.33 | 6.19 | 4.45 | 6.02 |
| 4 | 6.89 | 5.76 | 4.19 | 4.71 |
| 5 | 8.55 | 4.97 | 4.19 | 5.15 |
| 6 | 9.60 | 4.80 | 5.41 | 5.85 |
| 7 | 9.60 | 6.28 | 5.50 | 6.63 |
| 8 | 8.69 | 5.24 | 6.11 | 6.54 |
| 9 | 7.50 | 6.46 | 7.88 | 7.85 |
| 10 | 8.38 | 8.20 | 7.42 | 9.07 |
| 11 | 9.15 | 8.46 | 9.95 | 8.20 |
| 12 | 10.73 | 15.09 | 10.58 | 9.34 |
| 13 | 9.69 | 11.08 | 10.91 | 11.17 |
| 14 | 10.56 | 9.34 | 9.86 | 9.51 |
| 15 | 10.03 | 8.20 | 13.18 | 9.95 |
| 16 | 9.42 | 7.94 | 9.34 | 10.47 |
| 17 | 7.15 | 9.86 | 11.03 | 9.16 |
| 18 | 7.50 | 7.42 | 9.69 | 7.24 |
| 19 | 9.25 | 6.37 | 9.86 | 6.98 |
| 20 | 12.30 | 6.54 | 8.73 | 5.93 |
| 21 | 9.07 | 6.02 | 6.19 | 6.28 |
| 22 | 6.11 | 8.99 | 5.76 | 5.67 |
| 23 | 6.46 | 7.07 | 5.67 | 5.85 |
| 24 | 7.24 | 6.81 | 5.41 | 6.11 |

1.  Hours in AERMOD are defined as hour-ending, i.e., Hour 1 is the period from midnight through 1 AM, etc.

*Summary of Modeling Results*

The AERMOD modeling parameters for the Independence County area of analysis are summarized below in Table 5:

Table 5: AERMOD Modeling Parameters for the Independence County Area of Analysis

| Independence County, Arkansas Area of Analysis | |
|---|---|
| AERMOD Version | 15181 |
| Dispersion Characteristics | Rural |
| Modeled Sources | 1 |
| Modeled Stacks | 5 |
| Modeled Structures | Yes |
| Modeled Fence Lines | Yes (see Figure 5) |
| Total receptors | Large Grid (20 km) |

31

| | |
|---|---|
| | 13,812 receptors |
| Emissions Type | Actual |
| Emissions Years | 2012-2014 |
| Meteorology Years | 2012-2014 |
| Surface Meteorology Station | Adams Field in Little Rock |
| Upper Air Meteorology Station | North Little Rock Airport |
| Methodology for Calculating Background $SO_2$ Concentration | Seasonal and Diurnal background Values Little Rock monitor |
| Calculated Background $SO_2$ Concentration | Seasonal Diurnal Values Used (See Table 5) |

The results presented below in Table 6 show the magnitude of the highest predicted modeled concentration based on actual emissions.

Table 6: 2012 – 2014 Max Predicted 99th Percentile 1-Hour $SO_2$ Concentration in the Independence County Area of Analysis based on Actual Emissions

| Source | Independence Only | Independence and Background | 1-hr. $SO_2$ NAAQS | Below NAAQS? |
|---|---|---|---|---|
| Independence Station | 122.2 | 131.3 | 196.5 | Yes |

Figure 5: Independence Steam Electric Station Modeled Fence Lines



The state's modeling indicates that the predicted 99th percentile 1-hour average concentration within the chosen modeling domain is 131.3 μg/m$^3$, or 50.16 ppb. The modeled concentration is based on actual emissions from the facility and included the background concentration of $SO_2$.

33

Figure 6: Independence Modeled Impacts



**Jurisdictional Boundaries:**

Once the geographic area of analysis associated with the Independence station and background is determined, existing jurisdictional boundaries are considered for the purpose of informing our intended unclassifiable area, specifically with respect to clearly defined legal boundaries.

34

There is one other emitter of $SO_2$, Future Fuels, located approximately 12 km to the northwest of Independence station. The state did not include this facility in its modeling analysis, and the EPA is not prepared at this time to fully assess the expected maximum impacts from Future Fuels when considered alone, or in tandem with Independence station. We are also not prepared to assume that the emissions are captured fully by the background estimate since a temporally varying approach was used. As discussed in additional modeling we have reviewed, Future Fuels has very large impacts in Independence County and it is necessary to include Future Fuels directly in the modeling because of the size of their impacts. According to the 2011 NEI, there are no other sources emitting at or above 100 tpy of $SO_2$ in Independence County, or in any neighboring county. As a result, we do not have reason to believe that sources in any neighboring county have the potential to cause or contribute to a violation of the NAAQS within Independence County. The EPA believes that our intended unclassifiable area, consisting of Independence County, Arkansas, is comprised of clearly defined legal boundaries, and we find these boundaries to be a suitably clear basis for defining our intended unclassifiable area.

Other Relevant Information:

Additional modeling for the Independence station was received from the Sierra Club on September 30, 2015. It showed impacts in excess of the 1-hour $SO_2$ NAAQS. The modeling included emissions from two main Independence station stacks and Future Fuels. The modeling analysis indicated that many receptors were above the standard, with a maximum $SO_2$ concentration of 586 $\mu g/m^3$ (224 ppb). In November 2015, ADEQ and Entergy (Independence station) submitted modeling to the EPA in response to Sierra Club's September 30, 2015 submission. The cumulative modeled emission results for Future Fuels were similar to those provided by Sierra Club. Both sets of modeling confirm that Future Fuels has exceedances, but there is disagreement on whether those exceedances actually contribute to the impacts from Independence station. Sierra Club reported that those exceedances contribute, whereas ADEQ and Entergy (Independence station) reported that they do not.

The EPA's review of the Sierra Club's modeling analysis identified areas that were either inconsistent with, or as not as refined as the Modeling TAD recommends. For example, Sierra Club did not include variable stack velocity and temperature for the Independence station stacks, and they utilized actual annualized emissions from the 2012 State Emissions Inventory to calculate Future Fuel's emission rate. The Independence station modeling report submitted in November 2015 followed the Modeling TAD more closely by including source apportionment. This analysis indicated that the contribution of emissions from Independence station compared to the modeled exceedances was not above the interim 1-hr $SO_2$ SIL. However, the emission rates used in the Independence station modeling were obtained from Sierra Club modeling, which were inconsistent with the Modeling TAD, specifically with respect to the emissions from Future Fuels. As a result, the EPA believes that the extent and temporal pattern of the potential modeled nonattainment due to Future Fuels has not been adequately characterized. Consequently, the EPA does not have sufficient information to accurately assess the potential contribution of Independence station from either set of modeling. The analysis and evaluation of the Independence facility impacts cannot be completed until the modeling inputs are refined to include Future Fuels' emissions in a manner that is consistent with the Modeling TAD.

Conclusion

After careful evaluation of the state's recommendation and supporting information, as well as all available relevant information, the EPA intends to designate the area around Independence station as unclassifiable for the 2010 $SO_2$ NAAQS. Specifically, the boundaries are comprised of all area within the Independence County borders. Our decision is based on the state's recommendation and modeling results provided by various parties.

The initial modeling provided by the state did not include emissions from sources near Independence station which may have an impact on air quality. Specifically, the state did not include emissions from Future Fuels. Sierra Club's modeling for the area around Independence station asserting violations of the NAAQS, which included emissions from Future Fuels, was premised on several factors that are inconsistent with the Modeling TAD. Lastly, while the state provided a response to Sierra Club's modeling, the EPA believes that without a comprehensive emissions profile for the area, including emissions from Future Fuels, air quality in the area has not been sufficiently characterized to inform an intended designation other than unclassifiable. The EPA notes that the state has submitted its list of sources that must be characterized under the $SO_2$ Data Requirements Rule,[5] and Future Fuels' inclusion on the list requires the state to characterize its emissions in accordance with all applicable regulatory requirements. Based on all available information, including the reasons discussed above, the EPA is unable at this time to determine whether the area is meeting or not meeting the NAAQS.

At this time, our intended designation for the state only applies to this area and the other area presented in this technical support document. Consistent with the conditions in the March 2, 2015 consent decree, the EPA will evaluate and designate all remaining undesignated areas in Arkansas by either December 31, 2017, or December 31, 2020.

---

[5] 80 FR 51052.

**Tab 143: Letter from Ron Curry, Regional Administrator, EPA Region 6 to Hon. Greg Abbott, Governor of Texas (Feb. 11, 2016)**



Office of the Regional Administrator

February 11, 2016

Case: 21-60673   Document: 65-1   Page: 176   Date Filed: 03/30/2022

The Honorable Greg Abbott
Governor of Texas
Post Office Box 12428
Austin, Texas  78711

Dear Governor Abbott:

Thank you for your recommendations dated September 18, 2015, on air quality designations for the state of Texas for the 2010 revision to the primary National Ambient Air Quality Standard (NAAQS) for sulfur dioxide ($SO_2$). Reducing levels of $SO_2$ pollution is an important part of the U.S. Environmental Protection Agency's commitment to a clean, healthy environment. Exposure to $SO_2$ can cause a range of adverse health effects, including narrowing of the airways which can cause difficulty breathing and increased asthma symptoms. This letter is to notify you of the EPA's preliminary intentions regarding your recommended designations.

On June 3, 2010, the EPA strengthened the health-based or "primary" standard for $SO_2$ by establishing a standard for 1-hour average $SO_2$ concentrations at a level of 75 parts per billion. Within one year after a new or revised standard is established, the Clean Air Act requires the Governor of each state to submit to the EPA a list of all areas in the state, with recommendations for whether each area meets the standard. Through an interactive process, the EPA considers the recommendations and then promulgates designations for all areas across the country. On July 25, 2013, the EPA designated 29 areas in 16 states as nonattainment, but did not at that time designate other areas. Pursuant to a March 2, 2015, court-ordered schedule,[1] the EPA must complete the remaining $SO_2$ designations by three specific deadlines: July 2, 2016, December 31, 2017, and December 31, 2020.

This current round of designations, to be completed by July 2, 2016, addresses two groups of areas: (1) areas that have newly monitored violations of the 2010 $SO_2$ NAAQS based on the most recent three calendar years of certified monitored ambient air quality data, and (2) areas that contain any stationary source that had not been announced as of March 2, 2015, for retirement and that according to the EPA's Air Markets Database emitted in 2012 either (i) more than 16,000 tons of $SO_2$ or (ii) more than 2,600 tons of $SO_2$ with an annual average emission rate of at least 0.45 pounds of $SO_2$/mmBTU.

After carefully considering Texas' recommendations and other available technical information, the EPA intends to designate as nonattainment or unclassifiable/attainment the following areas, including the following counties or portions of counties:

---

[1] *Sierra Club v. McCarthy*, No. 3-13-cv-3953 (SI) (N.D. Cal. Mar. 2, 2015).

This paper is printed with vegetable-oil-based inks and is 100-percent postconsumer recycled material, chlorine-free-processed and recyclable

| Intended Nonattainment Area | Intended Nonattainment Counties |
|---|---|
| Freestone-Anderson Counties, Texas (parts of)* | Freestone County (p) and Anderson County (p) |
| Rusk-Gregg-Panola Counties, Texas (parts of)* | Rusk County (p), Gregg County (p), and Panola County (p) |
| Titus County, Texas (part)* | Titus County (p) |
| | (p) indicates portion of county |

| Intended Unclassifiable/Attainment Area | Intended Unclassifiable/Attainment Area Counties |
|---|---|
| Atascosa County, Texas | Atascosa County |
| Goliad County, Texas | Goliad County |
| Lamb County, Texas | Lamb County |
| Limestone County, Texas | Limestone County |
| Robertson County, Texas | Robertson County |

The asterisk (*) indicates the designation and boundary for the intended nonattainment areas represents a modification to the designation and boundary that you have recommended.

Because the EPA has insufficient information to determine whether the following areas are meeting or not meeting the $SO_2$ NAAQS, the EPA intends to designate these areas as unclassifiable:

| Intended Unclassifiable Area | Intended Unclassifiable Counties |
|---|---|
| McLennan County, Texas* | McLennan County |
| Milam County, Texas* | Milam County |
| Potter County, Texas* | Potter County |
| Fort Bend County, Texas* | Fort Bend County |

The asterisk (*) indicates the designation for these intended unclassifiable areas represents a modification to the designation that you have recommended.

As noted above, we intend to designate Fort Bend County as unclassifiable. On January 25, 2016, the EPA received a revised modeling submittal from industry for the area surrounding the W.A. Parish Electric Generating Station located in Fort Bend County, Texas. The EPA's review of this latest modeling is currently underway. Due to the date of receipt of the latest modeling from industry relative

to our scheduled timeline for proposing designations in order to meet the court-ordered deadline, we have not had sufficient time to thoroughly review the January 25, 2016 submittal to determine if the modeling is sufficient to support a designation of unclassifiable/attainment. The EPA will continue our review of industry's January 25, 2016 submittal and will take it into consideration in our final designation for the area around W.A. Parish Electric Generating Station.

The enclosed Technical Support Document provides a detailed analysis that supports our intended designation decisions. If your state has additional information that the EPA should consider prior to finalizing these designations, please submit it to us by April 19, 2016. We also will be publishing a notice in the *Federal Register* announcing a 30-day period for the public to provide input on the EPA's intended designation decisions. We will promulgate the designations for these areas by July 2, 2016. We will designate all other previously undesignated areas in the state on a schedule consistent with the prescribed timing of the court order, i.e., by December 31, 2017, or December 31, 2020.

We look forward to a continued dialogue with you and your staff as we work together to complete the area designations and implement the 2010 primary $SO_2$ standard. For additional information regarding designations under the $SO_2$ standard, please visit our website at *www.epa.gov/so2designations*. Should you have any questions, please do not hesitate to call me, or have your staff contact Mr. Guy Donaldson of my staff at (214) 665-7242, or via email at Donaldson.guy@epa.gov.

Sincerely,

Ron Curry,
Regional Administrator

Enclosure

cc: Richard A. Hyde, P.E.
    Executive Director, Texas Commission on Environmental Quality

    Steve Hagle, P.E.
    Deputy Director, Office of Air, Texas Commission on Environmental Quality

No. 17-60088

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY L.L.C.; BIG BROWN POWER COMPANY L.L.C.; SANDOW POWER COMPANY L.L.C.; LUMINANT MINING COMPANY L.L.C.,**
                                                    Petitioners

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, in His Official Capacity as Administrator of the United States Environmental Protection Agency,**
                                                    Respondents

Consolidated with

No. 21-60673

**STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; LUMINANT MINING COMPANY, L.L.C.,**
                                                    Petitioners

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,**
                                                    Respondents

**On Petition for Review of Final Agency Actions of the United States Environmental Protection Agency**

**Rule 30.2(a) Appendix – Volume Two of Eight (Tabs 144 - 152)**

KEN PAXTON
Attorney General of Texas
BRENT WEBSTER
First Assistant Attorney General
GRANT DORFMAN
Deputy First Assistant Attorney General
SHAWN COWLES
Deputy Attorney General for Civil
Litigation
PRISCILLA M. HUBENAK
Chief, Environmental Protection Division

**March 30, 2022**

LINDA B. SECORD
Assistant Attorney General
Linda.Secord@oag.texas.gov
JOHN R. HULME
Assistant Attorney General
John.Hulme@oag.texas.gov
OFFICE OF THE ATTORNEY
GENERAL OF TEXAS
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
512-463-2012 (phone)
*Counsel for the State of Texas and Texas*
*Commission on Environmental Quality*

# **TABLE OF CONTENTS**
## **Volume Two of Eight***

Tab

Texas Technical Support Document for the EPA's Intended Designations ................... 144

Draft Technical Support Document for Nebraska Area Designations for the
    National Area Designations for the 2010 SO2 Primary National Ambient
    Air Quality Standard......................................................................................... 152

*(See other volumes for additional appendix documents)*

---

\* Consistent with how the record material was cited in the briefs, appendix tab numbers correspond to the final four digits (minus leading zeros) of "Document ID" numbers on the certified index of record contents.

## **CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this appendix, which includes Volumes One through Eight, via the Court's CM/ECF system on this 30th day of March, 2022. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Trend Micro and is free of viruses.

s/ P. Stephen Gidiere III

*Counsel for Luminant Petitioners*

**Tab 144: Texas Technical Support Document for the EPA's Intended Designations**

Technical Support Document
Texas
Area Designations for the 2010 SO₂ Primary National Ambient Air Quality Standard

### Summary

Pursuant to section 107(d) of the Clean Air Act (CAA), the U.S. Environmental Protection Agency (EPA) must designate areas as either "unclassifiable," "attainment," or "nonattainment" for the 2010 one-hour sulfur dioxide ($SO_2$) primary national ambient air quality standard (NAAQS). The CAA defines a nonattainment area as one that does not meet the NAAQS or that contributes to a violation in a nearby area. An attainment area is defined as any area other than a nonattainment area that meets the NAAQS. Unclassifiable areas are defined as those that cannot be classified on the basis of available information as meeting or not meeting the NAAQS.

Texas submitted updated recommendations on September 18, 2015, ahead of a July 2, 2016, deadline for the EPA to designate certain areas established by the U.S. District Court for the Northern District of California. This deadline is the first of three deadlines established by the court for the EPA to complete area designations for the 2010 $SO_2$ NAAQS. Table 1 below lists Texas's recommendations and identifies the counties or portions of counties in Texas that the EPA intends to designate by July 2, 2016 based on an assessment and characterization of air quality through ambient air quality data, air dispersion modeling, other evidence and supporting information, or a combination of the above.

Table 1: Texas' Recommended and EPA's Intended Designations

| Area | Texas' Recommended Area Definition | Texas' Recommended Designation | EPA's Intended Area Definition | EPA's Intended Designation |
|------|-----------------------------------|-------------------------------|-------------------------------|---------------------------|
| Atascosa County, Texas | Atascosa County | Unclassifiable/ Attainment | Same as State's Recommendation | Unclassifiable/ Attainment |
| Fort Bend County, Texas | Fort Bend County | Unclassifiable/ Attainment | Same as State's Recommendation | Unclassifiable |
| Freestone-Anderson Counties, Texas | Freestone County | Unclassifiable/ Attainment | Portions of Freestone and Anderson Counties.<br><br>The area bound by the following UTM coordinates* (NAD 83 Datum, UTM Zone 14):<br>  X        Y<br>762752, 3540333<br>762752, 3510333<br>789753, 3510333<br>789753, 3540333 | Nonattainment |

| | | | *EXCLUDING portions of Navarro County that fall within this UTM-based boundary. | |
|---|---|---|---|---|
| Goliad County, Texas | Goliad County | Unclassifiable/ Attainment | Same as State's Recommendation | Unclassifiable/ Attainment |
| Lamb County, Texas | Lamb County | Unclassifiable/ Attainment | Same as State's Recommendation | Unclassifiable/ Attainment |
| Limestone County, Texas | Limestone County | Unclassifiable/ Attainment | Same as State's Recommendation | Unclassifiable/ Attainment |
| McLennan County, Texas | McLennan County | Attainment | Same as State's Recommendation | Unclassifiable |
| Milam County, Texas | Milam County | Unclassifiable/ Attainment | Same as State's Recommendation | Unclassifiable |
| Potter County, Texas | Potter County | Unclassifiable | Same as State's Recommendation | Unclassifiable |
| Robertson County, Texas | Robertson County | Unclassifiable/ Attainment | Same as State's Recommendation | Unclassifiable/ Attainment |
| Rusk-Gregg-Panola Counties, Texas | Rusk County | Unclassifiable/ Attainment | Portions of Rusk, Gregg, and Panola Counties.<br><br>The area bounded by the following UTM coordinates* (NAD 83 Datum, UTM Zone 15):<br>    X          Y<br>336067, 3585315<br>336067, 3558314<br>361568, 3558314<br>361568, 3585315<br>* EXCLUDING the portion of Harrison County that fall within this UTM-based boundary. | Nonattainment |

2

| | | Unclassifiable/ Attainment | Portions of Titus County.<br><br>The area bounded by the following UTM Coordinates* (NAD 83 Datum, UTM Zone 15):<br>   X       Y<br>302329, 3666971<br>302329, 3660770<br>313530, 3660770<br>313530, 3666971<br>* EXCLUDING portions of Camp County, Texas that fall within this UTM-based boundary. | Nonattainment |
|---|---|---|---|---|
| Titus County, Texas | Titus County | | | |

## Background

On June 3, 2010, the EPA revised the primary (health based) $SO_2$ NAAQS by establishing a new one-hour standard at a level of 75 parts per billion (ppb) which is attained when the three-year average of the 99th percentile of one-hour daily maximum concentrations does not exceed 75 ppb. This NAAQS was published in the Federal Register on June 22, 2010 (75 FR 35520) and is codified at 40 CFR 50.17. The EPA determined this is the level necessary to protect public health with an adequate margin of safety, especially for children, the elderly and those with asthma. These groups are particularly susceptible to the health effects associated with breathing $SO_2$. The two prior primary standards of 140 ppb evaluated over 24 hours, and 30 ppb evaluated over an entire year, codified at 40 CFR 50.4, remain applicable.[1] However, the EPA is not currently designating areas on the basis of either of these two primary standards. Similarly, the secondary standard for $SO_2$, set at 500 ppb evaluated over 3 hours has not been revised, and the EPA is also not currently designating areas on the basis of the secondary standard.

## General Approach and Schedule

Section 107(d) of the Clean Air Act requires that not later than one year after promulgation of a new or revised NAAQS, state governors must submit their recommendations for designations and boundaries to EPA. Section 107(d) also requires the EPA to provide notification to states no less than 120 days prior to promulgating an initial area designation that is a modification of a state's recommendation. If a state does not submit designation recommendations, the EPA will promulgate the designations that it deems

---

[1] 40 CFR 50.4(e) provides that the two prior primary NAAQS will no longer apply to an area one year after its designation under the 2010 NAAQS, except that for areas designated nonattainment under the prior NAAQS as of August 22, 2010, and areas not meeting the requirements of a SIP Call under the prior NAAQS, the prior NAAQS will apply until that area submits and EPA approves a SIP providing for attainment of the 2010 NAAQS. There are no currently designated nonattainment areas in Texas under the previous $SO_2$ NAAQS, and no part of the state is subject to a SIP Call under the prior NAAQS.

appropriate. If a state or tribe disagrees with the EPA's intended designations, they are given an opportunity within the 120 day period to demonstrate why any proposed modification is inappropriate.

On August 5, 2013, the EPA published a final rule establishing air quality designations for 29 areas in the United States for the 2010 $SO_2$ NAAQS, based on recorded air quality monitoring data from 2009 - 2011 showing violations of the NAAQS (78 FR 47191). In that rulemaking, the EPA committed to address, in separate future actions, the designations for all other areas for which the Agency was not yet prepared to issue designations.

Following the initial August 5, 2013 designations, three lawsuits were filed against the EPA in different U.S. District Courts, alleging the agency had failed to perform a nondiscretionary duty under the CAA by not designating all portions of the country by the June 2013 deadline. In an effort intended to resolve the litigation in one of those cases, plaintiffs Sierra Club and the Natural Resources Defense Council and the EPA filed a proposed consent decree with the U.S. District Court for the Northern District of California. On March 2, 2015, the court entered the consent decree and issued an enforceable order for the EPA to complete the area designations according to the consent decree schedule.

According to the consent decree, the EPA must complete the remaining designations on a schedule that contains three specific deadlines. By no later than July 2, 2016 (16 months from the court's order), the EPA must designate two groups of areas: (1) areas that have newly monitored violations of the 2010 $SO_2$ NAAQS and (2) areas that contain any stationary sources that had not been announced as of March 2, 2015 for retirement and that according to the EPA's Air Markets Database emitted in 2012 either (i) more than 16,000 tons of $SO_2$ or (ii) more than 2,600 tons of $SO_2$ with an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU). Specifically, a stationary source with a coal-fired unit that as of January 1, 2010 had a capacity of over 5 megawatts and otherwise meets the emissions criteria, is excluded from the July 2, 2016 deadline if it had announced through a company public announcement, public utilities commission filing, consent decree, public legal settlement, final state or federal permit filing, or other similar means of communication, by March 2, 2015, that it will cease burning coal at that unit.

The last two deadlines for completing remaining designations are December 31, 2017, and December 31, 2020. The EPA has separately promulgated requirements for states and other air agencies to provide additional monitoring or modeling information on a timetable consistent with these designation deadlines. We expect this information to become available in time to help inform these subsequent designations. These requirements were promulgated on August 21, 2015 (80 FR 51052), in a rule known as the $SO_2$ Data Requirements Rule (DRR).

Updated designations guidance was issued by the EPA through a March 20, 2015 memorandum from Stephen D. Page, Director, U.S. EPA, Office of Air Quality Planning and Standards, to Air Division Directors, U.S. EPA Regions I-X. This memorandum supersedes earlier designation guidance for the 2010 $SO_2$ NAAQS, issued on March 24, 2011, and it identifies factors that the EPA intends to evaluate in determining whether areas are in violation of the 2010 $SO_2$ NAAQS. The guidance also contains the factors the EPA intends to evaluate in determining the boundaries for all remaining areas in the country, consistent with the court's order and schedule. These factors include: 1) Air quality characterization via ambient monitoring or dispersion modeling results; 2) Emissions-related data; 3) Meteorology; 4) Geography and topography; and 5) Jurisdictional boundaries. This guidance was supplemented by two

4

technical assistance documents intended to assist states and other interested parties in their efforts to characterize air quality through air dispersion modeling or ambient air quality monitoring for sources that emit $SO_2$. Notably, the EPA released its most recent versions of documents titled, "$SO_2$ NAAQS Designations Modeling Technical Assistance Document" (Modeling TAD) and "$SO_2$ NAAQS Designations Source-Oriented Monitoring Technical Assistance Document" (Monitoring TAD) in December 2013.

Based on ambient air quality data collected between 2012 and 2014, no monitored violations of the 2010 $SO_2$ NAAQS have been recorded in any undesignated part of Texas.[2] However, there are twelve sources in the state meeting the emissions criteria of the consent decree for which the EPA must complete designations by July 2, 2016. In this draft technical support document, the EPA discusses its review and technical analysis of Texas's recommendations for the areas that we must designate. The EPA also discusses any intended modification from the state's recommendation based on all available data before us.

The following are definitions of important terms used in this document:

1) 2010 $SO_2$ NAAQS – The primary NAAQS for $SO_2$ promulgated in 2010. This NAAQS is 75 ppb, based on the three year average of the 99th percentile of the annual distribution of daily maximum one-hour average concentrations. See 40 CFR 50.17.

2) Design Value - a statistic computed according to the data handling procedures of the NAAQS (in 40 CFR part 50 Appendix T) that, by comparison to the level of the NAAQS, indicates whether the area is violating the NAAQS.

3) Designated nonattainment area – an area which the EPA has determined has violated the 2010 $SO_2$ NAAQS or contributed to a violation in a nearby area. A nonattainment designation would reflect considerations of state recommendations and all of the information discussed in this document. The EPA's decision would be based on all available information including the most recent 3 years of air quality monitoring data, available modeling analysis, and any other relevant information.

4) Designated unclassifiable area – an area which the EPA cannot determine based on all available information whether or not it meets the 2010 $SO_2$ NAAQS.

5) Designated unclassifiable/attainment area – an area which the EPA has determined to have sufficient evidence to find either is attaining or is likely to be attaining the NAAQS. The EPA's decision would be based on all available information including the most recent 3 years of air quality monitoring data, available modeling analysis, and any other relevant information.

6) Modeled violation – a violation based on air dispersion modeling.

7) Recommended attainment area – an area a state or tribe has recommended that the EPA designate as attainment.

---

[2] For designations based on ambient air quality monitoring data that violates the 2010 $SO_2$ NAAQS, the consent decree directs the EPA to evaluate data collected between 2013 and 2015. Absent complete, quality assured and certified data for 2015, the analyses of applicable areas for the EPA's intended designations will be informed by data collected between 2012 and 2014. States with monitors that have recorded a violation of the 2010 $SO_2$ NAAQS during these years have the option of submitting complete, quality assured and certified data for calendar year 2015 by April 19, 2016 to the EPA for evaluation. If after our review, the ambient air quality data for the area indicates that no violation of the NAAQS occurred between 2013 and 2015, the consent decree does not obligate the EPA to complete the designation. Instead, we may designate the area and all other previously undesignated areas in the state on a schedule consistent with the prescribed timing of the consent decree, i.e., by December 31, 2017, or December 31, 2020.

8) Recommended nonattainment area – an area a state or tribe has recommended that the EPA designate as nonattainment.

9) Recommended unclassifiable area – an area a state or tribe has recommended that the EPA designate as unclassifiable.

10) Recommended unclassifiable/attainment area – an area a state or tribe has recommended that the EPA designate as unclassifiable/attainment.

11) Violating monitor – an ambient air monitor meeting all methods, quality assurance and siting criteria and requirements whose valid design value exceeds 75 ppb, based on data analysis conducted in accordance with Appendix T of 40 CFR part 50.

6

**Technical Analysis for the Coleto Creek Power Station in Goliad County, Texas**

<u>Introduction</u>

The Goliad County, Texas area contains a stationary source that according to the EPA's Air Markets Database emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU). As of March 2, 2015, this stationary source had not met the specific requirements for being "announced for retirement." Specifically, in 2012, the Coleto Creek Power Station (Coleto Creek station) emitted 16,218 tons of $SO_2$, and had an emissions rate of 0.615 lbs $SO_2$/mmBTU. Pursuant to the March 2, 2015 consent decree, the EPA must designate the area surrounding the facility by July 2, 2016.

In its submission, Texas recommended that the area surrounding the Coleto Creek station, specifically the entirety of Goliad County, be designated as unclassifiable/attainment based on an assessment and characterization of air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. The state's assessment and characterization were performed following the notion that any areas without appropriately cited and qualified monitors should be considered unclassifiable or attainment based on lack of evidence that a violation of the NAAQS has occurred and the results of air dispersion modeling software, i.e., AERMOD, analyzing actual emissions. After careful review of the state's assessment, supporting documentation, and all available data, the EPA agrees that the area is attaining the standard, and intends to designate Goliad County as unclassifiable/attainment. The EPA did receive additional modeling information from industry for the area surrounding Coleto Creek Power Station, as discussed in the "Other Relevant Information" section of this document. While the industry modeling is also supportive of an unclassifiable/attainment designation, our intended designation for Goliad County is based on the modeling submitted by the state on the basis that this analysis was more consistent with current EPA modeling guidance, including the Modeling TAD.

The Coleto Creek station is located in southern Texas in the eastern portion of Goliad County. As seen in Figure 1 below, the facility is located approximately 24 km southwest of Victoria, Texas. The station is located near the Coleto Creek Reservoir. Figure 1 also shows the Goliad County boundary, which is the state's and EPA's recommended area for the unclassifiable/attainment designation. Figure 2 below shows Coleto Creek station and other nearby, large emitters of $SO_2$.

7

Figure 1. The EPA's intended designation for
Coleto Creek Power Station



Figure 2:  Coleto Creek Power Station and Nearby Large SO₂ Emitters



The discussion and analysis that follows below will reference the state's use of the Modeling TAD, the EPA's assessment of the state's modeling in accordance with the Modeling TAD, and the factors for evaluation contained in the EPA's March 20, 2015 guidance, as appropriate.

Detailed Assessment

*Air Quality Data*

This factor considers the SO₂ air quality monitoring data in the area surrounding Coleto Creek station. The facility is located in Goliad County; however, there are no ambient air quality monitors located in this county. The table below shows information related to the monitors located closest to the site. The design values were confirmed through the EPA's 2014 design value report for SO₂.[3] While the monitored data is instructive, the distance of the monitors from Coleto Creek station likely limits its value in this analysis and cannot be considered representative of the area around Coleto Creek station for

---

[3] The design value report for SO₂, as well as each of the other NAAQS, can be found at this link: http://www3.epa.gov/airtrends/values.html

designations purposes. More specifically, the absence of a violating monitor when considering the distance from the facility is not a sufficient technical justification to rule out that an exceedance of the 2010 $SO_2$ NAAQS may occur in the immediate vicinity of the facility.

Table 1: Available Air Quality Data for the Area Closest to the Coleto Creek Power Station

| County | Air Quality Systems (AQS) Monitor ID | Monitor Location | Distance to Coleto Creek station (km) | 2012 – 2014 $SO_2$ Design Value (ppb) |
|--------|--------------------------------------|------------------|---------------------------------------|---------------------------------------|
| Nueces | 48-355-0026 | Corpus Christi Tuloso | 103.5 | 4 |
| Nueces | 48-355-0032 | Corpus Christi Huisache | 103.0 | 7 |
| Nueces | 48-355-0025 | Corpus Christi West | 107.7 | 0 |

*Model Selection and Modeling Components*

The EPA's Modeling TAD notes that for area designations under the 2010 $SO_2$ NAAQS, the AERMOD modeling system should be used, unless use of an alternative model can be justified. In some instances the recommended model may be a model other than AERMOD, such as the BLP model for buoyant line sources. The AERMOD modeling system contains the following components:
- AERMOD: the dispersion model
- AERMAP: the terrain processor for AERMOD
- AERMET: the meteorological data processor for AERMOD
- BPIPPRIME: the building input processor
- AERMINUTE: a pre-processor to AERMET incorporating 1-minute automated surface observation system (ASOS) wind data
- AERSURFACE: the surface characteristics processor for AERMET
- AERSCREEN: a screening version of AERMOD

The state used AERMOD version 15181, and a discussion of the individual components will be referenced in the corresponding discussion that follows as appropriate.

*Modeling Parameter: Rural or Urban Dispersion*

The EPA's recommended procedure for characterizing an area by prevalent land use is based on evaluating the dispersion environment within 3 km of the facility. According to the EPA's modeling guidelines, rural dispersion coefficients are to be used in the dispersion modeling analysis if more than 50% of the area within a 3 km radius of the facility is classified as rural. Conversely, if more than 50% of the area is urban, urban dispersion coefficients should be used in the modeling analysis. When performing the modeling for the area of analysis, the state determined that it was most appropriate to run the model in rural mode.

10

In their submittal, the state indicated that the source is relatively isolated and based on our review of aerial photography of the area surrounding the facility provided as part of the state's recommendation, the determination to run the model in rural mode appears appropriate. The figure below provide an aerial image of the area surrounding the Coleto Creek station.

Figure 3: Aerial Image of Area Surrounding Coleto Creek Power Station



*Modeling Parameter: Area of Analysis (Receptor Grid)*

The EPA believes that a reasonable first step towards characterization of air quality in the area surrounding the Coleto Creek station is to determine the extent of the area of analysis, i.e., receptor grid. Considerations presented in the Modeling TAD include but are not limited to: the location of the $SO_2$ emission sources or facilities considered for modeling; the extent of significant concentration gradients of nearby sources; and sufficient receptor coverage and density to adequately capture and resolve the model predicted maximum $SO_2$ concentrations. For the Coleto Creek area, the state did not include any other emitters of $SO_2$ within their analysis. The state determined that this was the appropriate approach in order to adequately characterize air quality from the facility.

11

The State modeled a grid of 50 km around the Coleto Creek facility.[4] 50 kilometers is the nominal distance for $SO_2$ accuracy in AERMOD. The state determined that this was the appropriate distance in order to adequately characterize air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. Based on our review of the area of analysis, the jurisdictional boundaries relied upon in our intended designation, and the proximity of nearby large $SO_2$ emitters to the Coleto Creek facility, we agree that the grid is appropriate to characterize the air quality in the vicinity of the facility. The grid receptor spacing for the area of analysis chosen by the state is as follows:

- 100 meter grid from the property fence line Coleto Creek station out to approximately 1 km,
- 500 meter grid from the property fence line Coleto Creek station out to approximately 5 km, and
- 1000 meter (1 km) grid from the property fence line Coleto Creek station out to approximately 50 km.

The receptor network contained 12,801 receptors, and the network covered all of Goliad County, the majority of Victoria County, the southern portion of Dewitt County, western portions of Jackson and Calhoun Counties, the northern portions of Aransas and Refugio Counties, and the eastern portions of Bee and Karnes Counties.

Figure 4 shows the state's chosen area of analysis surrounding the Coleto Creek station, as well as receptor grid for the area of analysis. Receptors were placed throughout the modeled area, which is a conservative approach and consistent with EPA guidance. The impacts of the area's geography and topography will follow in the appropriate section.

---

[4] AERMOD is a Gaussian Plume Air Dispersion Model, 50km is the useful distance to which most steady-state Gaussian plume models are considered accurate for setting emission limits per SCRAM guidance.

12

Figure 4: Receptor Grid for the Coleto Creek Power Station Area of Analysis



*Modeling Parameter: Source Characterization*

The state characterized the source within the area of analysis in accordance with the best practices outlined in the Modeling TAD. Specifically, the state used actual stack heights in conjunction with actual emissions. The state also correctly characterized the source's building layout and location, as well as the stack parameters, e.g., exit temperature, exit velocity, location, and diameter. Where appropriate, the AERMOD component BPIPPRIME was used to assist in addressing building downwash.

*Modeling Parameter: Emissions*

The EPA's Modeling TAD notes that for the purposes of modeling to characterize air quality for use in designations, the recommended approach is to use the most recent 3 years of actual emissions data and concurrent meteorological data. However, the TAD does provide for the flexibility of using allowable emissions in the form of the most recently permitted (referred to as PTE or allowable) emissions rate.

The EPA believes that continuous emissions monitoring systems (CEMS) data provide acceptable historical emissions information when it is available, and that these data are available for many electric

13

generating units. In the absence of CEMS data, the EPA's Modeling TAD highly encourages the use of AERMOD's hourly varying emissions keyword HOUREMIS or the use of AERMOD's variable emissions factors keyword EMISFACT. When choosing one of these methods, the EPA believes that detailed throughput, operating schedules, and emissions information from the impacted source should be used.

In certain instances, states and other interested parties may find that it is more advantageous or simpler to use PTE rates as part of their modeling runs. Specifically, a facility may have recently adopted a new federally enforceable emissions limit, been subject to a federally enforceable consent decree, or implemented other federally enforceable mechanisms and control technologies to limit $SO_2$ emissions to a level that indicates compliance with the NAAQS. These new limits or conditions may be used in the application of AERMOD. In these cases, the Modeling TAD notes that the existing $SO_2$ emissions inventories used for permitting or SIP planning demonstrations should contain the necessary emissions information for designations-related modeling. In the event that these short-term emissions are not readily available, they may be calculated using the methodology in Table 8-1 of Appendix W to 40 CFR Part 51 titled, "Guideline on Air Quality Models."

As previously noted, the state included Coleto Creek station and no other emitters of $SO_2$ in the area of analysis. No other sources beyond the area of analysis were determined by the state to have the potential to cause significant concentration gradient impacts within the area of analysis.  The state reviewed nearby $SO_2$ emitters and determined that based on the magnitude of emissions and proximity of those emitters to Coleto Creek station, the nearby sources are not expected cause significant concentration gradients and would be represented via background monitor concentrations. We reviewed nearby large $SO_2$ emitters located within the area of analysis that were not explicitly included in the state's modeling analysis.  Seadrift Coke LP is located in the southeastern portion of the area of analysis approximately 46 km from Coleto Creek station and emitted 400 tons of $SO_2$ based on 2011 National Emissions Inventory (NEI) data. Based on the magnitude of emissions from Seadrift Coke LP, its proximity to Coleto Creek station, and the magnitude of modeled impacts from Coleto Creek station in the vicinity of Seadrift (less than 20 $\mu g/m^3$), we do not expect the inclusion of this emission source to impact the assessment of air quality in the Goliad County area of analysis or our intended designation

Table 2: Actual $SO_2$ Emissions Between 2012 – 2014 from the Coleto Creek Power Station.

| Company ID | Facility Name | $SO_2$ Emissions (tons per year) | | |
|---|---|---|---|---|
| | | 2012 | 2013 | 2014 |
| GDF Suez Energy, NA | Coleto Creek Power Station | 16,218 | 14,344 | 16,942 |

*Modeling Parameter: Meteorology and Surface Characteristics*

The most recent 3 years of meteorological data (concurrent with the most recent 3 years of emissions data) should be used in designations efforts. As noted in the Modeling TAD, the selection of data should be based on spatial and climatological (temporal) representativeness. The representativeness of the data are based on: 1) the proximity of the meteorological monitoring site to the area under consideration, 2) the complexity of terrain, 3) the exposure of the meteorological site, and 4) the period of time during

14

which data are collected. Sources of meteorological data include National Weather Service (NWS) stations, site-specific or onsite data, and other sources such as universities, Federal Aviation Administration (FAA), and military stations.

For the Coleto Creek station area of analysis, surface meteorology from the NWS station in Victoria, Texas, 64 km to the east, and coincident upper air observations from the NWS station in Corpus Christi, Texas, 105 km to the south southwest were selected as best representative of meteorological conditions within the area of analysis. The state used AERSURFACE version 13016 using data from the NWS station in Victoria, Texas (located at latitude 28.867, longitude -96.933) to estimate the surface characteristics of the area of analysis. The state estimated values for 1 spatial sector out to 1 km at an annual temporal resolution for average conditions. The state also estimated values for albedo (the fraction of solar energy reflected from the earth back into space), the Bowen ratio (the method generally used to calculate heat lost or heat gained in a substance), and the surface roughness (sometimes referred to as "Zo"). In the figures below, the location of the Victoria, Texas NWS station and Corpus Christi, Texas NWS are shown relative to the Coleto Creek station.

15

Figure 5: Coleto Creek Power Station Area of Analysis and the Victoria, Texas NWS



16

Figure 6: Coleto Creek Power Station Area of Analysis and the Corpus Christi, Texas NWS



The 3-year surface wind rose for Victoria, Texas is depicted in Figure 7 below. In this figure, the frequency and magnitude of wind speed and direction are defined in terms of where the wind is blowing. The wind rose shows the predominant pattern is a south southeast wind about 22% of the time with a secondary dominant northerly wind about 12 % of the time.  The average wind speed is 4.37 m/s, with calm hours accounting for approximately 3% of the overall measured time.

17

Figure 7: Victoria, Texas NWS Wind Rose for Years 2012 – 2014



Meteorological data from the above surface and upper air stations were used in generating AERMOD-ready files with the AERMET processor. The output meteorological data created by the AERMET processor is suitable for being applied with AERMOD input files for AERMOD modeling runs. The state followed the methodology and settings presented in the EPA's SO$_2$ TAD in the processing of the raw meteorological data into an AERMOD-ready format, and used AERSURFACE to best represent surface characteristics.

Hourly surface meteorological data records are read by AERMET, and include all the necessary elements for data processing. However, wind data taken at hourly intervals may not always portray wind conditions for the entire hour, which can be variable in nature. Hourly wind data may also be overly prone to indicate calm conditions, which are not modeled by AERMOD. In order to better represent actual wind conditions at the meteorological tower, wind data of one minute duration was provided from the same instrument tower, but in a different formatted file to be processed by a separate preprocessor, AERMINUTE. These data were subsequently integrated into the AERMET processing to produce final

18

hourly wind records of AERMOD-ready meteorological data that better estimate actual hourly average conditions and that are less prone to over-report calm wind conditions. This allows AERMOD to apply more hours of meteorology to modeled inputs, and therefore produce a more complete set of concentration estimates. As a guard against excessively high concentrations that could be produced by AERMOD in very light wind conditions, the state set a minimum threshold of 0.5 meters per second in processing meteorological data for use in AERMOD. This approach is consistent with a March 2013 EPA memo titled, "Use of ASOS meteorological data in AERMOD dispersion Modeling." In setting this threshold, no wind speeds lower than this value would be used for determining concentrations. This threshold was specifically applied to the one minute wind data.

*Modeling Parameter: Geography and Terrain*

The terrain in the area of analysis is best described as gently rolling. To account for these terrain changes, the AERMAP terrain program within AERMOD was used to specify terrain elevations for all the receptors. The source of the elevation data incorporated into the model is from the USGS National Elevation Database data.

*Modeling Parameter: Background Concentrations of $SO_2$*

The Modeling TAD offers two mechanisms for characterizing background concentrations of $SO_2$ that are ultimately added to the modeled design values: 1) a "first tier" approach, based on monitored design values, or 2) a temporally varying approach, based on the 99th percentile monitored concentrations by hour of day and season or month. For the Goliad County area of analysis, the state chose the first tier approach. The background concentration for this area of analysis was determined by the state to be 15 micrograms per cubic meter ($\mu g/m^3$), and that value was incorporated into the final AERMOD results.

*Summary of Modeling Results*

The AERMOD modeling parameters for the Coleto Creek station area of analysis are summarized below in Table 3.

Table 3: AERMOD Modeling Parameters for the Coleto Creek Power Station Area of Analysis

| Coleto Creek Power Station Area of Analysis | |
|---|---|
| AERMOD Version | 15181 |
| Dispersion Characteristics | Rural |
| Modeled Sources | 1 |
| Modeled Stacks | 1 |
| Modeled Structures | 17 |
| Modeled Fencelines | 1 |
| Total receptors | 12801 |
| Emissions Type | Actual |
| Emissions Years | 2012-2014 |

19

| Meteorology Years | 2012-2014 |
|---|---|
| Surface Meteorology Station | Victoria, Texas |
| Upper Air Meteorology Station | Corpus Christi, Texas |
| Methodology for Calculating Background $SO_2$ Concentration | 1st Tier/used design value from Corpus Christi Monitor 483550032 |
| Calculated Background $SO_2$ Concentration | 15 $\mu g/m^3$ |

The results presented below in Table 4 show the magnitude and geographic location of the highest predicted modeled concentration based on actual emissions.

Table 4: Maximum Predicted 99th Percentile 1-Hour $SO_2$ Concentration in the Coleto Creek Power Station Area of Analysis Based on Actual Emissions

| Averaging Period | Data Period | Receptor Location | | $SO_2$ Concentration ($\mu g/m^3$) | |
| | | UTM/Easting (meters) | UTM/Northing (meters) | Modeled (including background) | NAAQS |
|---|---|---|---|---|---|
| 99th Percentile 1-Hour Average | 2012-2014 | 673515.5 | 3179025.3 | 100 | 196.5* |

*Equivalent to the 2010 $SO_2$ NAAQS set at 75 ppb. The conversion factor for $SO_2$ (at the standard conditions applied in the ambient $SO_2$ reference method) is 1ppb = approximately 2.62 $\mu g/m^3$.

The state's modeling indicates that the predicted 99th percentile 1-hour average concentration within the chosen modeling domain is 100 $\mu g/m^3$, or 38.2 ppb. This modeled concentration included the background concentration of $SO_2$, and is based on actual emissions from the facility. This predicted value occurred near the western boundary of the facility property line.

Jurisdictional Boundaries:

Once the geographic area of analysis associated with the Coleto Creek station, other nearby sources, and background is determined, existing jurisdictional boundaries are considered for the purpose of informing our intended unclassifiable/attainment area, specifically with respect to clearly defined legal boundaries.

The EPA believes that our intended unclassifiable/attainment area, consisting of Goliad County, is comprised of clearly defined legal boundaries, and we find these boundaries to be a suitably clear basis for defining our intended unclassifiable area. Other than Coleto Creek station, there are no other sources in Goliad County or near the county boundary emitting at or above 100 tpy. The only 100+ tpy emitter of $SO_2$ within 50 km of Coleto Creek station is the Seadrift Coke LP facility located in Calhoun County. (Shown in Figure 8 below.) The EPA notes that although the state did not include emissions from Seadrift Coke (410 tpy of $SO_2$) in Calhoun County in the modeling analysis for the study area, we believe that due to this facility's relatively low emissions in comparison to Coleto Creek station, the fact

20

that the wind patterns in the area, as shown by Figure 7, infrequently blow from the Seadrift facility to Coleto Creek station, the distance from the Seadrift facility to the Goliad County border, i.e., approximately 36 km, and the fact that the highest modeled impacts from Coleto Creek station is approximately 50% of the 2010 $SO_2$ NAAQS, it is unlikely the emissions from Seadrift Coke are causing or contributing to a violation of the NAAQS within Goliad County. We do not believe inclusion of emissions from the Seadrift Coke Facility would change our determination of the attainment status for Goliad County and the surrounding area.

Figure 8: Location of Seadrift Coke Facility in Relation to Coleto Creek Power Station and Goliad County Boundary.



## Other Relevant Information

The EPA did receive additional dispersion modeling for the Goliad County area of analysis from industry. Industry's submittal dated September 17, 2015 included modeling results showed impacts less than the 1-hour $SO_2$ NAAQS supporting a designation of unclassifiable/attainment similar to Texas' recommendation.[5] We reviewed industry's submittal and identified areas in the modeling approach that were inconsistent with the Modeling TAD. Specifically, industry processed the NWS surface station meteorological data based on the surface characteristics of the facility, instead of the meteorological station. We also identified instances where the hourly emissions input data was inconsistent with CAMD. The EPA participated in conference calls with industry to discuss the findings of our review and the noted inconsistencies with the Modeling TAD. Industry did not submit a revised modeling analysis based on our comments. Therefore, because of the noted deficiencies, our intended designation

---

[5] Industry's submittal included a maximum modeled concentration of 111.0 μg/m³ (42.4 ppb) including a seasonal, diurnal background concentration.

in based solely on the state's submittal and does not rely on industry's modeling analysis. However, for reference the facility's modeling submittal, including modeling files and associated modeling report, are available for review as part of the docket for the $SO_2$ designations action.

Conclusion

After careful evaluation of the state's recommendation and supporting information, as well as all available relevant information, the EPA intends to designate the area around Coleto Creek station as an unclassifiable/attainment area for the 2010 $SO_2$ NAAQS. Specifically, the boundaries are comprised of the jurisdictional boundaries of Goliad County, Texas. This intended designation with associated boundaries is based on the state's modeling of actual emissions reported from the facility during the 2012 to 2014 calendar years. An analysis of the modeling data indicates it was performed in accordance with appropriate EPA modeling guidance using conservative assumptions. Additionally, the EPA has confirmed that there are no other sources in Goliad County or near its borders that are likely to cause or contribute to a violation of the NAAQS within Goliad County.

At this time, our intended designations for the state only apply to this area and the other areas presented in this technical support document. Consistent with the conditions in the March 2, 2015 consent decree, the EPA will evaluate and designate all remaining undesignated areas in Texas by either December 31, 2017, or December 31, 2020.

**Technical Analysis for the San Miguel Electric, Lignite Fired Power Plant,**

**Atascosa County, Texas Area**

Introduction

The Atascosa County area contains a stationary source that according to the EPA's Air Markets Database emitted in 2012 either more than 16,000 tons of $SO_2$ in 2012 or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU). As of March 2, 2015, this stationary source had not met the specific requirements for being "announced for retirement." Specifically, in 2012, the San Miguel Lignite Fired Power Plant (San Miguel Power Plant) emitted 10,950 tons of $SO_2$, and had an emissions rate of 0.63 $SO_2$/MMBTU. Pursuant to the March 2, 2015 court-ordered schedule, the EPA must designate the area surrounding the facility by July 2, 2016.

In its submission, Texas recommended that the area surrounding the San Miguel Power Plant, specifically the entirety of Atascosa County, be designated as unclassifiable/attainment based on assessment and characterization of air quality from the facility and nearby sources that may have a potential impact in the area where maximum concentrations of $SO_2$ are expected. In this technical support document, the EPA discusses its review and technical analysis of industry's assessment of the area surrounding the San Miguel Power Plant, which was included as an attachment to Texas' designation recommendation. [6] This assessment and characterization was performed using air dispersion modeling software, i.e., AERMOD, analyzing actual emissions. After careful review of the state's assessment, supporting documentation, and all available data, the EPA agrees that the area is attaining the standard, and intends to designate Atascosa County as unclassifiable/attainment.

The San Miguel Power Plant is located in in the town of Christine, Texas. The station is located about 6 miles south-southeast of downtown Christine. The site is accessed by FM 3387 south of Christine, TX. The station is approximately 50 miles south of San Antonio, Texas and 90 miles northwest of Corpus Christi, Texas. Approximate site coordinates are 28.704° North Latitude, 98.477° West Longitude. The base elevation of the facility is 325' (99.06m) above sea level. The facility is located approximately 25 km south-southeast of the center of Atascosa. Figure 1 below presents the location of the facility, other nearby emitters of $SO_2$, the state's recommended area, and the EPA's intended area for the unclassifiable/attainment designation.

---

[6] URS submitted a support document for industry to the State of Texas which was then supplied to the EPA, throughout this technical support document we will refer to this submission as Texas' or the state's.

23

Figure 1: The EPA's intended designation for San Miguel Lignite Fired Power Plant



*Air Quality Data*

This factor considers the SO₂ air quality monitoring data in the area surrounding San Miguel Power Plant. The facility is located in Atascosa County, and in its recommendation the state included the most recent 3 years of monitoring data, i.e., 2012-2014, in the supporting information from facility modeling. The table below shows information related to the monitors located in Atascosa County, which was provided by the facility.

24

Table 1: Available Air Quality Data for the Area Closest to San Miguel Power Plant

| County | State Recommendation | Air Quality Systems (AQS) Monitor ID | Monitor Location | Distance to San Miguel (km) | 2012 – 2014 SO$_2$ Design Value in ppb |
|---|---|---|---|---|---|
| Bexar | Unclassifiable/Attainment | 48-029-0059 | Calaveras Lake - north of San Miguel | 65.4 | 3 |
| Bexar | Unclassifiable/Attainment | 48-029-0622 | Heritage Middle School -north of San Miguel | 73.3 | 3 |
| McLennan | Attainment | 48-309-1037 | Waco – northeast of San Miguel | 354.6 | 6 |

Based on available ambient air quality collected between 2012 and 2014, the counties surrounding San Miguel Power Plant do not show monitored violations of the 2010 SO$_2$ NAAQS. However, the absence of a violating monitor when considering the distances from the facility is not a sufficient technical justification to rule out that an exceedance of the 2010 SO$_2$ NAAQS may occur in the immediate vicinity of the facility.

The discussion and analysis that follows below will reference the state's use of the Modeling TAD, the EPA's assessment of the state's modeling in accordance with the Modeling TAD, and the factors for evaluation contained in the EPA's March 20, 2015 guidance, as appropriate.

Detailed Assessment

*Model Selection and Modeling Components*

The EPA received air dispersion modeling results from San Miguel Electric Cooperative Inc., conducted by Environmental Resources Management (ERM) Consultants, indicating that the SO$_2$ emissions from San Miguel's Electric Generating Unit when combined with representative background concentrations result in maximum predicted impacts below the 1-hour SO$_2$ National Ambient Air Quality Standard and recommending an attainment designation for Atascosa County and the surrounding area. These modeling results were also included as part of the state's unclassifiable/attainment recommendation for the area submitted on September 18, 2015. Following receipt of Texas' submittal, industry did request feedback from the EPA on the modeling conducted for San Miguel Power Plant.  Following discussions regarding the initial modeling analysis, industry did revise their modeling analysis and resubmitted to the EPA on December 29, 2015.  This revised modeling addressed the EPA's comment regarding the calculation of surface characteristics for use in processing meteorological input for the dispersions modeling.  Specifically, industry reprocessed the met data based on surface characteristics calculated at the meteorological station instead of the facility, as was done in the initial modeling.  The analysis

25

discussed in the following sections of this technical support document are based on the most recent modeling received from industry on December 29, 2015.

The EPA's Modeling TAD notes that for area designations under the 2010 $SO_2$ NAAQS, the AERMOD modeling system should be used, unless use of an alternative model can be justified. In some instances the recommended model may be a model other than AERMOD, such as the BLP model for buoyant line sources. The AERMOD modeling system contains the following components:
- AERMOD: the dispersion model
- AERMAP: the terrain processor for AERMOD
- AERMET: the meteorological data processor for AERMOD
- BPIPPRIME: the building input processor
- AERMINUTE: a pre-processor to AERMET incorporating 1-minute automated surface observation system (ASOS) wind data
- AERSURFACE: the surface characteristics processor for AERMET
- AERSCREEN: a screening version of AERMOD

The latest version of EPA's AERMOD model (v.15181) was used for predicting ambient impacts for 1-hour $SO_2$. An initial AERMOD report dated August 2015 was provided by the industry where the EPA found issue regarding appropriate use of AERSURFACE. Industry revised the initial modeling in accordance with the EPA's comments and submitted updated modeling and a revised report dated December 2015. The modeling details outlined in this TSD reference the most recent modeling submitted by industry in December 2015. Regulatory default options were used in the analysis. Model predicted impacts were combined with ambient background concentrations and compared to the 1-hour $SO_2$ NAAQS to determine the recommended attainment status of the area in the vicinity of the facility. The individual components of the modeling analysis will be referenced as appropriate in the corresponding discussion that follows.

*Modeling Parameter: Rural or Urban Dispersion*

The EPA's recommended procedure for characterizing an area by prevalent land use is based on evaluating the dispersion environment within 3 km of the facility. According to the EPA's modeling guidelines, rural dispersion coefficients are to be used in the dispersion modeling analysis if more than 50% of the area within a 3 km radius of the facility is classified as rural. Conversely, if more than 50% of the area is urban, urban dispersion coefficients should be used in the modeling analysis. When performing the modeling for the area of analysis, the industry determined that it was most appropriate to run the model in rural mode. Rural mode was determined by analyzing satellite imagery. Aerial views showed a region dominated by sparsely populated farmland and no topographical features.

*Modeling Parameter: Area of Analysis (Receptor Grid)*

A comprehensive Cartesian receptor grid extending out to approximately 50 kilometers (km) from San Miguel Power Plant was used in the AERMOD modeling analysis to assess maximum ground-level 1-

hour $SO_2$ concentrations.  The $SO_2$ Modeling TAD states that the receptor grid must be sufficient to determine ambient air in the vicinity of the source being studied. The 50-kilometer receptor grid is sufficient to resolve the maximum 1-hour $SO_2$ impacts, and it clearly illustrates decreasing $SO_2$ concentration gradients in relation to the plant in all directions out to the edge of the grid.[7]

The Cartesian receptor grid consisted of the following receptor spacing:

- 25-meter spacing along the facility fence line;
- 25-meter spacing extending from the fence line to 300 meters;
- 100-meter spacing extending from 300 meters to 1 kilometer;
- 500-meter spacing extending from 1 to 5 kilometers; and
- 1,000-meter spacing extending from 5 to 50 kilometers.

The receptor network contained 15,458 receptors, and the network covered most of Atascosa County, most of McMullen and Live Oak Counties, eastern portions of Frio and La Salle Counties, and portions of San Antonio, Wilson, Karnes, and Bee Counties.

Figure 2, shows the chosen area of analysis surrounding San Miguel Power Plant, and the receptor grid for the area of analysis.

---

[7] AERMOD is a Gaussian Plume Air Dispersion Model, 50km is the useful distance to which most steady-state Gaussian plume models are considered accurate for setting emission limits per SCRAM guidance.

Figure 2: Receptor Grid for San Miguel Lignite Fired Power Plant Area of Analysis





Figure 3: Receptors used in San Miguel Power Plant SO$_2$ modeling (within 5 km)



Figure 4: Receptors used in San Miguel Power Plant SO$_2$ modeling (50 km)

29

Figures 3 and 4, included in the information submitted by San Miguel Power Plant to the EPA, show San Miguel Power Plant's chosen area of analysis surrounding the San Miguel Power Plant, as well as the receptor grid for the area of analysis within 5 km and 50 km, respectively. Consistent with the Modeling TAD, receptors for the purposes of this designation effort were placed only in areas where it would also be feasible to place a monitor and record ambient air impacts. The impacts of the area's geography and topography will be discussed later within this document.

*Modeling Parameter: Source Characterization*

The analysis characterized the sources within the area of analysis in accordance with the best practices outlined in the Modeling TAD. Specifically, it used actual stack heights in conjunction with actual emissions, also adequately characterized the sources' building layout and location, as well as the stack parameters, e.g., exit temperature, exit velocity, location, and diameter. Where appropriate, the AERMOD component BPIPPRIME was used to assist in addressing building downwash.

*Modeling Parameter: Emissions*

The EPA's Modeling TAD notes that for the purposes of modeling to characterize air quality for use in designations, the recommended approach is to use the most recent 3 years of actual emissions data and concurrent meteorological data. However, the TAD does provide for the flexibility of using allowable emissions in the form of the most recently permitted (referred to as PTE or allowable) emissions rate.

The EPA believes that continuous emissions monitoring systems (CEMS) data provide acceptable historical emissions information when it is available, and that these data are available for many electric generating units. In the absence of CEMS data, the EPA's Modeling TAD highly encourages the use of AERMOD's hourly varying emissions keyword HOUREMIS or the use of AERMOD's variable emissions factors keyword EMISFACT. When choosing one of these methods, the EPA believes detailed throughput, operating schedules, and emissions information from the impacted source(s) should be used.

In certain instances, states and other interested parties may find it is more advantageous or simpler to use PTE rates as part of their modeling runs. Specifically, a facility may have recently adopted a new federally enforceable emissions limit, been subject to a federally enforceable consent decree, or implemented other federally enforceable mechanisms and control technologies to limit $SO_2$ emissions to a level that indicates compliance with the NAAQS. These new limits or conditions may be used in the application of AERMOD. In these cases, the Modeling TAD notes that the existing $SO_2$ emissions inventories used for permitting or SIP planning demonstrations should contain the necessary emissions information for designations-

related modeling. In the event that these short-term emissions are not readily available, they may be calculated using the methodology in Table 8-1 of Appendix W to 40 CFR Part 51 titled, "Guideline on Air Quality Models."

Evidence of $SO_2$ emissions from the source meeting the emissions criteria of the March 2, 2015 consent decree, i.e., San Miguel Power Plant, is an important factor for determining whether the immediate area is experiencing elevated levels of $SO_2$ concentrations. Other considerations for this factor include county level $SO_2$ emissions data and data for sources located within 50 km.

The analysis did not include any annual emissions data for point sources in Atascosa County, nor did the state include any annual emissions data from point sources in neighboring counties. No other nearby sources were identified by the state as having the potential to cause significant concentration gradient impacts within the area of analysis.

The actual emissions data used in the modeling are described below:

- Boiler Stack (Source ID: STACK). This unit is a coal fired utility boiler that produces steam for the generation of electricity. For this unit, three years (2012-2014) of actual hourly emissions, stack temperature, and exhaust flow rate data were input into the model. These data were provided by San Miguel Power Plant based on CEMS data collected at the site. As per the TAD, the actual height of the stack was represented in the model.

Other sources at the site include emergency engines and fire pumps. These sources are used exclusively in emergency situations except for approximately one hour/week testing. Therefore, in accordance with EPA guidance for intermittent sources, the emergency generator and fire pump engine were not included in the modeling demonstration for the 1-hour $SO_2$ NAAQS.

The 2011 EPA National Emissions Inventories (NEI) was reviewed to determine candidate major sources. For the purpose of modeling analysis, all major sources of $SO_2$ within 50 kilometers of San Miguel Power Plant that had at least 2,000 tons of $SO_2$ emissions were considered for inclusion in the modeling. No facilities within 50 kilometers were found to have emitted at least 2,000 tons of $SO_2$ in 2011. In fact, the only sources with greater than 100 tons of $SO_2$ within 50 km of San Miguel Power Plant were the Pawnee Gas Plant and the Choke Canyon Amine Plant. Choke Canyon is located in Live Oak County and reported 101 tpy of $SO_2$ according to the 2011 NEI, and is located approximately 15 km southeast of Atascosa County. Based on its emissions and distance from Atascosa County, the EPA does not believe that Choke Canyon Amine Plant is likely to cause or contribute to a violation of the NAAQS within Atascosa County. Pawnee Gas Plant, located 48.6 km away in Pawnee, TX, emitted 480 tons. Industry indicated that Pawnee Gas Plant and Choke Canyon Amine Plant were not explicitly included in the modeling for the following reasons:

31

- Due to the low emissions from Pawnee Gas Plant in conjunction with the distance from San Miguel Power Plant, industry concluded in their submittal that the impacts from the facility's emissions could be represented as background concentration in the San Miguel Power Plant area of analysis.

- The March 1, 2011 EPA clarification memorandum for modeling $NO_2$ states that "Even accounting for some terrain influences on the location and gradients of maximum 1-hour concentrations, these considerations suggest that the emphasis on determining which nearby sources to include in the modeling analysis should focus on the area within about 10 kilometers of the project location in most cases…" Pawnee Gas Plant is more than 4 times that distance from San Miguel Power Plant.

- The relative locations of the facilities: Wind blowing from San Miguel Power Plant to Pawnee Gas Plant is on a bearing of 110 degrees, while wind blowing from Pawnee Gas Plant to San Miguel Power Plant would be on a bearing of 281 degrees. A review of the 3 years of wind data (2012-2014) used in the modeling shows that the wind blows between the two facilities only about 4 percent of the time, and of that 4 percent none of the hours during the 3 years of data had sufficient wind speed (13.4 m/s) to carry a plume from one facility to the other in one hour. The wind data review also shows how infrequently wind would influence Choke Canyon Amine Plant emissions combining with San Miguel Power Plant. This fact along with the relatively small size of the Choke Canyon emissions, leads the EPA to believe it will not impact San Miguel Power Plant's air quality designation status.

- The concentration gradient from San Miguel Power Plant impacts drops sharply to the east of the facility (see Figure 4), such that the impacts from San Miguel Power Plant would not be expected to interact with those from Pawnee Gas Plant.

- The Waco ambient monitor was determined to be representative of the $SO_2$ emissions in the area around San Miguel Power Plant.

Therefore, industry did not include any other facilities in the modeling. Based on the magnitude of emissions from these two facilities, their proximity to San Miguel Power Plant and the predominant wind patterns in the area, and the concentration gradient of the impacts from San Miguel Power Plant, we do not believe that the inclusion of Choke Canyon Amine Plant and the Pawnee Gas Plant would significantly impact the predicted concentrations in the area surrounding San Miguel Power Plant or change our intended designation or associated area boundaries.

The appropriate seasonal diurnal ambient concentration from the Waco monitor was added to the impacts from San Miguel Power Plant to represent other sources in the area (see the section below titled *Modeling Parameter: Background Concentrations of $SO_2$*). Table 2 presents actual 2012-2014 emissions from facilities in the San Miguel Power Plant area of analysis.

32

Table 2: Actual 2012-2014 SO$_2$ Emissions from Facilities in the San Miguel Power Plant Area of Analysis

| Facility Name | SO$_2$ Emissions (tons per year) | | |
|---|---|---|---|
| | 2012 | 2013 | 2014 |
| San Miguel Power Plant | 10,950 | 10,169 | 6,909 |

As previously noted, the state included San Miguel Power Plant and no other sources of SO$_2$ in the area of analysis. This facility was selected because the state believes that this area of analysis adequately represents the area where maximum concentrations of SO$_2$ are expected and adequately includes the source which might cause these concentrations. No other sources beyond were determined by the state to have the potential to cause significant concentration gradient impacts within the area of analysis.

*Modeling Parameter: Meteorology and Surface Characteristics*

The most recent 3 years of meteorological data (concurrent with the most recent 3 years of emissions data) should be used in designation efforts. As noted in the Modeling TAD, the selection of data should be based on spatial and climatological (temporal) representativeness. The representativeness of the data are based on: 1) the proximity of the meteorological monitoring site to the area under consideration, 2) the complexity of terrain, 3) the exposure of the meteorological site, and 4) the period of time during which data are collected. Source of meteorological data include National Weather Service (NWS) station, site-specific or onsite data, and other sources such as universities, Federal Aviation Administration (FAA), and military stations.

For the San Miguel Power Plant area of analysis, surface meteorology from the NWS station in South Texas Regional Airport in Hondo, TX (WBAN No. 12962) and concurrent upper air data from Corpus Christi, TX (WBAN No. 12924) indicate winds blow predominantly from the north. The analysis used AERSURFACE version 13016 using data from the NWS station in South Texas Regional Airport (located at 29.367 latitude, -99.167 longitude). Figure 5 shows the location of the South Texas Regional Airport in Hondo relative to San Miguel Power Plant.

Figure 5: Relative distance between South Texas Regional Airport and San Miguel Area of analysis



Three years (2012-2014) of surface observations from the NWS tower at South Texas Regional Airport in Hondo, TX (WBAN No. 12962) and concurrent upper air data from Corpus Christi, TX (WBAN No. 12924) were processed with AERMET (v.15181), the meteorological preprocessor for AERMOD, along with the two pre-processors to AERMET: AERSURFACE (v.13016) and AERMINUTE (v.14237). AERMET was applied to create the two meteorological data files required for input to AERMOD.

AERMET requires specification of site characteristics including surface roughness (zo), albedo (r), and Bowen ratio (Bo). These parameters were developed according to the guidance provided by the state using AERSURFACE. The area within 1 km of the facility was analyzed to determine the surface characteristics around the main stack. AERMET uses the surface characteristics in the sector from which the wind approaches the stack as part of the meteorological data processing for each hour.

In AERSURFACE, the various land cover categories are linked to a set of seasonal surface characteristics. As such, AERSURFACE requires specification of the seasonal category for each month of the year. The following five seasonal categories are offered by AERSURFACE:

1. Midsummer with lush vegetation;
2. Autumn with unharvested cropland;
3. Late autumn after frost and harvest, or winter with no snow;
4. Winter with continuous snow on ground; and
5. Transitional spring with partial green coverage or short annuals.

The AERSURFACE run was performed using the annual temporal resolution option.  The seasonal default values were broken down as follows:

•        January, December, February: Winter with no snow.
•        March, April, May: Transitional spring.
•        June, July, August: Midsummer
•        September, October, November: Autumn

The precipitation was assigned to "Average" for the purpose of Bowen Ratio calculations during each month. Additionally, 1-minute ASOS wind data, collected at the South Texas Regional Airport meteorological tower, were processed using the AERMINUTE pre-processor for AERMET. The data characteristics of South Texas Regional Airport are shown in Table 3. Figure 4 shows the relative location of South Texas Regional Airport and San Miguel Power Plant, and Figure 6 shows the 3-year wind rose for South Texas Regional Airport. As shown in Figure 4, the geographic and topographic features of the facility and the surface meteorological station are similar with no significant geographic features located between the two.  Therefore, we expect the meteorological conditions at the South Texas Regional Airport to be representative of the facility. Furthermore, the Texas Commission on Environmental Quality (TCEQ) has specified that the meteorological stations used in the analysis are the preferred stations for Atascosa County.

Table 3: Characteristics of the South Texas Regional Airport Meteorological Data

| Distance from San Miguel Power Plant | 61.8 miles |
|---|---|
| Average Wind Speed | 4.14 m/s |
| Percent Calm Hours | 1.72% |
| Data Completeness | 98.75% |

35

Figure 6: The 3-year (2012-2014) wind rose for South Texas Regional Airport



*Modeling Parameter: Geography and Terrain*

The terrain in the area of analysis is best described as complex to gently rolling. To account for these terrain changes, the AERMAP terrain program within AERMOD was used to specify terrain elevations for all the receptors. The source of the elevation data incorporated into the model is from the National Elevation Data (NED) from USGS and the data were processed using the most recent version of AERMAP (v.11103) to develop the receptor terrain elevations required by AERMOD. NED data files contain profiles of terrain elevations, which in conjunction with receptor locations, are used to generate receptor height scales. The height scale is the terrain elevation in the vicinity of a receptor that has the greatest influence on dispersion at that location and is used for model computations in complex terrain areas.

*Modeling Parameter: Background Concentrations of $SO_2$*

The Modeling TAD offers two mechanisms for characterizing background concentrations of $SO_2$ that are ultimately added to the modeled design values: 1) a "first tier" approach, based on monitored design values, or 2) a temporally varying approach, based on the 99th percentile monitored concentrations by hour of day and season or month. For the Atascosa area of analysis, San Miguel Power Plant chose to account for other sources of $SO_2$ in the area by adding an ambient background concentration to model-predicted impacts from San Miguel Power Plant for comparison to the NAAQS. The modeling was performed with a set of seasonal diurnal values developed using the methodology described in the EPA March 1st, 2011 Clarification Memorandum for 1-hour $NO_2$ Modeling. Though this memorandum primarily addresses $NO_2$ modeling, page 20 describes the process for developing seasonal diurnal background values for $SO_2$ as well.  The seasonal diurnal values that were used in the modeling are shown on the in Table 4.

Table 4: Seasonal Diurnal Ambient $SO_2$ Concentrations ($\mu g/m^3$)

| Hour | Winter | Spring | Summer | Fall |
|------|--------|--------|--------|------|
| 1 | 3.05 | 3.23 | 3.40 | 4.80 |
| 2 | 2.70 | 2.88 | 3.75 | 9.60 |
| 3 | 2.97 | 2.97 | 3.32 | 9.07 |
| 4 | 1.83 | 1.66 | 2.36 | 2.53 |
| 5 | 2.18 | 1.40 | 2.36 | 2.70 |
| 6 | 1.92 | 1.48 | 2.01 | 3.23 |
| 7 | 1.83 | 1.40 | 1.83 | 2.62 |
| 8 | 2.70 | 2.09 | 4.19 | 3.75 |
| 9 | 4.01 | 4.19 | 7.33 | 7.77 |
| 10 | 11.34 | 5.32 | 6.54 | 13.44 |
| 11 | 13.26 | 3.40 | 4.80 | 9.07 |
| 12 | 12.74 | 3.14 | 5.24 | 7.68 |
| 13 | 12.13 | 4.28 | 5.06 | 8.99 |
| 14 | 7.07 | 4.01 | 4.01 | 7.15 |
| 15 | 8.73 | 4.19 | 3.66 | 7.33 |
| 16 | 8.64 | 3.75 | 4.10 | 6.81 |
| 17 | 6.81 | 3.66 | 3.40 | 7.07 |
| 18 | 7.77 | 3.49 | 3.75 | 6.81 |
| 19 | 4.54 | 6.63 | 4.80 | 9.34 |
| 20 | 4.54 | 6.63 | 4.80 | 9.34 |
| 21 | 4.54 | 4.45 | 8.81 | 7.33 |
| 22 | 3.05 | 4.89 | 6.02 | 6.20 |
| 23 | 3.75 | 5.93 | 4.36 | 5.50 |

37

| 24 | 2.88 | 3.58 | 3.66 | 8.46 |
| Note: Hours in AERMOD are defined as hour-ending. i.e., hour 1 is the period from midnight through 1 AM, etc. | | | | |

*Summary of Modeling Results*

The AERMOD modeling parameters for the San Miguel Power Plant area of analysis are summarized below in Table 5.

Table 5: AERMOD Modeling Parameters for the San Miguel Power Plant, Atascosa, Texas Area of Analysis

| San Miguel Power Plant Area of Analysis | |
| --- | --- |
| AERMOD Version | 15181 |
| Dispersion Characteristics | Rural |
| Modeled Sources | 1 |
| Modeled Stacks | 1 |
| Modeled Structures | 54 |
| Modeled Fence lines | 8 |
| Total receptors | 15,458 |
| Emissions Type | Actual |
| Emissions Years | 2012-2014 |
| Meteorology Years | 2012-2014 |
| Surface Meteorology Station | Hondo, TX |
| Upper Air Meteorology Station | Corpus Christi, TX |
| Methodology for Calculating Background $SO_2$ Concentration | Temporal Varying |
| Calculated Background $SO_2$ Concentration | 5.8 $\mu g/m^3$ at modeled max concentration |

The results presented below in Table 6 show the magnitude and geographic location of the highest predicted modeled concentration based on actual emissions.

38

Table 6: Maximum Predicted 99th Percentile 1-Hour SO$_2$ Concentration in the Atascosa, Texas Area of Analysis Based on Actual Emissions

| Averaging Period | Data Period | Receptor Location | | SO$_2$ Concentration (µg/m$^3$) | |
|---|---|---|---|---|---|
| | | UTM/Latitude | UTM/Longitude | Modeled (including background) | NAAQS |
| 99th Percentile 1-Hour Average | 2012-2014 | 550,394.00 | 3,176,351.00 | 111.5 | 196.4* |

*Equivalent to the 2010 SO$_2$ NAAQS set at 75 ppb

The state's modeling indicates that the predicted 99th percentile 1-hour average concentration within the chosen modeling domain is 111.5 µg/m$^3$, or 42.6 ppb. This modeled concentration included the background concentration of SO$_2$, and is based on actual emissions from the facilities. Figure 7 below was included as part of San Miguel Power Plant's information submitted to the EPA, and indicates that the predicted value occurred using the most recent three years of actual emissions data and added to representative ambient background concentrations, are below the level of 1-hour SO$_2$ NAAQS of 75 ppb or 196.4 µg/m$^3$. San Miguel Power Plant's receptor grid is also shown in Figures 2 through 4.

Figure 7: San Miguel Power Plant 1-hr SO$_2$ NAAQS actual emissions



39

Jurisdictional Boundaries:

Once the geographic area of analysis associated with the San Miguel Power Plant and background concentration is determined, existing jurisdictional boundaries are considered for the purpose of informing our intended unclassifiable/attainment area, specifically with respect to clearly defined legal boundaries.

The EPA believes that our intended unclassifiable/attainment area, consisting of Atascosa County, is comprised of clearly defined legal boundaries, and we find these boundaries to be a suitably clear basis for defining our intended area.  The EPA has confirmed that except for San Miguel Power Plant, whose emissions have been satisfactorily demonstrated to not cause or contribute to a violation of the NAAQS, there are no other large sources with reported 2011 NEI $SO_2$ emissions at or above 100 tpy within Atascosa County. Furthermore, there are only two sources with $SO_2$ emissions greater than 100 tpy within 20 km of Atascosa County's borders. Choke Canyon Amine Plant, located in Live Oak County reported 101 tpy of $SO_2$ according to the 2011 NEI, and is located approximately 15 km southeast of Atascosa County. Based on its emissions and distance from Atascosa County, the EPA does not believe that Choke Canyon Amine Plant is likely to cause or contribute to a violation of the NAAQS within Atascosa County. The Pawnee Gas Plant in Bee County is located approximately 20 km south of Atascosa County, and reported 480 tpy of $SO_2$ according to the 2011 NEI. Based on its emissions and distance from Atascosa County, the EPA does not believe that the Pawnee Gas Plant is likely to cause or contribute to a violation of the NAAQS within Atascosa County.

Conclusion

After careful evaluation of the state's recommendation and supporting information, as well as all available relevant information including the dispersion modeling submitted by industry, the EPA intends to designate the area around San Miguel Power Plant as unclassifiable/attainment area for the 2010 $SO_2$ NAAQS. Specifically, the boundaries are comprised of Atascosa County, Texas. This recommendation is made based on the modeling of actual emissions collected via CEMS that were reported from the facility during the 2012 to 2014 calendar years.  An examination of the modeling analysis indicates it was performed in accordance with appropriate EPA modeling guidance and using conservative assumptions. The EPA has also confirmed, based on available information, that there are no other sources in or near Atascosa County or in nearby areas that are likely to cause or contribute to a violation of the NAAQS within Atascosa County.

At this time, our intended designations for the state only apply to this area and the other areas presented in this technical support document. Consistent with the conditions in the March 2, 2015 consent decree, the EPA will evaluate and designate all remaining undesignated areas in Texas by either December 31, 2017, or December 31, 2020.

**Technical Analysis for the Tolk Electric Station in Lamb County, Texas**

<u>Introduction</u>

The Lamb County area contains a stationary source that according to the EPA's Air Markets Database emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU). As of March 2, 2015, this stationary source had not met the specific requirements for being "announced for retirement." Specifically, in 2012, the Tolk Electric Station (Tolk station) emitted 19,168 tons of $SO_2$, and had an emissions rate of 0.52 lbs/ $SO_2$/mmBTU. Pursuant to the March 2, 2015 consent decree, the EPA must designate the area surrounding the facility by July 2, 2016.

In its submission, Texas recommended that the area surrounding the Tolk station, specifically Lamb County, be designated as unclassifiable/attainment based on an assessment and characterization of air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. This assessment and characterization was performed using air dispersion modeling software, i.e., AERMOD, analyzing actual emissions. After careful review of the state's assessment, supporting documentation, and all available data, the EPA agrees that the area is attaining the standard, and intends to designate Lamb County as unclassifiable/attainment.

The Tolk station is located in West Texas in the northwestern portion of Lamb County. As seen in Figure 1 below, the facility is located approximately 14.5 km northwest of the center of Lamb County, and there are no other large emitters of $SO_2$ in the county. Also included in the figure are the state's recommended area for the unclassifiable/attainment designation, and the EPA's intended unclassifiable/attainment designation for the area

41

Figure 1. Tolk Electric Station —Lamb County



The discussion and analysis that follows below will reference the state's use of the Modeling TAD, the EPA's assessment of the state's modeling in accordance with the Modeling TAD, and the factors for evaluation contained in the EPA's March 20, 2015 guidance, as appropriate.

Detailed Assessment

*Model Selection and Modeling Components*

The EPA's Modeling TAD notes that for area designations under the 2010 $SO_2$ NAAQS, the AERMOD modeling system should be used, unless use of an alternative model can be justified. In some instances the recommended model may be a model other than AERMOD, such as the BLP model for buoyant line sources.   The AERMOD modeling system contains the following components:
  - AERMOD: the dispersion model
  - AERMAP: the terrain processor for AERMOD
  - AERMET: the meteorological data processor for AERMOD
  - BPIPPRIME: the building input processor

42

- AERMINUTE: a pre-processor to AERMET incorporating 1-minute automated surface observation system (ASOS) wind data
- AERSURFACE: the surface characteristics processor for AERMET
- AERSCREEN: a screening version of AERMOD

The state used AERMOD version 15181, and a discussion of the individual components will be referenced in the corresponding discussion that follows, as appropriate.

*Modeling Parameter: Rural or Urban Dispersion*

The EPA's recommended procedure for characterizing an area by prevalent land use is based on evaluating the dispersion environment within 3 km of the facility. According to the EPA's modeling guidelines, rural dispersion coefficients are to be used in the dispersion modeling analysis if more than 50% of the area within a 3 km radius of the facility is classified as rural. Conversely, if more than 50% of the area is urban, urban dispersion coefficients should be used in the modeling analysis. When performing the modeling for the area of analysis, the state determined that it was most appropriate to run the model in rural mode. Figure 2 shown below is an aerial map showing the region surround Tolk station. The land is mainly flat and devoid of any geographic features.

Figure 2: Aerial Map of the land surrounding Tolk Electric Station



*Modeling Parameter: Area of Analysis (Receptor Grid)*

The EPA believes that a reasonable first step towards characterization of air quality in the area surrounding Tolk station is to determine the extent of the area of analysis, i.e., receptor grid. Considerations presented in the Modeling TAD include but are not limited to: the location of the $SO_2$ emission sources or facilities considered for modeling; the extent of significant concentration gradients of nearby sources; and sufficient receptor coverage and density to adequately capture and resolve the model predicted maximum $SO_2$ concentrations. For the Tolk station area, the state considered two sources located 24 km east and 80 km north-northwest of the Tolk facility. The state ascertained that these sources, emitting 5 and 63 tons of $SO_2$ in 2013 respectively, would not be expected to cause significant concentration gradients in the vicinity of Tolk station and are represented in the modeling via monitored background concentrations. The State modeled a grid of 50 km around the facility.[8] The state determined that this was the appropriate distance in order to adequately characterize air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. The grid receptor spacing for the area of analysis chosen by the state is as follows:
- 100 meter grid from center of Tolk station out to 1 km,
- 500 meter grid centered on Big Brown out to 5 km, and
- 1000 meter (1 km) grid centered on Big Brown out to 50 km.

The receptor network contained 12,894 receptors, and the network covered the following Texas counties: Lamb County, Baily County, portions of western Swisher, and western Hale County, large portions of both Parmer County and Castro County, northern portions of both Hockley County and Cochran County, and the northwestern portions of Lubbock County. The network extended into Curry and Roosevelt Counties in New Mexico.

Figures 3 and 4 show the state's chosen area of analysis surrounding the Tolk station, as well as receptor grid for the area of analysis. Consistent with the Modeling TAD, receptors for the purposes of this designation effort were placed only in areas where it would also be feasible to place a monitor to record ambient impacts. The impacts of the area's geography and topography will follow in the appropriate section.

---

[8] AERMOD is a Gaussian Plume Air Dispersion Model, 50km is the useful distance to which most steady-state Gaussian plume models are considered accurate for setting emission limits per SCRAM guidance.

Figure 3: Tolk Electric Station Area of Analysis



Figure 4: Receptor Grid for the Tolk Electric Station Area of Analysis



*Modeling Parameter: Source Characterization*

The state characterized the sources within the area of analysis in accordance with the best practices outlined in the Modeling TAD. Specifically, the state used actual stack heights in conjunction with actual emissions.  The state also correctly characterized the source's building layout and location, as well as the stack parameters, e.g., exit temperature, exit velocity, location, and diameter. Where appropriate, the AERMOD component BPIPPRIME was used to assist in addressing building downwash.

*Modeling Parameter: Emissions*

The EPA's Modeling TAD notes that for the purposes of modeling to characterize air quality for use in designations, the recommended approach is to use the most recent 3 years of actual emissions data and concurrent meteorological data. However, the TAD does provide for the flexibility of using allowable emissions in the form of the most recently permitted, (referred to as PTE or allowable) emissions rate.

The EPA believes that continuous emissions monitoring systems (CEMS) data provide acceptable historical emissions information when it is available, and that these data are available

46

for many electric generating units. In the absence of CEMS data, the EPA's Modeling TAD highly encourages the use of AERMOD's hourly varying emissions keyword HOUREMIS or the use of AERMOD's variable emissions factors keyword EMISFACT. When choosing one of these methods, the EPA believes that detailed throughput, operating schedules, and emissions information from the impacted sources should be used.

In certain instances, states and other interested parties may find that it is more advantageous or simpler to use PTE rates as part of their modeling runs. Specifically, a facility may have recently adopted a new federally enforceable emissions limit, been subject to a federally enforceable consent decree, or implemented other federally enforceable mechanisms and control technologies to limit $SO_2$ emissions to a level that indicates compliance with the NAAQS. These new limits or conditions may be used in the application of AERMOD. In these cases, the Modeling TAD notes that the existing $SO_2$ emissions inventories used for permitting or SIP planning demonstrations should contain the necessary emissions information for designations-related modeling. In the event that these short-term emissions are not readily available, they may be calculated using the methodology in Table 8-1 of Appendix W to 40 CFR Part 51 titled, "Guideline on Air Quality Models."

As previously noted, the state only modeled the Tolk station source and no other emitters of $SO_2$ in the area of analysis. This distance was selected because the state believes that this area of analysis adequately represents the area where maximum concentrations of $SO_2$ are expected and adequately includes the source which might cause these concentrations. No sources beyond were determined by the state to have the potential to cause significant concentration gradient impacts within the area of analysis. Tolk station is a relatively isolated source. TCEQ emissions inventory data from 2013 were reviewed and there is a source located approximately 15 km east of the facility with five tons of $SO_2$ emissions. There is another source located approximately 50 km north-northwest of the facility with 63 tons of $SO_2$ emissions. Given the distance and magnitude of emissions, these sources would not be expected to cause significant concentration gradients in the vicinity of Tolk station and are represented in the modeling via monitored background concentrations. An emissions summary of Tolk station from 2012 to 2014 is provided below in Table 1.

Table 1: Actual $SO_2$ Emissions Between 2012 – 2014 from the Tolk Electric Station.

| Facility Name | $SO_2$ Emissions (tons per year) | | |
|---|---|---|---|
| | 2012 | 2013 | 2014 |
| Tolk Electric Station | 19,168 | 19,454 | 16,759 |

*Modeling Parameter: Meteorology and Surface Characteristics*

The most recent 3 years of meteorological data (concurrent with the most recent 3 years of emissions data) should be used in designations efforts. As noted in the Modeling TAD, the selection of data should be based on spatial and climatological (temporal) representativeness. The representativeness of the data are based on: 1) the proximity of the meteorological

47

monitoring site to the area under consideration, 2) the complexity of terrain, 3) the exposure of the meteorological site, and 4) the period of time during which data are collected. Sources of meteorological data include National Weather Service (NWS) stations, site-specific or onsite data, and other sources such as universities, Federal Aviation Administration (FAA), and military stations.

For the Tolk station area of analysis, surface meteorology from the NWS station in Lubbock, Texas, 95 km to the southeast, and coincident upper air observations from the NWS station in Amarillo, Texas, 260 km to the north-northeast were selected as best representative of meteorological conditions within the area of analysis. See Figure 5 for a wind rose plot showing predominant winds at the Lubbock meteorological station based on 2012-2014 data.

Figure 5: Wind Rose for Lubbock, Texas Surface Meteorological Station (2012-2014)



The state used AERSURFACE version 13016 using data from the NWS station in Lubbock, Texas (Station #: 23042) to estimate the surface characteristics of the area of analysis. The state estimated values for 1 spatial sectors out to 1 km at an annual temporal resolution for average conditions. The state also estimated values for albedo (the fraction of solar energy reflected from the earth back into space), the Bowen ratio (the method generally used to calculate heat lost or heat gained in a substance), and the surface roughness (sometimes referred to as "Zo").

Hourly surface meteorological data records are read by AERMET, and include all the necessary elements for data processing. However, wind data taken at hourly intervals may not always portray wind conditions for the entire hour, which can be variable in nature.  Hourly wind data

may also be overly prone to indicate calm conditions, which are not modeled by AERMOD. In order to better represent actual wind conditions at the meteorological tower, wind data of one minute duration was provided from the same instrument tower, but in a different formatted file to be processed by a separate preprocessor, AERMINUTE. These data were subsequently integrated into the AERMET processing to produce final hourly wind records of AERMOD-ready meteorological data that better estimate actual hourly average conditions and that are less prone to over-report calm wind conditions. This allows AERMOD to apply more hours of meteorology to modeled inputs, and therefore produce a more complete set of concentration estimates. As a guard against excessively high concentrations that could be produced by AERMOD in very light wind conditions, the state set a minimum threshold of 0.5 meters per second in processing meteorological data for use in AERMOD. This approach is consistent with a March 2013 EPA memo titled, "Use of ASOS meteorological data in AERMOD dispersion Modeling." In setting this threshold, no wind speeds lower than this value would be used for determining concentrations. This threshold was specifically applied to the one minute wind data.

*Modeling Parameter: Geography and Terrain*

The terrain in the area of analysis is best described as flat with no significant terrain barriers.  To account for these terrain changes, the AERMAP terrain program within AERMOD was used to specify terrain elevations for all the receptors. The source of the elevation data incorporated into the model is from the USGS National Elevation Database.

*Modeling Parameter: Background Concentrations of $SO_2$*

The Modeling TAD offers two mechanisms for characterizing background concentrations of $SO_2$ that are ultimately added to the modeled design values: 1) a "first tier" approach, based on monitored design values, or 2) a temporally varying approach, based on the 99th percentile monitored concentrations by hour of day and season or month. For the Tolk station area of analysis, the state chose 2012-2014 monitored design values from Waco, Texas because there are no $SO_2$ monitors in Lamb County, TX.  The Waco monitor was also most representative of the background $SO_2$ conditions for Tolk station. The background concentration for this area of analysis was determined by the state to be 16 micrograms per cubic meter ($\mu g/m^3$), or 6.11 ppb,[9] and that value was incorporated into the final AERMOD results.

*Summary of Modeling Results*

The AERMOD modeling parameters for the Tolk station area of analysis are summarized below in Table 2.

---

[9] The conversion factor for $SO_2$ (at the standard conditions applied in the ambient $SO_2$ reference method) is 1ppb = approximately $2.62\mu g/m^3$.

Table 2: AERMOD Modeling Parameters for the Tolk Electric Station Area of Analysis

| Tolk Electric Station Area of Analysis | |
|---|---|
| AERMOD Version | 15181 |
| Dispersion Characteristics | Rural |
| Modeled Sources | 1 |
| Modeled Stacks | 2 |
| Modeled Structures | 0 |
| Modeled Fencelines | 4 |
| Total receptors | 12894 |
| Emissions Type | Actual |
| Emissions Years | 2012-2014 |
| Meteorology Years | 2012-2014 |
| Surface Meteorology Station | Lubbock, Texas |
| Upper Air Meteorology Station | Amarillo, Texas |
| Methodology for Calculating Background $SO_2$ Concentration | Waco, Texas monitor, 2012-2014 design values |
| Calculated Background $SO_2$ Concentration | 16 μg/m³ |

The results presented below in Table 3 show the magnitude and geographic location of the highest predicted modeled concentration based on actual emissions.

Table 3: Maximum Predicted 99th Percentile 1-Hour $SO_2$ Concentration in the Tolk Station Area of Analysis Based on Actual Emissions

| | | Receptor Location | | $SO_2$ Concentration (μg/m³) | |
|---|---|---|---|---|---|
| Averaging Period | Data Period | UTM/Latitude | UTM/Longitude | Modeled (including background) | NAAQS |
| 99th Percentile 1-Hour Average | 2012-2014 | 723614 | 3783986 | 166 | 196.5* |

*Equivalent to the 2010 $SO_2$ NAAQS set at 75 ppb

The state's modeling indicates that the predicted 99th percentile 1-hour average concentration within the chosen modeling domain is 166 μg/m³, or 63.4 ppb. This modeled concentration included the background concentration of $SO_2$, and is based on actual emissions from the facilities. This predicted value occurred at UTM Zone 13N, 723614 easting and 3783986 northing, and is graphically represented along with all the other receptors below in Figure 6.

Figure 6: Maximum Predicted 99th Percentile 1-Hour $SO_2$ Concentrations in the Tolk Station Area of Analysis Based on Actual Emissions



Jurisdictional Boundaries:

Once the geographic area of analysis associated with the Tolk station is determined, existing jurisdictional boundaries are considered for the purpose of informing our intended unclassifiable/attainment area, specifically with respect to clearly defined legal boundaries.

The EPA has confirmed that there are no additional sources of $SO_2$ emitting 100 tpy or above within Lamb County or near its borders. The closest $SO_2$ emitter above 100 tpy is Slaughter Gasoline Plant in neighboring Hockley County. This facility had reported $SO_2$ emissions of 820 tpy according to the 2011 NEI, and is approximately 80 km from the Lamb County border. Due to its emissions and distance from the county border, based on available information the EPA does not believe that this source has the potential to cause or contribute to a violation of the NAAQS within Lamb County.

The EPA believes that our intended unclassifiable/ attainment area, consisting of Lamb County is comprised of clearly defined legal boundaries, and we find these boundaries to be a suitably clear basis for defining our intended unclassifiable/attainment area.

Other Relevant Information

The EPA did not receive any additional relevant information with respect to the area surrounding Tolk station.

Conclusion

After careful evaluation of the state's recommendation and supporting information, as well as all available relevant information, the EPA intends to designate the area around Tolk station as unclassifiable/attainment for the 2010 $SO_2$ NAAQS. Specifically, the boundaries are comprised of Lamb County. This recommendation is made based on the modeling of actual emissions reported from the facility during the 2012 to 2014 calendar years. An analysis of the modeling data indicates it was performed in accordance with appropriate EPA modeling guidance and using conservative assumptions. Additionally, the EPA has confirmed that there are no other sources in Lamb County or near its borders that are likely to cause or contribute to a violation of the NAAQS within Lamb County.

At this time, our intended designations for the state only apply to this area and the other areas presented in this technical support document. Consistent with the conditions in the March 2, 2015 consent decree, the EPA will evaluate and designate all remaining undesignated areas in Texas by either December 31, 2017, or December 31, 2020.

52

**Technical Analysis for the Limestone Power Station in Limestone County, Texas**

Introduction

The Limestone area contains a stationary source that according to the EPA's Air Markets Database emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU). As of March 2, 2015, this stationary source had not met the specific requirements for being "announced for retirement." Specifically, in 2012, the Limestone Power Station emitted 20,671 tons of $SO_2$, and had an emissions rate of 0.36 lbs $SO_2$/mmBTU. Pursuant to the March 2, 2015 consent decree, the EPA must designate the area surrounding the facility by July 2, 2016.

In its submission, Texas recommended that the area surrounding the Limestone Power Station, specifically the entirety of Limestone County, be designated as attainment based on an assessment and characterization of air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. In its recommendation provided to the EPA on September 17, 2015, the Texas Commission on Environmental Quality (TCEQ) included modeling completed by industry for the Limestone Power Station as Attachment F.[10]

After the EPA had completed its review and analysis of the modeling submitted by the state, industry submitted a supplemental modeling report on December 1, 2015. This supplemental report presents the results of additional dispersion modeling completed to address comments and requests for additional information. Notably, the EPA participated in numerous conference calls and meetings to discuss potential model input errors and inconsistencies in the modeling compared to the procedures described in the EPA's Modeling TAD. In response to those discussions, industry provided the December 1, 2015 supplement, which was submitted to address the following:

1. Correct errors in the hourly $SO_2$ emissions and parameter input file;
2. Examine the effect on modeled concentrations of correcting and using land use information for the Corsicana airport, which was used to develop meteorological inputs to AERMOD; and
3. Examine the effect on modeled concentrations of the use of two options within AERMOD that are currently designated as "beta" options requiring justification, but which EPA has proposed to designate as "default" options.

---

[10] The State of Texas relied on the supporting documentation by Environmental Resources Management, submitted on behalf of the NRG Limestone Power Station.

Following review of the supplement modeling report, the EPA requested additional information regarding the revised Limestone modeling analysis. Specifically, the EPA requested that industry review the stack parameter information included as model inputs and confirm their accuracy. In response to our request, industry submitted the January 25, 2016 supplement,[11] to provide Verification of stack parameters as requested by the EPA. Industry indicated that the stack parameters included in the December 1, 2015 submittal were accurate and representative of the emission sources at the Limestone Power Station.

As discussed later in the "Additional Relevant Information – Sierra Club" section of this TSD, the EPA received dispersion modeling results from the Sierra Club, asserting that the area around the Limestone Power Station experiences violations of the NAAQS, and urging the EPA to designate the area as nonattainment. The Sierra Club submitted two modeling analyses (dated September 17, 2015; and December 15, 2015) showing modeled violations of the 1-hour $SO_2$ NAAQS.

After careful review of the state's assessment, supporting documentation, and all available data, the EPA agrees that the area is attaining the standard, and intends to designate Limestone County as unclassifiable/attainment.

The Limestone Power Station is located in east Texas in the southeastern most portion of Limestone County. As seen in Figure 1 below, the facility is located approximately 34 km southeast of the center of Limestone County, and 8 km east of Lake Limestone. Also included in the figure are nearby large emitters of $SO_2$, the state's recommended area for the unclassifiable/attainment designation, and the EPA's intended unclassifiable/attainment designation boundary for the area.

---

[11] Electronic report providing response to the EPA's request for stack parameter verification was provided via email on January 25, 2016.

Figure 1. The EPA's intended designation(s) for Limestone County, Texas



The discussion and analysis that follows below will reference industry's use of the Modeling TAD, the EPA's assessment of industry's modeling in accordance with the Modeling TAD, and the factors for evaluation contained in the EPA's March 20, 2015 guidance, as appropriate.

Detailed Assessment: Texas' Submittal

*Air Quality Data*

This factor considers the $SO_2$ air quality monitoring data in the area surrounding Limestone Power Station. The facility is located in Limestone County; however, there are no ambient air quality monitors located in this county. The state included the most recent 3 years of monitoring data, i.e., 2012 – 2014 in its recommendation from the Waco site in McLennan County. These data are presented in Table 1.

Table 1: Available Air Quality Data for the Monitors Closest to Limestone Power Station

| County | State Recommendation | Air Quality Systems (AQS) Monitor ID | Monitor Location | Distance to Limestone Power Station (km) | 2012 – 2014 SO$_2$ Design Value in ppb |
|---|---|---|---|---|---|
| Navarro | Unclassifiable/ Attainment | 48-349-1051 | Corsicana | 69.5 | 35 |
| McLennan | Unclassifiable/ Attainment | 48-309-1037 | Waco | 82.2 | 6 |

Based on available ambient air quality collected between 2012 and 2014, the monitors located closest to the Limestone Power Station do not show a violation of the 2010 SO$_2$ NAAQS. However, considering the distance from the facility for the non-violating Navarro and McLennan County monitors, it is not a sufficient technical justification to rule out that an exceedance of the 2010 SO$_2$ NAAQS may occur in the immediate vicinity of the facility.

*Emissions and Emissions-Related Data*

To determine whether the immediate area around the source is meeting the emissions criteria of the March 2, 2015 consent decree, i.e., whether Limestone County is experiencing elevated ambient SO$_2$ concentrations, the state gathered evidence of SO$_2$ emissions from the source, as well as county level SO$_2$ emissions data, and data for sources located within 50 km.

As part of its recommendation, Texas referenced modeling completed by industry that included the emissions for all sources in Limestone County emitting at or above 1,000 tons per year (tpy) of SO$_2$. Sources less than 1,000 tpy were evaluated and determined that they would have negligible impact on NAAQS attainment status. Additionally, modeling included the emissions for all sources emitting at or above 1,000 tpy of SO$_2$ in neighboring Freestone and Robertson Counties. Texas obtained the data for these emissions from the 2011 National Emissions Inventory (NEI).[12] The 2011 EPA NEI was reviewed to determine candidate major sources. These emissions data are summarized in Table 2 below.

---

[12] Detailed information for the 2011 NEI can be found at this link:
http://www3.epa.gov/ttnchie1/net/2011inventory.html

Table 2: SO₂ Emissions from Other Local Sources

| County | Facility Name | Facility Subject to the Emissions Criteria of the March 2, 2015 consent decree? | Distance to Facility that Meets the Consent Decree Criteria in km | Facility Total SO₂ Emissions (tpy) 2011 NEI |
|---|---|---|---|---|
| Freestone | Big Brown | Yes | 47.9 | 64,198 |
| Robertson | Oak Grove | Yes | 34.9 | 4,911 |

Note: No source in Leon County emitted greater than 100 tons of $SO_2$ in 2011 according to the 2011 NEI.


*Emissions Controls*

The EPA recognizes that control strategies implemented on the sources above that occurred after the release of the 2011 NEI may not be reflected, or may warrant further discussion. The EPA has not received any additional information on emissions reductions resulting from controls put into place after 2011.

*Meteorology (Weather & Transport Patterns)*

Evidence of source-receptor relationships between specific emissions sources and high $SO_2$ concentrations in the surrounding area is another important factor in determining the appropriate extent of the EPA's intended unclassifiable/attainment area. As discussed below in the section titled, "Other Relevant Information", meteorological records for the nearest National Weather Service meteorological station from the Corsicana Municipal Airport indicate winds blow predominantly from the south, south-east with a secondary northerly flow component.

*Geography and Topography (Mountain Ranges or Other Air Basin Boundaries)*

The area is generally flat, rural and agricultural, without mountain ranges or restrictive geological features likely to affect predictive air impacts of $SO_2$.

*Jurisdictional Boundaries*

Once the geographic area associated with the immediate area surrounding the Limestone Power Station, other nearby sources, and background concentration is determined, existing jurisdictional boundaries are considered for the purpose of informing our intended unclassifiable/attainment area, specifically with respect to clearly defined legal boundaries.

As discussed below in the section titled, "Other Relevant Information: State and Industry Submittals," the area around Limestone Power Station has been modeled by industry to show

compliance with the NAAQS. This modeling included emissions from one source, i.e., Big Brown Power Station in Freestone County also impacted by the court-ordered July 2, 2016 deadline for the EPA to promulgate designations.

Another source impacted by the court-ordered July 2, 2016 deadline, i.e., Sandy Creek Energy Station in McLennan County, is discussed elsewhere in this document. While the EPA intends to designate the area around Sandy Creek Energy Station as unclassifiable (discussed elsewhere in this technical support document), the distance between the facility and the Limestone County border (17 km) leads the EPA to believe that it is unlikely for its emissions to cause or contribute to a violation of the NAAQS within Limestone County. For comparison purposes, the EPA intends to designate the area around Big Brown Power Station in Freestone County as nonattainment (also discussed elsewhere in this technical support document). The Big Brown Power Station's 2012 emissions were more than 12 times those from Sandy Creek Energy Station, and air dispersion modeling indicates compliance with the NAAQS at distances of 15 km from Big Brown Power Station. As a result, the EPA does not believe that it is likely for the emissions from any of the off-site inventory sources in the Limestone Power Station area of analysis to cause or contribute to a violation in Limestone County.

Additionally, the EPA intends to designate the area around Twin Oaks Power Station as unclassifiable/attainment. This facility is also impacted by the July 2, 2016 court-ordered deadline, and is located approximately 17 km from the Limestone County Border. As discussed elsewhere in this technical support document, the emissions in the Twin Oaks area of analysis have been modeled to show attainment with the NAAQS. Therefore, the EPA does not believe that emissions in the Twin Oaks area are likely to cause or contribute to a violation of the NAAQS within Limestone County.

The EPA has also confirmed that there are no other sources in Limestone County that according to the 2011 NEI emit at or above 100 tpy of $SO_2$. There are several sources of $SO_2$ that are not impacted by the July 2, 2016 court-ordered deadline that emit at or above 100 tpy within 20 km of Limestone County's borders: Teague Gas Plant (Freestone County), Nucor Steel (Leon County), BOA Gas Plant (Robertson County), and Oak Grove Power Station (Robertson County). Oak Grove's emissions were included in the Limestone area of analysis, both of which were modeled to show compliance with the standard. Nucor Steel's emissions of 273 tpy along with its distance from the Limestone County border (10km) lead the EPA to believe that it is unlikely to cause or contribute to a violation of the NAAQS within Limestone County. Similarly, the EPA believes that the emissions and distances to the Limestone County border from the other facilities, i.e., Teague Gas Plant (213 tpy, 12 km) and BOA Gas Plant (123 tpy, 4 km), make them unlikely to cause or contribute to a violation of the NAAQS in Limestone county.

The EPA believes that our intended unclassifiable/attainment area, consisting of Limestone County, is comprised of clearly defined legal boundaries, and we find these boundaries to be a suitably clear basis for defining our intended unclassifiable/attainment area.


Modeling Information: State and Industry Submittals

The EPA received a submittal from the state containing modeling conducted by industry, indicating $SO_2$ emissions from Limestone Power Station, when considered alone or in tandem with other local sources, are not causing a violation of the NAAQS. Based on EPA's initial review, industry did provide supplemental modeling and reports characterizing the air quality in the vicinity of the Limestone Power Station. A discussion and review of the most recent modeling performed by industry follows below, with references to the EPA's Modeling TAD as appropriate. This modeling was discussed in the December 1, 2015 supplemental report submitted by industry to the EPA.

*Model Selection and Modeling Components*

The EPA's Modeling TAD notes that for area designations under the 2010 $SO_2$ NAAQS, the AERMOD modeling system should be used, unless use of an alternative model can be justified. In some instances the recommended model may be a model other than AERMOD, such as the BLP model for buoyant line sources.  The AERMOD modeling system contains the following components:
- AERMOD: the dispersion model
- AERMAP: the terrain processor for AERMOD
- AERMET: the meteorological data processor for AERMOD
- BPIPPRIME: the building input processor
- AERMINUTE: a pre-processor to AERMET incorporating 1-minute automated surface observation system (ASOS) wind data
- AERSURFACE: the surface characteristics processor for AERMET
- AERSCREEN: a screening version of AERMOD

Industry used AERMOD version 15181, and a discussion of the individual components will be referenced in the corresponding discussion that follows as appropriate.

*Modeling Parameter: Rural or Urban Dispersion*

The EPA's recommended procedure for characterizing an area by prevalent land use is based on evaluating the dispersion environment within 3 km of the facility. According to the EPA's modeling guidelines, rural dispersion coefficients are to be used in the dispersion modeling analysis if more than 50% of the area within a 3 km radius of the facility is classified as rural.

59

Conversely, if more than 50% of the area is urban, urban dispersion coefficients should be used in the modeling analysis. When performing the modeling for the area of analysis, industry determined that it was most appropriate to run the model in rural mode.

Based on our review of aerial photography of the area surrounding the facility provided as part of the state's recommendation as presented in Figure 2, below, the determination to run the model in rural mode appears appropriate.

60

Figure 2: Industry's Area of Analysis for Limestone



*Modeling Parameter: Area of Analysis (Receptor Grid)*

The EPA believes that a reasonable first step towards characterization of air quality in the area surrounding the Limestone Power Station is to determine the extent of the area of analysis, i.e., receptor grid. Considerations presented in the Modeling TAD include but are not limited to: the location of the $SO_2$ emission sources or facilities considered for modeling; the extent of

61

significant concentration gradients of nearby sources; and sufficient receptor coverage and density to adequately capture and resolve the model predicted maximum $SO_2$ concentrations. Industry included 2 other sources of $SO_2$ within 50 kilometers (km) of Limestone Power Station. The nominal distance for modeled near-field accuracy using AERMOD is 50 km.[13] Industry utilized a grid spacing out to 20 km because the source concentration gradient decreased well below the NAAQS even at this distance. Industry determined that this was the appropriate distance in order to adequately characterize air quality from the facility and other nearby sources that may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. In addition to the Limestone Power Station, the other emitters of $SO_2$ included in the area of analysis are: Big Brown Power Station and Oak Grove Power Station. The grid receptor spacing for the area of analysis chosen by industry is as follows:

- 50 meter grid along the facility fence line,
- 100 meter grid extending from the fence line to 3 km,
- 200 meter grid extending from 3 to 5 km,
- 500 meter grid extending from 5 to 10 km, and
- 1,000 meter grid extending from 10 to 20 km.

The receptor network contained 7,841 receptors, and the network covered the majority of southeast Limestone, and southwest Freestone County.  Northwest Leon County, as well as the northeastern Robertson County are also included.  All locations are within east, central Texas.

Figures 2 and 3 show the chosen area of analysis surrounding the Limestone Power Station, as well as receptor grid for the area of analysis. Consistent with the Modeling TAD, receptors for the purposes of this designation effort were placed only in areas where it would also be feasible to place a monitor. The impacts of the area's geography and topography will follow in the appropriate section.

---

[13] AERMOD is a Gaussian Plume Air Dispersion Model, 50 km is the useful distance to which most steady-state Gaussian plume models are considered accurate for setting emission limits per SCRAM guidance.

Figure 3: Industry's Receptor Grid for the Limestone Area of Analysis



*Modeling Parameter: Source Characterization*

Industry's modeling, which was included in the state's submittal, characterized the sources within the area of analysis in accordance with the best practices outlined in the Modeling TAD. Specifically, it used actual stack heights in conjunction with actual emissions.  The modeling

63

also correctly characterized the sources' building layout and location, as well as the stack parameters, e.g., exit temperature, exit velocity, location, and diameter. Where appropriate, the AERMOD component BPIPPRIME was used to assist in addressing building downwash.

As previously mentioned, the EPA requested additional clarification and confirmation from industry regarding the modeled stack parameters for the on-site sources the Limestone Power Station.  Industry reviewed the information and confirmed that the stack parameters included in their most recent modeling were accurate.

*Modeling Parameter: Emissions*

The EPA's Modeling TAD notes that for the purposes of modeling to characterize air quality for use in designations, the recommended approach is to use the most recent 3 years of actual emissions data and concurrent meteorological data. However, the TAD does provide for the flexibility of using allowable emissions in the form of the most recently permitted, (referred to as PTE or allowable) emissions rate.

The EPA believes that continuous emissions monitoring systems (CEMS) data provide acceptable historical emissions information when it is available, and that these data are available for many electric generating units. In the absence of CEMS data, the EPA's Modeling TAD highly encourages the use of AERMOD's hourly varying emissions keyword HOUREMIS, or through the use of AERMOD's variable emissions factors keyword EMISFACT. When choosing one of these methods, the EPA believes that detailed throughput, operating schedules, and emissions information from the impacted source(s) should be used.

In certain instances, states and other interested parties may find that it is more advantageous or simpler to use PTE rates as part of their modeling runs. Specifically, a facility may have recently adopted a new federally enforceable emissions limit, been subject to a federally enforceable consent decree, or implemented other federally enforceable mechanisms and control technologies to limit $SO_2$ emissions to a level that indicates compliance with the NAAQS. These new limits or conditions may be used in the application of AERMOD. In these cases, the Modeling TAD notes that the existing $SO_2$ emissions inventories used for permitting or SIP planning demonstrations should contain the necessary emissions information for designations-related modeling. In the event that these short-term emissions are not readily available, they may be calculated using the methodology in Table 8-1 of Appendix W to 40 CFR Part 51 titled, "Guideline on Air Quality Models."

Industry included Limestone Power Station and 2 other emitters of $SO_2$ within 50 km in the area of analysis. This distance and these facilities were selected because they believed that this area of analysis adequately represents the area where maximum concentrations of $SO_2$ are expected and

adequately includes the sources which might contribute to those concentrations. No other sources beyond 50 km were determined by industry to have the potential to cause significant concentration gradient impacts within the area of analysis. The facilities in the area of analysis and their associated annual actual $SO_2$ emissions between 2012 and 2014 are summarized below and were used for the modeling input analysis.

Table 3: Actual $SO_2$ Emissions Between 2012 – 2014 from Facilities in the Limestone, Texas Area of Analysis, Provided by the State

|  |  | $SO_2$ Emissions (tpy) | | |
|---|---|---|---|---|
|  | Facility Name | 2012 | 2013 | 2014 |
|  | Big Brown | 60,681 | 62,494 | 57,460 |
|  | Oak Grove | 4,911 | 6,531 | 7,404 |
| Total Emissions | All Facilities | 65,592 | 69,025 | 64,864 |

For the Limestone area of analysis, the modeling included actual emissions from the most recent 3-year data set, i.e., 2012 – 2014. These emissions data were obtained from hourly emissions data for each EGU at all three stations were downloaded from the Clean Air Markets database for use in the modeling, and stack parameters for each unit were provided by TCEQ via email on July 16, 2015.  These methods have been accepted by the EPA.

*Modeling Parameter: Meteorology and Surface Characteristics*

The most recent 3 years of meteorological data (concurrent with the most recent 3 years of emissions data) should be used in designations efforts. As noted in the Modeling TAD, the selection of data should be based on spatial and climatological (temporal) representativeness. The representativeness of the data are based on: 1) the proximity of the meteorological monitoring site to the area under consideration, 2) the complexity of terrain, 3) the exposure of the meteorological site, and 4) the period of time during which data are collected. Sources of meteorological data include National Weather Service (NWS) stations, site-specific or onsite data, and other sources such as universities, Federal Aviation Administration (FAA), and military stations.

For the Limestone area of analysis, surface meteorology from the NWS station at Corsicana Municipal Airport in Corsicana, Texas, 42.8 miles to the north, and coincident upper air observations from the NWS station in Fort Worth, Texas, about 110 miles to the northwest, were selected by industry as best representative of meteorological conditions within the area of analysis.

Industry used AERSURFACE version 13016 from the NWS station in Corsicana, Texas (WBAN No. 53912) to estimate the surface characteristics of the area of analysis. In the figure below, the

65

location of the Corsicana, Texas NWS station is shown relative to the Limestone Power Station area of analysis.

Figure 4: Limestone Power Station Area of Analysis and the Corsicana, Texas NWS



Industry provided the 3-year surface wind rose for Corsicana, Texas. In this figure, the frequency and magnitude of wind speed and direction are defined in terms of where the wind is blowing from predominantly the south, south-east with a secondary northerly flow component.

Figure 5: Corsicana, Texas Cumulative Annual Wind Rose for Years 2012 – 2014



Meteorological data from the above surface and upper air stations were used in generating AERMOD-ready files with the AERMET processor. The output meteorological data created by the AERMET processor is suitable for being applied with AERMOD input files for AERMOD

modeling runs. Industry followed the methodology and settings presented in the most recent versions of meteorological preprocessing files of AERMOD, and are approved by EPA guidance in the processing of the raw meteorological data into an AERMOD-ready format, and used AERSURFACE to best represent surface characteristics.

Hourly surface meteorological data records are read by AERMET, and include all the necessary elements for data processing. However, wind data taken at hourly intervals may not always portray wind conditions for the entire hour, which can be variable in nature.  Hourly wind data may also be overly prone to indicate calm conditions, which are not modeled by AERMOD. In order to better represent actual wind conditions at the meteorological tower, wind data of one minute duration was provided from the same instrument tower, but in a different formatted file to be processed by a separate preprocessor, AERMINUTE. These data were subsequently integrated into the AERMET processing to produce final hourly wind records of AERMOD-ready meteorological data that better estimate actual hourly average conditions and that are less prone to over-report calm wind conditions. This allows AERMOD to apply more hours of meteorology to modeled inputs, and therefore produce a more complete set of concentration estimates. As a guard against unrealistically high concentrations that could be produced by AERMOD in very light wind conditions, Industry set a minimum threshold of 0.5 meters per second in processing meteorological data for use in AERMOD. In setting this threshold, no wind speeds lower than this value would be used for determining concentrations. This threshold was applied to the one minute wind data.

*Modeling Parameter: Geography and Terrain*

The terrain in the area of analysis is best described as flat with no significant terrain barriers. To account for these terrain changes, the AERMAP terrain program was used to specify terrain elevations for all the receptors. The elevation data incorporated into the model is from the USGS National Elevation Database.

*Modeling Parameter: Background Concentrations of $SO_2$*

The Modeling TAD offers two mechanisms for characterizing background concentrations of $SO_2$ that are ultimately added to the modeled design values: 1) a "first tier" approach, based on monitored design values, or 2) a temporally varying approach, based on the 99th percentile monitored concentrations by hour of day and season or month. For the Limestone area of analysis, industry chose a temporally varying approach based on seasonality from the Waco background monitors that most appropriately represented sources not explicitly included in the modeling runs.  EPA guidance allows simulation of background values that vary by season and hour of day that could simulate a lower value than the 99th percentile. The modeling was

performed with a set of seasonal diurnal values developed using the methodology described in the EPA's March 1, 2011 Clarification Memorandum titled, "Additional Clarification Regarding Application of Appendix W Modeling Guidance for the 1-hour $NO_2$ National Ambient Air Quality Standard." While this memo primarily addresses $NO_2$, portions also address $SO_2$.[14]

Table 4: Background Seasonal Diurnal $SO_2$ values for the Area of Analysis

| Hour | Winter | Spring | Summer | Fall |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |

*Summary of Modeling Results*

The AERMOD modeling parameters for the Limestone area of analysis, as provided by the State, are summarized below in Table 5.

---

[14] See http://www3.epa.gov/scram001/guidance/clarification/Additional_Clarifications_AppendixW_Hourly-NO2-NAAQS_FINAL_03-01-2011.pdf, p 19 - 20

Table 5: AERMOD Modeling Parameters for the Limestone Area of Analysis,

| Limestone, Texas Area of Analysis | |
|---|---|
| AERMOD Version | 15181 |
| Dispersion Characteristics | Rural |
| Modeled Sources | 6 |
| Modeled Stacks | |
| Modeled Structures | 38 |
| Modeled Fencelines | |
| Total receptors | 7841 |
| Emissions Type | Actual |
| Emissions Years | 2012-2014 |
| Meteorology Years | 2012-2014 |
| Surface Meteorology Station | Corsicana, Texas |
| Upper Air Meteorology Station | Fort Worth, Texas |
| Methodology for Calculating Background $SO_2$ Concentration | Seasonal Diurnal Values |
| Calculated Background $SO_2$ Concentration | Seasonal Diurnal Values Used (See Table 4) |

The results presented below in Table 6 show the magnitude and geographic location of the highest predicted modeled concentration of $SO_2$ based on actual emissions.

Table 6: Maximum Predicted 99th Percentile 1-Hour $SO_2$ Concentration in the Limestone, Texas Area of Analysis Based on Actual Emissions, Provided by Industry

| | | Receptor Location | | $SO_2$ Concentration ($\mu g/m^3$) Based on Actual Emissions | |
|---|---|---|---|---|---|
| Averaging Period | Data Period | UTM/Latitude | UTM/Longitude | Modeled (including background) | NAAQS |
| 99th Percentile 1-Hour Average | [2012-2014] | | | 174.9 | 196.5* |

* Equivalent to the 2010 $SO_2$ NAAQS set at 75 ppb

Industry's submitted modeling indicates that the predicted 99th percentile 1-hour average concentration within the chosen modeling domain is 174.9 $\mu g/m^3$, or 66.76 ppb. This modeled concentration included the background concentration of $SO_2$, and is based on actual emissions from the facilities. This predicted value occurred northwest of the facility and is graphically represented along with all the other receptors below in Figure 6.

Figure 6: Maximum Predicted 99th Percentile 1-Hour SO₂ Concentrations in the Limestone Area of Analysis Based on Actual Emissions



71

Other Relevant Information: Sierra Club

The EPA received air dispersion modeling results from Sierra Club, asserting that $SO_2$ emissions from Limestone Power Station, when considered alone or in tandem or other local sources, are causing a violation of the NAAQS. A discussion and review of the modeling performed by Sierra Club follows below, with references to the EPA's Modeling TAD as appropriate.

The EPA received air dispersion modeling from Sierra Club, asserting that $SO_2$ emissions from Limestone Power Station, when considered alone or cumulatively with other nearby sources, are causing a violation of the NAAQS. The latest modeling for the Limestone Power Station submitted by the Sierra Club was dated December 15, 2015. This supplemental modeling was provided to correct input errors in previous modeling and to update the model input to include variable stack temperatures and velocities and building downwash based on the initial modeling submitted by the state on September 17, 2015. As noted above, industry submitted supplemental modeling on November 30, 2015 to correct errors in the July 24, 2015 state recommendation. Therefore, the latest modeling from Sierra Club does contain those input errors and is not as representative as the November 30, 2015 modeling submitted by industry. In addition, industry utilized additional modeling refinements allowed by the Modeling TAD and EPA modeling guidance that were not utilized by Sierra Club (i.e., 2nd tier $SO_2$ seasonal, diurnal background concentrations; revised land use date inputs for meteorological data processing). Because of the model input errors and the availability of more refined modeling that indicates that modeled impacts from the Limestone Power Station do not exceed the standard, the EPA is not proposing a designation of nonattainment based on Sierra Club's modeling for the area surrounding the facility.

*Model Selection and Modeling Components*

The EPA's Modeling TAD notes that for area designations under the 2010 $SO_2$ NAAQS, the AERMOD modeling system should be used, unless use of an alternative model can be justified. In some instances the recommended model may be a model other than AERMOD, such as the BLP model for buoyant line sources.   The AERMOD modeling system contains the following components:
- AERMOD: the dispersion model
- AERMAP: the terrain processor for AERMOD
- BPIPPRIME: the building input processor
- AERMET: the meteorological data processor for AERMOD
- AERMINUTE: a pre-processor to AERMET incorporating 1-minute automated surface observation system (ASOS) wind data
- AERSURFACE: the surface characteristics processor for AERMET
- AERSCREEN: a screening version of AERMOD

Sierra Club used AERMOD version 15181 as available from the Support Center for Regulatory Atmospheric Modeling (SCRAM) website, and a discussion of the individual components will be referenced in the corresponding discussion that follows as appropriate.

### Modeling Parameter: Rural or Urban Dispersion

The EPA's recommended procedure for characterizing an area by prevalent land use is based on evaluating the dispersion environment within 3 km of the facility. According to the EPA's modeling guidelines, rural dispersion coefficients are to be used in the dispersion modeling analysis if more than 50% of the area within a 3 km radius of the facility is classified as rural. Conversely, if more than 50% of the area is urban, urban dispersion coefficients should be used in the modeling analysis. When performing the modeling for the area of analysis, Sierra Club determined that it was most appropriate to run the model in rural mode.

The determination to run the model in rural mode appears appropriate as described in the previous section based on our review of aerial photography of the area surrounding the facility.

### Modeling Parameter: Area of Analysis (Receptor Grid)

The EPA believes that a reasonable first step towards characterization of air quality in the area surrounding the Limestone Power Station is to determine the extent of the area of analysis, i.e., receptor grid. Considerations presented in the Modeling TAD include but are not limited to: the location of the $SO_2$ emission sources or facilities considered for modeling; the extent of significant concentration gradients of nearby sources; and sufficient receptor coverage and density to adequately capture and resolve the model predicted maximum $SO_2$ concentrations. For the Limestone area, Sierra Club has included 3 other sources of $SO_2$ within 50 kilometers (km) of Limestone Power Station in any direction. Sierra Club determined that this was the appropriate distance in order to adequately characterize air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. The nominal distance for modeled near-field accuracy using AERMOD is 50 km. In addition to the Limestone Power Station, the other emitters of $SO_2$ included in the area of analysis are: Big Brown Power Station, Oak Grove Power Station, and Twin Oaks Power Station. The grid receptor spacing for the area of analysis chosen by Sierra Club is as follows:
- 100 meter grid from center of Limestone Power Station out to 5 km,
- 500 meter grid centered on Limestone Power Station out to 10 km, and
- 1000 meter (1 km) grid centered on Limestone Power Station out to 50 km.

The receptor network contained 21,201 receptors, and the network covered the majority of Limestone, Leon, and Freestone County, as well as the northern half of Robertson County.  All

locations are within east, central Texas. Sierra Club modeling used a slightly elevated flagpole receptor height, but if this was correct to EPA's recommended height we would expect only a slight change in the modeled numbers and the area of exceedances and magnitude of the values would be basically the equivalent and not change our proposed action.

Figures 7 and 8 show Sierra Club's chosen area of analysis surrounding the Limestone Power Station, as well as receptor grid for the area of analysis. Consistent with the Modeling TAD, receptors for the purposes of this designation effort were placed only in areas where it would also be feasible to place a monitor. The impacts of the area's geography and topography will follow in the appropriate section.

Figure 7: Sierra Club's Area of Analysis for Limestone, Texas



Figure 8: Sierra Club's Receptor Grid for the Limestone, Texas Area of Analysis



*Modeling Parameter: Source Characterization*

Sierra Club characterized the sources within the area of analysis in accordance with the best practices outlined in the Modeling TAD. Specifically, it used actual stack heights in conjunction with actual emissions. Sierra Club also correctly characterized the source's building layout and location, as well as the stack parameters, e.g., exit temperature, exit velocity, location, and diameter. Some of these stack parameters originally had flaws which were later recognized, however Sierra Club did not remodel with the updated parameters. Where appropriate, the AERMOD component BPIPPRIME was used to assist in addressing building downwash.

*Modeling Parameter: Emissions*

The EPA's Modeling TAD notes that for the purposes of modeling to characterize air quality for use in designations, the recommended approach is to use the most recent 3 years of actual emissions data and concurrent meteorological data. However, the TAD does provide for the flexibility of using allowable emissions in the form of the most recently permitted, (referred to as PTE or allowable) emissions rate.

75

The EPA believes that continuous emissions monitoring systems (CEMS) data provide acceptable historical emissions information when it is available, and that these data are available for many electric generating units. In the absence of CEMS data, the EPA's Modeling TAD highly encourages the use of AERMOD's hourly varying emissions keyword HOUREMIS, or through the use of AERMOD's variable emissions factors keyword EMISFACT. When choosing one of these methods, the EPA believes that detailed throughput, operating schedules, and emissions information from the impacted sources should be used.

As previously noted, Sierra Club included Limestone Power Station and 3 other emitters of $SO_2$ within 50 km in the area of analysis. This distance and these facilities were selected because Sierra Club believes that this area of analysis adequately represents the area where maximum concentrations of $SO_2$ are expected and adequately includes the sources which might contribute to those concentrations. No other sources beyond 50 km were determined by Sierra Club to have the potential to cause significant concentration gradient impacts within the area of analysis.

For Limestone Power Station and the other power plants in the area of analysis, Sierra Club used actual emissions from the most recent available 3-year period, i.e., 2012 – 2014. These emissions data were obtained from allowable and measured actual emissions.  Sierra Club's modeling showed exceedances of the NAAQS by the plant using allowable and actual emission. Allowable is the peak emission rate from each unit as approved by the current air quality operation permit for the facility.  Actual emissions are the measured emissions for each hour between January 1, 2012 and December 31, 2014 as taken from USEPA Air Markets Program Data.

For Limestone, Sierra Club provided modeling that used actual hourly temperatures and stack velocities.  For the remaining sources, Sierra club used stack temperatures and velocities estimated based on 100% load.

*Modeling Parameter: Meteorology and Surface Characteristics*

The most recent 3 years of meteorological data (concurrent with the most recent 3 years of emissions data) should be used in designations efforts. As noted in the Modeling TAD, the selection of data should be based on spatial and climatological (temporal) representativeness. The representativeness of the data are based on: 1) the proximity of the meteorological monitoring site to the area under consideration, 2) the complexity of terrain, 3) the exposure of the meteorological site, and 4) the period of time during which data are collected. Sources of meteorological data include National Weather Service (NWS) stations, site-specific or onsite data, and other sources such as universities, Federal Aviation Administration (FAA), and military stations.

For the Limestone area of analysis, surface meteorology from the NWS station at Corsicana Municipal Airport in Corsicana, Texas, 42.8 miles to the north, and coincident upper air observations from the NWS station in Fort Worth, Texas, about 110 miles to the northwest, were selected by Sierra Club as best representative of meteorological conditions within the area of analysis.

Sierra Club used AERSURFACE version 13016 from the NCDC station in Corsicana, Texas to estimate the surface characteristics of the area of analysis. Sierra Club estimated values for 12 spatial sectors out to 1 km at a seasonal temporal resolution for average conditions. Sierra Club also estimated values for albedo (the fraction of solar energy reflected from the earth back into space), the Bowen ratio (the method generally used to calculate heat lost or heat gained in a substance), and the surface roughness (sometimes referred to as "Zo").

Meteorological data from the above surface and upper air stations were used in generating AERMOD-ready files with the AERMET processor. The output meteorological data created by the AERMET processor is suitable for being applied with AERMOD input files for AERMOD modeling runs. Sierra Club followed the methodology and settings presented in draft guidance issued by Regional Offices in the processing of the raw meteorological data into an AERMOD-ready format, and used AERSURFACE to best represent surface characteristics.

Hourly surface meteorological data records are read by AERMET, and include all the necessary elements for data processing. However, wind data taken at hourly intervals may not always portray wind conditions for the entire hour, which can be variable in nature.  Hourly wind data may also be overly prone to indicate calm conditions, which are not modeled by AERMOD. In order to better represent actual wind conditions at the meteorological tower, wind data of one minute duration were provided from the same instrument tower, but in a different formatted file to be processed by a separate preprocessor, AERMINUTE. These data were subsequently integrated into the AERMET processing to produce final hourly wind records of AERMOD-ready meteorological data that better estimate actual hourly average conditions and that are less prone to over-report calm wind conditions. This allows AERMOD to apply more hours of meteorology to modeled inputs, and therefore produce a more complete set of concentration estimates. As a guard against unrealistically high concentrations that could be produced by AERMOD in very light wind conditions, Sierra Club set a minimum threshold of 0.5 meters per second in processing meteorological data for use in AERMOD. In setting this threshold, no wind speeds lower than this value would be used for determining concentrations. This threshold was applied to the one minute wind data.

*Modeling Parameter: Geography and Terrain*

The terrain in the area of analysis is best described as flat with no significant terrain barriers. To account for these terrain changes, the AERMAP terrain program within AERMOD was used to

specify terrain elevations for all the receptors. The source of the elevation data incorporated into the model is from the USGS National Elevation Database.

*Modeling Parameter: Background Concentrations of SO$_2$*

The Modeling TAD offers two mechanisms for characterizing background concentrations of SO$_2$ that are ultimately added to the modeled design values: 1) a "first tier" approach, based on monitored design values, or 2) a temporally varying approach, based on the 99th percentile monitored concentrations by hour of day and season or month. For the Limestone area of analysis, Sierra Club chose to preserve the form of the 1-hour SO2 standard, based on the 99th percentile of the annual distribution of daily maximum 1-hour concentrations averaged across the number of years modeled, the background fourth-highest daily maximum 1-hour SO2 concentration was added to the modeled fourth-highest daily maximum 1-hour SO2 concentration. Background concentrations were based on the 2011-13 design value measured by the ambient monitors located in El Paso, Texas. The background concentration for this area of analysis was determined to be 7.8 μg/m$^3$, or 2.98 ppb,[15] and that value was incorporated into the final AERMOD results. Sierra Club also used the Harris County, Texas monitor in another scenario, where the background concentration was 23.5 μg/m$^3$. The Harris County monitor is directly upwind of the prevailing wind direction for Leon County. The second background concentration used for the modeling analysis is 23.5 μg/m$^3$, which is the lowest measured design value for 2011-2013 from the nine ambient monitors located in Harris County, Texas (i.e., Monitor Site ID 482010046). The monitors in Harris County measured concentrations from 23.5 to 107.5 μg/m$^3$ with an average of 59.9 μg/m$^3$.

*Summary of Modeling Results*

The AERMOD modeling parameters for the Limestone area of analysis, as provided by Sierra Club, are summarized below in Table 7.

Table 7: AERMOD Modeling Parameters for the Limestone Area of Analysis, Provided by Sierra Club

| Limestone Area of Analysis | |
|---|---|
| AERMOD Version | 15181 |
| Dispersion Characteristics | Rural |
| Modeled Sources | 8 |
| Modeled Stacks | 8 |
| Modeled Structures | 0 |

---

[15] The conversion factor for SO$_2$ (at the standard conditions applied in the ambient SO$_2$ reference method) is 1ppb = approximately 2.62 μg/m$^3$.

| | |
|---|---|
| Modeled Fencelines | 0 |
| Total receptors | 21,201 |
| Emissions Type | Actual |
| Emissions Years | 2012-2014 |
| Meteorology Years | 2012-2014 |
| Surface Meteorology Station | Corsicana Municipal Airport NCDC |
| Upper Air Meteorology Station | Fort Worth, Texas |
| Methodology for Calculating Background SO$_2$ Concentration | Design Values |
| Calculated Background SO$_2$ Concentration | 7.8  $\mu g/m^3$ |

The results presented below in Table 8 show the magnitude and geographic location of the highest predicted modeled concentration of SO$_2$ based on actual emissions.

Table 8: Maximum Predicted 99th Percentile 1-Hour SO$_2$ Concentration in the Limestone Area of Analysis Based on Actual Emissions, Provided by Sierra Club

| | | Receptor Location | | SO$_2$ Concentration ($\mu g/m^3$) Based on Actual Emissions | |
|---|---|---|---|---|---|
| Averaging Period | Data Period | UTM/Latitude | UTM/Longitude | Modeled (including background) | NAAQS |
| 99th Percentile 1-Hour Average | 2012-2014 | 775,099 | 3,525,813 | 373.7* | 196.5** |

*Represents impacts from all modeled sources, with majority of contribution from the Big Brown facility.  Impacts from Limestone alone were 197.6    g/m$^3$ (75.4 ppb).
** Equivalent to the 2010 SO$_2$ NAAQS set at 75 ppb

Sierra Club's modeling indicates that the predicted 99th percentile 1-hour average concentration within the chosen modeling domain is 373.7 $\mu g/m^3$, or 142.6 ppb. This modeled concentration included the background concentration of SO$_2$, and is based on actual emissions from the facilities. This predicted maximum value occurred to the north and east of the facility near the Big Brown facility and is graphically represented along with all the other receptors below in Figure 9.

Figure 9: Sierra Club's Maximum Predicted 99th Percentile 1-Hour $SO_2$ Concentrations in the Limestone Area of Analysis Based on Actual Emissions with Corsicana Meteorology and El Paso Background DV



Conclusion

After careful evaluation of the state's recommendation and supporting information, as well as all available relevant information including modeling provided by Sierra Club, the EPA intends to designate the area around Limestone Power Station as unclassifiable/attainment for the 2010 $SO_2$ NAAQS. Specifically, the boundaries are comprised of Limestone County. This intended

designation is based on the modeling of actual emissions reported from the facility during the 2012 to 2014 calendar years.  An analysis of the modeling analysis submitted by the state and supplement by industry indicates it was performed in accordance with appropriate EPA modeling guidance and using conservative assumptions.

While nonattainment is asserted in the modeling analysis completed by Sierra Club, various issues concerning this modeling lead us to believe this modeling is less reliable than the modeling provide by industry. Sierra Club relied on hourly emission rates, stack velocities and temperatures provided by NRG that were later found to have flaws and NRG corrected for this in subsequent model submittals. These flaws caused some of the data to be matched to the wrong hours and thus to the wrong meteorological conditions.  The Sierra Club modeling was also less refined than the NRG modeling because the NRG modeling used updated surface characteristics. Finally, NRG used more refined seasonal estimates of background. As discussed in this technical support document, in the most recent submittal from Sierra Club we have identified model input errors and additional areas in the modeling approach that could be further refined in order to be consistent with the Modeling TAD. Therefore, we do not believe that the submittals received from Sierra Club contain sufficient information to indicate that the area of analysis should be designated nonattainment.

The state and industry's submissions have been reviewed and show no exceedances in the county or nearby counties. The EPA does not believe that emissions from any source in Limestone County or within 20 km of its borders are likely to cause or contribute to violations of the NAAQS in Limestone County.

At this time, our intended designations for the state only apply to this area and the other areas presented in this technical support document. Consistent with the conditions in the March 2, 2015 consent decree, the EPA will evaluate and designate all remaining undesignated areas in Texas by either December 31, 2017, or December 31, 2020.

**Technical Analysis for the Twin Oaks Power Station,**
**Robertson County, Texas**
**Area**

<u>Introduction</u>

The Robertson County area contains a stationary source that according to the EPA's Air Markets Database emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/MMBTU). As of March 2, 2015, this stationary source had not met the specific requirements for being "announced for retirement." Specifically, in 2012, the Twin Oaks Power Station emitted 4,038 tons of $SO_2$, and had an emissions rate of 0.51 lbs $SO_2$/MMBTU. Pursuant to the March 2, 2015 consent decree, the EPA must designate the area surrounding the facility by July 2, 2016.

In its submission, Texas recommended that the area surrounding the Twin Oaks Power Station, specifically Robertson County, be designated as unclassifiable/attainment based on an assessment and characterization of air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. This assessment and characterization was performed using air dispersion modeling software, i.e., AERMOD, analyzing actual emissions. After careful review of the state's assessment, supporting documentation, and all available data, the EPA agrees that the area is attaining the standard, and intends to designate Robertson County as unclassifiable/attainment.

The Twin Oaks Power Station is located in southern Texas in the western northern portion of Robertson County. As seen in Figure 1 below, the facility is located approximately 22 km northwest of the center of Robertson County. Also included in the figure are nearby emitters of $SO_2$, the state's recommended area for the unclassifiable/attainment designation, and the EPA's intended unclassifiable/attainment designation for the area.

82

Figure 1: The EPA's intended designation(s) for Robertson County, Texas



The discussion and analysis that follows below will reference the state's use of the Modeling TAD, the EPA's assessment of the state's modeling in accordance with the Modeling TAD, and the factors for evaluation contained in the EPA's March 20, 2015 guidance, as appropriate.

Detailed Assessment

*Model Selection and Modeling Components*

The EPA's Modeling TAD notes that for area designations under the 2010 $SO_2$ NAAQS, the AERMOD modeling system should be used, unless use of an alternative model can be justified. In some instances the recommended model may be a model other than AERMOD, such as the BLP model for buoyant line sources.   The AERMOD modeling system contains the following components:
-   AERMOD: the dispersion model
-   AERMAP: the terrain processor for AERMOD

83

- AERMET: the meteorological data processor for AERMOD
- BPIPPRIME: the building input processor
- AERMINUTE: a pre-processor to AERMET incorporating 1-minute automated surface observation system (ASOS) wind data
- AERSURFACE: the surface characteristics processor for AERMET
- AERSCREEN: a screening version of AERMOD

The state used AERMOD version 15181, and a discussion of the individual components will be referenced in the corresponding discussion that follows as appropriate.

*Modeling Parameter: Rural or Urban Dispersion*

The EPA's recommended procedure for characterizing an area by prevalent land use is based on evaluating the dispersion environment within 3 km of the facility. According to the EPA's modeling guidelines, rural dispersion coefficients are to be used in the dispersion modeling analysis if more than 50% of the area within a 3 km radius of the facility is classified as rural. Conversely, if more than 50% of the area is urban, urban dispersion coefficients should be used in the modeling analysis. When performing the modeling for the area of analysis, the state determined that it was most appropriate to run the model in rural mode. Rural mode was confirmed by analyzing satellite imagery. Aerial views showed no topographic features in the vicinity of Twin Oaks Power Station and the area is mostly dominated by farm/ranch land as shown in Figure 2 below.

Figure 2: Aerial Image for Twin Oaks Power Station



*Modeling Parameter: Area of Analysis (Receptor Grid)*

The EPA believes that a reasonable first step towards characterization of air quality in the area surrounding the Twin Oaks Power Station is to determine the extent of the area of analysis, i.e., receptor grid. Considerations presented in the Modeling TAD include but are not limited to: the location of the $SO_2$ emission sources or facilities considered for modeling; the extent of significant concentration gradients of nearby sources; and sufficient receptor coverage and density to adequately capture and resolve the model predicted maximum $SO_2$ concentrations. For the Twin Oaks area, the state has included the nearest $SO_2$ source (Oak Grove Steam Electric Station) located within 21 kilometers away from the Twin Oaks Power Station. The Oak Grove Steam Electric Station, reported 6,950 tons of $SO_2$ in 2013.  Although the state suggested that this source would be unlikely to cause a significant concentration gradient in the vicinity of the Twin Oaks Power Station, it was included in the state modeling.  Figure 3 shows the location of Twin Oaks Power Station and Oak Grove Steam Electric Station.

Figure 3: Location of Twin Oaks Power Station and Oak Grove Steam Electric Station.



The State modeled a grid of 50 km around the Twin Oaks facility.[16] 50 kilometers is the nominal distance for $SO_2$ accuracy in AERMOD.  The state determined that this was the appropriate distance in order to adequately characterize air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. The grid receptor spacing for the area of analysis chosen by the state is as follows:

- 100 meter spacing along the fence line out to 1 km
- 500 meter spacing out to 5 km
- 1 km spacing out to 50 km

The receptor network contained 13,862 receptors, and the network covered all of Robertson County in Texas, most of Milam County, Falls County, the northeastern portion of McLennan County, in addition to portions of Limestone, Leon, Madison, Brazos, and Burleson Counties.

Figure 4 shows the state's chosen area of analysis surrounding the Twin Oaks Power Station, as well as receptor grid for the area of analysis.

---

[16] AERMOD is a Gaussian Plume Air Dispersion Model, 50km is the useful distance to which most steady-state Gaussian plume models are considered accurate for setting emission limits per SCRAM guidance.

Consistent with the Modeling TAD, receptors for the purposes of this designation effort were placed only in areas where it would also be appropriate to place a monitor and record ambient air impacts. The impacts of the area's geography and topography will follow in the appropriate section.

Figure 4: Receptor Grid for the Twin Oaks, Texas Area of Analysis



*Modeling Parameter: Source Characterization*

The state characterized the sources within the area of analysis in accordance with the best practices outlined in the Modeling TAD. Specifically, the state used actual stack heights in conjunction with actual emissions. The state also correctly characterized the sources' building layout and location, as well as the stack parameters, e.g., exit temperature, exit velocity, location, and diameter. Where appropriate, the AERMOD component BPIPPRIME was used to assist in addressing building downwash.

*Modeling Parameter: Emissions*

The EPA's Modeling TAD notes that for the purposes of modeling to characterize air quality for use in designations, the recommended approach is to use the most recent 3 years of actual emissions data and concurrent meteorological data. However, the TAD does provide for the

flexibility of using allowable emissions in the form of the most recently permitted, (referred to as PTE or allowable) emissions rate.

The EPA believes that continuous emissions monitoring systems (CEMS) data provide acceptable historical emissions information when it is available, and that these data are available for many electric generating units. In the absence of CEMS data, the EPA's Modeling TAD highly encourages the use of AERMOD's hourly varying emissions keyword HOUREMIS, or the use of AERMOD's variable emissions factors keyword EMISFACT. When choosing one of these methods, the EPA believes that detailed throughput, operating schedules, and emissions information from the impacted sources should be used.

In certain instances, states and other interested parties may find that it is more advantageous or simpler to use PTE rates as part of their modeling runs. Specifically, a facility may have recently adopted a new federally enforceable emissions limit, been subject to a federally enforceable consent decree, or implemented other federally enforceable mechanisms and control technologies to limit $SO_2$ emissions to a level that indicates compliance with the NAAQS. These new limits or conditions may be used in the application of AERMOD. In these cases, the Modeling TAD notes that the existing $SO_2$ emissions inventories used for permitting or SIP planning demonstrations should contain the necessary emissions information for designations-related modeling. In the event that these short-term emissions are not readily available, they may be calculated using the methodology in Table 8-1 of Appendix W to 40 CFR Part 51 titled, "Guideline on Air Quality Models."

As previously noted, the state included Oak Grove Steam Electric Station in the modeling analysis, the area of analysis. The emissions data for Oak Grove Steam Electric Stations were obtained from the EPA's Acid Rain Program database and included in the hourly emissions file. The modeled emission rates represent the actual 1-hour average emission rates reported. The modeled 50 km receptor grid was selected because the state believes that this area of analysis adequately represents the area where maximum concentrations of $SO_2$ are expected and adequately includes the source which might cause these concentrations. With respect to any additional nearby sources of $SO_2$, TCEQ reviewed emission inventory data and the nearest sources are located 29-35 kilometers east of the site with a total of 69 tons of $SO_2$ emission. Given the distance and magnitude of emissions, these sources were determined by the state not to cause significant concentration gradient impacts within the area of analysis and are represented in the modeling via monitored background concentrations. Table 1 below shows the 2012-2014 actual $SO_2$ emissions for Twin Oaks Power Station and Oak Grove Steam Electric Station in the Robertson County Area of Analysis.

Table 1: Actual $SO_2$ Emissions 2012 – 2014 in the Robertson County Area of Analysis

| Company | Facility Name | $SO_2$ Emissions (tons per year) | | |
|---|---|---|---|---|
| | | 2012 | 2013 | 2014 |
| Major Oak Power, LLC | Twin Oaks Power Station | 4,038 | 5,334 | 5,762 |
| Oak Grove Management Company, LLC | Oak Grove Steam Electric Station | 6,531 | 6,950 | 7,404 |

*Modeling Parameter: Meteorology and Surface Characteristics*

The most recent 3 years of meteorological data (concurrent with the most recent 3 years of emissions data) should be used in designations efforts. As noted in the Modeling TAD, the selection of data should be based on spatial and climatological (temporal) representativeness. The representativeness of the data are based on: 1) the proximity of the meteorological monitoring site to the area under consideration, 2) the complexity of terrain, 3) the exposure of the meteorological site, and 4) the period of time during which data are collected. Sources of meteorological data include National Weather Service (NWS) stations, site-specific or onsite data, and other sources such as universities, Federal Aviation Administration (FAA), and military stations.

For the Twin Oaks Power Station area of analysis, surface meteorology from the NWS station in College Station Texas (Station # 3904) and concurrent upper air station Fort Worth, TX (Station # 3990) were selected as nearest stations to Twin Oaks Power Station and are best representative of meteorological conditions within the area of analysis. Figure 5 includes the wind rose for the meteorological data from the College Station meteorological station.

Figure 5: Wind Rose for College Station, Texas NWS Site (2012-2014)



The state used AERSURFACE version 13016 using data from the NWS station in College Station, Texas (located at 30.589 latitude-96.365 longitude to estimate the surface characteristics of the area of analysis. The state also estimated values for albedo 0.17 (the fraction of solar energy reflected from the earth back into space), the Bowen ratio 0.70 (the method generally used to calculate heat lost or heat gained in a substance), and the surface roughness 0.043 meters (sometimes referred to as "Zo"). In the figure below, the location of the College Station NWS station is shown relative to the Twin Oaks Power Station site.

Figure 6: Twin Oaks Power Station Area of Analysis and the College Station NWS



Meteorological data from the above surface and upper air stations were used in generating AERMOD-ready files with the AERMET processor. The output meteorological data created by the AERMET processor is suitable for being applied with AERMOD input files for AERMOD modeling runs. The state followed the methodology and settings presented in guidance given in the AERMOD Implementation Guide (March 19, 2009) in the processing of the raw meteorological data into an AERMOD-ready format, and used AERSURFACE to best represent surface characteristics.

Hourly surface meteorological data records are read by AERMET, and include all the necessary elements for data processing. However, wind data taken at hourly intervals may not always portray wind conditions for the entire hour, which can be variable in nature.  Hourly wind data may also be overly prone to indicate calm conditions, which are not modeled by AERMOD. In order to better represent actual wind conditions at the meteorological tower, wind data of one minute duration was provided from the same instrument tower, but in a different formatted file to be processed by a separate preprocessor, AERMINUTE. These data were subsequently integrated into the AERMET processing to produce final hourly wind records of AERMOD-ready meteorological data that better estimate actual hourly average conditions and that are less prone to over-report calm wind conditions. This allows AERMOD to apply more hours of meteorology to modeled inputs, and therefore produce a more complete set of concentration estimates. As a guard against excessively high concentrations that could be produced by AERMOD in very light wind conditions, the state set a minimum threshold of 0.5 meters per second in processing meteorological data for use in AERMOD. This approach is consistent with a March 2013 EPA memo titled, "Use of ASOS meteorological data in AERMOD dispersion

Modeling." In setting this threshold, no wind speeds lower than this value would be used for determining concentrations. This threshold was specifically applied to the one minute wind data.

*Parameter: Geography and Terrain*

Terrain elevations from National Elevation Data ("NED") from USGS were processed using the most recent version of AERMAP (v.11103) to develop the receptor terrain elevations required by AERMOD. NED data files contain profiles of terrain elevations, which in conjunction with receptor locations are used to generate receptor height scales. The height scale is the terrain elevation in the vicinity of a receptor that has the greatest influence on dispersion at that location and is used for model computations in complex terrain areas.

*Modeling Parameter: Background Concentrations of $SO_2$*

The Modeling TAD offers two mechanisms for characterizing background concentrations of $SO_2$ that are ultimately added to the modeled design values: 1) a "first tier" approach, based on monitored design values, or 2) a temporally varying approach, based on the 99th percentile monitored concentrations by hour of day and season or month. For the Twin Oaks site area of analysis, the state chose background concentrations for $SO_2$ from the EPA Aerometric Information Retrieval System (AIRS) monitor 483091037 located at 4472 Mazaneck Road, Waco McLennan County. The three average (2012-2014) of the 99th percentile of the annual distribution of the maximum daily 1-hour concentration was used for the 1-hr value. The background concentration for this area of analysis was determined by the state to be 16 micrograms per cubic meter ($\mu g/m^3$), or 6.1 ppb,[17] and that value was incorporated into the final AERMOD results.

*Summary of Modeling Results*

The AERMOD modeling parameters for the Twin Oaks area of analysis are summarized below in Table 2.

Table 2: AERMOD Modeling Parameters for the Twin Oaks, Robertson, Texas Area of Analysis

| Twin Oaks Area of Analysis | |
|---|---|
| AERMOD Version | 15181 |
| Dispersion Characteristics | Rural |
| Modeled Sources | 2 |
| Modeled Stacks | 2 |
| Modeled Fence lines | 1 |

---

[17] The conversion factor for $SO_2$ (at the standard conditions applied in the ambient $SO_2$ reference method) is 1ppb = approximately $2.62\mu g/m^3$.

| Total receptors | 13,862 |
|---|---|
| Emissions Type | Actual |
| Emissions Years | 2012-2014 |
| Meteorology Years | 2012-2014 |
| Surface Meteorology Station | College Station, TX |
| Upper Air Meteorology Station | Fort Worth, TX |
| Methodology for Calculating Background $SO_2$ Concentration | Averaging 99th percentile of the annual distribution of the maximum daily 1-hour concentration was used for the 1-hr value |
| Calculated Background $SO_2$ Concentration | 16 $\mu g/m^3$ |

The results presented below in Table 3 show the magnitude and geographic location of the highest predicted modeled concentration based on actual emissions.

Table 3: Maximum Predicted 99th Percentile 1-Hour $SO_2$ Concentration in the Twin Oaks, Texas Area of Analysis Based on Actual Emissions

| | | Receptor Location | | $SO_2$ Concentration ($\mu g/m^3$) | |
|---|---|---|---|---|---|
| Averaging Period | Data Period | UTM/Latitude | UTM/Longitude | Modeled (including background) | NAAQS |
| 99th Percentile 1-Hour Average | 2012-2014 | 719635 | 3443500 | 100 | 196.5* |

*Equivalent to the 2010 $SO_2$ NAAQS set at 75 ppb using 2.62 conversion

The state's modeling indicates that the predicted 99th percentile 1-hour average concentration within the chosen modeling domain is 100 $\mu g/m^3$, or 38.2 ppb. This modeled concentration included the background concentration of $SO_2$, and is based on actual emissions from the facilities. This predicted value occurred using the most recent three years of actual emissions data and added to representative ambient background concentrations, are below the level of 1-hour $SO_2$ NAAQS of 75ppb or 196.5 $\mu g/m^3$, and is graphically represented along with all the other receptors in Figure 4 above.

Jurisdictional Boundaries:

Once the geographic area of analysis associated with the Twin Oaks Power Station, nearby sources and background concentration is determined, existing jurisdictional boundaries are

considered for the purpose of informing our intended unclassifiable/attainment area, specifically with respect to clearly defined legal boundaries.

The EPA believes that our intended unclassifiable/attainment area, consisting of Robertson county, is comprised of clearly defined legal boundaries, and we find these boundaries to be a suitably clear basis for defining our intended unclassifiable area. As previously described, emissions from the Twin Oaks Power Station and Oak Grove Steam Electric Station were modeled to show compliance with the NAAQS. The EPA has confirmed that there is only one additional emitter of $SO_2$ within Robertson County with 2011 NEI $SO_2$ emissions above 100 tpy. The BOA Gas Treatment Plant is located approximately 35 km to the east of Twin Oaks Power Station, and when its relative location is combined with its reported emissions of 123 tpy, the EPA does not believe it has the potential to influence the maximum modeled concentration in the Twin Oaks Power Station area of analysis. Additionally, the EPA does not believe that emissions from the BOA Gas Treatment Plant are likely to cause or contribute to a violation of the NAAQS elsewhere in Robertson County.

There are 2 facilities located within 15 km of Robertson County's borders with reported emissions of 100 tpy or greater. Nucor Steel in neighboring Leon County, had a reported $SO_2$ emissions of 273 tpy according to the 2011 NEI. This facility is approximately 15 km from the Robertson County border, but due to its relatively low emissions, the EPA does not believe its emissions are likely to cause or contribute to a violation of the NAAQS within Robertson County.

Limestone Generating Station, located approximately 10 km to the northeast of the Limestone County/Robertson County border is being addressed in a separate portion of this technical support document. We intend to designate the area around the facility as unclassifiable/attainment as emissions within the area of analysis has been modeled to show compliance with the NAAQS. As a result, the EPA does not believe it is likely for emissions from Limestone Generating Station to cause or contribute to a violation of the NAAQs within Robertson County.

Other Relevant Information

The EPA did not receive any additional information with respect to the immediate area around Twin Oaks Power Station.

Conclusion

After careful evaluation of the state's recommendation and supporting information, as well as all available relevant information, the EPA intends to designate the area around Twin Oaks Power Station as unclassifiable/attainment area for the 2010 $SO_2$ NAAQS. Specifically, the boundaries are comprised of Robertson County, Texas. This recommendation is made based on the modeling of actual emissions reported from the facility during the 2012 to 2014 calendar years.

An analysis of the modeling data indicates it was performed in accordance with appropriate EPA modeling guidance and using conservative assumptions. Additionally, the EPA has confirmed that there are no other sources in Robertson County or near its borders that are likely to cause or contribute to a violation of the NAAQS within Robertson County.

At this time, our intended designations for the state only apply to this area and the other areas presented in this technical support document. Consistent with the conditions in the March 2, 2015 consent decree, the EPA will evaluate and designate all remaining undesignated areas in Texas by either December 31, 2017, or December 31, 2020.

**Technical Analysis for the W.A. Parish Electric Generating Station**
**Fort Bend County, Texas Area**

<u>Introduction</u>

The Fort Bend County area contains a stationary source that according to the EPA's Air Markets Database emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/MMBTU). As of March 2, 2015, this stationary source had not met the specific requirements for being "announced for retirement." Specifically, in 2012, the W.A. Parish Electric Generating Station (W.A. Parish station) emitted 37,861 tons of $SO_2$, and had an emissions rate of 0.49 lbs $SO_2$/MMBTU. Pursuant to the March 2, 2015 consent decree, the EPA must designate the area surrounding the facility by July 2, 2016.

Texas recommended that the area surrounding the W.A. Parish station, specifically the entirety of Fort Bend County, be designated as unclassifiable/attainment based on an assessment and characterization of air quality from the facility and other nearby sources, which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. In its recommendation provided to the EPA on September 17, 2015, the Texas Commission on Environmental Quality (TCEQ) included modeling completed by industry for the W.A. Parish station as Attachment F.[18]

After the EPA had completed its review and analysis of the modeling submitted by the state, industry submitted supplemental modeling reports on December 1, 2015, and January 25, 2016. These supplemental reports present the results of additional dispersion modeling completed to address comments and requests for additional information. Notably, the EPA participated in numerous conference calls and meetings to discuss potential model input errors and inconsistencies in the modeling compared to the procedures described in the EPA's Modeling TAD. In response to those discussions, industry provided the December 1, 2015 supplement, which was submitted to address the following:

4. Correct errors in the hourly $SO_2$ emissions and parameter input file;
5. Examine the effect on modeled concentrations of correcting and using land use information for the Sugar Land airport, which was used to develop meteorological inputs to AERMOD; and
6. Examine the effect on modeled concentrations of the use of two options within AERMOD that are currently designated as "beta" options requiring justification, but which EPA has proposed to designate as "default" options.

---

[18] The State of Texas relied on the supporting documentation by Environmental Resources Management, submitted on behalf of the NRG W.A. Parish Electric Generating Station.

As discussed later in the "Additional Relevant Information – Sierra Club" section of this TSD, the EPA received dispersion modeling results from the Sierra Club, asserting that the area around the W.A. Parish station experiences violations of the NAAQS, and urging the EPA to designate the area as nonattainment. The Sierra Club submitted three separate modeling analyses (dated August 2, 2015; September 17, 2015; and December 15, 2015) showing modeled violations of the 1-hour $SO_2$ NAAQS.

On January 7, 2016, the EPA received a letter from the Sierra Club that included an independent review of the initial modeling completed by industry, which identified potential issues and errors in industry's modeling analysis. The EPA provided a copy of the comments to industry and requested additional information from industry regarding the Sierra Club's review. Specifically, the EPA requested that industry review the stack parameter information included as model inputs and confirm their accuracy. In response to our request, industry submitted the January 25, 2016 supplement,[19] which included the following:

1. Verification of stack parameters as requested by the EPA and submittal of updated modeling results for the facility based on the verified stack parameters;
2. Analysis of the Sierra Club's January 7, 2016 comments on the 1-hour $SO_2$ NAAQS attainment demonstration for the facility; and
3. Analysis of the Sierra Club's December 15, 2015 $SO_2$ modeling reports for the facility.

After careful review of the state's assessment, supporting and supplemental documentation, and all available modeling analyses submitted by industry and the Sierra Club, the EPA disagrees with the state's recommendation for the area, and intends to designate the areas as unclassifiable on the basis that we do not have sufficient information available to designate the area as meeting or not meeting the NAAQS. Based on our current review of all available analyses, we believe that the latest modeling from industry may support a designation of unclassifiable/attainment and is more consistent with the modeling approaches and refinements outlined in the EPA's Modeling TAD. However, due to the date of receipt of the latest modeling from industry relative to our scheduled timeline for proposing designations in order to meet the court-ordered deadline, we have not had sufficient time to thoroughly review the January 25, 2016 submittal to determine if the modeling is sufficient to support a designation of unclassifiable/attainment. The EPA will continue our review of industry's January 25, 2016 submittal and will take it into consideration in our final designation for the area around W.A. Parish station.

The W.A. Parish station is located in the town of Thompson in the southeastern part of Fort Bend

---

[19] Electronic report providing response to the EPA's request for stack parameter verification and to Sierra Club's review, along with a summary of revised modeling results, were provided via email on January 25, 2016. The EPA received the associated modeling files on January 27, 2016.

County, Texas. The station is located about 25 miles southwest of downtown Houston, Texas and approximately 40 miles from the Gulf of Mexico. As seen in Figure 1 below, the facility is located approximately 5 miles away from Brazos Bend State Park, and approximately 4 miles to the southwest of Brazos River. Also included in the figure are nearby emitters of $SO_2$ and the EPA's intended boundaries for the unclassifiable area.

Figure 1: The EPA's Intended Boundaries for Fort Bend County, Texas



The discussion and analysis that follows below will reference the industry's use of the Modeling TAD in its modeling analyses, which were originally submitted by the state as part of the designations recommendation, Sierra Club's use of the Modeling TAD in its analyses, the EPA's assessment of the competing modeling in accordance with the Modeling TAD, and the factors for evaluation contained in the EPA's March 20, 2015 guidance, as appropriate.

Detailed Assessment

*Air Quality Data*

This factor considers the $SO_2$ air quality monitoring data in the area surrounding W.A. Parish station. The facility is located in Fort Bend County, and the state included the most recent 3 years of monitoring data, i.e., 2012 – 2014 in its recommendation. Table 1below shows information provided by the state related to the monitor located in Harris County, approximately 13.9 miles from W.A. Parish station in Fort Bend County.  Monitor's location relative to the W.A. Parish facility shown in Figure 2.

98

Table 1: Available Air Quality Data for the Area Closest to W.A. Parish Station

| County | State Recommendation | Air Quality Systems (AQS) Monitor ID | Monitor Location | Distance to W.A. Parish Station (km) | 2012-2014 SO$_2$ Design Value (ppb) |
|---|---|---|---|---|---|
| Harris | Unclassifiable/ Attainment | 482010051 | Houston – Croquet, Harris County | 22.3 | 19 |

Figure 2: Air Quality Data for area closest to W.A. Parish Electric Generating Station



Based on available ambient air quality collected between 2012 and 2014, the county surrounding W.A. Parish station does not show a violation of the 2010 $SO_2$ NAAQS at its monitor. However, the absence of a violating monitor when considering the distance from the facility is not a sufficient technical justification to rule out that an exceedance of the 2010 $SO_2$ NAAQS may occur in the immediate vicinity of the facility.

*Emissions and Emissions-Related Data*

Evidence of $SO_2$ emissions from the source meeting the emissions criteria of the March 2, 2015 consent decree, i.e., W.A. Parish station, is an important factor for determining whether the immediate area is experiencing elevated levels of $SO_2$ concentrations. Other considerations for this factor include county level $SO_2$ emissions data, and data for sources located within 50 km.

As part of its recommendation, Texas referenced modeling completed by industry that included the emissions for all sources in Fort Bend County emitting at or above 100 tons per year of $SO_2$. The W.A. Parish station is the only source located in Fort Bend County that emitted at or above 100 tons per year based on 2011 NEI data.  Additionally, the state has included the annual emissions for all sources emitting at or above 100 tons per year of $SO_2$ in neighboring counties and located within 50 km of W.A. Parish station. Texas obtained the data for these emissions from the 2011 National Emissions Inventory (NEI).[20] These emissions data are summarized below.

Table 2: $SO_2$ Emissions from Other Nearby Sources

| County | Facility Name | Facility Subject to the Emissions Criteria of the March 2, 2015 consent decree? | Distance to Facility that Meets the Consent Decree Criteria (km) | Facility Total $SO_2$ Emissions (2011 NEI tons/yr) |
|---|---|---|---|---|
| Harris | Rhodia - Houston Plant | Yes | 44.6 | 3755.3 |

*Emissions Controls*

The EPA recognizes that control strategies implemented on the sources above that occurred after the release of the 2011 NEI may not be reflected, or may warrant further discussion. The EPA has not received any additional information on emissions reductions resulting from controls put into place after 2011.

*Meteorology (Weather & Transport Patterns)*

Evidence of source-receptor relationships between specific emissions sources and high $SO_2$ concentrations in the surrounding area is another important factor in determining the appropriate extent of the EPA's intended unclassifiable area. As shown below in Figure 3, meteorological records for the nearest National Weather Service meteorological tower at Sugar Land Regional Airport in Sugar Land, TX (WBAN No.12977) and concurrent upper air data from Lake Charles, LA (WBAN No. 03937) station indicate winds blow predominantly from south-southeast flow, with secondary northerly flow. This is typical of many locations in east Texas and is thus indicative that the winds measured at the airport are representative of a large area.

Figure 3: Three year Wind Rose (2012-2014) Sugar Land Regional Airport



*Geography and Topography (Mountain Ranges or Other Air Basin Boundaries)*

This area of Texas is predominantly flat; the airport is only about 3 meters higher in elevation than the facility. There are no intervening terrain features that could significantly affect wind flow. No geological features are likely to affect predictive air impacts of $SO_2$.

*Jurisdictional Boundaries*

Once the geographic area associated with the immediate area surrounding W.A. Parish station, and any nearby areas which may potentially be contributing to elevated levels of $SO_2$ around the facility are determined, existing jurisdictional boundaries are considered for the purpose of informing our intended unclassifiable area, specifically with respect to clearly defined legal boundaries.

The EPA has confirmed that aside from the W.A. Parish station, there are no other sources in Fort Bend County or within 20 km of its borders that according to the 2011 NEI, have reported $SO_2$ emissions of 100 tpy or greater. As a result, the EPA believes that it is unlikely for any sources in a neighboring county to cause or contribute to a violation of the NAAQS in Fort Bend County.

The EPA believes that our intended unclassifiable area, consisting of Fort Bend County, is comprised of clearly defined legal boundaries, and we find these boundaries to be a suitably clear basis for defining our intended unclassifiable area.

<u>Other Relevant Information – State and Industry Submittals</u>

As previously discussed, the EPA has received three submittals containing air dispersion modeling completed by industry for the W.A. Parish station. A discussion of the most recent modeling performed by industry follows below, with references to the EPA's Modeling TAD as appropriate. While we believe industry's modeling is more representative of the concentrations surrounding the W.A. Parish station based on corrected model inputs and additional refinements, the EPA has not completed a thorough review of industry's latest modeling due to its late submittal and is not able to determine that a designation of unclassifiable/attainment is appropriate. As stated previously, we will continue to review industry's January 25, 2016 submittal and consider this information, as well as any additional information received during the comment period as part of our final designations determination.

*Model Selection and Modeling Components*

The EPA's Modeling TAD notes that for area designations under the 2010 $SO_2$ NAAQS, the AERMOD modeling system should be used, unless use of an alternative model can be justified. In some instances the recommended model may be a model other than AERMOD, such as the

BLP model for buoyant line sources. The AERMOD modeling system contains the following components:

- AERMOD: the dispersion model
- AERMAP: the terrain processor for AERMOD
- AERMET: the meteorological data processor for AERMOD
- BPIPPRIME: the building input processor
- AERMINUTE: a pre-processor to AERMET incorporating 1-minute automated surface observation system (ASOS) wind data
- AERSURFACE: the surface characteristics processor for AERMET
- AERSCREEN: a screening version of AERMOD

Industry used AERMOD version 15181, and a discussion of the individual components will be referenced in the corresponding discussion that follows as appropriate.

*Modeling Parameter: Rural or Urban Dispersion*

The EPA's recommended procedure for characterizing an area by prevalent land use is based on evaluating the dispersion environment within 3 km of the facility. According to the EPA's modeling guidelines, rural dispersion coefficients are to be used in the dispersion modeling analysis if more than 50% of the area within a 3 km radius of the facility is classified as rural. Conversely, if more than 50% of the area is urban, urban dispersion coefficients should be used in the modeling analysis. When performing the modeling for the area of analysis, industry determined that it was most appropriate to run the model in rural mode.

Based on our review of aerial photography of the area surrounding the facility provided as part of the state's recommendation as presented in Figure 4, below, the determination to run the model in rural mode appears appropriate.

103

Figure 4: Aerial Image Showing W.A. Parish Station and Surrounding Area



*Modeling Parameter: Area of Analysis (Receptor Grid)*

The EPA believes that a reasonable first step towards characterization of air quality in the area surrounding the W.A. Parish station is to determine the extent of the area of analysis, i.e., receptor grid. Considerations presented in the Modeling TAD include but are not limited to: the

104

location of the SO$_2$ emission sources or facilities considered for modeling; the extent of significant concentration gradients of nearby sources; and sufficient receptor coverage and density to adequately capture and resolve the model predicted maximum SO$_2$ concentrations.

Industry's modeling analysis used a receptor grid extending approximately 20 kilometers from the W.A. Parish station. Industry utilized a grid spacing out to 20 km because the source concentration gradient decreased well below the NAAQS even at this distance. They determined that this was the appropriate distance in order to adequately characterize air quality from the facility and other nearby sources that may have a potential impact in the area of analysis where maximum concentrations of SO$_2$ are expected. Industry's modeling submittal indicated that beyond approximately 15 km, modeled impacts drop below 100 μg/m3. Based on the modeled concentration gradient coupled with the fact that the closest 100+ tpy SO$_2$ source is more than 40 km away from the W.A. Parish station, we find that the use of the 20 km receptor grid is appropriate to characterize the ambient air quality surrounding the W.A. Parish facility. The receptor grid consisted of the following receptor spacing:

- 50-meter spacing along the facility fence line;
- 100-meter spacing extending from the fence line to 3 kilometers;
- 200-meter spacing extending from 3 to 5 kilometers;
- 500-meter spacing extending from 5 to 10 kilometers; and
- 1,000-meter spacing extending from 10 to 20 kilometers.

In the facility's modeling, the receptor network contained 6,909 receptors and the network covered the majority of Fort Bend County and small portions southwest of Harris County and northwest of Brazoria County, as shown below in Figure 5. Industry conservatively did not exclude any receptors from the modeling based on the Modeling TAD's option to not include those locations where it would not be feasible to place a monitor and record ambient impacts. The impacts of the area's geography and topography will follow in the appropriate section.

Figure 5: Industry's modeling receptor network



Industry reviewed the locations of all major sources of $SO_2$ within 50 kilometers of W.A. Parish station to determine what off-site sources may need to be included in the modeling analysis. It concluded that the closest source emitting at least 2,000 tons was the Rhodia Chemical Plant in Houston located 44.6 km to the northeast of the W.A. Parish station. After further review of the following factors industry did not include the Rhodia facility from the modeling due to:

- Distance from W.A. Parish station;
- Direction upwind and downwind of W.A. Parish station and frequency that the wind blows in those directions; and
- The presence of a significant concentration gradient in the direction of the sources being considered.

Sierra Club did include the Rhodia facility in their cumulative modeling analysis. However, comparison of the $SO_2$ modeling results shown in the December 15, 2015 submittal both with and without Rhodia emissions included does not show any difference in the maximum modeled impacts. Industry also noted that Sierra Club's modeling including Rhodia was conservative and not representative of the facility's emissions because they included modeled emission rates based on the facility's 2012 operating permit, which do not reflect the $SO_2$ controls installed after 2012.

Industry stated that current emission rates from Rhodia are lower than the emission rates that Sierra Club modeled and that the 2014 emissions were less than 1,000 tpy.

*Modeling Parameter: Source Characterization*

Industry characterized the sources within the area of analysis in accordance with the best practices outlined in the Modeling TAD. Specifically, it used actual stack heights in conjunction with actual emissions. Industry also characterized the facility's building layout and locations, as well as the stack parameters, e.g., exit temperature, exit velocity, location, and diameter. The locations of the structures included in the modeling for downwash purposes are shown in Figure 6 below, taken from the modeling report submitted by industry. The EPA is still reviewing the most recent modeling analysis to confirm that source characterizations are accurate and representative of the facility.  However, based on initial review, the general approach used appears to be consistent with the Modeling TAD's best practices.

Figure 6: Structures included in W.A. Parish Station Modeling Analysis





During the EPA's review of industry's initial modeling submittals, we identified modeled source parameters that appeared to contain potential errors and requested that industry confirm the

108

values and update the modeling, as necessary, to reflect the actual stack parameters. The most recent modeling received from industry contained updated modeling results based on revisions to various stack heights and diameters for sources located at the W.A. Parish station. As discussed previously, this revised modeling is still under review by the EPA and will be considered as part of final designation of the area surrounding the W.A. Parish station.

*Modeling Parameter: Emissions*

The EPA's Modeling TAD notes that for the purposes of modeling to characterize air quality for use in designations, the recommended approach is to use the most recent 3 years of actual emissions data and concurrent meteorological data. However, the TAD does provide for the flexibility of using allowable emissions in the form of the most recently permitted, emissions rate.

The EPA believes that continuous emissions monitoring systems (CEMS) data provide acceptable historical emissions information when it is available, and that these data are available for many electric generating units. In the absence of CEMS data, the EPA's Modeling TAD highly encourages the use of AERMOD's hourly varying emissions keyword HOUREMIS, or through the use of AERMOD's variable emissions factors keyword EMISFACT. When choosing one of these methods, the EPA believes that detailed throughput, operating schedules, and emissions information from the impacted source(s) should be used.

In certain instances, states and other interested parties may find that it is more advantageous or simpler to use PTE rates as part of their modeling runs. Specifically, a facility may have recently adopted a new federally enforceable emissions limit, been subject to a federally enforceable consent decree, or implemented other federally enforceable mechanisms and control technologies to limit $SO_2$ emissions to a level that indicates compliance with the NAAQS. These new limits or conditions may be used in the application of AERMOD. In these cases, the Modeling TAD notes that the existing $SO_2$ emissions inventories used for permitting or SIP planning demonstrations should contain the necessary emissions information for designations-related modeling. In the event that these short-term emissions are not readily available, they may be calculated using the methodology in Table 8-1 of Appendix W to 40 CFR Part 51 titled, "Guideline on Air Quality Models."

The original modeling analysis prepared by industry for the W.A. Parish station submitted by the state on September 17, 2015, included actual hourly $SO_2$ emissions, stack temperature, and exhaust velocity for three years (2012-2014) to coincide with the meteorological data. Following discussions with the EPA, industry submitted a supplemental modeling analysis and report on December 1, 2015 addressing inconsistencies with hourly $SO_2$ emissions data reported to EPA's Clean Air Markets Division (CAMD) archive. The identified inconsistencies included:

- 1-hour time difference between the NRG dataset and the CAMD data for 2014;
- Differences between hourly emissions when a unit was operating only part of an hour; and
- The NRG dataset, not applying a bias adjustment factor (based on a RATA test) of 1.037 to the emissions for Unit 5 for the time period 3/16/2012 through 1/22/2013. These discrepancies have been corrected and hourly emissions in the modeled data set were aligned with the CAMD data.

Following the December 1, 2015 submittal, additional inconsistencies in modeled stack parameters were identified (incorrect stack heights and diameters for some of the W.A. Parish station sources). A second supplemental report and revised modeling to address these errors were submitted by industry on January 25, 2016, which is still under by the EPA.

*Modeling Parameter: Meteorology and Surface Characteristics*

The most recent 3 years of meteorological data (concurrent with the most recent 3 years of emissions data) should be used in designations efforts. As noted in the Modeling TAD, the selection of data should be based on spatial and climatological (temporal) representativeness. The representativeness of the data are based on: 1) the proximity of the meteorological monitoring site to the area under consideration, 2) the complexity of terrain, 3) the exposure of the meteorological site, and 4) the period of time during which data are collected. Sources of meteorological data include National Weather Service (NWS) stations, site-specific or onsite data, and other sources such as universities, Federal Aviation Administration (FAA), and military stations.

For the Fort Bend County area of analysis, surface meteorology from the NWS station at Sugar Land Regional Airport in Sugar Land, TX (WBAN No. 12977) and concurrent upper air data from Lake Charles, LA (WBAN No. 03937) were selected by industry as best representative of meteorological conditions within the area of analysis.

Industry used AERSURFACE version 13016 and land use data from the NWS station in Sugar Land, Texas (located at 29.6197,-95.6575) to estimate the surface characteristics of the area of analysis. Industry estimated values for 12 spatial sectors out to 1 km at a monthly temporal resolution for moisture conditions defined by month. It also estimated values for albedo (the fraction of solar energy reflected from the earth back into space), the Bowen ratio (the method generally used to calculate heat lost or heat gained in a substance), and the surface roughness (sometimes referred to as "Zo"). In Figure 4, the location of the Sugar Land Regional Airport NWS station is shown relative to the W.A. Parish station.

When completing the AERSURFACE analysis, industry did make adjustments to the NLCD 1992 land use category information to be more consistent with the current conditions and surface

types at the Sugar Land Airport. Figure 7 below shows the initial 1992 land use definitions alongside the revised land use definitions superimposed on a current aerial photograph of the meteorological station.

Figure 7: 1992 NLCD Land Use and Updated Land Use for Sugar Land Airport



Meteorological data from the stated surface and upper air stations were used in generating AERMOD-ready files with the AERMET processor. The output meteorological data created by the AERMET processor is suitable for being applied with AERMOD input files for AERMOD modeling runs. Texas followed the methodology and settings presented in the most recent versions of meteorological preprocessing files of AERMOD, and is consistent with EPA

guidance in the processing of the raw meteorological data into an AERMOD-ready format, and used AERSURFACE to best represent surface characteristics.

Hourly surface meteorological data records are read by AERMET, and include all the necessary elements for data processing. However, wind data taken at hourly intervals may not always portray wind conditions for the entire hour, which can be variable in nature. Hourly wind data may also be overly prone to indicate calm conditions, which are not modeled by AERMOD. In order to better represent actual wind conditions at the meteorological tower, wind data of one minute duration was provided from the same instrument tower, but in a different formatted file to be processed by a separate preprocessor, AERMINUTE. These data were subsequently integrated into the AERMET processing to produce final hourly wind records of AERMOD-ready meteorological data that better estimate actual hourly average conditions and that are less prone to over-report calm wind conditions. This allows AERMOD to apply more hours of meteorology to modeled inputs, and therefore produce a more complete set of concentration estimates. As a guard against excessively high concentrations that could be produced by AERMOD in very light wind conditions, industry set a minimum threshold of 0.5 meters per second in processing meteorological data for use in AERMOD. In setting this threshold, no wind speeds lower than this value would be used for determining concentrations. This threshold was applied to the one minute wind data.

*Modeling Parameter: Geography and Terrain*

Figure 8 provides a depiction of terrain elevations surrounding the airport and the W.A. Parish station. This terrain in this area of Texas is flat; the airport's location is only about 3 meters higher in elevation than the W.A. Parish station, and as the following figure shows there are no intervening terrain features that could significantly affect wind flow.

Figure 8: Area Terrain Elevation surrounding W.A. Parish Electric Generating Station



As shown earlier in Figure 3 of this technical support document, the predominant wind pattern is south to south-southeast flow, with secondary northerly flow, is typical of many locations in East Texas and is thus indicative that the winds measured at the airport are representative of a large area. The terrain in the area of analysis is best described as flat with no significant terrain barriers. To account for these terrain changes, the AERMAP terrain program within AERMOD was used to specify terrain elevations for all the receptors. The source of the elevation data incorporated into the model is from the USGS National Elevation Database.

*Modeling Parameter: Background Concentrations of SO$_2$*

The Modeling TAD offers two mechanisms for characterizing background concentrations of SO$_2$ that are ultimately added to the modeled design values: 1) a "first tier" approach, based on monitored design values, or 2) a temporally varying approach, based on the 99th percentile monitored concentrations by hour of day and season or month. For the Fort Bend area of analysis, the industry used 2nd tier seasonal variable diurnal profiles for the background concentrations from data collected at Italy, Texas, located about 320 km WNW of the W.A. Parish station. Table 3 contains the seasonal, diurnal SO$_2$ concentrations for the Italy monitor. These background concentrations were incorporated into the final AERMOD results.

Table 3: Seasonal, Diurnal 1-hour SO₂ Concentrations for the Italy, Texas Monitor



*Summary of Modeling Results*

The AERMOD modeling parameters used by industry for the Fort Bend area of analysis are summarized below in Table 4.

Table 4: AERMOD Modeling Parameters for the Fort Bend, Texas Area of Analysis

| Fort Bend County Area of Analysis | |
|---|---|
| AERMOD Version | 15181 |
| Dispersion Characteristics | Rural |
| Modeled Sources | 1 |
| Modeled Stacks | 14 |
| Modeled Structures | 353 |
| Modeled Fencelines | Yes, W.A. Parish Station Fenceline |
| Total receptors | 6,909 |

114

| Emissions Type | Actual |
|---|---|
| Emissions Years | 2012-2014 |
| Meteorology Years | 2012-2014 |
| Surface Meteorology Station | Sugar Land Regional Airport, TX |
| Upper Air Meteorology Station | Lake Charles, LA |
| Methodology for Calculating Background $SO_2$ Concentration | Seasonal diurnal values |
| Calculated Background $SO_2$ Concentration | See Table 6 |

Industry's modeling results are shown in Table 8 below. The design value represents the modeled 3-year average of the 99th percentile, maximum daily 1-hour average impact, consistent with the form of the $SO_2$ 1-hour NAAQS. The first row in this table shows the results that were presented in the initial September 17, 2015 submittal. The second and third rows show results from the subsequently revised modeling analyses submitted by industry to correct errors to model inputs. In all cases, the predicted total ambient concentration when the seasonal diurnal background is added demonstrates attainment of the 1-hour $SO_2$ NAAQS. The corresponding predicted impacts in ppb for the values listed in Table 5 are as follows: 64.6 ppb (September 17, 2015 modeling), 70.3 ppb (November 30, 2015 modeling), and 70.3 ppb (January 22, 2016 modeling).[21] As discussed previously, the latest modeling submittal is still under review by the EPA and will be considered as part of our final designations action.

Table 5: 1-hour $SO_2$ Modeling Results for W.A. Parish Station and Background ($\mu g/m^3$), Provided by Industry

| Source | Parish Station Only (µg/m³) | Parish and Background (µg/m³) | 1-hr SO₂ NAAQS (µg/m³) | Below NAAQS? |
|---|---|---|---|---|
| September 17, 2015 modeling | 163.2 | 168.6 | 196.5 | Yes |
| November 30, 2015 modeling | 178.407 | 164.182 | 196.5 | Yes |
| January 22, 2016 modeling | 178.404 | 164.184 | 196.5 | Yes |

Other Relevant Information – Sierra Club Submittals

The EPA received air dispersion modeling from Sierra Club, asserting that $SO_2$ emissions from W.A. Parish station, when considered alone or cumulatively with other nearby sources, are

---

[21] The conversion factor for $SO_2$ (at the standard conditions applied in the ambient $SO_2$ reference method) is 1ppb = approximately 2.62 $\mu g/m^3$.

causing a violation of the NAAQS. The latest modeling for the W.A. Parish station submitted by the Sierra Club was dated December 15, 2015. This supplemental modeling was provided to correct input errors in previous modeling and to update the model input to include variable stack temperatures and velocities and building downwash based on the initial modeling submitted by the state on September 17, 2015. As noted above, industry submitted supplemental modeling on December 1, 2015 to correct errors in the September 17, 2015 state recommendation. Therefore, the latest modeling from Sierra Club does contain those initial model input errors and is not as representative as the December 1, 2015 modeling submitted by industry. In addition, industry utilized additional modeling refinements recommended by the Modeling TAD and consistent EPA modeling guidance that were not utilized by Sierra Club (i.e., 2nd tier $SO_2$ seasonal, diurnal background concentrations; revised land use date inputs for meteorological data processing). Based on our comparison of Sierra Club's modeling and industry's modeling, we expect that if the Sierra Club's modeling were revised to account for these two differences the modeled impacts would be reduced.  It is unclear what would be the magnitude of the reductions. Because of the model input errors, the availability of more refined modeling that indicates that modeled impacts from the W.A. Parish station do not exceed the standard, and the need for EPA to perform a more detailed analysis of this recent modeling, the EPA's current intended designations is not nonattainment based solely on Sierra Club's modeling for the area surrounding the facility. Specifically, the EPA does not believe that the current Sierra Club modeling provides a basis to support a nonattainment designation for the area of analysis because of the more recent modeling industry submitted without apparent model input errors that requires further review by EPA.  A discussion of the most recent modeling performed by Sierra Club follows below, with references to the EPA's Modeling TAD as appropriate.

*Model Selection and Modeling Components*

Sierra Club used AERMOD version 15181 as available from the Support Center for Regulatory Atmospheric Modeling (SCRAM) website, and a discussion of the individual components will be referenced in the corresponding discussion that follows as appropriate.

*Modeling Parameter: Rural or Urban Dispersion*

Similar to the industry modeling, Sierra Club determined that it was most appropriate to run the model in rural mode. Specifically, Sierra Club conducted an evaluation to determine if the modeled facility was located in a rural or urban setting using USEPA's methodology outlined in Section 7.2.3 of the Guideline on Air Quality Models.[22] For urban sources, the URBANOPT option was used in conjunction with the urban population from an appropriate nearby city and a default surface roughness of 1.0 meter. Sierra Club used AERSURFACE v. 13016 and Geographic Information System (GIS) to determine whether rural or urban dispersion

---

[22] USEPA, Revisions to the Guideline on Air Quality Models: Adoption of a Preferred General Purpose (Flat and Complex Terrain) Dispersion Model and other Revisions, Appendix W to 40 CFR Part 51, November 9, 2005, Section 7.2.3.

coefficients apply to a site Land use within a three-kilometer radius circle surrounding the facility was considered. USEPA guidance states that urban dispersion coefficient are used if more than 50% of the area within 3 kilometers has urban land uses. Otherwise, rural dispersion coefficients are appropriate. Based on AERSURFACE analysis, Sierra Club concluded that the rural option would be used for the modeling of W.A. Parish facility.

The determination to run the model in rural mode appears appropriate based on our review of aerial photography of the area surrounding the facility.

*Modeling Parameter: Area of Analysis (Receptor Grid)*

For the Fort Bend area, Sierra Club included other emitters of $SO_2$ within 50 kilometers (km) of W.A. Parish station in any direction. Sierra Club determined that this was the appropriate distance in order to adequately characterize air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. In addition to the W.A. Parish station, the other emitter of $SO_2$ included in the area of analysis is Rhodia Houston Plant. The grid receptor spacing for the area of analysis chosen by Sierra Club is as follows:

- 100 meter grid from center of W.A. Parish station out to 5 km;
- 500 meter grid from center of W.A. Parish station out to 10 km; and
- 1,000 meter grid from center of W.A. Parish station out to 50 km.

The Sierra Club modeling receptor network contained 21,201 receptors, and the network covered all of the Fort Bend county and majority/portion of adjacent counties as shown in Figure 9 below. Sierra Club modeling used a slightly elevated flagpole receptor height, but if this was corrected to EPA's recommended ground level height we would expect only a slight change in the modeled numbers.

Figure 9: Sierra Club's Modeled Receptors in Area of Analysis



*Modeling Parameter: Source Characterization*

Sierra Club characterized the sources within the area of analysis in accordance with the best practices outlined in the Modeling TAD. Specifically, it used actual stack heights in conjunction with actual emissions. Sierra Club also correctly characterized the source's building layout and location, as well as the stack parameters, e.g., exit temperature, exit velocity, location, and diameter. Some of these stack parameters originally had flaws which were later recognized and revised by industry in their supplemental modeling. The most recent Sierra Club modeling was submitted prior to the latest supplement from industry; and therefore, did not include the updated parameters that Sierra Club did not previously have access to. Where appropriate, the AERMOD component BPIPPRIME was used to assist in addressing building downwash.

*Modeling Parameter: Emissions*

In addition to the W.A. Parish station emissions sources, Sierra Club included emissions from Rhodia's Houston Plant, located within 50 kilometers of the Parish facility.  This distance and these facilities were selected because Sierra Club believes that this area of analysis adequately represents the area where maximum concentrations of $SO_2$ are expected and adequately includes the sources which might contribute to those concentrations. No other sources beyond 50 km were determined by Sierra Club to have the potential to cause significant concentration gradient impacts within the area of analysis. As discussed previously, industry determined that no additional sources needed to be included in the area of analysis based on the distance between W.A. Parish station and the closest nearby large $SO_2$ emitters, the concentration gradient of impacts from W.A. Parish station in the direction of those emitters, and the examination of predominant wind patterns and the frequency of occurrence that winds would result in overlap of W.A. Parish station emissions with off-site sources. Based on these same factors, we agree that the inclusion of Rhodia's emissions would not significantly impact the modeled concentrations in the area of analysis. The modeling results provided by Sierra Club support this determination, in that, the maximum impacts from the combined impacts from W.A. Parish station and Rhodia are only 0.1 $\mu g/m^3$ more than the impacts of W.A. Parish station alone.  While there would be more interaction between the emissions at receptors located along the northeast edges of the receptor grid in the direction of the Rhodia Houston Plant, the maximum modeled values including background from industry's latest modeling submittal in this area of the receptor grid are less than 65 $\mu g/m^3$ (24.8 ppb), or 25% of the NAAQS.  Based on these relatively low impacts from the W.A. Parish facility, we expect that even with the addition of Rhodia's emissions the cumulative impacts would remain well below the 1-hour standard.

For the W.A. Parish station, Sierra Club used actual measured emissions for each hour between January 1, 2012 and December 31, 2014 as taken from USEPA Air Markets Program Data. For the Rhodia Plant, actual emissions are the annual average of those reported to the TCEQ for calendar year 2014. When modeling the actual hourly emissions from the W.A. Parish station, hourly stack exit temperatures and velocities were based on information provided by USEPA, which were taken from industry's initial modeling submittals.  Stack parameters for Rhodia emission sources were based on 100% operating load using maximum exhaust flow rates and temperatures.

*Modeling Parameter: Meteorology and Surface Characteristics*

For the Fort Bend area of analysis, surface meteorology from the NWS station at Sugar Land Regional Airport in Sugar Land, TX (WBAN No. 12977) and concurrent upper air data from Lake Charles, LA (WBAN No. 03937) were selected by Sierra Club as best representative of meteorological conditions within the area of analysis. These are the same meteorological stations chosen by industry in their modeling analysis.

Sierra Club used AERSURFACE version 13016 at the NWS station in Sugar Land, TX (located at 29.620, -95.658) to estimate the surface characteristics of the area of analysis. Sierra Club estimated values for 12 spatial sectors out to 1 km at an annual temporal resolution for average conditions. Sierra Club also estimated values for albedo (the fraction of solar energy reflected

from the earth back into space), the Bowen ratio (the method generally used to calculate heat lost or heat gained in a substance), and the surface roughness (sometimes referred to as "Zo").

Meteorological data from the above surface and upper air stations were used in generating AERMOD-ready files with the AERMET processor. The output meteorological data created by the AERMET processor is suitable for being applied with AERMOD input files for AERMOD modeling runs. Sierra Club followed the methodology and settings presented in the most recent versions of meteorological preprocessing files of AERMOD, and it is consistent with EPA guidance in the processing of the raw meteorological data into an AERMOD-ready format, and used AERSURFACE to best represent surface characteristics.

Hourly surface meteorological data records are read by AERMET, and include all the necessary elements for data processing. However, wind data taken at hourly intervals may not always portray wind conditions for the entire hour, which can be variable in nature.  Hourly wind data may also be overly prone to indicate calm conditions, which are not modeled by AERMOD. In order to better represent actual wind conditions at the meteorological tower, wind data of one minute duration was provided from the same instrument tower, but in a different formatted file to be processed by a separate preprocessor, AERMINUTE. These data were subsequently integrated into the AERMET processing to produce final hourly wind records of AERMOD-ready meteorological data that better estimate actual hourly average conditions and that are less prone to over-report calm wind conditions. This allows AERMOD to apply more hours of meteorology to modeled inputs, and therefore produce a more complete set of concentration estimates. As a guard against excessively high concentrations that could be produced by AERMOD in very light wind conditions, Sierra Club set a minimum threshold of 0.5 meters per second in processing meteorological data for use in AERMOD. In setting this threshold, no wind speeds lower than this value would be used for determining concentrations. This threshold was specifically applied to the one minute wind data.

*Modeling Parameter: Geography and Terrain*

The terrain in the area of analysis is best described as flat with no significant terrain barriers. To account for these terrain changes, the AERMAP terrain program within AERMOD was used to specify terrain elevations for all the receptors. The source of the elevation data incorporated into the model is from the USGS National Elevation Database.

*Modeling Parameter: Background Concentrations of SO$_2$*

For the Fort Bend area of analysis, Sierra Club used a background concentration of 7.8 μg/m$^3$ which is the 2011-2013 design value for El Paso County, Texas, and that value was incorporated into the final AERMOD results.  Sierra Club state that the DV from El Paso was the lowest value for all monitoring stations in Texas for that time period.

120

Sierra Club also included a supplemental analysis that included background concentration values from a monitor located in Harris County, which they identified as being the closest county to the W.A. Parish station that contained $SO_2$ monitors.  They referenced the lowest DV for 2011-2013 for all Harris County monitors as being 23.5 μg/m³. However they did not provide any additional information besides proximity to demonstrate that the Harris County monitor was representative of background in the Fort Bend County area of analysis. For example, they did not address if the magnitude of emissions in the vicinity of the monitor was similar to that in the area of analysis. Without additional it is unclear if the monitor is appropriate for characterizing the background concentration surrounding the W.A. Parish station.

*Summary of Modeling Results*

The AERMOD modeling parameters for the Fort Bend area of analysis, as provided by Sierra Club, are summarized below in Table 6.

Table 6: AERMOD Modeling Parameters for the Fort Bend Area of Analysis, Provided by Sierra Club

| Fort Bend Area of Analysis | |
|---|---|
| AERMOD Version | 15181 |
| Dispersion Characteristics | Rural |
| Modeled Sources | 2 |
| Modeled Stacks | 6 |
| Modeled Structures | Yes; downwash based on initial industry modeling |
| Modeled Fencelines | No; however, report indicated that maximum modeled impacts occur off property |
| Total receptors | 21,201 |
| Emissions Type | Actuals |
| Emissions Years | 2012-2014 |
| Meteorology Years | 2012-2014 |
| Surface Meteorology Station | Sugar Land Regional Airport, TX |
| Upper Air Meteorology Station | Lake Charles, LA |
| Methodology for Calculating Background $SO_2$ Concentration | 2011-2013 Design Values measured at ambient monitors in TX |
| Calculated Background $SO_2$ Concentration | 7.8  μg/m³ (El Paso monitor DV) |

The results presented below in Table 7 show the magnitude and geographic location of the highest predicted modeled concentration of $SO_2$ based on actual emissions.

Table 7: Maximum Predicted 99th Percentile 1-Hour $SO_2$ Concentration in the W.A. Parish Station Area of Analysis Based on Actual Emissions, Provided by Sierra Club

| Averaging Period | Data Period | Receptor Location | | $SO_2$ Concentration ($\mu g/m^3$) Based on Actual Emissions | |
| | | UTM/Latitude | UTM/Longitude | Modeled (including background)* | NAAQS |
| 99th Percentile 1-Hour Average | 2012-2014 | 241,606.75 | 3,263,457.75 | 215.5 | 196.5** |

\* Sierra Club's submittal indicated that highest predicted concentration occurred off facility property so the absence of fenceline and removal of on-site receptors did not impact their final determination regarding NAAQS exceedances.
\*\* Equivalent to the 2010 $SO_2$ NAAQS set at 75 ppb

Sierra Club's modeling indicates that the predicted 99th percentile 1-hour average concentration within the chosen modeling domain is 215.5 $\mu g/m^3$, or 82.3 ppb. This modeled concentration included the background concentration of $SO_2$, and is based on actual emissions from the facilities. The area of maximum impacts, including the overall maximum, is located to the southwest of the facility as illustrated in the following figure.

Figure 10: Sierra Club's Maximum Predicted 99th Percentile 1-Hour SO₂ Concentrations in the
W.A. Parish Area of Analysis Based on Actual Emissions and El Paso Background DV



As stated in the previous section, the EPA has identified several areas in Sierra Club's most recent modeling that contain model input errors and areas where further refinements are necessary to be most consistent with the modeling approaches found in the Modeling TAD and EPA guidance. Specifically, stack parameters for several of the W.A. Parish station sources contain errors because they were based on inaccurate information included my industry in their early modeling submittals. While Sierra Club did not have the most recent stack parameters corrections made by industry prior to their modeling submittal, the current modeling as provided by Sierra Club does not accurately represent the W.A. Parish facility's emission sources. Sierra Club also did not utilize all of the model refinements that were used by industry (i.e., seasonal, diurnal background concentrations; updates to land use date to account for current land use for AERSURFACE calculations), which are consistent with the Modeling TAD and EPA guidance. Because the EPA had received more accurate and refined modeling data that disputes, Sierra

Club's recommendation for nonattainment, the current Sierra Club modeling is not sufficient to support a nonattainment designation for the Fort Bend County area of analysis.

<u>Conclusion</u>

After careful evaluation of the state's recommendation and supporting information, as well as all available relevant information, the EPA intends to designate the area around W.A Parish station as unclassifiable for the 2010 $SO_2$ NAAQS. Specifically, the boundaries are comprised of Fort Bend County.

For the analysis area surrounding the W.A. Parish station, the EPA has received three modeling analysis submittals from Sierra Club, and three modeling analysis submittals from industry, and one modeling analysis submittal from the state as prepared by industry. As discussed in this technical support document, in the most recent submittal from Sierra Club we have identified model input errors that later were identified and corrected by industry in their January 25, 2015 submittal (i.e., stack parameters for several on-site sources were determined by industry to contain errors and not accurately reflect the actual stack parameters) and additional areas in the modeling approach that could be further refined (i.e., seasonal, diurnal background concentrations; updates to land use data so that calculated surface characteristics are more representative of current surface characteristics)  in order to be consistent with the Modeling TAD. Therefore, we do not believe that the submittals received from Sierra Club contain sufficient information to indicate that the area of analysis should be designated nonattainment. Same as the three Sierra Club modeling submittals, the two initial modeling submittals received from industry contained errors in model inputs (i.e., errors in hourly emissions input data and modeled stack parameters) and utilized modeling approaches (i.e., AERSURFACE analysis conducted at facility instead of meteorological station) that were inconsistent with the Modeling TAD and other EPA modeling guidance. On January 25, 2016, however, the EPA received the third revised modeling submittal from industry that was provided to address the model inputs errors and the modeling approaches contained in its September and November 2015 modeling. The EPA's review of this latest modeling is currently underway. Based on our current review of all available analyses, we preliminarily believe that the latest modeling from industry is more consistent with the modeling approach and refinements outlined in the Modeling TAD. However, due to the date of receipt of the latest modeling from industry relative to our scheduled timeline for proposing designations in order to meet the court-ordered deadline, we have not had sufficient time to thoroughly review the January 25, 2016 submittal to determine if the modeling is sufficient to support a designation of unclassifiable/attainment as it requests. The EPA will continue our review of industry's January 25, 2016 submittal and will take it into consideration in our final designation for the area around W.A. Parish station. Therefore, the EPA is intends to designate the area surrounding the W.A. Parish station as unclassifiable.

At this time, our intended designations for the state only apply to this area and the other areas presented in this technical support document. Consistent with the conditions in the March 2,

2015 consent decree, the EPA will evaluate and designate all remaining undesignated areas in Texas by either December 31, 2017, or December 31, 2020.

**Technical Analysis for the Sandy Creek Energy Station,**
**McLennan, Texas**
**Area**

Introduction

McLennan County, Texas contains a stationary source that according to the EPA's Air Markets Database emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU). As of March 2, 2015, this stationary source had not met the specific requirements for being "announced for retirement." Specifically, in 2012, the Sandy Creek Energy Station emitted 4,955 tons of $SO_2$, and had an emissions rate of 1.41 lbs $SO_2$/mmBTU based on EPA's Air Markets Database. Pursuant to the March 2, 2015 consent decree, the EPA must designate the area surrounding the facility by July 2, 2016.[23]

In its submission, Texas recommended that the area surrounding the Sandy Creek Energy Station, specifically the entirety of McLennan County, be designated as attainment based on an assessment and characterization of air quality from the facility. This assessment and characterization was based on historical modeling performed in 2011 by the facility using air dispersion modeling software, i.e., AERMOD, analyzing permitted emissions and review of available monitor data.[24] After careful review of the state's assessment, supporting documentation, and all available data, the EPA does not agree with the state's recommendation for the area, and intends to designate McLennan County as unclassifiable.

The Sandy Creek Energy Station is located in Texas in the eastern southern portion of McLennan County close the border of McLennan and Falls county. As seen in Figure [1] below, the facility is located approximately 23 km east of the center of McLennan County. Also included in the figure are nearby emitters of $SO_2$, the state's recommended area for the attainment designation (McLennan County), and the EPA's recommended area for the intended unclassifiable designation.

---

[23] TCEQ and Sandy Creek Energy Station have provided information that the EPA's Air Markets Database emission data for 2012 for the facility is substituted emissions data and not measured emission data. On April 5, 2013 Sandy Creek Energy Station submitted a petition for an alternate methodology for reporting substituted emissions data. Based on this alternate methodology, revised reported emissions for the facility for 2012 would be 2,280 tpy, below the 2600 tpy threshold for CD sources. EPA has not acted on that petition at this time. If the petition is approved and the Air Market's Database is updated to reflect this change by the deadline for designations, the EPA consent decree obligation to designate this area by July 2, 2016 would not apply.

[24] Waco Manzac Monitor located 14 miles northwest of the facility.

Figure 1. The EPA's intended designation(s) for McLennan County, Texas



To assist states and other interested parties in their efforts to characterize air quality through air dispersion modeling for sources that emit $SO_2$, the EPA released its most recent version of a document titled, "$SO_2$ NAAQS Designations Modeling Technical Assistance Document" (Modeling TAD) in December 2013. The discussion and analysis that follows below will reference the state's use of the Modeling TAD, the EPA's assessment of the state's modeling in accordance with the Modeling TAD, and the factors for evaluation contained in the EPA's March 20, 2015 guidance, as appropriate.

Detailed Assessment

*Model Selection and Modeling Components*

The EPA's Modeling TAD notes that for area designations under the 2010 $SO_2$ NAAQS, the AERMOD modeling system should be used, unless use of an alternative model can be justified. In some instances the recommended model may be a model other than AERMOD, such as the

127

BLP model for buoyant line sources. The AERMOD modeling system contains the following components:

- AERMOD: the dispersion model
- AERMAP: the terrain processor for AERMOD
- AERMET: the meteorological data processor for AERMOD
- BPIPPRIME: the building input processor
- AERMINUTE: a pre-processor to AERMET incorporating 1-minute automated surface observation system (ASOS) wind data
- AERSURFACE: the surface characteristics processor for AERMET
- AERSCREEN: a screening version of AERMOD

Texas relied on historical modeling performed by the facility in 2011 that utilized AERMOD version 11103. A discussion of the individual components will be referenced in the corresponding discussion that follows, as appropriate.

*Modeling Parameter: Rural or Urban Dispersion*

The EPA's recommended procedure for characterizing an area by prevalent land use is based on evaluating the dispersion environment within 3 km of the facility. According to the EPA's modeling guidelines, rural dispersion coefficients are to be used in the dispersion modeling analysis if more than 50% of the area within a 3 km radius of the facility is classified as rural. Conversely, if more than 50% of the area is urban, urban dispersion coefficients should be used in the modeling analysis. When performing the modeling for the area of analysis, industry determined that it was most appropriate to run the model in rural mode. Based on our review of aerial photography of the area surrounding the Sandy Creek Energy Station, the determination of modeling using rural mode is appropriate as shown in Figure 2 below.

Figure 2: Aerial Image Showing Immediate Area Surrounding Sandy Creek Energy Station



*Modeling Parameter: Area of Analysis (Receptor Grid)*

The EPA believes that a reasonable first step towards characterization of air quality in the area surrounding the Sandy Creek Energy Station is to determine the extent of the area of analysis, i.e., receptor grid. Considerations presented in the Modeling TAD include but are not limited to: the location of the $SO_2$ emission sources or facilities considered for modeling; the extent of significant concentration gradients of nearby sources; and sufficient receptor coverage and density to adequately capture and resolve the model predicted maximum $SO_2$ concentrations.

For the area surrounding Sandy Creek Energy Station, the location of the highest one-hour concentrations predicted by the facility's 2011 AERMOD modeling analysis are northwest and northeast of the facility, all within 700 meters of the property line, with the highest concentration predicted to occur 350 meters beyond the property line to the northwest. Concentrations predicted for receptors from 350 meters to 5,000 meters from any property boundary steadily decreased with distance in every direction. The facility determined that running AERMOD to predict concentrations for receptors located beyond 5,000 meters for the property line was

129

unwarranted. The concentration gradients due to nearby sources (see Figure 1) were not considered in the modeling analysis. The grid receptor spacing for the area of analysis chosen by the facility is as follows:

- Receptors spaced 25 meters apart, extending to 200 meters from the legal property boundary
- Receptors spaced 100 meters apart, extending to 1,000 meters from the legal property boundary
- Receptors spaced 500 meters apart, extending to 5,000 meters from the legal property boundary

The receptor network contained 5,900 receptors located within 5 kilometers of the Sandy Creek facility's property line. The receptor network covered portions of McLennan County, and a small portion of Falls County. Figure 3, shows the receptor grid in the chosen area of analysis surrounding Sandy Creek Energy Station.

Figure 3: Receptor Grid for Sandy Creek Energy Station Area of Analysis



According to the TAD, selection of modeling domain is important in terms of how many sources to explicity model and what kind of receptor network to create depending on the number and locations of sources that meet or exceed the EPA determined emissions threshold, to be

established in the future data requirement rule. Figure 2 above shows the receptor grid for Sandy Creek Energy Station area of analysis and other nearby large SO$_2$ sources (>100 tons/yr.). The size of the receptor network selected and used in the modeling analysis for Sandy Creek Energy Station was limited to only 10% (5 km) of how large AERMOD models domain (up to 50 km) can be established. The receptor network should cover the modeling domain and generally follow the recommendations of Section 7.2.2 of Appendix W with the exception of areas to exclude based on feasibility of monitor placement. No technical or receptor placement feasibility justifications were mentioned in the modeling analysis for using limited size receptor network. Also, if modeling indicates elevated levels of SO$_2$ near the edge of receptor grid, expanding the grid or conducting an additional modeling run centered on the area of concern should be considered to ensure that maximum impacts are captured by the modeling to clearly support designation of the area.  While the modeling results included in the Sandy Creek analysis showed impacts below the NAAQS through the entire modeled domain, the modeling approach as discussed in the following sections is not consistent with the modeling TAD. Revised modeling completed consistent with the TAD may result in modeled areas of concern within the relatively small receptor grid that would require the inclusion of additional receptors to ensure that the area potentially impacted by Sandy Creek Energy Station and large nearby SO$_2$ emitters does not show predicted violations of the 1-hour SO$_2$ NAAQS.

*Modeling Parameter: Source Characterization*

The analysis characterized the source's building layout and location, as well as the stack parameters, e.g., exit temperature, exit velocity, location, and diameter, as discussed below. Where appropriate, the AERMOD component BPIPPRIME was used to assist in addressing building downwash. The facility used "BEE-Line BEEST for Windows" computer interface to run the BIPPRM subroutine (Version 04274) in order to calculate downwash parameter values for the analysis.

*Modeling Parameter: Emissions*

The EPA's Modeling TAD notes that for the purposes of modeling to characterize air quality for use in designations, the recommended approach is to use the most recent 3 years of actual emissions data and concurrent meteorological data. However, the TAD does provide for the flexibility of using allowable emissions in the form of the most recently permitted (referred to as PTE or allowable) emissions rate.

The EPA believes that continuous emissions monitoring systems (CEMS) data provide acceptable historical emissions information when it is available, and that these data are available for many electric generating units. In the absence of CEMS data, the EPA's Modeling TAD

highly encourages the use of AERMOD's hourly varying emissions keyword HOUREMIS or the use of AERMOD's variable emissions factors keyword EMISFACT. When choosing one of these methods, the EPA believes that detailed throughput, operating schedules, and emissions information from the impacted source(s) should be used.

In certain instances, states and other interested parties may find that it is more advantageous or simpler to use PTE rates as part of their modeling runs. Specifically, a facility may have recently adopted a new federally enforceable emissions limit, been subject to a federally enforceable consent decree, or implemented other federally enforceable mechanisms and control technologies to limit $SO_2$ emissions to a level that indicates compliance with the NAAQS. These new limits or conditions may be used in the application of AERMOD. In these cases, the Modeling TAD notes that the existing $SO_2$ emissions inventories used for permitting or SIP planning demonstrations should contain the necessary emissions information for designations-related modeling. In the event that these short-term emissions are not readily available, they may be calculated using the methodology in Table 8-1 of Appendix W to 40 CFR Part 51 titled, "Guideline on Air Quality Models."

As previously noted, the state included Sandy Creek Energy Station and no other emitters of $SO_2$ in the area of analysis which included receptors out to 5 km in all directions from the facility. This distance was selected because the state believes that this area of analysis adequately represents the area where maximum concentrations of $SO_2$ are expected and adequately includes the source which might cause these concentrations. No other nearby sources were identified by the state as having the potential to cause significant concentration gradient impacts within the area of analysis.

Table 1: Actual $SO_2$ Emissions 2012-2014 in McLennan County Area of Analysis

| Company ID | Facility Name | $SO_2$ Emissions (tons per year)[25] | | |
| --- | --- | --- | --- | --- |
| | | 2012 | 2013 | 2014 |
| Sandy Creek Services LLC | Sandy Creek Energy Station | 4,955 | 9,680 | 2,648 |

For Sandy Creek Energy Station, the source modeled hourly emission rates, presented in Table 2 below. The modeled emission rates are based on permit allowable emissions rates. For Emission Point Number (EPNs) for Emergency Diesel Fuel-Fired Fire Water Pump and Booster Pump, S33 and S34 do not match current permit allowable emission rates; however, since these sources are considered intermittent due to their emergency status, these sources were modeled using annual average $SO_2$ emission rates in lieu of the permit allowable hourly rates.

---

[25] Data from EPA's Air Markets Database.

Table 2: Sandy Creek Point Sources and Modeled Hourly Emission Rates

| EPN | Source description | Modeled Hourly emission rate (lb/hr) |
|-----|--------------------|--------------------------------------|
| S01 | Pulverized Coal Boiler | 2,892 |
| S02 | Auxiliary Boiler | 0.17 |
| S33 | Diesel-fired Emergency Generator | 0.029 |
| S34 | Emergency Diesel Fuel-Fired Firewater Pump | 0.029 |
| S40 | Emergency Diesel Fuel Fired Firewater Booster Pump | 0.029 |

Table 3 presents modeled stack exit parameter values for Sandy Creek Energy Station sources. All combustion sources were modeled as point sources using constant values for exhaust parameters (i.e., stack exit velocities, diameters, and temperatures). All combustion exhaust was treated in the modeling analysis as being released vertically.

Table 3: Modeled Stack Parameters for Contributing Sources in Area of Analysis

| EPN | Easting (X) (m) | Northing (Y) (m) | Base Elevation (m) | Exit Height (ft) | Exit Temperature (°F) | Exit Velocity (fps) | Exit Diameter (ft) |
|-----|------|------|------|------|------|------|------|
| S01 | 694,227 | 3,484,006 | 146.6 | 360.0 | 165.0 | 65.0 | 27.80 |
| S02 | 694,071 | 3,484,039 | 146.6 | 265.0 | 300.0 | 135.0 | 5.00 |
| S33 | 693,999 | 3,483,915 | 146.6 | 35.0 | 835.0 | 254.9 | 0.92 |
| S34 | 694,086 | 3,484,098 | 146.6 | 13.0 | 844.0 | 160.4 | 0.50 |
| S40 | 694,025 | 3,483,924 | 146.6 | 13.0 | 846.0 | 34.7 | 0.50 |

*Air Quality Data*

This factor considers the $SO_2$ air quality monitoring data in the area surrounding Sandy Creek Energy Station. The table below shows information related to the monitor located in McLennan County. Based on available ambient air quality collected between 2012 and 2014, the county containing Sandy Creek Energy Station does not show a violation of the 2010 $SO_2$ NAAQS at its monitor. However, the absence of a violating monitor when considering the distance from the facility is not a sufficient technical justification to rule out that an exceedance of the 2010 $SO_2$ NAAQS may occur in the immediate vicinity of the facility.

Table 4: Available Air Quality Data for the Area Closest to Sandy Creek Energy Station

| County | State Recommendation | Air Quality Systems (AQS) Monitor ID | Monitor Location | Distance to San Miguel (km) | 2012 – 2014 $SO_2$ Design Value (ppb) |
|--------|---------------------|--------------------------------------|------------------|------------------------------|----------------------------------------|
| McLennan | Attainment | 483091037 | Waco Mazanec | 24.5 | 6 |

*Modeling Parameter: Meteorology and Surface Characteristics*

The most recent 3 years of meteorological data (concurrent with the most recent 3 years of emissions data) should be used in designations efforts. As noted in the Modeling TAD, the selection of data should be based on spatial and climatological (temporal) representativeness. The representativeness of the data are based on: 1) the proximity of the meteorological monitoring site to the area under consideration, 2) the complexity of terrain, 3) the exposure of the meteorological site, and 4) the period of time during which data are collected. Sources of meteorological data include National Weather Service (NWS) stations, site-specific or onsite data, and other sources such as universities, Federal Aviation Administration (FAA), and military stations.

For the Sandy Creek Energy Station area of analysis, surface meteorology from the NWS surface data from Waco Regional Airport (Station #13959) and NWS upper air data from Stephenville, TX (Station #13091) were selected as nearest stations to Sandy Creek Energy Station and are best representative of meteorological conditions within the area of analysis. The analysis utilized pre-processed AERMOD meteorological data sets available from TCEQ for "medium surface roughness" (0.1-0.7 m surface roughness) for five years (1985, 1987, 1988, 1989, and 1990). Meteorological data from the above surface and upper air stations were used in generating AERMOD-ready files with the AERMET processor. The "medium surface roughness" data was selected based on AERSURFACE estimation, using USGS NLCD 1992 data, of surface roughness at the Sandy Creek Energy Station site of 0.135 m. The modeling analysis does not provide information on surface characteristics at the NWS site where the meteorological data were recorded.

The Modeling TAD recommends steps to characterize "current" air quality based on actual emissions for the most recent years for a source of interest and for any nearby sources, which may influence the air quality of the area for the purpose of designation.  The Sandy Creek Energy Station submittal included historical modeling analysis performed in 2011, which was not performed in accordance with current EPA modeling guidance and the modeling TAD. Significant deviations from current guidance include the use of a much earlier version of AERMOD, inclusion of outdated meteorological data when more recent data is available from the meteorological stations, and the calculation of surface characteristics at the facility location and not the meteorological site. Because of the deviations from modeling guidance, particularly with respect to the meteorological data, which will directly impact plume rise and track, the modeled $SO_2$ concentrations are not clearly reliable in characterizing current air quality in the area of analysis. As further discussed in this document, the identified inconsistencies in the modeling as compared with EPA guidance result in Sandy Creek Energy Station's analysis being insufficient to support a determination that the area of McLennan County is in compliance with the 1-hour $SO_2$ NAAQS.

*Parameter: Geography and Terrain*

Terrain elevations from Digital Elevation Map Data ("DEM") from U.G. Geological Survey (USGS) were processed using AERMAP to determine elevations for the emission sources and structures capable of down washing source plumes at the site, as well as elevations of the off property locations (receptors) at which ambient air $SO_2$ concentrations were calculated. The DEM files, each with a 30-meter resolution, were obtained from the Texas Natural Resources Information System (TNRIS).

*Modeling Parameter: Background Concentrations of SO₂*

The Modeling TAD offers two mechanisms for characterizing background concentrations of $SO_2$ that are ultimately added to the modeled design values: 1) a "first tier" approach, based on monitored design values, or 2) a temporally varying approach, based on the 99th percentile monitored concentrations by hour of day and season or month. For the Sandy Creek Energy Station site area of analysis, the state chose background concentrations for $SO_2$ from the EPA Aerometric Information Retrieval System (AIRS) monitor 48-309-1037 located at 4472 Mazaneck Road, Waco-McLennan County. The three-year average of the most recent data available at the time of the analysis (2008-2010) of the 99th percentile of the annual distribution of the maximum daily 1-hour concentration was used for the 1-hour value.  The background concentration for this area of analysis was determined by the state to be 16.8 micrograms per cubic meter ($\mu g/m^3$) (6.4 ppb), and that value was incorporated into the final AERMOD results. The background concentration calculated for the modeling analysis is presented in Table 5.

Table 5: Background Concentration Calculated for the Modeling Analysis

| Pollutant | Monitor Station | County | Averaging Period | Concentration ($\mu g/m^{3)}$) | Averaging Method for Concentration |
|---|---|---|---|---|---|
| SO₂ | Waco Mazanec | McLennan | 1-Hour | 16.8 (6.4 ppb) | Three-year average of 99th percentile of the daily one-hour maximum concentration for the period 2008-2010 |

*Summary of Modeling Results*

The AERMOD modeling parameters for the McLennan County area of analysis are summarized below in Table 6.

Table 6: AERMOD Modeling Parameters for the Sandy Creek, McLennan County Area of
Analysis

| McLennan County Area of Analysis | |
|---|---|
| AERMOD Version | 11103 |
| Dispersion Characteristics | Not provided |
| Modeled Sources | 1 |
| Modeled Stacks | 5 |
| Modeled Structures | Yes |
| Modeled Fence lines | Yes (see Figure 3) |
| Total receptors | 5,900 |
| Emissions Type | PTE |
| Emissions Years | -- |
| Meteorology Years | 1985, 1987-1990 |
| Surface Meteorology Station | Waco, TX |
| Upper Air Meteorology Station | Stephenville, TX |
| Methodology for Calculating Background SO$_2$ Concentration | Three-year average of 99th percentile of the daily one-hour maximum concentration for the period 2008-2010 |
| Calculated Background SO$_2$ Concentration | 16.8 $\mu g/m^3$ (6.4 ppb) |

The results presented below in Table 7 show the magnitude and geographic location of the
highest predicted modeled concentration based on actual emissions.

Table 7: Maximum Predicted 99th Percentile 1-Hour SO$_2$ Concentration from Sandy Creek,
McLennan County Area of Analysis Based on Actual Emissions

| Averaging Period | Data Period | Receptor Location | | SO$_2$ Concentration ($\mu g/m^3$) | |
| | | UTM/Latitude | UTM/Longitude | Modeled (including background) | NAAQS |
|---|---|---|---|---|---|
| 99th Percentile 1-Hour Average | PTE; 1985, 1987-1990 | 693,200 | 3,484,200 | 134 | 196.5[*] |

[*]Equivalent to the 2010 SO$_2$ NAAQS set at 75 ppb

The facility's modeling indicates that the predicted 99th percentile 1-hour average concentration within the chosen modeling domain is 134 $\mu g/m^3$, or 51.12 ppb. This modeled concentration included the background concentration of $SO_2$, and is based on permitted emissions from the facility and constant stack parameters.

Jurisdictional Boundaries:

Once the geographic area of analysis associated with the Sandy Creek Energy Station is determined, existing jurisdictional boundaries are considered for the purpose of informing our intended unclassifiable area, specifically with respect to clearly defined legal boundaries.

The EPA believes that our intended unclassifiable area, consisting of McLennan county, Texas, is comprised of clearly defined legal boundaries, and we find these boundaries to be a suitably clear basis for defining our intended unclassifiable area.

The EPA has confirmed that the Sandy Creek Energy Station is the only large source of $SO_2$ emissions within a 50 km radius, and that there is only one emitter of $SO_2$ in any county neighboring McLennan County with emissions above 100 tpy. Specifically, the Chemical Lime Clifton Plant in Bosque County is located approximately 10 km from the McLennan County border. Its 2011 NEI reported $SO_2$ emissions were 383 tpy. Due to its low emissions and distance from the McLennan County border and based on all available information, the EPA does not believe that emissions from the plant are likely to cause or contribute to a violation of the NAAQS within McLennan County.

Conclusion

After careful evaluation of the state's recommendation and supporting information, as well as all available relevant information, the EPA intends to designate the area around Sandy Creek Energy Station as unclassifiable for the 2010 $SO_2$ NAAQS. Specifically, the boundaries are comprised of the jurisdictional boundaries of McLennan County, Texas. This intended designation and associated boundaries are based on review of available modeling submitted by industry.

As discussed in this technical support document, the EPA reviewed the modeling submitted by Sandy Creek Energy Station and identified several areas where the modeling is inconsistent with our modeling guidance. Based on our review these inconsistencies are significant enough that the submitted modeling does not adequately indicate that the area surrounding Sandy Creek Energy Station is attaining the 2010 1-hour SO2 NAAQS.  Based on all available information, and the reasons listed above, the EPA is unable at this time to determine whether the area is meeting or not meeting the NAAQS, and we intend to designate McLennan County as unclassifiable.

At this time, our intended designations for the state only apply to this area and the other areas presented in this technical support document. Consistent with the conditions in the March 2, 2015 consent decree, the EPA will evaluate and designate all remaining undesignated areas in Texas by either December 31, 2017, or December 31, 2020.

**Technical Analysis for the Milam County Area**

Introduction

Milam County, Texas contains a stationary source that according to the EPA's Air Markets Database emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU). As of March 2, 2015, this stationary source had not met the specific requirements for being "announced for retirement." Specifically, in 2012, the Sandow Power Plant emitted 22,511 tons of $SO_2$, and had an emissions rate of 1.00 lbs $SO_2$/mmBTU. Pursuant to the March 2, 2015 consent decree, the EPA must designate the area surrounding the facility by July 2, 2016.

Texas provided no formal recommendation for the area surrounding the Sandow Power Plant. Instead, as part of its September 18, 2015 submittal, Texas provided a general recommendation of unclassifiable/attainment for the 243 counties, including Milam County, located in the state that do not have any operational $SO_2$ regulatory monitors.  This general recommendation for Milam County was not accompanied by modeling, monitoring or other relevant technical information for that area that could be used to inform the attainment status of Milam County. After review of the state's submittal and based on the lack of information regarding the attainment status of the area surrounding the Sandow Power Plant, the EPA does not agree with the state's recommendation for the area, and since the area cannot be classified on the basis of available information as meeting or not meeting the NAAQS, intends to designate Milam County as unclassifiable.

The Sandow Power Plant is located in east Texas in the southwest portion of Milam County. As seen in Figure 1 below, the facility is located approximately 74 km from Austin, Texas, and approximately 1 km southeast of Alcoa Lake. The figure also shows other nearby, large emitters of $SO_2$, and the EPA's intended unclassifiable designation for the area, which are the geographic boundaries for Milam County, Texas.

Figure 1. The EPA's intended designation(s) for Milam County



*Jurisdictional Boundaries*

The EPA believes that our intended unclassifiable area, consisting of Milam County, is comprised of clearly defined legal boundaries, and we find these boundaries to be a suitably clear basis for defining our intended unclassifiable area.

Other Relevant Information

The EPA did not receive any additional information about the area in the immediate vicinity of the Sandow Power Plant.

Conclusion

The EPA did not receive any supporting documents or analyses from either the state or other third parties regarding the designation of the area surrounding the Sandow Power Plant. Based on all available information, the EPA is unable at this time to determine whether the area is meeting or not meeting the NAAQS. Therefore, due to the lack of modeling and monitoring data or other relevant information, the EPA intends to designate Milam as unclassifiable for the 2010 SO$_2$ NAAQS. Specifically, the boundaries are comprised of the jurisdictional boundaries of

140

Milam County. On the basis of available information, the EPA is also unable to determine whether nearby areas contribute to ambient air quality impacts within Milam County. Texas.

At this time, our intended designations for Texas only apply to this area, and the others identified in this technical support document. Consistent with the conditions in the March 2, 2015 consent decree, the EPA will evaluate and designate all remaining undesignated areas in Texas by either December 31, 2017, or December 31, 2020.

**Technical Analysis for the Potter County Area**

<u>Introduction</u>

Potter County, Texas contains a stationary source that according to the EPA's Air Markets Database emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU). As of March 2, 2015, this stationary source had not met the specific requirements for being "announced for retirement." Specifically, in 2012, the Harrington Power Station emitted 15,383 tons of $SO_2$, and had an emissions rate of 0.46 lbs $SO_2$/mmBTU. Pursuant to the March 2, 2015 consent decree, the EPA must designate the area surrounding the facility by July 2, 2016.

Texas provided no formal recommendation for the area surrounding the Harrington Power Station. Instead, as part of their September 18, 2015 submittal, Texas provided a general recommendation of unclassifiable/attainment for the 243 counties located in the state, including Potter County, that do not have any operational $SO_2$ regulatory monitors. This general recommendation for Potter County was not accompanied by modeling, monitoring, or other technical information to inform our decision regarding the attainment status of the area. After review of the state's submittal and based on the lack of information regarding the attainment status of the area surrounding the Harrington Power Station, the EPA does not agree with the state's recommendation for the area, and, since the area cannot be classified on the basis of available information as meeting or not meeting the NAAQS, intends to designate the area as unclassifiable.

The Harrington Power Station is located in north Texas in the southeast portion of Potter County. As seen in Figure 1 below, the facility is located approximately 12 km from Amarillo, TX. Alternatively, Harrington Power Station is approximately 40 km south of Lake Meredith.

Figure 1. The EPA's intended designation(s) for Potter County



Also included in the figure are nearby emitters of SO₂, and the EPA's intended unclassifiable designation for the area.

*Jurisdictional Boundaries*

The EPA believes that our intended unclassifiable area, consisting of Potter County, is comprised of clearly defined legal boundaries, and we find these boundaries to be a suitably clear basis for defining our intended unclassifiable area.

Other Relevant Information

The EPA did not receive any additional information about the area in the immediate vicinity of Harrington Power Station.

Conclusion

The EPA did not receive any supporting documents or analyses from either the state or other third parties regarding the designation of the area surrounding Harrington Power Station. Based on all available information, the EPA is unable at this time to determine whether the area is meeting or not meeting the NAAQS. Therefore, due to lack of modeling and monitoring data or other relevant information, the EPA intends to designate the area around Harrington Power Station as unclassifiable for the 2010 SO₂ NAAQS. Specifically, the boundaries are comprised of Potter County. On the basis of available information, the EPA is also unable to determine whether nearby areas contribute to ambient air quality impacts within Potter County.

143

At this time, our intended designations for Texas only apply to this area, and the others identified in this technical support document. Consistent with the conditions in the March 2, 2015 consent decree, the EPA will evaluate and designate all remaining undesignated areas in Texas by either December 31, 2017, or December 31, 2020.

## Technical Analysis for the Martin Lake Electrical Station in Rusk County, Texas

<u>Introduction</u>

The Rusk County area contains a stationary source that according to the EPA's Air Markets Database emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU). As of March 2, 2015, this stationary source had not met the specific requirements for being "announced for retirement." Specifically, in 2012, the Martin Lake Electrical Station (Martin Lake station) emitted 43,093 tons of $SO_2$, and had an emissions rate of 0.5504 lbs $SO_2$/mmBTU. Pursuant to the March 2, 2015 consent decree, the EPA must designate the area surrounding the facility by July 2, 2016.

In its submission, Texas recommended that the area surrounding Martin Lake station, specifically Rusk County, be designated as unclassifiable/attainment based on an assessment and characterization of air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. This assessment and characterization was performed using the logic that any areas without appropriately cited and qualified monitors should be considered unclassifiable or attainment based on lack of evidence that a violation of the NAAQS has occurred. After careful review of the state's assessment, supporting documentation, and all available data, the EPA does not agree with the state's recommendation for this area, and intends to designate the area as nonattainment. Specifically, our intended nonattainment area consists of the area bounded by the following Universal Transverse Mercator (UTM) coordinates in meters (NAD83 Datum, Zone 15):

| X | Y |
|---|---|
| 336067, | 3585315 |
| 336067, | 3558314 |
| 361568, | 3558314 |
| 361568, | 3585315 |

However, our intended nonattainment area excludes the portions of Harrison County, Texas that fall within this UTM-based boundary on the basis that none of the modeled receptors in Harrison County show violations of the NAAQS. As discussed below, our intended designation for Rusk County is based on the technical analysis, including dispersion modeling, performed by Sierra Club and submitted to the EPA for review.

Martin Lake station is located in East Texas in the eastern portion of Rusk County. As seen in Figure 1 below, the facility is located approximately 30 km southeast of Longview, Texas. The station is located on the northwest shore of Martin Lake and is substantially surrounded by the waters of this lake. Figure 1 also shows nearby large sources of $SO_2$ emissions in the area.

Figure 1. The Location of the Martin Lake Electrical Station and Other Large Sources of SO₂ in the Area



The discussion and analysis that follows below will reference the factors contained in the EPA's March 20, 2015 guidance, as appropriate.

Detailed Assessment

*Air Quality Data*

This factor considers the $SO_2$ air quality monitoring data in the area surrounding Martin Lake station. The facility is located in Rusk County; however, there are no ambient air quality monitors located in this county. The state included the most recent 3 years of monitoring data, i.e., 2012 – 2014 in its recommendation for the closest neighboring county, i.e., Gregg County. The table below shows information related to the monitor located in Gregg County, which was provided by the state.

Table 1: Available Air Quality Data for the Area Closest to Martin Lake Electrical Station

| County | Air Quality Systems (AQS) Monitor ID | Monitor Location | Distance to Martin Lake Electrical Station (km) | 2012 – 2014 $SO_2$ Design Value (ppb) |
|--------|--------------------------------------|------------------|--------------------------------------------------|----------------------------------------|
| Gregg | 48-183-0001 | South of Longview, Texas | 19 | 50 |

Based on available monitored ambient air quality data collected between 2012 and 2014, the county near Martin Lake station does not show a violation of the 2010 $SO_2$ NAAQS at its monitor. However, the absence of a violating monitor, when considering the distance from the facility is not a sufficient technical justification to rule out that an exceedance of the 2010 $SO_2$ NAAQS may occur in the immediate vicinity of the facility.

*Emissions and Emissions-Related Data*

Evidence of $SO_2$ emissions from the source meeting the emissions criteria of the March 2, 2015 consent decree, i.e., Martin Lake station, is an important factor for determining whether the immediate area is experiencing elevated levels of $SO_2$ concentrations. Other considerations for this factor include county level $SO_2$ emissions data, and data for sources located within 50 km.

Texas did not include any annual emissions data for sources in Rusk County, nor did the state include any annual emissions data from sources in neighboring Cherokee, Gregg, Harrison Nacogdoches, Panola, Shelby and Smith Counties. The EPA therefore believes that it is reasonable to evaluate data obtained from the 2011 National Emissions Inventory (NEI). [26] The annual $SO_2$ emissions data for sources emitting at or above 100 tons per year in Rusk County and neighboring Harrison County are summarized below in Table 2. There were no other sources listed as emitting $SO_2$ at or above 100 tons per year within 50 km. We note that Texas, through

---

[26] Detailed information for the 2011 NEI can be found at this link:
http://www3.epa.gov/ttnchie1/net/2011inventory.html

147

its environmental agency the Texas Commission on Environmental Quality (TCEQ) included the H.W. Pirkey Power Plant (Pirkey) in their list of sources subject to the $SO_2$ Data Requirements Rule (DRR), with 2014 $SO_2$ emissions of 2,916 tpy (DRR List Letter from Richard A. Hyde, TCEQ to Ron Curry, EPA; January 15, 2016).

Table 2: 2011 NEI $SO_2$ Emissions from Other Nearby Sources

| County | Facility Name | Facility Subject to the Emissions Criteria of the March 2, 2015 consent decree? | Distance to Facility that Meets the Consent Decree Criteria (km) | Facility Total $SO_2$ Emissions (tons) |
|---|---|---|---|---|
| Rusk | Henderson Plant 1 | No | 23.8 | 122.5 |
| Harrison | AEP H.W. Pirkey Power Plant | No | 23.7 | 7255.4 |
| Harrison | Marshall Plant, Chemical Plant | No | 34.5 | 752.6 |

*Emissions Controls*

The EPA recognizes that control strategies implemented on the sources above that occurred after the release of the 2011 NEI may not be reflected, or may warrant further discussion. The EPA has not received any additional information on emissions reductions resulting from controls put into place after 2011.

*Meteorology (Weather & Transport Patterns)*

Evidence of source-receptor relationships between specific emissions sources and high $SO_2$ concentrations in the surrounding area is another important factor in determining the appropriate extent of the EPA's intended nonattainment area. As discussed below in the section titled, "Other Relevant Information", meteorological records for the nearest National Weather Service meteorological station at the Longview Texas Regional Airport and upper air meteorological data from NWS station in Shreveport, Louisiana, were used by Sierra Club to model the effects of meteorology and emission on the area surrounding Martin Lake station. Figure 2 provides a wind rose for the Longview Texas Regional Airport station.

Figure 2. Wind Rose for Longview Texas Regional Airport (2012-2014)



*Geography and Topography (Mountain Ranges or Other Air Basin Boundaries)*

The area is generally flat, rural and agricultural, without mountains ranges or restrictive geological features likely to affect predictive air impacts of $SO_2$. Martin Lake station is surrounded on three sides by an artificial water reservoir, Martin Lake, which will likely affect the location of the highest meaningful impact of modeled $SO_2$ emissions.

*Jurisdictional Boundaries*

Once the geographic area associated with the immediate area surrounding Martin Lake station, and any nearby areas which may potentially be contributing to elevated levels of $SO_2$ around the facility are determined, existing jurisdictional boundaries are considered for the purpose of informing our intended nonattainment area, specifically with respect to clearly defined legal boundaries.

Modeling provided by Sierra Club asserts that portions of Gregg, Panola and Rusk Counties are in exceedance of the 2010 $SO_2$ 1-hr standard. There are two other larger emitters of $SO_2$ located in neighboring Harrison County. Pirkey was the largest, with greater than 7,200 tons of $SO_2$ in 2011, and more than 2,900 tons emitted in 2014. Harrison County, along with any other undesignated areas in Texas, will be designated by either December 31, 2017, or December 31, 2020, consistent with the deadlines of the final consent decree.

The EPA believes that our intended nonattainment area designation, consisting of portions of Gregg, Panola, and Rusk Counties, has a clearly defined legal boundary, and we find it to be a suitably clear basis for defining our intended nonattainment area.

<u>Other Relevant Information</u>

As noted above, the EPA received air dispersion modeling results from Sierra Club, asserting that $SO_2$ emissions from Martin Lake station have associated impacts that exceed the 1-hr NAAQS. The discussion and analysis that follows below will reference Sierra Club's use of the Modeling TAD, the EPA's assessment of Sierra Club's modeling in accordance with EPA's December 2013 $SO_2$ NAAQS Designations Technical Assistance Document (Modeling TAD), and the factors for evaluation contained in the EPA's March 20, 2015 guidance, as appropriate.

*Model Selection and Modeling Components*

The EPA's Modeling TAD notes that for area designations under the 2010 $SO_2$ NAAQS, the AERMOD modeling system should be used, unless use of an alternative model can be justified. In some instances the recommended model may be a model other than AERMOD, such as the BLP model for buoyant line sources.   The AERMOD modeling system contains the following components:
-   AERMOD: the dispersion model
-   AERMAP: the terrain processor for AERMOD
-   AERMET: the meteorological data processor for AERMOD
-   BPIPPRIME: the building input processor
-   AERMINUTE: a pre-processor to AERMET incorporating 1-minute automated surface observation system (ASOS) wind data
-   AERSURFACE: the surface characteristics processor for AERMET
-   AERSCREEN: a screening version of AERMOD

Sierra Club used AERMOD version 14134, and a discussion of the individual components will be referenced in the corresponding discussion that follows as appropriate.  While the version of AERMOD used in Sierra Club's modeling is not the latest version of the model available, the EPA does not believe that updating the model version and rerunning with the same model inputs and options would result in significantly different modeled impacts or change our intended designation for the area of analysis.  The EPA conducts tests cases for newly released versions of AERMOD to document the differences in several "standard" test case scenarios to compare results with previous releases of the model.[27] Review of version 15181 test case results and comparison with version 14134 shows that the updated model version impacts modeled results for only a small subset of the test scenarios (capped and horizontal stacks and multiple urban areas), which are not applicable to Martin Lake station. Therefore, we do not anticipate that rerunning the model with the later model version would significantly impact the modeled concentrations, especially considering the magnitude Sierra Club's modeling results relative to the NAAQS.

---

[27] AERMOD test case information available at the following website:
http://www3.epa.gov/ttn/scram/dispersion_prefrec.htm.

*Modeling Parameter: Rural or Urban Dispersion*

The EPA's recommended procedure for characterizing an area by prevalent land use is based on evaluating the dispersion environment within 3 km of the facility. According to the EPA's modeling guidelines, rural dispersion coefficients are to be used in the dispersion modeling analysis if more than 50% of the area within a 3 km radius of the facility is classified as rural. Conversely, if more than 50% of the area is urban, urban dispersion coefficients should be used in the modeling analysis. When performing the modeling for the area of analysis, Sierra Club determined that it was most appropriate to run the model in rural mode. Based on review of aerial images of the area surrounding Martin Lake station, we agree with Sierra Club's determination that the area is best defined as rural.  Figure 3 includes an aerial image showing the area surrounding Martin Lake station.

Figure 3:  Area Surrounding Martin Lake Electrical Station



*Modeling Parameter: Area of Analysis (Receptor Grid)*

The EPA believes that a reasonable first step towards characterization of air quality in the area surrounding Martin Lake station is to determine the extent of the area of analysis, i.e., receptor

151

grid. Considerations presented in the Modeling TAD include but are not limited to: the location of the $SO_2$ emission sources or facilities considered for modeling; the extent of significant concentration gradients of nearby sources; and sufficient receptor coverage and density to adequately capture and resolve the model predicted maximum $SO_2$ concentrations. For the Martin Lake area, Sierra Club has included Pirkey, which is within 24 km of the facility in the area of analysis. Sierra Club determined that this was appropriate in order to adequately characterize air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected.  Sierra Club included receptors out to 50 km, which is the nominal distance for $SO_2$ in AERMOD. The grid receptor spacing for the area of analysis chosen by the state is as follows:

- 100 meter grid from center of Martin Lake station out to 5 km,
- 500 meter grid centered on Martin Lake station out to 10 km, and
- 1000 meter (1 km) grid centered on Martin Lake station out to 50 km.

The receptor network contained 21,201 receptors and covered Rusk, Panola, Harrison and Gregg Counties, Texas. The network also covered portions of southern Upshur and Marion Counties, northeastern Cherokee County, northern Nacogdoches County and northwestern Shelby County, Texas. Sierra Club modeling used a slightly elevated flagpole receptor height, but if this was corrected to EPA's recommended height we would expect only a slight change in the modeled numbers and the area of exceedances and magnitude of the values would be basically the equivalent and not change our proposed action.

Figure 4 shows Sierra Club's chosen area of analysis surrounding Martin Lake station, and the receptor grid for the area of analysis. Figure 5 shows Sierra Club's predicted impacts for the 2012 – 2014 actual emissions from the facility. The impacts of the area's geography and topography will follow in the appropriate section.

Figure 4: Sierra Club's Modeling Grid for Martin Lake Electrical Station Area of Analysis



153

Figure 5: Sierra Club's Predicted Impact for the Martin Lake Electrical Station Area of Analysis



1-hour average SO2 concentrations (ug per cubic meter) - All colored areas exceed the NAAQS.

*Modeling Parameter: Source Characterization*

Sierra Club characterized the sources within the area of analysis in accordance with the best practices outlined in the Modeling TAD. Specifically, it used actual stack heights in conjunction with actual emissions. Variable stack temperatures and velocities were not included because they are not publically available for use by Sierra Club. Similar to variable stack parameters, building information was not publically available. Therefore, Sierra Club did not include building downwash in their analysis stating that this was the conservative approach and would likely

154

underestimate impacts from emissions.  While, we do not agree with Sierra Club's assertion that exclusion of downwash is conservative in all cases, we do not believe that inclusion of building information and associated downwash in this analysis would change our recommended designation of nonattainment. The modeling values are sufficiently above the standard and inclusion of downwash often leads to higher concentrations closer to the source but even in situations we have seen where this did not occur, any decreases in maximum modeled values from inclusion of downwash were relatively small and not expected to be enough of a decrease to resolve all modeled exceedance values in Rusk County.

*Modeling Parameter: Emissions*

The EPA's Modeling TAD notes that for the purposes of modeling to characterize air quality for use in designations, the recommended approach is to use the most recent 3 years of actual emissions data and concurrent meteorological data. However, the Modeling TAD does provide for the flexibility of using allowable emissions in the form of the most recently permitted, (referred to as PTE or allowable) emissions rate.

The EPA believes that continuous emissions monitoring systems (CEMS) data provide acceptable historical emissions information when it is available, and that these data are available for many electric generating units. In the absence of CEMS data, the EPA's Modeling TAD highly encourages the use of AERMOD's hourly varying emissions keyword HOUREMIS, or through the use of AERMOD's variable emissions factors keyword EMISFACT. When choosing one of these methods, the EPA believes that detailed throughput, operating schedules, and emissions information from the impacted source(s) should be used.

In certain instances, states and other interested parties may find that it is more advantageous or simpler to use PTE rates as part of their modeling runs. Specifically, a facility may have recently adopted a new federally enforceable emissions limit, been subject to a federally enforceable consent decree, or implemented other federally enforceable mechanisms and control technologies to limit $SO_2$ emissions to a level that indicates compliance with the NAAQS. These new limits or conditions may be used in the application of AERMOD. In these cases, the Modeling TAD notes that the existing $SO_2$ emissions inventories used for permitting or SIP planning demonstrations should contain the necessary emissions information for designations-related modeling. In the event that these short-term emissions are not readily available, they may be calculated using the methodology in Table 8-1 of Appendix W to 40 CFR Part 51 titled, "Guideline on Air Quality Models."

As previously noted, Sierra Club included Martin Lake station and Pirkey, which is within 24 km of Martin Lake station, in the area of analysis. This distance and these facilities were selected because Sierra Club believes that this area of analysis adequately represents the area where maximum concentrations of $SO_2$ are expected and adequately includes the sources which might contribute to those concentrations. No other sources beyond were determined by Sierra Club to have the potential to cause significant concentration gradient impacts within the area of analysis. The facilities in the area of analysis and their associated annual actual $SO_2$ emissions between 2012 and 2014 are summarized below in Table 3.

Table 3: Actual SO$_2$ Emissions from Facilities in the Martin Lake Electrical Station Area of Analysis 2012 – 2014, Provided by Sierra Club

| Company ID | Facility Name | SO$_2$ Emissions (tons per year) | | |
| --- | --- | --- | --- | --- |
| | | 2012 | 2013 | 2014 |
| EFH | Martin Lake Electrical Station | 43,093 | 62,735 | 53,656 |
| AEP | H.W. Pirkey Power Plant | 3,853 | 7,339 | 2,916 |
| Total Emissions | All Facilities | 46,946 | 70,074 | 56,572 |

For Martin Lake station and Pirkey, Sierra Club used actual emissions from the most recent 3-year data set, i.e., 2012 – 2014. This emissions data was obtained from emissions data reported to the EPA Air Markets Program Data.

*Modeling Parameter: Meteorology and Surface Characteristics*

The most recent 3 years of meteorological data (concurrent with the most recent 3 years of emissions data) should be used in designations efforts. As noted in the Modeling TAD, the selection of data should be based on spatial and climatological (temporal) representativeness. The representativeness of the data are based on: 1) the proximity of the meteorological monitoring site to the area under consideration, 2) the complexity of terrain, 3) the exposure of the meteorological site, and 4) the period of time during which data are collected. Sources of meteorological data include National Weather Service (NWS) stations, site-specific or onsite data, and other sources such as universities, Federal Aviation Administration (FAA), and military stations.

For the Martin Lake area of analysis, surface meteorology from Longview Texas Regional Airport, and coincident upper air observations from the NWS station in Shreveport, Louisiana were selected by Sierra Club as best representative of meteorological conditions within the area of analysis.

Sierra Club used AERSURFACE version 13016 from the NWS station in Longview, Texas (located at latitude 32.390920 N, longitude 94.713940 W) to estimate the surface characteristics of the area of analysis. Sierra Club estimated values for twelve spatial sectors out to 1.0 km at a seasonal temporal resolution for average conditions. Sierra Club also estimated values for albedo (the fraction of solar energy reflected from the earth back into space), the Bowen ratio (the method generally used to calculate heat lost or heat gained in a substance), and the surface roughness (sometimes referred to as "Zo"). In Figure 6 below, the location of the Longview, Texas NWS station is shown relative to Martin Lake station.

Figure 6: Martin Lake Electrical Station and the Longview, Texas NWS



Meteorological data from the above surface and upper air stations were used in generating AERMOD-ready files with the AERMET processor. The output meteorological data created by the AERMET processor is suitable for being applied with AERMOD input files for AERMOD modeling runs. The Sierra Club analysis was conducted in adherence to all available EPA guidance for evaluating source impacts on attainment of the 1-hour $SO_2$ NAAQS via aerial dispersion modeling, including the AERMOD Implementation Guide; EPA's Applicability of Appendix W Modeling Guidance for the 1-hour $SO_2$ National Ambient Air Quality Standard, August 23, 2010; modeling guidance promulgated by EPA in Appendix W to 40 CFR Part 51; EPA's March 2011 Modeling Guidance for $SO_2$ NAAQS Designations; and EPA's Modeling TAD in the processing of the raw meteorological data into an AERMOD-ready format, and used AERSURFACE to best represent surface characteristics.

Hourly surface meteorological data records are read by AERMET, and include all the necessary elements for data processing. However, wind data taken at hourly intervals may not always portray wind conditions for the entire hour, which can be variable in nature. Hourly wind data may also be overly prone to indicate calm conditions, which are not modeled by AERMOD. In order to better represent actual wind conditions at the meteorological tower, wind data of one minute duration was provided from the same instrument tower, but in a different formatted file to be processed by a separate preprocessor, AERMINUTE. These data were subsequently integrated into the AERMET processing to produce final hourly wind records of AERMOD-

ready meteorological data that better estimate actual hourly average conditions and that are less prone to over-report calm wind conditions. This allows AERMOD to apply more hours of meteorology to modeled inputs, and therefore produce a more complete set of concentration estimates. As a guard against excessively high concentrations that could be produced by AERMOD in very light wind conditions, Sierra Club set a minimum threshold of 0.5 meters per second in processing meteorological data for use in AERMOD. This approach is consistent with EPA's March 8, 2013 memo entitled, "Use of ASOS Meteorological Data in AERMOD Dispersion Modeling." In setting this threshold, no wind speeds lower than this value would be used for determining concentrations. This threshold was specifically applied to the one minute wind data.

*Modeling Parameter: Geography and Terrain*

The terrain in the area of analysis is best described as to rural and gently rolling. To account for these terrain changes, the AERMAP terrain program within AERMOD was used to specify terrain elevations for all the receptors. The source of the elevation data incorporated into the model is from the USGS National Elevation Database.

*Modeling Parameter: Background Concentrations of $SO_2$*

The Modeling TAD offers two mechanisms for characterizing background concentrations of $SO_2$ that are ultimately added to the modeled design values: 1) a "first tier" approach, based on monitored design values, or 2) a temporally varying approach, based on the 99th percentile monitored concentrations by hour of day and season or month. For the Rusk County area of analysis, the Sierra Club used the 2011-13 design value for El Paso. The Sierra Club stated that this was the lowest background for the entire state and was therefore a conservative assumption. The background concentration for this area of analysis was determined by SC to be 7.8 micrograms per cubic meter ($\mu g/m^3$), or 20.4 ppb,[28] and that value was incorporated into the final AERMOD results.

*Summary of Modeling Results*

The AERMOD modeling parameters for the Martin Lake area of analysis, as provided by Sierra Club, are summarized below in Table 4.

Table 4: AERMOD Modeling Parameters for the Martin Lake Electrical Station Area of Analysis, Provided by Sierra Club

| Martin Lake Electric Station Area of Analysis | |
|---|---|
| AERMOD Version | 14134 |
| Dispersion Characteristics | Rural |
| Modeled Sources | 2 |
| Modeled Stacks | 4 |

---

[28] The conversion factor for $SO_2$ (at the standard conditions applied in the ambient $SO_2$ reference method) is 1ppb = approximately $2.62\mu g/m^3$.

| | |
|---|---|
| Modeled Structures | 0 |
| Modeled Fencelines | 0* |
| Total receptors | 21,201 |
| Emissions Type | Actual |
| Emissions Years | 2012-2014 |
| Meteorology Years | 2012-2014 |
| Surface Meteorology Station | Longview, Texas |
| Upper Air Meteorology Station | Shreveport, Louisiana |
| Methodology for Calculating Background $SO_2$ Concentration | Design Value |
| Calculated Background $SO_2$ Concentration | 7.8 $\mu g/m^3$ |

*While the Sierra Club modeling did not specifically include a fenceline in their modeling analysis, the EPA did compare the modeled results with fenceline information from previous industry dispersion modeling to confirm that the modeled exceedances of the NAAQS shown in Sierra Club's analysis did occur in ambient air.

The results presented below in Table 5 show the magnitude and geographic location of the highest predicted modeled concentration of $SO_2$ based on actual emissions.

Table 5:  Maximum Predicted 99th Percentile 1-Hour $SO_2$ Concentration in the Martin Lake Electrical Station Area of Analysis Based on Actual Emissions, Provided by Sierra Club

| Averaging Period | Data Period | Receptor Location | | $SO_2$ Concentration ($\mu g/m^3$) Based on Actual Emissions | |
|---|---|---|---|---|---|
| | | UTM/Latitude | UTM/Longitude | Modeled (including background) | NAAQS |
| 99th Percentile 1-Hour Average | 2012-2014 | 348067.310 | 3570214.750 | 347.71 | 196.5* |

* Equivalent to the 2010 $SO_2$ NAAQS set at 75 ppb

Sierra Club's modeling indicates that the predicted 99th percentile 1-hour average concentration within the chosen modeling domain is 347.71 $\mu g/m^3$, or 132.7 ppb. This modeled concentration included the background concentration of $SO_2$, and is based on actual emissions from the facilities. This highest predicted values occurred to the east of the facility, with concentrations above 300 $\mu g/m^3$ predicted to the southwest and north of the facility as well.  The modeled concentrations are graphically represented along with all the other receptors in Figures 4 and 5, above.

Sierra Club also included individual modeled results for the two facilities (Martin Lake station and Pirkey) in their submittal using source group based model outputs.  The maximum modeled

159

impacts from Pirkey alone, not including background, were 40.9 $\mu g/m^3$, or 15.6 ppb. The maximum modeled impacts from Martin Lake station alone, not including background, were 339.8 $\mu g/m^3$, or 129.7 ppb. Based on the relatively low modeled impacts from Pirkey; the fact that impacts from Martin Lake station alone are only 0.1 $\mu g/m^3$ lower than the combined impacts (339.9 $\mu g/m^3$, excluding background); and the fact the closest receptor showing a modeled NAAQS violation is approximately 12 km from this Harrison County facility, it is not clear that the Pirkey Station contributes to the modeled exceedances. While Sierra Club's submittal did include information about the overall maximum impacts from Pirkey, it did not include a source contribution analysis or model output necessary to further examine the magnitude of contributions from this facility to each of the modeled violations surrounding Martin Lake station. Therefore, as previously mentioned, our intended nonattainment boundary excludes Harrison County.  It is important to note that Pirkey was identified by Texas as a source subject to the SO$_2$ DRR, and it and the surrounding area in Harrison County will be specifically addressed in the next rounds of SO$_2$ designations.

Conclusion

After careful evaluation of the state's recommendation and supporting information, as well as all available relevant information including the Sierra Club's modeling, the EPA intends to designate portions of Rusk, Gregg, and Panola Counties, Texas as nonattainment for the 2010 SO$_2$ NAAQS. Specifically, the intended nonattainment is comprised of the area bounded by the following UTM coordinates in meters (NAD83 Datum, Zone 15):

| X | Y |
|---|---|
| 336067, | 3585315 |
| 336067, | 3558314 |
| 361568, | 3558314 |
| 361568, | 3585315 |

The nonattainment area excludes the portions of Harrison County, Texas that fall within the area bounded by the listed UTM coordinates. Harrison County is excluded from the nonattainment area on the basis that none of the modeled receptors in this county were shown to violate the 2010 SO$_2$ NAAQS. Figure 7 below graphically illustrates our intended nonattainment area.

Figure 7: Proposed Nonattainment Area for Martin Lake Electrical Station



Our intended designation is made based on the modeling of actual emissions reported from the facility during the 2012 to 2014 calendar years.  An analysis of the modeling data, performed by Sierra Club, indicates it was performed substantially in accordance with appropriate EPA modeling guidance and using generally conservative assumptions.

The modeling did not include building downwash or variable stack temperature and velocity, since Sierra Club did not have access to information needed to support such inclusion.  Building downwash will generally, though not always, increase the predicted maximum modeled concentrations.  Sierra Club used stack velocity and temperatures consistent with 100% load. This, coupled with actual hourly emission rates, should provide conservative estimates of actual concentrations because higher temperatures and velocities of 100% load when paired with lower emissions of less than 100% load should provide an overestimation of the dispersion and thus an underestimation of maximum concentrations. Given that modeled concentrations are almost double the standard, the inclusion of building downwash and variable stack parameters, etc. in the modeling would not result in values near or below the standard, therefore the modeling is sufficient for a determination of nonattainment. In addition to adequately characterizing Martin

Lake station, the Sierra Club modeling took into account emissions from other nearby facilities as well as a background concentration of $SO_2$.

Therefore, the EPA believes that Sierra Club's modeling is relevant information that must be considered in our designation decision.  We received no additional relevant technical information from the state or other parties, besides that previously discussed. Based on the information available showing that the area in the vicinity of Martin Lake station does not meet the 1-hr $SO_2$ standard, we intend to designate the area as nonattainment. EPA's intended boundaries for the nonattainment area encompass the area shown to be in violation of the standard and the source that contributes to the violation.

At this time, our intended designations for the state only apply to this area and the other areas presented in this technical support document. Consistent with the conditions in the March 2, 2015 consent decree, the EPA will evaluate and designate all remaining undesignated areas in Texas by either December 31, 2017, or December 31, 2020.

162

**Technical Analysis for the Monticello Steam Electric Station,**

**Titus County, Texas**

Introduction

The Titus County, Texas area contains a stationary source that according to the EPA's Air Markets Database emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU). As of March 2, 2015, this stationary source had not met the specific requirements for being "announced for retirement." Specifically, in 2012, the Monticello Steam Electric Station (Monticello station) emitted 31,447.2 tons of $SO_2$, and had an emissions rate of 0.784 lbs $SO_2$/mmBTU. Pursuant to the March 2, 2015 consent decree, the EPA must designate the area surrounding the facility by July 2, 2016.

In its submission, Texas recommended that the area surrounding Monticello station, specifically Titus County, be designated as unclassifiable/attainment based on an assessment and characterization of air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. The state's assessment and characterization was performed following the notion that any areas without appropriately cited and qualified monitors should be considered unclassifiable or attainment based on lack of monitored evidence that a violation of the NAAQS has occurred. After careful review of the state's assessment, supporting documentation, and all available data, the EPA does not agree with the state's recommendation for this area, and intends to designate the areas as nonattainment. Specifically, the boundaries for our intended nonattainment area are comprised of the portion of Titus County bounded by the following Universal Transverse Mercator (UTM) Coordinates in meters (NAD83 Datum, Zone 15):

| X | Y |
|---|---|
| 302329, | 3666971 |
| 302329, | 3660770 |
| 313530, | 3660770 |
| 313530, | 3666971 |

However, our intended nonattainment area does not include the portions of Camp County that fall within the area bounded by these UTM Coordinates on the basis that the modeled impacts at all receptors located in Camp County included in the area of analysis were less than the 1-hr $SO_2$ NAAQS. As discussed below, our intended designation for Titus County is based on the technical analysis, including dispersion modeling performed by Sierra Club and submitted to the EPA for review.

Monticello station is located in Northeast Texas in the central portion of Titus County. As seen in Figure 1 below, the facility is located approximately 10 km southwest of the center of Mount Pleasant, Texas. The closest nearby emitters of $SO_2$ are also shown in this figure. The facility is substantially surrounded by the waters of Lake Bob Sandlin to the west and south of the location. In Figure 2, the jurisdictional boundaries of Titus County, Texas, which is the state's recommended area for the unclassifiable/attainment designation are shown. The EPA's intended

163

designated nonattainment area and the affected counties are shown later in this document in Figure 8.

Figure 1. The Location of the Monticello Steam Electric Station.



Figure 2. The Monticello Steam Electric Station, Nearby Large SO₂ Emitters, and Titus County, Texas Boundaries.



The discussion and analysis that follows below will reference the factors contained in the EPA's March 20, 2015 guidance, as appropriate.

Detailed Assessment

*Air Quality Data*

This factor considers the SO₂ air quality monitoring data in the area surrounding Monticello station. The facility is located in Titus County; however, there are no ambient air quality monitors located in this county. The state did include the most recent 3 years of monitoring data, i.e., 2012 – 2014 in its recommendation for the closest neighboring county, i.e., Gregg County. Table 1 below shows information related to the monitor located in Gregg County, the closest

165

monitor to the Monticello site. The design value was confirmed through the EPA's 2014 design value report for $SO_2$.[29]

Table 1: Available Air Quality Data for the Area Closest to the Monticello Steam Electric Station County

| County | Air Quality Systems (AQS) Monitor ID | Monitor Location | Distance to Monticello (km) | 2012 – 2014 $SO_2$ Design Value (ppb) |
|--------|--------------------------------------|------------------|-----------------------------|----------------------------------------|
| Gregg | 48-183-0001 | Longview, Texas | 85 | 50 |

Based on available ambient air quality collected between 2012 and 2014, the nearest county with a $SO_2$ monitor does not show a monitored violation of the 2010 $SO_2$ NAAQS. However, the absence of a violating monitor when considering the distance from the facility is not a sufficient technical justification to rule out that an exceedance of the 2010 $SO_2$ NAAQS may occur in the immediate vicinity of the facility.

*Emissions and Emissions-Related Data*

Evidence of $SO_2$ emissions from the source meeting the emissions criteria of the March 2, 2015 consent decree, i.e., Monticello station is an important factor for determining whether the immediate area is experiencing elevated levels of $SO_2$ concentrations. Other considerations for this factor include county level $SO_2$ emissions data, and data for sources located within 50 km.

Texas did not include any annual emissions data for sources in Titus County, nor did the state include any annual emissions data from sources in neighboring counties. The EPA therefore believes that it is reasonable to evaluate data obtained from the 2011 National Emissions Inventory (NEI). [30] The annual $SO_2$ emissions data for sources emitting at or above 100 tons per year in Titus and Camp Counties are summarized in Table 2 below. No emissions sources with $SO_2$ emissions at or above 100 tons per year were located in any of the other surrounding counties.

---

[29] The design value report for $SO_2$, as well as each of the other NAAQS, can be found at this link: http://www3.epa.gov/airtrends/values.html
[30] Detailed information for the 2011 NEI can be found at this link: http://www3.epa.gov/ttnchie1/net/2011inventory.html

Table 2: 2011 NEI $SO_2$ Emissions from Other Local Sources

| County | Facility Name | Facility Subject to the Emissions Criteria of the March 2, 2015 consent decree? | Distance to Facility that Meets the Consent Decree Criteria in km | Facility Total $SO_2$ Emissions (Tons, based on 2011 NEI data) |
|---|---|---|---|---|
| Titus | Welsh Power Plant | No* | 19 | 25,622.1 |
| Camp | Pittsburg Gas Plant | No | 22 | 104.9 |

*Welsh is under consent decree to shut down its unit 2 no later than December 31, 2016. Consequently, the EPA is not required under the court order to designate the area surrounding this source solely due to its amount of emissions, but may consider the source's impacts in designating other areas that it may affect.

*Emissions Controls*

The EPA recognizes that control strategies implemented on the sources above that occurred after the release of the 2011 NEI may not be reflected, or may warrant further discussion. The EPA has not received any additional information on emissions reductions resulting from controls put into place after 2011.

*Meteorology (Weather & Transport Patterns)*

Evidence of source-receptor relationships between specific emissions sources and high $SO_2$ concentrations in the surrounding area is another important factor in determining the appropriate extent of the EPA's intended nonattainment area. As discussed below in the section titled, "Other Relevant Information", surface meteorological records for the nearest National Weather Service (NWS) meteorological station at the Longview Texas Regional Airport and upper air meteorological data from NWS station in Shreveport, Louisiana, were used by Sierra Club to model the effects of meteorology and emission on the area surrounding Monticello station. Figure 3 provides a wind rose for the Longview Texas Regional Airport station.

Figure 3. Wind Rose for Longview Texas Regional Airport (2012-2014)



*Geography and Topography (Mountain Ranges or Other Air Basin Boundaries)*

The area is rural in nature without any confining geographical features to consider in the analysis.  The station is located next to a recreational lake and the company property is relatively large encompassing several service yards.

*Jurisdictional Boundaries*

Once the geographic area associated with the immediate area surrounding Monticello station, and any nearby areas which may potentially be contributing to elevated levels of $SO_2$ around the facility are determined, existing jurisdictional boundaries are considered for the purpose of informing our intended unclassifiable area, specifically with respect to clearly defined legal boundaries.

Modeling provided by the Sierra Club asserts that portions of Titus County are in exceedance of the 2010 $SO_2$ 1-hr standard. There are two other sources in Titus County with emissions greater than 100 tons of $SO_2$, according to the 2011 NEI. The larger of these is the Welsh Power Plant (Welsh), which emitted 25,622 tons of $SO_2$, and the smaller is the Pittsburg Plant (Pittsburg), which emitted 105 tons of $SO_2$. Both facilities are located approximately 20 km from Monticello station. Sierra Club included emissions from Welsh in their modeling analysis but excluded Pittsburg. Based on the magnitude of emissions from these two facilities and their distance from Monticello station, we agree with Sierra Club's approach to include the larger source in their

168

modeling because of the potential for this source to contribute to a potential violation in the area of analysis. We discuss later in the document how the intended nonattainment boundary was determined and the basis for excluding Welsh from the boundary.

The EPA believes that our intended nonattainment area, consisting of portions of Titus County in Texas comprise clearly defined legal boundaries, and we find these boundaries to be a suitably clear basis for defining our intended nonattainment area.

Other Relevant Information

As noted above, the EPA received air dispersion modeling results from Sierra Club asserting that violations of the NAAQS occur in the area around Monticello station. This initial modeling was provided to the EPA on September 11, 2015. The Texas Commission of Environmental Quality (TCEQ) submitted a letter on November 17, 2015, to the EPA to provide comments on the Sierra Club's modeling analysis for facilities in Texas, including Monticello station, noting that the initial Sierra Club modeling was conducted with only one year of meteorological data instead of three, modeled actual emission rates were not consistent with CAMD for certain hours, and that modeled maximum impacts occurred on-property. TCEQ also commented on the alternative modeling Sierra Club conducted using allowable emissions, as well as, on statements that Sierra Club included in their modeling report regarding contribution of specific sources to modeled violations without detailed analysis to support the claim. In response, Sierra Club updated its modeling for the area and submitted the results to the EPA on December 15, 2015.  The review that follows is based on the December 15, 2015 modeling which asserts that $SO_2$ emissions from Monticello station have associated modeled impacts that exceed the 1-hr NAAQS. Our discussion and analysis will reference Sierra Club's use of the EPA's December 2013 $SO_2$ NAAQS Designations Technical Assistance Document (Modeling TAD), the EPA's assessment of Sierra Club's modeling in accordance with the Modeling TAD, and the factors for evaluation contained in the EPA's March 20, 2015 guidance, as appropriate.

*Model Selection and Modeling Components*

The EPA's Modeling TAD notes that for area designations under the 2010 $SO_2$ NAAQS, the AERMOD modeling system should be used, unless use of an alternative model can be justified. In some instances the recommended model may be a model other than AERMOD, such as the BLP model for buoyant line sources.   The AERMOD modeling system contains the following components:
- AERMOD: the dispersion model
- AERMAP: the terrain processor for AERMOD
- AERMET: the meteorological data processor for AERMOD
- BPIPPRIME: the building input processor
- AERMINUTE: a pre-processor to AERMET incorporating 1-minute automated surface observation system (ASOS) wind data
- AERSURFACE: the surface characteristics processor for AERMET
- AERSCREEN: a screening version of AERMOD

Sierra Club used AERMOD version 15181, and a discussion of the individual components will be referenced in the corresponding discussion that follows as appropriate.

*Modeling Parameter: Rural or Urban Dispersion*

The EPA's recommended procedure for characterizing an area by prevalent land use is based on evaluating the dispersion environment within 3 km of the facility. According to the EPA's modeling guidelines, rural dispersion coefficients are to be used in the dispersion modeling analysis if more than 50% of the area within a 3 km radius of the facility is classified as rural. Conversely, if more than 50% of the area is urban, urban dispersion coefficients should be used in the modeling analysis. When performing the modeling for the area of analysis, Sierra Club determined that it was most appropriate to run the model in rural mode. Based on review of aerial images of the area surrounding Monticello station, we agree with Sierra Club's determination that the area is best defined as rural.  Figure 4 includes an aerial image showing the area surrounding Monticello station.

Figure 4:  Area Surrounding Monticello Steam Electrical Station



170

*Modeling Parameter: Area of Analysis (Receptor Grid)*

The EPA believes that a reasonable first step towards characterization of air quality in the area surrounding Monticello station is to determine the extent of the area of analysis, i.e., receptor grid. Considerations presented in the Modeling TAD include but are not limited to: the location of the $SO_2$ emission sources or facilities considered for modeling; the extent of significant concentration gradients of nearby sources; and sufficient receptor coverage and density to adequately capture and resolve the model predicted maximum $SO_2$ concentrations. For the area around Monticello station, Sierra Club has included one other emitter of $SO_2$ that has the potential to create concentration gradients in the area near Monticello station and within Titus, Camp and Morris Counties. Sierra Club determined that inclusion of Welsh emissions was appropriate in order to adequately characterize air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. We agree that in addition to Monticello station, the Welsh facility had the ability to result in concentration gradients within Titus, Morris and Camp Counties (based on emissions, meteorology and proximity to the Monticello facility and Morris and Camp Counties) and should be included in the modeling for Titus County. Sierra Club included receptors out to 50 km, which is the nominal distance for $SO_2$ in AERMOD. The grid receptor spacing for the area of analysis chosen by the state is as follows:
- 100 meter grid from center of Monticello station out to 5 km,
- 500 meter grid centered on Monticello station out to 10 km, and
- 1000 meter (1 km) grid centered on Monticello station out to 50 km.

The receptor network contained 21,201 receptors, and the network covered a large portion of Northeast Texas including all of Titus, Franklin, Morris and Camp Counties. The network also covered portions of Hopkins, Delta, Lamar, Red River, Bowie, Cass, Marion, Harrison, Gregg, Upshur and Wood Counties. This is a larger grid than we might normally recommend but was also necessary to assess impacts of the Welsh facility emissions on Titus County. Sierra Club modeling used a slightly elevated receptor height, but if this was corrected to EPA's recommended height we would expect only a slight change in the modeled numbers and the area of exceedances and magnitude of the values would be basically the equivalent and not change our proposed action.

Figure 5 shows Sierra Club's chosen area of analysis surrounding Monticello station. Figure 6 shows Sierra Club's modeled impacts for the area of analysis. The impacts of the area's geography and topography will follow in the appropriate section.

171

Figure 5: Sierra Club's Modeling Grid for Monticello Steam Electric Station Area of Analysis



Figure 6: Sierra Club's Modeled Impacts using Actual Emissions from 2012 – 2014 for the
Monticello Steam Electric Station Area of Analysis



*Modeling Parameter: Source Characterization*

Sierra Club characterized the sources within the area of analysis in accordance with the best
practices outlined in the Modeling TAD. Sierra Club characterized the source locations and stack
parameters, e.g., exit temperature, exit velocity, and diameter.  Variable stack temperatures and
velocities were not included because they are not publically available for use by Sierra Club.

173

Similar to variable stack parameters, building information was not publically available. Therefore, Sierra Club did not include building downwash in their analysis stating that this was the conservative approach and would likely underestimate impacts from emissions resulting in lower modeled concentrations than modeling that included building downwash. While we do not agree with Sierra Club's assertion that exclusion of downwash is conservative in all cases, we do not believe that inclusion of building information and associated downwash in this analysis would change our recommended designation of nonattainment. The modeling values are sufficiently above the standard and inclusion of downwash often leads to higher concentrations closer to the source but even in situations we have seen where this did not occur, any decreases in maximum modeled values from inclusion of downwash were relatively small and not expected to be enough of a decrease to resolve all modeled exceedance values in Titus County.

*Modeling Parameter: Emissions*

The EPA's Modeling TAD notes that for the purposes of modeling to characterize air quality for use in designations, the recommended approach is to use the most recent 3 years of actual emissions data and concurrent meteorological data. However, the TAD does provide for the flexibility of using allowable emissions in the form of the most recently permitted, (referred to as PTE or allowable) emissions rate.

The EPA believes that continuous emissions monitoring systems (CEMS) data provide acceptable historical emissions information when it is available, and that these data are available for many electric generating units. In the absence of CEMS data, the EPA's Modeling TAD highly encourages the use of AERMOD's hourly varying emissions keyword HOUREMIS, or through the use of AERMOD's variable emissions factors keyword EMISFACT. When choosing one of these methods, the EPA believes that detailed throughput, operating schedules, and emissions information from the impacted source(s) should be used.

In certain instances, states and other interested parties may find that it is more advantageous or simpler to use PTE rates as part of their modeling runs. Specifically, a facility may have recently adopted a new federally enforceable emissions limit, been subject to a federally enforceable consent decree, or implemented other federally enforceable mechanisms and control technologies to limit $SO_2$ emissions to a level that indicates compliance with the NAAQS. These new limits or conditions may be used in the application of AERMOD. In these cases, the Modeling TAD notes that the existing $SO_2$ emissions inventories used for permitting or SIP planning demonstrations should contain the necessary emissions information for designations-related modeling. In the event that these short-term emissions are not readily available, they may be calculated using the methodology in Table 8-1 of Appendix W to 40 CFR Part 51 titled, "Guideline on Air Quality Models."

As previously noted, Sierra Club included Monticello station and one other emitter of $SO_2$ within 50 km in the area of analysis. This distance and these facilities were selected because Sierra Club believes that this area of analysis adequately represents the area where maximum concentrations of $SO_2$ are expected and adequately includes the sources which might contribute to those concentrations. No other sources beyond 50 km were determined by Sierra Club to have the potential to cause significant concentration gradient impacts within the area of analysis. The

174

facilities in the area of analysis and their associated annual actual $SO_2$ emissions between 2012 and 2014 are summarized below.

For the following facilities in the area of analysis, Sierra Club included actual hourly $SO_2$ emissions rates between 2012 and 2014 taken from the EPA Air Markets Program Data. This information is summarized as annual emissions in Table 3 below.

Table 3: Actual $SO_2$ Emissions from Facilities in the Monticello Steam Electric Station Area of Analysis, 2012 – 2014. Provided by Sierra Club.

| Company ID | Facility Name | $SO_2$ Emissions (tons per year) | | |
|---|---|---|---|---|
| | | 2012 | 2013 | 2014 |
| Luminant | Monticello Steam Electric Station | 31,447 | 24,396 | 20,438 |
| AEP/SWEPCO | Welsh Power Plant | 23,212 | 19,720 | 18,225 |
| Total Emissions | All Facilities | 54,659 | 44,116 | 38,663 |

*Modeling Parameter: Meteorology and Surface Characteristics*

The most recent 3 years of meteorological data (concurrent with the most recent 3 years of emissions data) should be used in designations efforts. As noted in the Modeling TAD, the selection of data should be based on spatial and climatological (temporal) representativeness. The representativeness of the data are based on: 1) the proximity of the meteorological monitoring site to the area under consideration, 2) the complexity of terrain, 3) the exposure of the meteorological site, and 4) the period of time during which data are collected. Sources of meteorological data include National Weather Service (NWS) stations, site-specific or onsite data, and other sources such as universities, Federal Aviation Administration (FAA), and military stations.

For the Monticello area of analysis, surface meteorology from the NWS station in Longview, Texas, 84 km to the south southeast, and coincident upper air observations from the NWS station in Shreveport, Louisiana, 134 km to the southeast were selected by Sierra Club as best representative of meteorological conditions within the area of analysis.

Sierra Club used AERSURFACE version 13036 from the NWS station in Longview, Texas (located at Latitude 32.390920 N and Longitude 94.713940 W) to estimate the surface characteristics of the area of analysis. Sierra Club estimated values for twelve spatial sectors out to one km at a seasonal temporal resolution for average moisture conditions. Sierra Club also estimated values for albedo (the fraction of solar energy reflected from the earth back into space), the Bowen ratio (the method generally used to calculate heat lost or heat gained in a substance), and the surface roughness (sometimes referred to as "Zo"). In the figure below, the location of the Longview, Texas NWS station is shown relative to Monticello station.

Figure 7: Monticello Steam Electric Station Area of Analysis and the Longview, Texas NWS



Meteorological data from the above surface and upper air stations were used in generating AERMOD-ready files with the AERMET processor. The output meteorological data created by the AERMET processor is suitable for being applied with AERMOD input files for AERMOD modeling runs. The Sierra Club analysis was conducted in adherence to all available EPA guidance for evaluating source impacts on attainment of the 1-hour $SO_2$ NAAQS via aerial dispersion modeling, including the AERMOD Implementation Guide; EPA's Applicability of Appendix W Modeling Guidance for the 1-hour $SO_2$ National Ambient Air Quality Standard, August 23, 2010; modeling guidance promulgated by EPA in Appendix W to 40 CFR Part 51; EPA's March 2011 Modeling Guidance for $SO_2$ NAAQS Designations; and EPA's Modeling TAD in the processing of the raw meteorological data into an AERMOD-ready format, and used AERSURFACE to best represent surface characteristics.

Hourly surface meteorological data records are read by AERMET, and include all the necessary elements for data processing. However, wind data taken at hourly intervals may not always portray wind conditions for the entire hour, which can be variable in nature.  Hourly wind data may also be overly prone to indicate calm conditions, which are not modeled by AERMOD. In order to better represent actual wind conditions at the meteorological tower, wind data of one

minute duration was provided from the same instrument tower, but in a different formatted file to be processed by a separate preprocessor, AERMINUTE. These data were subsequently integrated into the AERMET processing to produce final hourly wind records of AERMOD-ready meteorological data that better estimate actual hourly average conditions and that are less prone to over-report calm wind conditions. This allows AERMOD to apply more hours of meteorology to modeled inputs, and therefore produce a more complete set of concentration estimates. As a guard against excessively high concentrations that could be produced by AERMOD in very light wind conditions, Sierra Club set a minimum threshold of 0.5 meters per second in processing meteorological data for use in AERMOD. This approach is consistent with EPA's March 2013 memo entitled, "Use of ASOS Meteorological Data in AERMOD Dispersion Modeling." In setting this threshold, no wind speeds lower than this value would be used for determining concentrations. This threshold was specifically applied to the one minute wind data.

*Modeling Parameter: Geography and Terrain*

The terrain in the area of analysis is best described as gently rolling. To account for these terrain changes, the AERMAP terrain program within AERMOD was used to specify terrain elevations for all the receptors. The source of the elevation data incorporated into the model is from the USGS National Elevation Database.

*Modeling Parameter: Background Concentrations of SO$_2$*

The Modeling TAD offers two mechanisms for characterizing background concentrations of SO$_2$ that are ultimately added to the modeled design values: 1) a "first tier" approach, based on monitored design values, or 2) a temporally varying approach, based on the 99th percentile monitored concentrations by hour of day and season or month. For the Titus, Camp and Franklin County area of analysis, the Sierra Club used the 2011-13 design value for El Paso. The Sierra Club stated that this was the lowest background for the entire state and was therefore a conservative assumption. The background concentration for this area of analysis was determined by the state to be 7.8 micrograms per cubic meter ($\mu g/m^3$), or 2.98 ppb,[31] and that value was incorporated into the final AERMOD results.

*Summary of Modeling Results*

The AERMOD modeling parameters for the Monticello Steam Electric Station area of analysis, as provided by Sierra Club, are summarized below in Table 4.

---

[31] The conversion factor for SO$_2$ (at the standard conditions applied in the ambient SO$_2$ reference method) is 1ppb = approximately 2.62$\mu g/m^3$.

Table 4: AERMOD Modeling Parameters for the Monticello Steam Electric Station Area of Analysis, Provided by Sierra Club

| Monticello Steam Electric Station Area of Analysis | |
|---|---|
| AERMOD Version | 15181 |
| Dispersion Characteristics | Rural |
| Modeled Sources | 2 |
| Modeled Stacks | 5 |
| Modeled Structures | 0 |
| Modeled Fencelines | 0* |
| Total receptors | 21,201 |
| Emissions Type | Actual |
| Emissions Years | 2012-2014 |
| Meteorology Years | 2012-2014 |
| Surface Meteorology Station | Longview, Texas |
| Upper Air Meteorology Station | Shreveport, Louisiana |
| Methodology for Calculating Background $SO_2$ Concentration | Design Value |
| Calculated Background $SO_2$ Concentration | 7.8 $\mu g/m^3$ |

*While the Sierra Club modeling did not specifically include a fenceline in their modeling analysis, the EPA did compare the modeled results with fenceline information from previous industry dispersion modeling to confirm that the modeled exceedances of the NAAQS shown in Sierra Club's analysis did occur in ambient air.

The results presented below in Table 5 show the magnitude and geographic location of the highest predicted modeled concentration of $SO_2$ based on actual emissions.

Table 5: Maximum Predicted 99th Percentile 1-Hour $SO_2$ Concentration in the Monticello Steam Electric Station Area of Analysis Based on Actual Emissions, Provided by Sierra Club

| | | Receptor Location | | $SO_2$ Concentration ($\mu g/m^3$) Based on Actual Emissions | |
|---|---|---|---|---|---|
| Averaging Period | Data Period | UTM/Latitude | UTM/Longitude | Modeled (including background) | NAAQS |
| 99th Percentile 1-Hour Average | 2012-2014 | 310129.030 | 3664670.500 | 237.26 | 196.5* |

* Equivalent to the 2010 $SO_2$ NAAQS set at 75 ppb

Sierra Club's modeling indicates that the predicted 99th percentile 1-hour average concentration within the chosen modeling domain is 237.26 $\mu g/m^3$, or 90.7 ppb. This modeled concentration included the background concentration of $SO_2$, and is based on actual emissions from the

178

facilities. This highest predicted value occurred approximately 1.5 km to the north northeast of the facility center and is described in Table 5, above.

Sierra Club also included individual modeled results for the two facilities (Monticello station and Welsh) in their submittal using source group based model outputs.  The maximum modeled impacts from Welsh alone, not including background, were 124.2 $\mu g/m^3$, or 47.4 ppb. The maximum modeled impacts from Monticello station alone, not including background, were 229.4 $\mu g/m^3$, or 87.6 ppb. Based on the fact that impacts from Monticello station alone are only 0.1 $\mu g/m^3$ lower than the combined impacts (229.5 $\mu g/m^3$, excluding background); the magnitude of modeled impacts from Welsh; and the and the fact the closest receptor showing a modeled NAAQS violation is approximately 16 km from the Welsh facility, it is not clear that Welsh contributes to the modeled NAAQS exceedances. While Sierra Club's submittal did include information about the overall maximum impacts from Welsh, it did not include a source contribution analysis or model output necessary to further examine the magnitude of contributions from this facility to each of the modeled violations surrounding Monticello station. Therefore, our intended nonattainment boundary does not include Welsh and is limited to the immediate area surrounding Monticello station.  It is important to note that Welsh was identified by Texas as a source subject to the $SO_2$ DRR, and it and the surrounding area in Titus County will be specifically addressed in the next rounds of $SO_2$ designations.

Conclusion

After careful evaluation of the Sierra Club's recommendation and supporting information, as well as all available relevant information, the EPA intends to designate the area around the Monticello station in Titus County, Texas as nonattainment for the 2010 $SO_2$ NAAQS. Specifically, the intended nonattainment area is comprised of the portion of Titus County bounded by the following UTM Coordinates in meters (NAD83 Datum, Zone 15):

| X | Y |
|---|---|
| 302329, | 3666971 |
| 302329, | 3660770 |
| 313530, | 3660770 |
| 313530, | 3666971 |

The nonattainment area excludes the portion of Camp County that falls within the area bounded by the listed UTM coordinates. Modeled impacts at all receptors located in Camp County included in the area of analysis were less than the 1-hr $SO_2$ NAAQS. Figure 8 below graphically illustrates our intended nonattainment area.

Figure 8: Monticello Nonattainment Area



Our intended designation is based on the modeling of actual emissions reported from the facilities during the 2012 to 2014 calendar years.  An analysis of the modeling data, performed by Sierra Club, indicates it was performed substantially in accordance with appropriate EPA modeling guidance and using generally conservative assumptions.

The modeling did not include building downwash or variable stack temperature and velocity, since Sierra Club did not have access to information needed to support such inclusion.  Building downwash will generally, though not always, increase the predicted maximum modeled concentrations.  Sierra Club used stack velocity and temperatures consistent with 100% load. This, coupled with actual hourly emission rates, should provide conservative estimates of actual concentrations because higher temperatures and velocities of 100% load when paired with lower emissions of less than 100% load should provide an overestimation of the dispersion and thus an underestimation of maximum concentrations. Given that modeled concentrations are almost double the standard, the inclusion of building downwash and variable stack parameters, etc. in the modeling would not result in values near or below the standard, therefore the modeling is sufficient for a determination of nonattainment. In addition to adequately characterizing

180

Monticello station, the Sierra Club modeling took into account emissions from other nearby facilities as well as a background concentration of $SO_2$.

Therefore, the EPA believes that the Sierra Club modeling is relevant information that must be considered in our designation decision.  While, TCEQ did provide comments on Sierra Club's initial modeling submittal, we received no additional relevant technical information from the state or other parties. In response, Sierra Club updated its modeling for the area addressing most of the concerns raised by TCEQ and submitted the results to the EPA on December 15, 2015. Based on the information available showing that the area in the vicinity of Monticello station does not meet the 1-hr $SO_2$ standard, we intend to designate the area as nonattainment. EPA's intended boundaries for the nonattainment area encompass the area shown to be in violation of the standard and the principal source that contributes to the violation.

At this time, our intended designations for the state only apply to this area and the other areas presented in this technical support document. Consistent with the conditions in the March 2, 2015 consent decree, the EPA will evaluate and designate all remaining undesignated areas in Texas by either December 31, 2017, or December 31, 2020.

**Technical Analysis for the Big Brown Steam Electric Station in
Freestone County, Texas**

<u>Introduction</u>

The Freestone County area contains a stationary source that according to the EPA's Air Markets Database emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU). As of March 2, 2015, this stationary source had not met the specific requirements for being "announced for retirement." Specifically, in 2012, the Big Brown Steam Electric Station (Big Brown) emitted 60,681 tons of $SO_2$, and had an emissions rate of 1.59 lbs $SO_2$/mmBTU. Pursuant to the March 2, 2015 consent decree, the EPA must designate the area surrounding the facility by July 2, 2016.

In its submission, Texas recommended that the area surrounding Big Brown, specifically Freestone County, be designated as unclassifiable/attainment based on an assessment and characterization of air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. The state's assessment and characterization was performed following the notion that any areas without appropriately cited and qualified monitors should be considered unclassifiable or attainment based on a lack of monitored evidence that a violation of the NAAQS has occurred. After careful review of the state's assessment, supporting documentation, and all available data, the EPA does not agree with the state's recommendation for this area, and intends to designate the areas as nonattainment. Specifically, the boundaries for our intended nonattainment area are comprised of portions of Freestone and Anderson Counties, bound by these UTM coordinates (NAD 83 Datum, UTM Zone 14):

| X | Y |
|---|---|
| 762752, | 3540333 |
| 762752, | 3510333 |
| 789753, | 3510333 |
| 789753, | 3540333 |

However, our intended nonattainment area excludes portions of Navarro County that fall within this UTM-based boundary. Modeled impacts at all receptors located in Navarro County included in the area of analysis were less than the 1-hr $SO_2$ NAAQS. As discussed below, our intended designation for Freestone County was informed by the technical analysis, including dispersion modeling, submitted to the EPA for review by Sierra Club.

Big Brown is located in central Texas in the eastern portion of Freestone County. As shown in Figure 1 below, the facility is located at Fairfield Lake, approximately 9.5 miles northeast of Fairfield, Texas. Figure 1 also includes nearby large sources of $SO_2$ emissions.

Figure 1. The Location of the Big Brown Steam Electric Station and Other Large Sources of SO$_2$ in the Area.



The discussion and analysis that follows below will reference the factors contained in the EPA's March 20, 2015 guidance, as appropriate. .

Detailed Assessment

*Air Quality Data*

This factor considers the SO$_2$ air quality monitoring data in the area surrounding Big Brown. The facility is located in Freestone County; however, there are no ambient air quality monitors located in this county. The state did not include the most recent 3 years of monitoring data, i.e., 2012 – 2014 in its recommendation for the closest neighboring county, i.e., Navarro County. The table below shows information related to the monitors located in the nearby counties. The design values were confirmed through the EPA's 2014 design value report for SO$_2$.[32]

---

[32] The design value report for SO$_2$ as well as each of the other NAAQS, can be found at this link: http://www3.epa.gov/airtrends/values.html

Table 1: Available Air Quality Data for the Area Closest to the Big Brown Steam Electric Station

| County | Air Quality Systems (AQS) Monitor ID | Monitor Location | Distance to Big Brown (mi) | 2012 – 2014 SO$_2$ Design Value (ppb) |
|---|---|---|---|---|
| Navarro | 48-349-1051 | Corsicana | 25 | 35 |
| McLennan | 48-309-1037 | Waco | 61 | 06 |

Based on available ambient air quality monitored data collected between 2012 and 2014, the counties surrounding Freestone County, where Big Brown is located, do not show a violation of the 2010 SO$_2$ NAAQS at the closest monitors. These monitors are in adjacent counties and were not sited such that they would represent either the maximum or highly elevated levels much closer to the Big Brown facility. In the absence of a violating monitor, when considering the location and distances of these monitors relative to the facility and that the monitors are not located to represent maximum/high impacts from Big Brown's emissions, is not by itself a sufficient technical justification to rule out that an exceedance of the 2010 SO$_2$ NAAQS may occur in the immediate vicinity of the facility.

*Emissions and Emissions-Related Data*

Evidence of SO$_2$ emissions from the source meeting the emissions criteria of the March 2, 2015 consent decree is an important factor for determining whether the immediate area is experiencing elevated levels of SO$_2$ concentrations. Other considerations for this factor include county level SO$_2$ emissions data, and data for sources located within 50 km. The 50 km distance is a relative conservative distance to collect any sources that may cause a concentration gradient in Freestone County.

Texas did not include any annual emissions data for sources in the vicinity of Big Brown. The EPA therefore must develop its own emissions information to inform the intended designation, and believes that it is reasonable to evaluate data obtained from the most recent publically available database, the NEI 2011 National Emissions Inventory (NEI).[33] The annual SO$_2$ emissions data for sources emitting at or above 100 tons per year in Freestone, and neighboring Anderson, Henderson, Leon, Limestone and Navarro Counties are summarized in Table 2 below.

Of the sources in Table 2, Sierra Club modeled Big Brown and the NRG Limestone Power Station (Limestone). The modeling results, dated September 11, 2015, assert there are modeled impacts in excess of the 1-hour SO$_2$ NAAQS in the area around the Big Brown facility. The 2011 data also included a few relatively small sources outside Freestone County (less than 300 tpy in this relative situation) at distances 30 km and greater from Big Brown that were not explicitly modeled by Sierra Club. Based on the amount of emissions, location of these sources in relation

---

[33] Detailed information for the 2011 NEI can be found at this link:
http://www3.epa.gov/ttnchie1/net/2011inventory.html

to the area of concern we do not think these smaller sources would contribute to the concentration gradients around Big Brown and in Freestone County. The Teague Gas Plant facility is within Freestone County but is relatively small compared to Big Brown's emissions and would not be expected to have much of a concentration gradient in the area around Big Brown that has modeled exceedance levels in Freestone County.

While the Streetman facility is 29.5 km from Big Brown, it is potentially large enough to create concentration gradients within Freestone County and potentially be a contributor to the modeled exceedance levels so this facility should be included any future modeling. We note that Texas Commission of Environmental Quality (TCEQ) included the Streetman facility in their list of Data Requirements Rule (DRR) sources with 2014 emissions of 3350 tpy (DRR list Letter from Richard A. Hyde, TCEQ to Ron Curry, EPA; January 15, 2016). TCEQ also included the Big Brown facility (2014 emissions of 57,460 tpy) and Limestone facility (2014 emissions of 27,862 tpy) in a letter with a list of the sources subject to the $SO_2$ Data Requirements Rule (DRR).

Table 2: 2011 NEI $SO_2$ Emissions from Other Nearby Sources

| County | Facility Name | Facility Subject to the Emissions Criteria of the March 2, 2015 consent decree? | Distance to Facility that Meets the Consent Decree Criteria (km) | Facility Total $SO_2$ Emissions (tons), based on the 2011 NEI |
|---|---|---|---|---|
| Limestone | Limestone Electric Generating Station | Yes | 48.2 km | 24,893.6 Tons |
| Navarro | Streetman Plant | No | 29.5 km | 3,505.7 Tons |
| Leon | Nucor Steel | No | 53.4 km | 272.7 Tons |
| Navarro | Guardian Industries, Corsicana | No | 44.8 km | 225.1 Tons |
| Henderson | Eustace Plant, (Gas Processing) | No | 48.9 km | 222.5 Tons |
| Freestone | Teague Gas Plant | No | 30.0 km | 213.1 Tons |
| Limestone | Farrar Treating Plant | No | 44.3 km | 205.2 Tons |
| Anderson | Ram Field Facility | No | 62.9 km | 129.2 Tons |

*Emissions Controls*

The EPA recognizes that control strategies implemented on the sources above that occurred after the release of the 2011 NEI may not be reflected, or may warrant further discussion. The EPA has not received any additional information on emissions reductions resulting from controls put into place after 2011.

*Meteorology (Weather & Transport Patterns)*

Evidence of source-receptor relationships between specific emissions sources and high SO$_2$ concentrations in the surrounding area is another important factor in determining the appropriate extent of the EPA's intended nonattainment area. As shown below in the section titled, "Other Relevant Information," surface meteorological records for the nearest National Weather Service meteorological station at Corsicana Campbell Field near Corsicana, Texas, and upper air meteorological data from NWS station in Fort Worth, Texas were used by Sierra Club to model the effects of meteorology and emission on the area surrounding Big Brown. Figure 2 includes the wind rose for the Corsicana Campbell Field meteorological station for 2012-2014.

Figure 2. Wind rose for Corsicana Campbell Field (2012 – 2014).



*Geography and Topography (Mountain Ranges or Other Air Basin Boundaries)*

The area is generally flat, rural and agricultural, without mountain ranges or restrictive geological features likely to affect predictive air impacts of $SO_2$.

*Jurisdictional Boundaries*

Once the geographic area associated with the immediate area surrounding Big Brown in Freestone County, and any nearby areas which may potentially be contributing to elevated levels of $SO_2$ around the facility are determined, existing jurisdictional boundaries are considered for the purpose of informing our intended nonattainment area, specifically with respect to clearly defined legal boundaries.

Modeling provided by Sierra Club asserts that portions of Freestone and Anderson Counties may experience violations of the 2010 $SO_2$ NAAQS. The EPA believes that our intended nonattainment area boundaries are comprised of clearly defined legal boundaries that adequately encompass all areas where violations of the NAAQS may occur. It should be noted that there is a facility in neighboring Limestone County, specifically Limestone, which is also impacted by the July 2, 2016 court-ordered deadline for the EPA to issue designations. The EPA intends to designate the area around Limestone as unclassifiable/attainment, and our analysis and evaluation of all available information is included in a separate section of this technical support document.

Other Relevant Information

As noted above, the EPA received air dispersion modeling results from Sierra Club. The submitter's initial modeling results, dated September 11, 2015, assert that there are impacts in excess of the 1-hour $SO_2$ NAAQS in the area surrounding Big Brown. The TCEQ submitted a letter on November 17, 2015, to the EPA to provide comments on the Sierra Club's modeling analysis for facilities in Texas, including Big Brown, noting that the initial Sierra Club modeling was conducted with only one year of meteorological data instead of three and that modeled maximum impacts occurred on-property. TCEQ also commented on the alternative modeling Sierra Club conducted using allowable emissions, and statements that Sierra Club included in their modeling report regarding contribution of specific sources to modeled violations without detailed analysis to support the claim. In response, Sierra Club updated its modeling for the area and submitted the results to the EPA on December 15, 2015. Our review of Sierra Club's modeling is based on what was submitted in December 2015. Specifically, Sierra Club's updated modeling asserts that $SO_2$ emissions from Big Brown have associated impacts that exceed the 1-hour $SO_2$ NAAQS, and was revised to use the most recent version of AERMOD, as well as, to include the full three years of meteorological data. The discussion and analysis that follows below will reference Sierra Club's use of the Modeling TAD, the EPA's assessment of Sierra Club's modeling in accordance with the Modeling TAD, and the factors for evaluation contained in the EPA's March 20, 2015 guidance, as appropriate.

*Model Selection and Modeling Components*

The EPA's Modeling TAD notes that for area designations under the 2010 $SO_2$ NAAQS, the AERMOD modeling system should be used, unless use of an alternative model can be justified. In some instances the recommended model may be a model other than AERMOD, such as the BLP model for buoyant line sources.   The AERMOD modeling system contains the following components:
-   AERMOD: the dispersion model
-   AERMAP: the terrain processor for AERMOD
-   AERMET: the meteorological data processor for AERMOD
-   BPIPPRIME: the building input processor
-   AERMINUTE: a pre-processor to AERMET incorporating 1-minute automated surface observation system (ASOS) wind data
-   AERSURFACE: the surface characteristics processor for AERMET
-   AERSCREEN: a screening version of AERMOD

Sierra Club used AERMOD version 15181, and a discussion of the individual components will be referenced in the corresponding discussion that follows as appropriate.

*Modeling Parameter: Rural or Urban Dispersion*

The EPA's recommended procedure for characterizing an area by prevalent land use is based on evaluating the dispersion environment with 3 km of the facility. According to the EPA's modeling guidelines, rural dispersion coefficients are to be used in the dispersion modeling analysis if more than 50% of the area within a 3 km radius of the facility is classified as rural. Conversely, if more than 50% of the area is urban, urban dispersion coefficients should be used in the modeling analysis. When performing the modeling for the area of analysis, Sierra Club determined that it was most appropriate to run the model in rural mode. Based on review of aerial images of the area surrounding Big Brown, we agree with Sierra Club's determination that the area is best defined as rural.

*Modeling Parameter: Area of Analysis (Receptor Grid)*

The EPA believes that a reasonable first step towards characterization of air quality in the area surrounding Big Brown is to determine the extent of the area of analysis, i.e., receptor grid. Considerations presented in the Modeling TAD include but are not limited to: the location of the $SO_2$ emission sources or facilities considered for modeling; the extent of significant concentration gradients of nearby sources; and sufficient receptor coverage and density to adequately capture and resolve the model predicted maximum $SO_2$ concentrations. For the Big Brown area, Sierra Club has included one other emitter of $SO_2$ that has the potential to create concentration gradients with the area around Big Brown and within Freestone County. Sierra Club included Limestone's emissions because they thought it was appropriate in order to adequately characterize air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. We agree that in addition to Big Brown, the Limestone facility and potentially the Streetman Plant facility have the ability to result in concentration gradients within Freestone County (based on emissions, meteorology and proximity to Freestone County) and should be included in the

modeling for Freestone County. Limestone is a large source and is near the Freestone County border so it needed to be included for that reason, but it is 47 km from Big Brown which is close to the 50 km distance that we usually identify as a conservative distance for inclusion of sources. Sierra Club did not include the Streetman Plant in their modeling and TCEQ recently identified Streetman Plant as a source subject to the $SO_2$ DRR for future evaluation. We recommend that the Streetman Plant should be included in further modeling and analysis of $SO_2$ levels in Freestone County. The grid receptor spacing for the area of analysis chosen by the Sierra Club is as follows:

- 100 meter grid from center of Big Brown out to 5 km,
- 500 meter grid centered on Big Brown out to 10 km, and
- 1000 meter (1 km) grid centered on Big Brown out to 50 km.

The receptor network included 21,201 total receptors and covered the central and southwestern portions of Freestone County, the eastern portion of Anderson County, the southern portion of Henderson County and the central and northeastern portion of Limestone County.  This is a larger grid than we might normally recommend, but also provided the ability to assess impacts of Limestone facility emissions on Freestone County and areas around Big Brown. Sierra Club modeling used a slightly elevated flagpole receptor height, but if this was corrected to EPA's recommended height we would expect only a slight change in the modeled numbers and the area of exceedances and magnitude of the values would be basically the equivalent and not change our proposed action.

As previously mentioned, Figure 1 shows the area surrounding Big Brown and location of Limestone. Figure 3 below shows the area of analysis and the modeled impacts from the Sierra Club modeling illustrating the areas with impacts above the 2010 $SO_2$ NAAQS.

Figure 3: Sierra Club's Area of Analysis for Big Brown and Limestone Stations Showing Modeled Impacts using Actual Emissions from 2012 - 2014.



*Modeling Parameter: Source Characterization*

Sierra Club characterized the sources within the area of analysis in accordance with the best practices outlined in the Modeling TAD. Specifically, it used actual stack heights in conjunction with actual emissions. Sierra Club characterized the source locations and stack parameters, e.g.,

exit temperature, exit velocity, and diameter. Variable stack temperatures and velocities were not included because they are not publically available for use by Sierra Club.  Similar to variable stack parameters, building information was not publically available. Therefore, Sierra Club did not include building downwash in their analysis stating that this was the conservative approach and would likely underestimate impacts from emissions resulting in lower modeled concentrations than modeling that included building downwash.  While we do not agree with Sierra Club's assertion that exclusion of downwash is conservative in all cases, in our opinion the inclusion of building information and associated downwash in this analysis would not change our recommended designation of nonattainment. The modeling values are sufficiently above the standard and inclusion of downwash often leads to higher concentrations closer to the source but even in situations we have seen where this did not occur, any decreases in maximum modeled values from inclusion of downwash were relatively small and not expected to be enough of a decrease to resolve all modeled exceedance values in Freestone County.

In our review, the EPA did identify potential errors regarding the modeled locations of the main stacks at the Big Brown and Limestone facilities. It appears that Sierra Club may have inadvertently switched the UTM location information for Big Brown Stacks 1 and 2. Because of the close proximity of the two stacks and the locations relative to fenceline locations, the impact of this error in the model inputs on modeled concentrations is not expected to be significant nor change the resulting design value from violating to not violating the NAAQS.  Therefore, our intended designation of nonattainment is not affected by this discrepancy. It appears that in Sierra Club's modeling for Big Brown a similar error was made in the modeled locations for the two off-site modeled stacks at the Limestone facility.  Again, based on the proximity of Limestone's main stacks to each other coupled with their distance to the Freestone County, and the lack of impact on modeled exceedances, we do not expect this error in modeled impacts to change our determination regarding designation of the area.

*Modeling Parameter: Emissions*

The EPA's Modeling TAD notes that for the purposes of modeling to characterize air quality for use in designations, the recommended approach is to use the most recent 3 years of actual emissions data and concurrent meteorological data. However, the TAD does provide for the flexibility of using allowable emissions in the form of the most recently permitted, (referred to as PTE or allowable) emissions rate.

The EPA believes that continuous emissions monitoring systems (CEMS) data provide acceptable historical emissions information when it is available, and that these data are available for many electric generating units. In the absence of CEMS data, the EPA's Modeling TAD highly encourages the use of AERMOD's hourly varying emissions keyword HOUREMIS, or through the use of AERMOD's variable emissions factors keyword EMISFACT. When choosing one of these methods, the EPA believes that detailed throughput, operating schedules, and emissions information from the impacted source(s) should be used.

In certain instances, states and other interested parties may find that it is more advantageous or simpler to use PTE rates as part of their modeling runs. Specifically, a facility may have recently adopted a new federally enforceable emissions limit, been subject to a federally enforceable

191

consent decree, or implemented other federally enforceable mechanisms and control technologies to limit $SO_2$ emissions to a level that indicates compliance with the NAAQS. These new limits or conditions may be used in the application of AERMOD. In these cases, the Modeling TAD notes that the existing $SO_2$ emissions inventories used for permitting or SIP planning demonstrations should contain the necessary emissions information for designations-related modeling. In the event that these short-term emissions are not readily available, they may be calculated using the methodology in Table 8-1 of Appendix W to 40 CFR Part 51 titled, "Guideline on Air Quality Models."

As previously noted, Sierra Club included Big Brown and Limestone within 50 km in the area of analysis. The use of a 50 km radius in generating a list of sources to include in the modeling can be conservative, but Sierra Club only modeled the source(s) that it felt resulted in concentration gradients in the area of concern and not all of the sources. Sierra Club did not model all major sources of $SO_2$ (sources greater than 100 tpy) within 50 km of Big Brown, but did include the Limestone facility in the modeling as it could cause concentration gradients in Freestone County and potentially in the area of modeled exceedances. We agree that the Limestone facility does result in concentration gradients in Freestone County but as discussed below, initial analysis of the maximum impacts around Big Brown indicated that Big Brown was responsible for almost 100% of the impacts on the maximum, so we do not think Limestone contributes significantly to modeled exceedances. Therefore based on the information, No other sources within d 50 km were determined by Sierra Club to have the potential to cause significant concentration gradient impacts within the area of analysis. The facilities in the area of analysis and their associated annual actual $SO_2$ emissions between 2012 and 2014 are summarized below.

Table 3: Actual $SO_2$ Emissions from Facilities in the Freestone Area of Analysis (2012 – 2014), Provided by Sierra Club

| Company ID | Facility Name | $SO_2$ Emissions (tons per year) | | |
|---|---|---|---|---|
| | | 2012 | 2013 | 2014 |
| EFH | Big Brown | 60681 | 62494 | 57460 |
| NRG | Limestone | 20671 | 25619 | 27862 |
| Total Emissions | All Facilities Modeled | 81352 | 88113 | 85322 |

For Big Brown and Limestone, Sierra Club used actual hourly emissions from the most recent 3-year data set, i.e., 2012 – 2014. This emissions data was obtained from USEPA Air Market Program Data.

*Modeling Parameter: Meteorology and Surface Characteristics*

The most recent 3 years of meteorological data (concurrent with the most recent 3 years of emissions data) should be used in designations efforts. As noted in the Modeling TAD, the selection of data should be based on spatial and climatological (temporal) representativeness. The representativeness of the data are based on: 1) the proximity of the meteorological monitoring site to the area under consideration, 2) the complexity of terrain, 3) the exposure of

the meteorological site, and 4) the period of time during which data are collected. Sources of meteorological data include National Weather Service (NWS) stations, site-specific or onsite data, and other sources such as universities, Federal Aviation Administration (FAA), and military stations.

For the Freestone County area of analysis, surface meteorology from the NWS station Corsicana Campbell Field near Corsicana, Texas, approximately 40 km to the northwest, and coincident upper air observations from the NWS station in Fort Worth, Texas, approximately 160 km to the northwest, were selected by Sierra Club as best representative of meteorological conditions within the area of analysis.

Sierra Club used AERSURFACE version 13016 from the NWS station in Corsicana Campbell Field, Texas (located at latitude 32.032 N, longitude 96.399 W) to estimate the surface characteristics of the area of analysis. Sierra Club estimated values for twelve spatial sectors out to 1.0 km at a seasonal temporal resolution for average conditions. Sierra Club also estimated values for albedo (the fraction of solar energy reflected from the earth back into space), the Bowen ratio (the method generally used to calculate heat lost or heat gained in a substance), and the surface roughness (sometimes referred to as "Zo"). In Figure 4, below, the location of the Corsicana Campbell Field, Texas NWS station is shown relative to the Big Brown.

Figure 4: Big Brown Steam Electric Station and the Corsicana Campbell Field NWS



Meteorological data from the above surface and upper air stations were used in generating AERMOD-ready files with the AERMET processor. The output meteorological data created by the AERMET processor is suitable for being applied with AERMOD input files for AERMOD modeling runs. The Sierra Club analysis was conducted in adherence to all available USEPA guidance for evaluating source impacts on attainment of the 1-hour $SO_2$ NAAQS via aerial dispersion modeling, including the AERMOD Implementation Guide; USEPA's Applicability of Appendix W Modeling Guidance for the 1-hour $SO_2$ National Ambient Air Quality Standard, August 23, 2010; modeling guidance promulgated by USEPA in Appendix W to 40 CFR Part 51; USEPA's March 2011 Modeling Guidance for $SO_2$ NAAQS Designations; and, USEPA's December 2013 $SO_2$ NAAQS Designations Technical Assistance Document in the processing of the raw meteorological data into an AERMOD-ready format, and used AERSURFACE to best represent surface characteristics.

Hourly surface meteorological data records are read by AERMET, and include all the necessary elements for data processing. However, wind data taken at hourly intervals may not always portray wind conditions for the entire hour, which can be variable in nature.  Hourly wind data may also be overly prone to indicate calm conditions, which are not modeled by AERMOD. In order to better represent actual wind conditions at the meteorological tower, wind data of one minute duration was provided from the same instrument tower, but in a different formatted file to be processed by a separate preprocessor, AERMINUTE. These data were subsequently integrated into the AERMET processor to produce final hourly wind records of AERMOD-ready meteorological data that better estimate actual hourly average conditions and that are less prone to over-report calm wind conditions. This allows AERMOD to apply more hours of meteorology to modeled inputs, and therefore produce a more complete set of concentration estimates. As a guard against excessively high concentrations that could be produced by AERMOD in very light wind conditions, Sierra Club set a minimum threshold of 0.5 meters per second in processing meteorological data for use in AERMOD. This approach is consistent with a March 2013 EPA memo titled, "Use of ASOS meteorological data in AERMOD dispersion Modeling." In setting this threshold, no wind speeds lower than this value would be used for determining concentrations. This threshold was specifically applied to the one minute wind data.

*Modeling Parameter: Geography and Terrain*

The terrain in the area of analysis is best described as gently rolling. To account for these terrain changes, the AERMAP version 11103 terrain program within AERMOD was used to specify terrain elevations for all the receptors. The source of the elevation data incorporated into the model is from the USGS National Elevation Database.

*Modeling Parameter: Background Concentrations of $SO_2$*

The Modeling TAD offers two mechanisms for characterizing background concentrations of $SO_2$ that are ultimately added to the modeled design values: 1) a "first tier" approach, based on monitored design values, or 2) a temporally varying approach, based on the 99th percentile monitored concentrations by hour of day and season or month. For the Freestone County area of analysis, the Sierra Club used the 2011-13 monitored design value for El Paso. The Sierra Club

194

stated that this was the lowest background for the entire state and was therefore a conservative assumption. The background concentration for this area of analysis was determined by the state to be 7.8 micrograms per cubic meter ($\mu g/m^3$), or 2.98 ppb,[34] and that value was incorporated into the final AERMOD results.

*Summary of Modeling Results*

The AERMOD modeling parameters for the Big Brown area of analysis, as provided by Sierra Club, are summarized below in Table 4.

Table 4: AERMOD Modeling Parameters for the Freestone County Area of Analysis, Provided by Sierra Club

| Freestone County Area of Analysis | |
|---|---|
| AERMOD Version | 15181 |
| Dispersion Characteristics | Rural |
| Modeled Sources | 2 |
| Modeled Stacks | 4 |
| Modeled Structures | 0 |
| Modeled Fencelines | 0* |
| Total receptors | 21,201 |
| Emissions Type | Actual |
| Emissions Years | 2012-2014 |
| Meteorology Years | 2012-2014 |
| Surface Meteorology Station | Corsicana Campbell Field |
| Upper Air Meteorology Station | Fort Worth, Texas |
| Methodology for Calculating Background $SO_2$ Concentration | Design Value |
| Calculated Background $SO_2$ Concentration | 7.8 $\mu g/m^3$ |

*While the Sierra Club modeling did not specifically include a fenceline in their modeling analysis, the EPA did compare the modeled results with fenceline information from previous industry dispersion modeling to confirm that the modeled exceedances of the NAAQS shown in Sierra Club's analysis did occur outside the fenceline and thus in ambient air.

The results presented below in Table 5 show the magnitude and geographic location of the highest predicted modeled concentration of $SO_2$ based on actual emissions.

---

[34] The conversion factor for $SO_2$ (at the standard conditions applied in the ambient $SO_2$ reference method) is 1ppb = approximately 2.62$\mu g/m^3$.

Table 5: Maximum Predicted 99th Percentile 1-Hour $SO_2$ Concentration in the Freestone County Area of Analysis Based on Actual Emissions, Provided by Sierra Club

| Averaging Period | Data Period | Receptor Location | | $SO_2$ Concentration ($\mu g/m^3$) Based on Actual Emissions | |
|---|---|---|---|---|---|
| | | UTM/Latitude | UTM/Longitude | Modeled (including background) | NAAQS |
| 99th Percentile 1-Hour Average | 2012-2014 | 775052.690 | 3525933.000 | 387.9 | 196.5* |

* Equivalent to the 2010 $SO_2$ NAAQS set at 75 ppb

Sierra Club's modeling indicates that the predicted 99th percentile 1-hour average concentration within the chosen modeling domain is 387.9 $\mu g/m^3$, or 148.1 ppb. This modeled concentration included the background concentration of $SO_2$, and is based on actual emissions from the modeled facilities. This highest predicted values occurred in a circular pattern from approximately one km from the facility center to as far 15 km to the northeast, and is graphically represented along with all the other receptors in Figures 5 and 6, below. The single highest value modeled was 387.9 $\mu g/m^3$ and is located approximately 4 km northwest of the center of the Big Brown facility. We evaluated the maximum impact around Big Brown and the modeling indicated that Big Brown was responsible for almost 100% of the impacts on the maximum (approximately 0.2 ppb from other sources), so we do not think Limestone contributes significantly to modeled exceedances. We also note that Limestone is almost 50 km away and the meteorological conditions that would result in the maximum Big Brown impacts would most likely not be the same conditions that would result in impacts from Limestone on the Big Brown driven exceedances.

Figure 5: Sierra Club's Modeling Grid for the 1-Hour $SO_2$ Concentrations in the Freestone County Area of Analysis Based on Actual Emissions



197

Figure 6: Sierra Club's Maximum Predicted 99th Percentile 1-Hour $SO_2$ Concentrations in the Freestone County Area of Analysis Based on Actual Emissions



Conclusion

After careful evaluation of the information provided by Sierra Club, as well as available relevant information, the EPA intends to designate the area around Big Brown in Freestone County, Texas as nonattainment for the 2010 $SO_2$ NAAQS. Specifically, the intended nonattainment area is comprised of the portions of Freestone and Anderson Counties, Texas bounded by the following UTM coordinates in meters (NAD83 Datum, Zone 14):

| X | Y |
|---|---|
| 762752, | 3540333 |
| 762752, | 3510333 |
| 789753, | 3510333 |
| 789753, | 3540333 |

The nonattainment area excludes the portions of Navarro County that fall within the area bounded by the listed UTM coordinates on the basis that none of the modeled receptors in

198

Navarro County show modeled violations of the NAAQS. Figure 7 below graphically illustrates our intended nonattainment area.

Figure 7: Big Brown Nonattainment Area



Our intended designation is based on Sierra Club's modeling of actual emissions reported from the facilities during the 2012 to 2014 calendar years. An analysis of the modeling data indicates it was performed in accordance with appropriate EPA modeling guidance and using generally conservative assumptions.

The modeling did not include building downwash or variable stack temperature and velocity, since Sierra Club did not have access to information needed to support such inclusion. Building downwash will generally, though not always, increase the predicted maximum modeled concentrations. Sierra Club used stack velocity and temperatures consistent with 100% load. This, coupled with actual hourly emission rates, should provide conservative estimates of actual concentrations because higher temperatures and velocities of 100% load when paired with lower emissions of less than 100% load should provide an overestimation of the dispersion and thus an underestimation of maximum concentrations. Given that modeled concentrations are almost

199

double the standard, the inclusion of building downwash and variable stack parameters, etc. in the modeling would not result in values near or below the standard, therefore the modeling is sufficient for a determination of nonattainment.

Therefore, EPA believes that the Sierra Club modeling is relevant information that must be considered in our designation decision.  While, TCEQ did provide comments on Sierra Club's initial modeling submittal, we received no additional relevant technical information from the State or other parties. In response, Sierra Club updated its modeling for the area addressing most of the concerns raised by TCEQ and submitted the results to the EPA on December 15, 2015. Based on the information available showing the area in the vicinity of Big Brown does not meet the 1-hr $SO_2$ standard, we intend to designate the area defined above as nonattainment.

EPA's intended boundaries for the nonattainment area encompass the area shown to be in violation of the standard and the principal source that contributes to the violation.

At this time, our intended designations for the state only apply to this area and the other areas presented in this technical support document. Consistent with the conditions in the March 2, 2015 consent decree, the EPA will evaluate and designate all remaining undesignated areas in Texas by either December 31, 2017, or December 31, 2020.

**Tab 152: Draft Technical Support Document for Nebraska Area Designations for the National Area Designations for the 2010 SO2 Primary National Ambient Air Quality Standard**

<u>Draft Technical Support Document</u>

Nebraska
Area Designations for the 2010 SO$_2$ Primary National Ambient Air Quality Standard

<u>Summary</u>

Pursuant to section 107(d) of the Clean Air Act (CAA), the U.S. Environmental Protection Agency (EPA, or the Agency) must designate areas as either "unclassifiable," "attainment," or "nonattainment" for the 2010 one-hour sulfur dioxide (SO$_2$) primary national ambient air quality standard (NAAQS). The CAA defines a nonattainment area as one that does not meet the NAAQS or that contributes to a violation in a nearby area. An attainment area is defined as any area other than a nonattainment area that meets the NAAQS. Unclassifiable areas are defined as those that cannot be classified on the basis of available information as meeting or not meeting the NAAQS.

Nebraska submitted updated recommendations on September 18, 2015, ahead of a July 2, 2016, deadline for the EPA to designate certain areas established by the U.S. District Court for the Northern District of California. This deadline is the first of three deadlines established by the court for the EPA to complete area designations for the 2010 SO$_2$ NAAQS. Table 1 below lists Nebraska's recommendations and identifies the counties or portions of counties in Nebraska that the EPA intends to designate by July 2, 2016 based on an assessment and characterization of air quality through ambient air quality data, air dispersion modeling, other evidence and supporting information, or a combination of the above.

**Table 1: Nebraska's Recommended and EPA's Intended Designations**

| Area | Nebraska's Recommended Area Definition | Nebraska's Recommended Designation | EPA's Intended Area Definition | EPA's Intended Designation |
|------|------|------|------|------|
| Otoe County, Nebraska | No Boundaries were defined in the State's official recommendation | Attainment | Otoe County, Nebraska | Unclassifiable/ Attainment |
| Lincoln County, Nebraska | No Boundaries were defined in the State's official recommendation | Attainment | Lincoln County, Nebraska | Unclassifiable/ Attainment |
| Lancaster County, Nebraska | No Boundaries were defined in the State's official recommendation | Unclassifiable | Lancaster County, Nebraska | Unclassifiable |

<u>Background</u>

1

On June 3, 2010, the EPA revised the primary (health based) $SO_2$ NAAQS by establishing a new one-hour standard at a level of 75 parts per billion (ppb) which is attained when the three-year average of the 99th percentile of one-hour daily maximum concentrations does not exceed 75 ppb. This NAAQS was published in the Federal Register on June 22, 2010 (75 FR 35520) and is codified at 40 CFR 50.17. The EPA determined this is the level necessary to protect public health with an adequate margin of safety, especially for children, the elderly and those with asthma. These groups are particularly susceptible to the health effects associated with breathing $SO_2$. The two prior primary standards of 140 ppb evaluated over 24 hours, and 30 ppb evaluated over an entire year, codified at 40 CFR 50.4, remain applicable.[1] However, the EPA is not currently designating areas on the basis of either of these two primary standards. Similarly, the secondary standard for $SO_2$ set at 500 ppb evaluated over 3 hours has not been revised, and the EPA is also not currently designating areas on the basis of the secondary standard.

General Approach and Schedule

Section 107(d) of the Clean Air Act requires that not later than one year after promulgation of a new or revised NAAQS, state governors must submit their recommendations for designations and boundaries to EPA. Section 107(d) also requires the EPA to provide notification to states no less than 120 days prior to promulgating an initial area designation that is a modification of a state's recommendation. If a state does not submit designation recommendations, the EPA will promulgate the designations that it deems appropriate. If a state or tribe disagrees with the EPA's intended designations, they are given an opportunity within the 120 day period to demonstrate why any proposed modification is inappropriate.

On August 5, 2013, the EPA published a final rule establishing air quality designations for 29 areas in the United States for the 2010 $SO_2$ NAAQS, based on recorded air quality monitoring data from 2009 - 2011 showing violations of the NAAQS (78 FR 47191). In that rulemaking, the EPA committed to address, in separate future actions, the designations for all other areas for which the Agency was not yet prepared to issue designations.

Following the initial August 5, 2013 designations, three lawsuits were filed against the EPA in different U.S. District Courts, alleging the Agency had failed to perform a nondiscretionary duty under the CAA by not designating all portions of the country by the June 2013 deadline. In an effort intended to resolve the litigation in one of those cases, plaintiffs Sierra Club and the Natural Resources Defense Council and the EPA filed a proposed consent decree with the U.S. District Court for the Northern District of California. On March 2, 2015, the court entered the consent decree and issued an enforceable order for the EPA to complete the area designations according to the court-ordered schedule.

---

[1] 40 CFR 50.4(e) provides that the two prior primary NAAQS will no longer apply to an area one year after its designation under the 2010 NAAQS, except that for areas designated nonattainment under the prior NAAQS as of August 22, 2010, and areas not meeting the requirements of a SIP Call under the prior NAAQS, the prior NAAQS will apply until that area submits and EPA approves a SIP providing for attainment of the 2010 NAAQS. No Nebraska areas were designated nonattainment for the prior NAAQS at the time of this designation.

2

According to the court-ordered schedule, the EPA must complete the remaining designations by three specific deadlines. By no later than July 2, 2016 (16 months from the court's order), the EPA must designate two groups of areas: (1) areas that have newly monitored violations of the 2010 $SO_2$ NAAQS and (2) areas that contain any stationary sources that had not been announced as of March 2, 2015 for retirement and that according to the EPA's Air Markets Database emitted in 2012 either (i) more than 16,000 tons of $SO_2$ or (ii) more than 2,600 tons of $SO_2$ with an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU). Specifically, a stationary source with a coal-fired unit that as of January 1, 2010 had a capacity of over 5 megawatts and otherwise meets the emissions criteria, is excluded from the July 2, 2016 deadline if it had announced through a company public announcement, public utilities commission filing, consent decree, public legal settlement, final state or federal permit filing, or other similar means of communication, by March 2, 2015, that it will cease burning coal at that unit.

The last two deadlines for completing remaining designations are December 31, 2017, and December 31, 2020. The EPA has separately promulgated requirements for states and other air agencies to provide additional monitoring or modeling information on a timetable consistent with these designation deadlines. We expect this information to become available in time to help inform these subsequent designations. These requirements were promulgated on August 21, 2015 (80 FR 51052), in a rule known as the $SO_2$ Data Requirements Rule (DRR).

Updated designations guidance was issued by the EPA through a March 20, 2015 memorandum from Stephen D. Page, Director, U.S. EPA, Office of Air Quality Planning and Standards, to Air Division Directors, U.S. EPA Regions 1-10. This memorandum supersedes earlier designation guidance for the 2010 $SO_2$ NAAQS, issued on March 24, 2011, and it identifies factors that the EPA intends to evaluate in determining whether areas are in violation of the 2010 $SO_2$ NAAQS. The guidance also contains the factors the EPA intends to evaluate in determining the boundaries for all remaining areas in the country, consistent with the court's order and schedule. These factors include: 1) Air quality characterization via ambient monitoring or dispersion modeling results; 2) Emissions-related data; 3) Meteorology; 4) Geography and topography; and 5) Jurisdictional boundaries. This guidance was supplemented by two technical assistance documents intended to assist states and other interested parties in their efforts to characterize air quality through air dispersion modeling or ambient air quality monitoring for sources that emit $SO_2$. Notably, the EPA released its most recent versions of documents titled, "$SO_2$ NAAQS Designations Modeling Technical Assistance Document" (Modeling TAD) and "$SO_2$ NAAQS Designations Source-Oriented Monitoring Technical Assistance Document" (Monitoring TAD) in December 2013.

Based on ambient air quality data collected between 2012 and 2014, no violations of the 2010 $SO_2$ NAAQS have been recorded in any undesignated part of the state[2]. However, there are three

---

[2] For designations based on ambient air quality monitoring data that violates the 2010 $SO_2$ NAAQS, the consent decree directs the EPA to evaluate data collected between 2013 and 2015. Absent complete, quality assured and certified data for 2015, the analyses of applicable areas for the EPA's intended designations will be informed by data collected between 2012 and 2014. States with monitors that have recorded a violation of the 2010 $SO_2$ NAAQS during these years have the option of submitting complete, quality assured and certified data for calendar year 2015 by April 19, 2016 to the EPA for evaluation. If after our review, the ambient air quality data for the area indicates that no violation of the NAAQS occurred between 2013 and 2015, the consent decree does not obligate the EPA to

3

sources in the state meeting the emissions criteria of the consent decree for which the EPA must complete designations by July 2, 2016. In this draft technical support document, the EPA discusses its review and technical analysis of Nebraska's updated recommendations for the areas that we must designate. The EPA also discusses any intended modifications from the state's recommendation based on all available data before us.

The following are definitions of important terms used in this document:

1) 2010 $SO_2$ NAAQS – The primary NAAQS for $SO_2$ promulgated in 2010. This NAAQS is 75 ppb, based on the three year average of the 99th percentile of the annual distribution of daily maximum one-hour average concentrations. See 40 CFR 50.17.

2) Design Value – a statistic computed according to the data handling procedures of the NAAQS (in 40 CFR part 50 Appendix T) that, by comparison to the level of the NAAQS, indicates whether the area is violating the NAAQS.

3) Designated nonattainment area – an area which the EPA has determined has violated the 2010 $SO_2$ NAAQS or contributed to a violation in a nearby area. A nonattainment designation reflects considerations of state recommendations and all of the information discussed in this document. The EPA's decision is based on all available information including the most recent 3 years of air quality monitoring data, available modeling analysis, and any other relevant information.

4) Designated unclassifiable area – an area which the EPA cannot determine based on all available information whether or not it meets the 2010 $SO_2$ NAAQS.

5) Designated unclassifiable/attainment area – an area which the EPA has determined to have sufficient evidence to find either is attaining or is likely to be attaining the NAAQS. The EPA's decision is based on all available information including the most recent 3 years of air quality monitoring data, available modeling analysis, and any other relevant information.

6) Modeled violation – a violation based on air dispersion modeling.

7) Recommended attainment area – an area a state or tribe has recommended that the EPA designate as attainment.

8) Recommended nonattainment area – an area a state or tribe has recommended that the EPA designate as nonattainment.

9) Recommended unclassifiable area – an area a state or tribe has recommended that the EPA designate as unclassifiable.

10) Recommended unclassifiable/attainment area – an area a state or tribe has recommended that the EPA designate as unclassifiable/attainment.

11) Violating monitor – an ambient air monitor meeting all methods, quality assurance and siting criteria and requirements whose valid design value exceeds 75 ppb, based on data analysis conducted in accordance with Appendix T of 40 CFR part 50.

---

complete the designation. Instead, we may designate the area and all other previously undesignated areas in the state on a schedule consistent with the prescribed timing of the court order, i.e., by December 31, 2017, or December 31, 2020.

4

**Technical Analysis for the Nebraska City Station, Nebraska Area**

Proposed Designation Summary

After careful evaluation of the state's recommendation and supporting information, as well as all available relevant information, the EPA intends to designate the area around the Nebraska City Station as unclassifiable/attainment for the 2010 $SO_2$ NAAQS. Specifically, the boundaries are comprised of the entirety of Otoe County, Nebraska.

The unclassifiable/attainment designation is based on the modeling analysis that the State of Nebraska provided to EPA.

Introduction

The Nebraska City, Nebraska area contains a stationary source that according to the EPA's Air Markets Database emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU). As of March 2, 2015, this stationary source had not met the specific requirements for being "announced for retirement." Specifically, in 2012, the Omaha Public Power District's (OPPD) Nebraska City Station emitted 16,766 tons of $SO_2$ and had an emissions rate of 0.722 lbs $SO_2$/mmBTU. Pursuant to the March 2, 2015 court-ordered schedule, the EPA must designate the area surrounding the facility by July 2, 2016.

In its submission, Nebraska recommended that the area surrounding the Nebraska City Station be designated as attainment based on an assessment and characterization of air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. No area (e.g., jurisdictional boundaries) was officially recommended by Nebraska. This assessment and characterization was performed using air dispersion modeling software, i.e., AERMOD, analyzing actual emissions. After careful review of the state's assessment, supporting documentation, and all available data, the EPA agrees that the area around Nebraska City Station is attaining the standard. Specifically, we intend to designate Otoe County as unclassifiable/attainment.

The Nebraska City Station is located in southeast Nebraska in the eastern portion of Otoe County. As seen in Figure 1 below, the facility is located approximately 10 km southeast of Nebraska City. The Nebraska City Station lies near and within the Missouri River Valley along the Nebraska and Iowa border. The Nebraska City Station includes two coal boiler stacks. No significant emitters of $SO_2$ are located nearby the Nebraska City Station. The state did not recommend a boundary for its attainment designation for the area. Thus, the EPA's intended unclassifiable/attainment designation for the area will comprise the entirety of Otoe County, Nebraska.

**Figure 1: The EPA's intended unclassifiable/attainment designation for Otoe County, Nebraska, which includes the Nebraska City Station. The Nebraska City Station is located in the eastern portion of Otoe County, along the Nebraska-Iowa border within the Missouri River Valley.**



The discussion and analysis that follows below will reference the state's use of the Modeling TAD, the EPA's assessment of the state's modeling in accordance with the Modeling TAD, and the factors for evaluation contained in the EPA's March 20, 2015 guidance, as appropriate.

Detailed Assessment

*Air Quality Data*

This factor considers the $SO_2$ air quality monitoring data in the area surrounding the Nebraska City facility. Since no $SO_2$ ambient monitors were located in Otoe County, no monitoring data was relied upon in EPA's proposed designation for this area.

*Model Selection and Modeling Components*

6

The EPA's Modeling TAD notes that for area designations under the 2010 $SO_2$ NAAQS, the AERMOD modeling system should be used, unless use of an alternative model can be justified. In some instances the recommended model may be a model other than AERMOD, such as the BLP model for buoyant line sources. The AERMOD modeling system contains the following components:

- AERMOD: the dispersion model
- AERMAP: the terrain processor for AERMOD
- AERMET: the meteorological data processor for AERMOD
- BPIPPRIME: the building input processor
- AERMINUTE: a pre-processor to AERMET incorporating 1-minute automated surface observation system (ASOS) wind data
- AERSURFACE: the surface characteristics processor for AERMET
- AERSCREEN: a screening version of AERMOD

The state used AERMOD version 14134, which was the most recent version of AERMOD at the time of their submittal, and a discussion of the individual components will be referenced in the corresponding discussion that follows, as appropriate.

*Modeling Parameter: Rural or Urban Dispersion*

The EPA's recommended procedure for characterizing an area by prevalent land use is based on evaluating the dispersion environment with 3 km of the facility. According to the EPA's modeling guidelines, rural dispersion coefficients are to be used in the dispersion modeling analysis if more than 50% of the area within a 3 km radius of the facility is classified as rural. Conversely, if more than 50% of the area is urban, urban dispersion coefficients should be used in the modeling analysis. When performing the modeling for the area of analysis, the state determined that it was most appropriate to run the model in rural mode. As previously mentioned, the Nebraska City Station is located in the Missouri River valley along the Nebraska-Iowa border, and the rural determination was made based on the land cover around the facility.

*Modeling Parameter: Area of Analysis (Receptor Grid)*

The EPA believes that a reasonable first step towards characterization of air quality in the area surrounding the Nebraska City Station is to determine the extent of the area of analysis, i.e., receptor grid. Considerations presented in the Modeling TAD include but are not limited to: the location of the $SO_2$ emission sources or facilities considered for modeling; the extent of significant concentration gradients of nearby sources; and sufficient receptor coverage and density to adequately capture and resolve the model predicted maximum $SO_2$ concentrations. For the Nebraska City Station area, the state has included no other emitters of $SO_2$ within its area of analysis. There are no other significant source of $SO_2$ within 80 km in any direction of the Nebraska City Station according to the 2011 National Emissions Inventory (NEI). Thus, no other emitters of $SO_2$ would have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. The grid receptor spacing for the area of analysis chosen by the state is as follows:

- 50 meter spacing on the fence line

7

- 50 meter spacing from the fence to 1 kilometer from the fence
- 100 meter spacing from 1 kilometer to 2 kilometers from the fence
- 250 meter spacing from 2 kilometer to 5 kilometers from the fence
- 500 meter spacing from 5 kilometer to 7 kilometers from the fence
- 1000 meter spacing from 7 to 10 kilometers from the fence

The receptor network contained 10,964 receptors and covered the eastern portion of Otoe County in Nebraska and the western portion of Fremont County in Iowa.

Figure 2, included in the state submittal and reproduced below, shows the chosen area of analysis surrounding the Nebraska City Station, as well as receptor grid for the area of analysis.

Receptors for the purposes of this designation effort were placed over the Missouri River. The Modeling TAD states that since modeling is being utilized to reflect what a monitor would record for the $SO_2$ designations that will occur prior to July 2, 2016, receptors are not required to be placed over bodies of water since it would not be feasible to place a monitor in those locations. Otherwise, receptor placement followed the Modeling TAD. The impacts of the area's geography and topography will be discussed later within this document.

**Figure 2: Receptor Grid for the Nebraska City, Nebraska Area of Analysis. Courtesy of Nebraska DEQ.**



*Modeling Parameter: Source Characterization*

The state characterized the source within the area of analysis in accordance with the best practices outlined in the Modeling TAD. Specifically, the state used actual stack heights in conjunction with actual emissions. The state also adequately characterized the source's building layout and location, as well as the stack parameters, e.g., exit temperature, exit velocity, location, and diameter. Where appropriate, the AERMOD component BPIPPRIME was used to assist in addressing building downwash.

*Modeling Parameter: Emissions*

The EPA's Modeling TAD notes that for the purposes of modeling to characterize air quality for use in designations, the recommended approach is to use the most recent 3 years of actual emissions data and concurrent meteorological data. However, the TAD does provide for the flexibility of using allowable emissions in the form of the most recently permitted (referred to as PTE or allowable) emissions rate.

9

The EPA believes that continuous emissions monitoring systems (CEMS) data provide acceptable historical emissions information, when it is available, and that these data are available for many electric generating units. In the absence of CEMS data, the EPA's Modeling TAD highly encourages the use of AERMOD's hourly varying emissions keyword HOUREMIS or through the use of AERMOD's variable emissions factors keyword EMISFACT. When choosing one of these methods, the EPA believes that detailed throughput, operating schedules, and emissions information from the impacted source should be used.

In certain instances, states and other interested parties may find that it is more advantageous or simpler to use PTE rates as part of their modeling runs. Specifically, a facility may have recently adopted a new federally enforceable emissions limit, been subject to a federally enforceable consent decree, or implemented other federally enforceable mechanisms and control technologies to limit $SO_2$ emissions to a level that indicates compliance with the NAAQS. These new limits or conditions may be used in the application of AERMOD. In these cases, the Modeling TAD notes that the existing $SO_2$ emissions inventories used for permitting or SIP planning demonstrations should contain the necessary emissions information for designations-related modeling. In the event that these short-term emissions are not readily available, they may be calculated using the methodology in Table 8-1 of Appendix W to 40 CFR Part 51 titled, "Guideline on Air Quality Models."

As previously noted, the state included the 2 Units for Nebraska City Station and no other emitters of $SO_2$ within its area of analysis. The state believes that these units adequately include the sources which might contribute to the area where maximum concentrations of $SO_2$ are expected. As previously mentioned, there are no other sources located within 80 km of the Nebraska City Station that have the potential to cause significant concentration gradient impacts within the area of analysis. The Nebraska City Station's annual actual $SO_2$ emissions between 2012 and 2014 are summarized below.

**Table 1: Actual SO$_2$ Emissions Between 2012 – 2014 from Facilities in the Nebraska City Station, Nebraska Area of Analysis**

|  | SO$_2$ Emissions (tons per year) | | |
|---|---|---|---|
| Facility Name | 2012 | 2013 | 2014 |
| OPPD Nebraska City Station Unit 1 | 14,544 | 14,696 | 13,969 |
| OPPD Nebraska City Station Unit 2 | 2,222 | 2,214 | 2,165 |
| Total Emissions From All Facilities in the State's Area of Analysis | 16,766 | 16,910 | 16,134 |

For the Nebraska City Station in the area of analysis, the state used actual emissions from the most recent 3-year data set, i.e., 2012 – 2014. CEMS emissions data were used and obtained from the EPA's Clean Air Markets Division.

*Modeling Parameter: Meteorology and Surface Characteristics*

The most recent 3 years of meteorological data (concurrent with the most recent 3 years of emissions data) should be used in designations efforts. As noted in the Modeling TAD, the selection of data should be based on spatial and climatological (temporal) representativeness.

10

The representativeness of the data are based on: 1) the proximity of the meteorological monitoring site to the area under consideration, 2) the complexity of terrain, 3) the exposure of the meteorological site, and 4) the period of time during which data are collected. Sources of meteorological data include National Weather Service (NWS) stations, site-specific or onsite data, and other sources such as universities, Federal Aviation Administration (FAA), and military stations.

For the Nebraska City Station area of analysis, surface meteorology from Falls City, Nebraska 85 km to the south, and coincident upper air observations from the NWS station in Topeka, Kansas, 185 km to the south were selected as best representative of meteorological conditions within the area of analysis.

The state used AERSURFACE version 13016 using data from the NWS station in Falls City, Nebraska (located at 40.06N, 95.60W) to estimate the surface characteristics of the area of analysis. The state also estimated values for albedo (the fraction of solar energy reflected from the earth back into space), the Bowen ratio (the method generally used to calculate heat lost or heat gained in a substance), and the surface roughness (sometimes referred to as "Zo"). In Figure 3 below, which was included in the state's recommendation, the location of the Falls City, Nebraska NWS station is shown relative to the Nebraska City area of analysis.

**Figure 3: Nebraska City Station Area of Analysis and the Falls City, Nebraska NWS site used for surface meteorology, the Topeka, Kansas NWS site used for upper air meteorology, and the location of the background $SO_2$ monitor in Trego, Kansas.**



As part of its recommendation, the state provided the 3-year surface wind rose for Falls City, Nebraska. In Figure 4, the frequency and magnitude of wind speed and direction are defined in terms of from where the wind is blowing. Winds at the Falls City, Nebraska location are predominately out of south-southeast or northwest, which is consistent with the expected wind climatology of the region.

**Figure 4: Falls City, Nebraska Cumulative Annual Wind Rose for Years 2012 – 2014**



Meteorological data from the Falls City, Nebraska surface and Topeka, KS upper air stations were used in generating AERMOD-ready files with the AERMET processor. The output meteorological data created by the AERMET processor is suitable for being applied with AERMOD input files for AERMOD modeling runs. The state followed the methodology and settings presented in EPA's Modeling TAD in the processing of the raw meteorological data into an AERMOD-ready format and used AERSURFACE to best represent surface characteristics.

Hourly surface meteorological data records are read by AERMET and include all the necessary elements for data processing. However, wind data taken at hourly intervals may not always portray wind conditions for the entire hour, which can be variable in nature. Hourly wind data may also be overly prone to indicate calm conditions, which are not modeled by AERMOD. In order to better represent actual wind conditions at the meteorological tower, wind data of one minute duration was provided from the same instrument tower but in a different formatted file to

12

be processed by a separate preprocessor, AERMINUTE. These data were subsequently integrated into the AERMET processing to produce final hourly wind records of AERMOD-ready meteorological data that better estimate actual hourly average conditions and that are less prone to over-report calm wind conditions. This allows AERMOD to apply more hours of meteorology to modeled inputs, and therefore produce a more complete set of concentration estimates. As a guard against excessively high concentrations that could be produced by AERMOD in very light wind conditions, the state set a minimum threshold of 0.5 meters per second in processing meteorological data for use in AERMOD. This approach is consistent with a March 2013 EPA memo titled, "Use of ASOS meteorological data in AERMOD dispersion Modeling." In setting this threshold, no wind speeds lower than this value would be used for determining concentrations. This threshold was specifically applied to the one minute wind data.

*Modeling Parameter: Geography and Terrain*

The terrain in the area of analysis is best described as relatively flat within the Missouri River valley with some bluffs and hills above the valley. To account for these terrain changes, the AERMAP terrain program within AERMOD was used to specify terrain elevations for all the receptors. The source of the elevation data incorporated into the model is from the National Elevation Dataset (NED). The NED data, available on-line in 1 arc-second spacing from the US Geological Survey, was used in the modeling analysis. The NED data for this analysis was based on North American Datum (NAD) 83 for horizontal locations and NAD88 for elevations.

*Modeling Parameter: Background Concentrations of $SO_2$*

The Modeling TAD offers two mechanisms for characterizing background concentrations of $SO_2$ that are ultimately added to the modeled design values: 1) a "first tier" approach, based on monitored design values, or 2) a temporally varying approach, based on the 99th percentile monitored concentrations by hour of day and season or month. For the Nebraska City Station area of analysis, the state chose the monitored design value at the Trego, Kansas monitoring location. The background concentration for this area of analysis was determined by the state to be 9 micrograms per cubic meter ($\mu g/m^3$), or 3.4 ppb,[3] and that value was incorporated into the final AERMOD results.

*Summary of Modeling Results*

The AERMOD modeling parameters for the Nebraska City Station area of analysis are summarized below in Table 2.

**Table 2: AERMOD Modeling Parameters for the Nebraska City Station Area of Analysis**

| Nebraska City Area of Analysis | |
|---|---|
| AERMOD Version | 14134 |

---

[3] The conversion factor for $SO_2$ (at the standard conditions applied in the ambient $SO_2$ reference method) is 1ppb = approximately $2.62\mu g/m^3$.

13

| Dispersion Characteristics | Rural |
|---|---|
| Modeled Sources | 1 |
| Modeled Stacks | 2 |
| Modeled Structures | 5 |
| Modeled Fencelines | 1 |
| Total receptors | 10,964 |
| Emissions Type | Actual |
| Emissions Years | 2012-2014 |
| Meteorology Years | 2012-2014 |
| Surface Meteorology Station | Falls City, Nebraska |
| Upper Air Meteorology Station | Topeka, Kansas |
| Methodology for Calculating Background $SO_2$ Concentration | 1st tier |
| Calculated Background $SO_2$ Concentration | 9 $\mu g/m^3$ |

The results presented below in Table 3 show the magnitude and geographic location of the highest predicted modeled concentration based on actual emissions.

**Table 3: Maximum Predicted 99th Percentile 1-Hour $SO_2$ Concentration in the Nebraska City Station Area of Analysis Based on Actual Emissions**

| | | Receptor Location | | $SO_2$ Concentration ($\mu g/m^3$) | |
|---|---|---|---|---|---|
| Averaging Period | Data Period | UTM/Latitude | UTM/Longitude | Modeled (including background) | NAAQS |
| 99th Percentile 1-Hour Average | 2012-2014 | 264750 | 4505000 | 78.5 | 196.5* |

*Equivalent to the 2010 $SO_2$ NAAQS set at 75 ppb

The state's modeling indicates that the predicted 99th percentile 1-hour average concentration within the chosen modeling domain is 78.5 $\mu g/m^3$, or 32.7 ppb, which is less than the 2010 $SO_2$ NAAQS of 75 ppb. This modeled concentration included the background concentration of $SO_2$ and is based on actual emissions from the facility. Figure 5 below was included as part of the state's recommendation and indicates that the predicted value occurred northwest of the facility.

14

**Figure 5: Maximum Predicted 99th Percentile 1-Hour SO₂ Concentrations (69.5 µg/m³ without background) in the Nebraska City Station Area of Analysis Based on Actual Emissions.**



Jurisdictional Boundaries:

Once the geographic area of analysis associated with the Nebraska City Station and background concentration is determined, existing jurisdictional boundaries are considered for the purpose of informing our intended unclassifiable/attainment area, specifically with respect to clearly defined legal boundaries.

The EPA has confirmed that there are no other sources in Otoe County or within 20 km of its borders, except for the Nebraska City Station which has been modeled to show compliance with the NAAQS. As a result, the EPA does not believe that sources or emissions from Otoe County or near its borders have the potential to cause or contribute to a violation of the NAAQS within Otoe County.

15

As the state did not recommend specific boundaries for its proposed attainment area for the Nebraska City Station area, the EPA believes that Otoe County comprises a reasonable boundary for our intended unclassifiable/attainment area. Otoe County consists of clearly defined legal boundaries and we find these boundaries to be a suitably clear basis for defining our intended unclassifiable/attainment area.

Other Relevant Information

EPA did not receive 3rd party information pertaining to the analysis of the 1-hr $SO_2$ impacts for the Nebraska City Station.

Conclusion

After careful evaluation of the state's recommendation and supporting information, as well as all available relevant information, the EPA intends to designate the area around the Nebraska City Station as unclassifiable/attainment for the 2010 $SO_2$ NAAQS. Specifically, the boundaries are comprised of the entirety of Otoe County, Nebraska.

The unclassifiable/attainment designation is based on the modeling analysis that the State of Nebraska provided to EPA, and we have confirmed that there are no other sources in Otoe County or near its borders that are likely to cause or contribute to a violation of the NAAQS within Otoe County. The modeling analysis submitted by the Nebraska DEQ for Nebraska City Station using actual emissions from 2012-2014 shows attainment and this modeling followed the recommended EPA modeling TAD for designation purposes.

At this time, our intended designations for the state only apply to this area and the other areas presented in this technical support document. Consistent with the conditions in the March 2, 2015, consent decree, the EPA will evaluate and designate all remaining undesignated areas in Nebraska by either December 31, 2017, or December 31, 2020

16

**Technical Analysis for the Gerald Gentleman Station, Nebraska Area**

Proposed Designation Summary

After careful evaluation of the state's recommendation and supporting information, as well as all available relevant information, the EPA intends to designate the area around the Gerald Gentleman Station as unclassifiable/attainment for the 2010 $SO_2$ NAAQS. Specifically, the boundaries are comprised of the entirety of Lincoln County, Nebraska.

The unclassifiable/attainment designation is based on the modeling analysis that the State of Nebraska provided to EPA.

Introduction

The Sutherland, Nebraska area, located in Lincoln County, Nebraska, contains a stationary source that according to the EPA's Air Markets Database emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU). As of March 2, 2015, this stationary source had not met the specific requirements for being "announced for retirement." Specifically, in 2012, the Nebraska Public Power District's (NPPD) Gerald Gentleman Station emitted 26,437 tons of $SO_2$ and had an emissions rate of 1.05 lbs $SO_2$/mmBTU. Pursuant to the March 2, 2015 court-ordered schedule, the EPA must designate the area surrounding the facility by July 2, 2016.

In its submission, Nebraska recommended that the general area surrounding the Gerald Gentleman Station be designated as attainment based on an assessment and characterization of air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. No specific area (e.g., jurisdictional boundaries) was officially recommended by Nebraska. This assessment and characterization was performed using air dispersion modeling software, i.e., AERMOD, analyzing actual emissions. After careful review of the state's assessment, supporting documentation, and all available data, the EPA agrees that the area around Gerald Gentleman Station is attaining the standard. Specifically, we intend to designate Lincoln County as unclassifiable/attainment.

The Gerald Gentleman Station is located in west-central Nebraska in the western portion of Lincoln County. As seen in Figure 6 below, the facility is located approximately 10 km west of North Platte (~pop. 25,000). The Gerald Gentleman Station lies near the small community of Sutherland, Nebraska and near the Platte River Valley. The Gerald Gentleman Station includes two coal boiler stacks. No other significant emitters of $SO_2$ are located near the Gerald Gentleman Station or within Lincoln County. The state did not recommend a boundary for its attainment designation. The EPA's intended unclassifiable/attainment designation for the area will default to the entirety of Lincoln County, Nebraska.

17

**Figure 6: The EPA's intended unclassifiable/attainment designation for Lincoln County, Nebraska area which includes the Gerald Gentleman Station. The Gerald Gentleman Station is located in the western portion of Lincoln County.**



The discussion and analysis that follows below will reference the state's use of the Modeling TAD, the EPA's assessment of the state's modeling in accordance with the Modeling TAD, and the factors for evaluation contained in the EPA's March 20, 2015 guidance, as appropriate.

<u>Detailed Assessment</u>

*Air Quality Data*

This factor considers the $SO_2$ air quality monitoring data in the area surrounding the Gerald Gentleman facility. Since no $SO_2$ ambient monitors were located in Lincoln County, no monitoring data was relied upon in EPA's proposed designation for this area.

18

*Model Selection and Modeling Components*

The EPA's Modeling TAD notes that for area designations under the 2010 $SO_2$ NAAQS, the AERMOD modeling system should be used unless use of an alternative model can be justified. In some instances the recommended model may be a model other than AERMOD, such as the BLP model for buoyant line sources. The AERMOD modeling system contains the following components:

- AERMOD: the dispersion model
- AERMAP: the terrain processor for AERMOD
- AERMET: the meteorological data processor for AERMOD
- BPIPPRIME: the building input processor
- AERMINUTE: a pre-processor to AERMET incorporating 1-minute automated surface observation system (ASOS) wind data
- AERSURFACE: the surface characteristics processor for AERMET
- AERSCREEN: a screening version of AERMOD

The state used AERMOD version 14134, which was the most recent version of AERMOD at the time, and a discussion of the individual components will be referenced in the corresponding discussion that follows, as appropriate.

*Modeling Parameter: Rural or Urban Dispersion*

The EPA's recommended procedure for characterizing an area by prevalent land use is based on evaluating the dispersion environment with 3 km of the facility. According to the EPA's modeling guidelines, rural dispersion coefficients are to be used in the dispersion modeling analysis if more than 50% of the area within a 3 km radius of the facility is classified as rural. Conversely, if more than 50% of the area is urban, urban dispersion coefficients should be used in the modeling analysis. When performing the modeling for the area of analysis, the state determined that it was most appropriate to run the model in rural mode. As previously mentioned, the Gerald Gentleman Station is located in rural west-central Nebraska near the Platte River and the rural determination was made based on the land cover around the facility.

*Modeling Parameter: Area of Analysis (Receptor Grid)*

The EPA believes that a reasonable first step towards characterization of air quality in the area surrounding the Gerald Gentleman Station is to determine the extent of the area of analysis, i.e., receptor grid. Considerations presented in the Modeling TAD include but are not limited to: the location of the $SO_2$ emission sources or facilities considered for modeling; the extent of significant concentration gradients of nearby sources; and sufficient receptor coverage and density to adequately capture and resolve the model predicted maximum $SO_2$ concentrations. For the Gerald Gentleman Station area, the state has included no other emitters of $SO_2$ within its area of analysis. There are no other significant source of $SO_2$ within 200 km in any direction of the Gerald Gentleman Station according to the 2011 National Emissions Inventory (NEI). Thus, no other emitters of $SO_2$ would have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. The grid receptor spacing for the area of analysis chosen by the state is as follows:

19

- 50 meter spacing on the fence line
- 50 meter spacing from the fence to 1 kilometer from the fence
- 100 meter spacing from 1 kilometer to 2 kilometers from the fence
- 250 meter spacing from 2 kilometer to 5 kilometers from the fence
- 500 meter spacing from 5 kilometer to 7 kilometers from the fence
- 1000 meter spacing from 7 to 10 kilometers from the fence

The receptor network contained 8,882 receptors and covered the western portion of Lincoln County in Nebraska. Figure 7, which was included in the state's recommendation, shows the chosen area of analysis surrounding the Gerald Gentleman Station, as well as the receptor grid for the area of analysis.

Consistent with the Modeling TAD, receptors for the purposes of this designation effort were placed only in areas where it would also be feasible to place a monitor and record ambient impacts. The impacts of the area's geography and topography will be discussed later within this document.

**Figure 7: Receptor Grid for the Gerald Gentleman Station, Nebraska Area of Analysis.**



*Modeling Parameter: Source Characterization*

The state characterized the source within the area of analysis in accordance with the best practices outlined in the Modeling TAD. Specifically, the state used actual stack heights in conjunction with actual emissions. The state also adequately characterized the source's building layout and location, as well as the stack parameters, e.g., exit temperature, exit velocity, location, and diameter. Where appropriate, the AERMOD component BPIPPRIME was used to assist in addressing building downwash.

*Modeling Parameter: Emissions*

The EPA's Modeling TAD notes that for the purposes of modeling to characterize air quality for use in designations, the recommended approach is to use the most recent 3 years of actual emissions data and concurrent meteorological data. However, the Modeling TAD does provide for the flexibility of using allowable emissions in the form of the most recently permitted (referred to as PTE or allowable) emissions rate.

The EPA believes that continuous emissions monitoring systems (CEMS) data provide acceptable historical emissions information, when it is available, and that these data are available for many electric generating units. In the absence of CEMS data, the EPA's Modeling TAD highly encourages the use of AERMOD's hourly varying emissions keyword HOUREMIS or through the use of AERMOD's variable emissions factors keyword EMISFACT. When choosing one of these methods, the EPA believes that detailed throughput, operating schedules, and emissions information from the impacted source should be used.

In certain instances, states and other interested parties may find that it is more advantageous or simpler to use PTE rates as part of their modeling runs. Specifically, a facility may have recently adopted a new federally enforceable emissions limit, been subject to a federally enforceable consent decree, or implemented other federally enforceable mechanisms and control technologies to limit $SO_2$ emissions to a level that indicates compliance with the NAAQS. These new limits or conditions may be used in the application of AERMOD. In these cases, the Modeling TAD notes that the existing $SO_2$ emissions inventories used for permitting or SIP planning demonstrations should contain the necessary emissions information for designations-related modeling. In the event that these short-term emissions are not readily available, they may be calculated using the methodology in Table 8-1 of Appendix W to 40 CFR Part 51 titled, "Guideline on Air Quality Models."

As previously noted, the state included the 2 units for Gerald Gentleman Station and no other emitters of $SO_2$ within its area of analysis. The state believes that these units adequately include the sources that might contribute to the area where maximum concentrations of $SO_2$ are expected. As mentioned previously, there are no other sources located within 200 km of the Gerald Gentleman Station that have the potential to cause significant concentration gradient impacts within the area of analysis. The Gerald Gentleman Station's annual actual $SO_2$ emissions between 2012 and 2014 are summarized below.

**Table 4: Actual SO₂ Emissions Between 2012 – 2014 from Facilities in the Gerald Gentleman, Nebraska Area of Analysis**

| Facility Name | SO$_2$ Emissions (tons per year) | | |
|---|---|---|---|
| | 2012 | 2013 | 2014 |
| NPPD Gerald Gentleman Station Unit 1 | 14,832 | 13,047 | 12,539 |
| NPPD Gerald Gentleman Station Unit 2 | 11,605 | 15,383 | 11,945 |
| Total Emissions From All Facilities in the State's Area of Analysis | 26,437 | 28,430 | 24,484 |

For the Gerald Gentleman Station in the area of analysis, the state used actual emissions from the most recent 3-year data set, i.e., 2012 – 2014. CEMS emissions data were used and obtained from the EPA's Clean Air Markets Division.

*Modeling Parameter: Meteorology and Surface Characteristics*

The most recent 3 years of meteorological data (concurrent with the most recent 3 years of emissions data) should be used in designations efforts. As noted in the Modeling TAD, the selection of data should be based on spatial and climatological (temporal) representativeness. The representativeness of the data are based on: 1) the proximity of the meteorological monitoring site to the area under consideration, 2) the complexity of terrain, 3) the exposure of the meteorological site, and 4) the period of time during which data are collected. Sources of meteorological data include NWS stations, site-specific or onsite data, and other sources such as universities, the FAA, and military stations.

For the Gerald Gentleman Station area of analysis, surface meteorology from Imperial, Nebraska, approximately 60 km to the southwest, and coincident upper air observations from the NWS station in North Platte, Nebraska, 20 km to the east were selected as best representative of meteorological conditions within the area of analysis. The location of the meteorological surface and upper air stations are shown in Figure 8.

The state used AERSURFACE version 13016 using data from the NWS station in Imperial, Nebraska (located at 40.52N, 101.64W) to estimate the surface characteristics of the area of analysis. The state also estimated values for albedo (the fraction of solar energy reflected from the earth back into space), the Bowen ratio (the method generally used to calculate heat lost or heat gained in a substance), and the surface roughness (sometimes referred to as "Zo"). In Figure 8 below, which was included in the state's recommendation, the location of the Imperial, Nebraska NWS station is shown relative to the Gerald Gentleman Station area of analysis.

**Figure 8: Gerald Gentleman Station Area of Analysis and the Imperial, Nebraska NWS site used for surface meteorology, the North Platte, Nebraska NWS site used for upper air meteorology, and the location of the background SO₂ monitor in Trego, Kansas.**



As part of its recommendation, the state provided the 3-year surface wind rose for Imperial, Nebraska. In Figure 9, the frequency and magnitude of wind speed and direction are defined in terms of from where the wind is blowing. Winds at the Imperial, Nebraska location are predominately out of south-southeast or northwest, which is consistent with the expected wind climatology for the region.

23

**Figure 9: Imperial, Nebraska Cumulative Annual Wind Rose for Years 2012 – 2014**



Meteorological data from the Imperial, Nebraska surface and North Platte, Nebraska upper air stations were used in generating AERMOD-ready files with the AERMET processor. The output meteorological data created by the AERMET processor is suitable for being applied with AERMOD input files for AERMOD modeling runs. The state followed the methodology and settings presented in EPA's Modeling TAD in the processing of the raw meteorological data into an AERMOD-ready format and used AERSURFACE to best represent surface characteristics.

Hourly surface meteorological data records are read by AERMET and include all the necessary elements for data processing. However, wind data taken at hourly intervals may not always portray wind conditions for the entire hour, which can be variable in nature. Hourly wind data may also be overly prone to indicate calm conditions, which are not modeled by AERMOD. In order to better represent actual wind conditions at the meteorological tower, wind data of one minute duration was provided from the same instrument tower but in a different formatted file to be processed by a separate preprocessor, AERMINUTE. These data were subsequently integrated into the AERMET processing to produce final hourly wind records of AERMOD-ready meteorological data that better estimate actual hourly average conditions and that are less prone to over-report calm wind conditions. This allows AERMOD to apply more hours of meteorology to modeled inputs and therefore produce a more complete set of concentration estimates. As a guard against excessively high concentrations that could be produced by AERMOD in very light wind conditions, the state set a minimum threshold of 0.5 meters per second in processing meteorological data for use in AERMOD. This approach is consistent with

24

a March 2013 EPA memo titled, "Use of ASOS meteorological data in AERMOD dispersion Modeling." In setting this threshold, no wind speeds lower than this value would be used for determining concentrations. This threshold was specifically applied to the one minute wind data.

*Modeling Parameter: Geography and Terrain*

The terrain in the area of analysis is best described as relatively flat near the Platte River valley with some rolling hills above the valley. To account for these terrain changes, the AERMAP terrain program within AERMOD was used to specify terrain elevations for all the receptors. The source of the elevation data incorporated into the model is from the National Elevation Dataset (NED). The NED data available on-line in 1 arc-second spacing from the US Geological Survey was used in the modeling analysis. The NED data for this analysis was based on North American Datum (NAD) 83 for horizontal locations and NAD88 for elevation.

*Modeling Parameter: Background Concentrations of $SO_2$*

The Modeling TAD offers two mechanisms for characterizing background concentrations of $SO_2$ that are ultimately added to the modeled design values: 1) a "first tier" approach, based on monitored design values, or 2) a temporally varying approach, based on the 99th percentile monitored concentrations by hour of day and season or month. For the Gerald Gentleman Station area of analysis, the state chose the monitored design value at the Trego, Kansas monitoring location, which is located in rural western Kansas, approximately 300 km to the south of Gerald Gentleman. The Trego County monitor is representative of the Gerald Gentleman area of analysis as there are no significant $SO_2$ sources near the Trego County monitor. The background concentration for this area of analysis was determined by the state to be 9 micrograms per cubic meter ($\mu$g/m$^3$), or 3.4 ppb,[4] and that value was incorporated into the final AERMOD results.

*Summary of Modeling Results*

The AERMOD modeling parameters for the Gerald Gentleman area of analysis are summarized below in Table 5.

**Table 5: AERMOD Modeling Parameters for the Gerald Gentleman Station Area of Analysis**

| Gerald Gentleman Area of Analysis | |
|---|---|
| AERMOD Version | 14134 |
| Dispersion Characteristics | Rural |
| Modeled Sources | 1 |
| Modeled Stacks | 2 |

---

[4] The conversion factor for $SO_2$ (at the standard conditions applied in the ambient $SO_2$ reference method) is 1ppb = approximately 2.62$\mu$g/m$^3$.

| | |
|---|---|
| Modeled Structures | 12 |
| Modeled Fencelines | 1 |
| Total receptors | 8,882 |
| Emissions Type | Actual |
| Emissions Years | 2012-2014 |
| Meteorology Years | 2012-2014 |
| Surface Meteorology Station | Imperial, Nebraska |
| Upper Air Meteorology Station | North Platte, Nebraska |
| Methodology for Calculating Background $SO_2$ Concentration | 1st tier |
| Calculated Background $SO_2$ Concentration | 9 μg/m$^3$ |

The results presented below in table 6 show the magnitude and geographic location of the highest predicted modeled concentration based on actual emissions.

**Table 6: Maximum Predicted 99th Percentile 1-Hour $SO_2$ Concentration in the Gerald Gentleman Station Area of Analysis Based on Actual Emissions**

| | | Receptor Location | | $SO_2$ Concentration (μg/m$^3$) | |
|---|---|---|---|---|---|
| Averaging Period | Data Period | UTM/Latitude | UTM/Longitude | Modeled (including background) | NAAQS |
| 99th Percentile 1-Hour Average | 2012-2014 | 321900 | 4548800 | 144.8 | 196.5* |

*Equivalent to the 2010 $SO_2$ NAAQS set at 75 ppb

The state's modeling indicates that the predicted 99th percentile 1-hour average concentration within the chosen modeling domain is 144.8 μg/m$^3$ or 55.3 ppb, which is less than the 2010 $SO_2$ NAAQS of 75 ppb. This modeled concentration included the background concentration of $SO_2$ and is based on actual emissions from the facilities. Figure 10 below was included as part of the state's recommendation and indicates that the predicted value occurred just to the southeast of the facility.

**Figure 10: Maximum Predicted 99th Percentile 1-Hour SO₂ Concentrations (135.8 μg/m³ without background) in the Gerald Gentleman Station Area of Analysis Based on Actual Emissions.**



Jurisdictional Boundaries:

Once the geographic area of analysis associated with the Gerald Gentleman Station and background concentration is determined, existing jurisdictional boundaries are considered for the purpose of informing our intended unclassifiable/attainment area, specifically with respect to clearly defined legal boundaries.

The EPA has confirmed that there are no other sources in Lincoln County or in any of its neighboring counties, except for Gerald Gentleman Station which has been modeled to show compliance with the NAAQS. As a result, the EPA does not believe that sources or emissions from Lincoln County or any of its neighboring counties have the potential to cause or contribute to a violation of the NAAQS within Lincoln County.

27

As the state did not recommend specific boundaries for its proposed attainment area for the Gerald Gentleman Station, the EPA believes that Lincoln County comprises a reasonable boundary for our intended unclassifiable/attainment area. Lincoln County consists of clearly defined legal boundaries and we find these boundaries to be a suitably clear basis for defining our intended unclassifiable/attainment area.

Other Relevant Information

The EPA received air dispersion modeling results from Sierra Club, asserting that $SO_2$ emissions from Gerald Gentleman Station, when considered alone and without any other local sources, are causing a violation of the NAAQS. A discussion of the modeling performed by Sierra Club follows below and the major differences between the State's and Sierra Club modeling will be highlighted.

Sierra Club provided two modeling demonstrations, one using actual emissions and another using allowable emissions. Both modeling scenarios show violations of the 1-hr $SO_2$ NAAQS. Sierra Club's modeling that used 2012-2014 actual emissions from CEMS resulted in a 99th percentile 1-hr daily maximum of 217.5 $\mu g/m^3$ or 83 ppb. This is in comparison to the State's modeling that used the same actual emissions from CEMS and which resulted in a 99th percentile 1-hr daily maximum of 144.8 $\mu g/m^3$ or 55.3 ppb.

There are some significant differences between the modeling conducted by the Sierra Club and the State. The Sierra Club did not include the building dimension information and thus did not address the effects of building downwash. Inclusion of downwash often leads to higher concentrations closer to the source but not in all cases. Without actually including downwash in the modeling it is impossible to characterize the design value impacts from downwash for this source.

Also, the surface meteorology data used by Sierra Club was obtained from the NWS North Platte, Nebraska site, while the State's modeling used surface meteorology data from the NWS Imperial, Nebraska site. The North Platte NWS is closer to the Imperial NWS site, with North Platte and Imperial sites located 30 km and 60 km from the Gerald Gentleman Station, respectively. Both sites represent the terrain of west central Nebraska and the Gerald Gentleman Station Area. Figure 11 shows the wind rose comparison for the North Platte and Imperial surface meteorological sites for the 2012-2014 period. The winds at each locations are out of the southeast and northwest. The North Platte site does have a more easterly component than that of the Imperial site. EPA believes both the Imperial site used by the state and the North Platte site used by the Sierra Club accurately represent the Gerald Gentleman area. Without a provided modeling analysis that only evaluates the impacts from just the different NWS site inputs, EPA can make no determination on what impact the selection of the surface meteorology station has on predicted model $SO_2$ concentrations.

**Figure 11: Imperial, Nebraska (state used) and North Platte, Nebraska (Sierra Club used) Cumulative Annual Wind Rose for Years 2012 – 2014**



The most significant difference between the Sierra Club and the state's modeling is the chosen location and value of the background $SO_2$ concentration. The locations of the Omaha, Nebraska monitoring site used by the Sierra Club and the Trego County, Kansas monitoring site are shown in Figure 12. The Sierra Club based it background, 88.9 $\mu g/m^3$, on the lowest measured 2011-2013 1-hr $SO_2$ design value in the State of Nebraska. There are only two $SO_2$ monitoring sites located in Nebraska, with both located in urban Omaha, Nebraska. The Omaha site with the lower 2011-2013 design value is sited near the Douglas County Hospital. It is in an urban setting in eastern Nebraska over 450 km from the Gerald Gentleman Station. Figure 13 shows the location Omaha Douglas County Hospital monitor and the large sources of $SO_2$ within 20 km of its location, most notable the North Omaha Power Station (2014 actual $SO_2$ emission of 11,245 tons) and the Walter Scott Energy Center (2014 actual emissions of 13,749 tons) in nearby Council Bluffs, Iowa.

**Figure 12: Locations of the background monitor used for Gerald Gentleman Station. The Omaha monitoring site used for Sierra Club background concentration and the Trego County, Kansas monitoring site used for the state's background concentration. The blue dots represent the location of sources of SO₂ with emissions greater than 10 tons per year according to the 2011 NEI.**



As previously discussed, the state based its background concentration, 9 μg/m³, the design value from the monitor located in Trego County, Kansas, approximately 300 km directly south of the Gerald Gentleman Station. The Trego County monitor is located in rural west central Kansas, and like the Gerald Gentleman Station has no significant nearby sources of SO₂. EPA believes the Trego County monitor provides a better representation of the SO₂ background than the Omaha monitor for the Gerald Gentleman Station area of analysis.

30

**Figure 13: Location of the Douglas County Hospital SO₂ monitor and the nearby significant sources of SO₂.**



In summary, EPA believes the 9 μg/m³ background concentration from the Trego County monitor is more representative of the background SO₂ levels around Gerald Gentleman. EPA will not rely on the chosen background of the Omaha monitor used in Sierra Club modeling because the monitor is influenced by significant local SO₂ sources.

The Sierra Club also provided modeling using allowable emissions based on the 2002 operating permit issued by the regulatory agency. The modeling with allowable emissions resulted in a 99th percentile 1-hr daily maximum of 898.6 μg/m³. However, as mentioned previously, the EPA's Modeling TAD notes that for the purposes of modeling to characterize air quality for use in designations, the recommended approach is to use the most recent 3 years of actual emissions data and concurrent meteorological data, and both the State and Sierra Club provided such actual emissions-based modeling. Therefore, the Sierra Club modeling analysis using allowable emissions will not be assessed for designation purposes for the Gerald Gentleman Station.

Conclusion

After careful evaluation of the state's recommendation and supporting information, as well as all available relevant information, the EPA intends to designate the area around the Gerald

31

Gentleman Station as unclassifiable/attainment for the 2010 $SO_2$ NAAQS. Specifically, the boundaries are comprised of the entirety of Lincoln County, Nebraska.

The unclassifiable/attainment designation is based on the modeling analysis that the state of Nebraska provided to EPA, and we have confirmed that there are no other sources in Lincoln County or any of its neighboring counties that are likely to cause or contribute to a violation of the NAAQS within Lincoln County. The modeling provided by the state for the Gerald Gentleman Station indicates that when using actual emissions from 2012-2014 from the facility, the modeled maximum concentrations are below the 1-hr $SO_2$ NAAQS. The modeling performed by the state followed the recommended EPA modeling TAD for designation purposes. The Sierra Club also provided a modeling analysis for Gerald Gentleman. Sierra Club's modeling used actual emissions from 2012-2014 and showed modeled violations of the 1-hr $SO_2$ NAAQS. However, the Sierra Club's modeling used a background concentration from an urban monitoring location that is influenced by significant local sources. The Sierra Club's chosen background does not represent the rural background of the Gerald Gentleman Station location.

At this time, our intended designations for the state only apply to this area and the other areas presented in this technical support document. Consistent with the conditions in the March 2, 2015, consent decree, the EPA will evaluate and designate all remaining undesignated areas in Nebraska by either December 31, 2017, or December 31, 2020.

**Technical Analysis for the Sheldon Station, Nebraska Area**

Proposed Designation Summary

After careful evaluation of the state's recommendation and supporting information, as well as all available relevant information, the EPA intends to designate the area around Sheldon Station as unclassifiable for the 2010 $SO_2$ NAAQS. Specifically, the boundaries are comprised of the entirety of Lancaster County, Nebraska.

The unclassifiable designation is based on shortcomings from the modeling analyses that were submitted by both the state of Nebraska and the Sierra Club. The two modeling scenarios that the state conducted relied upon changes to the current Sheldon Station operations that would either reduce emissions or enhance dispersion of emissions but do not appear likely to be completed by July 2, 2016. Both modeling scenarios submitted by the Sierra Club use a background value that EPA believes is not representative of the area surrounding the Sheldon Station facility. Therefore the EPA did not have a reliable modeling analysis to designate this area at this time.

Introduction

The Hallam, Nebraska area located in Lancaster County Nebraska, contains a stationary source that according to the EPA's Air Markets Database emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU). As of March 2, 2015, this stationary source had not met the specific requirements for being "announced for retirement." Specifically, in 2012, the Nebraska Public Power District's (NPPD) Sheldon Station emitted 2,760 tons of $SO_2$ and had an emissions rate of 0.92 lbs $SO_2$/mmBTU. Pursuant to the March 2, 2015 court-ordered schedule, the EPA must designate the area surrounding the facility by July 2, 2016.

In its submission, Nebraska recommended that the area around Sheldon Station be designated as unclassifiable based on an assessment and characterization of air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. No area (e.g., jurisdictional boundaries) was officially recommended by Nebraska. This assessment and characterization was performed using air dispersion modeling software, i.e., AERMOD, analyzing actual emissions. The State performed two modeling scenarios that purported to demonstrate compliance with the $SO_2$ 1-hr NAAQS based on actual emissions that would result from changes that would either reduce actual emissions or enhance dispersion of emissions. One modeling scenario relies upon increasing the stack heights for both boiler units (Units 1 and 2) at the Sheldon Station. The second modeling scenario relies upon increasing the stack height for Unit 1 and ceasing the combustion of coal for Unit 2. These two modeling scenarios depend upon changes to the current Sheldon Station operations that, if adopted, would affect actual emissions. The changes for Unit 2 under either scenario do not appear likely to be completed by July 2, 2016. After careful review of the state's assessment, supporting documentation, and all available data, the EPA agrees with the state's recommendation for the area and intends to designate Lancaster County as unclassifiable.

33

The Sheldon Station is located in southeastern Nebraska in the southern portion of Lancaster County. As seen in Figure 14 below, the facility is located approximately 2 km north of the community of Hallam, and 20 km south of Lincoln, Nebraska (pop., 250,000). The Sheldon Station includes two coal-fired boilers. Figure 14 shows that there are no other significant emitters of $SO_2$ within 20 km of the Sheldon Station. The nearby $SO_2$ sources outside of 20 km include the Energy Adams facility in Gage County, with 41 tpy of $SO_2$ based on the 2011 NEI and the Archer Daniels Company, with 107 tpy in Lancaster County, over 50 km from Sheldon Station. The state did not recommend a boundary for its unclassifiable designation, and the EPA believes that a reasonable boundary consists of Lancaster County, Nebraska.

**Figure 14: The EPA's intended unclassifiable designation for the Lancaster County, Nebraska area which includes the Sheldon Station. The Sheldon Station is located in the southern portion of Lancaster County.**



The discussion and analysis that follows below will reference the state's use of the Modeling TAD, the EPA's assessment of the state's modeling in accordance with the Modeling TAD, and the factors for evaluation contained in the EPA's March 20, 2015 guidance, as appropriate.

Detailed Assessment

35

*Air Quality Data*

This factor considers the $SO_2$ air quality monitoring data in the area surrounding the Sheldon Station facility. Since no $SO_2$ ambient monitors were located in Lancaster County, no monitoring data was relied upon in EPA's proposed designation for this area.

*Model Selection and Modeling Components*

The EPA's Modeling TAD notes that for area designations under the 2010 $SO_2$ NAAQS, the AERMOD modeling system should be used, unless use of an alternative model can be justified. In some instances the recommended model may be a model other than AERMOD, such as the BLP model for buoyant line sources. The AERMOD modeling system contains the following components:
- AERMOD: the dispersion model
- AERMAP: the terrain processor for AERMOD
- AERMET: the meteorological data processor for AERMOD
- BPIPPRIME: the building input processor
- AERMINUTE: a pre-processor to AERMET incorporating 1-minute automated surface observation system (ASOS) wind data
- AERSURFACE: the surface characteristics processor for AERMET
- AERSCREEN: a screening version of AERMOD

The state used AERMOD version 14134, which was the most recent version of AERMOD at the time of their submittal, and a discussion of the individual components will be referenced in the corresponding discussion that follows, as appropriate.

*Modeling Parameter: Rural or Urban Dispersion*

The EPA's recommended procedure for characterizing an area by prevalent land use is based on evaluating the dispersion environment with 3 km of the facility. According to the EPA's modeling guidelines, rural dispersion coefficients are to be used in the dispersion modeling analysis if more than 50% of the area within a 3 km radius of the facility is classified as rural. Conversely, if more than 50% of the area is urban, urban dispersion coefficients should be used in the modeling analysis. When performing the modeling for the area of analysis, the state determined that it was most appropriate to run the model in rural mode. The rural determination was made based on the land-use characteristics around the facility.

*Modeling Parameter: Area of Analysis (Receptor Grid)*

The EPA believes that a reasonable first step towards characterization of the air quality in the area surrounding the Sheldon Station is to determine the extent of the area of analysis, i.e., receptor grid. Considerations presented in the Modeling TAD include but are not limited to: the location of the $SO_2$ emission sources or facilities considered for modeling; the extent of significant concentration gradients of nearby sources; and sufficient receptor coverage and density to adequately capture and resolve the model predicted maximum $SO_2$ concentrations. For the Sheldon Station area, the state has included no other emitters of $SO_2$ within its area of analysis. There are no other significant source of $SO_2$ within 20 km in any direction of the

Sheldon Station according to the 2011 National Emissions Inventory (NEI) (Figure 14). Thus, no other emitters of $SO_2$ would have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. The grid receptor spacing for the area of analysis chosen by the state is as follows:

- 50 meter spacing on the fence line
- 50 meter spacing from the fence to 1 kilometer from the fence
- 100 meter spacing from 1 kilometer to 2 kilometers from the fence
- 250 meter spacing from 2 kilometer to 5 kilometers from the fence
- 500 meter spacing from 5 kilometer to 7 kilometers from the fence
- 1000 meter spacing from 7 to 10 kilometers from the fence

The receptor network contained 6,668 receptors and covered the southern portion of Lancaster County in Nebraska. Figure 15, which was included in the state's recommendation, shows the chosen area of analysis surrounding the Sheldon Station, as well as the receptor grid for the area of analysis.

Consistent with the Modeling TAD, receptors for the purposes of this designation effort were placed only in areas where it would also be feasible to place a monitor and record ambient impacts. The impacts of the area's geography and topography will be discussed later within this document.

37

**Figure 15: Receptor Grid for the Sheldon Station, Nebraska Area of Analysis.**



*Modeling Parameter: Source Characterization*

The state characterized the source within the area of analysis that differed from the best practices outlined in the Modeling TAD. As mentioned previously, one of the state's modeling scenarios for Sheldon Station increased the stack height for Unit 1 & 2. The other modeling scenario increased the stack height for Unit 1 and a shutdown of Unit 2. Neither of these two modeling analysis correctly represent the current source characteristics.

*Modeling Parameter: Emissions*

The EPA's Modeling TAD notes that for the purposes of modeling to characterize air quality for use in designations, the recommended approach is to use the most recent 3 years of actual emissions data and concurrent meteorological data. However, the TAD does provide for the flexibility of using allowable emissions in the form of the most recently permitted (referred to as PTE or allowable) emissions rate.

The EPA believes that continuous emissions monitoring systems (CEMS) data provide acceptable historical emissions information, when it is available, and that these data are available for many electric generating units. In the absence of CEMS data, the EPA's Modeling TAD highly encourages the use of AERMOD's hourly varying emissions keyword HOUREMIS or through the use of AERMOD's variable emissions factors keyword EMISFACT. When choosing one of these methods, the EPA believes that detailed throughput, operating schedules, and emissions information from the impacted source should be used.

In certain instances, states and other interested parties may find that it is more advantageous or simpler to use PTE rates as part of their modeling runs. Specifically, a facility may have recently adopted a new federally enforceable emissions limit, been subject to a federally enforceable consent decree, or implemented other federally enforceable mechanisms and control technologies to limit $SO_2$ emissions to a level that indicates compliance with the NAAQS. These new limits or conditions may be used in the application of AERMOD. In these cases, the Modeling TAD notes that the existing $SO_2$ emissions inventories used for permitting or SIP planning demonstrations should contain the necessary emissions information for designations-related modeling. In the event that these short-term emissions are not readily available, they may be calculated using the methodology in Table 8-1 of Appendix W to 40 CFR Part 51 titled, "Guideline on Air Quality Models."

As previously noted, the state included the 2 units for Sheldon Station and no other emitters of $SO_2$ within its area of analysis. The state believes that these units adequately include the sources which might contribute to the area where the maximum concentrations of $SO_2$ are expected. No other sources were determined by the state to have the potential to cause significant concentration gradient impacts within the area of analysis. The Sheldon Station's annual actual $SO_2$ emissions between 2012 and 2014 are summarized in Table 7 below.

**Table 7: Actual $SO_2$ Emissions Between 2012 – 2014 from Facilities in the Sheldon Station, Nebraska Area of Analysis**

| Facility Name | $SO_2$ Emissions (tons per year) | | |
|---|---|---|---|
| | 2012 | 2013 | 2014 |
| NPPD Sheldon Station Unit 1 | 1,241 | 1,514 | 1,648 |
| NPPD Sheldon Station Unit 2 | 1,519 | 1,321 | 1,594 |
| Total Emissions From All Facilities in the State's Area of Analysis | 2,760 | 2,835 | 3,242 |

For the Sheldon Station in the area of analysis, the state modeled using two separate emission scenarios. First, the state used actual emissions from the most recent 3-year data set, i.e., 2012 – 2014. CEMS emissions data were used and obtained from the EPA's Clean Air Markets Division. This modeling scenario modified the impact of actual emissions by assuming increases to the stack height for both Units 1 and 2. The second modeled scenario includes the most recent 3-year data set of actual emissions for Unit 1 as modified by an assumed stack height increase, and by an assumed elimination of $SO_2$ emissions from Unit 2 resulting from the cessation of combusting coal.

*Modeling Parameter: Meteorology and Surface Characteristics*

The most recent 3 years of meteorological data (concurrent with the most recent 3 years of emissions data) should be used in designations efforts. As noted in the Modeling TAD, the selection of data should be based on spatial and climatological (temporal) representativeness. The representativeness of the data are based on: 1) the proximity of the meteorological monitoring site to the area under consideration, 2) the complexity of terrain, 3) the exposure of the meteorological site, and 4) the period of time during which data are collected. Sources of meteorological data include NWS stations, site-specific or onsite data, and other sources such as universities, the FAA, and military stations.

For the Sheldon Station area of analysis, surface meteorology from Lincoln, Nebraska, approximately 20 km to the north, and coincident upper air observations from the NWS station in Omaha, Nebraska, 120 km to the northeast were selected as best representative of meteorological conditions within the area of analysis. The location of the meteorological surface and upper air stations are shown in Figure 16.

The state used AERSURFACE version 13016 using data from the NWS station in Lincoln, Nebraska (located at 40.85N, 96.76W) to estimate the surface characteristics of the area of analysis. The state also estimated values for albedo (the fraction of solar energy reflected from the earth back into space), the Bowen ratio (the method generally used to calculate heat lost or heat gained in a substance), and the surface roughness (sometimes referred to as "Zo"). In Figure 16 below, which was included in the state's recommendation, the location of the Lincoln, Nebraska NWS station is shown relative to the Sheldon Station area of analysis.

40

**Figure 16: Sheldon Station Area of Analysis and the Lincoln, Nebraska NWS site used for surface meteorology, the Omaha, Nebraska NWS site used for upper air meteorology, and the location of the background SO$_2$ monitor in Trego, Kansas.**



As part of its recommendation, the state provided the 3-year surface wind rose for Lincoln, Nebraska. In Figure 17, the frequency and magnitude of wind speed and direction are defined in terms of from where the wind is blowing. Winds at the Lincoln, Nebraska location are predominately out of south-southeast or north-northwest, which is the expected wind climatology for the region.

**Figure 17: Lincoln, Nebraska Cumulative Annual Wind Rose for Years 2012 – 2014**



Meteorological data from the Lincoln, Nebraska surface and Omaha, Nebraska upper air stations were used in generating AERMOD-ready files with the AERMET processor. The output meteorological data created by the AERMET processor is suitable for being applied with AERMOD input files for AERMOD modeling runs. The state followed the methodology and settings presented in EPA's Modeling TAD in the processing of the raw meteorological data into an AERMOD-ready format and used AERSURFACE to best represent surface characteristics.

Hourly surface meteorological data records are read by AERMET and include all the necessary elements for data processing. However, wind data taken at hourly intervals may not always portray wind conditions for the entire hour, which can be variable in nature. Hourly wind data may also be overly prone to indicate calm conditions, which are not modeled by AERMOD. In order to better represent actual wind conditions at the meteorological tower, wind data of one minute duration was provided from the same instrument tower but in a different formatted file to be processed by a separate preprocessor, AERMINUTE. These data were subsequently integrated into the AERMET processing to produce final hourly wind records of AERMOD-

42

ready meteorological data that better estimate actual hourly average conditions and that are less prone to over-report calm wind conditions. This allows AERMOD to apply more hours of meteorology to modeled inputs and therefore produce a more complete set of concentration estimates. As a guard against excessively high concentrations that could be produced by AERMOD in very light wind conditions, the state set a minimum threshold of 0.5 meters per second in processing meteorological data for use in AERMOD. This approach is consistent with a March 2013 EPA memo titled, "Use of ASOS meteorological data in AERMOD dispersion Modeling." In setting this threshold, no wind speeds lower than this value would be used for determining concentrations. This threshold was specifically applied to the one minute wind data.

*Modeling Parameter: Geography and Terrain*

The terrain in the area of analysis is best described as relatively flat. To account for these terrain changes, the AERMAP terrain program within AERMOD was used to specify terrain elevations for all the receptors. The source of the elevation data incorporated into the model is from the National Elevation Dataset (NED). The NED data available on-line in 1 arc-second spacing from the US Geological Survey was used in the modeling analysis. The NED data for this analysis was based on North American Datum (NAD) 83 for horizontal locations and NAD88 for elevation.

*Modeling Parameter: Background Concentrations of $SO_2$*

The Modeling TAD offers two mechanisms for characterizing background concentrations of $SO_2$ that are ultimately added to the modeled design values: 1) a "first tier" approach, based on monitored design values, or 2) a temporally varying approach, based on the 99th percentile monitored concentrations by hour of day and season or month. For the Sheldon Station area of analysis, the state chose the monitored design value at the Trego, Kansas monitoring location, which is located in rural western Kansas. The background concentration for this area of analysis was determined by the state to be 9 micrograms per cubic meter ($\mu g/m^3$), or 3.4 ppb,[5] and that value was incorporated into the final AERMOD results.

*Summary of Modeling Results*

The AERMOD modeling parameters for the Sheldon Station area of analysis are summarized below in Table 8.

**Table 8: AERMOD Modeling Parameters for the Sheldon Station Area of Analysis**

| Sheldon Station Area of Analysis | |
|---|---|
| AERMOD Version | 14134 |
| Dispersion Characteristics | Rural |
| Modeled Sources | 1 |

---

[5] The conversion factor for $SO_2$ (at the standard conditions applied in the ambient $SO_2$ reference method) is 1ppb = approximately 2.62$\mu g/m^3$.

43

| | |
|---|---|
| Modeled Stacks | 2 |
| Modeled Structures | 13 |
| Modeled Fencelines | 1 |
| Total receptors | 6,668 |
| Emissions Type | Actual for Unit 1 with proposed stack modifications and actual for two scenarios for Unit 2, one with a stack modification and one assuming no $SO_2$ emissions as a result of ceasing coal combustion |
| Emissions Years | 2012-2014 |
| Meteorology Years | 2012-2014 |
| Surface Meteorology Station | Lincoln, Nebraska |
| Upper Air Meteorology Station | Omaha, Nebraska |
| Methodology for Calculating Background $SO_2$ Concentration | 1st tier |
| Calculated Background $SO_2$ Concentration | 9 μg/m$^3$ |

The results presented below in table 9 show the magnitude and geographic location of the highest predicted modeled concentration based on actual emissions as modified by assuming future actions taken to reduce emissions or enhance dispersion of emissions. The two modeling scenarios are given, e.g.: scenario 1 which depends upon raising the stack heights on both Unit 1 and Unit 2 and scenario 2 which depends upon raising the stack height for Unit 1 and uses and assuming no $SO_2$ emissions for Unit 2.

**Table 9: Maximum Predicted 99th Percentile 1-Hour $SO_2$ Concentration in the Sheldon Station Area of Analysis Based on Actual Emissions as Modified by Assumed Future Changes**

| | | | Receptor Location | | $SO_2$ Concentration (μg/m$^3$) | |
|---|---|---|---|---|---|---|
| Averaging Period | Data Period | Model Scenario | UTM/Latitude | UTM/Longitude | Modeled (including background) | NAAQS |
| 99th Percentile 1-Hour Average | 2012-2014 | Unit 1 & 2 with stack increase | 688050 | 4491750 | 180.0 | 196.5* |
| 99th Percentile 1-Hour Average | 2012-2014 | Unit 1 with stack increase | 687950 | 4491750 | 185.6 | 196.5* |

| | | and No Unit 2 emissions | | | | |
|---|---|---|---|---|---|---|

*Equivalent to the 2010 SO$_2$ NAAQS set at 75 ppb

The state's modeling indicates that the predicted 99th percentile 1-hour average concentration within the chosen modeling domain would be 180.0 μg/m$^3$, or 69.2 ppb with both units' stack height increased. The state's modeling indicates that the predicted 99th percentile 1-hour average would be 185.6 μg/m$^3$, or 71.4 ppb with Unit 1 stack height increased and using no SO$_2$ emissions for Unit 2. This modeled concentration included the background concentration of SO$_2$ and is based on modified actual emissions from the facilities. Figures 18 and 19 below were included as part of the state's recommendation and indicate that the predicted value occurred just to the southeast of the facility for both modeling scenarios.

**Figure 18: Maximum Predicted 99th Percentile 1-Hour SO$_2$ Concentrations (171.0 μg/m$^3$ without background) in the Sheldon Station Area of Analysis Based on Actual Emissions. This is for the modeling scenario with Unit 1 & 2 with increased stack heights.**



**Figure 19: Maximum Predicted 99th Percentile 1-Hour SO₂ Concentrations (176.6 μg/m³ without background) in the Sheldon Station Area of Analysis Based on Modified Actual Emissions. This is for the modeling scenario with Unit 1 increased stack height and no SO₂ emissions for Unit 2.**



Jurisdictional Boundaries:

Once the geographic area of analysis associated with the Sheldon Station and background concentration is determined, existing jurisdictional boundaries are considered for the purpose of informing our intended unclassifiable area, specifically with respect to clearly defined legal boundaries.

The EPA has confirmed that except for Sheldon Station, the only other source within Lancaster County or within 20 km of its borders that emits at or above 100 tpy is Archer Daniels Midland Co. The reported emissions for this facility according to the 2011 NEI was 106.74 tpy, and it is located approximately 30 km to the northeast of the Sheldon Station and 12 km away from the Lancaster County border. At this time and based on all available information, the EPA is not

prepared to assess the ambient impacts from this facility on air quality in Lancaster County. Instead, we will evaluate its impacts by either December 31, 2017, or December 31, 2020, consistent with the conditions in the consent decree.

The State did not recommend boundaries with its proposed unclassifiable area for Sheldon Station. Based on all available information, the EPA believes that Lancaster County is a reasonable boundary for our intended unclassifiable area. The borders of Lancaster County, Nebraska, are comprised of clearly defined legal boundaries and we find these boundaries to be a suitably clear basis for defining our intended unclassifiable area.

Other Relevant Information

The EPA received air dispersion modeling results from the Sierra Club, asserting that $SO_2$ emissions from Sheldon Station, when considered alone and without any other local sources, are causing a violation of the NAAQS. A discussion of the modeling performed by the Sierra Club follows below and the major differences between the State's and Sierra Club modeling will be highlighted.

The Sierra Club provided two modeling demonstrations, one using actual emissions and another using allowable emissions. Both modeling scenarios show violations of the 1-hr $SO_2$ NAAQS. The Sierra Club's modeling that used 2012-2014 actual emissions from CEMS resulted in a 99th percentile 1-hr daily maximum of 208.6 $\mu g/m^3$.

The Sierra Club also provided modeling using allowable emissions based on the 2010 operating permit issued by the regulatory agency. The modeling with allowable emissions resulted in a 99th percentile 1-hr daily maximum of 930.1 $\mu g/m^3$. Although Sierra Club submitted modeling based on allowable emission rates, we have concerns that the allowable modeling, as presented, does not represent true $SO_2$ concentrations in the area, and we are unable to reliably determine whether the area is in attainment or nonattainment based on the allowable modeling.  While the modeling TAD does not preclude the use of allowable emissions, for designations allowable emissions are generally used in the case where controls and limits have been recently established, and not to establish actual $SO_2$ concentrations a monitor might record.[6]

There are some significant differences between the modeling conducted by the Sierra Club and the state. The Sierra Club used actual emissions with the correct Sheldon Station source characteristics, however the Sierra Club did not include the building dimension information and thus did not address the effects of building downwash.  Inclusion of downwash often leads to higher concentrations closer to the source but not in all cases. Without actually including

---

[6] Designations are intended to address current actual air quality (i.e., modeling simulates a monitor), and, thus, are unlike attainment plan modeling, which must provide assurances that attainment will occur. For the purposes of designations, modeling can be used as a surrogate to ambient monitoring to characterize air quality for the designations process. The EPA recommends modeling the most recent 3 years of actual emissions.  Emissions Input section (Page 9)
http://www3.epa.gov/airquality/sulfurdioxide/pdfs/SO2ModelingTAD.pdf

downwash in the modeling it is impossible to characterize the design value impacts from downwash for this source.

The chosen monitor location and, thus, the chosen background $SO_2$ concentration is another significant difference between the Sierra Club and the state's modeling. The location of Sheldon Station and the location of the Omaha, Nebraska monitoring site used by Sierra Club and the Trego County, Kansas monitoring site used by the state are shown in Figure 20. The Sierra Club based its background, 88.9 $\mu g/m^3$, on the lowest measured 2011-2013 1-hr $SO_2$ design value in the state of Nebraska. There are only two $SO_2$ monitoring sites located in Nebraska, with both located in urban Omaha, Nebraska. The Omaha site with the lower 2011-2013 design value is sited near the Douglas County Hospital, which is 100 km to the northeast of the Sheldon Station. As previously discussed, the state based its background concentration, 9 $\mu g/m^3$, on the design value from the monitor located in Trego County, Kansas, approximately 300 km southwest of the Sheldon Station. The monitoring site near the Omaha Douglas County Hospital is closer to the Sheldon Station than the Trego County monitor, however the Omaha Douglas County monitor has large sources of $SO_2$ within 20 km of its location, most notably the North Omaha Power Station (2014 actual $SO_2$ emission of 11,245 tons) and the Walter Scott Energy Center (2014 actual emissions of 13,749) in nearby Council Bluffs, Iowa (Figure 21). According to the 2011 NEI, no $SO_2$ sources with emissions greater than 50 tpy of $SO_2$ are within 50 km of the Sheldon Station. The Trego County monitor is located in rural west central Kansas, and like the Sheldon Station has no significant nearby sources of $SO_2$. EPA believes the Trego County monitor provides a better representation of the $SO_2$ background than the Omaha monitor for the Sheldon Station area of analysis.

**Figure 20: Locations of the background monitor used for Sheldon Station. The Omaha monitoring site used for Sierra Club background concentration and the Trego County, Kansas monitoring site used for the state's background concentration. The blue dots represent the location of sources of SO$_2$ with emissions greater than 10 tons per year according to the 2011 NEI.**



49

**Figure 21: Location of the SO₂ monitor near the Douglas County Hospital and the nearby significant sources of SO₂.**



Conclusion

After careful evaluation of the state's recommendation and supporting information, as well as all available relevant information, the EPA intends to designate the area around Sheldon Station as unclassifiable for the 2010 SO₂ NAAQS. Specifically, the boundaries are comprised of the entirety of Lancaster County, Nebraska.

The unclassifiable designation is based on shortcomings in the modeling analyses that the State of Nebraska and the Sierra Club provided to EPA. As previously described, the State performed two modeling scenarios that demonstrated compliance with the SO₂ 1-hr NAAQS, but the use of these scenarios do not comport with EPA's recommended practice for either actual emissions based modeling or allowable emissions based modeling in the TAD. One modeling scenario assumes stack height increases for both boiler units (Units 1 and 2) at the Sheldon Station as modifying impacts of actual emissions. The second modeling scenario assumes a stack height increase to Unit 1 and ceasing the combustion of coal for Unit 2 as modifying such impacts. These two modeling scenarios depend upon changes to the current Sheldon Station operations. The changes for Unit 2 under either scenario do not appear likely to be completed by July 2, 2016, and are therefore not creditable as affecting either 2012-2014 actual emissions or current and future allowable emissions for informing a final designation.

The Sierra Club also provided a modeling analysis for Sheldon Station. Sierra Club's modeling used actual emissions from 2012-2014 and asserted that there were violations of the 1-hr SO₂

NAAQS. However, the Sierra Club's modeling used a background concentration from a more urban monitoring location that does not appear to represent the rural background of the Sheldon Station location and over-estimated the background emissions, thus resulting in an over-estimated design value.

For the reasons described above, EPA is unable at this time, based on available information, to determine whether the area is meeting or not meeting the NAAQS.

At this time, our intended designations for the state only apply to this area and the other areas presented in this technical support document. Consistent with the conditions in the March 2, 2015, consent decree, the EPA will evaluate and designate all remaining undesignated areas in Nebraska by either December 31, 2017, or December 31, 2020.