No. 17-60088

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY L.L.C.; BIG BROWN POWER COMPANY L.L.C.; SANDOW POWER COMPANY L.L.C.; LUMINANT MINING COMPANY L.L.C.,**
**Petitioners**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, in His Official Capacity as Administrator of the United States Environmental Protection Agency,**
**Respondents**

Consolidated with

No. 21-60673

**STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; LUMINANT MINING COMPANY, L.L.C.,**
**Petitioners**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,**
**Respondents**

On Petition for Review of Final Agency Actions of the United States Environmental Protection Agency

Rule 30.2(a) Appendix – Volume Five of Eight (Tabs 389 - 420)

KEN PAXTON
Attorney General of Texas
BRENT WEBSTER
First Assistant Attorney General
GRANT DORFMAN
Deputy First Assistant Attorney General
SHAWN COWLES
Deputy Attorney General for Civil Litigation
PRISCILLA M. HUBENAK
Chief, Environmental Protection Division

LINDA B. SECORD
Assistant Attorney General
Linda.Secord@oag.texas.gov
JOHN R. HULME
Assistant Attorney General
John.Hulme@oag.texas.gov
OFFICE OF THE ATTORNEY
GENERAL OF TEXAS
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
512-463-2012 (phone)
*Counsel for the State of Texas and Texas Commission on Environmental Quality*

**March 30, 2022**

# TABLE OF CONTENTS
## Volume Five of Eight*

Tab

EPA Responses to Significant Comments on the Designation Recommendations for the 2010 $SO_2$ Primary National Ambient Air Quality Standard (All Areas) (June 30, 2016) ................................................................. 389

Final Technical Support Document for Nebraska Area Designations for the 2010 $SO_2$ Primary National Ambient Air Quality Standard (June 30, 2016) ............................................................................................................. 392

Final Technical Support Document for Final Action on Indiana Area Designations for the 2010 $SO_2$ Primary National Ambient Air Quality Standard (July 1, 2016) ............................................................................. 403

Final Technical Support Document For Final Action on Ohio Area Designations for the 2010 $SO_2$ Primary National Ambient Air Quality Standard (June 30, 2016) ............................................................................ 405

Final Technical Support Document for Arkansas Area Designation for the 2010 $SO_2$ Primary National Ambient Air Quality Standard (June 30, 2016) ............................................................................................................. 410

Sierra Club Modeling Comments (Mar. 31, 2016) ............................................................. 420

*(See other volumes for additional appendix documents)*

---

* Consistent with how the record material was cited in the briefs, appendix tab numbers correspond to the final four digits (minus leading zeros) of "Document ID" numbers on the certified index of record contents.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this appendix, which includes Volumes One through Eight, via the Court's CM/ECF system on this 30th day of March, 2022. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Trend Micro and is free of viruses.

s/ P. Stephen Gidiere III

*Counsel for Luminant Petitioners*

**Tab 389: EPA Responses to Significant Comments on the Designation Recommendations for the 2010 SO2 Primary National Ambient Air Quality Standard (All Areas) (June 30, 2016)**

# Responses to Significant Comments on the Designation Recommendations for the 2010 Sulfur Dioxide Primary National Ambient Air Quality Standard (NAAQS)

Docket Number EPA–HQ–OAR–2014–0464
U.S. Environmental Protection Agency

June 30, 2016

# Contents

I. Introduction ....................................................................................................................5

II. Background ...................................................................................................................5

III. General Comments ......................................................................................................6

    A. Modeling .................................................................................................................6

        1. AERMOD LOWWIND3 Option .....................................................................6

        2. Modeling to determine attainment status ....................................................11

        3. AERMOD FLAGPOLE option .....................................................................12

    B. Designation Categories ........................................................................................13

    C. Monitoring ............................................................................................................14

    D. Consent Decree ...................................................................................................16

    E. Consider all information in the record ...................................................................17

    F. Support Other's Comments ...................................................................................17

    G. Other Comments .................................................................................................18

IV. Arkansas ...................................................................................................................19

    A. Independence County...........................................................................................19

    B. Jefferson County ..................................................................................................20

V. Colorado.....................................................................................................................20

    A. Colorado Springs .................................................................................................20

    B. Morgan County .....................................................................................................34

VI. Georgia......................................................................................................................35

    A. Juliette .................................................................................................................35

VIII. Illinois ......................................................................................................................37

    A. Alton Township .....................................................................................................37

    B. Marion..................................................................................................................41

IX. Indiana ......................................................................................................................42

    General.....................................................................................................................42

    A. Gibson County .....................................................................................................43

    B. Posey County .......................................................................................................46

X. Iowa............................................................................................................................48

    A. Des Moines County ..............................................................................................48

    B. Wapello County ...................................................................................................49

    C. Woodbury County ................................................................................................50

XI. Kansas ....................................................................................................................... 51

    A. Wyandotte County .................................................................................................. 51

XII. Kentucky ................................................................................................................... 51

    A. Ohio County ............................................................................................................ 51

    B. Pulaski County ........................................................................................................ 52

XIII. Louisiana ................................................................................................................. 53

    A. DeSoto Parish ......................................................................................................... 53

    B. Calcasieu Parish ..................................................................................................... 60

XIV. Maryland ................................................................................................................. 69

    A. Anne Arundel County and Baltimore County ....................................................... 69

XV. Michigan .................................................................................................................. 74

    A. St. Clair ................................................................................................................... 74

    B. Bay County ............................................................................................................. 75

    E. Monroe County ....................................................................................................... 75

XVII. Missouri ................................................................................................................. 77

    A. Franklin County ...................................................................................................... 77

    B. Jackson County ..................................................................................................... 123

    C. Scott County ......................................................................................................... 125

XVIII. Nebraska ............................................................................................................. 125

    A. Lancaster County .................................................................................................. 125

    B. Lincoln County ..................................................................................................... 126

XX. North Carolina ....................................................................................................... 126

    A. Brunswick County ................................................................................................ 126

XXI. North Dakota ......................................................................................................... 127

    A. Mclean County/Eastern Mercer County .............................................................. 127

XXII. Ohio ..................................................................................................................... 128

    A. Clermont County .................................................................................................. 128

    B. Gallia/Meigs County ............................................................................................ 128

XXIII. Oklahoma ........................................................................................................... 132

    A. Muskogee County ................................................................................................ 132

    B. Noble County ....................................................................................................... 133

XXIV. South Dakota ...................................................................................................... 134

    A. Grant County ........................................................................................................ 134

3

XXV. Tennessee ........................................................................................................................135

    A. Sumner County ...............................................................................................................135

XXVI. Texas ............................................................................................................................135

    General Comments ...........................................................................................................135

    A. Atascosa County ............................................................................................................142

    B. Fort Bend County ..........................................................................................................142

    C. Freestone-Anderson County .........................................................................................143

    D. Goliad County ...............................................................................................................143

    E. Gregg County ................................................................................................................143

    F. Lamb County .................................................................................................................145

    G. Limestone County .........................................................................................................145

    H. McLennan County .........................................................................................................145

    I. Milam County ................................................................................................................149

    J. Panola County ...............................................................................................................149

    K. Potter County ...............................................................................................................150

    L. Robertson County..........................................................................................................150

    M. Rusk County ................................................................................................................150

    N. Titus County..................................................................................................................151

## I. Introduction

This document, together with the preamble to the final designations action, and the Technical Support Documents (TSDs) for the designations, presents the responses of the U.S. Environmental Protection Agency (EPA) to the significant comments we received on our responses to certain state designation recommendations for the 2010 Sulfur Dioxide ($SO_2$) Primary National Ambient Air Quality Standard (NAAQS).  The public comment period for the EPA's intended designations ended on March 31, 2016. The responses presented in this document are intended to either augment the responses to comments that appear in the preamble to the final action and the TSDs or to address comments not discussed in those documents. In this document "APC" refers to anonymous public comments.

## II. Background

On June 2, 2010, the EPA established a new primary 1-hour $SO_2$ standard at a level of 75 parts per billion (ppb) to protect against health effects associated with $SO_2$ exposure, including a range of serious respiratory illnesses. The EPA retained the secondary 3-hour $SO_2$ standard on March 20, 2012, to protect against welfare effects, including impacts on sensitive vegetation and forested ecosystems.

The process for designating areas following promulgation of a new or revised NAAQS is contained in the Clean Air Act (CAA) section 107(d) (42 U.S.C. 7407). After promulgation of a new or revised NAAQS, each governor or tribal leader has an opportunity to recommend air quality designations, including the appropriate boundaries for nonattainment areas, to the EPA. The EPA considers these recommendations as part of its duty to promulgate the formal area designations and boundaries for the new or revised NAAQS. By no later than 120 days prior to promulgating designations, the EPA is required to notify states and tribes, as appropriate, of any intended modifications to an area designation or boundary recommendation that the EPA deems necessary.

The EPA completed an initial round of $SO_2$ designations for certain areas of the country on July 25, 2013, designating 29 areas in 16 states as nonattainment. Pursuant to a March 2, 2015, court-ordered schedule, the EPA must complete $SO_2$ designations for the remaining areas of the country by three specific deadlines: July 2, 2016, December 31, 2017, and December 31, 2020. This current second round of designations addresses two groups of areas: (1) Areas that have newly monitored violations of the 2010 $SO_2$ NAAQS, and (2) areas that contain any stationary sources that had not been announced as of March 2, 2015, for retirement and that according to the EPA's Air Markets Database emitted in 2012 either (i) more than 16,000 tons of $SO_2$, or (ii) more than 2,600 tons of $SO_2$ with an annual average emission rate of at least 0.45 pounds of $SO_2$/mmBTU.

The EPA has determined that the areas meeting these criteria are associated with 64 stationary sources and the island of Hawaii. On or about February 16, 2016, the EPA notified affected states of its intended designation of certain specific areas as either nonattainment, unclassifiable/attainment, or unclassifiable for the 2010 $SO_2$ NAAQS. On March 1, 2016 (81 FR 10564), the EPA published a notice of availability to solicit input from interested parties other than states on the EPA's recent responses to the state designation recommendations for the 2010 $SO_2$ NAAQS.

## III. General Comments

### A. Modeling

#### 1. AERMOD LOWWIND3 Option

*Comment:* Some commenters (0296-FirstEnergy, 0299-OH Utilities Group, 0309-DTE Energy, 0310- NAAQS Implementation Coalition, 0314-OH Valley Electric, 0329-UARG) suggested the EPA should allow states to use the LOWWIND3 option in conjunction with ADJ_ U* to provide better performance of the model under low wind speed conditions. Two commenters (0309-DTE Energy, 0329-UARG) stated that the EPA's refusal to accept modeling demonstrations that utilize these more sophisticated options may lead to areas being designated nonattainment for this NAAQS where actual air quality meets this NAAQS due to the default model's over-prediction tendency.

*EPA's Response:*

The EPA proposed revisions to the *Guideline on Air Quality Models* on July 29, 2015, which include proposed updates to the AERMOD modeling system, the air quality dispersion model recommended for use in the $SO_2$ NAAQS designation process. Specifically, EPA proposed incorporating two Beta options:

- An option in AERMET to adjust the surface friction velocity (u*) to address issues with AERMOD over prediction under stable, low wind speed conditions.
- A low wind option, LOWWIND3, to address issues with model over predictions under low wind conditions. This option increases the minimum value of the lateral turbulence intensity (sigma-v) from 0.2 to 0.3 and adjusts the dispersion coefficient to account for the effects of horizontal plume meander on the plume centerline concentrations. It also eliminates upwind dispersion, which is incongruous with a straight-line, steady-state plume dispersion model such as AERMOD.

These "Beta options" are currently being considered as part of an ongoing rulemaking process and have not been formally adopted into the regulatory version of AERMOD, and pending completion of that rulemaking EPA considers the use of AERMOD run with non-regulatory options as an alternative model. The necessity for this EPA approval of any regulatory application of an alternative model is described in Section 3 of the $SO_2$ Modeling TAD (first draft available May 2013). Furthermore, the use of AERMOD Beta options was discussed at the 11th Modeling Conference in August 2015 and subsequently clarified in a December 10, 2015, memorandum.[1] The Beta options are also discussed in Section 2 of the latest version of the Modeling TAD (February 2016). In order to obtain EPA approval to run AERMOD using the Beta options, the alternative model demonstrations must first be submitted to the EPA Region for approval and concurred with by the Model Clearinghouse. At this time, EPA will only consider

---

[1] *See* https://www3.epa.gov/ttn/scram/guidance/clarification/AERMOD_Beta_Options_Memo-20151210.pdf

the modeling analyses that used the current regulatory defaults within AERMOD to predict $SO_2$ design values for the designations due July 2, 2016, unless an entity seeking to use a Beta option has gained formal approval to use an alternative model consistent with this longstanding process. Where such a request has not been submitted and approved for a specific case, EPA cannot rely upon modeling results that use these Beta options in making its final designation.

**Comment:** Two commenters (0314-OH Valley Electric, 0327-AEP) recognized that the LOWWIND3 Option is not fully approved as a default option in AERMOD, and an alternative model demonstration is required. The commenters stated that Ohio EPA did perform the necessary study and submitted it as part of their demonstration package. Commenters stated that while the EPA does not discuss the appropriateness of Ohio EPA's alternative model demonstration, it cites a guidance memo to apparently disregard Ohio EPA's demonstration. The memo requires a specific process to use an alternative model, but the memo did not exist at the time the proposed designation modeling was filed. Commenters stated that a guidance memorandum cannot be used to establish legally binding requirements, and retroactive application of any rule is also inappropriate. One commenter (0327-AEP) stated that the EPA should approve the use of the LOWWIND3 Beta Option after considering the study submitted by Ohio EPA on its merits, using the requirements that applied to such demonstrations at the time of the submission.

One commenter (0329-UARG) recognized that in a memorandum from December, the EPA announced that use of proposed "future regulatory options" for AERMOD for $SO_2$ designations "require[s] formal approval as an alternative model and [is] subject to the requirements of Appendix W, Section 3.2.2." The commenter stated that this memorandum is merely guidance, it is not binding, and it was not issued until after the September 18, 2015, date by which the EPA requested states to provide their updated designations to the Agency. Commenter stated it would be arbitrary and unreasonable for the EPA to expect states' recommendations to have complied with this later guidance.

**EPA's Response:**

EPA clearly described the necessity for approval of any regulatory application of an alternative model in Section 3 of the $SO_2$ modeling TAD (first draft available in May 2013). Furthermore, the use of AERMOD Beta options was discussed at the 11th Modeling Conference in August 2015 and subsequently clarified in a December 10, 2015, memorandum. The Beta options are also discussed in Section 2 of the latest version of the modeling TAD (February 2016). In order to obtain EPA approval to run AERMOD using the Beta options, the alternative model demonstrations must first be submitted to the EPA Region for approval and concurred with by the Model Clearinghouse. At this time, EPA will only consider modeling analyses that used the current regulatory defaults within AERMOD to predict $SO_2$ design values for the designations due July 2, 2016, unless an entity seeking to use a Beta option has gained formal approval to use an alternative model consistent with this longstanding process. Where such a request has not

7

been submitted and approved for a specific case, EPA cannot rely upon modeling results that use these Beta options in making its final designation. The EPA recognizes that the TAD is not a legally binding, final agency action, and that the other guidance memoranda are similarly non-binding. However, the EPA disagrees that requiring Model Clearinghouse approval in order to use the non-regulatory Beta options in these designations constitutes an impermissible retroactive application of a rule or converts the TAD and the guidance into binding final requirements. That is because these designations themselves are final actions, and the EPA has explained a reasonable basis for not relying upon modeling using the Beta options unless certain processes are followed to ensure that their use is appropriate in a given case. However, these designations do not take final action on the pending rulemaking to revise Appendix W itself, nor do they pre-judge the outcome of that pending rulemaking in any way.

*Comment:* Some commenters (0314-OH Valley Electric, 0327-AEP, 0329-UARG) supported the EPA's positions that the alternative model formulation is superior to the approved version of the model, and that there is no information available demonstrating that AERMOD with LOWWIND3 provides improved statistical performance on tall stack sources. The commenters stated that the Version 15181 Addendum to the AERMOD User's Guide, Appendix F contains an analysis using the EPA's standard Lovett evaluation database, which is a tall stack case. The commenters stated that this case demonstrates that the LOWWIND3 Beta Option coupled with the Beta U* Option in AERMET shows a statistically better performance than both the base AERMOD Model and the other LOWWIND Beta Options present in AERMOD. Such a finding contradicts the EPA's statement in the TSD. One commenter (0329-UARG) stated that this level of demonstration should suffice to support the use of those techniques in modeling.

*EPA's Response:*
The commenter is referring to technical information provided by EPA as part of its proposed regulatory revisions to the *Guideline on Air Quality Models* (July 2015). Such information was provided to the public in considering the merits of incorporating the LOWWIND3 and adjusted u* Beta options in the regulatory version of AERMOD. At this time, the EPA is still considering the merits of these options as part of that separate rulemaking process, and these final designations are not taking final action on that pending rulemaking or pre-judging it in any way. Therefore, pending completion of that rulemaking, for these designations we have explained that it is necessary to gain approval of any regulatory application of an alternative model (i.e. AERMOD with use of LOWWIND3 and/or adjusted u* Beta options) as noted in Section 3 of the SO2 Modeling TAD (first draft available in May 2013). This will ensure that the use of a Beta option in any specific area designation is appropriate, based on its own facts. The use of AERMOD Beta options was discussed at the 11th Modeling Conference in August 2015 and subsequently clarified in a December 10, 2015 memorandum. The Beta options are also discussed in Section 2 of the latest version of the SO2 Modeling TAD (February 2016). While a state or other entity conducting modeling may have run AERMOD using the Beta options, for these designations EPA will only consider modeling analyses that used the current regulatory

8

defaults within AERMOD to predict SO$_2$ design values, unless an entity seeking to use a Beta option has gained formal approval to use an alternative model.

*Comment:* Two commenters (0296-FirstEnergy, 0299-OH Utilities Group) stated that Ohio EPA met the recommendation of Appendix W, Section 3.2.2. The commenters stated there is peer-reviewed work published with respect to LOWWIND3 in Paine et.al. (2015).

Another two commenters (0310-NAAQS Implementation Coalition, 0329-UARG) requested that the EPA reopen comment on the Appendix W Proposal for the limited purpose of allowing the public to respond on the record to critical evaluations of LOWWIND3 not available prior to the close of the comment period. One commenter ((0310-NAAQS Implementation Coalition) stated that, in their review of the Appendix W Proposal's official docket, there is just one comment containing specific concerns with the performance of LOWWIND3, while a substantial majority of the comments were generally supportive. The commenter ((0310-NAAQS Implementation Coalition) also stated that the EPA's rationale for not including LOWWIND3 is unclear. According to the commenter, the EPA proposed to include LOWWIND3 in the Appendix W Proposal because it "improve[s] model performance," but then the EPA refused to use LOWWIND3 for SO$_2$ designations on grounds that it has not been demonstrated to "statistically improve [model] performance."

*EPA's Response:*
EPA does not consider the request to reopen the public comment period for its proposed revisions to the *Guideline on Air Quality Models* (July 2015) to be within the scope of these final designations.  Pending completion of that rulemaking, we have explained that for these designations it is necessary to gain approval of any regulatory application of an alternative model (i.e. AERMOD with use of LOWWIND3 and/or adjusted u* Beta options) as noted in Section 3 of the SO2 modeling TAD (first draft available in May 2013).  The use of AERMOD beta options was discussed at the 11th Modeling Conference in August 2015 and subsequently clarified in a December 10, 2015, memorandum. They are also discussed in Section 2 of the latest version of the SO2 Modeling TAD (February 2016). The information brought forward by the commenter would need to be formally considered on a case-by-case basis as part of that process. While a state may have run AERMOD using the Beta options, EPA will only consider modeling analyses that used the current regulatory defaults within AERMOD to predict SO$_2$ design values for the designations due July 2, 2016, unless an entity seeking to use a Beta option has gained formal approval to use an alternative model.

*Comment:* One commenter (0329-UARG) explained (pdf pages 5-6 of their comment letter) that AECOM's recent analyses provide added justification for accepting modeling with the LOWWIND3 option as the basis for an attainment designation. The commenter noted that the EPA explains its reluctance to accept use of the low wind speed options with AERMOD on the basis that it is still reviewing "a number of public comments specific to the LOWWIND3 beta options." According to the commenter however, only one comment by Sierra Club provided a substantive critique of low wind speed options with AERMOD. The commenter attached a report, prepared by Christopher Warren and others at AECOM Environment, which refutes the

concerns expressed in Sierra Club's comments and provides further evidence that the LOWWIND3 option improves AERMOD's performance.

*EPA's Response:*

Pending completion of the separate rulemaking referenced by commenter, the EPA has explained that for these designations it is necessary to gain approval of any regulatory application of an alternative model (i.e. AERMOD with use of LOWWIND3 and/or adjusted u* Beta options) as noted in Section 3 of the SO2 modeling TAD (first draft available in May 2013). The use of AERMOD beta options was discussed at the 11th Modeling Conference in August 2015 and subsequently clarified in a December 10, 2015, memorandum. They are also discussed in Section 2 of the latest version of the SO2 Modeling TAD (February 2016). The information brought forward by the commenter would need to be formally considered on a case-by-case basis as part of that process. While a state may have run AERMOD using the Beta options, EPA will only consider modeling analyses that used the current regulatory defaults within AERMOD to predict $SO_2$ design values for the designations due July 2, 2016, unless an entity seeking to use a Beta option has gained formal approval to use an alternative model.

*Comment:* One commenter (0329-UARG) stated there are no legal barriers to EPA's reliance on the ADJ_U* and LOWWIND3 options. Commenter stated that section 3.2.2 of the current regulatory Guideline gives responsibility for approving an alternative model solely to the Regional Office. Commenter also stated that the Guideline does not apply to modeling for initial designations because it applies only to State Implementation Plan revisions for existing sources and to new source reviews. Commenter stated that the Modeling Technical Assistance Document (TAD) specifies that it does not impose binding and enforceable requirements or obligations and is not final agency action.

*EPA's Response:*

The Beta options are currently being considered as part of an ongoing separate rulemaking process and have not been formally adopted into the regulatory version of AERMOD, and pending completion of that rulemaking EPA considers the use of AERMOD run with non-regulatory options as an alternative model. EPA has discussed the process to gain approval of alternative models in previous responses to comments in this section. The necessity for this EPA approval of any regulatory application of an alternative model is described in Section 3 of the $SO_2$ Modeling TAD (first draft available May 2013) and the Beta options are discussed in the latest version of the TAD (February 2016). Furthermore, the use of AERMOD Beta options was discussed at the 11th Modeling Conference in August 2015 and subsequently clarified in a December 10, 2015, memorandum. In order to obtain EPA approval to run AERMOD using the Beta options, the alternative model demonstrations must first be submitted to the EPA Region for approval and concurred with by the Model Clearinghouse. At this time, EPA will only consider the modeling analyses that used the current regulatory defaults within AERMOD to predict $SO_2$ design values for the designations due July 2, 2016, unless an entity seeking to use a Beta option has gained formal approval to use an alternative model consistent with this longstanding process. Where such a request has not been submitted and approved for a specific case, EPA cannot rely upon modeling results that use these Beta options in making its final designation. The $SO_2$

Modeling TAD is EPA guidance regarding compliance with the relevant statutory and regulatory requirements, and the TAD recommends that the designations modeling should rely upon the principles and techniques in the *Guideline*, Appendix W.

*Comment:* One commenter (0332-Sierra Club) stated that ADJ_U* and LOWWIND3 have been shown to decrease model performance and accuracy and should not be relied on by EPA. Commenter provided an attachment to their comments (Exhibit 6) which describes the flaws commenter sees in these options. Commenter stated that use of these options would cripple the efficacy of AERMOD, and lead to significant under-prediction of air pollution impacts. Commenter stated that, to the extent that states or industry submit modeling analyses that incorporate use of these options, EPA should reject them as being inconsistent with regulatory guidance and for the identified issue of inaccuracies flowing from their use. Commenter stated that, in instances where states or industry submit modeling incorporating these options and accompany it with information purporting to justify use of the non-regulatory default configuration of AERMOD, EPA should look very closely at the submissions, the submissions should only be considered as a sensitivity analysis, and the submissions should be accompanied by modeling performed according to EPA's guidance using the regulatory default configuration of AERMOD.

### EPA's Response:

EPA clearly described the necessity for approval of any regulatory application of an alternative model in Section 3 of the $SO_2$ modeling TAD (first draft available in May 2013). Furthermore, the use of AERMOD beta options was discussed at the 11th Modeling Conference in August 2015 and subsequently clarified in a December 10, 2015, memorandum and also discussed in Section 2 of the latest version of the modeling TAD (February 2016). In order to obtain EPA approval to run AERMOD using the Beta options, the alternative model demonstrations must first be submitted to the EPA Region for approval and concurred with by the Model Clearinghouse. At this time, EPA will only consider modeling analyses that used the current regulatory defaults within AERMOD to predict $SO_2$ design values for the designations due July 2, 2016, unless an entity seeking to use a Beta option has gained formal approval to use an alternative model consistent with this longstanding process. In either granting or not granting such approval, the EPA is not taking final action with respect to the pending separate Appendix W rulemaking, or pre-judging its future outcome in any way.

### 2. Modeling to determine attainment status

*Comment:* One commenter (0332-Sierra Club) stated that dispersion modeling is a rigorously verified method for evaluating impacts on the $SO_2$ NAAQS, and has a lengthy and court-validated history as an appropriate tool for use in designations. Commenter provided a detailed discussion (pdf pages 6-9 of commenter's letter) to support their position that aerial dispersion modeling is the appropriate approach to ascertaining attainment status under the $SO_2$ NAAQS. Commenter provided several references to support their position, including: the final $SO_2$ NAAQS Rule, *Implementation of the 1-Hour $SO_2$ NAAQS Draft White Paper for Discussion,* EPA's 1994 $SO_2$ Guideline Document, Respondent's Opposition to Motion of the State of North Dakota for a Stay of EPA's 1-Hour Sulfur Dioxide Ambient Standard Rule (attached to

commenter's letter as Exhibit 1), and Sheldon Meyers Memorandum re Section 107 Designation Policy Summary (April 21, 1983) (attached to commenter's letter as Exhibit 2). Commenter also cited several court cases and statements from EPA staff (attached to commenter's letter as Exhibits 3 and 4) to further support their position. Commenter stated that EPA's practice that all nitrogen dioxide, fine particulate matter and $SO_2$ PSD increment compliance verification analyses are performed with air dispersion modeling demonstrates that modeling is a technically superior approach for ascertaining impacts on NAAQS.

One commenter (0332-Sierra Club) stated that AERMOD accurately models medium-to-large $SO_2$ sources—even with conditions of low wind speed, the use of off-site meteorological data, and variable weather conditions. Commenter stated that AERMOD has been tested and performs very well during conditions of low wind speeds (see Exhibit 5 attached to commenter's letter). Commenter stated that EPA's use of air dispersion modeling and AERMOD in particular was upheld in the context of a recent CAA section 126 petition for resolution of cross-state impacts.

One commenter (0332-Sierra Club) stated that, by modeling a source to ascertain its impact on the NAAQS, regulators are simultaneously determining how much emissions need to be reduced to avoid causing NAAQS exceedances. Commenter stated that using modeling for and from designations purposes in nonattainment SIP preparation thus can help states and EPA avoid the chronic problem of late NAAQS implementation. Commenter stated it can also be a powerful tool in enabling EPA to prepare federal implementation plans for states that have failed to prepare their SIPs. Commenter stated the EPA should make clear to the states that they can and must submit nonattainment SIPs by the required deadline, and that if not, EPA will use the modeling before it to generate and promulgate federal implementation plans, and will do so far sooner than the expiration of the two-year deadline the Clean Air Act affords EPA.

***EPA's Response:*** EPA appreciates the commenters' support of the use of dispersion modeling for *$SO_2$ NAAQS* designations. In this action the EPA is not addressing the submission of nonattainment SIPs or federal implementation plans; comments related to these separate issues are out of scope of the current final action.

### 3. AERMOD FLAGPOLE option

***Comment:*** One commenter (0332-Sierra Club) stated that flagpole receptors are part of the regulatory default AERMOD configuration and their use can only make modeling results more relevant. Commenter stated that, since people breathe through their noses and mouths, not through their shoes and socks, modeling impacts at face-height instead of at foot-height is better practice. Commenter stated this is in part why air monitoring sensors are likewise not placed directly on the ground. Commenter stated that criticisms of Sierra Club modeling on the basis of the use of the FLAGPOLE option should be disregarded.

***EPA's Response:***

EPA disagrees with the statement that the flagpole receptors are part of the regulatory default AERMOD configuration. While not a Beta option, the flagpole receptors must be specified and therefore are not part of the default options. EPA has stated in Section 4.2 of the $SO_2$ NAAQS

12

Designations Modeling Technical Assistance Document (TAD) that the use of flagpole receptors is not necessary. The TAD also states that Appendix W does not specify receptors be placed at levels other than ground level for comparison to the NAAQS. The use of flagpole receptors in specific cases of modeling is addressed in the Technical Support Documents (TSDs) for those areas, and/or in responses to comments on the EPA's intended designations for those areas.

## B. Designation Categories

*Comment:* Two commenters (0301-IN Municipal Power, 0302-Duke Energy) supported an "attainment" rather than "attainment/unclassifiable" designation and stated that section 107 of the Clean Air Act does not appear to provide for the "attainment/unclassifiable" designation category. Also see section IX.A. Gibson County.

One commenter (0329-UARG) stated the CAA does not provide for an unclassifiable/attainment designation and it does not authorize EPA to add to additional designations to those specified in the Act. Commenter stated that, where EPA finds that an area attains the NAAQS, the Agency has no basis for designating it anything other than attainment. Commenter stated that making an attainment designation is important because it conveys to those in the area or who may be considering moving to the area that air quality there meets health-based standards. Commenter stated that a designation of unclassifiable/attainment does not convey that same message and should not be used.

*EPA's Response:* In the March 20, 2015, guidance memo (Steve Page, Director EPA-OAQPS to Regional Air Directors, Updated Guidance for Area Designations for the 2010 Primary Sulfur Dioxide National Ambient Air Quality Standard) and the August 21, 2015, Data Requirements Rule final rule Federal Register notice the EPA stated that, while states have and may continue to submit designations recommendations identifying areas as ''attainment,'' the EPA expects to continue its traditional approach, where appropriate, of using a designation category of ''unclassifiable/attainment'' for areas that the EPA determines meet the 2010 $SO_2$ NAAQS. In this action, the EPA is using the designation category of "unclassifiable/attainment" for areas that are meeting the 2010 $SO_2$ NAAQS, and is using the category ''unclassifiable'' for areas where the EPA cannot determine based on available information whether the area is meeting or not meeting the NAAQS or where the EPA cannot determine whether the area contributes to a violation in a nearby area. The EPA is not establishing an additional designations category with this long-standing approach. The EPA also disagrees that the use of the continued unclassifiable/attainment designation conveys the negative message claimed by the commenter, as the designation is premised on an EPA finding that the area is meeting the NAAQS. In any event, the EPA notes that there is no difference in terms of resulting regulatory burden between and unclassifiable, unclassifiable/attainment, or attainment designation, so the use of the unclassifiable/attainment term imposes no injury on any party.

*Comment:* One commenter (0319-Entergy Arkansas) supported the EPA's position that in all legal and practical circumstances the designation of "unclassifiable/attainment" is the same as a designation of "attainment" under the Clean Air Act, and, therefore, it triggers no additional mandates or other data requirements. Commenter stated this follows from EPA's repeated

statements documenting its traditional use of "unclassifiable/attainment" for those areas that the Agency determines meet the NAAQS (e.g., 80 FR 51052, 51084).

*EPA's Response:* The EPA appreciates the commenters support of our interpretation of the legal and practical consequences associated with a designation of "unclassifiable/attainment." For areas that the EPA is designating unclassifiable/attainment in this final action, this determination is based on the finding that the area is meeting the 2010 $SO_2$ NAAQS.

## C. Monitoring

*Comment:* One commenter (0328-Luminant) stated the EPA's proposal is unlawful and should not be finalized, in part, because EPA has consistently supported monitoring over modeling for NAAQS designation purposes and its new approach here is inconsistent with the statute, regulations, and EPA's prior practice. Commenter stated the EPA should utilize monitoring data, not modeling data if it is going to overturn the State of Texas' recommended designations in favor of its own designations. Commenter supported the TCEQ's (0294-TCEQ) position that monitoring data is necessary to accurately characterize actual air quality for attainment and nonattainment designations. Commenter stated the EPA has been clear that monitoring data is preferred for NAAQS designations, and EPA's offer for states to use modeling for the $SO_2$ NAAQS was simply intended to provide states with another option. Commenter stated that modeling was intended to provide an opportunity for states to avoid the cost and resources associated with siting, installing, and maintaining monitors where the state preferred to rely on modeling. Commenter stated the EPA's new approach here to *require* modeling and rely solely on that data for designations is inconsistent with the statute and EPA's prior practice.

One commenter (TX Response) stated, when modeling and monitoring data conflict, courts have acknowledged that actual air monitoring data is superior to modeling data so long as the monitor is sufficient to accurately represent the area in question. *E.g., Republic Steel Corp. v. Castle,* 621F.3d797, 805 (6th Cir.1980); *PPG Industries, Inc. v. Castle,* 630 F.3d 462, 46'7-68 (6th Cir. 1980).

One commenter (TX Response) stated that a designation of nonattainment has serious consequences to industry, the economy of an area, its citizens, and the state. Commenter stated that nonattainment designations should only be made based on data from 40 CFR Part 58 compliant (regulatory) monitoring showing a violation of the standard. Commenter stated that using modeling to determine a nonattainment designation could result in major capital expenditures for industry to address an issue that may not be an actual problem. Commenter stated that air modeling analyses are a useful tool in determining the impact of a new or modified facility for permitting purposes but not for predicting future design values to demonstrate attainment of NAAQS. Commenter stated that, because of the magnitude of the potential impact areas may face due to a nonattainment designation, such a determination should be based only on real world, monitored data, and not predicted values subject to the limitations and flaws of a model.

14

***EPA's Response:*** The EPA is not at this time taking final action to designate the areas in Texas that had been proposed as nonattainment designations, and will address comments regarding those areas at a later date. However, as a general matter, the EPA maintains our previous position for the reasons delineated in the preamble to the final rule of the 2010 $SO_2$ NAAQS rulemaking, the February 2013 Strategy Paper, and in the proposed and final $SO_2$ Data Requirements Rule for why both air quality modeling and ambient monitoring are appropriate tools for characterizing ambient air quality for purposes of informing decisions to implement the $SO_2$ NAAQS, including designation determinations. The EPA's reliance on modeling to assess $SO_2$ air quality status, even in the face of conflicting monitoring, has been judicially affirmed. See, e.g., *Montana Sulphur & Chemical Company v. EPA*, 666 F.3d 1174, 1185 (9th Cir. 2012). Moreover, it has long been the EPA's practice to rely upon appropriate modeling when issuing designations under $SO_2$ NAAQS. See, e.g., 43 FR 8962 (March 3, 1978), 43 FR 40416 (September 11, 1978), 43 FR 40502 (September 12, 1978). EPA has also explained the importance of using modeling information for source-oriented pollutants such as $SO_2$ in cases where existing monitors do not adequately characterize peak ambient concentrations, See, e.g., Memorandum from Sheldon Myers, Director, EPA Office of Air Quality Planning and Standards, to Regional Office Air Division Directors, "Section 107 Designation Policy Summary," April 21, 1983. All designation determinations made by the EPA in this final action are based on the EPA's complete and thorough review and analysis of all available information, as described in each area's final technical support document in this docket.

***Comment:*** One commenter (0329-UARG) suggested that an area conducting monitoring consistent with EPA Guidance should be designated unclassifiable and allowed to complete three years of monitoring as long as monitored air quality remains below the NAAQS. Commenter stated that awaiting monitoring results would also be appropriate if modeling studies have produced differing predictions regarding NAAQS compliance. Commenter stated that providing the opportunity for such monitoring could allow an area in which monitoring demonstrates that the 1-hour $SO_2$ standard is attained to avoid costly implementation measures.

***EPA's Response:*** As stated further above, the EPA maintains the position that both air quality modeling and ambient monitoring are appropriate tools for characterizing ambient air quality for purposes of informing decisions to implement the $SO_2$ NAAQS, including designation determinations. In response to the commenter's suggestion that designations should await future completion of three years of monitoring, the EPA notes that in the case of the designations subject to the court's order to designate certain areas by July 2, 2016, the agency does not have the discretion to await the results of future monitoring.

***Comment:*** One commenter (0328-Luminant) explained (pdf pages 36-42) why they believe AERMOD is not a reliable approach for NAAQS designations, and cannot substitute for the preferred option of monitoring.

***EPA's Response:*** As stated further above, the EPA is not at this time taking final action to designate the areas in Texas addressed by the commenter, and will respond to comments on those areas at a later time. However, as a general matter, the EPA maintains the position that both air quality modeling and ambient monitoring are appropriate tools for characterizing

15

ambient air quality for purposes of informing decisions to implement the SO2 NAAQS, including designation determinations.

## D. Consent Decree

**Comment:** One commenter (0328-Luminant) stated that the Consent Decree must be read consistently with the May 13, 2014 Data Requirements Rule (DRR). Commenter stated the EPA cannot now contravene its own regulations and deprive states of the opportunity to utilize monitoring data collected under (or alongside) the rule to inform designations by interpreting the Consent Decree in a manner that forecloses monitoring. Commenter stated that, if EPA interprets the Consent Decree to impermissibly require the use of modeling where sufficient monitoring data is not available, even though monitoring data will be available in the future, its interpretation would effectively abrogate the CAA's unclassifiable designation and EPA's prior statements regarding the importance of the use of monitoring data.

One commenter (0328-Luminant) stated that, if read to effectively force a certain designation through the application of over-predictive modeling alone, the Consent Decree would not only contravene the CAA, it would also modify the DRR in a manner that deprives the regulated community of its ability to meaningfully comment, which is an improper rulemaking and impermissible under the Administrative Procedure Act. Commenter stated that the proposed DRR, for instance, did not say the rule's procedures allowing states until 2020 to issue recommendations for areas relying on monitoring did not apply to areas with "large" (as defined specifically for this purpose for the first time in the Consent Decree) stationary sources.

One commenter (0328-Luminant) stated the Consent Decree imposes impermissible legal obligations on states that did not consent to the decree.

**EPA's Response:** The commenter's objections to the consent decree, as well as the commenter's views regarding the Data Requirements Rule, are beyond the scope of this final rule issuing designations. Moreover, as explained above, the EPA is not at this time taking final action to designate the areas on which the commenter submitted comments, and will respond to those comments at a later time.  However, the EPA notes that our authority for this final action is CAA Section 107(d), which required the EPA to promulgate designations for the 2010 SO2 NAAQS no later than three years after the date of promulgation of this NAAQS, as the EPA exercised the available one year extension available under the Act. As stated further above, the EPA maintains our previous position that both air quality modeling and ambient monitoring are appropriate tools for characterizing ambient air quality for purposes of informing decisions to implement the SO2 NAAQS, including designation determinations. Furthermore, the Consent Decree referenced by commenter sets dates the EPA must act by, not dates that the EPA must wait until to act. Additionally, the SO2 Data Requirements Rule does not restrict the EPA's CAA Section 107(d) authority, but rather will provide future air quality data developed by air agencies that may be used by the EPA in future actions to evaluate areas' air quality under the 2010 SO2 NAAQS, including area designations and redesignations, as appropriate.  Nothing in either the consent

decree or the Data Requirements Rule has determined the substantive outcome of any of the final designations being issued in this final rule.

**Comment:** One commenter (0332-Sierra Club) stated that, in completing area designations, it is critical that EPA consider all $SO_2$-emitting sources in the areas under consideration for the 2016 designations round, and not merely the sources who meet the triggering criteria of the Consent Decree. Commenter stated that, because the Consent Decree speaks in terms of *areas* to be evaluated, not *sources,* it would be contrary to the Consent Decree if EPA were to finalize designations based solely on sources fitting the Consent Decree criteria. Commenter stated that the Modeling TAD provides that "all sources expected to cause a significant concentration gradient in the vicinity of the source of interest should be explicitly modeled". Commenter stated that, in performing its own air quality modeling, the Sierra Club and others have used the 50 km modeling domain of AERMOD as a tool in determining what sources to include in area modeling evaluations and the EPA should do the same.

**EPA's Response:** As explained in each area's Technical Support Document, in this final designations rulemaking the EPA appropriately evaluated all $SO_2$-emitting sources that were expected to have impacts on the subject area, and the agency refers to those TSDs and/or specific responses to comments for those areas for further explanation of the scope of each area's analysis.

## E. Consider all information in the record

**Comment:** One commenter (0332-Sierra Club) supported the EPA's use of a mixture of state, industry, and public health and environmental submissions of data, including modeling data. Commenter stated the EPA has properly elected to consider all information before it in keeping with foundational principles of administrative law. Commenter expressed concern that, if EPA were to ignore materials it receives from environmental and public health organizations or from concerned citizens while it was simultaneously accepting and considering materials submitted by states, this would arbitrarily skew EPA's analysis—particularly if state comments are responsive to or critique comments submitted by the public.

**EPA's Response:** As described further in the final technical support documents, EPA reviewed and analyzed all available information in determining designations in this final action.

## F. Support Other's Comments

American Electric Power (0327) endorsed the comments of the Utility Air Regulatory Group (0329) and the Ohio Utility Group (0299), incorporating those comments by reference.

Georgia Power (0291) supported comments submitted by the Utility Air Regulatory Group (0329).

Wabash Power (0303) supported Duke Energy's (0302) comments for Gibson County in Indiana and supported the comments submitted by the Utility Air Regulatory Group (0329).

Ohio Valley Electric (0314) endorsed and incorporated by reference the comments submitted by American Electric Power (AEP), the Utility Air Regulatory Group (0329) and the Ohio Utility Group (0299).

## G. Other Comments

***Comment:*** Some commenters generally supported action for clean air with the following statements: I support clean air (0214-APC); we want clean air and a serious effort to halt climate change (0216-APC); clean, clear, heathy air is needed and has been needed for a long time (0217-APC); it would be a gross miscreance to allow our health to be compromised by classifying the air quality standards "attainment" (0265-APC); pollution matters (0276-APC); rights to clean air should trump these companies rights (0215-APC); As someone with asthma, I need the air to be as clean as possible (0237-APC).

***EPA's Response:*** The EPA notes that the EPA established the 75 parts per billion (ppb) primary 1-hour SO2 standard at issue in this action's designations to protect against health effects associated with $SO_2$ exposure, including a range of serious respiratory illnesses. As described further in the final technical support documents, EPA reviewed and analyzed all available information in determining appropriate designations in this final action.

***Comment:*** One commenter (0329-UARG) noted that inaccurate "nonattainment" designations lead to unnecessary planning and emission control expenses. Indeed, even an area receiving an unwarranted "unclassifiable" designation may find itself stigmatized when seeking economic growth. The commenter urged EPA to give significant weight to states' designations for areas within their borders and to exercise restraint in modifying those designation recommendations.

***EPA's Response:*** As described further in the final technical support documents, EPA reviewed and analyzed all available information in determining designations in this final action.

***Comment:*** One commenter (0293-APC) requested the reduction of CO in Anne Arundel Co, MD.

***EPA's Response:*** The EPA thanks the commenter for this submission but notes this comment is out of scope of the current final action regarding sulfur dioxide.

***Comment:*** One commenter (0245-APC) supported a designation of nonattainment, but did not identify the area.

***EPA's Response:*** The EPA thanks the commenter for their submission, but was unable to ascertain on the information provided which area commenter was referring to. Regardless, as described further in the final technical support documents, EPA reviewed and analyzed all available information in determining designations in this final action.

***Comment:*** One commenter (0311-APC) stated Ameren should be held to the law and do the right thing for future generations.

*EPA's Response:* As described further in the final technical support document for the area at issue in this comment, EPA reviewed and analyzed all available air quality characterization information in determining the appropriate designation in this final action.

*Comment:* One commenter (0207-APC) suggested the EPA should go after companies who dump illegally around Curtis Bay rather than a high profile power station that keeps utilities affordable.

*EPA's Response:* The EPA thanks the commenter for this submission but notes this comment is out of scope of the current final action regarding the EPA's mandatory duty to designate areas under the 2010 SO$_2$ NAAQS.

## IV. Arkansas

### A. Independence County

*Comment:* One commenter (0319-Entergy Arkansas) expressed its support of the State's recommendation to designate Independence County, Arkansas, as unclassifiable/attainment. Commenter asserted that the State's recommendation was based on modeling showing that the Independence plant neither causes nor contributes to any model predicted exceedance of the SO$_2$ standard in the area. In addition, commenter stated that the Arkansas Department of Environmental Quality is preparing modeling and other support information that will address the Agency's concern that previous modeling did not establish a comprehensive emissions profile for the area's air quality. Commenter urged the EPA to carefully consider all technical support documents and adopt the State's recommendation.

*EPA's Response:*

According to the information received by EPA from the State, the submittal of additional modeling and other support information has been delayed. Since no other additional information has been made available, there is currently no information available to justify a change in EPA's proposed designation of unclassifiable.

As further detailed in the Arkansas technical support document for this area, when evaluating the initial modeling that came in from the state, the State did not include all emissions from contributing sources; specifically the State did not include the emissions from Future Fuels. The Sierra Club's submitted modeling for Independence, however, showed inconsistencies with the Modeling TAD. The State did provide updated modeling, including Future Fuels emissions, in response to Sierra Club's modeling, but without further refinements to the modeling of Future Fuels to address the inconsistencies with the Modeling TAD. Because of the identified inconsistencies with the Modeling TAD in each of the State's and Sierra Club's modeling submittals, EPA does not have sufficient information to support a designation of nonattainment

19

or unclassifiable/attainment. Therefore, the EPA's designation for the area within Independence County is unclassifiable. EPA notes that in future $SO_2$ designations, ADEQ will be required to address the Future Fuels facility, which will include analysis of any contributing impacts from the Independence Electric Station, and notes that Future Fuels is a listed source under the Data Requirements Rule.

## B. Jefferson County

***Comment:*** One commenter (0319-Entergy Arkansas) supported the EPA's proposal to adopt the State's recommendation and to designate Jefferson County, Arkansas, as unclassifiable/attainment. Commenter stated that the EPA's position is based on a close examination of the State's recommendation and the State's supporting information and is consistent with the State's AERMOD modeling and analysis, which follows the EPA's guidance.

***EPA's Response:*** EPA appreciates the supportive comments, but notes that the EPA's designation for this area was based on review and analysis of all available information.

# V. Colorado

## A. Colorado Springs

***Comment:*** Some commenters (0209-APC, 0228-APC, 0244-Masias, 0249-APC, 0262-APC, 0263-Colorado groups and citizens, 0270-APC, 0281-APC, 0287-Ostrom, 0298-Weise, 0307-EDF, 0321-AEC, 0332-AA-Sierra Club) requested that the EPA change its designation of El Paso County, Colorado from unclassifiable to nonattainment. Commenters stated that credible data on this matter have been provided by multiple air quality professionals showing violations of air quality caused by the Martin Drake Plant. Some commenters (0307-EDF, 0321-AEC, 0332-AA-Sierra Club) provided detailed technical comments in their letters and attachments to support their positions.

One commenter (0307-EDF) stated that the modeling report by Dr. Andrew Gray attached to their comment letter demonstrates that, using the actual hourly emission rates from the period 2011 to 2013 shows that the design value is almost ten times the allowable health-based NAAQS, even when one assumes a background concentration of zero. Commenter stated that two independent modeling studies (Klafka and Barrett) demonstrate exceedances of the NAAQS from the Martin Drake power Plant.

One commenter (0332-AA-Sierra Club) provided two modeling studies by Wingra Engineering (Klafka) and stated that both reports showed violations of the standard. Two commenters (0307-EDF, 0332-AA-Sierra Club) stated that critiques raised by EPA in its proposed designation (model assumptions such as downwash, urban verses rural dispersion coefficients, stack heights

and use a newer version of AERMOD/AERMET etc.) simply do not affect the conclusion that the area should be designated nonattainment and do not support a conclusion that the area should be found to be "unclassifiable." Commenter's (0307-EDF) letter includes a detailed discussion of why the commenter believes other factors identified by EPA for rejecting the Klafka model are not a basis for the "unclassifiable" designation.

One commenter (0307-EDF) stated that modeling future allowable rates is not representative of the current attainment status and would understate the impacts of the current uncontrolled $SO_2$ emissions. Two commenters (0307-EDF, 0332-AA-Sierra Club) stated that the nonattainment results occur even when one assumes that the operator has installed and is operating pollution controls that are not yet fully operating (and won't be required until December 31, 2017).

*EPA's Response:* The EPA has determined that the meteorological data from the Colorado Springs Airport are not representative of meteorological conditions at the Martin Drake Power Plant. Considering the unique topography influencing the area around the Martin Drake Power Plant, the EPA finds that a modeling demonstration for this area could not adequately inform a designation decision absent representative meteorological data. Therefore, modeling which relies on meteorological data from the Colorado Springs Airport is not sufficient to enable the EPA to determine whether the area impacted by emissions from the Martin Drake Power Plant is meeting the 2010 $SO_2$ NAAQS. As further detailed in the final Colorado Technical Support Document in this docket and elsewhere in this response to comment (RTC) document Section V.A., the two areas have different terrain patterns generating different wind patterns, wind drainage patterns, and upslope and downslope wind conditions. These characteristics will significantly impact the transport and dispersion conditions of the Martin Drake Power Plant plumes due to the differences in meteorological conditions between the Colorado Springs Airport and the Martin Drake Power Plant.

In addition to the meteorological data not being representative, the Barrett and Klafka AERMOD simulations did not align with EPA's recommended configuration options. The non-default options utilized in these simulations included:
- Population estimate is too high and not representative (668,000 vs 416,000)
- Receptors are included within secured facility boundaries, while receptors should only be placed in areas where the public has access.

Further, the actual emissions were based on years 2011 to 2013 and not based on the most recent three years of $SO_2$ emissions data from the facility. The total $SO_2$ emissions at the facility from 2013 to 2015 were 79.77 percent of the total emissions from 2011 to 2013, meaning updated emissions would most likely decrease impacts. Some of the modeling analyses used future allowable emission rates which considered the $SO_2$ controls currently being installed at the Martin Drake Power Plant. With regard to these analyses, EPA emphasizes that the use of allowable emissions that are not federally enforceable is inconsistent with the Modeling TAD and modeling analyses that include such allowable emissions cannot be relied upon in determining whether the area is meeting or not meeting the 2010 $SO_2$ NAAQS. The EPA also notes that the State recently received a permit modification application from Colorado Springs Utilities which requires the shutdown of unit 5 by the end of 2016.

Certain configuration options and input assumptions selected by the commenter, particularly the use of actual emissions from 2011 to 2013 instead of more recent years and the inclusion of receptors on the facility's secured property, most likely contribute to modeled design values of $SO_2$ concentrations that are significantly too high.

The EPA disagrees that refinements with the meteorological data and model configuration options do not affect our conclusion regarding the designation for this area. EPA has been provided numerous model simulations and analyses that utilized various emissions data (actual and allowable emissions, and even expected future allowable emissions), meteorological data sets (airport, highway, and on-site data sets), and configuration options (rural, urban, building downwash). Most of the analyses presented the model results in the form of the design value to illustrate the model's sensitivity to various configuration options. In merely reviewing the modeled design values of $SO_2$ concentrations from the various AERMOD simulations provided to EPA, the modeled results are indeed very sensitive to the meteorological and emissions data sets and model configuration options. The EPA's analysis, provided in the final technical support document for this area and elsewhere in this RTC document Section V.A., illustrates the model's sensitivity to various input data and selected model configurations to support that model refinements are necessary to ensure accurate predictions of the modeled design values of $SO_2$ concentrations.

Furthermore, some of the model simulations and associated analyses provided to EPA predict modeled design values of $SO_2$ concentrations below the $SO_2$ NAAQS. Therefore, it is imperative that the input data and AERMOD configuration are representative and align with EPA air quality modeling guidance to support the decision regarding whether the area is meeting or not meeting the 2010 $SO_2$ NAAQS and the designation of the area impacted by emissions from the Martin Drake Power Plant.

*Comment:* One commenter (0332-AA-Sierra Club) Sierra Club states that nothing in the record suggests that any modeling has ever been conducted that shows the air in Colorado Springs meets the $SO_2$ NAAQS.

*EPA's Response:* EPA agrees that air quality modeling conducted to date has not shown that the air in Colorado Springs meets the 2010 $SO_2$ NAAQS as the EPA finds that any modeling demonstration for this area could not adequately inform a designation decision absent representative meteorological data. This is one reason that, based on available information, the EPA is unable to determine whether the area is meeting or not meeting the 2010 $SO_2$ NAAQS. However, EPA has had significant concerns with the input assumptions and configurations options used in the completed air quality modeling that commenters assert are sufficient information to demonstrate that the area is not meeting the NAAQS. In particular, the completed air quality modeling has not used representative meteorological data (which are not available), appropriate emissions, or configuration options that align with EPA air quality modeling guidance. Given these issues, the predicted $SO_2$ concentrations are most likely too high and not representative for this area. As a result, the model results available to date are not sufficient to enable EPA to determine whether the area impacted by emissions from the Martin Drake Power Plant is meeting the NAAQS.

*Comment:* Two commenters (0307-EDF, 0332-AA-Sierra Club) stated that, based on the extensive available evidence, it would be arbitrary and capricious to designate the Colorado Springs area as anything other than nonattainment for the one hour $SO_2$ NAAQS. Another commenter (0270-APC) expressed concern that, given the available data, an unclassifiable designation would be tantamount to negligence and will potentially mire Colorado Springs Utilities, CDPHE, and EPA in further legal battles with various individuals and environmental groups.

*EPA's Response:* The EPA disagrees that our designation decision is arbitrary, capricious, or negligent. The EPA has fully considered all of the technical information received regarding our intended designation, and has determined that the Colorado Springs area cannot be classified on the basis of available information as meeting or not meeting the 2010 $SO_2$ NAAQS, and that therefore the EPA determines that the area must be designated unclassifiable. For full discussion of the EPA's review and analysis of all available information, see the final Colorado technical support document section regarding the Colorado Springs area and also see the EPA's responses elsewhere in this RTC document Section V.A.

*Comment:* Some commenters (0244-Masias, 0287-Ostrom, 0298-Weise) stated that it is unacceptable for EPA and CDPHE to reject the Sierra Club's modeling and ignore the evidence in the record when making a designation. Commenters stated the EPA must consider the evidence before it and provide substantial contrary evidence supporting its own positions. One commenter (0298-Weise) provided a list of eight findings and questions in support of a nonattainment designation and also three attached letters. One commenter (0219-APC) stated there is no reasonable scientific justification to avoid the conclusion that the air quality is out of compliance with our Clean Air standards and describing this region as "non-classifiable" is scientifically dishonest.

One commenter (0307-EDF) urged the EPA to either rely upon the existing modeling to designate the Colorado Springs area as nonattainment for the $SO_2$ NAAQS or to make the appropriate adjustments to the model and use those model outputs to classify the area as nonattainment. One commenter (0332-AA-Sierra Club) stated that neither the plant-owner, nor the state, nor EPA have provided any modeling whatsoever showing that the air in Colorado Springs meets the NAAQS for $SO_2$. Commenter (0332-AA-Sierra Club) stated that, when CDPHE re-ran Sierra Club's modeling to account for its own criticisms, the adjusted results still showed exceedances of the $SO_2$ NAAQS.

One commenter (0287-Ostrom) stated that CDPHE and CSU have never placed any physical monitors in the foothills on the west side of Colorado Springs, where multiple models show there are the greatest exceedances of $SO_2$. One commenter (0332-AA-Sierra Club) stated that the limited data available from the Highway 24 monitor was outside of the plume of high $SO_2$ concentrations predicted by the model and, thus, consistent with Sierra Club's modeling.

*EPA's Response:* The EPA has considered all of the information before it, and provided significant review of that information and its impact on our final designation decision. This

review, as well as our justification for final designation, can be found in our final technical support document for this designation and also can be found in the EPA's responses elsewhere in this RTC document Section V.A.. The EPA disagrees that our final designation decision is "scientifically dishonest." It is the agency's honest scientific opinion that absent representative meteorological data, the existing modeling is not sufficient to form the basis for a determination that the area is either meeting or not meeting the NAAQS.

The EPA does not agree with many of the modeling configuration options chosen by Sierra Club in their modeling analysis, as discussed in our February 16, 2016, Draft Technical Support Document. The attaining design value from the Highway 24 monitor is not sufficient to compensate for these flaws in the modeling, nor is the lack of historic monitoring in the foothills west of Colorado Springs. The EPA also notes that in the modeling analyses submitted by Air Expertise Colorado (AEC), every violating plume includes the attaining monitor.

According to Clean Air Act section 107(d)(1), it is the responsibility of the states to provide designation recommendations to the EPA following the promulgation of a new NAAQS. The EPA also requested that third parties submit relevant information to assist in this round of designations for the 2010 SO$_2$ NAAQS, and appreciates the commenters having done so. In this instance, both the State and EPA have determined that representative meteorological data with which the Martin Drake Power Plant could adequately be modeled does not exist. Therefore, EPA could not have conducted sufficient modeling to correct the fundamental problem in these modeling runs to determine whether the area meets or does not meet the 2010 SO$_2$ NAAQS, namely, the absence of necessary representative meteorological data.

In regards to Colorado's modeling, the State neither submitted the associated input files nor considered the results of the analysis to be reliable due to the lack of representative meteorological data. Without representative meteorological data or the associated input files, the EPA cannot determine whether the area is meeting or not meeting the 2010 SO$_2$ NAAQS based on Colorado's modeling.

**Comment:** Some commenters (0262-APC, 0270-APC, 0332-AA-Sierra Club) did not agree that a designation decision should be delayed for two years due to availability of meteorological data. One commenter (0262-APC) stated that historical data show a strong correlation between the two sites and that the minor variation of airport versus Drake wind data, in the models, would tend to model lower concentrations, and yet the models show clear violations. The commenter (0262-APC) added that, while data from a tower constructed in October 2015 will be valuable to assess future NAAQS compliance, the best available, and representative data between 2010 and 2015 is the airport data. Another commenter (0270-APC) stated that granting the facility permission to harm our citizens for a minimum of two more years in the face of evidence that requires action would be a dereliction of duty.

Two commenters (0307-EDF, 0332-AA-Sierra Club) stated that the proposed classification appears to rest upon the erroneous conclusion that there is no existing meteorological data that is "representative of meteorological conditions at the Martin Drake Power Plant" that can be used for AERMOD modeling. The commenters stated that (1) the available meteorological data represent a reasonable data set for modeling with AERMOD, and (2) the modeled design values

are not particularly sensitive to the meteorological data used with respect to the attainment analysis. Commenters' letters include a detailed discussion of why the meteorological data used to model the SO$_2$ design values is appropriate.

One commenter (0332-AA-Sierra Club) stated that finalizing an "unclassifiable" designation means that, even if CDPHE were to generate on-site meteorological data, it is unclear on what timeline—if ever—EPA would redesignate the Colorado Springs area. Commenter stated there is no reason for such an open-ended delay in addressing the air pollution problems threatening the residents of Colorado Springs: all the information before the Agency clearly necessitates a nonattainment designation.

Another commenter (0286-CS Utilities) provided a five factor analysis to support an unclassifiable recommendation, including a meteorological analysis to support the conclusion that modeling efforts to date utilizing the airport data should not be considered in the designation determination.

***EPA's Response:*** The EPA does not consider the time needed to be taken to collect onsite meteorological data to be unacceptable in the case of the Martin Drake Power Plant, as the area currently lacks representative meteorological data. EPA further notes that we could revisit this unclassifiable designation after receiving any additional air quality characterization required for Martin Drake under the Data Requirements Rule (80 FR 51052, August 21, 2015). The availability of on-site meteorological data currently being collected could inform future decisions addressing the air quality status of the area. As stated in the DRR, "If the EPA has previously determined through a designation action that sufficient information has not yet been identified to support an attainment or nonattainment designation (*i.e.,* the area was initially designated as unclassifiable), then the additional information required by this rule will be used to inform possible future actions by the EPA or the state (*e.g.,* to determine whether the area is attaining or not attaining the standard, and change designation status)." (80 FR 51084).

As discussed in the final Colorado technical support document and elsewhere in this RTC document Section V.A., the EPA disagrees that the Highway 24 data and Colorado Springs Airport data are similar. Based on the wind rose plots provided to EPA, the wind conditions are significantly different between the two data sets. In particular, the prominent wind directions of the Highway 24 data is northwest and southeast, while the Colorado Springs Airport data is generally north and south-southeast. Further, the Highway 24 data contain wind speeds that are generally lower than those at the Colorado Springs Airport. This information supports EPA's decision that representative meteorological data is needed, such as measurement of meteorological conditions at the Martin Drake Power Plant, given the significant differences among these two data sets alone.

The EPA disagrees that the modeling efforts to date utilizing the airport data should not be considered in the designation determination, but does find that the lack of available representative meteorological data for these modeling analyses prevents EPA from relying on the conclusions of these analyses for the purpose of determining whether the area is meeting or not meeting the 2010 SO$_2$ NAAQS.

*Comment:* Commenters (0307-EDF, 0332-AA-Sierra Club) assert that the lower wind speeds at the Martin Drake Power Plant compared to those at the Colorado Springs Airport would actually lead to higher modeled concentrations if the facility was modeled using on-site meteorological data.

*EPA's Response:* EPA agrees that slower wind speeds measured by the Highway 24 monitor, relative to the Colorado Springs Airport, could potentially generate peak modeled $SO_2$ concentration impacts from the Martin Drake Power Plant that would be higher than the results from AERMOD simulations using the Colorado Springs Airport data. However, EPA cannot confirm this possibility because no modeling has been conducted with the Highway 24 meteorological data which lacks many of the input parameters necessary for use with AERMOD.

*Comment:* One commenter (0321-AEC) provided AERMOD analysis and stated that it shows that the 1-hour $SO_2$ impacts at the Martin Drake are essentially equivalent for the case of using meteorological data from the nearby National Weather Service station, to the results for the case of using onsite meteorological data collected by Colorado Springs Utilities at the Martin Drake site. Commenter stated that the airport meteorological data are fully representative of conditions at the Martin Drake plant. The commenter provided information and access to the EPA for all of the modeling files.

*EPA's Response:* EPA disagrees that the predicted 1-hour $SO_2$ impacts at the Martin Drake Power Plant from an AERMOD simulation that uses the Colorado Springs Utilities SODAR data and an AERMOD simulation that uses the Colorado Springs Airport NWS data are similar. Based on EPA's review of the model results, the AERMOD simulation that uses the SODAR data produces a dominant plume originating from the Martin Drake Power Plant to about 2 km northeast of the Plant, whereas the AERMOD simulation that uses the NWS data produces a plume that generally disperses equally/radially from the Plant to about 2 km in all directions. This information supports EPA's decision that representative meteorological data is needed, such as measurement of meteorological conditions at the Martin Drake Power Plant, given the significant differences among these two data sets alone. EPA also notes that the comparative simulations produced by AEC using the Airport and SODAR data have additional flaws (as discussed in the final Colorado technical support document section for this designation and elsewhere in this RTC document Section V.A.) which make them insufficient for the purposes of informing a determination regarding whether the area is meeting the NAAQS.

*Comment:* Commenter (0307-EDF) stated that the Colorado Springs surface hourly and one-minute data, combined with the upper air data (morning soundings) from the Denver Airport, represent a reasonable data set for modeling with AERMOD.

*EPA's Response:* EPA does not agree that the Colorado Springs airport meteorological data represents a reasonable data set for modeling with AERMOD. AERMOD's meteorological preprocessor program, AERMET, is used to organize and process meteorological data and estimate the necessary boundary layer parameters for dispersion calculations in AERMOD. AERMET processes the meteorological data to generate AERMOD-ready input files for each hour of the simulated time period. The key input variables for AERMET include surface characteristics, wind speed, wind direction, cloud cover, and temperature to adequately represent

26

the meteorology affecting plume transport and dispersion. Therefore, it is important that the data used as inputs to AERMET possess an adequate degree of representativeness to ensure that the wind, temperature and turbulence profiles derived by AERMOD are both laterally and vertically representative of the source area. Furthermore, similar emphasis should be given to assessing the representativeness of the surface characteristics, particularly for areas where surface conditions vary significantly (i.e., complex terrain), to ensure adequate characterization of the transport and dispersion between the source(s) of concern and area(s) where maximum design concentrations are anticipated to occur. Given this information, AERMET has the ability to capture various drainage flows and variable meteorological conditions by hourly time periods, providing that these conditions are represented within the meteorological data. This means that as long as representative meteorological data are used in AERMOD, AERMOD will have the capacity to account for any unique drainage flows and meteorological conditions that exist in the analysis domain.

EPA was provided meteorological data from a sound detection and ranging (SODAR) tower located on-site at the Martin Drake Power Plant (hereafter referred to as "on-site meteorological data"). This on-site meteorological data were collected between October 18, 2015, and December 31, 2015. In EPA's analysis of the on-site meteorological data and corresponding National Weather Service meteorological data from the Colorado Springs Airport (hereafter referred to as "NWS meteorological data"), EPA identified significant differences among the two data sets. In particular, wind rose plots show that the dominant wind direction of the on-site meteorological data during this timeframe is from the north-west, and consistently lower wind speeds, while the dominant wind directions of the NWS meteorological data are from the north and south, with wind speeds consistently higher. Note that the on-site meteorological data was only collected for a short time period, where the differences in meteorological conditions among the on-site and NWS meteorological data sets are likely to be even more evident during other times of the year. This is because the increased heating during the summer months is likely to generate more variable meteorological conditions, including more diverse wind patterns.

Further, aerial images of the terrain and surface characteristics where the on-site and NWS meteorological data were collected are significantly different. The on-site tower (i.e, Martin Drake Power Plant) is surrounded by urban development in the immediate vicinity and a steep elevation increase from the mountains within five kilometers to the west of the plant, while the NWS station (i.e., Colorado Springs Airport) does not have urban development in the immediate vicinity (i.e., closest development about 3 kilometers) and higher terrain (though to a much lesser extent than the elevation gain west of Martin Drake)[2] begins about 8 kilometers to the north. Additional information regarding the representativeness of the NWS meteorological data or the Colorado Springs Airport data is also provided in EPA's draft and final technical support documents.

Given the significance differences between on-site and NWS meteorological data sets due to the unique topographical features near Martin Drake Power Plant and AERMOD's sensitivity to these differences (i.e., wind speed and direction and surface characteristics), representative meteorological data is imperative in order for AERMOD to accurately predict $SO_2$

---

[2] The highest elevation increase near the airport is of roughly 600 feet, which is at a peak about 10 kilometers to the northeast.

concentrations in this area. In the absence of that representative meteorological data, EPA is unable based on the provided modeling or available information to determine whether the area is meeting or not meeting the 2010 $SO_2$ NAAQS.

*Comment:* One commenter (0307-EDF) states that Colorado was incorrect regarding its assertions about upper air meteorological data. The commenter went into detail regarding the influence of upper air data when using AERMOD, arguing that it is less influential than the State has asserted.

*EPA's Response:* EPA disagrees that vertical measurements are not important and disagrees that AERMOD can make accurate predictions without upper air measurements. It also appears that the commenters are confusing or intermixing the purposes of upper air data and vertical profiles for transport. A full morning upper air sounding is a required input for AERMET in order to calculate the convective mixing height throughout the day. Without this information, AERMOD cannot estimate the convective parameters that impact the transport and dispersion of a plume. Vertical measurements of meteorological conditions or wind profiles for the plume transport (i.e., multi-level tower) are also important for constructing realistic vertical profiles of wind direction, wind speed, temperature, vertical potential temperature gradient, and vertical and lateral turbulence. These measurements are most important in applications involving complex terrain (like the Martin Drake Power Plant) to accurately capture the relationship between the plume and receptor heights. While upper air and vertical profiles of meteorological data are sparse and may not be as imperative as meteorological conditions at the surface, these data are important for modeling the plume transport accurately, particularly in complex terrain. Given that unique terrain features are in close proximity to the Martin Drake Power Plant, representative upper air measurements and vertical measurement are needed to accurately predict the transport and dispersion of the emissions from this facility, and to enable EPA to determine based on a modeling analysis whether the area is meeting the NAAQS. Therefore, if it is feasible to set up a multi-level meteorological tower at or near the site, this option would be preferable over meteorological data collected from distant locations, especially in areas with complex terrain.

*Comment:* One commenter (0307 – EDF) stated that the modeled design values for the Martin Drake facility are not particularly sensitive to the meteorological data used with respect to the attainment analysis.

*EPA's Response:* EPA does not agree that the modeled design values for the Martin Drake facility are not sensitive to the meteorological data used by the commenter with respect to the attainment analysis. The analysis provided to EPA to support this comment was based on running AERMOD with eight different meteorological data sets and calculating the modeled design value $SO_2$ concentrations. The meteorological data sets included:
1. Albuquerque, NM;
2. Bakersfield, CA;
3. Columbus, OH;
4. Jefferson County, MO;
5. Rochester, MN;
6. Rome, GA;
7. Colorado Springs Airport, CO; and

28

8. Colorado Springs Highway 24 Monitor, CO.

The results of the simulations completed by the commenter predicted modeled design values of $SO_2$ concentrations between about 190 μg/m$^3$ and 402 μg/m$^3$. While all but one site (Bakersfield, CA) predicted $SO_2$ concentrations above the NAAQS, the analysis has many deficiencies that prohibit the interpretation of the results in an appropriate and accurate manner, and used assumptions that are not representative for this area or do not align with EPA air quality modeling guidance. In merely reviewing the modeled design values of $SO_2$ concentrations from the various AERMOD simulations provided by the commenter (Gray, page 7/table7), unlike the conclusion provided in this comment, the modeled results are indeed significantly sensitive to the meteorological data sets given that the modeled design values of $SO_2$ concentrations range from 190 μg/m$^3$ and 402 μg/m$^3$. This suggests that the modeled design values of $SO_2$ concentrations could change by a factor of two depending on the meteorological data set. Additionally, based on EPA's analysis of the AERMOD output from the simulations provided by commenter, EPA found that the location of the modeled design values of $SO_2$ concentrations changed significantly depending on the meteorological data set used in AERMOD.

In regards to the AERMOD configuration used for these simulations, the analysis provided by the commenter does not use configuration options that align with EPA air quality modeling guidance. Based on EPA's analysis of the AERMOD output from the simulations provided by commenter, EPA found that most of the modeled design values of $SO_2$ concentrations could potentially be found on the secured facility's property, inside the fence, to which the public does not have access. If the analysis was consistent with EPA's air quality modeling guidance, the receptors associated with the modeled design values of $SO_2$ concentrations from the commenter's analysis would have been excluded, resulting in modeled design values of $SO_2$ concentrations that would most likely be significantly lower. Furthermore, the simulations assumed values for the population density that are too high. These simulations assumed an unsupported population density of 668,000, which based on United States Census Bureau reports should be around 416,000 people. Some of the simulations also used older versions of AERMET (12345, 13350, 14134) that do not include bug fixes and enhancements that improve the performance of AERMET (e.g., mixing heights, minimum wind thresholds, cloud cover values, bulk Richardson scheme). Using the configuration options and input assumptions selected by the commenter, particularly including receptors on the facility's secured property, are most likely contributing to modeled design values of $SO_2$ concentrations that are too high.

In other words, the modeled design values of $SO_2$ concentrations could potentially be significantly lower, if more appropriate configuration options and representative input assumptions were utilized in these AERMOD simulations, aside from the central issues resulting from the use of unrepresentative meteorological data sets.

The EPA was provided the meteorological data sets from the eight sites used in this analysis. In EPA's analysis of meteorological data sets, EPA identified significant differences among the eight data sets. In particular, wind rose plots show that the dominant wind directions and range of wind speeds of the data sets vary greatly among the selected meteorological data sets. EPA was also provided meteorological data from the SODAR tower located on-site at the Martin Drake plant. In EPA's analysis, none of the data sets used by the commenter are similar to or representative of the on-site meteorological data. Further, aerial images of the terrain and surface

29

characteristics where the meteorological data sets were collected are significantly different from each other and, more importantly, from the location of the Martin Drake Power Plant in Colorado Springs, Colorado.

Given that AERMOD's meteorological preprocessor program, AERMET, requires the input of surface characteristics, wind speed, wind direction, cloud cover, and temperature to estimate the necessary parameters for the dispersion calculations in AERMOD, it is of paramount importance that the data used as input to AERMET are representative to adequately represent the meteorology affecting plume transport and dispersion. Given this information, AERMET has the ability to capture various drainage flows and variable meteorological conditions by hourly time periods, providing that these conditions are represented within the meteorological data. This means that as long as representative meteorological data are used in AERMOD, AERMOD will have the capacity to account for any unique drainage flows and meteorological conditions that exist in the analysis domain.

As a result, representative meteorological and emissions data, along with AERMOD configurations that align with EPA guidance, are needed to accurately predict the modeled design values of $SO_2$ concentrations for this area. Based on the information provided, the predicted $SO_2$ concentrations for the Martin Drake facility are sensitive to these parameters, generating modeled design values for the facility that could potentially be below the NAAQS if other, more representative input data and configuration assumptions were utilized in the analyses. Without representative meteorological data, the EPA determines that the area is unable to be classified based on the provided modeling or available information whether it meets or does not meet the 2010 $SO_2$ NAAQS.

*Comment:* One commenter (0307 – EDF) stated that AERMOD can accurately predict peak concentrations as long as the general dispersive nature of the atmosphere is reasonably well represented by the meteorological data used by the model. The commenter further states that the wind data used in AERMOD does not need characterize the upslope and drainage flows associated with the nearby terrain features, so long as the wind data adequately represent the distribution of dispersive conditions of the atmosphere and for the model to be able to accurately predict the peak distribution of ambient concentrations.

*EPA's Response:* EPA agrees that AERMOD has the ability to provide reliable statistical distributions of the daily peak hourly average $SO_2$ concentration. However, EPA does not agree that it is not necessary for the meteorological data used in AERMOD to characterize the drainage flows and other meteorological conditions in order to accurately predict peak distributions of $SO_2$ concentrations. The reliability of AERMOD's predictions are strongly dependent on the representativeness of the input assumptions, surface characteristics, and primary atmospheric input variables, including wind speed and direction, temperature, and cloud cover. These input variables provide the information for AERMOD to characterize the drainage flows and meteorological conditions associated with terrain features in order to predict the transport and distributions of $SO_2$ concentrations. Therefore, as long as representative input information, such as meteorological data, are used in AERMOD, AERMOD will have the capacity to account for any unique drainage flows and meteorological conditions that exist in the analysis domain. Further, the accuracy of the peak $SO_2$ concentrations not only depends on the magnitude of the

predicted concentrations but also the location of the peak concentrations or the dispersion of the plume that forms the peak concentrations. The relationship between the dispersion of the plume and the calculation of the $SO_2$ design values is strongly dependent on representative input information, where differences in the transport and dispersion of the pollutant will impact the estimation of the peak concentrations because the distribution of the concentrations will change based on the input information used to estimate the dispersion of the pollutants.

As discussed further above, based on EPA's review of the AERMOD modeling analyses provided by the commenters, it is evident that AERMOD is sensitive to the use of various input variables. The modeling analyses provided by the commenter used various meteorological and emissions data and different configuration options. The results from these AERMOD simulations illustrate that the predicted peak hourly average $SO_2$ concentration changes significantly in magnitude and location. Therefore, it is imperative to ensure that input information used in AERMOD is representative in order to estimate accurate modeled design values of $SO_2$ concentrations for this area.

*Comment:* One commenter (0307-EDF) asserted that AERMOD is capable of reliably predicting peak concentrations using airport data much further than the distance from the Martin Drake Power Plant to the airport NWS station (11 km).

*EPA's Response:* EPA agrees that it is acceptable in some cases to use meteorological data collected at an airport NWS station that may be located a significant distance from the modeled source. However, where the meteorological data collected at the airports were utilized in regulatory application of AERMOD, the data have been representative of the meteorological conditions at the location of the modeled source. As EPA explained in the February 16, 2016, draft technical support document, the meteorological data collected at the Colorado Springs airport, instead, is not representative of the meteorological conditions and surface characteristics at the location of the Martin Drake Power Plant, and the most recent meteorological data from the SODAR tower located on-site at the Martin Drake plant have significant differences in wind speed and direction compared to the data from the Colorado Springs Airport data. Therefore, EPA does not consider this case to be one in which it is accurate to accept the airport data collected at some distances from the modeled source as providing representative information of the meteorological conditions at the modeled source.

*Comment:* One commenter (EDF-0307) asserted that EPA's emphasis on representative meteorological data is unnecessary because AERMOD does not pick up on meteorological subtleties, specifically stating that the AERMOD model does not simulate air pollutant transport around complex terrain features.

*EPA's Response:* EPA does not agree that AERMOD cannot simulate the transport of air pollutants in complex terrain. EPA air quality guidance recommends AERMOD as the preferred near-field model, even in complex terrain. AERMOD's meteorological preprocessor program, AERMET, is used to organize and process meteorological data and estimate the necessary boundary layer parameters for dispersion calculations in AERMOD. The key input variables for AERMET include surface characteristics, wind speed, wind direction, cloud cover, and temperature to adequately represent the meteorology affecting plume transport and dispersion.

31

Therefore, it is of paramount importance that the data used as inputs to AERMET possess an adequate degree of representativeness to ensure that the wind, temperature and turbulence profiles derived by AERMOD are both laterally and vertically representative of the source area. Furthermore, similar emphasis should be given to assessing the representativeness of the surface characteristics, particularly for areas where surface conditions vary significantly (i.e., complex terrain), to ensure adequate characterization of the transport and dispersion between the source(s) of concern and area(s) where maximum design concentrations are anticipated to occur. Given this information, AERMET has the ability to capture various drainage flows and variable meteorological conditions providing that these conditions are represented within the meteorological data. This means that as long as representative meteorological data are used in AERMOD, AERMOD will have the capacity to account for any unique drainage flows and meteorological conditions that exist in the analysis domain.

*Comment:* One commenter (0307-EDF) stated that wind speed and direction are specifically inconsequential to AERMOD results.

*EPA's Response:* EPA does not agree that wind direction is not important to plume dispersion and concentrations predicted by AERMOD. In particular, wind direction is important in AERMOD for estimating the impacts that building downwash and complex terrain have on the dispersion and transport of the plume. Without representative wind direction data, the dispersion of the plume will be impacted, subsequently making it difficult for AERMOD to predict accurate concentrations for this area. According to studies referenced in EPA's Appendix W Guidelines,[3] uncertainty of 5 to 10 degrees in the measured wind direction, which transports the plume, can result in concentration errors of 20 to 70 percent for a particular time and location, depending on stability and station location.

*Comment:* Some commenters (0249-APC, 0263-Colorado groups and citizens, 0298-Weise) stated that the pollutants from the Martin Drake plant have a disproportionate effect on these low-income and minority communities, those who are most vulnerable and least able to advocate for the health of their community. Some commenters (0227-Permut) expressed concern about air quality in the area. One commenter (0249-APC) stated that a designation of nonattainment is the only way to allow for swift and necessary action to stop harmful emissions, and provide sufficient oversight to protect public health to ensure the air we breathe is safe.

*EPA's Response:* EPA agrees that $SO_2$ pollution can be very harmful to public health, which is why EPA established the 2010 $SO_2$ NAAQS for the pollutant. As we explained in the preamble to the final SO2 NAAQS, the prevalence and severity of asthma is higher among certain ethnic or racial groups and in minority and inner-city communities, which indicates that exposure to ambient SO2 could have a significant impact on the public health of these groups and communities.  75 FR at 35527.  We also agree that it is necessary to designate areas nonattainment when the available information demonstrates that an area is not meeting the NAAQS and therefore indicates that such a designation is appropriate so that harmful pollution problems must be addressed through a required state implementation plan leading to expeditious

---

[3] 40 CFR Part 51: Revision to the Guideline on Air Quality Models: Adoption of the Preferred General Purpose (Flat and Complex Terrain) Dispersion Model and Other Revisions; Final Rule, November 9, 2005.

future NAAQS attainment. However, as EPA has determined that based on currently available information the area cannot be classified as meeting or not meeting the NAAQS, it is not appropriate for the EPA to designate it as nonattainment.

*Comment:* One commenter (0226-APC) stated this is not a health issue, but an attempt to close a power plant that operates very efficiently and releases a steam cloud. Commenter cautioned to not be influenced by this radical group of individuals.

*EPA's Response:* The EPA does not agree that designation under the 2010 SO$_2$ NAAQS is not an issue of health, as the primary NAAQS are set with the purpose of protecting public health with an adequate margin of safety, and the EPA has made the designation determinations in this action based upon its own review and technical analysis of all available information.

*Comment:* One commenter (0254-Goins) opposed a designation to nonattainment until more monitoring is conducted at ground level. The commenter stated that, given that past monitoring showed the area was not close to exceeding the standard and with no change to coal fired sources, it does not make sense that the area would all of a sudden be exceeding the standard.

*EPA's Response:* The EPA agrees that there is not sufficient technical information to determine whether the area around the Martin Drake Power Plant is meeting or is not meeting the 2010 SO$_2$ NAAQS. However, the EPA disagrees that ambient air monitoring is the only way the area can be characterized in the future to inform any potential redesignation of the area for this NAAQS.

*Comment:* One commenter (0286-CS Utilities) recommended the unclassifiable area be limited to the City of Colorado Springs west of Academy Blvd. Commenter provided a five factor analysis to support its recommendation. Commenter stated that air quality monitoring throughout El Paso County at numerous monitoring stations from 1988 through the present has consistently shown attainment of the 2010 sulfur dioxide NAAQS. Commenter suggested that it is necessary to update the emissions and emission controls factor analysis to include the announced decommissioning of Drake Unit 5.

One commenter (0321-AEC) stated that analyses completed by AEC support a designation of nonattainment for the 1-hour SO$_2$ NAAQS for an approximately five square-kilometer area around the Martin Drake plant in Colorado Springs, Colorado. The commenter provided information and access to the EPA for all of the modeling files.

One commenter (CO Response) recommended an unclassifiable designation for the area surrounding Drake Power Plant and attached a TSD (CO Response Attachment 1) that provides detailed information for the specific boundary recommendation. The commenter stated the TSD analyzes each of the five factors set forth in EPA's March 20, 2015 memorandum. The commenter stated that the TSD shows that their designation boundary recommendations are accurate and supportable for EPA approval and stated that the boundaries are based on guidelines

33

in EPA's Modeling TAD and an EPA memo issued March 1, 2011 as well as other factors. The commenter recommended a boundary around a portion of the city of Colorado Springs, including enclosed unincorporated county areas, bounded to the north by East Woodmen Road, North Academy Boulevard, and city limits, to the east by North/South Powers Boulevard, and to the south and west by city limits, with the addition of the census designated place termed "Stratmoor" bounded by South Academy Boulevard. As described in detail in the TSD, commenter stated this recommendation is based on the following information:

- Preliminary monitoring and emissions-related data shows that this boundary incorporates the primary source (Martin Drake Power Plant). Emissions from the only other notable $SO_2$ source in the vicinity are in a separate airshed;
- Meteorological and topographical information indicate that potential impacts would be contained within this boundary;
- The mountains that generally begin just to the west of the cities of Colorado Springs and Manitou Springs constitute a geographical boundary limit;
- Basing the area boundary on the guideline 10 km radius for a modeling domain is not appropriate because of the complex terrain and urban demographics;
- Affected populations, including sensitive subpopulations, within the city of Colorado Springs, including those living in unincorporated enclosed county areas, and the city of Manitou Springs are located within this boundary. EPA has previously approved area boundaries for other Round 2 $SO_2$ designation boundaries that align with roadways, rather than the outermost jurisdictional boundaries of a unit of local government.

*EPA's Response:* The EPA considers the updated boundary recommendations submitted by Colorado to be appropriate for the final designation of this unclassifiable area. See the final Colorado technical support document for this designation for the complete rationale.

## B. Morgan County

*Comment:* One commenter (CO Response) recommended an unclassifiable designation for the area surrounding Pawnee Power Plant and attached a TSD (CO Response Attachment 1) that provides detailed information for the specific boundary recommendation. The commenter stated the TSD analyzes each of the five factors set forth in EPA's March 20, 2015 memorandum. The commenter stated that the TSD shows that their designation boundary recommendations are accurate and supportable for EPA approval and stated that the boundaries are based on guidelines in EPA's Modeling TAD and an EPA memo issued March 1, 2011 as well as other factors. As described in more detail in the TSD, commenter recommended a radius of 10 kilometers around the Pawnee Power Plant as the boundary for the unclassifiable designation based on the following information:

- EPA's Modeling TAD and March 1, 2011 Memo distance guidelines indicate that a 10 km radius normally establishes an appropriate modeling domain. $SO_2$ modeling for the area around the Pawnee Power Plant will not be completed before the court ordered deadline for making Round 2 designations. No $SO_2$ ambient monitoring data is available

for this area. Without completed modeling results or ambient monitoring data, it is appropriate to base the $SO_2$ area boundary on the 10 km radius outlined in EPA's March 1, 2011 Memo;

- $SO_2$ emissions from the Pawnee Power Plant have been significantly reduced since the installation of the semi-dry lime scrubber in 2014. Emissions from Cargill Meat Solutions are captured by the 10 km radius. The Western Sugar Cooperative facility is located further than 10 km from the Pawnee Power Plant, and has significantly lower emissions than the power plant;
- There are no significant meteorological, geographical or topographical features that make the 10 km radius an inappropriate area designation boundary;
- The nearby town of Brush and the affected areas of the city of Fort Morgan closest to the Pawnee Power Plant are included in this proposed radius.

*EPA's Response:* The EPA's review of Colorado's updated designation recommendation can be found in the final Colorado technical support document for this designation.

## VI. Georgia

### A. Juliette

*Comment:* One commenter (0291-GA Power) generally supported the EPA's response and technical analysis, with the following exceptions: (1) the deferral of designations for Bibb County, and (2) the use of a background concentration that may already include impacts from Plant Scherer.

*EPA's Response:* The EPA acknowledges the Commenter's support of the EPA's considerations for the Robert W. Scherer Power Plant in the Juliette, Georgia, Area. Regarding the two exceptions asserted by the Commenter, please refer to the separate responses below.

*Comment:* One commenter (0291-GA Power) stated the EPA should not defer designation of Bibb County for the following reasons: (1) the state's modeling and analyses already show attainment; (2) the state has a population-based air quality monitor in the county that has been consistently monitoring attainment; and (3) there are no individual or collection of sources in Bibb County or neighboring counties that will be required to conduct source-specific modeling or monitoring under the consent decree or the Data Requirements Rule (DRR) for purposes of the remaining area designations in 2017 or 2020. Additional details on these points is provided in the Commenter's letter.

*The EPA's Response:* On March 2, 2015, the U.S. District Court for the Northern District of California issued a court order requiring the EPA to complete designations for the 2010 1-hour $SO_2$ NAAQS by three future deadlines. Phase 1 requires the EPA to designate areas by July 2, 2016 (16 months from the court's order) for 1) areas that have newly monitored violations of the 2010 $SO_2$ NAAQS, and (2) areas that contain any stationary sources that had not been announced as of March 2, 2015, for retirement and that, according to the EPA's Air Markets Database,

35

emitted in 2012 either: (i) more than 16,000 tons of $SO_2$, or (ii) more than 2,600 tons of $SO_2$ with an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU). Phase 2 requires the EPA, by December 31, 2017, to finalize designations for remaining undesignated areas in which, by January 1, 2017, states have not installed and begun operating new $SO_2$ monitoring networks meeting EPA's specifications. Finally, Phase 3 requires the EPA, by December 31, 2020, to designate all remaining undesignated areas. The EPA notes that the court-ordered designations schedule for Phase 2 and 3 will be informed and benefited by any additional information that is timely obtained pursuant to the DRR.

Bibb County does not contain a source that meets the criteria, as specified in the consent decree, for the designations due by July 2, 2016. Furthermore, the Commenter did not provide any comment to the contrary. As the EPA noted in the final Georgia TSD, the Agency intends to designate Bibb County and all other remaining undesignated areas of Georgia not addressed in this action by either December 31, 2017, or December 31, 2020, consistent with the deadlines of the March 2, 2015, final court ordered consent decree.  The EPA believes that in this case it is reasonable to limit the scope of our final designations in the current round to those areas that met the criteria for being required to be designated now.  This will provide a more complete opportunity for states and the EPA to fully implement its carefully developed strategy for implementation of the 2010 $SO_2$ NAAQS.

*Comment:* One Commenter (0291-GA Power) asserted that the TSD for the Juliette, Georgia, Area provides an overly conservative analysis regarding background concentrations. Specifically, the commenter suggests that the background concentration from the Bibb County monitor (AQS Site ID: 130210012) may already include impacts from Plant Scherer suggesting double counting the source's impacts. The Commenter goes on to suggest that further analysis should have been performed to determine if Plant Scherer was impacting the monitor. Lastly, the Commenter asserts that their analysis indicates that Plant Scherer impacts the monitor in a 45° sector downwind of the source and therefore monitored values measured while winds were blowing in this sector results in a background concentration of 11 ppb and therefore EPA should revise the TSD to incorporate an adjusted background concentration of 11 parts per billion (ppb), rather than 15 ppb.

*The EPA's Response:* The EPA disagrees with the Commenter's assertion that the background concentration represents an overly conservative analysis. As discussed in the EPA's final Georgia TSD, the Agency finds that the Bibb County monitor provides the most representative background concentration for the modeling due to its proximity to the area of analysis. The EPA has reviewed the additional information provided by the Commenter and has concluded that the Commenter's analysis of the Bibb County monitor data does show the potential for impacts from Plant Scherer's emissions to be included in the monitored background value (i.e., potential for double counting). The Commenter presented information to show that the 99th percentile monitored values at the Bibb County monitor in 2012 and 2013 occurred during hours when the winds were blowing from the direction of Plant Scherer. Therefore, use of the design value from the Bibb County monitor likely adds some level of conservativism to the modeled estimate of ambient impacts in the area around Plant Scherer. However, this only serves to reinforce the EPA's decision to designate the area around Plant Scherer as unclassifiable/attainment.

# VIII. Illinois

## A. Alton Township

*Comment:* One commenter (0315-Alton Steel) requested that the EPA reject the State's recommendation and include the Alton Township Area in the larger unclassifiable area so that the region's overall attainment status can be comprehensively addressed using more reliable data at a later stage of this designation process. Commenter did not agree that Alton Steel, which was identified as a 38-40 tpy $SO_2$ source, alone caused the Alton Township Area to be classified as nonattainment, while Wood River -- a 6,700 – 7,600 tpy $SO_2$ source less than 2,500 meters away -- was deemed "unclassifiable" and presumed not to be contributing to Alton Township's nonattainment. Commenter stated that the only reason the Alton Township Area was included in EPA's initial round of $SO_2$ designations was its proximity to the Wood River Power Station.

Commenter (0315-Alton Steel) stated that, while Illinois EPA's recommended designation of the Alton Township Area is based on the State's use of AERMOD, the State's modeling is unsuitable for several reasons, including: it is a deterministic model, there are little to no actual emissions data, it has an inability to properly account for heated releases, it was run on incorrect and incomplete data, and it is known to over-predict emissions in low-wind and downwash areas. Commenter stated that Illinois EPA could have validated the model by including modeled results at the location of two nearby $SO_2$ monitors, which have not recorded an $SO_2$ exceedance. In the commenter's letter additional details are provided on these points.

The commenter asserts that "the model utilized incomplete and, in many cases, incorrect data," and expresses particular concern about the emissions data that Illinois used. The commenter states that "emissions [for the ladle metallurgy facility (LMF)] were based on the industry emission factor that was higher than Alton Steel's stack testing results throughout the majority of the stack test." The commenter asserts that a number of the features of AERMOD make it unsuitable for determining the attainment status of the area near Alton Steel. The commenter asserts that "AERMOD is a deterministic model for [addressing] a snapshot in time," whereas the standard "is a probabilistic standard . . . [the results of which] require significant refinement to realistically address the frequency of the peak short-term impacts that are the output of the model." The commenter asserts that "the downwash formulation in AERMOD have known formulation deficiencies which may cause unrealistically high concentration predictions," The commenter asserts that the plume, emanating from a ladle metallurgy facility, has significant buoyancy that Illinois' modeling does not properly address.

The commenter asserts that AERMOD is "known to over-predict emissions in low-wind areas," but EPA "failed to properly account for the relative absence of wind around the [critical] receptors." The commenter also stated that "multiple conditions present [at the 14 receptors with 'potential' exceedances] reflect factors well known . . . as leading to AERMOD's significant

overestimation," and that the result of Illinois' failure "to properly account for those factors" was the exclusion of a much larger source from the nonattainment area and the identification of a "'hot spot' requiring only a very small nonattainment designation. Commenter (0315-Alton Steel) stated that, given the flaws in Illinois EPA's modeling effort, if EPA were to adopt Illinois EPA's recommendations for the Alton Township Area, that decision would be arbitrary, capricious and an abuse of its discretion under the Clean Air Act. Commenter stated that the modeling effort conducted thus far is sufficient only to support a decision to place a monitor in the area of the allegedly violating receptors.

***EPA's Response:***

Under a court order, EPA is obligated to designate the area around the Wood River power plant by July 2, 2016, and EPA to designate the remainder of the country (excepting areas newly monitoring according to specified criteria) by December 31, 2017. Illinois has provided pertinent information and recommendations regarding an area near the Wood River power plant that includes all of Wood River Township, a portion of Chouteau Township, and a portion of Alton Township that includes Alton Steel. Alton Township is nearby the Wood River power plant. Specifically, it is directly adjacent to the Wood River Township and the Wood River power plant. Upon consideration of the State's recommendations, based on its own modeling which followed EPA's modeling TAD, EPA finds that there is persuasive evidence regarding the air quality in this portion of Alton Township which warrants a finding that the area is not meeting the NAAQS and a nonattainment designation, and EPA is making this designation under the EPA's Clean Air Act section 107 authority.

As mandated under Clean Air Act section 107, EPA has evaluated both the area that is violating the air quality standard and any nearby sources that may be contributing to that violation. Through this evaluation, EPA reviewed modeled violations in the immediate vicinity of Alton Steel. EPA further analyzed whether the Wood River power plant should be considered to contribute to these violations; EPA's proposed designation reflected the EPA's finding that "the critical day impacts of the [Wood River] power plant at the location of modeled violations at the fenceline of Alton Steel are likely to be minimal." As stated in the technical support document for the proposed designation, exceedances of the standard at the locations of modeled violations primarily occur with southwest winds, when emissions from the Wood River power plant are being transported well to the east of the area of violations. Despite the disparity in tons per year of emissions noted by the commenter, the commenter provides no evidence that emissions from the power plant are having more than a de minimis impact on concentrations near Alton Steel at times when concentrations above the standard are occurring. While the commenter implies that the modest emissions from Alton Steel cannot alone be the cause of violations, particularly with a much larger source a few kilometers away, EPA finds that, based on our technical knowledge of the nature of $SO_2$ emissions and our analysis of Illinois' modeling results, as further detailed in the Illinois final TSD, available information provides convincing evidence to support our conclusion that in fact the Wood River power plant (with most of its impact occurring elsewhere on occasions of violations near Alton Steel) does not contribute to the modeled violations near

Alton Steel and that Alton Steel (with relatively short stacks and significant building downwash) does contribute to those violations.

While the commenter objects to Illinois' emission factor, the commenter does not provide quantitative evidence with which to judge how accurate Illinois' emission factor was in representing average emissions from the LMF, including the portions of the stack test when results apparently exceeded the industry emission factor. For example, batch processes in which emissions are elevated only a minority of the time would by definition have lower emissions "throughout the majority of the stack test," but the comment sidesteps the question of whether the emission factor is accurate considering the entirety of the stack test. The commenter does not explain how use of an average emission rate (uniformly distributing Alton Steel's annual emissions) can result in overestimating Alton Steel's actual emissions, nor does the commenter explain why a mix of understating and overstating hourly emission rates wouldn't be just as likely to understate as to overstate the impacts of this facility. Given that the commenter has not provided quantitative evidence as to the degree to which Illinois has allegedly overstated emissions (and presumably at other times understated emissions), and given the substantial margin by which estimated concentrations exceed the standard, EPA finds that the available evidence is adequate to conclude that the area is violating the standard.

Contrary to the commenter's objections based on the design of AERMOD, AERMOD is in fact designed to use a representative set of meteorological data (in this case for the 3 years of 2012 to 2014), to estimate the ensemble of concentrations over that time, and from that ensemble to judge the expected 99th percentile of daily maximum concentrations at each modeled location. The commenter has not identified any further refinements that would be needed to estimate design concentrations for the area, nor has the commenter identified any reason that this approach inherent in using AERMOD has any tendency to over- or underestimate the design value that can be expected.

The commenter provides no evidence or justification for its assertion regarding deficiencies in the treatment of downwash in AERMOD. EPA continues to maintain the position that the downwash formulation in AERMOD provides the best available means of estimating the increase in concentrations associated with the downwash phenomenon.

To evaluate comments regarding buoyancy at Alton Steel, EPA must consider the configuration at the facility. At this facility, the vents are positioned adjacent to a building that is roughly three times the height of the vents, and the discharge is in a downward direction. Therefore, the dominant dispersion phenomenon is the downwash/dilution of the plume caused by the building structure, and the buoyancy of the plume would likely be inadequate to escape the building wake influences.

The standard approach for modeling a horizontal (or downward) discharge of emissions is detailed in the AERMOD Implementation Guide (2009) document. This document discusses both horizontal discharge and rain-capped stacks for situations with and without building downwash. The approach for a horizontal release or a capped stack in a situation with building downwash utilizes a minimal exit velocity to account for the zero momentum rise the

release.   The actual stack diameter and exit gas temperature are used in the modeling.  The consequence of this is that plume rise is limited both in terms of momentum and buoyancy.   Illinois' modeling approach used this approach.

EPA has also developed a beta option for capped stacks and horizontal releases, i.e. the POINTCAP and POINTHOR options that further consider buoyancy.  However, Illinois did not request use of these options, and neither Illinois nor the commenter provided the necessary justification for their use.  Furthermore, given the immediate proximity of the release to a substantially taller building, the dominant influence on concentrations will likely be the building wake effects, and it appears unlikely that the buoyancy of the plume would influence concentrations sufficiently to indicate attainment.  The commenter provided no evidence that Illinois' approach significantly overestimated impacts.  Therefore, EPA finds that Illinois' modeling approach provides reasonable estimates of concentrations in the area.

Regarding comments relating to low wind situations, the commenter did not document or support any rationale that the treatment of low wind conditions is causing an overestimation of concentrations near Alton Steel.  Similarly, regarding factors allegedly causing AERMOD to overestimate concentrations, which are purported to result in exclusion of the Wood River power plant from the recommended nonattainment area, the commenter does not identify and provides no explanation of the allegedly problematic factors, and so the commenter provides no information for EPA to consider within any portion of the analysis supporting designating the area near Alton Steel as nonattainment.

While Illinois did not obtain or use hourly emission data for this facility, Illinois has used the best available emissions data.  The commenter has provided no reason to believe that more detailed emission data would yield a different result as to whether this area is violating the standard, particularly given the margin by which the area is estimated to be violating the standard, and so EPA views our analysis of this comment and the Illinois modeling as providing a reasonable basis for EPA to conclude that the area is violating the NAAQS and that a nonattainment designation is warranted.

**Comment:** Commenter (0315-Alton Steel) disagreed with the selected receptor locations because they do not represent locations that could have an actual $SO_2$ monitor located at them.  Commenter stated that many, if not all of these receptors are located where it would not be possible to locate a $SO_2$ monitor given the presence of a railroad track and a railroad right-of way.

**EPA's Response:**

The TAD provides the option not to place receptors at locations where monitoring is not feasible, but states nevertheless retain the option to consider concentrations estimated at such ambient air locations.  In any case, a careful review of the location of the violating receptors does not show these receptors to be located on railroad tracks, and instead shows that the receptors are located at ambient air locations where monitoring is feasible and therefore should be included when

40

modeling to adequately characterize air quality. Furthermore, the fact that 14 separate receptors show modeled violations suggests that even if the commenter had identified receptors of concern and had proposed alternate nearby locations as replacement receptors, these replacement receptors would likely have shown violations as well. Illustrative of this point is the fact that two of Illinois' receptors, located 13 meters apart on opposite sides of the railroad tracks, are estimated to have nearly identical concentrations, both approximately twice the standard. A public road with numerous businesses on the near side is about 100 meters from the railroad track, and the commenter has provided no evidence to dispute the conclusion that many of these locations, which clearly represent appropriate locations to monitor, are within an area that EPA's analysis has determined is violating the standard.

*Comment:* Commenter (0315-Alton Steel) objects that Illinois did not use monitoring data from two monitors in Madison County to assess model performance, which the commenter presumes would have demonstrated the over-conservatism of the model. The commenter recommends that EPA defer designating the area and provide for the attainment status to be "comprehensively addressed using more reliable data at a later stage of this designation process."

*EPA's Response:*

The monitors that the commenter seeks to be used for model performance evaluation purposes are approximately 5 and 10 kilometers from the Alton Steel facility, respectively. Given the short range of the influence of downwash on ambient concentrations, especially given the short stacks present at the Alton Steel facility which limits dispersion, these monitors are far too distant to provide any indication of the validity of model performance near Alton Steel. These monitors are both in the area that EPA proposed to designate as unclassifiable/attainment, and data from these monitors tend to corroborate the modeling evidence that Wood River Township and relevant portions of Chouteau Township are attaining the standard, but data from these monitors do not indicate whether or not violations are occurring near Alton Steel. Illinois has recommended that this area be designated nonattainment, EPA's analysis of the evidence supports the conclusion that the area is in fact violating the standard, and EPA finds that deferring action on the designation of the area near Alton Steel is not warranted.

B. Marion

*Comment:* Two commenters (IL Response, 0318-Paine) requested that the EPA revise the proposed designation of Williamson County, IL from nonattainment to attainment.

One commenter (0318-Paine) attached a recent modeling report to address the EPA's response to the Illinois EPA designation recommendations: *Characterization of 1-Hour SO$_2$ Concentrations for the Marion Power Plant* by AECOM, March 2016. Commenter stated the updated AERMOD analyses (1) were conducted for the latest 3 years (the 2013-2015 period), a period which was associated with a reduction in SO$_2$ emissions relative to previous years due to improved emission controls associated with MATS and CSAPR; (2) were conducted using the current regulatory

defaults in one set of runs, as well as another set of runs with refinements, such as EPA-proposed low wind options; and (3) show attainment in all of the modeling approaches, including the default options with no refinements. The AECOM report stated that three modeling scenarios were conducted with the current EPA default options, AERMOIST source characterization, and ADJ_U*/LOWWIND3 beta options and the results of these three modeling scenarios all support an attainment designation. The AERCOM report stated that, with refined modeling approaches, the 2013-2015 3-year average design concentration is likely to be about 80% of the $SO_2$ NAAQS and, in the future, with continued implementation of the CSAPR and MATS controls, the design concentration is expected to be lower.

One commenter (IL Response) stated the Illinois EPA has reviewed and considered the modeling submitted by AECOM on behalf of Southern Illinois Power Cooperative (SIPCO), supports the methodology and inputs, and agrees with the results that demonstrate Williamson County should be designated in attainment of the $SO_2$ NAAQS. The commenter noted that the Illinois EPA comments on the SIPCO modeling relate to the AECOM modeling using default options. Commenter stated the receptor network used by AECOM followed guidance provided in the Modeling TAD. Commenter stated the meteorological data used in AECOM's modeling uses the same information the Illinois EPA had used, except for the very minor issue involving AECOM's generation of monthly surface characteristics values for the month of February 2015. Commenter stated this minor difference would have no effect on the modeled determination that the area should be designated attainment. Commenter stated that EPA Region 5 has informed Illinois EPA that it has reviewed the hourly emissions data and determined that they translate to the annual emission totals reported to CAMD, with emissions that seem sufficiently regular to be considered adequately representative.

***EPA's Response:***

A full review of the modeling submitted by this commenter is provided in the final Illinois technical support document for the final Illinois designations.  The commenter has not adequately justified use of alternate modeling approaches, and the modeling has omitted significant receptor areas that appear to be violating the standard.


## IX. Indiana


### General


***Comment:*** Regarding designations in the Counties of Gibson, Posey and Jefferson, one commenter (0271-Blair) requested the EPA thoroughly review the modeling inputs, parameters and source code used by the state and noted that in all the cases they looked at, there was almost zero margin of error, even after IDEM suggested new emissions limits for the power plants involved. Commenter stated that, since the NAAQS require a reasonable margin of safety, it seems to follow that new emissions limits suggested by the state should not be so close to violation of the NAAQS for $SO_2$.

*EPA's Response:*

EPA has thoroughly reviewed Indiana's modeling inputs for all of the relevant parameters and found the modeling to be fully appropriate for the purposes for which EPA is using this modeling.  (Indiana used AERMOD, a model which EPA developed, so no further review of the source code is needed.)  More complete discussion of EPA's technical evaluation of Indiana's modeling for these areas is found in the Indiana technical support documents for this action, particularly in the draft technical support document for the intended Indiana designations, although EPA reaffirms this review in its final technical support document for the final Indiana designations.  EPA has established an air quality standard that, in accordance with CAA section 109, protects public health with an adequate margin of safety, but EPA's assessments of whether emission limits yield attainment of that standard are not contingent on the limits providing an additional margin of safety beyond that inherent in the standard.

## A. Gibson County

*Comment:* Some commenters (0301-IN Municipal Power, 0302-Duke Energy, 0303-Wabash Power) supported the EPA's assessment that that the Gibson area is in attainment and that the Coal Road (CR) and Mount Carmel (MC) monitors are reliable indicators of whether the area is meeting the standard. One commenter (0302-Duke Energy) supported EPA's assessment that the CR and MC monitors are reliable indicators of whether the area is meeting the 1 hour $SO_2$ NAAQS. Commenter (0302-Duke Energy) provided the following additional information in support of an attainment designation.

1. IDEM modeling and wind flow patterns in Gibson area suggest that the CR and MC monitors are reasonably well located to monitor maximum concentrations in the area.

2. The MC and CR monitors have historically shown higher concentrations.

3. The CR and MC monitoring data indicates that the design values are trending downward.

4. IDEM modeling indicates that AERMOD tends to over predict and does a poor job predicting concentrations in space and time when compared to the actual monitored data.

*EPA's Response:*

EPA agrees that the Coal Road and Mt. Carmel sites are appropriately located to monitor maximum concentrations in the area, and that these monitors have historically shown higher concentrations than other monitors previously and/or currently in the area.  The data do not indicate a clear trend in ambient concentrations, but the data do indicate that concentrations are remaining below the standard.  For example, compared to 2012 to 2014 design values at the Coal

43

Road and Mt. Carmel sites of 72 and 66 ppb, respectively, the 2013 to 2015 design values at these sites are 67 and 50 ppb, respectively.

EPA does not agree that AERMOD over predicts or otherwise "does a poor job of predicting concentrations." Further response regarding IDEM's model evaluation study in this area is provided below.

*Comment:* Also see commenters' (0301-IN Municipal Power, 0302-Duke Energy) comments in sections III.B regarding designation categories.

*Comment:* Commenter (0301-IN Municipal Power) supported Duke Energy's comment (0302-Duke Energy) that the Indiana Department of Environmental Management's AERMOD evaluation study at Gibson, dated May 15, 2015, indicates that AERMOD tends to over-predict at the level of the standard when compared to actual monitored data. In addition, commenter stated that AERMOD does a poor job predicting concentrations in space and time when compared to the actual monitored data and the results of this evaluation call into question the representativeness of the AERMOD data.

*EPA's Response:*

The IDEM May 15, 2015, model evaluation cited by the commenter is a seriously flawed analysis. Most notably, comparisons in this report involve comparisons of modeled levels expressed in $\mu g/m^3$ against monitored values in ppb, which would treat perfect agreement between model and monitored results as if the model were over predicting by a factor of over 2.6. A more appropriate assessment of this model-monitor comparison, as discussed, for example, in an article in the Journal of the Air and Waste Management Association by Kali Frost of the Indiana Department of Environmental Management, published April 9, 2014, shows that AERMOD results match monitoring data relatively closely. Thus, while EPA agrees that the monitoring network in this area is adequate, based upon the complete analysis detailed in the final technical support document for Indiana, for EPA to determine that the monitoring data is a more reliable basis for judging whether the area meets the NAAQS and to support the appropriate designation of this area, EPA does not agree that the cited model comparison indicates poor model performance by AERMOD as a general matter.

*Comment*: Some commenters (0231-Hirschland, 0234-APC, 0235-Jay, 0236-APC) expressed concern regarding the adverse health effects of coal extraction and burning and stated that Gibson County should be designated as nonattainment. The commenters stated that modeling by the State of Indiana demonstrates that the Gibson coal-burning plant causes violations of the health-based 2010 $SO_2$ standard.

*EPA's Response:*

This rulemaking evaluates whether the ambient air quality in the area rises to levels that result in adverse health effects of exposure to SO2, or more precisely whether this and other areas have concentrations of SO2 above the standard (i.e., the level established as providing an adequate margin of safety to protect public health). The existence of coal extraction and burning does not

mean that the area is encountering excessive concentrations of SO2, and is not indicative of whether the area is violating the standard and should be designated as nonattainment for the SO2 standard. While modeling by Indiana provides evidence that the area might be violating the SO2 standard, EPA must also weigh the evidence in the form of monitoring indicating that the area is attaining the standard, as well as all other available information. Weighing all of the evidence, in this case EPA has concluded that the area is attaining the standard, based on the uniquely large set of current and historical monitoring information supporting that conclusion.

*Comment:* One commenter (0332-AE-Sierra Club) urged the EPA to issue a final nonattainment designation for Gibson County. Commenter stated that, although the EPA proposed an unclassifiable/attainment designation based on results from air monitors near the Gibson plant, these monitors are not located to capture peak impacts and, thus, the EPA should rely on the overwhelming air modeling information to finalize a nonattainment designation.

Commenter stated that both the Sierra Club (Exhibit 2 of 0332-AE-Sierra Club comment letter) and Indiana Department of Environmental Management (IDEM) submitted air dispersion modeling in September 2015 that showed violations of the $SO_2$ NAAQS. Commenter stated that the Sierra Club modeling comports with EPA's Appendix W modeling guidelines, and that they submitted a March 2016 supplemental modeling analysis (Exhibit 3) that responds to certain concerns raised by IDEM (Exhibit 1) and confirms that the Gibson plant has caused and will continue to cause significant violations of the $SO_2$ NAAQS.

Commenter stated that they did not agree with EPA that there is conflicting evidence on the attainment status in Gibson County. Commenter stated the EPA should consider that, while the Coal Road (CR) monitor has registered design values in recent years that are just below the 75 ppb NAAQS, the modeling evidence—Sierra Club's two sets of analyses and IDEM's analysis— show very high exceedances of the $SO_2$ NAAQS. Commenter stated that the EPA's failure to weight this evidence at all makes its proposed designation arbitrary and unreasonable. In addition, commenter stated that the modeling and monitoring evidence are not in conflict because the CR monitor is not located to capture peak impacts from the plant, which are modeled to occur closer to the plant. Commenter stated that, because the CR monitor has registered high $SO_2$ values in recent years and this monitor is not located to capture peak impacts from Gibson, this evidence actually shows that the Gibson plant has likely been violating the $SO_2$ NAAQS in recent years, which is consistent with the modeling evidence provided by Sierra Club and IDEM.

*EPA's Response:*

EPA continues to find that the monitors are sufficiently representative to provide a reliable basis for determining whether the area is meeting the 2010 $SO_2$ NAAQS. The commenter states that the monitors are not located to measure peak impacts, but the commenter does not provide persuasive evidence that concentrations would be higher at other locations. The commenter cites as evidence EPA's observation that "[modeling results suggest that] 'a maximum concentration is estimated to occur approximately 2 kilometers from the plant,' while [the Coal Road] monitor is 3 kilometers away." However, the commenter does not demonstrate that monitoring at

locations 2 kilometers from the plant would necessarily show concentrations higher than those at 3 kilometers away, or in particular that the concentrations that would be monitored 2 kilometers away from the plant would show violations.

EPA finds that the monitors in this area are sufficiently representative of maximum concentrations, based on EPA's complete analysis detailed in the final technical response document for Indiana, which includes evidence from historical monitoring. Therefore, EPA maintains that the monitors are indicative of whether $SO_2$ concentrations in the area are exceeding the standard.

The final technical support document for the final Indiana designations describes a full review of the modeling provided by the commenter. The modeling provided by the commenter is consistent with the recommendations of Appendix W, but the same is true of the modeling by Indiana. Since the results differ in some respects, the evaluation of these two sets of modeling evidence must consider which analysis is more likely to provide a more accurate representation of Gibson's impacts, especially with respect to the spatial variations of these impacts and the likely areas where violations have the greatest potential to be occurring. As discussed in more detail in the final Indiana technical support document for the final designation, consideration of modeling evidence, historical monitoring evidence, and other evidence leads to the conclusion that the monitors are sufficiently representative to measure maximum concentrations in the area. The monitors and available modeling provide conflicting evidence as to whether the areas a few kilometers north and north northeast of Gibson are violating the standard, but EPA finds that the monitoring evidence provides a reliable indication of whether the areas of maximum concentration are meeting the standard. Weighing the monitoring evidence that these areas (and thus Gibson County as a whole) are meeting the standard, notwithstanding modeling evidence that these areas are violating the standard, EPA concludes that these areas, and Gibson County as a whole, are meeting the standard.

## B. Posey County

*Comment:* One commenter (0271-Blair) stated that, in the case of AB Brown in Posey County, others have modeled current emissions and determined that emissions limits substantially lower than those proposed by Vectren/IDEM should be achieved in order to comply with the NAAQS.

One commenter (0282-Bryant) expressed concern over the amount of respiratory and cardiovascular disease in Posey County and objected to the proposed attainment designation. Commenter stated this area has historically exceeded $SO_2$ emission standards and that one cannot assume IDEM's modeling is accurate since IDEM failed to disclose any information about their modeling effort.

*EPA's Response:*

46

The commenter does not identify the "others" that determined that lower limits should be achieved to meet the NAAQS, and the commenter provides no specific evidence as to the adequacy of applicable limits for providing for attainment.  If the commenter is implicitly referring to modeling provided by Sierra Club, a response is provided below, stating that no violations were identified in the area of A.B. Brown, and the area where violations were identified (in and near Warrick County, Indiana) will be addressed in future rulemaking.  Comments regarding the amount of respiratory and cardiovascular disease in Posey County and regarding compliance with emission limits do not inform the judgment as to whether $SO_2$ concentrations are exceeding the 2010 $SO_2$ NAAQS.  The docket for the proposed designation included information from Indiana summarizing its modeling, so that the commenter had a reasonable opportunity to identify specific concerns regarding Indiana's modeling.

*Comment:* One commenter (0332-AE-Sierra Club) urged the EPA to issue a final nonattainment designation for the A.B. Brown plant. Commenter stated that IDEM initially concluded that A.B. Brown contributed to exceedances of the NAAQS, but then remodeled the source using lower emissions based on proposed, allowable emissions. Commenter stated that the EPA cannot designate areas as attainment on the basis of modeling that uses allowable emissions from a proposed SIP revision.

Commenter stated that IDEM's modeling is not reliable and cannot support attainment designations as explained in their comments to the State (Exhibit 4). Commenter stated that IDEM's modeling failed to account for major background sources within the modeling domain. Commenter stated that IDEM's use of an across-the-board distance threshold for excluding major background sources is particularly troubling given that IDEM's results, 196.08 $\mu g/m^3$, are so close to the NAAQS limit of 196.2 $\mu g/m^3$. Commenter stated that Wingra Engineering conducted modeling (Exhibit 5) using the proposed emission limits IDEM used in its modeling, but adding the concentrations from major background sources. Commenter stated the results indicate that areas east of A.B. Brown exceed the 1-hour $SO_2$ NAAQS. Commenter stated that the EPA should designate the portions of the counties identified in Appendix E Exhibit 5 as exceeding the NAAQS as nonattainment areas.

*EPA's Response:*

On May 6, 2016, at 81 FR 27330 (effective June 6, 2016), EPA published action approving Commissioner's Orders for A.B. Brown and for Clifty Creek, thereby making these Orders federally enforceable.  As a result, EPA policy provides that the emission levels mandated by these orders are an appropriate basis on which to determine the attainment status of the respective areas.  Indeed, the comment objecting to use of limits in a proposed SIP revision may be viewed as supporting EPA's proposed action (proposing nonattainment designations in the absence of fully approved emission limits) and not commenting on EPA's contingent proposal (anticipating promulgating unclassifiable/attainment designations if the Commissioner's Orders were to become SIP approved).

EPA finds Indiana's modeling to be adequately reliable in support of unclassifiable/attainment designations for the pertinent areas. The sources that the commenter believes should have been included in the analysis for A.B. Brown are at considerable distance from the facility. Indeed, the commenter acknowledges the distances, identifying the Warrick power plant and the ALCOA industrial operations as being 35 km away, the Culley power plant also being 35 km away, and the Gibson plant being 50 km away. EPA agrees with Indiana's implicit conclusion that these facilities are sufficiently distant from the A.B. Brown facility that the spatial gradients in $SO_2$ impacts are likely to be minimal, and Indiana's background concentration estimates may be considered to include the impacts of these facilities. The commenter provides no evidence that including these facilities in the modeling analysis and reducing the background concentration values to remove the impact of these facilities would increase rather than decrease net concentration estimates. Although Indiana's modeling indicates that air quality near A.B. Brown is close to the standard (albeit less close to a more carefully calculated equivalent to 75 ppb, namely 196.4 $\mu g/m^3$, than to the 196.2 $\mu g/m^3$ figure cited by the commenter), the commenter has not provided persuasive evidence that the area is above rather than just below the standard.

The commenter states that "areas east of A.B. Brown exceed the 1-hour $SO_2$ NAAQS." However, the areas estimated to exceed the NAAQS are in fact two counties east of A.B. Brown (generally in Warrick County), well removed from the area being addressed in this action, in an area that is not required to be designated in this round of designations. EPA will designate the Warrick County area in a subsequent round of designations, at a time when EPA may have additional information pursuant to the DRR.

## X. Iowa

### A. Des Moines County

*Comment:* Two commenters (IA Response, 0233-Alliant) recommended an attainment designation for both Des Moines County and Wapello County. Commenters asserted that the State submitted additional modeling information to the EPA on December 23, 2015 which demonstrates that both Des Moines County and Wapello County still show modeled attainment.

One commenter (IA Response) stated that the updated modeling emission rates were defined using either existing federally enforceable maximum allowable emissions rates or three years of recent historical actual emissions data. Commenter stated those modeling results captured the areas of maximum impact and showed attainment with the 1-hr $SO_2$ NAAQS in both Wapello and Des Moines Counties. Commenter stated the use of proposed maximum allowable emission rates was eliminated. Commenter provided the following information regarding the areas of maximum impact:

- The Burlington Generating Station is situated in the Mississippi River valley. The area around the generating station consists of the flood plain and surrounding bluffs. The change in elevation between the flood plain and the highest points along the bluffs is on the order of 150-200 feet, which could have an impact on predicted concentrations. The nearest area of elevated terrain is the bluff along the western edge of the flood plain, which is located only approximately 1 km north-northwest of the facility. This area of elevated terrain is included in the current modeling domain provided to EPA. The next nearest area of elevated terrain is the bluff along the eastern edge of the flood plain in Illinois. This area is approximately 8 km away. Based on proximity, meteorological conditions in the area, and dispersion characteristics, the maximum concentration from the facility almost certainly occurs in the closer area of elevated terrain. For this reason the current modeling domain is sufficient to determine the magnitude of maximum concentration from this facility.

- The Ottumwa Generating Station is situated along the edge of the Des Moines River valley. The area around the generating station consists of the narrow Des Moines River valley and multiple small valley tributaries, along with the areas of higher elevation above these valleys. The elevations in the area range from approximately 640 feet above sea level in the valley to 890 feet above sea level, with the main boiler stack base elevation at approximately 680 feet above sea level. The current modeling domain provided to EPA encompasses the entire range of elevated terrain in this area. As such, there is no need to expand the receptor grid in order to encompass additional terrain features. Since the modeled concentrations are decreasing at the edge of the existing receptor grid, the current modeling domain is sufficient to determine the magnitude of maximum concentration from this facility.

***EPA's Response:***

The EPA acknowledges that we received information from IDNR regarding our intended designation for this area prior to the February 16, 2016, notification to the state. However, due to the timing of this information relative to the scheduled timeline for announcing our intended designation, the EPA was not able to fully evaluate the information at that time. The final Iowa technical support document for this area and our final designation incorporates our analyses and conclusions regarding that information.

## B. Wapello County

***Comment:*** Two commenters (IA Response, 0233-Alliant) recommended an attainment designation for both Des Moines County and Wapello County. See discussion immediately above in section X.A. Des Moines County.

***EPA's Response:***

The EPA acknowledges that we received information from IDNR regarding our intended designation for this area prior to the February 16, 2016, notification to the state. However, due to the timing of this information relative to the scheduled timeline for announcing our intended designation, the EPA was not able to fully evaluate the information at that time. The final Iowa technical support document for this area and our final designation incorporates our analyses and conclusions regarding that information.

## C. Woodbury County

*Comment:* One commenter (IA Response) recommended the EPA designate Woodbury County attainment. Commenter stated that, although the original modeling results submitted to EPA captured the areas of maximum impact around the George Neal facilities, the DNR has extended the modeling receptor grid to address EPA's concerns and used finer receptor grids embedded within areas of elevated $SO_2$ concentrations. Commenter stated that the modeled concentrations are now clearly decreasing at the edges of the grid and the maximum total concentration demonstrates attainment with the 1-hr $SO_2$ NAAQS. Commenter stated that, while these modeling results conservatively assume that George Neal North Units 1 and 2 will combust natural gas, these units will permanently shut down on or before April 16, 2016. Commenter stated that the process to revoke their air construction permits, which will make their shutdown federally enforceable, cannot be completed until after a 60-day public comment period and the DNR expects to complete the permit revocation process near EPA's July 2, 2016, designations deadline. Commenter noted that emissions from Cargill Inc. – Sioux City are less than 1 ton per year and will not affect the attainment status of the area. Commenter stated that, if the EPA instead designates Woodbury County as unclassifiable because the permanent closures of George Neal North Units 1 and 2 are not yet federally enforceable, the DNR anticipates that the State of Iowa will submit an attainment redesignation request after their closure is made federally enforceable through the revocation of their air construction permits.

*EPA's Response:*

In order for operational limitations, including shutdowns, to be considered in this designation process, the operational limitations must be federally enforceable and take effect in time for the state to conduct and for EPA to review modeling based on the effective allowable emissions limits. Since the shutdowns of George Neal Units 1 and 2 were not federally enforceable prior to July 2, 2016, the allowable emissions limits reflecting the shutdowns could not be relied upon in modeling analyses, in lieu of actual emissions that reflected the recent historical operation of those units, for the final designation determination. EPA acknowledges that IDNR plans to submit a redesignation request for this area once the limits reflecting the shutdown are effective and anticipates that a proposed unclassifiable/attainment redesignation may be appropriate once the shutdowns are federally enforceable if the area is shown to be meeting the 2010 SO2 NAAQS based on such allowable emissions and other statutory criteria for obtaining a redesignation are met.

50

# XI. Kansas

## A. Wyandotte County

*Comment:* One commenter (0313-KC Utilities) stated that EPA should revise its proposed designation from "unclassifiable" to "unclassifiable/attainment" based on new modeling analyses conducted in response to the EPA's concerns identified in the Draft TSD. A copy of the revised Trinity modeling, entitled "Air Dispersion Modeling Report for 1-Hour $SO_2$ NAAQS Designation" (March 2016), is attached with these comments. Commenter stated the revised modeling shows $SO_2$ concentrations at all receptors within the new 100 km x 100 km grid are in attainment with the 2010 $SO_2$ NAAQS and thus reaffirms the Kansas Department of Health and Environment's (KDHE) earlier modeling results that Nearman Station is not causing or contributing to a violation of the NAAQS in either Wyandotte County, Kansas or in Missouri.

*EPA's Response:*

While the revised modeling corrected issues related to modeling receptor domain and the inclusion of all nearby sources of $SO_2$, the revised modeling continued to use emission limits that will not be federally enforceable by July 2, 2016. Therefore, EPA can neither rely on the updated information referred to by the commenter to support a finding that the area is now meeting the 2010 $SO_2$ NAAQS based on currently effective limits, nor support a designation of unclassifiable/attainment for the Nearman Station area.

# XII. Kentucky

## A. Ohio County

*Comment:* On April 18, 2016, the Commonwealth of Kentucky provided the EPA additional information to consider in response to the agency's February 16, 2016, intended designation for the Ohio County, KY, area. Kentucky subsequently submitted a proposed Title V permit renewal on April 26, 2016, which included a new federally enforceable allowable permit limit for the Big Rivers Electric Corporation D.B. Wilson Station source in support of the Commonwealth's September 16, 2015, recommendation for Pulaski County to be designated attainment for the 2010 1-hour $SO_2$ NAAQS. This permit submission initiated EPA's 45-day review period and on May 20, 2016, the agency provided comments to the Commonwealth on the proposed Title V permit revision.   As a follow up to the EPA's May 20, 2016, letter, Kentucky submitted responses to the EPA's comments on June 20, 2016, and finalized the Title V permit with modifications.

*EPA's Response:* Kentucky's most recent information was provided too late for the EPA to be able to review it in the same depth as the April 18 information. Nevertheless, the EPA analyzed the new information to the extent time allowed before completing the final designation. Based on the EPA's review of the additional information provided on June 20, 2016, the EPA's position is that Kentucky has not sufficiently addressed the outstanding technical concerns, as outlined in the TSD for the EPA's February 16, 2016, intended designation for the Ohio County, KY, area, nor did the responses or modifications sufficiently address the EPA's concerns, as outlined in the EPA's May 20, 2016, letter related to the Title V permit. The EPA is still unable on the basis of available information to determine whether the area is meeting or not meeting the 2010 1-hour $SO_2$ NAAQS, and therefore is designating the area as unclassifiable for the 2010 1-hour $SO_2$ NAAQS. Furthermore, the EPA notes that the Agency carefully considered the additional information provided by Kentucky of April 18, 2016, in support of their recommendation of attainment for Ohio County, and determined that the agency's previous concerns were not fully addressed. Please refer to the final Kentucky TSD for more information and rationale.

## B. Pulaski County

*Comment:* On April 18, 2016, the Commonwealth of Kentucky provided the EPA additional information to consider in response to the agency's February 16, 2016 2010 $SO_2$ NAAQS intended designation for the Pulaski County, KY area. This information was supported by a proposed Title V permit renewal submitted to the EPA on April 14, 2016, which included a new federally enforceable allowable permit limit for East Kentucky Power Cooperative John Sherman Cooper Power Station source in support of the Commonwealth's September 16, 2015 recommendation for Pulaski County to be designated attainment for the 2010 1-hour $SO_2$ NAAQS. This permit submission initiated EPA's 45-day review period and on May 20, 2016, the agency provided comments to the Commonwealth on the proposed Title V permit revision. As a follow up to the EPA's May 20, 2016, Kentucky submitted responses to the EPA's comments on June 20, 2016, and finalized the title v permit with modifications.

*EPA's Response:* Kentucky's most recent information was provided too late for the EPA to be able to review it in the same depth as the April 18 information. Nevertheless, the EPA analyzed the new information to the extent time allowed before completing the final designation. Based on the EPA's review of the additional information provided on June 20, 2016, the EPA's position is that Kentucky has not sufficiently addressed the outstanding technical concerns as outlined the TSD for the EPA's February 16, 2016, intended designation for the area, nor did the responses or modifications sufficiently address the EPA's concerns as outlined in EPA's May 20, 2016, letter related to the Title V permit. The EPA is still unable to determine on the basis of available information whether the area is meeting or not meeting the 2010 1-hour $SO_2$ NAAQS, and therefore is designating the area as unclassifiable for the 2010 1-hour $SO_2$ NAAQS. Further,

the EPA notes that the Agency carefully considered the additional information provided by Kentucky on April 18, 2016, in support of their recommendation of attainment for Pulaski County, and determined the agency's previous concerns were not fully addressed. Please refer to the final Kentucky TSD for more information and rationale.

## XIII. Louisiana

### A. DeSoto Parish

*Comment:* One commenter (0327-AEP) recommended that, based on new more accurate information, the EPA should revise the proposed nonattainment designation to attainment. Commenter stated that the Sierra Club modeling used by the EPA did not use hourly exit gas temperatures and velocities in their analysis that reflect the actual operating conditions at the Dolet Hills Power Station and did not include emissions from the International Paper Mansfield Plant. Commenter stated that when the hourly inputs for the Dolet Hills Power Station are corrected to reflect actual operating conditions and the emissions from the Mansfield Plant are added, the modeled results demonstrate attainment. A Technical Note and supporting modeling files covering this work are attached with these comments.

*EPA's Response:*

EPA has reviewed the supplemental air modeling and finds that it complies with the modeling TAD and incorporates CEMS data for emissions rate, stack temperature, and stack velocity, and simulates building downwash. A refined background was also estimated which varied by season and hour of day. A subset of the simulations included the emissions from the International Paper Mansfield Plant. The results of the model indicate that the highest design value for DeSoto Parish with Dolet Hills alone is 170.5 ug/m3 and in combination with Mansfield Mill is 171 ug/m3. Both of these values are less than the 1-hour SO2 standard of 196.2 ug/m3 indicating modeled attainment. As further detailed in the final Louisiana technical support document, based on this analysis of the modeling EPA revises the proposed nonattainment status for DeSoto Parish to unclassifiable/attainment for the 1-hour SO2 standard.

*Comment:* Two commenters (0331-Cleco and LDEQ) stated the EPA should accept the Louisiana Department of Environmental Quality's (LDEQ) recommendation to designate DeSoto Parish as attainment for the 1-hour SO$_2$ NAAQS. Commenter stated that, based on air quality modeling conducted by American Electric Power and monitoring data derived from a properly-sited air monitor located in DeSoto Parish, there is substantial evidence to accept LDEQ's attainment recommendation for this area. Commenter stated that, if EPA does not accept LDEQ's recommendation, a designation of "unclassifiable/attainment" is more appropriate for DeSoto Parish than the designation recently proposed by EPA.

*EPA Response:*

53

EPA has reviewed the AEP air modeling and finds that it complies with the modeling TAD and incorporates CEM data for emissions rate, stack temperature and stack velocity and simulates building downwash.  A refined background was also estimated which varied by season and hour of day.  A subset of the simulations included the emissions from the International Paper Mansfield Plant.  The results of the model indicate that the highest design value for DeSoto Parish with Dolet Hills alone is 170.5 ug/m3 and in combination with Mansfield Mill is 171 ug/m3.  Both of these values are less than the 1-hour $SO_2$ standard of 196 ug/m3 indicating modeled attainment. As further detailed in the final Louisiana technical support document, based on this analysis of the modeling EPA revises the proposed nonattainment status for DeSoto Parish to unclassifiable/attainment for the 1-hour $SO_2$ standard.

A demonstration of attainment using monitoring data requires well-sited monitor(s) with three most recent years of $SO_2$ data.  The newly sited $SO_2$ monitor in DeSoto Parish appears to be located according to EPA guidance, as contained in the Monitoring TAD, but has acquired less than one-year of data.  The EPA notes that though no exceedances of the standard have been recorded to date, because of the short period of record the data do not demonstrate attainment of the standard. Additionally, based on past modeling information and current information shared for monitoring siting, there was a second area to the west of the facility that we would also recommend for monitoring. Therefore, even if the one monitor had three years of data we would likely not be able to determine attainment status based on monitoring data since a monitor was not installed to the west of the facility in the other hot spot identified. Other monitors in the state are located too far away to record peak concentrations from Dolet Hills. Because of these considerations, if only the monitor data existed, DeSoto Parish would be likely be designated as unclassifiable due to the lack of relevant data. Regardless, the second monitor issue is not controlling here because the updated modeling provides sufficient basis for the EPA's designation determination.

*Comment:* One commenter (0331-Cleco) provided a detailed discussion of issues in their comment letter and also attached modeling and monitoring analyses. Commenter requested that the EPA provide a detailed, written response to each of the following comments.

1. Supplemental air modeling conducted by AEP demonstrates that $SO_2$ emissions from the Dolet Hills Power Station and the paper mill are below the 1-hour $SO_2$ NAAQS. This modeling is more accurate than prior modeling analyses conducted by the Sierra Club and the LDEQ/industry responds to specific issues raised by EPA in its technical analysis. This modeling includes actual stack temperature and stack velocity and building downwash and is more representative of actuals than the Sierra Club's modeling that used constant stack temperature and velocity and no downwash.

2. Emissions from International Paper's Mansfield Mill do not contribute to concentration gradients around the Dolet Hills Power Station or to the south of this facility as asserted in EPA's I20-day letter. Because such emissions have now been adequately considered in AEP's modeling analysis, an attainment designation is appropriate.

3. A more representative background concentration should be used for the DeSoto Parish area modeling analyses than what was used by the Sierra Club or LDEQ.

4. EPA accepted similar air modeling in Arkansas that used better site data and more closely adhered to EPA's technical assistance document. For consistency, EPA should also accept the attached modeling report that demonstrates attainment with the $SO_2$ NAAQS.

5. EPA should consider the existing ambient air monitoring data that exists for the DeSoto Parish area that was located using EPA-accepted protocol. This monitoring data confirms that the 1-hour $SO_2$ NAAQS has been satisfied for a representative period. At a minimum, the monitoring data demonstrates that not enough data exists to classify the area as nonattainment.

6. Based on the available information, EPA should allow more time to evaluate the monitoring data before designating any part of DeSoto Parish as nonattainment. Sufficient data does not exist to make a conclusion that the DeSoto Parish area is not meeting the 1-hour $SO_2$ NAAQS.

***EPA's Response:***

***The EPA responds to each of the above numbered comments as follows:***

1. EPA has reviewed the air modeling of the Sierra Club and AEP and finds that they comply with the modeling TAD.  However, the AEP modeling incorporates CEMS data for emissions rate, stack temperature, and stack velocity, and simulates building downwash.  A refined background was also used in the AEP modeling, which varied by season and hour of day.  The results of the AEP modeling indicate that the highest design value for DeSoto Parish with Dolet Hills alone declined from 218.7 ug/m3 (Sierra Club) to 170.5 ug/m3(AEP) with the refined modeling inputs.

   Also, AEP explicitly modeled the Mansfield Mill as a contributing source and found a small increase of the design value to 171 ug/m3.  Since no exceedances were predicted it was not necessary to evaluate the Mansfield Mill contribution beyond looking at contribution to the maximum. Both of these values are less than the 1-hour $SO_2$ standard of 196.2 ug/m3 which indicates modeled attainment.

2. Both International Paper (IP) and AEP modeled the combination of Dolet Hills and Mansfield Mill using slightly different inputs.  For IP's modeling: 0.2 ug/m3, and for AEP modeling: 0.5 ug/m3, to the domain maximums in the refined modeling provided. Since no exceedances were predicted it was not necessary to evaluate the Mansfield Mill contribution beyond looking at contribution to the maximum.

   IP modeling was initially conducted prior to AEP/Dolet Hills refined modeling runs. The IP modeling used CEMS data for emission rate and velocity but used a fixed, nominal temperature for the Dolet Hills source; while AEP used CEMS data for emission rate, velocity, and temperature.  With the lower, fixed temperature used in the IP modeling, Dolet Hills was still modeled to contribute to concentrations higher

than the standard, 207.6 ug/m3 with a small contribution, about 0.2 ug/m3 from Mansfield Mill. The AEP modeling using full CEMS data found the modeled impact to be 171.0 ug/m3, below the standard. Since the AEP modeling used the most realistic stack parameters, the EPA finds that the AEP model results are the most representative of what a monitor would have recorded.

Mansfield Mill's emissions rates were modeled conservatively using an analysis of the CEMS $SO_2$ emission rate (lb/MBTU) to estimate the mean $SO_2$ emission rate over the three-year period for the two largest sources, Boiler 1 and Boiler 2. The modeled emissions from the boilers were held constant and set as the product of the maximum unit heat rate and the mean $SO_2$ emission rate. All other sources were modeled at allowable emissions. AECOM modeled the maximum design value for Mansfield Mill at 137.6 ug/m3.

3.  Per the modeling TAD, EPA recommends either tier 1 or tier 2 background determinations for modeled $SO_2$ attainment designations. The more conservative tier 1 background determination uses an average of 3-years of the annual monitor design value during conditions when the modeled sources are not contributing. The Tier 2 background determination breaks the monitor concentration into seasonal and hourly bins and computes a design value corresponding to the 99th percentile concentration for each bin. EPA's view is that the tier 2 background method yields background estimates which are more realistic, but its use is optional. We are relying on modeling that also incorporated the Tier 2 approach in support of this designation.

4.  For each designation area EPA reviews all available sources of data, and analyzes whether the information meet the recommendations of the Modeling and Monitoring TADs. In this case, we have reviewed the submitted modeling report and are utilizing this information in our final designation as the modeling is more representative of actual conditions than previous modeling.

5.  The EPA maintains our position, most recently recounted in the Data Requirements Rule, that, in order to demonstrate attainment with the 1-hour $SO_2$ standard, the most recent three years of monitor data must show that the design value does not exceed the standard over that period. The newly installed monitor in Desoto Parish appears to have been located following the Monitoring TAD guidelines and is considered to be properly located in one of the hotspot areas around the facility. Based on past modeling information for monitor siting pursuant to EPA's Monitoring TAD and current information shared for monitoring siting, there was a second area to the west of the facility that we would also recommend for monitoring, so we do not agree that one monitor would be enough monitors in this case. However, the period of record (less than one year) for the one monitor is not sufficient to demonstrate compliance even if only one monitor was needed to characterize air quality for designations. The fact that that the 1-hour standard has not been exceeded in that period is consistent with a demonstration of attainment but is not sufficient to base such a designation on. Even if the one monitor had three years of data we would likely not be able to determine attainment status based on monitoring data since a monitor was not

installed to the west of the facility in the other hot spot identified.  The second monitor issue is not controlling in this case because of the updated modeling, which provides sufficient information to make the designation.

6.  The EPA maintains our previous position, for the reasons delineated in the preamble to the final rule of the 2010 $SO_2$ NAAQS rulemaking, the February 2013 Strategy Paper, and in the proposed and final $SO_2$ Data Requirements Rule, that both air quality modeling and ambient monitoring are appropriate tools for characterizing ambient air quality for purposes of informing decisions to implement the $SO_2$ NAAQS, including designation determinations. The EPA considered all available information in making this action's final designations. Because of the lack of a suitably located $SO_2$ monitoring sites with only one of the two monitors that we would recommend and less than 3 years of data, the EPA finds that the monitoring data cannot be used to designate the area.  However, suitable modeling data are available and have been used as a basis for designating attainment for DeSoto Parish, as further discussed in the final Louisiana technical support document.

**Comment:** One commenter (0332-Appendix F-Sierra Club) supported EPA's proposal to designate the area surrounding the Dolet Hills Power Station in DeSoto Parish, Louisiana as nonattainment for purposes of compliance with the 2010 1-hour $SO_2$ NAAQS. Commenter stated that two separate rounds of modeling by Sierra Club (September and December 2015) that adhered to EPA's guidance have now reached the same results: Dolet Hills causes the areas surrounding each facility to be in nonattainment. Commenter stated that EPA's suggested adjustments and refinements to this modeling would likely only increase Dolet Hills' modeled impacts. These modeling issues are described in detail in the commenter's letter and include: International Paper Mansfield Mill and background concentrations, downwash, stack temperature and velocity, flagpole height receptors, and LOWWIND3 in the previous LDEQ modeling.

The revised Sierra Club modeling (12/15/2015) updated to the most current version of AERMOD but kept in place protocol options that were held by the Sierra Club to most likely tend to decrease the maximum modeled concentrations for the Dolet Hills Power Plant and that EPA's suggested refinements would likely increase the modeled impacts:
- Use of temperature and velocity for 100% load from the most recent permit application instead of actual temperature and velocity values
- Lack of building or structure downwash
- Lack of including other large $SO_2$ sources in DeSoto Parish.  There is one other large source, Mansfield Mill, located 14 miles north of Dolet Hills, but Sierra Club's contractor investigated and estimate only a 0.03 µg/m$^3$ increase near the Dolet Hills facility when the mill was included.

One commenter (0332-AF-Sierra Club) stated that LDEQ's modeling that included the LOWWIND3 option was not in accordance with EPA's Modeling TAD or Appendix W. Commenter stated that information submitted by the owner of Dolet Hills did not follow the monitoring TAD or modeling TAD. Commenter stated that EPA and LDEQ recognized that Sierra Club's modeling inputs and assumptions were generally acceptable and followed EPA's

guidance. Commenter concluded that the only "reliable" and "acceptable" evidence in the record makes clear that the area around Dolet Hills should be designated as being in nonattainment with the 2010 1-hour $SO_2$ NAAQS.

*EPA's Response:*
EPA agrees, as discussed in the Desoto Parish portion of the draft Louisiana TSD, that LDEQ's initial modeling was problematic in following the Modeling TAD.  The Sierra Club performed air modeling (initially in September 2015 and updated in December 2015), asserting that the area around Dolet Hills experiences impacts in exceedance of the NAAQS. The state reviewed this modeling, and subsequently performed its own revised modeling using the input parameters provided by Sierra Club. These assessments and characterization were performed using air dispersion modeling software, i.e., AERMOD, analyzing actual emissions. However, the state factored and used the currently non-default beta option low wind speed modification (LOWWIND3). This revised modeling using LOWWIND3 predicted peak concentrations slightly below the NAAQS. As a result, the state changed its unclassifiable recommendation to attainment. The EPA notes that the use of beta options, such as ADJ_U* and LOWWIND3, in AERMOD for any regulatory applications should follow the recommendations of Appendix W, Section 3.2.2. This is further explained in the EPA's December 10, 2015, Memorandum titled, "Clarification on the Approval Process for Regulatory Application of the AERMOD Modeling System Beta Options." Among other conditions, the use of beta options should include consultation with the appropriate EPA Regional Offices. Upon concurrence by the EPA's Modeling Clearinghouse, EPA Regional Offices may approve the use of these beta options for regulatory applications as an alternative model on a case-by-case basis. However, LDEQ performed air dispersion modeling intended to characterize air quality as a result of $SO_2$ emissions from Dolet Hills without prior consultation with or approval from an EPA Regional Office, and therefore has not been consistent with Appendix W, Section 3.2.2.  As a result, the EPA finds that the air quality modeling results obtained from the use of these beta options cannot be used as a reliable indicator of attainment status in the area around Dolet Hills until appropriate alternative model approval is granted, or these beta options are promulgated as regulatory options in AERMOD through EPA rulemaking.

The recently submitted AEP modeling used the majority of the Sierra Club inputs but used the CEMS actual temperature and velocity, added building downwash, and included Mansfield Mill as a contributing source. Also, a seasonal hourly background was used which was derived by AECOM.  These refinements reduced the modeled concentrations to below the 1-hour $SO_2$ standard.  The EPA's Modeling TAD notes that for the purposes of modeling to characterize air quality for use in designations, the recommended approach is to use the most recent 3 years of actual emissions data. To be as realistic as possible, in the absence of CEMS data, the EPA's Modeling TAD highly encourages the use of AERMOD's hourly varying emissions keyword HOUREMIS, or through the use of AERMOD's variable emissions factors keyword EMISFACT. When choosing one of these methods, the EPA's view is that detailed throughput, operating schedules, and emissions information from the impacted source(s) should be used. The EPA's position is that CEMS data, such as that used by AEP, provide acceptable historical emissions information when it is available.

Sierra Club continues to support their use of flagpole receptor height (1.5 meters), but we note that EPA guidance does not require or specifically recommend using flagpole receptor height. Regardless, the change in impacts here are extremely small and not consequential. Analysis provided by Sierra Club and industry both indicate a small change in the area around the plant and the value (less than 1 $\mu g/m^3$ to the maximum modeled value around  Dolet Hills) regarding receptor height, and it does not alter the attainment projection of the modeling based on industry modeling.

As detailed above, subsequent to the submission of the Sierra Club modeling a more refined model analysis was conducted by AEP.  As detailed in the final Louisiana technical support document, this modeling has been reviewed by EPA and found to adhere to the Modeling TAD and to employ more realistic data than were available to the Sierra Club for their modeling.  EPA finds that the AEP refined modeling is a better indicator of what an ambient monitor would read because of the more realistic inputs of stack temperature and velocity, the incorporation of building downwash, and the use of seasonal hour background concentrations.

*Comment:* Two commenters (0317-International Paper, 0325-LA Pulp and Paper) stated that the Mansfield Mill and the surrounding area should be excluded from the nonattainment area proposed by the EPA for DeSoto Parish.

One commenter (0317-International Paper) stated that the modeling report conducted by AECOM and attached to their comment letter verifies that emissions from the Mansfield Mill do not contribute, or only minimally contribute (less than one percent), to any modeled exceedances of the $SO_2$ NAAQS for this area. The commenter stated that the highest offsite impacts attributed to the Mansfield Mill are well below the standard and those impacts are in relatively close proximity to the mill, but are not close to the Dolet Hills Power Station. Commenter stated that the AECOM modeling used AERMOD (Version 15181) and was performed in accordance with EPA's draft air modeling guidance document, *$SO_2$ NAAQS Designations Modeling Technical Assistance Document,* dated February 2016.

One commenter (0325-LA Pulp and Paper) stated that, because the modeling analyses submitted by the Sierra Club and the LDEQ did not include $SO_2$ emissions from the paper mill, the EPA has no scientific or technical basis to conclude that the paper mill contributes to concentration gradients near those caused by the coal-fired utility. Commenter stated the EPA's decision should not be based on conjecture or speculation and encouraged the EPA to base its final decision strictly on information that is known to it and has been included in the administrative record. The commenter stated that, based on current information, it is arbitrary and capricious for EPA to include International Paper's Mansfield Mill in the proposed nonattainment area for DeSoto Parish.

*EPA's Response:*
While the EPA previously expected that Mansfield Mill could significantly impact locations when available information indicated that Dolet Hills was modeled to contribute to 1-hour $SO_2$ nonattainment,  the modeling results submitted by AEP and IP, show, however, that refined modeling with both sources does not result in any modeled nonattainment instances, and are a better indicator of what an ambient monitor would read because of the more realistic inputs of

stack temperature and velocity, the incorporation of building downwash, and the use of seasonal hour background concentrations.  In light of this additional information, the EPA finds that Mansfield Mill does not contribute to any non-attainment values.

*Comment:* One commenter (0325-LA Pulp and Paper) encouraged the EPA to consider supplemental modeling that International Paper and the LDEQ have submitted in their comments related to the $SO_2$ NAAQS designation for DeSoto Parish. Commenter stated that, if the modeling demonstrates that $SO_2$ emissions from the paper mill have a *de minimis* impact to any modeled exceedances of the $SO_2$ NAAQS for this area, EPA should exclude the paper mill from the final nonattainment area. Commenter stated there is no legal basis to include a stationary source in a nonattainment area simply because it emits above a certain threshold.
One commenter (0317-International Paper) stated that, not only should the Mansfield Mill not be included in the nonattainment designation area in DeSoto Parish, the modeling supports the area around Mansfield Mill as being in attainment with the 1-hour $SO_2$ NAAQS. Commenter also provided modeling results indicating the other areas around Dolet Hills and the rest of the domain were attainment levels and impacts from the Mansfield Mill were included demonstrating that the Mill does not contribute to nonattainment. Commenter stated that they are aware of modeling conducted on behalf of the Dolet Hills Power Station that indicates attainment for all of DeSoto Parish.

Another commenter (0325-LA Pulp and Paper) stated that, if other modeling supports a designation of attainment for the entire parish, then the EPA should accept LDEQ's initial recommendation of attainment for this area by July 2, 2016.

*EPA's Response:*
The basis for including a stationary source in a non-attainment area is that it contributes to concentrations above the standard or that contributes to gradients in concentration near such events.  The potential contributing source's emissions are used as part of a determination in addition to direction from the main source and its proximity.  EPA used all available information in its proposed non-attainment designations.  Prior to receiving the AERMOD results for the combined impact of Mansfield Mill and Dolet Hills, the EPA expected that Mansfield Mill could significantly impact locations when available information indicated that Dolet Hills was modeled to contribute to 1-hour SO2 nonattainment.  However, the modeling results submitted by AEP and IP show that there are no modeled nonattainment instances in DeSoto Parish, therefore the Mansfield facility does not contribute to nonattainment given the final designation of DeSoto Parish as unclassifiable/attainment.


As stated in other responses above and in more detail in the final Louisiana technical support document, the EPA finds that the modeling provided by AEP provides the most realistic projection of ambient concentrations of all of the analyses that were provided and is consistent with EPA's Technical Assistance Document.  Based on the EPA's analysis of that modeling, the EPA is finalizing a designation of unclassifiable/attainment for DeSoto Parish.

B. Calcasieu Parish

***Comment:*** One commenter (0323-Beall) stated that Calcasieu Parish should be designated as "attainment," or at a minimum, "unclassifiable/attainment." The commenter stated that the air modeling conducted by Providence Engineering and Environmental Group LLC demonstrates that this area is meeting the 1-hour $SO_2$ NAAQS. Commenter stated this conclusion is supported by ambient monitoring data from three air monitoring stations located throughout the parish and near the modeled industrial sources. Commenter stated that the EPA failed to consider other valid $SO_2$ ambient air monitors located in Calcasieu Parish in its *Technical Analysis for Calcasieu.* Commenter concluded that the EPA should consider all three monitors in Calcasieu Parrish (Westlake, LAIA North, and LAIA South) when evaluating a final $SO_2$ designation for this parish. Commenter provided a detailed discussion of the ambient data and requested that the EPA provide a detailed, written response.

One commenter (0320-Entergy LA-TX) supported the recommendation by LDEQ to designate Calcasieu Parish, Louisiana, as in attainment for the 2010 $SO_2$ NAAQS, and urged the EPA to adopt the same. Commenter stated that, in consideration of the entirety of the monitoring data in close proximity to the industrial sources in question and the non contradicted air quality modeling analysis submitted by LDEQ, EPA should affirm LDEQ's attainment recommendation for Calcasieu Parish, Louisiana.

One Commenter (LDEQ) stated that the current Westlake monitor is 32 ppb and that they disagree with EPA's proposal to designate the areas unclassifiable. Commenter stated that the modeling showed maximum value of 170 ug/m3, AERMOD over predicts concentrations when used to determine a one-hour standard and provides conservative results, and emissions in the area of analysis have been reduced by some 20% from 2012 to 2014. Commenter concludes that all these factors are indicative that the areas is in attainment and EPA should conclude the area is in attainment.

### EPA's Response:

The EPA disagrees with the comment that the three air monitoring stations support an attainment designation. EPA stated in its proposed action that the lack of air monitoring showing nonattainment is not sufficient information to determine an area is meeting the standard because a monitor may not be located in the area of greatest impact and is not sufficient to rule out that a violation of the 2010 $SO_2$ NAAQS may occur in the immediate vicinity of the facility or other facilities in the Parish. The EPA provided analysis of the closest monitor to the Nelson & NISCO facilities on page 21-22 of the draft TSD, the Westlake monitor (AQS ID 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). As discussed below, this monitor, as well as the others not listed, were not representative of the maximum emission impacts (maximum ambient concentrations), making any further analysis for the other monitors is unnecessary.

EPA's Monitoring TAD provides recommendations on performing modeling to locate the areas of maximum impacts and frequency of impacts around a facility for selecting a location for monitoring the maximum impacts from a source. No modeling analysis following EPA's TAD, other modeling analysis, or other technical analysis other than proximity to a source were provided to substantiate that any of the three monitors are located to pick up the maximum

61

impacts from the sources. EPA's Monitoring TAD relies on both proximity and wind data (speed and direction) to identify appropriate monitor locations and recommends modeling as the most sophisticated tool typically used to site monitors because it takes into account many atmospheric conditions (upper and lower atmosphere wind speed and direction; location, emission rates, and dispersion of pollutants from background sources; etc.) to estimate the areas where maximum impacts would most likely occur. The only justification provided by the commenters was general proximity without consideration of meteorology and other factors. As discussed in the draft TSD, the maximum impact from the Nelson & NISCO facilities would likely be closer to the facilities and would be in a different direction than the direction of the Westlake monitor. Based on past modeling in the area (including the Sasol PSD permit modeling that was very close to the Westlake monitor), the maximum impacts from the Nelson & NISCO facilities were to the Northwest of the facility and to the Southwest of the facility and the Westlake monitor is actually to the Southeast of the Nelson & NISCO facilities. Therefore, the EPA finds that available information indicates that the Westlake monitor is not in the area where maximum impacts from the Nelson & NISCO facilities would be expected. Additionally, the LAIA North monitor is located just west of Nelson and South-Southwest of NISCO and the monitor is not situated to be downwind of both facilities at any given time, so it would not be representative of the maximum impact (See Figure 3 of LDEQ's September 18, 2015 recommendation). The LAIA South monitor is located where winds from a North-Northeast direction could transport both facilities impacts to the monitor, but the monitor is over 8 km away, so it is not situated to monitor the maximum impacts from these two facilities. We evaluated LDEQ's recommendation and map in preparing our proposal and concluded that no monitors in the area were located to monitor maximum ambient concentrations, including the Westlake monitor (Proposed Designation draft TSD for Louisiana). Moreover, there is no substantial information to indicate that any of the three monitors are located in the area of maximum impacts from sources and the information available indicates that none of these monitors are situated to monitor the maximum impacts from these two facilities, nor from all the facilities in Calcasieu Parrish.

The EPA also noted in our TSD several discrepancies in the modeling provided that make it unreliable for making a decision of attainment or nonattainment. Some of these issues are also discussed below in response to other comments, and in the draft and final TSDs. The EPA finds that based on our analysis of available information, it is unclear whether the area would model attainment or non-attainment if the discrepancies remedied.

With regard to concerns about model over-prediction, AERMOD underwent a very detailed performance analysis using many field study datasets to assess the model's capabilities and determine the model was adequate for estimating ambient concentrations from emission sources before it was promulgated in 2005 as EPA's preferred model for estimating ambient concentrations for near field impacts. As discussed in a previous response above, performance analyses show that AERMOD results match monitoring data relatively closely. We disagree with the commenter that AERMOD results in overly conservative estimates for the situations modeled in the Calcasieu area.

62

The emission decreases that the commenter raises could have been fully taken into account in modeling actual emissions for each of the facilities in the domain, but the modeling provided did not include short-term actual emissions or stack parameters. The EPA cannot predict how modeling both the best estimates of actual emissions and actual stack parameters (exit velocity, temperature, etc.) would change the modeled concentrations. Building downwash, appropriate meteorology, and other modeling considerations would also have to be appropriately included/addressed in order to assess if maximum modeled concentrations were above or below the standard. Decreases in emissions could potentially also be paired with decrease in stack velocities or temperatures, that also would have to be factored into the dispersion and estimated concentrations.

The modeling used an estimate of background concentrations that was likely too low. Background was estimated by using data from the Westlake monitor but excluding data collected when winds were from a 90 degree arc said to be influenced by non-background sources (i.e. sources explicitly modeled). As discussed in our TSD and elsewhere in this RTC, the 90 degree arc likely excludes too much data, resulting in background levels that are too low.

Given the above deficiencies in the modeling, the EPA finds that the modeling is not reliable for making a decision regarding attainment or nonattainment of the 2010 $SO_2$ NAAQS. Further, existing air monitoring data is not representative of the areas of expected maximum impacts. As a result, EPA does not agree that sufficient information exists to support a designation of unclassifiable/attainment.

**Comment:** One commenter (0320-Entergy LA-TX) stated that the impact of the alleged technical errors or discrepancies in the September 2015 air quality modeling analysis concerning the area of analysis, meteorology and surface characteristics and background concentrations are trivial and do not justify modification of LDEQ's attainment recommendation, particularly considering that no alternate analysis is available in the public record of EPA's proposed designation. Commenter stated that many of the alleged technical errors regarding meteorology and surface data are not prohibited by EPA's Modeling TAD and have been accepted by LDEQ and EPA in previous New Source Review modeling analyses.

One commenter (0323-Beall) provided a detailed discussion of the modeling analysis, including area of analysis, meteorology and surface characteristics, background concentration, standard conditions, and emissions and requested that the EPA provide a detailed, written response to the following:
- The air modeling analysis conducted on behalf of the Calcasieu $SO_2$ Stakeholders Group demonstrates that Calcasieu Parish should be designated as "attainment" for the 1-hour S02 NAAQS. At a minimum, the data supports a designation of "unclassifiable/attainment" for this area.
- The conversion from modeled concentrations to Standard Temperature and Pressure (STP) has not been required in some modeling analyses in the state of Louisiana and accepted by EPA and LDEQ in the past.
- CEMS data for Nelson and NISCO facilities were not used and would be used if given more time.

63

- EPA failed to consider other valid SO$_2$ ambient air monitors located in Calcasieu Parish in its *Technical Analysis for Calcasieu*. Full consideration of this data supports a final designation of "attainment" for this area. At a minimum, the data supports a designation of "unclassifiable/attainment" for Calcasieu Parish.

- EPA should allow more time to evaluate the available modeling and monitoring data *after* a final designation is made for this area by July 2, 2016. It is wholly inequitable to require Calcasieu Parish to meet either January 2017 EPA deadline (which also mandates a state deadline of July 1, 2016) if EPA makes a final designation of "unclassifiable" for this area.

**EPA's Response:**

The EPA disagrees with the comment that the technical errors and discrepancies cited by the EPA are "alleged" or "trivial." As discussed in this response, other responses within this RTC, and our TSDs, the EPA has many concerns with the reported modeling results. Also, public health protection in areas where there may be a violation of the standard are serious matters and not considered trivial. These concerns can make significant differences in the modeling. Without corrected modeling it is difficult to predict exactly how model results would change, but in the EPA's experience we could easily see differences of 10 to 30% for many of these errors /discrepancies, which could result in very different modeled results.

The EPA disagrees with the comment that Calcasieu Parish should be designated as "attainment." When evaluating the modeling submitted by the industry, the EPA determined that the industry modeling approach is not consistent with the SO$_2$ Modeling TAD.

As further detailed in the TSDs, the use of Baton Rouge surface data instead of Lake Charles data in the industry modeling does not follow the guidance in the TAD regarding the proximity and representativeness of the site to the area under consideration, nor does it follow LDEQ's own guidance for modeling in Southwestern Louisiana. The TAD, Guideline on Air Quality Models (40 CFR Part 51 App. W), and EPA guidance do not specifically prohibit the use of meteorological data from another area, but there are several things that have to be addressed in order to do so, and in this case none of these issues were adequately addressed. First, no was information provided as to why the Lake Charles (Calcasieu Parish) area meteorological data was not acceptable and was not utilized. Secondly, no information was provided to support a conclusion that the Baton Rouge NWS data is representative of the Calcasieu Parrish area. The data has to be representative of the meteorology that transports pollutants in the area being analyzed, use local data if available (in this case there is a local station), and if no local data is available then the data must nevertheless still be representative (40 CFR Part 51 App. W). Adequate reasoning was not provided for why NWS surface station information in Calcasieu Parrish was not used in the modeling and little evidence was provided to support using the alternate location, on the other side of the state, for surface data. Given the differences in surface, locations/distances, and orientation to water bodies (both the Gulf of Mexico and Lake Ponchartrain) between the two stations, the EPA does not find a basis for the position that the alternate station would be representative. While the comment generally states that the meteorological data is similar, this assertion is not substantiated by the commenter and no reason was provided for not using the local Calcasieu NWS data. Also, the meteorological data was from 2009-2013 rather than the latest three years recommended in the modeling TAD. Without

64

modeling that uses representative meteorological data and data from the appropriate time period, the modeling provided by the industry and state is of limited value and is not sufficient for EPA to appropriately assess the local attainment status of the area.

As we noted in our proposed designation TSD, the industry group's report included an error in the conversion of the AERMOD modeled 99th percentile impact from $\mu g/m3$ to ppb, converting 168.6 $\mu g/m3$ to 59.77 ppb. However, based on standard conditions of 25C, 1 atm, and a molecular weight of 64 for SO2, 168.6 $\mu g/m3$ equals 64.46 ppb. The AERMOD results provided are for STP conditions but in the modeling analysis provided the conversion was done at non-STP conditions. AERMOD uses a 0.3823 multiplier to convert $\mu g/m3$ to ppb. When this correction is applied, the industry group's modeling indicates that the predicted 99th percentile 1-hour average concentration within the chosen modeling domain is 206.61 $\mu g/m3$, or 78.78 ppb. This modeled concentration is based on actual annual emissions from the facilities. Furthermore, based on our correction to the industry group's calculated background concentration that involved an interpolation between two data points, the predicted 99th percentile 1-hour average is 207.6 $\mu g/m3$, or 79.31ppb. To be clear, the EPA's view is that this background value is still likely underestimated because of the use of 90 degree arcs to exclude data from the background value calculation.

Hourly CEMS data available for Nelson Electric Generating Plant and the Nelson Industrial Steam Company (NISCO) were available but not utilized in the modeling, which is inconsistent with the TAD. Additionally, the industry's modeling did not include any varying emission rates for any of the facilities and the same rate was modeled for all years, which is also inconsistent with the TAD.

In regards to the background value used in the analysis (discussed in more detail in another response within this RTC), given the close proximity of the sources (primarily Entergy and Sasol) to the Westlake monitor, we have concerns that more data was excluded than should have been by using the 90 degree arc. The likely result of correcting this issue would be higher background value, as more data would most likely result in a higher value and could not result in a lower value, which, when added to modeling results, would yield higher values than the current analysis presents. Thus, the EPA's view is that the modeling results are biased low.

The modeling only takes into account 2013 actual annual emissions based on LDEQ inventory data—the hourly CEMS data for Nelson Electric Generating Plant and the Nelson Industrial Steam Company for the 2012-2014 period was not utilized in the modeling—and held constant, rather than utilizing hourly-variable stack temperature and exit velocity. As discussed above, the background monitor value used may not reflect actual conditions in the area that experiences the predicted maximum impacts of $SO_2$.

Lastly, it is also unclear what building information was available for downwash and what facilities/sources downwash was considered within the modeling. Downwash can have significant impacts on modeled values.

In our TSD for the proposal, we raised concerns that we could not evaluate the adequacy of the area of analysis.  Commenter asserted that the area of analysis was sufficient without additional information. EPA still finds that it is not possible to ascertain whether the area of analysis used in the modeling is adequate.  The modeling provided was broken into over 40 model runs and no maps of the receptor grids were provided to review how the receptors grids were broken up and whether the receptor grid was adequate for the analysis area. We have consistently and historically strongly discourage the breaking of modeling into more than 2 or 3 receptor grids, as it makes the modeling extremely difficult to review, especially in the time frame that reviews have to be completed. Of particular concern is whether adequate receptors were included in areas around other relevant sources. Lastly, as discussed above, the background monitor value used may not reflect actual conditions in the area that experiences the predicted maximum impacts of $SO_2$.

As discussed above, we also do not have information on any potential impacts on the western part of Calcasieu Parish from two large Orange County, Texas, sources near the western border, the lack of which also provides uncertainty in designating Calcasieu Parish. For these reasons and based on available information, EPA does not have sufficient information to determine whether the area is attaining or not attaining the standard. Therefore, the EPA's final designation for the area within Calcasieu Parish is unclassifiable.

The EPA disagrees with the comment that we did not consider other valid monitors in the parish. As discussed in more detail in another response to comment in this document, EPA stated in its proposed action and still maintains that the lack of air monitoring showing a nonattainment problem is not sufficient information to determine an area is meeting the standard because a monitors may not be located in the area of greatest impact.

The EPA disagrees with the comment that more time should be allowed to evaluate the available modeling and monitoring data *after* a final designation is made for this area by July 2, 2016. The EPA has fully reviewed and analyzed the currently available information referred to by commenter and has determined that this information does not provide an adequate basis for the EPA to determine whether the area is meeting or not meeting the 2010 $SO_2$ NAAQS. Regarding the comment on Data Requirements Rule deadlines, while out of scope of this final action, as discussed within that rulemaking, the EPA's view is that the schedule and deadlines are reasonable. The EPA stated specifically in that rulemaking that, while the schedule for meeting the requirements of this rule is expeditious, the schedule can be achieved with the appropriate planning, coordination, and program implementation by affected air agencies. The EPA strongly encouraged air agencies to start their investigation of that issue as soon as practicable, as any further delay in air quality characterization around sources subject to the DRR would delay implementation of the standard and public health protection in areas where there may be a violation of the standard.

*Comment:*

One commenter (0320-Entergy LA-TX) stated that both the non-contradicting 2015 air quality modeling analysis and EPA's Louisiana TSD reflect that the most recent design value based on data collected between 2012 and 2014 for the Westlake monitor was 35 ppb. Commenter stated

that the EPA concludes that the Westlake monitor's design value demonstrates that the two Nelson facilities likely are not the primary contributors to EPA's predicted maximum concentrations of $SO_2$. Commenter stated that, given these findings, EPA should conclude that $SO_2$ emissions reductions at the Nelson facilities are not warranted or necessary to achieve a designation of attainment for Calcasieu Parish for the 2010 $SO_2$ NAAQS.

One commenter (0320-Entergy LA-TX) stated that EPA's own Louisiana TSD includes an apparent contradiction with respect to the Westlake monitor by encouraging the use of the monitored data in establishing background concentrations based on the monitor's "close proximity" to Entergy's Nelson facilities, while simultaneously asserting that the monitor is "not representative of the maximum from Nelson facilities and other cumulative sources."

***EPA's Response:***

The EPA disagrees with the comment that we did not consider other valid monitors in the parish. As discussed in more detail in another response in this document, the EPA provided analysis of the closest monitor to the Nelson & NISCO facilities on page 21-22 of the draft TSD, the Westlake monitor (AQS ID 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), but this monitor, as well as the others not listed, were not representative of the maximum impacts.

The EPA disagrees with the commenter's reasoning that emission reductions are not potentially needed to achieve attainment. While the ambient air quality data collected at the Westlake monitor (AQS ID 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) may not adequately characterize the impacts from the Nelson & NISCO facilities, the most recent design value, based on data collected between 2012 and 2014, at the Westlake monitor was 35 ppb. This monitor is located approximately 2.5 km south of the Nelson & NISCO facilities, and 10 km north of the area where the greatest impacts of $SO_2$ are expected based on our grouping analysis. While this monitor is not a good monitor for the maximum impacts of Nelson & NISCO and other sources, it is close enough to the Nelson & NISCO facilities that they could have impacts often enough to affect the Westlake monitor's design value. This analysis does not alter our previous analysis discussed above in this RTC that the Westlake monitoring data is not informative as to whether these two facilities are causing any NAAQS exceedance or violation. The Nelson & NISCO facilities are several kilometers from other high modeled values near the standard (considering discrepancies and errors). Therefore the EPA's analysis is that the Nelson & NISCO facilities are not the primary contributors to the predicted maximum concentrations of $SO_2$ near Rain, Citgo, and Alcoa but the Nelson & NISCO facilities could still have some impact on these higher impact areas, and the EPA notes that these potential impacts will likely need to continue to be considered in future assessment of the areas.

The EPA disagrees with the comment that there is a contradiction in the discussion regarding the Westlake monitor. None of the monitors represent the maximum impacts from the Nelson & NISCO facilities. The Westlake monitor is located such that it is more likely to pick up the maximum impacts from the Sasol facility, not the Nelson & NISCO facilities. The draft TSD highlighted the Westlake monitor to show that even the closest monitor was not very representative of the maximum impacts.

The EPA did not choose or recommend the use of the Westlake monitor as background specifically. The modeling provided used a technique in utilizing the Westlake monitoring data,

using only the data when the wind directions were from directions not potentially impacted from an industrial facility, to create an artificial background value. As discussed above, the analysis used a 90 degree arc around the facility that, due to proximity of local sources to the monitor, resulted in dropping more data than EPA finds would be appropriate. A different background monitor than the Westlake monitor could potentially be used, or refinements would be needed to include additional data if the Westlake monitor is used to estimate background concentrations, which would likely increase the estimated background values. The commenter erroneously asserts that EPA encourages the use of the Westlake monitor due to its close proximity to the Nelson & NISCO facilities. EPA's concern was due to the close proximity of the monitor to the Nelson & NISCO facilities that the 90 degree arc (+/- 45 degrees centered on the wind direction from the Nelson & NISCO facilities to the Westlake monitor) excludes some wind directions to the Westlake monitor that would not include impact at the monitor from the Nelson & NISCO facilities, thus excluding monitoring data from the background concentration calculation and resulting in a biased low value within the modeled value for estimating ambient concentrations.

*Comment:* Two commenters (0320-Entergy LA-TX , 0323-Beall) stated that, if EPA makes a final designation for Calcasieu Parish of unclassifiable, the EPA should allow more time to evaluate the available modeling and monitoring data after a final designation is made for this area by July 2, 2016. Commenter (0323-Beall) stated it is inequitable to require Calcasieu Parish to meet either the January 2017 EPA deadline (which also mandates a state deadline of July 1, 2016) if EPA makes a final designation of "unclassifiable" for this area.

Commenter (0320-Entergy LA-TX) asserted that it is inequitable to require the State and affected sources to comply with the July 1, 2016 deadline for air quality characterization under the Data Requirements Rule where EPA will not finalize the area designation which triggers applicability of the DRR until July 2, 2016. Commenter stated that, for such areas, EPA should not arbitrarily impose an unrealistic deadline for completing the additional evaluation at the expense of the public and affected sources.

*EPA's Response:*

The EPA disagrees with the comment that more time should be allowed to evaluate the available modeling and monitoring data *after* a final designation is made for this area by July 2, 2016. The EPA has fully reviewed and analyzed the currently available information referred to by commenter and has determined that this information does not provide an adequate basis for the EPA to determine whether the area is meeting or not meeting the 2010 $SO_2$ NAAQS. Regarding the comment on Data Requirements Rule deadlines, while out of scope of this final action, as discussed within that rulemaking, the EPA's view is that the schedule and deadlines are reasonable. The EPA stated specifically in that rulemaking that, while the schedule for meeting the requirements of this rule is expeditious, the schedule can be achieved with the appropriate planning, coordination, and program implementation by affected air agencies. The EPA strongly encouraged air agencies to start their investigation of that issue as soon as practicable, as any further delay in air quality characterization around sources subject to the DRR would delay implementation of the standard and public health protection in areas where there may be a violation of the standard. Moreover, the fact that EPA is issuing an unclassifiable designation for this area does not affect the applicability of the DRR in this case – the area was already subject to it as an undesignated area, and simply remains so following designation as

unclassifiable.  Only a designation of nonattainment would have changed the applicability of the DRR.

# XIV. Maryland

## A. Anne Arundel County and Baltimore County

*Comment:* Some commenters (0208-APC, 0210-APC, 0211-Didonato, 0218-APC, 0247-Garofolo, 0259-Allen, 0264-Smith, 0267-APC, 0273-APC, 0277-APC, 0279-Meadows, 0290-Fernandez, 0292-Zetter, 0295-ACP) expressed concern about air quality in this area. Many of these commenters suggested that the coal-fired power plants in the area (Wagner and Brandon Shores) should reduce their sulfur dioxide emissions. One commenter (0247-Garofolo) urged the State of MD and Raven power to provide readily accessible information about the hourly rates and appropriate and timely notifications to local communities when the regulated rates are exceeded.

*EPA's Response:* EPA acknowledges the commenters' concerns.  With this designation, EPA is taking action to address air quality in the area surrounding the Wagner power plant.  EPA's designations and implementation processes for the 2010 1-hour $SO_2$ NAAQS will address through the planning process of Part D of Title I of the CAA ambient air quality issues resulting from sulfur dioxide emissions in the nonattainment area.  It is beyond the scope of this action for EPA to comment on MD's or Raven Power's ability to provide the local communities with accessibility to sulfur dioxide emissions data.

*Comment:* Some commenters (0212-APC, 0225-APC, 0229-APC, 0230-APC, 0232-Leopold, 0247-Garofolo, 0278-APC, 0332-AB-Sierra Club, Sierra Club 5-10-16) supported the EPA designation of "nonattainment" for the area. Commenter (0230-APC) provided five attachments regarding air quality in this area. One commenter (Sierra Club 5-10-16) stated that Maryland should establish modeling-informed short-term emission limits for Wagner, Crane and Brandon Shores sufficient to ensure that the areas around these plants attains EPA's health-protective $SO_2$ NAAQS and, in the interim, EPA should finalize its proposed nonattainment designation.

One commenter (0332-AB-Sierra Club) stated that, while both the Sierra Club and the State of Maryland submitted air dispersion modeling analyses, the EPA found the Sierra Club modeling of violations persuasive and stated that it closely follows the EPA modeling guidance. Commenter stated that the EPA found Maryland's modeling analysis problematic and not in accordance with EPA's modeling guidance. Commenter stated that, both for the reasons identified in the EPA TSD and as discussed in commenter's letter regarding use of synthetic emission rates and the LOWWIND3 option, Maryland's modeling does not support an attainment designation. Commenter stated that, absent an enforceable 1-hour limit on Wagner Unit 2's $SO_2$ emissions, there is no basis for Maryland's modeling analysis revising downward the unit's historical emissions.

Commenter (0332-AB-Sierra Club) objected to the modeling provided by AECOM to Maryland because the EPA has not formally approved the use of the ADJ_U* and LOWWIND3 options as the regulatory default under Appendix W and because AECOM failed to support the preferability of these options for modeling the Baltimore-area coal plants, especially for determining whether the area is attaining the 1-hour $SO_2$ NAAQS. Commenter provided discussion of this issue in their letter and attachments, including attached comments of Camille Sears (Exhibit 4). Also see discussion of these options in section III.A.1 of this document.

Commenter (0332-AB-Sierra Club) stated that, while the Sierra Club believes that their 2015 modeling fully supports a nonattainment designation, they attached a supplemental modeling report (Appendix B Exhibit 3) demonstrating that the results of the 2015 modeling report are robust to the modeling years selected, the use of emission data from EPA's Emissions Modeling Clearinghouse and to the inclusion of variable hourly exit velocities. Commenter stated that, consistent with these conclusions and with the supplemental information described in their letter and attachments, they urged the EPA to finalize its proposed nonattainment designation for the areas around the Wagner coal-fired power plant.

*EPA's Response:* EPA appreciates the support for the proposed nonattainment area. EPA discusses in detail the modeling analyses submitted by both Sierra Club and the State of Maryland in order to inform EPA's proposed designation in the Maryland technical support document (TSD) for the intended designation. The modeling analyses submitted by Sierra Club and Maryland during the public and state comment periods are discussed in detail in the TSD for the final designation.

*Comment:* Two commenters (MD Response, Attachment 1, 0308-Raven Power) stated that a nonattainment designation is not supported by the data available.

One commenter (MD Response) stated that refined modeling of the 1-hour $SO_2$ emissions in the area of Wagner shows that the area is in attainment of the standard. Commenter's letter referred to detailed comments their TSD (MD Response, Attachment 1, 13 pages and Appendices A-E). Commenter included five additional attachments: AECOM modeling report April 2016 for Wagner and Brandon (Attachment 2); AECOM modeling report January 2016 for Wagner and Brandon Shores (Attachment 3); MDE April 14, 2016 letter to EPA Region 3 (Attachment 4); MDE April 19, 2016 technical report for Wagner and Brandon Shores (Attachment 5); and MDE letter to EPA Region 3 November 20, 2015 (Attachment 6).

Commenter (MD Response, Attachment 1) provided the following summary to show that an attainment designation is supported by the available data and analysis. Additional details are provided in their comments (MD Response, Attachment 1, pdf pages 4-7).

1. Modeling results for a 12-month period of post-MATS actual emissions for the Wagner facility show the area to be in attainment of the 1-hour $SO_2$ standard.

2. As found in the three-year study that MDE provided to EPA in January 2016, and as substantiated through additional modeling evidence produced since and described in this document, the Wagner area is currently attaining the 1-hour $SO_2$ NAAQS. This modeling

takes into account emissions reductions achieved through compliance with EPA's MATS Rule and the application of some permissible AERMOD modeling options, as listed below. See commenter's Attachment 4 which describes commenter's position that the ADJ_U* option is justified for use in the 1-hour $SO_2$ characterization air quality modeling for the Wagner power plant.

    a.  (i) ADJUST U star (ADJ_U*)
    b.  (ii) LOWWIND3
    c.  (iii) Sector-specific 1-hour $SO_2$ background concentrations
    d.  (iv) Variable actual emission rates, exit temperatures, and exit velocities

3.  The MATS Rule emission limits will be incorporated into the facilities' Title V Operating Permits making them federally enforceable and therefore appropriate for use in this modeling demonstration.

Commenter (0308-Raven Power) stated the EPA has not adequately justified its dismissal of the modeling demonstration provided by the Maryland Department of Environment (MDE) initially. Commenter stated that the MDE modeling results demonstrated that the area around Wagner is in attainment with the $SO_2$ standard when emission reductions achieved through compliance with EPA's MATS Rule are accounted for, and when some permissible AERMOD modeling options including beta U*, LOWWIND3, and sector-specific background levels are applied.

One commenter (Sierra Club 5-10-16) stated that nothing in Maryland's April 14 and 19 submissions alters the facts that (1) Maryland has identified no federally enforceable short-term $SO_2$ limits for the Wagner plant, thereby delegitimizing any modeling that fails to reflect the Wagner plant's actual historical emissions and (2) when Wagner's actual emissions are modeled, both MDE's and Sierra Club's modeling show nonattainment. Commenter stated that, in Wagner Units 2 and 3, Raven is authorized to blend and burn a range of coals, which could result in significant fluctuation in the plant's future emissions rate, including emissions at rates that exceed those modeled by AECOM and MDE. Commenter stated that, because the State of Maryland has not adopted any federally enforceable emission limitations that would eliminate these violations, the EPA should finalize its proposed nonattainment designation.

***EPA's Response:*** EPA disagrees with the commenters MD and Raven Power and finds that a nonattainment designation for the area surrounding the Wagner power plant is indeed supported by the available data. EPA's detailed analyses and explanations concerning the points listed above can be found in both EPA's TSDs for the intended and final designations for the State of Maryland.

EPA agrees with commenter Sierra Club concerning no federally enforceable $SO_2$ limits being identified in Maryland's submissions. A detailed analysis of Maryland's April 14 and 19 submissions can be found in EPA's final designations Maryland TSD.

***Comment:*** Commenters (MD Response, Attachment 1, 0308-Raven Power) stated that, while the EPA primarily relied on Sierra Club's modeling for its preliminary recommendation of nonattainment, there are many deficiencies in the Sierra Club modeling, including issues with

background concentrations, meteorological data processing, receptor locations and the use of constant stack exit temperatures. Additional details are provided in their comments (MD Response, Attachment 1, pdf pages 7-9; 0308-Raven Power, pdf pages 5-7). Commenter (MD Response, Attachment 1) stated these errors in the Sierra Club modeling make it unsuitable for use in the designation process.

One commenter (Sierra Club 5-10-16) stated that Maryland's criticisms of certain factors in the Sierra Club modeling have not been shown to have any meaningful impact on the modeled results. Commenter stated that the EPA TSD indicated that these factors should not significantly change the final model concentrations. Commenter stated that Maryland's critiques are poorly taken given that it is Maryland's preferred modeling analysis, not Sierra Club's, which is fundamentally inconsistent with EPA's modeling guidance. Commenter stated that, when MDE modeled actual emissions for Wagner, its modeled results did not differ appreciably from those in the Sierra Club modeling.

***EPA's Response:*** EPA disagrees with the commenters MD and Raven Power. EPA's detailed analysis of the Sierra Club's modeling can be found in EPA's draft TSD for the State of Maryland. EPA, however, received new modeling from both Maryland and Sierra Club during the state and public comment periods, and after evaluating these newer modeling analyses, EPA is finalizing a designation of nonattainment for an area surrounding the Wagner power plant based largely on one of Maryland's modeling analyses (i.e. the BETA Adjust U* modeling run found in Appendix of D of Maryland's April 19, 2016, submission). As such, EPA agrees with commenter Sierra Club in that ultimately Maryland's Appendix D run, which EPA determined to be most representative of actual air quality in the area surrounding Wagner, still showed $SO_2$ NAAQS violations in the area surrounding Wagner. A detailed analysis of the new modeling analyses submitted to EPA during the comment periods can be found in EPA's final TSD for the State of Maryland.

***Comment:*** Two commenters (MD Response, Attachment 1, 0308-Raven Power) disagreed with the EPA's proposed designation and stated that variations in modeling results support an unclassifiable/attainment designation. Commenter (0308-Raven Power) stated that the EPA has designated areas in other states as unclassifiable/attainment when conflicting information was presented or if modeling submitted from different parties showed results just under or over the NAAQS. Commenter (MD Response, Attachment 1) stated that an unclassifiable designation would allow for additional time to address the modeling uncertainties, better capture the benefits of the MATS reductions and potentially conduct additional monitoring. Additional details are provided in their comments (MD Response, Attachment 1, pdf pages 9-10; 0308-Raven Power, pdf page 7).

One commenter (Sierra Club 5-10-16) stated that, although Maryland contends that there is conflicting modeling and this warrants an "unclassifiable" designation, there is actually broad agreement between MDE's modeling and the Sierra Club modeling. Commenter stated that there is no significant difference in the modeling results as both show that the plant, as currently permitted and based on its actual emissions, is causing nonattainment.

***EPA's Response:*** EPA disagrees with the first commenter. As discussed in both the draft and final Maryland TSDs, EPA does not agree that the available information supports an attainment designation or an unclassifiable designation given the modeling results available to and considered by the EPA. As the EPA has consistently maintained, including in EPA's $SO_2$ Data Requirements Rule (DRR) (80 FR 51054, August 21, 2015), any emission reductions a source relies upon must be achieved through federally enforceable mechanisms in place prior to final designations. For instance, such a federally enforceable mechanism could include a $SO_2$ emission rate approved into a title V permit or into the state's state implementation plan (SIP) prior to final designations. Relying on a limit established to comply with MATS that has not been reflected in a federally enforceable permit or SIP is not sufficient for demonstrating that an area is complying with the 2010 $SO_2$ NAAQS. In addition, in both the proposed and final Maryland TSDs, EPA discusses that EPA's guidance provides that modeling for the $SO_2$ NAAQS should be done using federally enforceable limits. As discussed in the TSDs, the modeling referred to by the commenter did not rely on any such federally enforceable limits which would show attainment of the NAAQS or undermine the Sierra Club modeling which supports a nonattainment designation. Finally, EPA discusses the use of AERMOD modeling options including beta adjust U* in the final Maryland TSD. As discussed in more detail in that TSD, the EPA evaluated Maryland's modeling with acceptable AERMOD alternatives and finds that the modeling still supports a designation of nonattainment for the area around the Wagner power plant.

***Comment:*** One commenter (0289-Transpoint Atlantic) stated that a nonattainment designation in Anne Arundel County is not technically supported and will cause grave economic consequences to the growth of the region and their planned port-to-rail-to-road facility at the former Bethlehem Steel Plant in Sparrows Point. The commenter disagreed in particular that the boundary of the nonattainment area should extend 35.5 km from Wagner, which would have the effect of including Transpoint Atlantic's property in Baltimore County. The commenter stated that (1) no monitor in Maryland has shown a violation of the one hour $SO_2$ NAAQS, (2) peak daily one hour values in the summer of 2013 were generally well below the applicable standard, (3) Wagner unit 2 began in April 2015 to use low sulfur coal at that facility, and (4) unit 3 will be adding an injection system that can also help reduce $SO_2$ emissions.

Two commenters (MD Response, Attachment 1, 0308-Raven Power) stated that the extent of the nonattainment area proposed by EPA is unjustified because, for the distant receptor locations, it is impossible for the plume to travel that distance within the model's 1-hour averaging time. A more detailed explanation of these views is provided in the commenters' letters (MD Response, Attachment 1, pdf pages 11-13; 0308-Raven Power, pdf page 8).

***EPA's Response:*** EPA acknowledges Transport Atlantic's concerns, however, EPA disagrees that a nonattainment designation is not technically supported. As discussed in the draft TSD, although no monitor in Maryland has shown a violation of the SO2 NAAQS, there are no ambient SO2 air quality monitors located in Anne Arundel County, the county within which Wagner Generating Station is located, so reliance on air quality data alone is not sufficient in this case to evaluate the area's status in attaining the SO2 NAAQS. The commenter's point

concerning peak daily 1-hour values in the summer of 2013 as being generally below the standard is likewise discussed in the draft TSD (p. 9) in which the EPA provided its response to the 2013 data.  EPA disagrees that this data is a reliable indication of the actual air quality in the area surrounding Wagner for the reasons discussed in the TSD.  With regards to the commenter's third and fourth points concerning Wagner's use of low sulfur coat in unit 2 and proposed dry sorbent injection (DSI) installation in unit 3, as discussed earlier in this document, any emission reductions must be achieved through federally enforceable mechanisms in place prior to final designations to be considered relevant for that designation.  Wagner's use of low sulfur coal has not been incorporated into a federally enforceable mechanism, nor has a DSI system been installed yet.  EPA cannot base a final designation decision on emission reductions systems that are not federally enforceable, or in the case of the DSI system, that are proposed for the future and do not yet exist.

EPA acknowledges Raven Power's comment concerning the extent of the nonattainment area boundary. EPA has evaluated additional information received during the public and state comment periods and as further detailed in the final Maryland TSD, EPA is modifying the nonattainment area boundary to exclude the far north/northwest portions of Baltimore County.

## XV. Michigan

### A. St. Clair

*Comment:* One commenter (0309-DTE Energy) agreed with the designation recommendation that only a portion of St. Clair County should be considered nonattainment. Commenter supported the EPA's change to clarify the southeastern and northeastern corners of the nonattainment area. The commenter disagreed with the use of the Pontiac meteorological station instead of the closer St. Clair Airport based on proximity to Lake St. Clair.

*EPA's Response:* The EPA appreciates the support on the recommendation.  As discussed further in the final Michigan TSD, for the recommendation of meteorological stations, the EPA maintains that meteorological data were selected from the Pontiac Station because the Pontiac Station had a more complete data set than the St. Clair Airport.  Specifically, the Pontiac Station had one minute Automated Surface Observing System (ASOS) data available, and the St. Clair Airport did not.  Therefore, the Pontiac Station offered a more appropriate data set within the guidelines of Appendix W and the Modeling TAD.

*Comment:* One commenter (0332-AG-Sierra Club) supported the EPA's intended designation of the area around DTE's Belle River and St. Clair Power Plants, including portions of St. Clair

74

County, as a nonattainment area for the 2010 1-hour SO$_2$ NAAQS. Commenter stated these are two of the largest SO$_2$ emitters in the nation, have no SO$_2$ controls, and such a designation is compelled by the modeling performed by MDEQ and Sierra Club. Commenter stated that MDEQ and Sierra Club's modeling evaluations adhere to EPA's Modeling TAD and Appendix W and both predict levels that far exceed the SO$_2$ NAAQS. Commenter stated that the EPA's proposed nonattainment area boundaries are equally supported by all of the modeling in the record.

*EPA's Response:* The EPA appreciates the support.

## B. Bay County

*Comment:* One commenter (MI Response) requested that Bay County be designated as unclassified/attainment for the SO$_2$ 1-hour NAAQS, rather than unclassified, because the Consumers Energy's Weadock facility in Bay County permanently discontinued operations. Commenter stated that, in a February 16, 2016, letter from Acting Regional Administrator Robert Kaplan to Governor Rick Snyder, the EPA stated that Bay County could be designated unclassified/attainment if the Weadock facility were shut down by April 15, 2016. Commenter stated that, based on federal consent orders for the facility, that the requirement has now been satisfied.

*EPA's Response:* As further discussed in the final Michigan TSD, at the time of proposal the EPA stated in the draft TSD that the modeling in the Michigan Department of Environmental Quality's (MDEQ) September 18, 2015, submittal, was an appropriate characterization of the air quality in the area other than the assumption that Weadock had no emissions. Now that Weadock is shut down, assuming zero tons per year of allowable SO$_2$ emissions is appropriate and EPA agrees that Michigan's modeling supports the EPA's conclusion that the area is meeting the NAAQS and the EPA's unclassifiable/attainment designation for the Bay County Area.

## E. Monroe County

*Comment:* One commenter (MI Response) stated that Consumers Energy's Whiting facility in Monroe County permanently discontinued operations. Therefore, the commenter requested that the county be designated as unclassified/attainment for the SO$_2$ 1-hour NAAQS rather than unclassified. One commenter (MI Response) requested that Monroe County be designated as unclassified/attainment for the SO$_2$ 1-hour NAAQS, rather than unclassified, because the Consumers Energy's Whiting facility in Monroe County permanently discontinued operations. Commenter stated that, in a February 16, 2016, letter from Acting Regional Administrator Robert Kaplan to Governor Rick Snyder, the EPA stated that Monroe County could be

designated unclassified/attainment if the Whiting facility were shut down by April 15, 2016. Commenter stated that, based on federal consent orders for the facility, that the requirement has now been satisfied.

*EPA's Response:* As further discussed in the final Michigan TSD, at the time of proposal the EPA stated in the draft TSD that the modeling in the MDEQ's September 18, 2015, submittal the modeling was an appropriate characterization of the air quality in the area other than the assumption that Whiting had no emissions. Now that Whiting is shut down, assuming zero tons per year of allowable $SO_2$ emissions is appropriate and EPA agrees that Michigan's modeling supports the EPA's conclusion that the area is meeting the NAAQS and the EPA's unclassifiable/attainment designation for the Monroe County Area.

*Comment:* One commenter (0309-DTE Energy) objected to the EPA's proposed unclassifiable designation for Monroe County based on that the retirement date (April 15, 2016) for the J. R. Whiting Power Plant had not passed. Commenter stated that adequate documentation has been provided to the EPA to designate Monroe County as attainment and there is no useful purpose for the interim "unclassifiable" label. Commenter stated the modeling demonstration, even with conservative assumptions, clearly shows that this NAAQS is attained and there are three years of monitoring data with a design concentration well below the NAAQS at a location as close as possible to the modeled peak impact receptor for Monroe Power Plant. The commenter also objected to the use meteorological data from Toledo Express Airport because it is 50 kilometers away from the Monroe Power Plant and Lake Erie has a profound effect on wind speed and direction when light gradient winds are present in Monroe County.

*EPA's Response:* As discussed elsewhere in this section and the final Michigan TSD, the EPA agrees that since Whiting is now shut down, assuming zero tons per year of allowable $SO_2$ emissions is appropriate and Michigan's modeling supports a conclusion that the area is meeting the NAAQS and an unclassifiable/attainment designation for the Monroe County Area. EPA maintains that meteorological data were selected from the Toledo Express Airport because the Toledo Airport had a more complete data set than the Monroe Custer Airport. Specifically, the Toledo Express Airport, also near Lake Erie, had one minute Automated Surface Observing System (ASOS) data available, and the Monroe Custer Airport did not. Therefore, Toledo Express Airport offered a more appropriate data set within the guidelines of Appendix W and the Modeling TAD.

*Comment:* One commenter (0332-AG-Sierra Club) stated that the EPA should designate Monroe County as in nonattainment with the 1-hour $SO_2$ NAAQS. Commenter stated that modeling provided by MDEQ is not in accordance with EPA's Modeling TAD or Appendix W, and does

not support an unclassifiable designation. Commenter stated that the Sierra Club modeling demonstrates violations and is consistent with EPA's Modeling TAD as it modeled actual emissions from all the sources in Monroe County that are likely to cause or contribute to an exceedance of the NAAQS in 2012 to 2014. Commenter stated that MDEQ's modeling uses an emission rate for the J.R. Whiting facility that reflects neither actual historical $SO_2$ emissions nor CAA enforceable emissions. Commenter stated that, absent an enforceable 1-hour limit, there is no basis for revising downward J.R. Whiting's historical emissions to zero.

*EPA's Response:* The EPA disagrees that the modeling for the Monroe County area is not in accordance with Appendix W and the Modeling TAD. The Modeling TAD allows for the modeling of allowable emissions or actual emissions to represent the current air quality. Allowable emissions can be more reflective of the current air quality, rather than historical actual emissions, especially when recent controls have been installed, which has occurred at the Monroe facility. Assuming no emissions from a permanently shut down facility is also appropriate to reflect current air quality conditions. Since the Whiting facility shut down, assuming zero tons per year of allowable $SO_2$ emissions is appropriate and the EPA finds that Michigan's modeling is sufficient and in the basis of our determination that the area is meeting the 2010 $SO_2$ NAAQS and the EPA's unclassifiable/attainment designation for the Monroe County Area.

# XVII. Missouri

## A. Franklin County

*Comment:* One commenter (0326-Ameren) stated that EPA's Proposed Designation is contrary to law, the available credible evidence, and EPA's own guidance and practice with respect to the 2010 $SO_2$ NAAQS and, therefore, is arbitrary and capricious. Commenter stated that:

1. EPA may not base an area designation on unreliable or non-representative data that does not clearly demonstrate nonattainment.

2. EPA's proposed designation is premature and arbitrary and capricious because it effectively prohibits consideration of monitoring data in contravention of EPA's own regulation.

3. EPA's approach in designating Franklin County as nonattainment is inconsistent with similarly-situated areas that EPA designated as unclassifiable and, therefore, is arbitrary and capricious.

4. An unclassifiable designation is required where reliable conflicting information exits.

5. It is arbitrary and capricious for EPA to disregard a state unclassifiable designation based upon third-Party Data.

***EPA's Response:*** In order, 1) EPA agrees with the commenter that designations should be made based on representative data, including for both unclassifiable/attainment and nonattainment. 2) As we stated in our March 20, 2015, guidance memo, we recognized that the timeline for designations by the court-ordered deadline of July 2, 2016, does not provide for establishment and use of data from new ambient monitors. We further stated that we anticipated that in many areas the most reliable information for information the July 2, 2016, designation would be based on modeling. As we discuss in the response to comments for the final Data Requirements Rule, EPA has historically used modeling for designation purposes under the $SO_2$ NAAQS and it is the EPA's position that it is appropriate to do so. See section (III)(A)(2) of this document for further information on utilizing modeling for the purposes of designations. 3) EPA disagrees with the commenter that the Labadie area is similarly-situated with other areas in the data available and circumstances surrounding the proposed designation – see the EPA's response to Ameren response request #2. 4) Based on all the available and reliable data, including new information received following the notification of our intended nonattainment designation, EPA is making a final designation of unclassifiable. 5) EPA did not disregard the state's designation recommendation. Both EPA's intended and final designation were based on all available and reliable information, including the state's submittal and recommendations to EPA and 3rd party information, including information submitted by Ameren.

***Comment:*** One commenter (0326-Ameren) requested that EPA respond to the following issues:

1. EPA's basis for failing to account for Ameren's actual monitoring data, where EPA relied upon available monitoring data in Colorado Springs, for example, in proposing an unclassifiable designation.

2. EPA's basis for failing to treat Ameren's actual monitoring data as a "reliable indicator" that Franklin County is attaining the NAAQS, where the monitors are located in areas of maximum concentration and where EPA relied upon similar monitoring data in Gibson County and Gallia County, for example, as an support for an attainment/unclassifiable and unclassifiable designation, respectively.

3. EPA's basis for failing to evaluate the accuracy of modeling in light of Ameren and MDNR quality-assured monitoring results and issuing a request to MDNR to perform additional modeling with revised assumptions.

4. EPA's basis for ignoring Ameren's alternative modeling as an indication that MDNR and Sierra Club's modeling over-predict s $SO_2$ concentration levels and, therefore, is unreliable.

5. EPA's basis for crediting Sierra Club modeling uses standard cubic feet per minute (SCFM) rather than actual cubic feet per minute (ACFM) and the reliability of such analysis given this fundamental error.

6. EPA's basis for ignoring monitoring data on grounds that it was not quality assured where there is clear evidence that such quality assurance has occurred and verification of such data was made available to EPA.

7. EPA's substantiation for how historic hourly monitoring data can support a present-day nonattainment designation.

8. EPA's justification for modeling separate emissions from the combined Unit 3 and Unit 4 stack.

9. EPA's justification for relying on background concentrations from East St. Louis rather than Nilwood, where the latter is more representative of onsite conditions.

10. The status of Ameren/MDNR's outstanding site-specific request for use of beta options for modeling.

11. EPA's basis for rejecting the use of ADJ_U* beta option where it has previously been approved by EPA for use.

12. EPA's justification for ignoring/not addressing modeling over-prediction caused by the known penetrated plume issue.

***EPA's Response:***

The EPA will respond to each of the commenter's numbered comments in turn within this response, below. The EPA notes that on March 31, 2016, Mr. Steven C. Whitworth provided comments on EPA's proposed nonattainment designation for the area around Labadie Energy Center in Franklin County, Missouri. The comments were extensive and as noted above included 18 additional exhibits, including dispersion modeling provided directly to EPA Region 7 on both March 18th, 2016, and March 29th, 2016. In sum, Ameren contended in this submittal that new monitoring data supports attainment, revised modeling submitted by Ameren supports attainment, use of ADJ_U* and LOWWIND3 in modeling is more representative than default model options and supports attainment, and dispersion modeling EPA relied upon from MDNR over predicts actual conditions and is in error.

As detailed below, EPA does not agree that an attainment designation is appropriate for numerous reasons and is specifically responding to the 12 issues requested in the comment. Note that EPA has combined responses to some of the comments when there was overlap between such comments.

***EPA's Response to Ameren #1 and #2 - Claims that current monitoring data around Labadie shows attainment.***

EPA finds that the record reviewed and analyzed for this designations action does not support a claim that the current two monitors around Labadie are placed in areas representative of maximum concentrations when considering terrain and available meteorological data. This EPA

conclusion is based on an analysis of all available data, including historic and new meteorological and monitoring data. For example, using the historic 1995-1998 Augusta Quarry meteorology data, the three year windrose shows that the predominant surface winds around Labadie are north and south while the current SO2 monitors are located to the east and west of Labadie stacks. While surface winds are not always representative of upper air flow patterns, these surface winds are clearly indicative of the directions emissions will travel once those emissions are mixed to the lower levels of the atmosphere.



This historic windrose data is also complemented by the new Valley meteorology site that shows a very similar pattern as the historic Augusta Quarry meteorology data. The EPA notes that the Valley site only includes data from April 2015 through December 31, 2015, so it is likely missing some of the northern components seen in the historic dataset, given that some of the winter months are missing when northern winds are more prevalent. Note that no other Valley data beyond December 31, 2015, was available to EPA at the time of preparation of this response to comments document.



The EPA's position is that neither of the current monitoring site locations are placed in areas representative of maximum concentrations based on an examination of both the current or historic wind rose information, as the wind frequency is predominantly north and south, not east and west as the current monitors are oriented.

An analysis of the historic monitor locations also shows they were located at higher elevations with better exposure to direct stack emissions, as opposed to the new monitors located at lower elevations. The figure below shows the current monitors are located at elevations of ~520 ft (NW monitor) and ~470 ft (Valley monitor), while the historic monitors are at elevations of ~600 ft (Augusta Quarry monitor) and ~860 ft (Augusta monitor). Because emissions are released at 700 ft above their base elevation, monitors placed at high elevations in the direction of higher wind frequencies are more likely to record higher concentrations, or peak concentrations. The current monitors are not in the predominant wind directions, nor are they located at elevated terrain surrounding Labadie, like the historic monitors were. In addition, in the EPA's analysis, it appears that the NW monitor may actually be somewhat shielded by other terrain features located between the Labadie stacks and this monitor location. When examining the maximum hourly readings for the two new monitors we note that there is a substantial difference in the maximum values between the two monitors, and this terrain shielding may be partially responsible for these differences in maximum values.

82



App. 984

*Revision Date: June 2016*

Ameren claims these new monitors are sited using EPA methodology and approval. MDNR is classifying the new Labadie monitors as Special Purpose Monitors (SPM) (http://dnr.mo.gov/env/apcp/docs/2015-monitoring-network-plan.pdf), and EPA has not yet concurred that the monitors are in locations expected to measure maximum concentrations, as EPA would need to for, for example, a Data Requirements Rule source. While EPA has indicated for MDNR's 2015 monitoring network plan that the monitors meet siting criteria for purposes of being away from obstructions, etc., EPA has not made any determinations of whether the monitors are in expected peak concentration locations as outlined by the 1-hr SO2 designations Monitoring Technical Assistance Document. Given our analysis of both the windrose and terrain information, along with factoring in historic monitoring locations, it appears that the current monitors are not likely sited in an area to measure the maximum concentrations.

EPA analyzed the modeling and data that Ameren submitted using the onsite meteorology. The plot below is a frequency plot of AERMOD modeled hourly impacts, where a count of maximum hourly impacts is made based on the onsite modeling data Ameren has provided. These counts represent the receptor with the maximum modeled reading during any given hour throughout the entire modeling domain being used by Ameren. The frequency of maximum hourly impacts occurs to the north of the Labadie stacks, not the northwest or east at the Valley monitor location. In the figure, the 'x' represents the location of Lababie and the 'o' are the locations of the two current monitors.

*Revision Date: June 2016*





The plot below is very similar to the one above except a > 30 ug/m3 modeled cutoff was used to eliminate the low concentration hours where no receptors are indicating high impacts. Similar to the plot above, the frequency of maximum houly impacts occurs to the north of the Labadie stacks, not to the northwest or east at the Valley monitor location.

*Revision Date: June 2016*



The final plot is a similar concept as above except, rather than just counting the frequency of maximum impacts, EPA is summing the maximum modeled impacts on an hourly basis. Again, this plot is based on the modeling using Ameren's onsite modeling inputs provided to EPA for the period 4/22/2015 to 12/31/2015. Summing the maximum hourly impacts gives additional weight to the magnitude of the modeling impacts along with the frequency and locations. The result is again similar to the two plots above, except that it appears to indicate that elevated impacts are occurring to the south of the Labadie stacks as well.

Again, it is important to note that this modeling is for just a portion of calendar year 2015 and does not include the entire winter period where northerly winds would likely be more prevalent. In addition, this modeling also uses actual hourly emissions and stack parameters. Thus, the impacts are specific to actual plant conditions occurring during this period and not necessarily indicative of future conditions. EPA notes there were several units that did not operate for a portion of this period. These plots all demonstrate the current monitors did not likely record the maximum impacts from Labadie during this 8 month period. The EPA's view is that this

*Revision Date: June 2016*

information is likely very representative of actual impacts since the modeling analysis used site specific conditions provided by Ameren, and the modeling is performing very well at the current monitoring locations (see model performance discussion in Beta option response).



Concerning Ameren's contention that EPA is classifying other areas such as Martin Drake area in Colorado Springs, Colorado as unclassifiable based on monitoring alone, EPA analyzes each area independently and includes all relevant and available data to form the basis of a designation decision. Ameren is incorrect in its assessment that EPA somehow relied on the monitoring near Martin Drake to support a final designation of unclassifiable for the area surrounding Martin Drake. See Final Technical Support Document for Colorado. In the Labadie case, there are not 3 years of monitoring data and the monitors are likely not located in areas representative of peak concentrations. In the Gibson, Indiana case cited by Ameren, there was a long record (many years) of monitoring data available at numerous locations that EPA found representative of maximum area of impact, which is not the case for the *monitors currently around Labadie. See Final* Technical Support Document for Indiana. For the reasons above, these areas are quite different and are not comparable to Labadie.

87

**EPA Response to Ameren #3 and #4. Alternative modeling provided by Ameren shows NAAQS attainment.**

Ameren provided alternative modeling to MDNR during the state's public process but all four runs were unsupportable with the information available at that time. Two runs relied upon unapproved beta options and the other two runs relied upon inputs that EPA could not verify at that time (mainly combined stack information). In addition, all four runs utilized a background value from Nilwood, IL, with minimal supporting information at that time other than to state that the Nilwood, IL, monitor is in a rural area, similar to Labadie.

Ameren asserts EPA provided no rational basis in the TSD for disregarding Ameren's alternative modeling data. EPA disagrees, as EPA did provide the rationale within the TSD for not accepting Ameren's modeling, specifically the beta option modeling showing attainment, which Ameren did not and still does not have approval to use in a regulatory modeling analysis. As described in the TSD, there were numerous modeling runs provided, and all the modeling runs using regulatory defaults indicated nonattainment, including Ameren's own regulatory default modeling runs using two different meteorology datasets. All the modeling analyses EPA relied upon for its intended designation used approved default options, followed the modeling TAD and indicated the area did not attain the NAAQS.

Ameren also outlines in their comments that a designation decision be based on data that is:
(1) reliable – meaning the data must not be based on incorrect or questionable inputs or assumptions;
(2) supportable – meaning that alternate available modeling or monitoring data does not support a different designation;
(3) representative – meaning that the data, whether it consists of modeling or monitoring data, accurately reflects conditions that are, or have in the past, occurred in the designation area; and
(4) inclusive – meaning that the data takes into account all available information (provided it is reliable and representative).

Ameren further claims the modeling and data we relied upon to form our proposed designation met none of the conditions above (1-4). EPA disagrees with this argument by Ameren. EPA reviewed and relied upon the all relevant and available information at the time of the initial recommendation and has continued to do so for the final unclassifiable designation. The EPA's position is that the TSD adequately describes the record and approach EPA used and the reasons why some data was not initially considered or weighted above other data.

To date EPA has received a total of 48 model runs for Labadie, 22 from Ameren, 23 from the Sierra Club, and 3 from MDNR. EPA reviewed all of the modeling runs provided along with all of the information submitted to inform the agency, including comments and exhibits from Ameren.

Ameren submitted numerous modeling analyses on 3/29/2016 and 5/2/2016 using 2013-2015 emissions but, as detailed here and in the TSDs, the EPA finds that they were all impacted by errors. The most substantial error was the incorrect calculation of the modeling input for the

*Revision Date: June 2016*

Bowen ratio, which is done through the AERMOD preprocessor AERSURFACE. Ameren attempted to process the surface data and calculate the Bowen Ratio on a monthly basis. The monthly approach Ameren attempted to implement is more representative of actual conditions than just assuming average moisture conditions on a yearly basis. However, there was a processing error in the implementation where the Bowen ratio lookup for a period of wet, dry, or average conditions was done incorrectly. This error caused the incorrect monthly Bowen ratios to be used for many hours in each month. This error can be graphically visualized by plotting the Bowen ratio for any given month in the AERMET surface file. An example is given below for the month of December 2015 from the Ameren 5/2/2016 modeling submittal.



The Bowen ratio should be a fixed value for this month (and other months) at a value equal to the moisture conditions that existed during this month (wet, dry, avg). As can be seen in the chart above, the Bowen ratios are not fixed for December 2015 and do not appear to be fixed in any other month in the Ameren meteorological surface datasets. Further, the processing approach Ameren used for the monthly moisture is likely not appropriate since there were periods where continuous monthly snow cover was assumed, which is not supported by the snow cover record Ameren provided. Ameren's modeling also contained other errors such as incorrectly calculating the exit velocity when merging the stacks which impacted all 8 of the Ameren modeling submittals on 3/29/2016. This error was corrected for the modeling runs Ameren submitted on 5/2/2016.

Ameren commented that EPA must rely upon "reliable, supportable, representative, and inclusive" data. The 12 modeling runs provided by Ameren to support an attainment designation using the 2013-2015 emissions data do not meet EPA's criteria for representative modeling to form our decision. Therefore, EPA cannot rely on these 12 modeling runs submitted by Ameren to designate the area as attainment, as suggested by Ameren.

Note the MDNR modeling runs are discussed in further detail elsewhere in the TSD but EPA generally agrees with Ameren's comments that all the MDNR runs using fixed temperature and exit velocities are not as representative as using variable stack conditions.

*Revision Date: June 2016*

**EPA Response to Ameren #5. Sierra Club modeling ACFM versus SCFM.**

The basis of our proposed nonattainment designation was not Sierra Club modeling as Ameren indicates. The basis for our proposed nonattainment designation was the modeling conducted by MDNR using default modeling options and 2012 – 2014 emissions data. The use of SCFM as a modeling input to determine exit velocity is not prohibited in EPA guidance, nor is it a fundamental error. We do agree with Ameren that ACFM, if calculated appropriately, is more representative in dispersion modeling to characterize actual impacts.

**EPA Response to Ameren #6. EPA ignores monitoring data and claims it is not quality assured in TSD.**

The basis for our statement in the initial TSD that the monitoring data Ameren has recently collected was not quality assured were statements made in MDNR's 2010 1-Hour Sulfur Dioxide Standard Area Boundary Recommendations, Adoption September 24, 2015 (see page 30). It is EPA's understanding that the 2015 data for the monitors surrounding Labadie have now been quality assured.

EPA acknowledges Ameren's and MDNR's efforts to install and operate monitoring around Labadie, including meteorology monitoring, and acknowledges that Ameren and MDNR have made these datasets available to EPA in a timely manner as the data becomes available and is quality assured. However, since the current monitoring dataset doesn't include the 3 years needed to calculate a design value to compare to the NAAQS and the fact that, as detailed above, the EPA's analysis of available information indicates that the new monitors are not located in an area where the expected maximum concentration occurs, the EPA cannot rely on the monitoring data generated by the new monitors in informing our final designation (see response to #1 and #2). The fact that EPA cannot rely on this data to inform our final designation does not mean that EPA is ignoring or not analyzing the data. We have performed extensive analysis of the monitoring data that we have been provided and will continue to do so for any monitoring data we receive in the future.

**EPA Response to Ameren #7. EPA analysis of historic monitoring and how it supports nonattainment.**

To be clear, EPA did not state in the TSD that the historic monitoring alone supports nonattainment. The EPA analyzed the historic monitoring data to determine the conditions that led to higher monitor concentrations in 1997, which was the last available full year of data collected at the historic $SO_2$ monitors around Labadie. EPA analyzed the historic monitored concentrations, available meteorology, and hourly emissions from Labadie. Based on this analysis, and as stated in the TSD, the EPA's position is that conditions still exist at Labadie today that could lead to exceedances of the NAAQS. Please note an exceedance of the 75 ppb NAAQS is not a violation, as violations are determined from the 99th percentile readings averaged over 3 years, or via representative modeling. Additional discussion of EPA's analysis is presented below. Ameren's contention EPA "cherry picked" a single data point is also not accurate. EPA included the 4th high day as one example to demonstrate our contention that the

90

*Revision Date: June 2016*

conditions that led to higher monitored concentrations still exist today and could cause hourly monitored readings above 75 ppb, as these conditions have led to NAAQS exceedances in the past based on the available data record.

Ameren indicates they believe that there were periods in the historic monitoring data set that indicate attainment. Ameren also points out that significant reductions in annual $SO_2$ emissions have occurred at Labadie in recent years. EPA concurs that annual $SO_2$ emissions have been trending downward over the past several years. The emission reduction first appears to occur in 1997, around the time Ameren switched to burning a lower sulfur content coal. However, since the form of the $SO_2$ standard is hourly, EPA analyzed the hourly emission rates that caused historic high monitored values at the Augusta Quarry monitor to better understand conditions, both meteorological conditions and corresponding hourly emissions, which could have led to exceedances of the new hourly NAAQS in the past. EPA's analysis focused on the year 1997, where the Augusta Quarry monitor had a 4th high daily value of 80 ppb, with a maximum recorded value of 284 ppb. The year 1997 was chosen because the annual emissions in 1997 appear to best reflect current annual emissions, in that the annual emissions were the lowest of the years in which the historic monitoring was conducted, and it was the last historic monitoring year where a full year of monitoring data was available.

EPA has gathered the CEM data publically available from the Clean Air Markets website (http://www2.epa.gov/airmarkets) and evaluated the overall emission rates from the four Labadie units on a daily basis for calendar year 1997. SO2 emissions ranged from 107,058 lbs per day to 850,911 lbs per day, with an average of 295,485 lbs/day or approximately 148 tons/day from the four units combined. Figure 9 below shows the range of daily emissions in 1997 in pounds per day.



*Figure 9. Daily emissions from the 4 Labadie Energy Center Units in 1997*

Figure 10 shows a comparison of the daily emissions from Labadie in 1997 to a more current 2012-2014 timeframe.

*Revision Date: June 2016*



***Figure 10. Daily summary of emissions from Labadie for 1997 and 2012-2014.***

For the months of February – October, daily emissions in 1997 appear similar in magnitude to the daily emissions occurring from 2012 -2014. Emission were higher in January, November, and December of 1997 when compared to the same months from 2012 – 2014, with daily $SO_2$ emissions ranging between 400,000 to 850,000 lbs. Labadie did not emit more than 410,000 lbs of SO2 on any day in 2012 – 2014.

In 1997, there were four days in which one or more hours exceeded the 75 ppb standard: 10/18, 01/14, 12/07, 03/16. Exceedances on 01/14 and 12/07 occurred on days with large daily emission outputs. The highest 1997 exceedance on 10/18 occurred with a daily emissions of ~400,000 lbs. For comparison, the recent year 2012 does have days with daily emissions at ~400,000 lbs. The 3/16 monitored exceedance occurred on days where the $SO_2$ emissions are in a similar range or below what are seen in the 2012 -2014 timeframe. Further analysis of the four individual days are provided in the following section.

For the following analysis, EPA gathered data from public sources. EPA gathered CEM data for the Labadie units through EPA Clean Air Markets (http://www2.epa.gov/airmarkets). EPA gathered monitoring data and meteorology data from the EPA AQS system (http://www3.epa.gov/airdata). Further, EPA relied on meteorology data from the NWS for Jefferson City Airport. In the windrose analysis, for each day EPA has included a windrose from both the Jefferson City NWS site, which is the surface location used in the MDNR modeling, and also onsite meteorological data collected at the Augusta Quarry site and reported to the EPA AQS system.

### *10/18/1997 – 284 ppb maximum 1-hr concentration*

Labadie only operated Units 2 and 4 on 10/18. The majority of the SO2 emissions were from Unit 2 on this day. Emissions averaged 18,166 lbs/hr during this day. The Augusta Quarry site monitored 5 consecutive hours of high SO2 on this day starting at noon and ending at 4pm. On that day, winds were light from the ESE. The Augusta Quarry site measured a 1 hour peak of 284

92

*Revision Date: June 2016*

ppb which is approximately 3.79 times 75 ppb. This indicates that, under these meteorological conditions occurring on this day, an hourly emission rate from Labadie units of 18,166/3.79 = 4,797 lbs/hr would have resulted in a 75 ppb monitored value at the Augusta Quarry site.





*Figure 11 Hourly emissions, monitor concentration and windrose on 10/18/1997*

*Revision Date: June 2016*

**01/14/1997 – 133 ppb maximum 1-hr concentration**

Labadie operated all 4 units on this day with the majority of emissions coming from units 3 and 4. Overall emissions averaged 26,697 lbs/hr throughout this day. The hourly emission rates were fairly constant. High $SO_2$ concentrations were measured during evening hours, i.e., 8-9pm, but elevated levels were measured starting at around 10 am on this day. Winds were from the ESE during most hours during this day according to the NWS dataset while the onsite data shows fairly calm winds from varying directions, but from the south during the hours with peak concentrations. The 1 hour peak on this day was 133 ppb, which is approximately 1.77 times 75 ppb. This indicates that, under these meteorological conditions on this day, an hourly emission rate from Labadie units of 26,697/1.77 = 15,055 lbs/hr would have resulted in a 75 ppb monitored value at the Augusta Quarry site.



*Revision Date: June 2016*



*Figure 12. Hourly emissions, monitor concentration and windrose on 1/14/1997.*

### 12/07/1997 – **88 ppb 1-hr maximum concentration**

Labadie operated all 4 units on this day with the majority of emissions coming from units 1 and 2. Overall emissions averaged 31,295 lbs/hr throughout this day and hourly emission rates

increased into the evening hours. High readings were measured during morning hours, peaking at 11am, but elevated levels were measured starting at around 10am on this day. Winds were predominantly from the NW and from the ESE during this day according to the NWS site. The onsite meteorological data shows more variability with light winds throughout the day. The 1 hour peak on this day was 88 ppb, which is approximately 1.17 times 75 ppb. This indicates that, under these meteorological conditions on this day, an hourly emission rate from Labadie units of 31295/1.17 = 26,671 lbs/hr would have resulted in a 75 ppb monitored value at the Augusta Quarry site.





*Revision Date: June 2016*

Figure 13. Hourly emissions, monitor concentration and windrose on 12/7/1997

***03/16/1997 – 80 ppb 1-hr maximum concentration***

Labadie operated all 4 units on this day, with the 4th unit operating only in the early morning hours. The majority of the emissions came from units 1 and 2 on this day. Overall emissions averaged 6,813 lbs/hr throughout this day, which was fairly low for days in 1997. High readings were measured during morning hours, i.e., 6 am, but elevated levels were measured starting at around 4 am on this day. Winds were from the SSE during this day at both the NWS and onsite meteorological stations. Because the peak monitored value occurred in the earlier morning hours, EPA also looked at emissions from the prior day on 3/15/1997, where the average emission rate was a bit higher, averaging 11,016 lbs/hr. However, 10 hours proceeding the monitored exceedance the average hourly rate is 8,149 lbs/hr. The highest measured 1-hour $SO_2$ concentration on this day was 80 ppb, which is approximately 1.07 times 75 ppb. This indicates that, under these meteorological conditions on this day, an hourly emission rate from Labadie units of 6,813/1.07 = 6,387 lbs/hr would have resulted in a 75 ppb monitored value at the Augusta Quarry site.



97

*Revision Date: June 2016*



Figure 14. Hourly emissions, monitor concentration and windrose on 3/16/1997

From this analysis, EPA has observed that the Augusta Quarry monitor in 1997 likely is recording values from the plume from a nearby source, as for all individual days analyzed, the monitor records very low hourly concentration values and then records a spike in concentrations for a few hours and returns to a low value again. Given the proximity of Labadie, and the wind direction during monitored spikes, it is likely that Labadie Energy Center emissions are the cause of elevated monitored values in 1997.

An analysis of emissions during the four historic days in 1997 where measured concentrations were above the 2010 1-hour primary NAAQS of 75 ppb indicates that both high and low hourly emission rates can cause elevated hourly measured concentrations. This analysis indicates meteorology has a large impact on the concentrations recorded by the monitor and appears to be just as important as the hourly emission rates in the probability of high monitored values in this case. In fact, high hourly emissions don't necessarily lead to high monitored concentrations at any given hour, which is expected given the height of the Labadie stacks. It is also clear that on all four exceedance days where there were elevated hourly impacts, winds were from a direction that would indicate the Labadie emissions were being measured at the Augusta Quarry monitor. It is also evident that even at modest hourly emission rates, at least modest under current operations at Labadie, exceedances of the NAAQS can occur. For example, on 3/16/1997, the average hourly rate from all four units was 6,813 lbs/hr, which equates to less than 30,000 tons/yr if this emission rate is assumed for all hours during a year. This actual emission rate caused a monitored hourly exceedance of 80 ppb in 1997. As seen in Figure 15, 81% of the days from the 2012 – 2014 period have average daily hourly rates from all Labadie units greater than the 6,813 lbs/hr, so the probability is high that there are many hours where emission rates are high enough that exceedances could still occur around the Augusta Quarry site. In fact, we see evidence that an hourly emission rate as low as 4,797 lbs/hr can cause a monitored value above 75 ppb at the Augusta Quarry site. During 2012-2014 there were 24,880 hours with a total

98

*Revision Date: June 2016*

emissions at or greater than this 4,797 lbs, which represents over 94.5% of all hours in 2012-2014.

Given that the local meteorological conditions and terrain are unlikely to have significantly changed since 1997, the SO$_2$ emissions emitted from Labadie in 2012 -2015 would be capable of contributing to exceedances of the 75 ppb NAAQS in the vicinity of the historic monitors. When you look further at the other days that show historic exceedances and calculate the average hourly rate that would have caused a 75 ppb monitored value, we see two additional days where the average hourly emissions fall within the current actual average hourly emission rates. These days are 10/18/1997 with 4,797 lbs/hr and 1/14/1997 with 15,055 lbs/hr.  Based on this analysis, current hourly emission rates being emitted at Labadie are equivalent to the emission rates that were being emitted during days in 1997 where the monitor recorded a value greater than the NAAQS. Therefore, there is a possibility, based on this analysis alone, that values greater than the NAAQS could be recorded today at the Augusta Quarry site if a monitor at that site or similar site was still in operation.

EPA also notes MDNR's latest SO$_2$ rule, 10 CSR 10-6.261, currently allows Labadie to emit 40,837 lbs/hr using a 24 hour block average which is well above the rates that caused historic monitored exceedances. Nothing in the operational history or enforceable agreement/permit would indicate Labadie emission rates will continue to decrease or even stay at current levels. In fact, Labadie's annual emissions have varied from under 40,000 tons in 1999 and 2000 to over 60,000 tons in 2009 and 2010.



Figure 15. Daily average hourly emissions (lbs/hr) at Labadie.

Although the EPA's view was that the historic monitoring performed at the two Augusta sites near Labadie supported our proposed nonattainment designation for the area near Labadie, it was not the basis of this proposed designation. All evidence indicates the hourly emissions from the

99

App. 1000

four Labadie units that appear to have caused NAAQS exceedances at the historic Augusta Quarry monitor in the past, exist today based on the most recent CEM data. The historic monitor analysis indicates meteorological conditions are just as significant in impacting the $SO_2$ concentrations as the hourly emission rates, since moderate hourly emission rates in *1997* resulted in a monitor reading above the NAAQS. The analysis indicates emissions from Labadie are currently at levels that could result in exceedances above the NAAQS at the historic monitor location. This stresses the importance of having a monitor(s) sited in both the correct terrain and wind direction to reflect the predominant wind and dispersion conditions, where exceedances in the area surrounding Labadie might occur. We also note that MDNR's latest $SO_2$ rule, 10 CSR 10-6.261, currently allows Labadie to emit 40,837 lbs/hr using a 24 hour block average. On all four days in 1997 where the monitored exceedances occurred at the Augusta Quarry the actual 24 hour block average on these days were well below this 40,837 lbs/hr allowed for in 10 CSR 10-6.261.

EPA notes, however, that due to the lack of a monitor currently located at or near the Augusta Quarry site, this historic monitoring does not provide EPA a clear basis to determine whether the area meets or does not meet the 2010 $SO_2$ NAAQS based on all currently available information.

### EPA Response to Ameren #8. EPA's justification for modeling separate stacks for Units #3 and #4.

EPA relied upon no modeling performed by the agency itself to form our proposed designation recommendation of nonattainment as Ameren alludes to in this comment. EPA relied upon modeling and other analysis submitted to the agency by the state and other parties, including Ameren. EPA did note in the February 16, 2016, TSD that additional justification for combining stacks in modeling would likely be needed. This additional justification included the calculation methodology and supporting data to do such stack merging calculations, along with the justification of merging the stacks in the model.

At the time EPA analyzed and authored the proposed nonattainment designation recommendation the agency did not have this data (i.e. the calculations or underlying data) to review or the justification for merging available, thus the February 16, 2016, TSD statement that additional justification would be required for merging of stacks. EPA has and will continue to use data that is most representative for decision making including data used to verify merged modeling of Labadie Units 3 and 4.

We do agree with Ameren that Units 3 and 4 are physically in a dual flue stack configuration and, provided that the merging calculations are performed correctly and data is available, that merging the plumes within the modeling for designations purposes is likely reasonable and most representative of Labadie's configuration. Again, as discussed above during EPA's initial authoring of the TSD, EPA did not have the actual calculations supporting the merging. We do believe at this point that Ameren has supplied the justification to merge stacks in the modeling and, provided the merging calculations are performed correctly for emissions, temperature, and exit velocities and these calculations are well documented, agrees that any modeling merging stacks can be considered in forming a designation.

*Revision Date: June 2016*

**EPA Response to Ameren #9. EPA's justification of relying on background data from East St. Louis.**

EPA did not select the monitor to use for a background site. MDNR selected this background monitor and EPA worked with and agrees with MDNR's approach to exclude sectors or periods where the monitor was picking up impacts not representative of Labadie. MDNR provided their technical analysis supporting this background value and site and EPA accepted the background value the state used as representative.

Ameren currently contends that a seasonal, hourly background value from Nilwood, IL, is an appropriate background value, while MDNR in their initial recommendation chose an annual background value from a different monitor. In addition to the Nilwood recommendation, Ameren in a March 2016 submittal to EPA, performed a background analysis using the monitored data from the NW and Valley monitors. In this analysis Ameren excluded certain sectors with wind blowing to the respective monitors and calculated the hourly background at the 99th percentile from the remaining dataset. In reviewing this analysis EPA notes that some of the highest readings in remaining hours not excluded were also the highest recorded at those monitors. In other words the highest hourly readings don't reflect winds from the known Labadie location. The Ameren analysis indicate a fixed background of 4-5 ppb (10.5-13.1 ug/m3), higher than many hours in the Nillwood dataset where the average hourly value is 7.7 ug/m3. We note the Ameren analysis was missing January, February, March, and much of April when higher readings at Nilwood occur (i.e. winter and spring).

While it is likely that Labadie is the sole cause of the highest monitor readings, this background analysis by Ameren and EPA also indicates that recirculation of the Labadie plume(s) likely leads to the highest impacts, and the winds aren't always in the direction from Labadie during those highest monitor hours. Because of this wind direction issue, EPA chose to focus on an analysis of the 5-minute monitoring and meteorological data collected during the 4/22-12/31, 2015 period. While still not an entire year with all seasons represented, it is still useful data collected concurrently around Labadie.

The plots below depict 5 minute monitored $SO_2$ concentrations (red and black dots) with green dots representing measured incoming solar radiation and were created by EPA based on Ameren data. The plots below demonstrate that there are periods where a well-mixed plume appear to impact both monitors concurrently. These events of both monitors being impacted at the same time can occur over multiple hours at varying times during a 24-hour period. The plots for 12/15/2015 and 12/22/2015 are provided below. These plots show that the 5-minute data is well correlated between the monitors during the day. The 5-minute recorded wind directions with windbarbs below the plots indicate that these correlated monitored concentrations are not from direct Labadie emissions. They appear to be from a plume recirculation, or possibly another source. The concern in these situations is that when these well mixed concentrations that occur over a large area, at least a 6km wide area, are added to new emissions, this situation can cause greater impacts that occur where there is no monitor recording them, and clearly the background concentrations are large under these recirculation situations, larger than Nilwood, IL, background values Ameren asserts are appropriate.

*Revision Date: June 2016*



*Revision Date: June 2016*

Because these recirculation events or distant source impacts can be multi-hour in duration, and don't reflect direct Labadie emission impacts, AERMOD would not capture these impacts except in a background value. In other words, these likely recirculation events would need to be represented as background within AERMOD, as AERMOD is an hourly steady state model. In fact, during one of the highest hourly recorded events at the Valley location it appears that the background during this period is likely above that assumed from Nilwood or East St. Louis. This is based on the fact that both the NW and Valley sites see elevated concurrent concentrations during hours 13-14, while the Valley site greatly exceeds the NW monitor after the wind shifts blowing the direct plume from Labadie to the Valley site and it appears that both the direct and recirculated plume are impacting the Valley site concurrently, leading to much higher concentrations.



The likely recirculation event described above also appears to be what was happening from an EPA analysis of the historic 1997 data. While the area did not have the 5-minute monitor frequency or a second monitor in 1997, there is the onsite meteorological data where the same wind shifts are observed during some high monitored events. As an example, take the 12/7/1997 period where winds are from the north in the early morning hours and then the winds shift from the south and the monitor experiences the elevated plume from what appear to be both recirculation and likely some direct impacts. Note that this monitor was much better positioned to see direct impacts being at a higher elevation and in better alignment with predominant wind directions.

*Revision Date: June 2016*



The 3/15-16, 1997 is another example of a likely recirculation event where the plume appears to be advected back into the vicinity of the monitor after being transported to the south for multiple hours before the monitored exceedance on 3/16/1997. This is another example of where a Nilwood background value would potentially be too low and an inaccurate assumption.

*Revision Date: June 2016*



*Revision Date: June 2016*



While the analysis of the current onsite monitor dataset does indicate there are periods where a background of 9 ppb is too high, the data also indicate that there are periods where the Nilwood, IL, seasonal by hour backgrounds values are too low. Given the designation decision relies upon peak modeled impacts, and these peak modeling impacts may have plume recirculation that a steady-state model could not predict, EPA believes a fixed background between 4-9 ppb is reasonable. EPA also finds numerous periods where there are clearly no hourly background impacts, however the purpose of the background value is to capture those conditions leading to peak concentrations using a steady state dispersion model. Given this information and further analysis discussed above, EPA finds that the 9 ppb recommendation from MDNR is reasonable, and it is supportable both in the MDNR analysis and further analysis EPA performed here, i.e. there are periods where 9 ppb is seen at both the current monitors concurrently indicating these are indirect or background events not explicitly modeled. EPA does note that a 9 ppb background would likely not be appropriate to use if investigating AERMOD model performance for all hours, especially at lower modeling impacts during all periods, or at monitors not sited in areas of peak expected concentrations. In the beta option analysis the data indicate a value greater than 4ppb is needed to reduce all under predictions at the peak concentrations, and 9ppb at these peak predictions is not unreasonable.

*Revision Date: June 2016*

### Response to Ameren #10 and #12. Status of Ameren's beta option request with EPA and over prediction of the model without beta options and the penetrated plume issue.

As outlined in the February 16, 2016, TSD, approval of a beta option request can be performed under several scenarios including a peer reviewed option, where that option applies to Labadie, or a site specific study where Ameren demonstrates that an alternative model has superior performance based on a comparison to representative site specific data. Ameren is pursuing two beta option approval tracks asserting that both LOWWIND3 and ADJ_U* have been peer reviewed and apply in the tall stack Labadie case, and using a separate site specific analysis, with site specific modeling data submitted to EPA Region 7 on 3/17/2016.

While we do agree the ADJ_U* has been peer reviewed, the LOWWIND3 option has not met the criteria of scientific peer review consistent with Section 3.2.2.(e)(i) of Appendix W at the time of authoring this document. Ameren in their comments, and more specifically AECOM, point to a peer reviewed article where LOWWIND2 was analyzed with a follow-up submittal analyzing LOWWIND3. The addition of the supplemental study to the peer reviewed article does not make the supplemental peer reviewed, nor does it suggest that the study applies in the case of Labadie.

For the site specific demonstration, Ameren has included the latest modeling they have performed using the April 22nd, 2015 – December 31, 2015 data. In this study they have both the monitoring data at two sites, NW and Valley, along with the CEMS emissions from the Labadie stacks and use a 4 ppb background value. Also available is onsite meteorology at the Valley location.

In the most recent onsite data submittal AECOM is using a performance technique that relies only upon the daily maximum modeled and monitored pairs. EPA does not agree with using only the maximum daily statistic as EPA guidance (Protocol for Determining the Best Performing Model, September 1992) suggests using all hours in the modeling analysis for Q-Q plots and all hours for other statistical metrics such as the Robust Highest Concentration (RHC). EPA finds that the most representative on-site model run is the one using the onsite meteorological data collected at the Valley location.

Figure 9 in the AMEREN Exhibit #2 report, shown below, compares the modeled and monitored values for 3 runs – default runs using both combined and uncombined stacks at units 3 and 4, and a LOWWIND3 run with uncombined stacks. These runs are the most representative of actual conditions around Labadie as they utilize the onsite data being collected at the Valley site. As seen in the figure, using maximum daily values for the partial year of 2015, the two default runs appear to have quite different performance at the Valley site, with the individual stack runs over-predicting while combining the stacks seems to result in under-predictions, especially at the higher concentrations. In focusing on the 99th percentile value in Figure 9, it would appear that the default settings with no merging of stacks performs best, lying directly on the 1-1 line. Note that EPA has produced Q-Q plots displaying the hourly values, rather than just the maximum daily values further below.

*Revision Date: June 2016*



Figure 5, from the same Ameren Exhibit #2, provides the NW monitor performance again with the onsite meteorological data. As seen in Ameren's Figure 5, combining the plumes seems to result in under-predictions at the NW site using the maximum daily values only at the higher end of the distribution. At the 99th percentile it appears all three models are performing about the same showing slight over-predictions. EPA cautions that this monitor has a fairly low design value and it is likely not representative of the highest impacts around Labadie and therefore likely not the best monitor to review for model performance.

*Revision Date: June 2016*



Also note that none of these runs include the combination of LOWWIND3 and combined units 3 and 4 which would likely show values below the "Def 34comb", a clear under prediction, and Ameren proposes that this is the run (along with Nillwood background) they believe would likely be most representative. EPA does not believe that the site specific data provided support even LOWWIND3 with the stacks separate, and clearly would not support combined stacks and LOWWIND3 using an even lower background.

 Ameren provided runs using three sets of meteorological data using combined and separate stack configurations for units 3 and 4. Meteorological data at Jefferson City, Spirit of St. Louis, and local data collected at the Valley monitoring sites were provided by Ameren. In the prior

App. 1010

*Revision Date: June 2016*

2012-2014 modeling submitted to EPA it was determined by MDNR that the most representative meteorology dataset was from the Jefferson City NWS airport site. Onsite data, if collected properly and in a representative location, should provide better model performance than offsite NWS airport data.

Below is a similar comparison of modeling performance (Q-Q and RHC) using the three meteorological sites Ameren provided with both combined and separate stacks using all hours rather than a maximum daily values. In all cases below, no background value is used and all inputs Ameren provided were utilized by EPA as submitted including Ameren processed meteorology and varying stack parameters including temperatures and exit velocities on an hourly basis.



*Revision Date: June 2016*



*Revision Date: June 2016*



*Revision Date: June 2016*



From the Q-Q plots and RHC metrics using default modeling settings, it does appear that combining the stacks provides better modeling performance at the two monitoring sites, Valley and NW. Because the meteorology data is being collected at the Valley site, and the Valley site has a higher design value, EPA weights the performance metrics at this site above the NW site. From the combined Valley figure it is apparent that the onsite data performs much better than either of the offsite NWS datasets at these two specific locations. This performance improvement is expected as the local meteorology should be more representative for an individual location than offsite data especially when comparing to a specific monitor. This does not necessarily indicate the use of NWS data for designations is inappropriate as only two locations are provided here in the performance metrics, and the higher predictions at these locations using NWS data are likely a function of more frequent winds in the direction of the monitor locations which don't

113

actually occur at Labadie. In other words, the AERMOD model using NWS data likely over predicts at these locations and under predicts in other areas around Labadie since the wind directions are not as accurate as the site specific winds. The overall 4th high domain wide modeled concentration is likely similar in magnitude, just at a different location. Note there is not enough onsite data at this point to do this type of comparison since not all seasons are represented in the onsite data.

Because site specific meteorology, emissions, and stack parameters are being used, the model performance appears very good with RHC=1.02 at the valley site with combined units 3 and 4 and many points on the 1-1 Q-Q line. At the high end of the modeled distribution there is a slight under prediction of modeled values, but this is likely due to no background values being included in the modeling presented above. We also note that the Jefferson City meteorology data appears to perform better than the Spirit of St. Louis NWS data at these two locations. Better model performance using Jefferson City data is likely a function of the current monitors being sited using Jefferson City NWS data and this alone does not necessarily indicate that Spirit of St. Louis NWS data is less representative than Jefferson City NWS data.

Because this onsite dataset was being provided for a site specific beta request, EPA also investigated the performance metrics using the adj_U* and LOWWIND3 at both the NW and Valley sites using the most representative dataset, i.e. the onsite valley meteorology at the valley monitoring site. The comparison of performance using the beta options vs. default options is found below. Based on the analysis above EPA believes using the combined stacks and Valley location is most representative for this analysis, but plots for both combined and separate stacks at the Valley location are included below since Ameren included both.

*Revision Date: June 2016*



## Q-Q for Valley (3&4 Combined)

*Revision Date: June 2016*



As described above, EPA's view is that the RHC statics and Q-Q plots indicate performance using default AERMOD model settings and onsite data is very good, with almost perfect agreement of modeled to monitored values (units 3 and 4 combined). Introduction of the beta options, specifically LOWWIND3, does not appear to improve performance and appears to introduce an under prediction bias that can be seen in the Q-Q plots. We do not agree that the site specific data provided by Ameren to date support approval of the beta option requests from Ameren, specifically LOWWIND3. Adding a background value to the modeled values eventually results in the RHC statistic (N=26) approaching 1.0 using beta options but the Q-Q plot still indicates under prediction at the peak concentrations, while the performance of the default option remains acceptable as shown in the figure below.

116

*Revision Date: June 2016*



Finally, we note that both of the existing monitors appear to be in a location that is not expected to measure peak concentrations, as discussed in more detail elsewhere. Ideally, a performance evaluation should be performed at a monitor in a location of expected peak concentrations, as performance at a high concentration is important when determining an area designation. The current data available shows the AERMOD model performs well and there is no clear bias towards model over prediction when using default model settings and onsite representative data. EPA finds no evidence in this onsite dataset of either the penetrated plume over prediction issue discussed by Ameren in requested response #12 or clear over predictions requiring adj_U*+LOWWIND3 that Ameren claims exist in the AERMOD model using default settings.

*Revision Date: June 2016*

**Response to Ameren #11. Use and approval of adj_U* only.**

In the requests that EPA has reviewed from Ameren for use of beta options, they all appear to include a combination of both adj_U* and LOWWIND3. EPA would consider an adj_U* only approval based on the peer review record for adj_U*. In response to Ameren requests #10 and #12 above, we do note that it does not appear to EPA there is the need for model adjustments based on site specific data, as performance using default options appear appropriate.

**Comment:** One commenter (Washington University in St. Louis, for the Sierra Club, on 4/19/2016) expressed concern that updated emissions alone are not the reason for Ameren's attainment modeling. Specifically the commenter contends that undisclosed manipulation of surface characteristics were performed leading to attainment modeling. The commenter disagrees with merging of Unit 3&4 stacks at Labadie and points out what appear to be an error in the merging of stacks. The commenter also believes unusual outages that occurred during the modeling period that may not represent future emissions and therefore substitute emissions should be used. Finally the commenter contends there are no guarantees that Ameren will continue to use ultra-low sulfur coal or will continue to be able to purchase it from their current supplier. This same commenter provided additional modeling via email to EPA Region 7 (on 4/29/2016) using augmented or substitute emissions for what the commenter felt were certain unusual outages.

**EPA's Response:** EPA has evaluated the approach Ameren used in processing AERMET in its 2013-2015 modeling datasets. As identified in EPA's response to Ameren's response request #3 and #4 above, EPA did find an error in the processing of surface characteristics that the EPA's finds makes us unable to rely on Ameren's modeling. Concerning merging of Units 3 & 4, EPA has determined merging is allowed and representative, as further described in the final Missouri TSD and this RTC. The commenter is correct that an error in the processing of the 2015 merging of Units 3 and 4 was made, and Ameren corrected that error in a submittal made to the EPA on 5/2/2016. Concerning unusual outages and low sulfur coal availability, designations are made on the basis of what the actual ambient air concentrations would be during the latest 3 year period for which data is available, which is calendar years 2013-2015 in this area's case. EPA does agree that emissions do vary, and that historical information shows emission variation both annually and hourly, but EPA can't predict the future emissions referenced by commenter, thus we are not using, recommending, or relying on modeling with substitute emissions during unusual outages.

**Comment:** One commenter (Ameren) filed a 4/29/2016 response to Sierra Club comments made on 4/19/2016. The commenter states monitoring shows attainment, disagrees with Sierra Club assertions that surface characteristics used in Ameren's modeling are inappropriate, states that snow cover assignments that Ameren used are appropriate and not determinative of attainment, asserts merged stacks are appropriate and allowed by guidance, asserts stack temperatures are correct, corrected an error in the processing of merged unit 3 and 4 exit velocities, asserts extended outages are a normal process for utilities, asserts the facility is in a rural location and therefor a rural background is appropriate, and finally Ameren states that they are contractually

118

obligated to use ultra-low sulfur coal at Labadie and they should be applauded by both Sierra Club and EPA for the resulting environmental improvements. The commenter provided four additional modeling runs to support their positions.

*EPA's Response:* EPA has provided responses to all the issues raised by the commenter in the Ameren response requests 1-12 above, responses to Sierra Club, and within the final Missouri TSD.

*Comment:* One commenter (0326-Ameren) stated that Ameren's updated modeling data, coupled with nearly a year of Ameren and Missouri Department of Natural Resources quality-assured monitoring data similarly evidencing attainment, provides a great weight of evidence that demands that EPA designate the Labadie area as in attainment of the 2010 $SO_2$ NAAQS. In addition to commenter's 45 page letter, commenter included eighteen exhibits in the docket.

*EPA's Response:*

Please see EPA's response to Ameren's response requests #1, #2, #3, and #4 above.

*Comment:* Some commenters (0238-Hinson, 0239-Schatz, 0240-Mathews, 0326-Ameren) disagreed that Franklin County be designated nonattainment and recommended a designation of unclassifiable. Commenters stated that air quality data (data attached to their letters) from 2 monitors installed in April 2015 demonstrate attainment and that modeling cannot be considered reliable.

One commenter (0306-MO Industries) stated the EPA's decision to designate the Franklin County Missouri Area as nonattainment is arbitrary, wrong and must be reversed. The commenter stated the EPA's proposed decision fails to consider the monitored data gathered in the last year and fails to consider flaws in the modeling which lead to over-prediction. Commenter stated that two air monitors were installed in April, 2015 at locations around the Labadie Energy Center pursuant to EPA criteria and there has not been a single reading on either monitor in which the 1 hour $SO_2$ NAAQS was exceeded (monitoring data are attached to commenter's letter). Commenter supported the position that, in light of this monitoring data and uncertainties with the modeling, more information is needed before a correct designation decision can be made. Commenter stated that there is no benefit to recommending an area as nonattainment if the modeling cannot be considered reliable and if full consideration of actual data could very well demonstrate that the area actually attains the standard.

One commenter (0332-AC-Sierra Club) stated that monitoring data collected from two sites around the Labadie Plant since April 2015 do not provide convincing evidence that the area is in attainment. Commenter stated that eight months of monitoring data do not and cannot demonstrate attainment of the NAAQS because three full years of monitoring data are required to calculate a design value for comparison to the NAAQS. Commenter stated that, if monitored concentrations are higher in 2016 and/or 2017 than they were in 2015, the design value for one or both monitors could exceed the NAAQS once the requisite three years of data have been collected. As detailed in commenter's letter (pdf pages 15-18) commenter argued that the

*Revision Date: June 2016*

Labadie monitors are not sited in areas of expected peak SO$_2$ concentrations – based on modeling performed by Ameren itself for monitor siting purposes and also based on the modeling performed more recently by MDNR for area designation purposes.

***EPA's Response:***

For comments concerning monitor siting and use of current monitoring data for the Labadie area, please see EPA's response to Ameren's response requests #1 and #2 above. EPA agrees with the commenter that 8 months of monitoring data does not meet the completeness requirements in 40 CFR Part 50, Appendix T to be comparable to the 1 hour SO2 NAAQS.

***Comment:*** One commenter (0326-Ameren) stated the EPA should have proposed an unclassifiable designation, consistent with the Missouri Department of Natural Resources September 25, 2015 recommendation. The commenter stated that they provided a detailed discussion in their (45 page) comment letter and included eighteen attachments providing additional documentation to respond to every issue articulated by EPA in its Draft TSD and to show that each of EPA's contentions and bases for its Proposed Designation are in error.

One commenter (0326-Ameren) stated that, if EPA develops a rational basis for why attainment is not warranted, Ameren's updated modeling data is sufficient to warrant an unclassifiable designation. Commenter stated that the new modeling demonstrates attainment even using conservative inputs and demonstrates attainment by a wide margin when using representative inputs. Commenter stated the EPA cannot reasonably find that its Proposed Designation is based upon modeling that "clearly demonstrate[s]" nonattainment.

***EPA's Response:*** *Please see EPA's response to Ameren's response requests #3 and #4 above.*

***Comment:*** One commenter (MO Response, Attachment 1) stated that, because it cannot be determined with certainty based on available information whether the area is or is not meeting the 1-hour SO$_2$ standard, the air program recommended an unclassifiable designation for the area near Labadie. Commenter stated that the previously submitted modeling was updated to reflect the most recent emissions and meteorological data, 2013 through 2015 and these model results support an unclassifiable classification. Commenter stated that the air program performed two new modeling scenarios around the Labadie facility: (1) the only change made to the modeling was to include 2015 hourly emissions and meteorological data, which resulted in a decrease in the approximate design value of the area from 90 ppb to 77 ppb and (2) units 3 and 4 were modeled as a merged plume, which resulted in an approximate design value of 67 ppb which is in compliance with the 1-hour standard of 75 ppb. Commenter provided a detailed discussion of the use of a merged plume in their comments. Commenter stated that, although the dataset from Labadie's new SO$_2$ monitors is not yet complete, it further supports the unclassifiable designation for the area (Attachment 2) and the air program must consider it, consistent with state law.

*Revision Date: June 2016*

***EPA's Response:*** The EPA fully considered the commenters' recommendation, and reviewed and analyzed the modeling and data referenced by commenter, and has provided response in the final Missouri TSD.

***Comment:*** One commenter (0306-MO Industries) stated that the proposed decision violates the intent of the state of Missouri's decision, expressed through a vote of the general assembly and signature by the Governor, to require that any designation within its own borders be based upon the best available scientific information including actual monitored data. Commenter stated that a nonattainment designation will have long-term negative economic consequences and the EPA's reliance on flawed science also has the long-term effect of eroding public confidence in the Agency's credibility.

Another commenter (0326-Ameren) stated that the EPA's proposed designation is premature and arbitrary and capricious because it effectively prohibits consideration of monitoring data in contravention Missouri state law.

***EPA's Response:***

Pursuant to section 107(d) of the Clean Air Act (CAA), EPA must designate areas for the 2010 1-hour sulfur dioxide ($SO_2$) primary national ambient air quality standard (NAAQS). EPA is under an enforceable order to complete the area designations according to the court-ordered schedule. By no later than July 2, 2016 (16 months from the court's order), the EPA must designate two groups of areas: (1) areas that have newly monitored violations of the 2010 $SO_2$ NAAQS and (2) areas that contain any stationary sources that had not been announced as of March 2, 2015, for retirement and that according to the EPA's Air Markets Database emitted in 2012 either (i) more than 16,000 tons of $SO_2$ or (ii) more than 2,600 tons of $SO_2$ with an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU). EPA is bound by the CAA and the court order on this matter, and Missouri law is not controlling or relevant in this instance. EPA considered all available, relevant data in making the final designation. For further discussion on utilizing modeling to inform designation decisions, see section (III)(A)(2) of this RTC.

***Comment:*** Some commenters (0213-Mass Mailer, 0246-Labadie Environmental Org., 0250-APC, 0251-APC, 0252-APC, 0253-Alt, 0256-APC, 0258-Friedman, 0260-Zerbe, 0261-APC, 0266-APC, 0280-Orr, 0283-Dittrich, 0288-APC, 0304-APC, 0305-APC, 0322-APC, 0332-AC-Sierra Club) supported a nonattainment designation in order to improve air quality in the area. One commenter (0246- Labadie Environmental Org.) supported the EPA's nonattainment designation using the EPA's recommended model and stated there is not adequate monitoring data (3 years) to support a designation based on monitoring.

One comment letter (0213-Mass Mailer) consists of 565 individual comment letters. These comments supported the EPA's proposal to reject the unclassifiable sulfur dioxide designation, supported EPA's proposal to declare the area in nonattainment, and stated Ameren should have to reduce harmful sulfur dioxide emissions in this region to protect public health.

*Revision Date: June 2016*

***EPA's Response:*** The EPA considered all available, relevant data in making the final designation. After careful review of the information, the EPA is unable to determine whether the area is meeting the NAAQS, and so is designating the area as unclassifiable.

***Comment:*** One commenter (0332-AC-Sierra Club) supported the EPA's proposed nonattainment designation and stated that the evidence supporting a nonattainment designation is overwhelming. Commenter stated that modeling performed by MDNR, Sierra Club, and Ameren using AERMOD's regulatory default options shows nonattainment. Commenter stated that neither MDNR's nor Sierra Club's modeling shows attainment when run with Ameren's proposed beta options. Commenter stated that MDNR's and Sierra Club's modeling evaluations are consistent with EPA's Modeling TAD and Appendix W.

One commenter (0332-AC-Sierra Club) provided detailed comments (19 pages) regarding the use of modeling and monitoring data for the Labadie Plant in support of their position that the area be designated nonattainment. Commenter also submitted detailed comments in Exhibit 1 (54 pages) attached to their comment letter. Exhibit 1 is a copy of comments Sierra Club submitted to MDNR on September 3, 2015 regarding designation of the Labadie area. That comment letter argues that (1) modeling performed by MDNR and the Sierra Club make clear that the Labadie plant's $SO_2$ emissions are causing areas around the plant to exceed the NAAQS; (2) an unclassifiable designation is inappropriate because it relies on far less than three full years of monitoring data (from monitors that are not sited in areas of expected peak concentrations); and (3) modeling by Ameren's consultant deviated in several critical respects from MDNR's approach.

One commenter (0332-AC-Sierra Club) stated the EPA should continue to critically evaluate Ameren's modeling and should not rely on it for purposes of making its final designation decision. As detailed in commenter's letter (pdf pages 6-14) commenter objected to the Ameren modeling because Ameren (1) used ADJ_U* and LOWWIND3; (2) merged and modeled as a single release point the emissions from units 3 and 4; (3) used temporally varying background concentrations based on a monitor 130 kilometers from Labadie; and (4) used hourly stack parameters instead of fixed values, with hourly exit velocities based on (calculated) "actual" flows instead of standard flows.

Commenter (0332-AC-Sierra Club) submitted Exhibit 2 which contains supplemental comments submitted by Sierra Club to USEPA Region 7 on September 18, 2016 that address Ameren's modeling using the LOWWIND3 option. Commenter stated that, to their knowledge, Ameren did not submit and the Regional Administrator did not approve an alternate model demonstration showing that AERMOD performs better for Labadie with the LOWWIND3 option. Commenter stated that, absent an analysis of model performance that follows EPA's protocol, use of the beta LOWWIND3 option instead of the regulatory default option cannot be approved by the Regional Administrator, and Ameren's modeling cannot be used as the basis for an $SO_2$ area designation. Commenter stated that an alternate model demonstration that follows EPA's protocol for evaluating model performance for predicting peak concentration values is not currently possible for Labadie due to a paucity of measured air quality data.

*Revision Date: June 2016*

*EPA's Response:* EPA evaluated all information provided by all parties including modeling submitted by Ameren. EPA has further addressed the use of ADJ_U* and LOWWIND3, merged stacks for Labadie Units 3 & 4, background concentrations, and actual versus standard flows in response to Ameren comments above. A summary of all modeling runs and the EPA's analysis of their representativeness is found in the final Missouri TSD.

In response to comment related to the use of hourly stack parameters versus fixed stack parameters, hourly stack parameters for modeling purposes should be most representative of actual conditions and resulting ambient concentrations, although EPA's modeling TAD does not require the use of hourly stack parameters. Assuming the hourly varying stack parameter data is available and representative, it is appropriate to use this data in modeling for designation purposes. Fixed parameters for temperature and exit velocity at maximum design values or at similarly high values may not be representative of normal operations or operations at reduced loads. In modeling analyses where emissions are varying hourly, using variable stack parameters for those hours will more likely lead to values that would be observed by a monitor at each receptor location. Please see the final Missouri TSD for further discussion of the EPA's analysis of the hourly stack parameters and fixed stack parameters used in the modeling runs currently available for this area.

*Comment:* Some commenters (0241-Clauson, 0255-ACP, 0268-Brazil, 0283-Dittrich, 0284-APC) expressed concern and requested the EPA to act in the best interest of the health of those living near the Ameren Labadie power plant. Another comment (0272-Nohl) requested that scrubbers be installed on the Labadie power plant to help save the air. One commenter (0257-APC) stated Ameren must clean up their emissions.

*EPA's Response:*

The EPA appreciates the concerns expressed by citizens who live in the vicinities of sources of $SO_2$ air pollution emissions. The EPA evaluated the impacts of Ameren Labadie emissions as they relate to the 2010 $SO_2$ National Ambient Air Quality Standards health based air quality standard. EPA followed all relevant EPA rules, regulations, and guidance in this evaluation. After careful review of the available information, the EPA is unable to determine whether the area is meeting the NAAQS, so is designating the area as unclassifiable.

## B. Jackson County

*Comment:* One commenter (MO Response, Attachment 1) provided updates to their technical analysis and reaffirmed their recommendation of attainment for the portion of Jackson County containing the Sibley plant. Commenter stated the previously submitted modeling has been updated to reflect the most recent emissions and meteorological data and still demonstrates compliance with the standard at $189\mu g/m^3$ (or 72.7 ppb). Commenter responded to EPA concerns

*Revision Date: June 2016*

regarding three sources in the vicinity of the Sibley plant that could potentially interfere with attainment: the Veolia Energy steam plant (Veolia), the Blue Valley plant, and the Missouri City plant.

Commenter stated that the Veolia plant is being addressed through Missouri's Jackson County nonattainment area (NAA) plan (submitted to EPA on October 9, 2015) and the new limitations (compliance date of January 1, 2017) set through the NAA plan demonstrate compliance with the standard. Commenter stated that, because this compliance date occurs after this round's designation date of July 2, 2016, Veolia was included in Sibley's modeling analysis as an interactive source at their actual emission rates as reported in 2014. Commenter stated that modeling the higher emission rates for Veolia does not cause modeled violations within the attainment area boundary proposed for the Sibley plant. Commenter provided monitoring data (including Attachment 2) and stated that trends at the nearby Troost monitor reflect recent shift from coal to natural gas at the Veolia plant. Commenter stated that this indicates that the Jackson County nonattainment area will demonstrate compliance by the attainment date and the Veolia plant will not interfere with attainment around the Sibley plant.

Commenter stated that the EPA's concern regarding the Blue Valley plant is that the modeled emission rates were not federally enforceable at the time of the State's recommendations, even though Blue Valley had already switched to exclusively burning natural gas. Commenter stated that Blue Valley's Units 1 & 2 are subject to the Industrial Boiler MACT while Unit 3 is subject to the Mercury and Air Toxics Standard, which have compliance dates of January 31, 2016, and April 15, 2015, respectively. Commenter stated that the compliance strategy for these units as documented in their permit renewal is to cease burning coal and burn exclusively natural gas after January 31, 2016 and the federal regulations provide the enforceability to Blue Valley's early switch to exclusively burning natural gas. Commenter stated that, together these points demonstrate that the Blue Valley plant will not interfere with attainment around the Sibley plant.

Commenter stated that the Missouri City plant was not included in Sibley's modeling analysis as an interactive source as they have reportedly shut down. Commenter stated the Missouri City plant ceased burning coal effective January 31, 2016 in order to comply with the Industrial Boiler MACT and, since the plant is not capable of burning natural gas, the cessation of coal burning effectively is the shutdown of the plant. Commenter stated that, since this plant is no longer emitting $SO_2$, it will not interfere with attainment around the Sibley plant.

***EPA's Response:***

As further detailed in the final Missouri TSD, since the emission rates for Independence Power and Light Blue Valley Station that were used in the modeling analysis were not federally enforceable by the date of the final designation for the area, we could not rely upon the modeling analysis that was submitted by Missouri to determine whether the area was or was not meeting the 1-hour $SO_2$ NAAQS.

*Revision Date: June 2016*

## C. Scott County

**Comment:** One commenter (MO Response, Attachment 1) stated that, for the area surrounding the Sikeston Power Station (Sikeston), the air program reaffirms the recommendation of an attainment designation for Scott County. Commenter stated that the previously submitted modeling has been updated to reflect the most recent emissions and meteorological data, 2013 through 2015 and the resulting approximate design value for the area still demonstrates compliance with the standard at 96μg/m$^3$ (or 37 ppb).

**EPA's Response:** As further detailed in the final Missouri TSD, the EPA reviewed Missouri's updated modeling using 2013-2015 emissions and finds that the analysis demonstrates compliance with the 1-hour SO2 NAAQS.

# XVIII. Nebraska

## A. Lancaster County

**Comment:** One commenter (NE Response) attached supplemental information in support of the initial designation of unclassifiable for the 2010 1-hour $SO_2$ standard for Nebraska Public Power District (NPPD) Sheldon Station in Lancaster County, NE. Commenter stated the attached documentation was received from NPPD (Attachment 1 cover letter) and reflects actions they have taken to further comply with the 2010 1-hr $SO_2$ standard for Sheldon Station. Commenter stated these attachments include construction permits for Units #1 and #2 (Attachments 4 and 5) and dispersion modeling data and analysis (Attachments 2 and 3). Commenter stated the modeling analysis used the AERMOD model (Version 15181), actual hourly emissions inputs for the 2012-2014 period, and demonstrated compliance with the $SO_2$ 1-hour NAAQS by inclusion of stack height increases for the Unit 1 and 2 boiler stacks. Commenter stated that NPPD is in the process of increasing the Unit 1 stack height from 174 feet to 224 feet above local ground level, and the Unit 2 stack from 174 feet to 210 feet above local ground level. Commenter stated that, while the de minimis good engineering practice (GEP) stack height is 65 meters (213 feet), the new (modeled) heights of the stacks are well below the calculated GEP height of 335.6 feet (102.3 meters) for each stack.

One commenter (0269-NE Power) did not agree with the $SO_2$ emission rates found in the EPA's technical analysis document for Sheldon Station. Commenter stated that, in 2012, Sheldon Station emitted a total of 2,760 tons of $SO_2$ with a total heat input of 12,058,767 mmBTU, which results in an $SO_2$ emission rate for the facility of 0.458 lbs $SO_2$/mmBTU, not 0.92 lbs $SO_2$/mmBTU. Attached to the commenter's letter is additional information to support the basis for the $SO_2$ background concentration used in the dispersion modeling analysis for Sheldon

*Revision Date: June 2016*

Station submitted to the Nebraska Department of Environmental Quality in early September 2015.

**EPA's Response:**

EPA appreciates NPPD's identification of the inaccuracy of the 2012 $SO_2$ emission rates. EPA reviewed the available information and finds that the emission rates provided by NPPD are appropriate. This value was corrected in the final Nebraska TSD.  As explained in the final Nebraska TSD, EPA is designating the area as unclassifiable since available information does not enable EPA to determine whether the area is meeting or not meeting the $SO_2$ 1-hr NAAQS. The updated modeling that demonstrates compliance with the $SO_2$ 1-hr NAAQS is not consistent with EPA's recommended practice for using either actual emissions or allowable emissions in the Modeling TAD. While the modeling scenarios provided by the state use actual emissions, they also depend on future, not yet effective changes to Sheldon Station operations (i.e., increased stack heights, ceasing the combustion of coal at future unknown date). Therefore, the EPA finds that the modeling submitted is not a reliable basis to inform a decision that based on allowable emissions levels the area meets the NAAQS and to designate the area as unclassifiable/attainment.

## B. Lincoln County

**Comment:** Commenter (0269-NE Power) did not agree with the $SO_2$ emission rates found in the EPA's technical analysis document for the Gentleman plant. Commenter stated that, in 2012 Gentleman Station emitted a total of 26,437 tons of $SO_2$ with a total heat input of 89,473,660 mmBTU, which results in an $SO_2$ emission rate for the facility of 0.591 lbs SO2/mmBTU, not 1.05 lbs $SO_2$/mmBTU.

**EPA's Response:**

EPA appreciates NPPD's identification of the inaccuracy of the 2012 $SO_2$ emission rates. EPA reviewed the available information and finds that the emission rates provided by NPPD are appropriate. This value was corrected in the final Nebraska TSD.

# XX. North Carolina

## A. Brunswick County

*Revision Date: June 2016*

**Comment:** On April 19, 2016, to address the EPA's concerns related to the Northwest Township, as described in the February 16, 2016, correspondence on intended designations for Brunswick County, North Carolina provided documentation of the shutdown of the DAK Americas, LLC source in the Northwest Township of Brunswick County. Also on April 19, 2016, the State provided both additional, updated air dispersion modeling information and a final, issued title V permit, which asserts that compliance with the 1-hour $SO_2$ standard can be shown through compliance with a maximum hourly $SO_2$ emission rate of 453.6 pounds per hour for CPI Southport units ES01 and ES02 each. This information was submitted by the State after they were notified by CPI that 2015 actual emissions were higher than those modeled for their initial boundary recommendation. Limits of 453.6 pounds per hour for Units ES01 and ES02 (each) were incorporated into CPI's title V permit, which the State issued on April 18, 2016, and is therefore federally enforceable and effective.

**EPA Response:** The EPA has considered all of the information presented by North Carolina in the April 19, 2016, submission and has addressed that information in the final North Carolina TSD. As explained in the final North Carolina TSD, based on the available information the EPA is not able to determine whether the area is meeting or not meeting the NAAQS, and is designating the area as unclassifiable.

## XXI. North Dakota

### A. Mclean County/Eastern Mercer County

**Comment:** One commenter (ND Response) submitted a March 2016 modeling analysis by AECOM in support of the State's recommendation that the area around the Leland Olds Station, Stanton Station and Coal Creek Station be designated as attainment. Commenter stated that the updated modeling addresses the EPA's concern that the modeling submitted by NDDH in 2015 used a 30-day average allowable $SO_2$ emission rate rather than a 1-hour emission rate. Commenter stated that an appropriately conservative 1-hour emission rate has now been modeled along with the actual emissions from the other sources being included in the analysis. Commenter stated that, while the revised analysis indicates that a 1-hr emission rate of 1,430.3 lb/hr would be appropriate for a BART limit of 1,162.8 lb /hr on a 30-day rolling average basis, to be conservative, the source was modeled with an emission rate of 3,876 lb/hr which is more than three times the BART limit. Commenter stated the results of this modeling continue to show attainment of the $SO_2$ NAAQS.

Commenter (ND Response) stated that the AECOM March 2016 modeling was conducted with the EPA default option and beta ADJ_U* with LOWWIND3 options and the results with both options tested show compliance with the 1-hour $SO_2$ NAAQS by a comfortable margin, especially with the EPA-proposed low wind options employed using AERMOD version 15181. Attached to the AECOM March 2016 modeling report are: Appendix A Alternative Model Justification for Low Wind Speed Options (AERMET ADJ_U* and AERMOD LOWWIND3,

127

*Revision Date: June 2016*

Version 15181); Appendix B Evaluation of Low Wind Modeling Approaches for Two Tall-Stack Databases Technical Paper; and Appendix C Evaluation of Low Wind Modeling Approaches for Two Tall-Stack Databases with AERMET ADJ_U* and AERMOD LOWWIND3 Options.

***EPA's Response:*** Responses to these comments, as well as the EPA's review of North Dakota's updated designation recommendation, can be found in the final North Dakota technical support document for this designation.


## XXII. Ohio

### A. Clermont County

***Comment:*** Some commenters (OH Response, 0296-FirstEnergy, 0299-OH Utilities Group) supported a designation of attainment for Clermont County. One commenter (0296-FirstEnergy) agreed with Ohio EPA's modeling work and their recommendation that the area surrounding the Zimmer plant (Clermont County) should be classified as attainment.

***EPA's Response:***

EPA appreciates the commenter's support.


### B. Gallia/Meigs County

***Comment:*** Some commenters (OH Response, 0296-FirstEnergy, 0299-OH Utilities Group, 0314-OH Valley Electric) requested that U.S. EPA follow Ohio EPA's recommendation of attainment for these counties.

Two commenters (0314-OH Valley Electric, 0327-AEP) stated that, when AEP data is combined with the Ohio EPA modeling data submitted in September 2015, it should allow U.S. EPA to easily determine that the Ohio EPA modeling using AERMOD with the BETA U* and LOWWIND3 Beta Option with actual hourly emissions from the J. M. Gavin Plant and the Kyger Creek Station for the period 2012 – 2014 is acceptable and demonstrates compliance with the 1-Hour $SO_2$ Standard. One commenter (0327-AEP) stated this conclusion supports not only the proposed designation of unclassifiable, but would support a designation of attainment.

One commenter (OH Response) contended the September 15, 2015 Ohio EPA modeling using the LOWWIND3 beta option should be the basis for an attainment designation. Commenter stated that they have provided justification for the use of the LOWWIND3 beta option. Commenter stated that, if the EPA continues to contend that a sufficient demonstration has not been provided to justify LOWWIND3 usage, the EPA should rely on the regulatory default

*Revision Date: June 2016*

modeling that Ohio EPA provided (OH Response, Attachment 1) in making a designation of attainment.

One commenter (OH Response) stated that Ohio EPA provided revised refined dispersion modeling in this source area, in which AERMOD and AERMET were used in the regulatory default modes (OH Response, Attachment 1). Commenter stated that this dispersion modeling analysis used hourly variable $SO_2$ emissions, a variable background concentration and corrected 2014 meteorology data. Commenter stated that, for this analysis, the maximum modeled 3-year design value, years 2012-2014, was 74.1 ppb, including background and, thus, no exceedance of the standard was modeled.

**EPA's Response:**

See the EPA's response to other comments in this section below.

**Comment:** Some commenters (OH Response, 0296-FirstEnergy, 0299-OH Utilities Group, 0314-OH Valley Electric, 0327-AEP) did not agree with the EPA's objection to Ohio EPA's use of the beta option LOWWIND3. Also see section III.A.1 regarding LOWWIND3.

One commenter (OH Response) stated that Ohio EPA provided justification to utilize the LOWWIND3 and ADJ_U* options to the EPA on September 16, 2015 and December 17, 2015. Commenter stated that Ohio EPA consulted with the EPA and requested approval of the use of these beta options. Commenter stated that Ohio EPA is providing additional technical support information (OH Response, Attachment 1) to the EPA, including an expanded statistical analysis of model performance in the Gallia County, Ohio area. Commenter stated that, based upon the analysis performed by Ohio EPA in this source area, the only reliable indicator of any designation status for this area is modeling that incorporates the LOWWIND3 beta option. Commenter questioned why the EPA asserts LOWWIND3 is not appropriate in this specific area when Ohio EPA has provided a robust area-specific analysis justifying its use, yet the EPA proposes it as a regulatory default that could thereby be used in any area without the need for any analyses.

One commenter (0296-FirstEnergy) agreed with Ohio EPA's modeling work and their recommendation that the area surrounding the Gavin plant (Gallia County) should be classified as attainment. Commenter stated that Ohio EPA has fulfilled the recommendations set forth in Appendix W that pertain to the use of beta models, and EPA should therefore more carefully consider Ohio EPA's recommendations, and ultimately approve their submissions.

One commenter (0314-OH Valley Electric) stated the U.S. EPA has proposed to discount the Ohio EPA modeling results and designate this area as unclassifiable due to its apparent determination that Ohio EPA's modeling is inadequate due to the use of the LOWWIND3 Beta Option and the numerous inaccuracies identified in various reviews of the independently submitted Sierra Club modeling.

Two commenters (0314-OH Valley Electric, 0327-AEP) provided a Table in their comment letters and stated that the Table provides additional support and justification to the Ohio EPA demonstration. Commenters stated this is a supplement to the Ohio EPA demonstration that further amplifies the conclusion that LOWWIND3 provides superior model performance in the Gallia and Meigs County area when compared to a monitor that was sited at an area that had historically observed elevated $SO_2$ readings.

One commenter (0332-AD-Sierra Club) stated that, as explained in Sierra Club's national comments, EPA should not approve the use of ADJ_U* and LOWWIND3 beta options. See section III.A.1 of this document.


***EPA's Response:***

While EPA has proposed to modify 40 CFR Part 51 Appendix W to provide for more routine use of selected beta options including LOWWIND3 and ADJ_U*, unless and until such revisions are made, it is necessary that the use of these options in regulatory actions be justified and approved as alternate modeling techniques pursuant to Appendix W section 3.2.2. A commenter objects to being subject to a specific process for evaluating requests for justifying the use of alternative model options, identified in a memorandum issued after Ohio's submittal of modeling using these beta options. However, with or without this memorandum, during the time before any revisions are made to Appendix W, i.e., before any judgments are made as to the merits of these options as a general matter, it would be inappropriate for the EPA to rely on modeling results based on the use of these beta options without justification that these beta options improve the performance of the model in the particular areas being addressed.

The site from which Ohio obtained the data for its comparison to model estimates is located approximately 13 kilometers from the modeled sources, whereas the maximum modeled concentration was approximately 1.2 kilometers from one of the sources. Therefore, the EPA finds that model performance at the monitoring site in this area is not a reliable indication of how well the model is performing in the area of maximum concentrations or whether the use of beta options improve that performance. Additional statistics from the comparison at the monitoring site do not alter the conclusion that the available information is insufficient to evaluate the merits of the beta options in this area or to justify the use of these beta options.

***Comment:*** One commenter (0332-AD-Sierra Club) urged the EPA to issue a final nonattainment designation for Gallia County, Ohio. Commenter stated that the Sierra Club submitted modeling analyses in September 2015 (Exhibit 1 attached to their comment letter) and March 2016 (Exhibit 3) that show exceedances of the $SO_2$ NAAQS. Commenter stated that their 2015 modeling analysis complied with all regulatory requirements and did not agree that it is not reliable. As described in detail in their letter, commenter stated that their March 2016 modeling responds to certain concerns raised by Ohio EPA, and confirms that the Gavin and Kyger Creek plants have caused and will continue to cause significant violations of the $SO_2$ NAAQS. Commenter asserted that the State of Ohio submitted unreliable modeling that used two low-wind-speed beta options that are not approved for regulatory use. Commenter asserted that, if the state had not selected these beta options, its analysis would have very likely predicted

exceedances of the NAAQS. Commenter stated that against the Sierra Club modeling showing nonattainment, there is no reliable evidence showing attainment.

One commenter (0332-AD-Sierra Club) stated that, even if EPA were to consider the beta options for the designation here, Sierra Club's modeling analysis would still support a nonattainment designation for Gallia County. Commenter stated that, even if the peak impacts were reduced by 11 ppb, Sierra Club's modeling would continue to show exceedances of the standard (set at 75 ppb).

One commenter (0332-AD-Sierra Club) agreed with the EPA that the $SO_2$ monitor in Meigs County does not support an attainment designation. Commenter stated that, at 13 km from the Gavin stack, the Meigs County monitor is far too distant to capture peak $SO_2$ impacts from Gavin which, according to Sierra Club's modeling, occur within 2-4 km of the Gavin plant and because such impacts sometimes occur to the southeast of the Kyger Creek plant, in the opposite direction from the Meigs County monitor.

One commenter (OH Response) stated that a nonattainment designation would be inappropriate at this time. Commenter stated that there is significant bias and error determined at the representative monitor in the source area. Commenter stated that, if the EPA promulgates a designation other than attainment, the uncertainty of the modeled results demonstrated in this submittal must be taken into account. Commenter stated that the EPA's acknowledgement that there is a performance issue with AERMOD under low-wind conditions must be taken into account. Commenter stated that it would be highly inappropriate for the EPA to promulgate a designation of nonattainment based on a model that is demonstrably over-predictive until such a time that the inadequate performance of the AERMOD model under low wind conditions is corrected, and that such corrections be readily available for use by the States and not subject to overly complicated and burdensome demonstrations. Commenter stated that, if the EPA were to entertain a designation of nonattainment for this area based on this modeling, the State of Ohio must again be given time to review and comment on this modeling and any amended technical support document supporting such a designation, at least 120-days prior to such a designation occurring.

One commenter (OH Response) stated that the first round of modeling submitted by the Sierra Club for this area was flawed, as discussed in Ohio EPA's November 17, 2015 comments. Commenter stated that, while Ohio EPA has not had sufficient time to review the more recent Sierra Club comments and modeling, Ohio EPA is doubtful that Sierra Club's modeling corrected faulty 2014 meteorological data or used accurate 2015 emissions.

***EPA's Response:***

EPA finds that, based on the available information, we are unable to determine whether the area is meeting or not meeting the 2010 $SO_2$ NAAQS at this time.  The technical support document for the intended Ohio designations describes a review of the modeling Ohio provided with its recommendations and the modeling that Sierra Club provided in September 2015, and the technical support document for the final designations describes a review of the supplemental

modeling that Ohio provided in April 2016 and that Sierra Club provided in March 2016. In brief, Ohio's supplemental modeling uses background concentrations that reflect adjustments that are not justified and result in understating background concentrations in the area, and Sierra Club's modeling uses an unnecessarily conservative background concentration and reflects greater emissions than were actually emitted by the pertinent sources. While the area is clearly close to the standard, the available evidence is insufficient for the EPA to determine whether the area is meeting or not meeting the standard.

While the monitoring data indicate that the Meigs County portion of the area is likely attaining the standard, EPA agrees that the monitor is too far from the primary sources to provide conclusive evidence as to whether portions of the area closer to these sources are attaining the standard.

## XXIII. Oklahoma

### A. Muskogee County

*Comment:* One commenter (0312-OK Sierra Club, 0332-AH-Sierra Club) supported the proposed designation of the portions of Muskogee County near the coal fired power plant operated by Oklahoma Gas and Electric (OG&E) as nonattainment. Two commenters (0312-OK Sierra Club, 0330-Swan, 0334-Swan) expressed concern that unhealthy concentrations of $SO_2$ created by the power plant lead to adverse health impacts in the community.

One commenter (0332-AH-Sierra Club) stated the Muskogee Power Plant is one of the largest $SO_2$ emitters in Oklahoma, has no $SO_2$ controls, and such a designation is compelled by the modeling performed by the State. As described in detail in commenter's letter, commenter stated the EPA rightly concluded that monitoring data is not supportive of an attainment designation since the monitor is not located close to the facility and is not located in the area of highest $SO_2$ concentration. Commenter stated the EPA correctly rejected Oklahoma's weight of the evidence argument that the area should not be designated nonattainment because a monitor in the area has not shown exceedances. Commenter stated that, as a result, the EPA must base the designation on air quality modeling by the State which supports a nonattainment designation.

*EPA's Response*: The EPA is not at this time taking final action on the designation of the Muskogee area, and will respond to all comments regarding this area at a later time.

*Comment:* Two commenters (OK Response, 0316-OK Gas and Electric) stated the EPA should not proceed with the proposed nonattainment designation for the Muskogee area in 2016 because the EPA's consent decree with Sierra Club does not require EPA to address the Muskogee area at this time.

One commenter (0316-OK Gas and Electric) stated that, given that OG&E announced in 2014 that two of the Muskogee units will be converted to burn only natural gas before January 4,

*Revision Date: June 2016*

2019, the timing of this announcement meets the consent decree deadline for such announcements. Commenter stated OG&E remains committed to the conversion of these two units, and the conversions will address the modeled nonattainment of the area quicker than a designation would. Commenter stated that a designation would result in a meaningless and administratively burdensome paperwork exercise for both EPA and the State which is unnecessary to protect public health and the environment since a previously approved source-oriented monitor for the Muskogee area is well in attainment.

One commenter (OK Response) requested the EPA reconsider its intended designation of a portion of Muskogee County as being a nonattainment area. Commenter stated that the EPA is not required to designate a portion of Muskogee County at this time, due to Oklahoma Gas and Electric's (OG&E) Muskogee Generating Station having satisfied criteria which exempts it from this round of designations pursuant to the Consent Decree (CD) at issue. As described in detail in their letter, commenter stated that, because OG&E announced for retirement Units 4 and 5 at the Muskogee Generating Station within the meaning and timeframe established by the CD, it is therefore exempt from the CD. Commenter stated that the Muskogee Generating Station should be included in a subsequent designation round under EPA's Data Requirements Rule (DRR) and Muskogee County should be designated at a later date. Commenter noted that the area's major sources of $SO_2$ are currently in the process of retiring a total of three coal-fired units, which will result in significant reductions of $SO_2$ in the area.

***EPA's Response:*** The EPA is not at this time taking final action on the designation of the Muskogee area, and will respond to all comments regarding this area at a later time.

***Comment:*** Commenter (0316-OK Gas and Electric) stated that, if the EPA determines that the Muskogee area should be included in the 2016 round of designations, the EPA should designate the Muskogee area as attainment for the following reasons: (1) an EPA-approved source-oriented monitor shows attainment; (2) real-world monitoring data contradicts the model's conclusions; (3) federally enforceable regional haze emission limits should be considered in the modeling; and (4) the monitor is being moved to correlate with the modeling. Additional details regarding these points are included in the commenter's letter.

***EPA's Response:*** The EPA is not at this time taking final action on the designation of the Muskogee area, and will respond to all comments regarding this area at a later time.

## B. Noble County

***Comment:*** One commenter (0316-OK Gas and Electric) agreed with the EPA's determination that the area surrounding the Sooner Generating Station in Noble County, Oklahoma should be designated as unclassifiable/attainment. Commenter agreed with EPA that the modeling conducted by DEQ satisfied EPA guidance and showed the area in attainment with the 2010 $SO_2$ NAAQS.

*Revision Date: June 2016*

**EPA's Response:**

The EPA acknowledges the comment and agrees for the reasons detailed in the final Oklahoma technical support document, and is designating that area as unclassifiable/attainment.

## XXIV. South Dakota

### A. Grant County

**Comment:** One commenter (SD Response) requested the EPA reconsider its proposed unclassifiable designation and designate Grant County in attainment of the 1-hour sulfur dioxide standard. Commenter provided additional modeling and monitoring information and stated that all of the information South Dakota submitted to EPA indicates Grant County is in attainment. Commenter stated that South Dakota does not have and is not aware of any reliable documentation that would indicate Grant County would not be in attainment.

Commenter (SD Response) stated that new modeling shows compliance with the 1-hour standard by a wide margin, and thus supports the designation of Grant County as being in attainment. Commenter stated that included in the Burns & McDonnell modeling report (report attached to SD Response letter) is a description of the model, input parameters, and results for the $SO_2$ modeling of the Big Stone Plant. Commenter stated this modeling was conducted in accordance with the EPA and SD DENR modeling guidelines, including an adjustment factor that was applied to Big Stone Plant's federally enforceable 30-day rolling average $SO_2$ emission limitation, as specifically directed by EPA. Commenter stated that the new modeling also confirms that South Dakota's monitor operated in 2001/2002 near the Big Stone power plant was located in the high concentration area.

Commenter (SD Response) stated that DENR operates sulfur dioxide monitors at four locations in South Dakota and all four of these monitors prove South Dakota is attaining the 1-hour sulfur dioxide standard. Commenter stated that South Dakota submitted 12 months of historical monitoring data conducted near the Big Stone power plant which indicated the area is attaining the 1-hour sulfur dioxide standard and that modeling conducted at the time indicated the monitor was located in an area where high concentrations would likely be found. Commenter stated that their conclusion is strengthened by the Big Stone power plant's recent reductions in sulfur dioxide emissions. Commenter stated that the Big Stone power plant is operating using emission controls installed in December 2015 which reduced emissions by 82 percent.

**EPA's Response:** The EPA's review of South Dakota's updated designation recommendation can be found in the final South Dakota technical support document for this designation.

*Revision Date: June 2016*

## XXV. Tennessee

### A. Sumner County

**Comment:**  In the EPA's February 16, 2016, intended designations, we indicated that Tennessee provided additional information dated December 28, 2015, to support the State's recommendation. The Agency did not have sufficient time to complete a full review at that time, but indicated it would be considered prior to final designations. Tennessee subsequently updated the December 28, 2015, information with additional data on March 4, 2016. The purpose of this additional information was to present the dispersion modeling results that were performed in support for assessing compliance with the 1-hour $SO_2$ NAAQS for designation purposes. The primary objective of the modeling analysis by the State was to demonstrate that $SO_2$ emissions from the TVA Gallatin Fossil Plant would not cause or contribute to a violation of the 1-hour $SO_2$ NAAQS.

**EPA Response:**  The EPA has considered all of the information presented by Tennessee in the December 28, 2015, and March 4, 2016, submissions and has addressed that information in the final Tennessee TSD.

## XXVI. Texas

### General Comments

**1. Comment:** Commenter (0294-TCEQ) stated that the nonattainment designations that the EPA proposes for portions of Freestone, Anderson, Rusk, Gregg, Panola, and Titus Counties appear to have been based solely on third-party, non-peer reviewed modeling that has errors and clearly overestimates actual $SO_2$ concentrations as evidenced by the actual monitoring data in the proposed Gregg County nonattainment area.

**EPA's Response:** The EPA is not at this time taking final action to designate these areas, and will address comments regarding them at a later date.

**2. Comment:** Commenter (0294-TCEQ) stated that for Fort Bend, Milam, and Potter Counties, the State's recommended unclassifiable/attainment designations are more appropriate than the EPA's unclassifiable designation because no $SO_2$ monitoring data exists for Fort Bend and

*Revision Date: June 2016*

Milam Counties and the regulatory monitor in Potter County does not have three complete years of data but has been monitoring well below the standard.

***EPA's Response:*** EPA received revised modeling information for Fort Bend County and is revising its recommendation that Fort Bend be unclassifiable and is designating the area as unclassifiable/attainment.  With regard to Potter County, EPA has stated and maintains that the presence of monitoring data showing attainment is not sufficient to determine an area is attainment because the monitor may not be located at the point of maximum impact.   We received no additional information for this county.  Therefore, we are finalizing our proposal that the area be unclassifiable. We refer the reader to the proposed and final TSD for our full evaluation. The EPA is not at this time taking final action on the designation of the Milam area, and will respond to all comments regarding this area at a later time.

***3. Comment:*** As described in commenter's (0274-Mann) letter, over 1300 Sierra Club members and supporters in Texas submitted personal comments (attached to commenter's letter) to Administrator McCarty in support of EPA's proposed $SO_2$ nonattainment designations near the three Luminant plants (Big Brown, Monticello, and Martin Lake). Commenters generally stated that the three Luminant power plants in the EPA plan are among the worst polluters in Texas and even in the nation because none of them have modern pollution controls for sulfur dioxide and stated that it is time that these old plants are held to the public health standards that exist to ensure healthy air for all.

***EPA's Response:*** The EPA is not at this time taking final action on the designation of these areas, and will respond to all comments regarding them at a later time.

4.      ***Comment:*** One commenter (0328-Luminant) stated the EPA has been clear that monitoring data is preferred for NAAQS designations, and EPA's offer for states to use modeling for the $SO_2$ NAAQS was simply intended to provide states with another option. EPA's new approach here to require modeling and rely solely on that data for designations is inconsistent with the statute and EPA's prior practice.

***EPA's Response:***  The EPA is not at this time taking final action to designate the areas addressed in Luminant's comments, and will respond to comments on those areas at a later date.  As a general matter, EPA has not required that modeling be conducted for the sources covered by the consent decree.  Rather, the EPA is considering all information made available to the EPA in making designation determinations. Outside parties utilizing the modeling option for locations without adequate monitoring data have provided valuable information to the EPA, and in many cases have assisted EPA in $SO_2$ designations for the areas at issue in this final action.

 5.      ***Commen***t: One commenter (0328-Luminant) stated the EPA should uphold the State of Texas' recommended designations or at most, and as it did for Sandow Power Company, designate the areas around Martin Lake and Big Brown unclassifiable and allow the installation of monitoring equipment to properly evaluate and measure actual air quality for the purposes of designating attainment and nonattainment areas. Commenter stated that, based on conservative

modeling of future operating conditions (0328-Luminant, Attachments 1-4), areas around Martin Lake and Big Brown, which include Rusk, Panola, Freestone and Anderson Counties, should be designated  unclassifiable/attainment, and the area around Monticello, which includes Titus County, should be designated attainment or unclassifiable/attainment.

One commenter (TX Response) stated that Luminant recently submitted to the TCEQ (March 2016) AERMOD modeling analyses prepared by AECOM that characterize one-hour $SO_2$ concentrations in the vicinity of the Monticello Steam Electric Station, Big Brown Steam Electric Station, and Martin Lake Steam Electric Station using 2013- 2015 actual hourly emissions. Commenter stated the company intends to submit the reports (included in TX Response, Attachment 5), *Luminant Modeling Analyses,* and the associated modeling files to the EPA, to support attainment designations for the 2010 $SO_2$ NAAQS. Commenter stated Attachment 5 includes: A. *Characterization of One-Hour $SO_2$ Concentrations* in *the Vicinity of the Monticello Steam Electric Station;* B. *Supplemental Characterization of One-Hour $SO_2$ Concentrations* in *the Vicinity of the Monticello Steam Electric Station: Future Case; C. Characterization of One Hour $SO_2$ Concentrations* in *the Vicinity of the Big Brown Steam Electric Station; and D. Characterization of One-Hour $SO_2$ Concentrations In the Vicinity of the Martin Lake Steam Electric Station.*

One commenter (TX Response) stated the recent Luminant (March 2016) modeling analyses use source characterization techniques (AERLIFT and AERMOIST) as well as the low wind options (ADJ_u* and LOWWIND3) to address several technical issues related to AERMOD. Commenter stated the EPA and stakeholders discussed some of these technical issues during the 10th Modeling Conference, 11th Modeling Conference and the Regional, State, and Local Modeling Workshops in 2012, 2013, and 2014. Commenter stated that, while TCEQ did not have time to review the appropriateness of the source characterization techniques, Luminant provided documentation of peer-reviewed and published scientific literature to support the use of each technique and option (included in TX Response, Attachment 5). Commenter stated that the report states that the modeling results do not account for the penetrated plume over-prediction, which could easily result in lower predicted concentrations.

One commenter (TX Response) asserted that air quality monitoring is the only way to accurately characterize air quality. Commenter stated that, while AERMOD is a useful tool in certain situations, it does have known technical issues and the information provided by Luminant should be considered as additional support for the unclassifiable/ attainment designations recommended by Texas for Titus, Freestone, and Rusk Counties.

*EPA's Response:* The EPA is not at this time taking final action on the designation of the areas addressed by the commenters' points raised above, and will respond to all comments regarding them at a later time.  Please refer to the earlier discussions in this RTC regarding general comments on the use of modeling in designations actions.

6.    *Comment:* EPA rejects Sierra Club's modeling for the Gibson, Indiana area for the lack of "[u]se of hourly stack parameters more accurately characterize plume characteristics, which will provide greater reliability both in the estimated concentration and in the geographical distribution of concentrations." But for the same error in Sierra Club's modeling of the Martin Lake area, for example, EPA simply states that Sierra Club did not use variable stack temperatures and velocities "because they [we]re not publically available.

*EPA's Response:* The EPA is not at this time taking final action on the designation of the Martin Lake area, and will respond to all comments regarding this area at a later time**.**

7.    *Comment:* One commenter (328-Luminant) stated that for Gibson, Indiana there were several ambient monitors located near the source, including monitors near the highest projected concentrations. However, the peak modeled concentration from the State of Indiana's modeling was approximately two times higher than the monitored concentrations from the two monitoring stations near Gibson when excluding background). Based on this an equation was given which among other factors attempted to adjust the Sierra Club modeling design value down by a factor of 2 for Big Brown, Martin Lake and Monticello.

*EPA's Response:* The EPA is not at this time taking final action on the designation of these areas, and will respond to all comments regarding them at a later time.

8.    *Comment:* One commenter (0328-Luminant) stated the EPA's proposal is unlawful and should not be finalized, in part, because EPA's proposal relies solely on over-predictive Sierra Club modeling of Luminant's facilities. Commenter stated the flaws in Sierra Club's modeling arise from both the over-predictive aspects of its dispersion model and from errors in assessing source characteristics and, once corrected for those flaws, Sierra Club's modeling would show attainment with the standard and therefore should not be relied upon to overturn Texas's recommended designations. Commenter's letter (pdf pages 27-36) details why they believe the Sierra Club's modeling is biased, flawed, and unreliable for the three Luminant plants. Commenter's letter (pdf pages 43-49) details why they believe the areas around Luminant's plants show attainment when Sierra Club's modeling errors are corrected.

Commenter (0328-Luminant) stated that, while the Sierra Club submitted 27 AERMOD modeling evaluations alleging violations for specific locations, the EPA accepted only ten of these evaluations – including the three Luminant locations model evaluations – and disregarded approximately 63% of the Sierra Club AERMOD evaluations because of the same errors present in Sierra Club's modeling of Luminant's plants. Commenter stated the EPA should likewise disregard Sierra Club's modeling here.

One commenter (0328-Luminant) stated that, in a similar situation, EPA rejected modeling prepared by Sierra Club for the Gibson Station in Indiana. Commenter stated that Luminant has applied a similar analysis to the Sierra Club modeling submitted for its Big Brown, Martin Lake, and Monticello facilities and confirmed that Sierra Club has likely over-predicted the concentrations of $SO_2$ in the area around those facilities and that the modeling does not "clearly demonstrate" nonattainment.

Commenter (0328-Luminant) stated that the EPA's reliance on the Sierra Club modeling would deny Luminant and the State of Texas the opportunity to gather actual monitoring data to use for determining attainment status and is inconsistent with the CAA, EPA's regulations, and EPA's prior practice. Commenter stated that correcting the problems with that modeling demonstrates that modeling is inexact and cannot be used to demonstrably determine the attainment or nonattainment status of any area with the $SO_2$ standard, and specifically undermines any reliance on Sierra Club's overstated modeling.

*EPA's Response:* The EPA is not at this time taking final action on the designation of these areas, and will respond to all comments regarding them at a later time.

9. **Comment:** One commenter (0328-Luminant) stated the EPA's proposal is unlawful and should not be finalized, in part, because Luminant is submitting with their comments a modeling analysis for Freestone, Rusk, Titus, Anderson, and Panola Counties that supports an attainment or unclassifiable designation for each of these counties. Commenter stated that, in the face of conflicting analyses, EPA should either retain Texas's recommended designations or utilize the unclassifiable designation, or the unclassifiable/attainment designation, until monitoring data can be obtained.

*EPA's Response:* The EPA is not at this time taking final action on the designation of these areas, and will respond to all comments regarding them at a later time.

10. **Comment:** One commenter (0328-Luminant) stated the EPA's proposal is unlawful and should not be finalized, in part, because EPA has not demonstrated that its proposed changes to Texas's designations are "necessary" as it is required to do under the CAA. Commenter's letter (pdf pages 50-57 and attachments 1, 2 and 4) details why they believe Luminant's forecasted operations confirm that a modification of Texas' designation recommendations for the areas around these plants is not "necessary." Commenter stated that additional modeling, based on reasonable assumptions of future operating conditions, submitted with their comments demonstrates that the affected counties will not exceed the NAAQS in the future. Commenter stated that changes to Texas's proposed designations are not "necessary" when modeling of future operating conditions during the period of evaluation show attainment and, thus, EPA has no authority under the CAA to, and should not, finalize these designations. Commenter stated that a designation of nonattainment as EPA proposes for these areas would not serve the purposes of section 110 or 107 in any event because it would not accelerate attainment of the NAAQS for these areas.

*EPA's Response:* The EPA is not at this time taking final action on the designation of these areas, and will respond to all comments regarding them at a later time.

11. **Comment:** One commenter (0328-Luminant) stated the EPA's proposal is unlawful and should not be finalized, in part, because, in the face of inconsistent modeling results, the record

before EPA does not "clearly demonstrate" nonattainment of the SO₂ standard as is required under the CAA and, thus, the EPA has no authority under the CAA to, and should not, finalize these designations.

*EPA's Response:* The EPA is not at this time taking final action on the designation of these areas, and will respond to all comments regarding them at a later time.

12.    *Comment:* One commenter (0328-Luminant) stated that, if EPA will not reinstate Texas' recommendation of attainment for each of these counties, then, in light of the lack of monitored data and conflicting modeling assessments, EPA must designate the areas around these facilities as "unclassifiable." Commenter stated the CAA provides this classification option, and EPA has confirmed that it should apply this designation wherever available information does not clearly demonstrate that a nonattainment or attainment designation is warranted.

One commenter (0328-Luminant) provided a detailed discussion of the unclassifiable designation, including legislative history, case law, and EPA guidance and concluded that an unclassifiable designation is required where data is insufficient to support a designation of attainment or nonattainment. Commenter stated that, because of all the factors that influence modeling, modeling results in this case cannot "clearly demonstrate" that a nonattainment designation is warranted and should not be relied on for such purposes. Commenter stated the only monitoring data available shows attainment of the standard and Luminant's modeling shows that any monitor sited near one of its locations will also be attaining the standard. Commenter stated that, accordingly, EPA must designate the areas around Luminant's plants as unclassifiable and allow for monitors to be placed into service to acquire three years of data to accurately characterize actual air quality for attainment and nonattainment designations.

One commenter (0328-Luminant) stated that, although the Consent Decree requires EPA to complete designations of certain areas before monitoring data can be collected, it does not compel or authorize EPA to rely on questionable modeling and, therefore, where EPA lacks monitoring data, and modeling data is uncertain, EPA must use the unclassifiable designation. Commenter's letter (pdf pages 57-61) details why they believe that, to avoid a conflict between the Consent Decree, the DRR, and CAA's cooperative federalism system, EPA should designate the areas around Luminant's facilities as unclassifiable/attainment or unclassifiable until additional, reliable information is available to inform some other designation.

*EPA's Response:* The EPA is not at this time taking final action on the designation of these areas, and will respond to all comments regarding them at a later time.

13.    *Comment:* One commenter (0332-AI-Sierra Club) supported the EPA's proposal to designate areas surrounding the Big Brown power plant in Freestone County, Texas, the Martin Lake power plant in Rusk County, Texas, and the Monticello power plant in Titus County, Texas as nonattainment areas for purposes of compliance with the 2010 1-hour SO₂ NAAQS. Commenter stated that there are no monitoring stations located close to these three plants, and both the State of Texas and the plants' owner chose not to submit any modeling. Commenter stated the only evidence before EPA is the modeling submitted by the Sierra Club, which

*Revision Date: June 2016*

supports EPA's proposed nonattainment designation. Commenter stated that, with the updated modeling and analysis attached to their comments, three separate rounds of modeling (September 2015, December 2015, and March 2016) have now reached the same result: Big Brown, Martin Lake, and Monticello cause the areas surrounding each facility to be in nonattainment of the 1-hour $SO_2$ NAAQS.

Commenter stated that September 2015 modeling by Wingra Engineering demonstrates the areas surrounding Big Brown, Martin Lake, and Monticello should be designated as nonattainment areas. Commenter stated that, on December 14, 2015, Sierra Club submitted updated modeling analyses for Big Brown and Monticello which demonstrated that even using the most recent emission data and adjusting certain emissions and stack parameter assumptions, as suggested by TCEQ, Big Brown, Monticello, and Martin Lake caused significant exceedances of the 1-hour standard in the surrounding areas.

Commenter stated that, as explained in detail in comments prepared by Dr. H. Andy Gray (Exhibits 1 and 2 to commenter's 0332-AI-Sierra Club letter), making adjustments to Wingra Engineering's 2015 modeling, as suggested in the EPA TSD, would not change the outcome from nonattainment to attainment, given the large margin by which emissions from these plants exceed the NAAQS and the minor differences expected from these adjustments. Commenter stated that, in response to the issues raised in EPA's TSD for Texas, Sierra Club retained Wingra Engineering and Dr. H. Andrew Gray to update the modeling for Big Brown, Martin Lake, and Monticello. Commenter stated the March 31, 2016 modeling confirms that even after making all of the potential adjustments identified by EPA, the $SO_2$ concentrations in the areas surrounding Big Brown, Martin Lake, and Monticello exceed the 1-hr $SO_2$ NAAQS. These modeling analyses are in Exhibits 3-5 attached to commenter's (0332-AI-Sierra Club) letter.

*EPA's Response:* The EPA is not at this time taking final action on the designation of these areas, and will respond to all comments regarding them at a later time.

***14.*** ***Comment:*** One commenter (TX Response) stated that the TCEQ reviewed the December 2015 Sierra Club supplemental modeling and, while the modeling did address some issues, a number of techniques used in the modeling are still not consistent with the EPA's $SO_2$ Modeling TAD. Commenter stated that the EPA's review of the additional modeling also identified several of the same inconsistencies, such as the exclusion of building downwash and use of flagpole receptors. Commenter stated that, in addition to the inconsistencies, several refinements should be made to the modeling to more accurately represent conditions near the sites. Commenter stated that background concentrations should be refined, varying stack parameters should be used, and the 1992 National Land Cover Dataset used should be updated with recent data. Commenter stated that this is especially relevant for sites with predicted concentrations relatively close to the NAAQS, such as Monticello Steam Electric Station. Commenter stated the combination of these errors could lead to the over-prediction of NAAQS exceedances in Anderson, Gregg, and Panola Counties. Commenter noted that the Sierra Club modeling predicted only a few receptors in Gregg County would marginally exceed the NAAQS. Commenter stated that the EPA's review of the Sierra Club's modeling for Martin Lake indicated the "inclusion of downwash often leads to higher concentrations closer to the source."

*Revision Date: June 2016*

Commenter stated that, if more $SO_2$ emissions reach ground level near the source, this would almost certainly reduce the impact farther away, i.e. in Gregg and Panola Counties.

***EPA's Response:*** The EPA is not at this time taking final action on the designation of these areas, and will respond to all comments regarding them at a later time.

## A. Atascosa County

***Comment:*** Two commenters (TX Response, 0294-TCEQ) agreed with the EPA's intended designation for Atascosa County.

***EPA's Response:*** The EPA appreciates the support of commenters who agreed with the EPA's proposed designation for San Miguel Electric Lignite Fired Power Plant in Atascosa County.

## B. Fort Bend County

***Comment:*** Two commenters (TX Response, 0275-NRG Energy) requested that EPA designate Fort Bend County as unclassifiable/attainment. One commenter (0275-NRG Energy) attached a modeling report that indicates that the area is attaining the standard.

One commenter (TX Response) stated that NRG Energy provided supplemental modeling for the W.A. Parish Electric Generating Station in January 2016 in response to EPA comments on modeling submitted in September 2015 and November 2015. Commenter stated the TCEQ reviewed the supplemental modeling and determined the modeling and refinements made are consistent with the Modeling TAD and support a designation of unclassifiable/attainment for Fort Bend County. Commenter stated the EPA noted several inaccuracies, use of non-representative data, and non-adherence to the Modeling TAD in the Sierra Club's modeling. Commenter stated the EPA should find the recent NRG Energy modeling sufficient to designate the area around W.A. Parish station as unclassifiable/attainment.

***EPA's Response:*** The EPA acknowledges the receipt of the modeling analysis provided by industry for Fort Bend County. As detailed in our final Texas Technical Support Document for this county, based on the review of the most recent modeling analysis for Fort Bend County we are revising the designation of this area to unclassifiable/attainment. Additional details regarding the EPA's review and our findings that the revised modeling analysis addresses our previous concerns and is consistent with the Modeling TAD are provided in the final TSD made available as part of this final designations action.

***Comment:*** Also see General comments #2 in this section (Texas).

***EPA's Response:*** See our response to General Comment # 2 above.

*Revision Date: June 2016*

## C. Freestone-Anderson County

***Comment:*** Commenter (0294-TCEQ) stated that Anderson and Panola Counties should be designated as unclassifiable/attainment because their $SO_2$ emissions contributions to their respective proposed nonattainment areas are negligible, and therefore including portions of these counties is unnecessary to control additional $SO_2$ sources.

One commenter (TX Response) stated that Freestone-Anderson County should be designated unclassifiable/attainment.

One commenter (TX Response) stated that actual point source emissions inventory data for Anderson, Gregg, and Panola Counties indicate either no $SO_2$ point source emissions or insignificant $SO_2$ point source emissions. Commenter provided data analysis of the monitored values and point source emissions data in Attachments 1-3 of their comment letter. Commenter stated that, despite the actual monitored or reported data that indicate these counties' contributions to the proposed nonattainment areas are negligible, the EPA relied on third-party, non-peer reviewed modeling which predicted exceedances of the $SO_2$ NAAQS in these counties. Commenter stated that, because of the uncertainty present in the third-party modeling, the EPA should not impose unjustifiable regulatory burdens of a nonattainment designation on Anderson, Gregg, and Panola Counties.

***EPA's Response:*** The EPA is not at this time taking final action on the designation of these areas, and will respond to all comments regarding them at a later time.

## D. Goliad County

***Comment:*** Two commenters (TX Response, 0294-TCEQ) agreed with the EPA's intended designation for Goliad County.

***EPA's Response:*** The EPA appreciates the support of commenters who agreed with the EPA's proposed designation for Coleto Creek Power Station in Goliad County.

## E. Gregg County

***Comment:*** Two commenters (TX Response, 0294-TCEQ) stated the EPA should revise its proposed designation for Gregg County to attainment to comply with federal regulations at 40 CFR 50.17(b) and to reflect the observed air quality data from the regulatory monitor located in that portion of the county which has shown attainment since 2010.

One commenter (TX Response) stated the EPA has offered no rational explanation for refusing to designate as attainment those areas with ambient, regulatory monitoring data that demonstrate that the area is actually meeting the NAAQS. Commenter stated the EPA's actions on the Texas Annual Monitoring Plan and Annual Data Certification clearly indicate that Texas' ambient air monitoring network is in compliance with the Federal Clean Air Act and EPA requirements, both

in terms of placement and data quality, respectively. Commenter stated, when modeling and monitoring data conflict, courts have acknowledged that actual air monitoring data is superior to modeling data so long as the monitor is sufficient to accurately represent the area in question. *E.g., Republic Steel Corp. v. Castle,* 621F.3d797, 805 (6th Cir.1980); *PPG Industries, Inc. v. Castle,* 630 F.3d 462, 46'7-68 (6th Cir. 1980). Also see section III.C. Monitoring in this RTC.

Commenter (0285-Stoudt) requested that the EPA designate Gregg County as attainment. The commenter stated the EPA's proposal to designate portions of Gregg County as nonattainment disregards the certified monitoring data that are below the standard and relies instead on air quality modeling data of questionable origin and reliability. Commenter stated that the model's level of over-predicted should not be acceptable as the basis for a decision as significant as an attainment designation, particularly when certified monitoring data is available. The commenter stated that the proposed nonattainment area boundaries went beyond the receptors identified in the model as impacted by the Martin Lake Steam Electric Station., most of these receptors were over Lake Cherokee where potential exposure would be intermittent, and as a result, these boundaries include additional area in Gregg County for which there is no basis for a designation. The commenter stated that it seems questionable for a party who initiated the litigation, the Sierra Club, leading to an agreement concerning the designation process to provide the government with which it reached an agreement the data on which designations would be made.

One commenter (0328-Luminant) stated the EPA's proposal is unlawful and should not be finalized, in part, because the portion of Gregg County designated nonattainment contains a monitor that has collected actual data demonstrating attainment with the standard; thus a nonattainment designation for this area is wholly unsupported. Commenter stated the EPA should designate Gregg County as attainment because the design value for the monitor in the county is well below the SO$_2$ NAAQS.

*EPA's Response:* The EPA is not at this time taking final action on the designation of these areas, and will respond to all comments regarding them at a later time.  Please refer to the earlier sections of this RTC for responses to general comments on the use of modeling in designations.

*Comment:* One commenter (TX Response) stated that actual point source emissions inventory data for Anderson, Gregg, and Panola Counties indicate either no SO$_2$ point source emissions or insignificant SO$_2$ point source emissions. Commenter provided data analysis of the monitored values and point source emissions data in Attachments 1-3 of their comment letter. Commenter stated that, despite the actual monitored or reported data that indicate these counties' contributions to the proposed nonattainment areas are negligible, the EPA relied on third-party, non-peer reviewed modeling which predicted exceedances of the SO$_2$ NAAQS in these counties. Commenter stated that, because of the uncertainty present in the third-party modeling, the EPA should not impose unjustifiable regulatory burdens of a nonattainment designation on Anderson, Gregg, and Panola Counties. Also see General comment #14 regarding Sierra Club modeling.

*EPA's Response:* The EPA is not at this time taking final action on the designation of these areas, and will respond to all comments regarding them at a later time.

*Revision Date: June 2016*

## F. Lamb County

***Comment:*** Two commenters (TX Response, 0294-TCEQ) agreed with the EPA's intended designation for Lamb County.

***EPA's Response:*** The EPA appreciates the support of commenters who agreed with the EPA's proposed designation for Tolk Electric Station in Lamb County.

## G. Limestone County

***Comment:*** Commenters (TX Response, 0275-NRG Energy, 0294-TCEQ) agreed with the EPA's plan to designate Limestone County as unclassifiable/attainment. Commenter (0275-NRG Energy) attached a modeling analysis based on representative actual emissions.

***EPA's Response:*** The EPA acknowledges and appreciates the support of commenters who agreed with the EPA's proposed designation for Limestone Power Station in Limestone County as unclassifiable/attainment. As detailed in our proposed designation action and final Texas TSD, the designation of Limestone County is based on the information and results included in industry's most recent modeling analysis dated November 30, 2015, which was resubmitted to us by the commenter.

## H. McLennan County

***Comment:*** Two commenters (TX Response, 0294-TCEQ) stated that the EPA's proposed designation of unclassifiable for McLennan County disregards the monitoring data in those counties. Commenters stated that McLennan County should not be designated at this time because Sandy Creek Power Station's 2012 actual emissions are below the emissions threshold established in the EPA's consent decree.

One commenter (TX Response) stated that the EPA should act to approve Sandy Creek Energy Station's petition for an alternate methodology for reporting 2012 substituted emissions data. Commenter stated this would confirm that Sandy Creek Station is not subject to the emissions threshold established in the EPA's consent decree with the Sierra Club and Natural Resources Defense Council. Commenter stated that Sandy Creek's estimate of 2012 actual emissions, taking into account controls and actual conditions, is 25.6 tons, whereas the substituted emissions data used was 4,954.8 tons.

One commenter (TX Response) stated that, as additional evidence for the recommended attainment designation for McLennan County, the TCEQ provided updated AERMOD modeling for Sandy Creek Energy Station using permitted allowable emission rates (TX Response, Attachment 4). Commenter stated the updated modeling fully addresses all of EPA's written concerns regarding the previous modeling submitted for this source, including updated

meteorology and surface characteristics, expansion of the receptor grid, and use of latest versions of AERMET and AERMOD. Commenter stated this modeling demonstration supports the previous recommendation that McLennan County should be designated attainment.

***EPA's Response:***  As documented elsewhere in this Response to Comments document and the final Texas Technical Support Document (TSD), based on additional modeling information submitted by TCEQ for Sandy Creek Energy Center we are designating McLennan County as unclassifiable/attainment.  We note, as documented in the TSD that accompanied our proposed designation for McLennan County, the absence of a violating monitor within the county of concern when considering the distance of that monitor from a facility is not a sufficient justification to rule out that an exceedance of the 2010 $SO_2$ NAAQS may occur in the immediate vicinity of the facility. The Waco Mazanec monitor in McLennan County is located approximately 24.5 km from the Sandy Creek Energy Station. It is EPA's continued position that the monitoring data from the Waco $SO_2$ monitor is not sufficient to support an unclassifiable/attainment designation.

Regarding the commenter's statement that the Sandy Creek Energy Station should not be included in this round of $SO_2$ designations, we do not agree.  The sources included in the second round of $SO_2$ designations (i.e., "CD sources") were identified based on the 2012 $SO_2$ emissions information contained in the EPA's Air Markets Database.  While both the facility and TCEQ have provided information indicating the 2012 emissions are based on substituted emissions data and not measured emissions data, the magnitude of emissions contained in the Air Markets Database are above the thresholds contained in the March 2, 2015, consent decree. Therefore, the EPA is designating McLennan County as part of this round of designations.  We also address the updated modeling proved by TCEQ for McLennan County in our TSD.

***Comment:***  One commenter (0300-Sandy Creek Services) requested that the EPA designate McLennan County as attainment, not "unclassifiable." The commenter stated that proposal is unnecessary, unfounded, misinforms the general public, and burdens the State of Texas with additional demonstration requirements. The commenter stated the EPA has based the proposal on inaccurate emissions data, yet even with emissions modeled under the most conservative assumptions, the modeling supported an "attainment" designation. Commenter stated the EPA's treatment of McLennan County stands in stark contrast to far less conservative analyses of far larger sources. Extensive technical analyses are provided in the commenter's letter and attachments.  As part of that analysis, the commenter raised the following key points or concerns:

- McLennan County should not be subject to this round of $SO_2$ designations.  The commenter stated that Sandy Creek Energy Station should not have been included because the 2012 emissions information contained in the Acid Rain Database for the 29 days the SCES operated in 2012 was based on data substitution emissions and does not accurately reflect the actual (or allowable) emissions for that 29 day period, or any other. The commenter referenced a 2013 petition filed by SCES with the EPA's Clean Air Markets Division (CAMD) regarding the erroneous emissions data contained in the database that has not been acted on.  The commenter also stated that the EPA has

discretion to determine that SCES should not be included in this round on the basis that the petition had been filed with CAMD. (Pages 2-4 of comments pdf)

- The magnitude of $SO_2$ emissions from the SCES are much lower than emissions from other plants located in Texas for which EPA has proposed an unclassifiable/attainment designation.  Comparison of emissions with other plants coupled with the size of the SCES's property warrant an attainment designation. (Pages 4-5 of comments pdf)
- The modeling analysis previously submitted by industry in support of an attainment designation for McLennan County is much more conservative that the analyses submitted and accepted for any other source. (Pages 5-6 of comments pdf)
- The alleged deficiencies identified by the EPA in their proposed designation are at most trivial, with no possibility of affecting the ultimate conclusion regarding the designation for McLennan County. (Pages 6-13 of comments pdf)

***EPA's Response:***  We do not agree with the commenter's opinion that our proposed designation of McLennan County was unnecessary, unfounded, misinformed the general public, and burdened the State of Texas with additional demonstration requirements.  As outlined in our proposed designation, we were unable to determine if the area surrounding the SCES was meeting or not meeting the NAAQS.  Because we lacked definitive information to support a specific designation, the EPA proposed a designation of unclassifiable.  During the 120-day period, TCEQ did submit additional technical information, specifically an air dispersion modeling analysis for the area surrounding SCES.  As documented elsewhere in this Response to Comments document and the final Texas Technical Support Document (TSD), based on additional modeling information submitted by TCEQ for SCES we are designating McLennan County as unclassifiable/attainment.  While our revised designation is not based on the additional information provided by the commenter, we are providing responses to the specific points raised by the commenter below.

In response to a court order, the EPA is required to complete designations for the 2010 primary 1-hour $SO_2$ standard by July 2, 2016, for areas containing stationary sources that had not been announced as of March 2, 2015, for retirement and that, according to the EPA's Air Market Database, in 2012 emitted in 2012 either (i) more than 16,000 tons of $SO_2$, or (ii) more than 2,600 tons of $SO_2$ with an annual average emission rate of at least 0.45 lbs $SO_2$/mmBTU.  As of March 2, 2015, the SCES had not met the specific requirements for being "announced for retirement" and in 2012 the facility emitted 4,955 tons of $SO_2$, and had an emission rate of 1.41 lbs $SO_2$/MMBtu based on the EPA's Air Markets Database. In our proposal, we acknowledged that SCES had submitted a petition regarding the 2012 emissions contained in the Database and indicated that if that petition was approved and the Air Market's Database is updated to reflect a change in the reported emissions by the deadline for designations, the EPA consent decree obligation to designate this area by July 2, 2016, would not apply.  Absent an update to the 2012 emissions data, the SCES does meet the requirements for the consent decree; and therefore, the consent decree applies to the source and the EPA is under obligation to designate this area by July 2, 2016.

As the commenter stated in their letter, predicted impacts are dependent upon source-specific parameters and a straight comparison of annual plant-wide $SO_2$ emissions between facilities does not provide information that is sufficient to find the area is attaining of the 2010 $SO_2$ NAAQS.

*Revision Date: June 2016*

While the comparison of plant-wide actual emissions may provide some additional information about a given facility, it does not provide information regarding the $SO_2$ concentration values. As stated in our proposed designation, based on the information available at the time of our proposal we were unable to determine whether the area was meeting or not meeting the NAAQS and an unclassifiable designation was proposed.

The TSD accompanying our proposed designation of McLennan County outlined our evaluation of the modeling submittal for the SCES provided by industry. While we agree that several of the approaches used in this modeling would be considered conservative (i.e., modeling of permitting emission rates, background value combined with modeled concentrations, and inclusion of all receptors within a given grid without consideration of access), the original submittal did not provide information regarding the level or magnitude of conservatism provide by these approaches. Furthermore, we identified several areas where the modeling was inconsistent with the EPA's modeling guidance. Therefore, the modeling submittal did not provide sufficient information to support a specific NAAQS designation resulting in the EPA's proposed designation of McLennan County as unclassifiable.

As stated in the summary of the EPA's evaluation for the proposed unclassifiable designation for McLennan County, we identified several areas where the SCES modeling analysis submitted by industry was not consistent with the TAD. The combined potential impacts from these inconsistencies resulted in the determination that the modeling analysis, as submitted, was not sufficient to support a designation of unclassifiable/attainment. The information included in the initial modeling, nor the recent feedback provided by the commenter, do not provide any demonstration to support the claims that the inconsistencies with the TAD would not have resulted in significant differences in the modeling results. Without additional information to support these claims, it is unclear how the modeled concentrations would change if these inconsistencies were addressed. Therefore, we do not have sufficient information available to base a designation of unclassifiable/attainment using the modeling results provided by industry.

The EPA's discussion regarding the modeled receptor grid did acknowledge that modeled impacts throughout the grid were below the 2010 $SO_2$ NAAQS. However, as stated in the TSD, revised modeling conducted to address the inconsistencies with the modeling TAD may result in modeled areas of concern within the relatively small receptor grid that may require the inclusion of additional receptors outside the originally modeled 5-km receptor grid to demonstrate that no violations of the 1-hour $SO_2$ NAAQS are predicted in the area surrounding the SCES.

We do not agree that modeling conducted with an older version of AERMOD is not inconsistent with the modeling TAD. As documented in the model release information, the revised versions of AERMOD, which include various bug fixes and/or enhancements replace the previous version of the model. Therefore a reference to AERMOD within a guidance document is referencing the current release of the model, since previous version(s) have been replaced by the most recent release. Regarding the impact of the model version upon modeled impacts, this finding is one of several regarding the inconsistency of the SCES modeling analysis with EPA modeling guidance – specifically the modeling TAD. The original modeling submittal, nor the recent feedback provided by the commenter, do not quantify the differences in the predicted impacts as a result of the older model version. Even if these differences were quantified via test case information or

other information made available, it would not address the other inconsistencies in the modeling as compared with the modeling TAD. As previously stated in our proposal, based on the inconsistencies in the modeling with current EPA guidance, we do not have sufficient information based on the industry submitted modeling to support a designation of unclassifiable/attainment.

As stated in the TSD accompanying the proposed designation of McLennan County the meteorological data used in the SCES modeling analysis was outdated. Furthermore, the use of this data was inconsistent with the modeling TAD, especially considering that more recent meteorological data is available for the same station. The modeling TAD states the following: "When using allowable emissions, the most recent permitted or PTE rate should be used along with the most recent three years of meteorological data." The meteorological data included in the industry modeling is not consistent with modeling TAD.

The Modeling TAD provides information regarding the surface characteristics that should be used in the processing of meteorological data. In cases where meteorological data is not site-specific and instead taken from a meteorological station determined to be representative of the facility, the surface characteristics of the meteorological site (and not the facility) should be used in processing in the meteorological data Section 8.3.c of Appendix W and the AERSURFACE User's Guide (U.S. EPA 2008)]. When choosing the preprocessed meteorological dataset to be used in the SCES modeling, industry calculated the surface characteristics at the facility, which is not consistent with EPA modeling guidance. As stated previously, this is one of the inconsistencies found in the initial SCES modeling that resulted in our determination that the modeling did not adequately indicate that the area surrounding the facility is attaining the 2010 1-hour $SO_2$ NAAQS.

## I. Milam County

*Comment:* One commenter (TX Response) stated that Milam County should be designated unclassifiable/attainment.

*EPA Response:* The EPA is not at this time taking final action on the designation of the Milam area, and will respond to all comments regarding this area at a later time.

*Comment:* See General comments #2 in this section (Texas).

*EPA Response:* The EPA is not at this time taking final action on the designation of the Milam area, and will respond to all comments regarding this area at a later time.

## J. Panola County

*Comment:* Two commenters (TX Response, 0294-TCEQ) stated that Anderson and Panola Counties should be designated as unclassifiable/attainment because their $SO_2$ emissions contributions to their respective proposed nonattainment areas are negligible, and therefore including portions of these counties is unnecessary to control additional $SO_2$ sources.

*Revision Date: June 2016*

One commenter (TX Response) stated that actual point source emissions inventory data for Anderson, Gregg, and Panola Counties indicate either no $SO_2$ point source emissions or insignificant $SO_2$ point source emissions. Commenter provided data analysis of the monitored values and point source emissions data in Attachments 1-3 of their comment letter. Commenter stated that, despite the actual monitored or reported data that indicate these counties' contributions to the proposed nonattainment areas are negligible, the EPA relied on third-party, non-peer reviewed modeling which predicted exceedances of the $SO_2$ NAAQS in these counties. Commenter stated that, because of the uncertainty present in the third-party modeling, the EPA should not impose unjustifiable regulatory burdens of a nonattainment designation on Anderson, Gregg, and Panola Counties.

*EPA's Response:* The EPA is not at this time taking final action on the designation of this area, and will respond to all comments regarding it at a later time.

## K. Potter County

*Comment:* One commenter (TX Response) stated that Potter County should be designated unclassifiable/attainment.

*EPA's Response:* Please see the final Texas TSD for detailed reasoning regarding the EPA's final designation of Potter County as unclassifiable.

*Comment:* See General comments #2 in this section (Texas).

*EPA's Response:* See our response to General Comment # 2 above.

## L. Robertson County

*Comment:* Two commenters (TX Response, 0294-TCEQ) agreed with the EPA's intended designation for Robertson County.

*EPA's Response:* The EPA appreciates the support of commenters who agreed with the EPA's proposed designation for Twin Oaks Power Station in Robertson County.

## M. Rusk County

*Comment:* One commenter (TX Response) stated that Rusk County should be designated unclassifiable/attainment.

*EPA's Response:* The EPA is not at this time taking final action on the designation of this area, and will respond to all comments regarding it at a later time.

*Revision Date: June 2016*

## N. Titus County

***Comment:*** One commenter (0328-Luminant) stated that Luminant has provided to TCEQ a modeling report (attachment 3 to their comment letter) which supports a NAAQS attainment demonstration for the plant. Commenter stated this report documents the use of AERMOD modeling to characterize the $SO_2$ concentrations around the Monticello Steam Electric Station using the 2013-2015 actual hourly emissions. Commenter stated the use of source characterization techniques (AERLIFT and AERMOIST) as well as the low wind options (ADJ_U* and LOWWIND3) are supported by EPA's Appendix W proposals as well as peer-reviewed papers available for each option. Commenter stated that the modeling results remain highly conservative because they do not account for the penetrated plume over-prediction, which could easily result in a much lower actual concentration, as was found by EPA for the Gibson Generating Station.

***EPA's Response:*** The EPA is not at this time taking final action on the designation of this area, and will respond to all comments regarding it at a later time.

***Comment:*** One commenter (TX Response) stated that Titus County should be designated unclassifiable/attainment.

***EPA's Response:*** The EPA is not at this time taking final action on the designation of this area, and will respond to all comments regarding it at a later time.

**Tab 392: Final Technical Support Document for Nebraska Area Designations for the 2010 SO2 Primary National Ambient Air Quality Standard (June 30, 2016)**

**Final Technical Support Document**

Nebraska
Area Designations for the 2010 $SO_2$ Primary National Ambient Air Quality Standard

<u>Summary</u>

Pursuant to section 107(d) of the Clean Air Act (CAA), the U.S. Environmental Protection Agency (the EPA, or the Agency) must designate areas as either "unclassifiable," "attainment," or "nonattainment" for the 2010 1-hour sulfur dioxide ($SO_2$) primary national ambient air quality standard (NAAQS). Section 107(d) of the CAA defines a nonattainment area as one that does not meet the NAAQS or that contributes to a NAAQS violation in a nearby area, an attainment area as any area other than a nonattainment area that meets the NAAQS, and an unclassifiable area as any area that cannot be classified on the basis of available information as meeting or not meeting the NAAQS.

July 2, 2016, is the deadline established by the U.S. District Court for the Northern District of California for the EPA to designate certain areas. This deadline is the first of three deadlines established by the court for the EPA to complete area designations for the 2010 $SO_2$ NAAQS. This deadline applies to certain areas in Nebraska because three emission sources meet the conditions of the court's order.

Nebraska submitted updated recommendations on September 18, 2015. Table 1 below lists Nebraska's recommendations and identifies the counties in Nebraska that the EPA is designating in order to meet the July 2, 2016, court-ordered deadline. These final designations are based on an assessment and characterization of air quality through ambient air quality data, air dispersion modeling, other evidence and supporting information, or a combination of the above.

**Table 1 – Nebraska's Recommended and the EPA's Final Designations**

| Area | Nebraska's Recommended Area Definition | Nebraska's Recommended Designation | the EPA's Final Area Definition | the EPA's Final Designation |
|---|---|---|---|---|
| Nebraska City Station, Nebraska | No Boundaries were defined in the State's official recommendation | Attainment | Otoe County, Nebraska[1] (Otoe County, NE) | Unclassifiable/ Attainment[2] |

---

[1] The EPA notified the State of Nebraska on February 16, 2016, that our intended area definition consisted of the entirety of Otoe County, Nebraska. Our final area definition is the same as our intended area definition.

[2] The EPA notified the State of Nebraska on February 16, 2016, that our intended designation for the Nebraska City Station area was unclassifiable/attainment. Our final designation is the same as our intended designation.

1

| Gerald Gentleman Station, Nebraska | No Boundaries were defined in the State's official recommendation | Attainment | Lincoln County, Nebraska[3] (Lincoln County, NE) | Unclassifiable/ Attainment[4] |
|---|---|---|---|---|
| Sheldon Station, Nebraska | No Boundaries were defined in the State's official recommendation | Unclassifiable | Lancaster County, Nebraska[5] (Lancaster County, NE) | Unclassifiable[6] |

## Background

On June 3, 2010, the EPA revised the primary (health based) $SO_2$ NAAQS by establishing a new 1-hour standard at a level of 75 parts per billion (ppb) which is met at an ambient air quality monitoring station when the 3-year average of the 99th percentile of 1-hour daily maximum concentrations does not exceed 75 ppb. This NAAQS was published in the *Federal Register* on June 22, 2010 (75 FR 35520), and is codified at 40 CFR 50.17. The EPA determined this is the level necessary to protect public health with an adequate margin of safety, especially for children, the elderly, and those with asthma. These groups are particularly susceptible to the health effects associated with breathing $SO_2$. The two prior primary standards of 140 ppb evaluated over 24 hours, and 30 ppb evaluated over an entire year, codified at 40 CFR 50.4, remain applicable.[7] However, the EPA is not currently designating areas on the basis of either of these two primary standards. Similarly, the secondary standard for $SO_2$, set at 500 ppb evaluated over 3 hours, codified at 40 CFR 50.5, has not been revised, and the EPA is also not currently designating areas on the basis of the secondary standard.

## General Approach and Schedule

---

[3] The EPA notified the State of Nebraska on February 16, 2016, that our intended area definition consisted of the entirety of Lincoln County, Nebraska. Our final area definition is the same as our intended area definition.

[4] The EPA notified the State of Nebraska on February 16, 2016, that our intended designation for the Gerald Gentleman Station area was unclassifiable/attainment. Our final designation is the same as our intended designation.

[5] The EPA notified the State of Nebraska on February 16, 2016, that our intended area definition consisted of the entirety of Lancaster County, Nebraska. Our final area definition is the same as our intended area definition.

[6] The EPA notified the State of Nebraska on February 16, 2016, that our intended designation for the Sheldon Station area was unclassifiable/attainment. Our final designation is the same as our intended designation.

[7] 40 CFR 50.4(e) provides that the two prior primary NAAQS will no longer apply to an area 1 year after its designation under the 2010 NAAQS, except that for areas designated nonattainment under the prior NAAQS as of August 22, 2010, and areas not meeting the requirements of a SIP Call under the prior NAAQS, the prior NAAQS will apply until that area submits and the EPA approves a SIP providing for attainment of the 2010 NAAQS. No Nebraska areas were designated nonattainment for the prior NAAQS at the time of promulgation of the NAAQS, nor were any not meeting the requirements of a SIP Call under the prior NAAQS.

2

Section 107(d) of the CAA requires that not later than 1 year after promulgation of a new or revised NAAQS, state governors must submit their recommendations for designations and boundaries to the EPA. Section 107(d) also requires the EPA to provide notification to states no less than 120 days prior to promulgating an initial area designation that is a modification of a state's recommendation. If a state does not submit designation recommendations, the EPA may promulgate the designations that it deems appropriate without prior notification to the state, although it is our intention to provide such notification when possible. If a state or tribe disagrees with the EPA's intended designations, it is given an opportunity within the 120-day period to demonstrate why any proposed modification is inappropriate. The EPA is required to complete designations within 2 years after promulgation of a new or revised NAAQS, unless the EPA determines that sufficient information is not available, in which case the deadline is extended to 3 years. The 3-year deadline for the revised $SO_2$ NAAQS was June 2, 2013.

On August 5, 2013, the EPA published a final rule establishing air quality designations for 29 areas in the United States for the 2010 $SO_2$ NAAQS, based on recorded air quality monitoring data from 2009 - 2011 showing violations of the NAAQS (78 FR 47191). In that rulemaking, the EPA committed to address, in separate future actions, the designations for all other areas for which the Agency was not yet prepared to issue designations.

Following the initial August 5, 2013, designations, three lawsuits were filed against the EPA in different U.S. District Courts, alleging the Agency had failed to perform a nondiscretionary duty under the CAA by not designating all portions of the country by the June 2, 2013 deadline. In an effort intended to resolve the litigation in one of those cases, plaintiffs, Sierra Club and the Natural Resources Defense Council and the EPA filed a proposed consent decree with the U.S. District Court for the Northern District of California. On March 2, 2015, the court entered the consent decree and issued an enforceable order for the EPA to complete the area designations according to the court-ordered schedule.

According to the court-ordered schedule, the EPA must complete the remaining designations by three specific deadlines. By no later than July 2, 2016 (16 months from the court's order), the EPA must designate two groups of areas: (1) areas that have newly monitored violations of the 2010 $SO_2$ NAAQS and (2) areas that contain any stationary sources that had not been announced as of March 2, 2015, for retirement and that, according to the EPA's Air Markets Database, emitted in 2012 either (i) more than 16,000 tons of $SO_2$, or (ii) more than 2,600 tons of $SO_2$ with an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/MMBtu). Specifically, a stationary source with a coal-fired unit that, as of January 1, 2010, had a capacity of over 5 megawatts and otherwise meets the emissions criteria, is excluded from the July 2, 2016, deadline if it had announced through a company public announcement, public utilities commission filing, consent decree, public legal settlement, final state or federal permit filing, or other similar means of communication, by March 2, 2015, that it will cease burning coal at that unit.

The last two deadlines for completing remaining designations are December 31, 2017, and December 31, 2020. The EPA has separately promulgated requirements for state and other air agencies to provide additional monitoring or modeling information on a timetable consistent with these designation deadlines. We expect this information to become available in time to help

3

inform these subsequent designations. These requirements were promulgated on August 21, 2015 (80 FR 51052), in a rule known as the $SO_2$ Data Requirements Rule (DRR), codified at 40 CFR part 51 subpart BB.

Updated designations guidance was issued by the EPA through a March 20, 2015, memorandum from Stephen D. Page, Director, U.S. the EPA, Office of Air Quality Planning and Standards, to Air Division Directors, U.S. the EPA Regions 1-10. This memorandum supersedes earlier designation guidance for the 2010 $SO_2$ NAAQS, issued on March 24, 2011, and it identifies factors that the EPA intends to evaluate in determining whether areas are in violation of the 2010 $SO_2$ NAAQS. The guidance also contains the factors the EPA intends to evaluate in determining the boundaries for all remaining areas in the country, consistent with the court's order and schedule. These factors include: 1) Air quality characterization via ambient monitoring or dispersion modeling results; 2) Emissions-related data; 3) Meteorology; 4) Geography and topography; and 5) Jurisdictional boundaries. This guidance was supplemented by two non-binding technical assistance documents intended to assist states and other interested parties in their efforts to characterize air quality through air dispersion modeling or ambient air quality monitoring for sources that emit $SO_2$. Notably, the EPA's documents titled, "$SO_2$ NAAQS Designations Modeling Technical Assistance Document" (Modeling TAD) and "$SO_2$ NAAQS Designations Source-Oriented Monitoring Technical Assistance Document" (Monitoring TAD), were made available to states and other interested parties. Both of these TADs were most recently updated in February 2016.

Based on complete, quality assured and certified ambient air quality data collected between 2013 and 2015, no violations of the 2010 $SO_2$ NAAQS have been recorded at ambient air quality monitors in any undesignated part of Nebraska. However, there are three sources in the State meeting the emissions criteria of the consent decree for which the EPA must complete designations by July 2, 2016. In this final technical support document, the EPA discusses its review and technical analysis of Nebraska's updated recommendations for the areas that we must designate. The EPA also discusses any intended and final modifications from the State's recommendation based on all available data before us.

The following are definitions of important terms used in this document:

1) 2010 $SO_2$ NAAQS – the primary NAAQS for $SO_2$ promulgated in 2010. This NAAQS is 75 ppb, based on the 3-year average of the 99th percentile of the annual distribution of daily maximum 1-hour average concentrations. See 40 CFR 50.17.
2) Attaining monitor – an ambient air monitor meeting all methods, quality assurance, and siting criteria and requirements whose valid design value is under 75 ppb, based on data analysis conducted in accordance with Appendix T of 40 CFR part 50.
3) Design Value – a statistic computed according to the data handling procedures of the NAAQS (in 40 CFR part 50 Appendix T) that, by comparison to the level of the NAAQS, indicates whether the area is violating the NAAQS.
4) Designated nonattainment area – an area which the EPA has determined has violated the 2010 $SO_2$ NAAQS or contributed to a violation in a nearby area. A nonattainment designation reflects considerations of the state's recommendations and all of the information discussed in this document. The EPA's decision is based on all available

4

information including the most recent 3 years of air quality monitoring data, available modeling analyses, and any other relevant information.

5) Designated unclassifiable area – an area for which the EPA cannot determine based on all available information whether or not it meets the 2010 SO$_2$ NAAQS.

6) Designated unclassifiable/attainment area – an area which the EPA has determined to have sufficient evidence to find either is attaining or is likely to be attaining the NAAQS. The EPA's decision is based on all available information including the most recent 3 years of air quality monitoring data, available modeling analyses, and any other relevant information.

7) Modeled violation – a violation based on air dispersion modeling.

8) Recommended attainment area – an area a state or tribe has recommended that the EPA designate as attainment.

9) Recommended nonattainment area – an area a state or tribe has recommended that the EPA designate as nonattainment.

10) Recommended unclassifiable area – an area a state or tribe has recommended that the EPA designate as unclassifiable.

11) Recommended unclassifiable/attainment area – an area a state or tribe has recommended that the EPA designate as unclassifiable/attainment.

12) Violating monitor – an ambient air monitor meeting all methods, quality assurance, and siting criteria and requirements whose valid design value exceeds 75 ppb, based on data analysis conducted in accordance with Appendix T of 40 CFR part 50.

5

**Technical Analysis for the Nebraska City Station, Nebraska Area**

<u>Final Designation Summary</u>

After careful evaluation of the state's recommendation and supporting information, as well as all available relevant information, the EPA designates the area around the Nebraska City Station, Nebraska, as unclassifiable/attainment for the 2010 $SO_2$ NAAQS. Specifically, the boundaries are comprised of the entirety of Otoe County, Nebraska.

The unclassifiable/attainment designation is based on the modeling analysis that the State of Nebraska provided to the EPA.

<u>Introduction</u>

The Nebraska City Station, Nebraska, area contains a stationary source that, according to the EPA's Air Markets Database, emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/MMBtu). Specifically, in 2012, the Omaha Public Power District's (OPPD) Nebraska City Station electric generating facility emitted 16,766 tons of $SO_2$ and had an emissions rate of 0.35 lbs $SO_2$/MMBtu. As of March 2, 2015, this stationary source had not met the criteria for being "announced for retirement." Pursuant to the March 2, 2015, court-ordered schedule, the EPA must designate the area surrounding this facility by July 2, 2016.

In its September 18, 2015 submission, Nebraska recommended that the area surrounding Nebraska City Station electric generating facility be designated as attainment based on an assessment and characterization of air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. No area (e.g., jurisdictional boundaries) was officially recommended by Nebraska. This assessment and characterization was performed using air dispersion modeling software, i.e., AERMOD, analyzing actual emissions.

On February 16, 2016, the EPA notified Nebraska that we intended to designate the Nebraska City Station, Nebraska, area as unclassifiable/attainment, based on our view that the area was meeting the NAAQS. Additionally, we informed Nebraska that our intended boundaries for the unclassifiable/attainment area consisted of the entirety of Otoe County, Nebraska. Our intended designation and associated boundaries were based on the modeling analysis that the State of Nebraska provided to the EPA for the Nebraska City Station which showed attainment of the NAAQS and used actual emissions from 2012-2014 and followed the recommended the EPA modeling TAD. Detailed rationale, analyses, and other information supporting our intended designation for this area can be found in the preliminary technical support document for Nebraska, and this document along with all others related to this rulemaking can be found in Docket ID the EPA-HQ-OAR-2014-0464.

<u>Assessment and Conclusion</u>

6

In our February 16, 2016, notification to Nebraska regarding our intended unclassifiable/attainment designation for the Nebraska City Station, Nebraska area, the EPA requested that any additional information that the Agency should consider prior to finalizing the designation should be submitted by April 19, 2016. On March 1, 2016, the EPA also published a notice of availability and public comment period in the *Federal Register,* inviting the public to review and provide input on our intended designations by March 31, 2016 (81 FR 10563).

Subsequent to our February 16, 2016 notification, the EPA did not receive any additional information from Nebraska, nor did we receive any public comments, regarding our intended unclassifiable/attainment designation for the Nebraska City Station, Nebraska area. The EPA is explicitly incorporating and relying upon the analyses and information presented in the preliminary technical support document for the purposes of our final designation for this area, except to the extent that any new information submitted to the EPA or conclusions presented in this final technical support document and our response to comments document (RTC), available in the docket, supersede those found in the preliminary document.

Therefore, based on the information available to the EPA at this time including the analyses performed for the purposes of the preliminary technical support document, the EPA concludes that the area is meeting the 2010 primary $SO_2$ NAAQS, and therefore is designating the Nebraska City Station, Nebraska, area as unclassifiable/attainment for the 2010 $SO_2$ NAAQS. The boundaries for this unclassifiable/attainment area consist of the entirety of Otoe County, Nebraska, and are shown in the figure below. There are no other nearby emitters of $SO_2$ within Otoe County, Nebraska.

**Figure 1: The EPA's final unclassifiable/attainment area: Otoe County, Nebraska.**

7



At this time, our final designations for the state only apply to this area and the others contained in this final technical support document. Consistent with the court-ordered schedule, the EPA will evaluate and designate all remaining undesignated areas in Nebraska by either December 31, 2017, or December 31, 2020.

**Technical Analysis for the Gerald Gentleman Station, Nebraska Area**

<u>Final Designation Summary</u>

After careful evaluation of the state's recommendation and supporting information, as well as all available relevant information, the EPA designates the area around the Gerald Gentleman Station as unclassifiable/attainment for the 2010 $SO_2$ NAAQS. Specifically, the boundaries are comprised of the entirety of Lincoln County, Nebraska.

The unclassifiable/attainment designation is based on the modeling analysis that the State of Nebraska provided to the EPA.

<u>Introduction</u>

The Lincoln County, Nebraska, area contains a stationary source that, according to the EPA's Air Markets Database, emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/MMBtu). Specifically, in 2012, the Nebraska Public Power District's (NPPD) Gerald Gentleman electric generating facility emitted 16,766 tons of $SO_2$ and had an emissions rate of 0.59 lbs $SO_2$/MMBtu. As of March 2, 2015, this stationary source had not met the criteria for being "announced for retirement." Pursuant to the March 2, 2015, court-ordered schedule, the EPA must designate the area surrounding this facility by July 2, 2016.

In its September 18, 2016 submission, Nebraska recommended that the area surrounding the Gerald Gentleman electric generating facility be designated as attainment based on an assessment and characterization of air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. No area (e.g., jurisdictional boundaries) was officially recommended by Nebraska. This assessment and characterization was performed using air dispersion modeling software, i.e., AERMOD, analyzing actual emissions.

On February 16, 2016, the EPA notified Nebraska that we intended to designate the Gerald Gentleman area as unclassifiable/attainment, based on our view that the area was meeting the NAAQS. Additionally, we informed Nebraska that our intended boundaries for the unclassifiable/attainment area consisted of the entirety of Lincoln County, Nebraska. Our intended designation and associated boundaries were based on, among other things, the modeling analysis that the State of Nebraska provided to the EPA. The modeling analysis submitted by Nebraska for the Gerald Gentleman Station using actual emissions from 2012-2014 shows attainment and this modeling followed the recommended the EPA modeling TAD for designation purposes. Detailed rationale, analyses, and other information supporting our intended designation for this area can be found in the preliminary technical support document for Nebraska, and this document along with all others related to this rulemaking can be found in Docket ID the EPA-HQ-OAR-2014-0464.

<u>Assessment and Conclusion</u>

9

In our February 16, 2016 notification to Nebraska regarding our intended unclassifiable/attainment designation for the Gerald Gentleman area, the EPA requested that any additional information that the Agency should consider prior to finalizing the designation should be submitted by April 19, 2016. On March 1, 2016, the EPA also published a notice of availability and public comment period in the *Federal Register,* inviting the public to review and provide input on our intended designations by March 31, 2016 (81 FR 10563).

The EPA is explicitly incorporating and relying upon the analyses and information presented in the preliminary technical support document for the purposes of our final designation for this area, except to the extent that any new information submitted to the EPA or conclusions presented in this final technical support document and our response to comments document (RTC), available in the docket, supersede those found in the preliminary document.

The EPA received a comment from the Nebraska Public Power Department requesting a correction to the emission rate from the facility. This comment and our response can be found in the RTC. Therefore, based on the information available to the EPA at this time, including the modeling analysis performed by the State that shows attainment with the NAAQS and follows the modeling TAD, the EPA concludes that the area is meeting the 2010 primary $SO_2$ NAAQS, and therefore is designating the Gerald Gentleman Station area as unclassifiable/attainment for the 2010 $SO_2$ NAAQS. The boundaries for this unclassifiable/attainment area consist of the entirety of Lincoln County, Nebraska, and are shown in the figure below. There are no nearby emitters of $SO_2$ within Lincoln County, Nebraska.

**Figure 2: The EPA's final unclassifiable/attainment area: Lincoln County, Nebraska.**



At this time, our final designations for the state only apply to this area and the others contained in this final technical support document. Consistent with the court-ordered schedule, the EPA will evaluate and designate all remaining undesignated areas in Nebraska by either December 31, 2017, or December 31, 2020.

**Technical Analysis for Sheldon Station, Nebraska Area**

<u>Final Designation Summary</u>

After careful evaluation of the State's recommendation and supporting information, as well as all available relevant information, the EPA designates the area around Sheldon Station as unclassifiable for the 2010 $SO_2$ NAAQS. Specifically, the boundaries are comprised of the entirety of Lancaster County, Nebraska.

The unclassifiable designation is based on the EPA determining that the area cannot be classified on the basis of all available information, including all modeling analyses that were submitted by both the state of Nebraska and the Sierra Club, as meeting or not meeting the 2010 $SO_2$ NAAQS. All modeling analyses that the State conducted relied upon actual emissions from the 2012-2014 timeframe and included future changes to the current Sheldon Station operations that were not in place during the 2012-2014 timeframe. Both modeling analyses submitted by the Sierra Club use a background value that the EPA finds is not representative of the area surrounding the Sheldon Station facility.

<u>Introduction</u>

The Lancaster County, Nebraska, area contains a stationary source that, according to the EPA's Air Markets Database, emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/MMBtu). Specifically, in 2012, the Nebraska Public Power District's (NPPD) electric generating facility emitted 2,760 tons of $SO_2$ and had an emissions rate of 0.46 lbs $SO_2$/MMBtu. As of March 2, 2015, this stationary source had not met the criteria for being "announced for retirement." Pursuant to the March 2, 2015, court-ordered schedule, the EPA must designate the area surrounding this facility by July 2, 2016.

In its September 18, 2015 submission, Nebraska recommended that the area surrounding the Sheldon Station electric generating facility be designated as unclassifiable based on an assessment and characterization of air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. No area (e.g., jurisdictional boundaries) was officially recommended by Nebraska. This assessment and characterization was performed using air dispersion modeling software, i.e., AERMOD, analyzing actual emissions with future year stack height modifications to Sheldon Station Unit 1 and Unit 2.

On February 16, 2016, the EPA notified Nebraska that we intended to designate the Sheldon Station, Nebraska, area as unclassifiable. Additionally, we informed Nebraska that our intended boundaries for the unclassifiable area consisted of the entirety of Lancaster County, Nebraska. Our intended designation and associated boundaries were based on, among other things, the EPA determining that the modeling analyses that the state and Sierra Club provided to the EPA did not provide a basis to determine whether the area is or is not meeting the 2010 $SO_2$ NAAQS. Specifically, the State did not use historic actual stack heights when analyzing actual emissions and Sierra Club used a background $SO_2$ value that is not representative of the area surrounding

12

the Sheldon Station facility. Detailed rationale, analyses, and other information supporting our intended designation for this area can be found in the preliminary technical support document for Nebraska, and this document along with all others related to this rulemaking can be found in Docket ID the EPA-HQ-OAR-2014-0464.

Assessment of New Information

In our February 16, 2016, notification to Nebraska regarding our intended unclassifiable designation for the Sheldon Station area, the EPA requested that any additional information that the Agency should consider prior to finalizing the designation should be submitted by April 19, 2016. On March 1, 2016, the EPA also published a notice of availability and public comment period in the *Federal Register,* inviting the public to review and provide input on our intended designations by March 31, 2016 (81 FR 10563).

The EPA is explicitly incorporating and relying upon the analyses and information presented in the preliminary technical support document for the purposes of our final designation for this area, except to the extent that any new information submitted to the EPA or conclusions presented in this final technical support document and our response to comments document (RTC), available in the docket, supersede those found in the preliminary document.

As further detailed below, after carefully considering all available data and information, the EPA concludes that the available information still does not enable the Agency to determine whether the area is meeting or not meeting the 2010 primary $SO_2$ NAAQS, and therefore is designating the Sheldon Station area as unclassifiable for the 2010 $SO_2$ NAAQS. The boundaries for this unclassifiable area consist of the entirety of Lancaster County, Nebraska, and are shown in the figure below. Also included in the figure are nearby emitters of $SO_2$.

**Figure 3: The EPA's final unclassifiable area: Lancaster County, Nebraska**

13



The EPA received substantive comments regarding our intended unclassifiable designation for the Sheldon Station area, and a comprehensive summary of the majority of these comments and our responses can be found in the RTC. Specifically, the Nebraska Public Power District submitted a request to correct the $SO_2$ emission rate from the facility and provided an additional discussion on the appropriateness of the background value used by the State of Nebraska. The EPA concurs with the corrected emission rate and continues to find that the background value used by the State of Nebraska is appropriate.

Also, additional information, specifically air dispersion modeling, was submitted to the EPA during the state and public comment period in order to characterize air quality in the Sheldon

14

Station area. Notably, Nebraska provided additional air dispersion modeling information during the comment period asserting that the Sheldon Station area of analysis is in compliance with the 1-hour SO2 NAAQS, taking into consideration recently permitted stack modifications. This information was submitted to support our proposed unclassifiable designation boundaries for the area.

The additional modeling used actual emissions for Sheldon Station Units 1 and 2 from 2012 – 2014 with stack height modifications to each of the two Sheldon boiler stacks that post-dated those years. While the requirements of stack height modifications were incorporated into a modified construction permit for Sheldon Station on April 19, 2016, the stack height increases were not in place during the 2012 – 2014 period. As such, this additional modeling is inconsistent with the EPA's recommended practice for either actual emissions-based modeling or allowable emissions-based modeling in the TAD and could not be relied upon to determine that the area is meeting the NAAQS and designate the Sheldon Station area as unclassifiable/attainment. The discussion and analysis of this new information that follow reference the Modeling TAD, Monitoring TAD, and the factors for evaluation contained in the EPA's March 20, 2015, guidance, as appropriate and applicable.

*Model Selection and Modeling Components*

The EPA's Modeling TAD notes that for area designations under the 2010 SO$_2$ NAAQS, the AERMOD modeling system should be used, unless use of an alternative model can be justified. In some instances the recommended model may be a model other than AERMOD, such as the BLP model for buoyant line sources. The AERMOD modeling system contains the following components:
- AERMOD: the dispersion model
- AERMAP: the terrain processor for AERMOD
- AERMET: the meteorological data processor for AERMOD
- BPIPPRIME: the building input processor
- AERMINUTE: a pre-processor to AERMET incorporating 1-minute automated surface observation system (ASOS) wind data
- AERSURFACE: the surface characteristics processor for AERMET
- AERSCREEN: a screening version of AERMOD

The State used AERMOD version 15181, which is the most recent version of AERMOD, and a discussion of the individual components will be referenced in the corresponding discussion that follows, as appropriate.

*Modeling Parameter: Rural or Urban Dispersion*

The EPA's recommended procedure for characterizing an area by prevalent land use is based on evaluating the dispersion environment within 3 km of the facility. According to the EPA's modeling guidelines contained in documents such as the Modeling TAD, rural dispersion coefficients are to be used in the dispersion modeling analysis if more than 50% of the area within a 3 km radius of the facility is classified as rural. Conversely, if more than 50% of the area is urban, urban dispersion coefficients should be used in the modeling analysis. When performing the modeling for the area of analysis, the State determined that it was most

15

appropriate to run the model in rural mode. The rural determination is appropriate based on the land-use characteristics around the facility.

*Modeling Parameter: Area of Analysis (Receptor Grid)*

The EPA's view is that a reasonable first step towards characterization of air quality in the area surrounding the Sheldon Station is to determine the extent of the area of analysis, i.e., receptor grid. Considerations presented in the Modeling TAD include but are not limited to: the location of the $SO_2$ emission sources or facilities considered for modeling; the extent of significant concentration gradients of nearby sources; and sufficient receptor coverage and density to adequately capture and resolve the model predicted maximum $SO_2$ concentrations. For the Sheldon Station area, the State included no other emitters of $SO_2$ within its area of analysis. There are no other significant sources of $SO_2$ within 20 km in any direction of the Sheldon Station according to the 2011 National Emissions Inventory (NEI). Thus, no other emitters of $SO_2$ would have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. The grid receptor spacing for the area of analysis chosen by the state is as follows:

- 50 meter spacing on the fence line
- 50 meter spacing from the fence to 1 kilometer from the fence
- 100 meter spacing from 1 kilometer to 2 kilometers from the fence
- 250 meter spacing from 2 kilometer to 5 kilometers from the fence
- 500 meter spacing from 5 kilometer to 7 kilometers from the fence
- 1000 meter spacing from 7 to 10 kilometers from the fence

The receptor network contained 6,668 receptors and covered the southern portion of Lancaster County, Nebraska. Figure 4, which was included in the State's submission during the comment period, shows the chosen area of analysis surrounding the Sheldon Station, as well as the receptor grid for the area of analysis. Consistent with the Modeling TAD, receptors for the purposes of this designation effort were placed only in areas where it would also be feasible to place a monitor and record ambient air impacts. The impacts of the area's geography and topography will be discussed later within this document.

**Figure 4: Receptor Grid for the Sheldon Station Facility Area of Analysis**



*Modeling Parameter: Source Characterization*

The State characterized the source within the area of analysis that differed from the best practices outlined in the Modeling TAD. As mentioned previously, the state used actual emissions from 2012 – 2014 with stack height increases at Sheldon Station Units 1 and 2 that did not in fact occur during that period. Because the modeled stack height modifications were not in place in 2012 – 2014, the state did not properly characterize Sheldon Station during this timeframe.

*Modeling Parameter: Emissions*

The EPA's Modeling TAD notes that for the purposes of modeling to characterize air quality for use in designations, the recommended approach is to use the most recent 3 years of actual emissions data and concurrent meteorological data. However, the TAD also provides for the flexibility of using allowable emissions in the form of the most recently permitted (referred to as PTE or allowable) emissions rate.

17

The EPA maintains that continuous emissions monitoring systems (CEMS) data provide acceptable historical emissions information when it is available and that these data are available for many electric generating units. In the absence of CEMS data, the EPA's Modeling TAD highly encourages the use of AERMOD's hourly varying emissions keyword HOUREMIS or through the use of AERMOD's variable emissions factors keyword EMISFACT. When choosing one of these methods, the EPA thinks that detailed throughput, operating schedules, and emissions information from the impacted source should be used.

In certain instances, states and other interested parties may find that it is more advantageous or simpler to use PTE rates as part of their modeling runs. Specifically, a facility may have recently adopted a new federally enforceable emissions limit, been subject to a federally enforceable consent decree, or implemented other federally enforceable mechanisms and control technologies to limit $SO_2$ emissions to a level that indicates compliance with the NAAQS. These new limits or conditions may be used in the application of AERMOD. In these cases, the Modeling TAD notes that the existing $SO_2$ emissions inventories used for permitting or SIP planning demonstrations should contain the necessary emissions information for designations-related modeling. In the event that these short-term emissions are not readily available, they may be calculated using the methodology in Table 8-1 of Appendix W to 40 CFR Part 51 titled, "Guideline on Air Quality Models."

As previously noted, the State included the 2 units for Sheldon Station and no other emitters of $SO_2$ within its area of analysis. The State found that these units adequately include the sources which might contribute to the area where the maximum concentrations of $SO_2$ are expected. No other sources were determined by the State to have the potential to cause significant concentration gradient impacts within the area of analysis. The facility in the area of analysis and its associated annual actual $SO_2$ emissions from 2012 to 2014 are summarized below.

**Table 2: Actual $SO_2$ Emissions in 2012 – 2014 from Facilities in the Sheldon Station Area of Analysis**

| | $SO_2$ Emissions (tons per year) | | |
|---|---|---|---|
| Facility Name | 2012 | 2013 | 2014 |
| NPPD Sheldon Station Unit 1 | 1,241 | 1,514 | 1,648 |
| NPPD Sheldon Station Unit 2 | 1,519 | 1,321 | 1,594 |
| Total Emissions From All Facilities in Area of Analysis | 2,760 | 2,835 | 3,242 |

For the Sheldon Station area of analysis, the state used actual emissions from 2012 – 2014. CEMS emissions data were used and obtained from the EPA's Clean Air Markets Division.

As noted previously, the use of actual emissions from 2012 – 2014 with future stack height modifications should not be used to characterize 2012 – 2014 air quality for use in designations. The modeling analysis would need to use either historic stack heights with actual emissions to indicate what a monitor would have measured over this three year period, or a permitted (allowable) emission rate with the stack height modifications, subject to the EPA's regulations governing dispersion techniques and good engineering practice, to indicate what a monitor would measure after the stack height projects were completed.

18

*Modeling Parameter: Meteorology and Surface Characteristics*

The most recent 3 years of available meteorological data (concurrent with the most recent 3 years of emissions data) should be used in designations efforts. As noted in the Modeling TAD, the selection of data should be based on spatial and climatological (temporal) representativeness. The representativeness of the data are based on: 1) the proximity of the meteorological monitoring site to the area under consideration, 2) the complexity of terrain, 3) the exposure of the meteorological site, and 4) the period of time during which data are collected. Sources of meteorological data include National Weather Service (NWS) stations, site-specific or onsite data, and other sources such as universities, the Federal Aviation Administration (FAA), and military stations.

For the Sheldon Station area of analysis, surface meteorology from Lincoln, Nebraska, approximately 20 km to the north, and coincident upper air observations from the NWS station in Omaha, Nebraska, 120 km to the northeast were selected as most representative of meteorological conditions within the area of analysis. The location of the meteorological surface and upper air stations are shown in Figure 5.

The state used AERSURFACE version 13016 using data from the NWS station in Lincoln, Nebraska (located at 40.85N, 96.76W) to estimate the surface characteristics of the area of analysis. The state also estimated values for albedo (the fraction of solar energy reflected from the earth back into space), the Bowen ratio (the method generally used to calculate heat lost or heat gained in a substance), and the surface roughness (sometimes referred to as "Zo"). In Figure 5 below, which was included in the state's recommendation, the location of the Lincoln, Nebraska NWS station is shown relative to the Sheldon Station area of analysis.

**Figure 5: Sheldon Station Area of Analysis and the Lincoln, Nebraska NWS site used for surface meteorology, the Omaha, Nebraska NWS site used for upper air meteorology, and the location of the background SO$_2$ monitor in Trego, Kansas.**

19



Copyrighted map removed

Meteorological data from the Lincoln, Nebraska, surface and Omaha, Nebraska, upper air stations were used in generating AERMOD-ready files with the AERMET processor. The output meteorological data created by the AERMET processor is suitable for being applied with AERMOD input files for AERMOD modeling runs. The state followed the methodology and settings presented in the EPA's Modeling TAD in the processing of the raw meteorological data into an AERMOD-ready format and used AERSURFACE to best represent surface characteristics.

Hourly surface meteorological data records are read by AERMET and include all the necessary elements for data processing. However, wind data taken at hourly intervals may not always portray wind conditions for the entire hour, which can be variable in nature. Hourly wind data may also be overly prone to indicate calm conditions, which are not modeled by AERMOD. In order to better represent actual wind conditions at the meteorological tower, wind data of one minute duration was provided from the same instrument tower but in a different formatted file to be processed by a separate preprocessor, AERMINUTE. These data were subsequently integrated into the AERMET processing to produce final hourly wind records of AERMOD-ready meteorological data that better estimate actual hourly average conditions and that are less

20

prone to over-report calm wind conditions. This allows AERMOD to apply more hours of meteorology to modeled inputs and therefore produce a more complete set of concentration estimates. As a guard against excessively high concentrations that could be produced by AERMOD in very light wind conditions, the state set a minimum threshold of 0.5 meters per second in processing meteorological data for use in AERMOD. This approach is consistent with a March 2013 the EPA memo titled, "Use of ASOS meteorological data in AERMOD dispersion Modeling." In setting this threshold, no wind speeds lower than this value would be used for determining concentrations. This threshold was specifically applied to the one minute wind data.

*Modeling Parameter: Geography and Terrain*

The terrain in the area of analysis is best described as relatively flat. To account for terrain changes, the AERMAP terrain program within AERMOD was used to specify terrain elevations for all the receptors. The source of the elevation data incorporated into the model is from the National Elevation Dataset (NED). The NED data available on-line in 1 arc-second spacing from the US Geological Survey was used in the modeling analysis. The NED data for this analysis was based on North American Datum (NAD) 83 for horizontal locations and NAD88 for elevation.

*Modeling Parameter: Background Concentrations of $SO_2$*

The Modeling TAD offers two mechanisms for characterizing background concentrations of $SO_2$ that are ultimately added to the modeled design values: 1) a "first tier" approach, based on monitored design values, or 2) a temporally varying approach, based on the 99th percentile monitored concentrations by hour of day and season or month. For the Sheldon Station area of analysis, the state chose the monitored design value at the Trego, Kansas monitoring location. The background concentration for this area of analysis was determined by the state to be 9 micrograms per cubic meter ($\mu g/m^3$), or 3.4 ppb,[8] and that value was incorporated into the final AERMOD results. The Trego County monitor is located in rural west central Kansas, and like the Sheldon Station, has no significant nearby sources of $SO_2$. The EPA finds that the Trego County monitor provides an appropriate representation of the $SO_2$ background.

*Summary of Modeling Results*

The AERMOD modeling parameters, as supplied by additional information from the state during the comment period for the Sheldon Station area of analysis are summarized below in Table 3.

**Table 3: AERMOD Modeling Parameters for the Sheldon Station, Nebraska Area of Analysis**

| Sheldon Station, Nebraska Area of Analysis | |
|---|---|
| AERMOD Version | 15181 |

---

[8] The conversion factor for $SO_2$ (at the standard conditions applied in the ambient $SO_2$ reference method) is 1ppb = approximately $2.62\mu g/m^3$.

| Dispersion Characteristics | Rural |
|---|---|
| Modeled Sources | 1 |
| Modeled Stacks | 2 |
| Modeled Structures | 13 |
| Modeled Fence lines | 1 |
| Total receptors | 6,668 |
| Emissions Type | Actuals for Units 1 and 2 with stack height modifications. |
| Emissions Years | 2012-2014 |
| Meteorology Years | 2012-2014 |
| Surface Meteorology Station | Lincoln, Nebraska |
| Upper Air Meteorology Station | Omaha, Nebraska |
| Methodology for Calculating Background $SO_2$ Concentration | 1st tier |
| Calculated Background $SO_2$ Concentration | 9 $\mu g/m^3$ |

The results presented below in Table 4 show the magnitude and geographic location of the highest predicted modeled concentration based on actual emissions and the stack height modifications that did not occur until well after the 2012-2014 period.

**Table 4: Maximum Predicted 99th Percentile 1-Hour $SO_2$ Concentration in the Sheldon Station, Nebraska Area of Analysis Based on Actual Emissions and stack height modifications**

| | | Receptor Location | | $SO_2$ Concentration ($\mu g/m^3$) | |
|---|---|---|---|---|---|
| Averaging Period | Data Period | UTM/Latitude | UTM/Longitude | Modeled (including background) | NAAQS |
| 99th Percentile 1-Hour Average | 2012-2014 | 688150 | 4491700 | 170.8 | 196.5* |

*Equivalent to the 2010 $SO_2$ NAAQS set at 75 ppb

The state's modeling indicates that the highest predicted 3-year average 99th percentile 1-hour average concentration within the chosen modeling domain is 170.8 $\mu g/m^3$, or 65.2 ppb. This modeled concentration included the background concentration of $SO_2$, and is based on actual emissions from 2012-2014 but with stack height modifications at the facility that did not occur in this period and therefore could not have realistically influenced the ambient air impacts from 2012-2014. Figure 7 below indicates that the predicted value occurred to the southeast of facility.

**Figure 7: Maximum Predicted 99th Percentile 1-Hour $SO_2$ Concentrations in the Sheldon Station, Nebraska Area of Analysis Based on Actual Emissions and future stack height increases.**

22



*Jurisdictional Boundaries:*

Existing jurisdictional boundaries are considered for the purpose of informing our final unclassifiable area, specifically with respect to clearly defined legal boundaries. The EPA did not receive any comments regarding the intended boundaries for this area.

The EPA believes that our final unclassifiable area, consisting of the borders of Lancaster County, are comprised of clearly defined legal boundaries, and we find these boundaries to be a suitably clear basis for defining our final unclassifiable area.

<u>Conclusion</u>

After careful evaluation of the state's recommendation, all timely comments and information received during the state and public comment period, and additional relevant information as discussed in this document, the EPA is unable at this time, based on available information, to determine whether the area is meeting or not meeting the NAAQS and is therefore designating the area around Sheldon Station, Nebraska as unclassifiable for the 2010 $SO_2$ NAAQS. Specifically, the area is comprised of the entirety of Lancaster County, Nebraska.

The unclassifiable designation is based on the modeling analyses that the State of Nebraska provided to the EPA being inconsistent with the modeling TAD in a manner that did not provide

23

the EPA with information necessary to be able to determine whether the area is complying with the 2010 SO$_2$ NAAQS. The State provided modeling scenarios that demonstrated compliance with the SO$_2$ 1-hr NAAQS, but all of the modeling scenarios do not comport with the EPA's recommended practice for either actual emissions-based modeling or allowable emissions-based modeling in the TAD. All modeling scenarios provided by the State use actual emissions but depend on changes to Sheldon Station operations (i.e., increased stack heights, ceasing the combustion of coal at future unknown date), and therefore are not reliable to inform a conclusion about whether the area is meeting the NAAQS and designate the area as unclassifiable/attainment.

No other entity other than the State of Nebraska submitted modeling during the comment period for our intended designation. As discussed in our February 16, 2016 technical support document, the Sierra Club did provide a modeling analysis for Sheldon Station. As we stated in that technical support document, Sierra Club's modeling used actual emissions from 2012-2014 and asserted that there were violations of the 1-hr SO$_2$ NAAQS. However, we continue to find that the Sierra Club's modeling used a background concentration from a more urban monitoring location that does not appear to represent the rural background of the Sheldon Station location and over-estimated the background emissions, thus resulting in an over-estimated design value as the background value is added to the modeled impacts and this combined value is compared to the NAAQS.

At this time, our final designations for the state only apply to this area and the others contained in this final technical support document. Consistent with the court-ordered schedule, the EPA will evaluate and designate all remaining undesignated areas in Nebraska by either December 31, 2017, or December 31, 2020. For informational purposes, the EPA notes that this unclassifiable area is one for which the Agency expects the State to conduct additional characterization under the Data Requirements Rule, and that such future analysis may be used in possible future actions addressing the area's air quality status.

**Tab 403: Final Technical Support Document for Final Action on Indiana Area Designations for the 2010 SO2 Primary National Ambient Air Quality Standard (July 1, 2016)**

**Final Technical Support Document**

Final Action on Indiana Area Designations
for the 2010 SO$_2$ Primary National Ambient Air Quality Standard

Summary

Pursuant to section 107(d) of the Clean Air Act (CAA), the U.S. Environmental Protection
Agency (the EPA, or the Agency) must designate areas as either "unclassifiable," "attainment,"
or "nonattainment" for the 2010 1-hour sulfur dioxide (SO$_2$) primary national ambient air quality
standard (NAAQS). Section 107(d) of the CAA defines a nonattainment area as one that does not
meet the NAAQS or that contributes to a NAAQS violation in a nearby area, an attainment area
as any area other than a nonattainment area that meets the NAAQS, and an unclassifiable area as
any area that cannot be classified on the basis of available information as meeting or not meeting
the NAAQS.

July 2, 2016, is the deadline established by the U.S. District Court for the Northern District of
California for the EPA to designate certain areas. This deadline is the first of three deadlines
established by the court for the EPA to complete area designations for the 2010 SO$_2$ NAAQS.
This deadline applies to five areas in Indiana because five emission sources meet the conditions
for applicability of this deadline under the court's order.

Indiana submitted updated recommendations on September 16, 2015. Table 1 below lists
Indiana's recommendations and identifies the county/counties in Indiana that the EPA is
designating in order to meet the July 2, 2016 court-ordered deadline. These final designations are
based on an assessment and characterization of air quality through ambient air quality data, air
dispersion modeling, other evidence and supporting information, or a combination of the above.

**Table 1 – Indiana's Recommended and the EPA's Final Designations[1]**

| Area | Indiana's Recommendation | EPA's Final Area Definition | EPA's Final Designation |
|---|---|---|---|
| Gibson Co. | Full county attainment | Full county (Gibson County, IN) | Unclassifiable/ attainment |
| Jefferson Co. | Full county attainment | Graham, Lancaster, Madison, Monroe, Republican, Shelby, and Smyrna Townships (Jefferson County, IN) | Unclassifiable/ attainment |

---

[1] In its February 16, 2016, letter to Indiana notifying the State of its intended designations, the EPA proposed
different designations for two areas than are being promulgated. Specifically, the EPA proposed to designate the
Jefferson County and the Posey County areas as nonattainment.

1

| LaPorte Co. | Full county attainment | Full county (LaPorte County, IN) | Unclassifiable/ attainment |
| Posey Co. | Full county attainment | Bethel, Center, Harmony, Lynn, Marrs, Robb, Robinson, and Smith Townships (Posey County, IN) | Unclassifiable/ attainment |
| Spencer Co. | Full county attainment | Ohio Township north of UTM 4187.580 km northing, and Carter, Clay, Grass, Hammond, Harrison, and Jackson Townships (Spencer County, IN) | Unclassifiable/ attainment |

## Background

On June 3, 2010, the EPA revised the primary (health based) $SO_2$ NAAQS by establishing a new 1-hour standard, which is met at an ambient air quality monitoring site when the 3-year average of the 99th percentile of 1-hour daily maximum concentrations does not exceed 75 ppb. This NAAQS was published in the *Federal Register* on June 22, 2010 (75 FR 35520), and is codified at 40 CFR 50.17. The EPA determined this is the level necessary to protect public health with an adequate margin of safety, especially for children, the elderly, and those with asthma. These groups are particularly susceptible to the health effects associated with breathing $SO_2$. The two prior primary standards of 140 ppb evaluated over 24 hours, and 30 ppb evaluated over an entire year, codified at 40 CFR 50.4, remain applicable.[2] However, the EPA is not currently designating areas on the basis of either of these two primary standards. Similarly, the secondary standard for $SO_2$, set at 500 ppb evaluated over 3 hours, codified at 40 CFR 50.5, has not been revised, and the EPA is also not currently designating areas on the basis of the secondary standard.

## General Approach and Schedule

Section 107(d) of the CAA requires that not later than 1 year after promulgation of a new or revised NAAQS, state governors must submit their recommendations for designations and boundaries to the EPA. Section 107(d) also requires the EPA to provide notification to states no less than 120 days prior to promulgating an initial area designation that is a modification of a state's recommendation. If a state does not submit designation recommendations, the EPA may

---

[2] 40 CFR 50.4(e) provides that the two prior primary NAAQS will no longer apply to an area 1 year after its designation under the 2010 NAAQS, except that for areas designated nonattainment under the prior NAAQS as of August 22, 2010, and areas not meeting the requirements of a SIP Call under the prior NAAQS, the prior NAAQS will apply until that area submits and EPA approves a SIP providing for attainment of the 2010 NAAQS. No areas in Indiana meet either of these criteria.

2

promulgate the designations that it deems appropriate without prior notification to the state, although it is our intention to provide such notification when possible. If a state or tribe disagrees with the EPA's intended designations, it is given an opportunity within the 120-day period to demonstrate why any proposed modification is inappropriate. The EPA is required to complete designations within 2 years after promulgation of a new or revised NAAQS, unless the EPA determines that sufficient information is not available, in which case the deadline is extended to 3 years. The 3-year deadline for the revised $SO_2$ NAAQS was June 2, 2013.

On August 5, 2013, the EPA published a final rule establishing air quality designations for 29 areas in the United States for the 2010 $SO_2$ NAAQS, based on recorded air quality monitoring data from 2009 - 2011 showing violations of the NAAQS (78 FR 47191). In that rulemaking, the EPA committed to address, in separate future actions, the designations for all other areas for which the Agency was not yet prepared to issue designations. The EPA designated portions of Daviess, Marion, Morgan, Pike, and Vigo Counties in Indiana as nonattainment in this initial set of designations.

Following the initial August 5, 2013, designations, three lawsuits were filed against the EPA in different U.S. District Courts, alleging the Agency had failed to perform a nondiscretionary duty under the CAA by not designating all portions of the country by the June 2, 2013, deadline. In an effort intended to resolve the litigation in one of those cases, plaintiffs Sierra Club and the Natural Resources Defense Council and the EPA filed a proposed consent decree with the U.S. District Court for the Northern District of California. On March 2, 2015, the court entered the consent decree and issued an enforceable order for the EPA to complete the area designations according to the court-ordered schedule.

According to the court-ordered schedule, the EPA must complete the remaining designations by three specific deadlines. By no later than July 2, 2016 (16 months from the court's order), the EPA must designate two groups of areas: (1) areas that have newly monitored violations of the 2010 $SO_2$ NAAQS and (2) areas that contain any stationary sources that had not been announced as of March 2, 2015, for retirement and that according to the EPA's Air Markets Database emitted in 2012 either (i) more than 16,000 tons of $SO_2$ or (ii) more than 2,600 tons of $SO_2$ with an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/MMBTU). Specifically, a stationary source with a coal-fired unit that as of January 1, 2010, had a capacity of over 5 megawatts and otherwise meets the emissions criteria, is excluded from the July 2, 2016, deadline if it had announced through a company public announcement, public utilities commission filing, consent decree, public legal settlement, final state or federal permit filing, or other similar means of communication, by March 2, 2015, that it will cease burning coal at that unit.

The last two deadlines for completing remaining designations are December 31, 2017, and December 31, 2020. The EPA has separately promulgated requirements for state and other air agencies to provide additional monitoring or modeling information on a timetable consistent with these designation deadlines. We expect this information to become available in time to help inform these subsequent designations. These requirements were promulgated on August 21, 2015 (80 FR 51052), in a rule known as the $SO_2$ Data Requirements Rule (DRR), codified at 40 CFR part 51 subpart BB.

3

Updated designations guidance was issued by the EPA through a March 20, 2015, memorandum from Stephen D. Page, Director, U.S. EPA, Office of Air Quality Planning and Standards, to Air Division Directors, U.S. EPA Regions 1-10. This memorandum supersedes earlier designation guidance for the 2010 $SO_2$ NAAQS, issued on March 24, 2011, and it identifies factors that the EPA intends to evaluate in determining whether areas are in violation of the 2010 $SO_2$ NAAQS. The guidance also contains the factors the EPA intends to evaluate in determining the boundaries for all remaining areas in the country, consistent with the court's order and schedule. These factors include: 1) Air quality characterization via ambient monitoring or dispersion modeling results; 2) Emissions-related data; 3) Meteorology; 4) Geography and topography; and 5) Jurisdictional boundaries. This guidance was supplemented by two non-binding technical assistance documents intended to assist states and other interested parties in their efforts to characterize air quality through air dispersion modeling or ambient air quality monitoring for sources that emit $SO_2$. Notably, the EPA's documents titled, "$SO_2$ NAAQS Designations Modeling Technical Assistance Document" (Modeling TAD) and "$SO_2$ NAAQS Designations Source-Oriented Monitoring Technical Assistance Document" (Monitoring TAD), were available to states and other interested parties. Both of these TADs were most recently updated in February 2016.

Based on complete, quality assured and certified ambient air quality data collected between 2013 and 2015, no violations of the 2010 $SO_2$ NAAQS have been recorded at ambient air quality monitors in any undesignated part of Indiana. However, there are five sources in the state meeting the emissions criteria of the consent decree for which the EPA must complete designations by July 2, 2016. In this final technical support document, the EPA discusses its review and technical analysis of Indiana's updated recommendations for the areas that we must designate. The EPA also discusses final modifications from the State's recommendation based on all available data before us.

The following are definitions of important terms used in this document:

1) 2010 $SO_2$ NAAQS – the primary NAAQS for $SO_2$ promulgated in 2010. This NAAQS is 75 ppb, based on the 3-year average of the 99th percentile of the annual distribution of daily maximum 1-hour average concentrations. See 40 CFR 50.17.
2) Attaining monitor – an ambient air monitor meeting all methods, quality assurance, and siting criteria and requirements whose valid design value is less than or equal to 75 ppb, based on data analysis conducted in accordance with Appendix T of 40 CFR part 50.
3) Design Value – a statistic computed according to the data handling procedures of the NAAQS (in 40 CFR part 50 Appendix T) that, by comparison to the level of the NAAQS, indicates whether the area is violating the NAAQS.
4) Designated nonattainment area – an area which the EPA has determined has violated the 2010 $SO_2$ NAAQS or contributed to a violation in a nearby area. A nonattainment designation reflects considerations of the state's recommendations and all of the information discussed in this document. The EPA's decision is based on all available information including the most recent 3 years of air quality monitoring data, available modeling analyses, and any other relevant information.

4

5) Designated unclassifiable area – an area for which the EPA cannot determine based on all available information whether or not it meets the 2010 $SO_2$ NAAQS.

6) Designated unclassifiable/attainment area – an area which the EPA has determined to have sufficient evidence to find either is attaining or is likely to be attaining the NAAQS. The EPA's decision is based on all available information including the most recent 3 years of air quality monitoring data, available modeling analyses, and any other relevant information.

7) Modeled violation – a violation based on air dispersion modeling.

8) Recommended attainment area – an area a state or tribe has recommended that the EPA designate as attainment.

9) Recommended nonattainment area – an area a state or tribe has recommended that the EPA designate as nonattainment.

10) Recommended unclassifiable area – an area a state or tribe has recommended that the EPA designate as unclassifiable.

11) Recommended unclassifiable/attainment area – an area a state or tribe has recommended that the EPA designate as unclassifiable/attainment.

12) Violating monitor – an ambient air monitor meeting all methods, quality assurance, and siting criteria and requirements whose valid design value exceeds 75 ppb, based on data analysis conducted in accordance with Appendix T of 40 CFR part 50.

**Technical Analysis for Gibson County**

Introduction

Gibson County, Indiana contains a stationary source that, according to the EPA's Air Markets Database, emitted in 2012 either more than 16,000 tons of $SO_2$ in 2012 or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/MMBTU). As of March 2, 2015, this stationary source had not met the criteria for being "announced for retirement." Specifically, in 2012, the Gibson Generating Station ("Gibson") emitted 22,447 tons of $SO_2$ and had an emissions rate of 0.249 lbs $SO_2$/MMBTU. Pursuant to the March 2, 2015, court-ordered schedule, the EPA must designate the area surrounding the facility by July 2, 2016.

In its September 16, 2015, submission, Indiana recommended that the area surrounding Gibson, specifically the entirety of Gibson County, be designated as attainment based on an assessment and characterization of air quality affected by the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. This assessment and characterization relied on air quality monitoring data from current monitoring sites, supplemented by modeling information and data from historic monitoring sites which Indiana considered in concluding that the current monitoring sites address the sub-areas where maximum concentrations are expected, i.e. those portions of Gibson County that are most likely to be violating the $SO_2$ standard.

On February 16, 2016, the EPA notified Indiana that we intended to designate Gibson County as unclassifiable/attainment, based on our view that the area was meeting the NAAQS. Additionally, we informed Indiana that our intended boundaries for this area consisted of the Gibson County boundaries, incorporating the entire county as the unclassifiable/attainment area. Our intended designation and associated boundaries were based on, among other things, monitoring data from sites measuring values meeting the standard, as well as modeling and other types of information such as historic monitoring at sites that were no longer operational. Detailed rationale, analyses, and other information supporting our intended designation for this area can be found in the technical support document for our intended Indiana designations; that document along with all others related to this rulemaking can be found in Docket ID EPA-HQ-OAR-2014-0464.

The Gibson area is unique among the areas being addressed in this round of designations because of the unusually large extent of current and historical monitoring as well as modeling evidence available to inform the judgment regarding the appropriate designation. As just noted, the technical support document for the intended Indiana designations reviewed the information that was available at that time. The discussion that follows first reviews the new information that has become available since the EPA announced its intended designations. Then, based on this new information as well as the previously available information, the EPA reviews whether the existing air quality monitors represent air quality in the sub-areas that are expected to have maximum $SO_2$ concentrations in the area, which is critical for judging the reliability of these monitors for indicating whether the overall area is attaining the standard. Finally, the EPA uses all available information to evaluate the appropriate $SO_2$ designation for the Gibson area.

6

Assessment of New Information

In our February 16, 2016, notification to Indiana regarding our intended unclassifiable/attainment designation for Gibson County, the EPA requested that any additional information that Indiana wished the Agency to consider prior to finalizing the designation should be submitted by April 19, 2016. Indiana submitted no correspondence in response to this solicitation and provided no additional information with respect to Gibson County other than its routine entry of more recent air quality monitoring data into the EPA's Air Information Retrieval System, which allows determination of 2013 to 2015 monitoring-derived design values and which the EPA considered in developing the final designation. On March 1, 2016, the EPA also published a notice of availability and public comment period in the *Federal Register,* inviting the public to review and provide input on our intended designations by March 31, 2016 (81 FR 10563). Sierra Club provided comments and additional modeling in response to this proposal.

The EPA is explicitly incorporating and relying upon the analyses and information presented in that technical support document for the purposes of our final designation for this area, except to the extent that any new information submitted to the EPA or conclusions presented in this final technical support document and our response to comments document (RTC), available in the docket, supersede those found in the prior technical support document.

Detailed responses to Sierra Club's comments on the designation for Gibson County are provided in the RTC. Sierra Club submitted analyses which it asserts demonstrate that the currently operating monitors are not located to measure maximum ambient concentrations of $SO_2$ and are therefore insufficient to indicate whether the entire area is attaining the NAAQS. Sierra Club disagrees with the EPA's assertion that monitoring evidence and modeling evidence are in conflict as to whether the area is attaining, because in Sierra Club's view the monitoring evidence does not rebut the modeling evidence that violations are occurring at unmonitored receptors elsewhere. Sierra Club concludes that a proper weighing of evidence from modeling and from monitoring would lead to the conclusion that the area is violating the $SO_2$ standard, at least at the unmonitored receptors addressed in the modeling. As noted above, Sierra Club also provided additional modeling to support its position. This new modeling and additional 2015 monitoring information are reviewed below.

*New Air Quality Data*

The technical support document for the intended Indiana designations shows design values for 2010 to 2012, 2011 to 2013, and 2012 to 2014 at the two area monitors that are continuing to operate, as well as design values from the more substantial historical monitoring network. Table 2 below additionally provides the 2013 to 2015 design values at the two current sites and repeats the 2012 to 2014 design values for comparison purposes.

Table 2. Recent monitoring-derived design values near Gibson

| Site Name | Site ID | Design Value (ppb) | |
|---|---|---|---|
| | | 2012-2014 | 2013-2015 |
| | | | |

| Mt. Carmel | 17-185-0001 | 66 | 50 |
| Coal Road | 18-051-0002 | 72 | 67 |

The more recent design values are lower than the prior design values. Thus, the more recent monitoring data provide somewhat stronger evidence of the area attaining the standard than the prior monitoring data presented in the technical support document for our intended Indiana designations, not only at these two monitored sites but, as we explain later, in the area as a whole when considering the State's modeling and the unusually broad scope of the historic monitoring network that once operated in this area.

*New Modeling Information*

The technical support document for the intended Indiana designations reviews modeling Indiana provided with its recommendations, which Indiana provided for the purpose of assessing the adequacy of the monitoring network for assessing maximum area $SO_2$ concentrations, and modeling that Sierra Club provided in September 2015, which Sierra Club provided for purposes of offering a direct assessment of area air quality. In its public comments on our intended designations for Indiana, Sierra Club provided additional modeling of the Gibson area, primarily to address concerns identified by Indiana regarding Sierra Club's prior modeling. Sierra Club provided modeling both for the 2012 to 2014 period and for the 2013 to 2015 period. The following several sections review this new Sierra Club modeling.

*Modeling Parameter: Source Characterization*

Indiana had expressed concern that Sierra Club's September 2015 modeling had used fixed temperatures and exit velocities. Sierra Club's March 2016 modeling addresses these concerns by using hourly varying temperatures and exit velocities. Sierra Club obtained these data for 2012 to 2014 from the EPA's Emissions Modeling Clearinghouse, and Sierra Club inferred values for these variables from heat input data reported to the CAMD database. The 2012 to 2014 data are similar to the data used by Indiana, and those data as well as the 2015 data from Sierra Club (for which there are no Indiana-provided data for comparison) appear reasonable.

Nevertheless, a remaining distinction between Sierra Club's modeling and Indiana's modeling is that Indiana considered building downwash and Sierra Club did not. The potential implications of this distinction are discussed below. Indiana's modeling more accurately represents air quality in this respect.

*Modeling Parameter: Emissions*

In its September 2015 analysis, Sierra Club modeled 2012 to 2014 emissions for Gibson and for the IPL-Petersburg plant approximately 48 kilometers to the east. Indiana expressed concern that the impacts of the IPL-Petersburg plant in the Gibson area would be minimal and would already be included in the background concentration used in Sierra Club's modeling. Sierra Club's March 2016 analysis only models the Gibson facility. In addition, Sierra Club modeled both 2013 to 2015 emissions and 2012 to 2014 emissions. The emissions that Sierra Club modeled are

8

shown in Table 3. These emissions match the emissions that Gibson reported to the CAMD database.

Table 3: Actual SO$_2$ Emissions for 2012 – 2015 from Gibson

| Facility Name | Actual SO$_2$ Emissions (tons per year) | | | |
|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 |
| Gibson | 22,452 | 20,676 | 22,062 | 16,098 |

*Modeling Parameter: Background Concentrations*

Indiana expressed concern that Sierra Club's September 2015 analyses used an inappropriate and overly conservative background concentration. Sierra Club's March 2016 modeling used the same background concentrations--varying by hour and season of year--which Indiana determined to be appropriate for the area near A.B. Brown, which like Gibson is also in southwest Indiana. The EPA has determined that these values represent a reasonable assessment of background concentrations in the Gibson area as well.

*Summary of Modeling Inputs and Results*

Table 4 summarizes the modeling inputs used in this analysis.

Table 4: Sierra Club's AERMOD Modeling Parameters for its March 2016 Analysis for the Gibson Area

| Sierra Club's Gibson Area Modeling Parameters | |
|---|---|
| AERMOD Version | 15181 |
| Dispersion Characteristics | Rural |
| Modeled Sources | 1 |
| Modeled Stacks | 5 |
| Modeled Structures | 0 |
| Modeled Fence lines | 1 |
| Total receptors | 21,201 |
| Emissions Type | Actual emissions |
| Emission Years | Run 1: 2012-2014 Run 2: 2013-2015 |
| Meteorology Years | Same as Emission Years |
| Surface Meteorology Station | Evansville, Kentucky |
| Upper Air Meteorology Station | Lincoln, IL |
| Methodology for Calculating Background SO$_2$ Concentration | Variable Values, as determined by Indiana for Posey Co. |
| Calculated Background SO$_2$ Concentration | 1 to 19.76 ppb (see Table 3 of TSD for intended designations) |

9

Figure 1. Sierra Club's Model Estimates for the Gibson Area Based on 2012 to 2014 Actual Emissions



Figure 2. Sierra Club's Model Estimates for the Gibson Area Based on 2013 to 2015 Actual Emissions



For convenience, Indiana's modeling results, shown in the technical support document for the intended Indiana designations, are also shown here in Figure 3.

11

Figure 3. Results of Indiana Modeling to Estimate Distribution of Impacts from Gibson



As seen by comparing these three sets of modeling results, the results that Sierra Club obtained for 2012 to 2014 are quite similar to the results Sierra Club obtained for 2013 to 2015, showing a primary peak concentration about 3 kilometers to the west of Gibson and secondary peaks to the north and northeast of Gibson, although the run for 2012 to 2014 also shows a secondary peak south southwest of Gibson that does not appear in the 2013 to 2015 run. These two runs also show concentrations of similar magnitude. The results of these two runs show some similarities and some differences from the results obtained by Indiana. Like Sierra Club's runs, Indiana's results also show elevated concentrations to the north and northeast of Gibson, but Indiana's results do not show elevated concentrations west or south southwest of Gibson.

Neither Sierra Club nor Indiana attempt to explain the differences between the two sets of results obtained by Sierra Club and the results obtained by Indiana. However, the most significant difference in the model runs appears likely to be the consideration of building wake effects, i.e., downwash. Building wake effects can be highly dependent on wind direction, insofar as the wake effects can be a function of the relationship between the wind direction and the orientation of the building. Furthermore, the influence of these wake effects can be sufficient for areas with the greatest impacts of wake effects to have the maximum concentrations, so that consideration of building wake effects can significantly influence what area or areas are estimated to have the maximum concentrations. Put simply: building downwash can have a significant impact on where maximum concentration values might occur, and modeling such as Indiana's that considers building downwash provides a more credible assessment of the spatial distribution of Gibson's impacts than Sierra Club's modeling, which does not consider downwash. As further discussed below, this factor strongly influences the identification of the expected maximum concentration sub-areas, which consequently affects the determination of whether the design values for those sub-areas can be considered to represent attaining or not attaining levels for the entire area, compared to design values from properly sited monitors in this case.

Sierra Club also reported conducting a third run which did consider downwash. However, Sierra Club reported only the maximum concentration estimated in this run and did not report the spatial distribution of concentration estimates in this run. Thus, Sierra Club did not provide the information necessary for EPA to consider this run.

### _Final Review of Monitoring Network_

This area uniquely has both an extensive set of current and historical monitoring and modeling data available to inform the EPA's designation of the area. In determining how to use this information, an important step is to evaluate whether the currently operating monitors are properly located to obtain measurements in the sub-area or sub-areas where maximum $SO_2$ concentrations in the entire area would be expected.

The technical support document for the proposed Indiana designations provides a review of several types of evidence for making this evaluation. As noted in that document, the Monitoring TAD recommends three methods for assessing expected locations for monitoring maximum $SO_2$ concentrations: 1) conducting modeling, 2) conducting exploratory monitoring, and 3) using existing emissions, monitoring, and modeling data. The prior technical support document

13

provides a review of information that was then available based on each of these three methods; this technical support document will only repeat the highlights of that review. The additional information regarding spatial variations in concentrations to be considered now is based on the additional modeling provided by Sierra Club.

The first method for assessing the degree to which monitors are sited in locations expected to measure maximum area $SO_2$ concentrations is modeling. The prior technical support document summarized the review of modeling results by stating, "These results indicate that the maximum concentrations can be expected generally northeast of Gibson, approximately 1.5 to 4 kilometers from Gibson, with a maximum concentration estimated to occur approximately 2 kilometers from the plant. The two currently operating monitors are approximately 3 km from the plant in the directions that are most likely to observe maximum impacts from the plant. Thus, this modeling suggests that the monitors are reasonably well-sited to monitor maximum concentrations in the area."

The additional modeling from Sierra Club provides additional evidence that some of the maximum concentrations in the area would be expected 1 to 4 kilometers north as well as north northeast of Gibson, perhaps especially 2 to 3 kilometers in those directions from the plant. These results reinforce the view that the two currently operating monitors in this area are located, with respect to both distance and direction, to provide measurements in sub-areas where the EPA expects maximum concentrations for the entire area to occur. Sierra Club's additional modeling also indicates that an unmonitored area to the west of Gibson, and perhaps also an unmonitored area south southwest of Gibson, might also be sub-areas where maximum concentrations might be expected to occur. However, these results are contrary to the results of modeling provided by Indiana, which does not indicate elevated concentrations in these unmonitored areas. As discussed above, Indiana's modeling provides a more reliable assessment of the likely spatial distribution of impacts from Gibson, because Indiana's modeling considers a factor not considered in Sierra Club's modeling—building downwash--which, as explained above, can significantly influence the expected location of the area of maximum concentration. Therefore, it is the EPA's view that the available modeling evidence indicates that the maximum concentrations in the area would be expected in sub-areas 2 to 3 kilometers to the north and north northeast of Gibson, with lower concentrations expected in other directions and distances from the plant.

This view of maximum concentration location is supported by information we previously considered in developing our proposed designation. The technical support document for the proposed Indiana designations also evaluates exploratory monitoring as well as other historic monitoring evidence as to the likely location of maximum concentrations in the area. That document provides data from multiple monitors, including three monitors which are not currently operating. Most relevant is the monitor identified as Schrodt, located approximately 5.5 kilometers west of Gibson. This monitor generally measured design values significantly lower (by about 30 percent) than the Coal Road monitor north northeast of the plant located in the expected sub-area of maximum concentration. This monitor was located somewhat farther west but nevertheless in the same direction as the western receptors in Sierra Club's modeling

14

showing maximum concentrations, providing evidence that maximum concentrations are not expected to be found west of Gibson.

Similarly, the technical support document for the proposed Indiana designations describes historical monitoring data at a site known as Pumphouse, located south southwest of Gibson. Sierra Club's modeling for 2012 to 2014 included a site of secondary peak concentrations south southwest of Gibson. Monitoring data from the Pumphouse site, albeit from only about a 1-year period, also indicate concentrations lower (about 15 percent lower for a comparable period) than those monitored north and north northeast of the plant, and corroborate the conclusion that the most likely locations of maximum impacts of Gibson, in the entire area, are in the areas about 2 to 3 kilometers north and north northeast of the plant.

The technical support document for the intended Indiana designations also provides a review of windrose information. The windrose for the area shows a predominant wind direction from the south to southwest toward the north and northeast, further indicating a likelihood that maximum impacts would be north to northeast of the plant.

Thus, the Gibson area has an extensive set of evidence, notably including a long history with a substantial monitoring network as well as modeling and other evidence, for determining where maximum concentrations in the area can be expected. The EPA finds that an evaluation of this evidence, including both current and historical information, confirms that the current monitors are representative of the areas of maximum concentrations. This evidence further supports the view that the monitors' measurements represent concentrations not just at the precise locations of the monitors but rather represent concentrations throughout broader sub-areas where maximum concentrations in the Gibson area are expected. Insofar as lower concentrations are expected elsewhere in the Gibson area, the data from these monitors are indicative of whether violations are occurring anywhere in the Gibson area. Therefore the monitoring data can be relied upon to provide the primary evidence on which to determine the area's attainment status.

In summary, the available evidence suggests that the maximum $SO_2$ concentrations in the Gibson area can be expected to be found in the sub-areas about 2 to 3 kilometers north and north northeast of the plant. While Sierra Club's modeling suggests that elevated concentrations may also occur to the west and perhaps also to the south southwest of the plant, modeling results that are more credible because they appropriately incorporate downwash effects and historic monitoring at sites directionally aligned with those modeled locations indicate that concentrations in those sub-areas can be expected to be lower than the concentrations in the currently monitored sub-areas to the north and north northeast of the plant.

Review of the Designation for the Gibson Area

As noted above, the Gibson area has a unique wealth of unusually voluminous information available for judging whether the area is attaining the $SO_2$ standard. Modeling evidence suggests that this area is violating the standard. However, monitoring evidence at the sub-areas of expected maximum concentrations suggests that this area is attaining the standard, and that concentrations are decreasing.

15

In the Gibson area, a considerable historical monitoring record, the best available modeling information, and other information indicate that the two current monitors in the area are operating where the EPA expects that the sub-areas of maximum concentrations are located. That is, based on the EPA's review of available modeling and monitoring evidence as to the spatial distribution of $SO_2$ concentrations in the area, $SO_2$ design values at other locations in the Gibson area are expected to be lower than those found in the sub-areas where the two monitors are located. These two currently operating monitors both indicate attainment of the $SO_2$ standard. The EPA finds that the two monitors are the best indicators of air quality in those sub-areas and that attainment in these sub-areas suggests that the entire area around Gibson is attaining the $SO_2$ standard. Therefore, the EPA is designating the Gibson area as unclassifiable/attainment for the $SO_2$ standard.

As discussed in the technical support document for the intended Indiana designations, no significant emitters of $SO_2$ other than Gibson are located in or in the immediate vicinity of Gibson County. Thus, attainment in the maximum concentration sub-areas near the plant supports the conclusion that the entire county is attaining the standard. The county boundaries provide a suitable, well defined set of boundaries with which to define this designation area. Thus, the EPA is designating the entirety of Gibson County as unclassifiable/attainment. Figure 4 shows the area that the EPA is designating.

Figure 4: EPA's Final Unclassifiable/Attainment Area: Gibson County



At this time, our final designations for the state only apply to this area and the others addressed in this final technical support document. Consistent with the court-ordered schedule, the EPA will evaluate and designate all remaining undesignated areas in Indiana by either December 31, 2017, or December 31, 2020.

17

## Technical Analysis for Jefferson County

Introduction

The Jefferson County, Indiana area contains a stationary source that according to the EPA's Air Markets Database emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/MMBTU). Specifically, in 2012, the Clifty Creek electric generating facility ("Clifty Creek") emitted 52,839 tons of $SO_2$ and had an emissions rate of 1.767 lbs $SO_2$/MMBTU. As of March 2, 2015, this stationary source had not met the criteria for being "announced for retirement." Pursuant to the March 2, 2015 court-ordered schedule, the EPA must designate the area surrounding this facility by July 2, 2016.

In its submission, Indiana recommended that the area surrounding Clifty Creek, specifically the entirety of Jefferson County, be designated as attainment based on an assessment and characterization of air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. This assessment and characterization was performed using air dispersion modeling software, specifically using AERMOD, analyzing actual emissions.

On February 16, 2016, the EPA notified Indiana that we intended to designate a portion of Jefferson County, Indiana, as nonattainment, based on our view that the area was not meeting the NAAQS. Although Indiana had adopted limits on the emissions from Clifty Creek that the state had demonstrated would suffice to provide for attainment of the $SO_2$ NAAQS, these limits were not federally enforceable at the time, and available evidence indicated that the area was violating the NAAQS in absence of those limits. However, the EPA further indicated its expectation that if it approved these limits into the SIP before taking final action on the designation for the Jefferson County, Indiana area, the EPA would designate the area unclassifiable/attainment. Additionally, while we expressed an intent in the absence of the emission limits becoming federally enforceable to designate an area consisting of Madison Township in Jefferson County as nonattainment, we also informed Indiana that we expected in the case that the emission limits became federally enforceable that we would designate an unclassifiable/attainment area consisting of Graham, Lancaster, Madison, Monroe, Republican, Shelby, and Smyrna Townships in Jefferson County. Our views on the appropriate designation and associated boundaries with and without the emission limits becoming federally enforceable were based on, among other things, air dispersion modeling provided by Indiana, which first modeled actual emissions from Clifty Creek and then modeled allowable emissions from Clifty Creek according to the limits established by a Commissioner's Order that Indiana issued on February 1, 2016, with a compliance date of April 19, 2016.

Subsequent to the EPA's February 16, 2016 "120-day letter" to Indiana, the EPA has completed rulemaking on the emission limits that Indiana adopted for Clifty Creek. The EPA approved Indiana's Commissioner's Order for Clifty Creek (simultaneous with rulemaking on an analogous Commissioner's Order for A.B. Brown) in a final rule published on May 6, 2016, at 81 FR 27330, following publication of a proposed rule on February 25, 2016, at 81 FR 9395. By this action, the emission limits for Clifty Creek established in Indiana's Commissioner's Order

18

(as well as the limits in the analogous Commissioner's Order for A.B. Brown) became federally enforceable with adequate time for the EPA to consider the effect of these limits.

Since these limits, now federally enforceable, provide for attainment of the Jefferson County, Indiana area, Indiana has justified designating this area as unclassifiable/attainment. Detailed rationale, analyses, and other information supporting our designation for this area can be found in the technical support document for the intended Indiana designations, and this document along with all others related to this rulemaking can be found in Docket ID EPA-HQ-OAR-2014-0464.

Assessment and Conclusion

In our February 16, 2016 notification to Indiana regarding our intended and expected designation for the Jefferson County, Indiana area, the EPA requested that any additional information that the Agency should consider prior to finalizing the designation should be submitted by April 19, 2016. On March 1, 2016, the EPA also published a notice of availability and public comment period in the *Federal Register,* inviting the public to review and provide input on our intended designations by March 31, 2016 (81 FR 10563).

The EPA is explicitly incorporating and relying upon the analyses and information presented in the technical support document for our intended Indiana designations for the purposes of our final designation for this area, except to the extent that any new information submitted to the EPA or conclusions presented in this final technical support document and our RTC, available in the docket, supersede those found in the prior technical support document.

Subsequent to our February 16, 2016 notification, the EPA did not receive any additional information from Indiana, nor did we receive any public comments specifically addressing our proposed designation for the Jefferson County, Indiana area. Some commenters urged the EPA to review carefully Indiana's air quality modeling; the EPA has conducted this review and continues to believe that Indiana's modeling, as described in the technical support document for the intended Indiana designations, suitably justifies designating portions of Jefferson County as unclassifiable/attainment.

Therefore, based on the information available to the EPA at this time including the analyses performed for the purposes of the technical support document for the intended Indiana designations and including the EPA's May 6, 2016 published action approving the Indiana Commissioner's Order containing the Clifty Creek $SO_2$ limits necessary to provide for attainment (81 FR 27330, effective June 6, 2016), and in the absence of any new information that would otherwise lead to a different conclusion regarding air quality in the area or any new information that would otherwise lead to a different conclusion regarding the area boundaries, the EPA determines that the Jefferson County, Indiana, area is meeting the NAAQS, and therefore is designating the area as unclassifiable/attainment for the 2010 $SO_2$ NAAQS. The boundaries for this unclassifiable/attainment area consist of Graham, Lancaster, Madison, Monroe, Republican, Shelby, and Smyrna Townships in Jefferson County, and are shown in the figure below.

Figure 5: EPA's Final Unclassifiable/Attainment Area: Jefferson County



At this time, our final designations for the State only apply to this area and the others addressed in this final technical support document. Consistent with the court-ordered schedule, the EPA will evaluate and designate all remaining undesignated areas in Indiana by either December 31, 2017, or December 31, 2020.

**Technical Analysis for LaPorte County**

<u>Introduction</u>

The LaPorte County, Indiana area contains a stationary source that according to the EPA's Air Markets Database emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/MMBTU). Specifically, in 2012, the Michigan City electric generating facility ("Michigan City Station") emitted 11,584 tons of $SO_2$ and had an emissions rate of 1.006 lbs $SO_2$/MMBTU. As of March 2, 2015, this stationary source had not met the criteria for being "announced for retirement." Pursuant to the March 2, 2015 court-ordered schedule, the EPA must designate the area surrounding this facility by July 2, 2016.

In its submission, Indiana recommended that the area surrounding Michigan City Station, specifically the entirety of LaPorte County, be designated as attainment based on an assessment and characterization of air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. This assessment and characterization was performed using air dispersion modeling software, specifically using AERMOD, analyzing actual emissions.

On February 16, 2016, the EPA notified Indiana that we intended to designate the LaPorte County, Indiana area as unclassifiable/attainment, based on our view that the area was meeting the NAAQS. Additionally, we informed Indiana that our intended boundaries for the unclassifiable/attainment area consisted of the entirety of LaPorte County. Our intended designation and associated boundaries were based on, among other things, air dispersion modeling provided by Indiana, which demonstrates, even with consideration of the impacts of relatively nearby sources, that the area near Michigan City Station is attaining the $SO_2$ standard. Detailed rationale, analyses, and other information supporting our intended designation for this area can be found in the technical support document for the intended Indiana designations, and this document along with all others related to this rulemaking can be found in Docket ID EPA-HQ-OAR-2014-0464.

<u>Assessment and Conclusion</u>

In our February 16, 2016, notification to Indiana regarding our intended unclassifiable/attainment designation for the LaPorte County, Indiana, area, the EPA requested that any additional information that the Agency should consider prior to finalizing the designation should be submitted by April 19, 2016. On March 1, 2016, the EPA also published a notice of availability and public comment period in the *Federal Register,* inviting the public to review and provide input on our intended designations by March 31, 2016 (81 FR 10563). The EPA is explicitly incorporating and relying upon the analyses and information presented in the technical support document for our intended Indiana designations for the purposes of our final designation for this area, except to the extent that any new information submitted to the EPA or conclusions presented in this final technical support document and our RTC, available in the docket, supersede those found in the prior technical support document.

21

Subsequent to our February 16, 2016 notification, the EPA did not receive any additional information from Indiana, nor did we receive any public comments specifically addressing our intended unclassifiable/attainment designation for the LaPorte County, Indiana, area. Some commenters urged the EPA to review carefully Indiana's air quality modeling; the EPA has conducted this review and continues to believe that Indiana's modeling, as described in the technical support document for the intended designations, suitably justifies designating LaPorte County as unclassifiable/attainment.

Therefore, based on the information available to the EPA at this time, including the analyses performed for the purposes of the technical support document for the intended Indiana designations and in the absence of any new information that would otherwise lead to a different conclusion regarding air quality in the area or any new information that would otherwise lead to a different conclusion regarding the area boundaries, the EPA determines that the LaPorte County, Indiana, area is meeting the NAAQS, and therefore is designating the area as unclassifiable/attainment for the 2010 $SO_2$ NAAQS. The boundaries for this unclassifiable/attainment area consist of the entirety of LaPorte County, and are shown in the figure below.

Figure 6: EPA's Final Unclassifiable/Attainment Area: LaPorte County, Indiana



At this time, our final designations for the State only apply to this area and the others addressed in this final technical support document. Consistent with the court-ordered schedule, the EPA

22

will evaluate and designate all remaining undesignated areas in Indiana by either December 31, 2017, or December 31, 2020.

23

## Technical Analysis for Posey County

<u>Introduction</u>

The Posey County, Indiana, area contains a stationary source that, according to the EPA's Air Markets Database, emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/MMBTU). Specifically, in 2012, the A. B. Brown electric generating facility ("A.B. Brown") emitted 7,091 tons of $SO_2$ and had an emissions rate of 0.521 lbs $SO_2$/MMBTU. As of March 2, 2015, this stationary source had not met the criteria for being "announced for retirement." Pursuant to the March 2, 2015 court-ordered schedule, the EPA must designate the area surrounding this facility by July 2, 2016.

In its submission, Indiana recommended that the area surrounding A. B. Brown, specifically the entirety of Posey County, be designated as attainment based on an assessment and characterization of air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. This assessment and characterization was performed using air dispersion modeling software, specifically using AERMOD.

On February 16, 2016, the EPA notified Indiana that we intended to designate a portion of Posey County, Indiana as nonattainment, based on our view that the area was not meeting the NAAQS. Although Indiana had adopted limits on the emissions from A. B. Brown that the state had demonstrated would suffice to provide for attainment of the $SO_2$ NAAQS, these limits were not federally enforceable at the time, and available evidence indicated that the area was violating the NAAQS in absence of those limits. However, the EPA further indicated its expectation that if it approved these limits into the SIP before taking final action on the designation for the Posey County, Indiana, area, the EPA would designate the area unclassifiable/attainment. Additionally, while we expressed an intent in the absence of the emissions limits becoming federally enforceable to designate an area consisting of Marrs Township in Posey County as nonattainment, we also informed Indiana that we expected in the case that the emission limits became federally enforceable that we would designate an unclassifiable/attainment area consisting of Bethel, Center, Harmony, Lynn, Marrs, Robb, Robinson, and Smith Townships in Posey County. Our views on the appropriate designation and associated boundaries with and without the emission limits becoming federally enforceable were based on, among other things, air dispersion modeling submittals provided by Indiana, in which Indiana stated that modeling using A. B. Browns actual emissions indicated a violation of the $SO_2$ standard, but modeling using the allowable emissions from A. B. Brown according to the limits established by a Commissioner's Order that Indiana issued on January 11, 2016, with a compliance date of April 19, 2016, indicated that the area would attain the standard.

Subsequent to the EPA's February 16, 2016 "120-day letter" to Indiana, the EPA has completed rulemaking on the emission limits that Indiana adopted for A. B. Brown. The EPA approved Indiana's Commissioner's Order for A. B. Brown (simultaneous with rulemaking on an analogous Commissioner's Order for Clifty Creek) in a final rule published on May 6, 2016, at 81 FR 27330, following publication of a proposed rule on February 25, 2016, at 81 FR 9395. By

24

this action, the emission limits for A. B. Brown established in Indiana's Commissioner's Order (as well as the limits in the analogous Commissioner's Order for Clifty Creek) became federally enforceable with adequate time for the EPA to consider the effect of these limits.

Since these limits, now federally enforceable, provide for attainment of the Posey County, Indiana area, Indiana has justified determining that the area is meeting the NAAQS and designating this area as unclassifiable/attainment. Detailed rationale, analyses, and other information supporting our designation for this area can be found in the technical support document for the intended designations for Indiana, and this document along with all others related to this rulemaking can be found in Docket ID EPA-HQ-OAR-2014-0464.

Assessment of New Information

In our February 16, 2016, notification to Indiana regarding our intended and expected designation for the Posey County, Indiana area, the EPA requested that any additional information that the Agency should consider prior to finalizing the designation should be submitted by April 19, 2016. On March 1, 2016, the EPA also published a notice of availability and public comment period in the *Federal Register,* inviting the public to review and provide input on our intended designations by March 31, 2016 (81 FR 10563).

The EPA is explicitly incorporating and relying upon the analyses and information presented in the technical support document for our intended Indiana designations for the purposes of our final designation for this area, except to the extent that any new information submitted to the EPA or conclusions presented in this final technical support document and our RTC, available in the docket, supersede those found in the prior technical support document.

Subsequent to our February 16, 2016, notification, the EPA received substantive comments from Sierra Club regarding our expected unclassifiable/attainment designation for the Posey County, Indiana area. Other commenters, while not commenting specifically on the intended or expected designation for the Posey County, Indiana, area, provided general comments urging the EPA to review carefully Indiana's air quality modeling; the EPA has conducted this review and continues to find that Indiana's modeling, as described in the technical support document for the intended Indiana designations, suitably justifies designating portions of Posey County as unclassifiable/attainment.

After carefully considering all available data and information, including the EPA's May 6, 2016, published action approving an Indiana Commissioner's Order containing the A. B. Brown $SO_2$ limits necessary to provide for attainment (81 FR 27330, effective June 6, 2016), the EPA determines that the Posey County, Indiana area is meeting the NAAQS and is designating the area as unclassifiable/attainment for the 2010 $SO_2$ NAAQS. The boundaries for this unclassifiable/attainment area consist of Bethel, Center, Harmony, Lynn, Marrs, Robb, Robinson, and Smith Townships in Posey County, and are shown in the figure below.

Figure 7: EPA's Final Unclassifiable/Attainment Area: Posey County, Indiana

25



At this time, our final designations for the state only apply to this area and the others addressed in this final technical support document. Consistent with the court-ordered schedule, the EPA will evaluate and designate all remaining undesignated areas in Indiana by either December 31, 2017, or December 31, 2020.

# Technical Analysis for Spencer County

Introduction

The Spencer County, Indiana, area contains a stationary source that according to EPA's Air Markets Database emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/MMBTU). Specifically, in 2012, the Rockport electric generating facility ("Rockport") emitted 54,390 tons of $SO_2$ and had an emissions rate of 0.583 lbs $SO_2$/MMBTU. As of March 2, 2015, this stationary source had not met the criteria for being "announced for retirement." Pursuant to the March 2, 2015, court-ordered schedule, the EPA must designate the area surrounding this facility by July 2, 2016.

In its submission, Indiana recommended that the area surrounding Rockport, specifically the entirety of Spencer County, be designated as attainment based on an assessment and characterization of air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. This assessment and characterization was performed using air dispersion modeling software, specifically using AERMOD, analyzing actual emissions.

On February 16, 2016, the EPA notified Indiana that we intended to designate the Spencer County, Indiana area as unclassifiable/attainment, based on our view that the area was meeting the NAAQS. Additionally, we informed Indiana that our intended boundaries for the unclassifiable/attainment area consisted of an area within Spencer County that includes the portion of Ohio Township north of UTM 4187.580 km northing, and Carter, Clay, Grass, Hammond, Harrison, and Jackson Townships. Our intended designation and associated boundaries were based on, among other things, air dispersion modeling provided by Indiana which analyzed concentrations within about 12 kilometers of Rockport. Detailed rationale, analyses, and other information supporting our intended designation for this area can be found in the technical support document for the intended Indiana designations, and this document along with all others related to this rulemaking can be found in Docket ID EPA-HQ-OAR-2014-0464.

Assessment and Conclusion

In our February 16, 2016, notification to Indiana regarding our intended unclassifiable/attainment designation for the Spencer County, Indiana area, the EPA requested that any additional information that the Agency should consider prior to finalizing the designation should be submitted by April 19, 2016. On March 1, 2016, the EPA also published a notice of availability and public comment period in the *Federal Register,* inviting the public to review and provide input on our intended designations by March 31, 2016 (81 FR 10563).

The EPA is explicitly incorporating and relying upon the analyses and information presented in the technical support document for the intended Indiana designations for the purposes of our final designation for this area, except to the extent that any new information submitted to the EPA or conclusions presented in this final technical support document and our RTC, available in the docket, supersede those found in the prior technical support document.

Subsequent to our February 16, 2016, notification, the EPA did not receive any additional information from Indiana, nor did we receive any public comments specifically addressing our intended unclassifiable/attainment designation for the Spencer County, Indiana area. Some commenters urged the EPA to review carefully Indiana's air quality modeling; the EPA has conducted this review and continues to believe that Indiana's modeling, as described in the technical support document for the intended Indiana designations, suitably justifies designating Spencer County as unclassifiable/attainment.

Therefore, based on the information available to the EPA at this time including the analyses performed for the purposes of the technical support document for the intended designations and in the absence of any new information that would otherwise lead to a different conclusion regarding air quality in the area or any new information that would otherwise lead to a different conclusion regarding the area boundaries, the EPA determines that the Spencer County, Indiana area is meeting the NAAQS, and therefore is designating the area as unclassifiable/attainment for the 2010 $SO_2$ NAAQS. The boundaries for this unclassifiable/attainment area consist of the portion of Ohio Township north of UTM 4187.580 km northing, and Carter, Clay, Grass, Hammond, Harrison, and Jackson Townships, and are shown in the figure below

Figure 8: EPA's Final Unclassifiable/Attainment Area: Spencer County, Indiana



At this time, our final designations for the state only apply to this area and the others addressed in this final technical support document. Consistent with the court-ordered schedule, the EPA will evaluate and designate all remaining undesignated areas in Indiana by either December 31, 2017, or December 31, 2020.

29

**Tab 405: Final Technical Support Document For Final Action on Ohio Area Designations for the 2010 SO2 Primary National Ambient Air Quality Standard (June 30, 2016)**

**Final Technical Support Document**

For Final Action on Ohio Area Designations
for the 2010 SO$_2$ Primary National Ambient Air Quality Standard

<u>Summary</u>

Pursuant to section 107(d) of the Clean Air Act (CAA), the U.S. Environmental Protection Agency (EPA, or the Agency) must designate areas as either "unclassifiable," "attainment," or "nonattainment" for the 2010 1-hour sulfur dioxide (SO$_2$) primary national ambient air quality standard (NAAQS). Section 107(d) of the CAA defines a nonattainment area as one that does not meet the NAAQS or that contributes to a NAAQS violation in a nearby area, an attainment area as any area other than a nonattainment area that meets the NAAQS, and an unclassifiable area as any area that cannot be classified on the basis of available information as meeting or not meeting the NAAQS.

July 2, 2016, is the deadline established by the U.S. District Court for the Northern District of California for the EPA to designate certain areas. This deadline is the first of three deadlines established by the court for the EPA to complete area designations for the 2010 SO$_2$ NAAQS. This deadline applies to two areas in Ohio because two emission sources meet the criteria for applicability of this deadline under the court's order.

Ohio submitted updated recommendations on September 16, 2015. Table 1 below lists Ohio's recommendations and identifies the counties in Ohio that the EPA is designating in order to meet the July 2, 2016, court-ordered deadline. These final designations are based on an assessment and characterization of air quality through ambient air quality data, air dispersion modeling, other evidence and supporting information, or a combination of the above.

**Table 1 – Ohio's Recommended and the EPA's Final Designations**

| Area | Ohio's Recommended Area Definition | Ohio's Recommended Designation | EPA's Area Definition | EPA's Final Designation |
|---|---|---|---|---|
| Clermont County, Ohio | Clermont County, excluding Pierce Township | Attainment | Same as State's Recommendation (Clermont County, OH) | Unclassifiable/ Attainment |
| Gallia County, Ohio | Gallia County and In Meigs County: Bedford, Columbia, Rutland, Salem, Salisbury, and Scipio Townships | Attainment | Same as State's Recommendation (Gallia County, OH) | Unclassifiable |

1

## Background

On June 3, 2010, the EPA revised the primary (health based) $SO_2$ NAAQS by establishing a new 1-hour standard, which is met at an ambient air quality monitoring site when the 3-year average of the 99th percentile of 1-hour daily maximum concentrations does not exceed 75 ppb. This NAAQS was published in the *Federal Register* on June 22, 2010 (75 FR 35520), and is codified at 40 CFR 50.17. The EPA determined this is the level necessary to protect public health with an adequate margin of safety, especially for children, the elderly, and those with asthma. These groups are particularly susceptible to the health effects associated with breathing $SO_2$. The two prior primary standards of 140 ppb evaluated over 24 hours, and 30 ppb evaluated over an entire year, codified at 40 CFR 50.4, remain applicable.[1] However, the EPA is not currently designating areas on the basis of either of these two primary standards. Similarly, the secondary standard for $SO_2$, set at 500 ppb evaluated over 3 hours, codified at 40 CFR 50.5, has not been revised, and the EPA is also not currently designating areas on the basis of the secondary standard.

## General Approach and Schedule

Section 107(d) of the CAA requires that not later than 1 year after promulgation of a new or revised NAAQS, state governors must submit their recommendations for designations and boundaries to EPA. Section 107(d) also requires the EPA to provide notification to states no less than 120 days prior to promulgating an initial area designation that is a modification of a state's recommendation. If a state does not submit designation recommendations, the EPA may promulgate the designations that it deems appropriate without prior notification to the state, although it is our intention to provide such notification when possible. If a state or tribe disagrees with the EPA's intended designations, it is given an opportunity within the 120-day period to demonstrate why any proposed modification is inappropriate. The EPA is required to complete designations within 2 years after promulgation of a new or revised NAAQS, unless EPA determines that sufficient information is not available, in which case the deadline is extended to 3 years. The 3-year deadline for the revised $SO_2$ NAAQS was June 2, 2013.

On August 5, 2013, the EPA published a final rule establishing air quality designations for 29 areas in the United States for the 2010 $SO_2$ NAAQS, based on recorded air quality monitoring data from 2009 - 2011 showing violations of the NAAQS (78 FR 47191). In that rulemaking, the EPA committed to address, in separate future actions, the designations for all other areas for which the Agency was not yet prepared to issue designations.

Following the initial August 5, 2013, designations, three lawsuits were filed against the EPA in different U.S. District Courts, alleging the Agency had failed to perform a nondiscretionary duty

---

[1] 40 CFR 50.4(e) provides that the two prior primary NAAQS will no longer apply to an area 1 year after its designation under the 2010 NAAQS, except that for areas designated nonattainment under the prior NAAQS as of August 22, 2010, and areas not meeting the requirements of a SIP Call under the prior NAAQS, the prior NAAQS will apply until that area submits and EPA approves a SIP providing for attainment of the 2010 NAAQS. Clermont, Gallia, and Meigs Counties are not subject to these exceptions.

2

under the CAA by not designating all portions of the country by the June 2, 2013, deadline. In an effort intended to resolve the litigation in one of those cases, plaintiffs, Sierra Club and the Natural Resources Defense Council, and the EPA filed a proposed consent decree with the U.S. District Court for the Northern District of California. On March 2, 2015, the court entered the consent decree and issued an enforceable order for the EPA to complete the area designations according to the court-ordered schedule.

According to the court-ordered schedule, the EPA must complete the remaining designations by three specific deadlines. By no later than July 2, 2016 (16 months from the court's order), the EPA must designate two groups of areas: (1) areas that have newly monitored violations of the 2010 $SO_2$ NAAQS, and (2) areas that contain any stationary sources that had not been announced as of March 2, 2015, for retirement and that, according to the EPA's Air Markets Database, emitted in 2012 either (i) more than 16,000 tons of $SO_2$, or (ii) more than 2,600 tons of $SO_2$ with an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/MMBTU). Specifically, a stationary source with a coal-fired unit that, as of January 1, 2010, had a capacity of over 5 megawatts and otherwise meets the emissions criteria, is excluded from the July 2, 2016, deadline if it had announced through a company public announcement, public utilities commission filing, consent decree, public legal settlement, final state or federal permit filing, or other similar means of communication, by March 2, 2015, that it will cease burning coal at that unit.

The last two deadlines for completing remaining designations are December 31, 2017, and December 31, 2020. The EPA has separately promulgated requirements for state and other air agencies to provide additional monitoring or modeling information on a timetable consistent with these designation deadlines. We expect this information to become available in time to help inform these subsequent designations. These requirements were promulgated on August 21, 2015 (80 FR 51052), in a rule known as the $SO_2$ Data Requirements Rule (DRR), codified at 40 CFR part 51 subpart BB.

Updated designations guidance was issued by the EPA through a March 20, 2015, memorandum from Stephen D. Page, Director, U.S. EPA, Office of Air Quality Planning and Standards, to Air Division Directors, U.S. EPA Regions 1-10. This memorandum supersedes earlier designation guidance for the 2010 $SO_2$ NAAQS, issued on March 24, 2011, and it identifies factors that the EPA intends to evaluate in determining whether areas are in violation of the 2010 $SO_2$ NAAQS. The guidance also contains the factors the EPA intends to evaluate in determining the boundaries for all remaining areas in the country, consistent with the court's order and schedule. These factors include: 1) Air quality characterization via ambient monitoring or dispersion modeling results; 2) Emissions-related data; 3) Meteorology; 4) Geography and topography; and 5) Jurisdictional boundaries. This guidance was supplemented by two non-binding technical assistance documents intended to assist states and other interested parties in their efforts to characterize air quality through air dispersion modeling or ambient air quality monitoring for sources that emit $SO_2$. Notably, the EPA's documents titled, "$SO_2$ NAAQS Designations Modeling Technical Assistance Document" (Modeling TAD) and "$SO_2$ NAAQS Designations Source-Oriented Monitoring Technical Assistance Document" (Monitoring TAD), were available to states and other interested parties. Both of these TADs were most recently updated in February 2016.

3

Based on complete, quality assured and certified ambient air quality data collected between 2013 and 2015, no violations of the 2010 $SO_2$ NAAQS have been recorded at ambient air quality monitors in any undesignated part of Ohio. However, there are two sources in the State meeting the emissions criteria of the consent decree for which the EPA must complete designations by July 2, 2016. In this final technical support document, the EPA discusses its review and technical analysis of Ohio's updated recommendations for the areas that we must designate. The EPA also discusses any intended and final modifications from the State's recommendation based on all available data before us.

The following are definitions of important terms used in this document:

1) 2010 $SO_2$ NAAQS – the primary NAAQS for $SO_2$ promulgated in 2010. This NAAQS is 75 ppb, based on the 3-year average of the 99th percentile of the annual distribution of daily maximum 1-hour average concentrations. See 40 CFR 50.17.

2) Attaining monitor – an ambient air monitor meeting all methods, quality assurance, and siting criteria and requirements whose valid design value is at or under 75 ppb, based on data analysis conducted in accordance with Appendix T of 40 CFR part 50.

3) Design Value – a statistic computed according to the data handling procedures of the NAAQS (in 40 CFR part 50 Appendix T) that, by comparison to the level of the NAAQS, indicates whether the area is violating the NAAQS.

4) Designated nonattainment area – an area which the EPA has determined has violated the 2010 $SO_2$ NAAQS or contributed to a violation in a nearby area. A nonattainment designation reflects considerations of the state's recommendations and all of the information discussed in this document. The EPA's decision is based on all available information including the most recent 3 years of air quality monitoring data, available modeling analyses, and any other relevant information.

5) Designated unclassifiable area – an area for which the EPA cannot determine based on all available information whether or not it meets the 2010 $SO_2$ NAAQS.

6) Designated unclassifiable/attainment area – an area which the EPA has determined to have sufficient evidence to find either is attaining or is likely to be attaining the NAAQS. The EPA's decision is based on all available information including the most recent 3 years of air quality monitoring data, available modeling analyses, and any other relevant information.

7) Modeled violation – a violation based on air dispersion modeling.

8) Recommended attainment area – an area a state or tribe has recommended that the EPA designate as attainment.

9) Recommended nonattainment area – an area a state or tribe has recommended that the EPA designate as nonattainment.

10) Recommended unclassifiable area – an area a state or tribe has recommended that the EPA designate as unclassifiable.

11) Recommended unclassifiable/attainment area – an area a state or tribe has recommended that the EPA designate as unclassifiable/attainment.

12) Violating monitor – an ambient air monitor meeting all methods, quality assurance, and siting criteria and requirements whose valid design value exceeds 75 ppb, based on data analysis conducted in accordance with Appendix T of 40 CFR part 50.

4

App. 1110

**Technical Analysis for Clermont County, Ohio**

Introduction

Clermont County, Ohio, contains a stationary source that, according to the EPA's Air Markets Database, emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 lbs $SO_2$/MMBTU. Specifically, in 2012, the W.H. Zimmer Generating Station (Zimmer) emitted 11,975 tons of $SO_2$ and had an emissions rate of 0.53 lbs $SO_2$/MMBTU. As of March 2, 2015, this stationary source had not met the criteria for being "announced for retirement." Pursuant to the March 2, 2015, court-ordered schedule, the EPA must designate the area surrounding this facility by July 2, 2016.[2]

In its September 16, 2015, submission, Ohio recommended that the area surrounding Zimmer electric generating facility, specifically all townships in Clermont County with the exception of Pierce Township,[3] be designated as attainment based on an assessment and characterization of air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected.

This assessment and characterization was performed using air dispersion modeling software, i.e., AERMOD, analyzing actual emissions from 2012 through 2014 for Zimmer. No other sources were included in the modeling. Ohio considered fifteen other $SO_2$ sources of varying size, located within 50 km of Zimmer and found that none of these sources were determined by the state to have the potential to cause significant concentration gradient impacts within the area of analysis. Ohio followed the EPA's Modeling TAD for the purposes of modeling to characterize air quality for use in designations, and used the most recent 3 years of actual emissions data and concurrent meteorological data. Surface meteorology and surface characteristics from the Cincinnati NWS site (43 km northwest of Zimmer), and coincident upper air observations from Wilmington, Ohio (74 km to the northeast of Zimmer) were selected as most representative of meteorological conditions within the area. Ohio chose to use a fixed background concentration which was determined by the state to be the 99th percentile of monitored values from the $SO_2$ monitor in northern Campbell County, Kentucky (21-037-3002). This monitor was considered to be impacted by emissions from Beckjord, until the facility permanently shut down its coal-fired boilers in October 2014. The background value was determined by examining the monitored values for which Beckjord had zero emission and the monitor value was nonzero. The background concentration for this area was determined by the state to be 11 ppb and was incorporated into the final AERMOD results. The state's modeling indicates that the predicted 99th percentile 1-hour average concentration within the chosen modeling domain is 147.0 $\mu g/m^3$, or 56.1 ppb, occurring just north of Zimmer. The Sierra Club also submitted modeling showing violations of the standards from Zimmer. Ohio commented that the Sierra Club analysis used incomplete and incorrect hourly emissions and stack parameter information for Zimmer, and

[2] Clermont County also includes the Beckjord Generating Station, which emitted 67,069 tons in 2012, but which is not subject to a requirement for designation because the area around that plant has already been designated nonattainment.
[3] Pierce Township, Clermont County, Ohio, was designated nonattainment for the 2010 $SO_2$ NAAQS on August 5, 2013 (78 FR 47191). This township included a major source (Beckjord Generating Stations) that subsequently shut down. Ohio has addressed this township separately, notably by submitting a redesignation request on August 11, 2015, for this township, and EPA will be addressing this township separately as well.

6

emissions data which was more conservative than the Modeling TAD requires for two additional modeled sources. The EPA did not find compelling information to designate Clermont County as nonattainment based on Sierra Club's unreliable modeling parameters.

On February 16, 2016, the EPA notified Ohio that we intended to designate the Clermont County, Ohio, area as unclassifiable/attainment, based on our view that the area was meeting the NAAQS. Additionally, we informed Ohio that our intended boundaries for the unclassifiable/attainment area consisted of Clermont County (excluding Pierce Township). Our intended designation and associated boundaries were based on, among other things, careful review of the state's assessment, supporting documentation, and all available data. Detailed rationale, analyses, and other information supporting our intended designation for this area can be found in the preliminary technical support document for Ohio, and this document along with all others related to this rulemaking can be found in Docket ID EPA-HQ-OAR-2014-0464.

Assessment of New Information

In our February 16, 2016, notification to Ohio regarding our intended unclassifiable/attainment designation for the Clermont County, Ohio, area, the EPA requested that any additional information that the Agency should consider prior to finalizing the designation should be submitted by April 19, 2016. On March 1, 2016, the EPA also published a notice of availability and public comment period in the *Federal Register,* inviting the public to review and provide input on our intended designations by March 31, 2016 (81 FR 10563).

The EPA is explicitly incorporating and relying upon the analyses and information presented in the preliminary technical support document for the purposes of our final designation for this area, except to the extent that any new information submitted to the EPA or conclusions presented in this final technical support document and our response to comments document (RTC), available in the docket, supersede those found in the preliminary document.

Subsequent to our February 16, 2016, notification, the EPA received comments from various groups, such as Ohio Utilities Group and FirstEnergy, supporting our intended designation for the area. No commenters objected to this proposed designation or objected to any portion of EPA's rationale for designating this area as unclassifiable/attainment.

Conclusion

Therefore, based on the information available to the EPA at this time, including the analyses performed for the purposes of the preliminary technical support document, and in the absence of any new information that would otherwise lead to a different conclusion regarding air quality in the area or any new information that would otherwise lead to a different conclusion regarding the area boundaries, the EPA concludes that the Clermont County, Ohio, area is meeting the 2010 primary $SO_2$ NAAQS, and therefore is designating the area as unclassifiable/attainment under the NAAQS. As previously noted, we are explicitly incorporating and relying upon the analyses and information presented in the technical support document for our intended designations as a portion of the support for the final designation for this area. The boundaries for this unclassifiable/attainment area consist of Clermont County (excluding Pierce Township), and are

7

shown in the figure below. Also included in the figure are nearby emitters of $SO_2$ and Ohio's recommended area.

Figure 1: The EPA's final unclassifiable/attainment area: Clermont County, Ohio



At this time, our final designations for the state only apply to this area and the others contained in this final technical support document. Consistent with the court-ordered schedule, the EPA will evaluate and designate all remaining undesignated areas in Ohio by either December 31, 2017, or December 31, 2020.

## Technical Analysis for Gallia County, Ohio

<u>Introduction</u>

Gallia County, Ohio, contains a stationary source that, according to the EPA's Air Markets Database, emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 lbs $SO_2$/MMBTU. Specifically, in 2012, the General James M. Gavin Power Plant (Gavin) emitted 31,269 tons of $SO_2$ and had an emissions rate of 0.36 lbs $SO_2$/MMBTU. As of March 2, 2015, this stationary source had not met the criteria for being "announced for retirement." Pursuant to the March 2, 2015 court-ordered schedule, the EPA must designate the area surrounding this facility by July 2, 2016.

8

In its September 16, 2015, submission, Ohio recommended that the area surrounding Gavin, specifically Gallia County and a portion of Meigs County which contains an $SO_2$ monitor, be designated as attainment based on an assessment and characterization of air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. This assessment and characterization was performed using air dispersion modeling software, i.e., AERMOD, analyzing actual emissions.

On February 16, 2016, the EPA notified Ohio that we intended to designate the Gallia County, Ohio area as unclassifiable, due to our view that we could not determine based on available information whether the area was meeting the NAAQS. Additionally, we informed Ohio that our intended boundaries for the unclassifiable area consisted of Gallia County and a portion of Meigs County. Our intended designation and associated boundaries were based on, among other things, review of the state's assessment, supporting documentation, and all available data. Due to Ohio's unapproved use of the AERMOD beta option, LOWWIND3, the EPA did not find Ohio's modeling analysis to be a reliable assessment of whether the area is attaining the standard. Detailed rationale, analyses, and other information supporting our intended designation for this area can be found in the preliminary technical support document for Ohio, and this document along with all others related to this rulemaking can be found in Docket ID EPA-HQ-OAR-2014-0464.

<u>Assessment of New Information</u>

In our February 16, 2016, notification to Ohio regarding our intended unclassifiable designation for the Gallia County, Ohio area, the EPA requested that any additional information that the Agency should consider prior to finalizing the designation should be submitted by April 19, 2016. On March 1, 2016, the EPA also published a notice of availability and public comment period in the *Federal Register,* inviting the public to review and provide input on our intended designations by March 31, 2016 (81 FR 10563).

The EPA is explicitly incorporating and relying upon the analyses and information presented in the preliminary technical support document for the purposes of our final designation for this area, except to the extent that any new information submitted to the EPA or conclusions presented in this final technical support document and our response to comments document (RTC), available in the docket, supersede those found in the preliminary document.

As further detailed below, after carefully considering all available data and information, the EPA is unable to determine whether the Gallia County, OH, area is meeting the NAAQS, and therefore is designating the area as unclassifiable for the 2010 $SO_2$ NAAQS. The boundaries for this unclassifiable area consist of Gallia County and a portion of Meigs County, and are shown in the figure below. Also included in the figure are nearby emitters of $SO_2$ and Ohio's recommended area.

Figure 2: The EPA's final unclassifiable area: Gallia County, Ohio

9



Subsequent to our February 16, 2016, notification, the EPA received substantive comments from Sierra Club, Ohio Utility Group, Ohio Valley Electric Corporation, American Electric Power, and FirstEnergy regarding our intended unclassifiable designation for the Gallia County, Ohio area.

Also, additional information, specifically air dispersion modeling, was submitted to the EPA during the state and public comment period in order to characterize air quality in the Gallia County, Ohio, area. Notably, the state provided additional air dispersion modeling information during the comment period and asserted that the area surrounding Gavin has no modeled exceedances of the 2010 $SO_2$ standard based on the 2012-2014 period. Specifically, the state provided new background concentrations, revised meteorological data, and a new model run without the use of LOWWIND3. The Sierra Club also submitted additional air dispersion modeling information during the comment period and asserted that the Gallia County, Ohio, area should be designated as nonattainment. Specifically, Sierra Club provided new emissions data, omitted Mountaineer as an explicitly modeled source, adopted a new background concentration of 10 ppb, and utilized new stack configurations for Kyger Creek. The following discussion and analysis of this new information reference the Modeling TAD and the factors for evaluation contained in the EPA's March 20, 2015, guidance, as appropriate and applicable.

***Additional Modeling by the State***

*Model Selection and Modeling Components*

The EPA's Modeling TAD notes that for area designations under the 2010 $SO_2$ NAAQS, the AERMOD modeling system should be used, unless use of an alternative model can be justified. In some instances the recommended model may be a model other than AERMOD, such as the BLP model for buoyant line sources. The AERMOD modeling system contains the following components:
- AERMOD: the dispersion model
- AERMAP: the terrain processor for AERMOD
- AERMET: the meteorological data processor for AERMOD
- BPIPPRIME: the building input processor
- AERMINUTE: a pre-processor to AERMET incorporating 1-minute automated surface observation system (ASOS) wind data
- AERSURFACE: the surface characteristics processor for AERMET
- AERSCREEN: a screening version of AERMOD

The state used AERMOD version 15181, and a discussion of the individual components will be referenced in the corresponding discussion that follows, as appropriate.

*Modeling Parameter: Rural or Urban Dispersion*

The EPA's recommended procedure for characterizing an area by prevalent land use is based on evaluating the dispersion environment within 3 km of the facility. According to the EPA's modeling guidelines contained in documents such as the Modeling TAD, rural dispersion coefficients are to be used in the dispersion modeling analysis if more than 50% of the area within a 3 km radius of the facility is classified as rural. Conversely, if more than 50% of the area is urban, urban dispersion coefficients should be used in the modeling analysis. When performing the modeling for the area of analysis, Ohio determined that it was most appropriate to run the model in rural mode. Although Ohio did not conduct a formal Auer analysis of the area, less than 50% of the land use near the two large sources in Gallia County is industrial, commercial, or dense residential. The EPA is making a determination that rural dispersion coefficients are appropriate, based on aerial photographs in Google Maps, which confirm that more than 50% of the area within a 3 km radius of the facility is rural.

*Modeling Parameter: Area of Analysis (Receptor Grid)*

The EPA thinks that a reasonable first step towards characterization of air quality in the area surrounding Gavin is to determine the extent of the area of analysis, i.e., receptor grid. Considerations presented in the Modeling TAD include but are not limited to: the location of the $SO_2$ emission sources or facilities considered for modeling; the extent of significant concentration gradients of nearby sources; and sufficient receptor coverage and density to adequately capture and resolve the model predicted maximum $SO_2$ concentrations.

The grid receptor spacing for the area of analysis chosen by the state is as follows:
- 50 meter spacing along fenceline of both facilities and to 2 km from the fenceline

11

- 100 meter spacing to 3 km
- 250 meter spacing to 8 km
- 500 meter spacing to 15 km
- 1000 meter spacing beyond 10 km to 25 km
- 2000 meter spacing to 50 km
- Included discrete receptor at monitor location

The receptor network contained 34,255 receptors and covered the entirety of Gallia County and the western portion of Meigs County. Figure 3, which was included in Ohio's submission during the comment period, shows the chosen area of analysis surrounding the Gavin and Kyger Creek facilities, as well as the receptor grid for the area of analysis. The Modeling TAD states that the receptor grid need not include receptors in areas where it would not be feasible to place a monitor and record ambient air impacts, such as bodies of water. Ohio did not seek to identify areas where it might be infeasible to place a monitor, and instead conservatively placed receptors according to the above array without respect to feasibility of monitoring. The impacts of the area's geography and topography will be discussed later within this document.

Figure 3: Receptor Grid for the Gallia County Area of Analysis



For the Gallia County area, the state included one other emitter of $SO_2$ within 50 km of Gavin in any direction. The state determined that this was the appropriate distance in order to adequately characterize air quality from Gavin and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. As discussed below, the state also evaluated whether to include two West Virginia sources in its analysis, but concluded that inclusion of these sources was not warranted. In addition to Gavin, the other modeled emitter of $SO_2$ included in the area of analysis is Kyger Creek. As AERMOD is recommended for use within 50 km of a given emission source, the state determined that 50 km

12

was an appropriate distance to adequately characterize air quality from the facility and other nearby sources which are expected to cause significant concentration gradients in the area. EPA agrees that 50 km is a conservative, acceptable distance to characterize the air quality around the primary source.

*Modeling Parameter: Source Characterization*

The state characterized the sources within the area of analysis in accordance with practices outlined as acceptable in the Modeling TAD. Specifically, the state used actual stack heights in conjunction with actual emissions. The state also adequately characterized the sources' building layout and location, as well as the stack parameters, e.g., exit temperature, exit velocity, location, and diameter. Where appropriate, the AERMOD component BPIPPRIME was used to assist in addressing building downwash.

*Modeling Parameter: Emissions*

The EPA's Modeling TAD notes that for the purposes of modeling to characterize air quality for use in designations, the recommended approach is to use the most recent 3 years of actual emissions data and concurrent meteorological data. However, the TAD also provides for the flexibility of using allowable emissions in the form of the most recently permitted (referred to as PTE or allowable) emissions rate.

The EPA thinks that continuous emissions monitoring systems (CEMS) data provide acceptable historical emissions information when it is available and that these data are available for many electric generating units. In the absence of CEMS data, the EPA's Modeling TAD highly encourages the use of AERMOD's hourly varying emissions keyword HOUREMIS or through the use of AERMOD's variable emissions factors keyword EMISFACT. When choosing one of these methods, the EPA believes that detailed throughput, operating schedules, and emissions information from the impacted sources should be used.

In certain instances, states and other interested parties may find that it is more advantageous or simpler to use PTE rates as part of their modeling runs. Specifically, a facility may have recently adopted a new federally enforceable emissions limit, been subject to a federally enforceable consent decree, or implemented other federally enforceable mechanisms and control technologies to limit $SO_2$ emissions to a level that indicates compliance with the NAAQS. These new limits or conditions may be used in the application of AERMOD. In these cases, the Modeling TAD notes that the existing $SO_2$ emissions inventories used for permitting or SIP planning demonstrations should contain the necessary emissions information for designations-related modeling. In the event that these short-term emissions are not readily available, they may be calculated using the methodology in Table 8-1 of Appendix W to 40 CFR Part 51 titled, "Guideline on Air Quality Models."

As previously noted, the state evaluated other $SO_2$ sources located within 50 km of the area of analysis. The Phillip Sporn power station and the Mountaineer power station in Mason County, WV, are located approximately 17 km from Gavin. The Sporn station closed in June 2015. The predominant winds from the southwest, as measured at Huntington, WV, would commonly

13

disperse the emissions of the Mountaineer plant toward the eastern portion of Meigs County (not included in Ohio's designation recommendation). There are no other significant sources of $SO_2$ in or near Gallia and Meigs Counties. Only Gavin and Kyger Creek were determined by the state to have the potential to cause significant concentration gradient impacts within the area of analysis. The facilities in the area of analysis and their most recently available annual actual $SO_2$ are summarized below.

Table 2: Actual $SO_2$ Emissions in 2012 – 2014 from Facilities in the Gallia County, Ohio Area of Analysis

| Facility Name | Distance from Gavin (km) | Actual $SO_2$ Emissions (tons per year) | | | |
|---|---|---|---|---|---|
| | | 2012 | 2013 | 2014 | 2015 |
| AEP General James M. Gavin Plant | -- | 31,269[A] | 27,852 | 36,872 | 26,473 |
| AEP Kyger Creek Station | 2.5 | 4,989 | 9,434 | 13,748 | 4,847 |
| Appalachian Power Mountaineer Plant (Mason Co WV) | 16.7 | 1,151 | 2,903 | 4,411 | |
| Appalachian Power Phillip Sporn Plant (Mason Co WV) closed 6/2015 | 17.2 | 8,078 | 9,032 | 10,650 | |
| Felman Productions-New Haven (Mason Co WV)[B] | 17.2 | | | 534 | |
| Total Emissions From All Facilities in the State's Area of Analysis | | 46,021[C] | 49,755[C] | 66,215 | |

[A] Emissions from EPA's Air Markets Database. Other 2014 data from Ohio's Fee Emission Reports.
[B] Emissions from 2011 NEI.
[C] Assumes 534 tons per year from Felman Productions

For Gavin and Kyger Creek, in the area of analysis, the state used actual emissions from the most recently available 3-year data set, i.e., 2012 - 2014. These emissions data were developed by the American Electric Power Service Corporation, incorporating sensor data to produce an hourly emission inventory that reflects actual emissions at the facilities. Ohio examined 2015 emissions data and concluded that 2013 to 2015 emissions were sufficiently similar to emissions in 2012 to 2014 that derivation of 2015 emissions data for modeling purposes was not warranted. Emissions data for 2015 are shown in Table 2 above. Since emissions in 2015 are lower than emissions in 2012 (especially at Gavin), total emissions in 2013 to 2015 are about 6 percent lower for Gavin and about 0.5 percent lower for Kyger Creek than those of 2012 to 2014. Modeling 2012 to 2014 emissions is consistent with the Modeling TAD, which recommends using the most recent three years of available data. The impact of the decline in emissions is discussed further below.

Table 5 below shows that Ohio used emission values that added up to less than the values reported to CAMD. The values in the CAMD database reflect data substitution, in which hours for which emissions monitoring equipment was not operating correctly are given emission values (for purposes of determining the number of trading program allowances to be debited) that are computed to provide a conservative estimate of the emissions. Gavin reportedly had significant periods when its emission monitoring equipment was malfunctioning, so that the values in the CAMD database for this plant were likely to overstate actual emissions. To account for potential

14

emission inflation caused by Part 75 substitutions within the CAMD database, Ohio consulted with AEP to derive accurate hourly emission rates, release point temperatures, and exit velocities when faults in the continuous emission monitors resulted in erroneous data. The substitution of erroneous data and derivation of refined emission parameters resulted in the lower total emissions shown in Table 5. The EPA has reviewed the details of Ohio's emission inventory development in Appendix B of Ohio's recommended designation submittal from September 15, 2015, and agrees that these refined emission parameters correct inflated emission values in the CAMD database.

*Modeling Parameter: Meteorology and Surface Characteristics*

The most recent 3 years of available meteorological data (concurrent with the most recent 3 years of emissions data) should be used in designations efforts. As noted in the Modeling TAD, the selection of data should be based on spatial and climatological (temporal) representativeness. The representativeness of the data are based on: 1) the proximity of the meteorological monitoring site to the area under consideration, 2) the complexity of terrain, 3) the exposure of the meteorological site, and 4) the period of time during which data are collected. Sources of meteorological data include National Weather Service (NWS) stations, site-specific or onsite data, and other sources such as universities, the Federal Aviation Administration (FAA), and military stations.

For the Gallia County, Ohio, area of analysis, surface meteorology from the Huntington Tri-State Airport NWS station in West Virginia, approximately 65 km south-southeast of Gavin, and coincident upper air observations from the NWS station in Pittsburg, Pennsylvania, approximately 235 km to the northeast, were selected as best representative of meteorological conditions within the area of analysis. The Huntington, West Virginia, NWS is the site recommended by Ohio for regulatory modeling work. Both locations are located near the Ohio River although it's unlikely the river valley area is influencing either the Huntington NWS data or the power plant plumes. The Ohio River is roughly 170 m above sea level. The NWS location is at an elevation of about 250 m above sea level. The location of the Gavin and Kyger Creek facilities are roughly 180 m above sea level, however, the power plant stacks are approximately 250 m tall. Consequently, the Huntington NWS data, should serve as an adequate meteorological database with which to model the large-scale winds impacting the tall stacks at Gavin and Kyger Creek.

The State used AERSURFACE version 13016 using data from the Huntington NWS station located at (38.365, -82.555) to estimate the surface characteristics of the area of analysis. The State developed surface characteristics for 12 spatial sectors at a monthly temporal resolution at the Huntington NWS station. These surface characteristics are the albedo (the fraction of solar energy reflected from the earth back into space), the Bowen ratio (representing the ratio of sensible heat flux to latent heat flux at the ground level), and the surface roughness (representing the influence of ground features such as buildings and vegetation on surface wind flow).

Meteorological data from the above surface and upper air stations were used in generating AERMOD-ready files with the AERMET processor. The output meteorological data created by the AERMET processor is suitable for being applied with AERMOD input files for AERMOD

15

modeling runs. The state used AERSURFACE to determine appropriate surface characteristics, and followed EPA guidance in the processing of the raw meteorological data into an AERMOD-ready format. Ohio processed the Huntington NWS surface meteorological data using the AERMINUTE preprocessor, which uses one-minute meteorological observations to provide the most complete and accurate hourly-averaged surface wind data. Then Ohio used AERMET to combine surface and upper air data into input files required by the AERMOD model.

Hourly surface meteorological data records are read by AERMET, and include all the necessary elements for data processing. However, wind data taken at hourly intervals may not always portray wind conditions for the entire hour, which can be variable in nature. Hourly wind data may also be overly prone to indicate calm conditions, which are not modeled by AERMOD. In order to better represent actual wind conditions at the meteorological tower, wind data of 1 minute duration was provided from the same instrument tower, but in a different formatted file to be processed by a separate preprocessor, AERMINUTE. These data were subsequently integrated into the AERMET processing to produce final hourly wind records of AERMOD-ready meteorological data that better estimate actual hourly average conditions and that are less prone to over-report calm wind conditions. This allows AERMOD to apply more hours of meteorology to modeled inputs, and therefore produce a more complete set of concentration estimates. As a guard against excessively high concentrations that could be produced by AERMOD in very light wind conditions, Ohio set a minimum threshold of 0.5 meters per second in processing meteorological data for use in AERMOD. This approach is consistent with a March 2013 EPA memo titled, "Use of ASOS meteorological data in AERMOD dispersion Modeling." In setting this threshold, no wind speeds lower than this value would be used for determining concentrations. This threshold was specifically applied to the 1-minute wind data.

In the revised modeling, the State decided to substitute cloud-cover data into the 2014 Huntington surface meteorological data, utilizing regional cloud-cover data from Mason County Airport and Charleston-Yeager Airport. The State performed these substitutions in order to create a surface file that would be more representative of realistic meteorological conditions at the Huntington station. The State believes that the revised .SFC input file generated demonstrated more realistic convective and mechanical mixing heights, compared to the previously generated .SFC input file without substituted could-cover data for 2014. Upon close examination of the revised .SFC input file, the EPA agrees that the substituted cloud-cover data for 2014 generates surface characteristics that better represent reality.

*Modeling Parameter: Geography and Terrain*

The terrain in the area of analysis is best described as hilly, along the Ohio River Valley. To account for these terrain changes, the AERMAP terrain program within AERMOD was used to specify terrain elevations for all the receptors. The source of the elevation data incorporated into the model was the USGS National Elevation Database.

*Modeling Parameter: Background Concentrations of SO$_2$*

16

The Modeling TAD offers two mechanisms for characterizing background concentrations of $SO_2$ that are ultimately added to the modeled design values: 1) a "first tier" approach, based on monitored design values, or 2) a temporally varying approach, based on the 99th percentile monitored concentrations by hour of day and season or month. For the Gallia County, Ohio, area of analysis, the state chose to characterize background concentrations with a temporally varying approach and an additional bias adjustment. The background concentration for this area of analysis was determined by the state vary between 1 and 8.65 ppb,[4] and these values were incorporated into the final AERMOD results. As a first step in determining background concentrations, Ohio relied on temporary varying (by hour and season) background data from the Pomeroy monitor, which is located north of Gavin and Kyger Creek. The initial background profile was based conservatively on the 99th percentile monitored concentrations, excluding occasions when the monitor may have been downwind of significant emissions. The EPA considers this first step appropriate, based on the Modeling TAD, and it is in accordance with the second mechanism described above. The state then conducted an adjustment intended to remove bias, reducing the temporally varying background concentrations by 38%. This 38% adjustment was derived by a mean error/bias calculation from a statistical comparison study between modeled and monitor concentrations.

EPA does not agree that a bias adjustment to the background concentrations is appropriate. The rationale for the adjustment is based on a comparison of model estimates to monitored concentrations at a monitor location, approximately 13 kilometers from the facilities. At this distance, well removed from the expected location of peak concentrations in the area, the comparison of model estimates and monitored concentrations does not provide a reliable indication of how well the model is performing. In any case, even if the monitor were located closer to the expected location of peak concentrations, EPA does not agree that adjustment of background concentrations (or adjustment of any other model input or output) is appropriate. EPA finds that the temporally varying approach was acceptable and consistent with the Modeling TAD, but EPA finds that the state's 38% reduction of background concentrations is an inappropriate adjustment.

*Summary of Modeling Results*

The AERMOD modeling parameters, as supplied by additional information from the state during the comment period for the Gavin area of analysis are summarized below in Table 3.

Table 3: AERMOD Modeling Parameters for the Gallia County, Ohio Area of Analysis

| Gallia County, Ohio Area of Analysis | |
|---|---|
| AERMOD Version | 15181 |
| Dispersion Characteristics | Rural |

---

[4] The conversion factor for $SO_2$ (at the standard conditions applied in the ambient $SO_2$ reference method) is 1 ppb = approximately 2.62 $\mu g/m^3$.

17

| Modeled Sources | 2 |
|---|---|
| Modeled Stacks | 4 |
| Modeled Structures | 47 |
| Modeled Fencelines | 2 |
| Total receptors | 34,225 |
| Emissions Type | Actual hourly |
| Emissions Years | 2012-2014 |
| Meteorology Years | 2012-2014 |
| Surface Meteorology Station | Huntington, WV |
| Upper Air Meteorology Station | Pittsburgh, PA |
| Methodology for Calculating Background $SO_2$ Concentration | Temporally Varying |
| Calculated Background $SO_2$ Concentration | 1 to 8.65 ppb |

The results presented below in Table 4 show the magnitude and geographic location of the highest predicted modeled concentration based on actual emissions.

Table 4: Maximum Predicted 99th Percentile 1-Hour $SO_2$ Concentration in the Gallia County, Ohio Area of Analysis Based on Actual Emissions

| | | Receptor Location | | $SO_2$ Concentration ($\mu g/m^3$) | |
|---|---|---|---|---|---|
| Averaging Period | Data Period | UTM/Latitude | UTM/Longitude | Modeled (including background) | NAAQS |
| 99th Percentile 1-Hour Average | 2012-2014 | 401500.00 | 4306200.00 | 195.4 | 196.4* |

*Equivalent to the 2010 $SO_2$ NAAQS set at 75 ppb

The State's modeling indicates that the highest predicted 3-year average 99th percentile 1-hour average concentration within the chosen modeling domain is 195.4 $\mu g/m^3$, or 74.6 ppb. This modeled concentration included the background concentration of $SO_2$, and is based on actual emissions from the facilities. Figure 4 below was included as part of Ohio's submission and indicates that the predicted value occurred about 2,000 meters south-southwest of the Kyger Creek stacks.

Ohio did not provide an assessment of concentrations without the 38% bias adjustment on background concentrations. Since Ohio applied variable background concentrations, the impact of the adjustment would depend on the background concentrations at the critical times for which the estimated concentrations factored into the determination of the 99th percentile maximum daily concentration. While Ohio's estimated concentration is only about 0.4 ppb below the standard, the information provided by Ohio does not clearly indicate whether use of an unadjusted set of background concentrations would have shown violations of the standard. Similarly, Ohio did not provide evidence as to the degree to which the lower emissions in 2013 to 2015 as compared to 2012 to 2014 affected concentrations. Therefore, EPA cannot fully

18

determine on the basis of its review of the modeling demonstration submitted by Ohio whether the Gallia County area is showing attainment of the 1-hour primary NAAQS.

Figure 4: Maximum Predicted 99th Percentile 1-Hour $SO_2$ Concentrations in the Gallia County, Ohio Area of Analysis Based on Actual Emissions



Copyrighted map removed

*Additional Modeling by Sierra Club*

On March 29, 2016, the Sierra Club submitted a new modeling analysis for the area surrounding Gavin. This analysis indicated a violation of the NAAQS. Upon closer examination of emissions data utilized by Sierra Club, the EPA finds that the emissions inventory overestimates actual emissions for both facilities. Table 5 shows a comparison among the emission values available on the CAMD web site, the emission values used by Sierra Club, and the emission values used by Ohio, showing annual average emission rates for the 2012 to 2014 period. This table shows that Sierra Club used emission values that added up to more than the values reported to CAMD.

Table 5. Emission rates modeled by Sierra Club and Ohio compared to emission data reported to CAMD (average tons/year for 2012 to 2014)

| Facility | CAMD value | Sierra Club value | Ohio value |
|----------|------------|-------------------|------------|
| Gavin    | 31,998     | 32,012            | 28,048     |

19

| Kyger Creek | 9,390 | 9,442 | 9,133 |

In addition, Sierra Club substituted questionable emission rates for 955 data points that were originally blank in the CAMD data set, and also inserted emission rates for 1,700 data points that were found to be zero in the CAMD data set. Given that Sierra Club claimed to use CAMD emissions data, these unexplained data insertions and discrepancies in the Sierra Club emissions input file make the data questionable. Since the modeled concentrations are a function of the particular emission rates during the hours that have meteorology conducive to high concentrations, errors in the emission values for particular hours can have significant effects on the estimated design value. The EPA finds that Sierra Club's unexplained deviations from the original CAMD data make Sierra Club's modeling analysis less reliable and transparent.

Sierra Club's modeling used a fixed background concentration of 10 ppb, matching the value that Ohio used in the modeling Ohio did in support of its original recommendations for this area. As noted above, Ohio's reassessment of background concentrations led to a conclusion the use of variable background concentrations would result in more refined modeled concentrations. Without the 38% bias adjustment, Ohio found background concentrations to range from 1.61 to 13.95 ppb. Given the wide range of background concentrations that vary by season and time of day, the background concentration used by Sierra Club appears to be unnecessarily conservative for most hours and less representative of realistic background conditions.

These concerns about the modeled emission rates, along with the conservatism of the background value, have the potential to cause significant misrepresentations of the impacts of these sources. As a result, EPA does not consider the Sierra Club's modeling to provide a reliable assessment of whether the area is violating the NAAQS. As noted above, EPA also does not consider Ohio's analysis to be a reliable assessment of concentrations in the area. Since the issues EPA identifies in the two analyses are different, the Sierra Club analysis does not provide a reliable indication, even in combination with the state's analysis, as to whether the area is attaining the NAAQS.

Sierra Club modeled both 2012 to 2014 and 2013 to 2015, finding design values of 267 and 265 $\mu g/m^3$, respectively. This slight decline in design values from the 2012 to 2014 period to the 2013 to 2015 period is consistent with the slight decline in emissions from the one period to the other. This evidence reinforces the conclusion that EPA has insufficient evidence to determine the net effects that removing the background bias adjustment and using more recent emissions would have on estimated concentrations in the area.

### *Jurisdictional Boundaries*

Existing jurisdictional boundaries are considered for the purpose of informing our final unclassifiable area, specifically with respect to clearly defined legal boundaries. The EPA did not receive any comments regarding the intended boundaries for this area.

The EPA finds that our final unclassifiable area, consisting of all of Gallia County and the western half of Meigs County, which includes Bedford, Columbia, Rutland, Salem, Salisbury,

and Scipio Townships, are comprised of clearly defined legal boundaries, and we find these boundaries to be a suitably clear basis for defining our final unclassifiable area.

<u>Conclusion</u>

After careful evaluation of the state's recommendation, all timely comments and information received during the state and public comment period, and additional relevant information as discussed in this document, the EPA finds that the area around Gavin and Kyger Creek cannot be classified on the basis of available information as meeting or not meeting the 2010 $SO_2$ NAAQS, and therefore is designating the area as unclassifiable for the 2010 $SO_2$ NAAQS. Specifically, the area is comprised of all of Gallia County and the western half of Meigs County, which includes Bedford, Columbia, Rutland, Salem, Salisbury, and Scipio Townships.

The EPA has determined that the state's April 19, 2016, modeling analysis does not provide a reliable assessment of whether the area is attaining the NAAQS. Specifically, the EPA does not find the state's derivation of its final temporally varying background concentrations to be technically justifiable, and the available evidence does not conclusively indicate whether correction of the background concentrations, to remove the bias adjustment, as well as consideration of declines in emissions, would lead to identification of violations. The EPA has also determined that evidence of nonattainment demonstrated by Sierra Club is questionable due to its mischaracterized and overestimated emission input values, in addition to its generally overstated background inputs. Therefore, the EPA finds that a reliable basis does not exist after considering available information for designating the area either as attainment or nonattainment. Instead, after careful evaluation of available relevant information, the EPA designates Gallia County and Bedford, Columbia, Rutland, Salem, Salisbury, and Scipio Townships in Meigs County as unclassifiable for the 2010 $SO_2$ NAAQS.

At this time, our final designations for the state only apply to this area and the others contained in this final technical support document. Consistent with the court-ordered schedule, the EPA will evaluate and designate all remaining undesignated areas in Ohio by either December 31, 2017, or December 31, 2020.

21

**Tab 410: Final Technical Support Document for Arkansas Area Designation for the 2010 SO2 Primary National Ambient Air Quality Standard (June 30, 2016)**

**Final Technical Support Document**

Arkansas
Area Designations for the 2010 SO$_2$ Primary National Ambient Air Quality Standard

Summary

Pursuant to section 107(d) of the Clean Air Act (CAA), the U.S. Environmental Protection Agency (EPA, or the Agency) must designate areas as either "unclassifiable," "attainment," or "nonattainment" for the 2010 1-hour sulfur dioxide (SO$_2$) primary national ambient air quality standard (NAAQS). Section 107(d) of the CAA defines a nonattainment area as one that does not meet the NAAQS or that contributes to a NAAQS violation in a nearby area, an attainment area as any area other than a nonattainment area that meets the NAAQS, and an unclassifiable area as any area that cannot be classified on the basis of available information as meeting or not meeting the NAAQS.

July 2, 2016, is the deadline established by the U.S. District Court for the Northern District of California for the EPA to designate certain areas. This deadline is the first of three deadlines established by the court for the EPA to complete area designations for the 2010 SO$_2$ NAAQS. This deadline applies to certain areas in Arkansas because two emission sources meet the conditions of the court's order.

Arkansas submitted updated recommendations on September 11, 2015. Table 1 below lists Arkansas's recommendations and identifies the county/counties in Arkansas that the EPA is designating in order to meet the July 2, 2016 court-ordered deadline. These final designations are based on an assessment and characterization of air quality through ambient air quality data, air dispersion modeling, other evidence and supporting information, or a combination of the above.

**Table 1 – Arkansas's Recommended and the EPA's Final Designations**

| Area | State's Recommended Area Definition | State's Recommended Designation | EPA's Final Area Definition | EPA's Final Designation |
|---|---|---|---|---|
| Independence County, Arkansas | Independence County | Unclassifiable/ Attainment | Same as State's Recommendation (Independence County, AR) | Unclassifiable |
| Jefferson County, Arkansas | Jefferson County | Unclassifiable/ Attainment | Same as State's Recommendation (Jefferson County, AR) | Same as State's Recommendation |

Background

On June 3, 2010, the EPA revised the primary (health based) SO$_2$ NAAQS by establishing a new 1-hour standard at a level of 75 parts per billion (ppb) which is met an air quality monitoring site when the 3-year average of the 99th percentile of 1-hour daily maximum concentrations does not

1

exceed 75 ppb. This NAAQS was published in the *Federal Register* on June 22, 2010 (75 FR 35520), and is codified at 40 CFR 50.17. The EPA determined this is the level necessary to protect public health with an adequate margin of safety, especially for children, the elderly, and those with asthma. These groups are particularly susceptible to the health effects associated with breathing $SO_2$. The two prior primary standards of 140 ppb evaluated over 24 hours, and 30 ppb evaluated over an entire year, codified at 40 CFR 50.4, remain applicable.[1] However, the EPA is not currently designating areas on the basis of either of these two primary standards. Similarly, the secondary standard for $SO_2$, set at 500 ppb evaluated over 3 hours, codified at 40 CFR 50.5, has not been revised, and the EPA is also not currently designating areas on the basis of the secondary standard.

### General Approach and Schedule

Section 107(d) of the CAA requires that not later than 1 year after promulgation of a new or revised NAAQS, state governors must submit their recommendations for designations and boundaries to EPA. Section 107(d) also requires the EPA to provide notification to states no less than 120 days prior to promulgating an initial area designation that is a modification of a state's recommendation. If a state does not submit designation recommendations, the EPA may promulgate the designations that it deems appropriate without prior notification to the state, although it is our intention to provide such notification when possible. If a state or tribe disagrees with the EPA's intended designations, it is given an opportunity within the 120-day period to demonstrate why any proposed modification is inappropriate. The EPA is required to complete designations within 2 years after promulgation of a new or revised NAAQS, unless EPA determines that sufficient information is not available, in which case the deadline is extended to 3 years. The 3-year deadline for the revised $SO_2$ NAAQS was June 2, 2013.

On August 5, 2013, the EPA published a final rule establishing air quality designations for 29 areas in the United States for the 2010 $SO_2$ NAAQS, based on recorded air quality monitoring data from 2009 - 2011 showing violations of the NAAQS (78 FR 47191). In that rulemaking, the EPA committed to address, in separate future actions, the designations for all other areas for which the Agency was not yet prepared to issue designations.

Following the initial August 5, 2013, designations, three lawsuits were filed against the EPA in different U.S. District Courts, alleging the Agency had failed to perform a nondiscretionary duty under the CAA by not designating all portions of the country by the June 2, 2013 deadline. In an effort intended to resolve the litigation in one of those cases, plaintiffs Sierra Club and the Natural Resources Defense Council and the EPA filed a proposed consent decree with the U.S. District Court for the Northern District of California. On March 2, 2015, the court entered the consent decree and issued an enforceable order for the EPA to complete the area designations according to the court-ordered schedule.

---

[1] 40 CFR 50.4(e) provides that the two prior primary NAAQS will no longer apply to an area 1 year after its designation under the 2010 NAAQS, except that for areas designated nonattainment under the prior NAAQS as of August 22, 2010, and areas not meeting the requirements of a SIP Call under the prior NAAQS, the prior NAAQS will apply until that area submits and EPA approves a SIP providing for attainment of the 2010 NAAQS. No areas in Arkansas are subject to this clause.

2

According to the court-ordered schedule, the EPA must complete the remaining designations by three specific deadlines. By no later than July 2, 2016 (16 months from the court's order), the EPA must designate two groups of areas: (1) areas that have newly monitored violations of the 2010 $SO_2$ NAAQS and (2) areas that contain any stationary sources that had not been announced as of March 2, 2015, for retirement and that according to the EPA's Air Markets Database emitted in 2012 either (i) more than 16,000 tons of $SO_2$ or (ii) more than 2,600 tons of $SO_2$ with an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/MmBTU). Specifically, a stationary source with a coal-fired unit that as of January 1, 2010, had a capacity of over 5 megawatts and otherwise meets the emissions criteria, is excluded from the July 2, 2016, deadline if it had announced through a company public announcement, public utilities commission filing, consent decree, public legal settlement, final state or federal permit filing, or other similar means of communication, by March 2, 2015, that it will cease burning coal at that unit.

The last two deadlines for completing remaining designations are December 31, 2017, and December 31, 2020. The EPA has separately promulgated requirements for state and other air agencies to provide additional monitoring or modeling information on a timetable consistent with these designation deadlines. We expect this information to become available in time to help inform these subsequent designations. These requirements were promulgated on August 21, 2015 (80 FR 51052), in a rule known as the $SO_2$ Data Requirements Rule (DRR), codified at 40 CFR part 51 subpart BB.

Updated designations guidance was issued by the EPA through a March 20, 2015 memorandum from Stephen D. Page, Director, U.S. EPA, Office of Air Quality Planning and Standards, to Air Division Directors, U.S. EPA Regions 1-10. This memorandum supersedes earlier designation guidance for the 2010 $SO_2$ NAAQS, issued on March 24, 2011, and it identifies factors that the EPA intends to evaluate in determining whether areas are in violation of the 2010 $SO_2$ NAAQS. The guidance also contains the factors the EPA intends to evaluate in determining the boundaries for all remaining areas in the country, consistent with the court's order and schedule. These factors include: 1) Air quality characterization via ambient monitoring or dispersion modeling results; 2) Emissions-related data; 3) Meteorology; 4) Geography and topography; and 5) Jurisdictional boundaries. This guidance was supplemented by two non-binding technical assistance documents intended to assist states and other interested parties in their efforts to characterize air quality through air dispersion modeling or ambient air quality monitoring for sources that emit $SO_2$. Notably, the EPA's documents titled, "$SO_2$ NAAQS Designations Modeling Technical Assistance Document" (Modeling TAD) and "$SO_2$ NAAQS Designations Source-Oriented Monitoring Technical Assistance Document" (Monitoring TAD), were available to states and other interested parties. Both of these TADs were most recently updated in February 2016.

Based on complete, quality assured and certified ambient air quality data collected between 2013 and 2015, no violations of the 2010 $SO_2$ NAAQS have been recorded at ambient air quality monitors in any undesignated part of Arkansas. However, there are 2 sources in the state meeting the emissions criteria of the consent decree for which the EPA must complete designations by July 2, 2016. In this final technical support document, the EPA discusses its review and technical

3

analysis of Arkansas's updated recommendations for the areas that we must designate. The EPA also discusses any intended and final modifications from the State's recommendation based on all available data before us.

The following are definitions of important terms used in this document:

1) 2010 SO$_2$ NAAQS – the primary NAAQS for SO$_2$ promulgated in 2010. This NAAQS is 75 ppb, based on the 3-year average of the 99th percentile of the annual distribution of daily maximum 1-hour average concentrations. See 40 CFR 50.17.

2) Attaining monitor – an ambient air monitor meeting all methods, quality assurance, and siting criteria and requirements whose valid design value is equal to or less than 75 ppb, based on data analysis conducted in accordance with Appendix T of 40 CFR part 50.

3) Design Value – a statistic computed according to the data handling procedures of the NAAQS (in 40 CFR part 50 Appendix T) that, by comparison to the level of the NAAQS, indicates whether the area is violating the NAAQS.

4) Designated nonattainment area – an area which the EPA has determined has violated the 2010 SO$_2$ NAAQS or contributed to a violation in a nearby area. A nonattainment designation reflects considerations of the state's recommendations and all of the information discussed in this document. The EPA's decision is based on all available information including the most recent 3 years of air quality monitoring data, available modeling analyses, and any other relevant information.

5) Designated unclassifiable area – an area for which the EPA cannot determine based on all available information whether or not it meets the 2010 SO$_2$ NAAQS.

6) Designated unclassifiable/attainment area – an area which the EPA has determined to have sufficient evidence to find either is attaining or is likely to be attaining the NAAQS. The EPA's decision is based on all available information including the most recent 3 years of air quality monitoring data, available modeling analyses, and any other relevant information.

7) Modeled violation – a violation based on air dispersion modeling.

8) Recommended attainment area – an area a state or tribe has recommended that the EPA designate as attainment.

9) Recommended nonattainment area – an area a state or tribe has recommended that the EPA designate as nonattainment.

10) Recommended unclassifiable area – an area a state or tribe has recommended that the EPA designate as unclassifiable.

11) Recommended unclassifiable/attainment area – an area a state or tribe has recommended that the EPA designate as unclassifiable/attainment.

12) Violating monitor – an ambient air monitor meeting all methods, quality assurance, and siting criteria and requirements whose valid design value exceeds 75 ppb, based on data analysis conducted in accordance with Appendix T of 40 CFR part 50.

4

## Technical Analysis for Independence County, Arkansas

Introduction

The Independence County, Arkansas, area contains a stationary source that, according to the EPA's Air Markets Database, emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU). Specifically, in 2012, the Independence Steam Electric Station (Independence Station) emitted 32,974 tons of $SO_2$ and had an emissions rate of 0.59 lbs $SO_2$/mmBTU. As of March 2, 2015, this stationary source had not met the specific criteria for being "announced for retirement." Pursuant to the March 2, 2015, court-ordered schedule, the EPA must designate the area surrounding this facility by July 2, 2016.

In its September 11, 2015, submission, Arkansas recommended that the area surrounding the Independence Station, specifically the entirety of Independence County, be designated as unclassifiable/attainment based on an assessment and characterization of air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. This assessment and characterization was performed using air dispersion modeling software, i.e., AERMOD, analyzing actual emissions.

On February 11, 2016, the EPA notified Arkansas that we intended to designate the Independence County, Arkansas area as unclassifiable, based on our view that available information did not support a determination of whether the area was meeting or not meeting the 2010 $SO_2$ NAAQS. Additionally, we informed Arkansas that our intended boundaries for the unclassifiable area consisted of Independence County in its entirety. Our intended designation and associated boundaries were based on, among other things, the EPA's evaluation of the State's air dispersion modeling analysis, as well as the additional modeling analysis submitted by Sierra Club for the area surrounding Independence Station. The initial modeling provided by the State did not include emissions from sources near Independence Station, which may have an impact on air quality. Specifically, the State did not include emissions from Future Fuels. As discussed in our intended designation action, we cannot assume that impacts from this facility are captured fully in the temporally varying background concentration included in the State's modeling. The EPA also received additional modeling prior to our intended designation from Sierra Club that did include Future Fuels showing large impacts from that facility in Independence County, which supports the need for a more comprehensive emissions profile for the area to account for potential maximum impacts in Independence County. Sierra Club's modeling for the area around Independence Station asserting violations of the NAAQS, which included emissions from Future Fuels, was premised on several factors that are inconsistent with refinements provided for in the Modeling TAD. For example, Sierra Club did not include variable stack velocity and temperature for the Independence Station stacks. Additionally, the Sierra Club modeling characterized emissions from the Future Fuels facility utilized actual annualized emissions from the 2012 State Emissions Inventory.  Lastly, while the State provided a response to Sierra Club's modeling, which we factored into our intended designation, the EPA has determined that the lack of a comprehensive emissions profile for the area—including emissions from Future Fuels—caused EPA in the intended designation to state that it could not sufficiently characterize the air quality in Independence County and therefore intended to designate the area as unclassifiable. The boundaries for this intended designation were the

5

jurisdictional boundaries of Independence County, which were based upon the State's recommendation and their submitted analysis and our concurrence on their reasoning.

Detailed rationale, analyses, and other information supporting our intended designation for this area can be found in the preliminary technical support document for Arkansas. This document along with all others related to this rulemaking can be found in Docket ID EPA-HQ-OAR-2014-0464.

Assessment of New Information

In our February 11, 2016, notification to Arkansas regarding our intended unclassifiable designation for the Independence County, Arkansas area, the EPA requested that any additional information that the Agency should consider prior to finalizing the designation should be submitted by April 19, 2016. On March 1, 2016, the EPA also published a notice of availability and public comment period in the *Federal Register,* inviting the public to review and provide input on our intended designations by March 31, 2016 (81 FR 10563).

The EPA is explicitly incorporating and relying upon the analyses and information presented in the preliminary technical support document for the purposes of our final designation for this area, except to the extent that any new information submitted to the EPA or conclusions presented in this final technical support document and our response to comments document (RTC), available in the docket, supersede those found in the preliminary document.

As detailed further below, after carefully considering all available data and information, the EPA is designating the Independence County, Arkansas area as unclassifiable for the 2010 $SO_2$ NAAQS, because based on available information the area cannot be classified as meeting or not meeting the NAAQS. The boundaries for this unclassifiable area consist of Independence County in its entirety and are shown in the figure below. Also included in the figure are nearby emitters of $SO_2$ and Arkansas's recommended area.

6

Figure 1: The EPA's final unclassifiable area: Independence County, Arkansas



The EPA received substantive comments regarding our intended unclassifiable designation for the Independence County, Arkansas area. A comprehensive summary of these comments and our responses can be found in the RTC.

*Jurisdictional Boundaries:*

Existing jurisdictional boundaries are considered for the purpose of informing our final unclassifiable area, specifically with respect to clearly defined legal boundaries. The EPA did not receive any comments regarding the intended boundaries for this area.

The EPA believes that our final unclassifiable area, consisting of Independence County, Arkansas in its entirety, is comprised of clearly defined legal boundaries, and we find these boundaries to be a suitably clear basis for defining our final unclassifiable area.

<u>Conclusion</u>

7

After careful evaluation of the State's recommendation, all timely comments and information received during the state and public comment period, and additional relevant information as discussed in this document, the EPA finds that, based on available information, the EPA cannot determine whether the area around the Independence Station is meeting or not meeting the NAAQS, and is designating that area unclassifiable for the 2010 $SO_2$ NAAQS. Specifically, the area is comprised of Independence County, Arkansas, in its entirety.

The comments received from industry during the public comment period indicate that the Arkansas Department of Environmental Quality (ADEQ) is preparing additional modeling and supporting information to address the EPA's concerns that the modeling previously submitted by the State did not establish a comprehensive emissions impact profile for the Independence County, Arkansas, area's air quality. EPA has received a proposed modeling protocol from ADEQ describing the proposed approach for the additional modeling. However, the EPA has not received a complete modeling analysis with a comprehensive emissions profile at this time. Therefore, based on the information currently available, the EPA has determined that the area cannot be classified on the basis of available information as meeting or not meeting the NAAQS, and is finalizing our designation of Independence County as unclassifiable.

At this time, our final designations for the State only apply to this area and the others contained in this final technical support document. Consistent with the court-ordered schedule, the EPA will evaluate and designate all remaining undesignated areas in Arkansas by either December 31, 2017, or December 31, 2020.

8

## Technical Analysis for Jefferson County, Arkansas

<u>Introduction</u>

The Jefferson County, Arkansas, area contains a stationary source that, according to the EPA's Air Markets Database, emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU). Specifically, in 2012, the White Bluff Steam Electric Station (White Bluff Station) emitted 31,687 tons of $SO_2$ and had an emissions rate of 0.59 lbs $SO_2$/mmBTU. As of March 2, 2015, this stationary source had not met the criteria for being "announced for retirement." Pursuant to the March 2, 2015, court-ordered schedule, the EPA must designate the area surrounding this facility by July 2, 2016.

In its September 11, 2015, submission, Arkansas recommended that the area surrounding White Bluff Station, specifically the entirety of Jefferson County, be designated as unclassifiable/attainment, attainment based on an assessment and characterization of air quality from the facility and other nearby sources which may have a potential impact in the area of analysis where maximum concentrations of $SO_2$ are expected. This assessment and characterization was performed using air dispersion modeling software, i.e., AERMOD, analyzing actual emissions.

On February 11, 2016, the EPA notified Arkansas that we intended to designate the Jefferson County, Arkansas area as unclassifiable/attainment, based on our view that the area was meeting the NAAQS. Additionally, we informed Arkansas that our intended boundaries for the unclassifiable/attainment area consisted of Jefferson County in its entirety. Our intended designation and associated boundaries were based on, among other things, our evaluation of the State's modeling that showed attainment concluded that the modeling generally followed EPA guidance, including the Modeling TAD.

Detailed rationale, analyses, and other information supporting our intended designation for this area can be found in the preliminary technical support document for Arkansas. This document along with all others related to this rulemaking can be found in Docket ID EPA-HQ-OAR-2014-0464.

<u>Assessment of New Information</u>

In our February 11, 2016, notification to Arkansas regarding our intended unclassifiable/attainment designation for the Jefferson County, Arkansas, area, the EPA requested that any additional information that the Agency should consider prior to finalizing the designation should be submitted by April 19, 2016. On March 1, 2016, the EPA also published a notice of availability and public comment period in the *Federal Register,* inviting the public to review and provide input on our intended designations by March 31, 2016 (81 FR 10563).

9

The EPA is explicitly incorporating and relying upon the analyses and information presented in the preliminary technical support document for the purposes of our final designation for this area, except to the extent that any new information submitted to the EPA or conclusions presented in this final technical support document, the comments received, and our response to comments document (RTC), available in the docket, supersede those found in the preliminary document.

Subsequent to our February 11, 2016, notification, the EPA received comments from industry supporting our intended designation for the area, and we did not receive any additional comments from the public or from Arkansas. A summary of the comments and our responses can be found in the RTC.

<u>Conclusion</u>

The EPA concludes that Jefferson County, Arkansas is meeting the 2010 primary $SO_2$ primary NAAQS. Therefore, EPA is designating Jefferson County, Arkansas, as unclassifiable/attainment for the $SO_2$ NAAQS. This is based on the information available to the EPA at this time, including the analyses performed for the purposes of the preliminary technical support document, and in the absence of any new information that would otherwise lead to a different conclusion regarding air quality in the area or any new information that would otherwise lead to a different conclusion regarding the area boundaries. The boundaries for this unclassifiable/attainment area consist of the entirety of Jefferson County, Arkansas and are shown in the figure below. Also included in the figure are nearby emitters of $SO_2$.

10

Figure 1: The EPA's Final Unclassifiable/Attainment Area: Jefferson County, Arkansas



At this time, our final designations for the State only apply to this area and the other contained in this final technical support document. Consistent with the court-ordered schedule, the EPA will evaluate and designate all remaining undesignated areas in Arkansas by either December 31, 2017, or December 31, 2020.

11

**Tab 420: Sierra Club Modeling Comments (Mar. 31, 2016)**

RECEIVED

MAR 3 1 2016

EPA DOCKET CENTER

 **SIERRA CLUB**

RECEIVED

MAR 3 1 2016

EPA DOCKET CENTER

March 31, 2016

Ms. Amparo Castillo
OECA/OEI/ORD Docket Manager
OAR/OW Assistant Docket Manager
EPA Docket Center
EPA West Building, Room 3334
1301 Constitution Ave. NW
Washington, DC 20004

Rhea Jones
U.S. EPA
Office of Air Quality Planning and Standards
Air Quality Planning Division, C539-04
Research Triangle Park, NC 27711
Tel.: (919) 541-2940
jones.rhea@epa.gov

Re:    Comments on EPA Responses to Certain State Designation Recommendations for the
       2010 Sulfur Dioxide National Ambient Air Quality Standard, Docket ID No. EPA–HQ–
       OAR–2014–0464

The Sierra Club appreciates this opportunity to comment on the proposed area designations EPA
has set forward in the Agency's Responses to Certain State Designation Recommendations for
the 2010 Sulfur Dioxide National Ambient Air Quality Standard (the "Proposed Designations").[1]
Sierra Club commends EPA for moving forward with implementation of the extremely beneficial
to public health sulfur dioxide ("$SO_2$") National Ambient Air Quality Standard ("NAAQS"), and
agree wholeheartedly with the modeling-focused approach EPA has taken in preparing the
Proposed Designations. Specifically, Sierra Club notes the following:

-    Aerial dispersion modeling is the appropriate approach to ascertaining attainment status
     under the $SO_2$ NAAQS;
-    Designations modeling must include not just the Consent Decree sources, but also those
     other large sources within the modeling domain;

---

[1] As noted in the announcement of the public comment period on the Proposed Designation, EPA
will accept public comments through at least March 31, 2016. *See* 80 Fed. Reg. 10,563 (March
1, 2016). Accordingly, these comments are timely.

POSTMARKED

MAR 3 1 2016

EPA DOCKET CENTER

1

App. 1138

- EPA properly considered third-party modeling and should continue doing so in finalizing designations;
- The so-called "Beta Options" decrease model performance, and should not be relied on by EPA;
- Flagpole receptors are part of the regulatory default AERMOD configuration, and their use can only make modeling results more relevant; and,
- Modeling-based designations are ideal for swift SIP and FIP development to prevent further delays in NAAQS implementation.

Commenters also include materials intended to supplement the materials and data upon which EPA made its Proposed Designations. Such materials along with state-specific comments are included as separate Appendixes as detailed below:

- Appendix A – Colorado
- Appendix B – Maryland
- Appendix C – Missouri
- Appendix D – Ohio
- Appendix E – Indiana
- Appendix F – Louisiana
- Appendix G – Michigan
- Appendix H – Oklahoma
- Appendix I – Texas

Exhibits for each Appendix, including additional modeling reports and modeling files, are included as nested Exhibits to the corresponding Appendix. A copy of these comments, along with relevant state-specific materials, is simultaneously being sent to the appropriate EPA regional contacts.

**Factual and Regulatory Background**

A.     Sulfur Dioxide and the SO$_2$ NAAQS

Exposure to SO$_2$ in even very short time periods—such as five minutes—has significant health impacts and causes decrements in lung function, aggravation of asthma, and respiratory and cardiovascular morbidity. *See* Envtl. Prot. Agency, EPA/600/R-08/047F, *Integrated Science Assessment for Sulfur Oxides—Health Criteria* ch. 5 tbls. 5-1, 5-2 (2008), *available at* http://ofmpub.epa.gov/eims/eimscomm.getfile?p_download _id=491274; Final Rule, 75 Fed. Reg. at 35,525 (June 22, 2010); *see also* EPA, *Our Nation's Air: Status and Trends Through 2008* 4 (2010) (noting that the health effects of sulfur dioxide exposure include aggravation of asthma and chest tightness), *available at* http://www.epa.gov/airtrends/2010/report/fullreport.pdf. EPA has determined that SO$_2$ exposure can also aggravate existing heart disease, leading to increased hospitalizations and premature deaths. EPA, *Sulfur Dioxide - Health*, *available at* http://www.epa.gov/oaqps001/sulfurdioxide/health.html. Further, short-term SO$_2$ exposure is especially risky for children with asthma. *See* Final Rule, 75 Fed. Reg. at 35,525.

2

To address these significant health threats, on June 3, 2010, EPA issued a new $SO_2$ NAAQS standard, recognizing that the prior 24-hour and annual $SO_2$ standards did not adequately protect the public against adverse respiratory effects associated with short-term (5 minutes to 24 hours) $SO_2$ exposure. The new 2010 $SO_2$ NAAQS standard is a 1-hour standard set at 75 ppb, or approximately 196 micrograms per cubic meter. 40 C.F.R. § 50.17(a). The new standard was established in the form of the 99th percentile of the annual distribution of the daily maximum 1-hour average concentrations. *Id.* at § 50.17(b).

Due to both the shorter averaging time and the numerical difference, the new 1-hour $SO_2$ NAAQS is far more protective of human health than the prior $SO_2$ NAAQS and promises huge health benefits. <u>EPA has estimated that 2,300-5,900 premature deaths and 54,000 asthma attacks a year will be prevented by the new standard.</u> Envtl. Prot. Agency, *Final Regulatory Impact Analysis (RIA) for the $SO_2$ National Ambient Air Quality Standards (NAAQS) tbl. 5.14* (2010), *available at* http://www.epa.gov/ttnecas1/regdata/ RIAs/fso2ria100602full.pdf.

Accordingly, each year of delay in fully implementing the $SO_2$ NAAQS means as many as 5,900 people will die prematurely and 54,000 asthma attacks will occur unnecessarily. Each year of delay will likewise drive up the medical costs that individuals will have to pay, and will be another year in which people must abstain from everyday activities such as exercise, school, and work. EPA estimated that the <u>net</u> benefit of implementing the 75 ppb $SO_2$ NAAQS was up to $36 billion dollars. 75 Fed. Reg. 35,520, 35,588 (June 22, 2010).

B.     <u>Nearly All $SO_2$ Pollution Comes from a Handful of Large Coal-Fired Sources</u>

Sulfur dioxide is somewhat unique as a criteria pollutant in that the vast majority of all $SO_2$ emitted in the United States comes from large industrial sources that combust coal. In fact, according to the 2011 National Emissions Inventory ("NEI"), fully 91% of all U.S. $SO_2$ emissions come from coal-fired sources.[2]

---

[2] 2011 is the most recent year for which data is available. *See* U.S. EPA, 2011 National Emissions Inventory (NEI) Data, *at* https://www.epa.gov/air-emissions-inventories/2011-national-emissions-inventory-nei-data.

3

*Figure 1: U.S. SO₂ Emissions by Source*



Of that total, the overwhelming majority are coal-fired power plants for which continuous emissions monitoring systems ("CEMS") for $SO_2$ are already in place, dramatically simplifying the task of evaluating emissions impacts on ambient air quality for the short-term 1-hour $SO_2$ NAAQS.

Numerically, this is a small group. In the 2011 NEI, there were only 456 sources that emitted more than 2,000 tons of $SO_2$; collectively, this group was responsible for 5.2 million of the 6.4 million total tons of $SO_2$ emitted, or about 82%.[3] This number of sources has likely come down since 2011. As part of implementing EPA's Data Requirements Rule, states submitted information to EPA in January of 2016 concerning all sources that emitted more than 2000 tons of $SO_2$ per year; the collective list of sources generated thereby is fewer than 350.[4]

Indeed, fully nine sources of the top 25 emitters from the 2011 NEI are included as part of the 2016 proposed designations: Georgia's Plant Scherer, Michigan's St. Clair/Belle River and Monroe power plants, Missouri's Labadie plant, North Dakota's Leland Olds Station, and Texas's Martin Lake, Big Brown, Monticello, and W.A. Parish plants.

As described in more detail below, because nearly all the $SO_2$ emitted in the U.S. comes from this relatively small number of large, readily-characterized sources, source-oriented aerial dispersion modeling is an ideal approach to addressing area attainment designations.

---

[3] *Id.* Indeed, the top ten sources emitted fully 13% of all U.S. $SO_2$ pollution.

[4] *See* U.S. EPA, $SO_2$ Data Requirements Rule Implementation Information, *at* https://www3.epa.gov/airquality/sulfurdioxide/drr.html.

4

C.    Implementation of the SO₂ NAAQS

The promulgation of a national ambient air quality standard triggers mandatory statutory timetables for "designating" all areas of the country based on whether they comply with the new or revised standard.  Within one year of promulgation of a new or revised air quality standard, the governor of each state must submit to EPA a list of recommended designations for all areas (or portions thereof) in the state as nonattainment, attainment, or unclassifiable for that standard. 42 U.S.C. § 7407(d)(1)(A).  The Clean Air Act defines a nonattainment area as "any area that does not meet (or that contributes to ambient air quality in a nearby area that does not meet) the [NAAQS] for the pollutant."  *Id.* § 7407(d)(1)(A)(i).  An attainment area is "any area . . . that meets the [NAAQS] for the pollutant."  *Id.* § 7407(d)(1)(A)(ii).  An unclassifiable area is "any area that cannot be classified on the basis of available information as meeting or not meeting the [NAAQS] for the pollutant."  *Id.* § 7407(d)(1)(A)(iii).

EPA must then promulgate final designations for all areas in each state "as expeditiously as practicable, but in no case later than 2 years from the date of promulgation of the new or revised [NAAQS]."  *Id.*  § 7407(d)(1)(B)(i).  If the governor of a state "fails to submit the list" of designations in whole or in part, EPA is required to promulgate the designation that it deems appropriate for any area (or portion thereof) not designated by the state.  *Id.* § 7407(d)(1)(B)(ii). EPA may extend the two-year deadline by up to one year "in the event the Administrator has insufficient information to promulgate the designations."  *Id.* § 7407(d)(1)(B)(i).  Thus, at the outside, EPA must promulgate designations for all areas of every state within three years after the promulgation of a new or revised national ambient air quality standard.  *Id.*  EPA must publish notice in the Federal Register promulgating those designations.  42 U.S.C. § 7407(d)(2)(A).

In August of 2013, EPA issued a set of nonattainment designations for 29 areas in 16 states based on monitors reading design values above the SO₂ NAAQS.  *See* 78 Fed. Reg. 47,191 (Aug. 5, 2013) (effective October 4, 2013).  However, EPA declined to issue designations for the rest of the nation at that time.  Currently, EPA's completion of designations is governed by a Consent Decree entered by the United States District Court for the Northern District of California on March 2, 2015.[5]  According to that Consent Decree, EPA is to promulgate designations for areas containing sources meeting certain criteria by July 2, 2016.[6]  Remaining areas are to be designated by December 31 of 2017 and 2020, respectively.[7]

---

[5] *See* Consent Decree, Sierra Club v. McCarthy, 3:13-cv-03953-SI (N.D. Cal. March 2, 2015), *available at* 3:13-cv-03953-SI (hereinafter "Consent Decree").

[6] *Id.* ¶ 1.

[7] *Id.* ¶¶ 2-3.

5

**Substantive Comments**

    A.    <u>Aerial Dispersion Modeling Is the Appropriate Approach to Ascertaining Attainment Status under the $SO_2$ NAAQS</u>

As outlined by EPA in the Final $SO_2$ NAAQS Rule, 75 Fed. Reg. at 35,551, air dispersion modeling is the best method for evaluating the short-term impacts of large $SO_2$ sources. This is consistent with EPA's historic use of air dispersion modeling for multiple NAAQS implementation purposes, including for attainment designations.

EPA has historically used modeling in determining attainment for the $SO_2$ standard. *See e.g.*, U.S. EPA, *Implementation of the 1-Hour $SO_2$ NAAQS Draft White Paper for Discussion* at 3, fn. 1, [hereinafter "EPA White Paper"], *available at* http://www.epa.gov/airquality/sulfurdioxide/pdfs/20120522whitepaper.pdf; *see also* Respondent's Opposition to Motion of the State of North Dakota for a Stay of EPA's 1-Hour Sulfur Dioxide Ambient Standard Rule at 3, *National Environmental Development Association's Clean Air Project v. EPA* (D.C. Cir. 2010) (No. 10-1252), attached hereto as Exhibit 1 ("the Agency has historically relied on modeling to make designations for sulfur dioxide"). In fact, in EPA's 1994 $SO_2$ Guideline Document, EPA noted that "for $SO_2$ attainment demonstrations, monitoring data alone will generally not be adequate," U.S. EPA, 1994 $SO_2$ Guideline Document, [hereinafter "1994 $SO_2$ Guideline Document"], *available at* http://www.epa.gov/ttn/oarpg/t1/memoranda/so2_guide_092109.pdf, at 2-5, and that "[a]ttainment determinations for $SO_2$ will generally not rely on ambient monitoring data alone, but instead will be supported by an acceptable modeling analysis which quantifies that the SIP strategy is sound and that enforceable emission limits are responsible for attainment." *Id*. at 2-1. The 1994 $SO_2$ Guideline Document goes on to note that monitoring alone is likely to be inadequate: "[f]or $SO_2$, dispersion modeling will generally be necessary to evaluate comprehensively a source's impacts and to determine the areas of expected high concentrations based upon current conditions." *Id*. at 2-3.

Moreover, EPA's approval and acceptance of modeling for making attainment designations stretches back decades. In 1983, the Office of Air Quality Planning and Standards ("OAQPS") issued a CAA section 107 Designation Policy Summary. *See* Sheldon Meyers Memorandum re Section 107 Designation Policy Summary (April 21, 1983), attached hereto as Exhibit 2. OAQPS explained that "air quality modeling emissions data, etc., should be used to determine if the monitoring data accurately characterize the worst case air quality in the area." *Id*. at 1. Without modeling data, the worst-case air quality may not be accurately characterized. In certain instances, EPA relied solely on modeling data to determine nonattainment designations, thereby demonstrating that modeling is accepted and trustworthy. *Id*. at 2. In fact, reliance on modeling for nonattainment designations stretches back to the Carter Administration. In 1978, EPA designated Laurel, Montana as nonattainment "due to measured and modeled violations of the primary $SO_2$ standard." *Mont. Sulphur & Chem. Co.*, 666 F.3d at 1181 (citing 43 Fed. Reg. 8,962 (Mar. 3, 1978)).

EPA's Final 2010 $SO_2$ NAAQS rule simply built upon EPA's historical practice of using modeling to determine attainment and nonattainment status for $SO_2$ NAAQS. In doing so, EPA properly recognized the "strong source-oriented nature of $SO_2$ ambient impacts," Final $SO_2$

6

NAAQS Rule at 35,370, and concluded that the appropriate methodology for purposes of determining compliance, attainment, and nonattainment with the new NAAQS is modeling. *See id.* at 35,551 (describing dispersion modeling as "the most technically appropriate, efficient and readily available method for assessing short-term ambient $SO_2$ concentrations in areas with large point sources."). Accordingly, in promulgating the Final 2010 $SO_2$ NAAQS, EPA explained that, for the one-hour standard, "it is more appropriate and efficient to principally use modeling to assess compliance for medium to larger sources . . . ." *Id* at 35,570. Similarly, EPA then explained in the EPA White Paper that using modeling to determine attainment for the $SO_2$ standard "could better address several potentially problematic issues than would the narrower monitoring-focused approach discussed in the proposal for the $SO_2$ NAAQS, including the unique source-specific impacts of $SO_2$ emissions and the special challenges $SO_2$ emissions have historically presented in terms of monitoring short-term $SO_2$ levels for comparison with the NAAQS in many situations (75 FR 35550)." EPA White Paper at 3-4.

EPA's use of modeling in NAAQS implementation in general and attainment designations in specific is, additionally, court-validated.  For example, in *Montana Sulphur*, the company challenged a SIP call, a SIP disapproval, and a Federal Implementation Plan ("FIP") promulgation because they were premised on a modeling analysis that showed the Billings/Laurel, Montana area was in nonattainment for $SO_2$. 666 F.3d at 1184. The court rejected Montana Sulphur's argument that EPA's reliance on modeling was arbitrary and capricious or otherwise unlawful.  *Id.* at 1185; *see also Sierra Club v. Costle*, 657 F.2d 298, 332 (D.C. Cir. 1981) ("Realistically, computer modeling is a useful and often essential tool for performing the Herculean labors Congress imposed on EPA in the Clean Air Act"); *Republic Steel Corp. v. Costle*, 621 F.2d 797, 805 (6th Cir. 1980) (approving use of modeling to predict future violations and incorporating "worst-case" assumptions regarding weather and full-capacity operations of pollutant sources).  Further demonstrating the superiority of modeling, the D.C. Circuit has acknowledged the inherent problem of using monitored data for criteria pollutants, namely that "a monitor only measures air quality in its immediate vicinity."  *Catawba County v. EPA*, 571 F.3d 20, 30 (D.C. Cir. 2009).

Indeed, EPA employs and relies on modeling to inform its designations because the agency is well aware that modeling produces reliable results.  For example, as John C. Vimont, EPA Region 9's Regional Meteorologist, has stated under oath:

> EPA does recognize the usefulness of ambient measurements for information on background concentrations, provided reliable monitoring techniques are available. <u>EPA does not recommend, however, that ambient measurements be used as the sole basis of setting emission limitations or determining the ambient concentrations resulting from emissions from an industrial source. These should be based on an appropriate modeling analysis.</u>

Declaration of John C. Vimont at 1, 11 (emphasis added), attached hereto as Exhibit 3. Testimony as to the accuracy and appropriateness of modeling has also been presented by Roger Brode, a physical scientist in EPA's Air Quality Modeling Group who co-chairs the AMS/EPA Regulatory Model Improvement Committee and the AERMOD Implementation Workgroup.  *See* Declaration of Roger W. Brode at 1, 2, attached hereto as Exhibit 4.  Mr. Brode has stated under oath that AERMOD is "readily capable of accurately predicting whether the revised primary $SO_2$

7

NAAQS is attained and whether individual sources cause or contribute to a violation of the $SO_2$ NAAQS." *Id*. at 2.  Mr. Brode has explained:

> As part of the basis for EPA adopting the AERMOD model as the preferred model for nearfield applications in the *Guideline on Air Quality Models*, Appendix W to 40 CFR Part 51, <u>the performance of the AERMOD model was extensively evaluated based on a total of 17 field study data bases</u> (AERMOD: Latest Features and Evaluation Results. EPA-454/R-03-003. U.S. Environmental Protection Agency, Research Triangle Park (2003), portions of which are attached to this affidavit) ("EPA 2003"). <u>The scope of the model evaluations conducted for AERMOD far exceeds the scope of evaluations conducted on any other model that has been adopted in Appendix W to Part 51. These evaluations demonstrate the overall good performance of the AERMOD model</u> based on technically sound model evaluation procedures, and also illustrate the significant advancement in the science of dispersion modeling represented by the AERMOD model as compared to other models that have been used in the past. <u>In particular, adoption of the AERMOD model has significantly reduced the potential for overestimation of ambient impacts from elevated sources in complex terrain compared to other models.</u>

*Id*. at 3-4 (emphasis added).

EPA's practice in a number of other contexts also demonstrates that modeling is a technically superior approach for ascertaining impacts on NAAQS, as well as the extensive history of EPA's preference for modeling over monitoring to evaluate compliance.  For example, all nitrogen dioxide, fine particulate matter ("$PM_{2.5}$"), and $SO_2$ Prevention of Significant Deterioration ("PSD") increment compliance verification analyses are performed with air dispersion modeling, such as running AERMOD in a manner consistent with the Guideline on Air Quality Models. 40 C.F.R. § 52.21(l)(1).  Indeed, in order to ensure consistency in how air impacts are determined, both existing sources and newly permitted sources should be assessed using the same methods. AERMOD modeling performs particularly well in evaluating emission sources with one or a handful of large emission points.  The stacks are well characterized in terms of location, dimensions, and exhaust parameters, and have high release heights. AERMOD accurately models medium-to-large $SO_2$ sources—even with conditions of low wind speed, the use of off-site meteorological data, and variable weather conditions.  Indeed, AERMOD has been tested and performs very well during conditions of low wind speeds:

> AERMOD's evaluation analyses included a number of site-specific meteorological data sets that incorporate low wind speed conditions. For example, the Tracy evaluation included meteorological data with wind speeds as low as 0.39 meter/second (m/s); the Westvaco evaluation included wind speeds as low as 0.31 m/s; the Kincaid $SO_2$ evaluation included wind speeds as low as 0.37 m/s; and the Lovett evaluation included wind speeds as low as 0.30 m/s. Concerns . . . regarding AERMOD's ability to model low wind speed conditions seem to neglect the data used in actual AERMOD evaluations.

8

Comments of Camille Sears, at 10, attached hereto as Exhibit 5 (citing AERMOD evaluations and modeled meteorological data, *available at* http://www.epa.gov/ttn/scram/dispersion_prefrec.htm).

Finally, EPA's use of air dispersion modeling and AERMOD in particular was upheld in the context of a recent CAA section 126 petition for resolution of cross-state impacts. *See Genon Rema, LLC v. U.S. EPA*, 722 F.3d 513, 526 (3rd Cir. 2013). In this case, EPA granted the New Jersey Department of Environmental Protection's 126 petition, finding that trans-boundary $SO_2$ emissions from the Portland coal-fired power plant in Pennsylvania were significantly contributing to nonattainment and interference with the maintenance of the one-hour $SO_2$ NAAQS in New Jersey. *Id*. at 518. EPA based its finding on a review of the AERMOD dispersion modeling submitted by New Jersey, its independent assessment of AERMOD, and other highly technical analyses. *Id*. The court upheld EPA's decision after examining the record, which showed that EPA had thoroughly examined the relevant scientific data and clearly articulated a satisfactory explanation of the action that established a rational connection between the facts found and the choice made. *Id*. at 525-28.

Dispersion modeling, then, is a rigorously verified method for evaluating impacts on the $SO_2$ NAAQS, and has a lengthy and court-validated history as an appropriate tool for use in designations.

B.   Designations Modeling Must Include Not Just the Consent Decree Sources, But Also Those Other Large Sources within the Modeling Domain

In completing area designations, it is critical that EPA consider all $SO_2$-emitting sources in the areas under consideration for the 2016 designations round, and not merely the sources who meet the triggering criteria of the Consent Decree. To do otherwise inadequately and inaccurately characterizes air quality in areas with more than one source, runs the risk of "stranding" sources, and would wrongly subject residents of those areas to continuing harmful levels of $SO_2$ pollution. In performing its own air quality modeling, the Sierra Club and others have used the 50 km modeling domain of AERMOD as a tool in determining what sources to include in area modeling evaluations; EPA should do the same.

Under the terms of the Consent Decree, EPA must issue final designations by July 2, 2016, for "for remaining undesignated areas which . . . contain any stationary source" meeting certain delineated criteria.[8] Significantly, the Consent Decree speaks in terms of *areas* to be evaluated, and not *sources*. It would thus be contrary to the Consent Decree if EPA were to finalize designations based solely on sources fitting the Consent Decree criteria, and ignored and excluded other nearby sources that also contribute to ambient $SO_2$ pollution in the area.

Not only that, but such an approach would be contrary to EPA's own guidance. As the $SO_2$ NAAQS modeling Technical Assistance Document ("TAD") observes, "all sources expected to cause a significant concentration gradient in the vicinity of the source of interest should be explicitly modeled," and that only sources "not causing significant concentration gradients" should be excluded from being explicitly modeled and should instead "be included in

---

[8] Consent Decree ¶ 1.

9

the modeling via monitored background concentrations."[9]  Further, EPA notes that if a nearby source "exceeds the EPA interim [significant impact level] or a state-selected impact criterion, it should be evaluated with refined modeling."[10]  Again, the emphasis is on ensuring that all large sources in an area causing significant impacts on the NAAQS are modeled together, so that the modeling analyses performed are accurate and indicative of air quality.

        This is critical, given the phased designations approach that EPA is undertaking.  With $SO_2$ NAAQS designations occurring in 2013, 2016, 2017, and 2020 as per the Consent Decree and the Data Requirements Rule, EPA must take steps to ensure that sources are not ignored or orphaned by the multistage process.  For example, consider a hypothetical area with two sources, A and B, in which source A fits the criteria of the Consent Decree, and which source B will be considered in a subsequent designations round.  If the combined emissions of sources A and B cause exceedances of the NAAQS, but the sources are considered separately in separate rounds of designations, EPA may end up wrongfully promulgating two separate attainment or unclassifiable designations in 2016 and 2017, when a single nonattainment designation addressing both sources should have resulted.  In such a situation, members of the public would be subjected to unhealthy air without any requirement for the state or EPA to generate a cleanup plan, simply because of the staggered designations timeline EPA is now on.[11]

        As a result it is critical that EPA not narrowly and misleadingly consider only those sources identified by the criteria in the Consent Decree, but rather all sources significantly contributing in the *areas* in which one or more of the Consent Decree sources is located.

C.    EPA Properly Considered Third-Party Modeling and Should Continue Doing So in Finalizing Designations

        The Proposed Designations make use of a mixture of state, industry, and public health and environmental submissions of data, including modeling data.  EPA has properly elected to consider all information before it, and Commenters applaud the Agency for so doing.  This

---

[9] U.S. EPA, SO2 NAAQS Designations Modeling Technical Assistance Document at 7, *available at* https://www3.epa.gov/airquality/sulfurdioxide/pdfs/SO2ModelingTAD.pdf (hereinafter "Modeling TAD").

[10] *Id.* at 8.  EPA notes that it has considered a 3 parts per billion significant impact level for the $SO_2$ NAAQS; in transport and other contexts, EPA has considered 1% of the NAAQS to be a significant impact level (or 0.75 parts per billion for the $SO_2$ NAAQS).

[11] A similar problem can arise when EPA blends areas designated by monitoring with areas designated via modeling.  For example, the areas designated "nonattainment" in 2013 based on high $SO_2$ monitor readings oftentimes contain more than one large source, with the share of the impacts at the monitor site perhaps owing more to one source than another.  If the source with greater impact on the monitor cleans up, but the other sources do not, the monitor may show levels below the NAAQS, even if impacts from the other sources are causing air quality problems elsewhere in the designated area.  If such other sources are ignored or improperly treated in SIPs or in subsequent designation rounds, their negative impacts on air quality may never be addressed, to the detriment of public health.  EPA accordingly must carefully examine the combined impacts of sources before rendering area attainment decisions.

10

approach is in keeping with foundational principles of administrative law. In finalizing its area designations, EPA is required to base its decisions on all relevant data before it. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 30-31 (1983) ("[T]he agency must . . . examine the relevant data and articulate a satisfactory explanation for its action."). Not only that, however, but considering on an even playing field all submissions to the agency ensures that EPA is making designations based on the best available information. Commenters, for example, have made every effort to ensure that the modeling analyses submitted to EPA are useful, accurate, robust, and consistent with all available EPA guidance. Commenters have—as explained in more detail in the state-specific Appendixes included in these comments—taken steps to address additional questions or data concerns EPA expressed in the Proposed Designations with the goal in mind of providing the most relevant information possible to the Agency. EPA should continue its practice of regarding such submissions fairly and carefully.

However, Commenters are concerned by the different time periods by which members of the public and states have in which to submit comments on the Proposed Designations. If EPA were to ignore materials it receives from environmental and public health organizations or from concerned citizens while it was simultaneously accepting and considering materials submitted by states,[12] this would arbitrarily skew EPA's analysis—particularly if state comments are responsive to or critique comments submitted by the public. EPA must consider all information before it in making its decisions in finalizing the Proposed Designations.

D.     The So-Called "Beta Options" Decrease Model Performance, and Should Not Be Relied on by EPA

EPA's AERMOD refined aerial dispersion modeling software is, as noted above, the most rigorously field-tested model EPA has ever developed. It is more than capable of accurately assessing $SO_2$ NAAQS attainment in a robust and reliable manner. However, certain "Beta Options" to the regulatory default AERMOD software exist that—contrary to their purported intention—serve to undermine the credibility and reliability of the modeling. These Beta Options, namely AERMET ADJ_U* and AERMOD LOWWIND3, have, when examined, been shown to decrease model performance and accuracy. Indeed, applying these options to the original validation studies performed for AERMOD erratically and in some cases quite significantly reduces modeled impacts as compared to real-world data, particularly so in the case of the Tracy validation study data.

---

[12] Or industry, whether directly or through the vehicle of state submissions.

11

*Figure 2: Evaluation of Tracy Validation Trial Data with AERMOD v. 15181*



12

*Figure 3: Evaluation of Tracy Validation Trial Data with AERMOD v. 15181, Using Beta ADJ_U\*, LOWWIND3*



In Figures 2 and 3 above, the closer the model run was to actual observed data, the more the dots plotted will be along the blue diagonal line. To the extent that the dots fall below the line, that is indicative of underprediction of results. As can be plainly seen, addition of the ADJ_U* and LOWWIND3 options to the model decreases accuracy significantly, and appears to bias the modeling analysis towards underprediction of results, when compared against AERMOD's original validation trial study data.

Sierra Club has previously submitted these analyses pointing out the flaws in the Beta Options; a copy of this submission is attached hereto as Exhibit 6, and is also available at Regulations.gov. *See* Sierra Club Comments (Oct. 27, 2015) Docket ID No. EPA-HQ-OAR-2015-0310-0114. The options, far from being based on any of the 14 robust field studies performed by EPA to establish AERMOD as an accurate and reliable tool for assessing ambient concentrations, were based on testing the options against severely flawed and outdated datasets that are wholly inappropriate for evaluating model performance. For example, Beta Options were developed using data from the four-decades-old 1974 Idaho Falls Diffusion Study, which involved both a very small sample size of low wind speed gas releases and as well as used improper wind speed measure methodologies. The Idaho Falls data is thus nearly irrelevant for the task of ascertaining the accuracy of the ADJ_U* and LOWWIND3 options. Similarly, the Beta Options rely on data from the Cordero Rojo Mine study, but this study did not involve emissions monitoring or tracer gas release rates that could be known and controlled; thus, the

13

relationship between observed concentrations of air pollutants and emission rates is unknown, making the data set effectively useless for model evaluation.

In short, the proposed ADJ_U* and LOWWIND3 options neither do anything to improve model performance (and to the contrary, significantly decrease it) nor are based on relevant or meaningful real-world study data, and should accordingly not be used for evaluating area designations. Indeed, doing so would cripple the efficacy of AERMOD, and lead to significant underprediction of air pollution impacts, to the detriment of the environment and public health. EPA should not give these options its regulatory blessing. To the extent that states or industry submit modeling analyses that incorporate use of the Beta Options, EPA should reject them as being inconsistent with regulatory guidance and for the identified issue of inaccuracies flowing from use of the Beta Options. In instances where states or industry submit modeling incorporating the Beta Options and accompany it with information purporting to justify use of the non-regulatory default configuration of AERMOD, EPA should look very closely and with a critical eye on such submissions. Such submissions should only be considered at most as a sort of sensitivity analysis, and should be accompanied by modeling performed according to EPA's guidance using the regulatory default configuration of AERMOD.[13]

E.    Flagpole Receptors Are Part of the Regulatory Default AERMOD Configuration, and Their Use Can Only Make Modeling Results More Relevant

Conversely, while Sierra Club and others have used the FLAGPOLE option in AERMOD—which is an included option in the regulatory default configuration of the software— to increase the accuracy and representativeness of the modeling, some states have questioned the use of flagpole receptors. This is improper: as EPA has noted in its guidance, "modeling concentrations at breathing height would lead to better characterization of air quality at the level most individuals are breathing" and thus there should be no concern with using the FLAGPOLE option.[14] Although EPA does not *require* the use of such receptors, it plainly condones their use.

Indeed, to place receptors to ascertain air quality precisely at ground level makes little intuitive sense. The simple reality is that people breathe through their noses and mouths, not through their shoes and socks, and so modeling impacts at face-height instead of at foot-height is better practice; this is in part why air monitoring sensors are likewise not placed directly on the

---

[13] Commenters are very concerned about uses of the Beta Options to effectively undercount emissions, and to give a false clean bill of health to communities that are in reality suffering from unhealthy and unsafe levels of $SO_2$ pollution. Submissions consisting of Beta Option-reliant modeling without accompanying regulatory default modeling could well be the result of a sort of "model shopping" on the part of entities that would prefer to avoid requirements to reduce emissions, and thus should be regarded with a suspicious eye. To the extent that submitters are arguing in favor of case-specific application of the Beta Options, such modeling should always accompany modeling conducted according to regulatory defaults, so that EPA is not receiving a partial picture.

[14] Modeling TAD at 9.

14

ground.  Accordingly, criticisms of Sierra Club modeling on the basis of the use of the FLAGPOLE option should be disregarded.

F.      Modeling-Based Designations Are Ideal for Swift SIP and FIP Development to Prevent Further Delays in NAAQS Implementation

Not only are modeling-based designations quicker, more robust, and more accurate than monitor-based evaluation of air quality, but such designations based on modeling can also speed up $SO_2$ NAAQS implementation in areas failing to attain the standard.  This is because modeling can indicate exactly what emission limits need to be introduced to a large $SO_2$ pollution source to ensure that the standard is attained and maintained.

As noted above, unlike some other criteria pollutants for which EPA establishes a NAAQS, $SO_2$ overwhelmingly comes from a relatively small handful of large sources, whose exact emission profiles are well-documented.  As the NEI indicates, controlling pollution from these sources is effectively controlling *all* $SO_2$ pollution nationwide.  Accordingly, a modeling-based designations approach that addresses the large sources will ameliorate $SO_2$ pollution problems generally: by modeling a source to ascertain its impact on the NAAQs, regulators are simultaneously determining how much emissions need to be reduced to avoid causing NAAQS exceedances.  Thus, rather than simply identifying an ambient air pollution problem, aerial dispersion modeling accomplishes much of what would be required to develop a plan in a potential nonattainment SIP.[15]

This is particularly critical for NAAQS implementation.  While the Clean Air Act does impose strict timetables for states, upon promulgation by EPA of a nonattainment designation, for both preparation of a SIP and ultimate attainment of the standard, the unfortunate reality is that states are frequently late in developing their SIPs and in rectifying NAAQS-attainment problems.  For example, as EPA's Greenbook notes, many regions across the country are still failing to attain standards promulgated in the 2000s, the 1990s, the 1980s, and even *the 1970s*.[16] This is despite clear requirements for states to submit nonattainment SIPs shortly after receiving

_____

[15] *See* U.S. EPA, Guidance for 1-Hour $SO_2$ Nonattainment Area SIP Submissions (April 23, 2014) at 9-10, *available at* https://www3.epa.gov/airquality/sulfurdioxide/pdfs/20140423guidance.pdf ("The attainment plan for the affected area should also demonstrate, through the use of air quality dispersion modeling . . . that the area will attain the standard by its attainment date).  Critically, the Guidance indicates that attainment must be achieved *everywhere* in the area, not just at monitor locations: "[t]he attainment demonstration should also ensure that the area will attain the 2010 SO2 NAAQS with a 3 year design value of no greater than 75 ppb throughout the entire nonattainment area by the statutory attainment date." *Id.*

[16] Montana has areas failing to attain the 1978 lead and 1971 $SO_2$ NAAQS; likewise, New Jersey, Pennsylvania, and Utah have areas failing to attain the 1971 $SO_2$ NAAQS.  *See* U.S. EPA, Current Nonattainment Counties for All Criteria Pollutants, *at* https://www3.epa.gov/airquality/greenbook/ancl.html. Likewise, over 40 areas nationwide are failing to attain the 1987 PM10 NAAQS.  *Id.*  The list of areas failing to attain NAAQS of 1990s vintage is even longer; the list of areas failing to attain NAAQS from the 2000s longer still.  *Id.*

15

a nonattainment designation, and to return areas to attainment.  *See, e.g.*, 42 U.S.C. §§ 7514(a), 7514a(a) (setting 18-month deadlines for nonattainment SIPs for $SO_2$, $NO_2$, or lead nonattainment designations, and requiring attainment to be achieved within 5 years).  Similarly, when states fail to submit SIPs, EPA is required to generate and promulgate federal implementation plans—again, on a swift timetable.  *See* 42 U.S.C. § 7410(k)(1)(B) (requiring EPA to making findings of failure to submit where states fail to submit required SIPs); 42 U.S.C. 7410(c)(1)(A) (requiring EPA to promulgate a federal implementation plan "at any time within 2 years after the Administrator finds that a State has failed to make a required submission").

Using modeling for and from designations purposes in nonattainment SIP preparation thus can help states and EPA avoid the chronic problem of late NAAQS implementation.  It can also be a powerful tool in enabling EPA to prepare federal implementation plans for states that have failed to prepare their SIPs.  EPA should thus, in finalizing the Proposed Designations, make clear to the states that they can and must submit nonattainment SIPs by the required deadline, and that if not, EPA will use the modeling before it to generate and promulgate federal implementation plans, and will do so far sooner than the expiration of the two-year deadline the Clean Air Act affords EPA.

## Conclusion

For the foregoing reasons, EPA should finalize the nonattainment designations it has proposed, eschew the Beta Options for AERMOD, and carefully evaluate submissions of third-party modeling to ensure that EPA is properly designating as nonattainment those areas with modeled exceedances of the NAAQS.

Sincerely,


_____/s/_____
Zachary M. Fabish
Staff Attorney
The Sierra Club
50 F Street, NW - 8th Floor
Washington, DC 20001
(202) 675-7917
(202) 547-6009 (fax)
zachary.fabish@sierraclub.org

Enclosures:

- Appendix A – Colorado
- Appendix B – Maryland
- Appendix C – Missouri
- Appendix D – Ohio
- Appendix E – Indiana
- Appendix F – Louisiana

16

- Appendix G – Michigan
- Appendix H – Oklahoma
- Appendix I – Texas

Partial electronic cc:

EPA Region 1, Leiran Biton, biton.leiran@epa.gov.

EPA Region 2, Henry Feingersh, feingersh.henry@epa.gov.

EPA Region 3, Irene Shandruk, shandruk.irene@epa.gov.

EPA Region 4, Twunjala Bradley, bradley.twunjala@epa.gov.

EPA Region 5, John Summerhays, summerhays.john@epa.gov.

EPA Region 6, Dayana Medina, medina.dayana@epa.gov.

EPA Region 7, David Peter, peter.david@epa.gov.

EPA Region 8, Adam Clark, clark.adam@epa.gov.

EPA Region 9, Gwen Yoshimura, yoshimura.gwen@epa.gov.

EPA Region 10, John Chi, chi.john@epa.gov.

17

No. 17-60088

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY L.L.C.; BIG BROWN POWER COMPANY L.L.C.; SANDOW POWER COMPANY L.L.C.; LUMINANT MINING COMPANY L.L.C.,**
                                                    Petitioners
v.
**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, in His Official Capacity as Administrator of the United States Environmental Protection Agency,**
                                                    Respondents

Consolidated with

No. 21-60673

**STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; LUMINANT MINING COMPANY, L.L.C.,**
                                                    Petitioners
v.
**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,**
                                                    Respondents

**On Petition for Review of Final Agency Actions of the United States Environmental Protection Agency**

**Rule 30.2(a) Appendix – Volume Six of Eight (Tabs 427 - 464)**

KEN PAXTON
Attorney General of Texas
BRENT WEBSTER
First Assistant Attorney General
GRANT DORFMAN
Deputy First Assistant Attorney General
SHAWN COWLES
Deputy Attorney General for Civil Litigation
PRISCILLA M. HUBENAK
Chief, Environmental Protection Division

**March 30, 2022**

LINDA B. SECORD
Assistant Attorney General
Linda.Secord@oag.texas.gov
JOHN R. HULME
Assistant Attorney General
John.Hulme@oag.texas.gov
OFFICE OF THE ATTORNEY
GENERAL OF TEXAS
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
512-463-2012 (phone)
*Counsel for the State of Texas and Texas Commission on Environmental Quality*

# TABLE OF CONTENTS
## Volume Six of Eight*

Tab

Petition for Reconsideration Submitted by Stephen J. Bonebrake et al., Schiff
    Hardin LLP on behalf of Southern Illinois Power Cooperative (Sept. 12,
    2016) (with Exhibit 27) ................................................................................................. 427

81 Fed. Reg. 89,870 (Dec. 13, 2016) ................................................................................ 433

Final Technical Support Document for the Designation Recommendations
    for the 2010 Sulfur Dioxide National Ambient Air Quality Standards
    (NAAQS) – Supplement for Four Areas in Texas Not Addressed in June
    30, 2016, Version (Nov. 29, 2016) ............................................................................ 434

Responses to Significant Comments on the Designation Recommendations
    for the 2010 Sulfur Dioxide National Ambient Air Quality Standards
    (NAAQS) – Supplement for Four Areas in Texas Not Addressed in June
    30, 2016, Version (Nov. 29, 2016) ............................................................................ 438

Response to Petition for Reconsideration and Administrative Stay to Vistra
    Energy (Sept. 21, 2017) ................................................................................................. 454

84 Fed. Reg. 43,757 (Aug. 22, 2019) ............................................................................... 459

Comments of Luminant on Error Correction ............................................................... 464

*(See other volumes for additional appendix documents)*

---

\* Consistent with how the record material was cited in the briefs, appendix tab numbers
correspond to the final four digits (minus leading zeros) of "Document ID" numbers
on the certified index of record contents.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this appendix, which includes Volumes One through Eight, via the Court's CM/ECF system on this 30th day of March, 2022. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Trend Micro and is free of viruses.


s/ P. Stephen Gidiere III

*Counsel for Luminant Petitioners*

**Tab 427: Petition for Reconsideration Submitted by Stephen J. Bonebrake et al., Schiff Hardin LLP on behalf of Southern Illinois Power Cooperative (Sept. 12, 2016) (with Exhibit 27)**



Schiff Hardin LLP
233 South Wacker Drive
Suite 6600
Chicago, IL 60606

T 312.258.5500
F 312.258.5600

schiffhardin.com

**Stephen J. Bonebrake**
312.258.5646
sbonebrake@schiffhardin.com

September 12, 2016

<u>**VIA HAND DELIVERY**</u>
<u>**AND EMAIL**</u> (a-and-r-Docket@epa.gov)

Administrator McCarthy
U.S. Environmental Protection Agency
EPA Docket Center
WJC West Building, Room 3334
1301 Constitution Avenue, NW, Washington, DC 20004

Re:   **Petition for Reconsideration of the United States Environmental Protection Agency's Final Rule Designating Williamson County, Illinois, Nonattainment under Air Quality Designations for the 2010 Sulfur Dioxide ($SO_2$) Primary National Ambient Air Quality Standard – Round 2**

**EPA Docket ID No. EPA-HQ-OAR-2014-0464**

Dear Administrator McCarthy:

On behalf of Southern Illinois Power Cooperative ("SIPC"), the undersigned petitions the U.S. Environmental Protection Agency ("EPA" or the "Agency") to reconsider aspects of the Air Quality Designations for the 2010 Sulfur Dioxide ($SO_2$) Primary National Ambient Air Quality Standard – Round 2 (EPA-HQ-OAR-2014-0464) (hereinafter, the "2016 Designations"). 81 Fed. Reg. 45,039 (July 12, 2016). The rule becomes effective on September 12, 2016, 60 days after the date of publication in the *Federal Register,* which was on July 12, 2016. Therefore, this petition for reconsideration is timely. 42 U.S.C. § 7607(b)(1).[1]

---

[1] Concurrent with the filing of this petition for consideration, pursuant to 42 U.S.C. § 7607(b), on September 9, 2016, SIPC filed for judicial review of EPA's nonattainment designation for Williamson

## I.    INTRODUCTION

On July 12, 2016, EPA published the 2016 Designations.  81 Fed. Reg. 45,039.  *See*

**Exhibit 1.**  The rule established air quality designations under the revised Primary National

Ambient Air Quality Standard for Sulfur Dioxide, 75 Fed. Reg. 35,520 (June 22, 2010) ("2010

$SO_2$ NAAQS"), for certain areas subject to a March 2, 2015, consent decree entered by the U.S.

District Court for the Northern District of California ("Consent Decree").  *Sierra Club v.*

*McCarthy*, No. 13-CV-03953-SI, 2015 WL 889142 (N.D. Cal. Mar. 2, 2015), *appeal docketed*,

15-15894 (9th Cir. May 1, 2015).  SIPC is the owner and operator of the Marion Power Station

located in Williamson County, Illinois ("Marion Station").  SIPC submits this petition for

reconsideration ("Petition") pursuant to Section 307(d)(7)(B) (42 U.S.C. § 7607) of the Clean

Air Act ("CAA") of EPA's designation of Williamson County, Illinois, as nonattainment of the

2010 $SO_2$ NAAQS.

This Petition focuses narrowly on the nonattainment designation for Williamson County.

SIPC requests that EPA reconsider the nonattainment designation and instead designate

Williamson County (which includes the area around Marion Station) as in attainment of the 2010

SO2 NAAQS.  In the alternative, if EPA believes that there is insufficient information to support

an attainment designation, SIPC requests that EPA designate Williamson County as

unclassifiable given the absence of any valid and compelling data demonstrating nonattainment

and the significant conflicts between the modeling submitted to EPA.  In no event, however,

does the available information support a finding of nonattainment.

Reconsideration and reversal of the Williamson County nonattainment designation for the

2010 SO2 NAAQS is warranted for the following reasons:

---

County, Illinois in the United States Court of Appeals for the Seventh Circuit.  *SIPC v. EPA,* Case No.
16-3398 (filed September 9, 2016).

(1) EPA's nonattainment designation was based upon unreliable and non-representative data and inaccurate assumptions and inputs;

(2) Modeling data and supporting information submitted by SIPC during the public comment period demonstrates that Williamson County is attaining the 2010 $SO_2$ NAAQS;

(3) Updated modeling data submitted with this Petition provides corroborative and compelling support that the third-party modeling relied upon by EPA – when corrected for known deficiencies – in fact demonstrates that Williamson County attains the 2010 $SO_2$ NAAQS; and

(4) EPA may not base a nonattainment designation on modeling data alone.

## II.    BACKGROUND

### A.  Factual Background

On June 22, 2010, EPA promulgated a primary $SO_2$ NAAQS at a one-hour $SO_2$ concentration of 75 parts per billion (ppb) (196.5 ug/m3) (established by a 3-year average of the annual 99th percentile of 1-hour daily maximum concentrations).  Consistent with Section 107(d) of the CAA, the Illinois Environmental Protection Agency ("Illinois EPA") submitted its initial designation recommendations to EPA on June 2, 2011, including a recommended designation of unclassifiable for Williamson County.[2]  On July 25, 2013, EPA promulgated a final rule establishing air quality designations for 29 areas under the 2010 $SO_2$ NAAQS.  Air Quality Designations for the 2010 Sulfur Dioxide (S02) Primary National Ambient Air Quality

---

[2] In accordance with the CAA and EPA guidance, Illinois EPA designated all counties that lacked sufficient SO2 ambient air quality monitoring data as unclassifiable.  *See* Illinois EPA letter to EPA Region V re 2010 $SO_2$ NAAQS, at 1 (June 2, 2011), www.epa.gov/sites/production/files/2016-03/documents/il-rec.pdf.

Standard, 78 Fed. Reg. 47,191 (Aug. 5, 2013).  However, EPA did not issue a designation for Williamson County.

As a result of EPA's failure to issue timely designations, three lawsuits were filed against EPA alleging that EPA had failed to perform a nondiscretionary duty under the CAA.  Indeed, some petitioners argued that EPA is required to designate areas unclassifiable with respect to the 2010 $SO_2$ NAAQS where EPA is not able to determine, based upon available information, whether the area is or is not meeting the 1-hour $SO_2$ NAAQS.  In an attempt to resolve EPA's failure to act, as noted above, in March 2015 EPA entered a Consent Decree with the Sierra Club and the Natural Resources Defense Council.  *See Sierra Club v. McCarthy*, *supra*, **Exhibit 2.** Notably, the Consent Decree established an artificial, accelerated timeline that required that EPA designate by July 2, 2016 any undesignated area under the 2010 $SO_2$ NAAQS that contains any large stationary source of $SO_2$ emissions.  *Id.* at 4.  As discussed below, both the CAA and EPA historic practice mandate the use of actual, monitored, ambient air quality to designate regions as attainment, nonattainment, or unclassifiable of a NAAQS.  The Consent Decree inappropriately precluded the ability to use monitoring data for areas containing large stationary sources without existing monitors, including SIPC's Marion Station in Williamson County.

As a consequence, EPA had but sixteen (16) months to solicit and attempt to evaluate any available data upon which to base its 2016 Designations.  On September 18, 2015, Illinois EPA submitted modeling data to support Illinois EPA's recommendation that EPA designate the area in the vicinity of Marion Station (Williamson County) as attaining the 2010 $SO_2$ NAAQS.  *See* Illinois EPA letter to EPA Region V re: Updated Recommendations for 2010 $SO_2$ NAAQS (September 18, 2015), and accompanying Illinois EPA Technical Support Document for $SO_2$ Designation Recommendations for Electric Power Facility Areas (September 18, 2015),

4

*collectively* **Exhibit 3**.  Shortly thereafter, EPA Region 5 notified Illinois EPA directly that it had

received public comments and modeling data from Sierra Club that supported a nonattainment

designation for the Marion Station area, and solicited comments from Illinois EPA on the

reasonableness of Sierra Club's modeling.[3]  *See* EPA Region 5 letter to Illinois EPA, re: Sierra

Club modeling (October 20, 2015), **Exhibit 4**.  On November 9, 2015, Illinois EPA concluded

that Sierra Club's modeling could not be relied upon because it was flawed and not

representative of ambient air quality around the Marion Station.  *See* Illinois EPA letter to EPA

Region V, re: Sierra Club Sulfur Dioxide Modeling (Nov. 9, 2015), **Exhibit 6**.  In particular,

Illinois EPA objected to Sierra Club's failure to: (i) utilize variable stack temperature and flue

gas exit velocities required by EPA's Modeling Technical Assistance Document for the 2010

$SO_2$ NAAQS ("Modeling TAD") (**Exhibit 7**); (ii) utilize fenceline receptors to demarcate non-

ambient air areas (i.e., those where public access is precluded); and (iii) utilize more

representative background concentrations and inputs.  *Id.*

On or about December 21, 2015, SIPC's consultant AECOM, submitted modeling to

Illinois EPA to support an attainment finding for Marion Station.  *See* AECOM, Marion Power

Plant Southern Illinois Power Cooperative SO2 Modeling Archive (Dec. 21, 2015), **Exhibit 8**.

While AECOM's modeling results mirrored Illinois EPA's finding of attainment, its modeling

differed from Illinois EPA's modeling in several key respects.  AECOM corrected source

characterization and modeling inputs utilized in Illinois EPA's modeling submitted to EPA,

including correcting stack diameters and building heights at the Marion Station and the handling

of invalid data affecting stack temperature and exit velocity inputs.  Most significantly,

---

[3] Sierra Club's modeling was not made publically available for any entity other than Illinois EPA to review and evaluate.  Indeed, SIPC did not obtain a copy of Sierra Club's modeling – upon which EPA based its final nonattainment designation for Marion Station under the 2016 Designations – until August 24, 2016, in response to a Freedom of Information Act request submitted by SIPC.  *See* **Exhibit 5**.

5

consistent with EPA's Modeling TAD, AECOM corrected Illinois EPA's inclusion of modeling receptors in areas where public access is prohibited on Marion Station's property. *See* Illinois EPA 120-Day Comment letter to EPA Region V on Proposed Designation, at 1 (April 19, 2016), **Exhibit 9**. Unfortunately, Illinois EPA did not submit AECOM's corrected modeling to EPA. *See* EPA Technical Support Document ("TSD") for Illinois, at 59,[4] for EPA Region V, Proposed Designation for Illinois under 2016 Designations (February 16, 2016), *collectively* **Exhibit 10**.

On February 16, 2016, without the benefit of AECOM's corrected modeling, EPA issued its preliminary recommendation to designate the area around Marion Station in nonattainment of the 2010 $SO_2$ NAAQS based upon modeling data in EPA's possession at the time, which consisted only of the uncorrected Illinois EPA modeling and the Sierra Club modeling that Illinois EPA had already determined was flawed for multiple reasons.[5] *Id.* While EPA admitted that Sierra Club used "less reliable" data in their model, the Agency nonetheless based its initial designation on Sierra Club's modeling because – according to EPA – it was "a more reliable assessment" of ambient conditions around Marion Station than the uncorrected Illinois EPA modeling. *Id.* Notably, the deficiencies identified by AECOM in Illinois EPA's modeling were similarly present in Sierra Club's modeling, including the placement of modeling receptors on non-public property within the property boundary of Marion Station. *See* Final TSD for Illinois for 2016 Designations, at 22, 31 (July 2, 2016) ("Final TSD"), **Exhibit 11**. EPA did not properly evaluate whether the modeling receptors were inappropriately located on non-public property. *See, infra,* at Section IV.C.i.

---

[4] EPA makes no reference in the technical analysis for Williamson County that it knew of, received or evaluated the modeling AECOM submitted on behalf of SIPC to Illinois EPA in December 2015.

[5] EPA did not perform any independent modeling of Marion Station. EPA's preliminary and, later, final designation was based exclusively on EPA's review of Illinois EPA and third-party modeling data.

To ensure that EPA reviewed and considered SIPC's air quality modeling, which included necessary corrections to Illinois EPA's modeling, AECOM submitted modeling directly to EPA on behalf of SIPC on March 30, 2016.  The modeling was largely identical to the modeling submitted by AECOM to Illinois EPA in December 2015, with the exception that AECOM relied upon more current emissions data from 2013-2015 and the most current version of AERMOD (the modeling software utilized by Illinois EPA and Sierra Club and recommended by EPA's Modeling TAD).  Subsequently, on April 19, 2016, Illinois EPA submitted to EPA a 120-Day Comment letter in response to EPA's proposed nonattainment designation for Marion Station.  *See* Exhibit 9.  In that formal response, Illinois EPA found that AECOM's March 2016 modeling, which was submitted to EPA, corrected and improved upon Illinois EPA's modeling and provided substantial support for designating the area around Marion Station in attainment of the 2010 SO$_2$ NAAQS.  *Id.* at 1, 3 ("support[ing] the methodology and inputs, and agree[ing] with the results" of AECOM's "re-model" that utilized "refined inputs" from those used by Illinois EPA).  In addition, Illinois EPA concluded that AECOM's receptor placement "followed Federal guidance provided in the [Modeling TAD]."  *Id.* at 2.

On July 2, 2016, EPA promulgated the 2016 Recommendations.  EPA rejected Illinois EPA's recommendation and the supporting modeling independently provided by AECOM and designated Marion Station (and Williamson County) as nonattainment of the 2010 SO$_2$ NAAQS.

## B.  Regulatory Background

EPA's directive under the CAA is unambiguous and unassailable.  An area that "does not meet" the NAAQS is designated nonattainment.  An area that "meets the [NAAQS]" is designated attainment.  And an area that "cannot be classified on the *basis of available information* as meeting or not meeting the [NAAQS]" is designated unclassifiable.  42 U.S.C. §

7

7407(d)(1)(A)(i)-(iii) (emphasis added).  EPA may not base a designation on just any available information.  Rather, the data must be sufficiently compelling and reliable that it is representative of actual ambient air quality.  *See* EPA Responses to Significant Comments on the 2016 Designations, at 78 (June 30, 2016) ("designations should be *made based on representative data*, including for both unclassifiable/attainment and nonattainment") (emphasis added), www.epa.gov/sites/production/files/2016-07/documents/so2d-r2-response-to-comments-06302016.pdf ("Response to Comments"); s*ee also* EPA, Draft TSD Nebraska Area Designation for the 2010 SO$_2$ Primary National Ambient Air Quality Standard 47 n.6 (March 30, 2016), www3.epa.gov/so2designations/round2/07_NE_tsd.pdf ("[area] [d]esignations are intended to address *current actual air quality*…and, thus, are unlike attainment plan modeling, which must provide assurances that attainment will occur") (emphasis added).

An area is designated unclassifiable where there is no compelling data indicating attainment or nonattainment.  By analogue, an attainment or nonattainment designation is justifiable only where compelling data exists.  The need for compelling data requires that EPA not rely upon data that is "reasonably consider[ed] to be unsound" in issuing a designation. *Mississippi Comm'n Envtl. Quality v. EPA,* 790 F.3d 138, 154 (D.C. Cir. 2015).  As a result, "[i]n the absence of information *clearly demonstrating* a designation of 'attainment' or 'nonattainment,'" EPA informed states that the CAA requires issuance of an unclassifiable designation.  *See* EPA, "Updated Guidance for Area Designations for the 2010 Primary SO$_2$ NAAQS," at 5, www.epa.gov/sites/production/files/2016-06/documents/20150320so2designations.pdf (March 20, 2015) (emphasis added) ("EPA 2015 Designation Guidance").[6]

---

[6] *See also, supra,* EPA, Draft TSD for Nebraska, at 33.

Most recently, EPA reversed its initial proposed nonattainment designation for Franklin County, Missouri based on the presence of conflicting modeling data results. *See* EPA Final TSD for Missouri under 2016 Designations (July 2, 2016), www.epa.gov/sites/production/files/2016-07/documents/r7_mo_final_designation_tsd_ 07012016.pdf. Both Ameren Missouri (the owner of the primary $SO_2$ source in Franklin County) and the Missouri Department of Natural Resources submitted modeling supporting an attainment or unclassifiable designation. Sierra Club modeling – like here – supported a finding of nonattainment. In reviewing the available modeling data, EPA concluded that an unclassifiable designation was warranted because of flaws identified in each of the modeling runs submitted. *See* Response to Comments at 78 (unclassifiable appropriate "[b]ased on all the available and reliable data, including new information following the notification of our intended nonattainment designation").[7]

Taken as a whole, in order for a designation to be based on "actual air quality" – and thus reasonable and lawful – the data (whether monitoring or modeling) relied upon must be considered:

(1) reliable – meaning the data must not be based on incorrect or questionable inputs or assumptions;

(2) supportable – meaning that the available data does not support a different designation;

(3) representative – meaning that the data accurately reflects conditions that are, or have in the past, occurred in the designation area; and

---

[7] *See also* EPA Final TSD for Missouri, at 26 ("the EPA's view is that the modeling results widely vary and greatly depend upon how the modeling was conducted, as discussed in this Technical Support Document. Because of the issues present in the modeling methodologies, the EPA does not have a clear basis to determine whether the area currently meets or does not meet the 2010 SO2 NAAQS based on all currently available information").

9

(4) inclusive – meaning that the data takes into account all available information (provided it is reliable and representative).

As further discussed below, EPA relied upon Sierra Club and Illinois EPA modeling data that was neither reliable nor representative because the modeling contained incorrect data inputs and assumptions. Indeed, Illinois EPA acknowledged as much in its November 9, 2015, letter to EPA. *See* Exhibit 6. At the same time, EPA improperly disregarded modeling data earlier submitted by AECOM that supported an attainment designation. In addition, modeling refinements submitted with this petition further support an attainment designation. Therefore, EPA's nonattainment designation for Marion Station was not based upon all available, reliable, information. When all reliable information is considered, modeling demonstrates that the area around the Marion Station is attaining the 2010 $SO_2$ NAAQS. The existence of compelling data requires that EPA designate the area in attainment. At most, if EPA finds that there are legitimate conflicts between the modeling submitted by the various parties, then an unclassifiable designation is warranted. In no case does the available information support a nonattainment designation.

## III.     STANDARD FOR RECONSIDERATION

Upon request, the CAA directs EPA to reconsider any issue that has been raised "with reasonable specificity" during the public comment period. 42 U.S.C. § 7607(d)(7)(B). This does not mean that EPA is precluded from considering new information. Indeed, the CAA provides that EPA must consider issues that are of "central relevance to the outcome of the rule" that were "impracticable to raise" or that "arose after the period for public comment." *Id.* An issue is of "central relevance" if it "provides substantial support for the argument that the promulgated regulation should be revised." EPA, Basis for Denial of Petitions to Reconsider the CAA

Section 111(b) Standards of Performance for Greenhouse Gas Emissions from New, Modified, and Reconstructed Fossil Fuel-Fired Electric Utility Generating Units 2 (April 2016), www.epa.gov/sites/production/files/2016-04/documents/111b_recondocument_april2016.pdf.

Thus, on reconsideration, EPA must evaluate whether a reexamination of existing information or consideration of new information substantially supports a different outcome. To the extent additional information can substantiate whether certain data relied upon or ignored by EPA impacted modeling results, EPA is required to consider such information. *See Catawba County v. EPA*, 571 F.3d 20, 51 (D.C. Cir. 2009) (EPA calculations on reconsideration demonstrated that a correction in speciation profile would not have impacted area designations for the 1997 particulate matter NAAQS); *see also* Response to Comments at 78 (finding "new information" sufficient to reverse a proposed designation under the 2010 $SO_2$ NAAQS). Similarly, EPA must also consider information that evidences that data or information relied upon by the Agency to reach its designation was unreliable, non-representative or unsupportable.

## IV.    ARGUMENT

### A. EPA's Reliance on Third-Party Data to Discredit a State Attainment Designation Was Arbitrary and Capricious.

The NAAQS designation process is a cooperative effort between the EPA and the states. *See, e.g., Med. Advocates for Healthy Air v. U.S. E.P.A.,* No. C 11-3515 SI, 2012 WL 710352, at *1 (N.D. Cal. Mar. 5, 2012); *see also S. Coast Air Quality Mgmt. Dist. v. E.P.A.*, 472 F.3d 882, 886 (D.C. Cir. 2006) *decision clarified on denial of reh'g*, 489 F.3d 1245 (D.C. Cir. 2007). While the designation process allows for public comment and input, neither the CAA nor EPA regulations empower third-parties, like Sierra Club, to control the designation process. *See Mississippi Comm'n on Envtl. Quality v. E.P.A.,* 790 F.3d 138, 145 (D.C. Cir. 2015) ("EPA works collaboratively with the *states* to determine the NAAQS-attainment status for all areas

11

within a respective state's borders.") (emphasis added). Indeed, it is the state that issues the NAAQS designation recommendation to EPA. Thus, EPA's task was to review Illinois EPA's designation recommendation, *not* to review Sierra Club modeling and base a nonattainment designation on such third-party data. *See Pennsylvania, Dep't of Envtl. Prot. v. E.P.A.,* 429 F.3d 1125, 1126 (D.C. Cir. 2005) ("[a]fter receiving state recommendations, EPA promulgates final designations").

But here, EPA effectively ignored both Illinois EPA's modeling and recommendations – provided to EPA no less than three separate times – to designate Marion Station as attainment of the 2010 SO2 NAAQS. As noted above, on September 18, 2015, Illinois EPA submitted modeling supporting an attainment designation. On November 9, 2015, Illinois EPA again notified EPA of its recommendation to designate Williamson County as attainment, this time by way of itemizing the deficiencies in Sierra Club's modeling that EPA later relied upon in its 2016 Designations. Lastly, on April 19, 2016, Illinois EPA agreed with AECOM's modeling (submitted on behalf of SIPC) and determined that it provided substantial evidence supporting an attainment designation for Marion Station.

As discussed in more detail below, EPA did – albeit briefly – evaluate the modeling provided by Illinois EPA. In the Final TSD, EPA concluded that *both* Illinois EPA and Sierra Club modeling were based on potentially significant deficiencies in modeling inputs. *See* Exhibit 11 at 30 (Illinois EPA and Sierra Club modeling relied on different meteorological data, emission average periods, Marion Station stack parameters and building heights; and modeling receptor placements). Yet, in substantiating its nonattainment designation, EPA relied upon Sierra Club modeling despite the Agency's acknowledgement that it used "modeling inputs in a less reliable fashion than Illinois [EPA]." *See* Exhibit 10 at 59. Reliance on unreliable and non-

12

representative data is, on its own, impermissible in promulgating a rule.  But the Agency's decision-making is even more flawed taking into consideration that EPA looked only towards Illinois EPA's modeling to substantiate the "credib[ility]" of Sierra Club's modeling.  *See* Exhibit 11 at 31.  That is, EPA speculated that if Illinois EPA's modeling had used emission rates relied upon by Sierra Club, Illinois EPA would have modeled nonattainment.  *See id.*  But this ignored other errors in Illinois EPA's modeling.  *See* Exhibit 9 at 1 (acknowledging "discrepancies" in its modeling identified by AECOM).  At best, EPA's misuse of Illinois EPA's modeling can be characterized as an improper extraction and recharacterization of third-party data that ignored underlying flaws and inaccuracies. Indeed, EPA itself acknowledged that Sierra Club's modeling was based on faulty and non-representative modeling inputs.  *See* Exhibit 11 at 30, 31; *see also* Exhibit 10 at 59.  For all of these reasons, EPA's decision to rely on Sierra Club modeling was improper.

### B. It was Arbitrary and Capricious for EPA to Designate Williamson County under the 2010 SO₂ NAAQS Based on Modeling Data Alone.

If a designation may be based upon modeling data, then SIPC believes for the reasons set forth in this petition that the area around the Marion Station should be designated attainment. However, EPA's reliance upon modeling data alone to make its designation is, by itself, impermissible and a separate basis for setting aside the nonattainment designation.

Neither the CAA nor EPA regulations explicitly authorize EPA to rely on modeling data alone to designate an area as attaining or not attaining a NAAQS.  Indeed, initial area designations have historically always been based upon monitoring data rather than modeling data.  *See* Exhibit 7 at 1.[8]  This is because, in part, modeling is generally conservative in contrast

---

[8] *See also* EPA Region V letter to Governor of Illinois Pat Quinn, re response to Illinois EPA air quality recommendation for 2010 SO₂ NAAQS, at 1 (designating as nonattainment only those areas where *"monitoring data indicates violations"* of the 1-hour SO₂ standard," while leaving areas without

to monitoring, and tends to over-predict ambient concentrations when determining compliance with a NAAQS. *See* 40 C.F.R. Part 51, App. W, subsection 9.1.2 (Studies of Model Accuracy) ("[m]odels are more reliable for estimating longer time-averaged concentrations than for estimating short-term concentrations at specific locations"); subsection 10.2.2(b) (Use of Measured Data in Lieu of Model Estimates) (noting that reliance on monitoring data alone is acceptable "only in the case of a NAAQS assessment"). Reliance on modeling alone is also inconsistent with the plain language of the CAA. *See* 42 U.S.C. § 7407(d)(1)(A) (attainment, nonattainment and unclassifiable designations should be based on actual emissions); *see also* 42 U.S.C. § 7407(d)(3) (redesignations are to be "on the basis of *air quality data*") (emphasis added); 42 U.S.C. § 7407(d)(6)(A) (designations for the 1997 PM2.5 NAAQS must be "based on air quality *monitoring* data) (emphasis added).

With respect to the 2010 SO$_2$ NAAQS, EPA initially declared that area designations must be determined by ambient SO$_2$ monitoring data. *See* 74 Fed. Reg. 64,810, 64,846 (Dec. 8, 2009) ("monitoring data are used to determine whether an area is in violation of the SO$_2$ NAAQS"). In EPA's final rule, EPA confirmed that compliance should be determined "based on 3 years of complete, quality assured, certified *monitoring* data." 75 Fed. Reg. at 35,569. However, for the first time EPA also discussed a hybrid modeling and monitoring approach under the 2010 SO$_2$ NAAQS where insufficient monitoring data was available. *Id.* at 35,570-71. EPA based its change in position on recognition that many areas would *initially* be designated unclassifiable because of a lack of ambient monitoring data. *Id.* at 35,571. That did not occur in Williamson County. Instead, the accelerated designation schedule under the Consent Decree precluded a designation based on monitoring data.

---

monitoring data for "future actions") (emphasis added), www.epa.gov/sites/production/files/2016-03/documents/il-epa-resp.pdf.

14

As noted above, EPA entered into a Consent Decree with Sierra Club that forced the accelerated 2016 Designations for certain yet-undesignated areas under the 2010 SO$_2$ NAAQS. Yet the Consent Decree, as a matter of law, cannot authorize an otherwise prohibited action under the CAA. That is, the CAA (and EPA's own statements in the preamble to the 2010 SO$_2$ NAAQS) directs EPA to designate areas that lack sufficient available monitoring data as unclassifiable. *See* 42 U.S.C. § 7407(d)(1)(A)(iii). On EPA's own admission, the Consent Decree "affect[ed]…the extent to which the EPA will be able to use [monitored data]." *See* EPA, Data Requirements Rule for 2010 SO$_2$ NAAQS, 80 Fed. Reg. 51,052, 51,083 (Aug. 21, 2016). As a result, because of the absence of actual monitored data to designate Williamson County under the 2010 SO$_2$ NAAQS, EPA was required under the CAA to, at worse, designate the area as unclassifiable. EPA's reliance on modeling to designate Williamson County as nonattainment of the 2010 SO$_2$ NAAQS was inconsistent with the Clean Air Act and, thus, arbitrary and capricious.

**C. EPA Improperly Relied Upon Flawed Modeling to Base Its Nonattainment Designation.**

EPA's nonattainment designation for Marion Station is fundamentally flawed because it ignores and mischaracterizes available data and is based on a number of inaccurate, unreliable and non-representative modeling inputs, as described and *admitted* by EPA in the Final TSD. This is not proper. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'"). SIPC addresses the flaws in EPA's assessment and designation conclusion below.

**i.    *EPA Improperly Included Receptors on Secured Non-Public Property*.**

EPA relied upon insufficient, incomplete and inaccurate data to determine that the area

15

located to the northeast of Lake Egypt Road ("Northern Property") constituted ambient air and should be included in any model for Marion Station.  Instead, available data demonstrates that public access is prevented on the Northern Property to the extent necessary to exclude modeling receptors on that property.  In addition, to avoid any doubt on the issue SIPC has taken additional measures to ensure public access is prohibited.

NAAQS designations are intended to reflect actual ambient air quality conditions.  Thus, because the CAA dictates the use of actual emissions, EPA designations are generally based on actual data collected from areas where ambient monitors can be feasibly located.  As modeled data is intended to provide data representative of actual conditions, EPA policy directs sources to avoid modeling areas where public access is generally prohibited.  *See* Exhibit 7 at 8-9.  EPA correctly noted that a "*key* factor in in determining whether plant property is considered ambient air is the *degree to which* the public has access to the area."  Exhibit 11 at 23 (emphasis added).  Thus, public access does not need to be impossible.  *See* Memorandum from Stephen D. Page, Director, Office of Air Quality Planning & Standards, EPA at 6 n.1 (June 22, 2007), **Exhibit 12** ("[p]reclude does not necessarily imply that public access is absolutely impossible, but rather that the likelihood of such access is small").  Rather, consistent with EPA guidance and past practice, EPA must consider the *totality* of measures taken to preclude public access to determine whether they are an "*adequate* barrier to preclude access to the public."  EPA Model Clearinghouse Record, No. 99-V-03 (September 18, 1999) (discussing a "combination" of measures used to restrict access) (emphasis added), **Exhibit 13**; *see also* EPA Model Clearinghouse Record, No. 99-V-02 (August 30, 1999), **Exhibit 14**.

EPA did not follow its own directive.  Indeed, EPA admitted that it lacked sufficient information "as to the manner or degree to which public access is restricted" to determine

whether the public access to the Northern Property is adequately protected. *See* Exhibit 11 at 23. EPA's lack of information on public access is due, in part, to Illinois EPA's failure to provide EPA with the modeling AECOM submitted on behalf of SIPC to Illinois EPA on December 21, 2015. SIPC excluded modeling receptors from the Northern Property in its December 2015 modeling. Neither Illinois EPA nor Sierra Club excluded receptors from the Northern Property. *Id.* at 22. As a consequence, this Petition is the first time that SIPC has had the opportunity to respond to EPA's apparent confusion about site control at Marion Station and to provide the information needed for EPA to properly determine that the general public does not, in fact, have access on the Northern Property. *See id.* at 23*; see also* 42 U.S.C. § 7607(d)(7)(B) (issues or data that were impracticable to raise during public comment may be considered in a petition for reconsideration).

Nevertheless, rather than seeking information from SIPC about site access, EPA apparently looked for and relied upon *just two* (2) stock Google Maps images (a single Google "street view" image and a single Google satellite image) to conclude that the public had "easy access" to "most" of the Northern Property. *Id.* at 24-25, Figures 7 and 8. This is wholly deficient from both an evidentiary and a legal standpoint. EPA's historic practice is to rely on information provided by the source *and*, where appropriate, a site-visit to determine if "ambient air" exists. *See* Exhibit 13 (evidencing EPA's reliance on information provided about on-site security measures and a "tour of the...facility," which EPA described as being "useful and should help bring [the site access] issue to resolution"); Exhibit 14 (EPA noting that a "site visit will likely be necessary" to determine whether public access is adequately precluded). No such site-visit ever occurred at Marion Station.[9] EPA's Final TSD admits that it based its evaluation

---

[9] SIPC has no record of any EPA site visit to evaluate whether public access was precluded at or in the vicinity of Marion Station.

on the degree to which public access is available on the Northern Property entirely upon the two Google images.

As a result, EPA's erroneous conclusion about public access is based upon the Agency's superficial review of images that appear to depict a relatively low guard rail separating the Northern Property from Lake Egypt Road. However, images are often deceiving. Had EPA visited Marion Station, the Agency would have recognized that the satellite imagery wholly fails to reflect that public access is more than adequately prohibited for the following reasons:

(1) Access to the Northern Property along the 300-yard section depicted in Figure 7 of EPA's Final TSD is prohibited by man-made barriers:

    a.  A barbed-wire fence prohibits access to the Northern Property along either side of the brief 300-yard guard rail section. *See* **Exhibit 15** and **Exhibit 16**. The barbed-wire fence abutting this section is *not* visible in either image relied upon by EPA.

    b.  The 300-yard guard rail section was located on top of a spillway servicing the Lake of Egypt. *See* Exhibit 16 (illustrating Lake Egypt Road sitting atop of spillway, with Lake of Egypt to the left and the Northern Property to the right); *see also* **Exhibit 17** (security camera image depicting Lake Egypt Road separating the Northern Property and the Lake of Egypt). The Lake Egypt Road runs parallel immediately to the South of this 300-yard section. No pedestrian crossing or walkway is present alongside the Lake of Egypt road at this location. *See id.* Vehicles travel at or above the 55 mph listed speed limit, restricting the likelihood of public incursion onto the Northern Property.

    c.  The spillway is elevated over thirty (30) feet above the Northern Property.

18

*See* **Exhibit 18** (photograph taken at the base of the 30 foot elevation drop). A steep gradient descends onto the Northern Property immediately to the North of the guardrail depicted in Exhibits 15 and 16. *See* Exhibit 17.

(2) Natural barriers further restrict public access.

    a. The Lake of Egypt to the South of the Northern Property restricts public access points. *See* Exhibit 16 and Exhibit 17.

    b. The significant gradient between the guard rail and the Northern Property is a deterrent for public access. *See* Exhibit 17.

(3) SIPC has always – and will continue – to take additional reasonable measures to secure against public access to the Northern Property. Specifically:

    a. Warning signs are posted along the entire Northern Property boundary notifying the public that the area is restricted. *See* Exhibit 16 and **Exhibit 19**.

    b. SIPC operates and maintains a security camera that is regularly monitored by the on-duty boiler operator at Marion Station. *See* Affidavit of Robert Todd Gallenbach, Vice President of Operations for SIPC at Marion Station, at ¶¶ 5-7, **Exhibit 20**. The security camera feed provides a complete, unobstructed, view of all access points to the Northern Property (i.e., the area depicted in Figure 8 of EPA's Final TSD). *Id.* at Attachment 1; *see also* Exhibit 17.[10] In the unlikely event that an unauthorized member of the public gains access to the Northern Property, the boiler operator monitoring the security camera will notify security to promptly remove such individuals from the property. *See Affidavit* at ¶ 8.

_____

[10] SIPC also operates another security camera which covers other portions of the Marion Station property (areas where public access is also restricted through natural and man-made barriers).

(4) In an abundance of caution, SIPC recently added a barbed-wire security fence behind the existing guardrail located on the 300-yard stretch of spillway with a barbed-wire security fence.[11]  In addition, new "restricted area" warning signs were posted on the new barbed-wire fencing.  Images of the fencing and warning signs are provided in **Exhibit 21, Exhibit 22, Exhibit 23 and Exhibit 24**.  While public access has been adequately precluded by existing, long-standing, site control measures, the new fence in this limited area provides still further assurance that the Northern Property is secure from public access.

SIPC assumes that USEPA was unaware of these significant site control measures at the time it made its final designation.  Based upon these measures, collectively, it is clear that public access to the Northern Property is more than adequately prohibited.

EPA erred by concluding that public access is available merely because of two historic images that showed the absence of a fence along a brief 300-yard section.  *See In the Matter of Hibbing Taconite Company*, PSD Appeal No. 87-3, at 17-18 (July 19, 1989) ("The test for ambient air exclusion does *not require a continuous fence* around the perimeter of the property.  *Other types of physical barriers* can effectively preclude access.") (emphasis added), **Exhibit 25**.  EPA has previously found that physical barriers like those described above, in conjunction with security sign postings and 24-hour security camera surveillance is more than adequate to preclude public access.  Exhibit 13 ("[a] combination of fencing and other physical barriers, posting, and use of the 24-hour security camera surveillance and truck patrolling system should provide an adequate barrier to preclude access to the public").  In fact, EPA has found the use of video surveillance alone adequate to restrict access to the general public.  *See* Exhibit 13.

---

[11] *See* Exhibit 13 (finding the installation of "more fencing, and signage…appropriate" to ensure site access is restricted).

EPA itself acknowledged that the "removal of receptors from the area northeast of the plant may represent the *most significant difference* between [AECOM's] modeling and the modeling by Illinois [EPA] and Sierra Club. Exhibit 11 at 30 (emphasis added).[12] Thus, it is irrefutable that the proper selection of receptor locations is of "central relevance to the outcome" of EPA's 2016 Designations for Marion Station. Indeed, in Illinois EPA's 120-Day Comment Letter to EPA advocating for an attainment designation for Marion Station, Illinois EPA informed EPA that it supported AECOM's modeling in part because it properly excluded receptors from areas (like the Northern Property) where public access is prohibited. *See* Exhibit 9. EPA's finding that the public has access to the Northern Property both ignored contrary information and was based upon insufficient information. As a result, EPA's determination was improper. When all available information is considered, the evidence substantially supports the finding that Illinois EPA and Sierra Club modeling improperly included receptors on the Northern Property.

When the receptors on the Northern Property are excluded, as required by EPA's guidance given SIPC's substantial site control measures, modeling conclusively demonstrates attainment of the 2010 $SO_2$ NAAQS. *See* Exhibit 11 at 28, Table 4 (AECOM's March 2016 Modeling demonstrates default modeling of 190.4 ug/m3); *see also, infra,* Section IV.D, AECOM's Updated Modeling for Marion Station, September 2016, at Section 5.0, Table 5-1 (demonstrating default modeling of 191.0 ug/m3).

### ii.   *It was Improper for EPA to Rely on Modeling Based on Inaccurate or Non-Representative Modeling Inputs.*

Aside from reliance upon the improper inclusion of receptors on the Northern Property,

---

[12] SIPC agrees. As evidenced by the modeling submitted by AECOM on March 30, 2016 and with this Petition, the exclusion of receptors in the Northern Property has a significant impact on both the total ambient levels around Marion Station and the area of peak concentration (which occurs within the Northern Property *if* receptors are not excluded). *See infra,* Section IV.D.

21

EPA's nonattainment conclusion is flawed because it relies upon modeling that contains other significant flaws while essentially ignoring the AECOM modeling that supports an attainment designation and that Illinois EPA supported.

There is no dispute that modeling provided by Illinois EPA and Sierra Club rely upon modeling parameters and inputs that differ significantly from those used by AECOM. Both Illinois EPA and EPA highlight five significant mistakes (in addition to receptor placement) in the modeling provided by Illinois EPA and Sierra Club: (1) background data; (2) emission rates; (3) stack parameters; (4) building heights; and (5) hourly stack temperature and exit velocity. *See* Exhibit 9; Exhibit 11 at 21-30. Significantly, because EPA did not perform an independent modeling analysis, EPA was "*not clear how significant* [of an impact]…the revisions to stack parameters and building heights" (as well as other modeling parameters) would have on modeling results. Exhibit 11 at 30. Nonetheless, EPA issued a nonattainment designation based upon these flawed modeling submissions even in the face of Illinois EPA's information that made clear that the modeling submissions by it and Sierra Club were flawed and did not reflect the most accurate data. .

Modeling must "*clearly demonstrat[e]* that an area and its associated boundary are properly designated 'attainment' or 'nonattainment'" to warrant anything but an unclassifiable designation. *See* EPA 2015 Designation Guidance at Attachment 2, pg. 3 (emphasis added). EPA made no such demonstration here. Instead, in contradictory fashion, EPA on the one hand wholly disavowed AECOM's modeling because it "inappropriately removed [modeling] receptors" (it did not, as discussed above) while simultaneously accepting Sierra Club (and Illinois EPA) modeling as "credible" despite the above-noted mistakes and inaccuracies in modeling inputs. *See* Exhibit 11 at 31. EPA may not rely upon "unsound" data in issuing a

22

designation. *See Mississippi Comm'n,* 790 F.3d at 154. And it certainly may not do so knowingly without significant justification or substantiation.

AECOM analyzed the modeling inputs relied upon by Sierra Club and determined that the differences have a material impact on modeling results. *See* AECOM, Updated 1-Hour $SO_2$ NAAQS Compliance Modeling Demonstration for the Marion Power Plant, at Section 2.1 (September 2016) ("2016 AECOM Report"), attached as **Exhibit 26**.[13]

(1) <u>Background data</u>. Sierra Club used constant, rather than hourly and seasonal variations, in background concentrations. This does not conform with EPA's Modeling TAD. *See* Exhibit 7 at Section 5.2. Sierra Club also utilized a non-geographically appropriate – and, thus, non-representative – background concentration derived from an ambient monitor in Oglesby, Illinois using data from 2011 through 2013, despite the fact that Sierra Club modeling used emissions data from 2012 through 2014. Finally, contrary to EPA's Modeling TAD, Sierra Club inappropriately included emissions from Ameren Missouri's Joppa Power Plant located over 48 kilometers from Marion Station. *Id.* at Section 8.1.

(2) <u>Emission Rates</u>. Sierra Club (and Illinois EPA) relied upon emission data that is not representative of current (and future) emission rates at Marion Station. In 2015, emission rates at Marion Station decreased significantly as a result of measures taken by SIPC to comply with the federal Mercury and Air Toxics Standard (MATS) and the Cross-State Air Pollution Rule (CSAPR). *See* Exhibit 11 at 26, Table 2 (illustrating that actual SO2 emissions decreased by approximately 50% in 2015); *see also* Exhibit 26, at Section 5.0. As a result, AECOM's modeling, which relied upon

---

[13] Notably, both Illinois EPA and EPA reached many of these same conclusions; yet, EPA ignored Illinois EPA's recommendations and relied upon Sierra Club's modeling for designation.

emissions data from 2013-15, is far more representative than Sierra Club modeling

based on 2012-2014 emissions data. EPA's rationale – that the use of 2012-14 data is

credible because it represents only a 7% increase from 2013-15 data utilized by

AECOM – is irrelevant and fundamentally unsound. *See* Exhibit 11 at 30. A 7%

difference could clearly make the difference between attainment and nonattainment.[14]

As noted above, area designations are intended to reflect *actual* ambient conditions.

The use of emissions data that does not reflect federally mandated reductions

generates results that are not representative of actual ambient conditions and is

improper.

(3) <u>Corrected Source Characterization – Stack Parameters and Building Heights</u>.

AECOM modeling used more representative building heights and stack parameters

(stack diameter and stack height) for Unit 123 at Marion Station. Illinois EPA

acknowledged that AECOM's source characterization parameters were more reliable

and accurate inputs for modeling. *See* Exhibit 9. As demonstrated in Section IV.D of

this Petition, *infra*, even minor corrections to building dimensions can have a

significant impact on attainment modeling. EPA acknowledged that Sierra Club's

modeling included incorrect source characterization inputs but, in conclusory fashion,

relied upon the *absence* of information quantifying the impact of those deficiencies to

substantiate EPA's reliance on Sierra Club's modeling. *See* Exhibit 11 at 30. EPA's

reliance on insufficient and non-compelling data is contrary to both EPA's own

Modeling TAD and the CAA.

---

[14] Indeed, 7% of the 2010 SO2 NAAQS limit of 196.4 ug/m3 amounts to an undeniably significant 14 ug/m3 difference.

24

(4) <u>Stack Temperature and Flow</u>.  AECOM modeling relied upon hourly varying stack temperatures, velocities and flow rate data.  Not only is this approach consistent with EPA's Modeling TAD (as opposed to Sierra Club's use of constant values), but it allowed AECOM's modeling to substitute representative stack temperature data for periods without valid data.  Critically, EPA agreed that such "input data *improved the representation* of source characteristics."  Exhibit 11 at 25 (emphasis added).  As a result, EPA's reliance on modeling that used non-representative stack temperature and flow inputs was inconsistent with EPA's Modeling TAD and, therefore, not appropriate.

SIPC does not contend that EPA's designation was improper only because it relied on modeling that contained a single non-representative or inaccurate data input. Instead, SIPC contends that EPA's nonattainment designation was wholly based upon a plethora of errors and inconsistencies in the modeling upon which EPA relied, while simultaneously ignoring or discrediting better information provided by SIPC and AECOM.  EPA's mandate is to evaluate *all* available data and to designate an area as attainment or nonattainment only where *compelling* data supports that designation.  Based on the *totality* of inaccurate, faulty and non-representative data in Sierra Club's modeling, that modeling cannot – and does ***not*** – provide compelling data that the area around the Marion Station is in nonattainment of the 2010 $SO_2$ NAAQS.  Therefore, EPA's reliance on Sierra Club's modeling was improper.

### iii.   *EPA Improperly Ignored AERMOD Modeling that Utilized More Representative Source Characterization Inputs.*

AECOM's March 2016 modeling included modeling runs that adjusted stack temperature inputs to more accurately represent emission characteristics from Marion Station stacks.  *See* AECOM, Characterization of 1-Hour $SO_2$ Concentrations for the Marion Power Plant (March

2016), **Exhibit 27;** *see also* Exhibit 8.  EPA rejected these modeling runs without any evaluation because EPA argued they constituted an alternative model that required pre-approval under EPA's modeling regulations, 40 C.F.R. Part 51, Appendix W.  *See* Exhibit 11 at 22.  EPA is mistaken.  While EPA correctly noted that the use of alternative *modeling* requires EPA approval under Appendix W, AECOM's adjustment of stack temperature *inputs* to account for moisture in the flue gas (referred to as the "AERMOIST formulation") did not use or implement an alternate model.  *See* Exhibit 8 (discussing corrections to various stack inputs).  Appendix W does not require EPA approval to use more representative source inputs.  Therefore, EPA must reconsider and evaluate AECOM's modeling runs utilizing AERMOIST.

Appendix W is unambiguous.  Section 3.2.2 sets forth specific criteria and conditions to evaluate the "acceptability of an alternative *model*."  *See* 40 C.F.R. Part 51, Appendix W, subsection 3.2.1(a) (emphasis added); subsection 3.2.2(a) ("where "an alternative model is more appropriate than a preferred model, that model may be used subject to the recommendations of this subsection"); subsection 3.2.2(e) (identifying the 5 conditions for approvability of an alternative model).[15]  Wholly absent from the rule is any requirement that conditions the use of an alternate input to an existing model upon EPA approval.  This makes sense.  Each emission source generally possesses unique source characteristics that must be input into a model to

---

[15] EPA recently issued guidance clarifying that the use of so-called "beta options" in AERMOD modeling requires "adhere[nce] to the requirements of Section 3.2 in the current 2005 version of the *Guideline on Air Quality Models* (Appendix W)."  *See* EPA Memorandum, Clarification of the Approval Process for Regulatory Application of the AERMOD Modeling System Beta Options (Dec. 10, 2015), https://www3.epa.gov/ttn/scram/guidance/clarification/AERMOD_Beta_Options_Memo-20151210.pdf. Beta options such as "LOWWIND3" and "ADJ_U*" utilize changes to EPA's preferred modeling approaches under AERMOD.  As a result, use of beta option alternative models requires EPA approval under Appendix W.  Both AECOM and Illinois EPA submitted data and information supporting the use of LOWWIND3 at Marion Station in accordance with Appendix W.  *See* Exhibit 8; Exhibit 9 ("Illinois EPA supports allowing the use of such beta options such as LOWWIND3").

generate a source-specific result.  Changes in source characterization inputs are an inherent part of site-specific modeling and, therefore, do not require EPA approval.[16]

Unit 4 at Marion Station operates a wet limestone flue gas desulfurization device, which causes high stack moisture content in the flue gas and increased buoyancy in the resulting plume. *See* Exhibit 26 at Section 4.6.  AERMOD can effectively model this unique source characteristic by merely changing the hourly input stack temperature of the model's default dry plume (*i.e.*, the AERMOIST formulation). *Id.*  No modification of the underlying model occurs. *Id.*

As discussed above, EPA must rely on modeling that is representative of actual conditions.  The incorporation of AERMOIST into the default AERMOD modeling more accurately reflects actual ambient conditions around Marion Station.  The impact on modeling results is significant.  In AECOM's March 2016 modeling, AECOM demonstrated an 8% decrease (approximately 15 ug/m3) in modeled emissions as compared to modeling without AERMOIST.  *See* Exhibit 27, Table 4-1 (comparing modeled concentrations in "current default" to "current default with AERMOIST").  Similarly, AECOM's updated September 2016 modeling indicated a 4% decrease (approximately 8 ug/m3).  *See* Exhibit 26, Table 5-1 (comparing modeled concentrations in Scenario 1 to Scenario 2).  In both runs, use of AERMOIST demonstrated that the area around Marion Station is in attainment of the 2010 SO$_2$ NAAQS.

## D. Even Absent the Exclusion of Modeling Receptors from the Northern Property, Marion Station Models Attainment of the 2010 SO2 NAAQS.

The exclusion of modeling receptors from the Northern Property is consistent with EPA

---

[16] *See* EPA Region 4 Response to Eastman Chemical's Additional EASTMOD Information, attached as Appendix B to AECOM March 2016 modeling (Exhibit 27) submission to EPA ("EPA Region 4 has determined that the proposed AERLIFT component of EASTMOD is a source characterization procedure and is not an integral part of the AERMOD Modeling system").

guidance and the CAA. EPA's principal objection to AECOM's modeling, however, is the exclusion of receptors from this area. Conversely, SIPC's principal objection to EPA's determination – apart from EPA's improper inclusion of the receptors at the Northern Property – is EPA's reliance on non-representative modeling provided by Sierra Club. In order to address these discrepancies, AECOM ran additional modeling that conservatively (i) included receptors[17] in the Northern Property while (ii) utilizing more representative source characterization modeling inputs. The modeling demonstrates that even when *including* receptors in the non-public Northern Property, Marion Station models *attainment* of the 2010 SO$_2$ NAAQS.

The results (and additional analysis) of AECOM's updated modeling are included in the 2016 AECOM Report (Exhibit 26) and AECOM's supporting modeling files provided thereto.[18] AECOM utilized more accurate (*i.e.,* more representative) building dimensions based upon site-specific surveys taken in 2016 for two buildings located in close proximity to the Unit 123 stack.

---

[17] As further discussed in the 2016 AECOM Report, AECOM conservatively added additional receptors along Lake Egypt Road to address EPA's concerns that modeling should include roadways. SIPC notes that EPA's Modeling TAD effective at the date EPA promulgated the 2016 Designations did not require receptors on roadways. *See* Exhibit 7 at Section 4.2 ("[i]n areas where it is not feasible to place a monitor…receptors can be ignored or not placed"). Indeed, this makes particular sense with respect to Lake Egypt Road where the listed speed limit is 55 mph with shoulder, making the placement of monitors virtually impossible. In August 2016, *after* EPA designated Williamson County nonattainment, EPA issued an updated modeling TAD, in which the Agency advised that it may be appropriate to locate receptors "near" roadways. *See* https://www.epa.gov/sites/production/files/2016-06/documents/so2modelingtad.pdf. Thus, although not required, SIPC directed AECOM to update its default model to include receptors along Lake Egypt Road.

SIPC further notes that the inclusion of receptors on Lake Egypt Road addresses the concern EPA expressed in the Final TSD regarding the location of peak 3-year average 99th percentile 1-hour average concentrations. EPA noted that AECOM's modeling indicated peak concentrations occurred to the South-Southwest of Marion Station, while both Illinois EPA's and Sierra Club's modeling indicated peak concentrations to the North. *See* Exhibit 11 at 28-29. In the 2016 AECOM Report, default modeling now indicates that peak concentrations occur to the Northeast of the Marion Station stacks. Exhibit 26 at Section 5.0. Nevertheless, even with peak concentrations to the North of Marion Station, default modeling demonstrated *attainment* of the 2010 SO2 NAAQS.

[18] Note: Due to email size restrictions, a CD containing the modeling files for the 2016 AECOM Report was hand-delivered to EPA along with a copy of this Petition. Modeling files were not provided in the email submission of this Petition.

*See* 2016 AECOM Report at Sections 4.1, 5.0. The use of more representative building dimensions in conjunction with AECOM's default modeling inputs relied upon in AECOM's March 2016 modeling demonstrates that the highest ambient concentration of $SO_2$ is 194.9 ug/m3, ***below*** the 2010 SO2 NAAQS. *Id.* at Table 5-1. Further, when receptors are properly excluded from the Northern Property, modeling indicates that the highest ambient concentrations at receptor locations are even lower (191.0 ug/m3). *Id.*

In sum, modeling provides substantial support that Marion Station is in attainment of the 2010 $SO_2$ NAAQS, regardless of the use or exclusion of receptors in the Northern Property.

## CONCLUSION

For the reasons stated above, SIPC requests that EPA reconsider its 2016 Designation for Williamson County, Illinois and designate the area around Marion Station as in attainment of the 2010 $SO_2$ NAAQS. In the alternative, SIPC requests that EPA designate the area around Marion Station as unclassifiable of the 2010 $SO_2$ NAAQS if EPA determines that the existence of conflicting modeling data precludes an attainment designation at this time.

Respectfully submitted,

Southern Illinois Power Cooperative

Stephen J. Bonebrake
J. Michael Showalter
David M. Loring
Schiff Hardin LLP
233 South Wacker Drive, Suite 6600
Chicago, Illinois 60606
*Counsel for Southern Illinois Power Cooperative*

## EXHIBIT LIST

| | |
|---|---|
| Exhibit 1 | EPA Final Rule - 2016 Designations, 81 Fed. Reg. 45039 (July 12, 2016) |
| Exhibit 2 | *Sierra Club v. McCarthy* (N.D. Cal. Mar. 2, 2015) – Consent Decree |
| Exhibit 3 | Illinois EPA September 18, 2015 2010 $SO_2$ NAAQS Recommendations |
| Exhibit 4 | EPA Region 5 October 20, 2015 letter to Illinois EPA re Sierra Club |
| Exhibit 5 | Illinois EPA August 24, 2016 letter re SIPC FOIA Request |
| Exhibit 6 | Illinois EPA November 9, 2015 letter to EPA Region 5 re Sierra Club |
| Exhibit 7 | EPA Modeling TAD, December 2013 |
| Exhibit 8 | AECOM $SO_2$ Modeling on behalf of SIPC, December 21, 2015 |
| Exhibit 9 | Illinois EPA 120-Day letter to EPA re Proposed Designations, April 19, 2016 |
| Exhibit 10 | EPA Region 5 Preliminary Recommendations to Illinois, February 16, 2016 |
| Exhibit 11 | EPA Final TSD, July 2, 2016 |
| Exhibit 12 | EPA Memorandum, Interpretation of Ambient Air, June 22, 2007 |
| Exhibit 13 | EPA Model Clearinghouse, Record No. 99-V-03, September 18, 1999 |
| Exhibit 14 | EPA Model Clearinghouse, Record No. 99-V-02, August 18, 1999 |
| Exhibit 15 | Photograph – Guardrail Northern Property |
| Exhibit 16 | Photograph – Lake Egypt Road; Guardrail; Fencing; Spillway; Northern Property |
| Exhibit 17 | Photograph – Security Camera; Northern Property |
| Exhibit 18 | Photograph – Northern Property; slope |
| Exhibit 19 | Photograph – Northern Property; signage |
| Exhibit 20 | Affidavit of Robert Todd Gallenbach, Vice President of Operations, Marion Station |
| Exhibit 21 | Photograph – New fencing; new signage; Northern Property |
| Exhibit 22 | Photograph – New fencing; new signage; Northern Property |
| Exhibit 23 | Photograph – New fencing; new signage; Northern Property |
| Exhibit 24 | Photograph – New fencing; new signage; Northern Property |
| Exhibit 25 | EPA, *In the Matter of Hibbing Taconite Co.* |
| Exhibit 26 | AECOM Updated Modeling Report for Marion Station, September 2016 (CD of Modeling Data Provided to EPA by hand-delivery) |
| Exhibit 27 | AECOM Modeling Report for Marion Station, March 2016 |

# EXHIBIT 27



Environment

Submitted to:
Southern Illinois Power Cooperative
Marion, Illinois

Submitted by:
AECOM
Chelmsford, MA
60447675.100
March 2016

# Characterization of 1-Hour SO$_2$ Concentrations for the Marion Power Plant



Cover Photo Credit: https://vimeo.com/120840685



Environment

Submitted to:
Southern Illinois Power Cooperative
Marion, Illinois

Submitted by:
AECOM
Chelmsford, MA
60447675.100
March 2016

# Characterization of 1-Hour SO$_2$ Concentrations of the Marion Power Plant



Prepared By:  Laura L. Warren

Reviewed By:  Robert Paine

Project Quality Review By:  Melissa McLaughlin

# Contents

**1.0  Introduction** ........................................................................................................ **1-3**

    1.1  Report Organization ...................................................................................... 1-3

**2.0  Description of Modeled Emission Sources** ............................................... **2-1**

    2.1  Marion Power Plant ........................................................................................ 2-1

    2.2  Regional Background ...................................................................................... 2-1

**3.0  Dispersion Modeling Approach** .................................................................. **3-1**

    3.1  Good Engineering Practice Stack Height Analysis ........................................ 3-1

    3.2  Dispersion Environment ................................................................................. 3-1

    3.3  Model Receptor Grid and Terrain .................................................................. 3-2

    3.4  Meteorological Data Processing ..................................................................... 3-2

    3.5  Emissions and Stack Parameters .................................................................. 3-4

    3.6  Source Characterization and Model Options ................................................. 3-5

        3.6.1  Source Characterization using the AERMOIST Technique ............... 3-5

        3.6.2  Low Wind Model Options .................................................................. 3-6

**4.0  AERMOD Modeling Results and Conclusions** ......................................... **4-1**

**Appendix A:**  Atmospheric Environment Paper on Source Characterization Refinements for Routine Modeling Applications

**Appendix B:**  Communication from EPA Region 4 Regarding Eastman Modeling Approaches

**Appendix C:**  Alternative Model Justification for Low Wind Speed Options (AERMET ADJ_U* and AERMOD LOWWIND3, Version 15181)

**Appendix D:**  Evaluation of Low Wind Modeling Approaches for Two Tall-Stack Databases

**Appendix E:**  Evaluation of Low Wind Modeling Approaches for Two Tall-Stack Databases with AERMET ADJ_U* and AERMOD LOWWIND3 Options

**Appendix F:**  Modeling Archive (Provided on Compact Disc to EPA)

# List of Tables

Table 3-1:    AERSURFACE Bowen Ratio Condition Designations..................................................3-7

Table 3-2:    Stack Locations and Exhaust Parameters.................................................................3-7

Table 3-3:    Comparison of Stack Diameters used by AECOM and IEPA for Marion Power Plant ....3-8

Table 4-1:    AERMOD Modeled Design SO$_2$ Concentration Results ...............................................4-2

# List of Figures

Figure 2-1:    Aerial Imagery of the Marion Power Plant Location with Associated Boilers.................2-2

Figure 2-2:    SO$_2$ Background Sources Included in Modeling .........................................................2-2

Figure 2-3:    Randolph County Monitor Location with Respect to Marion Power Plant ......................2-3

Figure 2-4:    3-year Average of Maximum Concentration by Season and Hour of Day at the
              Randolph County SO$_2$ Monitor for 2013-2015 ............................................................2-3

Figure 3-1:    Building Layout used in Modeling for Marion Power Plant............................................3-8

Figure 3-2:    Modeling Receptor Grid – Far Field .........................................................................3-9

Figure 3-3:    Modeling Receptor Grid – Near Field.........................................................................3-9

Figure 3-4:    Paducah, KY Wind Rose (2013-2015) ....................................................................3-10

Figure 3-5:    Invalid Stack Temperature and Exit Velocity Data for 3/22/14 – 7/6/14 for Unit 123 ....3-10

Figure 3-6:    Cumulative Frequency of Stack Temperature for Valid Unit 123 in 2013-2015............3-11

Figure 3-7:    Invalid Stack Temperature and Emissions Data in 7/9/15 – 7/15/15 for Unit 4.............3-11

Figure 4-1:    99th Percentile 3-year Average 1-hour SO$_2$ Concentration Isopleths using Default
              Options ................................................................................................................4-2

Figure 4-2:    Zoomed in 99th Percentile 3-year Average 1-hour SO$_2$ Concentration Isopleths using
              Default Options....................................................................................................4-3

Figure 4-3:    99th Percentile 3-year Average 1-hour SO$_2$ Concentration Isopleths using Default
              Options and AERMOIST ........................................................................................4-3

Figure 4-4:    99th Percentile 3-year Average 1-hour SO$_2$ Concentration Isopleths using ADJ_U* and
              LOWWIND3 Options with AERMOIST ......................................................................4-4

Figure 4-5:    Monthly SO$_2$ Emissions at Marion Power Plant in 2012-2015 ......................................4-4

# 1.0   Introduction

The United States Environmental Protection Agency (EPA) is implementing the 2010 1-hour SO$_2$ National Ambient Air Quality Standard (NAAQS)[1] in an approach that involves either a dispersion modeling or monitoring approach to characterize local SO$_2$ concentrations near isolated emission sources.  On March 20, 2015, EPA informed affected states that certain emission sources within their states will be addressed in an expedited[2] round of designations under the 1-hour SO$_2$ NAAQS due to terms of the SO$_2$ Consent Decree negotiated between the Sierra Club and EPA.  The EPA intends to designate the affected areas as either unclassifiable/attainment, non-attainment or unclassifiable by July 2, 2016 after a review of available modeling or monitoring data to support the SO$_2$ concentration characterizations.  EPA completed its initial review of state recommendations and issued their comments on these recommendations to the states on February 16, 2016.  A public comment period on the state recommendations and EPA comments ends on March 31, 2016 and final input from the states must be received by April 19, 2016.  EPA will issue their final designation findings by July 2, 2016.

One of the affected sources is the Marion Power Plant, located in Marion, Illinois northwest of the Lake of Egypt, and owned and operated by the Southern Illinois Power Cooperative (SIPC).  The purpose of this report is to provide public comment with an updated modeling analysis on the EPA response[3] to the Illinois Environmental Protection Agency (IEPA) designation recommendations regarding the results of a dispersion modeling characterization of SO$_2$ concentrations in the vicinity of the Marion Power Plant.  As this report describes, this dispersion modeling analysis was conducted for the 2013-2015 period using both the current regulatory defaults and also using proposed EPA changes to the preferred modeling approaches.  A source characterization technique called AERMOIST was also used to more accurately model the plume rise effect caused by moisture in a stack's plume, currently unaccounted for in AERMOD.

This modeling builds off of the IEPA AERMOD 1-hour SO$_2$ area designations modeling, provided upon request to SIPC.  However, some errors in IEPA modeling were identified and corrected.  These issues were presented to IEPA on December 17, 2015 and are further discussed in the following sections.

## 1.1    Report Organization

Section 2 of this report describes the Marion Power Plant and the other sources modeled.  This section also describes the source of regional monitoring data that is used to represent distant source impacts.  Section 3 describes the dispersion model approaches used in this study.  Section 4 of the report describes the modeling results, and indicates that with modeling conducted in accordance with the Modeling Technical Assistance Document (TAD),[4] the characterization of SO$_2$ concentrations results in a finding of NAAQS attainment with both default and refined modeling approaches.

---

[1] 75 FR 35571 is the final rule for the 2010 SO$_2$ NAAQS.

[2] Information on the "SO$_2$ Consent Decree" is available at http://www.epa.gov/so2designations/data.html

[3] http://www.epa.gov/so2designations/stater2.html

[4] http://www.epa.gov/airquality/sulfurdioxide/pdfs/SO2ModelingTAD.pdf

**Appendices A and B** provide documentation for the source characterization technique, AERMOIST, and EPA comments on the use of a similar source characterization technique in a recent modeling application.  Documentation for the use of the low wind options as a non-default model is provided in **Appendix C to E**.  Modeling files are available by CD in a modeling archive provided to USEPA Region 5, representing **Appendix F**.

# 2.0    Description of Modeled Emission Sources

## 2.1    Marion Power Plant

The Marion Power Plant is a 433-megawatt power plant located in Marion, Illinois, northwest of the Lake of Egypt (**Figure 2-1**). The station operates a coal-fired circulating fluidized bed boiler (Unit 123) and a coal-fired cyclone boiler (Unit 4). Two other boilers are simple cycle combustion turbines that operate on natural gas or oil, Units 5 and 6. The area surrounding Marion is considered rural with mostly simple terrain out to 50 km from the facility.

## 2.2    Regional Background

According to the EPA March 1, 2011 Memorandum[5] and the analysis presented at the 2011 EPA modeling workshop[6], selection of regional background sources should be limited to 10 kilometers from the source location. In the IEPA designations recommendation, the U.S. Penitentiary was identified as a nearby background source, which is located approximately 5 km northwest of the Marion Power Plant (**Figure 2-2**)[7]. The U.S. Penitentiary has been included as a nearby background source in this modeling analysis. According to the EPA response to Illinois Technical Support Document (TSD), EPA found the IEPA's identification of this background source to be acceptable[8]. The total concentration for 1-hour $SO_2$ NAAQS compliance was computed by adding the modeled concentration to the regional background concentrations from the Houston, Illinois $SO_2$ monitor in Randolph County (AQS ID 17-157-0001) located about 94 km away from Marion, shown in **Figure 2-3**.

The background concentration was calculated as a 3-year average (2013-2015) of the maximum concentration by season and hour-of-day and added internally in AERMOD to the AERMOD-predicted concentration for comparison with the 1-hour $SO_2$ National Ambient Air Quality Standard (NAAQS) of 196.5 µg/m$^3$. The Randolph County monitor's seasonal $SO_2$ concentrations, obtained from the EPA AirData website, are displayed in **Figure 2-4**. Previous modeling by IEPA used the same season and hour-of-day background concentration approach derived from this $SO_2$ monitor for 2012-2014. In addition, IEPA may have excluded data from a specific wind sector to avoid double counting of modeled sources[9], likely due to the Baldwin Power Plant, located within 7 km to the WNW of the monitor. In this case, data was not excluded based on wind direction, making these background concentrations conservative. Future modeling analyses may involve a refinement of these background concentrations.

---

[5] http://www.epa.gov/scram001/guidance/clarification/Additional_Clarifications_AppendixW_Hourly-NO2-NAAQS_FINAL_03-01-2011.pdf

[6] http://www.cleanairinfo.com/regionalstatelocalmodelingworkshop/archive/2011/Presentations/6-Thursday_AM/6-3_AB-3_Presentation_at_EPA_Modeling_Workshop.pdf, Page 5

[7] Illinois TSD for $SO_2$ Designation Recommendations for Electric Power Facility Areas, https://www.epa.gov/so2designations/round2/R5ILRecAtt1TechAnalysis.pdf

[8] EPA Response TSD to Illinois Area Designations for the 2010 $SO_2$ Primary NAAQS, https://www.epa.gov/so2designations/round2/05_IL_tsd.pdf

[9] EPA Response TSD for Illinois, https://www.epa.gov/so2designations/round2/05_IL_tsd.pdf

**Figure 2-1:   Aerial Imagery of the Marion Power Plant Location with Associated Boilers**



**Figure 2-2:   SO$_2$ Background Sources Included in Modeling**



**Figure 2-3:   Randolph County Monitor Location with Respect to Marion Power Plant**



**Figure 2-4:   3-year Average of Maximum Concentration by Season and Hour of Day at the Randolph County SO₂ Monitor for 2013-2015**



# 3.0   Dispersion Modeling Approach

The suitability of an air quality dispersion model for a particular application is dependent upon several factors.  The following selection criteria have been evaluated:

- stack height relative to nearby structures;
- dispersion environment;
- local terrain; and
- representative meteorological data.

The EPA Guideline on Air Quality Models (Appendix W[10]) prescribes a set of approved models for regulatory applications for a wide range of source types and dispersion environments.  Based on a review of the factors discussed below, the latest version of AERMOD (version 15181) was used to assess air quality impacts for the Marion Power Plant for the most recent three years of 2013-2015 with actual emissions and concurrent meteorological data.  Previous modeling by IEPA also used the latest version of AERMOD, but it used 2012-2014 emissions which were higher than those of 2013-2015.

## 3.1     Good Engineering Practice Stack Height Analysis

Good engineering practice (GEP) stack height is defined as the stack height necessary to ensure that emissions from the stack do not result in excessive concentrations of any air pollutant as a result of atmospheric downwash, wakes, or eddy effects created by the source, nearby structures, or terrain features.  In this modeling exercise, actual stack heights were used, consistent with the EPA $SO_2$ Modeling TAD[11].  AECOM developed BPIP downwash parameters for Marion using SIPC-provided building information processed using BPIPPRIME (version 04274).  This building data, specifically the building heights, were found to differ from those used in the IEPA modeling.  Some SIPC building heights are higher while some were lower than IEPA building heights.  For the U.S. Penitentiary, AECOM used the BPIP downwash parameters provided by IEPA in their modeling files.  **Figure 3-1** shows the Marion Power Plant building layout.

## 3.2     Dispersion Environment

The application of AERMOD requires characterization of the local (within 3 kilometers) dispersion environment as either urban or rural, based on an EPA-recommended procedure that characterizes an area by prevalent land use.  This land use approach classifies an area according to 12 land use types.  In this scheme, areas of industrial, commercial, and compact residential land use are designated urban.  According to EPA modeling guidelines, if more than 50% of an area within a 3-km radius of the facility is classified as rural, then rural dispersion coefficients are to be used in the dispersion modeling analysis.  Conversely, if more than 50% of the area is urban, urban dispersion

---

[10] http://www.epa.gov/ttn/scram/guidance/guide/appw_05.pdf

[11] https://www.epa.gov/airquality/sulfurdioxide/pdfs/SO2ModelingTAD.pdf

coefficients are used. IEPA performed this analysis as described in the IEPA TSD and determined the 3-km area surrounding Marion Power Plant is rural[12]. Therefore, rural dispersion was assumed.

### 3.3    Model Receptor Grid and Terrain

Receptor grid spacing and extent used in this modeling exercise was the same as was used by IEPA in their 1-hour $SO_2$ modeling with some exceptions. The Marion Power Plant property boundaries were revised to more accurately reflect property owned by SIPC. SIPC owns an area of land northeast of the main property, across the street. This area is restricted from public access. The receptor grid also varies from IEPA's because receptors were removed from locations where an $SO_2$ monitor could not physically be placed (e.g., over water and on roadways). In particular, receptors were removed over the Lake of Egypt and along the roadway between the northeastern property and the main property. This change is consistent with the $SO_2$ Modeling TAD.

Terrain elevations from 30-meter National Elevation Data (NED) from USGS were processed with AERMAP (version 11103) to develop the receptor terrain elevations required by AERMOD. **Figures 3-2 and 3-3** show the receptor network used in this analysis.

### 3.4    Meteorological Data Processing

Meteorological data from Paducah, KY and upper air observations from Nashville, TN were processed using AERMET (version 15181) and included 1-minute wind data using AERMINUTE (version 15272) to reduce the occurrence of calm wind observations. **Figure 3-4** shows the 3-year average (2013-2015) wind rose. Processing was performed based on IEPA AERMET input files using both the AERMET default and ADJ_U* options. AECOM reprocessed 2013-2014 AERMOD-ready meteorological files using IEPA inputs. For 2015, additional processing was required using AERSURFACE (version 13016) which is described in further detail below.

AERMET creates two output files for input to AERMOD:

- SURFACE: a file with boundary layer parameters such as sensible heat flux, surface friction velocity, convective velocity scale, vertical potential temperature gradient in the 500-meter layer above the planetary boundary layer, and convective and mechanical mixing heights. Also provided are values of Monin-Obukhov length, surface roughness, albedo, Bowen ratio, wind speed, wind direction, temperature, and heights at which measurements were taken.

- PROFILE: a file containing multi-level meteorological data with wind speed, wind direction, temperature, sigma-theta ($\sigma_\theta$) and sigma-w ($\sigma_w$) when such data are available.

AERMET requires specification of the meteorological station site characteristics including surface roughness ($z_o$), albedo (r), and Bowen ratio ($B_o$). For 2013-2014, these parameters were provided by IEPA. For 2015, these parameters were developed by AECOM according to the guidance provided by EPA in the AERMOD Implementation Guide (AIG)[13].

The AIG provides the following recommendations for determining the site characteristics:

---

[12] Illinois TSD for $SO_2$ Designation Recommendations for Electric Power Facility Areas, https://www.epa.gov/so2designations/round2/R5ILRecAtt1TechAnalysis.pdf.

[13] EPA 2009. AERMOD Implementation Guide. U.S. Environmental Protection Agency, Research Triangle Park, NC. March 19, 2009.

1. The determination of the surface roughness length should be based on an inverse distance weighted geometric mean for a default upwind distance of 1 kilometer relative to the measurement site. Surface roughness length may be varied by sector to account for variations in land cover near the measurement site; however, the sector widths should be no smaller than 30 degrees.

2. The determination of the Bowen ratio should be based on a simple un-weighted geometric mean (i.e., no direction or distance dependency) for a representative domain, with a default domain defined by a 10-km by 10-km region centered on the measurement site.

3. The determination of the albedo should be based on a simple un-weighted arithmetic mean (i.e., no direction or distance dependency) for the same representative domain as defined for Bowen ratio, with a default domain defined by a 10-km by 10-km region centered on the measurement site.

The AIG recommends that the surface characteristics should be determined based on digitized land cover data. EPA has developed a tool called AERSURFACE that can be used to determine the site characteristics based on digitized land cover data in accordance with the recommendations from the AIG discussed above. AERSURFACE incorporates look-up tables of representative surface characteristic values by land cover category and seasonal category. AERSURFACE was applied with the instructions provided in the AERSURFACE User's Guide.

The current version of AERSURFACE (version 13016) supports the use of land cover data from the USGS National Land Cover Data 1992 archives (NLCD92). The NLCD92 archive provides data at a spatial resolution of 30 meters based upon a 21-category classification scheme applied over the continental U.S. The AIG recommends that the surface characteristics should be determined based on the land use surrounding the site where the surface meteorological data were collected.

As recommended in the AIG for surface roughness, the 1-km radius circular area centered at the meteorological station site was created. For the 2015 analysis, the area was divided into 12 sectors of 30° for consistency with IEPA[14].

In AERSURFACE, the various land cover categories are linked to a set of seasonal surface characteristics. As such, AERSURFACE requires specification of the seasonal category for each month of the year. The following five seasonal categories are supported by AERSURFACE, with the applicable months of the year specified for this site. Again, these designations were consistent with IEPA designations.

1. Midsummer with lush vegetation (June-August).
2. Autumn with un-harvested cropland (September-November).
3. Late autumn after frost and harvest, or winter with no snow (December-February).
4. Winter with continuous snow on ground (not applicable).
5. Transitional spring with partial green coverage or short annuals (March-May).

For Bowen ratio, the land use values are linked to three categories of surface moisture corresponding to average, wet, and dry conditions. The surface moisture condition for the site may vary depending

---

[14] Illinois TSD for SO$_2$ Designation Recommendations for Electric Power Facility Areas, https://www.epa.gov/so2designations/round2/R5ILRecAtt1TechAnalysis.pdf.

on the meteorological data period for which the surface characteristics will be applied. AERSURFACE applies the surface moisture condition for the entire data period. Therefore, if the surface moisture condition varies significantly across the data period, then AERSURFACE can be applied multiple times to account for those variations. As recommended in the AERSURFACE User's Guide, the surface moisture condition for each month was determined by comparing precipitation for the period of data to be processed to the 30-year climatological record, selecting "wet" conditions if precipitation is in the upper 30th percentile, "dry" conditions if precipitation is in the lower 30th percentile, and "average" conditions if precipitation is in the middle 40th percentile. The 30-year precipitation data set used in this modeling was taken from the NOAA Online Weather Data (NOWData)[15]. The monthly designations of surface moisture input to AERSURFACE are summarized in **Table 3-1**.

## 3.5     Emissions and Stack Parameters

Hourly $SO_2$ emissions for the Marion Power Plant were obtained from the EPA Clean Air Markets Division's (CAMD) Air Markets Program Data[16] for the latest three years (2013-2015), while SIPC provided hourly stack exhaust parameters. AECOM reviewed the hourly emission and stack exhaust parameters data for this period. For modeling purposes, we created a 3-year hourly emissions, exit velocity, and exit temperature file. An allowable $SO_2$ emission rate and constant stack exhaust parameters for the U.S. Penitentiary were used as provided by IEPA modeling files. **Table 3-2** provides the stack locations and exhaust parameters used in this modeling analysis.

It is important to note that some inconsistencies were found in the stack diameters used by IEPA in previous modeling and those listed in the IEPA TSD as shown in **Table 3-3**. After a review of the IEPA modeling files, AECOM corrected three of the four units' stack diameters based on information provided by SIPC. The largest difference was found in the Units 5 and 6 stack diameters, which have rectangular stack areas of 171 ft² with an equivalent stack diameter of 14.76 ft, or 4.50 m. However, this difference likely had minimal impact on the IEPA modeling due to the intermittency of Units 5 and 6 operations.

During the AECOM review of hourly emissions and hourly stack exhaust parameters data, multiple periods were identified where the reported Units 123 and 4 stack temperatures and/or exit velocities (i.e., flow rates) were missing or invalid when emissions were greater than zero. As a result, site-specific data handling and substitution procedures were required to correct the missing and invalid data. Hourly data with greater than zero emissions was the only concern for this analysis because AERMOD will ignore hourly data when emissions are zero. Two time periods of most significance were March 22 – July 6, 2014 for Unit 123 and July 9 – 15, 2015 for Unit 4.

For March 22 – July 6, 2014, Unit 123's continuous emission monitor system (CEMS) reported faulty stack temperature data (**Figure 3-5**). This issue also affected the exit velocity because exit velocity was derived from standard flow rates that were converted to actual flow rates using the stack temperature. A representative stack temperature was determined by examining a cumulative frequency chart of all valid Unit 123 stack temperatures during the modeling period (2013-2015). The chart shows a sharp increase in frequency at a temperature of 435 K, or 323°F (**Figure 3-6**). This stack temperature was substituted for the faulty temperature data in this period. This substitute can

---

[15] http://w2.weather.gov/climate/xmacis.php?wfo=pah

[16] https://ampd.epa.gov/ampd/

be considered as conservative because it is a lower temperature than 90% of the data and low temperatures lead to reduced plume rise.

For July 9 – 15, 2015, Unit 4's CEMS reported invalid stack temperature data as shown in **Figure 3-7**. Because this time period occurred during a short time and temperatures were nearly constant before and after the invalid data, the invalid data was substituted by taking the average of the hourly temperature before and the hourly temperature after the invalid data. This average was 338 K, or 149°F.

## 3.6     Source Characterization and Model Options

The initial modeling analysis described in this report used default model options, which should be acceptable to EPA without further justification. However, more accurate characterization of $SO_2$ concentrations in the vicinity of the Marion Power Plant involves implementation of a source characterization technique called AERMOIST and low wind model options that are currently proposed as default options in the preliminary revision to Appendix W modeling guidance. Therefore, additional modeling analyses were performed using a combination of AERMOIST and low wind options to provide supplemental information to EPA as to the more likely $SO_2$ concentrations in the vicinity of the plant.

### 3.6.1     Source Characterization using the AERMOIST Technique

For over ten years, Marion Power Plant's Unit 4 cyclone boiler has operated a wet limestone $SO_2$ control device. This control device results in an average stack moisture content of 12% for the plume. Stacks with substantially moist plumes can lead to latent heat release of condensation after the plume exits the stack, providing additional plume rise relative to a "dry" plume scenario. Although some of the initial added buoyancy is later lost due to partial evaporation, a net gain in plume rise occurs. The AERMOD plume rise formulation is based on the assumption of a dry plume, in that the chimney plume is considered to be far from being saturated and carries essentially no moisture. A procedure to incorporate the moist plume effect can be performed by adjusting the input exit temperature data prior to an AERMOD model analysis using a pre-processor called "AERMOIST". AERMOIST makes use of a European validated plume rise model called "IBJpluris" that already incorporates moist plume effects and has been found to accurately predict the final rise of a moist plume (Janicke and Janicke, 2001; Janicke Consulting, 2015)[17,18]. IBJpluris has been evaluated by Presotto et al. (2005)[19], which indicated that despite a number of entrainment formulas available, IBJpluris possessed the physical capability of representing the impacts of heat of condensation on symmetric chimney plume rise. Presotto et al. (2005) also reported field evaluation results for the IBJpluris model involving aircraft measurements through moist plumes emitted by stacks and cooling towers.

Plume rise adjustments using IBJpluris with and without moist plume effects are transferred to AERMOD through AERMOIST by adjusting the input stack temperature to calculate the equivalent dry

---

[17] Janicke, U., Janicke, L., 2001. A three-dimensional plume rise model for dry and wet plumes. *Atmos. Environ.* 35, 877-890.

[18] Janicke Consulting, Environmental Physics, 2015. Plume Rise Model IBJpluris. http://www.janicke.de/en/download-programs.html

[19] Presotto, L., Bellasia, R., Bianconi, R., 2005. Assessment of the visibility impact of a plume emitted by a desulphuration plant. *Atmos. Environ.* 39 (4), 719-737.

plume temperature on an hourly basis, as a function of ambient temperature and relative humidity. Ambient temperature and relative humidity are obtained from the AERMET surface file. These equivalent dry plume temperatures are used in AERMOD as an hourly emission and stack exhaust parameter file.

This source characterization technique is not a modification to AERMOD, and was included in a modeling protocol for an $SO_2$ non-attainment area application that has been proposed to the Pennsylvania Department of Environmental Protection and EPA Region 3. The AERMOIST formulation has been peer-reviewed and published in open access scientific literature and is provided in **Appendix A**. A similar technique for combining plume rise from stacks in a line was accepted by EPA Region 4 for Eastman Chemical (see **Appendix B**).

AERMOIST uses constant stack parameters. However, hourly-varying stack parameters can also be processed with the AERMOIST technique if AERMOIST is first run for multiple load conditions over the range[20] of each source's operations. Then, an interpolation procedure determines on an hourly basis an appropriate value for the equivalent dry plume hourly stack temperature.

### 3.6.2   Low Wind Model Options

In a proposed rulemaking published in the July 29, 2015 Federal Register[21], the EPA released a revised version of AERMOD (version 15181), which replaces the previous version of AERMOD dated 14134. EPA proposed refinements to its preferred short-range model, AERMOD, involving low wind conditions. These refinements involve an adjustment to the computation of the friction velocity ("ADJ_U*") in the AERMET meteorological pre-processor and a higher minimum lateral wind speed standard deviation, sigma-v ($\sigma_v$), as incorporated into the "LOWWIND3" option. The proposal indicates that "the LOWWIND3 BETA option increases the minimum value of sigma-v from 0.2 to 0.3 m/s, uses the FASTALL approach to replicate the centerline concentration accounting for horizontal meander, but utilizes an effective sigma-y and eliminates upwind dispersion".

Dispersion modeling scenarios were conducted using both the current regulatory defaults and using proposed EPA changes to the preferred modeling approaches with beta ADJ_U* and LOWWIND3 options. Documentation for an interim use of these low wind options as a non-default model is provided in **Appendices C, D, and E**. Recently, ADJ_U* has been accepted by a compliance demonstration.[22] While the proposed revisions to Appendix W supports the use of LOWWIND3 as a default model option, recent EPA Region 5 responses to state recommendations of 1-hour $SO_2$ area designations demonstrate that EPA is not yet willing to accept modeling with the LOWWIND3 option until the Appendix W rulemaking is finalized as proposed. EPA states that, "LOWWIND 3 at this time has not yet fully received scientific peer-review (i.e., criterion "i" for condition number 3 of Appendix W, Section 3.2.2(e)), and so this option must meet a more rigorous test for its approval as an alternative model."[23] However, AECOM recently submitted an article for publication to the Journal of Air & Waste

---

[20] The load-dependent stack temperature and exit velocity data are either provided through engineering considerations, or through a review of historical unit operations.

[21] 80 FR 45340

[22] https://www3.epa.gov/ttn/scram/guidance/mch/new_mch/16-X-01_MCResponse_Region10_Donlin-02102016.pdf

[23] EPA Response TSD to Ohio Area Designations for the 2010 $SO_2$ Primary NAAQS, http://www.epa.gov/so2designations/round2/05_OH_tsd.pdf

Management Association (JAWMA) which provides an evaluation demonstrating that LOWWIND3 statistically improves model performance over the performance of the regulatory default version of AERMOD.  This article, provided in **Appendix E**, supplements an existing peer-reviewed, published JAWMA article evaluating LOWWIND2 (**Appendix D**), satisfying criterion "i".

**Table 3-1:     AERSURFACE Bowen Ratio Condition Designations**

| Year | Bowen Ratio Category | | | | | | | | | | | |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
|      | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| 2015 | Dry | Ave | Wet | Wet | Ave | Dry | Wet | Ave | Dry | Dry | Wet | Wet |

**Table 3-2:     Stack Locations and Exhaust Parameters**

| Source ID | Unit | X (UTM83) | Y (UTM83) | Stack Height (m) | Stack Diameter (m) | Exit Temp. (K) | Exit Velocity (m/s) | Emissions (g/s) |
|-----------|------|-----------|-----------|------------------|---------------------|----------------|---------------------|-----------------|
| 0003 | Unit 4 Marion | 327601.09 | 4165324.96 | 121.92 | 4.57 | Hourly Varying | Hourly Varying | Hourly Varying |
| 0011 | Unit 5 Marion | 326901.44 | 4165425.60 | 17.07 | 4.50 | 590.37 | 22.85 | Hourly Varying |
| 0012 | Unit 6 Marion | 326839.03 | 4165425.94 | 17.07 | 4.50 | 590.37 | 22.85 | Hourly Varying |
| 0013 | Unit 123 Marion | 327700.40 | 4165369.62 | 59.13 | 2.91 | Hourly Varying | Hourly Varying | Hourly Varying |
| 0008USP | Unit 1 US Pen. | 324736.94 | 4170242.33 | 14.33 | 0.90 | 460.93 | 6.83 | 0.00128 |
| 0009USP | Unit 2 US Pen. | 324734.73 | 4170239.55 | 13.41 | 0.41 | 460.93 | 33.80 | 0.00128 |
| 0010USP | Unit 3 US Pen. | 324733.35 | 4170242.39 | 14.33 | 0.90 | 460.93 | 6.83 | 0.00128 |
| 0011USP | Unit 4 US Pen. | 324725.90 | 4170243.57 | 14.33 | 0.51 | 460.93 | 21.45 | 0.00128 |

Notes: Units 5 and 6 constant exit temperature/velocity data and U.S. Penitentiary data provided by IEPA modeling files.  Marion Power Plant stack diameters from IEPA were corrected using data provided by SIPC.

**Table 3-3:      Comparison of Stack Diameters used by AECOM and IEPA for Marion Power Plant**

| Source ID | Unit | Actual Stack Diameter (ft) | Actual Stack Diameter (m) | IEPA Modeling Files Stack Diameter (m) | IEPA TSD Stack Diameter (m) |
|---|---|---|---|---|---|
| 0003 | Unit 4 Marion | 15.00 | 4.57 | 4.57 | 4.40 |
| 0011 | Unit 5 Marion | 14.76 | 4.50 | 1.04 | 1.37 |
| 0012 | Unit 6 Marion | 14.76 | 4.50 | 1.04 | 1.13 |
| 0013 | Unit 123 Marion | 9.55 | 2.91 | 3.29 | 1.68 |

**Figure 3-1: Building Layout used in Modeling for Marion Power Plant**



**Figure 3-2: Modeling Receptor Grid – Far Field**



**Figure 3-3: Modeling Receptor Grid – Near Field**



**Figure 3-4:  Paducah, KY Wind Rose (2013-2015)**



**Figure 3-5:  Invalid Stack Temperature and Exit Velocity Data for 3/22/14 – 7/6/14 for Unit 123**



**Figure 3-6:  Cumulative Frequency of Stack Temperature for Valid Unit 123 in 2013-2015**



**Figure 3-7:  Invalid Stack Temperature and Emissions Data in 7/9/15 – 7/15/15 for Unit 4**



AECOM                                                                                                        Environment

# 4.0    AERMOD Modeling Results and Conclusions

The modeling results of 99th percentile peak daily 1-hour maximum concentrations averaged over the three years modeled are presented in **Table 4-1**.  The modeling was conducted with the current EPA default options, AERMOIST source characterization, and ADJ_U*/LOWWIND3 beta options.  The concentration isopleths for these three modeling analyses are plotted in **Figures 4-1 to 4-4**.  Note that the isopleths interpolate concentrations for areas where receptors do not exist such as those over the Lake of Egypt, therefore the isopleths in those areas do not represent actual model results.  Please refer to **Figures 3-2 and 3-3** for receptor locations.

Peak impacts using default model options (both with and without the AERMOIST characterization) from the Marion Power Plant occur in approximately the same location about 900 - 1000 meters south of the Marion stacks.  However, when ADJ_U* and LOWWIND3 are used in conjunction with AERMOIST for Unit 4, the peak impacts occur on the east side of the northern property boundary. These modeled peak impacts northeast of the Marion stacks coincide with the location of highest impacts one would expect by examining the wind rose in **Figure 3-4**.  The wind rose indicates the highest wind direction frequency to be southwesterly, which points to plumes traveling toward the northeast.

The results of these three modeling scenarios all support the designation of the area in the vicinity of the Marion Power Plant as attainment for the 1-hour $SO_2$ NAAQS.  Actual emissions modeling results using ADJ_U*, LOWWIND3, and AERMOIST, in particular, provide a more reasonable prediction of attainment due to moist plume source characterization of Unit 4, low wind condition corrections, and its agreement of peak impact location with the wind rose.  Using these results, it can be concluded that the more likely impact from Marion Power Plant is approximately 80% of the NAAQS.  Using a highly conservative (default) approach, these impacts are predicted to be up to 97% of the NAAQS.

As shown by this attainment demonstration, no new permit limit is necessary for the Marion Power Plant.  On September 18, 2015, IEPA proposed a new permit limit for this facility in their updated designation recommendation for Williamson County to EPA.  However, the facility's $SO_2$ annual emissions trends over the last ten years shows that 2015 was the lowest emission year.[24]  In addition, by examining monthly emissions from 2012-2015, it is clear that Marion Power Plant had consistently lower emissions in 2015 (**Figure 4-5**).  Emissions in future years are expected to be similar to 2015 due to emission controls associated with the Cross-State Air Pollution Rule (CSAPR) and Mercury and Air Toxics Standards (MATS).

Due to modeling results below the NAAQS with the use of conservative modeling approaches (default modeling options, high regional background, no consideration of moist plume rise, no low wind options), the area in the vicinity of the Marion Power Plant should be designated as attainment.  With refined modeling approaches, the 2013-2015 3-year average design concentration is likely to be about 80% of the $SO_2$ NAAQS.   In the future, with continued implementation of the CSAPR and MATS controls, the design concentration is expected to be lower.

---

[24] https://ampd.epa.gov/ampd/

AECOM                                                                                      Environment

**Table 4-1:   AERMOD Modeled Design SO$_2$ Concentration Results**

| AERMOD Modeling Scenario | Modeled Design Concentration (µg/m$^3$) | Ambient Background (µg/m$^3$) | Modeled Design Concentration with Background (µg/m$^3$) | NAAQS (µg/m$^3$) | % of NAAQS |
|---|---|---|---|---|---|
| Current Default | 174.5 | 15.9 | 190.4 | 196.5 | 97% |
| Current Default with AERMOIST | 161.9 | 13.2 | 175.1 | 196.5 | 89% |
| ADJ_U* and LOWWIND3 with AERMOIST | 142.1 | 15.9 | 158.0 | 196.5 | 80% |

Note: The "design concentration" is the 99th percentile peak daily 1-hour maximum concentration, averaged over the 3 years.

**Figure 4-1: 99th Percentile 3-year Average 1-hour SO$_2$ Concentration Isopleths using Default Options**



AECOM                                                    Environment

**Figure 4-2: Zoomed in 99th Percentile 3-year Average 1-hour SO₂ Concentration Isopleths using Default Options**



**Figure 4-3: 99th Percentile 3-year Average 1-hour SO₂ Concentration Isopleths using Default Options and AERMOIST**



AECOM                                                                                                Environment

**Figure 4-4: 99th Percentile 3-year Average 1-hour SO$_2$ Concentration Isopleths using ADJ_U* and LOWWIND3 Options with AERMOIST**



**Figure 4-5: Monthly SO$_2$ Emissions at Marion Power Plant in 2012-2015**



AECOM                                                    Environment

**Appendix A**

**Atmospheric Environment
Paper on Source
Characterization Refinements
for Routine Modeling
Applications**

Atmospheric Environment 129 (2016) 55–67



Contents lists available at ScienceDirect

# Atmospheric Environment

journal homepage: www.elsevier.com/locate/atmosenv



# Source characterization refinements for routine modeling applications



Robert Paine, Laura L. Warren[*], Gary E. Moore

*AECOM, 250 Apollo Drive, Chelmsford, MA 01824, USA*

## HIGHLIGHTS

- Dispersion modeling source characterizations for unique facilities are described.
- Highly industrialized areas causing a heat island effect can be modeled as urban.
- Stacks with waste heat countering downwash can apply weighting to these effects.
- Extra rise for moist plumes is realistically estimated for use in "dry" models.
- Stacks in a row with merged plumes can be better represented to improve modeling.

## ARTICLE INFO

*Article history:*
Received 24 September 2015
Received in revised form
18 December 2015
Accepted 4 January 2016
Available online 8 January 2016

*Keywords:*
Dispersion modeling
Model evaluation
Plume rise
Downwash
Source characterization

## ABSTRACT

Steady-state dispersion models recommended by various environmental agencies worldwide have generally been evaluated with traditional stack release databases, including tracer studies. The sources associated with these field data are generally those with isolated stacks or release points under relatively ideal conditions. Many modeling applications, however, involve sources that act to modify the local dispersion environment as well as the conditions associated with plume buoyancy and final plume rise. The source characterizations affecting plume rise that are introduced and discussed in this paper include: 1) sources with large fugitive heat releases that result in a local urbanized effect, 2) stacks on or near individual buildings with large fugitive heat releases that tend to result in buoyant "liftoff" effects counteracting aerodynamic downwash effects, 3) stacks with considerable moisture content, which leads to additional heat of condensation during plume rise — an effect that is not considered by most dispersion models, and 4) stacks in a line that result in at least partial plume merging and buoyancy enhancement under certain conditions. One or more of these effects are appropriate for a given modeling application. We present examples of specific applications for one or more of these procedures in the paper.

This paper describes methods to introduce the four source characterization approaches to more accurately simulate plume rise to a variety of dispersion models. The authors have focused upon applying these methods to the AERMOD modeling system, which is the United States Environmental Protection Agency's preferred model in addition to being used internationally, but the techniques are applicable to dispersion models worldwide. While the methods could be installed directly into specific models such as AERMOD, the advantage of implementing them outside the model is to allow them to be applicable to numerous models immediately and also to allow them to remain applicable when the dispersion models themselves are updated. Available evaluation experiences with these techniques, which are discussed in the paper, indicate improved model performance in a variety of application settings.

© 2016 The Authors. Published by Elsevier Ltd. This is an open access article under the CC BY license (http://creativecommons.org/licenses/by/4.0/).

## 1. Introduction

The AERMOD dispersion model (Cimorelli et al., 2005), recommended by United States Environmental Protection Agency (USEPA) for general short-range modeling applications out to a distance of 50 km, is widely used in air quality permit and compliance applications on an international scale (EPA Victoria, 2015). This model has been tested and evaluated against a number of traditional stack release databases (USEPA, 2003). However, aside from traditional building downwash situations, model evaluations for AERMOD and models used in other countries generally

* Corresponding author.
  *E-mail address:* laura.warren2@aecom.com (L.L. Warren).

http://dx.doi.org/10.1016/j.atmosenv.2016.01.003
1352-2310/© 2016 The Authors. Published by Elsevier Ltd. This is an open access article under the CC BY license (http://creativecommons.org/licenses/by/4.0/).

**Abbreviations**

| | |
|---|---|
| ADMS | Atmospheric Dispersion Modelling System, an air quality dispersion model used for industrial emissions developed by Cambridge Environmental Research Consultants |
| AERMODA | short range, steady-state air quality dispersion modeling system developed by the American Meteorological Society/U.S. Environmental Protection Agency Regulatory Model Improvement Committee (AERMIC) |
| ASTER | Advanced Spaceborne Thermal Emission and Reflection Radiometer, an instrument aboard the polar orbiting satellite called Terra |
| CALPUFF | A non-steady state air quality dispersion modeling system used for long range transport maintained and distributed by Exponent |
| HIA | Highly Industrialized Areas |
| OML | Short range air quality dispersion model that incorporates low wind effects related to aerodynamic downwash |
| PRIME | Plume Rise Model Enhancements, a building downwash algorithm used in the AERMOD model |
| SCICHEMSCIPUFF | air quality dispersion modeling system that includes chemistry |
| SCIPUFF | Second-order Closure Integrated Puff, an air quality dispersion modeling system maintained and distributed by Sage Management |
| SO₂ | Sulfur Dioxide |
| TAPM | The Air Pollution Model, a photochemical grid modeling system |
| USEPA | U.S. Environmental Protection Agency |

do not include scenarios in which the emission source itself substantially alters the dispersion environment. Because model performance can be an even greater challenge for some nontraditional emission sources, accurate representation of the source and its surrounding environment that influence plume rise is important.

To address this general issue, we have implemented and tested four different source characterization procedures with AERMOD, which could also be implemented in other models. All of these approaches affect buoyant plume rise, and in the case of the urban approach for highly industrialized areas, also affects plume dispersion. These approaches are different than other dispersion modeling refinements that might affect chemical transformation of released pollutants (such as NOx) because they generally do not change meteorological processing or dispersion (except for the urban approach). These effects are also independent of (and do not duplicate or replace) the low wind AERMOD enhancements described by USEPA (2012). While AERMOD itself could be modified to incorporate these changes, applying the source characterizations outside the model is beneficial because the procedures can be applicable to other dispersion models and would be more readily available for implementation. Any model changes to AERMOD would likely take several years for formal incorporation into the USEPA regulatory version. Therefore, as designed, each of the advanced plume rise techniques can be performed now using processors outside of AERMOD. In countries where other models are recommended, the methods described in this paper can be considered for those models as well. Other models for which these approaches could be used include, among others, CALPUFF (Scire et al., 2000), The Air Pollution Model

(TAPM) (Hurley, 2008), Atmospheric Dispersion Modelling System (ADMS) (CERC, 2015), SCIPUFF (Sykes et al., 1999), and OML (Olesen et al., 2007).

The first source characterization method addresses sources with large "fugitive" heat releases that result in a local urban-like dispersion environment. As used in this paper, "fugitive" refers to sources of heat that are not specifically considered as input to the dispersion model. While the stack exhaust temperature and velocity are considered for plume rise calculations, the heat releases of unrelated processes in large industrial complexes are generally ignored, although they affect the dispersion environment, as noted below. AERMOD estimates urban heat island effects using an urban/rural classification based on population or land use (USEPA, 2004a), but it does not consider the effects created by large industrial complexes located in remote, rural areas. The "highly industrialized area" (HIA) effect can be addressed by a technique that accounts for the heat from an industrial complex and derives an effective urban population equivalent to the scale of the HIA as input to AERMOD, which would model the source as urban.

A second source characterization issue unaccounted for within AERMOD is similarly related to fugitive heat releases on or near individual buildings that affect plume rise from nearby stacks. These unaccounted-for heat releases generally occur on a horizontal scale well below a kilometer and affect stack plume rise in the vicinity of individual buildings. While the areal extent of the fugitive heat releases may be too small to qualify as an urban-like HIA, they can exhibit a tendency to cause buoyant effects that counteract localized aerodynamic downwash effects that would otherwise result in plumes being caught in downdrafts behind buildings. Building aerodynamic effects are handled within AERMOD by the Plume Rise Model Enhancements (PRIME) (Schulman et al., 2000) model, which was developed with limited evaluation in low winds or with buildings associated with fugitive heat releases. To account for downwash effects for cases with fugitive heat releases from buildings, a procedure called "LIFTOFF" is described, along with a model-to-monitor field study evaluation demonstrating improved prediction of receptor impacts.

Thirdly, stacks with substantially moist plumes can lead to latent heat release of condensation after the plume exits the stack, providing additional plume rise relative to a "dry" plume scenario. Although some of the initial added buoyancy is later lost due to partial evaporation, a net gain in plume rise occurs. AERMOD (and many other steady-state plume models) have plume rise formulations that are based on the assumption of a dry plume, in that the chimney plume is considered to be far from being saturated and carries essentially no moisture. A procedure to incorporate the moist plume effect by adjusting the input exit temperature data can be performed prior to an AERMOD model analysis using a pre-processor called "AERMOIST." This pre-processor makes use of a European validated plume rise model called "IBJpluris" that already incorporates moist plume effects and has been found to accurately predict the final rise of a moist plume (Janicke and Janicke, 2001; Janicke Consulting, 2015). The adjustments to plume rise using IBJpluris with and without moist plume effects can be transferred to AERMOD (or other models, as appropriate) by adjusting the input stack temperature of each affected source on an hourly basis, as a function of ambient temperature and relative humidity.

Finally, multiple stacks in a line can result in plume merging and buoyancy enhancement under certain conditions. The tendency of adjacent stack plumes to at least partially merge is a function of several factors which include the separation between the stacks, the angle of the wind relative to the stack alignment, and the plume rise for individual stack plumes (associated with individual stack buoyancy flux and meteorological variables such as stack-top wind

R. Paine et al. / Atmospheric Environment 129 (2016) 55–67    57

speed). A procedure called "AERLIFT" has been created as a processor that works in conjunction with AERMOD for assessing and incorporating plume merging from aligned emission sources. It uses an hourly emissions file from an initial AERMOD run to refine the exhaust characteristics of the merging plumes on an hourly basis, and then AERMOD is run a second time with this new input of effective hourly exhaust parameters for each affected source.

In the sections below, we discuss the formulation and implementation of each of these source characterization effects. Note that these effects are generally independent from each other and can be run in combination, if appropriate. For example, in the case of a large industrial facility such as a steel mill, the characterization for a modeling application could include the urban characterization, liftoff effects of the plumes near buildings, moist plume effects (e.g., quench towers), and partial merging of plumes from stacks in a line.

## 2. Highly industrialized area heat islands

The urban heat island effect is a well-known phenomenon as it relates to urban and suburban areas that experience higher temperatures when compared with their rural surroundings. The key issue for plume dispersion in an urban area is that the urban heat island prevents the boundary layer from becoming stable at night, and results in weakly convective mixing at night within a deeper layer than that which exists in rural areas.

Urban surface characteristics such as albedo and surface roughness continuously affect boundary layer parameters (USEPA, 2004a). However, the boundary layer structure is most influenced by these urban surface characteristics at night (Oke, 1998). At night, an urban boundary layer is created when stable rural air reaches a warmer urban surface. Because buildings and urban surfaces trap heat more efficiently than rural areas, urban areas are slower to cool at night than the rural environments.

AERMOD currently accounts for urban environments by adjusting the urban area's surface heat flux and boundary layer height based on the urban-rural temperature difference of the urban core's temperature to the neighboring rural area's temperature (USEPA, 2004a). To calculate the urban-rural temperature difference, $\Delta T_{u-r}$, population information is used in the following equation:

$$\Delta T_{u-r} = \Delta T_{max}[0.1 \ln (P/P_o) + 1.0] \qquad (1)$$

where $\Delta T_{max}$ = 12 K, $P_o$ = 2,000,000, the population related to the maximum temperature difference in Oke (1973, 1978, 1982), and P is the population of the urban area being modeled (USEPA, 2004a). AERMOD uses the population input value to simulate the height of the urban boundary layer.

The area of population considered for input into this AERMOD model formulation is defined using methods described in USEPA model guidance (USEPA, 2005). For locations considered to be isolated urban areas, published census data are used. Guidance further states that, "[f]or urban areas adjacent to or near other urban areas, or part of urban corridors, the user should attempt to identify that part of the urban area that will contribute to the urban heat island plume affecting the source(s)." (USEPA, 2015) For other situations, the user may determine the population within the area where the population density exceeds 750 people per square kilometer as described in the AERMOD Implementation Guide (USEPA, 2015).

To determine upward surface heat flux, $H_u$, resulting from the urban-rural temperature difference at night, the following relationship can be derived:

$$H_u = \alpha \, \rho \, c_p \, \Delta T_{u-r} u_* \qquad (2)$$

where $\alpha$ is an empirical constant (0.03) described in the AERMOD model formulation document, $\rho$ is the density of air (about 1.2 kg/m$^3$), $c_p$ is the specific heat at constant pressure (1 W-s/g-K), and $u_*$ is on the order of 0.1 m/s (USEPA, 2004a). This equation can be solved for $\Delta T_{u-r}$ (in units of K):

$$\Delta T_{u-r} \approx H_u/4 \qquad (3)$$

where $H_u$ is the anthropogenic heat release in units of watts per square meter in the "urban core."

A lesser known cause of urban heat island effects, and unaccounted for in AERMOD, but described by Hanna and Britter (2002) is an industrial complex that mimics a heat signature similar to cities. Fugitive heat releases at industrial facilities can be equivalent to the level of heat trapped by urban surfaces and buildings, and contribute to the effects seen in highly industrialized areas on a more compact scale, but more centered at the location of the emissions. These HIAs are not considered in the traditional urban classification approaches used for AERMOD, even though Irwin (1978) suggested this approach in an internal USEPA memo. The population near such areas is often much reduced because of zoning issues, and the area beyond the immediate industrial park may be rural in nature, resulting in a misleading characterization for this type of source. This mischaracterization was recognized in an independent study by Schewe and Colebrook (2013), who recognized the appropriateness of the urban approach for a large industrialized area.

### 2.1. Surrogate population for highly industrialized area characterization

Based upon Irwin's suggestions and with some adaptations to the AERMOD formulation, we are providing an approach here to specify a nontraditional type of urban source that is subject to urban dispersion due to industrial anthropogenic heat release rather than due to the presence of a traditional city. The user would specify the anthropogenic heat flux resulting from the source, or an urban-rural temperature difference, if available. This would be used to determine a surrogate "effective" population value for input to AERMOD. The effective population could be calculated through the use of eq (1) if $\Delta T_{u-r}$ is specified or eqs (1)–(3) if the anthropogenic heat flux is specified. A value of $\Delta T_{u-r}$ less than 3–4 K is likely insufficient to support an urban designation with a large effective population because, according to eqs (1)–(3), the resulting effective population would be too small (e.g., only 2,500 for a 4 K temperature difference). A more practical temperature difference threshold is about 8 K, which corresponds to an effective population of 70,000.

In eqs (2) and (3), it is important to note that the "urban core" of a HIA heat release ($H_u$) depicts an area with a horizontal extent of at least a few hundred meters on a side. In a follow-up to Hanna and Britter (2002), Dr. Hanna indicated that the minimum size of an industrial area needed to take on urban characteristics has been the subject of much discussion (Hanna et al., 2011; Hanna, 2014 — personal communication to authors). In his personal communication, Hanna referred to his 2011 reference (noted below) and indicated that an "expert elicitation" would likely result in a minimum size estimate of a few hundred meters. The anthropogenic heat release per unit area of major cities such as Indianapolis (extensively studied by the Electric Power Research Institute (EPRI) in the 1980s) would be on the order of 50 W/m$^2$. This value lies within the 10–100 W/m$^2$ range stated by Hanna et al. (2011) for urban areas.

*R. Paine et al. / Atmospheric Environment 129 (2016) 55–67*

*2.2. Satellite analysis and model evaluation*

A modeling study was undertaken using an evaluation database in Lake County in northwestern Indiana USA to test the performance of the AERMOD model for a HIA. Several AERMOD options were tested to determine the most representative scenario of 1-h average ground-level SO₂ modeled concentrations due to emissions from industrial complexes such as steel mills with respect to ambient monitoring stations in Gary and Hammond, Indiana (Fig. 1). The Gary monitor was located about 300 m from the nearest source, and generally within 2 km of the cluster of sources in close proximity to the monitor. The Hammond monitor was generally between 1 and 4 km away from nearby sources. Downwash effects, if present, would have affected the Gary monitor more than the Hammond monitor.

USEPA guidance for land use characterization indicated that this area should be modeled as rural, but the heat releases from the numerous iron and steel industry sources in this area create a dispersion environment that is effectively representative of an urban area with a large population.

For this model evaluation, the thermal imagery method was selected to determine the temperature difference between the populated areas and the industrial facilities. The procedures for conducting this estimate, discussed in more detail in open literature (e.g., Fung et al., 2009; Nichol, 2005; Voogt and Oke, 2003), are to obtain thermal infrared radiation (TIR) data for multiple time periods from polar-orbiting satellite instruments such as Advanced Spaceborne Thermal Emission and Reflection Radiometer (ASTER) and Landsat 8 (NASA, 2004; USGS, 2015). These data are then processed to account for surface emissivity, based on additional land use-related satellite data coinciding with the same time periods of interest, to derive a form of land surface temperature called brightness temperature. The satellite data used in these analyses must have relatively cloud-free skies so that the resulting temperature is representative of the ground rather than a cloud layer. The ASTER and Landsat 8 instruments have the ability to reliably detect land surface temperature perturbations as small as 1–2 K (Fung et al., 2009).

Whenever possible, multiple satellite images should be selected representing ΔT_u-r to examine diurnal trends as well as seasonal temperature variations of the HIA's surroundings. Ultimately, satellite data availability and the need for a nearly cloud-free image often limit a comparison of this nature. The ΔT_u-r uncertainty is reduced when the HIA emits heat at a constant rate such as steel, iron, or aluminum processing plants which generally operate 24 h per day, 7 days per week.

Brightness temperature in northwest Indiana was reviewed to estimate the temperature difference for the area of interest, derived from measurements by the ASTER instrument. On a summer day, maximum temperatures associated with industrial facilities were approximately 310–315 K which led to a temperature difference of about 11–12 K (Fig. 2). Although the satellite-measured temperature difference between the HIAs and the populated areas would often be greater at night, the temperature difference in this case was based upon a summer day due to satellite data availability. Note that this temperature difference measured by the satellite automatically accounts for the "urbanized" temperature excess of the HIA caused by the overall industrial heat releases not otherwise accounted for in the model. Using eq (1), this temperature difference was consistent with heavily populated areas with typical populations on the order of 1,000,000 instead of the region's U.S. Census Bureau population data of 10,000.

Three scenarios for the northwest Indiana application were run with building downwash and actual emissions for the year 2008 using AERMOD with default options: 1) rural land use, 2) urban land use with a small (actual) population of 10,000, and 3) urban land use with a large population of 1,000,000. Two model receptors were used to coincide with the SO₂ monitoring locations nearest to the facilities. In all three scenarios, the highest concentrations most frequently occurred during the night or early morning hours. The rural and small urban population modeling approaches led to AERMOD overpredictions of 1-h SO₂ as high as a factor of 10 at two monitors ranging from 1 to 10 km from the sources being modeled. The urban, large population scenario resulted in improved model performance by reducing the atmospheric stability at night, leading to higher plume rise and a deeper mixing layer for plume dispersion. The results still indicate that AERMOD overpredicted the 99th percentile daily maximum 1-h SO₂ ground-level concentration



**Fig. 1.** Location of various emission sources in the Gary and Hammond, IN area in relation to the SO₂ ambient air monitors.



**Fig. 2.** Brightness temperature from ASTER band 14 on June 10, 2008 at 11 a.m. local time.

R. Paine et al. / Atmospheric Environment 129 (2016) 55–67    59

**Table 1**
AERMOD modeling results for rural and urban land use scenarios.

| Monitor | Land use | Population | 99th percentile of the daily maximum 1-h $SO_2$ ($\mu g/m^3$) |
|---|---|---|---|
| Hammond (96 $\mu g/m^3$) | Rural | NA | 290.4 |
| | Urban | 10,000 | 935.5 |
| | Urban | 1,000,000 | 179.0 |
| Gary (175 $\mu g/m^3$) | Rural | NA | 1298.2 |
| | Urban | 10,000 | 1855.9 |
| | Urban | 1,000,000 | 392.2 |

Note: 1-h $SO_2$ 99th percentile (4th highest) monitored values are listed in by monitor in parenthesis.

(which is the basis for the ambient standard in the United States) by a factor of about 2 at the Hammond and Gary monitors (Table 1). Additional refinements such as the use of liftoff effects as noted below might have further reduced this overprediction, but that analysis was not performed in this evaluation. In general, these results in comparison to the other scenarios indicate that improved model performance could be obtained by using an urban dispersion approach with an effective large population (e.g., on the order of 1,000,000).

Since actual rather than potential emissions were used in this evaluation, it is not likely that emission input uncertainty would cause the large overpredictions noted. It is possible that downwash effects are part of the overprediction problem, but such predictions are a function of the nocturnal temperature lapse rate, which is significantly different in urban vs. rural dispersion conditions in AERMOD. We strongly believe that the use of the urban characterization, as well as implementation of low wind speed improvements, are the enhancements leading to improved model performance. This northwest Indiana study involved the two monitors for which results have been reported. Additional case studies are needed to further verify these findings and approaches of which we present to encourage independent researchers to conduct such studies.

## 3. Plume liftoff in industrial complex environments with fugitive heat and low wind conditions

AERMOD estimates building downwash effects by applying its downwash model, PRIME, concentration estimates in the near-field where building wakes are predicted, while transitioning to the AERMOD estimates without building wake considerations in the far field (USEPA, 2004a). This transition is performed without consideration of low wind speed conditions, which can lead to poor model performance, particularly when building aerodynamic effects are estimated by the model under nearly calm conditions. Downwash conditions in near calm winds are likely to be subject to the effects of wind meander, leading to an intermittent downwash effect in any given direction. Such low wind effects have not been adequately evaluated.

In the current AERMOD implementation using default model options on a facility with short stacks close to the heights of nearby buildings, very high 1-h ground-level concentrations due to building downwash have been found by the authors to be predicted even with nearly calm winds in stable conditions. The top three predicted concentrations occurred with wind speeds less than 1.5 m/s. This is a condition for which persistent downwash effects might not be expected due to strongly buoyant plumes and weak building aerodynamic effects. For example, the CALPUFF model (Scire et al., 2000) does not consider building downwash to occur for wind speeds less than 0.5 m/s. In discussions among co-designers of the PRIME downwash algorithm in AERMOD, Dr. Lloyd Schulman and Mr. Robert Paine, Dr. Schulman confirmed that the PRIME downwash algorithm was

never tested for such light wind, stable conditions, and there is no mechanism in the model for addressing the lack of or intermittent nature of the wake behind a building in very light wind conditions (Schulman, personal communication to the author, November 4, 2011). The model is assuming a plume is caught in a building wake, even in such light wind conditions, and then impacting ground-level receptors at the fenceline under very low dilution conditions. Note that when the PRIME algorithm was developed, modeling and evaluating downwash under very light winds was not a major concern when airport wind speeds in the United States were not reported below 3 knots (about 1.5 m/s). In recent years, the further use of sonic anemometers at airports and the processing of 1-min data have made the need to accommodate very low wind speeds a significant challenge. It is also noteworthy that for airport databases (including that for the northwest Indiana study), there are no turbulence measurements, and so the simulation of turbulence is affected by the boundary layer parameterization. This is one reason why the use of urban dispersion and possibly the low wind improvements to AERMOD will lead to better performance for the plume liftoff field study and its associate model evaluation presented in more detail in a subsequent section. To the extent that building downwash may be a factor, it should be noted that the depth of the enhanced turbulence region in PRIME may be overstated, as indicated by Petersen (2015).

In light winds with significant wind meander, building wake effects are unsteady, as noted by Robins (1994). However, AERMOD's basic meander treatment for low winds only applies to non-downwash dispersion, and was never implemented in the PRIME model within AERMOD. Therefore, the building downwash impacts due to PRIME predictions do not account for the intermittency of downwash effects that would tend to reduce hourly-averaged ground-level concentrations in one location. A downwash approach that accounts for low wind speeds and the inherent intermittency of steady wake effects under such conditions is already incorporated into regulatory models similar to AERMOD such as the Danish OML model (Olesen and Genikhovich, 2000) and the United Kingdom ADMS model (Robins et al., 2013).

In addition to the mistreatment of low wind conditions, a plume is able to gain buoyancy within an environment where the source's buildings provide fugitive heat on a smaller scale in comparison to a highly industrialized area. AERMOD and other steady-state plume models do not consider the additional buoyancy plume uplift due to these waste heat releases (in addition to stack releases of the pollutants of interest) in the area of an emission source, especially on or around the controlling building. An example of this is a cooler vent from taconite production furnaces; the vents do not release pollutants, but they duct very hot air to the building roof environment that will affect the aerodynamics around the building. For these cases with significant additional heat releases in the same vicinity, but not related to the pollutant stacks, plumes will resist downwash effects, especially in light wind cases. This resistance allows the plume to avoid downdrafts behind the building, which

are nullified by "liftoff" conditions due to the excess heating (Hanna et al., 1998).

### 3.1. The LIFTOFF approach

The heat flux associated with thermal releases triggering plume liftoff can be estimated and used in an alternative approach with the use of a buoyancy flux term, $F_b$. Hanna et al. (1998) suggest a combined dimensionless buoyancy flux:

$$F^{**} = F_b / \left( W \, U \, U^3 \right) \tag{4}$$

where $F_b$ is the buoyancy flux, U is a reference wind speed, and W is the initial plume width. An approach that can be used as a post-processor to any dispersion model such as AERMOD, called "LIFTOFF", accounts for conditions with no downdraft effects using a weighting factor between two extreme (liftoff conditions, no downwash) and non-liftoff (normal downwash) modeled in separate AERMOD runs. This weighting factor, $\gamma$, ranges from 0 to 1 on an hourly basis (Hanna et al., 1998):

$$\gamma = \exp\left( -6F^{**0.4} \right) \tag{5}$$

where with large buoyancy, the downwash weight approaches 0 and with minimal buoyancy, it approaches 1. To perform these calculations, an estimate of the heating is needed for the buoyancy flux term, $F_b$. To quantify the combined effects of the heat release, wind, and plume width, it is necessary to estimate these values. Once these values are obtained, the final calculation can be performed using the hourly weighting factor between modeled concentrations with and without downwash ($C_{Downwash}$ and $C_{No\ Downwash}$, respectively) to determine the final LIFTOFF concentrations, $C_{LIFTOFF}$:

$$C_{LIFTOFF} = \gamma \, C_{Downwash} + (1 - \gamma) \, C_{No\ Downwash} \tag{6}$$

To account for low wind effects, LIFTOFF reads the 10-m reference wind speed information from the AERMET SURFACE file for each hour. In combination with the heat release and plume width information, LIFTOFF applies a weighting scheme as shown in eq (6), which is similar to the dependence on the wind intermittency for the approach used in the OML model (Olesen and Genikhovich, 2000). In general, during low wind events, it is expected that the no-downwash solution will be weighted more heavily than the downwash solution. The degree of weighting is also dependent upon the magnitude of the heat release and the initial plume width which is conservatively taken to be as large as the building width. Although the USEPA's Building Profile Input Program (USEPA, 2004b) is generally used to determine the building width, these input values can be manually edited in the event that this pre-processor overestimates the effective building width which can occur when the wind direction coincides with a long and narrow building.

For modeling applications without source-related fugitive heat releases, LIFTOFF should not be used because the calculated effect will be zero with no heat release rate. It is likely that the current PRIME model overpredicts in low winds due to its lack of considering wind meander and the related intermittent wake effects. However, with fugitive heat releases, there is a dependency of the liftoff potential on wind speed because a high wind speed would tend to dilute the effects of the heating. Therefore, the dependence of the LIFTOFF approach on all three components: heat release rate, wind speed, and initial source width is warranted. It is important, however, that any current evaluations of LIFTOFF with a substantially modified PRIME model would be useful to determine whether the weighting factor between the downwash and no downwash solutions should be adjusted.

For buoyancy effects due to source-related heat release scenarios, LIFTOFF calculates $F^{**}$ and applies the resulting weighting factor between the downwash and no downwash model runs. These calculations are performed for each hour using the wind direction and require building width information which serves as a conservatively large estimate of the initial plume width. Additionally, an estimation of the heating is needed for the buoyancy flux term. External heating measurements can be obtained from an engineering evaluation or by estimating the temperature excess in satellite thermal imagery using the same procedure described to estimate $\Delta T_{u-r}$ for a highly industrialized area. The temperature difference is used to solve for $H_u$ in eq (3), where the buoyancy flux, $F_b$, is proportional to the heat release rate, $H_u$ (USEPA, 1995; Briggs, 1969).

### 3.2. Model evaluation case study of the LIFTOFF approach

Model performance of the LIFTOFF procedure at an industrial facility featuring process areas with considerable fugitive heat releases was assessed using data from a three-month field study with four $SO_2$ monitors located on-site. These $SO_2$ monitors were oriented around the facility's three point sources in areas where the highest modeled impacts occurred based on AERMOD using default options and downwash without consideration of liftoff conditions. Monitors were approximately 400–1200 m away from the point sources (Fig. 3). The buildings affecting the point sources are shown in Fig. 4. The aspect ratio of the horizontal to vertical building dimensions was approximately 2.5:1.

Using the facility's continuous emission monitor data, several model scenarios were tested including AERMOD with default options and building downwash, AERMOD with default options and no building downwash, and the LIFTOFF technique. Although the facility was located in an isolated, rural area, it had a significant source-to-ambient temperature difference of approximately 8 K as measured by satellite imagery (Fig. 5). The area of fugitive heat was approximately 300 × 600 m, leading to a heat release of approximately 6 MW.

Modeled and monitored 1-h ground-level concentrations were



**Fig. 3.** At left, the industrial facility point source emissions in relation to $SO_2$ ambient air monitor locations.





**Fig. 4.** At right, a 3D view, looking toward the northeast, of the industrial facility's building dimensions and point source locations.

**Fig. 6.** Top 5 ranked daily maximum 1-h SO$_2$ at site 2. "Default" uses default options and downwash. "No DW" uses default options without downwash effects. "LIFTOFF" refers to the approach weighs the downwash and no downwash effects on an hourly basis.

ranked from highest to lowest and compared. In general, for the top five ranked concentrations, AERMOD with downwash indicated large overpredictions, while AERMOD without downwash exhibited a modest underprediction tendency. However, the LIFTOFF scenario (which is a weighted average of the downwash and no downwash cases computed from hourly wind and building dimension data) was relatively unbiased, and generally exhibited a modest overprediction tendency as shown by Fig. 6 for Site 2. Site 2 is the location that measured the highest SO$_2$ concentration during the field study. At all monitors, the top five ranked LIFTOFF concentrations were generally higher than the top five ranked observations, which is most evident in quantile-quantile comparisons of monitored to modeled concentrations as shown in Fig. 7 for each site. The LIFTOFF results have a modest overprediction and avoid the large overpredictions that are evident if no consideration is made for the fugitive heat release. More information on this model evaluation is provided in the corresponding supplemental material.



**Fig. 5.** Brightness temperature from Landsat 8 TIR band 11 April 21, 2013 10 p.m. local time.

## 4. Effects of a moist plume on plume rise calculations

The final plume rise formula in AERMOD and most other dispersion models is based on the assumption of a dry plume, where the stack plume is far from being saturated and carries essentially no liquid water load. However, in many cases for moist plumes, the effect on plume rise can be significant due to heat of condensation and should be accounted for, particularly for emission sources that operate flue gas desulphurization equipment, or scrubbers, designed to remove several pollutants from combustion plumes. The scrubbing process acts to partially or fully saturate exhaust gases while minimizing any liquid "drift" emerging from the scrubber to minimize chemically erosive processes. This process acts to cool the plume relative to the unscrubbed exhaust, resulting in a reduction of plume rise. However, the moist plume exits the stack and the heat of condensation released by the liquid water particles acts to make the plume gases warmer, giving the plume additional buoyancy. Some of this buoyancy is lost as the droplets evaporate on mixing, but a net gain in plume rise is realized from the heating/cooling process. The largest net rise is realized for the situation where the ambient air itself is near saturation.

A validated, moist plume rise model called "IBJpluris" has been found to accurately predict the final rise of a moist plume (Janicke and Janicke, 2001) and can be used to complement the dispersion modeling process when moisture content can be a significant factor. The IBJpluris model formulation includes a general solution for bent-over moist (initially saturated) chimney plumes (Janicke and Janicke, 2001). The model was reviewed by Presotto et al. (2005), which indicated that despite a number of entrainment formulas available, IBJpluris possessed the physical capability of representing the impacts of heat of condensation on symmetric chimney plume rise. The Presotto et al. (2005) paper also reported field evaluation results for the IBJpluris model involving aircraft measurements through moist plumes emitted by stacks and cooling towers. Therefore, IBJpluris was selected as the core model for developing and applying a simple adjustment method to the standard Briggs (1975) plume rise formula used by AERMOD to account for thermodynamic modification of plume rise.

### 4.1. The moist plume pre-processor

A method has been developed and incorporated into a preprocessor called "AERMOIST," whereby adjustments can be made



**Fig. 7.** Quantile-quantile comparisons between monitored and modeled daily maximum 1-h SO₂ concentrations at sites 1–4. "AERMOD Default" uses default options and downwash while "AERMOD No DW/Default" uses default options without downwash. "LIFTOFF" refers to the approach that weighs the downwash and no downwash effects on an hourly basis.

to better simulate the rise of a moist plume using a dry plume model like AERMOD. This is done by performing IBJpluris model runs for both the actual moist plume and a dry plume so that the adjustments for the difference can be made and transferred to hourly plume input data for models such as AERMOD. By assuming the ambient environment that the plume rises through is identical for both a dry and wet plume, a reasonable assumption is that the ratio of the wet to dry plume rise for IBJpluris can be used to adjust the dry dispersion model plume rise to a moist plume rise prediction:

$$[\Delta h_w(model)]/[\Delta h_d(model)] = [\Delta h_w(IBJpluris)]/[\Delta h_d(IBJpluris)] \quad (7)$$

where $\Delta h$ is the change in final plume rise, and subscripts "w" and "d" correspond to moist and dry plumes, respectively. The approach assumes that this scaling ratio is independent from changes in wind speed and stability, although the variations in rise may be rather large. This assumption is reasonable since the rise is functionally related to the sum of exiting buoyancy and vertical momentum fluxes and the difference between dry and moist rise depends mainly on buoyancy, which is primarily temperature- and relative humidity-dependent.

The rising plume, by analogy, can be treated as if it were a rising moist thermal and cloud dynamic process. Concepts such as the buoyancy factor (Jacobson, 2005) can be applied since this same buoyancy factor appears in the Briggs (1975) dry plume rise. The

major difference is that the cloud buoyancy depends on the virtual temperature, which depends on temperature, pressure, and relative humidity of both the plume and the environment. The buoyancy factor, $F_b$, for both plume and cloud water as normalized density can be expressed by the difference between plume temperature and ambient temperature, divided by the plume temperature, when virtual temperature is equal to dry bulb temperature. The approximate term appears in Briggs (1975) final plume rise formula for the dry buoyancy flux term. The final rise $\Delta h_f$ is a power law function of $F_b$, where the power is '1/3' as derived by Briggs (1975). Following Jacobson (2005), the moist buoyancy can be expressed in terms of the virtual temperatures and water vapor partial pressures of the plume and the ambient environment as $T_{va}$, $T_{vp}$, and $P_a$, $P_{wa}$, $P_{wp}$, where $P_{wp}$ is assumed to be saturated, $P_s$. The virtual temperature, $T_v$, can be expressed in terms of dry bulb temperature, T (Arya, 2001):

$$T_v = T(1 + 0.608 \, q_v)$$
$$= T\{1 + 0.608[0.622 \, (RH) \, P_s/(P_{da} + 0.622 \, (RH) \, P_s)]\} \quad (8)$$

where $q_v$ is the mixing ratio in kg of moisture per kg of dry air, $P_{da}$ is the dry atmosphere pressure, and RH is relative humidity as a fraction. For a plume exit temperature of 325 K, the virtual temperature of a saturated plume is 390 K. As the saturated plume temperature increases, so do the effects of virtual temperature, especially for higher stack temperature and relative humidity.

Using a relationship for estimating the saturation vapor pressure of water derived from the Clausius-Clapeyron equation (Arya, 2001), the relative humidity of a plume can be estimated from the moisture content (%) at the plume exit temperature:

$$P_s = 6.112 \exp\{6816[(1/273.15) - (1/T)] + 5.1309 \ln(273.15/T)\} \tag{9}$$

where all pressures are in hectopascals (millibars). The IBJpluris model has the ability to treat sub-saturated plumes as long as the plume emission temperature is held constant. Using eq (9) and the moisture content of the exiting plume, the relative humidity of the plume can be estimated. As the ambient air retains more moisture, the plume travels higher before reaching equilibrium with the ambient air.

### 4.1.1. Equivalent dry plume temperature approach

An effective approach for representing moisture in plumes is to adjust only the plume temperature rather than changing both plume and ambient temperatures, which would be required if virtual temperature were to be used directly. This revised plume temperature is generated by AERMOIST and can be referred to as an "equivalent dry plume temperature", and it is always greater than the original plume temperature and does not equal the virtual temperature. This hourly equivalent plume temperature is input to a dispersion model such as AERMOD in an hourly emissions input file so that the moist plume rise is more accurately modeled. The scaling relationship based on the right hand side of eq (7) forms the first part of the adjustment model. The plume height scaling parameter is given by the moist over the dry buoyancy flux:

$$\beta = \left(\Delta h_w^3 / \Delta h_d^3\right) \tag{10}$$

where subscripts w and d refer to moist and dry buoyancy fluxes, respectively.

Two equations relating final rise to equivalent plume and ambient temperature are:

$$\Delta h_d^3 = \lambda F_{bdry} = \lambda \left[(T_p - T_a)/T_p\right] \tag{11}$$

$$\Delta h_w^3 = \lambda F_{bwet} = \lambda \left[(T_p^{eq} - T_a)/T_p^{eq}\right] \tag{12}$$

The exponent of 3 in eq (10) is due to the Briggs (1975) plume rise dependence on the buoyant flux, $F_b$, to the '1/3' power. As the vertical momentum flux becomes a larger fraction of the total flux, the effective exponent for the buoyant rise becomes smaller because the momentum plume rise is proportional to the momentum flux, $F_m$, to the 1.5 power. In AERMIST, the exponent is treated as a user input to be conservative (<3) when the total plume rise may have appreciable momentum at release. A smaller buoyant rise exponent, such as 2.5, helps to insure that the model is conservative and the plume rise is not overstated.

From the equations stated above, the equivalent plume temperature, $T_p^{eq}$, can be solved for directly as:

$$T_p^{eq} = T_p T_a / [(1 - \beta)T_p + \beta T_a] \tag{13}$$

The ratio, $\beta$, is a function of both humidity and temperature and is found by the dry and moist plume simulations. As $\beta$ goes to 1, the equivalent plume temperature approaches the dry plume temperature, $T_p$.

To provide the hourly equivalent plume temperature to AERMOD, a simple interpolation bilinear model is constructed using a series of $\beta$s across a range of temperature and relative humidity. At the end points of each range, $\beta$ is calculated using IBJpluris and applied in a Taylor first-order expansion to create a bilinear model for the wet to dry ratio of plume rise within each range, $\beta(T_a, RH_a)$. The model assumes that ambient air at stack exit will be in the range from 253 to 313 K. Ambient temperatures outside of this range are clipped. The ambient relative humidity is assumed to lie between 0% and 95%. Values above 95% are clipped because these lie in a range of extreme sensitivity to conditional instability.

In AERMOIST, the IBJpluris model is exercised in both dry and wet mode for each range and an array of temperatures and humidity over the range of possible values, $\beta(T_i, RH_j)$ ratios, is saved for each stack that is modeled and are used to estimate the model adjustment coefficients, $C_{i,j}$ and $D_{i,j}$. The continuous model for the moist to dry plume rise ratio becomes:

$$\beta(T_a, RH_a) = \beta(T_i, RH_j) + (T_a - T_i) C_{i,j} + (RH_a - RH_j) D_{i,j} \tag{14}$$

The $\beta(T_a, RH_a)$ are used to estimate the equivalent hourly plume temperatures for input to the dispersion model for each hour of emissions. By modifying only the plume temperature, multiple sources can be included in the model run, each with their own series of equivalent hourly plume temperatures. Dry plumes can also be modeled with standard, constant input data.

### 4.1.2. Moist plume rise testing

The IBJpluris model was exercised for a typical saturated, scrubbed power plant, with characteristics as listed in Table 2. The exiting plume moisture content for this test stack is 13.4%, and for a surface pressure of 1000 hPa, $P_s = 134$ hPa which, according to eq (8), translates into a saturated plume ($RH_p = 100\%$) for an observed stack temperature of 325 K. The source's plume characteristics suggest that such an observed temperature (dry bulb) is actually near 340 K in terms of the virtual temperature for the saturated plume.

The profile used by AERMOST assumes neutral conditions with a height constant humidity and turbulence profile. For a given environmental humidity value, the plume was modeled with dry humidity (0%) and a moist humidity based on the actual moisture content of the plume. The resulting plume rises as a function of downwind distance are illustrated for the dry (0% $RH_p$) and the moist (100% $RH_p$) plume cases with a dry ambient humidity (0% $RH_a$), and for a saturated plume emitted into a nearly saturated environment in Fig. 8. The rise at 2000 m downwind is 189.8 m for the dry plume and dry environment, 209.3 m for a saturated plume in a dry ambient environment, and 219 m for the saturated plume rise in a 90% constant RH environment. At an ambient temperature of 293 K, the percent increase over the dry case is 10.3% and when a moist environment is considered, it is 15.4%.

AERMOIST systematically exercises IBJpluris for each of the temperatures and relative humidity ranges (bins). Assuming final rise estimates at 2000 m downwind for a select set of temperature and relative humidity ranges, it is apparent that the largest rise of the saturated plume occurs at 90% humidity environmental conditions for the cooler ambient temperatures. The dependency on ambient humidity of final rise at any ambient temperature is rather

**Table 2**
Moist plume characteristics used in the test case.

| Stack height (m) | Exit diameter (m) | Exit temperature (K) | Exit velocity (m/s) |
|---|---|---|---|
| 171.45 | 14.23 | 325.37 | 15.16 |



**Fig. 8.** Plume rise as a function of downwind distance for dry rise and an initially saturated plume by the test source for two constant relative humidity environmental conditions.

small for a dry plume, allowing for ambient RH to be ignored for dry plumes. However, moist plume rise will increase substantially as the ambient humidity approaches saturation with an increase of over 10% from dry, cool air to moist cool air. Using virtual temperature by itself does not explain this effect. As the ambient temperature increases and the buoyancy factor decreases, the change in plume rise with humidity is reduced. The resulting equivalent plume temperatures for use in dispersion modeling generated by AERMOIST, which actually runs the validated IBJpluris plume rise model, produce improved plume rise estimates for moist plumes. As evaluated by Presotto et al. (2005), the IBJpluris model predicts a more realistic plume rise for moist plumes than a model that represents a moist plume as a dry plume. Therefore, using the AERMOIST technique in conjunction with a dry plume model such as AERMOD will result in improved model performance by reduction its inherent model overprediction.

## 5. Plume merging of stacks in a line

When adjacent stacks are positioned in a line, the individual plumes have shown to have a tendency to merge causing a buoyancy enhancement under certain conditions. This plume merging tendency is influenced by the stacks' proximity, the wind direction relative to the stack configuration, and individual stack plume rises. Briggs (1984), refers to the results of wind tunnel studies for a row of identical stacks that indicate the usefulness of a merger parameter, S′, to determine the effect of the angle of the wind relative to the stack alignment:

$$S' = (\Delta s \sin\theta) / \left[L_b^{1/3}(\Delta s \cos\theta)^{2/3}\right] \quad (15)$$

where Δs is the average spacing between the aligned stacks, θ is the wind angle relative to the alignment angle of the adjacent, inline stacks, $L_b$ is the buoyancy length scale where:

- $L_b = F_b/U^3$,
- $F_b$ is the buoyancy flux where $F_b = g\ V_s^2 D_s^2/4\ [(T_p - T_a)/T_p]$,
- U is the wind speed at plume height,
- $V_s$ is the stack gas exit velocity,
- $T_p$ is the stack gas temperature,
- $T_a$ is the ambient temperature, and
- $D_s$ is the stack diameter.

By definition, S′ is undefined when the wind is exactly normal to the alignment angle, so in practice for that case, an angle not

exceeding 89.99° is used in the approach described in the next section.

Wind tunnel studies using neutral conditions showed that S′ less than 2.3 results in buoyancy enhancement while values above 3.3 indicate no enhancement (Briggs, 1984). Intermediate values would indicate partial enhancement. For those wind angles that allow plume merging, a formulation for the buoyancy enhancement accounting for other factors noted above due to the merging of adjacent plumes can be taken from the Manins implementation (Manins et al., 1992) of the Briggs formulation:

$$E = (N + S)/(1 + S) \quad (16)$$

$$S = 6\left\{[(N - 1)\ \Delta s]/\left(N^{1/3}\ \Delta h\right)\right\}^{3/2} \quad (17)$$

where E is the buoyancy enhancement factor, N is the number of stack in the row, S is a separation factor, and Δh is the plume rise for one stack. While the buoyancy flux would be enhanced, the momentum flux should be unchanged. The formula for the momentum flux in AERMOD and many other dispersion models is:

$$F_m = (T_a/T_p)\ V_s^2\ D_s^2/4 \quad (18)$$

Therefore, the buoyancy enhancement would increase $T_p$ and $V_s$ in a manner to provide the appropriate multiplier to $F_b$ while retaining $F_m$ by retaining the ratio of $V_s^2/T_p$.

Several investigators noted in Briggs (1984) have studied and reported buoyancy enhancement for only two stacks. Briggs noted that "all of the authors referenced in this section compared the predictions of their models, at least for N = 2, with the semi-empirical results of Briggs (1974) and concluded that, as different as these approaches seem, their predictions were very similar." Additionally, the plume rise enhancements plotted in neutral conditions by Anfossi (1985) indicated that even for stacks separated by 77 m, some enhancement was observed in conditions of substantial buoyancy.

Additional supporting evidence for plume merging from two stacks is available from more recent journal articles. These articles are consistent in reporting an angular dependence on the extent of the merging. Macdonald et al. (2002) indicated that there is a definite enhancement for flow parallel to the line of stacks. For larger angles, due to dual rotors from plumes (clockwise looking downwind on the right side and counterclockwise on the left side), there can sometimes be some plume rise suppression between two closely spaced stacks for wind angles approaching a perpendicular to the line of stacks. These authors also noted plume rise enhancement for power plant stacks separated by a distance of more than 1 km, providing support for no arbitrary distance cutoff for this algorithm. The Briggs algorithm will automatically reduce the plume rise enhancement as the distance between the stacks increases.

Furthermore, Overcamp and Ku (1988) conclude that "tests with azimuthal angles of 0° and 30° showed enhanced rise". Tests with azimuthal angles of 60° and 90° did not appear to exhibit enhanced rise (Overcamp and Ku, 1988), information that was incorporated into the Briggs formulation. Similar confirmation of plume merging effects from two identical, separated stacks is documented by Contini et al. (2006). The dependence of the enhanced buoyancy on the approach angle to the stacks is similar to findings by the other investigators.

### 5.1. The AERLIFT technique

The AERLIFT technique has been developed to account for

*R. Paine et al. / Atmospheric Environment 129 (2016) 55–67* 65

potential merging of plumes from aligned emission sources and the resulting partial to full enhanced plume buoyancy. This intermediate processor, run outside of the AERMOD modeling system for this implementation, creates an enhanced hourly emissions file using information from an initial model run with information for effective stack exhaust characteristics of the partially merged plumes. The model is then run a second time using the adjusted source parameters.

To define the parameters necessary for calculating the buoyancy enhancement on an hourly basis, the initial dispersion model run for the stacks involved is set up to run with a 10-km ring of 360 receptors set 1° apart in flat terrain. Next, the AERLIFT processor takes the meteorology and the model output data (i.e., the hourly and source specific final plume rise and effective wind speed) to determine first whether plume merging occurs, and if so, by how much.

The maximum enhancement factor applied to the buoyancy flux is the number of stacks in the line. The AERLIFT processor applies the enhancement factor to the original stack velocity and temperature, and derives an altered set of parameters that increases the buoyancy flux by the appropriate factor while preserving the momentum flux. This is done to conservatively apply the enhancement to only the buoyancy component. During stable hours, AERLIFT uses the plume rise directly in eq (17). For added degree of conservativeness, during unstable hours for when the stack top is less than the mixing height, AERLIFT selects the minimum between the final plume rise and the mixing height, which is defined as the maximum of the mechanical and convective mixing heights, for use in eq (17).

Finally, a second dispersion model run is performed using the appropriate terrain options and modeling receptors for the emission source as well as the enhanced hourly emission file from AERLIFT.

### 5.2. Evaluation of AERLIFT

AERMOD has been tested with the AERLIFT approach with a model evaluation field study conducted by Eastman Chemical Company in Kingsport, Tennessee, USA (described by Paine et al., 2013; Szembek et al., 2013). This study featured a 1-year monitoring period with 4 monitors featuring a line of 5 coal-fired boiler stacks. The inclusion of the AERLIFT approach significantly reduced AERMOD overpredictions, as noted by Szembek et al. (2013). The need for this feature was particularly evident when plumes from a row of 5 stacks indicated overprediction for impacts at a monitor located in elevated terrain, in spite of other model improvements from the low wind options (adjusted u* and LOWWIND options in AERMOD). When this single feature was tested in isolation, it resulted in a higher plume rise and a better model evaluation result in both flat and elevated terrain. This improvement was due to the effect of AERLIFT on plume rise and the attendant effect on predicted concentrations.

## 6. Examples of source characterization applications

Examples of the use of both the highly industrialized area (urban) application and the LIFTOFF approach would be a large aluminum smelter or large steel mill. These sources typically feature extensive areas of excess heat releases and stacks in the midst of the heated building areas. The heat release can be quantified with either a satellite thermal imagery analysis or through engineering estimates of the heat loss.

An example of a facility with only the LIFTOFF effect would be a smaller heated industrial area such as a taconite ore processing facility. This type of facility might typically have the heat release area encompassing only a few hundred meters. If the facility's point sources have considerable plume moisture, then the AERMOIST approach may also be used.

Stack releases from processes involving flue gas desulfurization controls would be good candidates for the AERMOIST approach. Flue gas desulfurization controls treat the plume by injecting an alkaline reagent into the flue gas to remove $SO_2$ from the gas. This treatment results in higher plume moisture content than those without the treatment, thus making it viable for the AERMOIST approach.

For any of these applications, a situation with a row of stacks (even if only 2) would qualify for the AERLIFT approach, especially if they are within a few stack diameters of each other. As noted above, the stack separation distance affects the plume rise change due to stack merging.

At the time this paper was submitted in revised form, there were a few modeling applications in the United States for which these methods have been proposed and are either being applied based upon the past evaluations reported in this paper, or are going to be evaluated in the near future based upon new field data. In the case of the Eastman Chemical evaluation study (Paine et al., 2013; Szembek et al., 2013), the urban characterization as well as LIFTOFF have been used in the same application as approved USEPA techniques.

## 7. Summary

Steady-state plume models such as AERMOD have not been extensively tested or designed for scenarios where an emission source modifies the dispersion environment. Model performance for these conditions has become increasingly important in light of short-term pollutant standards, e.g., for 1-h $SO_2$ and 1-h $NO_2$ United States ambient standards. Four independent source characterization techniques described in this paper have been adapted and evaluated to better represent plume rise effects for nontraditional sources and their surrounding environment. These techniques are implemented as universally applicable to many dispersion models and are thus designed to be used as external processors that interact with the main dispersion model.

Two of these source characterization methods address fugitive heat releases at industrial complexes. The first occurs on a large scale resulting in a local urban-like dispersion environment called a "highly industrialized area". To account for this excess heat, an effective population equivalent to the scale of the HIA can be calculated using an already existing relationship between population to urban-rural temperature difference and used as input to the dispersion model. We recommend that this approach is applied to areas with a scale of at least several hundred meters and an excess temperature between the HIA and the surrounding area of at least 8 K. The second, smaller scale excess heat release issue relates to building downwash effects, and can be addressed by using the LIFTOFF procedure and a weighting relationship using procedures developed by Hanna et al. (1998). Both the HIA's effective population and the LIFTOFF technique can be applied in the same modeling application. Both have been evaluated and shown to provide modest overpredictions.

Stacks with moist plumes can lead to latent heat release of condensation after the plume exits the stack, providing additional plume rise relative to a dry plume case. This effect has been neglected in many dispersion models, but with the increasing use of flue gas desulfurization controls that inject considerable water vapor into the plume exhaust, accommodating this effect is very important. The AERMOIST procedure incorporates this moist plume effect by refining the hourly input exit temperature data based on a scaling ratio developed using a previously validated European

model (the IBJpluris model) which incorporates moist plume effects. Stack sources for which this approach is particularly relevant is for processes involving wet and dry flue gas desulfurization controls.

Lastly, multiple stacks in a line can result in plume merging and buoyancy enhancement under certain conditions. The AERLIFT processor assesses and incorporates plume merging from aligned emission sources using an hourly emissions file from an initial model run. The exhaust characteristics of the merging plumes are refined by AERLIFT on an hourly basis, and then the dispersion model is run a second time with a new input of effective hourly exhaust parameters for each affected source.

These advanced plume rise procedures have been designed for use with dispersion models without the need to change the modeling system code, and are shown to improve model performance. They can be used individually, or in combination. By including these procedures outside of the modeling code as source characterization techniques, these procedures are available to a large suite of modeling approaches. In addition, their use as more accurately portraying the source plume behavior is inherently a refinement outside the model's treatment of plume transport and dispersion. Although we have provided available model performance results, we encourage much wider testing and evaluation of these approaches in a variety of settings.

## Acknowledgements

The authors would like to gratefully acknowledge the American Iron and Steel Institute for providing funding for this research.

## Appendix A. Supplementary data

Supplementary data related to this article can be found at http://dx.doi.org/10.1016/j.atmosenv.2016.01.003.

## References

Anfossi, D., 1985. Analysis of plume rise data from five TVA steam plants. J. Appl. Meteorol. Clim. 24, 1225–1236. http://dx.doi.org/10.1175/1520-0450(1985)024<1225:AOPRDF>2.0.CO;2.
Arya, S., 2001. Chapter 5: air temperature and humidity in the PBL. In: Introduction to Micrometeorology. Academic Press, Oxford, UK.
Briggs, G.A., 1969. Plume Rise. USAEC Critical Review Series, National Technical Information Service, Springfield, VA.
Briggs, G.A., 1974. Cooling Tower Environment — 1974: Plume Rise from Multiple Sources (CONF-740302). ERDA Symposium Series, National Technical Information Services, U.S. Dept. of Commerce, Springhill, VA.
Briggs, G.A., 1975. Plume rise predictions. In: Lectures on Air Pollution and Environmental Impact Analyses. American Meteorological Society, Boston, MA.
Briggs, G.A., 1984. Chapter 8: plume rise and buoyancy effects. In: Atmospheric Science and Power Production. Technical Information Center, Office of Scientific and Technical Information, U.S. Dept. of Energy, Oak Ridge, TN; Springfield, VA.
Cambridge Environmental Research Consultants Ltd, 2015. ADMS 5 Atmospheric Dispersion Modelling System User Guide. http://www.cerc.co.uk/environmental-software/assets/data/doc_userguides/CERC_ADMS_5_1_User_Guide.pdf (accessed 30.11.15).
Cimorelli, A.J., Perry, S.G., Venkatram, A., Weil, J.C., Paine, R.J., Wilson, R.B., Lee, R.F., Peters, W.D., Brode, R.W., 2005. AERMOD: a dispersion model for industrial source applications. Part I: general model formulation and boundary layer characterization. J. Appl. Meteorol. 44, 682–693. http://dx.doi.org/10.1175/JAM2227.1.
Contini, D., Hayden, P., Robins, A., 2006. Concentration field and turbulent fluxes during the mixing of two buoyant plumes. Atmos. Environ. 40 (40), 7842–7857. http://dx.doi.org/10.1016/j.atmosenv.2006.07.024.
Environmental Protection Authority Victoria, Australia. Monitoring the Environment: AERMOD Air Pollution Modelling. http://www.epa.vic.gov.au/our-work/monitoring-the-environment/monitoring-victorias-air/aermod-air-pollution-modelling (accessed 22.09.15).
Fung, W.Y., Lam, K.S., Nichol, J., Wong, M.S., 2009. Derivation of nighttime urban air temperatures using a satellite thermal image. J. Appl. Meteorol. Clim. 48, 863–872. http://dx.doi.org/10.1175/2008JAMC2001.1.
Hanna, S.R., Briggs, G.A., Chang, J.C., 1998. Lift-off of ground-based buoyant plumes. J. Hazard. Mater. 59, 123–130.
Hanna, S.R., Britter, R.E., 2002. Chapter 2: overview of meteorology and atmospheric dispersion. In: Wind Flow and Vapor Cloud Dispersion at Industrial and Urban Sites. John Wiley & Sons, Inc., Hoboken, NJ http://dx.doi.org/10.1002/9780470935613.refs.
Hanna, S., Marciotto, E., Britter, R., 2011. Urban energy fluxes in built-up downtown areas and variations across the urban area, for use in dispersion models. J. Appl. Meteorol. Clim. 50, 1341–1353.
Hurley, P., 2008. TAPM V4. Part 1: Technical Description. In: https://publications.csiro.au/rpr/download?pid=procite:0cff4149-4feb-4b86-abcb-c707168ecb0b&dsid=DS1 (accessed 30.11.15).
Irwin, J., 1978. Proposed Criteria for Selection of Urban versus Rural Dispersion Coefficients. Draft Staff Report (Docket No. A-80–46, II-B-8). Meteorology and Assessment Division, U.S. Environmental Protection Agency.
Jacobson, M.Z., 2005. Fundamentals of Atmospheric Modeling. Cambridge University Press, New York, NY.
Janicke, U., Janicke, L., 2001. A three-dimensional plume rise model for dry and wet plumes. Atmos. Environ. 35, 877–890.
Janicke Consulting, Environmental Physics, 2015. Plume Rise Model IBJpluris. http://www.janicke.de/en/download-programs.html (accessed 11.03.15).
Macdonald, R.W., Strom, R.K., Slawson, P.R., 2002. Water flume study of the enhancement of buoyant rise in pairs of merging plumes. Atmos. Environ. 36 (29), 4603–4615. http://dx.doi.org/10.1016/S1352-2310(02)00464-8.
Manins, P., Carras, J., Williams, D., 1992. Plume rise from multiple stacks. Clean. Air — Aust. 26 (2), 65–68.
National Aeronautics and Space Administration Jet Propulsion Laboratory, 2004. Advanced Spaceborne Thermal Emission and Reflection Radiometer. http://asterweb.jpl.nasa.gov (accessed 14.12.15).
Nichol, J., 2005. Remote sensing of urban heat islands by day and night. Photogramm. Eng. Remote Sens. 71, 613–621.
Olesen, H.R., Genikhovich, E., Ministry of Environment and Energy, 2000. Building Downwash Algorithm for OML Atmospheric Dispersion Model. http://www2.dmu.dk/1_viden/2_Publikationer/3_arbrapporter/rapporter/AR123.pdf (accessed 09.03.15).
Olesen, H.R., Berkowicz, R.B., Lofstrom, P., 2007. OML: Review of Model Formulation. National Environmental Research Institute, Denmark, p. 130. NERI Technical Report No. 609. http://www.dmu.dk/Pub/FR609.pdf (accessed 30.11.15).
Oke, T.R., 1973. City size and the urban heat island. Atmos. Environ. 7 (8), 769–779.
Oke, T.R., 1978. Boundary Layer Climates. John Wiley and Sons, New York, NY, p. 372.
Oke, T.R., 1982. The energetic basis of the urban heat island. Quart. J. Roy. Meteor. Soc. 108, 1–24.
Oke, T.R., November 2–4, 1998. An algorithmic scheme to estimate hourly heat island magnitude. In: Paper presented at the Second Symposium on Urban Environment. Am. Meteorol. Soc., Boston, MA.
Overcamp, T.J., Ku, T., 1988. Plume rise from two or more adjacent stacks. Atmos. Environ. 22 (4), 625–637.
Paine, R., Tringale, F., Gossett, S., 2013. Resolution of 1-hour SO₂ non-attainment area in Kingsport, TN: advanced meteorological and monitoring study. In: Control #7, Air & Waste Management Association Specialty Conference, Guideline on Air Quality Models: the Path Forward, Raleigh, NC. March.
Petersen, R., 2015. Building downwash — problems, solutions and next generation. In: 11th USEPA Modeling Conference, August 13. http://www3.epa.gov/ttn/scram/11thmodconf/presentations/3-6_Building_Downwash-CPP-11thMC.pdf (accessed 30.11.15).
Presotto, L., Bellasia, R., Bianconi, R., 2005. Assessment of the visibility impact of a plume emitted by a desulphurization plant. Atmos. Environ. 39 (4), 719–737.
Robins, A., 1994. Flow and dispersion around buildings in light wind conditions. In: Castro, Rockliff (Eds.), Stably Stratified Flows. Clarendon Press, Oxford UK, p. 372.
Robins, A., Apsley, D., Cambridge Environmental Research Consultants, 2013. Modelling of Building Effects in ADMS. http://www.cerc.co.uk/environmental-software/assets/data/doc_techspec/CERC_ADMS5_P16_01.pdf (accessed 22.09.15).
Schewe, G., Colebrook, J., 2013. Use of the urban option in AERMOD for a large industrial facility. In: Control #21, Air & Waste Management Association Specialty Conference, Guideline on Air Quality Models: the Path Forward, Raleigh, NC. March.
Scire, J.S., Strimaitis, D.G., Yamartino, R.J., 2000. A User's Guide for the CALPUFF Dispersion Model (Version 5). Tech. Rep. Earth Tech, Inc., Concord, MA, p. 521. http://www.src.com/calpuff/download/CALPUFF_UsersGuide.pdf (accessed 01.12.15).
Schulman, L.L., Strimaitis, D.G., Scire, J.S., 2000. Development and evaluation of the PRIME plume rise and building downwash model. J. Air Waste Manag. Assoc. 50, 378–390.
Sykes, R.I., Cerasoli, C.P., Henn, D.S., 1999. The representation of dynamic flow effects in a Lagrangian puff dispersion model. J. Hazard. Mater. 64, 223–247.
Szembek, C., Paine, R., Gossett, S., 2013. Resolution of 1-hour SO₂ non-attainment area in Kingsport, TN: model evaluation analysis results to date. In: Control #8, Air & Waste Management Association Specialty Conference, Guideline on Air Quality Models: the Path Forward, Raleigh, NC. March.
U.S. Environmental Protection Agency, 1995. SCREEN3 Model User's Guide. http://www.epa.gov/scram001/userg/screen/screen3d.pdf (accessed 09.03.15).
U.S. Environmental Protection Agency, 2003. AERMOD: Latest Features and Evaluation Results. http://www.epa.gov/ttn/scram/7thconf/aermod/aermod_mep.pdf (accessed 05.03.15).
U.S. Environmental Protection Agency, 2004a. AERMOD: Description of Model

*R. Paine et al. / Atmospheric Environment 129 (2016) 55–67*     67

Formulation. http://www.epa.gov/scram001/7thconf/aermod/aermod_mfd.pdf (accessed 13.03.15).

U.S. Environmental Protection Agency, 2004b. User's Guide to the Building Profile Input Program. http://www3.epa.gov/scram001/userg/relat/bpipdup.pdf (accessed 22.11.15).

U.S. Environmental Protection Agency, 2005. Guideline on Air Quality Models (Appendix W): 40 FR 68218. http://www.epa.gov/ttn/scram/guidance/guide/appw_05.pdf (accessed 14.12.15).

U.S. Environmental Protection Agency, 2012. AERMIC Update. http://www3.epa.gov/ttn/scram/10thmodconf/presentations/1-9-Brode_10thMC_AERMIC_Update_03-13-2012.pdf (accessed 14.12.15).

U.S. Environmental Protection Agency, 2015. AERMOD Implementation Guide. http://www.epa.gov/ttn/scram/7thconf/aermod/aermod_implmtn_guide_3August2015.pdf (accessed 27.08.15).

U. S. Geological Survey, 2015. Landsat Missions: Landsat 8. http://landsat.usgs.gov/landsat8.php (accessed 14.12.15).

Voogt, J.A., Oke, T.R., 2003. Thermal remote sensing of urban climates. Remote Sens. Environ. 86, 370–384.

# Appendix B

# Communication from EPA Region 4 Regarding Eastman Modeling Approaches

**EPA Region 4 Response to Eastman's Additional EASTMOD Information submitted via email from Stephen Gossett on March 3, 2015**

EPA Region 4 has completed our review of Eastman's proposal to use an alternative model (EASTMOD) for air modeling required for the Sullivan County, Tennessee, Sulfur Dioxide (SO2) Attainment Demonstration State Implementation Plan (SIP). Based upon a review of all of the information that has been provided by Eastman since the original proposal in 2014, EPA is in a position to approve portions of the proposed changes to the AERMOD Modeling System that are incorporated into the EASTMOD proposal and not allow other portions of the proposal. In order for an alternative to EPA's recommended AERMOD Modeling System to be approved for use in the SO2 Attainment Demonstration SIP, a formal approval from EPA Region 4 pursuant to Section 3.2.2 of 40 CFR Part 51, Appendix W, is needed. The following discussion identifies the portions of EASTMOD which we are in a position to approve and provides our rationale for not allowing other portions of the proposal.

We have determined that the following modifications to the regulatory AERMOD modeling system are acceptable for the Eastman SO2 Attainment Modeling:
- Beta ADJ_U* option in AERMET
- LOWWIND2 beta option in AERMOD (with a single 0.4 m/s minimum sigma-v value)
- AERLIFT for the five closely-spaced B-253 powerhouse stacks that are approximately 15 meters apart.

We have determined that the following modifications requested by Eastman are not acceptable:
- Proposed modifications to the LOWWIND2 beta option to allow use of split minimum sigma-v values for stable and unstable atmospheric conditions
- Proposed use of AERLIFT for the two widely-spaced B-83 powerhouse stacks that are approximately 50 meters apart.

EPA has performed considerable testing of both the beta ADJ_U* option in AERMET and the LOWWIND2 beta option in AERMOD using multiple tracer-studies. Since Eastman has shown that the combination of these beta options has improved model performance for their site-specific case, EPA believes that these alternative model options are appropriate for their SO2 Attainment Demonstration SIP modeling. As has been stated in the past, EPA continues to have concerns about Eastman's proposal to use split minimum sigma-v values for unstable (0.4 m/s) and stable (0.6 m/s) atmospheric conditions, due in part to the fact that the AERMOD model formulation incorporates a horizontal plume meander component that effectively increases lateral plume spread, especially under low wind stable conditions. As a result of these concerns, EPA does not believe that the additional information provided by Eastman on March 3, 2015, justifies use of this proposed change to the model.

Based upon the site-specific model performance information provided by Eastman, it appears that use of the LOWWIND2 beta option with a single minimum sigma-v value of 0.4 m/s significantly improves model performance for the Ross N. Robinson, Meadowview, Skyland Drive and B-267 monitors when compared to the regulatory default version of AERMOD. We are open to approving a minimum sigma-v value of 0.4 m/s (versus the current default value of

0.3 m/s associated with the beta LOWWIND2 option) for the Eastman specific case due to the complex dispersion environment associated with very low wind speeds and nearby complex terrain. These influences are likely to result in significant vertical wind shear that could contribute to increased lateral plume dispersion.

As indicated in our Technical Review Comments dated September 5, 2014, EPA Region 4 has determined that the proposed AERLIFT component of EASTMOD is a source characterization procedure and is not an integral part of the AERMOD Modeling System. Therefore, it is not subject to the Appendix W, Section 3.2.2 alternative model evaluation criteria. EPA Region 4 has considered the AERLIFT procedure separately from the modifications proposed to be made to the actual AERMOD Modeling System. Based upon the entirety of information provided by Eastman regarding AERLIFT, EPA believes that the AERLIFT procedure is acceptable for use in modeling the five closely-spaced stacks at the B-253 powerhouse, but is not acceptable for the two B-83 stacks.

The additional information provided by Eastman in the March 3, 2015, submittal clearly indicates that use of AERLIFT for the five closely spaced B-253 stacks improves model performance at the Ross N. Robinson, Skyland Drive and Meadowview monitor locations and shows a small improvement for the B-267 monitor location when compared to the no-AERLIFT cases. The studies in the references cited by both EPA and Eastman in previous correspondence provide supporting information for use of AERLIFT for the five closely-spaced (approx. 15 meters apart) B-253 stacks. Conversely, the use of AERLIFT for the two B-83 stacks that are relatively far apart (approx. 50 meter or 11 stack diameters apart) results in very little change to the model performance at the Ross N. Robinson, Skyland Drive, Meadowview and B-267 monitor locations when compared to the no-AERLIFT cases. As has been pointed out in previous EPA comments, the literature appears to be consistent regarding the lack of any plume rise enhancement for two stacks spaced far apart like the B-83 stacks. The lack of performance improvement with AERLIFT for the B-83 stacks is consistent with the studies which question plume rise enhancement for two far apart stacks. Therefore, EPA does not believe it is appropriate to approve the use of AERLIFT for the B-83 stacks.

EPA also notes that the additional information provided by Eastman indicates that importance of the AERLIFT procedure will be greatly reduced for the future attainment year modeling case, in which the B-253 SO2 emissions will be mostly eliminated by the fuel switch from coal to natural gas for the B-253 boilers.

AECOM                                                    Environment

# Appendix F

# Modeling Archive (Provided on Compact Disc to EPA)

**Tab 433: 81 Fed. Reg. 89,870 (Dec. 13, 2016)**

**89870** **Federal Register** / Vol. 81, No. 239 / Tuesday, December 13, 2016 / Rules and Regulations

appropriate, disproportionate human health or environmental effects, using practicable and legally permissible methods, under Executive Order 12898 (59 FR 7629, February 16, 1994).

*B. Submission to Congress and the Comptroller General*

The Congressional Review Act, 5 U.S.C. 801 *et seq.,* as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. EPA will submit a report containing this action and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. This action is not a "major rule" as defined by 5 U.S.C. 804(2).

In addition, this rulemaking determining that the Delaware County Area has attained the 2012 annual $PM_{2.5}$ NAAQS does not have tribal implications as specified by Executive Order 13175 (65 FR 67249, November 9, 2000), because the SIP is not approved to apply to Indian country located in the state, and EPA notes that it will not impose substantial direct costs on tribal governments or preempt tribal law.

*C. Petitions for Judicial Review*

Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by February 13, 2017. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this action for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed, and shall not postpone the effectiveness of such rule or action. Parties with objections to this direct final rule are encouraged to file a comment in response to the parallel notice of proposed rulemaking for this action published in the proposed rules section of this **Federal Register**, rather than file an immediate petition for judicial review of this direct final rule, so that EPA can withdraw this direct final rule and address the comment in the proposed rulemaking action.

This determination of attainment of the 2012 annual $PM_{2.5}$ NAAQS for the Delaware County nonattainment area may not be challenged later in

proceedings to enforce its requirements. (See section 307(b)(2)).

List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Incorporation by reference, Intergovernmental relations, Particulate matter, Reporting and recordkeeping requirements.

Dated: November 22, 2016.

**Shawn M. Garvin,**
*Regional Administrator, Region III.*

40 CFR part 52 is amended as follows:

**PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS**

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

**Subpart NN—Pennsylvania**

■ 2. In § 52.2059, add paragraph (u) to read as follows:

**§ 52.2059 Control strategy: Particulate matter.**

\*    \*    \*    \*    \*

(u) *Determination of attainment.* EPA has determined based on 2013 to 2015 ambient air quality monitoring data, that the Delaware County, Pennsylvania moderate nonattainment area has attained the 2012 annual fine particulate matter ($PM_{2.5}$) primary national ambient air quality standard (NAAQS). This determination, in accordance with 40 CFR 51.1015, suspends the requirements for this area to submit an attainment demonstration, associated reasonably available control measures, a reasonable further progress plan, contingency measures, and other planning state implementation plan revisions related to attainment of the standard for as long as this area continues to meet the 2012 annual $PM_{2.5}$ NAAQS.

[FR Doc. 2016–29751 Filed 12–12–16; 8:45 am]

**BILLING CODE 6560–50–P**

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 81**

[EPA–HQ–OAR–2014–0464; FRL–9956–10–OAR]

**Air Quality Designations for the 2010 Sulfur Dioxide ($SO_2$) Primary National Ambient Air Quality Standard—Supplement to Round 2 for Four Areas in Texas: Freestone and Anderson Counties, Milam County, Rusk and Panola Counties, and Titus County**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** This rule establishes the initial air quality designations for four areas in Texas for the 2010 primary sulfur dioxide ($SO_2$) National Ambient Air Quality Standard (NAAQS). The Environmental Protection Agency (EPA) is designating three of the areas as nonattainment because they do not meet the NAAQS. One area is being designated unclassifiable because it cannot be classified on the basis of available information as meeting or not meeting the NAAQS. The designations are based on the weight of evidence for each area, including available air quality monitoring data and air quality modeling. For the areas designated nonattainment by this rule, the Clean Air Act (CAA) directs the state of Texas to undertake certain planning and pollution control activities to attain the $SO_2$ NAAQS as expeditiously as practicable. This action is a supplement to the final rule addressing the second round of area designations for the 2010 $SO_2$ NAAQS, which the EPA Administrator signed on June 30, 2016.

**DATES:** The effective date of this rule is January 12, 2017.

**ADDRESSES:** The EPA has established a docket for the second round of designations, including this supplemental action, under Docket ID No. EPA–HQ–OAR–2014–0464. All documents in the docket are listed in the *http://www.regulations.gov* Web site. Although listed in the index, some information is not publicly available, *e.g.,* Confidential Business Information or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the Internet and will be publicly available only in hard copy form. Publicly available docket materials are available electronically in *http://www.regulations.gov.*

In addition, the EPA has established a Web site for the 2010 $SO_2$ NAAQS designations rulemakings at: *https://*

www.epa.gov/sulfur-dioxide-designations. The Web site includes the EPA's final $SO_2$ designations, as well as state and tribal initial recommendation letters, the EPA's letters announcing modifications to those recommendations, technical support documents, responses to comments and other related technical information.

**FOR FURTHER INFORMATION CONTACT:** For general questions concerning this supplemental action, please contact Liz Etchells, U.S. EPA, Office of Air Quality Planning and Standards, Air Quality Planning Division, C539–04, Research Triangle Park, NC 27711, telephone (919) 541–0253, email at etchells.elizabeth@epa.gov.

**SUPPLEMENTARY INFORMATION:**

*U.S. EPA Regional Office Contacts:* Region VI—Jim Grady, telephone (214) 665–6745, email at grady.james@epa.gov.

The public may inspect the rule and area-specific technical support information at the following location: Air Planning Section, EPA Region VI, 1445 Ross Avenue, Dallas, TX 75202.

**Table of Contents**

The following is an outline of the preamble.

I. Preamble Glossary of Terms and Acronyms
II. What is the purpose of this supplemental action?
III. What is the 2010 $SO_2$ NAAQS and what are the health concerns that it addresses?
IV. What are the CAA requirements for air quality designations and what action has the EPA taken to meet these requirements?
V. What guidance did the EPA issue and how did the EPA apply the statutory requirements and applicable guidance to determine area designations and boundaries?
VI. What air quality information has the EPA used for these designations?
VII. How do the designations supplementing the Round 2 designations affect Indian country?
VIII. Where can I find information forming the basis for this action and exchanges between the EPA, states and tribes related to this action?
IX. Environmental Justice Concerns
X. Statutory and Executive Order Reviews
   A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review
   B. Paperwork Reduction Act (PRA)
   C. Regulatory Flexibility Act (RFA)
   D. Unfunded Mandates Reform Act (URMA)
   E. Executive Order 13132: Federalism
   F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
   G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
   H. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution, or Use
   I. National Technology Transfer and Advancement Act (NTTAA)
   J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
   K. Congressional Review Act (CRA)
   L. Judicial Review

**I. Preamble Glossary of Terms and Acronyms**

The following are abbreviations of terms used in the preamble.

APA    Administrative Procedure Act
CAA    Clean Air Act
CFR    Code of Federal Regulations
DC    District of Columbia
EO    Executive Order
EPA    Environmental Protection Agency
FR    Federal Register
NAAQS    National Ambient Air Quality Standards
NTTAA    National Technology Transfer and Advancement Act
OMB    Office of Management and Budget
$SO_2$    Sulfur Dioxide
$SO_X$    Sulfur Oxides
RFA    Regulatory Flexibility Act
UMRA    Unfunded Mandate Reform Act of 1995
TAR    Tribal Authority Rule
TAD    Technical Assistance Document
TSD    Technical Support Document
US    United States

**II. What is the purpose of this supplemental action?**

The purpose of this final action is to announce and promulgate initial air quality designations for four areas in Texas for the 2010 primary $SO_2$ NAAQS, in accordance with the requirements of the CAA. The EPA is designating three of these areas as nonattainment, and one area as unclassifiable. As discussed in Section IV of this document, the EPA is designating areas for the 2010 $SO_2$ NAAQS in multiple rounds under a court-ordered schedule pursuant to a consent decree. The EPA completed the first round of $SO_2$ designations in an action signed by the Administrator on July 25, 2013 (78 FR 47191; August 5, 2013). In that action, the EPA designated 29 areas in 16 states as nonattainment, based on air quality monitoring data.

The court order required the EPA Administrator to sign a notice designating areas in a second round that contained sources meeting certain criteria no later than July 2, 2016. *See Sierra Club and NRDC* v. *McCarthy,* No. 3:13–cv–3953–SI (N.D. Cal.) (March 2, 2015). The four areas in Texas covered by this action met those criteria, and the EPA responded to state recommendations for Round 2

designations, including Texas' recommendations for these four areas, on February 11, 2016 (Letter from Ron Curry, EPA Region 6 Administrator, to Governor of Texas, Honorable Greg Abbott). In the second round of $SO_2$ designations signed on June 30, 2016, the EPA designated 61 areas in 24 states (including eight other areas in Texas): four nonattainment areas, 41 unclassifiable/attainment areas and 16 unclassifiable areas (81 FR 45039; July 12, 2016). However, by a series of stipulations of the parties in *Sierra Club and NRDC* v. *McCarthy* and orders of the Court, the deadline to promulgate designations was extended to November 29, 2016, for the four areas in Texas that are the subject of this supplemental action. This action to designate four Texas areas further discharges the EPA's duty to issue the second round of $SO_2$ designations, and uses the same administrative record as supported by the action signed on June 30, 2016, that addressed eight other Texas areas and other areas in the United States, as supplemented by additional materials further addressing these four Texas areas.

In this supplementary designation action, the list of areas being designated in Texas and the boundaries of each area appear in the tables within the regulatory text at the end of this notice. These designations are based on the EPA's technical assessment of the weight of evidence for each area, including but not limited to available air quality monitoring data or air quality modeling. With respect to air quality monitoring data, the EPA considered data from the most recent calendar years 2012–2015. In the modeling runs conducted by industry and members of the public, the air quality impacts of the actual emissions for the 3-year periods 2012–2014 or 2013–2015 were assessed.

For the areas being designated nonattainment, the CAA directs states to develop and submit to the EPA State Implementation Plans within 18 months of the effective date of this final rule that meet the requirements of sections 172(c) and 191–192 of the CAA and provide for attainment of the NAAQS as expeditiously as practicable, but not later than 5 years from the effective date of this final rule. We also note that under the EPA's $SO_2$ Data Requirements Rule in 40 CFR part 51, subpart BB (80 FR 51052; August 21, 2015), the EPA expects to receive additional air quality characterization for the one area in Milam County, Texas, designated unclassifiable in this action, and the agency will consider such data, as appropriate, in future actions.

**89872** **Federal Register** / Vol. 81, No. 239 / Tuesday, December 13, 2016 / Rules and Regulations

## III. What is the 2010 SO₂ NAAQS and what are the health concerns that it addresses?

The Administrator signed a final rule revising the primary SO₂ NAAQS on June 2, 2010. The rule was published in the **Federal Register** on June 22, 2010 (75 FR 35520) and became effective on August 23, 2010. Based on the Administrator's review of the air quality criteria for oxides of sulfur and the primary NAAQS for oxides of sulfur as measured by SO₂, the EPA revised the primary SO₂ NAAQS to provide requisite protection of public health with an adequate margin of safety. Specifically, the EPA established a new 1-hour SO₂ standard at a level of 75 parts per billion (ppb), which is met at an ambient air quality monitoring site when the 3-year average of the annual 99th percentile of 1-hour daily maximum concentrations is less than or equal to 75 ppb, as determined in accordance with Appendix T of 40 CFR part 50. 40 CFR 50.17(a)–(b). The EPA also established provisions to revoke both the existing 24-hour and annual primary SO₂ standards, subject to certain conditions. 40 CFR 50.4(e).

Additional information regarding the current scientific evidence on the health impacts of short-term exposures to SO₂ is provided in the **Federal Register** notice containing the final rule for the second round of SO₂ designations for other areas that was signed on June 30, 2016. *See* 81 FR 45041.

## IV. What are the CAA requirements for air quality designations and what action has the EPA taken to meet these requirements?

After the EPA promulgates a new or revised NAAQS, the EPA is required to designate all areas of the country as either "nonattainment," "attainment," or "unclassifiable," for that NAAQS pursuant to section 107(d)(1) of the CAA. Section 107(d)(1)(A)(i) of the CAA defines a nonattainment area as "any area that does not meet (or that contributes to ambient air quality in a nearby area that does not meet) the national primary or secondary ambient air quality standard for the pollutant." If an area meets either prong of this definition, then the EPA is obligated to designate the area as "nonattainment." This provision also defines an attainment area as any area other than a nonattainment area that meets the NAAQS and an unclassifiable area as any area that cannot be classified on the basis of available information as meeting or not meeting the NAAQS.

Additional information regarding the process for designating areas following promulgation of a new or revised NAAQS pursuant to section 107(d) of the CAA and how the EPA is applying this process to the designation of areas under the 2010 SO₂ NAAQS is provided in the final rule addressing the second round of SO₂ designations for other areas signed on June 30, 2016. *See* 81 FR 45041. For this supplemental action, the EPA reiterates that CAA section 107(d) provides the agency with discretion to determine how best to interpret the terms in the definition of a nonattainment area (*e.g.*, "contributes to" and "nearby") for a new or revised NAAQS, given considerations such as the nature of a specific pollutant, the types of sources that may contribute to violations, the form of the standards for the pollutant, and other relevant information. In particular, the EPA's position is that the statute does not require the agency to establish bright line tests or thresholds for what constitutes "contribution" or "nearby" for purposes of designations.[1]

Similarly, the EPA's position is that the statute permits the EPA to evaluate the appropriate application of the term "area" to include geographic areas based upon full or partial county boundaries, as may be appropriate for a particular NAAQS. For example, CAA section 107(d)(1)(B)(ii) explicitly provides that the EPA can make modifications to designation recommendations for an area "or portions thereof," and under CAA section 107(d)(1)(B)(iv) a designation remains in effect for an area "or portion thereof" until the EPA redesignates it.

As explained in more detail in the final rule addressing the second round of SO₂ designations for other areas, the EPA completed the first round of SO₂ designations for 29 areas on July 25, 2013 (78 FR 47191), and intends to complete up to three more rounds of designations to address all remaining areas pursuant to a schedule contained in a consent decree and enforceable order entered by the U.S. District Court for the Northern District of California on March 2, 2015. *See* 81 FR 45042.

The court order specifies that in this second round of SO₂ designations the EPA must designate two groups of areas: (1) Areas that have newly monitored violations of the 2010 SO₂ NAAQS and (2) areas that contain any stationary sources that had not been announced as of March 2, 2015, for retirement and that, according to the EPA's Air Markets Database, emitted in 2012 either (i) more than 16,000 tons of SO₂, or (ii) more than 2,600 tons of SO₂ with an annual

average emission rate of at least 0.45 pounds of SO₂ per one million British thermal units (lbs SO₂/mmBTU).

On March 20, 2015, the EPA sent letters to Governors notifying them of the schedule for completing the remaining designations for the 2010 1-hour SO₂ NAAQS. The EPA offered states, including Texas, the opportunity to submit updated recommendations and supporting information for the EPA to consider for the affected areas. The EPA also notified states that the agency had updated its March 24, 2011, SO₂ designations guidance to support analysis of designations and boundaries for the next rounds of designations. All of the states, including Texas, with affected areas submitted updated designation recommendations.

In a letter dated February 11, 2016, the EPA notified Texas of its intended designation of twelve Round 2 areas, including the four areas in Texas addressed in this final notice, as either nonattainment, attainment/ unclassifiable, or unclassifiable for the SO₂ NAAQS. Texas then had the opportunity to demonstrate why they believed the EPA's intended modification of their updated recommendations may be inappropriate. Although not required, as the EPA had done for the first round of SO₂ designations, the EPA also provided an opportunity for members of the public to comment on the EPA's February 2016 response letters. The EPA published a notice of availability and public comment period for the intended designation on March 1, 2016 (81 FR 10563). The public comment period closed on March 31, 2016. The updated recommendations, the EPA's February 2016 responses to those letters, any modifications, and the subsequent state and public comment letters, are in the docket for the Round 2 SO₂ designations at Docket ID No. EPA–HQ–OAR–2014–0464 and are available on the SO₂ designations Web site.

Before taking final action, however, the parties to *Sierra Club and NRDC* v. *McCarthy* filed the first in a series of joint stipulations extending the deadline for these four areas in Texas, out to November 29, 2016.[2] In the final rule signed on June 30, 2016, the EPA promulgated designations for the Round 2 areas for which no extensions in the deadline had been obtained (including the eight other Texas areas) and explained the ongoing process for completing SO₂ designations for all

---

[1] This view was confirmed in *Catawba County* v. *EPA*, 571 F.3d 20 (D.C. Cir. 2009).

[2] The parties to *Sierra Club and NRDC* v. *McCarthy* also filed a joint stipulation extending the Round 2 designation deadline for the Muskogee County Area in Oklahoma out to December 31, 2016.

areas of the country by December 31, 2020 (*see generally* 81 FR 45042–43).

In these supplemental Round 2 designations, and consistent with the extended deadline under the consent decree, the EPA must designate the four areas in Texas associated with the following sources by November 29, 2016: The Big Brown Steam Electric Station in the Freestone and Anderson Counties Area, the Sandow Power Station in the Milam County Area, the Martin Lake Electrical Station in the Rusk and Panola Counties Area, and the Monticello Steam Electric Station in the Titus County Area.

## V. What guidance did the EPA issue and how did the EPA apply the statutory requirements and applicable guidance to determine area designations and boundaries?

Following entry of the March 2, 2015, court order, the EPA issued updated designations guidance through a March 20, 2015, memorandum from Stephen D. Page, Director, U.S. EPA, Office of Air Quality Planning and Standards, to Air Division Directors, U.S. EPA Regions 1– 10 titled, "Updated Guidance for Area Designations for the 2010 Primary Sulfur Dioxide National Ambient Air Quality Standard." As explained in the final rule addressing the second round of $SO_2$ designations for other areas signed on June 30, 2016, this guidance contains the factors the EPA intends to evaluate in determining the appropriate designations and associated boundaries for all remaining areas in the country, including: (1) Air quality characterization via ambient monitoring or dispersion modeling results; (2) emissions-related data; (3) meteorology; (4) geography and topography; and (5) jurisdictional boundaries. *See* 81 FR at 45043. Additional information regarding relevant guidance relied upon in designating the other second round areas and that is also used in this supplemental action is available in the previously issued final rule. *See id.*

## VI. What air quality information has the EPA used for these designations?

To inform designations for the $SO_2$ NAAQS, air agencies have the flexibility to characterize air quality using either appropriately sited ambient air quality monitors or using modeling of actual or allowable source emissions. The EPA's non-binding Monitoring Technical Assistance Document (TAD) and Modeling TAD contain scientifically sound recommendations on how air agencies should conduct such monitoring or modeling. For the $SO_2$ designations of the four Texas areas addressed in this supplemental action,

the EPA is using the same approach taken for a number of areas designated in the final rule signed on June 30, 2016, and considering available air quality monitoring data from calendar years 2012–2015, and modeling submitted by the affected emissions sources and a public interest group. *See* 81 FR 45043. In the modeling runs, the impacts of the actual emissions for the 3-year periods 2012–2014 or 2013–2015 were considered. The 1-hour primary $SO_2$ standard is violated at an ambient air quality monitoring site (or in the case of dispersion modeling, at an ambient air quality receptor location) when the 3-year average of the annual 99th percentile of the daily maximum 1-hour average concentrations exceeds 75 ppb, as determined in accordance with appendix T of 40 CFR part 50. The EPA has concluded that dispersion modeling shows that three Round 2 areas in Texas (portions of Freestone and Anderson Counties, portions of Rusk and Panola Counties, and portions of Titus County) are not meeting the 1-hour primary $SO_2$ standard and we are, therefore, designating these areas as nonattainment. Based on available information, the EPA has also concluded that it cannot determine whether one Round 2 area in Texas (Milam County) is or is not meeting the 1-hour primary $SO_2$ standard and whether the area contributes to a violation in a nearby area. Therefore, we are designating this area as unclassifiable. Details about the available information can be found in the supplemental technical support document in the docket for the Round 2 $SO_2$ designations at Docket ID No. EPA–HQ–OAR–2014–0464.

## VII. How do the designations supplementing the Round 2 designations affect Indian country?

For the designations in four areas of Texas for the 2010 primary $SO_2$ NAAQS supplementing the Round 2 designations, the EPA is designating 3 state areas as nonattainment and 1 state area as unclassifiable. No areas of Indian country are being designated as part of this action.

## VIII. Where can I find information forming the basis for this action and exchanges between the EPA, states and tribes related to this action?

Information providing the basis for this action can be found in several technical support documents (TSDs), a response to comments document (RTC) and other information in the docket. The TSDs, RTC, applicable EPA guidance memoranda and copies of correspondence regarding this process

between the EPA and the states, tribes and other parties, are available for review at the EPA Docket Center listed above in the **ADDRESSES** section of this document and on the agency's $SO_2$ Designations Web site at *https:// www.epa.gov/sulfur-dioxide-designations.* Area-specific questions can be addressed by the EPA Regional office (*see* contact information provided at the beginning of this notice).

## IX. Environmental Justice Concerns

When the EPA establishes a new or revised NAAQS, the CAA requires the EPA to designate all areas of the U.S. as either nonattainment, attainment, or unclassifiable. This final action addresses designation determinations for four areas in Texas for the 2010 primary $SO_2$ NAAQS. Area designations address environmental justice concerns by ensuring that the public is properly informed about the air quality in an area. In locations where air quality does not meet the NAAQS, the CAA requires relevant state authorities to initiate appropriate air quality management actions to ensure that all those residing, working, attending school, or otherwise present in those areas are protected, regardless of minority and economic status.

## X. Statutory and Executive Order Reviews

Upon promulgation of a new or revised NAAQS, the CAA requires the EPA to designate areas as attaining or not attaining the NAAQS. The CAA then specifies requirements for areas based on whether such areas are attaining or not attaining the NAAQS. In this final rule, the EPA assigns designations to selected areas as required.

### A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review

This action is exempted from the Office of Management and Budget because it responds to the CAA requirement to promulgate air quality designations after promulgation of a new or revised NAAQS.

### B. Paperwork Reduction Act (PRA)

This action does not impose an information collection burden under the PRA. This action responds to the requirement to promulgate air quality designations after promulgation of a new or revised NAAQS. This requirement is prescribed in the CAA section 107 of title 1. This action does not contain any information collection activities.

*C. Regulatory Flexibility Act (RFA)*

This final rule is not subject to the RFA. The RFA applies only to rules subject to notice-and-comment rulemaking requirements under the Administrative Procedure Act (APA), 5 U.S.C. 553, or any other statute. This rule is not subject to notice-and-comment requirements under the APA but is subject to the CAA section 107(d)(2)(B) which does not require a notice-and-comment rulemaking to take this action.

*D. Unfunded Mandates Reform Act (UMRA)*

This action does not contain any unfunded mandates as described by URM, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. The action imposes no enforceable duty on any state, local or tribal governments or the private sector.

*E. Executive Order 13132: Federalism*

This final action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states or on the distribution of power and responsibilities among the various levels of government.

*F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This action does not have tribal implications, as specified in Executive Order 13175. This action concerns the designation of certain areas in the U.S. for the 2010 primary $SO_2$ NAAQS. The CAA provides for states and eligible tribes to develop plans to regulate emissions of air pollutants within their areas, as necessary, based on the designations. The Tribal Authority Rule (TAR) provides tribes the opportunity to apply for eligibility to develop and implement CAA programs, such as programs to attain and maintain the $SO_2$ NAAQS, but it leaves to the discretion of the tribe the decision of whether to apply to develop these programs and which programs, or appropriate elements of a program, the tribe will seek to adopt. This rule does not have a substantial direct effect on one or more Indian tribes. It does not create any additional requirements beyond those of the $SO_2$ NAAQS. This rule establishes the designations for certain areas of the country for the $SO_2$ NAAQS, but no areas of Indian country are being designated in this action. Furthermore, this rule does not affect the relationship or distribution of power and responsibilities between the federal government and Indian tribes. The CAA

and the TAR establish the relationship of the federal government and tribes in developing plans to attain the NAAQS, and this rule does nothing to modify that relationship. Thus, Executive Order 13175 does not apply.

Although Executive Order 13175 does not apply to this rule, after the EPA promulgated the 2010 primary $SO_2$ NAAQS, the EPA communicated with tribal leaders and environmental staff regarding the designations process. The EPA also sent individualized letters to all federally recognized tribes to explain the designation process for the 2010 primary $SO_2$ NAAQS, to provide the EPA designations guidance, and to offer consultation with the EPA. The EPA provided further information to tribes through presentations at the National Tribal Forum and through participation in National Tribal Air Association conference calls. The EPA also sent individualized letters to all federally recognized tribes that submitted recommendations to the EPA about the EPA's intended designations for the $SO_2$ standard and offered tribal leaders the opportunity for consultation. These communications provided opportunities for tribes to voice concerns to the EPA about the general designations process for the 2010 primary $SO_2$ NAAQS, as well as concerns specific to a tribe, and informed the EPA about key tribal concerns regarding designations as the rule was under development. For this supplemental round of $SO_2$ designations action, the EPA sent additional letters to tribes that could potentially be affected and offered additional opportunities for participation in the designations process. The communication letters to the tribes are provided in the dockets for Round 1 designations (Docket ID No. EPA–HQ–OAR–2012–0233) and Round 2 designations (Docket ID No. EPA–HQ–OAR–2014–0464).

*G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

The action is not subject to Executive Order 13045 because it is not an economically significant regulatory action as defined in Executive Order 12866. While not subject to the Executive Order, this final action may be especially important for asthmatics, including asthmatic children, living in $SO_2$ nonattainment areas because respiratory effects in asthmatics are among the most sensitive health endpoints for $SO_2$ exposure. Because asthmatic children are considered a sensitive population, the EPA evaluated the potential health effects of exposure to $SO_2$ pollution among asthmatic children as part of the EPA's prior

action establishing the 2010 primary $SO_2$ NAAQS. These effects and the size of the population affected are summarized in the EPA's final $SO_2$ NAAQS rules. *See http://www3.epa.gov/ttn/naaqs/standards/so2/fr/20100622.pdf.*

*H. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution, or Use*

This action is not subject to Executive Order 13211, because it is not a significant regulatory action under Executive Order 12866.

*I. National Technology Transfer and Advancement Act (NTTAA)*

This action does not involve technical standards.

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

The EPA believes this action does not have disproportionately high and adverse human health or environmental effects on minority populations, low-income populations and or indigenous peoples, as specified Executive Order 12898 (59 FR 7629, February 16, 1994). The documentation for this decision is contained in Section IX of this document.

*K. Congressional Review Act (CRA)*

The CRA, 5 U.S.C. 801 *et seq.,* as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the U.S. The EPA will submit a report containing this action and other required information to the U.S. Senate, the U.S. House of Representatives and the Comptroller General of the U.S. prior to publication of the rule in the **Federal Register**. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2). This rule will be effective January 12, 2017.

*L. Judicial Review*

Section 307 (b) (1) of the CAA indicates which Federal Courts of Appeal have venue for petitions for review of final actions by the EPA. This section provides, in part, that petitions for review must be filed in the Court of Appeals for the District of Columbia Circuit: (i) When the agency action consists of ''nationally applicable

regulations promulgated, or final actions taken, by the Administrator,'' or (ii) when such action is locally or regionally applicable, if ''such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination.''

This final action designating areas for the 2010 primary $SO_2$ NAAQS is ''nationally applicable'' within the meaning of section 307(b)(1). As explained in the preamble, this final action supplements the June 30, 2016 final action taken by the EPA to issue a second round of designations for areas across the U.S. for the 2010 primary $SO_2$ NAAQS. EPA determined the June 30, 2016 final action was ''nationally applicable'' within the meaning of section 307(b)(1). 81 FR 45045. The rulemaking docket, EPA–HQ–OAR– 2014–0464, is the same docket for both the June 30, 2016 action and for this supplemental action, with the relevant difference being that in addition to the materials it contained regarding these four Texas areas generated through June 30, 2016—the date that action was signed by the Administrator—it now also contains the final technical support documents and responses to comments related to these four areas. Both the June 30, 2016 action and this supplemental action were proposed in a single March 1, 2016, notice announcing the EPA's intended Round 2 designations and were taken to discharge a duty under the court order to issue a round of designations of areas with sources meeting common criteria in the court

order. As explained in the June 30, 2016 final rule, at the core of that final action and this supplemental final action is the EPA's interpretation of the definitions of nonattainment, attainment and unclassifiable under section 107(d)(1) of the CAA, and its application of that interpretation to areas across the country. *Id.* Accordingly, the Administrator has determined that this supplemental final action, which results from the same proposed action as the June 30, 2016 final action, is nationally applicable and is hereby publishing that finding in the **Federal Register**.

For the same reasons, the Administrator also is finding that this supplemental final action is based on a determination of nationwide scope and effect for the purposes of section 307(b)(1). As previously explained in the June 30, 2016 final action, in the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that an action is of ''nationwide scope or effect'' would be appropriate for any action that has a scope or effect beyond a single judicial circuit. H.R. Rep. No. 95–294 at 323, 324, *reprinted in* 1977 U.S.C.C.A.N. 1402–03. 81 FR 45045. Here, the June 30, 2016 final action and this supplemental final action combined issue designations in 65 areas in 24 states and extend to numerous judicial circuits. In these circumstances, section 307(b)(1) and its legislative history calls for the Administrator to find the action to be of ''nationwide scope or effect'' and for venue to be in the D.C. Circuit. Therefore, like the June 30, 2016 final

action it supplements, *see* 81 FR at 45045, this final action is based on a determination by the Administrator of nationwide scope or effect, and the Administrator is hereby publishing that finding in the **Federal Register**.

Thus, any petitions for review of these final designations must be filed in the Court of Appeals for the District of Columbia Circuit within 60 days from the date final action is published in the **Federal Register**.

## List of Subjects in 40 CFR Part 81

Environmental protection, Air pollution control, National parks, Wilderness areas.

Dated: November 29, 2016.

**Gina McCarthy,**

*Administrator.*

For the reasons set forth in the preamble, 40 CFR part 81 is amended as follows:

## PART 81—DESIGNATIONS OF AREAS FOR AIR QUALITY PLANNING PURPOSES

■ 1. The authority citation for part 81 continues to read as follows:

**Authority:** 42 U.S.C. 7401, *et seq.*

## Subpart C—Section 107 Attainment Status Designations

■ 2. Section 81.344 is amended by revising the table titled ''Texas—2010 Sulfur Dioxide NAAQS (Primary)'' to read as follows:

## §81.344   Texas.

\*      \*      \*      \*      \*

### TEXAS—2010 SULFUR DIOXIDE NAAQS (PRIMARY)

| Designated area | Designation | |
|---|---|---|
| | Date | Type |
| Freestone and Anderson Counties, TX [1] ............................................................................<br>Freestone County (part) and Anderson County (part)<br>Those portions of Freestone and Anderson Counties encompassed by the rectangle with the vertices using Universal Traverse Mercator (UTM) coordinates in UTM zone 14 with datum NAD83 as follows:<br>(1) Vertices—UTM Easting (m) 766752.69, UTM Northing (m) 3536333.0,<br>(2) vertices—UTM Easting (m) 784752.69, UTM Northing (m) 3536333.0,<br>(3) vertices—UTM Easting (m) 784752.69, UTM Northing (m) 3512333.0,<br>(4) vertices—UTM Easting (m) 766752.69, UTM Northing (m) 3512333.0 | 1/12/17 | Nonattainment. |
| Rusk and Panola Counties, TX [1] ......................................................................................<br>Rusk County (part) and Panola County (part)<br>Those portions of Rusk and Panola Counties encompassed by the rectangle with the vertices using Universal Traverse Mercator (UTM) coordinates in UTM zone 15 with datum NAD83 as follows:<br>(1) Vertices—UTM Easting (m) 340067.31, UTM Northing (m) 3575814.75,<br>(2) vertices—UTM Easting (m) 356767.31, UTM Northing (m) 3575814.75,<br>(3) vertices—UTM Easting (m) 356767.31, UTM Northing (m) 3564314.75,<br>(4) vertices—UTM Easting (m) 340067.31, UTM Northing (m) 3564314.75 | 1/12/17 | Nonattainment. |
| Titus County, TX [1] ..........................................................................................................<br>Titus County (part)<br>That portion of Titus County encompassed by the rectangle with the vertices using Universal Traverse Mercator (UTM) coordinates in UTM zone 15 with datum NAD83 as follows: | 1/12/17 | Nonattainment. |

TEXAS—2010 SULFUR DIOXIDE NAAQS (PRIMARY)—Continued

| Designated area | Designation | |
|---|---|---|
| | Date | Type |
| (1) Vertices—UTM Easting (m) 304329.030, UTM Northing (m) 3666971.0, (2) vertices—UTM Easting (m) 311629.030, UTM Northing (m) 3666971.0, (3) vertices—UTM Easting (m) 311629.03, UTM Northing (m) 3661870.5, (4) vertices—UTM Easting (m) 304329.03, UTM Northing (m) 3661870.5 | | |
| Milam County, TX[1] | 1/12/17 | Unclassifiable. |
| Milam County, TX | | |
| Potter County, TX[1] | 9/12/16 | Unclassifiable. |
| Potter County, TX | | |
| Atascosa County, TX[1] | 9/12/16 | Unclassifiable/Attainment. |
| Atascosa County, TX | | |
| Fort Bend County, TX[1] | 9/12/16 | Unclassifiable/Attainment. |
| Fort Bend County | | |
| Goliad County, TX[1] | 9/12/16 | Unclassifiable/Attainment. |
| Goliad County | | |
| Lamb County, TX[1] | 9/12/16 | Unclassifiable/Attainment. |
| Lamb County | | |
| Limestone County, TX[2] | 9/12/16 | Unclassifiable/Attainment. |
| Limestone County | | |
| McLennan County, TX[2] | 9/12/16 | Unclassifiable/Attainment. |
| McLennan County, TX | | |
| Robertson County, TX[2] | 9/12/16 | Unclassifiable/Attainment. |
| Robertson County | | |

[1] Excludes Indian country located in each area, if any, unless otherwise specified.
[2] Includes Indian country located in each area, if any, unless otherwise specified.

\* \* \* \* \*

[FR Doc. 2016–29561 Filed 12–12–16; 8:45 am]
**BILLING CODE 6560–50–P**

## DEPARTMENT OF COMMERCE

**National Oceanic and Atmospheric Administration**

**50 CFR Part 622**

[Docket No. 130312235–3658–02]

RIN 0648–XF058

**Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Re-Opening of the Commercial Sector for South Atlantic Vermilion Snapper**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Temporary rule; re-opening.

**SUMMARY:** NMFS announces the re-opening of the commercial sector for vermilion snapper in the exclusive economic zone (EEZ) of the South Atlantic through this temporary rule. The most recent commercial landing data for vermilion snapper indicate the commercial annual catch limit (ACL) for the July through December 2016 fishing season has not yet been reached. Therefore, NMFS re-opens the commercial sector for vermilion snapper in the South Atlantic EEZ for 2 days to allow the commercial ACL to be caught, while minimizing the risk of the commercial ACL being exceeded.

**DATES:** This rule is effective 12:01 a.m., local time, December 14, 2016, until 12:01 a.m., local time, December 16, 2016.

**FOR FURTHER INFORMATION CONTACT:** Mary Vara, NMFS Southeast Regional Office, telephone: 727–824–5305, email: *mary.vara@noaa.gov.*

**SUPPLEMENTARY INFORMATION:** The snapper-grouper fishery of the South Atlantic includes vermilion snapper and is managed under the Fishery Management Plan for the Snapper-Grouper Fishery of the South Atlantic Region (FMP). The FMP was prepared by the South Atlantic Fishery Management Council and is implemented by NMFS under the authority of the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act) by regulations at 50 CFR part 622.

The commercial ACL (equal to the commercial quota) for vermilion snapper in the South Atlantic is divided into separate quotas for two 6-month time periods each year, January through June and July through December. For the July through December 2016 period, the commercial quota is 388,703 lb (176,313 kg, gutted weight, 431,460 lb (195,707 kg), round weight), as specified in 50 CFR 622.190(a)(4)(ii)(D).

On July 1, 2016, the commercial fishing season opened for the second period of July through December for this fishing year. Under 50 CFR 622.191(a)(6)(ii), NMFS is required to reduce the commercial trip limit for vermilion snapper from 1,000 lb (454 kg), gutted weight, 1,110 lb (503 kg), round weight, when 75 percent of the respective fishing season commercial quota is reached or projected to be reached. Accordingly, on August 25, 2016 (81 FR 58411), NMFS published a temporary rule in the **Federal Register** to reduce the commercial trip limit for vermilion snapper in or from the EEZ of the South Atlantic for the July through December 2016 period to 500 lb (227 kg), gutted weight. The commercial trip limit reduction was effective at 12:01 a.m., local time, August 28, 2016.

Under 50 CFR 622.193(f)(1), NMFS is required to close the commercial sector for vermilion snapper when the

App. 1235

**Tab 434: Final Technical Support Document for the Designation Recommendations for the 2010 Sulfur Dioxide National Ambient Air Quality Standards (NAAQS) – Supplement for Four Areas in Texas Not Addressed in June 30, 2016, Version (Nov. 29, 2016)**

# Technical Support Document for the Designation Recommendations for the 2010 Sulfur Dioxide National Ambient Air Quality Standards (NAAQS) – Supplement for Four Areas in Texas Not Addressed in June 30, 2016, Version

Docket Number EPA–HQ–OAR–2014–0464
U.S. Environmental Protection Agency

November 29, 2016

1

**Final Technical Support Document for Supplemental Designations – Four Areas in Texas**

Texas
Area Designations for the 2010 SO$_2$ Primary National Ambient Air Quality Standard
Supplement for Four Deferred Areas

<u>Summary</u>

Pursuant to section 107(d) of the Clean Air Act (CAA), the U.S. Environmental Protection Agency (EPA, or the Agency) must designate areas as either "unclassifiable," "attainment," or "nonattainment" for the 2010 1-hour sulfur dioxide (SO$_2$) primary national ambient air quality standard (NAAQS). Section 107(d) of the CAA defines a nonattainment area as one that does not meet the NAAQS or that contributes to a NAAQS violation in a nearby area, an attainment area as any area other than a nonattainment area that meets the NAAQS, and an unclassifiable area as any area that cannot be classified on the basis of available information as meeting or not meeting the NAAQS.

July 2, 2016, was the deadline established by the U.S. District Court for the Northern District of California for the EPA to designate certain areas. This deadline was the first of three deadlines established by the court for the EPA to complete area designations for the 2010 SO$_2$ NAAQS. The EPA notified the areas subject to the July 2, 2016 deadline of its intended designations on March 1, 2016, including the four Texas areas addressed in this supplemental action. The EPA issued final designations for the majority of these areas on June 30, 2016. However, before meeting the July 2, 2016, deadline, the EPA and plaintiffs, who are parties to the consent decree that gave rise to the court order, agreed to extensions for a limited number of the subject areas in Texas: Freestone County – Big Brown Steam Electric Station, Titus County – Monticello Steam Electric Station, Rusk County – Martin Lake Electrical Station, and Milam County – Sandow Power Plant. The deadline for issuing a designation for these four areas was extended to November 29, 2016, and the EPA is now issuing final designations for these areas to supplement the June 30, 2016, designations.

Texas submitted updated recommendations on September 18, 2015. Table 1 below lists Texas' recommendations and identifies the counties in Texas that the EPA is designating in order to meet the November 29, 2016, court-ordered deadline. These final designations are based on an assessment and characterization of air quality through ambient air quality data, air dispersion modeling, other evidence and supporting information, or a combination of the above.

2

**Table 1: Texas' Recommended and EPA's Final Designations.**

| Area | Texas' Recommended Area Definition | Texas' Recommended Designation | EPA's Final Area Definition | EPA's Final Designation |
|---|---|---|---|---|
| Freestone-Anderson Counties, Texas | Freestone County Borders | Unclassifiable/ Attainment | Portions of Freestone and Anderson Counties<br><br>The area bound by the following UTM coordinates (NAD 83 Datum, UTM Zone 14):<br>766752.69, 3536333.0<br>784752.69, 3536333.0<br>784752.69, 3512333.0<br>766752.69, 3512333.0 | Nonattainment |
| Titus County, Texas | Titus County Borders | Unclassifiable/ Attainment | Portions of Titus County<br><br>The area bound by the following UTM coordinates (NAD 83 Datum, UTM Zone 15):<br><br>X       Y<br>304329.030, 3666971.000<br>311629.030, 3666971.000<br>311629.030, 3661870.500<br>304329.030, 3661870.500 | Nonattainment |
| Rusk-Panola Counties, Texas | Rusk County Borders | Unclassifiable/ Attainment | Portions of Rusk and Panola Counties<br><br>The area bound by the following UTM coordinates (NAD 83 Datum, UTM Zone 15):<br>X       Y<br>340067.31, 3575814.75<br>356767.31, 3575814.75<br>356767.31, 3564314.75<br>340067.31, 3564314.75 | Nonattainment |
| Milam County, Texas | Milam County Borders | Unclassifiable/ Attainment | Same as State's Recommendation | Unclassifiable |

3

## Background

On June 3, 2010, the EPA revised the primary (health based) $SO_2$ NAAQS by establishing a new 1-hour standard at a level of 75 parts per billion (ppb) which is met at an ambient air quality monitoring site when the 3-year average of the 99th percentile of 1-hour daily maximum concentrations does not exceed 75 ppb. This NAAQS was published in the *Federal Register* on June 22, 2010 (75 FR 35520), and is codified at 40 CFR 50.17. The EPA determined this is the level necessary to protect public health with an adequate margin of safety, especially for children, the elderly, and those with asthma. These groups are particularly susceptible to the health effects associated with breathing $SO_2$. The two prior primary standards of 140 ppb evaluated over 24 hours, and 30 ppb evaluated over an entire year, codified at 40 CFR 50.4, remain applicable.[1] However, the EPA is not currently designating areas on the basis of either of these two primary standards. Similarly, the secondary standard for $SO_2$, set at 500 ppb evaluated over 3 hours, codified at 40 CFR 50.5, has not been revised, and the EPA is also not currently designating areas on the basis of the secondary standard.

## General Approach and Schedule

Section 107(d) of the CAA requires that not later than 1 year after promulgation of a new or revised NAAQS, state governors must submit their recommendations for designations and boundaries to the EPA. Section 107(d) also requires the EPA to provide notification to states no less than 120 days prior to promulgating an initial area designation that is a modification of a state's recommendation. If a state does not submit designation recommendations, the EPA may promulgate the designations that it deems appropriate without prior notification to the state, although it is our intention to provide such notification when possible. If a state or tribe disagrees with the EPA's intended designations, it is given an opportunity within the 120-day period to demonstrate why any proposed modification is inappropriate. The EPA is required to complete designations within 2 years after promulgation of a new or revised NAAQS, unless the EPA determines that sufficient information is not available, in which case the deadline is extended to 3 years. The 3-year deadline for the revised $SO_2$ NAAQS was June 2, 2013.

On August 5, 2013, the EPA published a final rule establishing air quality designations for 29 areas in the United States for the 2010 $SO_2$ NAAQS, based on recorded air quality monitoring data from 2009 - 2011 showing violations of the NAAQS (78 FR 47191). In that rulemaking, the EPA committed to address, in separate future actions, the designations for all other areas for which the Agency was not yet prepared to issue designations.

Following the initial August 5, 2013, designations, three lawsuits were filed against the EPA in different U.S. District Courts, alleging the Agency had failed to perform a nondiscretionary duty under the CAA by not designating all portions of the country by the June 2, 2013, deadline. In an

---

[1] 40 CFR 50.4(e) provides that the two prior primary NAAQS will no longer apply to an area 1 year after its designation under the 2010 NAAQS, except that for areas designated nonattainment under the prior NAAQS as of August 22, 2010, and areas not meeting the requirements of a SIP Call under the prior NAAQS, the prior NAAQS will apply until that area submits and EPA approves a SIP providing for attainment of the 2010 NAAQS. On the effective date of the promulgation of the NAAQS, Texas did not contain any areas subject to the exception.

4

effort intended to resolve the litigation in one of those cases, plaintiffs, Sierra Club and the Natural Resources Defense Council, and the EPA filed a proposed consent decree with the U.S. District Court for the Northern District of California. On March 2, 2015, the court entered the consent decree and issued an enforceable order for the EPA to complete the area designations according to the court-ordered schedule.

According to the court-ordered schedule, the EPA must complete the remaining designations by three specific deadlines. By no later than July 2, 2016 (16 months from the court's order), the EPA must designate two groups of areas: (1) areas that have newly monitored violations of the 2010 $SO_2$ NAAQS, and (2) areas that contain any stationary sources that had not been announced as of March 2, 2015, for retirement and that, according to the EPA's Air Markets Database, emitted in 2012 either (i) more than 16,000 tons of $SO_2$, or (ii) more than 2,600 tons of $SO_2$ with an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU). Specifically, a stationary source with a coal-fired unit that, as of January 1, 2010, had a capacity of over 5 megawatts and otherwise meets the emissions criteria, is excluded from the July 2, 2016, deadline if it had announced through a company public announcement, public utilities commission filing, consent decree, public legal settlement, final state or federal permit filing, or other similar means of communication, by March 2, 2015, that it will cease burning coal at that unit. As discussed above, there were four areas in Texas for which extensions to the EPA's July 2, 2016, deadline were issued, and the current deadline is November 29, 2016. At this time, we are supplementing our previous Response to Comments and Technical Support Documents that were signed on June 30, 2016, as part of our final designation action to meet the July 2, 2016, date for the other sources and areas addressed in this round of designations.

The last two deadlines for completing remaining designations are December 31, 2017, and December 31, 2020. The EPA has separately promulgated requirements for state and other air agencies to provide additional monitoring or modeling information on a timetable consistent with these designation deadlines. We expect this information to become available in time to help inform these subsequent designations. These requirements were promulgated on August 21, 2015 (80 FR 51052), in a rule known as the $SO_2$ Data Requirements Rule (DRR), codified at 40 CFR part 51 subpart BB.

Updated designations guidance was issued by the EPA through a March 20, 2015, memorandum from Stephen D. Page, Director, U.S. EPA, Office of Air Quality Planning and Standards, to Air Division Directors, U.S. EPA Regions 1-10. This memorandum supersedes earlier designation guidance for the 2010 $SO_2$ NAAQS, issued on March 24, 2011, and it identifies factors that the EPA intends to evaluate in determining whether areas are in violation of the 2010 $SO_2$ NAAQS. The guidance also contains the factors the EPA intends to evaluate in determining the boundaries for all remaining areas in the country, consistent with the court's order and schedule. These factors include: 1) Air quality characterization via ambient monitoring or dispersion modeling results; 2) Emissions-related data; 3) Meteorology; 4) Geography and topography; and 5) Jurisdictional boundaries. This guidance was supplemented by two non-binding technical assistance documents intended to assist states and other interested parties in their efforts to characterize air quality through air dispersion modeling or ambient air quality monitoring for sources that emit $SO_2$. Notably, the EPA's documents titled, "$SO_2$ NAAQS Designations

5

Modeling Technical Assistance Document" (Modeling TAD) and "SO$_2$ NAAQS Designations Source-Oriented Monitoring Technical Assistance Document" (Monitoring TAD), were available to states and other interested parties.

Based on complete, quality assured and certified ambient air quality data collected between 2013 and 2015, no violations of the 2010 SO$_2$ NAAQS have been recorded at ambient air quality monitors in any undesignated part of Texas. However, these 4 sources in the State meet the emissions criteria of the consent decree for which the EPA must complete designations by the extension date of November 29, 2016. In this supplemental final technical support document, the EPA discusses its review and technical analysis of Texas' updated recommendations for the areas that we must designate. The EPA also discusses any intended and final modifications from the State's recommendation based on all available data before us.

The following are definitions of important terms used in this document:

1) 2010 SO$_2$ NAAQS – the primary NAAQS for SO$_2$ promulgated in 2010. This NAAQS is 75 ppb, based on the 3-year average of the 99th percentile of the annual distribution of daily maximum 1-hour average concentrations. See 40 CFR 50.17.
2) Attaining monitor – an ambient air monitor meeting all methods, quality assurance, and siting criteria and requirements whose valid design value is less than or equal to 75 ppb, based on data analysis conducted in accordance with Appendix T of 40 CFR part 50.
3) Design Value – a statistic computed according to the data handling procedures of the NAAQS (in 40 CFR part 50 Appendix T) that, by comparison to the level of the NAAQS, indicates whether the area is violating the NAAQS.
4) Designated nonattainment area – an area which the EPA has determined is violating the 2010 SO$_2$ NAAQS or contributes to a violation in a nearby area.  The EPA's decision is based on all available information including the most recent 3 years of air quality monitoring data, available modeling analyses, and any other relevant information.
5) Designated unclassifiable area – an area for which the EPA cannot determine based on all available information whether it meets the 2010 SO$_2$ NAAQS or whether it contributes to an area that does not meet the NAAQS.
6) Designated unclassifiable/attainment area – an area which the EPA has determined to have sufficient evidence to find either is attaining or is likely to be attaining the NAAQS and is not contributing to an area that violates the NAAQS. The EPA's decision is based on all available information including the most recent 3 years of air quality monitoring data, available modeling analyses, and any other relevant information.
7) Modeled violation – a violation based on air dispersion modeling.
8) Recommended attainment area – an area a state or tribe has recommended that the EPA designate as attainment.
9) Recommended nonattainment area – an area a state or tribe has recommended that the EPA designate as nonattainment.
10) Recommended unclassifiable area – an area a state or tribe has recommended that the EPA designate as unclassifiable.
11) Recommended unclassifiable/attainment area – an area a state or tribe has recommended that the EPA designate as unclassifiable/attainment.

6

12) Violating monitor – an ambient air monitor meeting all methods, quality assurance, and siting criteria and requirements whose valid design value exceeds 75 ppb, based on data analysis conducted in accordance with Appendix T of 40 CFR part 50.

## Technical Analysis for Freestone County, Texas

Introduction

The Freestone County, Texas, area contains a stationary source that, according to the EPA's Air Markets Database, emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU).  As of March 2, 2015, this stationary source had not met the specific criteria in the consent decree for being "announced for retirement." Specifically, in 2012, the Big Brown Steam Electric Station (Big Brown) emitted 60,681 tons of $SO_2$, and had an emissions rate of 1.59 lbs $SO_2$/mmBTU. Pursuant to the March 2, 2015, consent decree, the EPA must designate the area surrounding the facility by July 2, 2016. However, before meeting the July 2, 2016, deadline for this area, the EPA and plaintiffs, who are parties to the consent decree that gave rise to the court order, agreed to extensions for a limited number of the subject areas, including this area. The deadline for issuing a designation for this area is now November 29, 2016.

In its September 18, 2015 submission, Texas provided no formal recommendation for the specific area surrounding the Big Brown Steam Electric Station. Instead, as part of its September 18, 2015, submittal, Texas provided a general recommendation of unclassifiable/attainment for the 243 counties located in the State, including Freestone County (and Anderson County), that do not have any operational $SO_2$ regulatory monitors.  This general recommendation for Freestone County was not accompanied by modeling, monitoring, or other technical information to inform our decision regarding the attainment status of the area.

On February 11, 2016, the EPA notified Texas that we intended to designate the portions of Freestone and Anderson Counties, Texas, as nonattainment. Additionally, we informed Texas that our intended boundaries for the nonattainment area comprised of portions of Freestone and Anderson Counties, bound by these UTM coordinates (NAD 83 Datum, UTM Zone 14):

| X | Y |
|---|---|
| 762752, | 3540333 |
| 762752, | 3510333 |
| 789753, | 3510333 |
| 789753, | 3540333 |

Our intended designation and associated boundaries were based on, among other things, Sierra Club's modeling of actual emissions reported from both the Big Brown and background source Limestone Electric Generating Stations during the 2013 to 2015 calendar years.  An analysis of the modeling data indicates it was performed in accordance with appropriate EPA modeling guidance and using generally conservative assumptions.

The EPA identified aspects of Sierra Club's modeling used for our proposal that were not as refined as possible, but after our analysis of those aspects, we proposed that the modeling was adequate for a determination of nonattainment.  The modeling did not include building downwash or variable stack temperature and velocity, since Sierra Club did not have access to

8

information needed to support such inclusion. Including building downwash will generally, though not always, increase the predicted maximum modeled concentrations. Sierra Club used stack velocity and temperatures consistent with 100% load. This, coupled with actual hourly emission rates, should provide conservative estimates of actual concentrations because higher temperatures and velocities of 100% load when paired with lower emissions of less than 100% load should provide an overestimation of the dispersion and thus an underestimation of maximum ambient concentrations at ground level. Given that modeled concentrations are 64% above the standard, the inclusion of building downwash and variable stack parameters, etc. in the modeling would not result in values near or below the standard; therefore, the modeling is sufficient for a determination of nonattainment.

Therefore, EPA's view was that the Sierra Club modeling was relevant information that must be considered in our designation decision. While TCEQ provided comments on Sierra Club's initial modeling submittal, we received no additional relevant technical information from the State or other parties before issuing our intended designation. In response to the TCEQ comments, Sierra Club updated its modeling for the area addressing most of the concerns raised and submitted the results to the EPA on December 15, 2015. Therefore, we found Sierra Club's modeling was sufficient for a proposed determination of nonattainment. It should be noted that Sierra Club took into account emissions from other nearby facilities and background $SO_2$ concentration. Based on Sierra Club's December 2015 modeling showing the area in the vicinity of Big Brown does not meet the 1-hr $SO_2$ standard, we intended to designate the area defined above as nonattainment in our proposed designation.

EPA's intended boundaries for the proposed nonattainment area encompassed the area shown to be in violation of the standard and the principal source that contributes to the violation. We indicated that our initial analysis of the maximum impacts around Big Brown indicated that Big Brown was responsible for almost 100% of the impacts on the maximum, and therefore only included the principal source in the intended boundaries.

Detailed rationale, analyses, and other information supporting our intended designation for this area can be found in the draft technical support document for Texas, and this document along with all others related to this designation can be found in Docket ID EPA-HQ-OAR-2014-0464.

Assessment of New Information

In our February 11, 2016, notification to Texas regarding our intended nonattainment designation for the portions of Freestone and Anderson Counties, Texas, the EPA requested that any additional information that the Agency should consider prior to finalizing the designation should be submitted by April 19, 2016. On March 1, 2016, the EPA also published a notice of availability and public comment period in the *Federal Register,* inviting the public to review and provide input on our intended designations by March 31, 2016 (81 FR 10563). The EPA is explicitly incorporating and relying upon the analyses and information presented in the draft technical support document for the purposes of our final designation for this area, except to the extent that any new information submitted to the EPA or conclusions presented in this final technical support document and our supplement to the June 30, 2016, response to comments

9

document (RTC), available in the docket, Docket ID EPA-HQ-OAR-2014-0464, supersede those found in the draft document.

As further detailed below, after carefully considering all available data and information, the EPA is designating portions of Freestone and Anderson Counties, Texas, (to be referred to as the Freestone and Anderson Counties, Texas area) as nonattainment for the 2010 $SO_2$ NAAQS. This nonattainment area is bound by these UTM coordinates:

| X | Y |
|---|---|
| 766752.69, | 3536333.0 |
| 784752.69, | 3536333.0 |
| 784752.69, | 3512333.0 |
| 766752.69, | 3512333.0 |

NAD 83 Datum, UTM Zone 14

and is shown in Figure 1 below:

**Figure 1. The EPA's Final Nonattainment Area: Freestone and Anderson Counties Texas.**



The EPA received substantive comments from citizens, Sierra Club, Luminant, the Texas Commission on Environmental Quality, and the Governor of the State of Texas regarding our intended nonattainment designation for the Freestone and Anderson Counties, Texas, area, and a comprehensive summary of these comments and our responses can be found in the supplement to the RTC.

Also, additional information, specifically air dispersion modeling, was submitted to the EPA during the state and public comment period in order to characterize air quality in the Freestone and Anderson Counties, Texas, area. Notably, the Sierra Club and Luminant provided additional air dispersion modeling information during the comment period.  TCEQ also included Luminant's modeling analysis as an attachment to its comments. The Sierra Club's modeling report asserted that Big Brown is causing nonattainment of the 2010 one-hour $SO_2$ standard when modeled alone without considering any other nearby contributing sources. The Luminant modeling report asserted that Big Brown, when modeled with several adjustments intended to reduce what Luminant asserts is inappropriate "conservatism" (i.e., alleged overestimation of ambient concentrations, in this use of the term) in the AERMOD model, does not contribute to nonattainment in the Freestone and Anderson Counties, Texas, area. Luminant submitted this information to support a modification to either our proposed designation, our proposed designation boundaries for the area, or both. The discussion and analysis of this new information that follow reference the Modeling TAD, Monitoring TAD, and the factors for evaluation contained in the EPA's March 20, 2015, guidance, as appropriate and applicable.

*Model Selection and Modeling Components*

The EPA's Modeling TAD notes that for area designations under the 2010 $SO_2$ NAAQS, the AERMOD modeling system should be used, unless use of an alternative model can be justified. In some instances, the recommended model may be a model other than AERMOD, such as the BLP model for buoyant line sources. The AERMOD modeling system contains the following components:
   - AERMOD: the dispersion model
   - AERMAP: the terrain processor for AERMOD
   - AERMET: the meteorological data processor for AERMOD
   - BPIPPRIME: the building input processor
   - AERMINUTE: a pre-processor to AERMET incorporating 1-minute automated surface observation system (ASOS) wind data
   - AERSURFACE: the surface characteristics processor for AERMET
   - AERSCREEN: a screening version of AERMOD

Though new modeling was received from both Luminant and the Sierra Club, the Luminant modeling did not conform to the guidance of the Modeling TAD.

A non-EPA preprocessor model, AERLIFT, was applied by Luminant's contractor to the CEM data to increase the observed temperatures and velocities.  AERLIFT is directed toward situations where two or more stacks line up with the wind direction causing the plumes to merge as they rise and reducing the overall entrainment of cooler ambient air.

EPA generally encourages modeling improvements that give more realistic simulations of the dispersion from sources, but there is a process for approval of suggested alternatives.  AERMOD has undergone continual development since its introduction.  While the phenomena modeled by the AERLIFT technique are theorized and documented from field studies at a few other sources and may affect the dispersion from the modeled source, the implementation of them in a specific

11

case depends on the use of specific algorithms in computer code. However, any model enhancements are required to go through standard EPA model evaluation, review, and approval before being used in regulatory applications as required by 40 CFR Part 51 Appendix W (Guideline on Air Quality Models). Our evaluation of the adjustments that AERLIFT makes in stack parameters at sources indicates the adjustments are large and not consistent with the theory of how the adjustments should be implemented. Regardless, the existing AERMOD model (without AERLIFT adjustments) has been shown to do a good job at modeling impacts of emissions from tall stacks in a number of field studies and such changes to the model would have to be analyzed to ensure the model was still accurate and acceptable for regulatory use with the inclusion of such adjustments. A full review of AERLIFT's coding, applicability of the science and analysis with all the datasets that EPA uses in analyzing changes to the AERMOD system has not yet occurred for AERLIFT.

To get an idea of the degree of changes made by the AERLIFT implementation submitted by Luminant, a review of the modifications made to the observed stack parameters was conducted by EPA Region 6. This review was conducted by comparing the original CEM data to the AERLIFTed parameters. The review showed that the stack temperature can be increased during individual hours by as much as 200 K by the AERLIFT preprocessor. To put this modification to stack gas temperature in context, the wet scrubbed plumes are approximately 80-90 K above ambient conditions, so these adjustments would drastically impact the amount of buoyancy estimated in the model and ultimate plume rise and would result in large differences in modeled ground concentrations around the source.

The figure below of the *average* temperature increase by wind direction demonstrates for some wind directions AERLIFT increases the average stack temperature by over 90K. The AERLIFT model also seems to be increasing the stack temperature for wind directions that are not roughly in line with the stacks (331 and 151 degrees K). These temperature changes with the accompanying stack gas exit velocity increases raise the average buoyancy flux of the emissions by up to 50% for some wind directions. For certain hours the increase is far greater. Such changes in the modeled buoyancy of the plume are expected to have a major effect on the location and concentrations of maximum ground level impact. These changes seem disproportionately large and the impacts they would have on the modeling are very significant. Prior to use in a regulatory setting EPA believes that the particular implementations of AERLIFT needs to undergo extensive review versus test cases previously used for AERMOD model review. While the scientific principles seem like these might be refinements, it has not been substantiated that the implementation of these pre-processors and their coding is a refinement within AERMOD modeling platform and a full review as required by EPA for regulatory models has not been completed. There is no information to support that Luminant's modeling results with the AERLIFT processor meets the requirements for models used in a regulatory decision. It is premature to use AERLIFT in this context for informing our designation decisions.

12

**Figure 2.  Increase in stack temperature (degrees K) due to AERLIFT preprocessing for Big Brown.  The line of the stacks is denoted by the red line.**



As well, the Luminant modeling used a proposed beta option, LOWWIND3, which has not been approved by EPA for regulatory use. The EPA notes that the use of beta options, such as ADJ_U* and LOWWIND3, in AERMOD for any regulatory applications requires adherence with Appendix W, Section 3.2.2. This is further explained in the EPA's December 10, 2015, Memorandum titled, "Clarification on the Approval Process for Regulatory Application of the AERMOD Modeling System Beta Options." Among other conditions, the use of beta options requires consultation with the appropriate EPA Regional Offices. Upon concurrence by the EPA's Modeling Clearinghouse, EPA Regional Offices may approve the use of these beta options for regulatory applications as an alternative model.  This process was not initiated or completed in the modeling of Big Brown and thus the modeling based on their use is not acceptable for this regulatory use. We also note that at this point there have been some site

13

specific ADJ_U* approvals through the Model Clearinghouse process, but no LOWWIND3 approvals to date.

The Sierra Club's final modeling (March 2016) followed the guidance in the Modeling TAD subject to the constraints of the data available to them, used the default regulatory options, and used AERMOD version 15181, the most recent available at the time of the modeling. The Sierra Club used the actual 2013-2015 emission rates and hourly velocities based on data from the USEPA Clearinghouse and CAMD databases. The Sierra Club's 2016 modeling departed from the Modeling TAD's general recommendations in that they used 1.5m flagpole receptors. The use of the flagpole receptors is not expected to make a significant difference in the modeled design value concentrations in this case. If this was adjusted to EPA's implied recommended ground level height (0 m), we would expect only a very slight change in the modeled numbers, and the area of exceedances and magnitude of the values would be basically equivalent, and, therefore, not change our final action. Sensitivity modeling conducted by the Sierra Club for Big Brown indicated a 0.2% change in the maximum value. EPA Region 6 also had a sensitivity analyses for another CD source Dolet Hills in northwest Louisiana (further discussed below) and found decreases in modeled $SO_2$ DV of 0.003 $\mu g/m^3$. Therefore, from these two sensitivities the change in maximum DV was between almost 0% and 0.2% when removing the flagpole receptors and estimating concentrations at ground level. Since Sierra Club's 2016 modeling maximum is on the order of 64% above the standard, the change due to flagpole receptor heights would not decrease the value to below the standard. A discussion of the individual components will be referenced in the corresponding discussion that follows, as appropriate.

*Modeling Parameter: Rural or Urban Dispersion*

The EPA's recommended procedure for characterizing an area by prevalent land use is based on evaluating the dispersion environment within 3 km of the facility. According to the EPA's modeling guidelines contained in documents such as the Modeling TAD, rural dispersion coefficients are to be used in the dispersion modeling analysis if more than 50% of the area within a 3 km radius of the facility is classified as rural. Conversely, if more than 50% of the area is urban, urban dispersion coefficients should be used in the modeling analysis. The facility was evaluated to determine if it should be modeled using the rural or urban dispersion coefficient option in AERMOD. When performing the modeling for the area of analysis, the Sierra Club determined that it was most appropriate to run the model in rural mode for both earlier modeling and the most recent modeling provided to EPA. USEPA's AERSURFACE v. 13016 was used to develop the meteorological data for the modeling analysis. This model was also used to evaluate surrounding land use within 3 kilometers. Based on the output from the AERSURFACE, approximately 0.8% of surrounding land use around the modeled facility was of urban land use types including Type 21 – Low Intensity Residential, Type 22 – High Intensity Residential, and Type 23 – Commercial / Industrial / Transportation. The analysis showed that rural dispersion coefficients are appropriate. Based on the AERSURFACE analyses conducted by both Sierra Club (all modeling) and Luminant, they both concluded that the rural option should be used for modeling of this area, and EPA believes this conclusion is appropriate.

14

*Modeling Parameter: Area of Analysis (Receptor Grid)*

The EPA believes that a reasonable first step towards characterization of air quality in the area surrounding the Big Brown Steam Electric Station is to determine the extent of the area of analysis, i.e., receptor grid. Considerations presented in the Modeling TAD include but are not limited to: the location of the $SO_2$ emission sources or facilities considered for modeling; the extent of significant concentration gradients of nearby sources; and sufficient receptor coverage and density to adequately capture and resolve the model predicted maximum $SO_2$ concentrations.

The grid receptor spacing for the area of analysis chosen by the Sierra Club for all their modeling submittals is as follows:
- 100 meter grid from center of Big Brown out to 5 km,
- 500 meter grid centered on Big Brown out to 10 km, and
- 1000 meter (1 km) grid centered on Big Brown out to 50 km.

The receptor network included 21,201 total receptors and covered the central and southwestern portions of Freestone County, the eastern portion of Anderson County, the southern portion of Henderson County and the central and northeastern portion of Limestone County.  Sierra Club modeling used a flagpole receptor height of 1.5m (which they proffered as representative of the ambient air inhalation height of a standing human), rather than ground level more typically used for model receptors. If this was adjusted to EPA's implied recommended ground level height (0 m) we would expect only a very slight change in the modeled numbers and the area of exceedances and magnitude of the values would be basically equivalent, and, therefore, not change our final action. We have evaluated model sensitivity runs at other similar coal-fired EGU facilities in the June 30, 2016, designations that these Texas areas supplement. These runs are available in this docket, Docket ID EPA-HQ-OAR-2014-0464, and the use of flag pole receptors typically result with values that are different by a few percent or less. For example, a modeling sensitivity run for the Dolet Hills facility in Louisiana, resulted in only a 0.003 µg/m$^3$ change in the maximum design value. Additionally, Sierra Club conducted sensitivity modeling for Big Brown and found that adjustment for flagpole receptors' impact on the modeled concentrations was negative 0.2 %, reinforcing our expectation of a small change that would not change our final determination, since the modeling values are sufficiently above the standard (maximum value is 64% above the standard) that such adjustment would not be expected to be enough of a decrease to resolve all modeled exceedance values in Freestone County.

**Figure 3. Sierra Club's Area of Analysis for Big Brown Station Showing Modeled Impacts using Actual Emissions from 2013 - 2015.**



In contrast to its previous modeling for the area around Big Brown, in the most recent modeling Sierra Club included no other emitters of $SO_2$. The rationale for this choice was that previous modeling had shown minimal impact from the potential contributing sources and that the modeling was to be a demonstration that Big Brown was the sole contributor to areas of modeled nonattainment. Our initial analysis at the time of our intended designation for Freestone County was that Big Brown was the principle source to model, and that Limestone and Streetman likely should also be included in modeling, but that Big Brown likely contributed almost 100% of impact. We maintain that Big Brown is likely contributing almost if not equal to 100% of the impact. Furthermore, Sierra Club's modeling, by not including Limestone and Streetman, is a conservative (in an under-estimating sense) approach to determining whether the area is attaining and the boundaries of such area, as inclusion of these sources should result in either similar impacts and boundaries or slightly increased impacts and possibly slightly larger boundaries, but

16

should not result in decreased impacts or "shrinking" of boundaries from those modeled.  EPA believes that this is an acceptable choice in these circumstances.

*Modeling Parameter: Source Characterization*

Sierra Club characterized the sources within the area of analysis in accordance with the best practices outlined in the Modeling TAD. Specifically, it used actual stack heights in conjunction with actual emission rates. Sierra Club characterized the source locations and stack parameters, e.g., exit temperature, exit velocity, and diameter. Variable stack temperatures were not included because they are not publically available for use by Sierra Club.  The constant temperature used by Sierra Club for the stack was 458.9K, and when compared to the CEM temperatures furnished by Luminant as part of their modeling analysis was on the average 2.5% higher – the average temperature in the CEM data for near full load (filtered for stack velocity > 25 m/s) was 448K, ranging between 417-465K.  This temperature difference in Sierra Club's modeling would cause a 7% increase in buoyancy at 20C ambient temperature.  The Sierra Club also used a slightly larger inner stack diameter than did Luminant, 6.77m vs. 6.55m, yielding an area, and thus flow, 4.6% greater in Sierra Club's modeling than if Sierra Club had used the inner diameter of 6.55m (included in comments/modeling during the comment period) when calculating velocities from the actual flow rate from the CAMD database. The combination of these two differences yield, on the average, a buoyancy flux at 20C that is 12% greater than what Luminant has provided for their facility for the period of the model run.  This increase in buoyancy in Sierra Club's modeling would tend to reduce modeled concentrations, the amount depending on meteorological conditions, which would make Sierra Club's modeling slightly conservative (i.e., under-estimating of concentrations).

Similar to variable stack parameters, building information was not publically available. Therefore, Sierra Club did not include building downwash in their analysis stating that this was the conservative approach and would likely underestimate impacts from emissions resulting in lower modeled concentrations than modeling that included building downwash.  While we do not agree with Sierra Club's assertion that exclusion of downwash is conservative in all cases, in our opinion the inclusion of building information and associated downwash in this analysis would not change our conclusion that the area is violating the NAAQS and the designation of nonattainment. We note that in Luminant's modeling report (which Texas also included in its response) they indicated "We expect that the modeling results are not extremely sensitive to this issue because the stack heights are well above the buildings and there is considerable momentum and buoyancy rise for the stack plumes."[2] The modeling values are sufficiently above the standard and inclusion of downwash often leads to higher concentrations closer to the source. But, even in situations we have seen where this did not occur, any decreases in maximum modeled values from inclusion of downwash were relatively small, and so would not be expected to be enough of a decrease to resolve all modeled exceedance values in Freestone County.

*Modeling Parameter: Emissions*

The EPA's Modeling TAD notes that for the purposes of modeling to characterize air quality in designations, the recommended approach is to use the most recent three years of actual emissions

---

[2] Texas Response to EPA (041916_SO2 Designation 120 Day Response from TX.pdf) PDF page # 69.

data and concurrent meteorological data. However, the TAD also provides for the flexibility of using allowable emissions in the form of the most recently permitted (referred to as PTE or allowable) emissions rate.

As previously noted, Sierra Club's 2016 modeling included Big Brown and no other emitters of $SO_2$ within the area of analysis (unlike their previous modeling). Sierra Club wanted to clearly demonstrate that the Big Brown facility results in exceedances of the 2010 $SO_2$ standard.  Their previous modeling had shown small contributions from other nearby sources of $SO_2$. As discussed above, due to the small impacts from other nearby sources in the area of nonattainment around the Big Brown facility we would expect only slight changes, if any, to the area of nonattainment that we are designating if the other nearby sources were included in the modeling. The facilities in the area of analysis and their associated annual actual $SO_2$ emissions from 2013 to 2015 are summarized below.

**Table 2: Actual SO$_2$ Emissions in 2013 – 2015 from Facilities in the Big Brown Area of Analysis.**

| Company ID | Facility Name | SO$_2$ Emissions (tons per year) | | |
|---|---|---|---|---|
| | | 2013 | 2014 | 2015 |
| Luminant/EFH | Big Brown | 62494 | 57460 | 49884[3] |
| Total Emissions | All Facilities Modeled | 62494 | 57460 | 49884 |

Based on the small impact of other sources determined in the prior modeling results, EPA determines that the maximum impacts in the Big Brown area are adequately represented for purposes of designating the area without explicitly modeling the contributions from other sources within the area of analysis.

*Modeling Parameter: Meteorology and Surface Characteristics*

The most recent 3 years of meteorological data (concurrent with the most recent 3 years of emissions data) should be used in designations efforts. As noted in the Modeling TAD, the selection of data should be based on spatial and climatological (temporal) representativeness. The representativeness of the data are based on: 1) the proximity of the meteorological monitoring site to the area under consideration, 2) the complexity of terrain, 3) the exposure of the meteorological site, and 4) the period of time during which data are collected. Sources of meteorological data include National Weather Service (NWS) stations, site-specific or onsite data, and other sources such as universities, the Federal Aviation Administration (FAA), and military stations.

For the Freestone County area of analysis, surface meteorology from the NWS station Corsicana Campbell Field near Corsicana, Texas, approximately 40 km to the northwest, and coincident upper air observations from the NWS station in Fort Worth, Texas, approximately 160 km to the northwest, were selected by Sierra Club as best representative of meteorological conditions

---

[3] Total emissions for 2015 were not yet available in the Air Markets Program Data reports when this data was retrieved earlier this year.  2015 was calculated from the supplied emissions from the CEM.  Final CAMD data is 49837 tpy which is 47 tpy difference or a negligible 0.09 % decrease.

within the area of analysis. EPA agrees that the meteorological sites chosen for the modeling for Big Brown by Sierra Club are appropriate.

Sierra Club used AERSURFACE version 13016 from the NWS station in Corsicana Campbell Field, Texas (located at latitude 32.032 N, longitude 96.399 W) to estimate the surface characteristics of the area of analysis. Sierra Club estimated values for twelve spatial sectors out to 1.0 km at a seasonal temporal resolution for average conditions. Sierra Club also estimated values for albedo (the fraction of solar energy reflected from the earth back into space), the Bowen ratio (the method generally used to calculate heat lost or heat gained in a substance), and the surface roughness (sometimes referred to as "Zo"). In Figure 4, below, the location of the Corsicana Campbell Field, Texas, NWS station is shown relative to the Big Brown facility.

**Figure 4. Big Brown Steam Electric Station and the Corsicana Campbell Field NWS**



Meteorological data from the above surface and upper air stations were used in generating AERMOD-ready files with the AERMET processor. The output meteorological data created by the AERMET processor is suitable for being applied with AERMOD input files for AERMOD modeling runs. The Sierra Club analysis was conducted in adherence to all available USEPA guidance for evaluating source impacts on attainment of the 1-hour $SO_2$ NAAQS via aerial dispersion modeling, including the AERMOD Implementation Guide; USEPA's Applicability of Appendix W Modeling Guidance for the 1-hour $SO_2$ National Ambient Air Quality Standard, August 23, 2010; modeling guidance promulgated by USEPA in Appendix W to 40 CFR Part 51; USEPA's March 2011 Modeling Guidance for $SO_2$ NAAQS Designations; and, USEPA's December 2013 and 2015 $SO_2$ NAAQS Designations Technical Assistance Document in the

processing of the raw meteorological data into an AERMOD-ready format, and used AERSURFACE to best represent surface characteristics.

Hourly surface meteorological data records are read by AERMET, and include all the necessary elements for data processing. However, wind data taken at hourly intervals may not always portray wind conditions for the entire hour, which can be variable in nature. Hourly wind data may also be overly prone to indicate calm conditions, which are not modeled by AERMOD. In order to better represent actual wind conditions at the meteorological tower, wind data of one-minute duration was provided from the same instrument tower, but in a different formatted file to be processed by a separate preprocessor, AERMINUTE. These data were subsequently integrated into the AERMET processor to produce final hourly wind records of AERMOD-ready meteorological data that better estimate actual hourly average conditions and that are less prone to over-report calm wind conditions. This allows AERMOD to apply more hours of meteorology to modeled inputs, and therefore produce a more complete set of concentration estimates. As a guard against excessively high concentrations that could be produced by AERMOD in very light wind conditions, Sierra Club set a minimum threshold of 0.5 meters per second in processing meteorological data for use in AERMOD. This approach is consistent with a March 2013 EPA memo titled, "Use of ASOS meteorological data in AERMOD dispersion modeling." In setting this threshold, no wind speeds lower than this value would be used for determining concentrations. This threshold was specifically applied to the one-minute wind data.

*Modeling Parameter: Geography and Terrain*

The terrain in the area of analysis is best described as gently rolling. To account for these terrain changes, the AERMAP version 11103 terrain program within AERMOD was used to specify terrain elevations for all the receptors. The source of the elevation data incorporated into the model is from the USGS National Elevation Database.

*Modeling Parameter: Background Concentrations of $SO_2$*

The Modeling TAD offers two mechanisms for characterizing background concentrations of $SO_2$ that are ultimately added to the modeled design values: 1) a "first tier" approach, based on monitored design values, or 2) a temporally varying approach, based on the 99th percentile monitored concentrations by hour of day and season or month. For the Freestone County area of analysis, the Sierra Club used for a background concentration the 2012-2014 monitored design value for El Paso, which was 5.2 micrograms per cubic meter ($\mu g/m^3$), or 2 ppb,[4] and that value was incorporated into the final AERMOD results. Many of the $SO_2$ monitors in Texas are in urban areas and/or near a $SO_2$ point source, so there is limited data for background values. EPA finds that the lowest $SO_2$ design value for Texas for the 2013-2015 period was also 2 ppb. Using the El Paso monitor, which is the lowest design value in the state of Texas during this period, is a conservative assumption. Given the amount of $SO_2$ emissions in East Texas compared to El Paso area this assumption is conservative and likely leads to a small underestimation in the concentrations around these facilities but is within the framework of the TAD's options for inclusion of background monitoring data. Considering the impacts of Big Brown in the area, the

---

[4] The conversion factor for $SO_2$ (at the standard conditions applied in the ambient $SO_2$ reference method) is 1ppb = approximately 2.62$\mu g/m^3$.

background value is on the order of 1.5% of the total maximum values and if background monitoring data existed for east Texas it would be expected to be higher than the El Paso monitor data and would only have a small increase in the concentration levels around the Big Brown facility. Luminant's modeling used a temporally varying background monitor approach of hour of day and season with values ranging from 2-10 $\mu g/m^3$ based on a monitor in Waco. These values are similar to Sierra Club's background monitor data, but the amount of $SO_2$ emissions in the general Waco area is generally less than that in the general area around the Big Brown facility. Thus, background levels are likely underestimated in both Sierra Club's and Luminant's analyses. We note that in our earlier designations we received analysis of the Shreveport, LA $SO_2$ monitor to use for background concentration for the Dolet Hills facility in Louisiana. The Dolet Hills background values ranged from 4.88 to 24.85 $\mu g/m^3$. The Shreveport monitor is also generally upwind of Big Brown more often (Waco monitor is not normally upwind of Big Brown) and especially when winds are from the east (blowing westerly) which is when the modeling is predicting values above the standard to the west of the plant.

*Summary of Modeling Results*

The AERMOD modeling parameters, as supplied by additional information from Sierra Club during the comment period for the Freestone County, Texas, area of analysis are summarized below in Table 3.

**Table 3. AERMOD Modeling Parameters for the Freestone County Area of Analysis, Provided by Sierra Club**

| Freestone County, Texas Area of Analysis | |
|---|---|
| AERMOD Version | 15181 |
| Dispersion Characteristics | Rural |
| Modeled Sources | 1 |
| Modeled Stacks | 2 |
| Modeled Structures | 0 |
| Modeled Fencelines | 0* |
| Total receptors | 21,201 |
| Emissions Type | Actual |
| Emissions Years | 2013-2015 |
| Meteorology Years | 2013-2015 |
| Surface Meteorology Station | Corsicana Campbell Field |
| Upper Air Meteorology Station | Fort Worth, Texas |
| Methodology for Calculating Background $SO_2$ Concentration | Design Value |
| Calculated Background $SO_2$ Concentration | 5.2 $\mu g/m^3$ or 2 ppb |

*While the Sierra Club modeling did not specifically include a fenceline in their modeling analysis, the EPA did compare the modeled results with fenceline location information from previous industry dispersion modeling in our proposal and have also evaluated information provided by Luminant in March 2016 to confirm that the modeled exceedances of the NAAQS shown in Sierra Club's analysis did occur in ambient air.

21

The results presented below in Table 4 show the magnitude and geographic location of the highest predicted modeled $SO_2$ concentration based on actual emissions.

**Table 4: Maximum Predicted 99th Percentile 1-Hour $SO_2$ Concentration in the Freestone County, Texas Area of Analysis Based on actual Emissions (2013-2015). Provided by Sierra Club March 2016.**

| Averaging Period | Data Period | Receptor Location | | $SO_2$ Concentration ($\mu g/m^3$) | |
| --- | --- | --- | --- | --- | --- |
| | | UTM/Latitude | UTM/Longitude | Modeled (including background) | NAAQS |
| 99th Percentile 1-Hour Average | 2013-2015 | 774952.69 | 3526133.00 | 321.3 | 196.5* |

*Equivalent to the 2010 $SO_2$ NAAQS set at 75 ppb

The Sierra Club's modeling indicates that the highest predicted 3-year average 99th percentile 1-hour average concentration within the chosen modeling domain is 321 $\mu g/m^3$, or 123 ppb. This modeled concentration included the assumed background concentration of $SO_2$, and is based on actual emissions from the Big Brown Steam Electric Station. Figure 5 below was included as part of Sierra Club's updated submission and indicates that the predicted value occurred to the WNW of Big Brown. Most of the Sierra Club's chosen receptor grid is also shown in the figure.

Luminant provided a figure in their modeling report indicating the area that they did not think was available for siting a monitor based on exclusion within their property line and also lake/wetland areas. See Figure 6 below.

Luminant did not provide a detailed analysis of appropriate fencing and limiting of access to their property (necessary to determine if an area is actually not ambient air), nor other material documenting exclusion due to over water, etc. in support of the areas they have excluded. From the information we do have, and evaluation with GIS/aerial data, we have concerns that Luminant has excluded more areas than are appropriate. Regardless, we still have adequate information to conclude whether the area is attaining the 2010 $SO_2$ NAAQS, given that adequate modeling shows values over the standard outside the areas excluded by Luminant, in undisputed ambient air. We note that Figure 6 also excludes parts of some roadways that are not limited to Luminant access only (appear to be County and Farm to Market Roads 235, 833, 2570) and associated right of ways in their exclusion. These are areas that we would consider to be ambient air and potentially available for monitor siting. Receptors should have been placed between the fenceline and the public road in the right of ways. The maximum modeled values are to the west-northwest of the facility and beyond the area that Luminant/AECOM has excluded. The area of darker orange in Figure 5 is almost entirely ambient based on Luminant's map. There are 8-10 receptors at most that are closest to the facility (east edge of the dark orange receptors) that appear to be potentially within Luminant's property. The maximum and most of the receptors with values above 290 $\mu g/m^3$ are in ambient air. Therefore, there are many receptors well above the standard that are in ambient air.

**Figure 5. Sierra Club's Maximum Predicted 99ᵗʰ Percentile 1-Hour SO₂ Concentrations in the Freestone County Area of Analysis Based on Actual Emissions**



< 196.5;    196.5 – 215;    215 – 235;    235 – 285;    > 285

**Figure 6. Area excluded by Luminant based on assertion that receptors were within property boundaries or were lake/wetland areas.**



Jurisdictional Boundaries

Once the geographic area of analysis associated with Big Brown, other nearby sources of $SO_2$, and background concentration is determined, existing jurisdictional boundaries are considered for the purpose of informing our final nonattainment area, specifically with respect to clearly defined legal boundaries. Based on the previous Sierra Club modeling EPA had proposed to designate portions of Freestone and Anderson counties as nonattainment based on receptors which had modeled design values greater than the 1-hour $SO_2$ NAAQS.  Because the most recent Sierra Club model results using 2013-2015 emissions show a more compact area of violation of the 1-hour SO2 NAAQS, we believe it is appropriate to adjust the size of the final nonattainment area accordingly. As we have previously discussed, the most recent Sierra Club modeling included some new refinements not included in their 2015 modeling (which used 2012 - 2014 emissions). These refinements and corrections on stack location and stack parameters with the inclusion of velocities that varied resulted in a better estimate of the concentrations around the Big Brown facility.  The final area of modeled nonattainment still falls within Freestone and Anderson counties. The following Figure 7 compares the boundaries of the proposed and final $SO_2$ nonattainment area designations for Freestone and Anderson Counties.

**Figure 7. Proposed and Final Area Designations for The Big Brown Steam Electric Station.**



The EPA has determined that our final nonattainment area, consisting of portions of Freestone and Anderson Counties, is comprised of clearly defined legal boundaries, and we find these boundaries to be a suitably clear basis for defining our final nonattainment area.

25

Conclusion

After careful evaluation of the information provided by Sierra Club, as well as other available relevant information, the EPA designates the area around Big Brown in Freestone and Anderson Counties, Texas, as nonattainment for the 2010 $SO_2$ NAAQS. Specifically, the intended nonattainment area is comprised of the portions of Freestone and Anderson Counties, Texas, bounded by the following UTM coordinates in meters (NAD83 Datum, Zone 14):

|        X        |        Y        |
|-----------------|-----------------|
| 766752.69,      | 3536333.0       |
| 784752.69,      | 3536333.0       |
| 784752.69,      | 3512333.0       |
| 766752.69,      | 3512333.0       |

**Figure 8. Final Nonattainment Area for Big Brown Steam Electric Station.**



Our designation is based on Sierra Club's modeling of actual emissions reported from the facility during the 2013 to 2015 calendar years. The corrections and refinements, including the use of

26

hourly varying stack velocities, resulted in a more accurate assessment than Sierra Club's previous modeling.  For the reasons discussed above, Luminant's modeling was not acceptable to use and did not provide an accurate characterization of the impacts of the Big Brown facility on SO$_2$ levels around the facility.

In contrast, Sierra Club's modeling did follow accepted practices.  Exit velocities were derived from the hourly flow rates and heat input in the USEPA Clearinghouse and CAMD databases. The Clearinghouse emissions and exit velocities for 2013-2014 were supplemented with CAMD emissions for 2015. Sierra Club derived the velocities for 2015 were derived from the hourly heat input reported in CAMD. Our assessment of the modeling data indicates it was performed mostly in accordance with appropriate EPA modeling and SO$_2$ TAD guidance and using generally conservative assumptions.

The latest Sierra Club modeling was conservative in many respects, i.e., included several techniques which generally would tend to underestimate design value concentrations. In sum, as further discussed above:
- The modeling did not include building downwash, since Sierra Club did not have access to information needed to support such inclusion.  Building downwash will generally, though not always, increase the predicted maximum modeled concentrations and move the maximum impacts closer to the facility.
- The modeling did not include variable stack temperature, since Sierra Club did not have access to information needed to support such inclusion. Although Sierra Club used a constant stack temperature (459K), it was consistent with 100% load.  This, coupled with actual hourly emission rates, should provide conservative estimates of actual concentrations because higher temperatures of 100% load when paired with lower emissions of less than 100% load should provide an overestimation of the dispersion and thus an underestimation of maximum concentrations. EPA compared the constant stack exit temperature used by Sierra Club (459K) to the variable CEM temperatures used by Luminant. The comparison showed that during near-full-load operation the Sierra Club stack temperature is about 10 K higher than the average measured temperature. This difference should lead to higher modeled average plume rise and slightly lower, i.e. underestimation in, maximum concentrations in the Sierra Club modeling.
- The Sierra Club also used a diameter in their modeling of 6.77m rather than the diameter provided by Luminant during the comment period of 6.55m; which resulted in an increase in the stack exit area of 7%, also leading to slightly higher modeled plume rise and a slight underestimation in maximum concentrations. Also see table below, where Sierra Club's sensitivity modeling found a positive impact of 4.4 percent change in concentration in correcting stack diameter.
- The Sierra Club used a very low estimate of background SO$_2$ based on the lowest monitor in the state of Texas, far from the source and an area with less overall SO$_2$ emissions.  If more representative background monitoring data were available the concentration values would increase some, though should only be a few percent of the maximum estimated value.
- Sierra Club's modeling did not include other sources which could potentially contribute to SO$_2$ concentrations in the modeled area. The effect of this is expected to be small

based on the small contributions from other sources in the previous modeling but should lead to slightly higher concentrations in some areas around Big Brown facility.

Industry commenters addressed comments toward potential defects in the Sierra Club's previous modeling, some of which are still relevant to the final modeling and which could potentially increase modeled concentrations (the use of flagpole receptors and use of older land use data at the surface meteorological station). We note that Luminant's modeling also used the same 1992 land surface data in their modeling. We note that the other industry comment was corrected by Sierra Club in more recent modeling, the switched stack locations between units 1 and 2. To address the effect on modeled concentrations that might be caused by these various factors the Sierra Club conducted sensitivity modeling (See Table 5) and found both positive and negative impacts on the modeled concentrations – none greater than 4%.

**Table 5.  Sierra Club Sensitivity Modeling for Big Brown.**

| Sensitivity Run | Percent Change in Concentrations (- Means Lower Concentrations) |
| --- | --- |
| Correcting Stack Positions (corrected in new modeling) | -0.08 % (-0.3 µg/m$^3$) |
| Updating Surface Characteristics | -3.6 % (-14 µg/m$^3$) |
| Removing Flagpole Receptors | -0.21% (-0.8 µg/m$^3$) |
| Adjusting Stack Diameter | 4.4 % (16.4 µg/m$^3$) |

Given that modeled concentrations are 64% above the standard and that several factors are conservative and would tend to result in Sierra Club's modeling being biased lower for the maximum modeled concentrations, our technical assessment of the available information concludes that the Sierra Club's modeling results are likely underestimating the maximum impacts.  In the modeled values Sierra Club has already included the correction for stack positions, and the net change from updated surface characteristics, removal of flagpole receptors, and correcting stack diameter yield a net 0.59% increase in maximum concentration. Things that were not specifically quantified such as inclusion of downwash, inclusion of other nearby SO$_2$ sources in the modeling and use of a more representative (higher) background values should overall result in a net increase in the maximum concentration if they were included in the analysis.  Overall, inclusion of all potential adjustments, those that should either positively or negatively adjust impacts, should not result in modeled values near or below the standard given the high modeled concentrations above the standard and would not change the conclusion of nonattainment. Therefore, EPA determines that the final Sierra Club modeling submitted in March 2016 (2013-2015) is relevant information that must be considered in our designation decision, and that the modeling is a sufficient basis for a determination of nonattainment.

Based on the information available showing the area in the vicinity of Big Brown does not meet the 1-hr SO$_2$ standard, we designate the area defined above as nonattainment.

28

EPA's promulgated boundaries for the nonattainment area encompass the area shown to be in violation of the standard and the principal source that contributes to the violation.

At this time, our final designations for areas in the State of Texas have been completed only for this area, the three other areas contained in this final technical support document supplement and in this supplemental final action, and the other eight areas designated on June 30, 2016. Consistent with the remaining court-ordered schedule, the EPA will evaluate and designate all remaining undesignated areas in Texas by either December 31, 2017, or December 31, 2020.

29

## Technical Analysis for Titus County, Texas

<u>Introduction</u>

The Titus County, Texas, area contains a stationary source that, according to the EPA's Air Markets Database, emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU). As of March 2, 2015, this stationary source had not met the consent decree's criteria for being "announced for retirement." Specifically, the Monticello Steam Electric Station emitted 31,447 tons of $SO_2$ in 2012, and had an emissions rate of 0.78 lbs $SO_2$/mmBTU in 2012. Pursuant to the March 2, 2015, consent decree, the EPA must designate the area surrounding the facility by July 2, 2016. However, before meeting the July 2, 2016, deadline for this area, the EPA and plaintiffs, who are parties to the consent decree that gave rise to the court order, agreed to extensions for a limited number of the subject areas, including this area. The deadline for issuing a designation for this area is now November 29, 2016.

In their September 18, 2015, submittal, Texas provided no formal recommendation for the area surrounding the Monticello Steam Electric Station. Instead, as part of its September 18, 2015, submittal, Texas provided a general recommendation of unclassifiable/attainment for the 243 counties located in the State, including Titus County, that do not have any operational $SO_2$ regulatory monitors. This general recommendation for Titus County was not accompanied by modeling, monitoring, or other technical information to inform our decision regarding the attainment status of the area.

On February 11, 2016, the EPA notified Texas that we intended to designate part of Titus County, Texas, as nonattainment. Additionally, we informed Texas that our intended boundaries for the nonattainment area was comprised of a portion of Titus County bounded by the following UTM Coordinates in meters (NAD83 Datum, Zone 15):

| X | Y |
|---|---|
| 302329, | 3666971 |
| 302329, | 3660770 |
| 313530, | 3660770 |
| 313530, | 3666971 |

The nonattainment area excluded the portion of Camp County that fell within the area bounded by the listed UTM coordinates.

Our intended designation and associated boundaries were based on, among other things, Sierra Club's modeling of actual emissions reported from the facilities during the 2012 to 2014 calendar years. An analysis of the modeling data indicated that it was performed substantially in accordance with appropriate EPA modeling guidance and used generally conservative assumptions.

The EPA identified aspects of Sierra Club's modeling used for our proposal that were not as refined as possible but after our analysis of those aspects we concluded that the modeling was

30

adequate for a determination of nonattainment. The modeling did not include building downwash nor variable stack parameters such as temperature and velocity.  Including building downwash will generally, though not always, increase the predicted maximum modeled concentrations. Instead of variable stack parameters, the modeling included stack velocity and temperature consistent with 100% load. These parameters, when coupled with actual hourly emission rates, should provide conservative estimates of actual concentrations because higher temperatures and velocities at 100% load were paired with lower emissions at less than 100% load. This combination should provide an overestimation of the dispersion and thus an underestimation of maximum ambient concentrations at ground level.  As a result, the modeled concentrations for the intended designations were 17% above the standard. Even with the inclusion of the generally conservative factors building downwash and variable stack parameters the result should still exceed the standard. Therefore, we found Sierra Club's modeling was sufficient for a proposed determination of nonattainment. It should be noted that Sierra Club took into account emissions from other nearby facilities and background $SO_2$ concentration.

The EPA's view was that the Sierra Club's modeling was relevant information that must be considered in the designation decision. In advance of issuing our intended designation, we received no additional relevant technical information from the State or other parties beyond that previously discussed. Based on the information available showing that the area in the vicinity of Monticello Steam Generating Station does not meet the 1-hr $SO_2$ standard, we intended to designate the area defined above as nonattainment.

The EPA's intended boundaries for the nonattainment area encompassed the area shown to be in violation of the standard and the source that contributed to the violation. Sierra Club also included individual modeled results for the two facilities (Monticello Station and Welsh) in their 2015 modeling submittals using source group based model outputs. The maximum modeled impacts from Monticello Steam Electric Station alone, not including background, were 229.4 μg/m3, or 87.6 ppb. Based on the fact that impacts from Monticello station alone are only 0.1 μg/m3 lower than the combined impacts at the maximum (229.5 μg/m3, excluding background); the magnitude of modeled impacts from Welsh; and the and the fact the closest receptor showing a modeled NAAQS violation is approximately 16 km from the Welsh facility, it was not clear that Welsh contributes to the modeled NAAQS exceedances. Therefore, our intended nonattainment boundary did not include Welsh and was limited to the immediate area surrounding Monticello station. As discussed later, we are also finalizing a nonattainment boundary that does not include Welsh.

Detailed rationale, analyses, and other information supporting our intended designation for this area can be found in the draft technical support document for Texas, and this document along with all others related to this designation can be found in Docket ID EPA-HQ-OAR-2014-0464.

Assessment of New Information

In our February 11, 2016, notification to Texas regarding our intended nonattainment designation for the Titus County, Texas area, the EPA requested that any additional information that the Agency should consider prior to finalizing the designation should be submitted by April 19, 2016. On March 1, 2016, the EPA also published a notice of availability and public comment

period in the *Federal Register,* inviting the public to review and provide input on our intended designations by March 31, 2016 (81 FR 10563). The EPA is explicitly incorporating and relying upon the analyses and information presented in the draft technical support document for the purposes of our final designation for this area, except to the extent that any new information submitted to the EPA or conclusions presented in this final technical support document and our supplement to the June 30, 2016, response to comments document (RTC), and supplemental RTC available in the docket, Docket ID EPA-HQ-OAR-2014-0464, supersede those found in the draft document.

As further detailed below, after carefully considering all available data and information, the EPA is designating a portion of the Titus County, Texas, area as nonattainment for the 2010 $SO_2$ NAAQS. This nonattainment area is bound by the following UTM coordinates:

|  X | Y |
| --- | --- |
| 304329.030, | 3666971.000 |
| 311629.030, | 3666971.000 |
| 311629.030, | 3661870.500 |
| 304329.030, | 3661870.500 |

UTM Zone 15 (NAD83)

and are shown in Figure 9 below.

**Figure 9: The EPA's Final Nonattainment Area: Portion of Titus County, Texas.**



32

The EPA received substantive comments from citizens, Luminant, the Sierra Club, the Texas Commission on Environmental Quality, and the Governor of the State of Texas regarding our intended nonattainment designation for the Titus County, Texas, area. A comprehensive summary of these comments and our responses can be found in the supplement to the RTC.

Also, additional information, specifically air dispersion modeling, was submitted to the EPA during the state and public comment period in order to characterize air quality in the Titus County, Texas, area. Notably, the Sierra Club and Luminant provided additional air dispersion modeling information during the comment period. TCEQ also included Luminant's modeling analysis as an attachment to its comments. The Sierra Club's updated modeling report asserted that Monticello is causing nonattainment of the $SO_2$ standard even when modeled alone without any other contributing sources. The Luminant modeling report asserted that Monticello, when modeled with several adjustments intended to reduce what Luminant asserts is inappropriate conservatism (i.e., alleged overestimation of ambient concentrations, in Luminant's use of the term) in the AERMOD model, does not contribute to nonattainment in Titus County, Texas, area. A supplemental Luminant report showed similar results. It asserted that, even when using what Luminant described as "overly conservative" regulatory options in AERMOD, Monticello will not cause or contribute to nonattainment near the plant when modeled with projected future emissions. These projected emissions were associated with a switch to Powder River Basin coal and the improved $SO_2$ removal from upgraded equipment planned to be in effect by January 1, 2017. Luminant submitted this information to support a modification to either our proposed designation, our proposed designation boundaries for the area, or both. The discussion and analysis of this new information that follow reference the Modeling TAD, Monitoring TAD, and the factors for evaluation contained in the EPA's March 20, 2015, guidance, as appropriate and applicable.

*Model Selection and Modeling Components*

The EPA's Modeling TAD notes that for area designations under the 2010 $SO_2$ NAAQS, the AERMOD modeling system should be used, unless use of an alternative model can be justified. In some instances, the recommended model may be a model other than AERMOD, such as the BLP model for buoyant line sources. The AERMOD modeling system contains the following components:
- AERMOD: the dispersion model
- AERMAP: the terrain processor for AERMOD
- AERMET: the meteorological data processor for AERMOD
- BPIPPRIME: the building input processor
- AERMINUTE: a pre-processor to AERMET incorporating 1-minute automated surface observation system (ASOS) wind data
- AERSURFACE: the surface characteristics processor for AERMET
- AERSCREEN: a screening version of AERMOD

Though new modeling was received from both Luminant and the Sierra Club, the Luminant modeling did not conform to the guidance of the Modeling TAD. In the primary Luminant modeling submittal, non-EPA preprocessor models, AERLIFT and AERMOIST, were applied to the CEM data to increase the observed temperatures and (in the case of AERLIFT) velocities. In

the supplemental Luminant modeling submittal, projected future reduced emission rates were used that were based in part on future non-enforceable, voluntary operational changes at Monticello.

AERLIFT is directed toward situations where two or more stack plumes merge as a result of being lined up in the same direction as the wind. The theory is that under such an alignment, the plumes merge as they rise and consequently reduce the overall entrainment of cooler ambient air which would theoretically result with more plume rise.

AERMOIST is for plants which have wet $SO_2$ scrubbers where the stack gas is saturated with moisture. The moisture may condense on exiting the stack as it cools when mixing with ambient air. AERMOIST is an effort to account for this initial condensation of the plume moisture which liberates the heat of condensation. This additional heat increase is theorized to increase plume buoyancy during the initial rise phase. However, when the liquid water evaporates later on it reduces the buoyancy of the plume by the same amount of the initial increase. This reduction should then act to depress plume rise but it is theorized to occur when the plume is more dilute and may have approached reached final rise – thus minimizing the effect. Luminant asserts that their implementation of the non-EPA AERMOIST model is based on a model evaluated in the peer-reviewed literature, IBJpluris, for moist plumes. AERMOIST uses IBJpluris to determine hourly adjustments in plume rise and then modifies stack temperatures for input to the dry plume rise model in AERMOD to force simulation of increased plume rise. Similar to the AERLIFT model, the AERMOIST model modifies CEM measured data prior to input to the AERMOD system.

To get an idea of the degree of changes made by the AERLIFT implementation submitted by Luminant, a review of the modifications made to the observed stack parameters was conducted by EPA Region 6. This review was conducted by comparing the original CEM data to the AERLIFTed parameters. The review showed that, for Big Brown for example, the stack temperature can be increased during individual hours by as much as 200 K by the AERLIFT preprocessor. To put this modification to stack gas temperature in context, the wet scrubbed plumes are less than 80-90K above ambient conditions, so these adjustments would drastically impact the amount of buoyancy estimated in the model and ultimate plume rise and would result in very large differences in modeled ground concentrations around the source.

Furthermore, we also evaluated the impacts of AERLIFT and AERMOIST in Luminant's modeling for the Martin Lake facility. Our analysis discussed below resulted in similar changes in stack temperature as in our analysis of Big Brown (approximately up to 200K hourly differences). We also saw changes of up to 50% of the magnitude of the AERLIFT impacts. In the case of Martin Lake, the combination of AERLIFT and AERMOIST were resulting in approximately 70 % more plume buoyancy on average and much more under certain situations, which is a very large adjustment to a parameter that drives dispersion and ground concentrations. These changes seem disproportionately large and the impacts they would have on the modeling are very significant. Although we did not do a detailed evaluation of the adjustments that AERLIFT and AERMOIST were making on the temperature and velocities in Luminant's modeling analysis for Monticello, we fully expect similar results of increased plume buoyancy and associated modeled concentrations. Prior to use in a regulatory setting EPA believes that the

34

particular implementations of AERMOIST and AERLIFT need to undergo extensive review versus test cases previously used for AERMOD model review. While the scientific principles seem like these might be refinements, it has not been substantiated that the implementation of these pre-processors and their coding is a refinement within AERMOD modeling platform and a full review as required by EPA for regulatory models has not been completed. There is no information to support that Luminant's modeling results with the AERLIFT and AERMOIST processors meet the requirements for models used in a regulatory decision. It is premature to use AERMOIST and AERLIFT in this context for informing our designation decisions.

EPA generally encourages modeling improvements that give more realistic simulations of the dispersion from sources, but there is a process for approval of suggested alternatives. AERMOD has undergone continual development since its introduction. While the phenomena modeled by the AERLIFT and AERMOIST techniques are theorized and documented from field studies at a few other sources and may affect the dispersion from the modeled source, the implementation of them in a specific case depends on the use of specific algorithms in computer code. However, any model enhancements are required to go through standard EPA model evaluation, review, and approval before being used in regulatory applications as required by 40 CFR Part 51 Appendix W (Guideline on Air Quality Models). Our evaluation of the adjustments that AERLIFT and AERMOIST makes in stack parameters at sources indicates the adjustments are large and not consistent with the theory of how the adjustments should be implemented. Regardless, the existing AERMOD model (without AERLIFT and AERMOIST adjustments) has been shown to do a good job at modeling impacts of emissions from tall stacks in a number of field studies and such changes to the model would have to be analyzed to ensure the model was still accurate and acceptable for regulatory use with the inclusion of such adjustments. A full review of AERLIFT and AERMOIST's coding, applicability of the science and analysis with all the datasets that EPA uses in analyzing changes to the AERMOD system has not yet occurred for AERLIFT or AERMOIST.

In addition, the primary Luminant modeling used Beta options, LOWWIND3 and ADJ_U*, which require pre-approval from EPA for regulatory use. The EPA notes that the use of beta options, such as ADJ_U* and LOWWIND3, in AERMOD for any regulatory applications requires adherence with Appendix W, Section 3.2.2. This is further explained in the EPA's December 10, 2015, Memorandum titled, "Clarification on the Approval Process for Regulatory Application of the AERMOD Modeling System Beta Options." Among other conditions, the use of beta options requires consultation with the appropriate EPA Regional Offices. Upon concurrence by the EPA's Modeling Clearinghouse, EPA Regional Offices may approve the use of these beta options for regulatory applications as an alternative model. This process was not initiated or completed in the modeling of Monticello and thus the modeling based on their use is not acceptable for this regulatory use. We note that at this point there has been some site specific ADJ_U* approvals through the Model Clearinghouse process but no LOWWIND3 approvals.

The supplemental Luminant modeling using their estimates of future emissions (2017-2019) uses actual hourly stack parameters and adjusted hourly emission rates for 2013-2015 based on actual hourly heat input data and the expected Powder River Basin (PRB) fuel sulfur content. Luminant estimated their operations for 2017-2019 (using 2013-2015 heat input) using PRB at approximately 20-30% lower $SO_2$ emissions than the 2013-2015 period due primarily to the

35

anticipated fuel switch, plus an improved scrubber efficiency on Unit 3. This projected change would likely have a beneficial effect on lowering the $SO_2$ concentrations around the Monticello Power Plant, but the lowered emissions including revised stack parameters for Unit 3 would have to be modeled based on enforceable limits that are in effect prior to designation. For the purpose of determining whether the area is currently meeting the NAAQS and designating the area either actual emissions or a currently enforceable reduction in actual emissions should be used. In this case the intended switch to PRB coal at Monticello, whether it has occurred or not is not yet enforceable through any mechanism - such as a permit limit - and Luminant would be free to either not switch or, if it does switch, change back to a higher sulfur content coal in the future, depending on circumstances. Thus the modeling based on the possible future use of PRB fuel is not acceptable for this regulatory use.

The Sierra Club's 2016 modeling mostly followed the Modeling TAD with the level of refinement reflecting the data available to them, used the default regulatory options, and used AERMOD version 15181, the most recent available at the time of the modeling. The Sierra Club's March 2016 modeling did depart from the Modeling TAD general recommendations in that they used 1.5m flagpole receptors. The use of the flagpole receptors is not expected to make a significant difference in the modeled design value concentrations in this case. If this was adjusted to EPA's implied recommended ground level height (0 m) we would expect only a very slight change in the modeled numbers and the area of exceedances and magnitude of the values would be basically equivalent, and, therefore, not change our final action. Sensitivity modeling conducted by the Sierra Club and for another Round 2source (previously mentioned Dolet Hills, Louisiana area) found decreases in modeled $SO_2$ between almost 0 and 0.2% when removing the flagpole receptors and estimating concentrations at ground level. Since Sierra Club's 2016 modeling maximum is 8% above the standard the change due to flagpole receptor heights would not decrease the value to below the standard. A discussion of the individual components will be referenced in the corresponding discussion that follows, as appropriate.

*Modeling Parameter: Rural or Urban Dispersion*

The EPA's recommended procedure for characterizing an area by prevalent land use is based on evaluating the dispersion environment within 3 km of the facility. According to the EPA's modeling guidelines contained in documents such as the Modeling TAD, rural dispersion coefficients are to be used in the dispersion modeling analysis if more than 50% of the area within a 3 km radius of the facility is classified as rural. Conversely, if more than 50% of the area is urban, urban dispersion coefficients should be used in the modeling analysis. AERSURFACE was used to evaluate surrounding land use within 3 kilometers. Based on the output from the AERSURFACE, approximately 0.04% of surrounding land use around the modeled facility was of urban land use types including Type 21 – Low Intensity Residential, Type 22 – High Intensity Residential and Type 23 – Commercial / Industrial / Transportation. This is less than the 50% value considered appropriate for the use of urban dispersion coefficients. Based on the AERSURFACE analyses conducted by both Sierra Club (all modeling) and Luminant, they both concluded (and EPA concurs) that the rural option should be used for modeling of this area.

*Modeling Parameter: Area of Analysis (Receptor Grid)*

The EPA's position is that a reasonable first step towards characterization of air quality in the area surrounding the Monticello Steam Electric Station is to determine the extent of the area of analysis, i.e., receptor grid. Considerations presented in the Modeling TAD include but are not limited to: the location of the $SO_2$ emission sources or facilities considered for modeling; the extent of significant concentration gradients of nearby sources; and sufficient receptor coverage and density to adequately capture and resolve the model predicted maximum $SO_2$ concentrations.

The grid receptor spacing for the area of analysis chosen by Sierra Club in all their modeling is as follows:
- 100-meter spacing out to 5 kilometers
- 500-meter spacing out to 10 kilometers
- 1000-meter spacing out to 50 kilometers

The receptor network contained 21,201 receptors and covered Titus County and portions of surrounding counties. Figure 10, which was generated by the EPA, shows the chosen area of analysis and receptor grid surrounding the Monticello Steam Electric Station, Texas.

**Figure 10: Partial Receptor Grid for Sierra Club's Monticello Steam Electric Station Area of Analysis.**



To be consistent with the Modeling TAD for the purposes of this designation, we only evaluated concentrations at receptors that represented areas where it would also be feasible to place a monitor and record ambient air impacts. Figure 11 shows the near field receptor grid relative to

37

the lake bordering Monticello Steam Electric Station. The impacts of the area's geography and topography will be discussed later within this document.

**Figure 11: Near-field receptor Grid for the Monticello Steam Electric Station Area of Analysis**



🟩 ≤ 196.5;  🟨 196.5 – 215;  🟩 215 – 235;  🟧 235 – 285;  🟧 > 285

For the area around Monticello Steam Electric Station, Sierra Club did not include $SO_2$ emitters within 50 km of the Station in any direction. Although Sierra Club had included another source in their previous modeling, Sierra Club's rationale for omitting it in this modeling was that the previous modeling had shown minimal impact from the potentially contributing sources at the site of maximum concentration and that their modeling was to be a demonstration that Monticello can itself cause modeled nonattainment. The EPA maintains that Monticello is likely contributing almost if not equal to 100% of the impact for the values above the $SO_2$ NAAQS. Furthermore, Sierra Club's modeling, by not including Welsh, is a conservative (i.e., under-estimating) approach to determining whether the area is attaining and the boundaries of such area, as inclusion of this source should result in either similar impacts and boundaries or slightly increased impacts and possibly slightly larger boundaries, but should not result in decreased impacts or "shrinking" of boundaries from those modeled. The EPA believes that this is an acceptable choice in these circumstances.

*Modeling Parameter: Source Characterization*

Sierra Club's 2016 modeling characterized the source of Monticello in accordance with the best practices outlined in the Modeling TAD. Specifically, it used actual stack velocities in conjunction with actual emission rates. Sierra Club characterized the source locations and stack parameters, e.g., exit temperature, and diameter. Variable stack temperatures were not included because they were not publicly available for use by Sierra Club. A comparison of the constant stack exit temperatures used by Sierra Club (453K for Units 1-2 and 438K for Unit 3) to the CEM temperatures used by Luminant show that during near maximum load operation (data

38

filtered by stack velocity > 29 m/s) the Sierra Club stack temperature is about 10K lower for Units 1-2 and 58K higher for Unit 3 than the average measured temperature.  Sierra Club estimated hourly velocities from the hourly flow rates and heat rates from the USEPA Clearinghouse Database.  Comparing these estimated velocities to the CEM velocities furnished by Luminant show that the Sierra Club velocities were slightly higher, about 32.5 m/s compared to 31 m/s for the CEM data for Units 1-2 and 35 m/s compared to 30.6 m/s for unit 3.  The Briggs Buoyancy Flux ($F_b$) takes into account both the velocity and the temperature of the plume and is related to plume rise.  To examine the size of the effect of these variations on the buoyancy of the plume, $F_b$ at an assumed ambient temperature of 293K was calculated for each unit for both the Sierra Club stack parameters and the CEM data during those hours where the units were near full load.  For Units 1-2 the Sierra Club $F_b$ averaged 0.5% higher than the CEM $F_b$, but for the scrubbed Unit 3 the Sierra Club $F_b$ was 66% higher.

The higher $F_b$ would be expected to cause in the model higher average plume rise and lower design value concentrations.  Thus Sierra Club's stack parameters are conservative and would most likely underestimate the actual concentrations, especially for Unit 3.  During the period 2012-2014, Unit 3's emissions comprised 32% of the total plant emissions.

Similar to variable stack temperature, building information was not publicly available when Sierra Club did their modeling for submission during the public comment period. Therefore, Sierra Club did not include building downwash in their analysis stating that this was the conservative approach and would likely underestimate impacts from emissions resulting in lower modeled concentrations than modeling that included building downwash.  Luminant did have access to the non-public building downwash information and did include it in the modeling they submitted at the end of the public comment period (March 2016). Luminant also indicated they included it in their modeling but due to the tall stacks at their other two facilities they did not think inclusion of downwash would make much difference for their modeling of Big Brown and Martin Lake.  Luminant did not make the same assertion about the minimal impacts of including downwash for Monticello, but the stack heights are similar for all three facilities (Big Brown stack heights – 122 m, Martin Lake 137.7 and 137.8 m, and Monticello 121.9 m and 140.2 m). Overall we agree with Luminant that given these stack heights and the building heights provided by Luminant that inclusion of downwash would likely have a minimal impact on maximum concentrations   While we do not agree with Sierra Club's assertion that exclusion of downwash is conservative (in the under-estimating sense of the term) in all cases, our evaluation is that the inclusion of building information and associated downwash in this analysis would not change our conclusion that the area is violating the NAAQS and the designation of nonattainment. The modeling values are sufficiently above the standard and inclusion of downwash often leads to higher concentrations closer to the source but - even in situations we have seen where this did not occur - any decreases in maximum modeled values from inclusion of downwash were relatively small and not expected to be enough of a decrease to resolve all modeled exceedance values near Monticello in Titus County.

*Modeling Parameter: Emissions*

The EPA's Modeling TAD notes that for the purposes of modeling to characterize air quality in designations, the recommended approach is to use the most recent three years of actual emissions

data and concurrent meteorological data. However, the TAD also provides for the flexibility of using allowable emissions in the form of the most recently permitted (referred to as PTE or allowable) emissions rate.

As previously noted, Sierra Club's 2016 modeling included Monticello and no other emitters of $SO_2$ within the area of analysis. This was a change from their previous modeling. Sierra Club wanted to clearly demonstrate that the Monticello facility results in exceedances of the 2010 $SO_2$ standard. Their previous 2015 modeling had shown minimal contributions to the maximum concentrations around Monticello from other nearby sources of $SO_2$. As discussed above, due to the small impacts from other nearby sources in the area of nonattainment around the Monticello facility we would expect only slight changes, if any, to the area of nonattainment that we are designating if the other nearby sources were included in the modeling. In this situation EPA believes that this choice of sources may underestimate concentrations slightly but is acceptable for the modeling for designation. Based on the small impact of other sources determined in the prior modeling results, EPA determines that the maximum impacts in the Monticello area are adequately represented for purposes of designating the area without explicitly modeling the contributions from other sources within the area of analysis.

For the single facility modeled in the area of analysis, Sierra Club included actual hourly $SO_2$ emissions rates between 2012 and 2014 taken from the USEPA Air Markets Program Data. This information is summarized as annual emissions in Table 6 below. These emission rates are considered representative of the emissions from the Monticello Steam Electric Station.

**Table 6: Actual $SO_2$ Emissions in 2012 – 2014 of the Monticello Steam Electric Station, Texas Area of Analysis.**

|  | $SO_2$ Emissions (tons per year) | | |
|---|---|---|---|
| Facility Name | 2012 | 2013 | 2014 |
| Monticello Steam Electric Station | 31,447 | 24,396 | 20,438 |
| Total Emissions from All Facilities in Sierra Club's Area of Analysis | 31,447 | 24,396 | 20,438 |

*Modeling Parameter: Meteorology and Surface Characteristics*

The most recent 3 years of meteorological data (concurrent with the most recent 3 years of emissions data) should be used in designations efforts. As noted in the Modeling TAD, the selection of data should be based on spatial and climatological (temporal) representativeness. The representativeness of the data are based on: 1) the proximity of the meteorological monitoring site to the area under consideration, 2) the complexity of terrain, 3) the exposure of the meteorological site, and 4) the period of time during which data are collected. Sources of meteorological data include National Weather Service (NWS) stations, site-specific or onsite data, and other sources such as universities, the Federal Aviation Administration (FAA), and military stations.

For the Monticello Steam Electric Station (Titus County) area of analysis, surface meteorology from the NWS station in Longview, Texas, approximately 83 km to the SSE, and coincident upper air observations from the NWS station in Shreveport, Louisiana, approximately 132 km to

40

the SE were selected by the Sierra Club as best representative of meteorological conditions within the area of analysis (Figure 12). EPA agrees that the meteorological sites chosen for the modeling for Monticello by Sierra Club are appropriate.

Sierra Club used AERSURFACE version 13016 using data from the NWS station in Longview, Texas located at 32°23'2.00"N, 94°42'41.00"W to estimate the surface characteristics of the area of analysis. Sierra Club estimated values for twelve spatial sectors out to one km at a seasonal temporal resolution for average moisture conditions. Sierra Club also estimated values for albedo (the fraction of solar energy reflected from the earth back into space), the Bowen ratio (the method generally used to calculate heat lost or heat gained in a substance), and the surface roughness (sometimes referred to as "Zo"). In the figure below generated by the EPA, the locations of the Longview, Texas and Shreveport, Louisiana NWS stations are shown relative to the Monticello Steam Electric Station area of analysis.

**Figure 12: Monticello Steam Electric Station Area of Analysis and the Longview, Texas and Shreveport, Louisiana NWS Stations.**



Meteorological data from the above surface and upper air stations were used in generating AERMOD-ready files with the AERMET processor. The output meteorological data created by the AERMET processor is suitable for being applied with AERMOD input files for AERMOD modeling runs. The Sierra Club analysis was conducted in adherence to all available USEPA guidance for evaluating source impacts on attainment of the 1-hour SO$_2$ NAAQS via aerial dispersion modeling, including the AERMOD Implementation Guide; USEPA's Applicability of Appendix W Modeling Guidance for the 1-hour SO2 National Ambient Air Quality Standard, August 23, 2010; modeling guidance promulgated by USEPA in Appendix W to 40 CFR Part 51;

41

USEPA's March 2011 Modeling Guidance for $SO_2$ NAAQS Designations; and, USEPA's December 2013 $SO_2$ NAAQS Designations Technical Assistance Document in the processing of the raw meteorological data into an AERMOD-ready format, and used AERSURFACE to best represent surface characteristics.

Hourly surface meteorological data records are read by AERMET, and include all the necessary elements for data processing. However, wind data taken at hourly intervals may not always portray wind conditions for the entire hour, which can be variable in nature.  Hourly wind data may also be overly prone to indicate calm conditions, which are not modeled by AERMOD. In order to better represent actual wind conditions at the meteorological tower, wind data of 1-minute duration was provided from the same instrument tower, but in a different formatted file to be processed by a separate preprocessor, AERMINUTE. These data were subsequently integrated into the AERMET processing to produce final hourly wind records of AERMOD-ready meteorological data that better estimate actual hourly average conditions and that are less prone to over-report calm wind conditions. This allows AERMOD to apply more hours of meteorology to modeled inputs, and therefore produce a more complete set of concentration estimates. As a guard against excessively high concentrations that could be produced by AERMOD in very light wind conditions, Sierra Club set a minimum threshold of 0.5 meters per second in processing meteorological data for use in AERMOD. This approach is consistent with a March 2013 EPA memo titled, "Use of ASOS meteorological data in AERMOD dispersion Modeling." In setting this threshold, no wind speeds lower than this value would be used for determining concentrations. This threshold was specifically applied to the 1-minute wind data.

*Modeling Parameter: Geography and Terrain*

The terrain in the area of analysis is best described as gently rolling. To account for these terrain changes, the AERMAP terrain program within AERMOD was used to specify terrain elevations for all the receptors. The source of the elevation data incorporated into the model was the USGS National Elevation Database.

*Modeling Parameter: Background Concentrations of $SO_2$*

The Modeling TAD offers two mechanisms for characterizing background concentrations of $SO_2$ that are ultimately added to the modeled design values: 1) a "first tier" approach, based on monitored design values, or 2) a temporally varying approach, based on the 99th percentile monitored concentrations by hour of day and season or month. For the Monticello Steam Electric Station area of analysis, Sierra Club chose used the 2012-14 design value for El Paso. The Sierra Club stated that this was the lowest background for the entire state and was therefore a conservative assumption. The background concentration for this area of analysis was determined by the state to be 5.2 micrograms per cubic meter ($\mu g/m^3$), or 2 ppb,[5] and that value was incorporated into the final AERMOD results. Many of the $SO_2$ monitors in Texas are in urban areas and/or near a $SO_2$ point source, so there is limited data for background values.  Using the El Paso monitor, which is the lowest design value in the State of Texas during this period, is a

---

[5] The conversion factor for $SO_2$ (at the standard conditions applied in the ambient $SO_2$ reference method) is 1ppb = approximately 2.62$\mu g/m^3$.

conservative (i.e., under-estimating) assumption.  Given the amount of $SO_2$ emissions in East Texas compared to El Paso area this assumption likely leads to an underestimation in the concentrations around these facilities but is within the framework of the TAD's options for inclusion of background monitoring data.  Considering the impacts of Monticello in the area, the background value is on the order of 2.4 % of the total maximum values and if background monitoring data existed for east Texas it would be expected to be a higher than El Paso monitor data and would have an increase in the concentration levels around the Monticello facility. Luminant's modeling used a temporally varying background monitor approach of hour of day and season with values ranging from 2-10 $\mu g/m^3$ based on a monitor in Waco. These values are similar to Sierra Club's background monitor data but the amount of $SO_2$ emissions in the general Waco area is generally less than that of the general area around the Monticello facility; thus, background levels are likely underestimated in both Sierra Club and Luminant's analyses. We note that in our previous designation for the Dolet Hills facility outside Shreveport, LA, we were provided a temporally varying background $SO_2$ monitor approach for a monitor in Shreveport, LA. The Dolet Hills background values ranged from 4.88 to 24.85 $\mu g/m^3$.  The Shreveport monitor is also upwind of Monticello more often (Waco monitor is not normally upwind of Monticello) and especially when winds are from the east (blowing westerly) which is when the modeling is predicting values above the standard to the west of the plant. Given the closer proximity of Shreveport monitor to the Monticello facility than the Waco or El Paso monitors, similar emissions of $SO_2$ in the area around Shreveport and Monticello, and transport conditions when modeled exceedance occur, the Shreveport background data is more representative than either Luminant's or Sierra Club's proposed values.  Comparing to Sierra Club's results, an alternate background would change values from -0.1% to + 11.7% using the time varying data from Shreveport which is significantly closer to Monticello than the Waco monitor.  Since the modeling was not conducted with this varying background a direct calculation of the effect of using the Shreveport data can't be performed. For context, taking an average of the minimum and maximum values from the Shreveport data would yield an increase of 9.6 $\mu g/m^3$ above the Sierra Club background value.

*Summary of Modeling Results*

The AERMOD modeling parameters, as supplied by additional information from Sierra Club during the comment period for the Monticello Steam Electric Station area of analysis are summarized below in Table 7.

**Table 7: AERMOD Modeling Parameters for the Monticello Steam Electric Station, Texas, Area of Analysis.**

| Monticello Steam Electric Station, Texas Area of Analysis | |
|---|---|
| AERMOD Version | 15181 |
| Dispersion Characteristics | Rural |
| Modeled Sources | 1 |
| Modeled Stacks | 3 |
| Modeled Structures | 0 |
| Modeled Fencelines | 0* |
| Total receptors | 21,201 |
| Emissions Type | Actual |
| Emissions Years | 2012-2014 |
| Meteorology Years | 2012-2014 |
| Surface Meteorology Station | Longview, Texas |
| Upper Air Meteorology Station | Shreveport, Louisiana |
| Methodology for Calculating Background $SO_2$ Concentration | Design Value |
| Calculated Background $SO_2$ Concentration | 5.2 $\mu g/m^3$ or 2 ppb |

*While the Sierra Club modeling did not specifically include a fenceline in their modeling analysis, the EPA did compare the modeled results with fenceline information from previous industry dispersion modeling in our proposal and have also evaluated information provided by Luminant in March 2016 to confirm that the modeled exceedances of the NAAQS shown in Sierra Club's analysis did occur in ambient air.

The results presented below in Table 8 show the magnitude and geographic location of the highest predicted modeled concentration based on actual emissions.

**Table 8: Maximum Predicted 99th Percentile 1-Hour $SO_2$ Concentration in the Monticello Steam Electric Station, Texas Area of Analysis Based on Actual Emissions (2012-2014). Provided by Sierra Club March 2016.**

| | Receptor Location | | $SO_2$ Concentration ($\mu g/m^3$) | |
|---|---|---|---|---|
| Averaging Period | UTM/Latitude | UTM/Longitude | Modeled (including background) | NAAQS |
| 99th Percentile 1-Hour Average | 306229.03 | 3662670.50 | 212.0 | 196.5* |

*Equivalent to the 2010 $SO_2$ NAAQS set at 75 ppb

Sierra Club's modeling indicates that the highest predicted 3-year average 99th percentile 1-hour average concentration within the chosen modeling domain is 212.0 $\mu g/m^3$, or 80.9 ppb. This modeled concentration included the background concentration of $SO_2$, and is based on actual 2012-2014 emission rates from the Monticello Steam Electric Station. Figure 13 below was included as part of Sierra Club's submission and indicates that the predicted value occurred to the west of Monticello Steam Electric Station.

**Figure 13: Sierra Club's Maximum Predicted 99th Percentile 1-Hour SO₂ Concentrations in the Monticello Steam Electric Station Area of Analysis Based on Actual Emissions**



1-hour average SO2 concentrations (ug per cubic meter) - All colored areas exceed the NAAQS.

We note that Luminant included a figure with their near field receptors grid and they indicated that they excluded areas that were within their property line or lake/wetland areas. Luminant did not provide a detailed analysis of appropriate fencing and limiting of access to their property (necessary to determine if an area is actually not ambient air), nor other material documenting exclusion due to over water, etc. in support of the areas they have excluded. From the information we do have, and evaluation with GIS/aerial data, we have concerns that Luminant

45

App. 1280

has excluded more areas than are appropriate. Regardless, we still have adequate information to conclude whether the area is attaining the 2010 $SO_2$ NAAQS, given that adequate modeling shows values over the standard outside the areas excluded by Luminant, in undisputed ambient air. We have analyzed the information (See Figure 14) and determined that the area that is shown to be above the standard in the Figure above is all ambient air and not within Luminant's fenceline.

**Figure 14. Luminant's Near Field Receptor Grid with Area excluded by Luminant based on property boundaries or lake/wetland areas.**



Jurisdictional Boundaries

Once the geographic area of analysis associated with Monticello Steam Electric Station, other nearby sources of $SO_2$, and background concentration is determined, existing jurisdictional boundaries are considered for the purpose of informing our final nonattainment area, specifically with respect to clearly defined legal boundaries. Modeling provided by the Sierra Club shows portions of Titus County to be in exceedance of the 2010 $SO_2$ 1-hr standard.

There is one other source located in Titus County with emissions greater than 100 tons of $SO_2$ in 2011, the Welsh Power Plant. The previous 2015 Sierra Club modeling included estimates of impacts from the Welsh facility for the same years modeled in the updated modeling; in the following discussion this modeling is considered for assessing whether Welsh may contribute to the nonattainment area found in the updated modeling for Monticello. The maximum modeled impacts from Welsh alone, not including background, were 124.2 μg/m3, or 47.4 ppb, below the 1-hour SO2 standard.  Therefore, according to the previous Sierra Club modeling, Welsh does not independently cause nonattainment.  To look for its potential to contribute to the nonattainment area impacted by Monticello, the maximum modeled impact from Monticello station alone, not including background, of 229.4 μg/m3 was compared to the combined impact of Welsh and Monticello together of 229.5. Based on the fact that impacts from Monticello station alone are only 0.1 μg/m3 lower than the combined impacts; the magnitude of modeled impacts from Welsh; and the fact that the closest receptor showing a modeled NAAQS violation was approximately 16 km from the Welsh facility, it is not clear from the previous modeling that Welsh contributes to the modeled NAAQS exceedances. While Sierra Club's previous 2015 submittal did include information about the overall maximum impacts from Welsh, it did not include a source contribution analysis or model output necessary to further examine the magnitude of contributions from this facility to each of the modeled violations surrounding Monticello station. Therefore, based on the lack of evidence of contribution from either Sierra Club's 2016 or previous 2015 modeling of Welsh, our final nonattainment boundary does not include Welsh and is limited to the immediate area surrounding Monticello station where the 2016 modeling indicated design values exceeding the standard.

Based on actual emissions, Welsh is considered a Data Requirements Rule source and the area surrounding it will be further addressed during the upcoming rounds of $SO_2$ designations.

The EPA has determined that our final nonattainment area, consisting of portions of Titus County, Texas, is comprised of clearly defined legal boundaries, and we find these boundaries to be a suitably clear basis for defining our final nonattainment area.

Conclusion

After careful evaluation of the state's recommendation, all timely comments and information received during the state and public comment period, and additional relevant information as discussed in this document, the EPA is designating the area around Monticello Steam Electric Station, Texas, as nonattainment for the 2010 $SO_2$ NAAQS. Specifically, the area is comprised of portions of Titus County, Texas bounded by:

|  X  |  Y  |
| --- | --- |
| 304329.03, | 3666971.0 |
| 311629.03, | 3666971.0 |
| 311629.03, | 3661870.5 |
| 304329.03, | 3661870.5 |

UTM Zone 15 (NAD83)

Our final designation is based on Sierra Club's 2016 and previous 2015 modeling of actual emissions reported from the facilities during the 2012 to 2014 calendar years. To more accurately predict the dispersion of emissions, estimates of hourly exit velocities were used in Sierra Club's 2016 modeling. Exit velocities were derived from the hourly flow rates and heat input in the USEPA Clearinghouse and CAMD databases. Comparing these estimated velocities to the CEM velocities furnished by Luminant show that the Sierra Club velocities were slightly higher, about 32.5m/s compared to 31 m/s for the CEM data for Units 1-2 and 35m/s compared to 30.6 m/s for unit 3. An analysis of the modeling data indicates it was mostly performed in accordance with appropriate EPA modeling guidance and using generally conservative assumptions.

The Sierra Club modeling was deliberately conservative in many respects, i.e., included several techniques which generally would tend to underestimate design value concentrations from the model. Specifically, as further discussed above:

- The modeling did not include building downwash, since Sierra Club did not have access to information needed to support such inclusion. Building downwash will generally, though not always, increase the predicted maximum modeled concentrations and move the maximum impacts closer to the facility.
- The modeling did not include variable stack temperature, since Sierra Club did not have access to information needed to support such inclusion. Although Sierra Club used constant stack temperatures, it was consistent with 100% load. This, coupled with actual hourly emission rates, should provide conservative estimates of actual concentrations because higher temperatures of 100% load when paired with lower emissions of less than 100% load should provide an overestimation of the dispersion and thus an underestimation of maximum concentrations in Sierra Club's 2016 modeling.
- A comparison of the constant stack exit temperatures used by Sierra Club (453K for Units 1-2 and 438K for Unit 3) to the CEM temperatures used by Luminant show that during near-full-load operation (data filtered by stack velocity > 29 m/s) the Sierra Club stack temperature is about 10 degrees K lower for Units 1-2 and 58K higher for Unit 3 than the average measured temperature. The much greater temperature overestimate for Unit 3 relative to the underestimate Units 1-2 would tend to decrease the overall combined plant impact, thus underestimating the maximum concentrations.
- The Sierra Club used a very low estimate of background $SO_2$ based on the lowest monitor design value in the State of Texas, far from the source and an area with less overall $SO_2$ emissions. If more representative background monitoring data were used the concentration values would increase some, though should be less than 12 percent of the maximum estimated value based on evaluating the use of Shreveport monitoring data.

48

- Sierra Club's modeling did not include other sources which could potentially contribute to $SO_2$ concentrations in the modeled area. The effect of this is expected to be small based on the small contributions from other sources in the previous modeling but should lead to slightly higher concentrations in some areas around Monticello facility.

Industry commenters provided comments about potential defects in the Sierra Club's previous modeling which are still relevant to the final modeling and which could potentially increase/decrease modeled concentrations: the use of flagpole receptors, differing and non-varying stack temperatures, no building downwash inclusion, use of refined background, and use of older land use data at the surface meteorological station. To address the effect on modeled concentrations that might be caused by these various factors the Sierra Club conducted sensitivity modeling on Big Brown for some of these issues and found both positive and negative impacts on the modeled concentrations. While the modeling for other sources is not an exact analysis of change that would occur if these differences were assessed using the Monticello modeling, we can use the analyses from Big Brown and Dolet Hills to inform the amount of change that might happen in factually similar situations. In looking at the other information discussed previously we should expect a decrease in maximum concentrations of change of maybe 3.6 to 3.8% (7.6 - 8 $\mu g/m^3$) due to the use of flagpole receptors (0-0.2%) and Surface Characteristics update (-3.6%). We note that the background used is low for what we would expect for East Texas and using the data from Shreveport (Dolet Hills Analysis) the background could be 4.88-24.85 $\mu g/m^3$ compared to the constant of 5.2 $\mu g/m^3$ used by Sierra Club. An alternate background would change values from -0.1% to + 11.7% using the time varying data from Shreveport which is significantly closer to Monticello than the Waco monitor (Waco – 250 km, Shreveport – approx. 135 km). The Shreveport monitor is also generally upwind of Monticello more often and especially when winds are from the east (blowing westerly) which is when the modeling is predicting values above the standard to the west of the plant. An average of the minimum and maximum change would add 9.6 $\mu g/m^3$ to the exiting Sierra Club background concentration. For further context, we also looked at the seasonal average value (averaging all hours) and it ranged from 7.97 $\mu g/m^3$ to 10.83 $\mu g/m^3$ with an annual average of 9.1 $\mu g/m^3$. These issues combined with lack of any background sources in the modeling further support the use of the Shreveport monitor data for background. Without a direct analysis we do not know the exact impact but the net difference to the exceedance values due to flagpole height, updated surface characteristics, and more representative background would be an overall increase to the exceedance values.

The modeling did not include building downwash or variable stack temperature, since Sierra Club did not have access to information needed to support such inclusion. As previously discussed, building downwash will generally, though not always, increase the predicted maximum modeled concentrations. As previously discussed we also evaluated Sierra Club 2016 modeling's stack temperatures and use of varying velocities in our analysis of the Buoyancy Flux ($F_b$) in comparison to the data provided by Luminant in their modeling. For Units 1-2 the Sierra Club $F_b$ averaged 0.5% higher than the CEM $F_b$, but for the scrubbed Unit 3 the Sierra Club $F_b$ was 66% higher. The higher buoyancy fluxes would be expected to cause in the model higher average plume rise, increased dispersion, and lower design value concentrations. Thus Sierra Club's stack parameters are conservative and would most likely underestimate the actual

49

concentrations, especially for Unit 3.  During the period 2012-2014 Unit 3's emissions comprised 32% of the total plant emissions.

Furthermore, consideration of downwash, non-varying and differences in temperature, and not including other background sources in the modeling, would also likely result in an underestimation of values, thus further supporting the conclusion that the modeling when weighing all the factors is showing values exceeding the standard.

Given that Sierra Club's modeled concentrations (with a low background) are 8% above the standard and that several factors are deliberately conservative in under-estimating impacts and would tend to reduce the modeled concentrations (and actual modeled concentrations with appropriate background would be higher), our technical assessment of the available information concludes that the differences/changes to the Sierra Club modeling suggested by industry would not result in modeled values near or below the standard; therefore, EPA considers the final Sierra Club modeling submitted March 2016 to be relevant information that must be considered in our designation decision and finds that the modeling is a sufficient basis for a determination of nonattainment.

Based on the information available showing the area in the vicinity of Monticello does not meet the 1-hr $SO_2$ standard, we designate the area defined above as nonattainment.

EPA's boundaries for the nonattainment area encompass the area shown to be in violation of the standard and the principal source that contributes to the violation. No other potentially contributing sources were included in the Sierra Club 2016 modeling; Monticello was modeled to cause nonattainment of the 2010 $SO_2$ standard in the area.

At this time, our final designations for areas in the State of Texas have been completed only for this area, the three other areas contained in this final technical support document supplement and in this supplemental final action, and the other eight areas designated on June 30, 2016. Consistent with the remaining court-ordered schedule, the EPA will evaluate and designate all remaining undesignated areas in Texas by either December 31, 2017, or December 31, 2020.

## Technical Analysis for Rusk County, Texas

Introduction

The Rusk County area contains a stationary source that, according to the EPA's Air Markets Database, emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU). As of March 2, 2015, this stationary source had not met the consent decree's criteria for being "announced for retirement." Specifically, in 2012, the Martin Lake Electrical Station (Martin Lake station) emitted 43,093 tons of $SO_2$, and had an emissions rate of 0.5504 lbs $SO_2$/mmBTU. Pursuant to the March 2, 2015, consent decree, the EPA must designate the area surrounding the facility by July 2, 2016. However, before meeting the July 2, 2016, deadline for this area, the EPA and plaintiffs, who are parties to the consent decree that gave rise to the court order, agreed to extensions for a limited number of the subject areas, including this area. The deadline for issuing a designation for this area is now November 29, 2016.

In its September 18, 2015 submission, Texas provided no formal recommendation for the specific area surrounding the Martin Lake Power Plant. Instead, as part of their September 18, 2015, submittal, Texas provided a general recommendation of unclassifiable/attainment for the 243 counties located in the state, including Rusk (and Panola) County, that do not have any operational $SO_2$ regulatory monitors. This general recommendation for Rusk County was not accompanied by modeling, monitoring, or other technical information to inform our decision regarding the attainment status of the area. Texas recommended that Gregg County be designated attainment based on certified monitoring data showing no violations.

On February 11, 2016, the EPA notified Texas that we intended to designate portions of Rusk, Panola, and Gregg counties as nonattainment. Additionally, we informed Texas that our intended boundaries for the nonattainment area consisted of (NAD83 Datum, Zone 15):

| X | Y |
|---|---|
| 336067, | 3585315 |
| 336067, | 3558314 |
| 361568, | 3558314 |
| 361568, | 3585315 |

Our intended designation and associated boundaries were based on, among other things, Sierra Club's modeling of actual emissions reported from both the Martin Lake and Pirkey Electric Generating Stations during the 2012 to 2014 calendar years. An analysis of the modeling data indicates it was performed in accordance with appropriate EPA modeling guidance and using generally conservative assumptions. As discussed later, based on updated modeling provided by Sierra Club during the comment period and past modeling we are also finalizing a nonattainment boundary that does not include Pirkey and does not include any portions of Gregg County.

The EPA identified aspects of Sierra Club's 2015 modeling used for our proposal that were not as refined as possible but after our analysis of those aspects we concluded that the modeling was

51

adequate for a determination of nonattainment.  The modeling did not include building downwash or variable stack temperature and velocity, since Sierra Club did not have access to information needed to support such inclusion.  Including building downwash will generally, though not always, increase the predicted maximum modeled concentrations.  Sierra Club used stack velocity and temperatures consistent with 100% load.  This, coupled with actual hourly emission rates, should provide conservative estimates of actual concentrations because higher temperatures and velocities of 100% load when paired with lower emissions of less than 100% load should provide an overestimation of the dispersion and thus an underestimation of maximum ambient concentrations at ground level. Given that modeled concentrations for the intended designations were 73% above the standard, the inclusion of building downwash and variable stack parameters, etc. in the modeling would not result in values near or below the standard; therefore, the modeling is sufficient for a determination of nonattainment. In addition to adequately characterizing Martin Lake station, the Sierra Club modeling took into account emissions from other nearby facilities as well as a background concentration of $SO_2$.

The EPA's view was that Sierra Club's modeling was relevant information that must be considered in our designation decision.  While TCEQ did provide comments on Sierra Club's initial modeling submittal, we received no additional relevant technical information from the State or other parties before issuing our intended designation. In response to the TCEQ comments, Sierra Club updated its modeling for the area addressing most of the concerns raised and submitted the results to the EPA on December 15, 2015.  Based on the information available showing the area in the vicinity of Martin Lake does not meet the 1-hr $SO_2$ standard, we intended to designate the area defined above as nonattainment.

The EPA's intended boundaries for the nonattainment area encompassed the area shown to be in violation of the standard and the source that contributed to the violation. Sierra Club also included individual modeled results for the two facilities (Martin Lake Station and Pirkey) in their 2015 modeling submittals using source group based model outputs. The maximum modeled impacts from Martin Lake station alone, not including background, were 339.8 µg/m³. Based on the fact that impacts from Martin Lake station alone are only 0.1 µg/m3 lower than the combined impacts at the maximum (339.9 µg/m³ or 129.7 ppb, excluding background); the magnitude of modeled impacts from Pirkey; and the fact the closest receptor showing a modeled NAAQS violation which Pirkey could have contributed given transport winds is approximately 23.7 km from the Pirkey facility, it was not clear that Pirkey contributes to the modeled NAAQS exceedances (Pirkey's domain wide maximum impacts were 40.9 µg/m³). Therefore, our intended nonattainment boundary did not include Pirkey and was limited to the immediate area surrounding Martin Lake station. As discussed later, we are also finalizing a nonattainment boundary that does not include Pirkey.

Detailed rationale, analyses, and other information supporting our intended designation for this area can be found in the draft technical support document for Texas, and this document along with all others related to this designation can be found in Docket ID EPA-HQ-OAR-2014-0464.

<u>Assessment of New Information</u>

In our February 11, 2016, notification to Texas regarding our intended nonattainment designation for the Rusk County, Texas area, the EPA requested that any additional information that the Agency should consider prior to finalizing the designation should be submitted by April 19, 2016. On March 1, 2016, the EPA also published a notice of availability and public comment period in the *Federal Register,* inviting the public to review and provide input on our intended designations by March 31, 2016 (81 FR 10563). The EPA is explicitly incorporating and relying upon the analyses and information presented in the draft technical support document for the purposes of our final designation for this area, except to the extent that any new information submitted to the EPA or conclusions presented in this final technical support document and our supplement to the June 30, 2016, response to comments document (RTC), available in the docket, Docket ID EPA-HQ-OAR-2014-0464, supersede those found in the draft document.

As further explained below, after carefully considering all available data and information, the EPA is designating portions of Rusk and Panola Counties, Texas, area as nonattainment for the 2010 SO$_2$ NAAQS. The boundaries for this nonattainment area consist of:

|        X       |       Y        |
|----------------|----------------|
| 340067.31,     | 3575814.75     |
| 356767.31,     | 3575814.75     |
| 356767.31,     | 3564314.75     |
| 340067.31,     | 3564314.75     |

NAD83 Datum, Zone 15

and are shown in the figure below.

**Figure 15: The EPA's final nonattainment area: Rusk and Panola Counties, Texas.**



The EPA received substantive comments from citizens, Luminant, the Sierra Club, TCEQ, and the Governor of the State of Texas regarding our intended nonattainment designation for portions of the Rusk, Panola, and Gregg counties, Texas, area, and a comprehensive summary of these comments and our responses can be found in the supplement to the RTC.

Also, additional information, specifically air dispersion modeling, were submitted to the EPA during the state and public comment period in order to characterize air quality in the Rusk County, Texas, area. Notably, Luminant and Sierra Club provided additional air dispersion modeling information during the comment period. Texas also included Luminant's modeling analysis as an attachment to their comments. The Sierra Club's modeling report asserted that Martin Lake is causing nonattainment of the 2010 one-hour $SO_2$ standard even when modeled alone without any other contributing sources. The Luminant modeling report asserted that Martin Lake when modeled with several adjustments intended to reduce what Luminant asserts is inappropriate conservatism (i.e. alleged overestimation of concentrations, in Luminant's use of the term) in the AERMOD model, does not contribute to nonattainment in the Rusk County, Texas, area. Based on 2012-2014 model results and adjustment to the model for lower 2015

54

emissions etc., Luminant estimated (not actually modeled) 156 µg/m³.[6] This estimate was not well documented and not directly modeled by Luminant.  Luminant's report also showed similar conclusions for a future emission estimate scenario (2017-2019 estimated emissions). It asserted that, even when using what Luminant described as "overly conservative" regulatory options in AERMOD, Martin Lake will not cause or contribute to nonattainment near the plant when modeled with Luminant's projected future emissions (Maximum value of 192.1 µg/m³). These projected emissions were associated with potentially improving scrubber efficiency, fuel switches, and potentially collateral benefits with reductions of $SO_2$ from the facility complying with the Mercury Air Toxics Rule (MATS).

This information was submitted to support a modification to either our proposed designation, our proposed designation boundaries for the area, or both. The discussion and analysis of this new information that follow reference the Modeling TAD, Monitoring TAD, and the factors for evaluation contained in the EPA's March 20, 2015, guidance, as appropriate and applicable.

*Model Selection and Modeling Components*

The EPA's Modeling TAD notes that for area designations under the 2010 $SO_2$ NAAQS, the AERMOD modeling system should be used, unless use of an alternative model can be justified. In some instances, the recommended model may be a model other than AERMOD, such as the BLP model for buoyant line sources. The AERMOD modeling system contains the following components:
- AERMOD: the dispersion model
- AERMAP: the terrain processor for AERMOD
- AERMET: the meteorological data processor for AERMOD
- BPIPPRIME: the building input processor
- AERMINUTE: a pre-processor to AERMET incorporating 1-minute automated surface observation system (ASOS) wind data
- AERSURFACE: the surface characteristics processor for AERMET
- AERSCREEN: a screening version of AERMOD

Though new modeling was received from both Luminant and the Sierra Club, the Luminant modeling did not conform to the guidance of the Modeling Technical Advisory Document. In the Luminant modeling submittal, non-EPA preprocessor models, AERLIFT and AERMOIST, were applied to the CEM data to increase the observed temperatures and (in the case of AERLIFT) velocities. In the 2017-2019 emission modeling submission, Luminant projected future reduced emission rates were used that were based in part on future non-enforceable, voluntary operational changes at Martin Lake.  However, for the purpose of determining whether the area is currently meeting the NAAQS and designating the area either actual emissions or a currently enforceable reduction in actual emissions should be used.  Neither the efficiency improvements in operation of existing scrubbers or fuel switches were reflected in

---

[6] Included in Luminant's comments. (Estimated a 2015 DV by multiplying 2012 DV by ratio of 2015 SO2 emissions/2012 SO2 emissions yielding an estimated DV of 312 µg/m³ and then they did a 50% reduction in the value based on perceived overestimation bias due to plume penetrations issues to estimate the 156 µg/m³ value). We note that neither of these approaches are acceptable, especially not the 50% reduction.  See our RTC for this supplement for more discussion.

a permanently enforceable situation. This means that they could change, and are not a certain and effective limitation on either current or future emissions. Compliance with MATS does allow for using $SO_2$ limits as surrogates for other pollutants, but how a facility meets the MATS requirements can be changed by fuel switching/blending and testing directly for the MATS pollutants. In this case the intended switching of fuel and increases in scrubber efficiency, whether they have occurred or not, are not yet enforceable through any mechanism provided by Luminant - such as a permit limit - and Luminant would be free to either not switch or, if it does switch, change back to a higher sulfur content coal in the future, depending on circumstances. Thus the modeling based on possible future changes at the facility, rather than on actual emissions, is not acceptable for this regulatory use.

Preprocessor models, AERLIFT and AERMOIST, were applied to the CEM data to increase the observed temperatures and (in the case of AERLIFT) velocities.

AERLIFT is directed toward situations where two or more stack plumes merge as a result of being lined up in the same direction as the wind. The theory is that under such an alignment, the plumes merge as they rise and consequently reduce the overall entrainment of cooler ambient air which would theoretically result with more plume rise.

AERMOIST is for plants which have wet $SO_2$ scrubbers where the stack gas is saturated with moisture. The moisture may condense on exiting the stack as it cools when mixing with ambient air. AERMOIST is an effort to account for this initial condensation of the plume moisture which liberates the heat of condensation. This additional heat increase is theorized to increase plume buoyancy during the initial rise phase. However, when the liquid water evaporates later on it reduces the buoyancy of the plume by the same amount of the initial increase. This reduction should then act to depress plume rise but it is theorized to occur when the plume is more dilute and may have approached reached final rise – thus minimizing the effect. Luminant asserts that their implementation of the non-EPA AERMOIST model is based on a model evaluated in the peer-reviewed literature, IBJpluris, for moist plumes. AERMOIST uses IBJpluris to determine hourly adjustments in plume rise and then modifies stack temperatures for input to the dry plume rise model in AERMOD to force simulation of increased plume rise. Similar to the AERLIFT model, the AERMOIST model modifies CEM measured data prior to input to the AERMOD system.

To get an idea of the degree of changes made by the AERMOIST and AERLIFT implementations submitted by Luminant, a review of the modifications made to the observed stack parameters was conducted by EPA Region 6. This review was conducted by comparing the original CEM data to the AERMOIST and AERLIFT adjusted temperatures and velocities provided by Luminant. The review showed that the stack temperature can be increased during individual hours as much as 300K by the combination of the AERMOIST preprocessor followed by the AERLIFT preprocessor. In Figure 16 below a plot of the *average* temperature increase by wind direction for each preprocessor demonstrates for some wind directions AERMOIST+AERLIFT increases the average stack temperature by over 60K. The AERLIFT model also seems to be increasing the stack temperature for wind directions that are not roughly in line with the stacks (334 and 154 degrees). These temperature changes with the accompanying stack gas exit velocity increases raise the average buoyancy flux of the emissions

56

by 70% for some wind directions. For certain hours the increase is far greater. Such changes in the buoyancy of the plume are expected to have a major effect on the location and concentrations of maximum ground level impact. These changes seem disproportionately large and the impacts they would have on the modeling are very significant. Prior to use in a regulatory setting EPA believes that the particular implementations of AERMOIST and AERLIFT need to undergo extensive review versus test cases previously used for AERMOD model review. While the scientific principles seem like these might be refinements, it has not been substantiated that the implementation of these pre-processors and their coding is a refinement within AERMOD modeling platform and a full review as required by EPA for regulatory models has not been completed. There is no information to support that Luminant's modeling results with the AERLIFT and AERMOIST processors meet the requirements for models used in a regulatory decision. It is premature to use AERMOIST and AERLIFT in this context for informing our designation decisions.

**Figure 16: The average increase in stack temperature (degrees K) due to AERMOIST and AERLIFT preprocessing for Martin Lake.**



The AERMOIST increase is in blue, the total increase by AERMOIST+AERLIFT is in red. The line of the stacks is denoted by the green line.

EPA generally encourages modeling improvements that give more realistic simulations of the dispersion from sources, but there is a process for approval of suggested alternatives. AERMOD has undergone continual development since its introduction. While the phenomena modeled by the AERLIFT and AERMOIST techniques are theorized and documented from field studies at a few other sources and may affect the dispersion from the modeled source, the implementation of them in a specific case depends on the use of specific algorithms in computer code. However, any model enhancements are required to go through standard EPA model evaluation, review, and approval before being used in regulatory applications as required by 40 CFR Part 51 Appendix W (Guideline on Air Quality Models). Our evaluation of the adjustments that AERLIFT and AERMOIST makes in stack parameters at sources indicates the adjustments are large and not consistent with the theory of how the adjustments should be implemented. Regardless, the existing AERMOD model (without AERLIFT and AERMOIST adjustments) has been shown to do a good job at modeling impacts of emissions from tall stacks in a number of field studies and such changes to the model would have to be analyzed to ensure the model was still accurate and acceptable for regulatory use with the inclusion of such adjustments. A full review of AERLIFT and AERMOIST's coding, applicability of the science and analysis with all the datasets that EPA uses in analyzing changes to the AERMOD system has not yet occurred for AERLIFT or AERMOIST.

In addition, the Luminant modeling used Beta options, LOWWIND3 and ADJ_U*, which require pre-approval from EPA for regulatory use. The EPA notes that the use of beta options, such as ADJ_U* and LOWWIND3, in AERMOD for any regulatory applications requires adherence with Appendix W, Section 3.2.2. This is further explained in the EPA's December 10, 2015, Memorandum titled, "Clarification on the Approval Process for Regulatory Application of the AERMOD Modeling System Beta Options." Among other conditions, the use of beta options requires consultation with the appropriate EPA Regional Offices. Upon concurrence by the EPA's Modeling Clearinghouse, EPA Regional Offices may approve the use of these beta options for regulatory applications as an alternative model. This process was not initiated or completed in the modeling of Martin Lake and thus the modeling based on their use is not acceptable for this regulatory use. At this point there have been some site specific ADJ_U* approvals through the Model Clearinghouse process, but no LOWWIND3 approvals to date.

The Sierra Club's 2016 modeling mostly followed the Modeling TAD as with the level of refinement reflecting the data available to them, used the default regulatory options, and used AERMOD version 15181, the most recent available at the time of the modeling. The Sierra Club's 2016 modeling used the actual 2013-2015 emission rates and hourly velocities based on data from the USEPA Clearinghouse and CAMD databases. The Sierra Club's modeling did depart from the Modeling TAD in that they used 1.5m flagpole receptors. The use of the flagpole receptors is not expected to make a significant difference in the modeled design value concentrations in this case. If this was adjusted to EPA's implied recommended ground level height (0 m) we would expect only a very slight change in the modeled numbers and the area of exceedances and magnitude of the values would be basically equivalent, and, therefore, not change our final action. Sensitivity modeling conducted by the Sierra Club and for another CD source (Dolet Hills in northwest Louisiana dv change of 0.003 µg/m$^3$ facility) found decreases in modeled SO$_2$ between almost 0 and 0.2% when removing the flagpole receptors and estimating concentrations at ground level. Since Sierra Club's 2016 modeling maximum (in ambient air) is

at least 14% above the standard the change due to flagpole receptor heights would not decrease the value to below the standard. A discussion of the individual components will be referenced in the corresponding discussion that follows, as appropriate.

*Modeling Parameter: Rural or Urban Dispersion*

The EPA's recommended procedure for characterizing an area by prevalent land use is based on evaluating the dispersion environment within 3 km of the facility. According to the EPA's modeling guidelines contained in documents such as the Modeling TAD, rural dispersion coefficients are to be used in the dispersion modeling analysis if more than 50% of the area within a 3 km radius of the facility is classified as rural. Conversely, if more than 50% of the area is urban, urban dispersion coefficients should be used in the modeling analysis. When performing the modeling for the area of analysis, Sierra Club determined that it was most appropriate to run the model in rural mode. The facility was evaluated to determine if it should be modeled using the rural or urban dispersion coefficient option in AERMOD. USEPA guidance states that urban dispersion coefficients are used if more than 50% of the area within 3 kilometers has urban land uses. Otherwise, rural dispersion coefficients are appropriate. USEPA's AERSURFACE v. 13016 was used to develop the meteorological data for the modeling analysis. This model was also used to evaluate surrounding land use within 3 kilometers. Based on the output from the AERSURFACE, approximately 6.4% of surrounding land use around the modeled facility was of urban land use types including Type 21 – Low Intensity Residential, Type 22 – High Intensity Residential and Type 23 – Commercial / Industrial / Transportation. The analysis showed that rural dispersion coefficients are appropriate. This is less than the 50% value considered appropriate for the use of urban dispersion coefficients. Based on the AERSURFACE analyses conducted by both Sierra Club (all modeling) and Luminant, they both concluded (and EPA concurs) that the rural option should be used for modeling of this area.

*Modeling Parameter: Area of Analysis (Receptor Grid)*

The EPA believes that a reasonable first step towards characterization of air quality in the area surrounding the Martin Lake facility is to determine the extent of the area of analysis, i.e., receptor grid. Considerations presented in the Modeling TAD include but are not limited to: the location of the $SO_2$ emission sources or facilities considered for modeling; the extent of significant concentration gradients of nearby sources; and sufficient receptor coverage and density to adequately capture and resolve the model predicted maximum $SO_2$ concentrations.

The grid receptor spacing for the area of analysis chosen by Sierra Club is as follows:
- 100-meter spacing out to 5 kilometers
- 500-meter spacing out to 10 kilometers
- 1000-meter spacing out to 50 kilometers
- The receptor network contained 21,201 receptors and covered portions of Rusk, Panola, Gregg, and Harrison counties.

Figure 17, shows the chosen area of analysis surrounding the Martin Lake facility, as well as the receptor grid for the area of analysis. Sierra Club modeling used a flagpole receptor height of

59

1.5m (intended to represent the ambient air inhalation height of a standing human), rather than ground level more typically used for model receptors. As discussed elsewhere, if this was corrected to EPA's recommended 0m height (ground level) we would expect only a slight change in the modeled numbers and the area of exceedances and magnitude of the values would be basically the equivalent, and, therefore not change our final action. The design value with flagpole receptors was 0 to 0.2% higher than without flagpole receptors.

**Figure 17: Sierra Club's Area of Analysis for Martin Lake Station.**



To be consistent with the Modeling TAD for the purposes of this designation, we only evaluated concentrations at receptors that represented areas where it would also be feasible to place a monitor and record ambient air impacts. We will discuss this in further detail below. The impacts of the area's geography and topography will also be discussed later within this document.

For the area around Martin Lake Steam Electric Station, Sierra Club did not include $SO_2$ emitters within 50 km of the Station in any direction. Although Sierra Club had included another source in their previous modeling, Sierra Club's rationale for omitting it in this modeling was that the previous modeling had shown minimal impact from the potential contributing sources at the

60

maximum concentration and that their modeling was to be a demonstration that Martin Lake can itself cause modeled nonattainment. Since Sierra Club's most recent modeling does not include Pirkey, we do not have model run evidence using 2013-2015 emissions that Pirkey would contribute. We maintain that Martin Lake is likely contributing almost if not equal to 100% of the impact for the values above the $SO_2$ NAAQS.  Furthermore, Sierra Club's modeling, by not including Pirkey, is a conservative (i.e., under-estimating) approach to determining whether the area is attaining and to identifying the boundaries of such area, as inclusion of this source should result in either similar impacts and boundaries or slightly increased impacts and possibly slightly larger boundaries, but should not result in decreased impacts or "shrinking" of boundaries from those modeled.  EPA believes that this is an acceptable choice in these circumstances.

*Modeling Parameter: Source Characterization*

Sierra Club's 2016 modeling characterized the source of Martin Lake in accordance with the best practices outlined in the Modeling TAD. Specifically, it used actual stack velocities in conjunction with actual emission rates. Sierra Club characterized the source locations and stack parameters, e.g., exit temperature, and diameter. Variable stack temperatures were not included because they were not publicly available for use by Sierra Club.  The constant temperature used by Sierra Club for the stacks was 449.3K[7] and when compared to the CEM temperatures furnished by Luminant as part of their modeling analysis was on the average 21% higher – the average temperature in the CEM data for near full load (filtered for stack velocity > 25 m/s) was 356K, ranging between 338-478K.  This temperature difference would cause on the average a 196% increase in buoyancy flux versus using the CEM temperature when operating near full load.  On the average this increase in buoyancy is larger than the increase occasioned by the use of the AERMOIST and AERLIFT preprocessors. However, it is not explicitly varied with wind direction and does not have the extreme changes of up to 300K for certain hours as seen with the preprocessors.  Since the 2010 $SO_2$ standard is a one-hour standard, the buoyancy enhancements for critical hours would be the controlling factor in modifying the modeled design values.  This increase in buoyancy would tend to reduce modeled concentrations, the amount depending on meteorological conditions.  Thus the use of the Sierra Club's higher-than-actual constant temperature is conservative and would most likely underestimate the actual concentrations.

Similar to variable stack temperature, building information was not publicly available. Therefore, Sierra Club did not include building downwash in their analysis stating that this was the conservative approach and would likely underestimate impacts from emissions resulting in lower modeled concentrations than modeling that included building downwash.  While we do not agree with Sierra Club's assertion that exclusion of downwash is conservative in all cases, in our evaluation the inclusion of building information and associated downwash in this analysis would not change our recommended designation of nonattainment. We note that Luminant's modeling report (which Texas also included in their response) indicated "We expect that the modeling results are not extremely sensitive to this issue because the stack heights are well above the buildings and there is considerable momentum and buoyancy rise for the stack plumes."[8]  The modeling values are sufficiently above the standard and inclusion of downwash often leads to

---

[7] Exit temperatures were obtained from Environ, 2018 Base Case CAMx Simulation, Texas Haze Evaluation, Appendix A: Stack Parameters of Major Units at the Selected 38 Facilities, September 7, 2013.
[8] Texas Response to EPA (041916_SO2 Designation 120 Day Response from TX.pdf) PDF page # 69.

higher concentrations closer to the source but - even in situations we have seen where this did not occur - any decreases in maximum modeled values from inclusion of downwash were relatively small and not expected to be enough of a decrease to resolve all modeled exceedance values near Martin Lake.

*Modeling Parameter: Emissions*

The EPA's Modeling TAD notes that for the purposes of modeling to characterize air quality in designations, the recommended approach is to use the most recent three years of actual emissions data and concurrent meteorological data. However, the TAD also provides for the flexibility of using allowable emissions in the form of the most recently permitted (referred to as PTE or allowable) emissions rate.

As previously noted, Sierra Club's 2016 modeling included Martin Lake and no other emitters of $SO_2$ within the area of analysis (unlike their previous modeling). Sierra Club wanted to clearly demonstrate that the Martin Lake facility results in exceedances of the 2010 $SO_2$ standard. Their previous modeling had shown small contributions from other nearby sources of $SO_2$. As discussed above, due to the small impacts from other nearby sources in the area of nonattainment around the Martin Lake facility we would expect only slight changes, if any, to the area of nonattainment that we are designating if the other nearby sources were included in the modeling. The facilities in the area of analysis and their associated annual actual $SO_2$ emissions from 2013 to 2015 are summarized below.

**Table 9: Actual $SO_2$ Emissions in 2013-2015 from Facilities in the Martin Lake Area of Analysis**

| Facility Name | $SO_2$ Emissions (tons per year) | | |
|---|---|---|---|
| | 2013 | 2014 | 2015 |
| Martin Lake | 62,735 | 53,656 | 22,927[9] |
| Total Emissions from All Facilities in Sierra Club's Area of Analysis | 62,735 | 53,656 | 22,927 |

*Modeling Parameter: Meteorology and Surface Characteristics*

The most recent 3 years of meteorological data (concurrent with the most recent 3 years of emissions data) should be used in designations efforts. As noted in the Modeling TAD, the selection of data should be based on spatial and climatological (temporal) representativeness. The representativeness of the data are based on: 1) the proximity of the meteorological monitoring site to the area under consideration, 2) the complexity of terrain, 3) the exposure of the meteorological site, and 4) the period of time during which data are collected. Sources of meteorological data include National Weather Service (NWS) stations, site-specific or onsite data, and other sources such as universities, the Federal Aviation Administration (FAA), and military stations.

---

[9] Total emissions for 2015 were not yet available in the Air Markets Program Data reports. 2015 was calculated from the supplied emissions from the CEM data. Final CAMD data is 22928.3 tpy which is 1.3 tpy difference or a negligible 0.0057 % increase.

For the Martin Lake area of analysis, surface meteorology from the NWS station in Longview Texas Regional Airport, approximately 19 km to the NW, and coincident upper air observations from the NWS station in Shreveport Louisiana, approximately 92 km to the east were selected as best representative of meteorological conditions within the area of analysis (Figure 18). EPA agrees that the meteorological sites chosen for the modeling for Martin Lake by Sierra Club are appropriate.

Sierra Club used AERSURFACE version 13016 from the NWS station in in Longview, Texas, located at 32° 23′ 2″ N, 94° 42′ 41″ W to estimate the surface characteristics of the area of analysis. Sierra Club estimated values for 12 spatial sectors out to 1 km at a seasonal temporal resolution for average conditions. Sierra Club also estimated values for albedo (the fraction of solar energy reflected from the earth back into space), the Bowen ratio (the method generally used to calculate heat lost or heat gained in a substance), and the surface roughness (sometimes referred to as "Zo"). In Figure 18 below, generated by the EPA, the location of the Longview, Texas NWS station is shown relative to the Martin Lake area of analysis.

**Figure 18: Martin Lake Area of Analysis and the Longview, Texas NWS Station.**



Meteorological data from the above surface and upper air stations were used in generating AERMOD-ready files with the AERMET processor. The output meteorological data created by the AERMET processor is suitable for being applied with AERMOD input files for AERMOD modeling runs. The Sierra Club analysis was conducted in adherence to all available USEPA guidance for evaluating source impacts on attainment of the 1-hour $SO_2$ NAAQS via aerial dispersion modeling, including the AERMOD Implementation Guide; USEPA's Applicability of

63

Appendix W Modeling Guidance for the 1-hour $SO_2$ National Ambient Air Quality Standard, August 23, 2010; modeling guidance promulgated by USEPA in Appendix W to 40 CFR Part 51; USEPA's March 2011 Modeling Guidance for $SO_2$ NAAQS Designations; and, USEPA's December 2013 and 2015 $SO_2$ NAAQS Designations Technical Assistance Document in the processing of the raw meteorological data into an AERMOD-ready format, and used AERSURFACE to best represent surface characteristics.

Hourly surface meteorological data records are read by AERMET, and include all the necessary elements for data processing. However, wind data taken at hourly intervals may not always portray wind conditions for the entire hour, which can be variable in nature. Hourly wind data may also be overly prone to indicate calm conditions, which are not modeled by AERMOD. In order to better represent actual wind conditions at the meteorological tower, wind data of 1-minute duration was provided from the same instrument tower, but in a different formatted file to be processed by a separate preprocessor, AERMINUTE. These data were subsequently integrated into the AERMET processing to produce final hourly wind records of AERMOD-ready meteorological data that better estimate actual hourly average conditions and that are less prone to over-report calm wind conditions. This allows AERMOD to apply more hours of meteorology to modeled inputs, and therefore produce a more complete set of concentration estimates. As a guard against excessively high concentrations that could be produced by AERMOD in very light wind conditions, Sierra Club set a minimum threshold of 0.5 meters per second in processing meteorological data for use in AERMOD. This approach is consistent with a March 2013 EPA memo titled, "Use of ASOS meteorological data in AERMOD dispersion Modeling." In setting this threshold, no wind speeds lower than this value would be used for determining concentrations. This threshold was specifically applied to the 1-minute wind data.

*Modeling Parameter: Geography and Terrain*

The terrain in the area of analysis is best described as to rural and gently rolling. To account for these terrain changes, the AERMAP terrain program within AERMOD was used to specify terrain elevations for all the receptors. The source of the elevation data incorporated into the model is from the USGS National Elevation Database.

*Modeling Parameter: Background Concentrations of $SO_2$*

The Modeling TAD offers two mechanisms for characterizing background concentrations of $SO_2$ that are ultimately added to the modeled design values: 1) a "first tier" approach, based on monitored design values, or 2) a temporally varying approach, based on the 99th percentile monitored concentrations by hour of day and season or month. For the Martin Lake area of analysis, Sierra Club chose to use the lowest $SO_2$ design value for Texas for the years 2012-2014. The background concentration for this area of analysis was determined by Sierra Club to be 5.2 micrograms per cubic meter ($\mu g/m^3$), or 2 ppb,[10] and that value was incorporated into the final AERMOD results. EPA finds that the lowest $SO_2$ design value for Texas for the 2013-2015 period was also 2 ppb.

---

[10] The conversion factor for $SO_2$ (at the standard conditions applied in the ambient $SO_2$ reference method) is 1ppb = approximately 2.62 $\mu g/m^3$.

Many of the $SO_2$ monitors in Texas are in urban areas and/or near a $SO_2$ point source, so there is limited data for background values. Using the El Paso monitor, which is the lowest design value in the State of Texas during this period, is a conservative (i.e., under-estimating) assumption. Given the amount of $SO_2$ emissions in East Texas compared to El Paso area this assumption likely leads to an underestimation in the concentrations around these facilities but is within the framework of the TAD's options for inclusion of background monitoring data. Considering the impacts of Martin Lake in the area, the background value is on the order of 2.2 % of the total maximum values and if background monitoring data existed for east Texas it would be expected to be a higher than El Paso monitor data and would have an increase in the concentration levels around the Martin Lake facility. Luminant's modeling used a temporally varying background monitor approach of hour of day and season with values ranging from 2-10 $\mu g/m^3$ based on a monitor in Waco. These values are similar to Sierra Club's background monitor data but the amount of $SO_2$ emissions in the general Waco area is generally less than general area around the Martin Lake facility; thus, background levels are likely underestimated in both Sierra Club and Luminant's analyses. Luminant only went out to 50 km in their analysis of emissions around the monitor to support their conclusion of representativeness.

In looking at greater distances and transport patterns (what area is upwind) during the directions with the highest values a greater distance than 50 km and transport patterns should also be considered. We note that in our previous designation for the Dolet Hills facility outside Shreveport, LA, we were provided a temporally varying background $SO_2$ monitor approach for a monitor in Shreveport, LA. The Dolet Hills background values ranged from 4.88 to 24.85 $\mu g/m^3$. The Shreveport monitor is closer and also upwind of Martin Lake more often (Waco monitor is not normally upwind of Martin Lake) and especially when winds are from the east (blowing westerly) which is when the modeling is predicting values above the standard to the west of the plant. Given the closer proximity of Shreveport monitor to the Martin Lake facility than the Waco or El Paso monitors, similar emissions of $SO_2$ in the area around Shreveport and Martin Lake, and transport conditions when modeled exceedance occur, the Shreveport background data is more representative than either Luminant's or Sierra Club's proposed values. Comparing to Sierra Club's results, an alternate background would change values from -0.1% to + 11.7% using the time varying data from Shreveport which is significantly closer to Martin Lake than the Waco monitor. Since the modeling was not conducted with this varying background a direct calculation of the effect of using the Shreveport data can't be performed. For context, taking an average of the minimum and maximum values from the Shreveport data would yield an increase of 9.6 $\mu g/m^3$ above the Sierra Club background value.

*Summary of Modeling Results*

The AERMOD modeling parameters, as supplied by additional information from Sierra Club during the comment period for the Martin Lake area of analysis are summarized below in Table 10.

65

**Table 10: AERMOD Modeling Parameters for the Martin Lake, Texas Area of Analysis.**

| Martin Lake, Texas Area of Analysis | |
|---|---|
| AERMOD Version | 15181 |
| Dispersion Characteristics | Rural |
| Modeled Sources | 1 |
| Modeled Stacks | 3 |
| Modeled Structures | 0 |
| Modeled Fencelines | 0* |
| Total receptors | 21,201 |
| Emissions Type | Actual |
| Emissions Years | 2013-2015 |
| Meteorology Years | 2013-2015 |
| Surface Meteorology Station | Longview, TX |
| Upper Air Meteorology Station | Shreveport, Louisiana |
| Methodology for Calculating Background $SO_2$ Concentration | Design Value |
| Calculated Background $SO_2$ Concentration | 5.2 $\mu g/m^3$ or 2 ppb |

*While the Sierra Club modeling did not specifically include a fenceline in their modeling analysis, the EPA did compare the modeled results with fenceline information from previous industry dispersion modeling in our proposal and have also evaluated information provided by Luminant in March 2016 to confirm that the modeled exceedances of the NAAQS shown in Sierra Club's analysis did occur in ambient air.

The results presented below in Table 11 show the magnitude and geographic location of the highest predicted modeled concentration based on actual emissions.

**Table 11: Maximum Predicted 99th Percentile 1-Hour $SO_2$ Concentration in the Martin Lake, Texas Area of Analysis Based on Actual Emissions (2013-2015) Provided by Sierra Club March 2016.**

| Averaging Period | Data Period | Receptor Location | | $SO_2$ Concentration ($\mu g/m^3$) | |
|---|---|---|---|---|---|
| | | UTM/Latitude | UTM/Longitude | Modeled (including background) | NAAQS |
| 99th Percentile 1-Hour Average | 2013-2015 | 354267.31 | 3567914.75 | 249.3 | 196.5* |

*Equivalent to the 2010 $SO_2$ NAAQS set at 75 ppb

The Sierra Club's modeling indicates that the highest predicted 3-year average 99th percentile 1-hour average concentration within the chosen modeling domain is 249.3 $\mu g/m^3$, or 95.2 ppb. This modeled concentration included the background concentration of $SO_2$, and is based on actual

66

emissions from the Martin Lake. Figure 19 was included as part of Sierra Club's submission and indicates that the predicted value occurred to the SW of Martin Lake.

Luminant provided a figure in their modeling report indicating the area that they did not think was available for siting a monitor based on exclusion within their property line and also lake/ wetland areas. See Figure 20 below. Luminant did not provide a detailed analysis of appropriate fencing and limiting of access to their property (necessary to determine if an area is actually not ambient air), nor other material documenting exclusion due to over water, etc. in support of the areas they have excluded.  From the information we do have, and evaluation with GIS/aerial data, we have concerns that Luminant has excluded more areas than are appropriate. Regardless, we still have adequate information to conclude whether the area is attaining the 2010 $SO_2$ NAAQS, given that adequate modeling shows values over the standard outside the areas excluded by Luminant, in undisputed ambient air. We note that Figure 20 also excludes parts of some roadways that are not limited to Luminant access only (appear to be Farm to Market 2658 and County Roads 3231, 2144, 2145, 2126, 2138, etc.) and associated rights of way in their exclusion.  We also note that it appears that there are houses in some areas that are excluded in the figure provided by Luminant (personal property along FM 2658 etc.) that Luminant could not control access to and has erroneously marked as not available for monitor siting. These are areas that we would consider to be ambient air and potentially available for monitor siting.  Receptors should also have been placed between the fenceline and the public road (in the rights of way). The maximum modeled values are to the west (areas that Luminant did not exclude) and southwest of the facility where Luminant have excluded but have not provided sufficient information to verify the property (if owned) is truly limited access/non-ambient air.  The maximum value (249.3 $\mu g/m^3$) in the Sierra Club modeling is in this area to the southwest that Luminant has excluded.  Regardless there are exceedance areas in multiple directions from Martin Lake units that are not contested by Luminant and are clearly ambient:

- The area to the northwest of the facility has a number of exceedance values up to 222 $\mu g/m^3$.
- The area due West of the facility has values up to at least 224 $\mu g/m^3$.
- The area to the east of the facility has exceedance values.

The area of yellow contour values (above 225 $\mu g/m^3$) in Figure 19 appear to be mostly in areas excluded by Luminant.  As discussed before it is unclear if all of these are truly non-ambient receptors.

In Figure 21, we have indicated the two areas where the highest values appear in the area Northwest and West of the facility and are in areas not contested by Luminant. Overall, there are several areas with many receptors up to 14% (224 $\mu g/m^3$) above the standard that Luminant does not claim as excluded areas.  We do not concur with Luminant that all the areas they excluded in Figure 20 should be excluded, but even if we evaluate just the areas that Luminant does not contest, there are many receptors well above the standard. Figures 22-24 zoom in to where the 2016 Sierra Club modeling results have been overlaid on the Luminant map areas they indicated should be excluded.  We note the maximum values in the uncontested area is actually as high as 239.1 $\mu g/m^3$.  For our analysis, we conservatively used 224 $\mu g/m^3$ to evaluate the modeling but

67

the analysis could also be done based on the 239.1 µg/m$^3$ value. This would even more clearly demonstrate the area around Monticello is nonattainment.

**Figure 19. Maximum Predicted 99th Percentile 1-Hour SO$_2$ Concentrations in the Martin Lake Area of Analysis Based on Actual Emissions**



**Figure 20. Area excluded by Luminant based on assertion that receptors were within property boundaries or were lake/wetland areas.**



**Figure 21. Area excluded by Luminant based on assertion that receptors were within property boundaries or were lake/wetland areas.**



1-hour average SO2 concentrations (ug per cubic meter) - All colored areas exceed the NAAQS.

70

**Figure 22. Area 1 of 3 - Showing Sierra Club 2016 modeling (2013-2015) results overlaid with Area excluded by Luminant based on assertion that receptors were within property boundaries or were lake/wetland areas. (Maximum value of 229.1 µg/m³).**



**Figure 23. Area 2 of 2 – Showing Sierra Club 2016 modeling (2013-2015) results overlaid with Area excluded by Luminant based on assertion that receptors were within property boundaries or were lake/wetland areas. (Maximum value of 229.1 µg/m³).**



**Figure 24. Area 3 of 3 – Showing Sierra Club 2016 modeling (2013-2015) results overlaid with Area excluded by Luminant based on assertion that receptors were within property boundaries or were lake/wetland areas. (Maximum value of 222.5 µg/m³).**



Jurisdictional Boundaries

Once the geographic area of analysis associated with Martin Lake, other nearby sources of $SO_2$, and background concentration is determined, existing jurisdictional boundaries are considered for the purpose of informing our final nonattainment area, specifically with respect to clearly defined legal boundaries. Based on the previous Sierra Club modeling EPA had excluded Harrison County from the proposed nonattainment area since no receptors in Harrison County were found to be above the standard and the modeling did not demonstrate that Pirkey Power Plant, located in Harrison County, had a sizeable impact on the nonattainment near Martin Lake. Receptors in Rusk, Panola, and Gregg Counties were found to have modeled design values above the standard and were included in the proposed nonattainment area. The most recent Sierra Club modeling includes receptors with design values above the standard in Rusk and Panola counties but not in Gregg County. The final design of modeled nonattainment still falls within Harrison and Panola counties. The following Figure 25 shows the proposed nonattainment area and the final nonattainment area.

72

**Figure 25. Proposed and Final Nonattainment Areas Near Martin Lake Steam Electric Station, Texas.**



Existing jurisdictional boundaries are considered for the purpose of informing our final nonattainment area, specifically with respect to clearly defined legal boundaries. Comments regarding our intended boundaries for this area have been addressed in the supplement to the RTC or in this TSD.

The EPA has determined that our final nonattainment area, consisting of portions of Rusk and Panola counties, Texas, are comprised of clearly defined legal boundaries, and we find these boundaries to be a suitably clear basis for defining our final nonattainment area.

Conclusion

After careful evaluation of the state's recommendation, all timely comments and information received during the state and public comment period, and additional relevant information as discussed in this document, the EPA is designating the area around Martin Lake Steam Electric Station as nonattainment for the 2010 SO$_2$ NAAQS. Specifically, the area is comprised of (NAD83 Datum, Zone 15):

| X | Y |
|---|---|
| 340067.31, | 3575814.75 |
| 356767.31, | 3575814.75 |
| 356767.31, | 3564314.75 |
| 340067.31, | 3564314.75 |

**Figure 26. Final Nonattainment Area for Martin Lake Steam Electric Station.**




< 196.5;   196.5 – 215;   215 – 235;   235 – 285;   > 285

Our final designation is based on Sierra Club's updated (March 2016) modeling of actual emissions reported from the facility during the 2013 to 2015 calendar years. To more accurately predict the dispersion of emissions, hourly exit velocities were used. Exit velocities were derived from the hourly flow rates and heat input in the USEPA Clearinghouse and CAMD databases. The Clearinghouse emissions and exit velocities for 2013-2014 were supplemented with CAMD

74

emissions for 2015. The velocities for 2015 were derived from the hourly heat input reported in CAMD. An analysis of the modeling data indicates it was performed in accordance with appropriate EPA modeling guidance and using generally conservative assumptions.

The Sierra Club modeling was deliberately conservative (in an under-estimating sense) and included several techniques which generally would tend to reduce/underestimate design value concentrations from the model. Specifically, as further discussed above:

- The modeling did not include building downwash, since Sierra Club did not have access to information needed to support such inclusion. Building downwash will generally, though not always, increase the predicted maximum modeled concentrations. It may move maximum concentrations closer to the source but we would expect this to have negligible impact on our decision since there are currently modeled exceedances well beyond the property of the facility.

- The modeling did not include variable stack temperature, since Sierra Club did not have access to information needed to support such inclusion. Sierra Club used a constant stack temperature (449 K[11]) and when compared to the CEM temperatures furnished by Luminant as part of their modeling analysis was on the average 21% higher – the average temperature in the CEM data for near full load (filtered for stack velocity > 25 m/s) was 356K, ranging between 338-478K. This temperature difference would cause on the average a 196% increase in buoyancy flux versus using the CEM temperature when operating near full load. Overall this would move exceedances further out from the facility but also yield smaller DV's. So the overall impact of these differences if remodeled with Luminant's temperature data would most likely be larger impacts closer into the facility but we would still expect the area have exceedance areas at ambient air receptors. Based on our evaluation we consider the use of higher temperatures by Sierra Club to be a net conservative (under estimation of maximum concentrations) factor.

- The Sierra Club used a very low estimate of background $SO_2$ based on the lowest monitor in the State of Texas, far from the source and an area with less overall $SO_2$ emissions. If more representative background monitoring data were used the concentration values would increase some, though should be less than 12 percent of the maximum estimated value based on evaluating the use of Shreveport monitoring data.

- Sierra Club's modeling did not include other sources which could potentially contribute to $SO_2$ concentrations in the modeled area. The effect of this is expected to be small based on the small contributions from other sources in the previous modeling but should lead to slightly higher concentrations in some areas around Martin Lake facility.

Industry commenters provided comments about potential defects in the Sierra Club's previous modeling which are still relevant to the final modeling and which could potentially increase/decrease modeled concentrations: the use of flagpole receptors, differing and non-varying stack temperatures, no building downwash inclusion, use of refined background, and use of older land use data at the surface meteorological station. To address the effect on modeled concentrations that might be caused by these various factors the Sierra Club conducted sensitivity modeling on Big Brown for some of these issues and found both positive and negative

---

[11] Exit temperatures were obtained from Environ, 2018 Base Case CAMx Simulation, Texas Haze Evaluation, Appendix A: Stack Parameters of Major Units at the Selected 38 Facilities, September 7, 2013.

impacts on the modeled concentrations. While the modeling for other sources is not an exact analysis of change that would occur if these differences were assessed using the Martin Lake modeling, we can use the analyses from Big Brown and Dolet Hills to inform the amount of change that might happen in factually similar situations. As discussed before the uncontested maximum is 224 µg/m$^3$ and could be higher based on further evaluation of receptors that Luminant excluded. For the sake of this comparison analysis we are using the conservative approach of 224 µg/m$^3$ as the maximum value in the following analysis. In looking at the other information discussed previously we should expect a decrease in maximum concentrations of change of maybe 3.6 to 3.8% (8 – 8.5 µg/m$^3$) due to the use of flagpole receptors (0-0.2%) and Surface Characteristics update (-3.6%). We note that the background used is low for what we would expect for East Texas and using the data from Shreveport (Dolet Hills Analysis) the background could be 4.88-24.85 µg/m$^3$ compared to the constant of 5.2 µg/m$^3$ used by Sierra Club. An alternate background would change values from -0.1% to + 11.7% using the time varying data from Shreveport which is significantly closer to Martin Lake than the Waco monitor (Waco – 245 km, Shreveport – approx. 73 km). The Shreveport monitor is also generally upwind of Martin Lake more often and especially when winds are from the east-northeast (blowing westerly-southwesterly) which is when the modeling is predicting values above the standard to the west-southwest of the plant. An average of the minimum and maximum change would add 9.6 µg/m$^3$ to the exiting Sierra Club background concentration. For further context, we also looked at the seasonal average value (averaging all hours) and it ranged from 7.97 µg/m$^3$ to 10.83 µg/m$^3$ with an annual average of 9.1 µg/m$^3$. These issues combined with lack of any background sources in the modeling further support the use of the Shreveport monitor data for background. Without a direct analysis we don't know the exact impact but the net difference to the exceedance values due to flagpole receptor height, updated surface characteristics, and more representative background would be an overall increase to the exceedance values.

The modeling did not include building downwash or variable stack temperature, since Sierra Club did not have access to information needed to support such inclusion. As previously discussed, building downwash will generally, though not always, increase the predicted maximum modeled concentrations. As previously discussed we also evaluated Sierra Club 2016 modeling's stack temperatures and use of varying velocities in our analysis of the Buoyancy Flux ($F_b$) in comparison to the data provided by Luminant in their modeling. Sierra Club used a constant stack temperature and when compared to the CEM temperatures furnished by Luminant as part of their modeling analysis was on the average 21% higher. This temperature difference would cause on the average a 196% increase in buoyancy flux versus using the CEM temperature when operating near full load. Overall Sierra Club's Temperatures/buoyancy flux would move exceedances further out from the facility but also yield smaller DV's. So the overall impact of these differences (building downwash and Luminant's temperature data instead of Sierra Club's temperatures) if remodeled would be larger impacts closer into the facility but we would still expect the area have exceedance areas at ambient air receptors. Based on the current locations of the values over 220 µg/m$^3$ in the most recent Sierra Club modeling and the amount of non-contested ambient air receptors between the current highs and the excluded areas in alignment towards Martin Lake inclusion of downwash and use of Luminant's temperatures would not change our conclusions.

Given that Sierra Club's modeled concentrations (with a low background and no nearby sources) are 14 % above the standard using 224 µg/m$^3$  and 22% above the standard using 239.1 µg/m$^3$ as

the maximum and that several factors are deliberately conservative in under-estimating impacts and would tend to reduce the modeled concentrations (and actual modeled concentrations with appropriate background would be higher), our technical assessment of the available information concludes that the differences/changes to the Sierra Club modeling suggested by industry would not result in modeled values near or below the standard; therefore, EPA considers the final Sierra Club modeling submitted March 2016 to be relevant information that must be considered in our designation decision and finds that the modeling is a sufficient basis for a determination of nonattainment and clearly demonstrates the area around Martin Lake is nonattainment.

At this time, our final designations for areas in the State of Texas have been completed for this area, the three other areas contained in this final technical support document supplement and in this supplemental final action, and the other eight areas designated on June 30, 2016. Consistent with the remaining court-ordered schedule, the EPA will evaluate and designate all remaining undesignated areas in Texas by either December 31, 2017, or December 31, 2020.

## Technical Analysis for Milam County, Texas

Introduction

The Milam County, Texas, area contains a stationary source (Sandow 4 – "Sandow") that, according to the EPA's Air Markets Database, emitted in 2012 either more than 16,000 tons of $SO_2$ or more than 2,600 tons of $SO_2$ and had an annual average emission rate of at least 0.45 pounds of $SO_2$ per one million British thermal units (lbs $SO_2$/mmBTU). As of March 2, 2015, this stationary source had not met the consent decree's criteria for being "announced for retirement." Specifically, in 2012, the Sandow Power Plant emitted 22,511 tons of $SO_2$, and had an emissions rate of 1.00 lbs $SO_2$/mmBTU. Pursuant to the March 2, 2015, consent decree, the EPA must designate the area surrounding the facility by July 2, 2016. However, before meeting the July 2, 2016, deadline for this area, the EPA and plaintiffs, who are parties to the consent decree that gave rise to the court order, agreed to extensions for a limited number of the subject areas, including this area. The deadline for issuing a designation for this area is now November 29, 2016.

In its September 18, 2015 submission, Texas provided no formal recommendation for the specific area surrounding the Sandow Power Plant. Instead, as part of its September 18, 2015, submittal, Texas provided a general recommendation of unclassifiable/attainment for the 243 counties located in the state, including Milam County, that do not have any operational $SO_2$ regulatory monitors.  This general recommendation for Milam County was not accompanied by modeling, monitoring, or other technical information to inform our decision regarding the attainment status of the area.

On February 11, 2016, the EPA notified Texas that we intended to designate the area surrounding the Sandow Power Plant as unclassifiable. Additionally, we informed Texas that our intended boundaries for the unclassifiable area consisted of the entirety of Milam County. Our intended designation and associated boundaries were based on, among other things, the lack of information regarding the attainment status of the area surrounding the Sandow Power Plant. The EPA could not agree with the state's recommendation for the area, since the area could not be classified on the basis of available information as meeting or not meeting the NAAQS.

Detailed rationale, analyses, and other information supporting our intended designation for this area can be found in the draft technical support document for Texas, and this document along with all others related to this rulemaking can be found in Docket ID EPA-HQ-OAR-2014-0464.

Assessment of New Information

In our February 11, 2016, notification to Texas regarding our intended unclassifiable designation for the Milam County area, the EPA requested that any additional information that the Agency should consider prior to finalizing the designation should be submitted by April 19, 2016. On March 1, 2016, the EPA also published a notice of availability and public comment period in the *Federal Register,* inviting the public to review and provide input on our intended designations by March 31, 2016 (81 FR 10563). The EPA is explicitly incorporating and relying upon the analyses and information presented in the draft technical support document for the purposes of

78

our final designation for this area, except to the extent that any new information submitted to the EPA or conclusions presented in this final technical support document and our supplement to the June 30, 2016, response to comments document (RTC), available in the docket, Docket ID EPA-HQ-OAR-2014-0464, supersede those found in the draft document.

As further detailed below, after carefully considering all available data and information, the EPA is designating the area surrounding the Sandow Power Plant as unclassifiable for the 2010 $SO_2$ NAAQS. The boundaries for this unclassifiable area consist of all areas within Milam County borders and are shown in the Figure 27 below. Also included in Figure 27 are a nearby emitter of $SO_2$ and Texas's recommended area, which is the same as the EPA's recommendation.

**Figure 27: EPA's Final Unclassifiable Area for Milam County with Large Emitters of $SO_2$**

The EPA received substantive comments from citizen letters, Sierra Club, Luminant, the Texas Commission on Environmental Quality, and the Governor of the State of Texas regarding our intended unclassifiable designation for the Milam County, Texas, area. The commenters indicated that because there was no monitoring or modeling data for the areas, the area should be designated unclassifiable or unclassifiable/attainment.  However, to designate an area as unclassifiable/attainment under the 2010 $SO_2$ NAAQS, EPA would need to have a technical basis to conclude that the area is in fact meeting the NAAQS and is not contributing to a nearby area that is not meeting the NAAQS.  The absence of monitoring data is not a sufficient basis for EPA to determine an area is meeting the standard, particularly an area with a large $SO_2$ emissions source. Therefore, EPA does not have a technical basis to find the area is in attainment or unclassifiable/attainment. A comprehensive summary of these comments and our responses can be found in the supplement to the RTC.

Jurisdictional Boundaries

Existing jurisdictional boundaries are considered for the purpose of informing our final unclassifiable area, specifically with respect to clearly defined legal boundaries. Any comments regarding our intended boundaries for this area have been addressed in the supplement to the RTC.

The EPA has determined that the final unclassifiable area, consisting of the area within Milam County, is comprised of clearly defined legal boundaries, and we find these boundaries to be a suitably clear basis for defining the final unclassifiable area.

Conclusion

After careful evaluation of the state's recommendation, all timely comments and information received during the state and public comment period, and additional relevant information as discussed in this document, the EPA is unable to determine whether the area around the Sandow Power Plant (Unit 4) is meeting the 2010 $SO_2$ NAAQS or is contributing to an area that does not meet the NAAQS, and therefore is designating the area as unclassifiable. Specifically, the area is comprised of all area within Milam County borders.

At this time, our final designations for areas in the State of Texas have been completed only for this area, the three other areas contained in this final technical support document supplement and in this supplemental final action, and the other eight areas designated on June 30, 2016. Consistent with the conditions in the March 2, 2015, consent decree, the EPA will evaluate and designate all remaining undesignated areas in Texas by either December 31, 2017, or December 31, 2020.

Note:  Modeling files provided by Luminant and Sierra Club are large and cannot be added to the electronic docket.  Electronic files are available upon request.  Contact Erik Snyder (Snyder.erik@epa.gov 214-665-7305) or alternate Bob Imhoff (Imhoff.robert@epa.gov 214-665-7262).

**Tab 438: Responses to Significant Comments on the Designation Recommendations for the 2010 Sulfur Dioxide National Ambient Air Quality Standards (NAAQS) – Supplement for Four Areas in Texas Not Addressed in June 30, 2016, Version (Nov. 29, 2016)**

**Responses to Significant Comments on the Designation
Recommendations for the 2010 Sulfur Dioxide National Ambient
Air Quality Standards (NAAQS) – Supplement for Four Areas in
Texas Not Addressed in June 30, 2016, Version**

Docket Number EPA–HQ–OAR–2014–0464
U.S. Environmental Protection Agency

November 29, 2016

# Contents

I. Introduction ....................................................................................................................... 3

II. Background ...................................................................................................................... 3

III. General Comments .......................................................................................................... 4

   A. Modeling ...................................................................................................................... 4

   1. AERMOD LOWWIND3 Option ..................................................................................... 4

      2. Modeling to determine attainment status ............................................................. 9

      3. AERMOD FLAGPOLE option ................................................................................. 10

   B. Designation Categories .............................................................................................. 11

   C. Monitoring ................................................................................................................. 12

   D. Consent Decree ......................................................................................................... 14

   E. Consider all information in the record ........................................................................ 15

   G. Other Comments ....................................................................................................... 16

IV. Texas ............................................................................................................................ 17

   General Comments ......................................................................................................... 17

   A.    Freestone-Anderson County ................................................................................ 46

   B. Gregg County ............................................................................................................. 46

   C. Milam County ............................................................................................................ 48

   D. Panola County ........................................................................................................... 48

   E. Rusk County .............................................................................................................. 48

   F. Titus County .............................................................................................................. 48

## I. Introduction

This supplemental document, together with the preamble to the supplemental final designations action, and the supplemental Technical Support Document (TSD) for the designations for the subject areas, presents the responses of the U.S. Environmental Protection Agency (EPA) to the significant comments we received on our responses to the state designation recommendations regarding four areas in Texas for the 2010 Sulfur Dioxide ($SO_2$) Primary National Ambient Air Quality Standard (NAAQS).  The public comment period for the EPA's intended designations ended on March 31, 2016. The responses presented in this document are intended to either augment the responses to comments that appear in the preamble to the supplemental final action and the TSDs or to address comments not discussed in those documents. In this document "APC" refers to anonymous public comments.

## II. Background

On June 2, 2010, the EPA Administrator signed a notice establishing a new primary 1-hour $SO_2$ standard at a level of 75 parts per billion (ppb) to protect against health effects associated with $SO_2$ exposure, including a range of serious respiratory illnesses. The EPA retained the secondary 3-hour $SO_2$ standard on March 20, 2012, to protect against welfare effects, including impacts on sensitive vegetation and forested ecosystems.

The process for designating areas following promulgation of a new or revised NAAQS is contained in the Clean Air Act (CAA) section 107(d) (42 U.S.C. 7407). After promulgation of a new or revised NAAQS, each governor or tribal leader has an opportunity to recommend air quality designations, including the appropriate boundaries for nonattainment areas, to the EPA. The EPA considers these recommendations as part of its duty to promulgate the formal area designations and boundaries for the new or revised NAAQS. By no later than 120 days prior to promulgating designations, the EPA is required to notify states and tribes, as appropriate, of any intended modifications to an area designation or boundary recommendation that the EPA deems necessary.

The EPA completed an initial round of $SO_2$ designations for certain areas of the country on July 25, 2013, designating 29 areas in 16 states as nonattainment. Pursuant to a March 2, 2015, court-ordered schedule, the EPA must complete $SO_2$ designations for the remaining areas of the country by three specific deadlines: July 2, 2016, December 31, 2017, and December 31, 2020. The court order requires the second round of designations that were due July 2, 2016, to address two groups of areas: (1) Areas that have newly monitored violations of the 2010 $SO_2$ NAAQS, and (2) areas that contain any stationary sources that had not been announced as of March 2, 2015, for retirement and that according to the EPA's Air Markets Database emitted in 2012 either (i) more than 16,000 tons of $SO_2$, or (ii) more than 2,600 tons of $SO_2$ with an annual average emission rate of at least 0.45 pounds of $SO_2$/mmBTU.  The EPA issued a notice announcing its intended designations for all areas meeting these criteria on March 1, 2016 (81 FR 10564), which included the four Texas areas addressed in this document.  However, before meeting the July 2, 2016, deadline for areas meeting these criteria, the EPA and plaintiffs who are parties to the consent decree that gave rise to the court order agreed to extensions for a limited number of the subject areas, including these four Texas areas. The deadline for issuing designations for these four Texas areas is now November 29, 2016. Areas associated with the other sources required to be designated in the second round of designations were designated on

3

June 30, 2016 (81 FR 45039; July 12, 2016), except for the Muskogee, Oklahoma area which has been further extended and is therefore not addressed in this document.

# III. General Comments

## A. Modeling

### 1. AERMOD LOWWIND3 Option

***Comment:*** Numerous commenters on the EPA's March 1, 2016, notice announcing the agency's intended designations raised issues and concerns regarding the use of modeling in designations, including the use of the Lowwind3 and Adjusted U* beta options in AERMOD, relying on modeling to determine attainment status, and the use of flagpole receptors,  Other commenters addressed the names of EPA's designations categories, the role of monitoring in designations, the relationship of this round of designations to the court order and to EPA's Data Requirements Rule, the need to consider all available information in the administrative record, and other general topics.  The EPA summarized and responded to these comments in the June 30, 2016, version of the Response to Comments Document, and stands by those responses, which are in the docket for this supplemental action.  For general comments that were addressed by commenters who responded to the EPA's intended designations of the four areas in Texas addressed in this supplemental action, we are repeating the summaries and responses, with some changes to reflect the fact that we are now designating those areas.   Some commenters (0296-FirstEnergy, 0299-OH Utilities Group, 0309-DTE Energy, 0310- NAAQS Implementation Coalition, 0314-OH Valley Electric, 0329-UARG, 0328-Luminant) suggested the EPA should allow states to use the LOWWIND3 option in conjunction with ADJ_ U* to provide better performance of the model under low wind speed conditions. Two commenters (0309-DTE Energy, 0329-UARG) stated that the EPA's refusal to accept modeling demonstrations that utilize these more sophisticated options may lead to areas being designated nonattainment for this NAAQS where actual air quality meets this NAAQS due to the default model's over-prediction tendency.

***EPA's Response:***

The EPA proposed revisions to the *Guideline on Air Quality Models* on July 29, 2015, which include proposed updates to the AERMOD modeling system, the air quality dispersion model recommended for use in the $SO_2$ NAAQS designation process. Specifically, EPA proposed incorporating two Beta options:

An option in AERMET to adjust the surface friction velocity (u*) to address issues with AERMOD over prediction under stable, low wind speed conditions.

A low wind option, LOWWIND3, to address issues with model over predictions under low wind conditions. This option increases the minimum value of the lateral turbulence intensity (sigma-v) from 0.2 to 0.3 and adjusts the dispersion coefficient to account for the effects of horizontal plume meander on the plume centerline concentrations.  It also eliminates upwind dispersion, which is incongruous with a straight-line, steady-state plume dispersion model such as AERMOD.

4

These "Beta options" are currently being considered as part of an ongoing rulemaking process and have not been formally adopted into the regulatory version of AERMOD, and pending completion of that rulemaking EPA considers the use of AERMOD run with non-regulatory options as an alternative model. The necessity for this EPA approval of any regulatory application of an alternative model is described in Section 3 of the $SO_2$ Modeling TAD (first draft available May 2013).  Furthermore, the use of AERMOD Beta options was discussed at the 11th Modeling Conference in August 2015 and subsequently clarified in a December 10, 2015, memorandum.[1] The Beta options are also discussed in Section 2 of the latest version of the Modeling TAD (August 2016). In order to obtain EPA approval to run AERMOD using the Beta options, the alternative model demonstrations must first be submitted to the EPA Region for approval and concurred with by the Model Clearinghouse. At this time, EPA will only consider the modeling analyses that used the current regulatory defaults within AERMOD to predict $SO_2$ design values for the second round of designations, unless an entity seeking to use a Beta option has gained formal approval to use an alternative model consistent with this longstanding process. Where such a request has not been submitted and approved for a specific case, EPA cannot rely upon modeling results that use these Beta options in making its final designation.

*Comment:* Two commenters (0314-OH Valley Electric, 0327-AEP) recognized that the LOWWIND3 Option is not fully approved as a default option in AERMOD, and an alternative model demonstration is required. The commenters stated that Ohio EPA did perform the necessary study and submitted it as part of their demonstration package.  Commenters stated that while the EPA does not discuss the appropriateness of Ohio EPA's alternative model demonstration, it cites a guidance memo to apparently disregard Ohio EPA's demonstration.  The memo requires a specific process to use an alternative model, but the memo did not exist at the time the proposed designation modeling was filed. Commenters stated that a guidance memorandum cannot be used to establish legally binding requirements, and retroactive application of any rule is also inappropriate. One commenter (0327-AEP) stated that the EPA should approve the use of the LOWWIND3 Beta Option after considering the study submitted by Ohio EPA on its merits, using the requirements that applied to such demonstrations at the time of the submission.

One commenter (0329-UARG) recognized that in a memorandum from December, the EPA announced that use of proposed "future regulatory options" for AERMOD for $SO_2$ designations "require[s] formal approval as an alternative model and [is] subject to the requirements of Appendix W, Section 3.2.2." The commenter stated that this memorandum is merely guidance, it is not binding, and it was not issued until after the September 18, 2015, date by which the EPA requested states to provide their updated designations to the Agency. Commenter stated it would be arbitrary and unreasonable for the EPA to expect states' recommendations to have complied with this later guidance.

---

[1] *See* https://www3.epa.gov/ttn/scram/guidance/clarification/AERMOD_Beta_Options_Memo-20151210.pdf

*EPA's Response:*

EPA clearly described the necessity for approval of any regulatory application of an alternative model in Section 3 of the $SO_2$ modeling TAD (first draft available in May 2013). Furthermore, the use of AERMOD Beta options was discussed at the 11th Modeling Conference in August 2015 and subsequently clarified in a December 10, 2015, memorandum. The Beta options are also discussed in Section 2 of the latest version of the modeling TAD (August 2016). In order to obtain EPA approval to run AERMOD using the Beta options, the alternative model demonstrations must first be submitted to the EPA Region for approval and concurred with by the Model Clearinghouse. At this time, EPA will only consider modeling analyses that used the current regulatory defaults within AERMOD to predict $SO_2$ design values for the second round of designations, unless an entity seeking to use a Beta option has gained formal approval to use an alternative model consistent with this longstanding process. Where such a request has not been submitted and approved for a specific case, EPA cannot rely upon modeling results that use these Beta options in making its final designation. The EPA recognizes that the TAD is not a legally binding, final agency action, and that the other guidance memoranda are similarly non-binding. However, the EPA disagrees that requiring Model Clearinghouse approval in order to use the non-regulatory Beta options in these designations constitutes an impermissible retroactive application of a rule or converts the TAD and the guidance into binding final requirements. That is because these designations themselves are final actions, and the EPA has explained a reasonable basis for not relying upon modeling using the Beta options unless certain processes are followed to ensure that their use is appropriate in a given case. However, these designations do not take final action on the pending rulemaking to revise Appendix W itself, nor do they pre-judge the outcome of that pending rulemaking in any way.

*Comment:* Some commenters (0314-OH Valley Electric, 0327-AEP, 0329-UARG) supported the EPA's positions that the alternative model formulation is superior to the approved version of the model, and that there is no information available demonstrating that AERMOD with LOWWIND3 provides improved statistical performance on tall stack sources. The commenters stated that the Version 15181 Addendum to the AERMOD User's Guide, Appendix F contains an analysis using the EPA's standard Lovett evaluation database, which is a tall stack case. The commenters stated that this case demonstrates that the LOWWIND3 Beta Option coupled with the Beta U* Option in AERMET shows a statistically better performance than both the base AERMOD Model and the other LOWWIND Beta Options present in AERMOD. Such a finding contradicts the EPA's statement in the TSD. One commenter (0329-UARG) stated that this level of demonstration should suffice to support the use of those techniques in modeling.

*EPA's Response:*

The commenter is referring to technical information provided by EPA as part of its proposed regulatory revisions to the *Guideline on Air Quality Models* (July 2015). Such information was provided to the public in considering the merits of incorporating the LOWWIND3 and adjusted u* Beta options in the regulatory version of AERMOD. At this time, the EPA is still considering the merits of these options as part of that separate rulemaking process, and these final designations are not taking final action on that pending rulemaking or pre-judging it in any way. Therefore, pending completion of that rulemaking, for these designations we have explained that

6

it is necessary to gain approval of any regulatory application of an alternative model (i.e. AERMOD with use of LOWWIND3 and/or adjusted u* Beta options) as noted in Section 3 of the SO2 Modeling TAD (first draft available in May 2013). This will ensure that the use of a Beta option in any specific area designation is appropriate, based on its own facts. The use of AERMOD Beta options was discussed at the 11th Modeling Conference in August 2015 and subsequently clarified in a December 10, 2015 memorandum. The Beta options are also discussed in Section 2 of the latest version of the SO2 Modeling TAD (August 2016). While a state or other entity conducting modeling may have run AERMOD using the Beta options, for these designations EPA will only consider modeling analyses that used the current regulatory defaults within AERMOD to predict $SO_2$ design values, unless an entity seeking to use a Beta option has gained formal approval to use an alternative model.

*Comment:* Two commenters (0296-FirstEnergy, 0299-OH Utilities Group) stated that Ohio EPA met the recommendation of Appendix W, Section 3.2.2. The commenters stated there is peer-reviewed work published with respect to LOWWIND3 in Paine et.al. (2015).

Another two commenters (0310-NAAQS Implementation Coalition, 0329-UARG) requested that the EPA reopen comment on the Appendix W Proposal for the limited purpose of allowing the public to respond on the record to critical evaluations of LOWWIND3 not available prior to the close of the comment period. One commenter ((0310-NAAQS Implementation Coalition) stated that, in their review of the Appendix W Proposal's official docket, there is just one comment containing specific concerns with the performance of LOWWIND3, while a substantial majority of the comments were generally supportive. The commenter ((0310-NAAQS Implementation Coalition) also stated that the EPA's rationale for not including LOWWIND3 is unclear. According to the commenter, the EPA proposed to include LOWWIND3 in the Appendix W Proposal because it "improve[s] model performance," but then the EPA refused to use LOWWIND3 for $SO_2$ designations on grounds that it has not been demonstrated to "statistically improve [model] performance."

*EPA's Response:*
EPA does not consider the request to reopen the public comment period for its proposed revisions to the *Guideline on Air Quality Models* (July 2015) to be within the scope of these final designations. Pending completion of that rulemaking, we have explained that for these designations it is necessary to gain approval of any regulatory application of an alternative model (i.e. AERMOD with use of LOWWIND3 and/or adjusted u* Beta options) as noted in Section 2 of the $SO_2$ modeling TAD (first draft available in May 2013). The use of AERMOD beta options was discussed at the 11th Modeling Conference in August 2015 and subsequently clarified in a December 10, 2015, memorandum. They are also discussed in Section 2 of the latest version of the $SO_2$ Modeling TAD (August 2016). The information brought forward by the commenter would need to be formally considered on a case-by-case basis as part of that process. While a state or industry may have run AERMOD using the Beta options, EPA will only consider modeling analyses that used the current regulatory defaults within AERMOD to predict $SO_2$ design values for the designations due July 2, 2016, unless an entity seeking to use a Beta option has gained formal approval to use an alternative model.

*Comment:* Two commenters (0329-UARG and 0328-Luminant) explained (that AECOM's recent analyses provide added justification for accepting modeling with the LOWWIND3 option as the basis for an attainment designation. The commenter noted that the EPA explains its reluctance to accept use of the low wind speed options with AERMOD on the basis that it is still reviewing "a number of public comments specific to the LOWWIND3 beta options." According to the commenter however, only one comment by Sierra Club provided a substantive critique of low wind speed options with AERMOD. The commenter attached a report, prepared by Christopher Warren and others at AECOM Environment, which refutes the concerns expressed in Sierra Club's comments and provides further evidence that the LOWWIND3 option improves AERMOD's performance.

*EPA's Response:*

Pending completion of the separate rulemaking referenced by commenter, the EPA has explained that for these designations it is necessary to gain approval of any regulatory application of an alternative model (i.e. AERMOD with use of LOWWIND3 and/or adjusted u* Beta options) as noted in Section 2 of the $SO_2$ modeling TAD (first draft available in May 2013). The use of AERMOD beta options was discussed at the 11th Modeling Conference in August 2015 and subsequently clarified in a December 10, 2015, memorandum. They are also discussed in Section 2 of the latest version of the $SO_2$ Modeling TAD (August 2016). The information brought forward by the commenter would need to be formally considered on a case-by-case basis as part of that process. While a state may have run AERMOD using the Beta options, EPA will only consider modeling analyses that used the current regulatory defaults within AERMOD to predict $SO_2$ design values for the designations due July 2, 2016 (and as extended), unless an entity seeking to use a Beta option has gained formal approval to use an alternative model.

*Comment:* One commenter (0329-UARG) stated there are no legal barriers to EPA's reliance on the ADJ_U* and LOWWIND3 options. Commenter stated that section 3.2.2 of the current regulatory Guideline gives responsibility for approving an alternative model solely to the Regional Office. Commenter also stated that the Guideline does not apply to modeling for initial designations because it applies only to State Implementation Plan revisions for existing sources and to new source reviews. Commenter stated that the Modeling Technical Assistance Document (TAD) specifies that it does not impose binding and enforceable requirements or obligations and is not final agency action.

*EPA's Response:*

The Beta options are currently being considered as part of an ongoing separate rulemaking process and have not been formally adopted into the regulatory version of AERMOD, and pending completion of that rulemaking EPA considers the use of AERMOD run with non-regulatory options as an alternative model. EPA has discussed the process to gain approval of alternative models in previous responses to comments in this section. The necessity for this EPA approval of any regulatory application of an alternative model is described in Section 2 of the $SO_2$ Modeling TAD (first draft available May 2013) and the Beta options are discussed in the latest version of the TAD (August 2016). Furthermore, the use of AERMOD Beta options was discussed at the 11th Modeling Conference in August 2015 and subsequently clarified in a December 10, 2015, memorandum. In order to obtain EPA approval to run AERMOD using the

Beta options, the alternative model demonstrations must first be submitted to the EPA Region for approval and concurred with by the Model Clearinghouse. At this time, EPA will only consider the modeling analyses that used the current regulatory defaults within AERMOD to predict $SO_2$ design values for the designations due July 2, 2016 (and as extended), unless an entity seeking to use a Beta option has gained formal approval to use an alternative model consistent with this longstanding process. Where such a request has not been submitted and approved for a specific case, EPA cannot rely upon modeling results that use these Beta options in making its final designation. The $SO_2$ Modeling TAD is EPA guidance regarding compliance with the relevant statutory and regulatory requirements, and the TAD recommends that the designations modeling should rely upon the principles and techniques in the *Guideline*, Appendix W.

**Comment:** One commenter (0332-Sierra Club) stated that ADJ_U* and LOWWIND3 have been shown to decrease model performance and accuracy and should not be relied on by EPA. Commenter provided an attachment to their comments (Exhibit 6) which describes the flaws commenter sees in these options. Commenter stated that use of these options would cripple the efficacy of AERMOD, and lead to significant under-prediction of air pollution impacts. Commenter stated that, to the extent that states or industry submit modeling analyses that incorporate use of these options, EPA should reject them as being inconsistent with regulatory guidance and for the identified issue of inaccuracies flowing from their use. Commenter stated that, in instances where states or industry submit modeling incorporating these options and accompany it with information purporting to justify use of the non-regulatory default configuration of AERMOD, EPA should look very closely at the submissions, the submissions should only be considered as a sensitivity analysis, and the submissions should be accompanied by modeling performed according to EPA's guidance using the regulatory default configuration of AERMOD.

**EPA's Response:**
EPA clearly described the necessity for approval of any regulatory application of an alternative model in Section 3 of the $SO_2$ modeling TAD (first draft available in May 2013). Furthermore, the use of AERMOD beta options was discussed at the 11th Modeling Conference in August 2015 and subsequently clarified in a December 10, 2015, memorandum and also discussed in Section 2 of the latest version of the modeling TAD (August 2016). In order to obtain EPA approval to run AERMOD using the Beta options, the alternative model demonstrations must first be submitted to the EPA Region for approval and concurred with by the Model Clearinghouse. At this time, EPA will only consider modeling analyses that used the current regulatory defaults within AERMOD to predict $SO_2$ design values for the designations due July 2, 2016 (and as extended), unless an entity seeking to use a Beta option has gained formal approval to use an alternative model consistent with this longstanding process. In either granting or not granting such approval, the EPA is not taking final action with respect to the pending separate Appendix W rulemaking, or pre-judging its future outcome in any way.

## 2. Modeling to determine attainment status

**Comment:** One commenter (0332-Sierra Club) stated that dispersion modeling is a rigorously verified method for evaluating impacts on the $SO_2$ NAAQS, and has a lengthy and court-validated history as an appropriate tool for use in designations. Commenter provided a detailed

discussion (pdf pages 6-9 of commenter's letter) to support their position that aerial dispersion modeling is the appropriate approach to ascertaining attainment status under the $SO_2$ NAAQS. Commenter provided several references to support their position, including: the final $SO_2$ NAAQS Rule, *Implementation of the 1-Hour $SO_2$ NAAQS Draft White Paper for Discussion,* EPA's 1994 $SO_2$ Guideline Document, Respondent's Opposition to Motion of the State of North Dakota for a Stay of EPA's 1-Hour Sulfur Dioxide Ambient Standard Rule (attached to commenter's letter as Exhibit 1), and Sheldon Meyers Memorandum re Section 107 Designation Policy Summary (April 21, 1983) (attached to commenter's letter as Exhibit 2). Commenter also cited several court cases and statements from EPA staff (attached to commenter's letter as Exhibits 3 and 4) to further support their position. Commenter stated that EPA's practice that all nitrogen dioxide, fine particulate matter and $SO_2$ PSD increment compliance verification analyses are performed with air dispersion modeling demonstrates that modeling is a technically superior approach for ascertaining impacts on NAAQS.

One commenter (0332-Sierra Club) stated that AERMOD accurately models medium-to-large $SO_2$ sources—even with conditions of low wind speed, the use of off-site meteorological data, and variable weather conditions. Commenter stated that AERMOD has been tested and performs very well during conditions of low wind speeds (see Exhibit 5 attached to commenter's letter). Commenter stated that EPA's use of air dispersion modeling and AERMOD in particular was upheld in the context of a recent CAA section 126 petition for resolution of cross-state impacts.

One commenter (0332-Sierra Club) stated that, by modeling a source to ascertain its impact on the NAAQS, regulators are simultaneously determining how much emissions need to be reduced to avoid causing NAAQS exceedances. Commenter stated that using modeling for and from designations purposes in nonattainment SIP preparation thus can help states and EPA avoid the chronic problem of late NAAQS implementation. Commenter stated it can also be a powerful tool in enabling EPA to prepare federal implementation plans for states that have failed to prepare their SIPs. Commenter stated the EPA should make clear to the states that they can and must submit nonattainment SIPs by the required deadline, and that if not, EPA will use the modeling before it to generate and promulgate federal implementation plans, and will do so far sooner than the expiration of the two-year deadline the Clean Air Act affords EPA.

***EPA's Response:*** EPA appreciates the commenters' support of the use of dispersion modeling for *$SO_2$ NAAQS* designations. In this action the EPA is not addressing the submission of nonattainment SIPs or federal implementation plans; comments related to these separate issues are out of scope of the current final action

### 3. AERMOD FLAGPOLE option

***Comment:*** One commenter (0332-Sierra Club) stated that flagpole receptors are part of the regulatory default AERMOD configuration and their use can only make modeling results more relevant. Commenter stated that, since people breathe through their noses and mouths, not through their shoes and socks, modeling impacts at face-height instead of at foot-height is better practice. Commenter stated this is in part why air monitoring sensors are likewise not placed directly on the ground. Commenter stated that criticisms of Sierra Club modeling on the basis of the use of the FLAGPOLE option should be disregarded.

***EPA's Response:***

EPA disagrees with the statement that the flagpole receptors are part of the regulatory default AERMOD configuration. While not a Beta option, the flagpole receptors must be specified and therefore are not part of the default options. EPA has stated in Section 4.2 of the $SO_2$ NAAQS Designations Modeling Technical Assistance Document (TAD) that the use of flagpole receptors is not necessary. The TAD also states that Appendix W does not specify receptors be placed at levels other than ground level for comparison to the NAAQS. The use of flagpole receptors in specific cases of modeling is addressed in the Technical Support Document (TSD) for those areas, and/or in responses to comments on the EPA's intended designations for those areas.

## B. Designation Categories

***Comment:*** Two commenters (0301-IN Municipal Power, 0302-Duke Energy) supported an "attainment" rather than "attainment/unclassifiable" designation and stated that section 107 of the Clean Air Act does not appear to provide for the "attainment/unclassifiable" designation category. Also see section IX.A. Gibson County in the June 30, 2016, RTC.

One commenter (0329-UARG) stated the CAA does not provide for an unclassifiable/attainment designation and it does not authorize EPA to add to additional designations to those specified in the Act. Commenter stated that, where EPA finds that an area attains the NAAQS, the Agency has no basis for designating it anything other than attainment. Commenter stated that making an attainment designation is important because it conveys to those in the area or who may be considering moving to the area that air quality there meets health-based standards. Commenter stated that a designation of unclassifiable/attainment does not convey that same message and should not be used.

***EPA's Response:*** In the March 20, 2015, guidance memo (Steve Page, Director EPA-OAQPS to Regional Air Directors, Updated Guidance for Area Designations for the 2010 Primary Sulfur Dioxide National Ambient Air Quality Standard) and the August 21, 2015, Data Requirements Rule final rule Federal Register notice the EPA stated that, while states have and may continue to submit designations recommendations identifying areas as ''attainment,'' the EPA expects to continue its traditional approach, where appropriate, of using a designation category of ''unclassifiable/attainment'' for areas that the EPA determines meet the 2010 $SO_2$ NAAQS. In this action, the EPA is using the designation category of "unclassifiable/attainment" for areas that are meeting the 2010 $SO_2$ NAAQS, and is using the category ''unclassifiable'' for areas where the EPA cannot determine based on available information whether the area is meeting or not meeting the NAAQS or where the EPA cannot determine whether the area contributes to a violation in a nearby area. The EPA is not establishing an additional designations category with this long-standing approach. Moreover, none of the four areas designated in this supplemental action are being designated "unclassifiable/attainment". The EPA also disagrees that longstanding use of the unclassifiable/attainment designation conveys the negative message claimed by the commenter, as the designation is premised on an EPA finding that the area is meeting the NAAQS. In any event, the EPA notes that there is no difference in terms of

11

resulting regulatory burden between an unclassifiable, unclassifiable/attainment, or attainment designation, so the use of the unclassifiable/attainment term imposes no injury on any party.

## C. Monitoring

**Comment:** One commenter (0328-Luminant) asserted the EPA's proposal is unlawful and should not be finalized, in part, because EPA has consistently supported monitoring over modeling for NAAQS designation purposes and its new approach here is inconsistent with the statute, regulations, and EPA's prior practice. Commenter claims the EPA should utilize monitoring data, not modeling data if it is going to overturn the State of Texas' recommended designations in favor of its own designations. Commenter supported the TCEQ's (0294-TCEQ) position that monitoring data is necessary to accurately characterize actual air quality for attainment and nonattainment designations. Commenter asserted the EPA has been clear that monitoring data is preferred for NAAQS designations, and EPA's offer for states to use modeling for the SO2 NAAQS was simply intended to provide states with another option. Commenter claimed that modeling was intended to provide an opportunity for states to avoid the cost and resources associated with siting, installing, and maintaining monitors where the state preferred to rely on modeling. Commenter alleges that the EPA's new approach here to *require* modeling and rely solely on that data for designations is inconsistent with the statute and EPA's prior practice.

One commenter (TX Response) asserted that when modeling and monitoring data conflict, courts have acknowledged that actual air monitoring data is superior to modeling data so long as the monitor is sufficient to accurately represent the area in question. *E.g., Republic Steel Corp. v. Castle,* 621 F.3d 797, 805 (6th Cir.1980); *PPG Industries, Inc. v. Castle,* 630 F.3d 462, 467-68 (6th Cir. 1980).

One commenter (TX Response) stated that a designation of nonattainment has serious consequences to industry, the economy of an area, its citizens, and the state. Commenter claimed that nonattainment designations should only be made based on data from 40 CFR Part 58 compliant (regulatory) monitoring showing a violation of the standard. Commenter stated that using modeling to determine a nonattainment designation could result in major capital expenditures for industry to address an issue that may not be an actual problem. Commenter stated that air modeling analyses are a useful tool in determining the impact of a new or modified facility for permitting purposes but not for predicting future design values to demonstrate attainment of NAAQS. Commenter asserted that, because of the magnitude of the potential impact areas may face due to a nonattainment designation, such a determination should be based only on real world, monitored data, and not predicted values subject to the limitations and flaws of a model.

**EPA's Response:** The June 30, 2016, version of the Response to Comments document noted that EPA was not at that time taking final action on the Texas areas for which the agency had issued intended nonattainment designations on March 1, 2016 and also the Milam County (Sandow facility), but also provided general responses to the issues raised by commenters who had objected to those intended designations.  The EPA is now taking final action in this supplemental action to designate the areas in Texas that had been proposed as nonattainment designations.

12

The EPA maintains our previous position for the reasons delineated in the preamble to the final rule of the 2010 $SO_2$ NAAQS rulemaking, the February 2013 Strategy Paper, the proposed and final $SO_2$ Data Requirements Rule, and in the June 30, 2016, version of the Response to Comments document for why both air quality modeling and ambient monitoring are appropriate tools for characterizing ambient air quality for purposes of informing decisions to implement the $SO_2$ NAAQS, including designation determinations. The EPA's reliance on modeling to assess $SO_2$ air quality status, even in the face of conflicting monitoring, where appropriate, has been judicially affirmed. See, e.g., *Montana Sulphur & Chemical Company v. EPA*, 666 F.3d 1174, 1185 (9th Cir. 2012). Moreover, it has long been the EPA's practice to rely upon appropriate modeling when issuing designations under $SO_2$ NAAQS. See, e.g., 43 FR 8962 (March 3, 1978), 43 FR 40416 (September 11, 1978), 43 FR 40502 (September 12, 1978). The commenters are therefore incorrect to assert that the EPA's use of modeling to support determinations under the 2010 $SO_2$ NAAQS reflects a change from prior $SO_2$ practice. EPA has also explained the importance of using modeling information for source-oriented pollutants such as $SO_2$ in cases where existing monitors do not adequately characterize peak ambient concentrations. See, e.g., Memorandum from Sheldon Myers, Director, EPA Office of Air Quality Planning and Standards, to Regional Office Air Division Directors, "Section 107 Designation Policy Summary," April 21, 1983. All designation determinations made by the EPA in this final action are based on the EPA's complete and thorough review and analysis of all available information, as described in the final technical support document in this docket. Although it is true that the use of modeling can often be more economically efficient than installing and operating monitors, as the commenter observes, it is not true that the EPA's approach to designations under the $SO_2$ NAAQS represents an outright requirement to model, as the commenter alleges. Instead, where monitors have been shown to be representative of maximum ambient air concentrations, the EPA fully considers the information they provide and may base $SO_2$ NAAQS designations on such data. But not all monitors are so correctly sited, as the EPA has consistently observed in establishing and implementing this NAAQS. Modeling has proved to be an accurate and reliable tool for remedying the occasional weakness of $SO_2$ monitoring, and obviously in some cases is the only tool available where there is no $SO_2$ monitor in place to assess air quality. It is not the use of modeling as a measurement tool, therefore, that may result in adverse economic impacts to areas that are shown to be violating the NAAQS and that are designated nonattainment, as the commenter alleges; rather, it is the fact that the area is shown to be violating the NAAQS based on persuasive available information (whether resulting from monitoring or modeling) and under the CAA must be designated as nonattainment.

**Comment:** One commenter (0329-UARG) suggested that an area conducting monitoring consistent with EPA Guidance should be designated unclassifiable and allowed to complete three years of monitoring as long as monitored air quality remains below the NAAQS. Commenter stated that awaiting monitoring results would also be appropriate if modeling studies have produced differing predictions regarding NAAQS compliance. Commenter stated that providing the opportunity for such monitoring could allow an area in which monitoring demonstrates that the 1-hour $SO_2$ standard is attained to avoid costly implementation measures.

**EPA's Response:** As stated further above, the EPA maintains the position that both air quality modeling and ambient monitoring are appropriate tools for characterizing ambient air quality for purposes of informing decisions to implement the $SO_2$ NAAQS, including designation

determinations.  In response to the commenter's suggestion that designations should await future completion of three years of monitoring, the EPA notes that in the case of the designations subject to the court's order to designate certain areas by July 2, 2016, the agency does not have the discretion to await the results of future monitoring.

*Comment:* One commenter (0328-Luminant) explained (pdf pages 36-42) why they believe AERMOD is not a reliable approach for NAAQS designations, and cannot substitute for the preferred option of monitoring.

*EPA's Response:* As stated in a previous response, the EPA maintains the position that both air quality modeling and ambient monitoring are appropriate tools for characterizing ambient air quality for purposes of informing decisions to implement the $SO_2$ NAAQS, including designation determinations.

## D. Consent Decree

*Comment:* One commenter (0328-Luminant) asserted that the Consent Decree must be read consistently with the May 13, 2014, proposed Data Requirements Rule (DRR). Commenter claimed the EPA cannot now contravene its own regulations and deprive states of the opportunity to utilize monitoring data collected under (or alongside) the rule to inform designations by interpreting the Consent Decree in a manner that forecloses monitoring. Commenter alleged that if EPA interprets the Consent Decree to impermissibly require the use of modeling where sufficient monitoring data is not available, even though monitoring data will be available in the future, its interpretation would effectively abrogate the CAA's unclassifiable designation and EPA's prior statements regarding the importance of the use of monitoring data.

One commenter (0328-Luminant) asserted that, if read to effectively force a certain designation through the application of over-predictive modeling alone, the Consent Decree would not only contravene the CAA, it would also modify the DRR in a manner that deprives the regulated community of its ability to meaningfully comment, which is an improper rulemaking and impermissible under the Administrative Procedure Act. Commenter claimed that the proposed DRR, for instance, did not say the rule's procedures allowing states until 2020 to issue recommendations for areas relying on monitoring did not apply to areas with "large" (as defined specifically for this purpose for the first time in the Consent Decree) stationary sources.

One commenter (0328-Luminant) alleged the Consent Decree imposes impermissible legal obligations on states that did not consent to the decree.

*EPA's Response:* The EPA noted in the June 30, 2016, version of the Response to Comments document that it was not then taking final action on the areas the commenter was addressing, but explained that the commenter's objections to the consent decree, as well as the commenter's views regarding the Data Requirements Rule, are beyond the scope of the final rule issuing designations of the areas then covered. The comments are also beyond the scope of this supplemental final action designating four additional areas in Texas.  EPA notes that our authority for this final action is CAA Section 107(d), which required the EPA to promulgate

14

designations for the 2010 $SO_2$ NAAQS no later than three years after the date of promulgation of this NAAQS, as the EPA exercised the available one-year extension available under the Act. As stated further above, the EPA maintains our previous position that both air quality modeling and ambient monitoring are appropriate tools for characterizing ambient air quality for purposes of informing decisions to implement the $SO_2$ NAAQS, including designation determinations. Furthermore, the Consent Decree referenced by commenter sets dates the EPA must act by, not dates that the EPA must wait until to act, and it in no way prejudges what information may be considered or found to be most persuasive in issuing final designations when EPA does act. Additionally, the $SO_2$ Data Requirements Rule does not restrict the EPA's CAA Section 107(d) authority, but rather will provide future air quality data developed by air agencies that may be used by the EPA in future actions to evaluate areas' air quality under the 2010 $SO_2$ NAAQS, including area designations and redesignations, as appropriate. Nothing in either the consent decree or the Data Requirements Rule has determined the substantive outcome of any of the final designations being issued in this final rule. The commenter is clearly incorrect that either the consent decree or its relationship to the Data Requirements Rule precludes EPA from issuing designations other than nonattainment, as was amply shown in the June 30, 2016, designations action and is again shown in this supplemental final action for the additional four areas in Texas. Moreover, the consent decree did not modify the Data Requirements Rule (in fact, it and the court's order were entered before the final Data Requirements Rule was promulgated), so it is impossible to regard the court's order as having unlawfully amended a regulation that did not yet exist. The Data Requirements Rule has now been promulgated, is in effect, was never challenged in court, and states and the EPA are proceeding to implement it.

*Comment:* One commenter (0332-Sierra Club) stated that, in completing area designations, it is critical that EPA consider all $SO_2$-emitting sources in the areas under consideration for the 2016 designations round, and not merely the sources who meet the triggering criteria of the Consent Decree. Commenter stated that, because the Consent Decree speaks in terms of *areas* to be evaluated, not *sources,* it would be contrary to the Consent Decree if EPA were to finalize designations based solely on sources fitting the Consent Decree criteria. Commenter stated that the Modeling TAD provides that "all sources expected to cause a significant concentration gradient in the vicinity of the source of interest should be explicitly modeled". Commenter stated that, in performing its own air quality modeling, the Sierra Club and others have used the 50 km modeling domain of AERMOD as a tool in determining what sources to include in area modeling evaluations and the EPA should do the same.

*EPA's Response:* As explained in each area's Technical Support Document, in this final designations rulemaking the EPA appropriately evaluated all $SO_2$-emitting sources that were expected to have impacts on the subject area, and the agency refers to those TSD and/or specific responses to comments for those areas for further explanation of the scope of each area's analysis.

## E. Consider all information in the record

*Comment:* One commenter (0332-Sierra Club) supported the EPA's use of a mixture of state, industry, and public health and environmental submissions of data, including modeling data. Commenter stated the EPA has properly elected to consider all information before it in keeping

with foundational principles of administrative law. Commenter expressed concern that, if EPA were to ignore materials it receives from environmental and public health organizations or from concerned citizens while it was simultaneously accepting and considering materials submitted by states, this would arbitrarily skew EPA's analysis—particularly if state comments are responsive to or critique comments submitted by the public.

*EPA's Response:* As described further in the final technical support documents, EPA reviewed and analyzed all available information in determining designations in this final action.

## G. Other Comments

*Comment:* Some commenters generally supported action for clean air with the following statements: I support clean air (0214-APC); we want clean air and a serious effort to halt climate change (0216-APC); clean, clear, heathy air is needed and has been needed for a long time (0217-APC); it would be a gross miscreance to allow our health to be compromised by classifying the air quality standards "attainment" (0265-APC); pollution matters (0276-APC); rights to clean air should trump these companies rights (0215-APC); As someone with asthma, I need the air to be as clean as possible (0237-APC).

*EPA's Response:* The EPA notes that the EPA established the 75 parts per billion (ppb) primary 1-hour SO2 standard at issue in this action's designations to protect against health effects associated with $SO_2$ exposure, including a range of serious respiratory illnesses. As described further in the final technical support documents, EPA reviewed and analyzed all available information in determining appropriate designations in this final action.

*Comment:* One commenter (0329-UARG) noted that inaccurate "nonattainment" designations lead to unnecessary planning and emission control expenses. Indeed, even an area receiving an unwarranted "unclassifiable" designation may find itself stigmatized when seeking economic growth. The commenter urged EPA to give significant weight to states' designations for areas within their borders and to exercise restraint in modifying those designation recommendations.

*EPA's Response:* As described further in the final technical support documents, EPA reviewed and analyzed all available information in determining designations in this final action.

*Comment:* One commenter (0245-APC) supported a designation of nonattainment, but did not identify the area.

*EPA's Response:* The EPA thanks the commenter for their submission, but was unable to ascertain on the information provided which area commenter was referring to. Regardless, as described further in the final technical support documents, EPA reviewed and analyzed all available information in determining designations in this final action.

*Comment:* One commenter (0311-APC) stated Ameren should be held to the law and do the right thing for future generations.

16

*EPA's Response:* As described further in the final technical support document for the area at issue in this comment, EPA reviewed and analyzed all available air quality characterization information in determining the appropriate designation in this final action.

*Comment:* One commenter (0207-APC) suggested the EPA should go after companies who dump illegally around Curtis Bay rather than a high profile power station that keeps utilities affordable.

*EPA's Response:* The EPA thanks the commenter for this submission but notes this comment is out of scope of the current final action regarding the EPA's mandatory duty to designate areas under the 2010 SO$_2$ NAAQS.

## IV. Texas

### General Comments

1. *Comment:* Commenter (0294-TCEQ) asserted that the nonattainment designations that the EPA proposes for portions of Freestone, Anderson, Rusk, Gregg, Panola, and Titus Counties appear to have been based solely on third-party, non-peer reviewed modeling that has errors and clearly overestimates actual SO$_2$ concentrations as evidenced by the actual monitoring data in the proposed Gregg County nonattainment area.

*EPA's Response:* The EPA disagrees with the commenter's claim that the modeling supporting the nonattainment designations is erroneous and overestimates SO$_2$ concentrations in these areas. Although it is true that the modeling was provided by a party other than TCEQ and was not peer-reviewed, neither of these facts is relevant to whether the modeling accurately, reliably, and persuasively shows the areas to be violating the NAAQS. The EPA has concluded that, in these cases, the modeling is more informative than the monitoring information. The monitoring information provided is for monitors not sited to monitor the most likely areas of highest impacts around these four sources. Therefore, the monitoring data is of little/no value in determining whether the areas around the source are in attainment or nonattainment. We relied on modeling submitted to us in December 2015 for our proposal. During the comment period, we received additional modeling. The newest Sierra Club modeling includes refined inputs for stack and emissions data and several sensitivity runs that further inform our final decision. The EPA refers the commenter to the TSDs for these areas for our full evaluation of the available information. In our TSDs for our proposal and supplement for this action we explain that we have reviewed the modeling data and concluded that the modeling was of sufficient quality to make a decision regarding whether the area evaluated meets or does not meet the SO$_2$ NAAQS.

In our proposal, we included a portion of Gregg County in the area intended to be designated as nonattainment. As pointed out by the commenter, a monitor is located in this portion of Gregg County which has not recorded a violation of the SO$_2$ NAAQS. This monitor is not located in an

area expected to receive the highest impact of $SO_2$ emissions.as it is approximately 19 km from Martin Lake.  As discussed above, during the public comment period, we received revised modeling from Sierra Club with more refined inputs for stack and emissions data.  Based on our analysis of this new refined and updated modeling EPA has reduced the geographic scope of the nonattainment area for each of these areas.  This modeling showed smaller areas of nonattainment, and we found it to be the best modeling available to serve as the basis for our decision.  In particular, in our final action, we are not including the portion of Gregg County in the area designated as nonattainment.   In the other two nonattainment designations, we also reduced the size of the nonattainment areas but did not change the counties that were included.

2. **Comment:** Commenter (0294-TCEQ) claimed that for Milam County, the State's recommended unclassifiable/attainment designations are more appropriate than the EPA's unclassifiable designation because no $SO_2$ monitoring data exists for Milam County.

**EPA's Response:** EPA received no modeling, monitoring, or other information for Milam County.  In the absence of information sufficient to determine whether an area is meeting or not meeting the standard or whether it contributes to an area that is not meeting the NAAQS, an unclassifiable designation is appropriate.  Under the Data Requirements Rule, Texas will be expected to provide either modeling or monitoring information to further characterize the air quality of Milam County (unless the $SO_2$ source in Milam County limits the source's $SO_2$ emissions to less than 2,000 tons per year in lieu of characterization), and after the EPA receives that information the agency has discretion to consider whether to initiate action to redesignate that area based on that information. We proposed designating Milam County as unclassifiable, and we are finalizing the designation of unclassifiable as proposed, in the absence of available information that supports any other designation.

3. **Comment:** As described in commenter's (0274-Mann) letter, over 1300 Sierra Club members and supporters in Texas submitted personal comments (attached to commenter's letter) to Administrator McCarthy in support of EPA's proposed $SO_2$ nonattainment designations near the three Luminant plants (Big Brown, Monticello, and Martin Lake). Commenters generally claimed that the three Luminant power plants in the EPA plan are among the worst polluters in Texas and even in the nation because none of them have modern pollution controls for sulfur dioxide, and asserted that it is time that these old plants are held to the public health standards that exist to ensure healthy air for all.

**EPA's Response:**  EPA appreciates the concerns of the commenters.  We note that our proposal was based on the available information regarding $SO_2$ impacts from the facilities.  The EPA takes no position on whether the subject sources are the "worst polluters" either in Texas or nationwide, but instead bases its nonattainment designations for these areas on the available information in the record and the analyses described in our TSDs.

4. **Comment**: One commenter (0328-Luminant) asserted that the EPA has been clear that monitoring data is preferred for NAAQS designations, and EPA's offer for states to use modeling for the $SO_2$ NAAQS was simply intended to provide states with another option. EPA's new approach here to *require* modeling and rely solely on that data for designations is inconsistent with the statute and EPA's prior practice.

***EPA's Response:*** EPA does not require modeling as the only option available when conducting $SO_2$ designations. EPA is considering all information made available to it for all $SO_2$ designations. For the Luminant facilities, the data included available existing $SO_2$ monitoring data and modeling conducted by Luminant and other parties. In both cases, the information was evaluated using the guidance provided in the Technical Assistance Documents (TAD) for monitoring and modeling for applicability and representativeness to each source. The submission of the modeling data by other parties for locations that lack adequate and representative monitoring data identifying maximum ambient $SO_2$ concentrations has provided valuable information that has assisted EPA in $SO_2$ designations.

5. ***Comment:*** One commenter (0328-Luminant) stated that the EPA should uphold the State of Texas' recommended designations or at most, and as it did for Sandow, designate the areas around Martin Lake and Big Brown unclassifiable and allow the installation of monitoring equipment to properly evaluate and measure actual air quality for the purposes of designating attainment and nonattainment areas. Commenter asserted that, based on conservative modeling of future operating conditions, areas around Martin Lake and Big Brown, which include Rusk, Panola, Freestone, and Anderson Counties, should be designated unclassifiable/attainment, and the area around Monticello, which includes Titus County, should be also be designated attainment, unclassifiable, or unclassifiable/attainment.

One commenter (TX Response) stated the recent Luminant (March 2016) modeling analyses use source characterization techniques (AERLIFT and AERMOIST) as well as the low wind options (ADJ_u* and LOWWIND3) to address several technical issues related to AERMOD. Commenter stated the EPA and stakeholders discussed some of these technical issues during the 10th Modeling Conference, 11th Modeling Conference and the Regional, State, and Local Modeling Workshops in 2012, 2013, and 2014. Commenter stated that, while TCEQ did not have time to review the appropriateness of the source characterization techniques, Luminant provided documentation of peer-reviewed and published scientific literature to support the use of each technique and option (included in TX Response, Attachment 5). Commenter stated that the report states that the modeling results do not account for the penetrated plume over-prediction, which could easily result in lower predicted concentrations.

One commenter (TX Response) asserted that air quality monitoring is the only way to accurately characterize air quality. Commenter stated that, while AERMOD is a useful tool in certain situations, it does have known technical issues and the information provided by Luminant should be considered as additional support for the unclassifiable/attainment designations recommended by Texas for Titus, Freestone, and Rusk Counties.

***EPA's Response:***
EPA must consider all valid information in making our designation decisions. As discussed elsewhere, EPA believes valid modeling and appropriate monitoring can inform our decision. In the case of Sandow, neither monitoring nor modeling was provided, so an unclassifiable designation was appropriate. For the areas around Big Brown, Martin Lake, and Monticello,

EPA was provided valid modeling by Sierra Club, based on recent actual emissions which showed areas above the $SO_2$ standard. For a complete review of this modeling see the TSD for this action. EPA also evaluated available monitoring data for Gregg County, and determined it was not representative of the maximum impacts around Martin Lake. The closest monitoring data around Monticello or Big Brown were in nearby counties and were not representative to inform designation for these two sources.

The commenter further refers to modeling provided by Luminant to support their view that based on future emission levels (estimated 2017-2019 emissions), the area will continue to meet the standard. even if it does not meet it now. While the commenter indicates that emissions will continue to drop in the future compared to recent actuals, no permanently enforceable limits have been taken that would make such emission reductions enforceable. Furthermore, EPA cannot make its designation decision based on future conditions but must make its decision based on the state of air quality at the time of designation. Finally, as discussed in more detail later, EPA does not believe the Luminant modeling is valid because it relies on unapproved modeling options and processes.

The term "conservative" is frequently used in discussions of modeling possibly either over-predicting or under-predicting ambient pollution concentrations. Thus, the term is often used to mean the opposite of what it may mean in another case. We have tried in this document and in the TSD to make clear when we are using the term in either sense. In the case of this comment, the term "conservative" was being used to describe the commenter's view that modeling is over-predictive of concentrations. EPA does not agree that the modeling analysis from Sierra Club that we utilized in our proposal necessarily is "conservative" in the sense that it overestimates impacts. We also note that we have more refined modeling with sensitivity analyses provided by Sierra Club in March 2016 that we analyzed and are utilizing to inform our final decision. As discussed elsewhere in this RTC and the supplemental TSD, we do not find the latest Sierra Club modeling to overestimate impacts and find that the March 2016 modeling is more refined than the modeling we utilized in our proposal. Our evaluation indicates that it may actually have a slight underestimation bias since, for example, the modeling did not include surrounding $SO_2$ sources and used a very low background concentration. A more complete discussion of EPA's technical evaluation of the adequacy of AERMOD and the modeling submitted by Sierra Club and Luminant and any available monitoring data for these areas is found in the TSD for this supplemental final action, and in the draft TSDs for the intended Texas designations.

In regards to Texas referring to the Luminant modeling supporting a designation other than nonattainment, we have analyzed the Luminant modeling and found it to be unacceptable and not useful for informing our designation decisions. See other responses in this document and our supplemental TSD for this action for our full analysis and conclusions. In regards to the comment about using monitoring data only for designations, see response in III. C. and elsewhere in this RTC and TSD for this action.

6.  ***Comment:***

   One commenter (0328-Luminant) stated that, in a similar situation, EPA rejected modeling prepared by Sierra Club for the Gibson Station in Indiana. Commenter asserted that 1) Luminant has applied a similar analysis to the Sierra Club modeling submitted for its Big

Brown, Martin Lake, and Monticello facilities, 2) Sierra Club has likely over-predicted the concentrations of SO$_2$ in the area around those facilities, and 3) the modeling does not "clearly demonstrate" nonattainment.

***EPA's Response:***

In Gibson, EPA reviewed modeling from Sierra Club and the state, and historic and current monitoring data. EPA did not "reject" Sierra Club's modeling but rather concluded that the state's modeling, which incorporated downwash effects and variable stack parameters, was more representative than Sierra Club's. The state's modeling indicated areas of elevated concentration that directionally aligned with historic monitoring network sites that had been sited based on previous modeling to pick up high values around the source, which was unusually broad in scope and duration, and with the current monitors. EPA concluded that a considerable historical monitoring record, the best available modeling information, and other information indicate that the two current monitors in the area are operating where the EPA expects that the sub-areas of maximum concentrations are located, and thus that the two monitors are the best indicators of air quality in those sub-areas and that attainment in these sub-areas suggests that the entire area around Gibson is attaining the SO$_2$ standard.

In the case of the Big Brown, Martin Lake, and Monticello facilities, no such well-sited monitoring data exists. The closest monitor to Martin Lake is approximately 19 km from the source and the closet monitor to Big Brown is approximately 40 km, therefore they are clearly not sited to pick up the maximum impacts of these two facilities. No monitor exists near to the Monticello facility. Sierra Club provided additional modeling during the comment period that estimated a smaller exceedance area and lower overall maximum values for these three facilities that we have additionally reviewed to inform our supplemental final action. We have evaluated the more recent Sierra Club modeling and do not agree with the commenter that it over-predicts concentrations in the areas of these three facilities. As discussed in our final TSD of this supplemental action, the Sierra Club modeling followed our guidance in the Technical Assistance Document in most respects. The final Sierra Club modeling provided during the comment period included additional refinements by including the variation in stack velocity for the three-year period that were modeled and a number of model sensitivity runs. In fact, our analysis is that the final Sierra Club modeling is likely conservative in the area and magnitude of the projected nonattainment because, for example, some nearby large sources were not included in the model and a low background concentration was utilized. As a result, we are concluding from our evaluation that the modeling clearly demonstrates there is an area of nonattainment around each of these three facilities, in the boundaries finalized in this supplemental action. For more information, see the responses to other comments and the final TSD for this supplemental final action.

7.  ***Comment:*** EPA rejects Sierra Club's modeling for the Gibson area for the lack of "[u]se of hourly stack parameters more accurately characterize plume characteristics, which will provide greater reliability both in the estimated concentration and in the geographical distribution of concentrations." But for the same error in Sierra Club's modeling of the Martin Lake area, for example, EPA simply states that Sierra Club did not use variable stack temperatures and velocities "because they [we]re not publically (sic) available."

***EPA's Response:***

As discussed in response to comment 5 above, there are major differences between the monitoring data available for the Gibson source area and for the three Luminant sources (Martin Lake, Big Brown and Monticello).

Unlike for the Gibson area, Martin Lake, Monticello, and Big Brown did not have such monitoring data from well-sited monitors in the expected areas of maximum ambient concentrations. Therefore, we have only the available modeling data on which to base our final designations of these areas. Luminant did not provide acceptable modeling that followed the TAD. See elsewhere in this supplemental Response to Comments and in the supplemental TSD for our evaluation of the Luminant modeling for their Texas sources and why it was not acceptable. Based on our evaluation of the available data, Sierra Club's more recent modeling is mostly consistent with our guidance and provides the best assessment of air quality around these Luminant sources and informs our final designation.

We specifically note that Sierra Club provided modeling during the comment period that did factor in the hourly stack velocities for these Luminant sources. This refinement along with other adjustments such as the removal of some nearby sources from the model, using a lower background concentration and updating the years modeled for two of the sources resulted in a smaller estimate of the area and magnitude of nonattainment. EPA concludes that the modeling provides reliable information to inform our decision.

Furthermore, there were other issues in the Sierra Club modeling for Gibson in addition to the lack of hourly stack parameters. As explained in the proposed TSD materials for Gibson County, Indiana had identified a number of issues with modeling parameters used by Sierra Club to characterize the meteorological and surface conditions of the Gibson area. With respect to surface characterization, Sierra Club used average seasonal moisture conditions, instead of adjusting the surface characteristics based on the number of days with snow cover on the ground during the winter months. Sierra Club also did not adjust the Bowen ratio adjustment based on soil moisture and precipitation, an adjustment recommended in 'Regional Meteorological Data Processing Protocol EPA Region V and States.' Thus the non-use of variable actual stack temperature and velocity was just one of several factors that EPA weighed at proposed designation. In the Gibson case, the State had provided more refined modeling (compared to Sierra Club's modeling of Gibson) that did include the variable stack parameters, but neither the state of Texas nor Luminant has provided such acceptable modeling to EPA. As discussed in other responses and in the supplemental TSD, Luminant's modeling included modifications to inputs using non-approved pre-processors (AERLIFT and/or AERMOIST) as well as some beta options (LOWWIND3) that EPA has not approved for use in modeling the Luminant sources.

EPA also noted in the proposed TSD for Gibson that Indiana's modeling, instead, used hourly data for stack gas temperatures and flow rates. In reference to Indiana Department of Environmental Management's (IDEM) modeling, we noted that in important respects, the state characterized the source within the area of analysis in accordance with the best practices outlined in the Modeling TAD. Specifically, the submitted modeling reflected actual emissions for Gibson. The state also adequately characterized Gibson's building layout and location, as well as the stack parameters, e.g., exit temperature, exit velocity, location, and diameter. Where

appropriate, the AERMOD component BPIPPRIME was used to assist in addressing building downwash.

Although EPA did not rely on the IDEM modeling as the primary basis for its final designation of Gibson, we note that the impact of the use of the variable hourly temperature and velocity on the model-estimated design values in that situation resulted in higher predicted concentrations than did the inputs used by Sierra Club there. We note that there were some concerns that the meteorology data used may not be entirely representative for local transport winds as one of the potential reasons for differences between modeled and monitored values at Gibson. IDEM modeling found that the design value within the chosen modeling domain was 323 µg/m3, or 123 ppb. This modeled concentration did not include any background concentration of $SO_2$, and was based on actual emissions from Gibson. The Sierra Club modeling in Gibson found a maximum concentration of 276.8 ug/m3 or 105.6 ppb *including background*. Thus, the State's modeling adhering more closely to the TAD indicated even higher concentrations than the more "conservative" Sierra Club modeling. Our analysis of these three Texas areas, as further detailed in the proposed and final TSDs for this supplemental action, showed similar under-prediction in the modeling not using variable stack parameters. Therefore, the objections raised by the commenter, alleging that Sierra Club's similar modeling is "conservative" and likely over-predicting in the Texas areas, actually suggests that the Sierra Club modeling in Texas may be underestimating the maximum $SO_2$ concentrations relative to a more refined approach.

8. *Comment:* One commenter (328-Luminant) stated that for Gibson, there were several ambient monitors located near the source, including monitors near the highest projected concentrations. However, the peak modeled concentration from the State of Indiana's modeling was approximately two times higher than the monitored concentrations from the two monitoring stations near Gibson when excluding background. Based on this, Luminant provided an equation which among other factors attempted to adjust the Sierra Club modeling yearly design values from the proposal modeling down by a factor of 2 for Big Brown, Martin Lake, and Monticello in estimating an overall 2013-2015 design value for the sources.

*EPA's Response:*
Although EPA based its final designation for Gibson primarily on monitoring data (due to the existence of reliable monitoring in the area of expected maximum concentrations), the State of Indiana's modeling gave significantly higher concentrations for Gibson than did Sierra Club's modeling (323 µg/m³ vs <276.8 µg/m³) and also higher than the monitored design values. We note that there were some concerns that the meteorology data used may not be entirely representative for local transport winds as one of the potential reasons for differences between modeled and monitored values at Gibson. These differences in a situation with a couple of monitors compared to modeled values does not imply that making the commenter's suggested adjustment to Sierra Club's modeling of the Texas areas would yield a more accurate depiction of ambient concentrations in Texas areas. First, adjusting modeling results based on a one modeling scenario comparison to a few monitors is not appropriate and such approaches of attempting to calibrate the model results are prohibited by the **Guideline on Air Quality Models {GAQM}** (40 CFR Part 51 App. W 7.2.9 Calibration of Models; November 9, 2005). All modeling needs to be evaluated on a case-by-case basis and a scaling factor estimated from one

scenario cannot be extrapolated to another.   In this case, since the methodology of the State of Indiana's modeling differed from that used by Sierra Club for the Luminant plants that is another complicating factor.  Furthermore, it is even more inappropriate to assume that such an estimated calibration value from Gibson, though not allowed by GAQM, could be used to adjust modeling for the facilities in Texas.  The meteorology, emissions, stack parameters, building downwash, property boundaries, and potential distance to receptors are all different for the Luminant sources in comparison to the Gibson source and would result in different dispersion and modeled concentrations.

9.  *Comment:* One commenter (0328-Luminant) stated the EPA's proposal is unlawful and should not be finalized, in part, because EPA's proposal relies solely on over-predictive Sierra Club modeling of Luminant's facilities. Commenter stated the flaws in Sierra Club's modeling arise from both the over-predictive aspects of its dispersion model and from errors in assessing source characteristics and, once corrected for those flaws, Sierra Club's modeling would show attainment with the standard and therefore should not be relied upon to overturn Texas's recommended designations. Commenter's letter (pdf pages 27-36) details why they believe the Sierra Club's modeling is biased, flawed, and unreliable for the three Luminant plants. Commenter's letter (pdf pages 43-49) details why they believe the areas around Luminant's plants show attainment when Sierra Club's modeling errors are corrected. The commenter made a number of technical comments about the 2015 Sierra Club modeling that EPA evaluated for our proposal.  We have broken these technical comments up into sub-comments with individual responses.

- *Sub-Comment 9.1:* One commenter (Luminant) recommended the use of source characterization techniques to improve the realism of modeling.  According to the commenter, the Luminant plants at issue here all involve multiple stacks that the commenter asserted would be more accurately modeled through the application of AERLIFT.  Also, commenter asserted the Luminant plants with flue gas desulfurization controls that result in moist plumes would be more accurately modeled through the application of the AERMOIST preprocessor.

   *EPA's Response 9.1:*
   The AERLIFT and AERMOIST preprocessor models have not been subject to the required EPA model evaluation, review, and approval for use in regulatory applications. AERLIFT (a non-EPA preprocessor) is directed toward situations where two or more stacks line up with the wind direction causing the plumes to merge as they rise and reducing the overall entrainment of cooler ambient air. It is implemented as a preprocessor which estimates a buoyancy flux enhancement attributed to the merged stack plumes. These calculations are done for each source, for each hour. Based on several key factors, each source is tested to determine if enhancement (or partial enhancement) should occur. This enhancement is performed by modifying the hourly stack temperature and exit velocity prior to being input to AERMOD.  The technique as implemented would change actual measurements of the stack parameters.

24

AERMOIST is an effort to account for the initial condensation of the plume moisture in a wet scrubbed plume that liberates the heat of condensation. This additional heat increase is theorized to increase plume buoyancy during the initial rise phase. However, when the liquid water evaporates later on it will reduce the buoyancy of the plume by the same amount of the initial increase. This reduction should then act to depress plume rise but it is theorized to occur when the plume is more dilute and may have reached final rise – thus minimizing the effect. Luminant asserts that their implementation of the non-EPA AERMOIST preprocessor model is based on a model evaluated in the peer-reviewed literature, IBJpluris, for moist plumes. AERMOIST uses IBJpluris to determine hourly adjustments in plume rise and then modifies stack temperatures for input to the dry plume rise model in AERMOD to force simulation of an increased plume rise. Similar to the AERLIFT preprocessor the AERMOIST processor modifies actual measured data for input to the AERMOD system.

These two modeling approaches are not approved approaches for regulatory use. Based on our review, the use of these two preprocessors results in very large changes to inputs into AERMOD and the resulting concentrations estimated by AERMOD. Without a full evaluation of these preprocessors and resulting AERMOD modeled values including evaluation of the model performance with modeling datasets used to originally certify and promulgate AERMOD as acceptable for determining source impacts, the use of these preprocessors can't be used for regulatory purposes. The implementation of these two models as preprocessors does not remove them from the requirement of model validation and approval, especially considering the large changes to model concentrations that result from use of these preprocessors. Prior to use in a regulatory setting EPA believes that the particular implementations of AERMOIST and AERLIFT need to undergo extensive review versus test cases previously used for AERMOD model review. While the scientific principles seem like these might be refinements, it has not been substantiated that the implementation of these pre-processors and their coding is a refinement within AERMOD modeling platform and a full review as required by EPA for regulatory models has not been completed as required by 40 CFR Part 51 Appendix W (Guideline on Air Quality Models). There is no information to support that Luminant's modeling results with the AERLIFT and AERMOIST processors meet the requirements for models used in a regulatory decision. Clearly, the same techniques could have been implemented within the AERMOD system itself - removing the need for the preprocessing steps. If implemented within AERMOD it is apparent that any such modification of the plume rise calculations would require a full review. Placing these models outside AERMOD does not eliminate this prerequisite to regulatory use.

- *Sub-Comment 9.2:* According to a commenter (Luminant), the AERMOD model mishandles a penetrated plume causing overestimates of 50%. Luminant asserted that their Analysis of enhanced AERMOD debugging output confirmed that peak concentrations predicted by Sierra Club's modeling are caused by the failure to properly simulate a penetrated plume. Luminant used this 50% discount approach in manipulating Sierra Club's proposed modeling information to calculate a 2013-2015 DV for their Big Brown and Martin Lake facilities.

25

***EPA's Response 9.2:***

In support of this comment a reference was provided to a presentation[2]. Though not a peer-reviewed publication, the presentation was reviewed for relevancy to the current regulatory use of AERMOD. The supplied reference presentation cited an additional presentation which was also examined.

In the referenced presentation, a graph depicted a 50% over-prediction during penetrated plume dispersion. However, the same graph also noted an under-prediction of 30% when zeroing out the contribution of penetrated plumes. Based on this, penetrated plumes could potentially contribute to high one-hour ground-level $SO_2$ concentrations. The graph was based on work from the sub-referenced presentation.

EPA reviewed the sub-referenced presentation[3] in which a case was made for the over-prediction of concentrations by AERMOD during dispersion of a penetrated plume. This study involving three power plants' impacts on several monitors occurred in a complex airshed with sharp terrain relief. Such terrain likely affected dispersion from the power plants through effects such as enhancements of vertical mixing, channeling of flows, and divided flows that is not present for the Luminant plants in the relatively flat terrain of northeast Texas. Because of the complexity of the situation modeled in the study it is not clear whether the findings would apply to the Luminant plants - all of which are located in relatively flat terrain. Whether a finding of over-prediction of concentrations during this specific dispersion regime in this complex situation can be generalized to other locations is not known. However, the presentation indicates that *overall* the AERMOD estimations of ranked concentrations, even in this complex situation, are accurate. The correct conclusion relevant to the current use of AERMOD is that the model did an excellent job in estimating the ranked maximum concentrations at all locations where monitors were present. As stated in Paine et.al.[4] concerning the use of Q-Q plots:

> Such plots are useful for answering the question, "Over a period of time evaluated, does the distribution of the model predictions match those of observations?" Therefore, the Q-Q plot instead of the scatterplot is a pragmatic procedure for demonstrating model performance of applied models, and it is widely used by EPA (e.g., Perry et al. 2005). Venkatram et al. (2001) support the use of Q-Q plots for evaluating regulatory models.

---

[2] Robert Paine, AECOM, *AERMOD Issues for Design Concentrations Due to Penetrated Plume*, EPA's 11th Modeling Conference (Aug. 12, 2015), *available at* https://www3.epa.gov/ttn/scram/11thmodconf/presentations/2-4_Penetrated_Plume_Issues.pdf (hereinafter, "Paine 2015 presentation").
[3] http://www.casanz.org.au/sigs/ModSIG%20Workshop%20Sydney%20Conference%20%208%20September%2020201/Rayner_2013ModSIG_Workshop.pdf)
[4] Robert Paine, Olga Samani, Mary Kaplan, Eladio Knipping & Naresh Kumar (2015) Evaluation of low wind modeling approaches for two tall-stack databases, Journal of the Air & Waste Management Association, 65:11, 1341-1353, DOI:10.1080/10962247.2015.1085924

Since correctly estimating the ranked maximum 1-hour concentrations is the primary requirement for model performance in $SO_2$ nonattainment designations, the presentation supports the adequacy of the model for this use rather than the contrary. A Q-Q graph from the presentation for the same monitor that was noted in the primary reference is given below which demonstrates the excellent overall agreement of the AERMOD results.

The alternate DV calculations Luminant included that used Sierra Club's 2015 modeling for 2012-2014 is fundamentally flawed by their use of the 50% discounting factor. Luminant took 2012 maximum values and scaled the value down using a ratio of 2015 SO2 emissions divided by 2012 SO2 emissions (used the emission ratio times the 2012 Highest 4th High).  Luminant then used this scaled 2015 estimate based on Sierra Club modeling results for 2012 to estimate a new DV using the 2013 and 2014 Sierra Club results to estimate an artificial DV value for 2013-2015 for Big Brown and Martin Lake. These values were above the NAAQS, so Luminant utilized their proposed 50% discounting factor to further adjust these back of the envelope type estimates.  The use of the 50% discount factor is not appropriate and the unadjusted DV was above the standard for Big Brown and Martin Lake.

The commenter is also not considering that the same times that they have identified are some of the meteorological conditions that do result in higher ground level impacts.  So to identify all of these occurrences using the debugging output tool blankets all such conditions as suspect, when in reality this is one of the types of meteorological/dispersion situations that leads to higher impacts that can impact the DV.



*Figure 1. Overall good agreement for all hours by AERMOD for the Shotts Monitor*

Furthermore, adjusting modeling results based on a one or two modeling scenario comparisons to a few monitors is not appropriate and such approaches of attempting to calibrate the model results are prohibited by the **Guideline on Air Quality Models {GAQM}** (40 CFR Part 51 App. W 7.2.9 Calibration of Models; November 9, 2005).

- *Sub-Comment 9.3:* AERMOD can over-predict ambient concentrations during periods of low wind conditions because it rigidly assumes that low wind speeds remain unidirectional for every hour.

*EPA's Response 9.3:*
The general phenomena issues related to estimation of dispersion that occur with low wind speeds and AERMOD are being studied and EPA addresses the potential use of a LOWWIND3 beta option in previous responses to comments.  The commenter did not provide evidence of any specific modeled concentrations that exist in the Sierra Club modeling that result in overestimation of specific modeled values.  There are no monitors near the maximum ambient concentrations or in the areas that are predicted to be above the standard so no comparisons to monitored values can be made for these Luminant sources.  We further note that the area of predicted nonattainment is on the order of square miles at distances ranging from the facility fenceline to several miles from the fenceline and is not just one or two receptors that are just above the standard near the facility.  Based on the maximum distances from the facilities to the receptors with exceedance values, there are many receptors that are too far away from the emissions stacks to be a result of low wind speed transport.  The commenter did not provide an analysis showing that all the modeled exceedances were a result of transport and dispersion during low wind situations and that all predicted exceedances were directly a

28

result of the alleged overestimation by AERMOD with low wind speeds. Since many of the receptors are at distances that would require transport winds higher than a 'low wind' situation, the commenter has not provided evidence that the area would be modeled into attainment but for a potential low wind bias. Therefore, any potential overestimation under a low wind condition does not change the overall conclusions from the modeling results that there are large areas of nonattainment around these facilities based on recent actual emissions.

- *Sub-Comment 9.4:* General comment applicable to Big Brown, Monticello, and Martin Lake - One commenter (Luminant) stated that the EPA improperly accepted the Sierra Club modeling of the Martin Lake and Monticello facilities on the basis of it being a conservative representation of 100% load when the modeled fixed stack parameters (i.e., temperature and velocity) do not accurately represent 100% load. In addition, the commenter stated that EPA's review of the Sierra Club modeling for the three Luminant facilities is not consistent with the EPA's position that taken on the modeling analysis conducted for the Fort Gibson Plant in Indiana, in which EPA stated the greater reliability of modeling results from analyses using hourly stack parameters.

*EPA's Response 9.4:*
As detailed in the supplemental TSD accompanying the final designations for the Big Brown, Martin Lake, and Monticello facilities, the EPA received additional modeling analyses from Sierra Club during the public comment period on our intended designations. As part of the revised, modeling Sierra Club included hourly inputs to account for variable stack velocities to more accurately represent stack parameters in the model but they did not have include variable temperatures because they did not have the data. EPA evaluated the latest modeling in the supplemental TSD and compared stack parameters to Luminant data provided. See other RTC related to the Fort Gibson comment.

- *Sub-Comment 9.5:* General comment applicable to Big Brown, Monticello, and Martin Lake - One commenter (Luminant) stated that EPA did not fully explain their basis for accepting the Sierra Club modeling that did not include building downwash for the three Luminant facilities or their conclusion that any change in modeled maximum valued would be "relatively small" if downwash were included.

*EPA's Response 9.5:*
The Sierra Club's modeling analysis for the three Luminant facilities did not include building downwash since they did not have access to the information necessary to include downwash within in the modeling. As stated in the supplemental Technical Support Document accompanying our intended designations of the areas surround the Big Brown, Martin Lake, and Monticello facilities, the EPA does not believe that the inclusion of building downwash would significantly impacts modeled results nor change our determination that impacts in the areas surrounding these three facilities violates the NAAQS. The inclusion of building downwash accounts for the potential impacts on the plume rise and dispersion resulting from the presence of buildings and their wakes relative to stack releases and plumes. As stated in our original TSD, the inclusion of

29

building downwash often leads to higher modeled concentrations at receptors close to the source and even in situations where these nearby increases did not occur, any decreases in maximum modeled values were relatively small. In Luminant's own modeling reports they also indicated for two of the three facilities that they did not expect inclusion of downwash to make a significant impact in model concentrations. As discussed in the TSD all three facilities have similar stack heights and building heights, so inclusion of downwash would not be expected to lower the DVs. If downwash did have some impact it would most likely move the maximum concentrations closer to the facility and actually increase the maximum values. Given current exceedance levels are out from the facility several kilometers and there are many ambient air receptors between the exceedance values and the facility's restricted access (non-ambient air), inclusion of down wash would most likely result in higher ambient DVs.

- *Sub-Comment 9.6:* General comment applicable to Big Brown, Monticello, and Martin Lake - One commenter (Luminant) stated that EPA did not fully explain their claims that with the correction to the Sierra Club modeling to remove elevated flagpole receptors the EPA would "expect" only a slight change in the modeled concentrations.

*EPA's Response 9.6:*
Based on general experience and discussions between some of the modelers within EPA, the sensitivity analyses we had seen in other actions informed us that changing the receptor height from 1.5 meter to near 0 meter would not result in a significant change, especially for elevated point sources. Given that the plume may have traveled for a kilometer or two before touching down at either height, the actual difference of dispersion would be minimal between 1 km for a plume at 1.5 m above ground or a plume that touched the ground within 5-50 meters further downwind. As discussed in elsewhere and in our TSD, Sierra Club provided a sensitivity run showing only a 0.2% change in the maximum DV for Big Brown and we also had a similar sensitivity for Dolet Hills power plant in Louisiana showing only a 0.003 µg/m3 change in maximum DV. As stated in the TSD accompanying our intended designations for the areas surrounding the Big Brown, Martin Lake, and Monticello facilities, the EPA does not expect the removal of the flagpole height receptors to greatly impact the maximum modeled concentrations at any of Luminant's facilities as all of the stacks are similar height and similar dispersion patterns. These sensitivity results show the impact of the flagpole receptors on modeled results is almost 0% to 0.2%. We would expect the impacts of flagpole receptor heights to be similar small for the other facilities and not impact our determination of whether or not impacts from the facilities violate the NAAQS.

- *Sub-Comment 9.7:* General comment applicable to Big Brown, Monticello, and Martin Lake - One commenter (Luminant) stated that background monitored design value taken from the El Paso monitor, which was included in the Sierra Club modeling analysis for all three Luminant facilities is not the most accurate representation of the area surrounding the modeled facilities. The commenter suggested that a more accurate representation of background concentration should be based on the temporally varying background concentrations by hour of day and season or month from the Waco monitor.

*EPA's Response 9.7:*

Many of the $SO_2$ monitors in Texas are in urban areas and/or near a $SO_2$ point source, so there is limited data for background values. Using the El Paso monitor, which is the lowest design value in the State of Texas during this period, is a conservative (i.e., under-estimating) assumption. Given the amount of $SO_2$ emissions in East Texas compared to El Paso area this assumption leads to an underestimation in the concentrations around these facilities but is within the framework of the TAD's options for inclusion of background monitoring data in a conservative/underestimating conclusion. Considering the impacts of Big Brown, Monticello, and Martin Lake in the area, the background value is on the order of 2.4% or less of the total maximum values and if background monitoring data existed for east Texas it would be expected to be a higher than El Paso monitor data and would have an increase in the concentration levels around the Martin Lake facility. Luminant's modeling used a temporally varying background monitor approach of hour of day and season with values ranging from 2-10 $\mu g/m^3$ based on a monitor in Waco. These values are similar to Sierra Club's background monitor data but the amount of $SO_2$ emissions in the general Waco area is generally less than general area around and upwind of the three Luminant facilities; thus, background levels are likely underestimated in both Sierra Club and Luminant's analyses. Luminant only went out to 50 km in their analysis of emissions around the monitor and did not consider what the wind directions/transport when maximum DVs were modeled in support of their assertion that the Waco monitor is more representative and should be used.

In looking at greater distances and transport patterns (what area is upwind) during the directions with the highest values a greater distance than 50 km and transport patterns should also be considered. We note that in our previous designation for the Dolet Hills facility outside Shreveport, LA, we were provided a temporally varying background $SO_2$ monitor approach for a monitor in Shreveport, LA. The Dolet Hills background values ranged from 4.88 to 24.85 $\mu g/m^3$. The Shreveport monitor is closer and also upwind of the three Luminant facilities more often (Waco monitor is not normally upwind) and the maximum DVs in modeling for all three facilities are were when winds were from some general easterly direction (blowing to in a generally southwesterly to northwesterly direction). Given the closer proximity of Shreveport monitor to the Martin Lake and Monticello facilities than the Waco or El Paso monitors, similar emissions of $SO_2$ in the area around Shreveport and Martin Lake/Monticello, and transport conditions when modeled exceedance occur, the Shreveport background data is more representative than either Luminant's or Sierra Club's proposed values. Big Brown is further from Shreveport, but transport indicates Shreveport is generally more upwind when the highest values are modeled for Big Brown. Comparing to Sierra Club's results, an alternate background would change values from -0.1% to + 11.7% using the time varying data from Shreveport which is significantly closer to Martin Lake than the Waco monitor. Since the modeling was not conducted with this varying background a direct calculation of the effect of using the Shreveport data can't be performed. For context, taking an

average of the minimum and maximum values from the Shreveport data would yield an increase of 9.6 µg/m³ above the Sierra Club background value and the annual average value is approximately 4 µg/m³ higher than El Paso. As further discussed in our supplemental TSD for this action we think both the Waco monitor and El Paso monitor underestimate background concentrations for the three Luminant facilities.

- ***Sub-Comment 9.8:*** General comment applicable to Big Brown, Monticello, and Martin Lake - One Commenter (Luminant) stated that the Sierra Club modeling for the three Luminant facilities includes receptors that are inconsistent with the EPA's Modeling TAD. Specifically, the commenter claims that a portion of the modeled receptors are located on plant property, industrial property, and in water bodies. The commenter also points out that the EPA previously noted that the receptor grids included by Sierra Club were larger than those recommended by the EPA and that in the case of Monticello the erroneous inclusion of on property receptors was raised to Sierra Club in response to their September 11, 2015 submittal. Commenter also indicated that some sources were far away and should not have been included in the modeling (Limestone). The commenter made reference that the Limestone power plant was approximately 48 km from Big Brown and EPA guidance was that 20 km was the appropriate cut off distance for inclusion of nearby sources.

*EPA's Response 9.8:*
EPA had information from facility permitting in 2006 timeframe that had some plant boundaries in the modeling for the permit. In our proposal we did evaluate the information and try to limit the evaluation of concentrations from Sierra Club's modeling to only receptors that did not appear to be on Luminant's property. As we discuss in detail we have evaluated the information provided by Luminant for each of their three facilities and the areas they are asserting should be excluded either due to being plant property on a wetland or waterbody. We note in our TSD that Luminant has not provided information for review to show that all plant property should be classified as non-ambient air. Documentation from Luminant demonstrating appropriate fencing and limiting general public from accessing their property would be necessary to support a determination that a potential receptor is non-ambient. With the caveat that Luminant has not supplied sufficient information, we have conducted our evaluation including an analysis that assumes all receptors that Luminant proposes to exclude are not viable receptors. See our TSD for specific analyses for each area and our conclusions. It is not clear from the materials provided by Luminant that the maximum design receptor should have been excluded (being on Luminant property does not guarantee exclusion), but we have utilized all information provided and evaluated aerial and satellite information for the area to completer our final review and designation.
In our proposal materials we did note that the receptor grid was large but we didn not conclude that it was inappropriate. While the receptor grid was large and the area for inclusion of nearby sources was large than many modeling runs it was necessary and informative for the designation of the areas around these three very large facilities. EPA modeling guidance and the TAD both balance the distance to have receptor grids and inclusion of nearby sources with the impacts of the primary source being modeled. The commenter made reference that the Limestone power plant was approximately 48 km

32

from Big Brown. We note that Limestone and Big Brown are very large emission sources that have impacts a long way from their facilities. Also given the very low background value being used it was reasonable to include Limestone in the modeling to evaluate if Limestone contributed to exceedance values around Big Brown. We note that EPA's guidance is that you can go less than 50 km from a source much of the time, but that is dependent on the size of the source being modeled and how far it's impacts go out from the source. EPA's guidance is not prescriptive to only 20 km but has to be weighted with the individual situation. In this case Big Brown and Limestone both have a very large area that they impact and there was a possibility for alignment and accumulation of their emissions to values around Big Brown. Therefore, we disagree with Luminant's assertions about receptor grids and inclusion of nearby sources.

- *Sub-Comment 9.9:* Comment applicable to Big Brown - One commenter (Luminant) stated that the Sierra Club modeling for the Big Brown facility contained errors in modeled stack locations that were noted by the EPA and claimed that this error alone is grounds to invalidate the modeling results. The commenter also stated that the EPA did not adequately explain their determination that the correction of this stack location error would not significantly change the modeled results or change the resulting design value from violating to not violating the NAAQS.

*EPA's Response 9.9:*
As discussed in the TSD accompanying our final designation of the area surrounding Big Brown, Sierra Club provided additional information during the public comment period for the intended designations. This information included the corrected stack locations for the two main stacks at the Big Brown facility. The modeled impacts in the area surrounding the Luminant facility still show modeled violations of the NAAQS when the corrections to the stack locations were made. In addition, Sierra Club provided sensitivity testing results comparing initial modeling results (with stack coordinates switched) with the results from the stack location correction model test that show a minor change in modeled design values consistent with the EPA's initial determination documented in our intended designation that the switch in coordinates would have little impacts on design value based on the close proximity of the two stack.

- *Sub-Comment 9.10:* Comment applicable to Martin Lake - One commenter (Luminant) stated that the Sierra Club modeling for the Martin Lake facility was completed using an older version of AERMOD and cited the EPA's statement that they do not believe that completing the modeling using the newer version of AERMOD would result in "significantly different modeling impacts.".

*EPA's Response 9.10:*
As discussed in the TSD accompanying our intended designation for the area surrounding Martin Lake, the EPA reviewed the AERMOD test case results for the older version (14134) used by Sierra Club and the newer model version (15181) and determined that only a small subset of the test scenarios (capped and horizontal stack and multiple urban areas) show difference in modeled impacts. These identified test scenarios are not

33

applicable to the Martin Lake station.  Therefore, a rerunning of the modeling analysis using the later model version would not significantly impact the modeled maximum concentrations or our determination of the area's designation of nonattainment.
In addition, and as we discuss in the TSD accompanying the final designation of the area surrounding Martin Lake, Sierra Club provided additional modeling analysis for this area using the more recent version of AERMOD (15181), which still shows modeled violations of the NAAQS.

- *Sub-Comment 9.11:* Comment applicable to Monticello -  One commenter (Luminant) stated that in addition to the Sierra Club inaccurately representing 100% load in the analysis for the Monticello facility, the modeled stack temperature and velocity were incorrect.  The commenter states that the modeled stack parameters included in the modeling files did not match the parameters represented in the Sierra Club modeling report and did not accurately represent the actual stack parameters. The commenter claims that this discrepancy is sufficient to invalidate the Sierra Club modeling analysis for the Monticello facility.

*EPA's Response 9.11:*
As discussed in the supplemental TSD for these designations, we did receive updated modeling from Sierra Club with varying velocities and non-varying temperatures.  We have evaluated these new inputs in the new modeling from Sierra Club with the information provided by Luminant in their modeling.  Sierra Club did not have the varying stack parameters in previous modeling and used standard temperatures that they thought were appropriate and followed EPA's guidance on modeling for new sources when you don't have actual data for temperature or velocity.  We do not find fault with Sierra Club's modeling for not having these time varying inputs in the proposal modeling and it is not a requirement that the temperature and velocity have to vary hourly in the modeling for these SO2 sources.  If available it is generally preferred from the standpoint of modeling actual emissions and the resulting impacts, but it is not a requirement.  The proposal modeling was deemed sufficient for our proposal.  For our full review of the latest modeling from Sierra Club and Luminant see our TSD for this action.  We do not agree with the commenter that the modeling should have been consider insufficient for our proposal.  Regardless we have better information for our final designation.

- *Sub-Comment 9.12:* One commenter (Luminant) stated that the Sierra Club modeling for the Monticello facility modeled an allowable emission rate of 3.0 lb/MMBtu (23,790 lb/hr) for Unit 3 when the permit limit is actually 9,468 lb/hr.

*EPA's Response 9.12:*
We note that Sierra Club's modeling used in the proposal included modeling for both actuals and allowables.  In the Sierra Club modeling scenario of allowables, they may not have been aware of the permit limit, but it did not make a difference in the modeling of actual emissions scenario. In our evaluation of the Sierra Club modeling in our proposed designations we relied on modeling representing actuals based on CEM data.  Regardless we have more refined modeling using CEM based actual emissions data that we are relying upon in this final designation.

- ***Sub-Comment 9.13:*** One commenter (Luminant) stated that the EPA had erroneously indicated Monticello was modeling almost double the standard but elsewhere we discussed modeling results being 20% over the standard.

  ***EPA's Response 9.13:***
  If there was an error in some of the language it has been corrected with our evaluation of the latest modeling.

- ***Sub-Comment 9.14:*** One commenter (Luminant) stated that the CAMD CEM data is always biased high because of the bias adjustment factor so modeled impacts are overestimate/conservative.

  ***EPA's Response 9.14:***
  The purpose of the bias adjustment factor (BAF) is to correct "out of control" SO2, NOx, and flow measurements relative to standard reference methods as recorded during periodic stack tests. The bias adjustment factor is only applied to SO2 data when the CEM data are biased low; the BAF is intended to correct the CEM data in those cases where the CEM is reading low to adjust to what are the actual emissions. However, if Luminant wanted to use the CEM data without any bias adjustment, there would likely be times when the CEM is biased low, so the emission rates being modeled would actually under predict what is really occurring. The overall bias should be near 0% most of the time since that is the purpose of running audits and adjusting the raw CEM data. Ultimately, the CEM data is the best emission data available and it is somewhat up to the operator to ensure that they are not overestimating/underestimating emissions pursuant to EPA's QA/QC and reporting requirements for EGUs. Overestimation of emissions would also be detrimental to compliance with emission limits, emission caps or annual emission inventory fees. Luminant has not quantified this as a significant error in the emissions from the source and our expectation is that this would not be a significant error and is likely only a 1-2 % change in annual emissions at most under unusual situation. Without further information documenting the level of emissions overestimation as asserted by the commenter the comment is more of an accusation than proof of a bias that would impact our decision.

10. ***Comment:*** Commenter (0328-Luminant) stated that, while the Sierra Club submitted 27 AERMOD modeling evaluations alleging violations for specific locations addressed in EPA's March 2016 proposed designations, the EPA accepted only ten of these evaluations – including the three Luminant locations model evaluations – and disregarded approximately 63% of the Sierra Club AERMOD evaluations because of the same errors present in Sierra Club's modeling of Luminant's plants. Commenter stated the EPA should likewise disregard Sierra Club's modeling here.

*EPA's Response:*

EPA did not disregard any of Sierra Club's submitted modeling evaluations.  Instead, EPA reached different conclusions for different areas based on the available evidence for each area after evaluating the information consistent with our national interpretation of the statute, regulations, and guidance, and making judgments in each case regarding how it supported finding whether areas were meeting the NAAQS or could not be determined as meeting or not meeting the NAAQS. The designation of attainment or nonattainment in each area is based on a weight of evidence approach considering all of the applicable monitoring and modeling data. Each area has to be treated individually in considering the available evidence.  In some cases, acceptable monitoring data were available and in others more representative/refined modeling data were available which may have differed from the modeling results provided by Sierra Club. EPA must weigh the best available evidence in its designation determinations.  One aspect of the fitness of the modeling is its adherence to the Modeling TAD.

EPA evaluated the Sierra Club modeling as documented in the TSD and found that the Sierra Club modeling closely followed the TAD and was adequate to inform our nonattainment decision. Our analysis, as more fully detailed in the final TSD of this supplemental action, shows that the Sierra Club modeling likely represents a conservative estimate (in an under-estimating sense) of the pollution concentrations in the area and magnitude of nonattainment because, for example, the final Sierra Club modeling did not include some large nearby sources of $SO_2$ and used a low background concentration.

In contrast, the Luminant modeling did not closely follow the TAD.   In the current three areas in Texas, the Luminant modeling used several beta options for modeling that require review and approval from EPA before their use.  The EPA notes that the use of beta options, such as ADJ_U* and LOWWIND3, in AERMOD for any regulatory applications requires adherence with Appendix W, Section 3.2.2. This is further explained in the EPA's December 10, 2015 memorandum titled, "Clarification on the Approval Process for Regulatory Application of the AERMOD Modeling System Beta Options."  These options require special review and attention because EPA does not yet have sufficient information to determine their suitability for all conditions and thus their use must be evaluated on a case by case basis. Among other conditions, the use of beta options requires consultation with and receiving approval from the appropriate EPA Regional Offices. Upon concurrence by the EPA's Modeling Clearinghouse, EPA Regional Offices may approve the use of these beta options for regulatory applications as an alternative model.   This process was not initiated or completed in the modeling of the three Texas Luminant plants.

In addition, the Luminant modeling used two source parameter modification techniques.  These techniques, AERLIFT and AERMOIST, attempt to implement the findings of prior peer-reviewed research in buoyant plume rise.  While there is some evidence for the phenomena the technique attempts to simulate, the implementation of the source parameter modifications depends on the use of models.  These models must be required to go through the standard EPA model evaluation, review, and approval before being used in regulatory applications.   Without this review process, the validity of the models and resulting concentrations is not known.

36

AERLIFT (a non-EPA preprocessor) is directed toward situations where two or more stacks line up with the wind direction causing the plumes to merge as they rise and reducing the overall entrainment of cooler ambient air. It is implemented as a preprocessor which estimates a buoyancy flux enhancement attributed to the merged stack plumes. These calculations are done for each source, for each hour. Based on several key factors, each source is tested to determine if enhancement (or partial enhancement) should occur. This enhancement is performed by modifying the hourly stack temperature and exit velocity prior to being input to AERMOD. The technique as implemented would change actual measurements of the stack parameters.

AERMOIST is an effort to account for the initial condensation of the plume moisture in a wet scrubbed plume that liberates the heat of condensation. This additional heat increase is theorized to increase plume buoyancy during the initial rise phase. However, when the liquid water evaporates later on it will reduce the buoyancy of the plume by the same amount of the initial increase. This reduction should then act to depress plume rise but it is theorized to occur when the plume is more dilute and may have approached reached final rise – thus minimizing the effect. Luminant asserts that their implementation of the non-EPA AERMOIST preprocesser model is based on a model evaluated in the peer-reviewed literature, IBJpluris, for moist plumes. AERMOIST uses IBJpluris to determine hourly adjustments in plume rise and then modifies stack temperatures for input to the dry plume rise model in AERMOD to force simulation of an increased plume rise. Similar to the AERLIFT preprocessor, the AERMOIST processor modifies actual measured data for input to the AERMOD system.

A review by EPA of the model input files for AERMOD before and after modification by the preprocessors shows that for some wind directions the average Briggs buoyancy flux of the plume can be increased by up to 50% by AERLIFT alone and by up to 75% through pre-processing by AERMOIST and then AERLIFT. For some hours the measured stack temperature was increased by over 300 degrees Kelvin for input to AERMOD. Obviously, this degree of modification can have significant effects on AERMOD performance. As well, AERLIFT routinely enhanced plume buoyancy for directions which were not roughly aligned with the stacks.

The implementation of these two models as preprocessors does not remove them from the requirement of model validation and approval. Prior to use in a regulatory setting EPA believes that the particular implementations of AERMOIST and AERLIFT need to undergo extensive review versus test cases previously used for AERMOD model review. While the scientific principles seem like these might be refinements, it has not been substantiated that the implementation of these pre-processors and their coding is a refinement within AERMOD modeling platform and a full review as required by EPA for regulatory models has not been completed as required by 40 CFR Part 51 Appendix W (Guideline on Air Quality Models). There is no information to support that Luminant's modeling results with the AERLIFT and AERMOIST processors meet the requirements for models used in a regulatory decision. Clearly, the same techniques could have been implemented within the AERMOD system itself removing the need for the preprocessing steps. If implemented within AERMOD it is apparent that any such modification of the plume rise calculations would require a full review. Placing these models outside AERMOD does not eliminate this prerequisite to regulatory use.

11. ***Comment:*** Commenter (0328-Luminant) stated that the EPA's reliance on the Sierra Club modeling would deny Luminant and the State of Texas the opportunity to gather actual monitoring data to use for determining attainment status and is inconsistent with the CAA, EPA's regulations, and EPA's prior practice. Commenter stated that correcting the problems with that modeling demonstrates that modeling is inexact and cannot be used to demonstrably determine the attainment or nonattainment status of any area with the $SO_2$ standard, and specifically undermines any reliance on Sierra Club's overstated modeling.

***EPA's Response:***

In making a designation, EPA may consider all available information, as stated in CAA section 107(d)(1)(A), and modeling is not excluded. In evaluating attainment status under prior versions of the primary $SO_2$ NAAQS, EPA's consideration of dispersion modeling has been explicitly upheld when challenged in court. *Montana Sulphur & Chemical Co. v. EPA*, 666 F.3d 1174 (9th Cir. 2012). Moreover, nothing about EPA's action to designate these areas, in compliance with the court order, precludes Luminant or Texas from additionally taking the opportunity to gather additional monitoring data regarding the impacts of $SO_2$ pollution from these power plants. In fact, the EPA encourages states and sources to cooperate to establish and continuously conduct such monitoring, in situations where, as here, there are no monitors that are properly sited to characterize maximum ambient $SO_2$ concentrations and the only recourse is to conduct modeling on a one-time or recurring basis. EPA has carefully considered the modeling provided by Sierra Club and Luminant and determined that the information indicates that the area is not in attainment of the $SO_2$ standard. As discussed above and in the TSD for this supplemental action, the Luminant modeling utilized several unproven techniques, while the Sierra Club modeling generally followed EPA's modeling guidance and provided a conservative estimate of the ambient concentrations in the areas. For example, the Sierra Club's modeling did not include some nearby large sources and included a low estimate of background conditions, so it is expected that the modeling would tend to underestimate rather than overestimate concentrations, indicating that the areas are not meeting the standard.

12. ***Comment:*** One commenter (0328-Luminant) asserted the EPA's proposal is unlawful and should not be finalized, in part, because Luminant is submitting with their comments a modeling analysis for Freestone, Rusk, Titus, Anderson, and Panola Counties that supports an attainment or unclassifiable designation for each of these counties. Commenter claimed that, in the face of conflicting analyses, EPA should either retain Texas's recommended designations or utilize the unclassifiable designation, or the unclassifiable/attainment designation, until monitoring data can be obtained.

***EPA's Response:***

The concerns with the modeling analysis submitted by the commenter have been reviewed in response to previous comments and in EPA's TSD for this supplemental action. In brief, the use of non-reviewed, unapproved techniques to modify the inputs to AERMOD is not acceptable in a regulatory context especially given the erratic and sizeable changes in modeled concentrations. As detailed further in the final TSD for these areas, the most representative modeling that has been submitted to EPA for these three nonattainment areas that generally meets the requirements

of the Modeling TAD and is most informative in this designation process is the revised Sierra Club AERMOD modeling.

13. ***Comment:*** One commenter (0328-Luminant) stated the EPA's proposal is unlawful and should not be finalized, in part, because EPA has not demonstrated that its proposed changes to Texas's designations are "necessary" as it is required to do under the CAA. Commenter's letter (pdf pages 50-57 and attachments 1, 2 and 4) details why they believe Luminant's forecasted operations confirm that a modification of Texas' designation recommendations for the areas around these plants is not "necessary." Commenter stated that additional modeling, based on reasonable assumptions of future operating conditions, submitted with their comments demonstrates that the affected counties will not exceed the NAAQS in the future. Commenter stated that changes to Texas's proposed designations are not "necessary" when modeling of future operating conditions during the period of evaluation show attainment and, thus, EPA has no authority under the CAA to, and should not, finalize these designations. Commenter stated that a designation of nonattainment as EPA proposes for these areas would not serve the purposes of section 110 or 107 in any event because it would not accelerate attainment of the NAAQS for these areas.

***EPA's Response:***
During the comment period in the spring of 2016 we received modeling from Luminant and additional modeling from Sierra Club for these three Luminant facilities (Big Brown, Martin Lake and Monticello).  Our review and evaluation of these modeling evaluations is addressed in more detail in other responses and in the TSDs for this supplemental action. The Luminant modeling was determined to use both non-approved beta options in AERMOD and some preprocessors that drastically changed the modeling results and have not been approved for use in modeling of these sources.   In addition, the Luminant modeling relies on forecasted emissions.  Therefore, we do not agree that Luminant's modeling analysis demonstrates the area is currently in attainment, and EPA designations determination under CAA section 107(d)(1)(A) are to be whether an area currently "does not meet" or "meets" a NAAQS or currently "cannot be classified […] as meeting or not meeting" the NAAQS. The statutory language is stated in the present tense, not the future conditional, and therefore a designations decision is not based on whether EPA predicts that an area would meet or would not meet a NAAQS at some distant point in the future notwithstanding current conditions. EPA's approach regarding this issue for the three Texas areas is consistent with how EPA has faced similar situations involving the use of unapproved alternative modeling options and recently changed or future expected emissions reductions in the March 2016 proposed designations and the June 30, 2016, designations. In each case, where a source had not obtained advance approval of an alternative model, EPA was able to evaluate only the regulatory modeling, if it was submitted.  Where a source had taken an effective and enforceable limit to reduce emissions from recent actual levels, EPA was able to evaluate those limits for purposes of a designations decision.  But where, like here, no such effective and presently enforceable limit was in place, EPA could only base its decisions on actual emissions information.  The commenter reads Clean Air Act section 107(d)(1)(B)(ii) as imposing a burden on EPA to prove that any modification to a state's designation recommendation is "necessary," but this reads the word out of its larger context within that subsection, which confers broad technical discretion on EPA in promulgating final designations.

See, *Catawba Cnty., N.C. v. EPA*, 571 F.3d 20 (D.C. Cir. 2009). The EPA reasonably and consistently concludes that where a recommendation of a designation is based on future emissions limits that are not enforceable and may not in fact occur, it is clearly "necessary" to modify the designation to account for current actual information.

The commenter also incorrectly asserts that our action does not serve the purpose of section 110 because the commenter is incorrectly assuming that the Luminant modeling is both acceptable and accurate. We note that Sierra Club's more recent modeling followed the TAD and has been determined to be acceptable for informing EPA's designation of these three sources and the area around the sources. The more recent Sierra Club modeling used recent actual emissions (2013-2015). Luminant indicates that future emissions, well after the date of EPA's designation, will be lower than recent actuals, but has not entered into any agreements to make such lower emissions presently enforceable and permanent and therefore reliable as a basis for concluding that the areas currently "meet" the NAAQS. Without such enforceable limits further lowering emissions, EPA is reasonably relying on recent actual emissions and resulting modeled concentrations in this designation.

As mandated under Clean Air Act section 107, EPA must designate as nonattainment areas that are violating the standard or that contribute to nonattainment of the standard in a nearby area. EPA has evaluated the area that is violating the air quality standard. Through this evaluation, EPA reviewed modeled violations in the immediate vicinity of Big Brown, Martin Lake, and Monticello. Pursuant to section 107(d) of the Clean Air Act, EPA must designate areas for the 2010 1-hour $SO_2$ primary NAAQS. EPA is under an enforceable order to complete the area designations according to the court-ordered schedule. As is discussed elsewhere, EPA has to designate the area associated with these sources by November 29, 2016. EPA considered all available, relevant data in making the final designation. For further discussion on utilizing modeling to inform designation decisions, see section (III)(A)(2) of this RTC and elsewhere in this section (IV).

14. ***Comment:*** One commenter (0328-Luminant) stated the EPA's proposal is unlawful and should not be finalized, in part, because, in the face of inconsistent modeling results, the record before EPA does not "clearly demonstrate" nonattainment of the $SO_2$ standard as is required under the CAA and, thus, the EPA has no authority under the CAA to, and should not, finalize these designations.

***EPA's Response:***
The concerns with the modeling analysis submitted by the commenter have been reviewed in response to previous comments and in EPA's TSDs. In brief, the use of non-reviewed, unapproved techniques to modify the inputs to AERMOD is not acceptable in a regulatory context. Therefore, there are not inconsistent acceptable modeling results at issue here. EPA has also determined that Sierra Club's most recent modeling is representative and reliable, and that the modeling demonstrates nonattainment, as further detailed in the supplemental final TSD. The AERMOD modeling that has been submitted to EPA that generally meets the requirements of the Modeling TAD remains the revised Sierra Club AERMOD modeling. The Sierra Club modeling used the default regulatory AERMOD options and followed the Modeling TAD guidelines on meteorology, land surface, and receptors. In an effort to increase the realism of the simulation

and in response to comments provided by TCEQ on 11/17/15 on their earlier (9/11/2015) modeling, Sierra Club conducted a third round of modeling (3/31/2016) which used data from CAMD for emission rate; velocities were estimated from the stack flow rates (when available) and heat rate. For temperature, a constant temperature corresponding to full load was used since CAMD does not receive any stack temperature data. The EPA review based on the 3/31/2016 modeling indicates $SO_2$ emissions from Martin Lake, Monticello and Big Brown Steam Electric Stations have associated impacts that exceed the 1-hr NAAQS. We note in particular that Sierra Club's March 2016 modeling did not include nearby sources and also used a very low background concentration, which leads to the modeling likely underestimating actual concentrations around these three Luminant facilities, further supporting EPA's designations.

15. ***Comment:*** One commenter (0328-Luminant) stated that, if EPA will not reinstate Texas' recommendation of attainment for each of these counties, then, in light of the lack of monitored data and conflicting modeling assessments, EPA must designate the areas around these facilities as "unclassifiable." Commenter stated the CAA provides this classification option, and EPA has confirmed that it should apply this designation wherever available information is insufficient or does not clearly demonstrate that a nonattainment or attainment designation is warranted.

Commenter stated that, because of all the factors that influence modeling, modeling results in this case cannot "clearly demonstrate" that a nonattainment designation is warranted and should not be relied on for such purposes. Commenter stated the only monitoring data available shows attainment of the standard and Luminant's modeling shows that any monitor sited near one of its locations will also be attaining the standard. Commenter stated that, accordingly, EPA must designate the areas around Luminant's plants as unclassifiable and allow for monitors to be placed into service to acquire three years of data to accurately characterize actual air quality for attainment and nonattainment designations.

***EPA's Response:***
EPA addressed this issue with the Indiana-based Gibson power plant, where both monitoring and modeling assessments were available from Sierra Club and Indiana, and noted in the TSD for that designation that "[a]s a general matter, monitoring at a monitoring site provides a more reliable indication of concentrations *at a single specific location...* Thus, each monitoring site provides data only for the specific location of the monitor, while modeling provides a more direct estimate of concentrations at a range of receptor locations, commonly estimating concentrations at thousands of receptor points. Even if an area has multiple monitors, modeling will often provide more reliable information on the spatial distribution of $SO_2$ concentrations and on the magnitude of $SO_2$ concentrations at unmonitored locations."

Clearly, a monitor must be well-sited to characterize attainment for a region. In the case of the Gibson plant a modeling study and an analysis of wind rose data both confirmed that the monitors used to assess attainment status for Gibson were well-sited. No such characterization has been done for the Luminant plants and there are no monitors in the areas of the maximum modeled values from Sierra Club's most recent modeling. The simple availability of data from a monitor in the county or a nearby county is not sufficient to demonstrate attainment. We have responded elsewhere in this supplemental RTC and EPA's TSD about our evaluation of both the

41

flawed modeling provided by Luminant and the most recent Sierra Club modeling that is acceptable for using in this action. We are concluding that there is sufficient data to make a determination of nonattainment for the areas around three of Luminant's sources (Big Brown, Martin Lake and Monticello). The presence of conflicting information submitted between Luminant and Sierra Club alone does not compel that EPA conclude it does not have sufficient available information to make a determination of attainment status. Each area, and the information available for it, requires an independent analysis consistent with our national approach and based on the specific facts. In some cases, such conflicting information involves multiple sets of information, none of which are individually persuasive and cannot be reconciled to arrive at a sufficient basis for reaching a conclusion, i.e., are insufficiently reliable for EPA to reach a conclusion regarding NAAQS attainment status. In other cases, such as here and in the Gibson case, it has been possible for EPA even in the face of conflicting information to make a judgment based on our technical expertise that some of the available information is sufficient to enable an attainment or nonattainment determination.

16. **Comment:** One commenter (0328-Luminant) stated that, although the Consent Decree requires EPA to complete designations of certain areas before monitoring data can be collected, it does not compel or authorize EPA to rely on questionable modeling and, therefore, where EPA lacks monitoring data, and modeling data is uncertain, EPA must use the unclassifiable designation. Commenter's letter (pdf pages 57-61) details why they believe that, to avoid a conflict between the Consent Decree, the DRR, and CAA's cooperative federalism system, EPA should designate the areas around Luminant's facilities as unclassifiable/attainment or unclassifiable until additional, reliable information is available to inform some other designation.

*EPA's Response:*
EPA does not view AERMOD modeling following acceptable protocols, as performed by Sierra Club, as questionable. Nor does EPA agree that using this well-established analytical tool conflicts with either the consent decree, the Data Requirements Rule, or cooperative federalism. The concerns with the modeling analysis submitted by the commenter have been reviewed in response to previous comments and EPA's TSDs. In brief, the use of non-reviewed, unapproved techniques to modify the inputs to AERMOD is not acceptable in a regulatory context. In contrast, the AERMOD modeling that has been submitted to EPA Region 6 that best meets the Modeling TAD and EPA's modeling guidance remains the revised Sierra Club AERMOD modeling. EPA has also determined that Sierra Club's most recent modeling is representative and reliable, provides information that must be considered in a designation decision, and that the modeling demonstrates nonattainment, as further detailed in the final supplemental TSD. The Sierra Club modeling used the default regulatory AERMOD options and followed the Modeling TAD guidelines on meteorology, land surface, and receptors. In an effort to increase the realism of the simulation and in response to comments provided by TCEQ on 11/17/15 on their earlier (9/11/2015) modeling, Sierra Club conducted a third round of modeling (3/31/2016) which used data from CAMD for emission rate; velocities were estimated from the stack flow rates (when available) and heat rate. For temperature a constant temperature corresponding to full load was used since CAMD does not receive any stack temperature data. The EPA Region 6 review based on the 3/31/2016 modeling from Sierra Club indicates $SO_2$ emissions from Martin Lake,

42

Monticello and Big Brown Steam Electric Station have associated impacts that exceed the 1-hr NAAQS.

EPA's action here is fully consistent with the Consent Decree (which requires us to issue a designation of some kind), the Clean Air Act (which requires us to issue designations of certain kinds based on the quality of available information), and cooperative federalism (which preserves EPA's duty to issue the final designation, after review of available information). Under the Clean Air Act, the agency must consider available valid information. The concept of cooperative federalism does not preclude EPA's responsibility to consider all available valid information in making our decision, and clearly the Clean Air Act envisions the possibility that EPA will not agree with the State's recommendations. It is true that states are directed under CAA section 107 to recommend designations to EPA, implementing the Act's scheme of cooperative federalism. But it is also true that the EPA, in acting in response to a state's recommendation, must consider all valid submitted data and information, some of which may support a state's recommendation and some of which may not. It remains EPA's duty to make a final decision regarding what designation all of the data and information best supports. Further, nothing in the agency's Data Requirements Rule modifies EPA's duty or discretion in making designations determinations based on available information. As the court order requires EPA to issue the designations for these four Texas areas at this time, we cannot simply defer to the future implementation of the DRR as a basis for rejecting available information and not making decisions where it is sufficient to demonstrate either attainment or nonattainment. By the commenter's reasoning, not only should EPA not at this time determine that areas are not meeting the NAAQS, we should also not conclude that they are meeting it, even in the face of persuasive current information. This would clearly be unreasonable.

**17. *Comment:*** One commenter (0332-AI-Sierra Club {App. I}) supported the EPA's proposal to designate areas surrounding the Big Brown power plant in Freestone County, Texas, the Martin Lake power plant in Rusk County, Texas, and the Monticello power plant in Titus County, Texas as nonattainment areas for purposes of compliance with the 2010 1-hour $SO_2$ NAAQS. Commenter stated that there are no monitoring stations located close to these three plants, and both the State of Texas and the plants' owner chose not to submit any modeling. Commenter stated the only evidence before EPA is the modeling submitted by the Sierra Club, which supports EPA's proposed nonattainment designation. Commenter stated that, with the updated modeling and analysis attached to their comments, three separate rounds of modeling (September 2015, December 2015, and March 2016) have now reached the same result: Big Brown, Martin Lake, and Monticello cause the areas surrounding each facility to be in nonattainment of the 1-hour $SO_2$ NAAQS.

Commenter stated that September 2015 modeling by Wingra Engineering demonstrates the areas surrounding Big Brown, Martin Lake, and Monticello should be designated as nonattainment areas. Commenter stated that, on December 14, 2015, Sierra Club submitted updated modeling analyses for Big Brown and Monticello which demonstrated that even using the most recent emission data and adjusting certain emissions and stack parameter assumptions, as suggested by TCEQ, Big Brown, Monticello, and Martin Lake caused significant exceedances of the 1-hour standard in the surrounding areas.

43

Commenter stated that, as explained in detail in comments prepared by Dr. H. Andy Gray (Exhibits 1 and 2 to commenter's 0332-AI-Sierra Club letter), making adjustments to Wingra Engineering's 2015 modeling, as suggested in the EPA TSD, would not change the outcome from nonattainment to attainment, given the large margin by which emissions from these plants exceed the NAAQS and the minor differences expected from these adjustments. Commenter stated that, in response to the issues raised in EPA's TSD for Texas, Sierra Club retained Wingra Engineering and Dr. H. Andrew Gray to update the modeling for Big Brown, Martin Lake, and Monticello. Commenter stated the March 31, 2016 modeling confirms that even after making all of the potential adjustments identified by EPA, the $SO_2$ concentrations in the areas surrounding Big Brown, Martin Lake, and Monticello exceed the 1-hr $SO_2$ NAAQS. These modeling analyses are in Exhibits 3-5 attached to commenter's (0332-AI-Sierra Club) letter.

***EPA's Response:***

EPA has reviewed each of the successive submissions of the Sierra Club's modeling and has reviewed the report summarizing sensitivity runs for Martin Lake, Monticello, and Big Brown Power Plants. The most recent modeling incorporated more realistic stack parameters using estimated hourly velocities in addition to the hourly $SO_2$ emission rate. All rounds found modeled design values in excess of the 1-hour $SO_2$ standard.

Sensitivity Tests

Sensitivity testing was carried out varying one parameter at a time to determine the effect of the proposed changes.

- **Stack Positions -** The first is that the stack positions for Units 1 and 2 were reversed. EPA's judgment is that because the two stacks are in such close proximity that the design value concentrations would be little affected.
- **Stack Diameter -** There is an error in the stack diameter for Big Brown in the Sierra Club's modeling for Units 1 and 2. The Sierra Club used 6.77m and the diameter derived from satellite photographs is 6.553m. Assuming the same velocity, buoyancy flux would decrease about 6.7% resulting in lower plume rise and an expected somewhat higher predicted design value.
- **Flagpole Receptors -** The Modeling TAD recommends the use of ground surface elevation for the receptors whereas the Sierra Club used flagpole receptors at 1.5m height in an attempt to model concentrations at the height of a person's head. The EPA believes that the small change in height would have a very small effect on modeled concentrations. This had been borne out in previous sensitivity studies.
- **Tier 2 Background** - The Sierra Club used tier 1 estimates of the $SO_2$ background concentration whereas tier 2 seasonal-hourly estimates of $SO_2$ background were used by Luminant for their modeling. Tier 2 estimates are considered more realistic than tier 1 estimates which may be over-conservative. The change in background occasioned by the use of tier 2 estimates may be either higher or lower for any given hour of simulation than the tier 1 estimate, though on the average would be lower. This change could make

44

a difference if the direct contribution modeled for a source were very near the 1-hour $SO_2$ standard level.

- **Surface –** Sierra Club used alternative surface land use data from work performed by NRG for their Limestone facility to model the Big Brown area. This alternate surface data changed the surface land-use characteristics data used for Corsicana airport met data that is used by AERMET to develop the meteorological data necessary for running the AERMOD model. The changes involved displacing the center of the AERMET grid from the recommended location of the meteorological measurements to the location of the source.  In effect, NRG used surface data around NRG Limestone instead of the surface data at the Corsicana airport and this impacted the surface roughness value. The updated surface roughness data are generally much higher than the original data set for Corsicana, which results in increased dispersion (including higher mixing heights) and lower peak modeled concentrations. It is not clear that the NRG methodology is preferable or even acceptable.  Sierra Club used this alternate NRG met data as a sensitivity analysis in modeling the area around Big Brown.

Dr. Gray's report examined the sensitivity of the model design value concentrations to each of these factors individually to get an idea of the size of the effect for Big Brown Power Plant. The results are summarized in the table below.

| Sensitivity Run | Percent Change in Concentrations (- Means Lower Concentrations) |
|---|---|
| Correcting Stack Positions (corrected in new modeling) | -0.08 % (-0.3 µg/m$^3$) |
| Updating Surface Characteristics | -3.6 % (-14 µg/m$^3$) |
| Removing Flagpole Receptors | -0.21% (-0.8 µg/m$^3$) |
| Adjusting Stack Diameter | 4.4 % (16.4 µg/m$^3$) |

The largest changes noted in the sensitivity runs were decreases of about 4%.  In order to bring the modeled design value to the threshold of attainment a much large decrease would be required – an order of magnitude greater than the effects noted in the sensitivity tests. Therefore, we conclude that Sierra Club's modeling remains persuasive in showing violations of the NAAQS for the period addressed.

## Sierra Club Round March 2016 (Round 3) Modeling

Sierra Club has conducted a third round of modeling.  To improve the realism, this analysis used actual hourly emissions and stack exhaust flow rates for the 2013-15 period for Big Brown and Martin Lake. This analysis also incorporates a lower background concentration than the previous December 2015 modeling.  We note these are the maximum impacts from

the receptors that Sierra Club modeled.  We have done further analysis based on information provided by Luminant and the values in the table below may or may not be the actual ambient air maximum for where a monitor could be sited. For a specific analysis for each area see our supplemental TSD.

Sierra Club Modeling Design Values

| | Modeled Design Value (ug/m3) | | |
|---|---|---|---|
| Source | Round 1 | Round 2 | Round 3 |
| Big Brown | | 387.9 | 321.3 |
| Martin Lake | 347.7 | | 249.3 |
| Monticello | | 237.3 | 212.0 |

 Sierra Club's use of hourly velocities and a reduced background lowered the modeled impact at all three plants.  This had its largest effect on Martin Lake, though all plants remain above the standard level of 196.5 ug/m3.  In examining the Martin Lake stack parameters used in the first set of modeling (Round 1), it is noted that the velocities used there (~28 m/s) are much smaller than those when using the CEM hourly data (~45 m/s) near 100% load. Luminant's comment would seem to be substantiated that the Sierra Club stack velocities for the first set of modeling - purported to represent 100% load - were less than those characteristic of 75% load.  The constant temperature (449 K) used for Martin Lake's most recent modeling (Round 3) was the same as that used for earlier sets (Rounds 1 and 2) and so was not a factor in the reduced modeled impacts.

## A.  Freestone-Anderson County

**Comment:** Commenter (0294-TCEQ) stated that Anderson and Panola Counties should be designated as unclassifiable/attainment because their $SO_2$ emissions contributions to their respective proposed nonattainment areas are negligible, and therefore including portions of these counties is unnecessary to control additional $SO_2$ sources.

**EPA's Response:** The EPA disagrees with the comment and refers the commenter to the proposed TSD and our final supplemental TSD for our full evaluation. In the revised modeling from Sierra Club, there are still a number of receptors with values above the NAAQS, therefore part of these counties have modeled nonattainment and part of the county is being designated as nonattainment.

**Comment:** Also see General comments above and EPA's Responses.

## B. Gregg County

46

**Comment:** Commenter (0294-TCEQ) stated the EPA should revise its proposed designation for Gregg County to attainment to comply with federal regulations at 40 CFR 50.17(b) and to reflect the observed air quality data from the regulatory monitor located in that portion of the county which has shown attainment since 2010.

Commenter (0285-Stoudt) requested that the EPA designate Gregg County as attainment. The commenter stated the EPA's proposal to designate portions of Gregg County as nonattainment disregards the certified monitoring data that are below the standard and relies instead on air quality modeling data of questionable origin and reliability. Commenter stated that the model's level of over-prediction should not be acceptable as the basis for a decision as significant as an attainment designation, particularly when certified monitoring data is available. The commenter stated that the proposed nonattainment area boundaries went beyond the receptors identified in the model as impacted by the Martin Lake Steam Electric Station., most of these receptors were over Lake Cherokee where potential exposure would be intermittent, and as a result, these boundaries include additional area in Gregg County for which there is no basis for a designation. The commenter stated that it seems questionable for a party who initiated the litigation, the Sierra Club, leading to an agreement concerning the designation process to provide the government with which it reached an agreement the data on which designations would be made.

One commenter (0328-Luminant) stated the EPA's proposal is unlawful and should not be finalized, in part, because the portion of Gregg County designated nonattainment contains a monitor that has collected actual data demonstrating attainment with the standard; thus a nonattainment designation for this area is wholly unsupported. Commenter stated the EPA should designate Gregg County as attainment because the design value for the monitor in the county is well below the $SO_2$ NAAQS.

**EPA's Response:**
Regarding the claim that EPA's regulations at 40 CFR 50.17(b) restrict EPA's authority to base designations only on monitoring data, the EPA disagrees that it is so limited. That section simply states how the NAAQS is shown to be met at a monitoring site, but it does not by its terms preclude EPA's evaluation of and reliance upon additional kinds of information when issuing designations under CAA section 107. In fact, when EPA promulgated that section, it explained in the preamble to the rule that EPA expected to continue its historical practice of also basing designations under $SO_2$ NAAQS, where appropriate, on modeling information. Therefore, EPA concludes that it may, as indicated in sections 107(d)(1)(A)-(B) of the statute, base its designations on a broader set of "available information" as it "deems necessary" or "deems appropriate" to best support its technical conclusion.

In response to the comment arguing that it is inappropriate for EPA to consider and rely upon information submitted by a litigant who filed suit to compel EPA to act in the first instance, EPA notes that the commenters logic would compel that the agency also reject all information submitted by the State of Texas, who has also filed such suit against EPA in a separate case and who intervened as a plaintiff in the same suit filed by Sierra Club. EPA notes that the agency often is presented with information and data in rulemaking actions from entities that had previously filed suit to compel the subject agency action. Nothing in the Clean Air Act suggests that such litigants are subsequently precluded from submitting information to support an

advocated regulatory outcome. Consequently, in this case, both the State of Texas and Sierra Club have properly submitted information for EPA to consider in this supplemental final action, and EPA has reasonably evaluated it.

As discussed in previous comments, EPA received additional modeling from Sierra Club with hourly emission rates and revised background levels. With these refinements the area modeled as nonattainment became smaller and no longer includes portions of Gregg County. As a result, EPA will finalize a boundary that does not include Gregg County and should address the commenters concerns.

*Comment:* Also see General comments above and EPA's Responses.

## C. Milam County

*Comment:* See General comments above and EPA's Responses.

## D. Panola County

*Comment:* Commenter (0294-TCEQ) stated that Anderson and Panola Counties should be designated as unclassifiable/ attainment because their $SO_2$ emissions contributions to their respective proposed nonattainment areas are negligible, and therefore including portions of these counties is unnecessary to control additional $SO_2$ sources.

*EPA's Response:* The EPA disagrees with the comment and refers the commenter to the final supplemental TSD for our full evaluation. In our final supplemental TSD we have decreased the nonattainment area, but it still includes parts of Anderson and Panola Counties. In particular, EPA is required under the Clean Air Act to designate areas that have air quality that is not meeting the standard and that have emissions that contribute to nonattainment. In this case, EPA is finding that available information indicates that some portions of these counties are experiencing air quality that is in excess of the standard.

*Comment:* Also see General comments above and EPA's Responses.

## E. Rusk County

*Comment:* See General comments above and EPA's Responses.

## F. Titus County

*Comment:* One commenter (0328-Luminant) stated that Luminant has provided to TCEQ a modeling report (attachment 3 to their comment letter) which supports a NAAQS attainment demonstration for the plant. Commenter stated this report documents the use of AERMOD

48

modeling to characterize the $SO_2$ concentrations around the Monticello Steam Electric Station using the 2012-2014 actual hourly emissions. Commenter stated the use of source characterization techniques (AERLIFT and AERMOIST) as well as the low wind options (ADJ_U* and LOWWIND3) are supported by EPA's Appendix W proposals as well as peer-reviewed papers available for each option. Commenter stated that the modeling results remain highly conservative (by maximizing concentration estimates) because they do not account for the penetrated plume over-prediction, which could easily result in a much lower actual concentration, as was found by EPA for the Gibson Generating Station.

***EPA's Response:***

As discussed in more detail in other comments, Luminant has combined the use of several unapproved modeling techniques and unproven contentions about the approved model to conclude that the area around Monticello is showing attainment.   In contrast, Sierra Club has used approved approaches to modeling and provided additional modeling during the comment period to address concerns raised regarding their first two modeling submissions.   EPA's view is that we must consider such modeling information using accepted methods in making our decision.  As also explained elsewhere, the situations for these Texas areas are different from the Gibson situation, where the siting of the monitors was in the areas of expected maximum ambient concentrations.  No such showing has been made for monitors near these Texas areas and the closest monitors are 19 and 40 kilometers from Martin Lake and Big Brown respectively. EPA's evaluation is that the monitors are not near the sources and are not in or near the areas with the highest modeled impacts.  We have discussed elsewhere in this RTC and the supplemental Final TSD the inappropriateness of modeling using AERLIFT and AERMOIST and the proposed beta options of ADJ_U* and LOWWIND3.  As to any potential plume penetration over-prediction we also discuss in another response and in our supplemental TSD, but we note the values are above the standard and any impacts from such a phenomenon (if they exist at all) have not been shown by the commenter and would not be expected to result in values large enough to result in no modeled values above the $SO_2$ NAAQS.

***Comment:*** Also see General comments above and EPA's Responses.

**Tab 454: Response to Petition for Reconsideration and Administrative Stay to Vistra Energy (Sept. 21, 2017)**



E. SCOTT PRUITT
ADMINISTRATOR

September 21, 2017

Mr. Daniel Jude Kelly
Vice President and Associate General Counsel
Vistra Energy
1601 Bryan Street
Dallas, Texas 75201

Re: Response to Petition for Reconsideration and Administrative Stay

Dear Mr. Kelly:

Thank you for your petition for reconsideration and administrative stay dated February 13, 2017, to U.S. Environmental Protection Agency Acting Administrator Catherine McCabe regarding the EPA's December 13, 2016, final rule titled, "Air Quality Designations for the 2010 Sulfur Dioxide (SO₂) Primary National Ambient Air Quality Standard – Supplement to Round 2 for Four Areas in Texas: Freestone and Anderson Counties, Milam County, Rusk and Panola Counties, and Titus County" (81 FR 89870). In the petition, Vistra Energy Corporation requests that the EPA reconsider and immediately stay the effective date of the final rule for the three areas in Texas designated as nonattainment for the 2010 SO₂ Primary National Ambient Air Quality Standard.

We applaud the state and company's commitment to setting up a monitoring network and stand ready to provide constructive guidance regarding the best methods for collecting air quality information for these areas. After review of the information contained in your petition, we intend to undertake an administrative action with notice and comment to revisit the nonattainment designation for the portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County. While the notice-and-comment action is pending, the SO₂ nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties and Titus County set out in the December 13, 2016, *Federal Register* remain effective.

While the designations for these areas remain effective, the EPA is considering a variety of administrative options for revisiting them, some of which may alleviate associated and pending planning obligations. It is our intent to provide clarity regarding any potential changes before the state or regulated entity expend resources investing in regulatory obligations that are currently required. Accordingly, in order to better assist us in considering the available administrative

1200 PENNSYLVANIA AVE. NW • MAIL CODE 1101A • WASHINGTON, DC 20460 • (202) 564-4700 • FAX: (202) 501-1450

This paper is printed with vegetable-oil-based inks and is 100-percent postconsumer recycled material, chlorine-free-processed and recyclable.

App. 1366

options, we remain interested in a continued dialogue to discuss the state agency and stakeholder resource decisions likely to be impacted during the pendency of this review.

    If you have any questions, please contact me or have your staff contact Anna Marie Wood of the Office of Air Quality Planning and Standards at wood.anna@epa.gov or (919) 541-3604.

                    Respectfully yours,

                    E. Scott Pruitt

**Tab 459: 84 Fed. Reg. 43,757 (Aug. 22, 2019)**

because it implements a previously promulgated federal standard.

*I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

This action is not subject to Executive Order 13211 because it is not a significant regulatory action under Executive Order 12866.

*J. National Technology Transfer and Advancement Act (NTTAA) and 1 CFR Part 51*

This action involves technical standards. The EPA proposes to use EPA Methods 2, 2E, 3, 3A, 3C, 18, 21, 25, 25A, and 25C of 40 CFR part 60, appendix A. The EPA identified 15 voluntary consensus standards (VCS) as being potentially applicable (ASTM D3154–00 (2006), ASTM D3464–96 (2007), ASTM D3796–90 (2001), ANSI/ASME PTC 19–10–1981 Part 10, ASME B133.9–1994 (2001), ISO 10396:1993 (2007), ISO 12039:2001, ISO 10780:1994, ASTM D5835–95 (2013), ASTM D6522–11, ASTM D6420–99 (2010), CAN/CSA Z223.2–M86 (1999), ASTM D6060–96 (2009), ISO 14965:2000(E), EN 12619(1999)). The EPA determined that 14 of the 15 candidate VCS identified for measuring emissions of pollutants or their surrogates subject to emission standards in the rule would not be practical due to lack of equivalency, documentation, validation data, and other important technical and policy considerations. The agency identified no equivalent standards for EPA Methods 2E, 21, and 25C. However, one VCS was identified as an acceptable alternative to EPA Method 3A.

The VCS ASTM D6522–11, "Standard Test Method for the Determination of Nitrogen Oxides, Carbon Monoxide, and Oxygen Concentrations in Emissions from Natural Gas-Fired Reciprocating Engines, Combustion Turbines, Boilers, and Process Heaters Using Portable Analyzers," is an acceptable alternative to EPA Method 3A when used at the wellhead before combustion. It is advisable to know the flammability and check the lower explosive limit of the flue gas constituents, prior to sampling, in order to avoid undesired ignition of the gas. The results of ASTM D6522–11 may be used to determine nitrogen oxides and carbon monoxide emission concentrations from natural gas combustion at stationary sources. This test method may also be used to monitor emissions during short-term emission tests or periodically in order to optimize process operation for nitrogen oxides and carbon monoxide control. The

EPA's review, including review of comments for these 15 methods, is documented in the memorandum, *Voluntary Consensus Standard Results for Emission Guidelines and Compliance Times for Municipal Solid Waste Landfills, 2016,* which is available in the docket for the 2016 MSW Landfills EG (Docket ID Item No. EPA–HQ–OAR–2014–0451–0206).

*K. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

The EPA believes that this action does not have disproportionately high and adverse human health or environmental effects on minority populations, low-income populations, and/or indigenous peoples, as specified in Executive Order 12898 (59 FR 7629, February 16, 1994). The EPA has determined that because this action increases the level of environmental protection for all affected populations without having any disproportionately high and adverse human health or environmental effects on any population, including any minority, low-income, or indigenous populations. To the extent that any minority, low-income, or indigenous subpopulation is disproportionately impacted by landfill gas emissions due to the proximity of their homes to sources of these emissions, that subpopulation also stands to see increased environmental and health benefit from the emission reductions called for by this action. The results of the demographic analysis are presented in the *EJ Screening Report for Municipal Solid Waste Landfills,* July 2016, a copy of which is available in the 2016 MSW Landfills EG docket (Docket ID Item No. EPA–HQ–OAR–2014–0451–0223).

Dated: August 14, 2019.

**Andrew R. Wheeler,**
*Administrator.*

[FR Doc. 2019–17822 Filed 8–21–19; 8:45 am]

**BILLING CODE 6560–50–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 81**

**[EPA–HQ–OAR–2014–0464; FRL–9998–54–OAR]**

**Error Correction of the Area Designations for the 2010 1-Hour Sulfur Dioxide (SO₂) Primary National Ambient Air Quality Standard (NAAQS) in Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

---

**SUMMARY:** The Environmental Protection Agency (EPA) is proposing to correct an error in the designations for three areas in Texas: Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County. On December 13, 2016, portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County were designated as nonattainment for the 2010 primary sulfur dioxide (SO₂) National Ambient Air Quality Standard (NAAQS). Under our Clean Air Act (CAA or Act) authority to correct errors, the EPA is proposing that we erred in not giving greater weight to Texas' preference to characterize air quality through monitoring, and steps undertaken by Texas to begin monitoring in these three areas, when considering all available information; in relying on available air quality analyses in making the initial designations that the EPA recognizes included certain limitations; or a combination of these two issues. Therefore, to correct these errors, the EPA is proposing that the previously designated nonattainment areas in Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas each be revised to be designated as unclassifiable.

**DATES:** Comments must be received on or before September 23, 2019. Please refer to **SUPPLEMENTARY INFORMATION** for additional information on the comment period.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–HQ–OAR–2014–0464, at *http://www.regulations.gov.* Follow the online instructions for submitting comments. Once submitted, comments cannot be edited or removed from regulations.gov. The EPA may publish any comment received to our public docket. Do not submit electronically any information you consider to be Confidential

Business Information (CBI) or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. The EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.,* on the Web, Cloud, or other file sharing system). For additional submission methods, the full EPA public comment policy, information about CBI or multimedia submissions, and general guidance on making effective comments, please visit *https://www2.epa.gov/dockets/ commenting-epa-dockets.*

**FOR FURTHER INFORMATION CONTACT:** For further information concerning this action, please contact Corey Mocka, U.S. EPA, Office of Air Quality Planning and Standards, Air Quality Policy Division, Mail Code C539–01, 109 T.W. Alexander Drive, Research Triangle Park, NC 27709; by telephone at (919) 541–5142 or by email at *mocka.corey@ epa.gov.*

**SUPPLEMENTARY INFORMATION:** Throughout this document wherever "we," "us," or "our" is used, we mean the EPA.

**Table of Contents**

I. What is the purpose of this action?
   A. CAA Legal Authority
   B. Background on the Designations of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas
   C. Purpose of This Action
II. Instructions for Submitting Public Comments and Internet Website for Rulemaking Information
   A. Invitation To Comment
   B. What should I consider as I prepare my comments for the EPA?
   C. Where can I find additional information for this rulemaking?
III. Environmental Justice Concerns
IV. Statutory and Executive Order Reviews
   A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review
   B. Executive Order 13771: Reducing Regulations and Controlling Regulatory Costs
   C. Paperwork Reduction Act (PRA)
   D. Regulatory Flexibility Act (RFA)
   E. Unfunded Mandates Reform Act (UMRA)
   F. Executive Order 13132: Federalism
   G. Executive Order 13175: Consultation and Coordination With Indian Tribal Government
   H. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks
   I. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution or Use
   J. National Technology Transfer and Advancement Act (NTTAA)
   K. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

**I. What is the purpose of this action?**

*A. CAA Legal Authority*

Section 110(k)(6) of the CAA, 42 U.S.C. 7410(k)(6), as amended in 1990, provides: "Whenever the Administrator determines that the Administrator's action approving, disapproving, or promulgating any plan or plan revision (or part thereof), *area designation,* redesignation, classification or reclassification was in error, the Administrator may in the same manner as the approval, disapproval, or promulgation revise such action as appropriate without requiring any further submission from the state. Such determination and the basis thereof shall be provided to the state and the public." (Emphasis added.)

We interpret this provision to authorize the agency to make corrections to a promulgated area designation when it is shown to our satisfaction (or we discover) that (1) we clearly erred by failing to consider or by inappropriately considering information made available to the EPA at the time of the promulgation, or the information made available at the time of promulgation is subsequently demonstrated to have been clearly inadequate, and (2) other information persuasively supports a change in the action. *See, e.g.,* 57 FR 56762, 56763 (November 30, 1992) (correcting certain designations, boundaries, or classifications for a variety of NAAQS promulgated in agency actions shortly after the 1990 Clean Air Act amendments).

*B. Background on the Designations of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas*

On June 2, 2010, the EPA Administrator signed a notice of final rulemaking that revised the primary SO₂ NAAQS (75 FR 35520 (June 22, 2010)) after review of the existing primary SO₂ standards promulgated on April 30, 1971 (36 FR 8187). The EPA established the revised primary SO₂ NAAQS at 75 parts per billion (ppb), which is attained when the 3-year average of the annual 99th percentile of daily maximum 1-hour average concentrations does not exceed 75 ppb. 40 CFR 50.17(a)–(b).

The process for designating areas following promulgation of a new or revised NAAQS is contained in the CAA section 107(d) (42 U.S.C. 7407(d)). After promulgation of a new or revised NAAQS, each governor or tribal leader has an opportunity to recommend air quality designations, including the appropriate boundaries for nonattainment areas, to the EPA (42 U.S.C. 7407(d)(1)(A)). The EPA considers these recommendations when fulfilling its duty to promulgate the formal area designations and boundaries for the new or revised NAAQS. By no later than 120 days prior to promulgating designations, the EPA is required to notify states, territories, and tribes, as appropriate, of any intended modifications to an area designation or boundary recommendation that the EPA deems necessary (42 U.S.C. 7407(d)(1)(B)).

After invoking a 1-year extension of the deadlines to designate areas, as provided for in section 107(d)(1)(B) of the Act, the EPA published an initial round of SO₂ designations for certain areas of the country on August 5, 2013 (referred to as "Round 1") (78 FR 47191). Following the initial designations, three lawsuits were filed against the EPA in different U.S. District Courts, alleging the agency had failed to perform a nondiscretionary duty under the CAA by not designating all portions of the country by the June 2, 2013, statutory deadline. The state of Texas was a plaintiff or plaintiff-intervenor in two of those cases. In one of those cases (*Sierra Club and NRDC* v. *McCarthy,* No. 13–cv–3953), the U.S. District Court for the Northern District of California on March 2, 2015, entered an enforceable order for the EPA to complete the area designations by three specific deadlines according to the court-ordered schedule. The court order required the EPA to designate areas containing sources meeting certain criteria no later than July 2, 2016. The three Texas areas the EPA designated that are the subject of this proposed action contained sources meeting those criteria.

To meet the first court-ordered deadline for the next set of SO₂ designations, known as "Round 2," the final action designating 61 additional areas was signed on June 30, 2016, and a supplemental final action including the designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County, was signed on November 29, 2016 [1]

---

[1] By a series of stipulations of the parties in *Sierra Club and NRDC* v. *McCarthy* and orders of the Court, the deadline for the three areas in Texas that are the subject of this proposed action, and a fourth

(''Round 2 Supplement'') and published at 81 FR 45039 (July 12, 2016) and 81 FR 89870 (December 13, 2016), respectively. To meet the second court-ordered deadline, all remaining undesignated areas, except those where a state has installed and begun timely operating a new $SO_2$ monitoring network meeting the EPA specifications referenced in the EPA's $SO_2$ Data Requirements Rule, were designated on December 21, 2017, with a supplemental amendment on March 28, 2018 (referred to as ''Round 3'') and published at 83 FR 1098 (January 9, 2018) and 83 FR 14597 (April 14, 2018), respectively.[2] Pursuant to the court-ordered schedule, the EPA must complete $SO_2$ designations for the remaining areas of the country by December 31, 2020 (referred to as ''Round 4'').

On August 21, 2015 (80 FR 51052), the EPA separately promulgated an $SO_2$ air quality data rule. The Data Requirements Rule (DRR) requires state air agencies to provide additional monitoring or modeling information to characterize $SO_2$ air quality in areas containing $SO_2$ emissions sources either meeting certain criteria or that have otherwise been listed under the DRR by the EPA or state air agencies. In lieu of the $SO_2$ air quality characterization required under the DRR, air agencies could demonstrate that the listed sources restricted their annual $SO_2$ emissions to less than 2,000 tons per year (tpy) through federally enforceable and in effect emission limits, or provide documentation that the sources had been shut down, by January 13, 2017. Thus, for the purpose of meeting the DRR obligations, states were provided options on how to characterize their air quality, including setting up and beginning operation of new $SO_2$ monitoring networks by January 1, 2017. States were required to notify the EPA by July 1, 2016, of which characterization option they had selected for each listed DRR source. Since states were not required under the DRR to complete characterization of air quality in subject areas for purposes of that rule before the Round 2 deadline for the EPA to issue area designations, for those areas—including the three Round 2 Texas areas that are the subject of this proposed action—the EPA did not expect to have the results of the DRR

implementation in time for those areas' designations.

In Freestone County, Big Brown Steam Electric Station (''Big Brown'') was the largest source of $SO_2$ emissions in the area, but recently and permanently suspended operations as of January 2018, and the majority of its New Source Review (NSR) permits were voided on March 29, 2018, and it's operating permit was voided August 3, 2018.[3] In Titus County, Monticello Steam Electric Station (''Monticello'') was the largest source of $SO_2$ emissions in the area, but recently and permanently suspended operations as of February 2018 and the majority of its NSR permits were voided on February 14, 2018 and its operating permit was voided on August 3, 2018.[4][5] In Rusk County, Martin Lake Electric Station is the largest source of $SO_2$ emissions in the area and continues to operate. All three facilities are owned by Vistra Energy Corp and its subsidiary Luminant (''Vistra Energy'').

In 2011, following the promulgation of the revised NAAQS, the state of Texas initially recommended an unclassifiable designation for Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County since, at the time, there were not any $SO_2$ monitors in these counties. In September 2015, Texas updated its recommendation to unclassifiable/attainment for areas of the state where there were no monitors, including the above counties. Texas stated its position that ambient air monitoring data were the appropriate information for use in the designation process. In December 2015, prior to the EPA's notification to the Governor of our intended designations, we received air quality modeling from the Sierra Club for these three areas, but we did not receive any other monitoring, modeling, or technical information from Texas or Vistra Energy. In February 2016, the EPA notified Texas of our intended designations of nonattainment for three separate areas covering portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County,

based on the modeling submitted by Sierra Club.[6]

During the public comment period in March 2016, the EPA received substantive comments from citizens, Sierra Club, Vistra Energy, the Texas Commission on Environmental Quality (TCEQ), and the Governor of the state of Texas regarding our intended nonattainment designations for these three areas. Summaries of the comments received can be found in the Responses to Significant Comments on the Designation Recommendations for the 2010 Sulfur Dioxide National Ambient Air Quality Standards (NAAQS)—Supplement for Four Areas in Texas Not Addressed in June 30, 2016, Version.[7] Vistra Energy submitted air dispersion modeling for all three areas, and the Sierra Club submitted updated versions of the modeling previously submitted. The EPA determined that the modeling submitted by Vistra Energy was not representative of current air quality in these areas for several reasons. For example, Vistra Energy's modeling used a non-EPA preprocessor model, AERLIFT, to increase the observed temperatures and velocities of the plumes exiting from the stacks, which the EPA determined was not adequately justified, and, thus, could not be relied upon in the designations decision-making process. The Sierra Club's updated modeling used the latest model version available at the time, in accordance with the general recommendations on modeling provided by the EPA.[8] Texas did not submit modeling but maintained its position that monitoring of air quality was the proper basis for designating these areas. Concerning the Sierra Club modeling, Texas claimed that this modeling ''has errors and clearly overestimates actual $SO_2$ concentrations.'' [9] Full reviews of the modeling received can be found in the

---

area, Milam County, which is not part of this proposed action, was extended to November 29, 2016.

[2] The remaining undesignated portions of the five Texas counties that are the subject of this notice were designated attainment/unclassifiable in Round 3.

[3] See docket item number EPA–HQ–OAR–2014–0464–0455 for a list of Big Brown's voided NSR permits. Big Brown's voided operating permit is also located in Docket EPA–HQ–OAR–2014–0464.

[4] For Monticello, see docket item number EPA–HQ–OAR–2014–0464–0456 for a list of voided NSR permits, and docket item number EPA–HQ–OAR–2014–0464–0457 for the voided operating permit.

[5] Any remaining NSR or material handling permits for Big Brown and Monticello will only be maintained while the facilities complete closure activities related to coal piles, silos, conveyors, and other shutdown tasks.

[6] See the 120-day letter from the EPA to Texas: https://www.epa.gov/sites/production/files/2016-03/documents/il-epa-resp-r2.pdf and the Technical Support Document (TSD) for the intended designations for Texas: https://www.epa.gov/sites/production/files/2016-03/documents/tx-epa-tsd-r2.pdf (''Intended TSD'').

[7] https://www.epa.gov/sites/production/files/2016-11/documents/rtc_so2_comments_received_document_4_tx_sources_final_0.pdf.

[8] See the $SO_2$ NAAQS Designations Source-Oriented Monitoring Technical Assistance Document at https://www.epa.gov/sites/production/files/2016-06/documents/so2monitoringtad.pdf, and the $SO_2$ NAAQS Designations Modeling Technical Assistance Document at https://www.epa.gov/sites/production/files/2016-06/documents/so2modelingtad.pdf.

[9] Comment submitted on March 31, 2016 by Richard A. Hyde, Executive Director, Texas Commission on Environmental Quality. Docket ID# EPA–HQ–OAR–2014–0464–0294.

Texas Intended TSD [10] and Texas Final TSD [11] from Round 2. The final nonattainment designations were based on EPA's analysis of all the air quality modeling submitted by Vistra Energy and Sierra Club, as well as consideration of comments submitted by Texas.

On June 29, 2016, timely meeting its DRR option selection deadline, Texas separately communicated to the EPA that it had chosen the monitoring pathway for these areas to meet its obligations under that rule to characterize air quality for the sources in these areas that were listed under the DRR. In Texas' annual monitoring network plan for 2016, the state indicated that it intended to site new SO$_2$ monitors in any Round 2 area that the EPA designated as nonattainment. Following up on this intention, in its 2017 annual monitoring network plan, Texas included new proposed SO$_2$ monitoring sites in Freestone, Titus, and Rusk Counties to assess air quality in the three new SO$_2$ nonattainment areas involving Vistra Energy sources. Texas referred to the 2016 Sierra Club modeling analysis, among other information, to inform their proposed siting of the new monitors, but stated: "The use of the 2016 Sierra Club modeling analysis for possible monitor placement decisions does not infer TCEQ's concurrence with the use of this modeling analysis for any other purpose." [12] The EPA approved the three monitor siting proposals in an August 10, 2017, letter to TCEQ. [13]

On February 13, 2017, the state of Texas, TCEQ, and Vistra Energy and its subsidiary companies filed petitions for judicial review of the Round 2 Supplement in the Fifth Circuit Court of Appeals. [14] On that same day, Vistra Energy sent the EPA a petition for reconsideration and administrative stay of EPA's nonattainment designations for Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County. On March 15, 2017, TCEQ also submitted a request for an administrative stay of the Round 2 Supplement. On September 21, 2017, the EPA responded to Vistra Energy's February 2017 petition for reconsideration by indicating an intent to undertake an administrative action with notice and comment to revisit the nonattainment designations for the three areas. On October 12, 2017, the Fifth Circuit Court of Appeals granted EPA's motion to place the consolidated challenges to the Round 2 Supplement in abeyance on this basis. In December 2017, TCEQ submitted a new petition for reconsideration and Vistra Energy submitted additional information to support their February 2017 petition for reconsideration. Both submissions in December 2017 provided information regarding the planned retirements of the Big Brown (Freestone/Anderson Counties) and Monticello (Titus County) facilities. Since December 2017, both the Big Brown and Monticello power plants have ceased operations and surrendered their operating permits.

In November 2017, Texas sited an SO$_2$ monitor at the Martin Lake (Rusk/ Panola Counties) power plant. Texas also sited and began operating a monitor around the Big Brown power plant (Freestone/Anderson Counties) on October 30, 2017. The Big Brown power plant shut down in February 2018; however, Texas is currently continuing to operate the monitor. The EPA anticipates that these monitors will not have 3 years of monitoring data necessary to fully evaluate compliance with the SO$_2$ NAAQS until the end of calendar year 2020. Texas also planned to site a monitor around the Monticello power plant (Titus County), but once the retirement of the facility had been announced, the monitor was not installed.

## C. Purpose of This Action

In this document, the EPA is proposing that we erred in failing to give greater weight to the state of Texas' preference to use ambient air monitors to characterize SO$_2$ air quality in their state for purposes of the designation, when we considered all available information at the time of designation. The EPA has consistently recognized appropriately sited ambient air monitoring data as relevant information for determining an area's designation for the 2010 1-hour SO$_2$ NAAQS. [15] The

EPA's DRR gave states the ability to choose whether to characterize areas around listed sources through modeling or monitoring. It was also the EPA's stated intention in developing the overall implementation strategy for the 2010 SO$_2$ NAAQS to use the air quality characterizations required under the DRR to inform area designations, where those characterizations were conducted in time to inform the EPA's designations rounds. [17] However, areas required to be designated in Round 2 by the first court-ordered deadline of July 2, 2016, generally were designated before the air quality characterization information required under the DRR became available, and were required to be designated regardless of the state's choice of air quality characterization, including those states that planned to begin operating a new monitoring network in such an area in 2017 in accordance with the DRR.

Since 2011, the state of Texas has consistently communicated to the EPA their support of ambient air monitoring data as the appropriate information for use in the designations process for areas in Texas. [18] Because the

[10] https://www.epa.gov/sites/production/files/2016-03/documents/tx-epa-tsd-r2.pdf.

[11] https://www.epa.gov/sites/production/files/2016-11/documents/texas_4_deferred_luminant_tsd_final_docket.pdf.

[12] Appendix E: Sulfur Dioxide Data Requirements Rule Monitor Placement Evaluations, from 2017 TCEQ Annual Monitoring Network Plan.

[13] TCEQ subsequently deployed SO$_2$ monitors near Big Brown on October 30, 2017, and near Martin Lake on November 1, 2017. No monitors where deployed in the area around Monticello as the source was retired on February 8, 2018 (*see* 2018 TCEQ Annual Monitoring Network Plan).

[14] Sierra Club additionally filed a petition for judicial review of this action in the D.C. Circuit Court of Appeals, which was transferred to the Fifth Circuit on November 2, 2017, and consolidated with the pending petitions.

[15] *See* "Updated Guidance for Area Designations for the 2010 Primary Sulfur Dioxide National Ambient Air Quality Standard," memorandum to Regional Air Division Directors, Regions I–X, from Stephen D. Page, dated March 20, 2015, available at *https://www.epa.gov/sites/production/files/2016-04/documents/20150320so2designations.pdf*. The

EPA supplemented this guidance with documents first made available to states and other interested parties in 2013 and updated in 2016. See SO$_2$ NAAQS Designations Source-Oriented Monitoring Technical Assistance Document (February 2016), available at *https://www.epa.gov/sites/production/files/2016-06/documents/so2monitoringtad.pdf*, and SO$_2$ NAAQS Designations Modeling Technical Assistance Document (August 2016), available at *https://www.epa.gov/sites/production/files/2016-06/documents/so2modelingtad.pdf*.

[16] The EPA has relied on monitors, where appropriate, to determine that areas were affirmatively attaining or not attaining the 2010 SO$_2$ NAAQS in all three rounds of designations. *See, e.g.*, any Round 1 designations (all areas were designated based on monitored data), Round 2 designation for the Gibson County Area in Indiana (*https://www.epa.gov/sites/production/files/2016-03/documents/in-epa-tsd-r2.pdf* and *https://www.epa.gov/sites/production/files/2016-07/documents/r5_in_final_designation_tsd_06302016.pdf*), and Round 3 designation for the North Denver Area in Colorado (*https://www.epa.gov/sites/production/files/2017-08/documents/7_co_so2_rd3-final.pdf*).

[17] *See* "Next Steps on Designating Areas and Implementing the 1-Hour SO$_2$ Standard—EPA Webinar for State, Local, and Tribal Air Agencies," February 13, 2013, page 2, *https://archive.epa.gov/apti/video/web/pdf/presentation-7.pdf*; Data Requirements Rule for the 1-Hour Sulfur Dioxide Primary NAAQS—Proposed Rule, 79 FR 27446 (May 13, 2014) ("[t]he air quality data developed by the states in accordance with this rulemaking would be used by the EPA in future rounds of area designations for the 1-hour SO$_2$ NAAQS").

[18] Examples of these communications include: TCEQ's 2011 Comments on Guidance for 1-Hour SO$_2$ NAAQS SIP Submissions at *https://www.regulations.gov/document?D=EPA-HQ-OAR-2010-1059-0034*, TCEQ's 2014 comments regarding Data Requirements for the 1-Hour SO$_2$ NAAQS at *https://www.regulations.gov/document?D=EPA-HQ-OAR-2013-0711-0051*, Texas' 2016 Round 2 recommendations at *https://www.epa.gov/sites/*

areas around SO₂ emissions sources in Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County were subject to the Round 2 deadline of July 2, 2016, these areas were required to be designated at that time, regardless of the state of Texas' preference to characterize the areas based on monitoring data and its intention to monitor these areas, given additional time.

However, the EPA is proposing that we erred in failing to give greater weight to the preference of the state to monitor air quality in these areas when considering all available information at the time of designation. Accordingly, in light of the lack of monitoring data available at that time, and Texas' expressed preference at that time for designations of these areas to be based on monitoring data, we are proposing to correct this error by designating the areas as unclassifiable.

The EPA is also proposing a second, independent grounds for error, that we erred in relying on available air quality modeling, in particular modeling submitted by Sierra Club, in making the initial nonattainment designations for these three areas. As noted earlier, the modeling submitted by Vistra Energy, which purported to show attainment, used a non-EPA preprocessor which constitutes an alternative model for which the state did not secure approval from the EPA per Appendix W to 40 CFR part 51—Guideline on Air Quality Models. Also, as noted earlier, the modeling submitted by Sierra Club, which purported to show nonattainment, while developed in accordance with the general recommendations on modeling provided by the EPA, contained key limitations and uncertainties. On one hand, we noted in the Texas Intended TSD and Texas Final TSD from Round 2 that individually these key limitations and uncertainties would not significantly change modeled results or, in many cases, could result in underestimation of SO₂ concentrations.[19] On the other hand, given the possible collective significance of these issues and, in the case of the areas around the Martin Lake and Monticello power plants, given that the maximum modeled concentrations are within about 10% of the primary SO₂ NAAQS, we are less confident in our prior statements that potential adjustments to the Sierra Club modeling would not result in modeled values near or below the NAAQS.[20] We, therefore, propose that our error in relying on the Sierra Club modeling represents an insufficient basis for the EPA's initial nonattainment designations. Accordingly, we are proposing to correct this error by designating the areas as unclassifiable.

One of the most significant limitations and uncertainties with Sierra Club's modeling is the absence of variable stack conditions and representation of 100 percent load stack parameters. As commenters on the EPA's proposed designations noted, this issue is particularly pronounced as the Electric Reliability Council of Texas (ERCOT) market is competitive "with plant dispatch based on variable cost" and falling natural gas prices and renewable capacity resulting in these units running in variable operations.[21] The EPA noted in the technical support document for the 2016 designations in Indiana that "use of hourly stack parameters more accurately characterize plume characteristics, which will provide greater reliability both in the estimated concentration and in the geographical distribution of concentrations."[22] Other limitations and uncertainties with the Sierra Club modeling identified in the Texas Intended TSD and the Texas Final TSD for the 2016 SO₂ designations include: Use of an older version of AERMOD; representation of recent emissions, including controls after the 2011 National Emissions Inventory; inappropriate elevation of flagpole receptors; use of a larger receptor grid than recommended; treatment of building downwash, surface meteorology, hourly wind inputs,

potential to emit/allowable emissions, variable stack temperature, and velocity; approach to estimation of background concentrations; and failure to include building downwash and fenceline, or source contribution in the modeling analysis. While individually these deficiencies are not dispositive, collectively they are a sufficient basis for the EPA to propose that we erred in relying on the Sierra Club modeling in making the initial nonattainment designations for the three Texas areas.

This proposed rationale is consistent with related statements by the EPA. The EPA's March 2011 Guidance explained that given the currently limited network of SO₂ monitors and our expectation that states will not yet have completed appropriate modeling of all significant SO₂ sources, we anticipated that most areas of the country will be designated "unclassifiable." [23] The EPA's updated designations guidance in March 2015 indicated that: "In the absence of information clearly demonstrating a designation of 'attainment' or 'nonattainment,' the EPA intends to designate areas as 'unclassifiable' when it takes action pursuant to the court order." [24] In promulgating revisions to the SO₂ NAAQS in 2010, the EPA stated that where informational records "are insufficient to support initial designations of either 'attainment' or 'nonattainment' * * * EPA is required to issue a designation for the area of 'unclassifiable.' " [25] The EPA also stated that designations would be determined "based on 3 years of complete, quality assured, certified monitoring data" [26] and that the EPA would allow for modeling in addition to monitoring (where monitoring was insufficient).[27] The Northern District Court of California also stated in regards to the consent decree that the appropriate remedy was to ". . . require the EPA to issue designations pursuant to a schedule, not to mandate that EPA issue any particular designation." [28]

Furthermore, the EPA recognizes that its potential future reliance on properly sited monitors rather than dispersion modeling—as could be the case in a future redesignation of the Martin Lake power plant in Rusk/Panola Counties

---

production/files/2016-03/documents/tx-rec-r2.pdf, TCEQ's 2016 Annual Monitoring Network Plan at https://www.tceq.texas.gov/assets/public/compliance/monops/air/annual_review/historical/2016-AMNP.pdf, and TCEQ's 2017 Annual Monitoring Network Plan at https://www.tceq.texas.gov/assets/public/compliance/monops/air/annual_review/historical/2017-AMNP.pdf.

[19] See the Technical Support Document (TSD) for the intended designations for Texas: https://www.epa.gov/sites/production/files/2016-11/documents/texas_4_deferred_luminant_tsd_final_docket.pdf ("Final TSD").

[20] The maximum predicted 99th percentile 1-hour SO₂ concentrations are 224 µg/m³ for the modeling domain that includes the Martin Lake power plant, and 212 µg/m³ for the modeling domain that includes the Monticello power plant. (The 1-hour SO₂ NAAQS is achieved at 196.4 µg/m³.) The prior TSDs erred in stating that the modeling for Monticello showed concentrations "almost double the standard."

[21] Comment submitted on March 31, 206 from Kim Mireles, Luminant Generation Company, LLC. Docket ID# EPA–HQ–OAR–2014–0464–0328. ERCOT is the independent system operator responsible for dispatching electricity to the majority of Texas consumers.

[22] Technical Support Document for EPA's Intended Round 2 Area Designations for the 2010 SO₂ NAAQS in Indiana (page 46) at https://www.epa.gov/sites/production/files/2016-03/documents/in-epa-tsd-r2.pdf.

[23] Memorandum dated March 24, 2011, titled "Area Designations for the 2010 Revised Primary Sulfur Dioxide National Ambient Air Quality Standards," from Stephen D. Page, Director of EPA's Office of Air Quality Planning and Standards, to Regional Air Division Directors.

[24] https://www.epa.gov/sites/production/files/2016-06/documents/20150320so2designations.pdf.

[25] 75 FR 35571.

[26] 75 FR 35570–71.

[27] 75 FR 35569.

[28] Sierra Club, et al. v. McCarthy, 2015 WL 889142 at 11.

area and the Big Brown power plant in Freestone/Anderson Counties area—would be consistent with the approach the agency took in 2016 in designating the area around the Gibson power plant in Gibson County, Indiana. The EPA has also recognized in other areas that, where conflicting sets of model results exist, the appropriate designation may be "unclassifiable," depending on the facts of that area." [29] [30]

Additionally, the EPA is proposing that our error in relying on the Sierra Club modeling along with our error in failing to give proper weight to Texas' preference for monitoring, represents an insufficient basis for the EPA's initial nonattainment designations. Accordingly, we are proposing to correct this error by designating the areas as unclassifiable.

The proposed revised designation of unclassifiable indicates that the EPA could not determine based on available information at the time of issuing the designation whether the three Texas areas that are the subject of this proposed action were meeting or not meeting the 2010 $SO_2$ NAAQS. The EPA is initiating this notice-and-comment process for the public to comment on the EPA's proposed errors and approach to correct the initial designation for Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County to unclassifiable, rather than nonattainment.

Furthermore, independent from correcting these initial designations, the EPA is proposing to remove the portion of Titus County that was erroneously listed as attainment/unclassifiable on the Texas Part 81 attainment status designations table. As part the Round 3 final designations rule published on January 9, 2018 (83 FR 1098), the EPA inadvertently listed a portion of Titus County (i.e., the portion that is not being designated as part of this proposed

action nor the previous Round 2 final action) as attainment/unclassifiable. Consistent with the rulemaking records, the remaining portion of Titus County should not have been listed as attainment/unclassifiable in the part 81 table.[31] EPA will designate the remaining Titus County area by December 31, 2020 during the Round 4 designations process.

## II. Instructions for Submitting Public Comments and Internet Website for Rulemaking Information

### A. Invitation To Comment

The purpose of this document is to solicit input from the public on EPA's error in designating portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County as nonattainment, and the corrected designations of unclassifiable.

Please be as specific as possible in supporting your views.

• Describe any assumptions and provide any technical information and/or data that you used.

• Provide specific examples to illustrate your concerns, and suggest alternatives.

• Explain your views as clearly as possible.

• Provide your input by the comment period deadline identified.

Previous submissions and supporting technical analyses utilized for the initial Round 2 designations can be found at *https://www.epa.gov/sulfur-dioxide-designations* and, also, in the public docket for these $SO_2$ designations at Docket ID No. EPA–HQ–OAR–2014–0464. Air dispersion modeling input and output files are too large to post in the docket or on the website and must be requested from the EPA Docket Office or from the contact listed in the **FOR FURTHER INFORMATION CONTACT** section. The EPA Docket Office can be contacted at (202) 566–1744, and is located at EPA Docket Center Reading Room, WJC West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC 20004. The hours of operation at the EPA Docket Center are 8:30 a.m.–4:30 p.m., Monday–Friday.

The EPA invites public input on this proposed action regarding error correction of the designations of the Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County areas during the 30-day comment period provided in this document. In order to receive full consideration, input from

the public must be submitted to the docket by September 23, 2019. At this time, the EPA is not asking for public comment on areas beyond the three areas that are the subject of this proposed action. In addition, in finalizing this action the EPA will not revisit comments relating to the designations for these three areas in Texas received in previous public comment periods. (The agency has already responded to these comments in the previous designations actions.) This opportunity for public comment does not affect any rights or obligations of any state, territory, or tribe, or of the EPA, which might otherwise exist pursuant to the CAA section 107(d).

Please refer to the **FOR FURTHER INFORMATION CONTACT** section in this document for specific instructions on submitting comments and locating relevant public documents.

### B. What should I consider as I prepare my comments for the EPA?

1. *Submitting CBI.* Do not submit CBI information to the EPA through *https://www.regulations.gov* or email. Clearly mark the part or all of the information that you claim to be CBI. For CBI in any digital storage media that you mail to the EPA, mark the outside of the digital storage media as CBI and then identify electronically within the digital storage media the specific information that is claimed as CBI. In addition to one complete version of the comment that includes information claimed as CBI, a copy of the comment that does not contain the information claimed as CBI must be submitted for inclusion in the public docket. Information so marked will not be disclosed except in accordance with procedures set forth in 40 Code of Federal Regulations (CFR) part 2. Send or deliver information identified as CBI only to the following address: Tiffany Purifoy, OAQPS CBI Officer, U.S. EPA, Office of Air Quality Planning and Standards, Mail Code C404–02, Research Triangle Park, NC 27711, telephone (919) 541–0878, email at *purifoy.tiffany@epa.gov,* Attention Docket ID No. EPA–HQ–OAR–2014–0464.

2. *Tips for Preparing Your Comments.* When submitting comments, remember to:

• Identify the rulemaking by docket number and other identifying information (subject heading, **Federal Register** date and page number).

• Follow directions.

• Explain why you agree or disagree; suggest alternatives and substitute language for your requested changes.

---

[29] *See* "Technical Analysis for the Sheldon Station, Nebraska Area" in the Technical Support Document for EPA's Intended Round 2 Area Designations for the 2010 $SO_2$ NAAQS in Nebraska (page 33) at *https://www.epa.gov/sites/production/files/2016-03/documents/ne-epa-tsd-r2.pdf,* and in the Final Technical Support Document for EPA's Round 2 Area Designations for the 2010 $SO_2$ NAAQS in Nebraska (page 11) at *https://www.epa.gov/sites/production/files/2016-07/documents/r7_ne_final_designation_tsd_06302016.pdf.*

[30] *See* "Technical Analysis for Gallia County, Ohio" in the Technical Support Document for the EPA's Intended Round 2 Area Designations for the 2010 $SO_2$ NAAQS in Ohio (page 19) at *https://www.epa.gov/sites/production/files/2016-03/documents/oh-epa-tsd-r2.pdf,* and in the Technical Support Document for EPA's Final Round 2 Area Designations for the 2010 $SO_2$ NAAQS in Ohio (page 8) at *https://www.epa.gov/sites/production/files/2016-07/documents/r5_oh_final_designation_tsd_06302016.pdf.*

[31] For examples, see Table 2 in the Round 3 final designations TSD for Texas at *https://www.epa.gov/sites/production/files/2017-12/documents/39-tx-so2-rd3-final.pdf* and footnote #3 of the Texas Part 81 table.

*C. Where can I find additional information for this rulemaking?*

All documents in the docket are listed in the *www.regulations.gov* index, identified by Docket ID No. EPA–HQ–OAR–2014–0464, and on the agency's SO₂ Designations website at *https://www.epa.gov/sulfur-dioxide-designations.* Although listed in the index, some information is not publicly available, *e.g.,* CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, will be publicly available only in hard copy. Publicly available docket materials are available either electronically in *www.regulations.gov* or in hard copy at the EPA Docket Center. Air dispersion modeling input and output files are too large to post in the docket or on the website and must be requested from the contact listed in the **FOR FURTHER INFORMATION CONTACT** section. The EPA Docket Center can be contacted at (202) 566–1744, and is located at EPA Docket Center Reading Room, WJC West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC 20004. The hours of operation at the EPA Docket Center are 8:30 a.m.–4:30 p.m., Monday–Friday.

## III. Environmental Justice Concerns

When the EPA establishes a new or revised NAAQS, the CAA requires the EPA to designate all areas of the United States as either nonattainment, attainment, or unclassifiable. This proposed action would correct an error in the nonattainment designations for Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas for the 2010 SO₂ NAAQS. Area designations address environmental justice concerns by ensuring that the public is properly informed about the air quality in an area. In locations where air quality does not meet the NAAQS, the CAA requires relevant state authorities to initiate appropriate air quality management actions to ensure that all those residing, working, attending school, or otherwise present in those areas are protected, regardless of minority and economic status.

## IV. Statutory and Executive Order Reviews

*A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review*

This action is exempt from review by the Office of Management and Budget because it is proposing to correct an error in previously promulgated designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas for the 2010 1-hour SO₂ NAAQS.

*B. Executive Order 13771: Reducing Regulations and Controlling Regulatory Costs*

This action is not an Executive Order 13771 regulatory action because actions such as error corrections of air quality designations associated with a new revised NAAQS are exempt under Executive Order 12866.

*C. Paperwork Reduction Act (PRA)*

This action does not impose an information collection burden under the PRA. In this action, the EPA is correcting the SO₂ NAAQS designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas promulgated previously on December 13, 2016, and does not contain any information collection activities.

*D. Regulatory Flexibility Act (RFA)*

This proposed error correction action under CAA section 110(k)(6) is not subject to the RFA. The RFA applies only to rules subject to notice-and-comment rulemaking requirements under the Administrative Procedure Act (APA), 5 U.S.C. 553, or any other statute. Section 107(d)(2)(B) of the CAA explicitly provides that designations are exempt from the notice-and-comment provisions of the APA. In addition, designations under CAA section 107(d) are not among the list of actions that are subject to the notice-and-comment rulemaking requirements of CAA section 307(d).

*E. Unfunded Mandates Reform Act (UMRA)*

This action does not contain any unfunded mandate as described in UMRA, 2 U.S.C. 1531–1538 and does not significantly or uniquely affect small governments. The action imposes no enforceable duty on any state, local, or tribal governments or the private sector.

*F. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government. The division of responsibility between the federal government and the states for purposes of implementing the NAAQS is established under the CAA.

*G. Executive Order 13175: Consultation and Coordination With Indian Tribal Government*

This action does not have tribal implications, as specified in Executive Order 13175. This action concerns the designation of portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas for the 2010 SO₂ NAAQS. The CAA provides for states, territories, and eligible tribes to develop plans to regulate emissions of air pollutants within their areas, as necessary, based on the designations. The Tribal Authority Rule (TAR) provides tribes the opportunity to apply for eligibility to develop and implement CAA programs, such as programs to attain and maintain the SO₂ NAAQS, but it leaves to the discretion of the tribe the decision of whether to apply to develop these programs and which programs, or appropriate elements of a program, the tribe will seek to adopt. This rule does not have a substantial direct effect on one or more Indian tribes. It would not create any additional requirements beyond those of the SO₂ NAAQS. This rule, if finalized, would revise the designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas for the SO₂ NAAQS, but no areas of Indian country are intended to be designated by this action. Furthermore, this rule does not affect the relationship or distribution of power and responsibilities between the federal government and Indian tribes. The CAA and the TAR establish the relationship of the federal government and tribes in developing plans to attain the NAAQS, and this rule does nothing to modify that relationship. Thus, Executive Order 13175 does not apply.

*H. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks*

The EPA interprets Executive Order 13045 as applying to those regulatory actions that concern environmental health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of ''covered regulatory action'' in section 2–202 of the Executive Order. This action is not subject to Executive Order 13045 because it does not establish an environmental standard intended to mitigate health or safety risks.

*I. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution or Use*

This action is not subject to Executive Order 13211 because it is not a significant regulatory action under Executive Order 12866.

*J. National Technology Transfer and Advancement Act (NTTAA)*

This rulemaking does not involve technical standards.

*K. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

The EPA believes that this action does not have disproportionately high and adverse human health or environmental effects on minority health or environmental effects on minority populations, low-income populations and/or indigenous peoples, as specified in Executive Order 12898 (59 FR 7629, February 16, 1994). The documentation for this determination is contained in Section IV of this preamble, "Environmental Justice Concerns."

**List of Subjects in 40 CFR Part 81**

Environmental protection, Air pollution control, National parks, Wilderness areas.

Dated: August 13, 2019.

**Anne L. Idsal,**

*Acting Assistant Administrator.*

[FR Doc. 2019–18048 Filed 8–21–19; 8:45 am]

**BILLING CODE 6560–50–P**

---

**DEPARTMENT OF LABOR**

**Office of Federal Contract Compliance Programs**

**41 CFR Part 60–1**

**RIN 1250–AA09**

**Implementing Legal Requirements Regarding the Equal Opportunity Clause's Religious Exemption**

**AGENCY:** Office of Federal Contract Compliance Programs; Labor.

**ACTION:** Notice of proposed rulemaking; correction.

**SUMMARY:** On August 15, 2019, the Office of Federal Contract Compliance Programs (OFCCP) published a proposed rule to clarify the scope and application of the religious exemption contained in section 204(c) of Executive Order 11246, as amended. That document included incorrect information for the quantifiable costs that appear in Table 2. This document corrects Table 2 in the proposed rule.

**DATES:** August 22, 2019.

**FOR FURTHER INFORMATION CONTACT:** Harvey D. Fort, Acting Director, Division of Policy and Program Development, Office of Federal Contract Compliance Programs, 200 Constitution Avenue NW, Room C–3325, Washington, DC 20210. Telephone: (202) 693–0104 (voice) or (202) 693–1337 (TTY).

**SUPPLEMENTARY INFORMATION:** The following correction is made to the document that published in the **Federal Register** on August 15, 2019:

On page 41687, the first line of Table 2. Quantifiable Costs "First-Year Costs $24,197,500" is corrected to read "First-Year Costs $20,325,900".

**Craig E. Leen,**

*Director, OFCCP.*

[FR Doc. 2019–18060 Filed 8–21–19; 8:45 am]

**BILLING CODE 4510–45–P**

---

**FEDERAL COMMUNICATIONS COMMISSION**

**47 CFR Parts 1 and 54**

**[WC Docket Nos. 11–10 and 19–195, FCC No. 19–79]**

**Establishing the Digital Opportunity Data Collection and Modernizing the FCC Form 477 Data Program**

**AGENCY:** Federal Communications Commission.

**ACTION:** Proposed rule.

**SUMMARY:** In this document, the Federal Communications Commission (Commission) adopts a Report and Order and Second Further Notice of Proposed Rulemaking (*Second FNPRM*). This document seeks comment on certain aspects of the Digital Opportunity Data Collection to enhance its accuracy and usefulness. The *Second FNPRM* seeks comment on ways to develop location-specific data that could be used in conjunction with the polygon-based data in the new collection to precisely identify the homes and small businesses that have and do not have access to broadband services. With respect to mobile wireless coverage, the *Second FNPRM* seeks comment on how to align the Digital Opportunity Data Collection with changes in mobile broadband deployment technology, markets, and policy needs. The *Second FNPRM* also seeks comment on how to improve satellite broadband deployment data given the unique characteristics of satellites.

**DATES:** For the *Second FNPRM* comments are due on or before

September 23, 2019, and reply comments are due on or before October 7, 2019. Written comments on the Paperwork Reduction Act information collection requirements must be submitted by the public, OMB, and other interested parties on or before October 21, 2019.

**ADDRESSES:** In addition to filing comments with the Commission's Office of the Secretary, as set forth below, a copy of any comments on the Paperwork Reduction Act information collection requirements contained herein should be submitted to the Commission via email to *PRA@fcc.gov* and to Nicole Ongele, FCC, via email to *Nicole.Ongele@fcc.gov*.

**FOR FURTHER INFORMATION CONTACT:** Wireline Competition Bureau, Kirk Burgee, at (202) 418–1599, *Kirk.Burgee@fcc.gov*, or, Wireless Telecommunications Bureau, Garnet Hanly, at (202) 418–0995, *Garnet.Hanly@fcc.gov*. For additional information concerning the Paperwork Reduction Act information collection requirements contained in this document, send an email to *PRA@fcc.gov* or contact Nicole Ongele at (202) 418–2991.

**SUPPLEMENTARY INFORMATION:** This is a summary of the Commission's *Report and Order and Second Further Notice of Proposed Rulemaking* in WC Docket Nos. 11–10 and 19–195, FCC 19–79, adopted August 1, 2019 and released August 6, 2019. The full text of this document is available for public inspection during regular business hours in the FCC Reference Information Center, Portals II, 445 12th Street SW, Room CY–A257, Washington, DC 20554. It also is available on the Commission's website at *https://www.fcc.gov/document/fcc-improves-broadband-mapping-0*.

Pursuant to sections 1.415 and 1.419 of the Commission's rules, 47 CFR 1.415, 1.419, interested parties may file comments and reply comments in response to the *Second FNPRM* on or before the dates indicated on the first page of this document. Comments may be filed using the Commission's Electronic Filing System (ECFS). *See Electronic Filing of Documents in Rulemaking Proceedings,* 63 FR 24121 (1998).

■ *Electronic Filers:* Comments may be filed electronically using the internet by accessing the ECFS: *https://www.fcc.gov/ecfs/*.

■ *Paper Filers:* Parties who choose to file by paper must file an original and one copy of each filing. If more than one docket or rulemaking number appears in the caption of this proceeding, filers

# Tab 464: Comments of Luminant on Error Correction

<u>Comments of Luminant</u>

*Error Correction of the Area Designations for the 2010 1-Hour Sulfur Dioxide (SO₂) Primary National Ambient Air Quality Standard (NAAQS) in Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas*

84 Fed. Reg. 43,757 (Aug. 22, 2019)

Luminant[1] submits these comments on the U.S. Environmental Protection Agency's ("EPA") proposed *Error Correction of the Area Designations for the 2010 1-Hour Sulfur Dioxide (SO₂) Primary National Ambient Air Quality Standard (NAAQS) in Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas* ("Proposed Rule").[2]  In the Proposed Rule, EPA proposes to find that it erred in its prior nonattainment designations for three areas in Texas[3] and, therefore, proposes to correct its error and designate those areas as unclassifiable.[4]  Luminant agrees that EPA erred and, therefore, supports EPA's Proposed Rule to designate these areas unclassifiable.

I.    Luminant Has a Substantial Interest in the Proposed Rule

Luminant has a direct and substantial interest in the Proposed Rule.  Luminant is a competitive power generation business, with approximately 41,000 megawatts ("MW") of natural gas, nuclear, coal, and solar generation as of 2018.  Moreover, Luminant is the owner of the Big Brown, Martin Lake, and Monticello power plants, which are located in the three areas at issue in this Proposed Rule.  In early 2018, Luminant permanently retired the Big Brown and Monticello plants.[5]  Luminant continues to

---

[1] These comments are submitted by Luminant Generation Company LLC (the owner of the Monticello Power Plant and the owner and operator of the Martin Lake Power Plant, "Luminant Generation") and Big Brown Power Company LLC (the owner of the Big Brown Power Plant, "BBPC") (Luminant Generation and BBPC are collectively referred to herein as "Luminant").

[2] 84 Fed. Reg. 43,757 (Aug. 22, 2019).

[3] 81 Fed. Reg. 89,870 (Dec. 13, 2016) ("Texas Nonattainment Designations").

[4] 84 Fed. Reg. at 43,757.

[5] Luminant, *Luminant Announces Decision to Retire Its Monticello Power Plant* (Oct. 6, 2017), https://www.luminant.com/luminant-announces-decision-retire-monticello-power-plant/;        Luminant,

operate the Martin Lake Power Plant, which is a 2,250 MW coal-fueled electric generating unit ("EGU") located in Rusk County, Texas.  Martin Lake generates enough electricity to power approximately 1.25 million homes and continues to be an integral part of Luminant's diverse generation mix and power generation within the State of Texas, as underscored during the recent August heat wave when the Electric Reliability Council of Texas ("ERCOT") set a new all-time peak demand record and went into an Energy Emergency Alert on two days due to a shortage of operating reserves.[6]

As explained in Luminant's prior comments on the Texas Nonattainment Designations, the Texas Nonattainment Designations did not give appropriate deference to the State of Texas's preference to rely on monitoring rather than modeling for the sulfur dioxide ($SO_2$) National Ambient Air Quality Standard ("NAAQS") designations in the state.[7]  Moreover, the Texas Nonattainment Designations were unlawful because the record did not establish information "clearly demonstrating" that designations of nonattainment were appropriate.[8]  Modeling is, at best, an informed guess about what actual conditions are occurring, and, in this case, Sierra Club's modeling (EPA's only basis for the nonattainment designations) was further biased, flawed, and unreliable.[9]

---

*Luminant to Close Two Texas Power Plants* (Oct. 13, 2017), https://www.luminant.com/luminant-close-two-texas-power-plants/.

[6] ERCOT, *Extreme Heat Across the State Results in High Usage, Need for Conservation* (Aug. 13, 2019), http://www.ercot.com/news/releases/show/187793.

[7] Comments of Luminant on Proposed Texas Nonattainment Designations, Dock. ID No. EPA-HQ-OAR-2014-0464-0328, at 16-19 (Mar. 31, 2016).

[8] *See generally id.*

[9] *Id.* at 24-32.

II.   **The Proposed Rule Is Supported by the Statutory Structure of the Clean Air Act and EPA's Prior Actions**

The prior Texas Nonattainment Designations were inconsistent with the Clean Air Act and EPA's prior actions with respect to the 2010 $SO_2$ NAAQS.  The Proposed Rule is necessary to correct these prior errors and to correctly designate the three Texas areas as unclassifiable.

A.   **The Clean Air Act Gives States the Primary Authority to Implement the NAAQS**

The Clean Air Act creates a cooperative federalism structure that divides authority between the federal government and the states.[10]  Within this structure, "air pollution prevention . . . and air pollution control at its source is the primary responsibility of States and local governments."[11]  With respect to the NAAQS, the Clean Air Act requires EPA to set the NAAQS for certain pollutants, including $SO_2$.[12]  EPA is required to review the NAAQS at five year intervals and make revisions where necessary.[13]  On June 22, 2010, EPA revised the primary $SO_2$ NAAQS to establish a new 1-hour average standard of 75 parts per billion (ppb).[14]

However, while "[t]he Act assigns responsibility to the EPA for identifying air pollutants and establishing [the NAAQS,] . . . [t]he states, by contrast, bear the primary responsibility for implementing those standards."[15]  Accordingly, "[t]he structure of the Clean Air Act indicates a congressional preference that states, not EPA, drive the regulatory process."[16]  For example, the State of Texas, through the Texas Commission on Environmental Quality ("TCEQ"), is primarily responsible for assuring air quality

---

[10] *Luminant Generation Co. v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012).

[11] 42 U.S.C. § 7401(a)(3).

[12] *See id.* § 7409.

[13] *Id.* § 7409(d).

[14] 75 Fed. Reg. 35,520 (June 22, 2010).

[15] *Luminant Generation Co.*, 675 F.3d at 921 (internal citations and quotations omitted).

[16] *Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016).

App. 1378

throughout Texas.  Consistent with Congress's goals, each state is to implement the NAAQS through a State Implementation Plan ("SIP") that specifies how the NAAQS will be achieved and maintained in that state.[17]

Further, the Clean Air Act requires that within one year after a NAAQS is established or revised, each state must "submit to [EPA] a list of all areas (or portions thereof) in the State, designating as[:]

    i.      nonattainment, any area that does not meet . . . [the NAAQS],

    ii.     attainment, any area . . . that meets the [NAAQS], or

    iii.    unclassifiable, any area that cannot be classified on the basis of available information as meeting or not meeting the [NAAQS]."[18]

Relying on the designations submitted by the states, the Clean Air Act requires EPA to designate areas as nonattainment, attainment, or unclassifiable no later than three years after promulgation of a new or revised NAAQS.[19]  Although EPA issues the final designations, states are integrally involved in the process. Pursuant to Section 107, EPA must "promulgate the designations of all areas (or portions thereof) submitted [by the states] . . . ."[20]  EPA may only modify the designations made by the states if "necessary."[21]  In doing so, EPA must notify the state of its modification and provide the state with an opportunity to respond.[22]  Following the designation of areas within a state, the state has "virtually absolute power in allocating emission limitations so long as the national standards are met . . . ."[23]

---

[17] 42 U.S.C. § 7410(a).

[18] *Id*. § 7407(d)(1)(A).

[19] The statute has a two-year deadline with the possibility of an extension for one more year if the EPA Administrator "has insufficient information to promulgate the designations."  *Id.* § 7407(d)(1)(B)(i).

[20] *Id.*

[21] *Id.* § 7407(d)(1)(B)(ii).

[22] *Id.*

[23] *Union Elec. Co. v. EPA*, 427 U.S. 246, 267 (1976).

**B.**    **EPA's Proposal to Correct the Three Texas Designations to Unclassifiable Is Supported by EPA's Prior Actions and Implementation of the SO$_2$ NAAQS**

As noted above, EPA issued its final rule updating the SO$_2$ NAAQS on June 22, 2010.[24]    In accordance with its obligation under the Clean Air Act, on June 2, 2011, Texas submitted its designations to EPA, specifying which geographic areas within Texas met or failed to meet the 1-hour SO$_2$ NAAQS and which areas could not be classified based on available information.[25]    In its submission, TCEQ designated as nonattainment areas with monitored SO$_2$ regulatory design values exceeding 75.4 ppb, attainment for areas with monitored SO$_2$ regulatory design values of 75.4 ppb or less, and unclassifiable for all other counties in Texas.[26]

Although the Clean Air Act imposes a two-year deadline on EPA to complete designations after a new or revised NAAQS is promulgated,[27] EPA may extend the deadline by up to one year if the agency "has insufficient information to promulgate the designations."[28]    Based on this provision, on August 3, 2012, EPA extended the promulgation deadline for the 2010 1-hour SO$_2$ NAAQS.[29]    EPA explained that another year was needed to resolve "outstanding issues and uncertainty regarding the most appropriate implementation approach . . . ."[30]    With its extension, EPA's new deadline for completing designations was June 3, 2013.

EPA responded to Texas's designations on February 7, 2013, stating that it intended to designate as nonattainment areas in the state where existing monitoring data from 2009-2011 indicated violations

---

[24] 75 Fed. Reg. at 35,520; 40 C.F.R. § 50.17(a)-(b).

[25] Letter from Rick Perry, Governor, Texas, to Alfredo Armendariz, EPA Reg'l Adm'r, Region 6 (June 2, 2011).

[26] *Id.*

[27] 42 U.S.C. § 7407(d)(1)(B)(i).

[28] *Id.*

[29] 77 Fed. Reg. 46,295 (Aug. 3, 2012).

[30] *Id.* at 46,297.

of the 1-hour SO$_2$ standard.[31]  EPA stated that its review of the most recent monitoring data from Texas showed no violations of the 2010 SO$_2$ standard in any area.[32]  However, EPA said it was "not yet prepared to propose designation action in Texas" and was, therefore, "deferring action to designate areas in Texas."[33]  EPA said it intended to "proceed with designation action in Texas once additional data [was] gathered pursuant to [EPA's] comprehensive implementation strategy."[34]

In February 2013, EPA issued the comprehensive implementation strategy ("Strategy Paper") mentioned in its February 7, 2013 response to Texas.[35]  In the Strategy Paper, EPA explained that the next step for implementation would be to propose a rulemaking to characterize air quality in priority areas pursuant to a timeline identified in the rule.[36]

On May 13, 2014, EPA proposed the rulemaking contemplated in its Strategy Paper, namely, the Data Requirements Rule ("DRR").[37]  The proposed DRR set forth a process for characterizing current air quality in areas with large sources of SO$_2$ emissions either through monitoring or modeling techniques, as well as a timetable for air agencies to submit such data to EPA to inform the agency's designation decisions for these areas.[38]  EPA explained that the proposed timeline was responsive to concerns that states have flexibility and sufficient time to pursue either the monitoring or modeling pathway for

---

[31] Letter from Ron Curry, EPA Reg'l Adm'r, Region 6, to Rick Perry, Governor, Texas (Feb. 7, 2013).

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] EPA, *Next Steps for Area Designations and Implementation of the Sulfur Dioxide National Ambient Air Quality Standard* (Feb. 6, 2013) ("Strategy Paper").

[36] *Id.*

[37] 79 Fed. Reg. 27,446 (May 13, 2014).

[38] *Id.* at 27,456.  Specifically, EPA noted that although "[t]he area designations process typically relies on air quality concentrations characterized by ambient monitoring data collected by the air agency," EPA would allow states to rely on monitoring <u>or</u> modeling to inform their future designations in a timely manner.  *Id.* at 27,448, 27,456.

identified sources and also allowed states to account for $SO_2$ reductions that would occur over the next several years as a result of trends in the industry and implementation of national and state level programs.[39]  In addition to including modeling and monitoring information submittal deadlines, EPA also included in the proposed DRR "anticipated implementation milestones that are important in the $SO_2$ designations and implementation process," including intended designation deadlines.[40]

Luminant commented on the proposed DRR, generally supporting the flexibility the rule provided states to select monitoring or modeling to characterize air quality.[41]  Luminant raised concerns regarding the use of modeling for NAAQS designations, including AERMOD's tendency to over-predict $SO_2$ concentrations, and explained that it was not appropriate to designate an area as nonattainment without actual measured data obtained from monitors.[42]  Further, Luminant urged EPA to designate as unclassifiable areas that have not been designated due to lack of information.[43]

On August 21, 2015, EPA finalized the DRR.[44]  EPA noted that because the existing $SO_2$ monitoring network was limited, it was also allowing for modeling to characterize air quality in the vicinity of large sources of $SO_2$ emissions.[45]  EPA also set forth a program implementation timeline, but unlike the

---

[39] *Id.* at 27,456.

[40] *Id.*  For either the modeling or monitoring pathway, a protocol would be established for determining the analysis approach.  The results of a modeling approach would be available in early 2017, such that a designation would be issued by EPA by the end of 2017.  A monitoring approach would extend from 2017-2019, and a designation would be issued by EPA by the end of 2020.  *Id.* at 27,457.

[41] Comments of Luminant on Proposed DRR, Dock. ID No. EPA-HQ-OAR-2013-0711-0090 (July 14, 2014).

[42] *Id.* at 6.

[43] *Id.* at 3.

[44] 80 Fed. Reg. 51,052 (Aug. 21, 2015); 40 C.F.R. §§ 51.1200-51.1205.

[45] 80 Fed. Reg. at 51,053.

timeline in the proposed DRR, the timeline in the final DRR did not include intended designation deadlines.[46]

EPA explained that it avoided setting a timeline for designations in the final DRR because on March 2, 2015, just months before the DRR was finalized, the U.S. District Court for the Northern District of California entered a consent order proposed by Sierra Club and the National Resources Defense Council that required EPA to meet mandatory deadlines for issuing $SO_2$ NAAQS designations ("Consent Decree").[47]  The first round of the timeline in the Consent Decree required EPA to designate areas around large sources of $SO_2$ emissions by July 2, 2016.[48]  Because of the short time frame for EPA to issue the first round of designations under the Consent Decree, sources affected by the first round under the Consent Decree would not have time to gather three years of monitoring data, as provided for under EPA's Strategy Paper and the proposed DRR.  Recognizing this, several commenters, including Luminant and Texas, urged EPA to designate areas as "unclassifiable" where actual data (*i.e.*, monitoring data) was not available to inform a decision, as required by the Clean Air Act.[49]  Importantly, the district court made clear in its order entering the Consent Decree that "the appropriate remedy in a 'deadline' case such as

---

[46] *Compare id.* at 51,064 *with* 79 Fed. Reg. at 27,456-57.

[47] 80 Fed. Reg. at 51,064; s*ee also Sierra Club v. McCarthy*, No. 3:13-cv-3953, 2015 WL 889142 (N.D. Cal. Mar. 2, 2015).  In the docket, Case No. 3:13-cv-3953, the Consent Decree is Doc. No. 163 (Mar. 2, 2015) ("Consent Decree").

[48] Consent Decree ¶ 1.  Specifically, the Consent Decree required EPA to issue final designations by July 2, 2016, for areas that "contain any stationary source that has not been 'announced for retirement' . . . and that . . . emitted more than 16,000 tons of $SO_2$ in 2012 or [] emitted more than 2,600 tons of $SO_2$ and had an annual average emission rate of 0.45 lbs $SO_2$/Mmbtu or higher in 2012."  *Id.*  The two other deadlines set forth in the Consent Decree corresponded with EPA's anticipated schedule for future rounds of $SO_2$ designations in the DRR (*i.e.*, Dec. 2017 as the date by which EPA must issue final designations for all areas except those with monitoring networks that commenced operation on January 1, 2017, and December 2020 as the date by which EPA must issue final designations for the remainder of the country).  *Id.* ¶¶ 2, 3; *see also* 80 Fed. Reg. at 51,064.

[49] Comments of Luminant on Proposed Consent Decree, Dock. ID No. EPA-HQ-OGC-2014-0421-0119, at 4 (July 2, 2014); Comments of TCEQ on Proposed Consent Decree, Dock. ID No. EPA-HQ-OGC-2014-0421-0018, at 1 (July 1, 2014); Comments of the State of Texas, et al. on Proposed Consent Decree, Dock. ID No. EPA-HQ-OGC-2014-0421-0122, at 2 (July 2, 2014).

this is to require EPA to issue designations pursuant to a schedule, *not to mandate that EPA issue any particular designation*."[50]

On March 20, 2015, EPA issued updated guidance for $SO_2$ designations ("Updated Guidance").[51] In the Updated Guidance, EPA stated that it was required to operate pursuant to the Consent Decree and asserted that the Consent Decree's expedited deadline for the larger sources of $SO_2$ did not provide sufficient time for monitoring.[52]  Importantly, however, EPA stated that "[i]n the absence of information **clearly demonstrating** a designation of 'attainment' or 'nonattainment,' the EPA intend[ed] to designate the area as 'unclassifiable' when it takes action pursuant to the court order."[53]  EPA explained that the second and third designation deadlines set forth in the Consent Decree, which correspond with the designation deadlines set forth in the proposed DRR and are supported by the data collection timelines in the final DRR, would be informed by information provided by states pursuant to the DRR, including monitoring data.[54]

On March 20, 2015, EPA also sent TCEQ a letter updating TCEQ on its progress in implementing the NAAQS.[55]  EPA listed twelve EGUs in Texas as meeting the criteria for the first round of designations under the Consent Decree, including four power plants owned by Luminant: Big Brown, Martin Lake,

---

[50] *Sierra Club,* 2015 WL 889142, at *11 (emphasis added).

[51] Memorandum from Stephen D. Page, Dir., EPA Office of Air Quality Planning & Standards, to Reg'l Air Div. Dirs., Regions 1 − 10, *Updated Guidance for Area Designations for the 2010 Primary Sulfur Dioxide National Ambient Air Quality Standard* (Mar. 20, 2015) ("EPA's Updated Guidance").

[52] *Id.* at 2-3.

[53] *Id.* at 5 (emphasis added).  EPA made the same statement in its March 2011 Guidance.  *See* Memorandum from Stephen D. Page, Dir., EPA Office of Air Quality Planning & Standards, to EPA Reg'l Air Div. Dirs., Regions 1-10, *Area Designations for the 2010 Revised Primary Sulfur Dioxide National Ambient Air Quality Standards*, at 4 (Mar. 24, 2011) ("March 2011 Guidance").

[54] EPA's Updated Guidance at 2.

[55] Letter from Janet G. McCabe, Acting Assistant Adm'r, EPA Office of Air & Radiation, to Bryan W. Shaw, Chairman, TCEQ (Mar. 20, 2015) ("March 2015 Letter").

Monticello, and Sandow.[56]   EPA said it intended to designate areas as nonattainment, unclassifiable/attainment,[57] or unclassifiable using the most recent available information.[58]

On September 18, 2015, TCEQ responded to EPA's letter, reaffirming its previous submittal providing for a designation of attainment for counties with certified monitoring data showing no violations and unclassifiable/attainment designations for the remainder of the state.[59]   TCEQ emphasized that it "continue[d] to support the use of ambient air monitoring data as the appropriate information for use in making designation decisions" and, accordingly, sought to designate counties in Texas as either attainment based on monitoring data or unclassifiable/attainment where there were no monitors.[60]   TCEQ stressed that monitoring data "is necessary for accurate characterization of actual air quality for attainment and nonattainment designations."[61]

On February 11, 2016, EPA notified TCEQ of EPA's preliminary intentions regarding the designations submitted by TCEQ.[62]   For areas around the three Luminant's power plants at issue here, EPA modified all of TCEQ's designations and proposed to designate as nonattainment parts of Freestone

---

[56] *Id.* at 1-2.

[57] EPA stated in its Updated Guidance that "[w]hile states have and may continue to submit designations recommendations identifying areas as 'attainment,' the EPA expects to continue its traditional approach, where appropriate, of using a designation category of 'unclassifiable/attainment' for areas that the EPA determines meet the NAAQS.  The EPA expects to reserve the category 'unclassifiable' for areas where the EPA cannot determine based on available information whether the area is meeting or not meeting the NAAQS or where the EPA cannot determine whether the area contributes to a violation in a nearby area."  EPA's Updated Guidance at 5 n.7.  EPA must apply the same caution to "nonattainment" designations as it is applying to "attainment" designations, particularly when relying on modeling data for designation purposes, and failing to do so is arbitrary.

[58] March 2015 Letter at 1.

[59] Letter from Bryan W. Shaw, Chairman, TCEQ, to Janet G. McCabe, Assistant Adm'r, EPA Office of Air & Radiation (Sept. 18, 2015) ("September 2015 Letter").

[60] *Id.* at 1.

[61] *Id.*

[62] Letter from Ron Curry, Reg'l Adm'r, Region 6, to Greg Abbott, Governor, Texas (Feb. 11, 2016).

App. 1385

and Anderson Counties; parts of Rusk, Gregg, and Panola Counties; and parts of Titus County, which are around Big Brown, Martin Lake, and Monticello, respectively.[63]  These nonattainment designations were based on modeling conducted and submitted by Sierra Club.[64]  EPA requested additional information from TCEQ regarding the intended designations by April 19, 2016, and published a Federal Register notice announcing a 30-day comment period for the public to provide input on EPA's intended designations.[65]  TCEQ responded to EPA's proposed designations in a timely manner and made clear its preference for reliance on monitoring data and expressed concerns about EPA's reliance on third-party, non-peer reviewed modeling in its proposed designations.[66]  Further, Luminant filed comments highlighting TCEQ's preference for monitoring and also identifying multiple errors in the Sierra Club modeling that EPA relied on for its proposed designations.[67]  Nonetheless, EPA finalized its designations as proposed.[68]

On December 13, 2016, EPA published its final rule designating the three areas at issue here as nonattainment.[69]  In the Texas Nonattainment Designations, EPA relied solely on Sierra Club's modeling of emissions from Luminant's power plants to make its nonattainment designations[70] despite TCEQ's preference for monitoring and extensive public comments showing inaccuracies in Sierra Club's modeling.

---

[63] *Id.* at 2.

[64] EPA, *Draft Technical Support Document: Texas Area Designations for the 2010 SO2 Primary National Ambient Air Quality Standard*, at 145-200 (Feb. 11, 2016) ("Draft Texas TSD").

[65] 81 Fed. Reg. 10,563 (Mar. 1, 2016).

[66] Letter from Bryan W. Shaw, Chairman, TCEQ, to Janet G. McCabe, Assistant Adm'r, EPA Office of Air & Radiation, and Ron Curry, Reg'l Adm'r, EPA Region 6 (Apr. 19, 2016) ("April 2016 Letter").

[67] Comments of Luminant on Proposed Texas Nonattainment Designations, Dock. ID No. EPA-HQ-OAR-2014-0464-0328 (Mar. 31, 2016).

[68] 81 Fed. Reg. at 89,873.

[69] *Id.*

[70] *See generally* EPA, *Technical Support Document for the Designation Recommendations for the 2010 Sulfur Dioxide National Ambient Air Quality Standards (NAAQS) – Supplement for Four Areas in Texas Not Addressed in June 30, 2016, Version* (Nov. 29, 2016) ("Texas TSD").

Following the issuance of the Texas Nonattainment Designations, TCEQ and Luminant each filed petitions for reconsideration of the rule informing EPA of, among other things, TCEQ's deployment of additional air quality monitors around the areas at issue and of Luminant's retirement of its Monticello Plant and Big Brown Plant in the relevant areas.[71]

Moreover, both TCEQ and Luminant filed petitions for review of the Texas Nonattainment Designations in the Fifth Circuit on February 13, 2017.[72]    On March 24, 2017, EPA filed a motion to dismiss TCEQ's and Luminant's petitions for review of the Texas Nonattainment Designations or transfer the petitions to the D.C. Circuit Court of Appeals, arguing that the D.C. Circuit was the only proper forum to challenge the Texas Nonattainment Designations.[73]    TCEQ and Luminant opposed EPA's motion, and briefing and oral argument were held before the Fifth Circuit on the issue.    On August 25, 2017, the Fifth Circuit denied EPA's motion to dismiss or transfer, finding that the Texas Nonattainment Designations were "locally or regionally" applicable and explaining that it was "not convinced that the [Texas Nonattainment Designations were] based on determinations of nationwide scope or effect."[74]

On September 21, 2017, EPA responded to Luminant's petition for reconsideration and explained its intent to undertake administrative action to revisit the three areas at issue.[75]    In light of its intention to revisit the Texas Nonattainment Designations, on October 2, 2017, EPA filed a motion to hold in abeyance the litigation challenging the rule in the Fifth Circuit.[76]    The Fifth Circuit granted that motion, and TCEQ

---

[71] Luminant's Petition for Reconsideration, Dock. ID No. EPA-HQ-OAR-2014-0464-0446 (Feb. 13, 2017); TCEQ's Petition for Reconsideration, Dock. ID No. EPA-HQ-OAR-2014-0464-0452 (Dec. 11, 2017).

[72] *Texas et al. v. EPA*, No. 17-60088 (5th Cir. Feb. 13, 2017).

[73] Mot. to Dismiss, *Texas v. EPA*, No. 17-60088 (5th Cir. Mar. 24, 2017).

[74] *Texas v. EPA*, No. 17-60088, 706 Fed. Appx. 159, 165 (5th Cir. Aug. 25, 2017).

[75] Letter from E. Scott Pruitt, Adm'r, EPA, to Daniel J. Kelly, Vice President & Assoc. General Counsel, Vistra Energy (Sept. 21, 2017).

[76] Mot. for Abeyance, *Texas v. EPA*, No. 17-60088 (5th Cir. Oct. 2, 2017).

and Luminant's petitions for review of the Texas Nonattainment Designations remain pending before the Fifth Circuit. On August 22, 2019, EPA proposed the error correction here to address the nonattainment designations for the three areas in Texas.[77]

III.     **EPA Is Correct that the Texas Nonattainment Designations Erred in Failing to Give Appropriate Weight to Texas's Preference to Use Monitoring in SO$_2$ NAAQS Designations**

As discussed above, the Clean Air Act utilizes a system of cooperative federalism, and the states are given primary authority over the implementation of the NAAQS. The states' authority includes the authority to put forth designations for the NAAQS. And as EPA has previously explained, the Clean Air Act "gives EPA the power to modify a state's designation only to the extent 'necessary,' thereby establishing a deferential standard for EPA disposition of a state choice."[78] Further, the D.C. Circuit and EPA have both recognized that the Clean Air Act "gives great deference to governors' recommendations for areas within their states, providing only that EPA '*may*' make any modifications it 'deems necessary.'"[79] Because it was not "necessary" for EPA to modify Texas's designations, EPA acted beyond its authority and its nonattainment designations were in error.

A.     **Texas Clearly Stated Its Preference to Use Monitoring for Its SO$_2$ NAAQS Designations**

TCEQ established a clear and consistent preference for the use of monitoring data in SO$_2$ NAAQS designations, which the Texas Nonattainment Designations ignored. Dating back to 2011, TCEQ maintained that "monitoring is required to determine attainment status . . . ."[80] TCEQ continued to make clear its preference for monitoring throughout the SO$_2$ NAAQS designation process. For example, in its September 18, 2015, letter to EPA, TCEQ said it "continue[d] to support the use of ambient air monitoring

---

[77] 84 Fed. Reg. at 43,757.

[78] 52 Fed. Reg. 49,408, 49,410 (Dec. 31, 1987).

[79] *Pa. Dep't of Envtl. Prot. v. EPA*, 429 F.3d 1125, 1129 (D.C. Cir. 2005) (citing 42 U.S.C. § 7407(d)(1)(B)(ii)) (emphasis in original).

[80] Comments of TCEQ on EPA's Guidance for 1-Hour SO$_2$ NAAQS SIP Submissions, Dock. ID No. EPA-HQ-OAR-2010-1059-0034, at 3 (Dec. 2, 2011); *see also id.* at 5, 8, 10.

data as the appropriate information for use in making designation decisions."[81]     Further, TCEQ

"recommend[ed] that counties in Texas be designated . . . unclassifiable/attainment where there are no

monitors" because "[m]onitoring data is necessary for accurate characterization of actual air quality for

attainment and nonattainment designations."[82]     Later, in its response to EPA's proposed designations,

TCEQ highlighted that "[a] designation of nonattainment has serious consequences to industry, the

economy of an area, its citizens, and the state," and, therefore, "[n]onattainment designations should

only be made based on data from 40 CFR Part 58 compliant (regulatory) monitoring showing a violation of

the standard."[83]     Despite TCEQ's clear statements, EPA unlawfully ignored TCEQ's preference for

monitoring and did not give TCEQ's designations appropriate deference.

### B.     Texas's Preference for Monitoring Was Appropriate and Consistent with EPA's Own Guidance and Prior Practice

Moreover, TCEQ's preference for monitoring was consistent with EPA's own guidance.  Until its

abrupt change in the Consent Decree, EPA had consistently supported monitoring over modeling for

designation purposes.  In promulgating the 2010 $SO_2$ NAAQS, EPA stated that compliance with the NAAQS

should be determined "based on 3 years of complete, quality assured, certified monitoring data."[84]

However, because of the burdens and costs associated with implementing EPA's proposed monitoring

network, EPA said it was breaking from its traditional approach to designations and *allowing* for the use

of modeling *in addition to monitoring* to determine designations.[85]  EPA stated that modeling could be

used where insufficient monitoring data was available and anticipated that many areas would initially be

---

[81] September 2015 Letter at 1.

[82] *Id.*

[83] April 2016 Letter at 2.

[84] 75 Fed. Reg. at 35,569.

[85] *Id.* at 35,570.

designated unclassifiable because of the lack of ambient monitoring data.[86]   In other words, modeling

was intended to provide an opportunity for states to avoid the cost and resources associated with siting,

installing, and maintaining monitors <u>where the state</u> preferred to rely on modeling.

When EPA released its Strategy Paper in 2013, EPA confirmed that "the starting point for future

$SO_2$ designations should be, as with other NAAQS, a monitoring network to adequately characterize air

quality in areas of concern."[87]   Monitors reflect actual air quality more accurately than any hypothetical

model can.   EPA again said it was *allowing* agencies to use modeling to characterize actual air quality

around a source or source region "as a surrogate for ambient monitoring" "where monitoring is

impractical."[88]

Moreover, EPA has consistently relied on monitoring data when making initial designations for

other pollutants regulated under the NAAQS program.  As EPA acknowledged in the final DRR: "[i]t is true

that past area designations processes for most NAAQS (such as for ozone) . . . have relied primarily on air

quality monitoring data to identify areas that violate the standard."[89]   In 2013, for example, EPA

instructed states to base designations for a revised NAAQS for $PM_{2.5}$ on monitoring.[90]  Similarly, in 2012,

EPA relied on monitored air quality in making initial designations for revised ozone NAAQS.[91]   In 2010,

EPA determined that it should rely on monitoring data in the area designation process for the 1-hour

nitrogen dioxide ($NO_2$) NAAQS.  In that case, because the monitoring network for $NO_2$ was not sufficient

---

[86] *Id.* at 35,570-71.

[87] *See* Strategy Paper at 2.

[88] *Id.*  EPA explains in its Strategy Paper that it is merely allowing modeling in the $SO_2$ NAAQS context because of the limited monitoring network that existed at the time the new $SO_2$ NAAQS limit was set and the expense of establishing new monitoring sites.  *Id.*

[89] 80 Fed. Reg. at 51,057.

[90] *See* Memorandum from Gina McCarthy, Assistant Adm'r, EPA Office of Air & Radiation, to Reg'l Adm'rs, EPA Regions 1-10, at 2 (Apr. 16, 2013).

[91] *See* 77 Fed. Reg. 30,088, 30,091 (May 21, 2012).

to determine whether areas attained the new 1-hour $NO_2$ NAAQS, EPA designated the entire country as "unclassifiable/attainment" until a sufficient monitoring network could be established.[92]  It was not until the Consent Decree that EPA sought to change course and *require* modeling for the State of Texas.

In sum, EPA has been clear that monitoring data is preferred for NAAQS designations, and EPA's offer for states to use modeling for the $SO_2$ NAAQS was simply intended to provide states with another option.  EPA's approach in the Texas Nonattainment Designations to *require* modeling and rely solely on that data for designations was inconsistent with the statute and EPA's prior practice and did not give appropriate deference to Texas's stated preference.  Moreover, as discussed below, the only lawful and supportable designation for the areas at issue was unclassifiable; therefore, it was plainly not "necessary" for EPA to modify Texas's designations and such action was beyond EPA's statutory authority.  Accordingly, Luminant supports EPA's proposal to correct this error.

IV.    **EPA Is Correct that It Erred in Relying on Sierra Club's Flawed Modeling to Support Its Designations**

In addition to the Texas Nonattainment Designations' error in disregarding Texas's preference for monitoring, EPA also erred in relying on Sierra Club's biased, flawed, and unreliable dispersion modeling for the nonattainment designations.  EPA found multiple flaws with Sierra Club's modeling for Texas when discussing both its proposed and final nonattainment designations.  In the proposal, EPA noted errors including significant errors in stack configuration, AERMOD model versions, and process parameters, such as the failure to account for hourly varying temperatures and flows.[93]  Further, in the final rule, EPA highlighted that it "d[id] *not agree* with [some of] Sierra Club's assertion[s],"[94] and it conceded that Sierra

---

[92] *See* 77 Fed. Reg. 9,532, 9,535, 9,537-88 (Feb. 17, 2012).

[93] *See generally* Draft Texas TSD.

[94] Texas TSD at 17, 39, 61 (emphasis added).

Club's modeling was "not peer-reviewed"[95] and did not use building downwash or variable stack temperatures for the analyses of Luminant's plants[96] among other errors, and only "generally meets the requirements" of EPA's modeling guidance.[97]   Nonetheless, the Texas Nonattainment Designations relied on the Sierra Club modeling as the basis for the nonattainment designations.

EPA's use of Sierra Club's modeling for Texas was an aberration and an outlier.   EPA has consistently rejected Sierra Club's modeling for other areas in other states, often due to the same errors that arose in Sierra Club's Texas modeling.   In fact, in EPA's first round of designations under the Consent Decree, EPA found that Sierra Club's (and other environmental group's) modeling was insufficient to "clearly demonstrate" nonattainment where it contradicted the relevant state's designation in nearly every other scenario.[98]   For example, for Gibson County, Indiana, EPA found that Sierra Club's modeling was not sufficiently credible to support a nonattainment designation because it did not consider "building wake effects, i.e., downwash."[99]   In assessing the impact of this flaw, EPA explained that "[p]ut simply: building downwash can have a significant impact on where maximum concentration values might

---

[95] EPA, *Responses to Significant Comments on the Designation Recommendations for the 2010 Sulfur Dioxide National Ambient Air Quality Standards (NAAQS) – Supplement for Four Areas in Texas Not Addressed in June 30, 2016*, at 17 (Nov. 29, 2016).

[96] *Id.* at 29-30, 34.

[97] *Id.* at 40.

[98] *See, e.g.*, EPA, *SO2 Designations – Round 2 State Recommendations and EPA Responses*, https://www.epa.gov/sulfur-dioxide-designations/so2-designations-round-2-state-recommendations-and-epa-responses (Draft Technical Support Documents for Arkansas, Colorado, Georgia, Illinois, Indiana, Kansas, Michigan, Missouri, Nebraska, Ohio, Texas); EPA, *EPA Completes Second Round of Sulfur Dioxide Designations* (June 30, 2016), https://www.epa.gov/sulfur-dioxide-designations/epa-completes-second-round-sulfur-dioxide-designations (Final Technical Support Documents for Arkansas, Colorado, Georgia, Illinois, Indiana, Kansas, Louisiana, Michigan, Missouri, Nebraska, Ohio ("[State] TSD")).   EPA accepted Sierra Club's modeling and suggested designation for Williamson County, Illinois; however, EPA has since reconsidered and revised this designation from nonattainment to attainment/unclassifiable. 84 Fed. Reg. 48,286 (Sept. 13, 2019).

[99] Indiana TSD at 13.

occur."[100]  For the Independence Station in Arkansas, EPA's review of Sierra Club's modeling indicated that Sierra Club's modeling "was premised on several factors that [were] inconsistent with refinements provided for in the modeling [technical assistance document]," such as Sierra Club's failure to "include variable stack velocity and temperature" data.[101]  As EPA acknowledged, similar errors were made in Sierra Club's modeling that was used for the Texas Nonattainment Designations.  The Texas Nonattainment Designations provided no clear reason why the flaws in Sierra Club's modeling disqualified it in nearly every other scenario but was sufficient to "clearly demonstrate" nonattainment for the three areas at issue in Texas.  As EPA itself recognized, the results of Sierra Club's modeling for Texas were flawed, and, therefore, they should have been "reasonably consider[ed] to be unsound."[102]

Moreover, Sierra Club's modeling was not entitled to deference and should not have formed the basis for the Texas Nonattainment Designations.  EPA has historically rejected third-party data in making NAAQS designations, and the D.C. Circuit confirmed such an approach by EPA is appropriate.[103]  Specifically, in *Mississippi Commission on Environmental Quality v. EPA*, where the D.C. Circuit reviewed EPA's designations for the 2008 Ozone NAAQS, the D.C. Circuit rejected the idea that privately collected data was as good as that gathered through the regulatory process.[104]  Ultimately, the D.C. Circuit upheld EPA's decision to "reasonably decline[] to rely on data that it considered of insufficient quality for designations purposes."[105]  Similarly, in the Texas Nonattainment Designations it was inappropriate to

---

[100] *Id.*

[101] Arkansas TSD at 5.

[102] *Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 154 (D.C. Cir. 2015).

[103] *Id.* at 156.

[104] *Id.* at 155 ("Accepting [this] argument would require us to conclude that the EPA must apply *less stringent* post-collection validation requirements to data collected from private monitors in 'substantial compliance' with the agency's data-collection regulations than the agency applies to data collected from regulatory monitors in *actual* compliance with those regulations." (emphasis in original)).

[105] *Id.* at 156.

base nonattainment designations on Sierra Club's non-peer reviewed and error-ridden modeling. Accordingly, Luminant supports EPA's proposal here to find that its prior reliance on Sierra Club's modeling was in error and must be corrected.

## V.    The Texas Nonattainment Designations Were Unlawful and Must Be Corrected

EPA must correct the Texas Nonattainment Designations because they were unlawful.  The Clean Air Act establishes a clear regime for states and EPA to follow in determining the proper NAAQS designation.  As discussed above, if, at the time the state makes its designations, "any area [] cannot be classified on the basis of available information as meeting or not meeting [the NAAQS]," the state "shall" designate that area as "unclassifiable."[106]  The unclassifiable designation was added to the Clean Air Act to provide regulatory certainty for situations where, as here, an area does not clearly fall into the "attainment" or "nonattainment" category.  As EPA acknowledged in promulgating the 2010 $SO_2$ NAAQS:

> The absence of monitoring data showing violations for most areas, combined with the paucity of refined modeling of sources that have the potential to cause or contribute to violations of the NAAQS, will likely result in informational records that are insufficient to support initial designations of either "attainment" or "nonattainment" . . . . [I]n such a situation EPA **is required** to issue a designation for the area as "unclassifiable."[107]

The legislative history of Section 107(d) makes clear that the purpose of an unclassifiable designation was to accommodate situations where a source does not clearly fall into the "attainment" or "nonattainment" category.  Specifically, the 1977 amendments to the Clean Air Act added the unclassifiable designation for areas that "cannot be classified" as attainment or nonattainment,[108] particularly for the purpose of avoiding questionable nonattainment designations in the case of uncertainty.

---

[106] 42 U.S.C. § 7407(d)(1)(A)(iii).

[107] 75 Fed. Reg. at 35,571 (emphasis added).

[108] *See* S. Rep. No. 95-127, at 3 (1977); Pub. L. No. 95-95, 91 Stat. 685 (1977).

For this reason, courts have upheld unclassifiable designations when sufficient data is lacking to make an informed designation decision. As discussed above, in *Mississippi Commission on Environmental Quality*, various parties challenged EPA's 2013 designation of certain areas as "unclassifiable" for the 2008 ozone NAAQS.[109] Despite third-party data indicating exceedances of the NAAQS, EPA designated the area "unclassifiable" because there was uncertainty surrounding the limited data available at the time.[110] The court agreed that EPA is not required to rely on data "reasonably consider[ed] to be unsound" to designate an area attainment or nonattainment; instead, a designation of "unclassifiable" would be appropriate.[111] Thus, an unclassifiable designation is appropriate "if the area 'permit[s] no determination given existing data.'"[112]

In light of this functional role for the unclassifiable designation, EPA stated with respect to the new $SO_2$ NAAQS that all areas that were not designated "attainment" or "nonattainment," "including those with $SO_2$ monitors showing no violations but without modeling showing no violations, would be designated as 'unclassifiable.' Areas with no $SO_2$ monitors at all, *i.e.*, 'rest of State,' would be designated as 'unclassifiable' as well."[113] Similarly, EPA's guidance documents for implementing the $SO_2$ NAAQS clearly contemplated an initial designation of unclassifiable to provide states sufficient additional time to collect the data needed to make supportable designations.[114]

Moreover, in its Technical Support Document for Texas, EPA stated that a "[d]esignated nonattainment area" is "an area which the EPA **has determined is violating** the 2010 $SO_2$ NAAQS or

---

[109] *Miss. Comm'n on Envtl. Quality*, 790 F.3d at 154.

[110] *Id.* at 156.

[111] *Id.* at 154.

[112] *Id.* at 145 (quoting *Catawba Cnty., NC v. EPA*, 571 F.3d 20, 26 (D.C. Cir. 2009)) (alteration in original).

[113] 75 Fed. Reg. at 35,569 (emphasis added).

[114] March 2011 Guidance at 2; Strategy Paper at 6.

contributes to a violation in a nearby area."[115]  Similarly, in its updated guidance, EPA defined an area as "nonattainment" if it "**is violating**" the NAAQS.[116]  EPA could make no such determination for the areas at issue here.  The only monitoring data available at the time of the designations showed attainment of the standard.  Further, the flaws identified with Sierra Club's modeling confirmed that the modeling was unreliable and insufficient to inform designations of attainment or nonattainment.  Because of all the factors that influence modeling, the modeling results in this case could not "clearly demonstrate" that a nonattainment designation was warranted and should not be relied on for such purposes.  Accordingly, as EPA correctly now recognizes in the Proposed Rule, "EPA could not determine based on available information" for the areas at issue whether those areas "were meeting or not meeting the 2010 $SO_2$ NAAQS," and a designation of unclassifiable was required.[117]  Luminant supports EPA's proposal to correct its errors and make the requisite designations of unclassifiable for these areas.

## VI.  Unclassifiable Designations Were the Only Lawful Option in Light of the Consent Decree and the DRR

Additionally, designations of unclassifiable were the only legally supportable option in light of the Consent Decree and the DRR.  As noted above, in entering the Consent Decree, the court made clear that nothing in the Consent Decree required any particular outcome with respect to $SO_2$ NAAQS designations.[118]  Rather, the Consent Decree merely mandated an accelerated designation schedule for larger sources of $SO_2$ in the country.  It did not and could not require EPA to make any particular designation or compel EPA to accept Sierra Club's flawed modeling.  This was confirmed by the DRR, which EPA finalized shortly after the entry of the Consent Decree.  In the final DRR, EPA specifically

---

[115] *See* Texas TSD at 6 (emphasis added).

[116] EPA's Updated Guidance at 4 (emphasis added).

[117] 84 Fed. Reg. at 43,762.

[118] As the district court stated in its order granting the Consent Decree, "the appropriate remedy in a 'deadline' case such as this is to require EPA to issue designations pursuant to a schedule, not to mandate that EPA issue any particular designation." *Sierra Club,* 2015 WL 889142, at *11.

recognized that monitoring requirements for implementing the NAAQS do not always generate new information in time to inform timely area designations under Clean Air Act section 107.[119]  EPA explained that the unclassifiable designation remains a valid option because monitoring data could be utilized, whether "EPA promulgates initial designations of 'unclassifiable' (and then uses the information collected pursuant to this data requirements rule in later re-designations), or whether the EPA promulgates the remaining designations after the information required here becomes available . . . ."[120]

Moreover, EPA's final DRR made clear that the agency's intent to use an unclassifiable designation until "data to support more properly informed future judgments regarding areas' attainment status" was appropriate.[121]  Otherwise, areas with the largest sources of $SO_2$ emissions—those required to be designated in the first round under the Consent Decree—would arbitrarily be treated differently than all other areas of the country in violation of Section 107(d) of the Clean Air Act.  Accordingly, for sources affected by the first deadline in the Consent Decree, EPA should have designated an area as unclassifiable where data was insufficient, including cases where monitoring data was lacking.  Such an approach, which would have allowed states to rely on monitoring as they wished, was the only lawful approach in light of the Consent Decree and the DRR.  It was clear that neither the court nor EPA intended for the Consent Decree or the DRR to foreclose a state's ability to rely on monitoring to support its designations.  Accordingly, EPA's proposal to designate the areas at issue unclassifiable until monitors can acquire three years of data to accurately characterize air quality was and is the only lawful path forward.

---

[119] 80 Fed. Reg. at 51,056 (citing 75 Fed. Reg. 81,126, 81,130 (Dec. 27, 2010) (monitoring requirements for new lead NAAQS)).

[120] *Id.*

[121] *Id*. at 51,083.

VII.    EPA's Proposed Rule Is an Appropriate Approach to Correcting the Unlawful Texas Nonattainment Designations

EPA's proposal to use its authority under Section 110(k)(6) to address the unlawful designations promulgated in the Texas Nonattainment Designations is appropriate.  Section 110(k)(6) provides that:

> Whenever the Administrator determines that the Administrator's action . . . promulgating any . . . area designation . . . was in error, the Administrator may in the same manner as the . . . promulgation revise such action as appropriate without requiring any further submission from the State.[122]

As courts have explained, "Section 110(k)(6) confers discretion on the EPA to decide if and when it will invoke the statute to revise a prior action."[123]  Such an approach is appropriate so long as EPA "articulate[s] an 'error' and provide[s] 'the basis' of its determination that an error occurred."[124]  EPA has satisfied these requirements here.  As discussed above and as EPA details in its Proposed Rule, EPA erred in multiple ways in the Texas Nonattainment Designations.  First, EPA erred by not providing appropriate deference to TCEQ's preference to rely on monitoring data in making designations for the $SO_2$ NAAQS.[125]  Second, EPA erred by relying on Sierra Club's non-peer reviewed and inaccurate modeling as the basis for the designations at issue here.[126]

Further, EPA's Proposed Rule details its basis for determining it erred in promulgating the Texas Nonattainment Designations.[127]  Additionally, EPA is proposing to revise its action and correct such errors "in the same manner" as its original promulgation—through notice and comment rulemaking.[128]  Lastly,

---

[122] 42 U.S.C. § 7410(k)(6).

[123] *Ala. Envtl. Council v. EPA*, 711 F.3d 1277, 1287 (11th Cir. 2013).

[124] *Id.*

[125] 84 Fed. Reg. at 43,760-61.

[126] *Id.* at 43,761.

[127] *Id.* at 43,760-61.

[128] *See Ass'n of Irritated Residents v. EPA*, 790 F.3d 934, 949 (9th Cir. 2015) (determining that "in the same manner" is a procedural requirement).

EPA's proposal to correct its errors and classify the relevant areas as "unclassifiable" is "appropriate" under Section 110(k)(6) because designations of unclassifiable or unclassifiable/attainment are the only "appropriate" and legally supportable designations for the areas at issue here, as discussed above in Sections V and VI.  In fact, if not for the error correction provision of Section 110(k)(6), EPA would be required to repeal the Texas Nonattainment Designations because they were arbitrary and capricious and cannot be upheld under the law.  However, Luminant believes that the error correction provision of Section 110(k)(6) is an appropriate mechanism to address the unlawful designations put forth in the Texas Nonattainment Designations, and, accordingly, Luminant supports EPA's Proposed Rule.[129]

## VIII.   EPA Correctly Did Not Make a Finding That Its Texas-Only Proposal Is Based on a Determination of Nationwide Scope or Effect

The Proposed Rule is a locally or regionally applicable action for purposes of judicial review, as were the Texas Nonattainment Designations.[130]  The Proposed Rule, "on its face[,] regulates entities and conduct in a single state" and only has legal effect in the State of Texas.[131]  Specifically, the Proposed Rule removes the obligation for Texas to develop a nonattainment SIP or, alternatively, for EPA to develop a FIP for Texas.  The Proposed Rule has no impact on any other state beyond Texas.  Moreover, the Proposed Rule is based on "all available information" with respect to only the three areas at issue in Texas and relies entirely on *Texas's* preference for monitoring and EPA's assessment of Sierra Club's *Texas-*

---

[129] Although Luminant supports EPA's proposal, EPA must make clear that Texas is not under an obligation to submit a nonattainment SIP for the areas identified in this Proposed Rule.  Such an approach "enable[s EPA] to fix its mistake in light of the particular circumstances and goals of the CAA."  *Id.* at 951; *see also Ethyl Corp. v. Browner*, 67 F.3d 941, 945 (D.C. Cir. 1995) (using *nunc pro tunc* order to require retroactive effectiveness of EPA action to ensure a complete remedy for Petitioner).

[130] 42 U.S.C. § 7607(b)(1).

[131] *Texas*, 706 Fed. Appx. at 164.

*specific* modeling.[132]  Thus, the action is "locally or regionally applicable" under the Clean Air Act's judicial review provision.[133]

Moreover, EPA correctly did not make a finding that this action "is based on a determination of nationwide scope or effect."  For the purposes of the Clean Air Act's venue provision, "'the relevant determinations are those that lie at the core of the agency action,' not determinations that are 'peripheral or extraneous.'"[134]  "Determinations are not of nationwide scope or effect if they are 'intensely factual determinations such as those related to the particularities of the emissions sources in Texas.'"[135]  And, even if concepts or interpretations from the proposed action are applied in later rulemakings, that is irrelevant to the venue inquiry, because it is "typical" for "the interpretative reasoning offered by [EPA] . . . [to have] precedential effect in future EPA proceedings . . . , including regionally and locally applicable ones."[136]  Such precedential effect does not transform the action into one that is "based on a determination of nationwide scope or effect."  Rather, if EPA later relies on a concept or "interpretation set forth in the [action] in . . . other final agency action, it will be subject to judicial review upon challenge" to that separate action.[137]

Here, the Proposed Rule relied on the specific circumstances associated with its nonattainment designations for the three areas at issue here.  Specifically: (1) Texas's preference to rely on monitoring data to make designations for the areas at issue; and (2) flaws in Sierra Club's modeling for the specific

---

[132] 84 Fed. Reg. at 43,760.

[133] *Texas*, 829 F.3d at 419 ("The question of applicability turns on the legal impact of the action as a whole.").

[134] *Texas*, 706 Fed. Appx. at 164 (quoting *Texas*, 829 F.3d at 419).

[135] *Id.* (quoting *Texas*, 829 F.3d at 421).

[136] *Sierra Club v. EPA*, 926 F.3d 844, 850 (D.C. Cir. 2019); *see also Texas*, 829 F.3d at 423 ("Nor are we persuaded . . . that whatever precedential effect the Final Rule has shows that it is based on determinations with nationwide scope or effect.").

[137] *Sierra Club*, 926 F.3d at 849.

areas in Texas at issue in this rulemaking.  For the factual circumstances on which EPA's Proposed Rule is based, namely whether "all available information" with respect to the three areas at issue supported a nonattainment designation, EPA's Proposed Rule finds that it "could not determine . . . whether the three Texas areas that are the subject of this proposed action were meeting or not meeting the 2010 SO$_2$ NAAQS."[138]   Therefore, EPA made its determination to correct its errors in the Texas Nonattainment Designations by assessing the specific circumstances that resulted in the nonattainment designations and undertaking a solely Texas-specific inquiry.  Thus, just like EPA's initial promulgation of the Texas Nonattainment Designations, the action here is locally or regionally applicable, and EPA properly did not make a finding that the Texas-specific action is based on a determination of nationwide scope or effect.

IX.     Conclusion

EPA's Proposed Rule properly recognizes that EPA erred in the Texas Nonattainment Designations.  Accordingly, Luminant supports the Proposed Rule and encourages EPA to finalize the proposal.

---

[138] 84 Fed. Reg. at 43,761-62.

26