No. 17-60088

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY L.L.C.; BIG BROWN POWER COMPANY L.L.C.; SANDOW POWER COMPANY L.L.C.; LUMINANT MINING COMPANY L.L.C.,**

Petitioners

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, in His Official Capacity as Administrator of the United States Environmental Protection Agency,**

Respondents

Consolidated with

No. 21-60673

**STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; LUMINANT MINING COMPANY, L.L.C.,**

Petitioners

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,**

Respondents

On Petition for Review of Final Agency Actions of the United States Environmental Protection Agency

Rule 30.2(a) Appendix – Volume Seven of Eight (Tabs 466 - 471)

KEN PAXTON
Attorney General of Texas
BRENT WEBSTER
First Assistant Attorney General
GRANT DORFMAN
Deputy First Assistant Attorney General
SHAWN COWLES
Deputy Attorney General for Civil Litigation
PRISCILLA M. HUBENAK
Chief, Environmental Protection Division

**March 30, 2022**

LINDA B. SECORD
Assistant Attorney General
Linda.Secord@oag.texas.gov
JOHN R. HULME
Assistant Attorney General
John.Hulme@oag.texas.gov
OFFICE OF THE ATTORNEY
GENERAL OF TEXAS
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
512-463-2012 (phone)
*Counsel for the State of Texas and Texas Commission on Environmental Quality*

# **TABLE OF CONTENTS**
## **Volume Seven of Eight\***

Tab

Comment Submitted by Joshua Smith, Staff Attorney, Sierra Club (Sept. 23, 2019) (with Exhibits 1, 3, 5, & 6) ...................................................................... 466

86 Fed. Reg. 34,187 (June 29, 2021) ...................................................................... 469

Technical Support Document for the Withdrawal of EPA's Proposed Error Correction: Assessment of Sierra Club's September 2019 Modeling ......................... 470

86 Fed. Reg. 34,141 (June 29, 2021) ...................................................................... 471

*(See other volumes for additional appendix documents)*

---

\* Consistent with how the record material was cited in the briefs, appendix tab numbers correspond to the final four digits (minus leading zeros) of "Document ID" numbers on the certified index of record contents.

# **CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this appendix, which includes Volumes One through Eight, via the Court's CM/ECF system on this 30th day of March, 2022. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Trend Micro and is free of viruses.

s/ P. Stephen Gidiere III

*Counsel for Luminant Petitioners*

**Tab 466: Comment Submitted by Joshua Smith, Staff Attorney, Sierra Club (Sept. 23, 2019) (with Exhibits 1, 3, 5, & 6)**



**Via Regulations.gov and Hand Delivery**

September 23, 2019

U.S. Environmental Protection Agency
Office of Air Quality Planning and Standards
Air Quality Planning Division, C539-01
109 T.W. Alexander Drive
Research Triangle Park, NC 27709
Attention: Corey Mocka

U.S. Environmental Protection Agency
EPA Docket Center
EPA-HQ-OAR-2014-0464; FRL-9998-54-OAR
Mail Code 28221T
1200 Pennsylvania Avenue, NW
Washington D.C. 20460

U.S. Environmental Protection Agency
EPA Docket Center
WJC West Building, Room 3334
1301 Constitution Avenue, NW
Washington, DC 20004

**Re: Sierra Club Comments Regarding Error Correction of the Area Designations for the 2010 1-Hour Sulfur Dioxide (SO₂) Primary National Ambient Air Quality Standard (NAAQS) in Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas, 84 Fed. Reg. 43757 (Aug. 22, 2019), EPA Docket No. EPA-HQ-OAR-2014-0464; FRL-9998-54-OAR**

   On behalf of its 791,501 members nationwide, including 27,465 members in Texas, many of whom are adversely affected by harmful pollution from large coal-burning power plants, Sierra Club respectfully submits the following comments regarding the Environmental Protection Agency's ("EPA") proposed Error Correction of the Area Designations for the 2010 1-Hour Sulfur Dioxide (SO₂) Primary National Ambient Air Quality Standard (NAAQS) in Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas, 84 Fed. Reg. 43,757 (Aug. 22, 2019), EPA Docket No. EPA-HQ-OAR-2014-0464; FRL-9998-54-OAR. We incorporate by reference and are attaching two expert reports: (1) *Martin Lake Steam Electric Station, Tatum, Texas*

App. 1402

*Evaluation of Compliance with the 1-hour NAAQS for SO₂*, September 23, 2019, conducted by Steven Klafka, P.E., BCEE Wingra Engineering, S.C., Madison, Wisconsin (Ex. 1), and supporting modeling files, which were delivered by hand on September 23, 2019, to EPA's Docket Center in Washington, D.C., as reflected by the attached receipt[1]; and (2) *EPA's "Error Correction" of the SO₂ Area Designations in Texas*, conducted by Dr. H. Andrew Gray, dated September 23, 2019 [hereinafter, "September 2019 Gray Report"] (Ex. 2).[2] We also incorporate by reference and are attaching the comments submitted by Sierra Club regarding prior EPA actions taken in the development of the Texas area designations under the 2010 National Ambient Air Quality Standard ("NAAQS") for sulfur dioxide ("SO₂"). *See* EPA Docket No. EPA-HQ-OAR-2014-0464-0332 (Sierra Club March 31, 2016 legal comments and modeling report, captioned, *Martin Lake Steam Electric Station, Tatum, Texas Evaluation of Compliance with the 1-hour NAAQS for SO₂*, March 31, 2016, conducted by Steven Klafka, P.E., BCEE Wingra Engineering, S.C., Madison, Wisconsin, and modeling files, attached as Ex. 4).[3]

As discussed below, EPA cannot lawfully finalize its proposal to redesignate the areas surrounding the Big Brown Electric Station, the Martin Lake Electrical Station, and the Monticello Steam Electric Station in Texas from nonattainment to unclassifiable under the health-based 2010 SO₂ NAAQS. Contrary to EPA's conclusory assertions of error, the agency has failed to provide a rational explanation for redesignating the Texas nonattainment areas to unclassifiable, and the proposal is arbitrary and capricious and contrary to law for the following reasons:

- EPA's cannot circumvent the redesignation or reconsideration requirements of the Clean Air Act by "revisiting" the substance of the Texas nonattainment designations under the error correction provision of the Act.
- EPA's use of 42 U.S.C. § 7410(k)(6) is unlawful because EPA did not err in designating the three areas as nonattainment.
- EPA did not err in declining to defer to Texas's belated and irrelevant preference for monitoring.
- EPA did not err in considering Sierra Club's air dispersion modeling when assessing compliance with the 2010 SO₂ NAAQS.

---

[1] Flash drives with the modeling files were also delivered by FedEx overnight mail to Mr. Corey Mocka, at the address above.

[2] Exhibit 2 also incorporates the January 7, 2016 Mem. from H. Andrew Gray, Gray Sky Solutions to EPA, Region 6 Re: review of NRG's modeling of Parish SO2 emissions [hereinafter, January 2016 Gray Report"], and the March 31, 2016 Mem. from H. Andrew Gray, Gray Sky Solutions to EPA, Region 6 Re: EPA's SO2 Area Designations for Texas [hereinafter, "March 2016 Gray Report"], EPA Docket No. EPA-HQ-OAR-2014-0464-0332.

[3] We also incorporate by reference letters submitted by 970 different Sierra Club members that are adversely affected or concerned about harmful air pollution from Texas power plants. Each of those individual Sierra Club members support these legal and technical comments, and they oppose EPA's redesignation proposal. EPA must not finalize this unlawful proposal, but should instead move forward with implementing the requirements of the Clean Air Act to bring Texas into compliance with public health standards for SO2 pollution.

- EPA correctly concluded that Sierra Club's 2016 modeling demonstrated that the areas surrounding Big Brown, Monticello, and Martin Lake were in nonattainment.
- Sierra Club's September 2019 modeling confirms and makes clear that the area surrounding Martin Lake does not meet the 2010 $SO_2$ NAAQS and must be designated as being in nonattainment.
- Texas's own air quality monitoring now conclusively demonstrates that the area surrounding Martin Lake is in nonattainment.
- If EPA does finalize this arbitrary reversal, it must conclude that the Rule is based on determinations of nationwide scope and effect for the purposes of judicial review.

## BACKGROUND

### A. The Sulfur Dioxide NAAQS and Human Health

In 2010, EPA revised the primary, or health-based, NAAQS for $SO_2$. 75 Fed. Reg. 35,520 (June 22, 2010) ("2010 $SO_2$ NAAQS"). As EPA has long determined, $SO_2$ "cause[s] or contribute[s] to air pollution which may . . . endanger public health and welfare." *See id.* at 35,521 (quoting 42 U.S.C. § 7408(a)(1)(A)).[4] Exposure to $SO_2$, even for just a few minutes, can have significant human health impacts, including the aggravation of asthma attacks and cardiovascular and respiratory failure, leading to increased hospitalizations and premature death. *Id.* at 35,525. The 2010 $SO_2$ NAAQS addresses these health threats by lowering the NAAQS limit to 75 parts per billion ("ppb"), which EPA deems to be the level "requisite to protect the public health."[5] *Id.* at 35,521 (citation omitted). Under the new standard, EPA estimates that between 2,300 and 5,900 premature deaths and 54,000 asthma attacks will be prevented each year. EPA, Final Regulatory Impact Analysis (RIA) for the $SO_2$ National Ambient Air Quality Standards (NAAQS) at 5-35, Table 5.14 (June 2010), https://www3.epa.gov/ttnecas1/regdata/RIAs/fso2ria100602full.pdf. These reductions in adverse health effects are expected to save up to $36 billion dollars in avoided public health costs and lost productivity. 75 Fed. Reg. at 35,588. Sulfur dioxide pollution is not only harmful to human health by itself, but it also contributes to the atmospheric formation of fine particulate matter, which can penetrate deep into the lungs and cause a host of health problems, including aggravated asthma, chronic bronchitis, and premature death. 78 Fed. Reg. 3086, 3103, 3105-06 (Jan. 15, 2013). Indeed, $SO_2$ emissions from a handful of Texas power plants have been shown to contribute to premature death, asthma events, tens of thousands of lost work and school days, and billions in public health impacts *each year* across the central region states.[6]

---

[4] EPA first promulgated a NAAQS for $SO_2$ in 1971. *See* 36 Fed. Reg. 8186, 8187 (Apr. 30, 1971).

[5] The 2010 $SO_2$ NAAQS replaces a standard first set in 1971 and is based on the 3-year average of the 99th percentile of the yearly distribution of 1-hour daily maximum $SO_2$ concentrations. 75 Fed. Reg. at 35,521-22. Under the 1971 standard, EPA set the $SO_2$ NAAQS at 0.14 parts per million ("ppm") (365 $\mu g/m^3$) averaged over a 24-hour period, not to be exceeded more than once per year, and 0.030 ppm (80 $\mu g/m^3$) annual arithmetic mean. 36 Fed. Reg. at 8187. EPA revised the standard in light of epidemiological and controlled human exposure studies establishing a causal relationship between respiratory morbidity and short-term (5-minutes to 24-hours) exposure to $SO_2$. 75 Fed. Reg. at 35,524-29.

[6] Report of Dr. George Thurston, Docket ID No. EPA-R06-OAR-2016-0611 (May 4, 2017) (attached as Ex. 3).

### B.  Coal Burning Power Plants Are the Primary Source of SO$_2$ Pollution

Nearly all SO$_2$ pollution in the United States comes from a handful of very large coal-fired power plants.[7] Three of Texas's largest coal-fired power plants—Big Brown, Martin Lake, and Monticello—have routinely ranked among the top ten largest annual SO$_2$ polluters in the country.[8] Based on data from EPA's Air Markets Program Database, in the 2013-2015 period, which EPA based its designations on, these three plants emit, on average, more than 175,000 tons of SO$_2$ annually—more than all of the other Texas sources combined.[9] That is not because these three power plants are the largest, but because they lack the modern pollution controls commonly used in the industry.[10]

### C.  Implementation of the NAAQS

EPA's promulgation of the 2010 SO$_2$ NAAQS triggered the agency's statutory obligation to "designate" all areas of the country according to whether they comply with the standard. 42 U.S.C. § 7407(d)(1)(B)(i). Areas that comply are designated "attainment." *Id.* § 7407(d)(1)(A)(ii). Areas that do not comply must be designated "nonattainment." *Id.* § 7407(d)(1)(A)(i). Areas that "cannot be classified *on the basis of available information*" as complying or not complying with the standard are designated "unclassifiable." *Id.* § 7407(d)(1)(A)(iii) (emphasis added). As an initial step, states are charged with submitting initial designation recommendations for areas within their jurisdiction, and then EPA may make any modifications it "deems necessary." *Id.* § 7407(d)(1)(A), (B)(ii).

EPA's final air quality designations govern the stringency of the CAA state implementation plans ("SIPs") required from each state to ensure achievement of the NAAQS. *See id.* § 7407(a). If an area is designated "nonattainment," the state must develop and submit, within 18 months of the effective date of that designation, a SIP that provides for the attainment of the NAAQS "as expeditiously as practicable," but no later than 5 years from the date of the nonattainment designation. *Id.* §§ 7502, 7503, 7514, 7514a. By contrast, in areas that are designated unclassifiable or

---

[7] In fact, 91% of all U.S. SO$_2$ emissions come from coal-fired electric power plants. Sierra Club Comments, Docket ID No. EPA-HQ-OAR-2014-0464-0420, at 2 (Mar. 31, 2016) (citing U.S. EPA, 2011 National Emissions Inventory (NEI) Data, https://www.epa.gov/air-emissions-inventories/2011-national-emissions-inventory-nei-data). At the time EPA promulgated its area designations, 2011 was the most recent year for which complete National Emission Inventory data was available.

[8] 84 Fed. Reg. 43,759; *see also* https://ampd.epa.gov/ampd/ (select Reports, and Run Top Emitter Reports for SO$_2$). Although Luminant retired the Big Brown and Monticello coal-burning power plants in 2018, Martin Lake has continued to operate and, in 2018, emitted more SO$_2$ than any other source in the country. *Id.*

[9] These three plants also emit more SO$_2$ than all of the sources in Oklahoma and Louisiana combined. *See* EPA, Air Markets Program Data, https://ampd.epa.gov/ampd/ (under "Query" run report for annual emissions by state and compare to annual emissions by source).

[10] *See* EPA, Technical Support Document for the Cost of Controls Calculations for the Texas Regional Haze Federal Implementation Plan (Cost TSD), Docket ID No. EPA-R06-OAR-2014-0754-0008, at 1 (Nov. 2014) (13 units at 6 large facilities in Texas do not have scrubbers to control SO$_2$ pollution).

attainment, states are required only to prevent further significant deterioration of air quality. *Id.* § 7471.

In August 2013, EPA issued nonattainment designations for 29 areas in 16 states based on nearby monitor readings exceeding the 2010 $SO_2$ NAAQS. *See* Air Quality Designations for the 2010 Sulfur Dioxide ($SO_2$) Primary National Ambient Air Quality Standard, 78 Fed. Reg. 47,191 (Aug. 5, 2013) (effective Oct. 4, 2013). Because EPA failed to timely issue final designations for the remainder of the country, Sierra Club filed a citizen suit to compel the agency to fulfill its statutory duty.[11] As a result of a consent decree entered in that case, EPA was required to issue final designations for the areas with the largest sources of $SO_2$ by July 2, 2016.[12] Consent Decree ¶ 1, *Sierra Club v. McCarthy*, No. 3:13-cv-3953-SI (N.D. Cal. Mar. 2, 2015), ECF No. 163, EPA-HQ-OAR-2014-0464-0202. Pursuant to agreed-upon modifications to the Consent Decree, EPA received a short extension of time by which to designate the areas surrounding the Big Brown, Martin Lake, Monticello, and Sandow power plants—until November 29, 2016. *See Sierra Club v. McCarthy*, No. 3:13-cv-3953-SI (N.D. Cal. Oct. 28, 2016), ECF No. 180.

To facilitate the implementation of the NAAQS, on August 10, 2015, EPA finalized the Data Requirements Rule ("DRR"), which requires TCEQ to provide data to characterize air quality around many major sources of $SO_2$.[13] For areas around any source that emits 2,000 tons per year (tpy) or more of $SO_2$ states were required to notify EPA by July 1, 2016, whether they intended to: (1) characterize air quality through ambient monitoring; (2) characterize air quality through air quality modeling; or (3) whether it will be subjecting the pertinent source or sources to enforceable emission limits that will keep the source below this rule's 2,000 tpy threshold.

If the state intended to rely on monitoring to demonstrate attainment for a specific source, it was required to include information about the planned new monitors in the annual monitoring plan that the air agency was required to submit to the EPA by July 1, 2016; and the air agency was required to ensure that the new monitors are operational by January 1, 2017.[14] Moreover, if the state's new monitors were not approved and operational by January 1, 2017, the state was then required to demonstrate attainment with air dispersion modeling.[15]

---

[11] EPA is required to make its designations "as expeditiously as practicable, but in no case later than 2 years from the date of promulgation of the new or revised [NAAQS]"—unless EPA "has insufficient information to promulgate the designations", in which case EPA may have up to one additional year. *Id.* § 7407(d)(1)(B)(i). In the case of the 2010 $SO_2$ NAAQS, federal law mandated designations no later than 2013.

[12] EPA was required to promulgate designations for undesignated areas, which (a) based on air quality monitoring had violated the 2010 $SO_2$ NAAQS within the preceding three calendar years, or (b) contained any stationary source that had not been announced for retirement and which had either (i) emitted more than 16,000 tons of $SO_2$ in 2012 or (ii) emitted more than 2,600 tons of $SO_2$ and had an annual average emission rate of 0.45 lbs $SO_2$/Mmbtu or higher in 2012. Consent Decree ¶ 1.

[13] Data Requirements Rule for the 2010 1-Hour Sulfur Dioxide (SO2) Primary National Ambient Air Quality Standard (NAAQS), 80 Fed. Reg. 51,052 (Aug. 21, 2015) (to be codified at 40 C.F.R. § 51, Subpart BB).

[14] *See* 40 C.F.R. § 12.03.

[15] *Id.*; *see also* 80 Fed. Reg. at 51,074, 51,087-88.

5

### D. EPA's Texas Nonattainment Designations

In March 2016, EPA proposed its designations for those areas with the largest $SO_2$ sources. 81 Fed. Reg. 10,563 (Mar. 1, 2016). Consistent with the final $SO_2$ NAAQS rule, EPA's technical guidance, and the agency's past practice, EPA based its proposed designations on extensive air dispersion modeling evaluating the short-term impacts of numerous large $SO_2$ sources across the country. *See* 75 Fed. Reg. at 35,551 (modeling is "the most technically appropriate, efficient, and readily available method for assessing short-term ambient $SO_2$ concentrations in areas with large point sources"); *see also Mont. Sulphur & Chem. Co. v. EPA*, 666 F.3d 1174, 1185 (9th Cir. 2012) (approving EPA's use of modeling to predict compliance with NAAQS).

Consistent with EPA's technical guidance, Sierra Club submitted third-party modeling reports to inform EPA's evaluation of the short-term impacts of numerous large $SO_2$ sources across the country. All told, Sierra Club submitted dozens of air dispersion modeling reports for major sources across the country, including Luminant Generation Company's Big Brown, Martin Lake, and Monticello coal-burning power plants.[16] Sierra Club also submitted extensive technical and legal comments addressing the (often limited or flawed) modeling submitted by states or utilities, as well as additional technical issues and data concerns that arose during the rulemaking process.[17]

With regard to the large Texas sources—the focus of EPA's current proposed action—Sierra Club submitted multiple rounds of modeling. On September 17, 2015, Sierra Club submitted air dispersion modeling conducted by Wingra Engineering, S.C. demonstrating that $SO_2$ emissions from Big Brown, Martin Lake, and Monticello each caused violations of the 2010 $SO_2$ NAAQS, and therefore the areas surrounding the plants should be designated as nonattainment areas.[18] On December 14, 2015, Sierra Club submitted updated modeling analyses for Big Brown and Monticello, addressing issues raised by TCEQ and using the most recent emissions data for each facility.[19]

Consistent with Sierra Club's recommendation, and as supported by the Wingra Engineering modeling, EPA proposed to designate the areas around Big Brown, Monticello, and Martin Lake as nonattainment.[20] In its Technical Support Document ("TSD"), EPA generally agreed that Wingra Engineering followed the applicable EPA guidance for modeling the dispersion of $SO_2$ emissions.[21] However, EPA identified several minor issues or discrepancies in the inputs relied upon by Wingra.

---

[16] Although Luminant Generation Company is owned by "Vistra Energy Corporation," the operating permits for the Big Brown, Martin Lake, and Monticello coal-burning power plants list Luminant as the operator of the plants, and the vast majority of documents in the record refer to Luminant as the owner and operator. For simplicity and consistency, these comments refer only to Luminant as the owner and operator of each of the plants at issue, unless otherwise necessary.

[17] *See generally*, Sierra Club comments, EPA Docket EPA-HQ-OAR-2014-0464.

[18] *Martin Lake Steam Electric Station Tatum, Texas Evaluation of Compliance with the 1-hour NAAQS for $SO_2$*, dated September 11, 2015, conducted by Steven Klafka, P.E., BCEE Wingra Engineering, S.C., Madison, Wisconsin (attached as Ex. 8)

[19] *See* EPA Docket No. EPA-HQ-OAR-0464-0082.

[20] *See* 81 Fed. Reg. 10563; Texas Technical Support Document for EPA's Intended Designations, EPA Docket EPA-HQ-OAR-2014-0464-0144 (hereinafter, "Texas Intended TSD").

[21] Texas Intended TSD at 77.

On March 31, 2016, Sierra Club submitted technical comments and updated modeling demonstrating that, even after adjusting the analysis to follow EPA's suggestions, still indicated that Big Brown, Martin Lake, and Monticello caused significant exceedances of the 1-hour $SO_2$ standard.[22]

On December 13, 2016, EPA issued its final area designations for the four areas surrounding the Big Brown, Martin Lake, Monticello, and Sandow power plants. 81 Fed. Reg. 89,870 (Dec. 13, 2016). In line with Sierra Club's March 31, 2016 modeling, EPA determined that the areas surrounding three coal-fired power plants—Big Brown in the Freestone and Anderson Counties Area, Martin Lake in the Rusk and Panola Counties Area, and Monticello in the Titus County Area—failed to meet the health-based 2010 $SO_2$ NAAQS. Id. at 89,873.[23] As explained below in more detail, EPA reviewed Sierra Club's modeling and determined that it followed the applicable EPA guidelines, was "deliberately conservative" in that it underestimated total impacts, and was sufficient to demonstrate nonattainment.[24] Conversely, EPA correctly found that Luminant's air quality modeling relied on inputs and selected modeling options that were "not acceptable" for regulatory use and impermissibly underpredicted modeling impacts due, in part, to future, non-enforceable and voluntary emission reductions.[25]

### E. Challenges to EPA's Texas Designations and Petitions for Reconsideration.

On February 13, 2017, Texas and a set of utilities[26] filed petitions in the Fifth Circuit for judicial review of EPA's three Texas $SO_2$ nonattainment designations. See No. 17-60088. Sierra Club sought and was granted intervention in order to defend the three designations. Texas v. EPA, No. 17-600088 (5th Cir. Mar. 23, 2017), Doc. 0051392354.[27] Also on February 13, 2017, Luminant submitted to EPA a petition for administrative reconsideration and administrative stay of the effective date of the nonattainment designations.[28] On September 21, 2017, EPA responded to that request, explaining that the agency intended to propose an administrative action with notice and comment to "revisit" the Texas nonattainment designations.[29] In the interim, the Texas nonattainment designations remain effective. Id. Based on those developments, the Fifth Circuit granted EPA's request to hold the petitions in abeyance pending the outcome of EPA's

---

[22] See Ex. 4, attached to EPA Docket No. EPA-HQ-OAR-0464-0332.

[23] EPA also determined that the fourth area, Milam County surrounding the Sandow Power Station, was "unclassifiable." 81 Fed. Reg. at 89,871.

[24] EPA, Technical Support Document for the Designation Recommendations for the 2010 Sulfur Dioxide National Ambient Air Quality Standards (NAAQS)—Supplement for Four Areas in Texas Not Addressed in June 30, 2016, Version at 58, 77, EPA Docket No. EPA-HQ-OAR-2014-0464-0434 (Nov. 29, 2016) ["Final Texas Supplemental TSD"].

[25] Id. at 33, 58.

[26] Luminant Generation Company LLC, Big Brown Power Company LLC, Sandow Power Company LLC, and Luminant Mining Company LLC (collectively, "Luminant").

[27] Texas and Luminant, and Sierra Club each also filed petitions for review in the D.C. Circuit (Sierra Club sought an expansion of the nonattainment area surrounding the Big Brown plant). These petitions were later transferred to the Fifth Circuit and consolidated in case No. 17-60088.

[28] EPA-HQ-OAR-2014-0464-0446. Texas filed its own petition for reconsideration on December 11, 2017. EPA-HQ-OAR-2014-0464-0452.

[29] EPA-HQ-OAR-2014-0464-0454.

administrative proceedings. *Texas v. EPA*, No. 17-600088 (5th Cir. Oct. 12, 2017), Doc. 00514194243. That stay remains in effect.

## ARGUMENT

## I. EPA LACKS LEGAL AUTHORITY TO REDESIGNATE THE THREE TEXAS AREAS FROM NONATTAINMENT TO UNCLASSIFIABLE.

EPA's attempt to use its "error correction" authority to "revisit"[30] and redesignate the Martin Lake, Big Brown, and Monticello nonattainment designations from nonattainment to unclassifiable is arbitrary, capricious, and contrary to law for two overarching reasons.[31] First, the Clean Air Act provides two discrete mechanisms with specific and strictly enforced procedural requirements, under which EPA may "revisit" any final NAAQS designations: reconsideration under 42 U.S.C. § 7607(d)(7)(B), or redesignation under 42 U.S.C. § 7407(d)(3)(E). EPA has not properly invoked either of those mechanisms, and neither can lawfully be applied here.

Second, EPA's use of its Section 7410(k)(6) error correction authority is unlawful because there is no error to correct. Instead, the record makes clear that the new EPA administration has simply changed its mind about the legal and policy decisions underlying the agency's nonattainment designations. Specifically, the agency now contends that it should have considered Texas's intent to use monitoring to characterize the area's air quality, and that it should not have relied on Sierra Club's modeling. As discussed below, those purported errors do not withstand scrutiny, and EPA has not provided a reasoned basis for reversing nonattainment decisions that the agency itself concluded were based on extensive, thoroughly reviewed technical information and well-established legal principles.

### A. EPA's Cannot Circumvent the Redesignation or Reconsideration Requirements of the Clean Air Act by "Revisiting" the Substance of the Texas Nonattainment Designations Under the Error Correction Provisions of the Act.

The record and EPA's recitation of purported errors make clear that the agency simply wants to redo or reconsider the nonattainment designations to "alleviate" the obligations associated with coming into compliance with the Clean Air Act.[32] Indeed, EPA has repeatedly sought to hold the

---

[30] *See* September 21, 2017 Letter from Administrator Scott Pruitt to Mr. Daniel Jude Kelly Re: Response to Petition for Reconsideration and Administrative Stay, EPA Docket No. EPA-HQ-OAR-2014-0464-0454 (hereinafter, "EPA Response to Luminant Petition for Reconsideration") ("EPA is considering a variety of administrative options for revisiting" the Texas designations and noting the agency's intent to "revisit the nonattainment designations").

[31] As noted, Luminant Generation Company reportedly ceased operating the Big Brown and Monticello power plants in early 2018. The operator's voluntary operational decisions are not enforceable and do not automatically allow EPA to redesignate the areas. Instead, the state (or EPA, where the state refuses) must implement "permanent and enforceable reductions" of pollution, including reasonably available control technology at major existing sources, to ensure the achievement *and* maintenance of the NAAQS. 42 U.S.C. § 7407(d)(3)(E). For the purposes of these legal comments, however, we generally refer to Martin Lake as shorthand for all three plants.

[32] *See* EPA Response to Luminant Petition for Reconsideration, EPA Docket No. EPA-HQ-OAR-2014-0464-0454.

pending D.C. and Fifth Circuit litigation in abeyance so that the agency could "undertake further rulemaking" on the "reconsideration" petitions, which "could result in revisions to the designations."[33] In fact, EPA filed no fewer than 13 separate status reports with the D.C. and Fifth Circuit, seeking additional time so that it could "review and incorporate technical information" and then issue a proposal to "revisit" and make "changes to the determinations" at issue here.[34] The record is clear that both staff and OAR senior leadership were involved in a two-year effort to review and "revise" the Texas nonattainment designations.

And true to EPA's stated intent, the proposed "revision" of the Texas area nonattainment areas will "alleviate"—indeed, eliminate—the substantive requirements of the 2016 nonattainment designations by redesignating those Texas areas as unclassifiable. EPA's proposal is not only a substantive redesignation, but it indisputably responds to and relies on the very same arguments that Luminant and Texas raised in their comments on the proposed designations and in their petitions for reconsideration.

But as noted, the Clean Air Act provides only two mechanisms, under which EPA may "revisit" any final NAAQS designations: reconsideration under 42 U.S.C. § 7607(d)(7)(B), or redesignation under 42 U.S.C. § 7407(d)(3)(E). EPA has not, and cannot, properly invoked either of those mechanisms, and neither of those mechanisms can lawfully be applied here. Moreover, EPA cannot circumvent the Clean Air Act's strictly-applied redesignation or reconsideration requirements by simply asserting its previous legal and factual conclusions were wrong, without providing a reasoned and persuasive explanation for disregarding the facts and circumstances underlying the prior decision. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009).

### 1. EPA Is Prohibited From Redesignating a Nonattainment Area as Unclassifiable.

While EPA has authority to revisit existing designations by initiating a redesignation rulemaking, it must do so in accordance with statutory requirements. *See generally* 42 U.S.C. § 7407(d)(3). The Clean Air Act unambiguously prohibits EPA from redesignating an area from nonattainment to unclassifiable, *see* 42 U.S.C. § 7407 (d)(3)(F), and mandates a specific set of actions and findings before EPA may redesignate a nonattainment area as attainment. *See id.* § 7407(d)(3)(E). EPA must (1) determine that the area has *attained* the national ambient air quality standard; (2) fully approve the applicable "nonattainment" implementation plan for the area under Section 7410(k); (3) determine that the improvement in air quality is due to permanent and enforceable reductions in emissions resulting from implementation of the applicable implementation plan and applicable Federal air pollutant control regulations and other permanent and enforceable reductions; (4) fully approve a maintenance plan for the area; and (5) ensure that the area has met all of the requirements applicable to the area under Part D of the Act. 42 U.S.C. § 7407(d)(3)(E)(i)-(v). EPA has not satisfied any of those specific requirements with respect to the Texas nonattainment areas. Rather than comply with the Clean Air Act's redesignation provisions, EPA has invented errors in an

---

[33] EPA Motion to Govern and Motions to Sever and Hold in Abeyance at 6, *Samuel Masias v. U.S. EPA*, No. 16-1314 (consolidated with *Texas v. U.S. EPA*, 17-1053) (D.C. Cir. Sept. 22, 2017) (seeking an abeyance of litigation for Missouri and Ohio for the purposes of "reconsideration," and seeking an abeyance of the Texas litigation for the "same reasons").

[34] EPA Status Report, *Texas v. U.S. EPA*, No. 17-60088 at 3 (5th Cir. July 26, 2019), ECF Doc. No. 00515050801.

unlawful attempt to effectively redesignate the Texas nonattainment areas to unclassifiable under its error correction authority.

It is true that EPA has general authority under the Clean Air Act to correct errors, but EPA's error correction authority is appropriately used where EPA can point to a clear error underlying its original action—typically a legal error or typographical or other minor mistake. *See* Section I.B. Here, by contrast, the record makes clear that EPA simply wants to revisit the substance of the initial designation to adopt the arguments and position raised by Luminant and Texas during the initial rulemaking.

EPA cannot rely on its general error correction authority to redo an area designation. Indeed, "it is well established that an agency may not circumvent specific statutory limits on its actions by relying on separate, general rulemaking authority." *Air Alliance Houston v. Environmental Protection Agency*, 906 F.3d 1049, 1061 (D.C. Cir. 2018) (invalidating EPA's indefinite delay in implementing regulations while undertaking reconsideration where the Clean Air Act unambiguously imposed a three-month limit); *Citizens to Save Spencer Cty. v. EPA,* 600 F.2d 844, 873 (D.C. Cir. 1979) (explaining that a general power cannot "provide the [EPA] Administrator with Carte blanche authority to promulgate any rules, on any matter relating to the [Act], in any matter that the Administrator wishes").

Here, EPA cannot escape Congress's clear intent to prohibit "*any* redesignation of *any* area . . . from nonattainment to unclassifiable,*"* 42 U.S.C. § 7407(d)(3)(F) (emphasis added), by "grasping at its separate, more general authority" to correct errors under Section 7410(k)(6). *Air Alliance Houston*, 906 F.3d at 1061. Such a reading of the Clean Air Act would almost always allow EPA to redesignate an area and avoid the restrictions of Section 7407(d)(3)(E) and (F) by simply insisting it was correcting an error, even when it is indisputably revisiting and revising a designation from nonattainment to unclassifiable, contrary to the unambiguous prohibition in Section 7407(d)(3)(F).

Although EPA has general authority to correct an actual error in the designation, Courts have uniformly held that a "general grant of rulemaking power . . . [cannot] trump the specific provisions of the [Clean Air Act]." *Natural Resources Defense Council, Inc. v. Reilly*, 976 F.2d 36, 40 (D.C. Cir. 1992); *see also Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 169–70, (2007) (explaining that when two regulations conflict on the same subject matter, "the specific governs the general," and the more specific regulation applies); *Chemical Waste Mgmt., Inc. v. EPA*, 976 F.2d 2, 22 (D.C. Cir. 1992) (EPA may not "accommodate" two statutes by allowing one to "override" the more specific requirements of the other); *Murray Energy Corporation v. EPA*, -- F.3d --, 2019 WL 3977557, at *19 (D.C. Cir. Aug. 23, 2019) ("EPA has no authority to change that provision of the Act, whether by ad hoc waiver or rulemaking.").

This is especially true where, as here, EPA has simply "changed its mind" after a substantive "policy" review. *Cf. Murray Energy Corporation v. EPA*, -- F.3d --, 2019 WL 3977557, at *17 (D.C. Cir. 2019) (invalidating EPA's decision, under the Clean Air Act's grandfathering clause, to allow sources that had completed applications for preconstruction permits before the 2015 NAAQS went into effect to demonstrate compliance with the previous NAAQS rather than the new, more stringent standards.). As noted, in response to Texas's and Luminant's petitions for reconsideration, EPA announced its intent to "revisit" the Texas nonattainment designations and make "changes to the determinations" at issue here. Staff and OAR senior leadership were involved in a two-year effort to

"review and incorporate technical information"[35] into a proposal that would "revise" the Texas nonattainment designations and "alleviate associated and pending planning obligations." *See* EPA Response to Luminant Petition for Reconsideration, EPA Docket No. EPA-HQ-OAR-2014-0464-0454.

Moreover, EPA's proposal is not only a substantive redesignation, but it indisputably relies on the very same substantive arguments that Luminant and Texas raised in their comments on the proposed designations and in their petitions for reconsideration. Indeed, a cursory comparison of EPA's recitation of purported errors and Luminant's and Texas's comments makes clear that the agency simply wants to redo or reconsider the nonattainment designations. In fact, every single purported basis for an error is essentially cut and pasted from Texas's and Luminant's comments on the initial rulemaking, or their petitions for reconsideration. EPA cannot change its mind and redo a designation by simply asserting—two years after the fact—that it erred in not agreeing with Texas and Luminant in the first place. In short, EPA cannot circumvent the Clean Air Act's strictly-applied redesignation requirements by simply asserting its previous legal and factual conclusions were wrong, without providing a reasoned and persuasive explanation for disregarding the facts and circumstances underlying the prior decision. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16.

It is true that there is some tension between Section 7407(d)(3)(F) and section 7410(k)(6), but the two provisions can and should be read harmoniously. Read naturally, Section 7407(d)(3)(F)'s reference to "any" nonattainment designation "has an expansive meaning," and must mean a redesignation "of whatever kind." *United States v. Gonzales*, 520 U.S. 1, 5, (1997) (quoting Webster's Third New International Dictionary 97 (1976)). EPA's error correction proposal is, in substance and effect and in its own words, a "revision" and "redesignation" of the nonattainment areas to unclassifiable. The Clean Air Act prohibits that substantive revision. EPA's expansive reading of its general error correction authority would allow the agency to redesignate an area and avoid the restrictions of Section 7407(d)(3)(E) and (F) in any and every case by simply insisting it was correcting an error, even if it is indisputably just reversing course and adopting a position. The Clean Air Act does not permit such an arbitrary reversal. *Murray Energy Corporation v. EPA*, -- F.3d --, 2019 WL 3977557, at *18 (D.C. Cir. Aug. 23, 2019).

### 2.  EPA Cannot Use Error Correction to Circumvent Reconsideration Provisions.

Similarly, EPA cannot circumvent the reconsideration requirements of 42 U.S.C. § 7607(d) by asserting its general error correction authority. "Reconsideration" proceedings under Section 7607(d)(7)(B) are limited to "carefully defined" circumstances. *See Natural Res. Def. Council v. Reilly*, 976 F.2d 36, 40 (D.C. Cir. 1992). The "reconsideration" provision was intended to create an exhaustion requirement for a narrow class of issues arising at the tail end of a rulemaking, to ensure that the EPA addressed those issues before they were presented to a reviewing court.[36] Reconsideration is available *only* if two statutory conditions are met:

---

[35] EPA Status Report, *Texas v. U.S. EPA*, No. 17-60088 at 3 (5th Cir. July 26, 2019), ECF Doc. No. 00515050801.

[36] *See* H.R. Rep. No. 95-294, at 323 (1977) (provision targets "the circumstances in which a reviewing court may consider data and arguments that were not presented to the agency during the rulemaking").

> If the person raising an objection can demonstrate to the Administrator that [1] *it was impracticable to raise such objection within such time* or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and [2] *if such objection is of central relevance to the outcome of the rule*, the Administrator shall convene a proceeding for reconsideration of the rule . . . .

42 U.S.C. § 7607(d)(7)(B) (emphasis added). Courts have strictly enforced the "threshold" eligibility requirements for reconsideration. *Lead Indus. Ass'n v. EPA*, 647 F.2d 1130, 1172-74 (D.C. Cir. 1980). Reconsideration is not available when a party could have raised an issue during the comment period, but failed to do so. Likewise, reconsideration is not available when a party actually did raise the issue in comments. *See also Clean Air Council v. Pruitt*, 862 F.3d 1, 8 (D.C. Cir. 2017) (noting that an administrative stay pending reconsideration is available "[o]nly when these two conditions" are met, and concluding that EPA's administrative stay of greenhouse gas regulations was unlawful because EPA lacked authority to grant reconsideration on issues on which "industry groups had ample opportunity," and did, in fact, comment on).

As EPA implicitly recognizes in its attempt to justify its redesignation proposal, the Agency cannot properly rely on 42 U.S.C. § 7607(d)(7)(B) to grant Texas's or Luminant's petitions for reconsideration of the Texas nonattainment designations. Indeed, the EPA Administrator's September 21, 2017 response to Luminant's petition conspicuously did not grant the petition for reconsideration, but simply announced the agency's "intent to revisit, pursuant to notice-and-comment rulemaking, the three nonattainment designations in the Supplemental Rule."[37] Moreover, EPA could not grant those petitions for reconsideration even if it wanted to because *all* of the issues, except one,[38] that the Luminant Petitioners identified in their petition could have been, *and actually were*, raised and extensively deliberated during the comment period.[39]

---

[37] EPA Response to Luminant Petition for Reconsideration, EPA Docket No. EPA-HQ-OAR-2014-0464-0454. The Administrator's response references the Texas Petitioners' "commitment to setting up a monitoring network," which as discussed above, suggests that the agency effectively intends to "redesignate" the Texas nonattainment areas.

[38] The only plausible basis for reconsidering any part of the Texas nonattainment designations would be Luminant's subsequent decision to permanently retire the Big Brown and Monticello power plants. As explained below, however, the cessation of operations at those power plants does not provide a basis for reconsidering the designation of the area around Martin Lake. Moreover, as noted above, even if EPA followed the required reconsideration process for Big Brown and Monticello, it would still be unlawful to redesignate those areas as *unclassifiable* under 42 U.S.C. 7407(d)(3)(F). Instead, the agency must go through the process of demonstrating attainment in accordance with 42 U.S.C. § 7407(d)(3)(E).

[39] *See* Luminant Petition for Reconsideration at 2-4, EPA Docket EPA-HQ-OAR-2014-0464-0446 (seeking reconsideration based on Texas's intent to evaluate air quality through a monitoring network and based on Luminant's recent emission declines and operations); Texas Petition for Reconsideration at 15, EPA Docket EPA-HQ-OAR-2014-0464-0452 at 15 (arguing that Texas "should be allowed to install a monitoring network to provide data to determine the appropriate Designation"); *and id.* at 49-54 (pointing to decreased emissions from expected operations at Big Brown, Martin Lake, and Monticello as a basis for designating those areas as being in attainment or unclassifiable); *see also Clean Air Council v. Pruitt*, 862 F.3d at 8 (EPA lacks authority to grant reconsideration on issues on which parties "had ample opportunity to comment").

Despite implicitly acknowledging that neither Luminant's nor Texas's petitions for reconsideration satisfied the specific prerequisites for conducting a reconsideration rulemaking—indeed, EPA declined to grant the petitions—EPA now attempts to reconsider the designations under the guise of correcting an error. Comparing EPA's recitation of purported errors with Luminant's and Texas's initial comments and petitions for reconsideration reveals that EPA essentially just cut and pasted Luminant's and Texas's arguments into its "error correction" proposal.[40]

As explained above, EPA cannot escape Congress's clear intent to specifically limit the availability of reconsideration under Section 7607(d)(7)(B) by pointing to its separate, more general authority to "correct errors" under Section 7410(k)(6). *Air Alliance*, 906 F.3d at 1061. "That would almost always allow EPA to avoid the restrictions of Section 7607(d)(7)(B) by simply insisting it was invoking Section [7410(k)(6)], even when it is indisputably responding to a Section 7607(d)(7)(B) petition and reconsidering" the substance of a rule on the same, exact grounds raised in the petitioners comments and the reconsideration petitions. *Id.* Such an interpretation would allow EPA to circumvent the specific reconsideration provisions of the Act simply by asserting that it erred—an impermissible outcome.

## B. EPA's Use of 42 U.S.C. § 7410(k)(6) Is Unlawful Because EPA Did Not Err In Designating the Three Areas As Nonattainment.

Section 7410(k)(6) of the Clean Air Act authorizes EPA to revise area designations "[w]henever the Administrator determines that the Administrator's action . . . was in error" so long as "[s]uch determination and the basis thereof [are] provided to the State and public." 42 U.S.C. § 7410(k)(6). EPA has interpreted Section 7410(k)(6) to authorize corrections where the agency "(1) . . . clearly erred by failing to consider or by inappropriately considering information made available to EPA at the time of the promulgation, or the information made available at the time is subsequently demonstrated to have been clearly inadequate, and (2) other information persuasively supports a change in the action." 84 Fed. Reg. at 43,758 (citing 57 Fed. Reg. 56762, 56763 (Nov. 30, 1992)). Where—as with the 2016 nonattainment designations—EPA has committed no error, Section 7410(k)(6) does not apply.

EPA provides three justifications for its action, which each fail: (1) the Agency erred "in failing to give greater weight" to Texas' preference to base state air quality designations on monitoring data; (2) the Agency erred in relying on air quality modeling with "key limitations and uncertainties"; and (3) some combination of justifications one and two. 84 Fed. Reg. at 43,761–62. Texas' purported preference for monitoring is irrelevant and with no monitors in place, EPA lacked

---

[40] *Compare* 84 Fed. Reg. at 43,760 (proposing to find that EPA erred in failing to give greater weight to the state of Texas' preference to use ambient air monitors), *with* Luminant Petition for Reconsideration at 2-4 (seeking reconsideration based on Texas's intent to evaluate air quality through a monitoring); *compare also* 84 Fed. Reg. at 43,761 (citing uncertainties with Sierra Club's modeling, including absence of variable stack conditions and representation of 100 percent load stack parameters, use of older version of AERMOD, building downwash not included, elevated flagpole receptors, uncertainties with background concentrations, receptor locations it fenceline) *with* Luminant Petition for Reconsideration at 28-29 (Luminant comments raising every one of the same issues).

the ability to base the three designations on monitoring in any event. *See* Section I.B.1. Moreover, Sierra Club's modeling withstands scrutiny. None of the purported limitations and uncertainties now cited by the EPA appreciably impact modeled $SO_2$ concentrations, and many were in fact raised by EPA *and* addressed by the Sierra Club in 2016. *See* Section I.B.3.

EPA's own interpretation of Section 7410(k)(6) only serves to confirm that provision's misapplication here. First, contrary to EPA's new position, it was not only "appropriate" for EPA to consider Sierra Club's modeling, it was required.[41] *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. at 43; *see also* 84 Fed. Reg. at 43,758 (citing the first prong of the Section 7410(k)(6) test, 57 Fed. Reg. 56762, 56763 (Nov. 30, 1992)).

Neither does EPA provide information undermining the adequacy of its 2016 nonattainment determinations or otherwise supporting a redesignation to unclassifiable. *See* 84 Fed. Reg. at 43,578 (prongs one and two of EPA interpretation). Although EPA recites a litany of purported "limitations and uncertainties" in Sierra Club's modeling, the Agency neither explains their effect nor sets forth any mathematical analysis demonstrating how those "errors" might collectively result in a false finding of nonattainment. In fact, new information from a monitor installed near the Martin Lake plant in 2017—which EPA conspicuously omits mention of—confirms the accuracy of EPA's 2016 nonattainment designations. That monitoring data alone provides conclusive evidence of nonattainment. *See* Section III.

It is therefore no surprise that the proposed rule is an outlier among EPA's past uses of Section 7410(k)(6). The use of Section 7410(k)(6) is appropriate where EPA can point to a clear error underlying its original action. In nearly all instances, EPA has used the authority to correct legal errors or typographical and other minor mistakes. *See, e.g., Ass'n of Irritated Residents v. EPA,* 790 F.3d 934 (9th Cir. 2015) (upholding EPA's correction of SIP approval to remove certain provisions after learning that the local air control district did not have the ability to enforce them); 76 Fed. Reg. 48,208, 48,220-21 (Aug. 8, 2011) (correcting legal errors in SIP after court struck down the Clean Air Interstate Rule); 74 Fed. Reg. 11037 (Mar. 16, 2009) (correcting typos in plan title, citations of variance provisions, and compilation of federally enforceable regulations to ensure SIP was correctly identified in the Code of Federal Regulations); 61 Fed. Reg. 64294-01 (Dec. 4, 1996) (clarifying the street name for the southern boundary of a nonattainment area).[42]

In those rare instances where EPA has made substantive changes under Section 7410(k)(6), EPA has premised its action on both a clear failure to consider information available at the time of the initial rulemaking as well as new data contradicting the Agency's initial determination. *See, e.g.,* 70 Fed. Reg. 68,339, 68,342–43 (Nov. 10, 2005) (correcting nonattainment area boundary to exclude part of Reservation where EPA concluded it had erred in failing to consider data available at the time of designation showing that no part of the Reservation was in violation of one-hour ozone NAAQS, and where (1) new monitoring data also showed no violations and (2) analysis of

---

[41] Final Texas Supplemental TSD at 77 ("EPA considers the final Sierra Club modeling submitted March 2016 to be relevant information that must be considered").

[42] *See also* 84 Fed. Reg. 45422-01 (Aug. 29, 2019) (removing SIP provisions not related to attainment or maintenance of NAAQS); 71 Fed. Reg. 60429 (Oct. 13, 2006) (revising a boundary description to delete a highway and adding a second boundary description, which EPA had inadvertently omitted from the original rulemaking).

meteorological conditions, geography, and population density indicated negligible impacts from Reservation emissions); 62 Fed. Reg. 14,641, 14,642 (Mar. 27, 1997) (correcting boundary of ozone nonattainment areas to exclude counties where no data had ever indicated nonattainment and where years of subsequent in-county monitoring data had never exceeded the ozone NAAQS).

Here, by contrast, EPA can point to no new information—or old information, for that matter—explaining why it now finds the information it considered in 2016 insufficient to demonstrate nonattainment. EPA's nonattainment designations were not in error. Rather, EPA has simply changed its mind since 2016 and now seeks to disguise as an error correction what is truly a redesignation from nonattainment to unclassifiable in violation of the Clean Air Act.

1.  **EPA Did Not Err In Declining to Defer to Texas's Belated and Irrelevant Preference for Monitoring.**

EPA claims that it erred "in failing to give greater weight" to Texas' preference to base state air quality designations on monitoring data. 84 Fed. Reg. at 43,761. However, as EPA admits, the Agency was required to issue the three Texas area designations in 2016 based on all information then available. 84 Fed. Reg. at 43,760-61; *see also* 42 U.S.C. § 7407(d)(1)(A); *State Farm,* 463 U.S. 29, 43 (1983) ("The agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'") (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 158 (1962)). Because nearby sulfur dioxide monitors were not yet in place, EPA had neither the discretion nor the ability to base the Texas area designations on monitoring data.

As noted, EPA's promulgation of the revised one-hour $SO_2$ NAAQS in June 2010 triggered mandatory statutory timetables for EPA to "designate" all areas of the country failing to comply with the 2010 standard by 2013. EPA failed to issue timely final designations for most of the country, so Sierra Club and another environmental organization filed suit to compel EPA action on all outstanding area designations. The resultant consent decree required EPA to issue each of the remaining designations by certain mandatory deadlines.

Relevant here, EPA was required to designate those areas surrounding the very largest sources of sulfur dioxide first—by July 2, 2016—with the remaining designations to follow in 2017 and 2020. Consent Decree, *Sierra Club v. McCarthy,* No. 3:13-cv-3953-SI, (N.D. Cal. Mar. 2, 2015), ECF No. 63; *Sierra Club v. North Dakota,* 868 F.3d 1062 (9th Cir. 2017) (upholding Consent Decree). EPA concedes that each of the areas at issue here was subject to the 2016 designation deadline. 84 Fed. Reg. at 43,760-61 ("Because the areas around $SO_2$ emissions sources in Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County were subject to the Round 2 deadline of July 2, 2016, these areas were required to be designated at that time, regardless of the state of Texas' preference to characterize the areas based on monitoring data . . . .").[43]

EPA was therefore required by statute and court order to designate the three Texas areas in 2016 based on the information available at that time, *including* Sierra Club's air dispersion modeling. *State Farm,* 463 U.S. at 43 ("The agency "must examine the relevant data and articulate a satisfactory

---

[43] Pursuant to agreed-upon modifications to the consent decree, EPA received a short extension of time by which to issue the Texas designations, until November 29, 2016. *See Sierra Club v. McCarthy,* No. 3:13-cv-3953-SI (N.D. Cal. Oct. 28, 2016), ECF No. 180.

explanation for its action including a rational connection between the facts found and the choice made"). Under the Clean Air Act, EPA must designate as "nonattainment" "any area that does not meet . . . the [NAAQS]." 42 U.S.C. § 7407(d)(1)(A)(i). Notably, EPA may only designate as "unclassifiable" an area that "cannot be classified *on the basis of available information* as meeting or not meeting the [NAAQS]." *Id.* § 7407(d)(1)(A)(iii) (emphasis added); *see also Bethlehem Steel Corp. v. EPA*, 723 F.2d 1303, 1307 (7th Cir. 1983) (stating that "the only situation in which designation of an area as unclassifiable would be proper" is "if [] data [does] not exist").

Monitoring information was not available in 2016 and consequently could not inform EPA's decisionmaking. Compliance with the 2010 $SO_2$ NAAQS is determined based on the 3-year average of the 99th percentile of the yearly distribution of 1-hour daily maximum $SO_2$ concentrations. 75 Fed. Reg. at 35,521-22. Yet in 2016, Texas had not even installed monitors, much less accumulated three years' worth of monitoring data. Indeed, Texas did not install its Martin Lake (Rusk/Panola Counties) and Big Brown (Freestone/Anderson Counties) monitors until late 2017. 84 Fed. Reg. at 43,760.[44] Given the late date of their installation, three full years' of monitoring data will not be available until late 2020. *Id.* Without any monitoring data to review, EPA lacked both the ability and the discretion to defer to Texas' purported preference for monitoring.[45] 14 (Nov. 29, 2016)

Even if EPA had authority to further delay its area designations (which it does not), EPA is simply wrong in claiming that Texas "has consistently communicated to the EPA their support of ambient air monitoring data as the appropriate information for use in the designations decisions." 84 Fed. Reg. at 43,760. As an initial matter, in directly analogous contexts, Texas has repeatedly asserted that EPA "should be required to consider . . . modeling data" in making area designations under the NAAQS. *See* Initial Br. of Texas at 31, *Texas v. U.S. EPA*, No. 18-60606 (Nov. 26, 2018) (ECF No. 00514736185) (arguing that EPA was required to consider modeling in making area designations under the 2015 ozone NAAQS). Indeed, Texas has argued that the Clean Air Act gives EPA "leeway to consider modeling data" in making area designations in Texas, and that it would be "contrary to law" for EPA to decline to consider modeling when designating an area. *Id.* at 3, 17.

Texas has not only taken inconsistent positions on modeling to show compliance with the NAAQS, it failed both to timely elect to characterize the area around Martin Lake with monitoring under EPA's "Data Requirements Rule" and to timely install compliant monitors under that rule. *See* 40 C.F.R. § 51.1203(b) ("For each source area subject to requirements for air quality characterization, the air agency shall notify the EPA by July 1, 2016, whether it has chosen to characterize peak 1-hour $SO_2$ concentrations in such area through ambient air quality monitoring"); *id.* § 51.1203(c)(2) ("All existing, *new,* or relocated ambient monitors intended to meet the requirements of this paragraph (c) must be operational by January 1, 2017 . . . .") (emphasis added).[46]

---

[44] Texas cancelled plans to install a third monitor near the Monticello power plant (Titus County) in light of the plant's retirement in 2018. *Id.*

[45] EPA, Responses to Significant Comments on the Designation Recommendations for the 2010 $SO_2$ NAAQS – Supplement for Four Areas in Texas Not Addressed in June 30, 2016, at 14 (Nov. 29, 2016) [hereinafter, "Nov. 2016 Response to Comments"] ("EPA notes that in the case of designations subject to the court's order to designate certain areas by July 2, 2016, the agency does not have the discretion to await the results of future monitoring.").

[46] It is worth noting that EPA implemented the DRR for the purpose of collecting data for the next round of area designations, required under the court's order in *Sierra Club v. McCarthy*, which are due

Indeed, Texas's June 29, 2016 submissions under the DRR rule conspicuously fail to mention its intent to characterize the areas around Martin Lake, Monticello, or Big Brown with monitors, let alone include the detailed information necessary to elect to do so. *Id.* § 52.1203(c) ("The air agency shall include relevant information about monitors used to meet the requirements of this paragraph (c) in the air agency's Annual Monitoring Network Plan required by 40 CFR 58.10 due July 1, 2016."). *See* Ex. 5 (Texas submission under the DRR rule).

EPA's proposal suggests that Texas timely communicated its intent to use a "monitoring pathway for these areas to meet its obligations" under the rule. 84 Fed. Reg. at 43,760. This is demonstrably false. First, in response to EPA's proposal to designate the areas around Martin Lake, Monticello, and Big Brown as being in nonattainment, TCEQ stated only that it disagreed with EPA's proposal because the proposal was "based solely on third-party modeling."[47] Texas did not express any preference for, or intent, to install properly located monitors in those areas to characterize air quality.

Second, TCEQ's June 29 2016 letter to EPA regarding its "characterization plans" for sources subject to the DRR is similarly devoid of any intent to characterize the area around Martin Lake with monitoring. In fact, the state asserts that because EPA is required to designate those areas by July 2, 2016, there is "no need to provide any future air quality characterization plans." *See* Ex. 5 (Texas submission under the DRR rule). Although Texas asserted that it would use monitoring to characterize areas EPA designate those areas as unclassifiable, EPA did not designate Martin Lake as unclassifiable, so the June 29, 2016 letter cannot serve as a timely election to characterize the area with monitoring. And even if it could be interpreted as timely, Texas failed to meet the DRR deadline for installing and operating the monitor. 40 C.F.R. § 1203(c)(2). As a result, Texas cannot now opt into complying with the DRR rule through monitoring, because the DRR requires monitoring to be conducted for a full three years between 2017 and 2019. 80 Fed. Reg. at 51,054 ("For areas where air quality is to be characterized through ambient monitoring, the rule requires the monitoring to be conducted for the calendar years of 2017 through 2019, in order to calculate a valid design value for each area."). That TCEQ's 2016 Monitoring Network Plan includes a vague intent to site monitors near any source designated as nonattainment is not a valid substitute for timely meeting the specific procedural and substantive requirements of the DRR rule.

If Texas had wanted to base each of its area designations on monitoring, the state could and should have installed such monitors immediately following EPA's issuance of the 2010 $SO_2$ NAAQS. Instead, Texas waited seven years after the issuance of the revised NAAQS, and more than a year after the DRR deadline to install monitors to express any formal interest in demonstrating NAAQS compliance through monitoring.[48] And at that point, the area in question

---

in 2020. So, even if Texas had installed monitors in time for DRR rule, they would never have been installed before EPA's court-ordered July 2016 deadline for issuing area designations for large sources, like Luminant's Martin Lake, Big Brown, and Monticello power plants.

[47] Mar. 31, 2016 Letter from Richard Hyde, TCEQ, to EPA Re: EPA's 120-Day Letter Announcing Intended Designations, EPA Docket No. EPA-HQ-OAR-2014-0464-0294.

[48] As noted, and contrary to EPA's conclusory assertion, Texas's response to EPA's 120-day letter does not express the agency's intent to actually install and operate monitors to demonstrate compliance with the NAAQS. *Id.*

had already been designated as nonattainment. Texas' belated preference for monitoring does not suffice to justify a redo now.

In short, Texas failed to make a timely election under the DRR rule to use monitoring to characterize air quality around Martin Lake, and the agency failed to timely install monitors under the rule. EPA cannot rationally or logically conclude that it erred in declining to defer to Texas's unspoken intent to monitor the area around Martin Lake. EPA's after-the-fact rationale is nothing but an arbitrary and unlawful end-around the requirements of the DRR rule as well as the court-mandated deadline to designate areas with major $SO_2$ emission sources by 2016.

### 2. EPA Did Not Err in Considering Sierra Club's Air Dispersion Modeling When Assessing Compliance with the 2010 $SO_2$ NAAQS.

EPA did not "inappropriately consider" the Sierra Club's modeling, for two reasons. First, as outlined by EPA in the Final $SO_2$ NAAQS Rule itself, 75 Fed. Reg. at 35,551, air dispersion modeling is the best method for evaluating the short-term impacts of large $SO_2$ sources. This is consistent with EPA's historic use of air dispersion modeling for multiple NAAQS implementation purposes, including for attainment designations. EPA's attempt to reverse that longstanding, national approach to designations is arbitrary and capricious.

Second, in finalizing its area designations, EPA is required to base its decisions on all relevant data before it. *See State Farm*, 463 U.S. at 30–31. Indeed, EPA's final national area designation rule, of which the Texas designations were indisputably a part, relied on a mixture of state, industry, and public interest and environmental organizations' submissions of data, including extensive modeling data.[49] In issuing its final Texas designations, as well as its designations for other areas of the country, EPA repeatedly recognized that Sierra Club's modeling was useful, accurate, robust, and consistent with all available EPA guidance. EPA has failed to provide a rational explanation for departing from its nationally applicable approach to using air dispersion modeling to inform designation decisions. And given that all of the credible data in the record, including recent monitoring data, corroborates Sierra Club's modeling, it would be arbitrary and capricious for EPA to reverse course.[50]

---

[49] *See generally* Final Texas Supplemental TSD, EPA Docket No. EPA-HQ-OAR-2014-0464-0434.

[50] EPA alludes to a series of Agency statements supposedly consistent with disregarding Sierra Club's modeling and redesignating the Texas areas as unclassifiable. 84 Fed. Reg. at 43,761 and nn.23-27. None support EPA's proposed action. EPA first points to a 2011 guidance memo indicating its then-expectation that most areas would be designated as unclassifiable given the limited monitoring data available and likelihood that states "will not yet have completed appropriate modeling." However, EPA's 2011 expectations—regarding the information likely available to states when making recommended designations in accordance with a June 3, 2011 deadline—have no bearing on the information actually available to EPA and thus required to be considered by EPA in 2016 when issuing its final nonattainment designations. *See* 2011 Page Memo at 2. EPA's recitations of the statutory standard for designating an area unclassifiable do not invite the agency to ignore credible information that does exist. EPA's statement that designations would be based on three years of monitoring actually stems from its 2009 proposed rule and refers to an approach disregarded in the final 2010 rulemaking. 74 Fed. Reg. 64,810, 64,859 (Dec. 8, 2009); 75 Fed. Reg. at 35,570. Finally, EPA mischaracterizes the final 2010 rule in suggesting it only allowed modeling

a. <u>Air Dispersion Modeling Is an Appropriate, Longstanding, and Court-Validated Tool for Use in Promulgating NAAQS Area Designations.</u>

In issuing the 2010 $SO_2$ NAAQS, EPA recognized dispersion modeling as "the most technically appropriate, efficient, and readily available method for assessing short-term ambient $SO_2$ concentrations in areas with large point sources." 75 Fed. Reg. 35,520, 35,551 (June 22, 2010). As EPA explained, "[d]ue to the generally localized impacts of $SO_2$, [the Agency has] not historically considered monitoring alone to be an adequate, nor the most appropriate, tool to identify all maximum concentrations of $SO_2$." *Id.*; *cf. Catawba County v. EPA*, 571 F.3d 20, 30 (D.C. Cir. 2009) (acknowledging the inherent problem of using monitored data for criteria pollutants, namely that "a monitor only measures air quality in its immediate vicinity"). "[I]t is more appropriate and efficient to principally use modeling to assess compliance for medium to larger sources," 75 Fed. Reg. at 35,570, because it "better address[es] several potentially problematic issues than would the narrower monitoring-focused approach . . . , including the unique source-specific impacts of $SO_2$ emissions and the special challenges $SO_2$ emissions have historically presented in terms of monitoring short-term $SO_2$ levels for comparison with the NAAQS in many situations (75 Fed. Reg. 35,550)."[51].

EPA endorsed, supported, and relied on the use of modeling throughout the 2010 $SO_2$ NAAQS implementation process.[52] EPA's use of modeling to assess compliance with the 2010 $SO_2$ NAAQS is consistent with the Agency's historic use of such modeling for multiple NAAQS implementation purposes, including for attainment designations. As EPA explained:

Historically, we have favored dispersion modeling to support $SO_2$ NAAQS compliance determinations for areas with sources that have the potential to cause an $SO_2$ NAAQS violation, and we have explained that for an area to be designated as "attainment," dispersion modeling regarding such sources needs to show the absence

---

"where monitoring was insufficient." The final 2010 rule indicated that areas would be designated nonattainment *if either* modeling or monitoring showed a violation. 75 Fed. Reg. at 35,569-70.

[51] U.S. EPA, *Implementation of the 1-Hour SO2 NAAQS Draft White Paper for Discussion* at 3, fn. 1 (attached as Ex. 6).

[52] *See, e.g.*, Memorandum from Stephen D. Page, Director of EPA Office of Air Quality Planning and Standards, at 2, 4-5 (hereinafter, 2015 Page Memo), *available at* https://www.epa.gov/sites/production/files/201604/documents/20150320so2designations.pdf (recognizing modeling as "an appropriate tool to indicate a violation of the $SO_2$ NAAQS" and anticipating "that in many areas the most reliable information for informing these designations will be based on source modeling"); EPA, Draft $SO_2$ NAAQS Designation Modeling Technical Assistance Document, Aug. 2016 (hereinafter, 2016 Modeling TAD), *available at* https://www.epa.gov/sites/production/files/2016-06/documents/so2modelingtad.pdf (additional guidance document to assist states and other parties in characterizing air quality through air dispersion modeling for purposes of assessing compliance with the 2010 $SO_2$ NAAQS); EPA, Responses to Significant Comments on the Designation Recommendations for the 2010 $SO_2$ NAAQS – Supplement for Four Areas in Texas Not Addressed in June 30, 2016, Version Nov. 29, 2016 (hereinafter, Nov. 2016 Response to Comments), *available at* https://www.epa.gov/sites/production/files/2016-11/documents/rtc_so2_comments_received_document_4_tx_sources_final_0.pdf ("Modeling has proved to be an accurate and reliable tool for remedying the occasional weakness of $SO_2$ monitoring, and obviously in some cases is the only tool available where there is no $SO_2$ monitor in place to assess air quality.").

of violations even if monitoring does not show a violation. This has been our general position throughout the history of implementation of the SO$_2$ NAAQS program.

75 Fed. Reg. at 35,551 (citing 43 Fed. Reg. 40,412, 40,415–16 (Sept. 11, 1978); 43 Fed Reg. 45,993, 46,000–02 (Oct. 5, 1978); 57 Fed. Reg. 13,498, 13,545, 13,547–48 (Apr. 16, 1992); 58 Fed. Reg. 41,430 (Aug. 4, 1993); 59 Fed. Reg. 12,886, 12,887 (Mar. 18, 1994); 60 Fed. Reg. 12,492, 12,494–95 (Mar. 7, 1995); 67 Fed. Reg. 22,167, 22,170–71, 22,183–87 (May 2, 2002)).[53]

EPA's use of air modeling is also court-validated. *See, e.g.*, *Mont. Sulphur & Chem. Co. v. EPA*, 666 F.3d 1174, 1185 (9th Cir. 2012) (upholding EPA's reliance on predictive modeling in requiring amendments to State Implementation Plan to ensure SO$_2$ NAAQS compliance); *Republic Steel Corp. v. Costle*, 621 F.2d 797, 805 (6th Cir. 1980) (approving use of modeling to predict future violations and incorporating "worst-case" assumptions regarding weather and full capacity operations of pollutant sources); *see also Genon Rema, LLC v. U.S. EPA*, 722 F.3d 513, 526 (3rd Cir. 2013) (upholding the use of air dispersion modeling and AERMOD in particular in resolving a recent CAA section 126 petition for resolution of cross-state impacts).

EPA's decision to rely on air dispersion modeling in issuing its 2016 nonattainment designations is well supported by modeling's lengthy and court-validated history of use as a tool in promulgating NAAQS area designations.

    b.   <u>EPA Was, and Is, Required to Consider Credible Third-Party Modeling.</u>

As discussed above, EPA must base its decisionmaking on all available and relevant information. *State Farm*, 463 U.S. at 43 ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'") (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

EPA appropriately considered third party modeling when issuing the 2016 designations and cannot disregard such information now in an attempt to undo those designations. Agency action is arbitrary and capricious where it relies on irrelevant factors, "fail[s] to consider an important aspect of the problem," "runs counter to the evidence before the agency," or is wildly "implausible." *Id.* (internal quotation marks omitted).

Because Sierra Club's modeling credibly and conclusively demonstrates NAAQS violations, *see* Section I.B.3, EPA had and has no choice but to designate the Texas areas as nonattainment. 42 U.S.C. § 7407(d)(1)(A)(i) (EPA must designate as "nonattainment" "any area that does not meet . . .

---

[53] *See also* EPA, SO$_2$ Guideline Document, EPA-452/R-94-008 at 2-1 (Feb. 1994), *available at* https://nepis.epa.gov/Exe/ZyPDF.cgi/2000H22J.PDF?Dockey=2000H22J.PDF ("Attainment determinations for SO$_2$ will generally not rely on ambient monitoring data alone, but instead will be supported by an acceptable modeling analysis which quantifies that the SIP strategy is sound and that enforceable emission limits are responsible for attainment."); Memorandum from Sheldon Meyers, Director of EPA Office of Air Quality Planning and Standards, Section 107 Designation Policy Summary at 1-2 (Apr. 21, 1983) ("[A]ir quality modeling emissions data, etc., should be used to determine if the monitoring data accurately characterize the worst case air quality in the area. . . . In most SO$_2$ cases, monitoring data alone will not be sufficient for areas dominated by point sources.") (attached as Ex. 7).

the [NAAQS].'"). Significantly, EPA may only designate an area as "unclassifiable" when that area "cannot be classified *on the basis of available information* as meeting or not meeting the [NAAQS]." *Id.* § 7407(d)(1)(A)(iii) (emphasis added). As such, the Act affords EPA no discretion to ignore credible evidence and cherry-pick the information it wishes to rely on.

### 3. EPA Has Arbitrarily Failed to Identify or Explain Any Purported "Errors" in Sierra Club's March 2016 Modeling.

Moreover, in its redesignation proposal, EPA arbitrarily fails to identify or explain the "errors" in Sierra Club's March 2016 modeling that it now seeks to unlawfully ignore. In finalizing the 2016 nonattainment designations for the areas around the Martin Lake, Big Brown, and Monticello plants, EPA specifically addressed each and every one of the supposed "key limitations" that the agency now recites as the basis for its proposed redesignation. Although Sierra Club lacked certain data inputs that were not publicly available, EPA noted that Sierra Club's modeling "was deliberately conservative (in an under-estimating sense) and included several techniques which generally would tend to reduce/underestimate design value concentrations from the model." Final Texas Supplemental TSD at 75. In response to Luminant's criticisms, EPA noted that using variable temperatures and exit velocities—the factors EPA now cites as the "most significant limitations"— would most likely result in "larger impacts closer into the facility [and] we would still expect the area have exceedance areas at ambient air receptors." *Id.* Given that Sierra Club's conservatively modeled $SO_2$ concentrations (with low background and no nearby sources) showed impacts 22% above the standard, EPA correctly concluded that Sierra Club modeling was reliable and a "sufficient basis for a determination of nonattainment and clearly demonstrates the area around Martin Lake is nonattainment." *Id.* at 77.

EPA has provided no reasoned or persuasive explanation for disregarding the facts and conclusions underlying the agency's well-reasoned and thorough nonattainment decision. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16. As explained in detail in the attached technical comments prepared by Dr. H. Andy Gray,[54] none of the purported "limitations and uncertainties"— either individually or collectively—have any appreciable impact on the reliability of Sierra Club's modeling. In fact, many of EPA's "key limitations" are completely false.

Moreover, as demonstrated by recent sensitivity modeling scenarios conducted by Wingra Engineering in September 2019, several of EPA's supposed "limitations" significantly underestimated the modeled $SO_2$ concentrations caused by Luminant's Martin Lake power plant.[55] In fact, using Luminant's own data to update Sierra Club's March 31, 2016 modeling—including updates to account for variable stack operations, which EPA now asserts was one of the "most significant limitations" in the modeling, 84 Fed. Reg. at 43,761—it is even clearer that the area surrounding the Martin Lake power plant does not meet the NAAQS and must be designated as nonattainment.

We briefly address each of the purported limitations EPA identifies with Sierra Club's modeling.

---

[54] *See* Ex. 2, September 2019 Gray Report"; *see also id.,* March 2016 Gray Report.

[55] *See* Klafka, *Martin Lake Steam Electric Station, Tatum, Texas Evaluation of Compliance with the 1-hour NAAQS for $SO_2$* (Sept. 23, 2019), attached as Ex. 1 at 12-13.

a.   <u>Variable Stack Operations Temperature and Velocity</u>

EPA asserts, "[o]ne of the most significant limitations and uncertainties with Sierra Club's modeling is the absence of variable stack conditions and representation of 100 percent load stack parameters." 84 Fed. Reg. at 43,761. As explained by Dr. Gray, in his review of Sierra Club's modeling, this supposed limitation does not even exist because Sierra Club's March 31, 2016 modeling did, in fact, use variable (hourly) stack parameter data, reflecting the power plant's load during each hour of the modeling period, 2013-2015.[56] In fact, the March 31, 2016 Modeling Report from Wingra Engineering indisputably used *variable* exit velocities derived from EPA's Clearinghouse emissions inventory, and hourly actual emissions data obtained from EPA's Air Markets Database. *See Martin Lake Steam Electric Station, Tatum, Texas Evaluation of Compliance with the 1-hour NAAQS for SO₂*, March 31, 2016, conducted by Steven Klafka, P.E., BCEE Wingra Engineering, S.C., Madison, Wisconsin, attached as Ex. 4 at 2, 8, EPA Docket No. EPA-HQ-OAR-2014-0464-0332. EPA reviewed that modeling and confirmed that Sierra Club's modeling used variable stack conditions.[57] Using those variable exit velocities and hourly emissions data, Sierra Club's 2016 modeling, which EPA concluded was consistent with all EPA guidelines, demonstrated that Martin Lake causes exceedances of the NAAQS.[58]

Although Sierra Club's March 31, 2016 Modeling Report did use a constant stack temperature (because Luminant's temperature data was not publicly available), EPA correctly concluded that using Luminant's variable temperature data would most likely show larger $SO_2$ impacts. Indeed, Wingra Engineering used a constant stack temperature that was, on average, 21% higher than Luminant's own data.[59] As EPA further recognized, adjusting the modeling to use actual stack temperatures and velocities would decrease dispersion of $SO_2$, resulting in higher $SO_2$ concentrations surrounding the source.[60] In short, Wingra Engineering's methodology was conservative, and changing this aspect of the modeling would merely increase the margin by which these areas violate the NAAQS.

To confirm that conclusion, Wingra Engineering has now conducted an additional modeling scenario for the three year period from 2013 through 2015, using Luminant's own variable exit velocity, temperature, and hourly emissions "continuous emissions monitoring" (CEM) data from Luminant's March 2016 report, *Characterization of 1-Hour SO₂ Concentrations in the Vicinity of the Martin Lake Steam Electric Station*, prepared by AECOM.[61] As explained in the attached, updated modeling

---

[56] March 31, 2016 Modeling Report at 8.

[57] Final Texas Supplemental TSD at 58. It is true that Sierra Club had assumed 100% load stack parameters in a previous 2015 modeling report because it did not have access to variable stack data, but the March 31, 2016 Modeling Report included variable stack data. In any event, EPA correctly noted that the use of 100% load results in underestimating design value concentrations because the increased velocity will overestimate dispersion of pollution. *Id.* at 52.

[58] Final Texas Supplemental TSD at 33, 58.

[59] *Id.* at 75.

[60] *Id.* at 61.

[61] *See* EPA Docket No. EPA-HQ-OAR-2014-0464-0328; *see also* Modeling Files submitted by hand in Support of *Martin Lake Steam Electric Station Tatum, Texas Evaluation of Compliance with the 1-hour*

from Wingra Engineering, the use of the Martin Lake plant's CEM data shows that $SO_2$ concentrations caused by Martin Lake are significantly higher than Sierra Club's March 2016 report predicted using a constant temperature and publicly available, variable exit velocity and emissions data. In other words, the March 31, 2016 Modeling Report was conservative, and using Luminant's own variable data, as EPA now suggests is appropriate, shows that Martin Lake is causing exceedances of the NAAQS.

EPA's criticism is therefore factually wrong, irrelevant, and does not support an unclassifiable designation. Sierra Club's September 2019 modeling for the years 2013 through 2015 confirms that EPA's nonattainment designation was correct.

b. <u>AERMOD Version</u>

EPA suggests that Sierra Club's earlier modeling used an outdated version of AERMOD. Again, EPA is factually wrong.

While Sierra Club's December 2015 modeling used the previous version, AERMOD version 14134, for Martin Lake,[62] EPA's final TSD recognizes that the March 2016 Sierra Club modeling for Martin Lake used AERMOD version 15181—the "most recent available" at the time.[63] Moreover, as EPA indicated, and as demonstrated by Dr. Gray's technical evaluation and Wingra Engineering's March 2016 modeling for Martin Lake, September 2019 Gray Report, Ex. 2, the differences between version 14134 and version 15181 have no meaningful impact on the model results. This is largely because version 15181 differs from version 14314 only in respects that are not relevant to the modeling here, such as capped and horizontal stacks, and multiple urban area applications.

In any event, as explained in his technical comments, Dr. Gray reran the most recent version of AERMOD using the same March 2016 input files, and the results were identical to the 2016 Sierra Club modeling results.

c. <u>Recent Emissions</u>

EPA next asserts that another limitation in the Sierra Club modeling was the representation of recent emissions, including controls after the 2011 National Emissions Inventory. 84 Fed. Reg. at 43,761. The basis for this supposed limitation is unclear because Sierra Club's March 31, 2016 Modeling Report indisputably used actual hourly emissions, as reported by Luminant to EPA's Air Markets Database. Ex. 4 at 2, 8. EPA provides no explanation or support for its criticism. Moreover, nothing in EPA's final TSD, its Response to Comments, or the comments filed by Luminant on the proposed Martin Lake nonattainment designation mention or explain this supposed limitation.

---

*NAAQS for SO₂*, September 23, 2019, conducted by Steven Klafka, P.E., BCEE Wingra Engineering, S.C., Madison, Wisconsin (Ex. 1).
[62] Texas Intended TSD at 150.
[63] Final Texas Supplemental TSD at 58.

d.   Elevated Flagpole Receptors

EPA asserts that Wingra Engineering inappropriately used elevated flagpole receptor heights in its modeling. 84 Fed. Reg. at 43,761. It is true that the March 2016 modeling places receptors at a height of 1.5 meters rather than at ground level, but as EPA recognized and as Dr. Gray concludes in the attached technical review, adjusting the flagpole height downward by 1.5 meters changes the results by less than 0.2%.[64] Lowering the flagpole receptor height from 1.5 m to 0 m does not reduce Martin Lake impacts below the NAAQS.

In any event, we do not believe that the elevated flagpole height in Wingra Engineering's modeling was an error at all. It is appropriate to place receptors at 1.5 meters, for two reasons. First, the goal of the 1-hour $SO_2$ NAAQS is to protect human health. To that end, monitoring and modeling are used to assess whether the concentrations of $SO_2$ that people are *actually* breathing are unhealthful. Thus, it is reasonable to estimate the ambient concentration at the height that the average human breathes (*i.e.*, approximately 1.5 meters off the ground). Second, the overarching goal of modeling is to simulate the results that would be obtained from air quality monitors placed in a particular location. Air quality monitors are typically placed above ground level. EPA's criticism of measuring air quality at the level where humans breathe and air quality monitors are placed is unfounded.

Although we believe that measuring compliance with the health-based air quality standard at ground level makes no sense, in September 2019, Wingra Engineering conducted additional modeling, discussed *infra*, that removes the flagpole receptor. The September 2019 modeling confirms that the flagpole receptor height has no appreciable impact on the overall modeled concentrations of $SO_2$.[65]

e.   Use of a Larger Receptor Grid than Recommended

EPA next asserts that Sierra Club's receptor grid was larger than recommended. 84 Fed. Reg. at 43,761. Again, this is false. EPA's final TSD recognized that Sierra Club's receptor grid was "acceptable" and consistent with guidelines.[66] Dr. Gray's technical comments confirm that the Sierra Club modeling conforms with the recommended parameters for AERMOD. In any event, given that peak modeled impacts are less than about 5 km from the source, EPA does not explain how this supposed error is relevant.

f.   Building Downwash

EPA notes that Wingra Engineering did not account for the effects of building downwash in its 2016 modeling. 84 Fed. Reg. at 43,761. This was because building information for the Martin Lake, Monticello, and Big Brown facilities was not publically available, and therefore Wingra Engineering was unable to include it in the modeling analysis. In any event, EPA itself noted in the Final Texas Supplemental TSD that that accounting for building downwash would likely have had

---

[64] *See* September 2019 Gray Report at 4.
[65] Ex. 1 at 12-13 (sensitivity analysis, identifying and quantifying the effect of the 1.5 m flagpole receptor on the overall modeling, and confirming that the effect was a modest increase of 0.2 $\mu g/m^3$—or an approximately 0.05% of the total modeling impacts from Martin Lake).
[66] Final Texas Supplemental TSD at 61.

either no effect at all,[67] or would have increased the 1-hr SO$_2$ concentrations given the highly elevated stacks at Martin Lake.[68]

Although the effects of building downwash might be relevant for low stack heights, as explained by Dr. Gray, the effect is negligible for highly elevated stacks such as at Martin Lake.[69] In any event, Sierra Club's updated September 2019 modeling includes downwash (based on previously unavailable data obtained from AECOM), and as the 2016 EPA and Dr. Gray anticipated, , downwash has virtually no effect on the model results.[70]

### g.  Surface Meteorology and Hourly Wind Inputs

EPA cites surface meteorology and hourly wind inputs as another "limitation," but again, the agency fails to provide an explanation of their concern, or whether this issue even applies to the Martin Lake modeling. 84 Fed. Reg. at 43,761. As explained in Dr. Gray's attached report and in EPA's final 2016 TSD, EPA concluded that Sierra Club's inputs for surface meteorology for Martin Lake were "appropriate."[71] Nothing in the record or EPA's Error Correction proposal suggests otherwise.[72]

### h.  Treatment of Potential to Emit/Allowable Emissions

EPA asserts that Sierra Club's modeling inappropriately included allowable emissions, but this is false. The March 31, 2016 Modeling Report, on which EPA relied to issue the final designation, consisted solely of *actual* hourly SO$_2$ emission rates for each of the three Martin Lake stacks for 2013 through 2015, and did *not* reflect allowable emission levels.[73] For illustrative purposes, an earlier version of Sierra Club's modeling had included allowable emissions to show the potential impacts of emissions from Luminant's facility, but each of Sierra Club's modeling reports included actual emissions and there is no indication that EPA ever relied on allowable emissions to support its nonattainment designation.

### i.  Treatment of Variable Stack Temperature and Velocity

EPA next repeats this alleged limitation as part of the litany of supposed errors in Sierra Club's modeling. 84 Fed. Reg. at 43,761. But as explained above, Sierra Club's March 31, 2016

---

[67] *See* September 2019 Gray Report at 5; see also Final Texas Supplemental TSD at 61, 74-77.

[68] The three Martin lake stacks are more than 137 m high (450 feet) above ground level.

[69] Martin Lake stack heights are greater than 137 m (450 feet) above ground level.

[70] Final Texas Supplemental TSD at 75 (noting that the inclusion of downwash will typically *increase* modeled concentrations); Ex. 2, September 2019 Gray Report at 11-12.

[71] Final Texas Supplemental TSD at 63; September 2019 Gray Report at 9-10.

[72] In reviewing Sierra Club's initial 2015 Big Brown modeling, Dr. Gray made refinements to the surface roughness data to account for more recent land-use patterns near the Corsicana Airport, and ran a sensitivity to evaluate the impact of that input. Making those changes to the Big Brown modeling resulted in a very small reduction (3.6%) in total SO$_2$ concentrations. EPA does not explain whether that adjustment should have been made in the Martin Lake modeling, but even if it was, the impact would be similarly insignificant and not enough to show attainment. Ex. 2, September 2019 Gray Report at 10 (citing March 2016 Gray Report).

[73] *See* Ex. 4 at 2-3.

Modeling Report used actual emissions and actual variable exit velocity data, reflecting the power plant's load for each hour of the modeling period from 2013 through 2015.[74] Also as explained, Sierra Club's use of a constant stack temperature in the March 2016 modeling serves only to underestimate actual $SO_2$ concentrations caused by Martin Lake. Indeed, Wingra Engineering's September 2019 modeling, which incorporates Luminant's own stack temperature data, as reported in AECOM's modeling, shows that the actual modeled $SO_2$ impacts from Martin Lake during the 2013-2015 period are actually much higher than the March 2016 modeling predicted. In fact, the September 2019 Modeling Report shows that modeled design value at Martin Lake was more than double the NAAQS during the 2013 to 2015 period.

> j.    Approach to Estimation of Background Concentrations

EPA's notes that Sierra Club's March 2016 modeling for Martin Lake assumed a constant background $SO_2$ level. EPA has suggested that using varying background $SO_2$ concentrations represents a more rigorous approach, but as explained by Dr. Gray, the difference in modeled design value concentrations between the two approaches will never be more than difference between a variable background and the constant value used in the Sierra Club modeling approach. *See* Ex. 2, September 2019 Gray Report at 10-11.

In any event, Sierra Club's use of a constant background $SO_2$ level of 5.2 $\mu g/m^3$ in the March 31, 2016 modeling—the lowest monitored background level in the state for the 2013-2015 period— had no appreciable impact on the model's predicted nonattainment status for Martin Lake. Ex. 4 at 3. In fact, even if the model assumed *zero* background $SO_2$ levels, the modeled three-year design value due to Martin Lake emissions was **244.1 $\mu g/m^3$**, approximately 24 percent higher than the allowable NAAQS level (196.2 $\mu g/m^3$). *See* Ex. 2, September 2019 Gray Report at 11.

> k.    Failure to Include Fenceline Receptors

EPA next repeats its criticisms that the Sierra Club modeling failed to fenceline receptors in the modeling analysis. Once again, this criticism is either false or irrelevant.

With respect to "fenceline" concerns, we can only assume that EPA is referring to Luminant's baseless contention that predicted $SO_2$ concentrations on Luminant property or in locations where a monitor cannot be physically sited (e.g., on public waterbodies or private property) are somehow irrelevant.[75] As an initial matter, it is worth pointing out that Martin Lake is a popular and publicly-accessible lake used for recreation and fishing. That a monitor cannot be placed in the water is irrelevant to whether air quality on the lake, where people recreate and fish, is unhealthy to breathe. Equally baseless is Luminant's contention that modeled exceedances on private property are effectively irrelevant for the purposes of determining whether air quality harms public health.

In any event, as explained by Dr. Gray in his September 2019 analysis, there was no need to include fenceline receptors in the March 31, 2016 modeling analysis because the peak predicted concentration impacts were not on facility or private property. Ex. 2, September 2019 Gray Report

---

[74] *Id.* at 2, 8.
[75] Luminant Mar. 31, 2016 Comments at 28, EPA Docket No. EPA-HQ-OAR-2014-0464-0328; see also Final Texas Supplemental TSD at 67.

at 11-12. And as EPA's Final Texas Supplemental TSD recognized, the modeling shows exceedances of the NAAQS on public property and rights of way. [76]

Moreover, for the September 2019 modeling, Wingra Engineering obtained inputs from the analysis conducted by AECOM on behalf of Luminant, which excludes locations that Luminant assumed to be unavailable for placement of an ambient monitor. The results show maximum modeled concentrations are not on Luminant property, but outside the facility fence line or on publicly-accessible land. Ex. 1 at 11 (Figure 2).

l.   Treatment of Source Contribution in the Modeling Analysis

Once again, the basis for EPA's criticism is unclear because the agency fails to explain how source contribution issues are relevant at all to Sierra Club's modeling. 84 Fed. Reg. 43,761. Although an earlier Sierra Club modeling analysis included $SO_2$ contribution from the nearby H.W. Pirkey power plant,[77] Sierra Club's final March 31, 2016 modeling analysis—which EPA relied upon in finalizing its designation—included emissions from only one source: Martin Lake. The modeled $SO_2$ concentration impacts (*excluding* background) are therefore entirely attributable to the emissions from Martin Lake. Sierra Club excluded contributing sources from its final modeling analysis to demonstrate that emissions from Martin Lake, by itself, caused exceedances of the NAAQS. This analysis was "deliberately conservative" and almost certainly underestimates total $SO_2$ concentrations surrounding Marin Lake.[78]

m.   Collective effect of the purported limitation

Finally, EPA asserts that the "possible collective significance" of these supposed limitations undermines their confidence in Sierra Club's modeling, given that the maximum modeled concentrations are within about 10% of the primary $SO_2$ NAAQS. 84 Fed. Reg. at 43,761. Once again, EPA's factual assertions are demonstrably false, and its proposal technical conclusions are arbitrary, capricious, and contrary to the evidence in the record.

As an initial matter, with respect to the Martin Lake power plant, Sierra Club's March 31, 2016 Modeling Report, on which EPA based its final designation, shows the three-year average 99th percentile one-hour $SO_2$ concentration for the Martin Lake power plant was 249.3 µg/m$^3$ (equivalent to 95.3 ppb), which is 27% higher than the allowable one-hour $SO_2$ NAAQS level—i.e., not "within about 10%."[79] And as discussed above, those modeled exceedances reflect assumptions that were

---

[76] Final Texas Supplemental TSD at 66-72.

[77] *See* Ex. 8.

[78] Final Texas Supplemental TSD at 75. It is also worth noting that the impacts from the Pirkey power plant's actual emissions were negligible, and contributed just 0.1 µg/m$^3$ to the total concentration design value around Martin Lake. *See* Martin Lake Generating Station Tatum, Texas Evaluation of Compliance with the 1-hour NAAQS for $SO_2$ at 3 (Sept. 11, 2015).

[79] *Id.* The one-hour $SO_2$ NAAQS level is 75 ppb, which is equivalent to 196.2 µg/m$^3$. EPA's "10%" figure is based on a maximum value of 224 µg/m$^3$ (14% above design value). However, as EPA admitted in its final TSD, that value is not Sierra Club's modeled maximum but rather a conservative estimate of Sierra Club's modeled maximum when looking only at Luminant's (per EPA) inappropriately circumscribed set of receptor locations. Final Texas Supplemental TSD at 67-68

"deliberately conservative (in an under-estimating sense) and included several techniques which generally would tend to reduce/underestimate design value concentrations from" Martin Lake.[80]

Moreover, as explained in Dr. Gray's 2016 and 2019 technical review and sensitivity modeling, EPA's alleged limitations (individually or collectively) have no material effect on the model results. At most, those uncertainties would decrease impacts by about 4%, which still demonstrates that Martin Lake causes significant exceedances of the NAAQS, and is in nonattainment.[81] EPA's Error Correction proposal does not provide any support for concluding otherwise.

In short, EPA has provided no reasoned or persuasive explanation for reversing course and disregarding the facts and conclusions underlying the agency's well-reasoned and thorough nonattainment decision. *Fox Television Stations*, 556 U.S. at 515–16. In 2016, EPA concluded that Sierra Club's 2016 modeling was reliable and sufficiently demonstrated that the area surrounding Martin Lake does not meet the $SO_2$ NAAQS. As discussed, none of EPA's alleged "limitations" or errors has any technical merit; nor do they provide a valid technical basis for concluding that the agency erred in relying on Sierra Club's modeling. Because EPA's proposal does not provide any technical data or explanation for its assertion that the 2016 Sierra Club modeling was erroneous, the agency cannot use its error correction authority to redesignate the area around Martin Lake from nonattainment to unclassifiable.

## II.   SIERRA CLUB'S REVISED SEPTEMBER 2019 MODELING MAKES CLEAR THAT THE AREA SURROUNDING MARTIN LAKE MUST BE DESIGNATED NONATTAINMENT.

Although EPA's proposal does not provide any technical data or reasoned explanation for its assertion that the 2016 Sierra Club modeling analysis contained any material errors, in September 2019 Sierra Club retained Wingra Engineering to conduct updated modeling for Martin Lake for the years 2013 through 2018. That September 2019 modeling confirms that, even after addressing all of the potential adjustments identified by EPA, the $SO_2$ concentrations in the areas surrounding Martin Lake exceed the 1-hr $SO_2$ NAAQS under all scenarios.

As explained in the attached modeling report, Wingra Engineering updated the March 2016 modeling for Martin Lake by incorporating Luminant's own hourly emissions data, actual stack exit velocities, actual stack temperatures, and specific building dimensions and locations for the 2013–2015 modeling to address the "key limitations" identified in EPA's proposal. Specifically, the

---

("The maximum value (249.3 µg/m$^3$) in the Sierra Club modeling is in this area to the southwest Luminant has excluded. . . . We do not concur with Luminant that all the areas they excluded . . . should be excluded, but even if we evaluate just the areas that Luminant does not contest, there are many receptors well above the standard.  We note the maximum value[] in the uncontested area is actually as high as 239.1 µg/m$^3$. . . . For our analysis, we conservatively used 224 µg/m$^3$ to evaluate the modeling but the analysis could also be done based on the 239.1 µg/m$^3$ value.").

[80] Final Texas Supplemental TSD at 75.

[81] *See* Ex. 2, March 2016 Gray Report at 7.

September 23, 2019 supplemental modeling analysis conducted by Wingra Engineering incorporates the following changes and updates:[82]

- Although the March 31, 2016 Modeling Report used the most recently available version of AERMOD at the time, this analysis uses the current versions of the AERMOD modeling system v.18081.
- For the model years 2013 through 2015, the following model inputs were taken from AECOM's March 2016 report, *Characterization of 1-Hour SO₂ Concentrations in the Vicinity of the Martin Lake Steam Electric Station*, which AECOM prepared for Luminant, using Martin Lake's continuous emission monitoring:
  - Stack location, height, and diameters from AECOM's analysis.
  - Specific building locations and dimensions from AECOM's report allowed for evaluation of aerodynamic downwash. As shown below, these inputs have negligible impacts on modeled design values.
  - Updated hourly emission rates, stack temperatures and stack exit velocities for the 2013 through 2015 period, from AECOM's report.
- For the model years 2016 through 2018, the report uses actual hourly emission rates obtained from EPA's Air Markets Program Database.
- Because actual stack temperatures are not publicly available for the years 2016 through 2018, the updated modeling report used AECOM's hourly CEM temperature measurements from 2013–2015 to derive an average stack outlet temperature for each of the three units. The report then assumes this average temperature for modeling the 2016–2018 period. These average temperatures were 352, 358 and 355 K, respectively. These were significantly less than the 449 K temperature conservatively used for the 2016 Sierra Club report.
- Similarly, because hourly CEM measurements for the 2016–2018 period are not publicly available, exit velocities for 2013–2015 from the AECOM's modeling were combined with concurrent heat input obtained from the USEPA Air Markets Program Data to derive a relationship between exhaust gas flow rate and heat input for the three units.[83] This value of 16,359 standard cubic feet per mmbtu heat input was applied to the hourly heat input for each unit from the USEPA Air Markets Program Data during the 2016–2018 period to determine hourly exit velocities during 2016–2018.
- Updated meteorological data for the 2013–2018 period were obtained from the surface station at the Longview Texas Regional Airport.
- To address EPA concerns about consideration of recent land use surrounding the airport, the modeling uses a version of AERSURFACE that reduced the predicted impacts.
- The analysis was conducted using two modeling receptors grids. First, one which included all locations around the Martin Lake Generating Station accessible by the general public. A second receptor grid was obtained from Luminant's 2016 modeling analysis conducted by AECOM, which excludes locations that Luminant assumed to be unavailable for placement of an ambient monitor. As demonstrated in the attached report, under either scenario, Martin Lake causes exceedances of the SO₂ NAAQS outside the facility's fenceline and on publicly accessible property and rights of way.

---

[82] *See* Klafka, *Martin Lake Steam Electric Station, Tatum, Texas Evaluation of Compliance with the 1-hour NAAQS for SO₂* (Sept. 23, 2019), attached as Ex. 1 at 2-5.

[83] *See* https://ampd.epa.gov/ampd/.

- The background concentration was updated to the lowest value measured at ambient monitors in the State of Texas, for the 2016–2018 period.[84]
- To address EPA's concerns regarding the March 31, 2016 Modeling Report's use of a 1.5 meter flagpole receptor height to reflect a representative inhalation level, the September 2019 modeling does not use an elevated flagpole height.
- To address EPA's concerns about the size of the receptor grid in Sierra Club's March 31, 2016 Modeling Report, the 2019 modeling uses a 25 kilometer grid.

As demonstrated in the attached modeling, even after adjusting the modeling analysis to address EPA's alleged "key limitations," the results still indicate that Martin Lake causes significant exceedances of the 1-hour $SO_2$ standard. In fact, the updated September 2019 modeling analysis for the 2013-2015 time period indicates that Martin Lake causes $SO_2$ concentrations as high as **401.6 μg/m$^3$**—more than double the 1-hour standard. Even using Luminant's own receptor grid—which improperly excludes publicly-accessible areas—the impacts from Martin Lake are more than double the NAAQS: **396.5 μg/m$^3$**.

As explained in the attached September 23, 2019 Modeling Report, Wingra Engineering ran sensitivities to isolate and determine the impacts of each of the modeling assumptions that were changed in response to EPA's proposal. The sensitivity analysis demonstrates that the discrepancy between the maximum $SO_2$ concentration from Sierra Club's March 31, 2016 modeling results, and the current September 2019 modeling analysis, is almost entirely attributable to the use of Martin Lake's actual, variable emissions rate, temperature, and exit velocities, as reported in AECOM's modeling files.[85] In other words, using Luminant's own modeling inputs to address EPA's newfound "limitations" demonstrates that the total $SO_2$ impacts from Martin Lake for the 2013–2015 period are significantly higher than Sierra Club's "deliberately conservative" March 2016 modeling predicted.[86] Thus, none of the "key limitations" identified by EPA provide a valid technical or legal basis for reversing or redesignating the area around Martin Lake as unclassifiable under the NAAQS.

Also, as reflected in the attached modeling report, Wingra Engineering modeled subsequent three-year periods to obtain predicted design values for 2014–2016, 2015–2017 and 2016–2018. Under every modeled scenario from 2013 through 2018, the area surrounding Martin Lake "does not meet" the NAAQS, and must therefore be designated as nonattainment. 42 U.S.C. § 7407(d)(1)(A)(i).

---

[84] The Travis County monitor was used for this analysis because it reflected the lowest monitored background value in the state, because it is closer in geographic proximity to Martin Lake, and because the El Paso monitor, which previously had the lowest state value, has since been decommissioned. The background input is likely conservative and underestimates total concentrations.

[85] As explained in Wingra Engineering's report and EPA's 2016 Final Texas Supplemental TSD, AECOM's modeled results incorporated unapproved beta modeling options that significantly underestimated the modeled impacts from the plant.

[86] Final Texas Supplemental TSD at 75.

**Table 1 -- SO₂ Modeling Results for Martin Lake Generating Station (Receptor Grid #1)**[87]

| Emission Rates | Averaging Period | 99th Percentile 1-hour Daily Maximum ($\mu g/m^3$) | | | | Complies with NAAQS? |
|---|---|---|---|---|---|---|
| | | Impact | Background | Total | NAAQS | |
| Actual 2013-15 | 1-hour | 393.8 | 7.8 | 401.6 | 196.2 | No |
| Actual 2014-16 | 1-hour | 312.8 | 7.8 | 320.6 | 196.2 | No |
| Actual 2015-17 | 1-hour | 225.6 | 7.8 | 233.4 | 196.2 | No |
| Actual 2016-18 | 1-hour | 252.0 | 7.8 | 259.8 | 196.2 | No |

**Table 2 -- SO₂ Modeling Results for Martin Lake Generating Station (Receptor Grid #2)**

| Emission Rates | Averaging Period | 99th Percentile 1-hour Daily Maximum ($\mu g/m^3$) | | | | Complies with NAAQS? |
|---|---|---|---|---|---|---|
| | | Impact | Background | Total | NAAQS | |
| Actual 2013-15 | 1-hour | 388.7 | 7.8 | 396.5 | 196.2 | No |
| Actual 2014-16 | 1-hour | 311.0 | 7.8 | 318.8 | 196.2 | No |
| Actual 2015-17 | 1-hour | 209.2 | 7.8 | 217.0 | 196.2 | No |
| Actual 2016-18 | 1-hour | 238.4 | 7.8 | 246.2 | 196.2 | No |

Moreover, as reflected in Figure 1 below, using Luminant's own modeling inputs and its own receptor grid—*i.e.*, assuming that modeled violations on private property are essentially exempt from consideration—it is clear that Martin Lake causes significant excedances of the health based NAAQS on public land and rights of way. In the Figure below, each of individual x's (represented with an "+") represents a modeled receptor. As indicated in the Figure and the attached modeling, even using Luminant's preferred emissions, stack exit velocities, stack temperature, and receptor grid inputs, the Martin Lake power plant causes $SO_2$ concentrations that far exceed the NAAQS in publicly-accessible lands, rights of way, and as far away as the City of Longview.

---

[87] Tables 1 and 2 are reproduced from Wingra Engineering's September 23, 2019 Modeling Report. Table 1 in the September Modeling Report reflects the results using the same receptor grid Sierra Club used in the March 31, 2016 Modeling Report. Table 2 reflects the modeled maximum concentrations from Martin Lake, using the receptor grid inputs obtained from the AECOM modeling, conducted on behalf of Luminant. The results are generally consistent, although the use of AECOM's receptor grid results in slightly reduced maximum $SO_2$ concentrations because AECOM's modeling excludes receptor locations in areas owned by Luminant, or areas where the Company assumed that no monitor could be sited.

31



1-hour average SO2 concentrations (ug per cubic meter) - All colored areas exeed the NAAQS.

| 196 | 300 | 350 |
|---|---|---|

*Figure 1 -- Impacts Based on Receptor Grid #2 and Hourly Emissions for 2013-15 Period Using AECOM Actual Emissions, Stack Exit Velocities, Temperature, and Receptor Grid.*

32

III.  **TEXAS'S OWN AIR QUALITY MONITORING CONCLUSIVELY DEMONSTRATES THAT THE AREA SURROUNDING MARTIN LAKE IS IN NONATTAINMENT.**

Even if EPA had erred in declining to defer to Texas's preference for monitoring—which it did not, as explained above—the State's own EPA-approved monitor demonstrates conclusively that the ambient air quality surrounding the Martin Lake power plant "does not meet" the 2010 $SO_2$ NAAQS, and therefore the area must be designated as nonattainment. 42 U.S.C. § 7407(d)(1)(A)(i).[88] In response to EPA's nonattainment designations, in November 2017 (nearly a year after the regulatory deadline for installing monitors to characterize air quality under the 2010 $SO_2$ NAAQS, as explained above), Texas sited and began operating a new $SO_2$ monitor near the Martin Lake power plant. 84 Fed. Reg. at 43,760.[89] Relying on Sierra Club's March 2016 Modeling Report, Texas sited the Martin Creek Lake monitor approximately two kilometers north of the Martin Lake power plant in the Martin Creek State Park.[90] In an August 10, 2017 letter to Texas, EPA approved that siting location as compliant with regulatory requirements. 84 Fed. Reg. at 43,760. As reflected in TCEQ's own monitoring data, the EPA-approved Martin Lake monitor, which was located in reliance on Sierra Club's now-purportedly unreliable modeling,[91] definitively demonstrates that air quality surrounding the plant exceeds the health-based NAAQS, and that the area is, in fact, in nonattainment regardless of any supposed "limitations" or "uncertainties" in Sierra Club's modeling. Thus, it would be arbitrary, capricious, and contrary to law for EPA to redesignate the area as unclassifiable.

At the outset, EPA's proposal to redesignate Martin Lake from nonattainment to unclassifiable, based on purported "limitations" in Sierra Club's modeling, is arbitrarily inconsistent with the agency's approval of TCEQ's Martin Lake monitoring location, which was made based on that very same modeling.[92] It is arbitrary and capricious for EPA to rely on Sierra Club's modeling as reliable and technically sufficient for siting a monitor, but to subsequently conclude that the modeling was somehow flawed for the purposes of reliably characterizing air quality. Indeed, EPA has observed that modeling that follows EPA guidelines, as EPA concluded Sierra Club's March 2016 Modeling Report did,[93] "provides high confidence information to inform the monitor siting process."[94] Although EPA and TCEQ half-heartedly attempt to downplay the significance of their

---

[88] *See* Ex. 9 (CAMS 1082 Monthly Monitoring Data From November 2017 through September 2019, Tatum CR 2181d Martin Creek Lake C1082 - EPA Site: 48_401_1082, *available at* https://www.tceq.texas.gov/cgi-bin/compliance/monops/monthly_summary.pl?cams=1082).

[89] *See also* TCEQ, 2017 Annual Monitoring Network Plan at E-28, EPA Docket No. EPA-HQ-OAR-2014-0464-0461.

[90] *Id. See also* Tatum CR 2181d Martin Creek Lake C1082, EPA Site: 484011082, CAMS 1082, Activation Date, Nov. 1, 2017 (Latitude: 32° 16' 40" North (32.2778000º), Longitude: -94° 34' 15" West (-94.5708000º)), *data available at* https://www17.tceq.texas.gov/tamis/index.cfm?fuseaction=report.view_site&siteAQS=484011082.

[91] 84 Fed. Reg. at 43,760; see also TCEQ, 2017 Annual Monitoring Network Plan, Appendix E at B-28, EPA Docekt No. EPA-HQ-OAR-2014-0464-0461.

[92] *Id.*

[93] Final Texas Supplemental TSD at 14, 58.

[94] EPA, $SO_2$ NAAQS Designations Source-Oriented Monitoring Technical Assistance Document at 12 (Office of Air and Radiation Dec. 2013), EPA Docket No. EPA-HQ-OAR-2014-0464-0450.

reliance on Sierra Club modeling to locate the Martin Lake monitor, 84 Fed. Reg. at 43,760 (citing TCEQ's 2017 Monitoring Network Plan)  neither the Plan nor EPA's record identifies any other data supporting the state's monitor location.[95] EPA unlawfully fails to acknowledge, let alone reconcile, its reliance on Sierra Club's modeling for the purposes of siting a monitor with its new proposed action concluding that the very same modeling is unreliable. *Bauer v. DeVos*, 325 F. Supp. 3d 74, 109 (D.D.C. 2018) ("[U]nacknowledged and unexplained inconsistency is the hallmark of arbitrary and capricious decision-making . . . .").

### A. Air Quality Monitoring Data Near the Martin Lake Plant Conclusively Shows that the Area is in Nonattainment.

Although there is evidence that TCEQ's Martin Lake monitor is not even sited in a location that corresponds with the highest likely $SO_2$ concentrations around Martin Lake,[96] the hourly average $SO_2$ concentration data from the Martin Creek Lake monitor from November 2017 through September 2019 demonstrates that the area surrounding the Martin Lake power plant is in nonattainment with the 2010 1-hr $SO_2$ NAAQS. [97] As noted, the one-hour $SO_2$ NAAQS requires that the three-year average of the 99th percentile daily maximum $SO_2$ concentration—*i.e.*, the average of the fourth highest maximum one-hour reading for three years—must not exceed 75 ppb. 40 C.F.R. § 50.17(b). Although the Martin Lake monitor has not been operating for a full three years, the available data nonetheless demonstrates conclusively that the design value for the 2017–2019 period will exceed 75 ppb, and thus the monitor is in nonattainment. *See* Ex. 9.

As explained in detail in the attached technical comments prepared by Dr. H. Andy Gray,[98] and as reflected in TCEQ's own monitoring data,[99] the 20 months of available $SO_2$ measurements at the Martin Lake monitor unambiguously demonstrate that the area surrounding the Martin Lake power plant is in nonattainment with the one-hour $SO_2$ NAAQS. Indeed, the annual design value for the monitor was **109.1 ppb** in 2018, which was the fourth-highest hourly reading for that year. In 2019, the fourth-highest hourly reading is already **114.8 ppb**; thus, even assuming zero emissions for the remainder of the year, the minimum design value for 2019 will be 114.8 ppb. And although the monitor operated for only 32 days of 2017, the fourth-highest reading for that period was **22.2 ppb**. Thus, the design value for 2017-2019 was, at a minimum, **82.03 ppb**, well above the NAAQS.[100] This is a conservative design value—one that gives the benefit of the doubt to the source by essentially assumes zero emissions for many months of 2017. Thus, the 20 months of available $SO_2$ measurements at the Martin Lake monitor conclusively demonstrates that the area surrounding the Martin Lake power plant fails to meet the NAAQS, and is thus in nonattainment.

---

[95] TCEQ, 2017 Annual Monitoring Network Plan at E-28.

[96] *See, e.g.*, Ex. 1, September 23, 2019 Modeling Report at 13-14; Ex. 2, September 2019 Gray Report at 4 (each explaining that the Martin Lake monitor is not located where the station has its maximum modeled air quality impacts).

[97] *See* TCEQ, Monthly Summary Report CAMS 1082, Tatum CR 2181d Martin Lake Creek, *available at* https://www.tceq.texas.gov/cgi-bin/compliance/monops/monthly_summary.pl?cams=1082.

[98] Ex. 2, September 2019 Gray Report at 3–4.

[99] *See id.*; *see also* Ex. 9 (compilation of hourly monitoring data from CAMS 1082, Tatum CR 2181d Martin Lake Creek Monitor, as reported by TCEQ).

[100] 109.1 ppb + 114.8 ppb + 22.2 ppb = 246.1 ppb. 246.1 ppb ÷ 3 = 82.03 ppb.

The conclusion will almost certainly be the same for the 2018 through 2020 period. As explained by Dr. Gray, given the **109.1 ppb** annual design value for 2018 (the fourth highest), and the minimum **114.8 ppb** design value for 2019 (already the fourth highest), the three-year design value for the monitor will assuredly exceed 75 ppb. Indeed, the only way to avoid that result would be for the 4th highest daily peak one-hour $SO_2$ concentration in 2020 to be less than **1.1 ppb**. That is impossible, given that such a concentration is below the lowest monitored background level in the state—*i.e.*, 7.8 µg/m$^3$ or approximately 2.98 ppb.[101] Thus, even if the Martin Lake power plant emitted zero $SO_2$ for the remainder of 2019 and 2020, the monitor already demonstrates conclusively that the area does not meet the NAAQS, and thus EPA cannot redesignate the area as unclassifiable.

Moreover, as explained by Dr. Gray, there is a high likelihood that the single Martin Lake monitor north of the power plant does not actually capture the peak hourly $SO_2$ impacts from the plant. As explained above, to rely on monitoring to characterize air quality, Texas was required to demonstrate that its monitor captures the location or locations where peak 1-hour $SO_2$ concentrations are expected to occur.[102] Although EPA claims that "Texas referred to the 2016 Sierra Club modeling analysis, among other information, to inform their proposed siting of the new monitors,"[103] TCEQ's Martin Creek Lake monitoring location, 2 kilometers north of the Martin Lake power plant, does not actually coincide with the areas of maximum modeled impacts, which are 3-5 kilometers to the west-southwest and southeast of the power plant, as explained in detail in Dr. Gray's report. *See* Ex. 2, September 2019 Gray Report at 4-5. Because the model results reflect the long-term wind flow and pollutant transport patterns in the area, the single monitor in Rusk County likely does not capture the peak hourly $SO_2$ impacts from Martin Lake. Thus, even though the Martin Lake monitor already demonstrates the area is in nonattainment, it is likely that design value concentrations are even higher in other areas surrounding the plant.

---

[101] *See* Ex. 1, September 23, 2019 Modeling Report at 14-15.

[102] "The primary objective is to place monitoring sites at the location  or locations of expected peak concentrations." Data Requirements Rule's companion Technical Assistance Document at 16. Moreover, to determine compliance with the NAAQS:

> The EPA expects monitoring conducted in response to [an anticipated]  future data requirements rule to be targeted, source-oriented monitoring, for which the primary objective would be to  identify peak $SO_2$ concentrations in the ambient air that are attributable to an identified emission source or group of sources.

*See* $SO_2$ NAAQS Designations Source-Oriented Monitoring Technical Assistance Document, U.S. EPA  Office of Air and Radiation, Office of Air Quality Planning and Standards, Air Quality Assessment Division  (Dec. 2013 Draft), http://www.epa.gov/airquality/sulfurdioxide/pdfs/ SO2MonitoringTAD.pdf.

[103] 84 Fed. Reg. at 43,760 (citing Appendix E: Sulfur Dioxide Data Requirements Rule Monitor Placement Evaluations, from 2017 TCEQ Annual Monitoring Network Plan, EPA Docket No. EPA-HQ-OAR-2014-0464-0461).

*Figure 2 -- 2016 Sierra Club SO₂ Modeling Results for Martin Lake (showing the location of the Martin Creek Lake monitor)*



1-hour average SO2 concentrations (ug per cubic meter) - All colored areas exceed the NAAQS.

196                                        225

### B. A Comparison of Actual Monitoring Data to Modeled Ambient Concentrations from Sierra Club's Updated September 2019 Modeling Confirms the Accuracy of the Modeling and Corroborates the Nonattainment Designation.

Finally, to test the reliability and accuracy of Sierra Club's modeling, Sierra Club retained Wingra Engineering to compare the ambient *monitoring* measurements from the EPA-approved Martin Lake monitor with the *modeled* ambient concentrations from Sierra Club's September 2019

36

modeling analysis for the 2016–2018 period, described above.[104] Wingra Engineering compared the hourly monitored values at Texas's recently installed Martin Lake monitor for the year 2018 with the modeled hourly concentrations at the closest receptor in Sierra Club's updated September 2019 modeling report, so as to obtain an apples-to-apples, hourly comparison of modeled versus monitored values at that specific Martin Lake monitoring location.

As explained in Wingra Engineering's report, the modeling results and the ambient monitor measurements are highly correlated, which corroborates the accuracy of Sierra Club's modeling. Indeed, as demonstrated in the table below, reproduced from Wingra Engineering's report, the maximum, average and standard deviation concentrations and the number of hours during 2018 predicted to exceed the NAAQS of 196.2 $\mu g/m^3$ were substantially similar. In fact, the *actual measured* maximum values from the Martin Lake monitor were higher than the modeled results, confirming the conservative nature of the Sierra Club modeling. In other words, Sierra Club's modeling, as explained above and as EPA concluded in 2016, tends to underpredict ambient $SO_2$ concentrations. This comparison of the actual monitored values at the EPA-approved Martin Lake monitor and the modeled values in Sierra Club's updated September 2019 modeling confirms the overall reliability of Sierra Club's modeling.[105] It also demonstrates that EPA's reliance on Sierra Club's modeling to designate the area around Martin Lake as being in nonattainment was *not* an error. In fact, it demonstrates that EPA's proposal to redesignate the area around Martin Lake as unclassifiable would, itself, be technically flawed and arbitrary and capricious.

**Table 3 -- Comparison of Measured and Modeled $SO_2$ Concentrations During 2018**

| Parameter | Ambient Monitor | Modeling Results |
|---|---|---|
| Maximum ($\mu g/m^3$) | 418 | 313 |
| Average ($\mu g/m^3$) | 6 | 5 |
| Standard Deviation ($\mu g/m^3$) | 20 | 23 |
| Hours exceeding NAAQS | 14 | 15 |

In sum, Texas's own EPA-approved monitor demonstrates that the ambient air quality surrounding the Martin Lake power plant "does not meet" the 2010 $SO_2$ NAAQS, and therefore the area must be designated as nonattainment. 42 U.S. § 7407(d)(1)(A)(i). As explained, TCEQ relied on Sierra Club's 2016 Modeling Report to select a location for that monitor, and EPA approved that location. Yet EPA arbitrarily fails to discuss, let alone explain, how Sierra Club's 2016 Modeling Report was reliable enough to select a monitoring location, but somehow limited for the purposes of designating the area as nonattainment. *Bauer v. DeVos*, 325 F. Supp. 3d 74, 109 (D.D.C. 2018) ("unacknowledged and unexplained inconsistency is the hallmark of arbitrary and capricious decision-making").

If EPA moves forward with its proposal to redesignate the Martin Lake area (and it cannot lawfully do so, as explained above), EPA must consider the actual ambient measurements from that

---

[104] *See* Martin Lake Steam Electric Station, Tatum, Texas Evaluation of Compliance with the 1-hour NAAQS for $SO_2$ September 23, 2019 (attached as Ex. 1)

[105] This is consistent with EPA's observations that modeling "provides high confidence information to inform the monitor siting process." EPA, Office of Air and Radiation, $SO_2$ NAAQS Designations Source-Oriented Monitoring Technical Assistance Document, EPA Docket No. EPA-HQ-OAR-2014-0464-0450, at 12 (Dec. 2013).

EPA-approved monitor. *State Farm*, 463 U.S. at 43 ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"); *cf. F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. at 515–16 ("a reasoned explanation is needed for disregarding facts and circumstances that underlay" a proposed course of action); *Sierra Club v. EPA*, 671 F.3d 955, 967 (9th Cir. 2012) ("[I]f new information indicates to EPA that [a proposed rule] awaiting approval is inaccurate or not current, . . . EPA should properly evaluate the new information and may not simply ignore it without reasoned explanation of its choice."). Because the State's own EPA-approved monitor conclusively demonstrates that the three-year design value for the ambient air quality surrounding the Martin Lake power plant will "not meet" the 2010 $SO_2$ NAAQS, EPA must affirm its nonattainment designation for the area. 42 U.S. § 7407(d)(1)(A)(i).

## IV.   IF FINALIZED, THE PROPOSED ACTION WOULD BE SUBJECT TO REVIEW IN THE D.C. CIRCUIT.

As explained above, EPA cannot lawfully redesignate the Texas nonattainment areas to unclassifiable. Were it to do so, though, review of its action would occur in the D.C. Circuit, and any effort by the agency to evade this venue would be arbitrary. First, EPA's proposed action would, on its face, reverse parts of the agency's "nationally applicable" rulemaking that applied the same designation standards to every state. *ATK Launch Systems* v. *EPA*, 651 F.3d 1194, 1199 (10th Cir. 2011). Second, EPA's proposal would establish a nationally applicable policy of EPA deferring to state preferences to characterize air quality under the NAAQS, even though EPA's longstanding policy and precedent establish that modeling is a reliable and efficient method of determining compliance with the NAAQS. Third, any EPA refusal to issue a finding that the D.C. Circuit is the appropriate venue for review is likely to result in different standards and methodologies applying to designations in different areas of the country, thereby unlawfully and arbitrarily defeating the Clean Air Act's goal of ensuring uniformity of national issues. *See Texas v. EPA*, No. 10-60961, 2011 WL 710598, at *4 (5th Cir. Feb. 24, 2011; *Tex. Mun. Power Agency v. EPA,* 89 F.3d 858, 867 (D.C. Cir. 1996); *see also Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 891 F.3d 1041, 1054 (D.C. Cir. 2018) (Silberman, J., concurring) (the Clean Air Act's venue provision reflects "a clear congressional mandate: uniform judicial review of regulatory issues of national importance"). Fourth, EPA has continued to take the position that its area designations under the 2010 $SO_2$ NAAQS were nationally applicable or based on determinations of nationwide scope and effect, and should be reviewed in the D.C. Circuit Court of Appeals.[106] EPA has provided no rational explanation for departing from that approach.

Even if EPA determines that its proposal is not part of the nationally applicable $SO_2$ designation rule, EPA must still find that judicial review is appropriate only in the D.C. Circuit by publishing a finding that the proposed amendment to the national rule is "based on a determination of nationwide scope and effect." 42 U.S.C. § 7607(b)(1); *see also Texas*, 829 F.3d at 419-20 (EPA has discretion to move venue to D.C. Circuit via such finding). While EPA's venue determination (or lack thereof) is entitled to some deference, it "does not escape review under the APA's arbitrary and capricious standard." *Nat'l Envtl. Dev't*, 891 F.3d at 1053 (Silberman, J., concurring).

---

[106] EPA Motion to Govern and Motions to Sever and Hold in Abeyance at 8, *Samuel Masias v. U.S. EPA*, No. 16-1314 (consolidated with *Texas v. U.S. EPA*, 17-1053) (D.C. Cir. Sept. 22, 2017) ("EPA maintains its position that this Court is the exclusive venue for petitions for review of the Supplemental Rule, . . .").

A refusal to find that the rule is based on determinations of nationwide scope and effect would not only be arbitrarily inconsistent with the face of the rule, it would be arbitrarily inconsistent with the agency's findings regarding the Round 2 designations. 81 Fed. Reg. at 89,871-73, 89,875 (discussing nationwide interpretations of 42 U.S.C. § 7407(d)(i)(A) definitions and common five-factor test, analytical approach, and technical assessment considering all available air quality modeling and monitoring data). Those final designations and this proposal rest on a common and nationwide approach used by EPA thus far to promulgate Round 2 Designations for 65 areas in 24 states. 81 Fed. Reg. 45,039; 81 Fed. Reg. 89,870. EPA's proposal to redesignate the Texas nonattainment areas would necessarily reverse that national policy and thus any petition for review should be filed only in the D.C. Circuit. 42 U.S.C. § 7601(b)(1).

## <u>CONCLUSION</u>

For these reasons, EPA cannot lawfully finalize its proposal to redesignate the areas surrounding the Big Brown Electric Station, the Martin Lake Electrical Station, and the Monticello Steam Electric Station in Texas from nonattainment to unclassifiable under the health-based 2010 National Ambient Air Quality Standard ("NAAQS") for sulfur dioxide ("$SO_2$"). The proposal violates the plain language of the Clean Air Act, which flatly prohibits EPA from redesignating any nonattainment area to unclassifiable, 42 U.S.C. § 7407(d)(3)(F), and prohibits redesignating any such nonattainment area as attainment unless EPA complies with the specific requirements of Section 7407(d)(3)(E)—something EPA has indisputably failed to do.

EPA cannot circumvent those specific provisions by relying on its general error correction authority where, as here, there is no actual error to correct. Indeed, the record demonstrates conclusively that the area around the Martin Lake power plant "does not meet" the NAAQS, and must therefore be designated as nonattainment. 42 U.S.C. § 7407(d)(1)(A)(i). We urge EPA to reject this proposal and move forward with implementing the requirements of the Clean Air Act to bring the Martin Lake area into compliance with public health standards for $SO_2$ pollution as expeditiously as practicable, as mandated by the Clean Air Act. 42 U.S.C. § 7502.

If you have questions, or need any additional information, please do not hesitate to contact us.

Sincerely,

_____

Joshua Smith
Staff Attorney
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
Joshua.smith@sierraclub.org
(415)977-5560

Lisa K. Perfetto
Melissa Legge
Earthjustice
48 Wall Street, 19th Floor
New York, NY 10005
(212) 845-7388
lperfetto@earthjustice.org
mlegge@earthjustice.org

Exhibits:

Ex. 1 -- *Martin Lake Steam Electric Station, Tatum, Texas Evaluation of Compliance with the 1-hour NAAQS for SO₂*, September 23, 2019, conducted by Steven Klafka, P.E., BCEE Wingra Engineering, S.C., Madison, Wisconsin, and supporting modeling files delivered by hand as reflected by the EPA Docket Center's date-stamp.

Ex. 2 -- *EPA's "Error Correction" of the SO₂ Area Designations in Texas*, conducted by Dr. H. Andrew Gray, dated September 23, 2019 [hereinafter, "September 2019 Gray Report"] (incorporates the January 7, 2016 Mem. from H. Andrew Gray, Gray Sky Solutions to EPA, Region 6 Re: review of NRG's modeling of Parish SO2 emissions [hereinafter, January 2016 Gray Report"], and the March 31, 2016 Mem. from H. Andrew Gray, Gray Sky Solutions to EPA, Region 6 Re: EPA's SO2 Area Designations for Texas [hereinafter, "March 2016 Gray Report"], EPA Docket No. EPA-HQ-OAR-2014-0464-0332).

Ex. 3 -- Report of Dr. George Thurston, Docket ID No. EPA-R06-OAR-2016-0611 (May 4, 2017).

Ex. 4 -- *Martin Lake Steam Electric Station, Tatum, Texas Evaluation of Compliance with the 1-hour NAAQS for SO₂*, March 31, 2016, conducted by Steven Klafka, P.E., BCEE Wingra Engineering, S.C., Madison, Wisconsin (modeling files available in EPA Docket EPA-HQ-OAR-2014-0464).

Ex. 5 -- Texas June 29, 2016 submission under the DRR rule.

Ex. 6 -- U.S. EPA, *Implementation of the 1-Hour SO2 NAAQS Draft White Paper for Discussion* at 3, fn. 1.

Ex. 7 -- Memorandum from Sheldon Meyers, Director of EPA Office of Air Quality Planning and Standards, Section 107 Designation Policy Summary at 1-2 (Apr. 21, 1983).

Ex. 8 -- *Martin Lake Steam Electric Station Tatum, Texas Evaluation of Compliance with the 1-hour NAAQS for SO₂*, dated September 11, 2015, conducted by Steven Klafka, P.E., BCEE Wingra Engineering, S.C., Madison, Wisconsin (modeling files available in EPA Docket EPA-HQ-OAR-2014-0464).

Ex. 9 – TCEQ, CAMS 1082 Monthly Monitoring Data From November 2017 through September 2019, Tatum CR 2181d Martin Creek Lake C1082 - EPA Site: 48_401_1082, *available at* https://www.tceq.texas.gov/cgi-bin/compliance/monops/monthly_summary.pl?cams=1082).

Cc:

Mr. Guy Donaldson
Chief, Air Planning Section (6PD-L)
Environmental Protection Agency
1445 Ross Avenue, Suite 1200
Dallas, TX 75202-2733

# Exhibit 1

# Martin Lake Steam Electric Station

# Tatum, Texas

# Evaluation of Compliance with the 1-hour NAAQS for SO$_2$

# September 23, 2019

*Conducted by:*

*Steven Klafka, P.E., BCEE*

*Wingra Engineering, S.C.*

*Madison, Wisconsin*

## 1.    Introduction

Wingra Engineering, S.C. was hired by the Sierra Club to conduct an air modeling impact analysis to identify and confirm that certain large emission sources are likely causing exceedences of the 1-hour sulfur dioxide ($SO_2$) national ambient air quality standard (NAAQS). This document describes the results and procedures for an updated evaluation of the Martin Lake Steam Electric Station located in Tatum, Texas. This analysis supplements a March 31, 2016 evaluation prepared on behalf of the Sierra Club. Using the most recent version of AERMOD then available, and based on measured actual hourly emissions and variable exit velocities from the 2013-15 period, and a conservative background concentration, that modeling estimated that the Martin Lake Generating Station caused $SO_2$ concentrations which exceed the 1-hour NAAQS, with the three-year average of the 99th percentile 1-hour daily maximum impact of 249.3 $\mu g/m^3$ in ambient areas outside the facility. Assuming no background contribution from any other source, the model predicted Martin Lake, by itself, caused ambient air quality levels exceeding the NAAQS—that is, a three-year average of the 99th percentile 1-hour daily maximum impact of 244.1 $\mu g/m.^3$

To address recent comments the U.S. EPA provided on that March 31, 2016 Modeling Report,[1] this supplemental analysis incorporates the following changes and updates:

a)    The most current versions of the AERMOD modeling system v. 18081 were used for the analysis. The March 31, 2016 Modeling Report used the most recently available version of AERMOD at the time.

b)    Actual hourly emission rates were obtained from EPA's Air Markets Program Database for 2016 through 2018. The March 31, 2016 Modeling Report used the most recent three years of actual emissions data, which, at the time, was 2013 through 2015.

c)    Modeling inputs were obtained from the March 2016 report, *Characterization of 1-Hour SO₂ Concentrations in the Vicinity of the Martin Lake Steam Electric Station*, prepared by AECOM for Luminant Generation Company LLC, the owner and operator of the Martin Lake power plant. Based on Luminant's data, this report includes the following updated or refined inputs:

      i.    <u>Stack location, height, and diameters.</u> In the March 31, 2016 Modeling Report, stack locations were obtained from facility permits and prior modeling files provided by the Texas Commission on Environmental Quality. The stack

---

[1] *See Error Correction of the Area Designations for the 2010 1-Hour Sulfur Dioxide (SO₂) Primary National Ambient Air Quality Standard (NAAQS) in Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas,* 84 Fed. Reg. 43,757 (Aug. 22, 2019), EPA Docket No. EPA-HQ-OAR-2014-0464.

locations and diameters were then verified using aerial photographs. This report uses <u>stack location, height, and diameters</u> from AECOM's analysis.

ii. <u>Specific building locations and dimensions.</u>   In the March 31, 2016 Modeling Report, no building dimensions were publicly available, so downwash was not included. The availability of the building locations and dimensions, taken from AECOM's report allowed for evaluation of aerodynamic downwash. As shown below, these inputs have negligible impacts on modeled design values.

iii. <u>Updated hourly emission rates, stack temperatures and stack exit velocities</u>. The March 31, 2016 Modeling Report used actual hourly emissions, and estimated variable hourly exit velocities derived from flow rate and heat input information provided by USEPA Clearinghouse and CAMD databases. Because stack temperature data was not publicly available, the March 31, 2016 Modeling Report used a constant temperature obtained from a prior modeling study for regional haze. These input parameters were updated based on actual measurements.

iv. <u>Hourly CEM Measurements</u>. For this report, the actual hourly emission rates, stack temperatures and stack exit velocities for the 2013-2015 period were obtained from the station continuous emissions monitoring (CEM) system, as reported by AECOM. This report used AECOM's hourly CEM temperature measurements during 2013-15 to derive an average stack outlet temperature for each of the three units. The report then assumes this average temperature for modeling the 2016-18 period. These average temperatures were 352, 358 and 355 °K, respectively. These were significantly less than the 449 °K temperature conservatively used for the 2016 Sierra Club report.

v. <u>Derivation of Exit Velocity Based on CEM Measurements</u>. The hourly CEM measurements for the 2016-18 are not publicly available. Exit velocities for 2013-15 from the CEM measurements were combined with concurrent heat input obtained from the USEPA Air Markets Program Data to derive a relationship between exhaust gas flow rate and heat input for the three units.[2] This value of 16,359 standard cubic feet per mmbtu heat input was applied to the hourly heat input for each unit from the USEPA Air Markets Program Data during the 2016-18 period to determine hourly exit velocities during 2016-18.

---

[2] https://ampd.epa.gov/ampd/

      vi.  As reflected below, the use of Luminant's actual variable exit velocity and temperature (as provided by AECOM) demonstrate significant increases in total concentration. In other words, the lower actual stack temperatures and exit velocities result in decreased dispersion and higher modeled impacts.

d) Updated meteorological data for the 2013 to 2018 period were obtained from the surface station at the Longview Texas Regional Airport.

e) To address prior concerns about consideration of recent land use surrounding the airport, the beta version of AERSURFACE v. 19039 was used with National Land Cover Database for 2011 including land cover, canopy and impervious surfaces. In Section 2.3 it is shown that use of the 2011, rather than the original 1992 land use files, slightly reduced the predicted impacts.

f) The analysis was conducted using two modeling receptors grids. Receptor Grid #1 which included all locations around the Martin Lake Generating Station accessible by the general public. Receptor Grid #2 was obtained from the 2016 modeling analysis conducted by AECOM on behalf of Luminant and excludes locations that Luminant assumed to be unavailable for placement of an ambient monitor. The results show maximum modeled concentrations are not on Luminant property. Nevertheless, the report includes a separate receptor grid to address EPA's concern about modeling locations outside the facility fence line or on publicly-accessible land.

g) The background concentration was updated to the lowest value measured at ambient monitors in the State of Texas, for the 2016-2018 period. This was the monitor located in Travis County. This background input is likely conservative and underestimates total concentrations; in any event, the tables below reflect impacts without any background concentrations, making clear that Martin Lake, by itself, causes emissions that exceed 196.2 $\mu g/m^3$.

h) To address EPA's concerns regarding the March 31, 2016 Modeling Report's use of a 1.5 meter flagpole receptor height to reflect a representative inhalation level, this report does not use an elevated flagpole height.

i) To address EPA's concerns about the size of the receptor grid in Sierra Club's March 31, 2016 Modeling Report, this report uses a 25 kilometer grid.[3] The use of different sized

---

[3] The March 31, 2016 Modeling Report used a receptor grid extending out 50 kilometers, which is the maximum distance accepted by USEPA for the use of the AERMOD dispersion model. USEPA, Revision to the Guideline on Air

receptor grids is irrelevant because, as the modeling demonstrates, all of the maximum impacts are well within 25 kilometers of the plant.

j) Updated modeling results were obtained for four 3-year periods: 2013-2015, 2014-2016, 2015-2017 and 2016-2018.

The dispersion modeling analysis predicted ambient air concentrations for comparison with the 1-hour $SO_2$ NAAQS.  The modeling was performed using the most recent version of AERMOD, AERMET, and AERMINUTE, with data provided to the Sierra Club by regulatory air agencies and through other publicly-available sources as documented below.  The analysis was conducted in adherence to all available USEPA guidance for evaluating source impacts on attainment of the 1-hour $SO_2$ NAAQS via aerial dispersion modeling, including the AERMOD Implementation Guide; USEPA's Applicability of Appendix W Modeling Guidance for the 1-hour $SO_2$ National Ambient Air Quality Standard, August 23, 2010; modeling guidance promulgated by USEPA in Appendix W to 40 CFR Part 51; USEPA's March 2011 Modeling Guidance for $SO_2$ NAAQS Designations;[4] and, USEPA's August 2016 $SO_2$ NAAQS Designations Technical Assistance Document.[5]

Based on measured actual hourly emissions, stack temperatures, and variable stack velocities the Martin Lake Generating Station is estimated to cause $SO_2$ concentrations which exceed the 1-hour NAAQS under all scenarios.

## 2.    Compliance with the 1-hour SO₂ NAAQS

## 2.1    1-hour SO₂ NAAQS

The 1-hour $SO_2$ NAAQS takes the form of a three-year average of the 99th percentile of the annual distribution of daily maximum 1-hour concentrations, which cannot exceed 75 parts per billion (ppb).[6]  Compliance with this standard was verified using USEPA's AERMOD air dispersion model, which produces air concentrations in units of $\mu g/m^3$.  The 1-hour $SO_2$ NAAQS of 75 ppb equals 196.2 $\mu g/m^3$, and this is the value used for determining whether modeled impacts exceed the NAAQS.[7]  The 99th percentile of the annual distribution of daily maximum 1-hour concentrations

---

Quality Models: Adoption of a Preferred General Purpose (Flat and Complex Terrain) Dispersion Model and Other Revisions, Appendix W to 40 CFR Part 51, Section A.1.(1), November 9, 2005.

[4] http://www.epa.gov/scram001/so2_modeling_guidance.htm

[5] https://www.epa.gov/sites/production/files/2016-06/documents/so2modelingtad.pdf

[6] USEPA, Applicability of Appendix W Modeling Guidance for the 1-hour $SO_2$ National Ambient Air Quality Standard, August 23, 2010.

[7] The ppb to $\mu g/m^3$ conversion is found in the source code to AERMOD v. 18081, subroutine Modules.  The conversion calculation at 25 °C is 75/0.3823 = 196.2 $\mu g/m^3$. This conversion has been used for consistency with prior modeling reports. While USEPA has recently converted the 75 ppb standard to 196.5 $\mu g/m^3$, the alternative USEPA concentration does not change the conclusions of this report.

corresponds to the fourth-highest value at each receptor for a given year.

## 2.2    Modeling Results

Modeling results for Martin Lake Generating Station are summarized in Tables 1 and 2. Table 1 provides the modeling results using Receptor Grid #1. Table 2 provides the modeling results using Receptor Grid #2. Under either scenario, based on measured actual emissions, the Martin Lake Generating Station is estimated to create downwind $SO_2$ concentrations which exceed the 1-hour NAAQS in ambient areas outside the facility's property and on publicly-accessible lands and rights-of-way.

"Actual" represents the emissions which occurred during each hour of the 2013-18 period. The March 31, 2016 Modeling Report used actual hourly emissions and variable exit velocity, based on flow rate and heat input information provided by USEPA Clearinghouse and CAMD databases. Because stack temperature data was not publicly available, the March 31, 2016 Modeling Report conservatively estimated a constant temperature.

To address "limitations" EPA recently identified regarding the March 31, 2016 Modeling Report, this report uses refined hourly emissions, stack temperature and exit velocities. Actual emission measurements were taken from two sources:

- Hourly CEM measurements provided with supporting modeling files for the March 2016 report, *Characterization of 1-Hour SO₂ Concentrations in the Vicinity of the Martin Lake Steam Electric Station*, prepared by AECOM for Luminant Generation Company LLC.

- USEPA, *Clean Air Markets Program Data (CAMD)*

Refined inputs were obtained from the March 2016 report, *Characterization of 1-Hour SO₂ Concentrations in the Vicinity of the Martin Lake Steam Electric Station*, prepared by AECOM for Luminant Generation Company LLC. This information was not publicly available for the previous March 31, 2016 Modeling Report conducted by Wingra Engineering. Based on the AECOM report, this report used the following updated inputs: 1) stack location, height, and diameter; 2) building locations and dimensions; and 3) hourly emission rates, stack temperatures and stack exit velocities for the 2013-15 period.

<u>1) Specific stack location, height, and diameters.</u>

In the March 31, 2016 Modeling Report, Stack locations were obtained from facility permits and prior modeling files provided by the Texas Commission on Environmental Quality. The stack locations and diameters were then verified using aerial photographs. This report uses <u>stack location,</u>

height, and diameters from AECOM's analysis. Any discrepancy has negligible impacts on modeled design values.

2) Building locations, dimensions, and downwash.

In the March 31, 2016 Modeling Report, no building dimensions were publicly available, so downwash was not included. The availability of specific building locations and dimensions, as provided by AECOM, allowed for evaluation of aerodynamic downwash. As shown below, however, downwash effects were insignificant.

3) Adjustments to hourly emission rates, stack temperatures and stack exit velocities.
As noted, the March 31, 2016 Modeling Report used actual hourly emissions and estimated variable hourly exit velocities based on flow rate and heat input information provided by USEPA Clearinghouse and CAMD databases. Because stack temperature data was not publicly available, the March 31, 2016 Modeling Report conservatively estimated a constant temperature.

For this supplemental report, the actual hourly emission rates, stack temperatures, and stack exit velocities for 2013-15, were derived from the station continuous emissions monitoring (CEM) system, as reported by AECOM, and from USEPA Clearinghouse and CAMD databases for the period of 2016-18

**Actual hourly emissions**. For the years 2013 through 2015, this report uses actual hourly CEM emission rates, as reported by AECOM. Because Sierra Club does not have access to subsequent year of Luminant's CEM data, actual hourly emissions were taken from USEPA's *Clean Air Markets Program Database*.[8]

**Actual hourly temperatures**. Similarly, for the years 2013 through 2015, this report used the actual hourly CEM temperature measurements from AECOM. Those CEM measurements were then used to derive an average stack outlet temperature for each of the three units, which was used for modeling the years 2016, 2017, and 2018. These temperatures were 352, 358 and 355 °K, respectively, which this report uses for the years 2016-18. These were significantly less than the 449 °K temperature used for the 2016 Sierra Club report.

**Actual exit velocities**. For the years 2013 through 2015, this report used the actual hourly CEM measurements of exit velocity, as reported by AECOM. To derive exit velocities for 2016 through 2018, the hourly CEM measurements of exit velocities for 2013-15 were combined with concurrent heat input obtained from the USEPA Air Markets Program Data to derive a relationship between exhaust gas flow rate and heat input for the three units. This value of 16,359 standard cubic feet per mmbtu heat input was applied to the hourly heat input for each unit during the 2016-18 period

---

[8] http://ampd.epa.gov/ampd/

obtained from the USEPA Air Markets Program Data to determine the hourly exit velocity. As reflected below, the use of Luminant's own actual emissions, temperature, and exit velocity data (as provided by AECOM for 2013-15 and applied to 2016-18 EPA CAMD data) demonstrate significant increases in total predicted $SO_2$ concentration. This is likely due to lower actual stack temperatures and exit velocities, which result in decreased dispersion and higher modeled impacts than the constant temperature used in the March 31, 2016 Modeling Report.

Air quality impacts in Texas are based on a background concentration of 7.8 $\mu g/m^3$. This is the 2016-18 design value for Austin, Texas—the lowest measured background concentration in the state.[9]  This is the most recently available design value. *See* Section 5 for further discussion of the background concentrations used for this analysis.

As shown in Table 1, the use of refined actual hourly emission, temperature, exit velocity, and building downwash parameters (derived from AECOM's modeling files) for the 2013-15 period increases the total design value concentrations from Martin Lake from 244.1 to 393.8 $\mu g/m^3$ relative to Sierra Club's March 31, 2016 Modeling Report. This increase is likely due to the use of actual hourly stack temperatures and exit velocities based on the AECOM's reported CEM measurements from the Martin Lake station, instead of the values which were extrapolated from the USEPA Air Markets Program Data for the March 31, 2016 Modeling Report. The average temperatures for the 2013-15 period were calculated to be 352, 358 and 355 °K, respectively. These are significantly less than the 449 °K temperature used for the 2016 Sierra Club report. The lower plume temperatures would provide less dispersion of the emissions. Additionally, the lower plume temperatures would decrease the flow rate and exit velocity, again providing less dispersion and therefore increasing the estimated $SO_2$ design value concentrations caused by the power plant.

*Table 1 - SO₂ Modeling Results for Martin Lake Generating Station (Receptor Grid #1)*

| Emission Rates | Averaging Period | 99th Percentile 1-hour Daily Maximum (µg/m³) | | | | Complies with NAAQS? |
|---|---|---|---|---|---|---|
| | | Impact | Background | Total | NAAQS | |
| Actual 2013-15 | 1-hour | 393.8 | 7.8 | 401.6 | 196.2 | No |
| Actual 2014-16 | 1-hour | 312.8 | 7.8 | 320.6 | 196.2 | No |
| Actual 2015-17 | 1-hour | 225.6 | 7.8 | 233.4 | 196.2 | No |
| Actual 2016-18 | 1-hour | 252.0 | 7.8 | 259.8 | 196.2 | No |

Due to EPA concerns about the March 31, 2016 Modeling Report's treatment of the Luminant "fenceline," the analysis was conducted using two modeling receptors grids. Table 1 (Receptor Grid

---

[9] https://www.epa.gov/air-trends/air-quality-design-values

*Evaluation of Compliance with the 1-hour NAAQS for SO$_2$*
*September 23, 2019*
*Page 9*

#1) includes all locations around the Martin Lake Generating Station accessible by the general public. Table 2 (Receptor Grid #2) uses a receptor grid obtained from the 2016 modeling analysis conducted by AECOM on behalf of Luminant and excludes locations assumed to be unavailable for placement of an ambient monitor. As the results from Receptor Grid #1 show (see Figure 1), the maximum modeled concentrations are not on Luminant property in any event.

***Table 2 - SO$_2$ Modeling Results for Martin Lake Generating Station (Receptor Grid #2)***

| Emission Rates | Averaging Period | 99th Percentile 1-hour Daily Maximum (µg/m$^3$) | | | | Complies with NAAQS? |
|---|---|---|---|---|---|---|
| | | Impact | Background | Total | NAAQS | |
| Actual 2013-15 | 1-hour | 388.7 | 7.8 | 396.5 | 196.2 | No |
| Actual 2014-16 | 1-hour | 311.0 | 7.8 | 318.8 | 196.2 | No |
| Actual 2015-17 | 1-hour | 209.2 | 7.8 | 217.0 | 196.2 | No |
| Actual 2016-18 | 1-hour | 238.4 | 7.8 | 246.2 | 196.2 | No |

Figure 1 shows the extent of NAAQS violations based on actual hourly emissions for the 2013-15 period using Receptor Grid #1. The greatest impact occurs 2.4 kilometers west-southwest of the station, outside the property boundary for the power plant. Modeled SO$_2$ concentrations as high as 350 µg/m$^3$ occur on public rights of way to the north, west and southwest of the plant.

Figure 2 shows the extent of NAAQS violations based on actual hourly emissions for the 2013-15 period using Receptor Grid #2. The greatest impact occurs 2.7 kilometers west-southwest of the station, outside the property boundary for the power plant. Modeled SO$_2$ concentrations as high as 350 µg/m$^3$ occur on public rights of way to the north and west of the plant. This figure also identifies the receptor locations for Receptor Grid #2 to show areas excluded from consideration.

*Evaluation of Compliance with the 1-hour NAAQS for SO₂*
*September 23, 2019*
*Page 10*



1-hour average SO2 concentrations (ug per cubic meter) - All colored areas exceed the NAAQS.

*Figure 1 - Impacts Based on Receptor Grid #1 and Hourly Emissions for the 2013-15 Period*

*Evaluation of Compliance with the 1-hour NAAQS for SO₂*
*September 23, 2019*
*Page 11*



1-hour average SO2 concentrations (ug per cubic meter) - All colored areas exeed the NAAQS.

| 196 | 300 | 350 |

*Figure 2 - Impacts Based on Receptor Grid #2 and Hourly Emissions for 2013-15 Period*

## 2.3    Evaluation of Modeling Assumptions

USEPA provided comments on several assumptions used for the March 31, 2016 Modeling Report. These comments included: 1) failure to address downwash from buildings and structures; 2) use of non-default flagpole receptors; and, 3) use of older (i.e. 1992) LULC land use files to process the meteorological data. A separate modeling analysis was conducted for the 2013-15 period to determine influence of each these assumptions on the modeling results. For each analysis, only the specific modeling assumption was changed.

Additionally, to determine the effect of using the on-site CEM measurements, the modeling analysis was re-run using the original hourly stack emissions, temperature and exit velocity file from the March 31, 2016 Modeling Report. This had been developed from the USEPA CAMD database since the CEM measurements were not publicly available at the time.

The results of this analysis of modeling assumptions are presented in Table 3. The change in the modeling results compared to the current results is provided for each assumption. The following conclusions can be reached:

1.  The incorporation of downwash did not affect the modeling results, presumably since the facility stacks are too tall to be influenced by surrounding structures. The current analysis does incorporate downwash but this change is not expected to affect the current modeling results.

2.  The use of a 1.5-meter flagpole receptor height to simulate the breathing zone of individuals increased the modeling results by only 0.05%. Flag pole receptors were not used for the current analysis so any associated increase is not included in the current modeling results.

3.  The use of older 1992 land use files to developed the meteorological data increased the modeling results 1%. More recent 2011 land use files were used to used to prepare the meteorological data so any increase associated with the 1992 files is not included in the current modeling results.

4.  Lastly, use of the original hourly stack emissions, temperature and exit velocity file from the March 2016 Modeling Report, which were derived using EPA Air Market Database and Clearing house data, reduced the modeling results by 40%, relative to the use of Luminant's CEM data from 2013-2015 (as provided by AECOM). With the adjustments described in points 1 through 3 immediately above, the modeling results for 2013-2015 were slightly lower than those originally predicted in 2016. These results are reflected in the last row of Table 3, captioned CAMD data. This analysis supports the assumption that the higher modeling results presented in the current modeling analysis are due to the use of the actual CEM measurements from the Martin Lake Steam Electric Station. It is likely that the lower temperatures and exit

velocities in these measurements reduce dispersion and increase the predicted SO$_2$ impacts.

5. The March 2016 report, *Characterization of 1-Hour SO$_2$ Concentrations in the Vicinity of the Martin Lake Steam Electric Station*, prepared by AECOM for Luminant Generation Company LLC, was performed using a combination of modeling techniques which were not approved by USEPA. These included AERLIFT and AERMOIST. AERLIFT is an AECOM-developed procedure to account for the merging of adjacent stack plumes. AERMOIST is a pre-processor which incorporates the effect of a moist plume by adjusting the input stack temperature data. The CEM measurements for plume temperature and exit velocity from Martin Lake were pre-processed for input to AERMOD. Reviewing the input files before and after pre-processing, the two programs increased the plume temperature and exit velocity. These changes to the input file are expected to improve dispersion. This may explain the reduced SO$_2$ concentration predicted by AECOM for the 2013-15 period - 187.94 µg/m$^3$ for the facility alone. The analysis presented in this report used the original CEM measurements with adjustment and predicted a facility alone impact for the same period of 393.8 µg/m$^3$.

**Table 3 - SO$_2$ Modeling Results for Martin Lake Generating Station**

| Modeling Assumption | Averaging Period | 99th Percentile 1-hour Daily Maximum (µg/m³) | | | | Change from Current Analysis |
|---|---|---|---|---|---|---|
| | | Impact | Background | Total | NAAQS | |
| Original | 1-hour | 393.8 | 7.8 | 401.6 | 196.2 | 0% |
| No Downwash | 1-hour | 393.8 | 7.8 | 401.6 | 196.2 | 0% |
| Flagpole Receptors | 1-hour | 394.0 | 7.8 | 401.8 | 196.2 | + 0.05% |
| 1992 LULC | 1-hour | 399.4 | 7.8 | 407.2 | 196.2 | + 1% |
| CAMD Hourly File | 1-hour | 232.6 | 7.8 | 240.4 | 196.2 | - 40% |

## 2.4    Comparison with Ambient Monitoring Measurements

An ambient monitor for SO$_2$ began operation on November 1, 2017 approximately 1.9 kilometers north of the station in Martin Creek Lake State Park.[10] It is identified by EPA as Site Number 484011082. Based on the modeling analysis presented in this report and the March 31, 2016 Modeling Report, the monitor is <u>not</u> located where the station has its maximum air quality impacts. However, to evaluate the accuracy of the current modeling results, this report compares the modeled 2018 results with the ambient measurements from the Martin Lake monitor.

---

[10] https://www17.tceq.texas.gov/tamis/index.cfm?fuseaction=report.view_site&siteAQS=484011082

A full year of 1-hour average ambient monitor measurements was obtained for 2018.[11] A modeling analysis was conducted for the same year to estimate maximum 1-hour average concentrations at the monitor location. A comparison of the modeling results and monitor measurements is provided in Table 4.

In general, there is reasonable agreement between the modeling results and the ambient monitor measurements. The maximum, average and standard deviation concentrations were relatively similar. The number of hours during 2018 predicted to exceed the NAAQS of 196.2 $\mu g/m^3$ were also similar. The measured maximum values were higher than the modeled results. This comparison suggests the modeling results are representative of measurements that would be obtained from an ambient monitor.

*Table 4 - Comparison of Measured and Modeled SO₂ Concentrations During 2018*

| Parameter | Ambient Monitor | Modeling Results |
|---|---|---|
| Maximum ($\mu g/m^3$) | 418 | 313 |
| Average ($\mu g/m^3$) | 6 | 5 |
| Standard Deviation ($\mu g/m^3$) | 20 | 23 |
| Hours exceeding NAAQS | 14 | 15 |

## 2.5    Conservative Modeling Assumptions

A dispersion modeling analysis requires the selection of numerous parameters which affect the predicted concentrations. For this, several parameters were selected which under-predict facility impacts.

Assumptions used in this modeling analysis which likely under-estimate concentrations include the following:

- Use of estimated stack temperature and exit velocity for the 2016 to 2018 period. Modeling results for the 2013-15 using CEM measurements for hourly temperatures and exit velocities suggest impacts are greater using actual rather than estimated temperatures and velocities.
- No consideration of off-site sources. As noted in Sierra Club's September 11, 2015 Modeling Report, including other nearby sources of SO₂, such as the H.W. Pirkey Power Plant in Hallsville, Texas, will increase the predicted impacts in the area surrounding Martin Lake.
- Air quality impacts are based on a background SO₂ concentration of 7.8 μg/m3, which is the lowest measured background concentration in the state. Given the proximity to other major

---

[11] https://aqs.epa.gov/aqsweb/airdata/download_files.html

sources of SO$_2$, the actual background concentration may be higher. Moreover, as reflected in the tables above, even assuming zero background SO$_2$ concentration, Martin Lake, by itself, causes ambient air quality levels exceeding the NAAQS for each of the 3-year periods during 2013 to 2018.

## 3.    Modeling Methodology

### 3.1    Air Dispersion Model

The modeling analysis used the most recent version of USEPA's AERMOD program, v. 18081. AERMOD, as available from the Support Center for Regulatory Atmospheric Modeling (SCRAM) website, was used in conjunction with a third-party modeling software program, *AERMOD View*, sold by Lakes Environmental Software.

### 3.2    Control Options

The AERMOD model was run with the following control options:

- 1-hour average air concentrations
- Regulatory defaults

An evaluation was conducted to determine if the modeled facility was located in a rural or urban setting using USEPA's methodology outlined in Section 7.2.3 of the Guideline on Air Quality Models.[12]  For urban sources, the URBANOPT option is used in conjunction with the urban population from an appropriate nearby city and a default surface roughness of 1.0 meter.  Methods described in Section 4.1 were used to determine whether rural or urban dispersion coefficients were appropriate for the modeling analysis.

### 3.3    Output Options

The AERMOD analysis was based on recent meteorological data.  The modeling analyses was conducted using four separate periods of sequential meteorological data: 2013-2015, 2014-2016, 2015-2017, and 2016-2018. Consistent with USEPA's Modeling Guidance for SO$_2$ NAAQS Designations, AERMOD provided a table of fourth-high 1-hour SO$_2$ impacts concentrations consistent with the form of the 1-hour SO$_2$ NAAQS.[13]

Please refer to Tables 1 and 2 for the modeling results.

---

[12] USEPA, Revision to the Guideline on Air Quality Models: Adoption of a Preferred General Purpose (Flat and Complex Terrain) Dispersion Model and Other Revisions, Appendix W to 40 CFR Part 51, November 9, 2005.
[13] USEPA, Area Designations for the 2010 Revised Primary Sulfur Dioxide National Ambient Air Quality Standards, Attachment 3, March 24, 2011, pp. 24-26.

## 4.    Model Inputs

### 4.1    Geographical Inputs

The air dispersion modeling analysis used a coordinate system for identifying the geographical location of emission sources and receptors.  These geographical locations are used to determine local characteristics (such as land use and elevation), and also to ascertain source to receptor distances and relationships.

The Universal Transverse Mercator (UTM) NAD83 coordinate system was used for identifying the easting (x) and northing (y) coordinates of the modeled sources and receptors.

The facility was evaluated to determine if it should be modeled using the rural or urban dispersion coefficient option in AERMOD.  A GIS was used to determine whether rural or urban dispersion coefficients apply to a site.  Land use within a three-kilometer radius circle surrounding the facility was considered. USEPA guidance states that urban dispersion coefficients are used if more than 50% of the area within 3 kilometers has urban land uses. Otherwise, rural dispersion coefficients are appropriate.[14]

USEPA's AERSURFACE v. 19039 was used to develop the meteorological data for the modeling analysis. This model was also used to evaluate surrounding land use within 3 kilometers of the station. Based on the output from the AERSURFACE, approximately 9% of surrounding land use around the airport was of urban land use types including Types 22, 23 and 24 which are Low, Medium and High Intensity Development.

This is less than the 50% value considered appropriate for the use of urban dispersion coefficients. Based on the AERSURFACE analysis, it was concluded that the rural option would be used for the modeling summarized in this report.  Please refer to Section 4.5.3 for a discussion of the AERSURFACE analysis.

### 4.2    Emission Rates and Source Parameters

The modeling analyses only considered SO₂ emissions from the facility. Off-site sources were not considered. Stack parameters used for the modeling analysis are summarized in Table 4.

Model inputs were obtained from the March 2016 report, *Characterization of 1-Hour SO2 Concentrations in the Vicinity of the Martin Lake Steam Electric Station*, prepared by AECOM for

---

[14] USEPA, Revision to the Guideline on Air Quality Models: Adoption of a Preferred General Purpose (Flat and Complex Terrain) Dispersion Model and Other Revisions, Appendix W to 40 CFR Part 51, November 9, 2005, Section 7.2.3.

*Evaluation of Compliance with the 1-hour NAAQS for SO$_2$*
*September 23, 2019*
*Page 17*

Luminant Generation Company LLC. Inputs included: 1) stack location, height and diameter; 2) building locations and dimensions; and 3) hourly emission rates, stack temperatures and stack exit velocities for the 2013-15 period. The availability of the building locations and dimensions allowed for evaluation of aerodynamic downwash. The hourly emission rates, stack temperatures and stack exit velocities were derived from the station continuous emissions monitoring (CEM) system.

The hourly CEM measurements of temperature for operating hours for each unit during 2013-2015 were used to derive an average stack outlet temperature for each of the three units. This average temperature was then used for modeling the 2016-2018 period. These temperatures were 352, 358 and 355 °K, respectively. These were significantly less than the 449 °K temperature used for the 2016 Sierra Club report.

The hourly CEM measurements of exit velocities for 2013-2015 were combined with concurrent heat input obtained from the USEPA Air Markets Program Data to derive a relationship between exhaust gas flow rate and heat input for the three units. This value of 16,359 standard cubic feet per mmbtu heat input was applied to the hourly heat input for each unit during the 2016-2018 period obtained from the USEPA Air Markets Program Data to determine the hourly exit velocity.

*Table 4 – Facility Stack Parameters*

| Facility | Martin Lake | | |
|---|---|---|---|
| Stack | S01 | S02 | S03 |
| Description | Unit 1 | Unit 2 | Unit 3 |
| X Coord. [m] | 351999 | 352041 | 352084 |
| Y Coord. [m] | 3570400 | 3570309 | 3570217 |
| Base Elevation [m] | 95.01 | 95.01 | 95.01 |
| Release Height [m] | 137.77 | 137.77 | 137.77 |
| Inside Diameter [m] | 7.01 | 7.01 | 7.01 |
| Gas Exit Temperature [°K] [15] | 352 | 358 | 355 |
| Gas Exit Temperature [°K] | Hourly Values | | |
| Gas Exit Velocity [m/s] | | | |
| Actual Emission Rate [g/s] | | | |

## 4.3    Building Dimensions and GEP

Building locations and dimensions were obtained from the March 2016 report, *Characterization of 1-Hour SO2 Concentrations in the Vicinity of the Martin Lake Steam Electric Station*, prepared by AECOM for Luminant Generation Company LLC. The availability of the building locations and dimensions allowed for evaluation of aerodynamic downwash.

---

[15] Fixed exit temperatures were only used for the 2016-18 period.

## 4.4    Receptors

For Martin Lake Generating Station, two receptor grids were employed. Receptor Grid #1 included all locations around the Martin Lake Generating Station accessible by the general public. The 13,061 receptors distributed as follows:

1. A 100-meter Cartesian receptor grid centered on Martin Lake Generating Station and extending out 5 kilometers.
2. A 500-meter Cartesian receptor grid centered on Martin Lake Generating Station and extending out 10 kilometers.
3. A 1,000-meter Cartesian receptor grid centered on Martin Lake Generating Station and extending out 25 kilometers. The March 31, 2016 Modeling Report used a receptor grid extending out 50 kilometers, which is the maximum distance accepted by USEPA for the use of the AERMOD dispersion model.[16] To address EPA's concerns about the size of the receptor grid, this report uses a 25 kilometer grid. The use of different sized receptor grids is irrelevant because, as the modeling demonstrates, all of the maximum impacts are well within 25 kilometers of the plant.

Elevations for Receptor Grid #1 receptors were obtained from National Elevation Dataset (NED) GeoTiff data. GeoTiff is a binary file that includes data descriptors and geo-referencing information necessary for extracting terrain elevations. These elevations were extracted from 1 arc-second (30 meter) resolution NED files. The USEPA software program AERMAP v. 18081 is used for these tasks.

Receptor Grid #2 was obtained from the 2016 modeling analysis conducted by AECOM on behalf of Luminant. The 14,893 receptors extend out 50 kilometers from the station but exclude locations assumed to be unavailable for placement of an ambient monitor.

## 4.5    Meteorological Data

To ensure the accuracy of the modeling analysis, recent meteorological data for the 2013-2018 period were prepared using the USEPA's program AERMET which creates the model-ready surface and profile data files required by AERMOD.   Required data inputs to AERMET included surface meteorological measurements, twice-daily soundings of upper air measurements, and the micrometeorological parameters surface roughness, albedo, and Bowen ratio.   One-minute ASOS

---

[16] USEPA, Revision to the Guideline on Air Quality Models: Adoption of a Preferred General Purpose (Flat and Complex Terrain) Dispersion Model and Other Revisions, Appendix W to 40 CFR Part 51, Section A.1.(1), November 9, 2005.

data were available so USEPA methods were used to reduce calm and missing hours.[17] The USEPA software program AERMINUTE v. 15272 is used for these tasks.

This section discusses how the meteorological data was prepared for use in the 1-hour SO$_2$ NAAQS modeling analyses. The USEPA software program AERMET v. 18081 is used for these tasks.

### 4.5.1   Surface Meteorology

Surface meteorology was obtained for Longview Texas Regional Airport located near the Martin Lake Generating Station. Integrated Surface Hourly (ISH) data for the 2013-2018 period were obtained from the National Climatic Data Center (NCDC).   The ISH surface data was processed through AERMET Stage 1, which performs data extraction and quality control checks.

### 4.5.2   Upper Air Data

Upper-air data are collected by a "weather balloon" that is released twice per day at selected locations.   As the balloon is released, it rises through the atmosphere, and radios the data back to the surface.   The measuring and transmitting device is known as either a radiosonde, or rawindsonde. Data collected and radioed back include:   air pressure, height, temperature, dew point, wind speed, and wind direction.   The upper air data were processed through AERMET Stage 1, which performs data extraction and quality control checks.

For Martin Lake Generating Station, the concurrent 2013-2018 upper air data from twice-daily radiosonde measurements obtained at the most representative location were used.   This location was the Shreveport, Louisiana measurement station. These data are in Forecast Systems Laboratory (FSL) format and were downloaded in ASCII text format from NOAA's FSL website.[18]   All reporting levels were downloaded and processed with AERMET.

### 4.5.3   AERSURFACE

AERSURFACE is a program that extracts surface roughness, albedo, and daytime Bowen ratio for an area surrounding a given location.   AERSURFACE uses land use and land cover (LULC) data in the U.S. Geological Survey's National Land Cover Dataset to extract the necessary micrometeorological data.   The current version of AERSURFACE v. 13016, is designed to use 1992 LULC files. To account for recent land use surrounding the airport, the beta version of AERSURFACE v. 19039 was used with National Land Cover Database for 2011 including land cover, canopy and impervious surfaces.

---

[17] USEPA, Area Designations for the 2010 Revised Primary Sulfur Dioxide National Ambient Air Quality Standards, Attachment 3, March 24, 2011, p. 19.
[18] Available at: http://esrl.noaa.gov/raobs/

AERSURFACE was used to develop surface roughness, albedo, and daytime Bowen ratio values in a region surrounding the meteorological data collection site. AERSURFACE was used to develop surface roughness in a one-kilometer radius surrounding the data collection site. Bowen ratio and albedo were developed for a 10-kilometer by 10-kilometer area centered on the meteorological data collection site. These micrometeorological data were processed for seasonal periods using 30-degree sectors. Seasonal moisture conditions were considered average with winter months having no continuous snow cover.

### 4.5.4   Data Review

Missing meteorological data were not filled as the data file met USEPA's 90% data completeness requirement.[19]  The AERMOD output file shows there were 0.9% missing data across the entire 2013-18 meteorological period.

To confirm the representativeness of the airport meteorological data, the surface characteristics of the airport data collection site and the modeled source location were compared. Since the Longview Texas Regional Airport is located close to Martin Lake Generating Station, this meteorological data set was considered appropriate for this modeling analysis. [20] Additionally, this weather station provided high quality surface measurements, and had similar land use, surface characteristics, terrain features and climate.

Finally, TCEQ provides pre-processed meteorological data suitable for modeling for each county.[21] For Rusk County, TCEQ recommends using data from the same surface and upper air stations used for this modeling analysis. The TCEQ data were not used for this project because they had not been processed using the latest versions of USEPA modeling software.

## 5.    Background SO$_2$ Concentrations

Background concentrations were determined consistent with USEPA's Modeling Guidance for SO$_2$ NAAQS Designations.[22, 23]  To preserve the form of the 1-hour SO$_2$ standard, based on the 99th percentile of the annual distribution of daily maximum 1-hour concentrations averaged across the number of years modeled, the background fourth-highest daily maximum 1-hour SO$_2$ concentration

---

[19] USEPA, Meteorological Monitoring Guidance for Regulatory Modeling Applications, EPA-454/R-99-05, February 2000, Section 5.3.2, pp. 5-4 to 5-5.
[20] USEPA, AERMOD Implementation Guide, March 19, 2009, pp. 3-4.
[21] Texas Commission on Environmental Quality, Meteorological Data for Refined Screening with AERMOD, http://www.tceq.texas.gov/permitting/air/modeling/aermod-datasets.html, Last updated November 22, 2013.
[22] USEPA, Area Designations for the 2010 Revised Primary Sulfur Dioxide National Ambient Air Quality Standards, Attachment 3, March 24, 2011, pp. 20-23.
[23] USEPA, SO$_2$ NAAQS Designations Modeling Technical Assistance Document, August 2016, DRAFT.

was added to the modeled fourth-highest daily maximum 1-hour $SO_2$ concentration.[24]  The background concentration was based on the lowest 2016-2018 design value measured by the ambient monitors located in Texas.[25]  This was 7.8 $\mu g/m^3$ as measured by the monitor located in Travis County. The design values for prior years were slightly higher.

The original 2016 modeling analysis performed by Wingra Engineering used a background concentration from the El Paso, Texas monitoring station for the 2012-14 period. For that time period, it was the lowest reported design value in the state. For the 2016-18 period, this monitor was no longer in operation.

Aside from the Martin Lake monitor which began operation in 2017, the next closest monitor to the facility is the monitor at Longview (USEPA ID#481830001). It is 18.5 kilometers northwest the facility. The 2016-18 design value from this monitor is 96.8 $\mu g/m^3$. The design value from this monitor was not used for the background concentration to avoid double-counting impacts from the Martin Lake Steam Electric Station.

For the current analysis, exceedences of the 1-hour NAAQS for $SO_2$ were predicted regardless of the assumed background concentration.

## 6.    Reporting

All files from the programs used for this modeling analysis are available to regulatory agencies. These include analyses prepared with AERSURFACE, AERMET, AERMAP, and AERMOD.

---

[24] USEPA, Applicability of Appendix W Modeling Guidance for the 1-hour SO₂ National Ambient Air Quality Standard, August 23, 2010, p. 3.
[25] http://www.epa.gov/airtrends/values.html

# Exhibit 3

WRITTEN REPORT OF GEORGE D. THURSTON
REGARDING THE PUBLIC HEALTH BENEFITS OF EPA'S PROPOSED RULEMAKING
REGARDING BEST AVAILABLE RETROFIT TECHNOLOGY FOR TEXAS SOURCES
UNDER THE REGIONAL HAZE RULE

RE: ENVIRONMENTAL PROTECTION AGENCY,
Promulgation of Air Quality Implementation Plans; State of Texas; Regional Haze and Interstate
Transport of Pollution Affecting Visibility Federal Implemntation Plan, 82 Fed. Reg. 912
(proposed Jan. 4, 2017)
EPA Docket No.: EPA–R06–OAR–2016–0611; FRL–9955–77-Region 6

May 4, 2017

**PROFESSIONAL EXPERIENCE OF THE AUTHOR**

I am Professor of Environmental Medicine at the New York University (NYU) School of Medicine.

I have a Bachelor of Science degree in Engineering from Brown University, and a Masters and Doctorate of Environmental Health Sciences from the Harvard University School of Public Health.  I have over 30 years of subsequent experience in the evaluation of the human health effects of air pollution.  I have served on the U.S. Environmental Protection Agency's Clean Air Scientific Committee (CASAC) that advises the EPA on the promulgation of ambient air quality standards from 2007 through 2010, and I have served on the National Academy of Science's Committee on the Health Effects of Incineration from 1995 through 1999.  I have published extensively regarding the health effects of inhaled air pollutants on humans, particularly as it relates to asthma attacks, hospital admissions, and mortality, in prominent scientific journals, such as <u>Science,</u> <u>Lancet,</u> <u>Thorax,</u> and <u>The Journal of the American Medical Association</u> (JAMA).  I have also been called upon by both the U.S. House of Representatives and the U.S. Senate on multiple occasions in recent decades to provide testimony before them regarding the human health effects of air pollution, most recently on October 10, 2010. A statement of my qualifications is attached to my affidavit as Exhibit T-1.

**SUMMARY OF REPORT**

The purpose of this report is to document the adverse human health effects that are associated with exposures to air pollutants from fossil fuel-fired utility power plants generally, and in particular, the adverse human health effects that will be avoided by the application of EPA's proposed sulfur dioxide ($SO_2$) emission limits for 18 individual electric generating units (EGU) at nine power plants in Texas.

This report documents how emissions from these 18 EGUs contribute to the serious and well-documented adverse human health effects known to be associated with exposure to air pollution from fossil fuel-fired power plants.  The documentation I present confirms this conclusion, including both epidemiological and toxicological evidence that I and others have published in the medical and scientific literature.   In this work, I also rely upon the expert report submitted by Dr. Gray.  Applying this information to the U.S. EPA approved Environmental

2

Benefits Mapping and Analysis Program (BenMAP) model, I then provide calculations of the excess adverse human health impacts that would occur each year if EPA's proposed BART controls for these 18 Texas EGUs are not installed, as well as the annual economic valuation of those health impacts across 14 states.[1]

## BACKGROUND

The adverse health consequences of breathing air pollution from sources such as fossil-fuel fired utility power plants are well documented in the published medical and scientific literature. During the past decades, medical research examining air pollution and public health has shown that air pollution is associated with a host of serious adverse human health effects. This documentation includes impacts revealed by observational epidemiology, and confirmed by controlled chamber exposures, showing consistent associations between air pollution and adverse impacts across a wide range of human health outcomes.

Observational epidemiology studies provide the most compelling and consistent evidence of the adverse effects of air pollution. "Epidemiology" is literally "the study of epidemics," but includes all statistical investigations of human health and potentially causal factors of good or ill health. In the case of air pollution, such studies follow people as they undergo varying real-life exposures to pollution over time, or from one place to another, and then statistically inter-compare the health impacts that occur in these populations when higher (versus lower) exposures to pollution are experienced. In such studies, risks are often reported in terms of a Relative Risk (RR) of illness, wherein a RR =1.0 is an indication of no change in risk after exposure, while a RR>1.0 indicates an increase in health problems after pollution exposure, and that air pollution is damaging to health.

These epidemiological investigations are of two types: 1) population-based studies, in which an entire city's population might be considered in the analysis; and 2) cohort studies, in which selected individuals, such as a group of asthmatics, are considered. Both of these types of

---

[1] In April 2015, I prepared a separate report documenting the human health benefits across ten states resulting from EPA's proposed sulfur dioxide emission reductions at 14 Texas EGUs. *See* U.S. Environmental Protection Agency, Approval and Promulgation of Implementation Plans; Texas and Oklahoma; Regional Haze State Implementation Plans; Interstate Transport State Implementation Plan To Address Pollution Affecting Visibility and Regional Haze; Federal Implementation Plan for Regional Haze and Interstate Transport of Pollution Affecting Visibility; Proposed Rule, 79 Fed. Reg. 74,818 (Dec. 16, 2014), EPA Docket No. EPA-R06-OAR-2014-0754-0070.

epidemiologic studies have shown confirmatory associations between air pollution exposures and increasing numbers of adverse impacts, including:

- decreased lung function (a measure of our ability to breathe freely);
- more frequent asthma symptoms;
- increased numbers of asthma and heart attacks;
- more frequent emergency department visits;
- additional hospital admissions; and
- increased numbers of deaths.

The fact that the effects of air pollution have been shown so consistently for so many health endpoints, and in so many locales, indicates these associations to be causal.

Fine Particulate Matter (PM) is among the key air pollutants emitted from power plants that have been revealed by research to adversely affect human health. These research studies have been conducted for a wide array of geographic areas, including eastern North America. $PM_{2.5}$ air pollution has been carefully studied in recent decades. PM is composed of two major components: "primary" particles, or soot, emitted directly into the atmosphere by pollution sources, and; "secondary" particulate matter, formed in the atmosphere from gaseous pollutants, such as the sulfur oxides (SOx) and nitrogen oxides (NOx) also emitted by coal-fired power plants. After formation in the atmosphere, this secondary PM largely condenses upon the smallest existing primary particles that, collectively, represent the greatest surface area for the secondary PM to condense upon. These particles are very small, commonly having an aerodynamic diameter of less that 1.0 micrometer ($u$m) – a fraction of the diameter of a human hair. For example, after it is released from a smokestack, gaseous SOx is chemically converted in the atmosphere to become sulfate PM.

In addition to lung damage, recent epidemiological and toxicological studies of PM air pollution have shown adverse effects on the heart, including an increased risk of heart attacks. For example, when PM stresses the lung (*e.g.*, by inducing edema), it places extra burden on the heart, which can induce fatal complications for persons with cardiac problems. Indeed, for example, Peters et al. (2001) found that elevated concentrations of fine particles in the air can elevate the risk of Myocardial Infarctions (MI's) within a few hours, and extending 1 day after PM exposure. The Harvard University team found that a 48 percent increase in the risk of MI was associated with an increase of 25 $u$g/m$^3$ $PM_{2.5}$ during a 2-hour period before the onset of MI,

4

and a 69 percent increase in risk to be related to an increase of 20 $ug/m^3$ $PM_{2.5}$ in the 24-hour average 1 day before the MI onset (Peters et al., 2001). Numerous other U.S. studies have also shown qualitatively consistent acute cardiac effects, such as the Sullivan et al. (2005) study of acute myocardial infarctions in King County, Washington; the Zanobetti and Schwartz (2006) study of hospital admissions through emergency departments for myocardial infarction (ICD-9 code 410); and the Zanobetti et al. (2009) study that examined the relationship between daily $PM_{2.5}$ concentrations and emergency hospital admissions for cardiovascular causes, myocardial infarction, and congestive heart failure in 26 U.S. communities during 2000-2003.

Cardiac effects at the biological level have also been documented in both animal and human studies. Animal experiments at Harvard University by Godleski et al. (1996, 2000) indicate that exposures to elevated concentrations of ambient PM can result in cardiac related problems in dogs that had been pre-treated (in order to try to simulate sensitive individuals) to induce coronary occlusion (i.e., narrowed arteries in the heart) before exposing them to air pollution. The most biologically and clinically significant finding was that, in these dogs, the PM affected one of the major electrocardiogram (ECG) markers of heart attacks (myocardial ischemia) in humans, known as elevation of the ST segment. Cardiac effects at the biological level have been found in human studies, as well. For example, Pope et al. (1999) and Gold et al. (1999) found that PM exposure is associated with changes in human heart rate variability. Such changes in heart rate variability (HRV) may reflect changes in cardiac autonomic function and risk of sudden cardiac death. In the Pope et al. study, repeated ambulatory ECG monitoring was conducted on 7 subjects for a total of 29 person-days before, during, and after episodes of elevated pollution. After controlling for differences across patients, elevated particulate levels were found to be associated with (1) increased mean heart rate, (2) decreased SDNN, a measure of overall HRV, (3) decreased SDANN, a measure that corresponds to ultra-low frequency variability, and (4) increased r-MSSD, a measure that corresponds to high-frequency variability. This confirms, at the individual level, that biological changes do occur in heart function as a result of PM exposure, supporting the biological plausibility of the epidemiological associations between PM exposure and cardiac illnesses.

Epidemiologic research conducted on U.S. residents has indicated that acute exposure to PM air pollution is associated with increased risk of mortality. A nationwide time-series statistical analysis by the Health Effects Institute (HEI, 2003) of mortality and $PM_{10}$ air pollution in 90 cities across the US indicates that, for each increase of 10 $ug/m^3$ in daily $PM_{10}$ air pollution

concentration, there is an associated increase of approximately 0.3% in the *daily* risk of death. While a 0.3 % change in the daily death risk may seem small, it is important to realize that such added risks apply to the entire population, and accumulate day after day, week after week, and year after year, until they account for thousands of needless daily deaths from air pollution in the U.S. each year.  Indeed, I concur with the most recent U.S. EPA Particulate Matter Integrated Science Assessment (ISA) (USEPA, 2009), which unequivocally states that "Together, the collective evidence from epidemiologic, controlled human exposure, and toxicological studies is sufficient to conclude that *a causal relationship exists between short term exposures to* $PM_{2.5}$ *and cardiovascular effects . . . and mortality.*"[2]

In addition to the acute health effects associated with daily PM pollution, the long-term exposure to fine PM is also associated with increased lifetime risk of death and has been estimated to take years from the life expectancy of people living in the most polluted cities, relative to those living in cleaner cities.  For example, in the Six-Cities Study (which was one key basis for the setting of the original $PM_{2.5}$ annual standard in 1997), Dockery et al. (1993) analyzed survival probabilities among 8,111 adults living in six cities in the central and eastern portions of the United States during the 1970's and 80's.  The cities were: Portage, WI (P); Topeka, KS (T); a section of St. Louis, MO (L); Steubenville, OH (S); Watertown, MA (M); and Kingston-Harriman, TN (K).  Air quality was averaged over the period of study in order to study long-term (chronic) effects.  As shown in Figure 1, it was found that the long-term risk of death, relative to the cleanest city, increased with fine particle exposure, even after correcting for potentially confounding factors such as age, sex, race, smoking, etc.

In addition, a study that I wrote with co-authors, published in the Journal of the American Medical Association (JAMA), shows that long-term exposure to combustion-related fine particulate air pollution is an important environmental risk factor for cardiopulmonary and lung cancer mortality.  Indeed, as shown in Figure 2, this study indicates that the increase in risk of lung cancer from long-term exposure to $PM_{2.5}$ in a city like New York was of roughly the same size as the increase in lung cancer risk of a non-smoker who breathes passive smoke while living with a smoker, or about a 20% increase in lung cancer risk. *See* Pope, CA, et al., 2002.

---

[2] U.S. Environmental Protection Agency (2009a) (emphasis added).



Figure 1.  The Harvard Six-Cities Study showed that the lifetime risk of death increased across 6 U.S. cities as the average fine PM levels increased. (Source: Dockery et al., 1993).



Figure 2.  Cardiopulmonary and lung cancer mortality risks increase monotonically with exposure to long-term fine PM  (adapted from: Pope, Burnett, Thun, Calle, Krewski, Ito, and Thurston, 2002)

Most studies evaluate whether rising air pollution levels worsen health, but it has also been shown that reducing pollution in the air can result in health benefits to the public.  For

7

example, Pope (1989) conducted a compelling study clearly showing that, when pollution levels diminish, the health of the general public improves.  He investigated a period during the winter of 1986-87 when the Geneva Steel mill in the Utah Valley shut down during a strike.  The PM levels dropped dramatically in that strike-year winter, as opposed to the winters preceding and following when the steel mill was in operation.  As shown in Figure 3 below, hospital admissions in the valley showed the same pattern as the PM air pollution, decreasing dramatically during the strike.  As a control, Pope also examined the pollution and hospital admissions records in nearby Cache Valley, where the mill's pollution was not a factor, and no such drop in respiratory admissions was seen, showing that the drop in admissions in the Utah Valley was not due to some cause other than the reduction in the air pollution levels.



Figure 3.  Decreasing PM pollution lowered the number of children's hospital admissions (Source: Pope, 1989).

These studies of the health improvements associated with decreases in $PM_{2.5}$ pollution show that any reduction can be expected to result in commensurate health benefits to the public at ambient levels, even where the National Ambient Air Quality Standards (NAAQS) are already met.  A follow-up analysis of the Harvard Six-Cities Study cohort discussed earlier (Dockery et al., 1993), published in the March 15, 2006 issue of The American Journal of Respiratory and Critical Care Medicine (Laden et al., 2006), shows that mortality is decreased by lowering PM pollution.  This study was carried out in the same six metropolitan areas evaluated in the earlier study, study participants' ages ranged from 25 to 74 at enrollment in 1974, and the scientists tracked both PM air pollution and mortality through 1998 in these populations.  The Laden study

found that improved overall mortality (i.e., a risk ratio significantly below 1.0) was associated with decreased mean $PM_{2.5}$ over the study follow-up time (RR = 0.73; 95% per 10 $\mu g/m^3$, CI = 0.57-0.95).  In other words, for each decrease of 1 $\mu g/m^3$ of $PM_{2.5}$, the overall death rate from causes such as cardiovascular disease, respiratory illness and lung cancer decreased by nearly 3% (i.e., 10 $\mu g/m^3$ x 2.7% = 27% decrease, or RR=0.73).  The study also found that people who are exposed to lower pollution live longer than they would if they were exposed to higher pollution.  Francine Laden, the study's lead author, explained its key findings in the March 21, 2006 issue of the New York Times: "For the most part, pollution levels are lower in this country than they were in the 70's and 80's," and "the message here is that if you continue to decrease them, you will save more lives."[3] "Consistently," Dr. Laden said, "in the cities where there was the most cleanup, there was also the greatest decrease in risk of death."

Although the Laden study took place in urbanized areas, the same principle can be applied in more rural areas where the air is more pristine: higher concentrations of $PM_{2.5}$, even at very low overall levels, are associated with greater health risks.  Indeed, a more recent Canadian national-level cohort study, Crouse et al. (2012), has shown that the adverse effects of air pollution extend down to very low levels of $PM_{2.5}$.  These investigators calculated hazard ratios (i.e., risk ratios) and 95% confidence intervals (CIs), adjusted for available individual-level and contextual covariates, finding a relative risk (or hazard ratio) of 1.30 (95% CI: 1.18, 1.43) for cardiovascular mortality from Cox proportional hazards survival models with spatial random-effects.  Figure 4, taken from the Crouse study, illustrates the finding that mortality risk decreases with decreasing levels of $PM_{2.5}$, even at ambient $PM_{2.5}$ levels down to 1 $\mu g/m^3$.

---

[3] Nicholas Bakalar, *Cleaner Air Brings Drop in Death Rate*, New York Times (Mar. 21, 2006), pg F7.



Figure 4.  Cardiovascular Mortality Risk vs. $PM_{2.5}$ exposure (solid line) and 95% CIs (dashed lines), showing increasing risk of death with increasing $PM_{2.5}$, even at very low ambient levels of $PM_{2.5}$ air pollution (from Crouse et al., 2012).

Similarly, my own research has verified (as shown in Figure 5) that the association between $PM_{2.5}$ air pollution and cardiovascular mortality extends down to very low $PM_{2.5}$ concentration levels in the US as well (Thurston et al, 2016).  Importantly, this study is highly regarded, as it was conducted in a well characterized and large US population: the National Institutes of Health – American Assoiation of Retired Persons (NIH-AARP) Diet and Health Study cohort. The NIH-AARP Study was initiated when members of the AARP, aged 50 to 71 years from 6 US states (California, Florida, Louisiana, New Jersey, North Carolina, and Pennsylvania) and 2 metropolitan areas (Atlanta, Georgia, and Detroit, Michigan), responded to a mailed questionnaire in 1995 and 1996.  The NIH-AARP cohort questionnaires elicited information on demographic and anthropometric characteristics, dietary intake, and numerous health-related variables (e.g., marital status, body mass index, education, race, smoking status, physical activity, and alcohol consumption), that was used to control for these factors in the air pollution mortality impact assessment.

10



Figure 5. Mortality Risk from Cardiovascular Disease Increases with Rising PM2.5 Exposure, Even Well Below the Present US Ambient Air Quality Standard annual limit for PM2.5 (12 µg/m3). Thurston *et al.*, 2016a.

Although published too late to be considered by the U.S. EPA in their 2013 standard setting process, the Crouse et al. (2012) and Thurston et al. (2016a) results indicate that the mortality effects of $PM_{2.5}$ air pollution can occur at even lower ambient air pollution levels than shown by Pope et al. 2002, and even lower levels than that at which the U.S. EPA assumed the effects of $PM_{2.5}$ to exist in its 2012 Regulatory Impact Assessment for the revised annual PM NAAQS (U.S. EPA, 2012). These results confirm that, even in places where background air is relatively clean, small changes in air pollution concentration can have population health impacts.

As these studies show, there is no convincing evidence to date showing that there is any threshold below which such adverse effects of PM air pollution will not occur. This lack of a threshold of effects indicates that any reduction in air pollution can be expected to result in commensurate health benefits to the public at ambient levels.

With respect to PM$_{2.5}$ from power plants, my recent studies, and those by others, have also found that long-term exposure to combustion-related fine particulate air pollution is a particularly important environmental risk factor for cardiopulmonary and lung cancer mortality. Air pollutants associated with fossil fuel combustion (e.g., from oil, coal, and natural-gas-fired power plants) have well-documented adverse human health effects. The health impact is particularly high for particulate matter from fossil-fuel-burning facilities, such as coal burning, which has been associated with an ischemic heart disease mortality risk that is roughly five times that of the average for PM$_{2.5}$ particles in general (Thurston *et al.*, 2016b), and more damaging per µg/m$^3$ than PM$_{2.5}$ from other common sources (Figure 6).



Figure 6. Concentration-response curve (solid lines) and 95% confidence intervals (dashed lines) for source-specific PM$_{2.5}$ mass in the US American Cancer Society (ACS) Cohort. (Thurston et al., 2016b).

Thus, this new study, combined with past studies of US mortality and source-specific $PM_{2.5}$ (e.g., Ozkaynak and Thurston, 1987) indicate that the estimates provided here are conservative underestimates of the health benefits that would result from these proposed emissions controls, because the particles resulting from coal-combustion that will be eliminated are apparently far more toxic to human health than the average $PM_{2.5}$ mass, when considered on per $\mu g/m^3$ mass basis.  Thus, by assuming in this report that the toxicity of the particles controlled are the of same toxicity as other particles (including, for example, wind blown soil), the estimates provided for the numbers and monetary valuations of the human health benefits of the BART controls are very conservative.

Sulfur oxide (SOx) exposures have also been associated with adverse health effects, in addition to leading to the secondary formation of $PM_{2.5}$ in the atmosphere.  As concluded in the most recent U.S. EPA Risk and Exposure Assessment Report for $SO_2$ (EPA-452/R-09-007), research studies have provided scientific evidence that is sufficient to infer a similar relationship to also exist between short-term (e.g., daily) $SO_2$ exposure and adverse effects on the respiratory system. This finding of a causal relationship between $SO_2$ exposure and increased respiratory morbidity is supported by a large body of recent epidemiologic evidence, as well as by findings from human and animal experimental studies. These epidemiologic and experimental studies encompass a number of endpoints, including ED visits and hospitalizations, respiratory symptoms, airway hyperresponsiveness, and lung function (U.S. EPA, 2009).

Overall, there is a consistency between the epidemiologic study associations and experimental study results, supporting the conclusion that 1) there is indeed a cause-effect relationship between air pollution and negative health effects; and, 2) there is no known threshold below which no effects are experienced.  Thus, reductions in air pollution result in commensurate improvements in public health, as provided in this report.

**METHODS**

The U.S. EPA-approved Environmental Benefits Mapping and Analysis Program (BenMAP) is a Windows-based computer program that uses a Geographic Information System (GIS)-based method to estimate the health impacts and economic benefits occurring when populations experience changes in air quality (Abt Associates, 2010; U.S. EPA, 2015). Analysts have relied upon BenMAP to estimate the health impacts from air quality changes at the city and regional scale, both within and beyond the U.S. A copy of my BenMAP certification is attached as Exhibit T-2. Some of the purposes for which BenMAP has been used include the following:

• Generation of population/community level ambient pollution exposure maps;

• Comparison of benefits across multiple regulatory programs;

• Estimation of health impacts associated with exposure to existing air pollution concentrations;

• Estimation of health benefits of alternative ambient air quality standards.

BenMAP is primarily intended as a tool for estimating the health impacts, and associated economic values, associated with changes in ambient air pollution, as we apply it here. It accomplishes this by computing health impact functions that relate a change in the concentration of a pollutant with a change in the incidence of a health endpoint.

Inputs to health impact functions in this work included:

• The change in ambient air pollution level (as provided by Dr. Andrew Gray, of Gray Sky Solutions);

• Pollutant health effect estimates (based upon the scientific literature and present EPA practice);

• The exposed population, on a county basis, as provided in the BenMAP model; and,

• The baseline incidence rate of the health endpoint, on a county basis, as provided in the BenMAP model.

For example, in the case of a premature mortality health impact function, the BenMAP calculation can be represented, in a simplified form, as:

**Mortality Change = (Air Pollution Change) \* (Air Pollution Mortality Effect Estimate) \* (Mortality Incidence)\* (Exposed Population)**

• **Air Pollution Change**. The air quality change is calculated as the difference between the starting air pollution level, also called the baseline, and the air pollution level after

14

some change, such as that caused by a regulation. In the case of particulate matter, this is typically estimated in micrograms per meter cubed ($\mu g/m^3$). In this analysis, these concentrations were provided on a county-by-county population weighted centroid basis.

• **Mortality Effect Estimate**. The mortality effect estimate is an estimate of the percentage change in mortality due to a one unit change in ambient air pollution. Epidemiological studies provide a good source for effect estimates.[4] In this Report, since the choice of mortality effect study has such a large influence on the valuation of the adverse health impacts avoided by applying EPA's proposed emission limits, I have presented (in Table 1) several BenMAP estimates for the mortality effect estimate, ranging from the lower end of estimates (Krewski et al., 2009), the higher end (Laden et al, 2007), and an intermediate estimate (Lepeule et. al, 2012). However, for breakdowns in adverse effects, in order to show the distribution of the effects benefits of EPA's proposed BART controls (e.g., between states, power plants, or metropolitan areas, as in Tables 2-4), I present results using only the low mortality effect estimate (Krewski et al, 2009) to simplify comparisons. This conservative (lowest benefit estimate) choice of the ACS Cohort studies to evaluate mortality benefits of EPA's proposed emissions reductions is consistent with the estimate used by EPA in the agency's prior nationwide analysis of the health benefits of Best Available Retrofit Technology determinations under the Regional Haze Regulations.[5] This choice of a specific mortality study does not affect the *relative* comparisons between states, power plants, etc., which would remain the same irrespective of mortality effect estimate choice. It should be noted that, if I instead used the higher mortality per $\mu g/m^3$ $PM_{2.5}$ effect estimates from the other two studies in Table 1 (which are also scientifically supportable), the dollar valuation of health benefit estimates in Tables 2 thru 4 would be approximately 2.2 times higher using the Lepeul et al. study mortality effect estimate, or approximately 2.8 times higher using the Laden et al. study mortality effect estimate, across the board. However, the ratios of the *relative* impacts across categories would be unaffected by the choice of mortality

---

[4] When multiple epidemiological studies are available in BenMAP for a health outcome, multi-study pooled estimates have been made, following recent EPA practice (e.g., USEPA, 2012), and as delineated in Table 1.
[5] EPA, Regulatory Impact Analyis for Final Clean Air Visibility Rule of the Guidelines for Best Available Retrofit Technology (BART) Determinations Under the Regional Haze Regulations, EPA-452/R-05-004 (June 2005), *available at* http://www.epa.gov/oar/visibility/pdfs/bart_ria_2005_6_15.pdf.

impact study effect estimate.

• **Mortality Incidence**. The mortality incidence rate is an estimate of the average number of people that die in a given population over a given period of time, as provided in BenMAP. For example, the mortality incidence rate might be the probability that a person will die in a given year.

• **Exposed Population**. The exposed population is the number of people affected by the air pollution reductions required under EPA's BART proposal, based on Census data for each county within BenMAP.

For this work, population-weighted centroid $PM_{2.5}$ concentration impacts from each source in each county in the fourteen study states (Alabama, Arkansas, Colorado, Illinois, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, New Mexico, Oklahoma, Tennessee, and Texas) were determined by Andrew Gray for the (1) existing emissions; and (2) controlled emissions scenarios based on EPA's BART Proposal, respectively.  *See* Gray, Visibility and Health Modeling, Technical Support Document to Comments of Conservation Organizations (May 5, 2017), EPA Docket No. EPA-R06-OAR-2016-0611.  The arithmetic difference between the two scenario results were calculated (on a plant-by-plant and county-by-county basis) as the concentration reduction associated with the BART controls, for each plant and county in the study area modeled by Dr. Gray.  As outlined in more detail by Dr. Gray in his report, CALPUFF air dispersion modeling was used to estimate long-term (three-year modeled average) fine PM concentrations at the 837 county receptors within the CALPUFF modeling domain for both the 2001-2004 emissions baseline and for the proposed BART control emission scenario.  Postprocessing of the CALPUFF results was performed to sum the modeled sulfate, nitrate, and PM2.5 at each receptor in order to estimate the total fine PM concentration at each receptor, as contributed by each source, under both baseline and the control scenarios.] These values were entered into BenMAP to estimate the health benefits, and their dollar valuations, associated with EPA's BART controls on a county-by-county basis for each of nine electrical generating power plant sources.  The results for the nine power plants proposed for BART control by the EPA  were then summed on a cumulative basis (Table 1, with both numbers and valuations, by cause).  Furthermore, to allow an indication of the plant-by-plant and spatial distribution of the health and economic benefits from EPA's BART proposal, the health benefit valuations (summed over all causes, as dollars) were also calculated on a state-by-state (Table 2),

16

plant-by-plant (Table 3), and metropolitan area-specific (Table 4) basis, providing insight into the relative health impacts by specific sources to specific areas benefitting from the pollution control FIP. The Appendix to this report provides a complete breakdown of the annual health benefits associated with the application of EPA's proposed emission limits by individual power plant and health effect.

## RESULTS

Using the above-described EPA BenMAP methodology-based analysis, I conservatively estimate the total public health-based economic benefits associated with reductions in ambient $PM_{2.5}$ concentrations as a result of applying EPA's BART control determinations to the 18 individual Texas EGUs (as displayed in Table 1 for all nine electric generating stations, and all states considered, combined) to be between roughly $6.7 billion and nearly $17 billion per year, overall, primarily depending on the epidemiological study used to determine the $PM_{2.5}$ mortality impacts (*i.e.,* Krewski et al. (low)*,* Lapieule et al. (mid)*,* or Laden et al. (high)). These impacts reflect the range of potential mortality effects associated with the proposed EPA FIP, depending on the particular study used to estimate the effect per $\mu g/m^3$ $PM_{2.5}$ exposure. Further breakdowns of Table 1's estimates using only the Krewski et al. study (*i.e.*, the low mortality effect estimate) to estimate total mortality impacts are provided in Tables 2 through 4 of this report: *i*) by electric generating power plant (i.e., for each of the nine power plants over all areas modeled by Dr. Gray); *ii*) for all power plant generating unit impacts collectively by State of impact (i.e., in Alabama, Arkansas, Colorado, Illinois, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, New Mexico, Oklahoma, Tennessee, and Texas); and, *iii*) for all power plant generating unit impacts collectively by major metropolitan impact area.

As seen in Table 1, the numbers of adverse health events avoided by application of EPA's proposed $SO_2$ emission limits are dominated by the morbidity events, such as respiratory symptoms, restricted activity days, and work loss days. In contrast, the dollar valuation of the adverse health events are largely dominated, as would be expected, by the more severe health outcomes, including myocardial infarctions (heart attacks), chronic bronchitis, and (especially) deaths. As shown in Table 2, on a state-by-state basis, the largest health benefits go to the state in which the power plants are operating (Texas), but, because this pollution can be carried so far downwind, nearly one half of the health benefits would accrue in other (downwind) states. On a power plant basis (Table 3), it is seen that large health benefits are derived from controlling each

17

the nine plants EPA proposes to regulate under this FIP, with the greatest benefits being derived from controlling the Big Brown, Martin Lake, and Monticello plants. Table 4 makes clear that urban areas in Texas would receive the largest health benefits from the proposed BART emission controls at these generating stations, but that the benefits stretch long distances downwind, with still very large health benefits in cities as far away as Illinois.

Table 1. Annual Multi-State Human Health Effects and Monetary Valuations Associated With the $PM_{2.5}$ Air Pollution Avoided by Applying EPA's Proposed BART Controls for Texas Sources

| Health Endpoint | Expected Number Per Year Avoided* | Total Dollar Valuation (2010$)** |
|---|---|---|
| Respiratory Hospital Admissions (Kloog et al., 2012; Zanobetti et al., 2009) | 125[a] | $3,966,000 |
| Cardiovascular Hospital Admissions (Bell et al., 2008; Peng et al., 2008; Peng et al., 2009; Zanobetti et al., 2009) | 125[a] | $4,733,000 |
| Acute Bronchitis (Dockery et al., 1996) | 1317 | $633,000 |
| Acute Myocardial Infarction, Nonfatal (Pope et al., 2006; Sullivan et al., 2005; Zanobetti et al., 2009; Zanobetti & Schwartz, 2006) | 80[b] | $10,094,000[a] |
| Emergency Room Visits (Glad et al., 2012; Mar et al., 2010; Slaughter et al., 2005) | 381[b] | $162,000[a] |
| Asthma Exacerbation Symptoms (Mar et al., 2004; Ostro et al., 2001) | 24,818[b] | $1,434,000 |
| Upper Respiratory Symptoms (Pope et al., 1991) | 23,915 | $795,000 |
| Lower Respiratory Symptoms (Schwartz and Neas, 2000) | 16,767 | $352,000 |
| Minor Restricted Activity Days (Ostro & Rothschild, 1989) | 625,525 | $42,754,000 |
| Work Days Lost (Ostro et al., 1987) | 105,853 | $15,803,000 |
| Chronic Bronchitis (Abbey et al., 1995) | 521 | $147,152,000[c] |
| Mortality, All Causes (Krewski et. al, 2009) | 678 | $6,518,235,000 |
| Mortality, All Causes (Lepeule et. al, 2012) | 1541 | $14,823,929,000 |
| Mortality, All Causes (Laden et al., 2007) | 1760 | $16,921,843,000 |

\* Rounded to nearest whole number.
\*\* Rounded to nearest $1000.
a Pooled effects with averaging approach, as per EPA BenMAP default setting.
b Pooled effects with random/fixed effects approach, as per EPA BenMAP default setting.
c Pooled effects with summation approach, as per EPA BenMAP default setting.

Table 2.  State-By State Total Valuation of Annual Health Benefits of EPA Proposed BART
          Controls Applied to the Nine Power Plants At Issue* (Applying Krewski et al., 2009
          for mortality)

| State | Total Dollar Valuation (2010$)** |
|---|---|
| AL | $57,080,000 |
| AR | $522,356,000 |
| CO | $5,564,000 |
| IL | $46,516,000 |
| IN | $12,432,000 |
| KS | $152,556,000 |
| KY | $35,415,000 |
| LA | $492,830,000 |
| MS | $241,108,000 |
| MO | $324,832,000 |
| NM | $38,796,000 |
| OK | $771,304,000 |
| TN | $149,283,000 |
| TX | $3,896,042,000 |
| Total | $6,746,113,000 |

* Big Brown, Coleto Creek, Fayette, Harrington, JT Deely, Martin Lake, Monticello,
Parish, and Welsh.
** Rounded to nearest $1000.

Table 3.  Plant-By Plant Total Valuation of Annual Health Benefits of EPA Proposed BART
          Controls (Applying Krewski et al., 2009 for mortality)

| Electric Generating Station | Total Dollar Valuation (2010$)* |
|---|---|
| Big Brown | $1,617,952,000 |
| Coleto Creek | $261,901,000 |
| Fayette | $495,331,000 |
| Harrington | $153,627,000 |
| JT Deely | $508,409,021 |
| Martin Lake | $1,135,234,000 |
| Monticello | $1,553,080,000 |
| Parish | $816,736,000 |
| Welsh | $203,842,000 |
| Total | $6,746,113,000 |

* Rounded to nearest $1000.

App. 1482

Table 4.  Total Valuation of Annual Health Benefits of EPA Proposed BART Controls for
Selected Metropolitan Areas  (Applying Krewski et al., 2009 for mortality)

| City (Counties) | Total Dollar Valuation All 9 Plants (2010$)* |
|---|---|
| **Austin, TX** (Hayes, Travis, Williamson) | $182,849,000 |
| **Dallas, TX** (Colin, Dallas, Ellis, Rockwall) | $623,296,000 |
| **Ft. Worth, TX** (Johnson, Tarrant) | $369,004,000 |
| **Houston, TX** (Brazoria, Chambers, Fort Bend, Galveston, Harris) | $606,467,000 |
| **San Antonio, TX** (Bexar, Comal, Guadalupe) | $325,461,000 |
| **Little Rock, AR** (Lonoke, Pulaski, Saline) | $90,863,000 |
| **Kansas City, KS** (Johnson, Wyandotte, Cass, Clay, Jackson, Platte) | $6,670,000 |
| **New Orleans, LA** (Jefferson, Orleans, Plaguemines, St. Bernard, St. Charles, St. John the Baptist) | $56,435,000 |
| **Jackson, MS** (Hinds, Madison, Rankin) | $39,942000 |
| **Oklahoma City, OK** (Canadian, Cleveland, Logan, Oklahoma) | $185,587,000 |
| **Tulsa, OK** (Creek, Osage, Tulsa, Wagoner) | $156,516,000 |
| **Nashville, TN** (Davidson, Fsumner, Williamson, Wilson | $2,911,000 |

* Rounded to nearest $1000.

In addition to reflecting a conservative (i.e., low) mortality effects estimate, these overall
health impact counts and their dollar valuations are conservative estimates of the health benefits
after the application of the proposed BART controls at the affected power plant units for a
number of reasons, including: (a) additional health impacts not modeled in this analysis
attributable to co-reductions in other pollutants (*e.g.*, gaseous $SO_2$) are not included here; (b)
consideration of health impacts only for the ages of the exposed populations that were considered
in the epidemiological studies on which these analyses were based;  (c) there are either no health
impact studies or no dollar valuation available for many health outcomes thought to be adversely
affected by air pollution, such as effects of air pollution on birth outcomes; and (d) in Tables 2-4
we have applied the low estimate of the mortality benefits (whereas applying the other two
studies noted would roughly double or triple the estimates in Tables 2-4, respectively) .  Thus,
while all air pollution control costs associated with application of EPA's proposed BART
controls can be estimated, these estimates of the health benefits and their monetary valuations are
only available for a subset of likely health impacts from air pollution.  This, in addition to prior
discussion of the likely higher toxicity of particles from coal-fired power plants, means that my
analysis is very conservative, and likely underestimates the health and monetary benefits of
applying EPA's BART  emission limits to the affected Texas power plant units.

## CONCLUSIONS

Even applying conservative estimates and assumptions, the health benefits and valuations derived from the application of EPA's BART control determination to the 9 Texas electric generating power plants at issue are substantial. Moreover, these benefits and their valuations accrue each and every year those controls are operational. Accordingly, ten years from the compliance date, the health benefits and valuations of proposed controls will be roughly ten times the values provided in Tables 1 through 4, before adjustment for a discount rate and future affected population growth, as appropriate. Similarly, these benefits and their valuations are lost (not accrued) each and every year that application of the EPA's BART controls are delayed. Thus, even a delay of just a few months carries the risk of substantial, and irreparable, harm to public health. As demonstrated above, those public health impacts have an associated and quantifiable adverse economic impact. Thus, it is reasonable to conclude that any delay implementing EPA's Regional Haze BART controls for Texas will only exacerbate the substantial, and irreparable, harms to public health that have already been incurred to date by the operation of these electric generating units.

## LITERATURE CITED

Abbey, D.E., B.E. Ostro, F. Petersen and R.J. Burchette. (1995) Chronic Respiratory Symptoms Associated with Estimated Long-Term Ambient Concentrations of Fine Particulates Less Than 2.5 Microns in Aerodynamic Diameter (PM2.5) and Other Air Pollutants. J Expo Anal Environ Epidemiol. 1995 Apr-Jun;5(2):137-59.

Abt Associates (2010). BenMAP Environmental Benefits Mapping and Analysis Program User's Manual. Prepared for the U.S. EPA Office of Air Quality Planning and Standards, RTP, NC.

Bell, M. L., K. Ebisu, et al. (2008). "Seasonal and Regional Short-term Effects of Fine Particles on Hospital Admissions in 202 US Counties, 1999-2005." American Journal of Epidemiology 168 (11): 1301-1310.

Coffin, D. L., and D. E. Gardner. 1972. Interaction of biological agents and chemical air pollutants. *Ann. Occup. Hyg.* 15:219-35.

Crouse DL, Peters PA, van Donkelaar A, Goldberg MS, Villeneuve PJ, Brion O, Khan S, Atari DO, Jerrett M, Pope CA, Brauer M, Brook JR, Martin RV, Stieb D, Burnett RT. (2012). Risk of Nonaccidental and Cardiovascular Mortality in Relation to Long-term Exposure to Low Concentrations of Fine Particulate Matter: A Canadian National Level Cohort Study. Environ Health Perspect. 2012 May;120(5):708-14.

Dockery DW, Pope CA 3rd, Xu X, Spengler JD, Ware JH, Fay ME, Ferris BG Jr, Speizer FE. (1993). An association between air pollution and mortality in six U.S. cities. N Engl J Med. 1993 Dec 9;329(24):1753-9.

Dockery, D.W., J. Cunningham, A.I. Damokosh, L.M. Neas, J.D. Spengler, P. Koutrakis, J.H. Ware, M. Raizenne and F.E. Speizer. 1996. Health Effects of Acid Aerosols On North American Children - Respiratory Symptoms. Environ Health Perspect. 1996 May;104(5):500-5.

Glad JA, Brink LL, Talbott EO, Lee PC, Xu X, Saul M, Rager J. (2012) The relationship of ambient ozone and PM(2.5) levels and asthma emergency department visits: possible influence of gender and ethnicity. Arch Environ Occup Health. 2012;67(2):103-8.

Godleski, J.J.; Sioutas, C.; Katler, M.; Catalano, P.; and Koutrakis, P. (1996)  Death from inhalation of concentrated ambient air particles in animal models of pulmonary disease. *Proceedings of the Second Colloquium on Particulate Air Pollution and Human Health*,  May 1-3, 1996, Park City, Utah.

Godleski, JJ.  (2000) Mechanisms of Morbidity and Mortality from Exposure to Ambient Air Particles.  *Health Effects Institute Research Report 91*, 2000.  Health Effects Institute. Cambridge, MA.

Gold DR, Litonjua A, Schwartz J, Lovett E, Larson A, Nearing B, Allen G, Verrier M, Cherry R, Verrier R. (2000).   Ambient pollution and heart rate variability. Circulation. Mar 21;101(11): 1267-73.

Health Effects Institute (HEI)  (2003). Revised Analyses of Time-Series Studies of Air Pollution and Health. Special Report.Health Effects Institute, Boston MA.

Kloog I, Nordio F, Zanobetti A, Coull BA, Koutrakis P, Schwartz JD. (2014). Short term effects of particle exposure on hospital admissions in the Mid-Atlantic states: a population estimate. PLoS One. 2014 Feb 7;9(2):e88578. doi: 10.1371/journal.pone.0088578. eCollection 2014.

Krewski, D. et al.  (2000). Reanalysis of the Harvard Six Cities Study and the American Cancer Society Study of Particulate Air Pollution and Mortality: Investigators' Report Part I: Replication and Validation.  2000.  Health Effects Institute, Cambridge, MA.

Krewski D., Jerrett M, Burnett R, Ma R, Hughes E, Shi Y, Turner MC, Pope CA III, Thurston G, Calle E, and Thun MJ (2009). Extended Follow-Up and Spatial analysis of the American Cancer Society Linking Particulate Air Pollution and Mortality. Health Effects Institute, Cambridge MA

Laden F, Neas LM, Dockery DW, Schwartz J. (2000). Association of fine particulate matter from different sources with daily mortality in six U.S. cities. Environ Health Perspect. 2000 Oct;108(10):941-7.

Laden F, Schwartz J, Speizer FE, Dockery DW. Reduction in Fine Particulate Air Pollution and Mortality: Extended Follow-up of the Harvard Six Cities Study. Am J Respir Crit Care Med. 2006 Mar 15;173(6):667-72.

Lamm SH, Hall TA, Engel A, Rueter FH, White LD. (1994).  $PM_{10}$ Particulates: Are they the major determinant of pediatric respiratory admissions in Utah County, Utah (1985-1989) Ann. Occup. Hyg. 38: 969-972, 1994.

Lay JC, Bennett WD, Ghio AJ, Bromberg PA, Costa DL, Kim CS, Koren HS, Devlin RB. (1999). Cellular and biochemical response of the human lung after intrapulmonary instillation of ferric oxide particles.  Am J Respir Cell Mol Biol. 1999 Apr;20(4):631-42.

Lepeule J, Laden F, Dockery D, Schwartz J. (2012). Chronic exposure to fine particles and mortality: an extended follow-up of the Harvard Six Cities study from 1974 to 2009. Environ Health Perspect. 2012 Jul;120(7):965-70.

Mar TF, Koenig JQ,  and Primomo J. (2010). Associations between asthma emergency visits and particulate matter sources, including diesel emissions from stationary generators in Tacoma, Washington. Inhal Toxicol. Vol. 22 (6): 445-8.

22

Ministry of Health of Great Britain, (1954) Report on Pub. Health and Med. Subjects: Mortality and Morbidity During the London Fog of December 1952 (Her Majesty's Stationary Office, London).

Moolgavkar, S. H. 2000a. Air Pollution and Hospital Admissions for Chronic Obstructive Pulmonary Disease in Three Metropolitan Areas in the United States. Inhalation Toxicology. Vol. 12 (Supplement 4): 75-90.

Moolgavkar, S. H. 2000b. Air pollution and hospital admissions for diseases of the circulatory system in three U.S. metropolitan areas. J Air Waste Manag Assoc. Vol. 50 (7): 1199-206.

National Research Council (NRC) (1978) *Sulfur oxides.* Committee on Sulfur Oxides, Board on Toxicology and Environmental Health Hazards, Assembly of Life Sciences. Washington, D.C

National Research Council (NRC). (1977). *Airborne Particles*, National Academy of Sciences. Subcommittee on Airborne Particles, Committee on Medical and Biological Effects of Environmental Pollutants. University Park Press, Baltimore.

New York Times (2006). "Cleaner Air Brings Drop in Death Rate." March 21, 2006, pg F7.

Ostro, B.D. (1987). Air Pollution and Morbidity Revisited: A Specification Test. Journal of Environmental Economics and Management. 14: p. 87-98.

Ostro B, and Rothschild S. (1989). Air Pollution and Acute Respiratory Morbidity: An Observational Study of Multiple Pollutants, Environmental Research 50, 238-247.

Ostro, B, Lipsett M, Mann J, Braxton-Owens H, and White M. (2001). Air pollution and exacerbation of asthma in African-American children in Los Angeles. Epidemiology. Vol. 12 (2): 200-8.

Ozkaynak H, Thurston GD. (1987). Associations between 1980 U.S. mortality rates and alternative measures of airborne particle concentration. *Risk Anal.* 1987 Dec;7(4):449-61.

Peng, R. D., H. H. Chang, et al. (2008). "Coarse particulate matter air pollution and hospital admissions for cardiovascular and respiratory diseases among Medicare patients." JAMA 299 (18): 2172-9.

Peng, R. D., M. L. Bell, et al. (2009). "Emergency admissions for cardiovascular and respiratory diseases and the chemical composition of fine particle air pollution." Environ Health Perspect 117 (6): 957-63.

Peters A, Dockery DW, Muller JE, Mittleman MA. (2001). Increased particulate air pollution and the triggering of myocardial infarction. Circulation. 2001 Jun 12;103(23):2810-5.

Pope CA 3rd. (1989). Respiratory disease associated with community air pollution and a steel mill, Utah Valley.Am J Public Health. 1989 May;79(5):623-8.

Pope, C. A., D. W. Dockery, J. D. Spengler and M. E. Raizenne. 1991. Respiratory Health and PM10 Pollution - a Daily Time Series Analysis. American Review of Respiratory Disease. Vol. 144 (3): 668-674.

Pope CA 3rd, Thun MJ, Namboodiri MM, Dockery DW, Evans JS, Speizer FE, Heath CW Jr. (1995). Particulate air pollution as a predictor of mortality in a prospective study of U.S. adults. Am J Respir Crit Care Med. 1995 Mar; 151(3 Pt 1): 669-74.

Pope, CA (1996) Particulate pollution and health: A review of the Utah Valley Experience. J. Expos. And Env. Epi. Vol 6: 23-34.

Pope CA 3rd, Verrier RL, Lovett EG, Larson AC, Raizenne ME, Kanner RE, Schwartz J, Villegas GM, Gold DR, Dockery DW. (1999). Heart rate variability associated with particulate air pollution. Am Heart J. 1999 Nov; 138(5 Pt 1):890-9.

Pope, C.A. III,  Burnett, R.T., Thun, M.J., Calle, E.E., Krewski, D., Ito, K., and Thurston, G.D.  Lung cancer, cardiopulmonary mortality and long-term exposure to fine particulate air pollution.  J. Am. Med. Assoc. (JAMA) 287(9):1132-1141 (2002).

Pope, C. A., 3rd, J. B. Muhlestein, et al. (2006). "Ischemic heart disease events triggered by short-term exposure to fine particulate air pollution." Circulation 114 (23): 2443-8.

Rodriguez, C, Tonkin R, Heyworth J, Kusel M, De Klerk N, Sly P, Franklin P, Runnion T, Blockley A, Landau L & A Hinwood (2007), The relationship between outdoor air quality and respiratory symptoms in young children, International Journal of Environmental Health Research, 17:5, 351-360.

Schwartz, J. and L.M. Neas. 2000. Fine particles are more strongly associated than coarse particles with acute respiratory health effects in schoolchildren. Epidemiology. Vol. 11 (1): 6-10.

Slaughter, J. C., E. Kim, et al. (2005). "Association between particulate matter and emergency room visits, hospital admissions and mortality in Spokane, Washington." J Expo Anal Environ Epidemiol 15(2): 153-9.

State of California (2003). Final Regulation Order for the Rulemaking To Consider Amendments to Regulations for the State Ambient Air Quality Standards for Suspended Particulate Matter and Sulfates.  Sacramento, Ca.

Sullivan, J., L. Sheppard, et al. (2005). "Relation between short-term fine-particulate matter exposure and onset of myocardial infarction." Epidemiology 16 (1): 41-8

Thurston GD, Ito K, Kinney PL, Lippmann M. A multi-year study of air pollution and respiratory hospital admissions in three New York State metropolitan areas: results for 1988 and 1989 summers. J Expo Anal Environ Epidemiol. 1992 Oct-Dec;2(4):429-50.

Thurston GD, Lippmann M, Scott MB, Fine JM. (1997). Summertime haze air pollution and children with asthma. Am J Respir Crit Care Med. 1997 Feb;155(2):654-60.

Thurston GD, Ito K, Mar T, Christensen WF, Eatough DJ, Henry RC, Kim E, Laden F, Lall R, Larson TV, Liu H, Neas L, Pinto J, Stölzel M, Suh H, and Hopke, PK. (2005).  Workshop on the Source Apportionment of Particulate Matter Health Effects: Inter-Comparison of Results and Implications.  Env. Hlth. Perspect.: 113(12):1768-74.

Thurston GD, Ahn J, Cromar K, Shao Y, Reynolds H, Jerrett M, Lim C,  Shanley R, Park Y, Hayes RB. (2016a). Ambient Particulate Matter Air Pollution Exposure and Mortality in the NIH-AARP Diet and Health Cohort. Env. Health Persp. 2016 Apr;124(4):484-90. doi: 10.1289/ehp.1509676.

Thurston GD, Burnett RT, Turner MC, Shi Y, Krewski D, Lall R, Ito K, Jerrett M, Gapstur SM, Diver WR, Pope CA. (2016b). Ischemic Heart Disease Mortality and Long-Term Exposure to Source-Related Components of U.S. Fine Particle Air Pollution. Environ Health Perspect. 2016 Jun;124(6):785-94. doi: 10.1289/ehp.1509777.

U.S. EPA (2001). AIR DATA.  National Emissions Trends (NET) Database: http://www.epa.gov/air/data/net.html

U.S. EPA. (2004). Fourth External Review Draft of Air Quality Criteria for Particulate Matter (June, 2003). EPA/600/P-99/002aD, Office of Research and Development, Washington, DC.

U.S. EPA. (2004).  Air Quality Criteria for Particulate Matter (October, 2004).  Final. EPA/600/P-99/002aF, Office of Research and Development, Washington, DC.

U.S. EPA, (2005).  Regulatory Impact Analysis for the Final Clean Air Visibility Rule or the Guidelines for Best Available Retrofit Technology (BART) Determinations Under the Regional Haze Regulations, Research Triangle Park, NC, available at: http://www.epa.gov/oar/visibility/pdfs/bart_ria_2005_6_15.pdf

U.S. Environmental Protection Agency (2009a). Integrated Science Assessment for Particulate Matter (Final Report), Washington, DC, EPA/600/R-08/139F, at 2-10, 2-11 (emphasis in original), available at http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=216546

U.S. Environmental Protection Agency (2009b). Risk and Exposure Assessment to Support the Review of the SO2 Primary National Ambient Air Quality Standards. OAQPS. EPA-452/R-09-007. RTP, NC

U.S. Environmental Protection Agency (2012). Regulatory Impact Analysis for the Proposed Revisions to the National Ambient Air Quality Standards for Particulate Matter, OAQPS, EPA-452/R-12-003. RTP, NC.

U.S. EPA. (2015). BenMAP Environmental Benefits Mapping and Analysis Program – Community Edition: User's Manual Appendices.  Prepared by RTI International.  OAQPS, RTP, NC.   http://www2.epa.gov/benmap/benmap-community-edition

Veronesi B, Oortgiesen M, Carter JD, Devlin RB. (1999).  Particulate matter initiates inflammatory cytokine release by activation of capsaicin and acid receptors in a human bronchial epithelial cell line.  Toxicol Appl Pharmacol. 1999 Jan 1;154(1):106-15.

Wilson WE, Mage DT, Grant LD. (2000). Estimating separately personal exposure to ambient and nonambient particulate matter for epidemiology and risk assessment: why and how.  J Air Waste Manag. Assoc. Jul;50(7):1167-83.

Woodruff, T. J., J. Grillo and K. C. Schoendorf. 1997. The relationship between selected causes of postneonatal infant mortality and particulate air pollution in the United States. Environmental Health Perspectives. Vol. 105 (6): 608-612.

Zanobetti A, Schwartz J. Air pollution and emergency admissions in Boston, MA.. J Epidemiol Community Health. 2006 Oct;60(10):890-5.

Zanobetti, A., M. Franklin and J. Schwartz. 2009. Fine particulate air pollution and its components in association with cause-specific emergency admissions. Environmental Health Vol. 8: 58-60.

DATED: May 4, 2017, at Chester, New York.

_____
DR. GEORGE D. THURSTON

Curriculum Vitae

**GEORGE D. THURSTON**

3 Catherine Court
Chester, NY 10918
Hm: (845) 783-1978
Wk: (845) 731-3564
Fax: (845) 351-5472
Email: george.thurston@nyu.edu
http://www.med.nyu.edu/biosketch/gdt1

**Education**

| Degree | Field | Institution |
|---|---|---|
| Diploma | Academic | Barrington High School, RI |
| Sc.B. (Honors) | Environmental Engineering | Brown University |
| A.B. | Environmental Studies | Brown University |
| S.M. | Environmental Health Sciences | Harvard Univ. Schl. of Public Health |
| Sc.D. | Environmental Health Sciences | Harvard Univ. Schl. of Public Health |

**Postdoctoral Training**

| Specialty | Mentor | Place of Training |
|---|---|---|
| Environ. Epidemiology | Dr. H. Ozkaynak | Harvard Univ., Kennedy Schl. of Gov., Camb., MA |

**Internships and Residencies** N/A

**Clinical and Research Fellowships** N/A

**Licensure and Certification**: Environmental Benefits Mapping and Analysis Program - Community Edition (BenMAP-CE) Training Certification (August 2014).

**Academic Appointments**

| | |
|---|---|
| 1987-1993 | Assistant Professor, Dept. of Environmental Medicine, New York University School of Medicine, New York City, NY. |
| 1993-2006 | Associate Professor (Tenured), Dept. of Environmental Medicine, New York University School of Medicine, New York City, NY. |
| 2007-present | Professor (Tenured), Dept. of Environmental Medicine, New York University School of Medicine, New York City, NY. |
| 2007-present | Affiliated Faculty, Environmental Studies Program, College of Arts and Sciences, New York University, New York City, NY. |
| 2012-present | Affiliated Faculty, Marron Institute on Cities and the Urban Environment, New York University, New York City, NY |
| 2012-present | Faculty Mentoring Champion, Dept. of Environmental Medicine, New York University School of Medicine, New York City, NY. |

**Hospital Appointments:** N/A

**Other Professional Positions and Visiting Appointments:**
Oak Ridge Institute for Science and Education (ORISE) Fellow (2008-2010)

## Major Administrative Responsibilities

| Year | Title, Place of Responsibility |
|------|-------------------------------|
| 1995-2004 | Director, Community Outreach and Environmental Education Program, NYU-NIEHS Center of Excellence, Nelson Inst. of Environ. Med., NYU School of Medicine, Tuxedo, NY |
| 2002-2012 | Deputy Director, NYU Particulate Matter Research Center, Nelson Inst. of Environmental Medicine, NYU School of Medicine, Tuxedo, NY |
| 2007-2008 | Director, Environmental Epidemiology Core, NYU-NIEHS Center of Excellence, Department of Environmental Medicine, Tuxedo, NY |
| 2010-2015 | Co-Leader, Metals Research Focus Group, NYU-NIEHS Center of Excellence, Department of Environmental Medicine, Tuxedo, NY. |
| 2012-2016 | Chair, Appointments and Promotions Committee, Department of Environmental Medicine, NYU School of Medicine. |
| 2014-2016 | Co-Chair, Environmental Health Research Affinity Group, NYU Global Institute of Public Health (GIPH), New York University, Washington Square. |
| 2012-present | Director, Program in Exposure Assessment and Human Health Effects, Department of Environmental Medicine, NYU School of Medicine. |

## Teaching Experience

| Year | Name of course | | Type of Teaching |
|------|---------------|--|-----------------|
| 1984-1994 | Air Poll. Transport Modeling | (G48.2048) | Course Director |
| 2006-present | Climate, Air Pollution, & Health | (G48.1010) | Course Director |
| 1986-present | Aerosol Science | (G48.2033) | Course Director |
| 1984-2010 | Environmental Contamination | (G48.2305) | Lecturer |
| 1984-present | Environ. Hygiene Measurements | (G48.2035) | Lecturer/Lab |
| 1990-1998 | Environmental Toxicology | (G48.1006) | Lecturer |
| 1993-1995 | Environmental Epidemiology I | (G48.2039) | Lecturer |
| 2001-2003 | NYU Summer Institute, Wagner School | | Lecturer |
| 2006-present | Environmental Epidemiology I | (G48.2039) | Lecturer |
| 2006-present | Science, Health & Envir. Journalism | (G54.1017.0) | Lecturer |
| 2009-2011 | Global Environmental Health | (U10.2153.1) | Course Director |
| 2009-2012 | Global Issues in Environ. Health | (G48.1011) | Course Director |
| 2009-present | Earth Systems Science (undergrad) | (V36.0200) | Lecturer |
| 2011-present | Principles of Environmental Health | (G48.1004) | Course Director |
| 2013-present | Environ. Hygiene Measurements | (G48.2035) | Course Co-Director |

## Awards and Honors

| November 1999 | Orange Environment Citizens Action Group, OE Award for Excellence in Translating Science to the Public |
|---|---|
| December 2000 | NYU School of Medicine Dean's Research Incentive Award |
| October 2012 | Recipient of the "Haagen Smit Prize" for Best Paper, <u>Atmospheric Environment</u>. http://geo.arc.nasa.gov/sgg/singh/winners12.html |
| March 2013 | Recipient of the "Best Paper of the Year – Science" Award from <u>ES&T</u> http://pubs.acs.org/doi/full/10.1021/es400924t |

## Major Committee Assignments

<u>New York University Committees</u>

2007-present:  University Sustainability Task Force
2010-2012:    University Faculty Senate Alternate
2012-present:  University Faculty Senator

App. 1490

NYU School of Medicine Departmental Committees

| | |
|---|---|
| 1992-1998: | Sterling Forest Library Committee, Member, NYU SOM Dept of Environ. Medicine |
| 1991-1994 | Health & Safety Committee, Member, NYU SOM Dept. of Environ.. Medicine |
| 1992-2004 | Community Outreach and Education Comm., Chairman, NYSOM Dept. of Environ. Med. |
| 1999-2004 | Dept. Chairman's Internal Advisory Comm., Member, NYUSOM Dept. of Environ. Med. |
| 2005-present | Dept. Academic Steering Committee, Member, NYUSOM Dept. of Environ. Medicine |
| 2007-2012 | Dept. Appointments & Promotions Comm., Member, NYUSOM, Dept. of Environ. Medicine |
| 2012-present | Dept. Appointments & Promotions Comm., Chair, NYUSOM, Dept. of Environ. Medicine |

Advisory Committees

### Regional

| | |
|---|---|
| 1983-1984 | Massachusetts Acid Rain Advisory Board, Member, Mass. Dept. of Env. Protection |
| 1984-1986 | Committee on Environ. And Occup. Health. , NY State American Lung Association |
| 1991-1996 | Air Management Advisory Comm., Member of Health Effects Subcom., NY State DEC |
| 1995-1999 | Engineering Advisory Board, Member, Tuxedo, NY |
| 1997-1998 | Advisory Committee to the Mayor on the Port of Newburgh, Member, Newburgh, NY |
| 1996-1999 | CUES Asthma Working Group, Member, New York Academy of Medicine |
| 2008-2010 | New York City Community Air Study (NYCCAS) Advisory Panel |

### National

| | |
|---|---|
| 1995-1999 | Comm. on Health Effects of Waste Incineration, Member, National Academy of Sciences |
| 1995-1999 | National Air Conservation Commission, Member, American Lung Association |
| 2000-2004 | National Action Panel on Environment, Member, American Lung Association |
| 2005-present | National Clean Air Committee, Member, American Lung Association |
| 2007-2010 | U.S. EPA Clean Air Science Advisory Committee (CASAC) for SOx and NOx |
| Mar. 2012 | EPA Panelist for "Kickoff Workshop to Inform EPA's Review of the Primary $NO_2$ NAAQS" |

### International

| | |
|---|---|
| 1996-1997 | Sulfur in Gasoline Health and Environment Panel, Chairperson, Health Canada |
| Sept. 2007 | Illness Cost of Air Pollution Expert Committee, Canadian Medical Association |
| 2008-2012 | Global Burden of Disease (GBD), Committee on the Human Health Effects of Outdoor Air Pollution, World Health Organization (WHO) |

Grant Review Committees (National)

| | |
|---|---|
| March 1989 | EPA Air Chemistry and Physics Extramural Grants Review Panel (*ad hoc member*) |
| Oct. 1989 | NIEHS P30 Center Special Review Panel (*ad hoc member*) |
| July 1992 | NIH R01 Epidemiology & Disease Control Study Section (*ad hoc member*) |
| Nov. 1992 | NIEHS P20 Center Development Grant Special Study Section, (*ad hoc member*) |
| June 1996 | EPA Special Review Panel of the Health Effects Institute (HEI) (*ad hoc member*) |
| March 1997 | EPA Office of Res. and Development External Grant Review Panel (*ad hoc member*) |
| April 1997 | NIEHS Community-Based Participatory Res. R01 Special Study Sect. (*ad hoc member*) |
| July 1997 | EPA National Environ. Research Lab Intramural Research Review Panel (*ad hoc member*) |
| June 1998 | EPA Office of Res. and Development External Grant Review Panel (*ad hoc member*) |
| July 1998 | EPA Climate Policy and Programs Division Grant Application Review (*ad hoc member*) |
| Oct. 1998 | Mickey Leland Center for Air Toxics Grant Review Panel (*ad hoc member*) |
| April 2000 | NIEHS P30 Center Special Review Panel (*ad hoc member*) |
| July 2001 | NIEHS Community-Based Participatory Res. R01 Special Study Sect. (*ad hoc member*) |
| Dec. 2001 | NIEHS Program Project P01 Site Visit Review Panel (*ad hoc member*) |
| April 2003 | NIH R21 Fogarty Health, Env. and Economic Development Study Sect. (*ad hoc member*) |
| Nov. 2003 | U.S. EPA STAR Grant Panel (Epidemiologic Research on Health Effects of Long-Term Exposure to Ambient Particulate Matter and Other Air Pollutants) (*member*) |
| October 2004 | NIEHS Program Project P01 Review Panel (*ad hoc member*) |
| June 2005 | NIH Special Emphasis Panel (ZRG1 HOP Q 90 S) (*ad hoc member*) |
| Nov. 2005 | NIH Infectious Disease, Reproductive Health, Asthma/Allergy, and Pulmonary (IRAP) Conditions Study Section Review Panel (*ad hoc member*) |

App. 1491

| | |
|---|---|
| Feb. 2006 | NIH Infectious Disease, Reproductive Health, Asthma/Allergy, and Pulmonary (IRAP) Conditions Study Section Review Panel (*ad hoc member*) |
| June 2006 | NIH Infectious Disease, Reproductive Health, Asthma/Allergy, and Pulmonary (IRAP) Conditions Study Section Review Panel (*ad hoc member*) |
| Dec. 2006 | NIEHS Special Emphasis Panel on Genetics, Air Pollution, and Respiratory Effects (ZES1 TN-E FG P) (*member*) |
| Nov. 2007 | NIH Special Emphasis Panel on Community Participation in Research (ZRG1 HOP-S) (*member*) |
| June 2009 | NIH Study Section Review Panel on Challenge Grants in Health & Science Research |
| March 2011 | U.S. EPA Science to Achieve Results (STAR) Graduate Fellowship Review Panel – Clean Air Panel (*chair*) |
| Sept. 2011 | NIH Special Epidemiology Study Section (ZRG1 PSE K 02 M) (*member*) |
| Oct. 2012 | NIH Cardiac and Sleep Epidemiology (CASE) Study Section (*ad hoc member*) |
| June 2013 | NIH Special NHLBI Dataset Study Section (ZRG1 PSEQ 56) (*member*) |
| July 2013 | NIH "Career Awards" Study Section (ZES1 LWJ-D, K9) (*member*) |
| Sept. 2013-17 | Appointed Permanent Member, NIH Cancer, Heart, and Sleep Epidemiology Study Section (CHSE) Study Section |
| Nov. 2016 | NIEHS R13 Study Section (*member*) |

<u>Memberships, Offices, And Committee Assignments in Professional Societies</u>

| Year | Society/Committees |
|---|---|
| 1980-1996 | Air and Waste Management Association (Comm. on Health Effects and Exposure,) |
| 1992-Present | American Thoracic Society (ATS): Environmental and Occup. Health (EOH) Assembly, 1995-1999, 2012-present: ATS EOH Long Range Planning Committee; 1993-1994, 2002-2004: ATS Program Committee 2006-2007 Chairman of the ATS-EOH Nominating Committee 2010-present: ATS Environmental Health Policy Committee, member 2012-2014: ATS Environmental Health Policy Committee, Vice-Chairman 2015-2017: ATS Environmental Health Policy Committee, Chairman |
| 1990-present | International Society of Exposure Science |
| 1992-present | International Society for Environmental Epidemiology (Annual Meeting Program Committee: 1998, 2000, 2003, 2004, 2006) (ISEE Conference Planning Committee: 2006-present) |
| 2007-2009 | New York Academy of Sciences (membership given in appreciation for a 1/23/07 NYAS forum presentation) |
| 2017-present | American Public Health Association (APHA) |

## Editorial Positions

### Journal Board Membership

| Year | Name of Board |
|---|---|
| 1993-2008 | International Society of Exposure Analysis  (J. of Exp. Anal. and Environ. Epid.) |

### Ad Hoc Manuscript Reviewer

| Years | Journal |
|---|---|
| 1996-1998 | American Journal of Epidemiology |
| 1994 | Archives of Environmental Health |
| 1995-present | Atmospheric Environment |
| 1995-present | Environmental Health Perspectives |
| 1994-present | Environmental Research |
| 2004-present | Environmental Science and Technology |
| 2011-present | Epidemiology |
| 1993-present | Journal of Exposure Analysis and Environmental Epidemiology |

| | |
|---|---|
| 1994-present | Journal of the Air and Waste Management Association |
| 1996-present | Journal of the American Medical Association |
| 1997-present | Journal of Occupational and Environmental Medicine |
| 1997-present | Journal of Respiratory and Critical Care Medicine |
| 2006-present | Thorax |

<u>Scientific Report Reviewer</u>

| | |
|---|---|
| August, 1986 | Reviewer for the National Academy of Sciences, Board on Environmental Studies and Toxicology report "The Airliner Cabin Environment: Air Quality and Safety" |
| October, 2002 | Reviewer for the NAS, Board on Environmental Studies and Toxicology report "Estimating the Public Health Benefits of Proposed Air Pollution Regulations" |

**Mentoring of Graduate Students, Residents, Post-Doctoral Fellows in Research**

Under direct supervision:

| Student Name | Type of Position | Time Period | Present Position |
|---|---|---|---|
| Mark Ostapczuk | Masters | 1984-1986 | Industrial Hyg., Barr Labs, Pomona, NJ |
| Kazuhiko Ito | Masters/Doctoral | 1984-1990 | Scientist, NYC Dept. of Health, NYC, NY |
| Peter Jaques | Masters/Doctoral | 1988-1998 | Assoc. Prof., Clarkson Univ., Potsdam, NY |
| R. Charon Gwynn | Masters/Doctoral | 1992-1999 | Epidemiologist, Columbia Univ., NY |
| Ramona Lall | Masters/Doctoral | 2000-2007 | Research Sci. IV, NYC Dept. of Health, NY |
| Ariel Spira-Cohen | Masters/Doctoral | 2003-2009 | Research Sci. III, NYC Dept. of Health, NY |
| Kevin Cromar | Masters/Doctoral | 2008-2012 | Assistant Professor, NYU School Of Medicine |
| Lital Yinon | Doctoral | 2011-present | Doctoral Candidate, NYU School of Medicine |
| Chris Lim | Doctoral | 2012-present | Doctoral Candidate, NYU School of Medicine |

In advisory function (thesis committee):

| Student Name | Advisory Role | Time Period | Student's Supervisor |
|---|---|---|---|
| Shao-Keng Liang | Doctoral Committee member | 1990-1994 | Dr. J. Waldman, UMDNJ, Rutgers |
| Jerry Formisano | Doctoral Committee member | 1997-2000 | Dr. M. Lippmann, NYU SOM |
| Yair Hazi | Doctoral Committee member | 1993-2001 | Dr. B. Cohen, NYU SOM |
| Samantha Deleon | Doctoral Committee member | 1997-2003 | Dr. K Ito, NYU SOM |
| Chun Yi Wu | Doctoral Committee member | 2000-2004 | Dr. L.C. Chen, NYU SOM |
| Carlos Restrepo | Doctoral Committee member | 2002-2004 | Dr. R. Zimmerman, Wagner, NYU |
| Shaou-I Hsu | Doctoral Committee member | 2000-2009 | Dr. M. Lippmann, NYU-SOM |
| Steven Schauer | Doctoral Committee member | 2007-2009 | Dr. B. Cohen, NYU-SOM |
| Christine Ekenga | Doctoral Committee Chair | 2009-2011 | Dr. G. Friedman-Jimenez, NYU-SOM |
| Rebecca Gluskin | Doctoral Committee Chair | 2009-2012 | Dr. Kazuhiko Ito, NYU SOM |
| Jiang Zhou | Doctoral Committee Chair | 2008-2012 | Dr. Kazuhiko Ito, NYU SOM |
| Eric Saunders | Doctoral Committee Chair | 2012-present | Dr. Terry Gordon, NYU SOM |

**Teaching Awards Received**

N/A

**Major Research Interests**

1) <u>Air Pollution Epidemiology</u>: Real-world air pollution exposures and human health effects in the general population and study cohorts of suspected susceptible individuals (e.g., children).

2) <u>Aerosol Science</u>: Ambient particulate matter aerosol exposures, including designing and implementing air monitoring equipment to collect human exposures to air pollution.

3) <u>Environmental Exposure Assessment</u>: Methods to assess human exposures and health effects from air pollution, especially the development of source apportionment models to separate human effects on the basis of pollution source. Design of epidemiological models/methods that better incorporate potential air pollution confounders/effect modifiers (e.g. weather and genetic influences).

## Grants Received

*Prior:*

| Agency | Title | Grant # | Period | Total Direct Costs | Role | % Effort |
|--------|-------|---------|--------|--------------------|------|----------|
| USEPA | Effects of Acute Exposure to Summertime Haze Episodes on the Health of Humans | R811563 | 05/01/84-09/30/87 | $538,586 | Co-I | 50% |
| NIH | Acid Aerosol Exposure: Effect on Respiratory Morbidity | R01 ES04612 | 09/25/87-08/31/92 | $846,966 | PI | 30% |
| USEPA | Acid Aerosol Chamber Experiments | OD2524AEX | 7/2/90-7/31/90 | $5,810 | PI | 9% |
| USEPA | Analysis of Acid Aerosol Experiments | 00422248NAEX | 8/1/90-9/30/90 | $3,364 | PI | 5% |
| USEPA | Air Pollutants and Human Health | R814023 | 05/18/87-05/17/91 | $690,921 | CO-I | 50% |
| USEPA | Development and Field Applic. of an Automated Sequential Weekly Average H+ Sampler | Subcontract to EPA Grant CR816740-03 | 6/1/92-2/28/93 | $13,156. | PI | 15% |
| NIH | Acid Aerosol Exposure: Effect on Respiratory Morbidity | R01 ES04612 | 09/01/92-08/31/95 | $377,298. | PI | 30% |
| HEI | Retrospective Characterization of Ozone Exposures | Health Effects Institute Grant | 11/1/93-10/31/94 | $98,238 | CO-I | 10% |
| NIH | Temperature and Air Pollution Effects on Human Mortality | R01 ES05711 | 6/1/92-5/31/95 | $371,993 | PI | 30% |
| NYUSOM | Environmental Effects on Human Mortality and Morbidity | Bridge Grant | 9/1/95-8/31/96 | $48,400 | PI | - |
| USEPA | Effects of Exposure to Ambient Air Pollutants on Human Health | R808325 | 10/1/91-09/30/96 | $870,565 | CO-I | 50% |
| USEPA | Investigation of Acid Aerosol Exposures in Metropolitan Settings | Subcontract to Grant No. CR822050 | 11/1/93-10/31/96 | $200,499 | PI | 10% |
| USEPA | An Evaluation of Potential Confounders in PM10 Mortality Associations | R825271 | 11/25/96-11/24/01 | $219,410 | CO-I | 10% |
| USEPA | Acidic PM and Daily Human Mortality in Three U.S. Cities | #R825264 | 11/25/96-11/24/00 | $232,671 | PI | 15% |
| NYS-ERDA | Environmental Monitoring, Evaluation, and Protection Program | 6084-ERTER-ES00 | 12/01/99-11/30/02 | $341,926 | PI | 20% |
| HEI | Children's Asthma Incidence and Personal Exposures to Diesel Particles and Traffic in NYC | | 01/01/02-12/31/02 | $154,800 | PI | 30% |
| USEPA | Influence of Alternate | R827358 | 03/01/99- | $183,089 | PI | 30% |

| | Indicators of Exposure to PM and PM Components in Statistical Associations with Mortality and Hospital Admissions | | 02/28/03 | | | |
|---|---|---|---|---|---|---|
| NIH | NIEHS Center Supplement: Health Issues Related to the World Trade Center Disaster, Outreach Project | ES00260-S1 | 04/01/02-03/31/03 | Total=$ 936,487 Outreach=$172,031 | Co-PI PI | 10% 15% |
| NIH | Effects of Ambient Air Pollutants on Annual Mortality | RO1 ES09560 | 9/15/99-8/31/03 | $471,408 | PI | 30% |
| USEPA | Particle Exposures of High-Risk Sub Populations | R827164 | 10/01/98-09/30/03 | $1,327,240 | Co-I | 10% |
| USEPA | A Source Oriented Evaluation of the Combined Effects of Fine Particles and Co-pollutants | R827997 | 02/01/00-01/31/04 | $291,407 | Co-I | 15% |
| NIH | NIEHS Center Grant: Outreach and Education Program | ES00260 | 04/01/00-03/31/05 | Total=$5,000,000 Outreach=$240,365 | Co-I PI | 5% 5% |
| USEPA | EPA PM Health Effects Center Project 6: "A Prospective Study of Asthma Susceptibility to PM Epidemiologic Investigations of Key PM Components and Biomarkers of Effects & Community Outreach Project | R827351 | 06/01/99-05/31/05 | Total=$6,000,000 Project 6=$134,923 Outreach=$77,779 | Co-PI PI PI | 15% 10% 10% |
| NIH | Genetic/Epigenetic Susceptibility to Superfund Chemicals: Outreach Project | ES010344 | 05/08/00-03/31/06 | $156,812 | Co-I | 5% |
| USEPA | Env. Issues in the South Bronx. Thurston Project: S. Bronx Backpack Study | X1982152 | 08/01/00-09/30/06 | Total=$921,922 Project=$307,131 | CO-I PI | 5% 15% |
| NIH | NIEHS Center Supplement: Health Issues Related to the World Trade Center Disaster, Source Attribution (Project 4) & Community Outreach | ES00260-S2 | 04/01/02-03/31/04 | Total=$660,000 Project 4=$69,999 Outreach=$172,03 | Co-PI PI PI | 10% 10% 15% |
| USEPA | The role of traffic-related pollution in PM health effects associations among inner-city children with asthma | 16511 | 09/01/06-08/31/09 | $51,516 | PI | - |
| California Air Resources Board (CARB) | Spatio-temporal Analysis of Air Pollution and Mortality in California Based Upon the ACS Cohort (Thurston: Consulting Project) | | 06/01/07-5/31/10 | Project=$13,634 | Co-I | 4% |
| USEPA | Real time modeling of weather, air pollution, health outcome indicators in NYC. | RD-83362301-0 | 12/07-11/10 | $130,496 | Co-I | 5% |
| NIH | Fine Particles and Out-of-Hospital Cardiac Arrest in New York City | R01ES014387-01A2 | 04/09-12/11 | $200,000 | Co-I | 10% |

7

| Health Effects Institute (HEI) | Characteristics of PM Associated with Health Effects. *Thurston Project*: "Study Of PM Components and U.S. Human Mortality In The ACS Cohort. | 4750 | 01/01/07-3/31/11 | Total=$3,247,567<br><br>Project=$355,920 | Co-I<br><br>PI | 5%<br><br>20% |
| NT State DOT | Mobile Source Air Toxics Mitigation Measures | | 09/01/10 06/31/13 | SubProject=$89,062 | Co-I | 10% |
| Robert Wood Johnson Fndn. | The Effect of Peak-Shaving Regulations on the Activity, Toxic Emissions, and Health Impacts of Local Power Plants | Public Health Law Research | 1/12-7/13 | $151,500 | Co-I | 10% |
| NIH | Dietary Influence on Mortality from Air Pollution Exposure in the NIH-AARP Cohort (R21) | 1R21ES021194-01 | 7/12-6/15 | $150,000 | MPI (Contact PI) | 8% |

*Current:*

| Agency | Title | Grant # | Period | Total Direct Costs | Role | % Effort |
|--------|-------|---------|--------|-------------------|------|----------|
| | | | | | | |
| NIH | Long-term Air Pollution Exposure and Mortality in the NIH-AARP Cohort. | R01ES019584-01A1 | 1/01/12-6/30/18 | $1,221,253 | MPI (Contact PI) | 20% |
| The Public Health Research Institute of Abu Dhabi | Development of a Public Health Research Institute in Abu Dhabi. *Thurston Project*: "Air Pollution in Abu Dhabi". | | 3/2012-2/2018 | $9,993,960 | Co-I | 5% |

## Patents
None

## Boards and Community Organizations
1990-1995    St. Mary's Episcopal Church, Tuxedo, NY, Vestry member
1992-2008    Monroe-Woodbury Soccer Club, Coach (Board Member: 1999-2000)
1994-1999    Orange County Citizen's Foundation, Member
1999-2009    Y2CARE Monroe-Woodbury, NY School District Residents Action Group, Founder
2005-present  St. Mary's Episcopal Church, Tuxedo, NY, Community Outreach Committee, Member
2006-present  EPISCOBUILD-Newburgh, NY Habitat for Humanity Advisory Board, Member
2012-present  St. Mary's Episcopal Church, Tuxedo, NY, Vestry member

## Military Service
None

**International Scientific Meetings Organized**

| | |
|---|---|
| May 28-30, 2003 | "Workshop on the Source Apportionment of PM Health Effects." U.S. EPA PM Centers, Harriman, NY. |
| Aug. 1-4, 2004 | "Sixteenth Conference of the International Society for Environmental Epidemiology," Kimmel Conference Center, Washington Square, New York University, New York City, NY. |

**Scientific Forums for the Public Organized**

| | |
|---|---|
| June 2001 | "Science and Community Interaction Forum on the Environment." Held at Hostos Community College, Bronx, , New York City, NY. |
| October 2001 | "Forum on Environmental Health Issues Related to the World Trade Center Disaster." Held at NYU Law School, Washington Square, New York City, NY. |
| October 2002 | "2nd Annual Forum on the Environmental Health Issues Related to the World Trade Center Disaster." Held at Manhattan Borough Community College, New York City, NY. |
| October 2003 | "3nd Annual Forum on the Environmental Health Issues Related to the World Trade Center Disaster." Held at NYU Lower Manhattan Campus, New York City, NY. |

**Invited U.S. House and Senate Congressional Testimony**

| | |
|---|---|
| Feb. 5, 1997 | "Human Health Effects of Ambient Ozone Exposures" Statement before the Committee on Environment and Public Works, Subcommittee On Clean Air, Wetlands, Private Property, And Nuclear Safety, U.S. Senate, Washington, DC. http://epw.senate.gov/105th/thurston.htm |
| April 16, 1997 | "Human Health Effects of Ambient Ozone and Particulate Matter Exposures." Statement before the Government Reform and Oversight Committee of the U.S. House of Representatives, Washington, D.C. |
| May 8, 1997 | "Human Health Effects of Ambient Ozone and Particulate Matter Exposures." Statement before the Subcommittee on Health and Environment, Committee on Commerce of U.S. House of Representatives, Washington,. D.C. |
| July 29, 1997, | "The Human Health Effects of Ambient Ozone And Particulate Matter Air Pollution." Statement before the Subcommittee on Commercial and Administrative Law of the Judiciary Committee of the U.S. House of Representatives, Washington,. D.C. http://judiciary.house.gov/legacy/commercial.htm |
| October 22, 1997 | "Ozone and Particulate Matter Air Pollution Health Effects." Statement before the U.S. Senate Committee on Environment and Public Works Subcommittee on Clean Air, Wetlands, Private Property, and Nuclear Safety. Washington, DC. http://epw.senate.gov/105th/thurso2.htm |
| July 15, 1999: | "The Mandated Release of Government-Funded Research Data." Statement before the Committee On Government Reform, Subcommittee on Government Management, Information And Technology, U.S. House of Representatives |
| July 26, 2001 | "The Human Health Effects Of Air Pollution From Utility Power Plants." Statement before the Committee on Environment and Public Works, U.S. Senate, Washington, D.C. http://www.c-spanvideo.org/program/PlantE |
| Feb 11, 2002: | "The Air Pollution Effects of The World Trade Center Disaster." Statement before the Committee On Environment And Public Works, Subcommittee On Clean Air, Wetlands, And Climate Change. United States Senate, New York, NY. http://www.c-spanvideo.org/program/Qualitya |

9

| | |
|---|---|
| March 5, 2002 | "The Use of the Nationwide Registries to Assess Environmental Health Effects." Statement before the Committee On Health, Education, Labor, And Pensions, Subcommittee On Public Health, U.S. Senate, Washington, DC. |
| Sept. 3, 2002 | "The Clean Air Act and The Human Health Effects of Air Pollution from Utility Power Plants." Statement before the U.S. Senate Committee on Health, Education, Labor, and Pensions, Subcommittee on Public Health, Washington, D.C. http://www.c-spanvideo.org/program/AirStand |
| April 1, 2004 | "The Human Health Benefits Of Meeting the Ambient Ozone And Particulate Matter Air Quality Standards." Statement before the Committee on Environment and Public Works, Subcommittee on Clean Air, Climate Change, and Nuclear Safety, U.S. Senate, Washington, D.C. http://epw.senate.gov/epwmultimedia/epw040104.ram |
| July 19, 2006 | "The Science And Risk Assessment Of Particulate Matter (PM) Air Pollution Health Effects." Statement before the Committee on Environment and Public Works, U.S. Senate, Washington, D.C. *http://epw.senate.gov/hearingstatements.cfm?id=258766* |
| May 7, 2008 | "Science And Environmental Regulatory Decisions." Statement before the Committee On Environment And Public Works of The U.S. Senate, Subcommittee on Public Sector Solutions to Global Warming, Oversight, and Children's Health Protection, U.S. Senate, Washington, D.C. http://www.c-spanvideo.org/program/RegulatoryD http://epw.senate.gov/public/index.cfm?FuseAction=Hearings.Hearing&HearingID=a1954f70-802a-23ad-4192-fc2995dda7f4 |
| October 4, 2011 | "The Science of Air Pollution Health Effects and the Role of CASAC in EPA Standard Setting" Statement before the Subcommittee on Energy and the Environment, Committee on Science, Space and Technology, U.S. House Of Representatives, Washington, DC. http://science.house.gov/hearing/energy-and-environment-subcommittee-–-hearing-quality-science-quality-air |

**Other Invited Presentations**
*Regional Presentations*

| | |
|---|---|
| April 21, 1993 | "Summertime Smog and Hospital Admissions for Respiratory Illness", Environmental and Occupational Health Sciences Institute Seminar Series Lecture, UMDNJ-Robert Wood Johnson Medical School, Piscataway, NJ. |
| Dec .14, 1995 | "Health Effects of Acidic Aerosols", NY State Dept. of Health, Wadsworth Center Seminar, Albany, NY |
| Jan. 18, 1996 | "Outdoor Air Pollution and Asthma in Children " American Lung Association Press Briefing, New York, NY. |
| June 1, 1996 | "Asthma and Urban Air Pollution", WHEACT, Harlem Hospital, New York, NY. |
| July17, 1996 | "Asthma and Outdoor Air Pollution", Making the Connection: Urban Air Toxics & Public Health. Northeast States for Coordinated Air Use Management (NESCAUM), Roxbury, MA |
| Feb. 11, 1997 | "Outdoor Air Pollution and Asthma", Bellevue Hospital Asthma Clinic *Grand Rounds*. New York City, NY. |
| Feb. 26, 1998 | "Scientific Research for Ozone and Fine Particulate Standards ", Pace University School of Law, White Plains, NY |
| Nov. 30, 1998 | "Outdoor Air Pollution and Asthma", Center for Urban and Environmental Studies (CUES), NY Academy of Medicine,, New York, NY |
| Feb. 22, 1999 | "Asthma and Air Pollution", Cornell University, Ithaca, NY |

10

| | |
|---|---|
| April 28, 2001 | "Asthma and Air Pollution in New York City", NYC Council Environmental Candidate School, NY League of Conservation Voters, New York, NY. |
| Nov. 1, 2001 | "Air Quality and Environmental Impacts Due to the World Trade Center Disaster", Testimony before the Comm. on Environ. Protection, NYC Council, New York, NY. |
| Nov. 13, 2001 | "WTC Pollution Impacts in Lower Manhattan", Stuyvesant High School Parents Association General Meeting, Stuyvesant High School, New York, NY |
| Feb. 28, 2002 | "Lung Cancer Effects of Long-Term Exposure to Ambient Fine Particulate Matter", Mailman School of Public Health, Columbia University, New York, NY. |
| April 5, 2002 | "Air Pollution Impacts of the WTC Disaster", 23rd Annual Scientific Conference of the NY/NJ Education and Research Center: "Worker Health and Safety: Lessons Learned in the Aftermath of Sept. 11, 2001," Mt. Sinai School of Medicine, NYC, NY |
| April 21, 2002 | "Adverse Health Effects of Power Plant Air Pollution on Children" Earth Day 2002, 14th Street Y, New York City, NY. |
| May 23, 2002 | "Human Health Effects of Power Plant Pollution", Rockland County Conservation Association, Suffern, NY |
| May 31, 2002 | "Environmental Health Impacts of the World Trade Center Disaster", University of Rochester Medical School, Rochester, NY. |
| Sept. 19, 2002 | "Community Air Pollution Related to the World Trade Center Disaster". NYC Council Forum: The Environmental Health Consequences of 9/11: Where Do We Stand One Year Later? Borough of Manhattan Community College, New York City, NY. |
| Oct. 3, 2002 | "Community Exposures to Particulate Matter Air Pollution from the World Trade Center Disaster", Mount Sinai School of Medicine *Grand Rounds*, New York City, NY. |
| April 11, 2003 | "Environmental Impacts of the World Trade Center Disaster", NIEHS Public Interest Liaison Group, New York City, NY. |
| April 21, 2003 | "Asthma and Air Pollution", Airborne Threats to Human Health, NIEHS Town Hall Meeting, Syracuse, NY. |
| May 7, 2003 | "Asthma and Air Pollution in NY City" Environmental Candidate School for New York City Council Candidates, Wagner School, NYU, New York City, NY. |
| July 21, 2003 | "Health Effects of Particulate Matter Air Pollution", Ozone Transport Commission, Philadelphia, PA. |
| Nov. 18, 2004 | "Ambient Air Pollution Particulate Matter (PM): Sources and Health Impacts". U.S. Environmental Protection Agency, Region 2, New York City, NY. |
| Feb. 17, 2005 | "Community Air Pollution Aspects Of The Demolition Of 9-11 Contaminated Buildings". Testimony before the Committee On Lower Manhattan Redevelopment, New York City Council, New York City, NY. |
| Oct. 19, 2005 | Air Pollution Health Effects: Consideration of Mixtures. Fall Meeting of the Mid-Atlantic Chapter of the Society of Toxicology (MASOT), East Brunswick, NJ. |
| Dec.7, 2006 | Asthma and Air Pollution Effects in the South Bronx. New York City Child Health Forum, The Children's health Fund, Harlem, NYC, NY. |
| Jan. 18, 2007 | Air Pollution Effects in New York City. NYU Environmental Sciences Seminar Lecture, Washington Square, NYC, NY. |
| Jan. 23, 2007 | The South Bronx Backpack Study: Asthma and Air Pollution in NYC. Presented at the forum "High Asthma Rates in the Bronx: What Science Now Knows and Needs to Learn." New York Academy of Sciences, 7 World Trade Center, NYC, NY. |
| Oct. 2, 2009 | "Diesel Air Pollution and Asthma in New York City". Brown Superfund Research Program, Brown University, Providence, RI. |
| June 19, 2012 | "The Backpack Study of Asthma and Diesel Air Pollution in the South Bronx". Region 1 U.S. EPA, Citizen Science Workshop, New York City, NY. |

*National Presentations*

| | |
|---|---|
| Oct. 20, 1987. | NIEHS Symposium on the Health Effects of Acid Aerosols: "<u>Re-examination of London, England, Mortality in Relation to Exposure to Acidic Aerosols During 1963-1972 Winters</u>" RTP, NC. |
| Aug. 13, 1991 | "<u>Kuwait Mortality Risks from SO$_2$ and Particles: Insights from the London Fogs</u>"' The Kuwait Oil Fires Conf., American Academy of Arts and Sciences, Cambridge, MA. |
| Jan. 24, 1994 | "<u>Air Pollution Epidemiology: Is the Model the Message</u>?" The First Colloquium on Particulate Air Pollution and Human Morbidity and Mortality". Beckman Center of the NAS, Irvine, CA. |
| May 23, 1994 | " <u>Ozone Epidemiological and Field Studies</u>". American Thoracic Society Annual Meeting, Boston, MA. |
| May 25, 1994 | "<u>Epidemiological Evidence Linking Outdoor Air Pollution and Increased Hospital Admissions for Respiratory Ailments</u>" American Thoracic Society Annual Meeting, Boston, MA. |
| May 6, 1996 | "<u>Associations Between PM$_{10}$ & Mortality in Multiple US Cities</u>". Second Colloquium on Particulate Air Pollution and Health. Park City, Utah. |
| Sept. 5, 1996 | "<u>Particulate Matter Exposure Issues for Epidemiology</u>" U.S. EPA Particulate Matter Workshop, RTP, NC |
| April 3, 1997 | "<u>Health Effects of Ambient Ozone & Particulate Matter</u>" Air and Waste Assoc. Regional Conference On Impacts of EPA's Proposed Changes to Ozone and PM Standards, Oak Brook, IL |
| April 22, 1998 | "<u>The New EPA Standards for Ambient PM and Ozone</u>" American Lung Association Annual Meeting, Chicago, IL. |
| Dec. 21, 1999 | "<u>Global Overview of Human Death and Illness due to Air Pollution</u>". California Air Resources, Sacramento, CA. |
| March 24, 2000 | "<u>Estimating Ancillary Impacts, Benefits and Costs Of Proposed GHG Mitigation Policies For Public Health</u>" Resources for the Future, Wash., DC. |
| June 24, 2002 | "<u>Investigations Into the Environmental Health Impacts Related to the WTC Disaster</u>" Air And Waste Management Annual Meeting, Baltimore, MD. |
| July 15, 2002 | "<u>Air Pollution and Human Health</u>" NIEHS Built Environment Conference, RTP, NC |
| July 26, 2002 | "<u>The Human Health Effects of Power Plant Emissions and Associated Air Pollution</u>", The Environment & Health Forum, Physicians for Social Responsibility, Washington, DC. |
| October 7, 2002 | "<u>Community Exposures to Particulate Matter Air Pollution from the World Trade Center Disaster</u>" Plenary Speaker at the American Association for Aerosol Research, Charlottesville, North Carolina. |
| Nov. 11, 2002 | "<u>Characterization of Community Exposures to World Trade Center Disaster Airborne and Settled Dust Particulate Matter Air Pollution</u>", American Public Health Association Annual Meeting, Philadelphia, PA. |
| Dec. 5, 2002 | "<u>Susceptibility of Older Adults to Air Pollution</u>", EPA Workshop on Differential Susceptibility of Older People to Environmental Hazards. National Academy of Sciences, Washington, DC. |
| Feb. 3, 2003 | "<u>Health Effects of Particulate Matter Air Pollution</u>", National Air Quality Conference, U.S. EPA, San Antonio, Texas |
| May 17, 2003 | "<u>Assessing the Influence of Particle Sources and Characteristics on Adverse Health Effects of PM</u>", PG18 - New Tools to Evaluate the Health Effects of Air Pollution in Epidemiologic Studies. American Thoracic Society Annual Meeting, Seattle, WA. |
| Sep. 10, 2003 | "<u>Nature and impact of World Trade Center Disaster fine particulate matter air pollution at a site in Lower Manhattan after September 11.</u>" Annual Meeting of the American Chemical Society, New York, NY. |

12

| | |
|---|---|
| October 20, 2003 | "<u>Translating Air Pollution Risks to the Community</u>" Annual Meeting of the NIEHS Center Directors, Baltimore, MD. |
| May 18, 2004 | "<u>The Health Imperative for Implementation of the Clean Air Act</u>" State and Territorial Air Pollution Program Administrators/ Association of Local Air Pollution Control Officials (STAPPA/ALAPCO) National Conference, Point Clear, Alabama. |
| Oct. 18, 2004 | "<u>NIEHS Centers' Investigations of the World Trade Center Collapse Pollution Exposures and Effects: A Public Health Collaboration</u>" National Institute of Environmental Health Sciences Center Directors' Meeting, Research Triangle Park, NC. |
| May 25, 2005 | "<u>Human Health Effects Associated with Sulfate Aerosols</u>", American Thoracic Society Annual Meeting, San Diego, CA |
| Oct. 24, 2005 | "<u>The Science Behind the Particulate Matter (PM) Standards</u>" State and Territorial Air Pollution Program Administrators/ Association of Local Air Pollution Control Officials (STAPPA/ALAPCO) National Conference, Alexandria, Virginia. |
| Oct. 14, 2008 | "<u>Diesel Air Pollution and Asthma Exacerbations in a Group of Children with Asthma</u>" Annual Meeting of the International Society for Environmental Epidemiology (ISEE). Pasadena, California. |
| Feb. 26, 2010 | "<u>What studies are appropriate to use to estimate health impacts from specific sources such as diesel PM?</u>" CARB Symposium: "*Estimating Premature Deaths from Long-term Exposure to PM$_{2.5}$*". Sacramento, CA. |
| May 6, 2011 | "<u>Lung Cancer Risks from Exposure to Fine Particle Air Pollution</u>" NYU Cancer Institute Symposium: "Cancer and the Environment", NYC, NY. |
| May 16, 2012 | "<u>The Human Health Effects of Air Pollution</u>" The Air We Breathe: Regional Summit on Asthma and Environment at Allegheny General Hospital, Pittsburgh, PA. |
| June 20, 2013 | "Particles in our Air: A Global Health Risk", Northeastern University, Research Seminar. Boston, MA. |
| Mar 5, 2015 | "Air Pollution, Climate Change and Health". Stegner Institute Air Quality Symposium, Salt Lake City, Utah. |

*International Presentations*

| | |
|---|---|
| May 1, 1987 | "<u>Acid Aerosols: Their Origins, Occurrence, and Possible Health Effects</u>", Canadian Environmental Health Directorate Seminar, Health and Welfare Canada, Ottawa, Canada |
| July 2, 1987 | "<u>Health Effects of Air Pollution in the US</u>", University of Sao Paulo, Sao Paulo, Brasil |
| Feb. 5, 1991 | "<u>Results from the Analysis of Toronto Summer Sulfate and Aerosol and Acidity Data</u>", Workshop on Current Use and Future Directions of Hospital-Based Data in the Assessment of the Effects of Ambient Air Pollution on Human Health. Health and Welfare Canada, Ottawa, Canada. |
| April 23, 1997 | "<u>An Evaluation of the Role of Acid Aerosols in Particulate Matter Health Effects</u>", Conference on the Health Effects of Particulate Matter in Ambient Air. Air & Waste Management Association, Prague, Czech Republic. |
| May 12, 1998 | "<u>The Health Effects of PM and Ozone Air Pollution</u>", Air Pollution: Effects on Ontario's Health and Environment. Ontario Medical Association, Toronto, Canada |
| Nov. 1, 1999 | "<u>Climate Change and the Health Impacts of Air Pollution</u>". The Public Health Opportunities and Hazards of Global Warming Workshop at the U.N. Framework Convention on Climate Change, Conference of Parties (COP5), Bonn, Germany. |
| August 31, 2000 | "<u>Particulate Matter Air Pollution and Health in three Northeastern Cities</u>", World Congress on Lung Health, Florence, Italy |
| January 29, 2001 | "<u>PM Exposure Assessment and Epidemiology</u>", NERAM International Colloquia: Health and Air Quality: Interpreting Science for Decision Makers. Ottawa, Canada. |
| Feb. 4-5, 2002: | "<u>Air Pollution Exposure Assessment Approaches in U.S. Long-Term Health Studies</u>", Workshop on Exposure Assessment in Studies on the Chronic Effects of Long-term Exposure to Air Pollution, World Health Organization, Bonn, Germany |

| | |
|---|---|
| May 2, 2002 | "Health Effects of Sulfate Air Pollution" Air Pollution as a Climate Forcing Workshop, East-West Center, Honolulu, Hawaii |
| Sept. 24, 2003 | "Identification and Characterization of World Trade Center Disaster Fine Particulate Matter Air Pollution at a Site in Lower Manhattan Following September 11." Annual Meeting of the International Society for Environmental Epidemiology (ISEE). Perth, Australia. |
| Dec. 1, 2003 | "Terrorism and the Pulmonary Effects of the World Trade Center Disaster Particulate Matter Air Pollution", British Thoracic Society, London, England. |
| Sept 14, 2005 | "Results And Implications of The Workshop on the Source Apportionment of PM Health Effects", Annual Meeting of the International Society for Environmental Epidemiology (ISEE). Johannesburg, South Africa. |
| Sept. 4, 2006 | "A Source Apportionment of U.S. Fine Particulate Matter Pollution for Health Effects Analysis", Annual Meeting of the International Society for Environmental Epidemiology (ISEE). Paris, France. |
| Sept. 4, 2007 | "Applying Attributable Risk Methods to Identify Susceptible Subpopulations", Annual Meeting of the International Society for Environmental Epidemiology (ISEE). Mexico City, Mexico. |
| Aug. 27, 2009 | "Ischemic Heart Disease Mortality Associations with Long-Term Exposure to $PM_{2.5}$ Components", Annual Meeting of the International Society for Environmental Epidemiology (ISEE). Dublin, Ireland. |
| Dec. 1, 2010 | "The Hidden Air Quality Health Benefits of Climate Change Mitigation". The Energy and Resources Institute (TERI), Lodhi Road, New Delhi, India. |
| July 17, 2012 | "Recent Findings on the Mechanisms and Health Risks of Particulate Matter Air Pollution", European Centre for Environment & Human Health, Truro, England. |
| Aug. 29, 2012 | "Health Effects of PM Components: NYU NPACT Epidemiology Results and their Integration with Toxicology Results", Annual Meeting of the International Society for Environmental Epidemiology (ISEE). Columbia, SC. |
| May 20, 2013 | "Long-term $PM_{2.5}$ Exposure and Mortality in the NIH-AARP Cohort", Annual Meeting of the American Thoracic Society (ATS). Philadelphia, PA. |
| Oct. 27, 2013 | "Human Health Effects and Global Implications of Particle Air Pollution", Center of Excellence in Exposure Science and Environ. Health, Technion University, Haifa, Israel. |
| May 17, 2015 | "Human Health Co-Benefits of Climate Change Mitigation Measures" in the Environment, Global Climate Change And Cardiopulmonary Health session of the American Thoracic Society (ATS) Annual Meeting in Denver, CO, USA. |
| Jan. 21, 2016 | "Particle Air Pollution: Its Adverse Human Health Effects and Potential Climate Mitigation Health Co-Benefits". Imperial College. London, England. |
| Sep. 1, 2016 | "Air Quality Health Co-benefits from Climate Change Mitigation Measures". 2016 Annual Meeting of the International Society for Environmental Epidemiology (ISEE). Rome, Italy. |
| Apr. 22, 2017 | "Clean Air Health Benefits from Climate Change Mitigation Action". Global Health & Innovation Conference. Yale University, New Haven, CT. |

**Scientific Meeting Sessions Chaired**

| | |
|---|---|
| May 1, 1996 | "Epidemiological Findings", 2nd Colloquium on Particulate Air Pollution & Health. Park City, UT. |
| May 14, 1996 | "Particulate Toxicity", American Thoracic Society Annual Meeting, New Orleans, LA. |
| Jan. 30, 1998 | "Evaluation of PM Measurement Methods". PM2.5: A Fine Particulate Standard Specialty Conference. Los Angeles, CA. |
| August 18, 1998 | "Communities and Airports: How to Co-Exist?", Annual Meeting of the International Society for Environmental Epidemiology (ISEE). Boston, MA. |
| April 28, 1998 | "Clean Air Act Update", American Thoracic Society Annual Meeting, Chicago, IL. |

| | |
|---|---|
| Oct. 21, 1998 | "Health Effects and Regulatory Issues in PM", Particulate Methodology Workshop,. U.S. EPA Center, for Statistics and the Env., Univ. of Washington, Seattle, WA. |
| April 26, 1999 | "Pulmonary Smoking and Air Pollution Epidemiology." American Thoracic Society Annual Meeting, San Diego, CA |
| Sept. 6, 1999 | "Personal exposures to Gases and Particles", Annual Conference of the International Society for Environmental Epidemiology (ISEE), Athens, Greece. |
| March 31, 2000 | "Epidemiology: Particles, Co-pollutants & Morbidity and Mortality", Workshop on Inhaled Environmental/Occupational Irritants and Allergens: Mechanisms of Cardiovascular Responses, American Thoracic Society, Scottsdale, AZ |
| Jan. 26, 2000 | "Epidemiology of Particulate Matter Air Pollution", PM2000 Specialty Conference, Air & Waste Management Assoc., Charleston, SC |
| May 8, 2000 | "Outdoor Air Pollution: Epidemiologic Studies", American Thoracic Society Annual Meeting, Toronto, Canada |
| Sept. 5, 2001 | "Mortality Epidemiology Studies", Annual Meeting of the International Society for Environmental Epidemiology (ISEE). Garmisch, Germany. |
| May 20, 2002 | "After September 11: Bio-terrorism and The Environmental Health Aftermath of The World Trade Center Disaster", Plenary Session. American Thoracic Society Annual Meeting, Atlanta, GA. |
| April 1, 2003 | "Epidemiology: Short-Term and Long-Term Health Effects", Conference on Particulate Matter: Atmospheric Sciences, Exposure, and the Fourth Colloquium on PM and Human Health, Pittsburgh, PA |
| May 19, 2003 | "Particulate Air Pollution and Diseases in Adults", American Thoracic Society Annual Meeting, Seattle, WA. |
| May 21, 2003 | "Air Pollution as a Cause of Childhood Asthma and Chronic Airway Disease", American Thoracic Society Annual Meeting, Seattle, WA. |
| Sept. 2003 | "Unexplained Medical Symptoms", Annual Meeting of the International Society for Environmental Epidemiology (ISEE). Perth, Australia. |
| Sept. 25, 2005 | "Technology and Health", Annual Meeting of the International Society for Environmental Epidemiology (ISEE). Johannesburg, South Africa. |
| June 22, 2006 | "Characteristics of PM and Related Considerations", Annual Meeting of the Air and Waste Management Association, New Orleans, LA. |
| Sept. 3, 2006 | "Air Pollution Mechanisms", Annual Meeting of the International Society for Environmental Epidemiology (ISEE). Paris, France. |
| Sept. 20, 2006 | "Linkage and Analysis of Air Quality and Health Data", EPA & CDC Symposium on Air Pollution Exposure and Health, RTP, NC |
| Sept. 5, 2007 | "Radiation Exposures and Health Risks", 2007 Annual Meeting of the International Society for Environmental Epidemiology (ISEE). Mexico City, Mexico |
| Aug. 26, 2009 | "Exploring the Range of Methodological Approaches Available for Environmental Epidemiology." 2009 Annual Meeting of the International Society for Environmental Epidemiology (ISEE). Dublin, Ireland |
| March 23, 2010 | "Exposure to and Health Effects of Traffic Pollution", 2010 American Association for Aerosol Research Conference on Air Pollution and Health, San Diego, CA. |
| Sept. 16, 2011 | "Susceptibility to Air Pollution", 2011 Annual Meeting of the International Society for Environmental Epidemiology (ISEE). Barcelona, Spain. |
| Aug. 27, 2012 | "Source Apportionment Of Outdoor Air Pollution: Searching For Culprits". 2012 Annual Meeting of the International Society for Environmental Epidemiology (ISEE). Columbia, SC. |
| Aug. 21, 2013 | "Source-specific health effects of air pollution". 2013 Annual Meeting of the International Society for Environmental Epidemiology (ISEE). Basel, Switzerland. |

| May 19, 2015 | "Indoor and outdoor pollution: epidemiology and mechanisms". 2015 Annual Meeting of the American Thoracic Society (ATS). Denver, CO, USA. |
| Sep. 1, 2016 | "Climate Change, Mitigation Measures and Co-Benefits". 2016 Annual Meeting of the International Society for Environmental Epidemiology (ISEE).  Rome, Italy. |
| Feb. 12, 2017 | "Human Health Effects and Global Implications of Particle Air Pollution". MASDAR Institute.  Abu Dhabi, United Arab Republic. |

## Bibliography

*Invited Journal Editorials*

Thurston GD and Bates DM.  (2003). Air Pollution as an Underappreciated Cause of Asthma Symptoms, 2003. JAMA, 290:14, pp. 1915-1916.

Thurston G.D. (2006). Hospital admissions and fine particulate air pollution. JAMA.  Oct 25; 296(16):1966.

Thurston G.  (2007). Air pollution, human health, climate change and you.  Thorax. 2007 Sep; 62 (9): 748-9.

Thurston GD, Balmes JR. (2012 ). Particulate matter and the environmental protection agency: setting the right standard. Environmental Health Policy Committee of the American Thoracic Society. Am J Respir Cell Mol Biol. Dec;47(6):727-8. doi: 10.1165/rcmb.2012-0414ED.

Thurston GD. (2013). Mitigation Policy: Health Co-Benefits. Nature Climate Change. Oct. (3) 863-864.

Thurston GD, Balmes JR. (2017). "We need to "Think Different" about PM. Am. J Resp. & Crit. Care Med. (In Press)

*Book Chapters*

Thurston, G.D. and Leber, M. The relationship between asthma and air pollution.  In: *Emergency Asthma* (ed.: B. Brenner), pp. 127-144.  Marcel-Dekker, New York, NY (1999).

Thurston, G.D. and Ito, K.  Epidemiological studies of ozone exposure effects.  In: *Air Pollution and Health* (ed.: S. Holgate and H. Koren).  Academic Press. London. pp. 485-510 (1999).

Chen, LC, Thurston, G, and Schlesinger, RB.  Acid Aerosols as a Health Hazard.  In: *Air Pollution and Health* (ed.: J. Ayres, R. Maynard, and R. Richards).  Air pollution reviews: Vol. 3.  Imperial College Press.  London. pp. 111-161 (2006).

Thurston, G.D. and Wallace, L. Air Pollution: Outdoor and Indoor Sources.  In: *Environmental and Occupational Medicine*, 4th Edition (Eds.: W. Rom and S. Markowitz). Lippincott, Williams, and Wilkins, Philadelphia (2006).

Thurston, G.D.  Outdoor Air Pollution.  In: *Encyclopedia of Public Health* (ed. K. Heggenhougen) Elsevier Press. (2008).

Thurston, G.D and Bell, M.  Aerosols, global climate, and the human health co-benefits of climate change mitigation. In *Aerosol Handbook* (2nd edition) (eds.: Lev S. Ruzer and Naomi H. Harley). CRC Press (2012).

Thurston, G. and Bell, M. The Human Health Co-benefits of Air Quality Improvements Associated with Climate Change Mitigation.  In. Global Climate Change and Public Health (eds. Kent E. Pinkerton and William N. Rom). Humana Press (2013).

*National Academy Committee Books Co-Authored*

National Research Council (NRC), *Waste Incineration & Public Health.*  Committee on Health Effects of Waste Incineration.  Board on Environmental Studies and Toxicology.  National Academy Press, Washington, DC (2000).

16

*International Reports Co-Authored*

Health Canada, *Health and Environmental Impact Assessment Panel Report*, "Joint Industry/Government Study: Sulfur in Gasoline and Diesel Fuels". Ottawa, Canada. (1997).

World Health Organization (WHO), *Exposure assessment in studies on the chronic effects of long-term exposure to air pollution.* Report EUR/03/5039759. Geneva, Switzerland (2003).

*Peer Reviewed Journal Articles/Letters*

Thurston, G.D. General Discussion: Atmospheric dispersion modeling - A critical review. J. Air Pollut. Control Assoc. 29: 939 (1979).

Thurston, G.D. Discussion of multivariate analysis of particulate sulfate and other air quality variables by principal components - part I. Annual data from Los Angeles and New York. Atmos. Environ. 15: 424-425 (1981).

Thurston, G.D., J.D. Spengler and P.J. Samson. An assessment of the relationship between regional pollution transport and trace elements using wind trajectory analysis. Receptor Models Applied to Contemporary Pollution Problems, Ed. E. Frederick, Air Pollution Control Association, Pittsburgh, PA (1982).

Spengler, J.D. and G.D. Thurston. Mass and elemental composition of fine and coarse particles in six U.S. cities. J. Air Poll. Control Assoc. 33: 1162-1171 (1983).

Currie, L., R. Gerlach, C. Lewis, W.D. Balfour, J. Cooper, S. Dattner, R. DeCesar, G. Gordon, S. Heisler, P. Hopke, J. Shah and G. Thurston. Inter-laboratory comparison of source apportionment procedures: Results for simulated data sets. Atmos. Environ. 18: 1517-1537 (1984).

Thurston, G.D. and J.D. Spengler. A quantitative assessment of source contributions to inhalable particulate matter in metropolitan Boston, Massachusetts. Atmos. Environ. 19: 9-25 (1985).

Thurston, G.D. and N.M. Laird. Letters: Tracing aerosol pollution. Science 227: 1406-1407 (1985).

Thurston, G.D. and J.D. Spengler. A multivariate assessment of meteorological influences on inhalable particle source impacts. J. Clim. and Appl. Met. 24: 1245-1256 (1985).

Ozkaynak, H., J.D. Spengler, A. Garsd and G.D. Thurston. Assessment of population health risks resulting from exposures to airborne particles. Aerosols: Second U.S.-Dutch International Symposium, Lewis Publishing Co., December 1985 (Peer Reviewed).

Ozkaynak, H., A.D. Schatz, G.D. Thurston, R.G. Isaacs and R.B. Husar. Relationships between aerosol extinction coefficients derived from airport visual range observations and alternative measures of airborne particle mass. J. Air Pollut. Control Assoc. 35: 1176-1185 (1985).

Thurston, G.D. and P.J. Lioy. Receptor modeling and aerosol transport. Atmos. Environ. 21: 687-698 (1987).

Ozkaynak, H., and G.D. Thurston. Associations between 1980 U.S. mortality rates and alternative measures of airborne particle concentration. Risk Analysis 7: 449-460 (1987).

Lioy, P.J., D. Spektor, G. Thurston, N. Bock, F. Speizer, C. Hayes and M. Lippmann. The design considerations for ozone and acid aerosol exposure and health investigation: The Fairview Lake Summer Camp-Photochemical Smog Case Study. Environ. Int'l. 13: 27-83 (1987).

Spektor, D.M., M. Lippmann, P.J. Lioy, G.D. Thurston, K. Citak, D.J. James, N. Bock, F.E. Speizer and C. Hayes. Effects of ambient ozone on respiratory function in active normal children. Am. Rev. Resp. Dis. 137: 313-320 (1988).

Lippmann, M. and G.D. Thurston. Exposure Assessment - Input into risk assessment. Arch. Environ. Health 43: 113-123 (1988).

Spektor, D.M., M. Lippmann, G.D. Thurston, P.J. Lioy, J. Stecko, G. O'Connor, E. Garshick, F.E. Speizer, and C. Hayes. Effects of ambient ozone on respiratory function in healthy adults exercising outdoors. Am. Rev. Resp. Dis. 138: 821-828 (1988).

Ito, K. and G.D. Thurston. Characterization and reconstruction of historical London England acidic aerosol concentrations. Environ. Health Presp. 79: 35-42 (1989).

17

Thurston, G.D., K. Ito, M. Lippmann, and C. Hayes. Re-examination of London mortality in relation to exposure to acidic aerosols during 1962-1973 winters. Environ. Health Persp. 79: 73-82 (1989).

Waldman, J.M., P.J. Lioy, G.D. Thurston and M. Lippmann. Spatial and temporal patterns in summertime sulfate aerosol acidity and neutralization within a metropolitan area. Atmos. Environ. 24B: 115-126 (1990).

Echalar, E., P. Artaxo and G.D. Thurston. Source apportionment of aerosols in the industrial area of Cubatao, Brazil. In: Aerosols: Science, Industry, Health and Environment (S. Masuda and K. Takahashi, Eds.), pp. 942-945, Pergamon Press (1990).

Spektor, D.M., V.A. Hofmeister, P. Artaxo, J. Brague, F. Echelar, D.P. Nogueria, C. Hayes, G.D. Thurston and M. Lippmann. Effects of heavy industrial pollution on respiratory function in the children of Cubatao, Brazil: A preliminary report. Environ. Health Persp. 94: 51-54 (1991).

Waldman, J.M., S.K.C. Liang, P.J. Lioy, G.D. Thurston, and M. Lippmann. Measurements of sulfate aerosol and its acidity in the $SO_2$ source region of Chestnut Ridge, PA. Atmos. Environ. 25A: 1327-1333 (1991).

Spektor, D.M., G.D. Thurston, J. Mao, D. He, C. Hayes, and M. Lippmann. Effects of single and multiday ozone exposures on respiratory function in active normal children. Environ. Res. 55: 107-122 (1991).

Thurston, G.D. and H. Ozkaynak. Letters: Air pollution and mortality. Science 225: 382-383 (1992).

Thurston, G.D., J.F. Gorczynski Jr., P. Jaques, J. Currie and D. He. An automated sequential sampling system for particulate acid aerosols: Description, characterization and field sampling results. J. Exposure Anal. Environ. Epidemiol. 2: 415-428 (1992).

Thurston, G.D., K. Ito, P. Kinney and M. Lippmann. A multi-year study of air pollution and respiratory hospital admissions in three New York State metropolitan areas: Results for 1988 and 1989 summers. J. Exposure Anal. and Environ. Epidemiol. 2: 429-450 (1992).

Jaques, P.A., G.D. Thurston, P.L. Kinney, and J.E. Gorczynski, Jr. Precision of an ambient sequential acid aerosol sampling system. Appl. Occup. Environ. Hyg. 8: 313-316 (1993).

Kinney, P.L. and G.D. Thurston. Field evaluation of instrument performance: Statistical considerations. Appl. Occup. Environ. Hyg. 8: 267-271 (1993).

Ito, K., G.D. Thurston, C. Hayes, and M. Lippmann. Associations of London, England daily mortality with particulate matter, sulfur dioxide, and acidic aerosol pollution. Arch. Environ. Health 48: 213-220 (1993).

Thurston, G.D., K. Ito, M. Lippmann and D.V. Bates. Respiratory hospital admissions and summertime haze air pollution in Toronto, Ontario: Consideration of the role of acid aerosols. Environ. Res. 65: 271-290 (1994).

Thurston, G.D., J.E. Gorczynski, J.H. Currie, D. He, K. Ito, M. Lippmann, J. Waldman and P. Lioy. The nature and origins of acid aerosol pollution measured in Metropolitan Toronto, Ontario. Environ. Res. 65:254-270 (1994).

Kinney, P.L., Ito, K., and Thurston, G.D. A sensitivity analysis of mortality/PM10 associations in Los Angeles. Inhal. Toxicol. 7:59-69 (1995).

Thurston, G.D. and Kinney, P.L. Air pollution epidemiology: Considerations in time-series modeling. Inhal. Toxicol. 7:71-83 (1995).

Ito, K., Kinney, P., Christie, E., and Thurston, G.D. Variations in PM10 concentrations within two metropolitan areas and their implications to health effects analyses. Inhal. Toxicol. 7:735-745 (1995).

Waldman, J. M., Koutrakis, P., Allen, G.A., Thurston, G.D., Burton, R.M., and Wilson, W.E. Human Exposures to Particle Strong Acidity. Inhal. Toxicol. 7:657-670 (1995).

Thurston, G. Measurement methods to determine compliance with ambient air quality standards for suspended particles: Discussant. J. Air & Waste Manage. Assoc. 45:667-668 (1995).

App. 1506

Kinney, P.L., Thurston, G.D., and Raizenne, M. (1996) The effects of ambient ozone on lung function in children: a reanalysis of six summer camp studies. Environ. Health Perspect. 104:170-174.

Thurston, G.D. A critical review of PM10-mortality time-series studies. J. Exposure Anal. and Environ. Epidemiol. 6:3-22 (1996).

Ozkaynak, H., Xue, J., Zhou, H., Spengler, J.D., and Thurston, G.D. Intercommunity Differences in Acid Aerosol (H$^+$)/Sulfate (SO$_4^+$) Ratios. J. Exposure Anal. and Environ. Epidemiol. 6:57-78 (1996).

Ito, K. and Thurston, G.D. Daily PM10/mortality associations: An investigation of at-risk subpopulations. J. Exposure Anal. and Environ. Epidemiol. 6:79-96 (1996).

Lippmann, M. and Thurston, G.D. Sulfate concentrations as an indicator of ambient particulate matter air pollution for health risk evaluations. J. Exposure Anal. and Environ. Epidemiol. 6:123-146 (1996).

Thurston, G. D., Lippmann, M., Scott, M.B., and; Fine, J.M. Summertime haze air pollution and children with asthma. Am. J. Respir. and Crit. Care Med. 155:654-660 (1997).

Thurston, G.D. Mandating the release of health research data: issues and implications. *Tulane Environmental Law Journal.* 11(2):331-354 (1998).

Thurston, G.D. The health benefits of the U.S. EPA clean air standards. *Pace Environmental Law Review*. 16:1 (1998)

Cassino, C., Ito, K., Bader, I., Ciotoli, C., Thurston, G., and Reibman, J. Cigarette smoking and ozone-associated emergency department use for asthma by adults in New York City. *Am. J. Respir. Crit. Care Med.*. 159:1773-1779 (1999).

Gwynn, R.C., Burnett, R.T., and Thurston, G.D. A time-series analysis of acidic particulate matter and daily mortality and morbidity in the Buffalo, New York, region. Environ. Health Perspect. 108(2):125-133 (2000).

Cifuentes, L., Borja-Aburto, V., Gouveia, N., Thurston, G., and Davis, D. Assessment of the urban air pollution benefits of global warming mitigation: Santiago, São Paulo, Mexico City, and New York City. Environ. Health Perspect. 109, Supplement 3:419-425 (2001).

Thurston, G.D. and Ito K. Epidemiological studies of acute ozone exposures and mortality. J. Expo. Anal. Environ. Epidemiol. 11(4):286-294 (2001).

Gwynn, R.C. and Thurston, G.D. The burden of air pollution: Impacts in racial minorities. Environ. Health Perspect. 109 Suppl 4:501-506 (2001).

Cifuentes, L., Borja-Aburto, V.H., Gouveia, N., Thurston, G., and Davis, D.L. Climate change. Hidden health benefits of greenhouse gas mitigation. Science 293(5533):1257-1259 (2001).

Pope, C.A. III, Burnett, R.T., Thun, M.J., Calle, E.E., Krewski, D., Ito, K., and Thurston, G.D. Lung cancer, cardiopulmonary mortality and long-term exposure to fine particulate air pollution. J. Am. Med. Assoc. (JAMA) 287(9):1132-1141 (2002). PMID: 11879110.

Chen LC, Thurston G. World Trade Center Cough. Lancet. 2002 Dec;360 Suppl:s37-38.

Thurston GD, Chen LC. Risk communication in the aftermath of the World Trade Center disaster. Am J Ind. Med. Dec;42(6):543-4 (2002).

De Leon SF, Thurston GD, Ito K. Contribution of respiratory disease to nonrespiratory mortality associations with air pollution. Am J Respir Crit Care Med. Apr 15;167(8):1117-23 (2003).

Pope CA, Burnett R, Thurston, GD, Thun M, Calle E, Krewski, D, Godleski, J. Cardiovascular Mortality and Long-Term Exposure to Particulate Air Pollution: Epidemiological Evidence of General Pathophysiological Pathways of Disease. Circulation Jan 6;109 (1):71-7 (2004).

Landrigan PJ, Lioy PJ, Thurston G, Berkowitz G, Chen LC, Chillrud SN, Gavett SH, Georgopoulos PG, Geyh AS, Levin S, Perera F, Rappaport SM, Small C; NIEHS World Trade Center Working Group. Health and environmental consequences of the World Trade Center disaster. Environ Health Perspect. May;112(6):731-9 (2004).

Ito K, De Leon S, Thurston GD, Nadas A, Lippmann M. Monitor-to-monitor temporal correlation of air pollution in the contiguous US. J Expo Anal Environ Epidemiol. Jun:16 (2004).

Ito K , Xue N, Thurston G. (2004).  Spatial variation of $PM_{2.5}$ chemical species and source-apportioned mass concentrations in New York City. Atmos. Environ. 38: 5269–5282.

Lall R, Kendall M, Ito K, Thurston G. Estimation of historical annual $PM_{2.5}$ exposures for health effects assessment.  Atmos. Environ.  V38:31, pp. 5217-5226 (2004).

Maciejczyk, PB, Offenberg, JH, Clemente J, Blaustein M, Thurston G., Chen LC.  Ambient pollutant concentrations measured by a mobile laboratory in South Bronx, NY.  Atmospheric Environment.  V38:31, pp. 5295-5304 (2004).

Restrepo C, Zimmerman R, Thurston G, Clemente J, Gorczynski J, Zhong M, Blaustein M, and Chen LC. A comparison of ground-level air quality data with New York State Department of Environmental Conservation monitoring stations data in South Bronx, New York.  Atmospheric Environment.  V38:31, pp. 5283-5294 (2004).

Trasande L, and Thurston, GD. The role of air pollution in asthma and other pediatric morbidity. J. of Allergy & Clinical Immunol. Apr;115(4):689-99 (2005).

Krewski D, Burnett R, Jerrett M, Pope CA, Rainham D, Calle E, Thurston G, Thun M. Mortality and long-term exposure to ambient air pollution: ongoing analyses based on the American Cancer Society cohort. J Toxicol. Environ Health A. Jul 9-23;68(13-14):1093-109 (2005).

Jerrett M, Burnett RT, Ma R, Pope CA 3rd, Krewski D, Newbold KB, Thurston G, Shi Y, Finkelstein N, Calle EE, Thun MJ. Spatial analysis of air pollution and mortality in Los Angeles. Epidemiology. 2005 Nov;16(6):727-36.

Krewski D, Jerrett M, Burnett RT, Ma R, Hughes E, Shi Y, Turner MC, Pope CA 3rd, Thurston G, Calle EE, Thun MJ, Beckerman B, DeLuca P, Finkelstein N, Ito K, Moore DK, Newbold KB, Ramsay T, Ross Z, Shin H, Tempalski B. Extended follow-up and spatial analysis of the American Cancer Society study linking particulate air pollution and mortality.  Res Rep Health Eff Inst. 2009 May;(140):5-114

Thurston GD, Ito K, Mar T, Christensen WF, Eatough DJ, Henry RC, Kim E, Laden F, Lall R, Larson TV, Liu H, Neas L, Pinto J, Stolzel M, Suh H, Hopke PK.  Workgroup report: workshop on source apportionment of particulate matter health effects--intercomparison of results and implications.  Environ Health Perspect. 2005 Dec;113(12):1768-74.

Ito K, Christensen WF, Eatough DJ, Henry RC, Kim E, Laden F, Lall R, Larson TV, Neas L, Hopke PK, Thurston GD.  PM source apportionment and health effects: 2. An investigation of intermethod variability in associations between source-apportioned fine particle mass and daily mortality in Washington, DC.  J Expo Sci Environ Epidemiol. 2006 Jul;16(4):300-10.

Mar TF, Ito K, Koenig JQ, Larson TV, Eatough DJ, Henry RC, Kim E, Laden F, Lall R, Neas L, Stolzel M, Paatero P, Hopke PK, Thurston GD. PM source apportionment and health effects. 3. Investigation of inter-method variations in associations between estimated source contributions of PM(2.5) and daily mortality in Phoenix, AZ. J Expo Sci Environ Epidemiol. 2006. Jul;16(4):311-20.

Hopke PK, Ito K, Mar T, Christensen WF, Eatough DJ, Henry RC, Kim E, Laden F, Lall R, Larson TV, Liu H, Neas L, Pinto J, Stolzel M, Suh H, Paatero P, Thurston GD., PM source apportionment and health effects: 1. Intercomparison of source apportionment results.  J Expo Sci Environ Epidemiol. 2006 May;16(3):275-86.

Lall R and Thurston G. (2006).  Identifying and quantifying transported vs. local sources of New York City $PM_{2.5}$ fine particulate matter air pollution.  Atmospheric Environment, 40: S333–S346.

Ito K, Thurston GD, Silverman RA. Characterization of PM2.5, gaseous pollutants, and meteorological interactions in the context of time-series health effects models.  J Expo Sci Environ Epidemiol. 2007 Dec;17 Suppl 2:S45-60.

Kim JY, Burnett RT, Neas L, Thurston, G.D., Schwartz J, Tolbert PE, Brunekreef B, Goldberg MS, Romieu I.  Panel discussion review: session two--interpretation of observed associations between

20

multiple ambient air pollutants and health effects in epidemiologic analyses. J Expo Sci Environ Epidemiol. 2007 Dec;17 Suppl 2:S83-9.

Ross Z, Jerrett M, Ito K, Tempalski, Thurston G. A land use regression for predicting fine particulate matter concentrations in the New York City region. 2007. Atmospheric Environment. 41: 2255-2269.

Jerrett M, Newbold KB, Burnett RT, Thurston G., Lall R., Pope C. A. III, Ma R, De Luca P, Thun M., Calle J, Krewski D. Stoch. Environ. Res. Risk Assess. Geographies of uncertainty in the health benefits of air quality improvements. 2007. Volume 21, No. 5: 511-522.

Ito K, Thurston GD, Silverman RA. Characterization of $PM_{2.5}$, gaseous pollutants, and meteorological interactions in the context of time-series health effects models. J Expo Sci Environ Epidemiol. 2007 Dec;17 Suppl 2:S45-60.

Bell ML, Davis DL, Cifuentes LA, Krupnick AJ, Morgenstern RD, Thurston GD. Ancillary human health benefits of improved air quality resulting from climate change mitigation. Environ Health. 2008 Jul 31;7:41.

Thurston GD, Bekkedal MY, Roberts EM, Ito K, Arden Pope C 3rd, Glenn BS, Ozkaynak H, Utell MJ. (2009). Use of health information in air pollution health research: Past successes and emerging needs. J Expo Sci Environ Epidemiol. 2009 Jan;19(1):45-58. Epub 2008 Sep 10.

Jerrett M, Burnett RT, Pope C. A. III, Ito K, Thurston G., Krewski D., Shi Y., Calle J, Thun M., The Contribution of Long-Term Ozone Exposure to Mortality. NEJM. 360;11 March 12, 2009. PMID: 19279340.

Ying Z, Kampfrath T, Thurston G, Farrar B, Lippmann M, Wang A, Sun Q, Chen LC, Rajagopalan S. Ambient particulates alter vascular function through induction of reactive oxygen and nitrogen species. Toxicol Sci. 2009 Sep;111(1):80-8. Epub 2009 Jan 30.

McKean-Cowdin R, Calle EE, Peters JM, Henley J, Hannan L, Thurston GD, Thun MJ, Preston-Martin S. Ambient air pollution and brain cancer mortality. Cancer Causes Control. 2009 Nov;20(9):1645-51. Epub 2009 Aug 15.

Smith KR, Jerrett M, Anderson HR, Burnett RT, Stone V, Derwent R, Atkinson RW, Cohen A, Shonkoff SB, Krewski D, Pope CA 3rd, Thun MJ, Thurston G. Public health benefits of strategies to reduce greenhouse-gas emissions: health implications of short-lived greenhouse pollutants. Lancet. 2009 Dec 19;374(9707):2091-103. PMID: 19942276.

Chen L; Hwang J; Lall, R; Thurston, G; Lippmann, M. Alteration of cardiac function in ApoE-/- mice by subchronic urban and regional inhalation exposure to concentrated ambient PM 2.5. Inhalation toxicology. 2010 Jun;22(7):580-92.

Spira-Cohen A, Chen LC, Kendall M, Sheesley R, Thurston GD. (2010). Personal exposures to traffic-related particle pollution among children with asthma in the South Bronx, NY. J Expo Sci Environ Epidemiol. 2010 Jul;20(5):446-56. Epub 2009 Oct 28.

Ito K, Mathes R, Ross Z, NádasA, Thurston G, and Matte T. Fine Particulate Matter Constituents Associated with Cardiovascular Hospitalizations and Mortality in New York City Environmental Health Perspectives (EHP). 2011 Apr; 119(4):467-73. [Epub Dec. 2010 ahead of print]

Lall R, Ito K, Thurston G. Distributed Lag Analyses of Daily Hospital Admissions and Source-Apportioned Fine Particle Air Pollution. Environmental Health Perspectives (EHP). 2011 Apr; 119(4):455-60. PMC3080925.

Zhou J, Ito K, Lall R, Lippmann M, Thurston G. Time-series Analysis of Mortality Effects of Fine Particulate Matter Components in Detroit and Seattle. Environ Health Perspect. 2011 Apr;119(4):461-6. PMCID: PMC3080926.

Spira-Cohen A, Chen LC, Kendall M, Lall R, Thurston GD. Personal Exposures to Traffic-Related Air Pollution and Acute Respiratory Health Among Bronx School Children with Asthma. Environ Health Perspect. 2011 Apr;119(4):559-65. PMCID: PMC3080941.

Thurston G., Ito K, and Lall R. A Source Apportionment of U.S. Fine Particulate Matter Air Pollution. Atmospheric Environment. 2011Aug. 45(24): 3924-3936. PMCID: PMC3951912.

21

Brauer M, Amann M, Burnett RT, Cohen A, Dentener F, Ezzati M, Henderson SB, Krzyzanowski M, Martin RV, Van Dingenen R, van Donkelaar A, Thurston GD. (2012). Exposure Assessment for Estimation of the Global Burden of Disease Attributable to Outdoor Air Pollution. Environ. Sci. Technol. 2012 Jan 17;46(2):652-60. PMID: 22148428.

Restrepo CE, Simonoff JS, Thurston GD, Zimmerman R (2012) Asthma Hospital Admissions and Ambient Air Pollutant Concentrations in New York City. Journal of Environmental Protection, Vol. 3 No. 9, 2012, pp. 1102-1116.

Murray CJ, Vos T, Lozano R, et al. (2012) Disability-adjusted life years (DALYs) for 291 diseases and injuries in 21 regions, 1990-2010: a systematic analysis for the Global Burden of Disease Study 2010. Lancet. Dec 15; 380(9859):2197-223.

Lim S, Vos T, Flaxman A, et al. (2012) A comparative risk assessment of burden of disease and injury attributable to 67 risk factors and risk factor clusters in 21 regions, 1990-2010: a systematic analysis for the Global Burden of Disease Study 2010. Lancet. Dec 15;380(9859):2224-60.

Vos T, Flaxman AD, Naghavi M, Lozano R et al. (2012). Years lived with disability (YLDs) for 1160 sequelae of 289 diseases and injuries 1990-2010: a systematic analysis for the Global Burden of Disease Study 2010. Lancet Dec 15; 380(9859): 2163-96.

Trasande L, Wong K, Roy A; Savitz D, and Thurston, G (2013) Exploring prenatal outdoor air pollution, birth outcomes and neonatal health care utilization in a nationally representative sample". J Expo Sci Environ Epidemiol. 2013 May-Jun;23(3):315-21. doi: 10.1038/jes.2012.124. Epub 2013 Jan 23.

Jerrett M, Burnett RT, Beckerman BS, Turner MC, Krewski D, Thurston G, Martin R, von Donkelaar A, Hughes E, Shi Y, Gapstur SM, Thun MJ, Pope CA 3rd. (2013) Spatial Analysis of Air Pollution and Mortality in California. Am J Respir Crit Care Med. Sep 1;188(5):593-9. PMID: 23805824

Murray CJ, Abraham J, Ali MK, Alvarado M, et al. (2013) US Burden of Disease Collaborators. The State of US Health, 1990-2010: Burden of Diseases, Injuries, and Risk Factors. JAMA. 2013 Aug 14;310(6):591-608. PMID: 23842577.

Lippmann M, Chen LC, Gordon T, Ito K, Thurston GD. (2013) National Particle Component Toxicity (NPACT) Initiative: Integrated epidemiologic and toxicologic studies of the health effects of particulate matter components. Res Rep Health Eff Inst. 2013 Oct;(177): 5-13.

Rice MB, Thurston GD, Balmes JR, Pinkerton KE. Climate Change: A Global Threat to Cardiopulmonary Health. Am J Respir Crit Care Med. 2014 Mar 1;189(5):512-9.

Vilcassim MJ, Thurston GD, Peltier RE, Gordon T. Black Carbon and Particulate Matter (PM2.5) Concentrations in New York City's Subway Stations. Environ Sci Technol. 2014 Dec 16;48(24):14738-45.

Solenkova NV, Newman JD, Berger JS, Thurston G, Hochman JS, Lamas GA. Metal pollutants and cardiovascular disease: mechanisms and consequences of exposure. Am Heart J. 2014 Dec;168(6):812-22.

Sarfaty M, Bloodhart B, Ewart G, Thurston GD, Balmes JR, Guidotti TL, Maibach EW. American Thoracic Society Member Survey on Climate Change and Health. Ann Am Thorac Soc. 2014 Dec 23.

Newman JD, Thurston GD; Cromar K; Guo, Yu; Rockman, Caron B; Fisher, Edward A; Berger, Jeffrey S. Particulate Air Pollution and Carotid Artery Stenosis. Journal of the American College of Cardiology. 2015:1-5.

Naghavi M; Wang H; Lozano R, et al., Global, regional, and national age-sex specific all-cause and cause-specific mortality for 240 causes of death, 1990-2013: a systematic analysis for the Global Burden of Disease Study 2013. Lancet. 2015:385(9963):117-171.

Mirowsky J. E., Jin L; Thurston G, Lighthall D, Tyner T, Horton L, Galdanes K, Chillrud S, Ross J, Pinkerton K, Chen LC, Lippmann M, Gordon T. In vitro and in vivo toxicity of urban and rural particulate matter from California. 2015-04-10; 1352-2310, Atmospheric Environment (Oxford) - id: 1522182.

22

Thurston G, Lippmann M. Ambient particulate matter air pollution and cardiopulmonary diseases. Semin Respir Crit Care Med. 2015 Jun;36(3):422-32.

Thurston GD, Ahn J, Cromar K, Shao Y, Reynolds H, Jerrett M, Lim C, Shanley R, Park Y, Hayes RB, Ambient Particulate Matter Air Pollution Exposure and Mortality in the NIH-AARP Diet and Health Cohort. Env. Health Persp. 2016 Apr;124(4):484-90. doi: 10.1289/ehp.1509676. Epub 2015 Sep 15

Gany F, Bari S, Prasad L, Leng J, Lee T, Thurston GD, Gordon T, Acharya S, Zelikoff JT. Perception and reality of particulate matter exposure in New York City taxi drivers. J Expo Sci Environ Epidemiol. 2016 May 11. doi: 10.1038/jes.2016.23. [Epub ahead of print]

Thurston GD, Burnett RT, Turner MC, Shi Y, Krewski D, Lall R, Ito K, Jerrett M, Gapstur SM, Diver WR, Pope CA. Ischemic Heart Disease Mortality and Long-Term Exposure to Source-Related Components of U.S. Fine Particle Air Pollution. Environ Health Perspect. 2016 Jun;124(6):785-94. doi: 10.1289/ehp.1509777. Epub 2015 Dec 2.

Thurston GD, Kipen H, Annesi-Maesano I, Balmes J, Brook RD, Cromar K, De Matteis S, Forastiere F, Forsberg B, Frampton MW, Grigg J, Heederik D, Kelly FJ, Kuenzli N, Laumbach R, Peters A, Rajagopalan ST, Rich D, Ritz B, Samet JM, Sandstrom T, Sigsgaard T, Sunyer J, Brunekreef B. A Joint ERS/ATS Policy Statement: What Constitutes An Adverse Health Effect Of Air Pollution? An Analytical Framework. *European Respiratory Journal.* 2017 Jan 11; 49(1).

Bayram H; Bauer AK; Abdalati W; Carlsten C; Pinkerton KE; Thurston GD; Balmes JR; Takaro TK. Environment, Global Climate Change, And Cardiopulmonary Health. American Journal of Respiratory & Critical Care Medicine. 2017 Mar 15; 195(6):718-724

23

# Environmental Benefits Mapping and Analysis Program – Community Edition (BenMAP-CE) Training

## George Thurston

*NYU School of Medicine*

*Has satisfactorily completed the US Environmental Protection Agency's "Environmental Benefits Mapping and Analysis Program – Community Edition (BenMAP-CE) Training" workshop.*

**August 24, 2014**
**International Society for Environmental Epidemiology Conference, Seattle, WA**

*Jennifer M. Lloyd, Training Instructor*

Neal Fann
*BenMAP-CE Program Manager*

**Appendix Table 1:**

**Annual Multi-State Human Health Effects and Monetary Valuations of Benefits Associated with FIP, by Plant**

| Endpoint | Big Brown | | Harrington | |
|---|---|---|---|---|
| | **N** | **Valuation** | **N** | **Valuation** |
| Acute Bronchitis | 317.9 | $152,717 | 28.7 | $13,795 |
| Acute Myocardial Infarction, Nonfatal | 19.3 | $2,427,189 | 1.8 | $224,236 |
| Asthma Exacerbation, Asthma Attacks | 5990.0 | $346,010 | 542.0 | $31,309 |
| Chronic Bronchitis | 125.6 | $35,486,702 | 11.4 | $3,222,617 |
| Emergency Room Visits, Asthma | 91.8 | $39,138 | 8.3 | $3,555 |
| HA, All Cardiovascular | 29.9 | $1,131,636 | 2.8 | $107,289 |
| HA, All Respiratory | 30.2 | $955,064 | 2.8 | $89,376 |
| Lower Respiratory Symptoms | 4048.5 | $85,105 | 365.6 | $7,685 |
| Minor Restricted Activity Days | 151190.0 | $10,317,121 | 13619.4 | $929,377 |
| Mortality, All Cause | 162.5 | $1,562,986,230 | 15.5 | $148,644,072 |
| Upper Respiratory Symptoms | 5776.2 | $192,098 | 521.1 | $17,329 |
| Work Loss Days | 25551.2 | $3,833,337 | 2296.6 | $336,341 |
| **Total** | **193333.2** | **$1,617,952,348** | **17416.0** | **$153,626,981** |
| | | **$6,746,113,335** | | |

**Appendix Table 2:**

**Annual Multi-State Human Health Effects and Monetary Valuations of Benefits Associated with FIP, by State**

| Endpoint | Alabama | | Arkansas | |
|---|---|---|---|---|
| | **N** | **Valuation** | **N** | **Valuation** |
| Acute Bronchitis | 7.5 | $3,579 | 75.9 | $36,462 |
| Acute Myocardial Infarction, Nonfatal | 0.6 | $75,997 | 6.6 | $810,247 |
| Asthma Exacerbation, Asthma Attacks | 145.9 | $8,426 | 1440.6 | $83,214 |
| Chronic Bronchitis | 3.4 | $967,626 | 33.4 | $9,438,980 |

| | N | Valuation | N | Valuation |
|---|---|---|---|---|
| Emergency Room Visits, Asthma | 2.2 | $951 | 22.1 | $9,419 |
| HA, All Cardiovascular | 1.1 | $40,763 | 11.6 | $435,725 |
| HA, All Respiratory | 1.0 | $30,708 | 11.3 | $357,246 |
| Lower Respiratory Symptoms | 95.0 | $1,997 | 967.0 | $20,327 |
| Minor Restricted Activity Days | 3921.8 | $267,620 | 37958.6 | $2,590,272 |
| Mortality, All Cause | 5.8 | $55,587,462 | 52.8 | $507,673,855 |
| Upper Respiratory Symptoms | 135.8 | $4,517 | 1380.4 | $45,907 |
| Work Loss Days | 653.6 | $90,217 | 6363.7 | $853,933 |
| **Total** | **4973.7** | **$57,079,864** | **48323.9** | **$522,355,587** |
| | | **$6,746,113,335** | | |

**Appendix Table 3:**

**Monetary Valuations of Benefits Associated with FIP, by Major Metropolitan Area and Plant**

| | Little Rock, AR | | Kansas City, KS | |
|---|---|---|---|---|
| **Plant Name** | **N** | **Valuation** | **N** | **Valuation** |
| Acute Bronchitis | 14.8 | $7,101 | 1.3 | $627 |
| Acute Myocardial Infarction, Nonfatal | 1.2 | $148,096 | 0.1 | $10,069 |
| Asthma Exacerbation, Asthma Attacks | 271.7 | $15,696 | 23.9 | $1,383 |
| Chronic Bronchitis | 6.5 | $1,835,508 | 0.5 | $144,800 |
| Emergency Room Visits, Asthma | 4.3 | $1,845 | 0.4 | $190 |
| HA, All Cardiovascular | 1.9 | $72,893 | 0.1 | $4,453 |
| HA, All Respiratory | 1.9 | $59,888 | 0.1 | $2,636 |
| Lower Respiratory Symptoms | 188.3 | $3,957 | 16.7 | $350 |
| Minor Restricted Activity Days | 7565.3 | $516,249 | 571.2 | $38,975 |
| Mortality, All Cause | 9.2 | $88,006,537 | 0.7 | $6,450,637 |
| Upper Respiratory Symptoms | 268.5 | $8,931 | 23.8 | $792 |
| Work Loss Days | 1277.2 | $186,706 | 95.7 | $15,133 |
| **Total** | **9610.8** | **$90,863,407** | **734.5** | **$6,670,045** |

**Table x. Total Valuation of Annual Health Benefits of Proposed FIP for Selected Metropolitan Areas**

| City | Total Dollar Valuation, FIP (2010$)** |
|---|---|
| Little Rock, AR (Lonoke, Pulaski, Saline) | $90,863,407 |
| Kansas City, KS (Johnson, Wyandotte, Cass, Clay, Jackson, Platte) | $6,670,045 |
| New Orleans, LA (Jefferson, Orleans, Plaguemines, St. Bernard, St. Charles, St. John the Baptist) | $56,435,447 |
| Jackson, MS (Hinds, Madison, Rankin) | $39,942,398 |
| Oklahoma City, OK (Canadian, Cleveland, Logan, Oklahoma) | $185,586,904 |
| Tulsa, OK (Creek, Osage, Tulsa, Wagoner) | $156,515,690 |
| Nashville, TN (Davidson, Fsumner, Williamson, Wilson | $2,911,514 |
| Austin, TX (Hayes, Travis, Williamson) | $182,848,817 |
| Dallas, TX (Colin, Dallas, Ellis, Rockwall) | $623,295,615 |
| Ft. Worth, TX (Johnson, Tarrant) | $369,004,170 |
| Houston, TX (Brazoria, Chambers, Fort Bend, Galveston, Harris) | $606,467,468 |
| San Antonio, TX (Bexar, Comal, Guadalupe) | $325,461,350 |

| Health Endpoint | Expected Number | Total Dollar Valuation |
|---|---|---|
| HA, All Respiratory (Kloog et al., 2012; Zanobetti et al., 2009) | 125.2 | $3,966,129 |
| HA, All Cardiovascular (Bell et al., 2008; Peng et al., 2008; Peng et | 125.3 | $4,733,379 |

| | | |
|---|---|---|
| Acute Bronchitis (Dockery et al., 1996) | 1316.8 | $632,526 |
| Acute Myocardial Infarction, Nonfatal (Pope et al., 2006; Sullivan | 80.2 | $10,093,952 |
| Emergency Room Visits, Asthma (Glad et al., 2012; Mar et al., 201 | 380.6 | $162,177 |
| Asthma Exacerbation, Asthma Attacks (Mar et al., 2004; Ostro et a | 24818.2 | $1,433,608 |
| Upper Respiratory Symptoms (Pope et al., 1991) | 23915.2 | $795,350 |
| Lower Respiratory Symptoms (Schwartz and Neas, 2000) | 16766.7 | $352,459 |
| Minor Restricted Activity Days (Ostro & Rothschild, 1989) | 626525.0 | $42,753,705 |
| Work Loss Days (Ostro et al., 1987) | 105852.7 | $15,802,506 |
| Chronic Bronchitis (Abbey et al., 1995) | 520.8 | $147,152,200 |
| Mortality, All Causes (Krewski et al., 2009) | 677.8 | $6,518,235,343 |
| Mortality, All Causes (Lepeule et al., 2012) | 1541.5 | $14,823,928,663 |
| Mortality, All Causes (Laden et al., 2007) | 1759.7 | $16,921,842,783 |

| State | Total Dollar Valuation (2010$) |
|---|---|
| Alabama | $57,079,864 |
| Arkansas | $522,355,587 |
| Colorado | $5,563,595 |
| Illinois | $46,515,839 |
| Indiana | $12,432,425 |
| Kansas | $152,556,037 |
| Kentucky | $35,415,226 |
| Louisiana | $492,829,801 |
| Mississippi | $241,108,422 |
| Missouri | $324,832,342 |
| New Mexico | $38,795,780 |
| Oklahoma | $771,303,758 |
| Tennessee | $149,282,664 |

Texas $3,896,041,994

| Plant Name | Total Dollar Valuation (2010$) |
| --- | --- |
| Big Brown | $1,617,952,348 |
| Harrington | $153,626,981 |
| Martin Lake | $1,135,234,426 |
| Monticello | $1,553,079,820 |
| Welsh | $203,841,799 |
| Coleto Creek | $261,901,315 |
| **JT Deely** | **$508,409,021** |
| **Parish** | **$816,736,417** |
| **Fayette** | **$495,331,209** |
| **Total Public Health Benefit of BART for Texas** | **$6,746,113,336** |

| Martin Lake | | Monticello | | Welsh | | Coleto Creek | |
|---|---|---|---|---|---|---|---|
| N | Valuation | N | Valuation | N | Valuation | N | Valuation |
| 211.9 | $101,801 | 291.7 | $140,118 | 38.2 | $18,372 | 53.9 | $25,900 |
| 13.5 | $1,698,829 | 18.5 | $2,323,753 | 2.4 | $304,992 | 3.1 | $393,029 |
| 4000.7 | $231,097 | 5500.7 | $317,745 | 720.5 | $41,617 | 1014.5 | $58,602 |
| 85.0 | $24,007,173 | 116.7 | $32,964,746 | 15.3 | $4,323,149 | 21.0 | $5,936,148 |
| 61.7 | $26,308 | 84.9 | $36,199 | 11.1 | $4,737 | 15.4 | $6,573 |
| 21.3 | $803,204 | 29.0 | $1,096,627 | 3.8 | $143,928 | 4.8 | $182,271 |
| 21.1 | $668,992 | 29.1 | $921,628 | 3.8 | $121,047 | 4.8 | $152,593 |
| 2698.6 | $56,729 | 3714.7 | $78,088 | 486.9 | $10,236 | 686.3 | $14,428 |
| 101591.1 | $6,932,517 | 139422.1 | $9,514,080 | 18274.5 | $1,247,042 | 25477.4 | $1,738,560 |
| 114.2 | $1,098,034,421 | 156.2 | $1,502,003,604 | 20.5 | $197,143,881 | 26.3 | $252,717,123 |
| 3849.5 | $128,022 | 5300.1 | $176,266 | 694.2 | $23,087 | 978.2 | $32,533 |
| 17144.2 | $2,545,333 | 23534.1 | $3,506,966 | 3084.2 | $459,711 | 4310.4 | $643,556 |
| **129812.8** | **$1,135,234,426** | **178197.7** | **$1,553,079,820** | **23355.5** | **$203,841,799** | **32596.2** | **$261,901,315** |

| Colorado | | Illinois | | Indiana | | Kansas | |
|---|---|---|---|---|---|---|---|
| N | Valuation | N | Valuation | N | Valuation | N | Valuation |
| 0.7 | $360 | 5.7 | $2,741 | 1.7 | $821 | 23.7 | $11,376 |
| 0.0 | $5,857 | 0.6 | $72,139 | 0.2 | $20,827 | 1.4 | $166,932 |
| 14.4 | $832 | 110.9 | $6,404 | 32.8 | $1,897 | 447.1 | $25,828 |
| 0.4 | $101,925 | 2.8 | $780,413 | 0.8 | $226,527 | 9.6 | $2,723,958 |

| N | Valuation | N | Valuation | N | Valuation | N | Valuation |
|---|---|---|---|---|---|---|---|
| 0.2 | $81 | 2.7 | $1,153 | 0.7 | $283 | 8.5 | $3,608 |
| 0.1 | $2,921 | 1.1 | $42,218 | 0.3 | $11,787 | 2.5 | $94,806 |
| 0.1 | $3,832 | 1.1 | $34,377 | 0.3 | $9,589 | 2.9 | $92,724 |
| 9.5 | $200 | 72.7 | $1,528 | 21.8 | $458 | 301.6 | $6,341 |
| 392.9 | $26,812 | 3125.2 | $213,263 | 908.2 | $61,974 | 10983.3 | $749,495 |
| 0.6 | $5,410,969 | 4.7 | $45,274,978 | 1.3 | $12,075,106 | 15.4 | $148,392,349 |
| 13.6 | $452 | 103.7 | $3,449 | 31.1 | $1,034 | 430.4 | $14,313 |
| 65.2 | $9,354 | 521.4 | $83,178 | 151.1 | $22,121 | 1834.1 | $274,306 |
| **497.8** | **$5,563,595** | **3952.5** | **$46,515,839** | **1150.2** | **$12,432,425** | **14060.6** | **$152,556,037** |

| New Orleans, LA | | Jackson, MS | | OKC, OK | | Tulsa, OK | |
|---|---|---|---|---|---|---|---|
| N | Valuation | N | Valuation | N | Valuation | N | Valuation |
| 7.7 | $3,710 | 7.2 | $3,458 | 31.8 | $15,255 | 25.3 | $12,155 |
| 0.6 | $77,419 | 0.4 | $55,981 | 2.4 | $296,089 | 1.9 | $240,155 |
| 149.7 | $8,645 | 136.5 | $7,886 | 602.5 | $34,800 | 473.4 | $27,346 |
| 3.8 | $1,069,128 | 2.8 | $803,462 | 13.4 | $3,791,927 | 10.6 | $2,981,377 |
| 2.5 | $1,070 | 2.0 | $866 | 9.5 | $4,054 | 7.2 | $3,076 |
| 1.0 | $37,621 | 0.7 | $26,693 | 3.4 | $129,384 | 2.9 | $108,152 |
| 0.9 | $28,361 | 0.6 | $20,102 | 3.8 | $121,454 | 3.2 | $101,537 |
| 98.3 | $2,067 | 91.7 | $1,928 | 403.9 | $8,491 | 322.1 | $6,770 |
| 4562.9 | $311,371 | 3455.8 | $235,820 | 16436.4 | $1,121,612 | 12316.3 | $840,455 |
| 5.7 | $54,775,911 | 4.0 | $38,698,604 | 18.7 | $179,647,091 | 15.8 | $151,879,441 |
| 140.2 | $4,664 | 130.9 | $4,354 | 575.0 | $19,123 | 459.1 | $15,268 |
| 766.6 | $115,479 | 583.0 | $83,243 | 2776.0 | $397,623 | 2073.8 | $299,957 |
| **5739.9** | **$56,435,447** | **4415.8** | **$39,942,398** | **20876.8** | **$185,586,904** | **15711.6** | **$156,515,690** |

| JT Deely | | Parish | | Fayette | |
|---|---|---|---|---|---|
| N | Valuation | N | Valuation | N | Valuation |
| 103.7 | $49,826 | 171.1 | $82,193 | 99.5 | $47,805 |
| 6.0 | $749,178 | 9.7 | $1,230,600 | 5.9 | $742,145 |
| 1954.7 | $112,910 | 3221.2 | $186,072 | 1873.9 | $108,247 |
| 40.3 | $11,398,172 | 66.5 | $18,779,435 | 39.1 | $11,034,058 |
| 29.6 | $12,599 | 49.0 | $20,876 | 28.6 | $12,191 |
| 9.3 | $350,486 | 15.2 | $572,779 | 9.1 | $345,159 |
| 9.1 | $287,661 | 15.1 | $479,771 | 9.2 | $289,998 |
| 1320.6 | $27,760 | 2178.5 | $45,796 | 1266.9 | $26,633 |
| 48863.8 | $3,334,439 | 80887.7 | $5,519,729 | 47199.1 | $3,220,840 |
| 51.0 | $490,803,083 | 81.9 | $787,653,284 | 49.7 | $478,249,645 |
| 1883.0 | $62,623 | 3106.8 | $103,323 | 1806.2 | $60,068 |
| 8263.1 | $1,220,284 | 13688.9 | $2,062,559 | 7980.2 | $1,194,420 |
| **62534.2** | **$508,409,021** | **103491.6** | **$816,736,417** | **60367.4** | **$495,331,209** |

| Kentucky | | Lousiana | | Mississippi | | Missouri | |
|---|---|---|---|---|---|---|---|
| N | Valuation | N | Valuation | N | Valuation | N | Valuation |
| 4.3 | $2,079 | 74.3 | $35,701 | 36.8 | $17,655 | 44.6 | $21,435 |
| 0.5 | $65,704 | 5.3 | $664,096 | 2.6 | $316,827 | 3.9 | $486,215 |
| 82.2 | $4,747 | 1421.3 | $82,099 | 707.0 | $40,840 | 856.7 | $49,485 |
| 2.1 | $587,088 | 31.8 | $8,988,164 | 15.1 | $4,273,400 | 20.6 | $5,822,121 |

| N | Valuation | N | Valuation | N | Valuation | N | Valuation |
|---:|---:|---:|---:|---:|---:|---:|---:|
| 1.6 | $667 | 21.8 | $9,304 | 10.5 | $4,475 | 17.1 | $7,296 |
| 0.8 | $29,589 | 8.9 | $337,542 | 4.3 | $162,104 | 6.1 | $230,384 |
| 0.9 | $29,980 | 8.0 | $254,506 | 3.9 | $122,044 | 4.2 | $132,760 |
| 55.1 | $1,158 | 946.6 | $19,900 | 468.3 | $9,844 | 568.7 | $11,956 |
| 2298.2 | $156,829 | 37760.7 | $2,576,767 | 17817.8 | $1,215,876 | 23096.5 | $1,576,090 |
| 3.6 | $34,481,225 | 49.8 | $478,893,945 | 24.4 | $234,522,820 | 32.9 | $315,910,965 |
| 78.6 | $2,613 | 1350.8 | $44,925 | 668.6 | $22,235 | 812.4 | $27,017 |
| 383.1 | $53,547 | 6336.2 | $922,851 | 2989.4 | $400,301 | 3853.3 | $556,617 |
| **2911.0** | **$35,415,226** | **48015.8** | **$492,829,801** | **22748.6** | **$241,108,422** | **29317.0** | **$324,832,342** |

| Nashville, TN | | Austin, TX | | Dallas, TX | | Ft. Worth, TX | |
|---:|---:|---:|---:|---:|---:|---:|---:|
| **N** | **Valuation** | **N** | **Valuation** | **N** | **Valuation** | **N** | **Valuation** |
| 0.9 | $447 | 56.1 | $26,927 | 174.4 | $83,778 | 94.5 | $45,410 |
| 0.1 | $7,978 | 2.2 | $283,534 | 7.1 | $916,666 | 4.2 | $542,467 |
| 16.5 | $955 | 1053.3 | $60,844 | 3205.3 | $185,153 | 1743.6 | $100,721 |
| 0.3 | $89,480 | 22.6 | $6,379,043 | 63.4 | $17,911,805 | 34.1 | $9,642,104 |
| 0.3 | $116 | 17.1 | $7,302 | 48.0 | $20,454 | 25.7 | $10,941 |
| 0.1 | $2,617 | 3.0 | $114,894 | 10.1 | $382,028 | 6.1 | $229,786 |
| 0.1 | $2,192 | 2.9 | $93,694 | 10.6 | $336,123 | 6.8 | $216,780 |
| 11.9 | $249 | 712.5 | $14,978 | 2219.7 | $46,660 | 1203.2 | $25,294 |
| 363.5 | $24,805 | 29604.8 | $2,020,214 | 79202.4 | $5,404,725 | 42390.7 | $2,892,716 |
| 0.3 | $2,768,318 | 18.0 | $172,962,299 | 61.9 | $595,739,841 | 36.8 | $354,102,686 |
| 16.9 | $564 | 1013.3 | $33,698 | 3163.8 | $105,220 | 1715.3 | $57,045 |
| 60.7 | $13,792 | 5085.2 | $851,392 | 13545.7 | $2,163,161 | 7205.8 | $1,138,221 |
| **471.6** | **$2,911,514** | **37591.1** | **$182,848,817** | **101712.4** | **$623,295,615** | **54466.9** | **$369,004,170** |

| New Mexico | | Oklahoma | | Tennessee | | Texas | |
|---|---|---|---|---|---|---|---|
| N | Valuation | N | Valuation | N | Valuation | N | Valuation |
| 6.9 | $3,331 | 112.5 | $54,015 | 24.4 | $11,698 | 897.8 | $431,272 |
| 0.5 | $59,243 | 9.2 | $1,136,379 | 2.1 | $267,241 | 46.6 | $5,946,247 |
| 132.6 | $7,662 | 2135.7 | $123,365 | 463.5 | $26,773 | 16827.6 | $972,035 |
| 2.9 | $812,701 | 48.4 | $13,671,171 | 10.0 | $2,837,354 | 339.5 | $95,920,771 |

| N | Valuation | N | Valuation | N | Valuation | N | Valuation |
|---|---|---|---|---|---|---|---|
| 1.7 | $717 | 32.7 | $13,949 | 8.7 | $3,686 | 250.1 | $106,587 |
| 0.7 | $27,709 | 14.2 | $535,232 | 2.7 | $103,212 | 70.9 | $2,679,389 |
| 0.6 | $19,041 | 15.9 | $501,881 | 2.7 | $86,089 | 72.3 | $2,291,351 |
| 88.2 | $1,855 | 1431.7 | $30,097 | 310.5 | $6,527 | 11429.8 | $240,270 |
| 3356.0 | $229,014 | 56082.4 | $3,827,031 | 11906.9 | $812,518 | 416916.5 | $28,450,143 |
| 3.9 | $37,552,007 | 78.0 | $750,022,998 | 15.1 | $144,809,681 | 389.7 | $3,747,626,982 |
| 125.8 | $4,182 | 2041.9 | $67,907 | 443.8 | $14,759 | 16298.5 | $542,040 |
| 561.6 | $78,319 | 9410.4 | $1,319,732 | 2000.3 | $303,124 | 70729.4 | $10,834,908 |
| **4281.5** | **$38,795,780** | **71412.8** | **$771,303,758** | **15190.6** | **$149,282,664** | **534268.7** | **$3,896,041,994** |

| Houston, TX | | San Antonio, TX | |
|---|---|---|---|
| **N** | **Valuation** | **N** | **Valuation** |
| 174.9 | $84,018 | 74.1 | $35,586 |
| 7.3 | $946,867 | 3.6 | $453,354 |
| 3250.1 | $187,740 | 1402.2 | $80,995 |
| 63.1 | $17,843,268 | 27.6 | $7,809,773 |
| 48.3 | $20,580 | 20.5 | $8,720 |
| 10.8 | $409,491 | 5.8 | $217,253 |
| 11.3 | $358,102 | 4.6 | $146,762 |
| 2226.3 | $46,799 | 943.5 | $19,834 |
| 80042.2 | $5,462,033 | 34026.4 | $2,321,939 |
| 60.2 | $578,848,230 | 32.6 | $313,514,582 |
| 3173.4 | $105,539 | 1346.4 | $44,777 |
| 13651.0 | $2,154,802 | 5764.8 | $807,774 |
| **102718.9** | **$606,467,468** | **43652.0** | **$325,461,350** |

Exhibit 5

Bryan W. Shaw, Ph.D., P.E., *Chairman*
Toby Baker, *Commissioner*
Jon Niermann, *Commissioner*
Richard A. Hyde, P.E., *Executive Director*



# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

June 29, 2016

Mr. Ron Curry
Regional Administrator
U.S. Environmental Protection Agency, Region 6
1445 Ross Avenue, Suite 1200
Dallas, Texas 75202-2733

Subject: Air quality characterization plans for areas with identified sulfur dioxide ($SO_2$) sources

Dear Mr. Curry:

The August 2015 "Data Requirements Rule" (DRR) for the 2010 $SO_2$ National Ambient Air Quality Standard (NAAQS) requires states to identify the sources within their borders emitting 2,000 or more tons per year of $SO_2$, in order to determine where further evaluation for the purposes of air quality characterization is needed. The Texas Commission on Environmental Quality (TCEQ) submitted a list to the United States Environmental Protection Agency (EPA) on January 15, 2016, identifying 25 sources with $SO_2$ emissions at or above the DRR-specified threshold. On April 22, 2016 the TCEQ requested that the EPA amend the list to remove the ExxonMobil Refining and Supply Company's Baytown Refinery. On May 4, 2016, the EPA concurred with the TCEQ's request, leaving 24 $SO_2$ sources subject to the DRR. The DRR requires air agencies to notify the EPA by July 1, 2016 of the air quality characterization method planned to evaluate each of the areas where the 24 sources are located. This letter responds to that requirement.

With ambient air quality monitoring being the most accurate and appropriate means of determining compliance with the NAAQS, the TCEQ intends to monitor as many of the identified locations as possible. The TCEQ's 2016 Annual Monitoring Network Plan, which presents the current Texas air monitoring network along with all finalized and proposed changes to the network between July 1, 2015 and December 31, 2017, is to be submitted to the EPA on July 1, 2016. The TCEQ's plans for monitoring $SO_2$ are contained in Appendix E: *Sulfur Dioxide Data Requirements Rule Monitoring Placement Evaluations* of that plan
(https://www.tceq.texas.gov/airquality/monops/network_review.html).

Ron Curry
Page 2
June 29, 2016

The list of 24 sources identified to the EPA for air quality characterization includes 12 sources for which the EPA proposed designations on February 11, 2016, consistent with a March 2, 2015 court-approved consent decree. While these 12 sources are subject to ongoing data requirements per the DRR, there is no need to provide any future air quality characterization plans in addition to those contained in the 2016 monitoring plan, because the EPA is required to designate these 12 sources for the 2010 $SO_2$ NAAQS by July 2, 2016. However, should the EPA designate any of the 12 sources as unclassifiable (rather than attainment, nonattainment, or unclassifiable/attainment), the TCEQ intends to characterize those sources through monitoring. Accordingly, this plan may need to be revised by the TCEQ since the court-ordered deadline for final designations of these 12 sources falls after this letter is due.

Due to time and resource constraints, the TCEQ plans to utilize modeling results to characterize air quality for the Oklaunion Power Station and surrounding Wilbarger County. As required by the DRR, a protocol for the modeling to be performed is provided in the attachment, *1-Hour $SO_2$ Data Requirement Rule Air Quality Modeling Protocol for the Oklaunion Power Station Vernon, TX.* If you have any questions, please contact Steve Hagle at 512-239-1295 (Steve.Hagle@tceq.texas.gov), or David Brymer at 512-239-1725 (David.Brymer@tceq.texas.gov).

Sincerely,

Richard A. Hyde, P.E., Executive Director
Texas Commission on Environmental Quality

Enclosure

# Exhibit 6

DRAFT FOR DISCUSSION          NOT FINAL AGENCY ACTION                    PRE-DECISIONAL

**Implementation of the 2010 Primary 1-Hour SO$_2$ NAAQS**

**Draft White Paper for Discussion**

I.    Overview

The purpose of this paper is to facilitate input from states, tribes, and other interested stakeholders on EPA's implementation of the primary 1-hour sulfur dioxide (SO$_2$) National Ambient Air Quality Standard (NAAQS). In particular, this paper focuses on the determination of whether the air quality in a given area currently meets the NAAQS.  This determination occurs primarily in the context of designating areas as attainment, nonattainment, or unclassifiable; and in the context of redesignating areas from nonattainment, attainment, or unclassifiable to another status. EPA anticipates that some combination of enhanced ambient monitoring and technically credible dispersion modeling (the combination of which we refer to as a "hybrid approach") is likely needed to make this determination in these contexts.  To identify a workable approach, EPA is soliciting stakeholder input on how best to determine whether an area attains the SO$_2$ NAAQS (e.g., by defining and establishing a robust, representative monitoring network for SO$_2$ across the country, and/or by applying an appropriate modeling approach).  EPA is also soliciting input on how best to implement such an approach (e.g., implementation options and SIP timelines for areas in which violations may be identified). This paper addresses these topics and poses several "charge" questions intended to focus upcoming stakeholder discussions.

In EPA's final SO$_2$ NAAQS preamble and subsequent draft guidance in March and September 2011, EPA expressed its expectation that many areas would be initially designated as unclassifiable due to limitations in the scope of the ambient monitoring network and the short time available before which states could conduct modeling to support their designations recommendations due in June 2011.  In order to address concerns about potential violations in these unclassifiable areas, EPA recommended that states submit substantive attainment demonstration SIPs based on air quality modeling by June 2013 (under Clean Air Act section 110(a)(1)) that show how their unclassifiable areas would attain and maintain the NAAQS in the future.  As discussed below, commenters raised concerns with this approach, and we believe it is appropriate to further discuss potential implementation options.  Thus, EPA recently wrote to state environmental commissioners and tribal leaders explaining that, for the time being, we intend to move forward with the process of designating areas under the NAAQS, but that we are no longer recommending that demonstrations showing future attainment in unclassifiable areas be included in 2013 SIP submittals.

Nevertheless, EPA recognizes that, despite its current plans to move ahead expeditiously with nonattainment designations focused on areas with sufficient ambient air quality data, there will still be large portions of the country initially designated as unclassifiable, and there may be NAAQS violations in those areas. As we discuss the monitoring and modeling-based approaches in this paper for determining SO$_2$ concentrations, EPA is also interested in discussing the future use of this information in resolving the unclassifiable status of areas of

1

concern by affirmatively redesignating such areas as either attainment or nonattainment.  EPA is interested in whether this kind of approach would satisfactorily address concerns about unclassifiable areas, or whether other approaches to NAAQS implementation in such areas should be explored (e.g., affirmative planning requirements to identify and correct NAAQS violations in unclassifiable areas).

Finally, we note that the initial nonattainment designations will trigger planning requirements for those areas.  EPA expects to provide assistance to states in implementing these nonattainment area requirements, but this document is not focused on identifying or resolving issues that may arise in developing SIPs showing future attainment of the NAAQS.  We plan to provide separate guidance or rulemaking on attainment planning as soon as possible.  Nevertheless we expect that these discussions could serve as an opportunity to identify such issues and inform our future efforts.

II.    Introduction

In June 2010, EPA promulgated a revised primary $SO_2$ NAAQS, designed as a new 1-hour standard.  In the preamble to the final rule, EPA included a discussion of a possible implementation approach for the standard that differed in some ways from NAAQS implementation approaches taken for other pollutants.  Specifically, EPA discussed a possible hybrid implementation approach that would rely on both monitoring and modeling data for the purposes of designating areas as being in attainment or nonattainment of the standard, to the extent states had time and were able to develop such data in time to inform their designations recommendations.  The approach further addressed unclassifiable areas, which were expected to cover an extensive portion of the country, by recommending that states would submit SIPs showing future attainment of the NAAQS, not just for designated nonattainment areas but also for unclassifiable areas.  Following this, in March and September 2011, EPA issued guidance on designations and SIP planning for the $SO_2$ NAAQS, asking for comment on the latter.  Since that time, EPA has heard from a number of states and other stakeholders who have expressed concern with several aspects of EPA's proposed implementation approach.

On April 12, 2012, EPA announced in letters to state environmental commissioners and tribal leaders that it intends to move forward with the designations process as quickly as possible, focusing on areas with sufficient ambient air quality data.  Because we still expect this process will result in significant portions of the country being initially designated as unclassifiable, we also announced we would initiate a stakeholder engagement process to consider and discuss possible alternative implementation options to those described by EPA in the preamble to the final NAAQS and subsequent guidance documents. As discussed above, this document focuses on addressing future-designated unclassifiable areas by developing approaches to modeling and/or monitoring that would enable EPA to affirmatively determine whether or not areas of concern are attaining the NAAQS. EPA also communicated in the April 2012 letters that we expect all states by June 2013 to submit SIPs meeting the "infrastructure" SIP requirements under section 110(a)(2) of the Clean Air Act. However, given that we are undertaking a stakeholder outreach process to continue to develop possible approaches for

2

determining attainment with the $SO_2$ NAAQS, we made it clear in the April announcement that we do not expect states by June 2013 to submit substantive CAA section 110(a)(1) attainment demonstration SIPs for unclassifiable areas.

Distributing this paper will facilitate the process for obtaining stakeholder input. The paper describes concepts and discusses possible approaches for determining whether areas across the country are attaining the 1-hour $SO_2$ NAAQS. Appendix A provides basic information about the current population of $SO_2$ sources across the country, $SO_2$ emissions from these facilities, and the current $SO_2$ monitoring network. We anticipate that the ideas contained in this paper will provide a basis for productive discussions with stakeholders as we explore approaches to ensure attainment of the 1-hour primary $SO_2$ NAAQS, increase public health protection, and achieve continued improvement in air quality across the country through $SO_2$ emissions reductions.

III.    Background

In the proposal for the $SO_2$ NAAQS (74 FR 64810, December 8, 2009), EPA outlined a possible implementation approach for the NAAQS that, similar to implementation approaches for other criteria pollutant NAAQS, would have relied primarily on monitoring for determining attainment of the standard. The proposal discussion did not address how EPA has historically made significant use of modeling in implementing the prior daily and annual $SO_2$ NAAQS. During the public comment period, EPA heard from a number of commenters that the means of determining whether areas are either in attainment or nonattainment for the new standard described in the proposal were not appropriate or feasible. Specifically, numerous state and local government commenters expressed concerns regarding the perceived burdens of implementing the proposed monitoring network and the sufficiency of its scope for purposes of identifying violations. Some of these commenters suggested using modeling to determine the scope of monitoring requirements, or favored modeling over monitoring to determine attainment status. Partly in response to these comments, and after reconsidering the proposal's monitoring-focused approach, specifically regarding how EPA has historically determined $SO_2$ attainment status[1], the preamble to the final rule described how we anticipated using a hybrid analytic approach towards designations that combines the use of monitoring and available modeling to determine attainment with the new 1-hour $SO_2$ NAAQS (75 FR 35570). We also discussed the use of section 110(a)(1) of the CAA as the mechanism for states to submit substantive attainment and maintenance SIPs for areas initially designated as unclassifiable.

In the preamble to the final NAAQS, we provided preliminary rationale for the possible hybrid monitoring/modeling approach. We explained that this approach could better address several potentially problematic issues than would the narrower monitoring-focused approach discussed in the proposal for the $SO_2$ NAAQS, including the unique source-specific impacts of

---

[1] The final rule preamble (75 FR 35551) describes EPA's historic use of modeling in determining attainment for the SO2 standard. This discussion – and the documents referenced therein – may be helpful background for discussing possible improved approaches.

$SO_2$ emissions and the special challenges $SO_2$ emissions have historically presented in terms of monitoring short-term $SO_2$ levels for comparison with the NAAQS in many situations (75 FR 35550). We noted that we anticipated that many areas would be designated "unclassifiable," due to the short time period available to generate monitoring and/or modeling data before state designations recommendations were due under the CAA.  We also explained that to ensure that all areas of the country attain the NAAQS on a timely basis, EPA intended to emphasize the CAA section 110(a)(1) requirement that all states submit SIPs that show implementation, maintenance, and enforcement of the NAAQS in unclassifiable areas (75 FR 35573).  These plans were to take into account anticipated future $SO_2$ reductions from major rules such as the 2011 Cross-State Air Pollution Rule (CSAPR), the 2011 Mercury and Air Toxics Standards (MATS), and the reconsidered boiler MACT rules; and they were to be informed by updated modeling guidance. We also committed to soliciting public comment on guidance regarding modeling and on additional implementation planning guidance, including the content of the attainment and maintenance plans that would be submitted under section 110(a) of the CAA.

On March 24, 2011, EPA issued guidance to states for making initial area designation recommendations. As part of the guidance document, we described our intended approach at that time for making initial area designations based generally on a determination that relied on a combination of both monitoring and, as available, modeling data. We reiterated that many areas would need to be designated initially "unclassifiable" due to a lack of either monitoring and/or modeling data.  The guidance included a detailed attachment addressing how modeling could be conducted to support initial designations, if a state chose to do so.  We also noted that we were preparing separate guidance on developing SIP revisions for the $SO_2$ NAAQS, and that we intended to seek public comment on the draft guidance document.

On September 22, 2011, we released the draft guidance on SIP submissions, which included further guidance on air quality modeling for nonattainment areas and on developing attainment demonstrations under section 110(a) for unclassifiable areas.  We also provided further rationale for considering a hybrid monitoring/modeling approach for implementing the new 1-hour primary $SO_2$ NAAQS.  For areas initially designated as unclassifiable (i.e., areas without sufficient monitoring/modeling data to show nonattainment or demonstrate attainment), the draft guidance recommended that states submit substantive CAA section 110(a) SIPs that show how they would attain and maintain the NAAQS in the future. Because we are undertaking discussions that would affect this approach, we announced in letters to state environmental commissioners and tribal leaders in April 2012 that we no longer recommend such submittals.

IV.    Issues

A.    Key comments from stakeholders

EPA has received comments on $SO_2$ NAAQS implementation from state, local, and tribal governments; environmental groups; and industry stakeholders in several settings since we

DRAFT FOR DISCUSSION          NOT FINAL AGENCY ACTION          PRE-DECISIONAL

issued the final $SO_2$ NAAQS in June 2010. The public comment period for the September 2011 draft guidance for SIP submissions offered an opportunity for stakeholders to provide detailed written comments on the proposed 1-hour $SO_2$ NAAQS implementation approach.  In light of these comments, we present concepts in this paper for further exploration in upcoming stakeholder discussions. Stakeholder concerns generally related to one or more of the following aspects of the proposed approach:

1. Difficulty in meeting the suggested approach for attainment demonstrations and in demonstrating attainment everywhere based on air quality modeling, especially in multi-source areas;

2. Time and resource burden associated with conducting attainment demonstration modeling and establishing new control requirements for significant $SO_2$ sources located outside of designated nonattainment areas by June 2013; and,

3. Legal and policy objections to EPA's authority to expect modeling-based attainment demonstrations to satisfy the CAA section 110(a)(1) "implementation, enforcement, and maintenance" requirement for areas designated unclassifiable, especially in areas where nearby monitors indicate no exceedances.

More specifically, comments from states and other stakeholders asked that we reassess what may be reasonable for implementing the 1-hour primary $SO_2$ standard. First, some commenters have suggested that we may have underestimated the resources needed for widespread modeling, analysis, and rule development that may be necessary to follow our recommendations regarding CAA section 110(a) SIPs.  This concern is compounded by the level of effort that would be necessary by June 2013 to model emissions from numerous sources of $SO_2$ located across the country in order to support such submittals.

Second, many commenters have asserted that modeling attainment is difficult due to the purported conservative nature of modeling, even in areas that are not monitoring violations.  For example, modeling ambient $SO_2$ concentrations at a large number of receptor locations across an area may provide a more "conservative" assessment of ambient levels than a single or limited number of ambient monitors, especially when maximum allowable emissions are modeled.

Third, commenters have stated that the time discussed under the proposed approach for states to submit SIPs and demonstrate attainment is generally insufficient. Commenters claim this is especially true for unclassifiable areas, where, despite the large geographic scope and number of sources, the SIP submission deadline under CAA section 110(a) is actually sooner than would be the deadline for nonattainment areas under CAA section 191(a). While a few commenters expressed concern about nonattainment area planning requirements, the majority expressed concerns about the burden of developing SIPs for unclassifiable areas.

B.      EPA's evaluation of comments and understanding of the issues

Many commenters have asserted that the proposed implementation approach involving CAA section 110(a)(1) SIPs could place more burden on states to address areas designated

unclassifiable than to address areas with other evidence of a NAAQS violation.  In recognition of these concerns, we have identified potential approaches that place priority on addressing nonattainment area problems first (consistent with traditional NAAQS implementation efforts), while also addressing unclassifiable areas over the longer term to ensure these areas also attain the $SO_2$ NAAQS and achieve appropriate public health protection. The potential approaches focus on how to determine current attainment, rather than future attainment, in order to consider whether a more workable approach can be developed that significantly reduces the extent of unclassifiable areas, identifies and addresses sources of concern that are causing NAAQS violations, and avoids the issues that gave rise to many of the concerns expressed about the suggested CAA section 110(a) approach.

The options presented below are presented for the purpose of eliciting further comment and discussion with stakeholders, but should not be considered as limiting the range of options that could be discussed, nor as endorsing or rejecting any particular idea at this time.

V.    Implementation Concepts and Issues for Consideration

After considering the comments received on the September 2011 draft guidance, we have identified for further discussion two conceptual approaches for addressing the many areas still expected to be initially designated "unclassifiable" for the 1-hour NAAQS.  While this document provides a general outline of the approaches, there are several issues and key questions which need to be addressed before revised implementation guidance (or rules, if necessary) can be developed.  These issues and key questions will be the focus of the stakeholder discussions.

For most air pollutants, EPA relies on ambient monitoring data for determining whether an area is currently attaining the NAAQS.  The same approach could be taken to address the 1-hour $SO_2$ NAAQS by pursuing an adequately updated and expanded monitoring network to collect ambient air quality data. Such an approach would be conceptually similar to our implementation approach for other NAAQS in that it would rely on ambient monitoring data to evaluate air quality, serve as the basis for initial area designations (if developed on time), and inform ongoing compliance with the NAAQS.  Although EPA originally proposed an expanded monitoring network, in the preamble to the final $SO_2$ NAAQS we recognized that the proposed network might not be sufficiently expansive and discussed the potential resource burden of establishing a sufficient monitoring network in light of the unique source-specific impacts of $SO_2$.  Subsequently, some stakeholders asserted that the hybrid modeling/monitoring approach we proposed in response to this concern could also be overly burdensome.  Thus we are exploring alternative monitoring and modeling approaches to adequately measure air quality and protect public health.

A.    Monitoring Options

Under a monitoring-focused approach, the question turns to the nature of a potential monitoring network for implementing this NAAQS.  A map of the current national $SO_2$

6

DRAFT FOR DISCUSSION          NOT FINAL AGENCY ACTION          PRE-DECISIONAL

monitoring network is provided in Figure 1.  Currently, there are about 440 monitors in operation around the country, with not more than 1/3 being source-oriented or at high concentration sites.  As such, it is likely that a significant reallocation of monitors in the existing network plus expansion of the number of monitors in the network would be necessary to determine whether national ambient $SO_2$ levels are meeting the NAAQS and protective of public health under a monitoring-focused approach. However, it might not be necessary or feasible to expect monitoring for every single $SO_2$ source in the country.

**Figure 1**



There are two alternatives introduced in this paper for expanding the $SO_2$ monitoring network: (1) a national network reallocation and expansion and (2) a population-focused reallocation and expansion.

1.      National Network Reallocation and Expansion

As previously stated, not more than 1/3 of the current monitoring network is situated to characterize sources with high $SO_2$ emissions.  It may be appropriate to focus the monitoring network on the major sources of $SO_2$ emissions across the country.  EPA could establish through rulemaking an $SO_2$ emissions threshold above which an $SO_2$ monitor would be installed.  For example if a threshold of 2,000 tons of $SO_2$ per year (tpy) were deemed appropriate, that would address close to 600 of the $SO_2$ sources in the country, or 93% of the emissions.  The monitors in the current network could be reallocated to the identified sources, and new monitors could be installed and operated at the remaining sources.  This alternative could provide a

7

straightforward approach to implementing the SO$_2$ NAAQS and at the same time provide a more robust monitoring network across the country.

2.    Population-focused Reallocation and Expansion

A second alternative could resemble the current minimum monitoring requirements discussed in the final SO$_2$ NAAQS rule using the population weighted emissions index (PWEI) based on population and emissions inventory data at the core-based statistical area (CBSA) level.  This approach would assign a required number of monitors for a given CBSA based on relevant factors such as population and SO$_2$ emissions in the area.[2] The PWEI index provides an indication of population weighted exposure, and can help EPA and states prioritize limited monitoring resources with an emphasis on public health protection.

To identify priority locations at which to site monitors in these PWEI areas, an SO$_2$ emissions threshold could be used to focus the placement of monitors around the higher SO$_2$ emissions in the PWEI areas.  For example, a threshold of 750 tpy would provide for monitoring of approximately 400 sources in those PWEI areas responsible for 56% of the SO$_2$ emissions.  In addition, to monitor air quality near the largest sources of SO$_2$ that are located in areas not covered by the population-oriented PWEI approach, an emission threshold could be set to prioritize the location of an additional set of monitors outside of the PWEI areas.  For example, deploying monitors near sources with emissions over 5,000 tpy would approximately address an additional 170 sources outside of the PWEI areas and 34% of SO$_2$ emissions.  This approach would allow states to focus their resources in areas with the highest risk to public health and with the largest sources of emissions. Under this example, the resulting minimum network would consist of over 550 sites nationwide and would provide monitoring of sources responsible for 90% of the total national emissions.

3.    Other Alternatives and Considerations

In addition to the alternatives presented above, there are other threshold alternatives EPA could consider.  EPA could select thresholds based on annual emissions at various levels (see Appendix). EPA could also consider selection of thresholds based on hourly emissions, but for most sources, hourly data are much more limited.  EPA could also consider screening out sources based on thresholds that take into account not only a source's SO$_2$ emissions, but also the source's characteristics (e.g., stack height, source configuration, etc.).  Another alternative may be a tiered approach, where states would monitor sources with emissions above a high threshold and then have a range of options for assessing air quality at sources with emissions in a given range below that threshold, or vice-versa.

---

[2] The PWEI for a particular CBSA was proposed to be calculated by multiplying the population (using the latest Census Bureau estimates) of a CBSA by the total amount of SO2 emissions in that CBSA. The CBSA SO2 emission value would be in tons per year, and calculated by aggregating the county level emissions for each county in a CBSA. We would then divide the resulting product of CBSA population and CBSA SO2 emissions by 1,000,000 to provide a PWEI value, the units of which would be millions of people-tons per year.

For any source-focused monitoring alternative, the question arises as to how many monitors are needed to characterize the air quality around an $SO_2$ source. EPA is considering establishing approaches that would allow sources to be characterized by just a few monitors, or, if appropriate, a single properly-sited monitor. Under such approaches, modeling (or other analyses – e.g., examination of wind roses, identification of sensitive receptor locations, assessment of nearby terrain features, and estimation of distance of maximum impacts) would likely need to be completed to site these monitors at the areas of highest concentration.  This modeling might be less resource intensive than attainment demonstration modeling, but would require resources to complete the analysis.

In addition to any potentially revised monitoring network, as with all other NAAQS monitoring requirements, EPA Regional Administrators and states would have the authority to require additional monitoring in certain circumstances, such as in areas impacted by major industrial point sources or a combination of sources that are not required to monitor under the other monitoring provisions.  Also, attention should be given to the need to collect site-specific meteorological data, as well as ambient $SO_2$ data, in order to support data analyses (e.g., generation of pollution roses) and, if necessary, dispersion modeling.

Pursuing any of these approaches could require EPA to make revisions to the $SO_2$ monitoring regulations to address revised monitoring requirements, including any new requirements based on appropriate emissions thresholds.

4.    Key Questions

In order for EPA to determine the feasibility of using monitors principally to determine attainment or nonattainment of the standard, stakeholder input is needed on the following key questions:

a.  Are the conceptual monitoring networks described above sufficient to determine whether ambient $SO_2$ levels meet the NAAQS and are protective of public health without the need for additional modeling?  If not, then what enhancements should be made to them?  In what situations should meteorological data collection also be required?

b.  What is an appropriate number of monitors to site around a source to assess air quality?

c.  Is it reasonable for states to consider relocating monitors within their states?  What are potential barriers to relocation (e.g. , cost, agreement with local community)?  Is it reasonable for states to consider transferring their monitors to other states?

d.  What kind of modeling (or other analyses) would be necessary to identify the location of maximum impact?  What information and resources are necessary to

9

complete such modeling?  What is a reasonable schedule for completing this modeling?

    e.   What options exist for paying for the expanded $SO_2$ monitoring network?  Would stakeholders be willing to conduct monitoring at new locations, or provide funding to assist states in conducting such monitoring?  If so, what type of agreement would be needed between states and stakeholders to ensure the monitoring would be done?

    f.   For potential stakeholder operated monitors, what kind of oversight would the states need to perform?  Would EPA perform additional oversight?  Would someone audit these facility monitoring programs and associated monitors?  What type of agreement would be needed between the states and stakeholders to insure the monitoring was carried out?  How can we best ensure that these data are made public (e.g., require submittal to AQS)?

B.    Modeling Options

    The monitoring alternatives discussed above would identify a set of priority sources for monitoring.  In recognition of the limitations of monitoring to identify high concentrations in the vicinity of $SO_2$ sources and the resource burden associated with establishing a robust monitoring network, EPA believes that modeling may need to be used to supplement or in lieu of monitoring where appropriate.  States may prefer to model instead of monitor at sources where modeling is technically straightforward (e.g., consistent with the design of the model) and if they do not have enough resources to install the number of needed monitors.  At the same time, EPA recognizes that modeling these sources may also impose additional resource burdens on states, and modeling may not be appropriate in some situations.

    Under the modeling alternative, states could model the sources that otherwise would have required one or more monitors under potentially revised minimum monitoring requirements.  This modeling would use the AERMOD dispersion model, and EPA is exploring several options for the emissions levels that would be modeled to characterize current air quality, including: (1) actual emissions, where states would need to provide some ongoing assurance that the area's current air quality is being evaluated against the NAAQS similar to monitoring (in addition to assurance that results are not inappropriately affected by dispersion), and (2) allowable source emissions (e.g., federally enforceable permit limits or potential to emit). Recognizing the stakeholder interest in modeling actuals, EPA could develop approaches for states to provide this assurance by (1) setting enforceable emission limits for the sources equal to their actual emissions such that future levels would be no worse than current actuals, (2) periodically modeling levels of actual emissions to continue to ensure they are not violating the NAAQS, and/or (3) periodically reporting on whether the sources' actual emissions have increased relative to the prior modeling assessment, and in cases where the emissions increase has created the potential for violation of the NAAQS, completing additional modeling to determine whether the higher emissions level resulted in a modeled violation in

the area or in an affected area. Other technical modeling issues which need to be addressed include receptor placement, the spatial extent of the modeling, which other nearby sources need to be modeled, estimating background concentrations, and use of site-specific versus National Weather Service meteorological data.

In addition, it may be necessary to ensure that actual and allowable emissions for these sources are not inappropriately affected by dispersion techniques, such as stack heights greater than those considered within the limits of good engineering practice (GEP).  Moreover, in situations where it is found, perhaps through New Source Review (NSR) or Prevention of Significant Deterioration (PSD) modeling, that existing, new or modified sources in designated attainment or unclassifiable areas would cause NAAQS violations, EPA and states could act to revise the SIP through developing further emissions limits and a new demonstration of future attainment.  Any thresholds set forth in a potentially revised monitoring rule could also apply to modeling requirements.

For states that have unmonitored areas with no $SO_2$ sources, Appendix C in the September 2011 draft guidance discusses an example of a possible non-modeling option that could allow them to demonstrate attainment without needing to complete modeling. This, or variants on it, could also be considered under this option.

EPA recognizes that some of the issues discussed here may also be relevant to attainment demonstration modeling for nonattainment SIPs and may come up in stakeholder discussions and be relevant for consideration in future attainment planning guidance.

1.      Key Questions

In order for EPA to evaluate the feasibility of using modeling in conjunction with monitoring to determine either attainment or nonattainment of the standard, stakeholder input is needed on the following key questions:

a.  Should some criteria (e.g., the PWEI concept) be used to identify priority sources to be modeled in an area where there is no nearby monitor?

b.  How should the modeling be performed – i.e., what changes to the March 24, 2011 guidance should be made, such as the use of size cut-offs and use of actual emissions?

c.  Are there situations where modeling is preferable to monitoring? If so, then what are these situations?  Should EPA require modeling in certain situations, or is monitoring alone always a sufficient option for areas of concern?

d.  Are there situations where monitoring is preferable to modeling?  If so, then what are these situations? Should EPA require monitoring in certain situations, or is modeling alone always a sufficient option for areas of concern?

11

     e.   What options exist for paying for the new modeling analyses?  Would stakeholders be willing to conduct, or provide funding to assist states in conducting, any new modeling?  If so, what type of agreement would be needed between states and stakeholders to insure modeling would be done?

C.     Implementation Options

Regardless of the attainment determination approach that is ultimately used in a given context, EPA intends to move forward with proposing nonattainment area designations focused on areas with sufficient ambient air quality data. As noted above, this will trigger planning requirements, the implementation of which is important, but is not the primary focus of this document.

Nevertheless, it is important to consider how best to implement expeditiously whatever improved approach EPA ultimately recommends for unclassifiable areas. It is possible that an initial step could be issuance of EPA guidance or rulemaking adopting minimum monitoring/modeling/hybrid requirements for determining attainment. There would then likely be some state adoption or approval process, followed by the deployment or redeployment of monitors and/or the conducting of modeling to determine which areas are attaining and which are not. The timing of these actions is an important discussion topic, and involves consideration of the practical realities of enhancing the ambient monitoring network (such as cost, timing, etc.) and conducting necessary modeling, as well as the importance of being able to use the new approach to determine as expeditiously as practicable whether there are NAAQS violations occurring. Appropriate timing for these actions will need to be discussed in the context of the approach that EPA recommends (e.g., how many monitors, schedule for deployment, data collections, etc.).

Under a monitoring-focused alternative, an area designated unclassifiable might either have no monitor, or it may have a monitor or monitors that do not show violations of the NAAQS at the time of designation.  Following designation, states with unclassifiable areas might be required by revised rules to site new monitors or relocate existing monitors.  EPA could also potentially direct states (through rulemaking or other procedures, such as SIP Calls) to submit a plan for siting the monitors required by a revised monitoring rule, including requiring modeling (or other analyses) to demonstrate the appropriate placement of the monitors.  Any data ultimately collected by the comprehensive monitoring network could be used, as appropriate, for area redesignations or for any necessary future SIP calls.

EPA recognizes that any approach that would depend on the siting of additional monitors could impose additional resource burdens on states in order to install, maintain, and operate those devices. We acknowledged this issue in the preamble to the final $SO_2$ NAAQS, in which we indicated that EPA and states may not have adequate resources to site sufficient monitors to properly characterize air quality around major $SO_2$ sources.  Therefore, an alternative that would rely upon expanding the $SO_2$ monitoring network deserves further discussion with stakeholders. In particular, EPA would like to consider potential means of alleviating some of the cost burden on states, for example by having sources cover capital costs

12

and/or operating costs for monitors in their areas.  Considering the importance of monitoring the ambient air around these sites and continuing state budget concerns, states might reasonably expect sources to work jointly with the appropriate state or local agency to install and operate these monitors.  The source and the state would need to work together in siting the monitors and analyzing the data, which could then be reported to states and to EPA.

Regarding the role of modeling, as noted above, EPA recognizes that modeling may also present resource burdens on the states.  Under a modeling alternative, modeling could, for example, be completed for sources identified by minimum monitoring requirements but for which monitors were not deployed.  Some consideration would need to be given to when this modeling would need to be completed.  Similar to a potential monitoring network, the modeling could be done in a phased approach, having states model first the sources in areas with the highest population or some other determinant of greatest public health risk.  There may also be cost burdens on the states associated with data collection, such as more representative meteorological data.  Considering the potential importance of a modeling option in some locations and continuing state budget concerns, states might reasonably expect sources to work jointly with the appropriate state or local agency to both collect the necessary data, but also perform some or all of the modeling analysis.

Whatever approach is developed (e.g., monitoring-focused, modeling-focused, or allowing states flexibility to determine whether to use monitoring and/or modeling), there are practical considerations about how quickly monitors can be deployed and modeling can be completed. Depending on the significance of the changes being made, a phased-in approach may well be warranted. This phased approach could require the first monitors to be sited (or the first modeling to be conducted for sources) in areas with the highest population, highest emissions, or some other determinant of greatest public health risk.

Finally, EPA will need to decide on requirements regarding what SIP revisions will be needed to carry out the new approach. As referred to above, one approach would be to amend the minimum requirements for monitoring networks (and any modeling requirements as part of a hybrid approach), specify the appropriate deadlines, and then act promptly on that data to identify any new NAAQS violations in unclassifiable areas and redesignate those areas to nonattainment, or do a SIP call for those areas.  This approach is straightforward and most closely resembles our approach to implementing other NAAQS.  Nevertheless, some stakeholders suggested that we should explore approaches that do not involve additional nonattainment designations. For example, EPA could allow states to remedy violations in unclassifiable areas by demonstrating attainment before a redesignation occurs.  Instead, EPA could build in affirmative requirements for unclassifiable areas to discover and correct violations, similar to the original approach we previously recommended (but did not require) for demonstrating attainment under CAA section 110(a)(1). Alternatively, EPA could try to integrate such unclassifiable requirements into permitting actions (e.g., title V renewals) already happening in these areas.

1.    Key Questions

    a.    In what form should EPA set forth the revised approach?  Would rules need to be revised?  Which ones?  How should states adopt the new approach, and how much time is needed for this?

    b.    What is a reasonable schedule for 1) designing a sufficient monitoring network; and 2) deploying a new monitor or moving a monitor from an existing location? (What can be done to initiate monitoring as quickly as possible to collect sufficient data to make attainment/nonattainment determinations?) Is a phased approach useful?

    c.    By what date should the modeling be completed and submitted to EPA?  Is a phased approach useful?

    d.    Once the modeling/monitoring data are in, how should states and EPA use these data to address violations in unclassifiable areas? Is redesignating the most workable approach?   What should be the timing for these redesignations? Is the timing of the next $SO_2$ NAAQS revision a consideration?

    e.    Alternatively, should EPA consider approaches to identify and address violations in unclassifiable areas that do not involve redesignating these areas as "nonattainment"?  Which alternative approaches are most promising?

    f.    Is it possible to develop an attainment determination approach that provides reasonable assurance that sources of concern that are causing violations will be identified and addressed?

    g.    How should EPA address unclassifiable areas with no emissions or shown to have no monitored or modeled violations?  What requirements, if any, are appropriate to support designating these areas as attainment? Is this necessary?

## VI.   <u>Comments</u>

Additional information concerning the stakeholder process and opportunities to provide comments can be found on the following website: http://www.epa.gov/air/sulfurdioxide/implement.html

## APPENDIX A

**SO$_2$ Emissions**

|  | Number of Sources | Total Emissions | Percent |
|---|---|---|---|
| All SO$_2$ Sources in 2008 NEI emitting 1 ton or more | 7500 | 9,448,382 | 100% |
| SO$_2$ sources > 100 tons | 1684 | 9,374,962 | 99% |
| SO$_2$ sources > 250 tons | 1268 | 9,307,657 | 98% |
| SO$_2$ sources > 1000 tons | 779 | 9,042,377 | 96% |
| SO$_2$ sources > 2000 tons | 585 | 8,767,914 | 93% |
| SO$_2$ sources > 2880 tons | 479 | 8,508,328 | 90% |
| SO$_2$ sources > 5000 tons | 352 | 8,029,246 | 85% |

[Source:  http://www.epa.gov/ttn/chief/net/2008inventory.html]


**SO$_2$ Ambient Monitoring Network**

Current number of monitors nationally:  441
Number of monitors in 1980:  1500[3]
Current minimum monitoring requirements: 129 monitors required in 104 CBSAs[4]

For sake of comparison, the following table provides the current number of ambient monitors nationally for each criteria pollutant:

| Pollutant | **Number of Monitored Sites (as of end of 2011)[5]** |
|---|---|
| Carbon Monoxide | 330 |
| Lead | 198 (for TSP in local conditions) |
| Nitrogen Dioxide | 397 |
| Ozone | 1291 |
| PM2.5 | 868 |
| PM10 | 684 |
| SO$_2$ | 441 |


**SO$_2$ Ambient Monitoring Data**

Based on ambient monitoring data from 2008-2010, there were about 70 monitors located in 60 areas with 1-hour SO$_2$ concentrations exceeding the level of the standard.

---

[3] Source:  http://www.epa.gov/ttn/ecas/regdata/RIAs/pSO$_2$ch2_11-16-09.pdf
[4] Based on 2010 census data and 2008 NEI data.
[5] Based on AirData files pulled from AQS in February 2012.  Please note these are sites, and not necessarily individual monitors.

**Tab 469: 86 Fed. Reg. 34,187 (June 29, 2021)**

\*   \*   \*   \*   \*

[FR Doc. 2021–13693 Filed 6–28–21; 8:45 am]

**BILLING CODE 6560–50–P**

---

# ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Part 81

**[EPA–HQ–OAR–2014–0464; FRL–10024–28–OAR]**

## Error Correction of the Area Designations for the 2010 1-Hour Sulfur Dioxide (SO₂) Primary National Ambient Air Quality Standard (NAAQS) in Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule; withdrawal.

**SUMMARY:** The Environmental Protection Agency (EPA) is withdrawing its August 22, 2019, proposed rule, which proposed both to determine that the EPA made an error in the area designations for the 2010 Sulfur Dioxide (SO₂) Primary National Ambient Air Quality Standard (NAAQS) for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas, and to correct the proposed error by modifying the designations of those areas to unclassifiable. The EPA is withdrawing the proposed rule because the EPA, informed in part by technical information received during the public comment period on the proposed rule that further supports the EPA's initial designations of these areas, no longer believes the bases identified in the proposed error correction support the proposed conclusion that an error correction is appropriate.

**DATES:** As of June 29, 2021, the proposed rule published at 84 FR 43757 on August 22, 2019, is withdrawn.

**FOR FURTHER INFORMATION CONTACT:** Corey Mocka, U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, Air Quality Policy Division, 109 T.W. Alexander Drive, Mail Code C539–04, Research Triangle Park, NC 27711; phone number: (919) 541–5142; email address: *mocka.corey@epa.gov*.

**SUPPLEMENTARY INFORMATION:**

## I. Background

On December 13, 2016, the EPA designated portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas as nonattainment for the 2010 1-hour primary SO₂ NAAQS (81 FR 89870,

codified at 40 CFR 81.344) ("Round 2 Supplement"). On February 13, 2017, Vistra Energy, which owns SO₂ emissions sources in each of the three areas, sent the EPA a petition for reconsideration, purportedly pursuant to Clean Air Act (CAA) section 307(d)(7)(B) and the Administrative Procedure Act 5 U.S.C. 553(e), and for administrative stay of the EPA's nonattainment designations for portions of Freestone and Anderson Counties ("Big Brown Steam Electric Station area"), Rusk and Panola Counties ("Martin Lake Electrical Station area"), and Titus County ("Monticello Steam Electric Station area"). On March 15, 2017, the Texas Commission on Environmental Quality (TCEQ) also submitted a request for an administrative stay of the Round 2 Supplement final designations for these areas in Texas.[1] On September 21, 2017, the EPA initially responded to Vistra Energy's February 2017 petition for reconsideration by indicating an intent to undertake an administrative action with notice and comment to revisit the nonattainment designations for the three areas, but explained that pending completion of such action, the nonattainment designations remained in effect.[2][3]

The EPA published a proposed rule in the **Federal Register** on August 22, 2019, titled "Error Correction of the Area Designations for the 2010 1-hour Sulfur Dioxide (SO₂) Primary National Ambient Air Quality Standard (NAAQS) in Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas" (84 FR 43757) ("Proposed Error Correction"). Under the EPA's CAA authority at section 110(k)(6) to correct errors in acting on state implementation plans (SIPs) or in issuing designations, redesignations, classifications or reclassifications, the EPA proposed that in designating these areas as nonattainment under CAA sections 107(d)(1)(A)(i), (d)(1)(B)(ii), and (d)(2)(A), it erred in not giving greater weight to Texas's preference to characterize air quality through monitoring, and to steps undertaken by

Texas to begin monitoring in these three areas, when considering all available information; in relying on available air quality analyses in making the initial designations that the EPA recognized included certain limitations; or a combination of these two issues. Therefore, to correct these proposed errors, the EPA also proposed that the previously designated nonattainment areas in Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas each be revised to reflect an unclassifiable designation under CAA section 107(d)(1)(A)(iii). The EPA has not finalized the Proposed Error Correction and is not doing so in this action. Instead, the EPA is now withdrawing the Proposed Error Correction.[4]

## II. Reasons for Withdrawing the Proposed Error Correction

### A. Additional Air Quality Modeling

In the Proposed Error Correction, the EPA proposed that it erred in relying on available air quality modeling submitted by Sierra Club in making the initial nonattainment designations for these three areas. The EPA explained in the proposed action that the modeling submitted by Sierra Club ("December 2015" and "March 2016" modeling), which purported to show nonattainment, was developed in accordance with the general recommendations on modeling provided by the EPA but stated that the modeling contained "key limitations and uncertainties." We made this statement in the Proposed Error Correction despite also acknowledging that we had explained in the record for the Round 2 Supplement that individually these key limitations and uncertainties would not significantly change modeled results or, in many cases, could result in underestimation of SO₂ concentrations. In the Proposed Error Correction, the EPA also stated that given the possible collective significance of these issues and, in the case of the areas around the Martin Lake and Monticello facilities, given that the maximum modeled concentrations are within about 10 percent of the 2010 SO₂ NAAQS, we were less confident in our prior statements that potential adjustments to the Sierra Club modeling would not result in modeled values near

---

[1] Additionally, TCEQ submitted a petition for reconsideration on December 11, 2017, and on December 19, 2017, Vistra Energy provided additional information regarding facility retirements and the deployment of additional SO₂ monitors to support its February 2017 petition for reconsideration and administrative stay.

[2] *https://www.epa.gov/sites/production/files/2018-09/documents/3143_signed_response.pdf*.

[3] The EPA recently found that Texas has failed to submit State Implementation Plans to satisfy certain nonattainment planning requirements of the CAA for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County. *See* 85 FR 48111.

[4] Additionally, as detailed in a separate document published elsewhere in this issue of the **Federal Register** that has been signed concurrently along with this withdrawal notice, the EPA is also now denying the administrative petitions from Vistra Energy and TCEQ. *See https://www.regulations.gov* under Docket ID No. EPA–HQ–OAR–2014–0464.

or below the NAAQS.[5] Additionally, the EPA stated in the Proposed Error Correction that while individually these deficiencies are not dispositive, collectively they are a sufficient basis for the EPA to propose that we erred in relying on the Sierra Club modeling in making the initial nonattainment designations for the three Texas areas.

The EPA received several comments on the Proposed Error Correction. Sierra Club submitted a comment on the Proposed Error Correction that included updated modeling ("September 2019 modeling"). Sierra Club's updated September 2019 modeling addressed all aspects of the March 2016 modeling that the EPA had identified in the Proposed Error Correction as a limitation or uncertainty. The September 2019 modeling purported to demonstrate that the Martin Lake Electrical Station area did not meet the 2010 $SO_2$ NAAQS at the time of designation in the Round 2 Supplement (i.e., December 2016), and also currently does not meet the 2010 $SO_2$ NAAQS based on more recent data. Sierra Club did not submit updated modeling for the Big Brown and Monticello areas as part of its September 2019 comment submission, but rather asserted that the EPA's previously identified limitations (individually or collectively) have no material effect on the model results for those areas in the same way as they demonstrated with the Martin Lake area's modeling.

The EPA also notes, upon re-review of the Proposed Error Correction and Round 2 Supplement, that we did not acknowledge in the Proposed Error Correction that we actually considered the collective impact of all these same aspects of the modeling in the record for the Round 2 Supplement (to the extent those aspects remained in the March 2016 modeling relied on in the Round 2 Supplement).[6] In the Proposed Error Correction, we also did not explain any change in our thinking from our assessment of the collective impact in the Round 2 Supplement's record.

As explained further in the technical support document for this withdrawal, the EPA has assessed Sierra Club's September 2019 modeling submitted during the Proposed Error Correction

public comment period.[7] This assessment supports the EPA's previous reliance on the March 2016 modeling as the basis for its final nonattainment designation for the Martin Lake area in the Round 2 Supplement. Based on consideration of that information submitted by commenters and on further consideration of the entirety of our record for the Round 2 Supplement, the EPA now has concerns with the accuracy of the Proposed Error Correction's characterization of the March 2016 modeling and no longer believes that this proposed basis supports the proposed conclusion that an error correction is appropriate or that reliance on such information for the nonattainment designation was in error. The refined modeling submitted on the Proposed Error Correction demonstrates that the EPA's Round 2 Supplement assessment of the impact of further refining the March 2016 modeling was reasonable and correct, that such refinement would not alter the conclusion that the Martin Lake area was not attaining the NAAQS at the time of the Round 2 Supplement. Overall, the EPA's assessment of the information and of our record for the Round 2 Supplement for all three areas is that refinement of the aspects of the modeling the EPA identified in the Proposed Error Correction would not alter the EPA's nonattainment designations for any of the three nonattainment area designations in the Round 2 Supplement, and that the submitted information further confirms our Round 2 Supplement analysis of then-available data.

*B. Comments on Texas's Monitoring Preference*

In the Proposed Error Correction, the EPA also proposed that when we considered all available information at the time of designation, we erred in failing to give "greater" weight to the State of Texas' preference to use ambient air monitors to characterize $SO_2$ air quality in their state for purposes of the designation. We proposed this despite also acknowledging in the proposal that because these areas (around certain $SO_2$ emissions sources) were subject to the Round 2 deadline of July 2, 2016, these areas were required to be designated at that time based on the EPA's assessment of available information even though the State of Texas stated a preference to later characterize the areas based on future monitoring data and its intention to install monitors for these areas.

In addition to the modeling submitted during the public comment period for the Proposed Error Correction, the Sierra Club also commented that the EPA was required to designate the three areas in Texas by the court-ordered deadline based on the information available at that time (i.e., Sierra Club's December 2015 and March 2016 modeling). Because monitoring information was not available in 2016 for the Martin Lake, Big Brown, or Monticello areas, the Sierra Club stated that monitoring data consequently could not inform the EPA's designations decisions. The Environmental Protection Network (EPN) submitted a similar comment claiming that the EPA did not have the discretion to delay designations for these three areas in Texas under the applicable court-ordered deadline and that the EPA was required to designate the areas based on the best available data at the time of the designations. Additionally, EPN asserted that Texas's preference for future air quality monitoring did not undermine the available modeling data demonstrating that the areas were violating the 2010 $SO_2$ NAAQS.

In light of the comments submitted on the Proposed Error Correction, and the absence of a clearly identified error in the Round 2 Supplement, the EPA no longer believes that this proposed basis supports the proposed conclusion that an error correction is appropriate and no longer believes that we failed to give the appropriate weight to the State's preference for future monitoring information when we considered all available information at the time of the Round 2 Supplement. For the reasons discussed below, the EPA has concerns with the prior proposed assertion that the EPA was in error for not giving greater weight to the state's preference for *future* monitoring information in the absence of any available monitoring data at that time, let alone over reliance on *then-available* air quality modeling to assess $SO_2$ air quality. Given that the Proposed Error Correction's basis was predicated on the EPA relying on or weighing more heavily a preference for information that was not available at the time the EPA was required to finalize the Round 2 Supplement, the EPA no longer believes such a basis provides substantial support for the argument that the Round 2 Supplement should be revised.

CAA section 107(d) specifies that the EPA make designations based on the air quality at the time of final designations (i.e., determining at the time of signature whether the area meets the NAAQS) and consider all available information on air quality at that time. In other words, the

---

[5] As explained in the EPA's final designations Technical Support Document (TSD), the modeled 99th percentile daily maximum 1-hour $SO_2$ concentrations for the Martin Lake and Monticello facilities are 14 percent and 8 percent above the 2010 $SO_2$ NAAQS, respectively.

[6] See pages 27–29, 48–50, and 75–77 of the EPA's final designations TSD, available in the public docket and at *https://www.epa.gov/sites/production/files/2016-11/documents/texas_4_deferred_luminant_tsd_final_docket.pdf*.

[7] See *https://www.regulations.gov* under Docket ID No. EPA–HQ–OAR–2014–0464.

EPA does not interpret the statute as allowing the EPA to consider future air quality in the initial designations process, and the D.C. Circuit has upheld this interpretation as reasonable.[8] The record for the Round 2 Supplement explains, and the EPA maintains, that both air quality modeling and ambient monitoring are appropriate tools for characterizing ambient air quality for purposes of informing decisions to implement the $SO_2$ NAAQS, including designation determinations.[9] The EPA's reliance on modeling to assess $SO_2$ air quality, even in the face of conflicting monitoring, where appropriate, has been judicially affirmed. *See, e.g., Montana Sulphur & Chemical Company* v. *EPA,* 666 F.3d 1174, 1185 (9th Cir. 2012).

In the Round 2 Supplement for these three areas, the EPA considered Texas's recommendations but appropriately modified the recommendations, per CAA section 107(d)(1)(B)(2), because they were not supported by currently available information. Specifically, the EPA's assessment of Sierra Club's modeling was that currently available information showed violations of the 2010 $SO_2$ NAAQS. At the time of the EPA's final nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County, although Texas preferred that the EPA designate the areas based on proposed future monitoring data rather than on existing submitted modeling, there were no representative monitoring data[10] or other reliable modeling demonstrations available to refute Sierra Club's information demonstrating violations of the 2010 $SO_2$ NAAQS, as explained in

the EPA's final designations TSD.[11] The absence of available monitoring data at that time did not relieve the EPA of its obligation to issue designations for these areas by the court-ordered deadline. Furthermore, at the time of the final designations, the Agency did not have the discretion to await the results of 3 years of ambient air monitoring data (*i.e.,* 2018–2020) from Texas's proposed (but not yet established) monitoring sites before taking final action due to the court's order to designate certain areas in Texas. There was, however, as explained previously and in the EPA's final designations TSD, valid modeling submitted by the Sierra Club based on the then-most recent actual emissions demonstrating that the areas were violating the 2010 $SO_2$ NAAQS. As explained earlier, the EPA no longer believes there were errors in our Round 2 Supplement's analysis that Sierra Club submitted valid, representative modeling (based on the then-most recent actual $SO_2$ emissions) that demonstrated that the areas were violating the 2010 $SO_2$ NAAQS, or that further refining the modeling would result in modeled values near or below the standard. Therefore, even though the EPA considered Texas's preference for monitoring, given that the statute requires that the EPA consider available information, Texas's preference for reliance on monitoring information when there were no such monitoring data available at the time of the EPA's final designations in December 2016 did not and could not rebut Sierra Club's modeling showing violations of the 2010 $SO_2$ NAAQS.[12]

### III. Purpose of This Action

In the 2019 Proposed Error Correction, the EPA proposed that our relying on the Sierra Club modeling *along with* our not giving greater weight to Texas' preference for monitoring, represented an insufficient basis for the EPA's initial nonattainment designations. For the reasons discussed previously, the EPA no longer believes it has a basis under these reasons individually or collectively to propose to or conclude that we made errors in our nonattainment designations of these areas, and, therefore, no longer believes

that we have a basis to conclude that the EPA could not determine, based on available information at the time of issuing the designation, whether the three Texas areas that are the subject of this proposed action were meeting or not meeting the 2010 $SO_2$ NAAQS (*i.e.,* the conclusion necessary to correct the designations to unclassifiable). Therefore, the EPA is withdrawing the Proposed Error Correction.

### IV. Statutory and Executive Order Reviews

This withdrawal of a proposed rule does not establish new regulatory requirements. Hence, the requirements of other regulatory statutes and Executive Orders that generally apply to rulemakings (*e.g.,* the Regulatory Flexibility Act) do not apply to this action.

### List of Subjects in 40 CFR Part 81

Environmental protection, Air pollution control, Sulfur dioxide.

**Michael S. Regan,**
*Administrator.*

[FR Doc. 2021–13696 Filed 6–28–21; 8:45 am]

**BILLING CODE 6560–50–P**

---

### ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Parts 1036 and 1037

**[EPA–HQ–OAR–2019–0307; FRL–10018–51–OAR]**

### Improvements for Heavy-Duty Engine and Vehicle Test Procedures

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** This notice of proposed rulemaking includes corrections, clarifications, additional flexibilities, and adjustment factors to improve the Greenhouse gas Emissions Model (GEM) compliance tool for heavy-duty vehicles while more closely matching the outputs produced by the original GEM version 3.0 that was used to establish the $CO_2$ standards for Model Years 2021 and later in the 2016 Heavy-duty Phase 2 final rule. This document supplements the proposed rule published on May 12, 2020, which included a larger set of proposed revisions to modify and improve GEM. Most of the proposed revisions from that notice of proposed rulemaking are addressed in a final rulemaking published elsewhere in the Final Rules section of this issue of the **Federal Register**. Given the nature of this proposal, there will be neither

---

[8] *See Miss. Comm'n on Envtl. Quality* v. *EPA,* 790 F.3d 138, 156 (D.C. Cir. 2015); *Catawba County* v. *EPA,* 571 F.3d 20, 43–44 (D.C. Cir. 2009). The 2015 decision upheld the EPA's designations issued just days before new certified air quality data became available showing more areas violating the 2008 ozone NAAQS than the EPA designated as nonattainment. *See also State of Texas* v. *EPA,* 983 F.3d 826, 837–838 (5th Cir. 2020) (holding that the EPA's nonattainment designation, which modified the state's recommendation, was not arbitrary and capricious because the county was not compliant with the ozone NAAQS when the EPA promulgated its designation and the CAA uses concrete terms such that a county either does or does not meet the NAAQS).

[9] Round 2 Supplement Reponses to Comments, Page 13. Available in the public docket and at *https://www.epa.gov/sites/production/files/2016-11/documents/rtc_so2_comments_received_document_4_tx_sources_final_0.pdf.*

[10] As explained in the EPA's intended and final designations TSDs and the responses to comments document that accompanied the Round 2 Supplement, at the time of the EPA's final designations on December 13, 2016, there were no $SO_2$ monitors sited in the areas of maximum concentration to properly characterize the air quality around the Martin Lake, Big Brown, or Monticello areas, nor were there $SO_2$ monitors in the same counties as the facilities.

[11] The EPA received a comment from the Utility Air Regulatory Group on the Round 2 Supplement suggesting that the EPA wait for the future completion of three years of monitoring before designating certain Round 2 areas. In the Round 2 Supplement Responses to Comments (page 14), the EPA responded that the Agency does not have the discretion to await the results of future monitoring because of the court order to designate certain areas by the July 2, 2016, deadline.

[12] *See State of Texas* v. *EPA,* 983 F.3d 826, 836–838 (5th Cir. 2020).

**Tab 470: Technical Support Document for the
Withdrawal of EPA's Proposed Error Correction:
Assessment of Sierra Club's September 2019 Modeling**

**Technical Support Document for the Withdrawal of EPA's Proposed Error Correction: Assessment of Sierra Club's September 2019 Modeling**

## I.    Executive Summary

The Environmental Protection Agency (EPA) received several comments on its August 22, 2019, Clean Air Act (CAA) section 110(k)(6) proposed error correction action proposing to revise the nonattainment designations to unclassifiable for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County, Texas ("Proposed Error Correction," 84 FR 43757).[1] Specifically, on September 23, 2019, Sierra Club submitted a comment that included updated modeling purporting to demonstrate that the area around the Martin Lake Electric Station (*i.e.,* Rusk and Panola Counties) did not meet the 2010 Sulfur Dioxide ($SO_2$) Primary National Ambient Air Quality Standard (NAAQS) at the time of initial designations in December of 2016 and, at the time of the comment submission, did not meet the 2010 $SO_2$ NAAQS based on more recent data (*i.e.,* 2016-2018 data), even when potential modeling limitations (as characterized in the Proposed Error Correction) are appropriately addressed.[2]

As explained further in this document, EPA's assessment of Sierra Club's September 2019 modeling concludes that this modeling confirms EPA's initial assessment of the Sierra Club's March 2016 modeling for all three areas, which EPA used as the basis for its final nonattainment designations in the Round 2 Supplement (81 FR 89870). More specifically, Sierra Club's 2019 modeling confirms EPA's initial assessment that any further refinements to the modeling inputs used in the March 2016 modeling would <u>not</u> have resulted in designations other than nonattainment for these three areas. EPA's assessment of the March 2016 modeling in the record for the Round 2 Supplement, which is consistent with EPA's assessment in this document of Sierra Club's September 2019 modeling, concludes that there were not material errors in the March 2016 modeling for these three areas. Furthermore, EPA concludes that Sierra Club's September 2019 updated modeling further demonstrates that the individual and collective alleged limitations of the March 2016 modeling, as characterized in EPA's Proposed Error Correction, were not in fact limitations that undermined EPA's reasonable reliance on the March 2016 modeling to determine the areas were then violating the 2010 $SO_2$ NAAQS and designate them as nonattainment. In fact, EPA no longer believes that the bases identified in the Proposed Error Correction (*e.g.*, that those alleged limitations in the March 2016 modeling support action under CAA section 110(k)(6) to revise the designations) support the proposed conclusion that an error correction is appropriate. Overall, EPA believes that Sierra Club's September 2019 modeling, as it addresses air quality that existed at the time of the 2016 designations, further confirms our analysis and final December 13, 2016, nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County.[3]

---

[1] *See* Docket ID No. EPA-HQ-OAR-2014-0464.

[2] *See* Docket ID No. EPA-HQ-OAR-2014-0464-0466. Although Sierra Club did not submit updated modeling for the Big Brown and Monticello areas as part of the September 2019 submission, it also claims that EPA's proposed limitations (individually or collectively) have no material effect on the model results for those areas.

[3] As detailed in a separate *Federal Register* notice of availability that has been signed concurrently along with the withdrawal notice for the Proposed Error Correction, EPA is also now denying the administrative petitions from Vistra Energy and the Texas Commission on Environmental Quality. *See https://www.regulations.gov* under Docket ID No. EPA-HQ-OAR-2014-0464.

## II.     Background

*A.     Final Round 2 Supplement to 2010 SO₂ NAAQS Designations for Four Areas in Texas*

On December 13, 2016, EPA designated portions of Freestone and Anderson Counties (Big Brown Steam Electric Station), Rusk and Panola Counties (Martin Lake Electric Station), and Titus County (Monticello Steam Electric Station) as nonattainment for the 2010 SO₂ NAAQS based on EPA's assessment of all available information, including the Sierra Club's March 2016 modeling that demonstrated violations of the 2010 SO₂ NAAQS. *See* 81 FR 89870 ("Round 2 Supplement"). Vistra Energy's subsidiary Luminant owned all three power plants in 2016.

In finalizing the designations for the three Texas areas in 2016, EPA reviewed all available information and determined that Sierra Club's March 2016 modeling used the latest model version available at the time, used the default regulatory options, and was conducted in accordance with the general recommendations on modeling provided by EPA in its "SO₂ NAAQS Designations Modeling Technical Assistance Document" ("SO₂ NAAQS Designations Modeling TAD").[4] Sierra Club's March 2016 modeling provided to EPA was inherently subject to the constraints of the data available to Sierra Club, specifically the level of refinement reflected the modeling inputs. The Sierra Club's March 2016 modeling made adjustments and corrections to its previously submitted December 2015 and September 2015 modeling (collectively referred to as 2015 modeling) in response to EPA's assessment of the 2015 modeling in its February 2016 Intended Designations Technical Support Document (TSD). In the March 2016 modeling these adjustments and corrections included updating the model version used, updating to the most recent 3 years (2013-2015) of actual emissions for Martin Lake and Big Brown, inclusion of only the principle source in each area, and correction of switched stack locations at the Big Brown facility.[5] There were several aspects of the Sierra Club's March 2016 modeling that EPA discussed in the Final Designations Supplement TSD[6] regarding potential deviation from or lack of refinement where information was not publicly available under the SO₂ NAAQS Designations Modeling TAD:

1.  Exclusion of variable stack exit temperature (information not publicly available; used fixed values)
2.  Exclusion of building downwash (information not publicly available)
3.  Elevation of flagpole receptors (1.5 meters)
4.  Use of older land use data at the surface meteorological station
5.  Exclusion of fenceline or omission of receptors from certain locations (Luminant claimed certain locations were not feasible to place a monitor in receptor grid)
6.  Use of the lowest monitored background concentration in Texas

---

[4] *See* the SO₂ NAAQS Designations Modeling Technical Assistance Document ("SO₂ NAAQS Designations Modeling TAD") at *https://www.epa.gov/sites/production/files/2016-06/documents/so2modelingtad.pdf*.
[5] Technical Support Document Texas Area Designations for the 2010 SO₂ Primary National Ambient Air Quality Standard ("Intended Designations TSD"), available at *https://www.epa.gov/sites/production/files/2016-03/documents/tx-epa-tsd-r2.pdf*.
[6] Technical Support Document for the Designation Recommendations for the 2010 Sulfur Dioxide National Ambient Air Quality Standards (NAAQS) – Supplement for Four Areas in Texas Not Addressed in June 30, 2016 ("2016 Final Designations Supplement TSD"), available at *https://www.epa.gov/sites/production/files/2016-11/documents/texas_4_deferred_luminant_tsd_final_docket.pdf*.

However, EPA also analyzed the impact of these potential issues in the 2016 Final Designations Supplement TSD and determined that they did not undermine the use of the Sierra Club's March 2016 modeling for the purpose of designating the areas. EPA's analysis concluded that inclusion of such refinements or changes would not be expected to result in a change to the modeled concentrations to the degree that would alter the conclusion that the areas did not meet the 2010 $SO_2$ NAAQS. In the 2016 Final Designations Supplement TSD, EPA also noted that we received comments from Luminant. Luminant's comments included modeling, which did not conform with the $SO_2$ NAAQS Modeling TAD, but which provided some useful information regarding modeling inputs not previously available to the public.[7] For the area around the Martin Lake facility, EPA concluded the following in the 2016 Final Designations Supplement TSD:

1. Regarding stack temperature, EPA concluded that the constant temperature used by Sierra Club for the stacks (449.3K) was, on average, 21 percent higher than the continuous emissions monitor (CEM) temperatures furnished by Luminant as part of their 2016 modeling analysis, which for near full load (filtered for stack velocity > 25 m/s), has an average of 356K and ranged between 338-478K. EPA concluded that the increased temperature used by Sierra Club would increase the modeled buoyancy of the plume and tend to reduce modeled concentrations, and that the amount of reduction was dependent on meteorological conditions. EPA determined that the use of the Sierra Club's higher-than-actual constant temperature would likely underestimate the actual concentrations.[8]

2. Regarding building downwash, EPA concluded that, while we did not agree with the Sierra Club's assertion that exclusion of downwash is conservative in all cases, in our evaluation, the inclusion of building information and associated downwash in this analysis would not change our recommended designation of nonattainment. We noted that Luminant's modeling report (which Texas also included in their response to EPA's intended designations) indicated that they expected that the modeling results were not extremely sensitive to this issue because the stack heights are well above the buildings and there is considerable momentum and buoyancy rise for the stack plumes. EPA concluded that the modeling values were sufficiently above the standard and inclusion of downwash often leads to higher concentrations closer to the source but – even in situations we have seen where this did not occur – any decreases in maximum modeled values from inclusion of downwash were relatively small and not expected to be enough of a decrease to resolve all modeled exceedance values near Martin Lake.[9]

3. Regarding use of flagpole receptors, we stated that we would expect only a very slight change in the modeled numbers and the area of exceedances and magnitude of the values would be basically equivalent, and, therefore, not change our final action. We based this conclusion on analysis of sensitivity modeling conducted by the Sierra Club for another source, which found decreases in modeled $SO_2$ between almost 0 and 0.2 percent when removing the flagpole receptors and estimating concentrations at ground level. Since the Sierra Club's March 2016 maximum modeled design concentration (in ambient air) at

---

[7] See Docket ID No. EPA-HQ-OAR-2014-0464-0328.
[8] 2016 Final Designations Supplement TSD, p. 61.
[9] 2016 Final Designations Supplement TSD, pp. 61-62.

3

Martin Lake was at least 14 percent above the standard, EPA concluded that the change due to flagpole receptor heights would not decrease the value to below the standard.[10]

4. Regarding use of land surface data from 1992, EPA indicated based on Sierra Club's 2016 modeling, which included a sensitivity analysis for updated surface data/characteristics, that a small decrease (*i.e.*, approximately 3.6 percent) in maximum modeled design concentrations would be expected from updated surface characteristics.[11]

5. Regarding inclusion of contested receptors, EPA only evaluated concentrations in Sierra Club's March 2016 modeling at receptors that represented areas where it was clear to EPA based on available information that it would also be feasible to place a monitor and record ambient air impacts. Luminant's 2016 modeling included areas that it considered to be non-ambient, but EPA did not have sufficient information to evaluate and conclude that all the areas Luminant was claiming as non-ambient were in fact non-ambient areas. Without sufficient data to support Luminant's non-ambient area claims, EPA evaluated Sierra Club's March 2016 modeling results for the areas that Luminant did not claim as non-ambient, which we referred to as the "uncontested area." EPA's assessment included evaluating concentrations at only uncontested receptors and separately also evaluating concentrations at areas that clearly were erroneously claimed as unfeasible by Luminant. EPA also noted concerns that Luminant had contested receptors (excluded in Luminant's modeling) in more areas than were appropriate and that the maximum values in the uncontested area in Sierra Club's March 2016 modeling were as high as 239.1 micrograms per cubic meter ($\mu g/m^3$) near the Luminant excluded area.[12] For EPA's analysis, we explained that we used 224 $\mu g/m^3$ (highest concentration at an uncontested receptor) to evaluate the modeling, but the analysis could also be done based on the 239.1 $\mu g/m^3$ value, which would further support a nonattainment designation for the area around Martin Lake.[13]

6. Regarding background, EPA concluded that many of the $SO_2$ monitors in Texas are in urban areas and/or near a $SO_2$ point source, so there were limited data for background values. In addition, EPA concluded that using the El Paso monitor, which was the lowest design value in the state of Texas during this period, was an underestimation. Given the mass of $SO_2$ emissions in East Texas compared to the El Paso area, EPA explained that this assumption likely leads to an underestimation in the concentrations around these facilities (*i.e.*, if background monitoring data existed for East Texas it would be expected to be a higher value than the El Paso monitor data and would result in an increase in the modeled concentrations around the Martin Lake facility) but was within the framework of the $SO_2$ NAAQS Designations Modeling TAD's options for inclusion of background monitoring data.[14]

Based on the modeling available at the time, EPA also explained in the 2016 Final Designations Supplement TSD that inclusion of only the principle source in the modeling was an acceptable choice in this area's circumstances, as we maintained that Martin Lake was likely contributing

---

[10] 2016 Final Designations Supplement TSD, pp. 58-60.

[11] 2016 Final Designations Supplement TSD, pp. 28, 76.

[12] 2016 Final Designations Supplement TSD, pp. 65-72. Note the captions for Figures 22 and 23 in the 2016 Final Designations Supplement TSD indicate the Maximum value of 229.1 $\mu g/m^3$ but that is a typographical error and should have been 239.1 $\mu g/m^3$.

[13] 2016 Final Designations Supplement TSD, pp. 60, 66-72.

[14] 2016 Final Designations Supplement TSD, p. 65.

nearly 100 percent of the impact for the values above the 2010 $SO_2$ NAAQS. Sierra Club's modeling, by not including the nearby Pirkey Power Plant, was potentially slightly under-estimating approach to determining whether the area is attaining and to identifying the boundaries of such area, as inclusion of this source should result in either similar maximum impacts and boundaries or slightly increased impacts and possibly slightly larger boundaries, but should not result in decreased impacts or "shrinking" of boundaries from those modeled.[15]

In the 2016 Final Designations Supplement TSD, EPA concluded that the Sierra Club's March 2016 modeling followed the appropriate EPA modeling guidance based on the information that was available to Sierra Club at the time, and specifically concluded that several techniques (*i.e.*, not including building downwash, not using variable stack temperature, not including other $SO_2$ emissions sources, and using the lowest monitored background concentration) generally would tend to reduce/underestimate modeled design concentrations.[16] EPA also evaluated the combination of all these aspects (potential positive and negative impacts on concentrations) of the modeling through a comparison analysis, using 224 $\mu g/m^3$ as the maximum value based on the subset of uncontested receptors.[17] EPA's assessment of the available information ultimately concluded that the collective differences/changes to the Sierra Club modeling would not result in modeled values near or below the standard.[18] EPA reached this conclusion after considering that Sierra Club's modeled concentrations (with a low background and no nearby $SO_2$ emissions sources) were 14 percent above the standard using 224 $\mu g/m^3$ and 22 percent above the standard using 239.1 $\mu g/m^3$ as the maximum modeled design concentrations. EPA evaluated the factors listed previously and concluded that these would result in Sierra Club's 2016 modeling under-estimating impacts and that any differences/changes to Sierra Club's modeling would not result in modeled values near or below the standard. Instead, EPA concluded that any adjustments to these factors would actually result in higher modeled concentrations. Therefore, EPA considered the final Sierra Club modeling submitted March 2016 to be relevant information that must be considered in our designation decision and found that the modeling was a sufficient basis for a nonattainment designation because it clearly demonstrated the area around Martin Lake was violating the 2010 $SO_2$ NAAQS.[19]

In addition to the March 2016 updated Sierra Club modeling, EPA reviewed modeling submitted by Luminant during the public comment period in 2016.[20] The Luminant modeling did not conform to the guidance of the $SO_2$ Designations Modeling TAD nor the 40 CFR Part 51 Appendix W – Guideline on Air Quality Models. Furthermore, EPA determined that Luminant's modeling was not representative of current air quality in these areas for several reasons, as further explained in EPA's 2016 Final Designations Supplement TSD. Some examples of the issues EPA identified with Luminant's modeling were:
- Luminant applied non-EPA preprocessor models, AERLIFT and AERMOIST, to the CEM data to increase the observed temperatures and (in the case of AERLIFT) velocities of the plumes exiting from the stacks. EPA reviewed these proposed processors and

---

[15] 2016 Final Designations Supplement TSD, pp. 60-62.
[16] 2016 Final Designations Supplement TSD, p. 75.
[17] 2016 Final Designations Supplement TSD, p. 76.
[18] 2016 Final Designations Supplement TSD, pp. 75-77.
[19] 2016 Final Designations Supplement TSD, p. 75-77.
[20] *See* Docket ID No. EPA-HQ-OAR-2014-0464-0328.

supplied information, and then analyzed some of the significant changes that these processers were making to modeled stack parameters and buoyancy flux calculation. The lack of supporting documentation and EPA's review of the changes the processers were making resulted in EPA determining that AERLIFT and AERMOIST were not adequately justified and, thus, model results using these processors could not be relied upon in the designations decision-making process.[21]

- Luminant's March 2016 report included a then-future emissions estimate scenario (2017-2019 estimated $SO_2$ emissions). Luminant asserted that Martin Lake will not cause or contribute to nonattainment near the plant when modeled with Luminant's then-projected future emissions because the maximum modeled design concentration was 192.1 µg/m³. These projected emissions were associated with potentially improving scrubber efficiency, fuel switches, and potentially collateral benefits with reductions of $SO_2$ from the facility complying with the Mercury Air Toxics Rule (MATS). In the 2017-2019 future estimated emissions modeling scenario, Luminant projected future emissions rates in 2017-2019 that were lower than recent actual emissions at the time based in part on future non-enforceable, voluntary operational changes at Martin Lake.[22] However, for the purpose of determining whether the area is currently meeting the 2010 $SO_2$ NAAQS and designating the area, either actual emissions or currently enforceable allowable emissions limits should be modeled. EPA provided the following explanation in the 2016 Final Designations Supplement TSD:

> Neither the efficiency improvements in operation of existing scrubbers nor fuel switches were reflected in a permanently enforceable situation. This means that they could change, and are not a certain or effective limitation on either current or future emissions…In this case the intended switching of fuel and increases in scrubber efficiency, whether they have occurred or not, are not yet enforceable through any mechanism provided by Luminant - such as a permit limit - and Luminant would be free to either not switch or, if it does switch, change back to a higher sulfur content coal in the future, depending on circumstances.[23]

Without permanent and federally-enforceable emissions limits, the facility could make operational modifications (*e.g.*, change the fuel type, alter the volume of process exhaust bypassing the scrubber, etc.), which may not be protective of future air quality.[24]

- Luminant's modeling used Beta options LOWWIND3 and ADJ_U* which had not been approved by EPA for regulatory use and, among other conditions, required consultation and pre-approval from EPA for regulatory applications as an alternative model. This process was not initiated or completed in the modeling of these three areas and thus, the

---

[21] EPA also compared the difference between the pre-processors assumptions and impacts and the stack temperatures used in Sierra Club's March 2016 modeling. *See, e.g.,* 2016 Final Designations Supplement TSD at pp. 55-61.

[22] As discussed elsewhere, actual emissions for this time period were higher than Luminant predicted and similar to the actual 2013-2015 emissions that were modeled to inform designations.

[23] 2016 Final Designations Supplement TSD, p. 55-56.

[24] 2016 Final Designations Supplement TSD, p. 55-56.

modeling based on their use was determined by EPA to not be acceptable for this regulatory use.[25]

B.    *Proposed Error Correction of 2010 SO$_2$ NAAQS Designations for Three Areas in Texas*

On August 22, 2019, EPA proposed to determine it had made an error in the 2010 SO$_2$ NAAQS nonattainment area designations for three Texas areas and to revise the designations to unclassifiable for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County. *See* 84 FR 43757. EPA proposed that it erred: 1) in not giving greater weight to Texas' preference to characterize air quality through monitoring, and steps undertaken by Texas towards siting monitors with the intention to begin monitoring in these three areas, when considering all available information; 2) in relying on available air quality modeling analyses in making the initial designations that EPA recognized included certain limitations and uncertainties; or 3) a combination of these two issues.

Regarding the limitations and uncertainties with the Sierra Club 2015 and March 2016 modeling, EPA stated in the Proposed Error Correction that given the possible collective significance of these issues and, in the case of the areas around the Martin Lake and Monticello power plants, given that the maximum modeled concentrations are within about 10 percent of the primary SO$_2$ NAAQS, we were less confident in our prior statements that potential adjustments to the Sierra Club modeling would not result in modeled values near or below the SO$_2$ NAAQS.[26] In the Proposed Error Correction, EPA stated that limitations and uncertainties with the Sierra Club modeling identified in the Intended Designations TSD and the Final Designations Supplement TSD for the 2016 SO$_2$ designations included:

1.  Absence of variable stack conditions and representation of 100 percent load stack parameters. EPA stated that commenters on EPA's proposed designations noted this issue is particularly pronounced as the Electric Reliability Council of Texas (ERCOT) market is competitive with plant dispatch based on variable cost and falling natural gas prices and renewable capacity resulting in these units running in variable operations. EPA also noted that EPA stated in the technical support document for the 2016 designations in Indiana that use of hourly stack parameters more accurately characterizes plume characteristics, which will provide greater reliability both in the estimated concentration and in the geographical distribution of concentrations.
2.  Treatment of building downwash (failure to include), surface meteorology, hourly wind inputs, potential to emit/allowable emissions, variable stack temperature, and velocity.
3.  Inappropriate elevation of flagpole receptors.
4.  Use of an older version of AERMOD (Note: This refers to modeling in EPA's Intended Designations TSD but not in modeling for the 2016 Final Designations Supplement TSD).

---

[25] 2016 Final Designations Supplement TSD, p. 58.

[26] As explained in the 2016 Final Designations Supplement TSD, the modeled 99th percentile daily maximum 1-hour SO$_2$ concentrations for the Martin Lake and Monticello facilities are 14 percent and 8 percent above the 2010 SO$_2$ NAAQS, respectively. The Martin Lake figure is based on the approach of looking only at uncontested receptors.

5. Representation of recent emissions, including controls after the 2011 National Emissions Inventory.
6. Use of a larger receptor grid than recommended.
7. Approach to estimation of background concentrations.
8. Failure to include fenceline receptors or source contribution in the modeling analysis.

EPA stated that "while individually these deficiencies are not dispositive, collectively they are a sufficient basis for the EPA to propose that we erred in relying on the Sierra Club modeling in making the initial nonattainment designations for the three Texas areas." *See* 84 FR at 43761.

## III. Sierra Club Modeling Submitted in Response to EPA's September 2019 Proposed Error Correction

EPA received several comments on its August 22, 2019, Proposed Error Correction action proposing to revise the designations to unclassifiable for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County.[27] Specifically relevant to this technical support document, on September 23, 2019, Sierra Club submitted a comment including new modeling that addressed the limitations identified in the Proposed Error Correction regarding the Sierra Club's previous modeling,[28] both individually and collectively. The Sierra Club's September 2019 modeling purportedly demonstrated the area around Martin Lake was violating the 2010 $SO_2$ NAAQS based on modeling of 2013-2015 period with actual emissions for Martin Lake. The remainder of this document analyzes Sierra Club's September 2019 modeling for the 2013-2015 period and compares that modeling with the Sierra Club's March 2016 modeling used for EPA's final nonattainment designation of the Martin Lake area. The Sierra Club's September 2019 is modeling was conducted to characterize air quality in that area using the most recent 3 years of actual emissions then-available at the time of the Round 2 Supplement. The following assessment focuses on Sierra Club's September 2019 modeling of the 2013-2015 period, which collectively addressed all the issues raised in EPA's Proposed Error Correction; however, EPA also reviewed and agrees with the analyses of the individual factors as detailed in the Sierra Club's modeling report for the same reasons stated therein.

## A. Sierra Club's 2019 Updated Modeling for the 2013 -2015 Period

To address the issues EPA identified in its Proposed Error Correction, the September 2019 Sierra Club modeling for the 2013-2015 period utilizes modeling inputs from Luminant's March 2016 modeling analysis except where noted. Since the remainder of the updated modeling was unchanged, refer to the 2016 Final Designations Supplement TSD for the Round 2 Supplement for a discussion of the individual, unchanged elements.

1. The most current version of the AERMOD modeling system, version 18081, was used for the analysis. Note, as explained by EPA in the 2016 Final Designations TSD, the Sierra Club's March 2016 modeling analysis used the most recently available version (version 15181) of AERMOD at that time, which was an updated version of AERMOD compared

---

[27] *See* Docket ID No. EPA-HQ-OAR-2014-0464.
[28] This refers to Sierra Club's 2015 modeling used in the Intended Designation TSD and Sierra Club's March 2016 modeling used in the 2016 Final Designations Supplement TSD.

to the previous Sierra Club modeling (using AERMOD version 14134) that EPA reviewed in the Intended Designations TSD.

2. Refinements of the March 2016 modeling inputs for stack parameters, building dimensions and locations, emissions rates, and receptor grid were obtained directly from Luminant's March 2016 modeling analysis. The Sierra Club's updated modeling (2019) used Luminant's March 2016 report as a basis since the Luminant analysis contained more refined modeling inputs based on data available to the facility owner, such as CEM measured stack and emission/temperature/flow/velocity parameters, and stack and building location and dimensions.[29] Specifically, the following was updated:

   a. Stack location, height, and diameters.
   b. Specific building locations and dimensions allowing for evaluation of downwash.
   c. Updated hourly emissions rates, stack temperatures and stack exit velocities. The Sierra Club March 2016 modeling analysis had used a constant temperature obtained from a prior regional haze modeling study. While the facility's continuous emissions monitoring (CEM) system records temperatures, these data are not reported to EPA's Clean Air Markets Division (CAMD).[30] The updated Sierra Club analysis used Luminant's hourly CEM temperature measurements during 2013-2015.

3. Updated meteorological data were obtained from the surface station at the Longview Texas Regional Airport. To address potential concerns expressed during the Round 2 Supplement about recent changes in land use surrounding the airport, the beta version of AERSURFACE v. 19039 was run with 2011 National Land Cover Database (NLCD), an update from the previous 1992 NLCD data.

4. To address EPA's concerns regarding the Sierra Club's March 2016 modeling's use of a 1.5-meter flagpole receptor height to reflect a representative inhalation level, the updated analysis does not use an elevated flagpole height.

5. To address EPA's concerns about the size of the receptor grid in Sierra Club's March 2016 modeling, Sierra Club used a 25-kilometer grid for both of the two modeling receptor grids. Receptor Grid #1 includes all locations around the Martin Lake Generating Station accessible by the general public. Receptor Grid #2 was obtained from Luminant's 2016 modeling analysis that excluded locations that Luminant claimed was not feasible for placement of a monitor and/or which were claimed as Luminant's property that the public does not have access.[31]

---

[29] Sierra Club is using data (including stack location and parameters, emissions rates, actual varying stack temperatures, and stack velocities) provided by Luminant that is available to Luminant but not reported to EPA's CAMD database or normally available to the public. This data that Sierra Club used was not adjusted by the processors AERLIFT and AERMOIST that EPA determined invalidated the results of Luminant's 2016 modeling. EPA has reviewed the information/values that Sierra Club is using in its September 2019 updated modeling from Luminant's March 2016 modeling analysis, and EPA considers these to be acceptable because they comport with the $SO_2$ Designations Modeling TAD.

[30] *https://ampd.epa.gov/ampd/.*

[31] EPA has not determined whether the areas that Luminant claimed as non-ambient and they excluded receptors from is substantiated or not, but Sierra Club's Receptor Grid #2 estimates the air quality in the modeled area based on areas that Luminant identified in their March 2016 modeling analysis as ambient (uncontested receptors) with modeled DVs above the NAAQS (2016 Final Designations Supplement TSD, pp. 66-72).

*B.     Modeling for the 2016 - 2018 Period*

Sierra Club also submitted modeling for the more recent 2016-2018 3-year period. The additional years modeled in other scenarios are intended to address the identified limitation that the 2013-2015 years might not be representative of future emissions. Actual hourly emissions rates were obtained from EPA's CAMD database for 2016 through 2018. The Sierra Club attempted to derive representative stack temperatures and hourly-varying exit velocities for the 2016-2018 period. Since the full CEMS data were not publicly available for modeling the 2016-2018 period the 2013-2015 CEMS data were used to characterize the individual unit stack parameters. An average stack outlet temperature for each of the three units for 2013-2015 was calculated. Exit velocities for 2013-2015 from the CEM measurements were combined with concurrent heat input obtained from CAMD to derive a relationship between exhaust gas flow rate and heat input for the three units. The relationship was applied to the hourly heat input for each unit from CAMD during the 2016-2018 period to estimate hourly exit velocities during 2016-2018.

The background concentration was updated to the 99th percentile concentration in Travis County, Texas, the lowest design value measured at ambient monitors in the State of Texas, for the 2016-2018 period. Sierra Club indicated that this monitor was used because it is nearer to Martin Lake and because the monitor which previously had the lowest state value (El Paso UTEP) was decommissioned on December 31, 2017. The updated background concentration from the Austin Northwest monitor (AQS ID# 48-453-0014) is 7.8 $\mu g/m^3$ (3 ppb), which is 2.7 $\mu g/m^3$ (51 percent) higher than the background value of 5.1 $\mu g/m^3$ used in Sierra Club's March 2016 modeling.

*C.     Scenarios Examined*

The Sierra Club modeling analysis covered several scenarios relevant to assessing whether to revisit the initial designations for the three Texas areas, including our Proposed Error Correction. This modeling analysis provides new information that EPA did not have at the time of our Proposed Error Correction. One of the central issues that EPA had based our error correction proposal on was that EPA did not have enough information at the time of the Round 2 Supplement to assess a combination of issues in Sierra Club's March 2016 modeling, to the extent that the March 2016 modeling should not have been relied upon to determine whether the area around Martin Lake was not attaining the 2010 SO$_2$ NAAQS. Sierra Club's September 2019 updated modeling confirms EPA's initial analysis of Sierra Club's March 2016 modeling, which included both individual and collective analysis of such issues, and further demonstrates that the individual and collective alleged limitations of the March 2016 modeling, as characterized in EPA's Proposed Error Correction, were not limitations that undermined EPA's reasonable reliance on the March 2016 modeling to determine the areas were then violating the 2010 SO$_2$ NAAQS and designate them nonattainment. In fact, EPA no longer believes that the bases identified in the Proposed Error Correction support the proposed conclusion that an error correction is appropriate. The results of the relevant modeling scenarios are discussed in the remainder of this section.

10

The key modeling scenario in Sierra Club's September 2019 modeling analyses, for comparison to the March 2016 modeling analysis, which EPA relied on in the Round 2 Supplement, are the modeling files contained in the file "MLsx1315b.zip," which Sierra Club submitted during the public comment period, but hereinafter referred to the MLsc1315b scenario.[32] This MLsc1315b scenario is assessed in the next section and includes all the inputs and updates explained in the September 2019 modeling for the 2013-2015 Period, including Receptor Grid #2. EPA is focusing our comparison analysis on this specific modeling scenario that includes Receptor Grid #2, as this modeling analysis is for the same meteorological and emissions period (2013-2015) that was relied upon in the 2016 Final Designations Supplement TSD and also potentially underestimates the $SO_2$ air quality at the time of the Round 2 Supplement because it includes only uncontested modeling grid receptors.

Sierra Club's 2019 updated modeling reported results for four 3-year meteorological/emissions periods: 2013-2015, 2014-2016, 2015-2017 and 2016-2018. As discussed previously, the stack parameters for the years 2013, 2014, and 2015 were from the CEMS while for the other years were estimated based on relationships derived from the 2013-2015 period because Sierra Club did not have access to varying stack temperature and velocity for the other years (2016-2018). The September 2019 modeling for the 2013-2015 period is most accurate because it uses information from Luminant on stack parameters (velocity and temperature) not publicly available for 2016-2018 period and noted as either actual or estimated in Table 2. Table 2 includes a summary of all the Modeling Scenarios provided by Sierra Club in their 2019 modeling analysis and their March 2016 modeling analysis including the maximum design concentration and background used.

---

[32] Air dispersion modeling input and output files are too large to post in the docket or on EPA's website and must be requested from the EPA Docket Center, Corey Mocka (*mocka.corey@epa.gov*), or Erik Snyder (*snyder.erik@epa.gov*).

**Table 2.** Results for Select Scenarios from the Sierra Club's 2019 Modeling Analysis for the Martin Lake Area

| Modeling Analysis | Modeling Scenario ID | SO$_2$ Emissions Type | Receptor Grid | Stack Parameters | 99th Percentile 1-hour Daily Maximum (µg/m$^3$) | Backgr-ound (µg/m$^3$) | Total (µg/m$^3$) |
|---|---|---|---|---|---|---|---|
| **March 2016** | Not Applicable | Actual | Grid #1[a] | Fixed Velocity & Temperature | 239.0 | 5.1 | **244.1[b]** |
| **September 2019** | MLsc1315a | Actual 2013-15 | Grid #1 | Actual[c] | 393.8 | 7.8 | **401.6** |
| | MLsc1315b | Actual 2013-15 | Grid #2 | Actual[c] | 388.7 | 7.8 | **396.5** |
| | MLsc1416b | Actual 2014-16 | Grid #2 | Estimated | 311.0 | 7.8 | **318.8** |
| | MLsc1517b | Actual 2015-17 | Grid #2 | Estimated | 209.2 | 7.8 | **217.0** |
| | MLsc1618b | Actual 2016-18 | Grid #2 | Estimated | 238.4 | 7.8 | **246.2** |

[a] March 2016 Grid #1 extends to 50 km while the September 2019 Grid #1 extends to 25 km.
[b] **Bold** concentrations are above the 2010 SO$_2$ NAAQS (196.4 µg/m$^3$).
[c] Actual Stack Parameters - Variable stack velocity and temperature were used from Luminant data included in Luminant's 2016 modeling analysis. These values were measured or calculated from measured data and are not impacted by the processors that Luminant used (AERLIFT or AERMOIST) and are, therefore, acceptable. These values are more refined than the estimated values previously used by Sierra Club in their March 2016 modeling analysis.

## IV.     Comparison of Sierra Club's March 2016 and September 2019 Modeling for the 2013-2015 Period

The MLsc1315b modeling scenario provides modeling that addresses previously identified concerns in the Proposed Error Correction and refines the modeling analysis in strict accordance with the SO$_2$ NAAQS Designations Modeling TAD for the 2013-2015 modeling period. Sierra Club's September 2019 modeling for the 2013-2015 period has directly addressed all the modeling inputs that EPA identified in our Proposed Error Correction and/or the Round 2 Supplement. EPA has reviewed the September 2019 modeling, and the modeling strictly follows the SO$_2$ NAAQS Designations Modeling TAD, which EPA provided in advance of the Round 2 designations. Sierra Club made several refinements to the model input data, which became publicly available at the end of the Round 2 designations public comment period as part of Luminant's March 2016 comments, and these data and other updated components of the AERMOD modeling system were used in this September 2019 modeling. The changes, as detailed in the Section III of this document, are refinements to the model inputs, based on more detailed data, and more rigidly adhere to EPA's modeling guidance regarding when such refinements are available.

12

As explained in more detail later in this document, because the technical aspects of Sierra Club's March 2016 modeling identified by EPA in the Proposed Error Correction have been addressed in Sierra Club's September 2019 modeling of the 2013-2015 meteorology and emissions, the 2019 modeling effectively demonstrates whether EPA was correct in estimating the impact of any uncertainty from lack of refinement of inputs or deviation from the $SO_2$ NAAQS Designations Modeling TAD in the March 2016 modeling. In sum, the September 2019 modeling demonstrates that our initial designation of nonattainment for the area around Martin Lake, and by extension our initial designations for the areas around Big Brown and Monticello, were also valid. By comparing the key modeling scenario, MLsc1315b, for Sierra Club's September 2019 modeling analysis to Sierra Club's March 2016 modeling analysis, EPA can assess the overall combined impact of the issues identified and compare to the initial analysis EPA relied upon in the Round 2 Supplement. This assessment confirms EPA's conclusions and designations for all three areas in the Round 2 Supplement.

EPA notes that in the Proposed Error Correction we did not separate technical aspects that EPA analyzed in the Intended Designations TSD from those EPA analyzed in the 2016 Final Designations Supplement TSD. Additionally, EPA notes that Sierra Club's March 2016 modeling, which was relied on in the 2016 Final Designations Supplement TSD, included updates to Sierra Club's older 2015 modeling that addressed some technical aspects EPA identified in the Intended Designations TSD. The following technical aspects that potentially created uncertainties EPA identified in the Proposed Error Correction were only in the Sierra Club's older 2015 modeling in the Intended TSD and were updated in the Sierra Club's March 2016 modeling, which EPA relied on in the Final Designations Supplement TSD, to be strictly in accordance with the $SO_2$ NAAQS Designations Modeling TAD: 1) use of an older version of AERMOD (most recent version available at that time was used in the March 2016 modeling), and 2) representation of recent emissions, including controls after the 2011 National Emissions Inventory (the March 2016 modeling used the most recent three years (2013-2015) of actual emissions that were available at the time for Martin Lake and Big Brown as 2016 calendar year was still ongoing). Additionally, regarding the failure to include source contribution in the modeling analysis that EPA listed in the Proposed Error Correction, EPA notes that the older Sierra Club modeling included other sources to assess contribution, while the March 2016 modeling included only the principle source in each area in response to EPA's analysis in the Intended Designations TSD.

One of the technical aspects that potentially created uncertainties that EPA identified in the March 2016 modeling in the Proposed Error Correction was the absence of variable stack conditions and representation of 100 percent load stack parameters (variable stack temperature and velocity). EPA also identified the treatment of building downwash (failure to include), use of a larger receptor grid than recommended, and failure to include fenceline receptors as limitations or uncertainties in the Proposed Error Correction. In the 2016 Final Designations Supplement TSD, EPA explained that, when compared to the actual measured CEM temperatures furnished by Luminant as part of their modeling analysis, the Sierra Club's temperature was on the average 21 percent higher – the average temperature in the CEM data for near full load (filtered for stack velocity > 25 m/s) was 356K, ranging between 338-478K. EPA explained that this increase in buoyancy would tend to reduce modeled concentrations, the amount depending on meteorological conditions; therefore, EPA determined that the use of the Sierra Club's higher-

13

than-actual constant temperature likely underestimates the actual concentrations. More specifically, EPA explained that this temperature difference would cause on the average a 196 percent increase in buoyancy flux versus using the CEM temperature when operating near full load, and that the buoyancy flux is used by the plume rise algorithm in AERMOD to calculate buoyant plume rise.

EPA further explained that higher values of buoyancy flux yield higher plume rise, affecting the transport and dispersion of the plume, and that, typically, higher plume rise reduces peak ground-level concentrations and tends to move the maximum impacts further away from the source. EPA noted that because the 2010 $SO_2$ NAAQS is a one-hour standard, the buoyancy enhancements for critical hours would be a controlling factor in the modeled concentrations on which the maximum modeled design concentration is based, and that the use of Sierra Club's higher-than-actual constant temperature, judged without other factors, would most likely underestimate the actual maximum concentrations (*i.e.*, the use of higher temperatures in the Sierra Club's March 2016 modeling would lead to lower modeled concentrations than if the actual measured temperatures from Luminant would have been used, which would likely result in higher 99th percentile 1-hour daily maximum concentration). The increase in buoyancy over the actual buoyancy would increase plume rise and alter the geographic distribution of concentrations. The 2019 Sierra Club modeling scenario MLsc1315b includes variable stack temperature and variable stack velocity, eliminating this identified limitation. Sierra Club's September 2019 modeling for the 2013-2015 period also included a sensitivity run using the stack velocity and stack temperatures from the March 2016 modeling analysis to determine the impacts of using the estimated stack velocity and temperature on the maximum modeled design concentration. In this sensitivity run, Sierra Club only changed these specific inputs; all other inputs were unchanged from the MLsc1315b scenario. This sensitivity run indicates that using the estimated stack parameters in the March 2016 modeling resulted in a maximum modeled design concentration that was 40 percent lower than the maximum modeled design concentration when CEM based hourly varying temperature and velocity were used in the September 2019 modeling (232.6 $\mu g/m^3$ vs. 393.8 $\mu g/m^3$). In other words, the 224 $\mu g/m^3$ and 239 $\mu g/m^3$ maximum modeled design concentrations cited in the 2016 Final Designations Supplement TSD, increased on the order of 69 percent (232.6 $\mu g/m^3$ vs. 393.8 $\mu g/m^3$) when these refined data were used in the September 2019 modeling. This confirms EPA's assessment in the 2016 Final Designations Supplement TSD that Sierra Club's March 2016 maximum modeled design concentration was underestimated because of these technical aspects.

One of the technical aspects of Sierra Club's March 2016 modeling that EPA identified in the Proposed Error Correction as creating uncertainty was the absence of including building downwash. Regarding building downwash, in the 2016 Final Designations Supplement TSD, EPA concluded that, while we did not agree with Sierra Club's assertion that exclusion of downwash would underestimate the maximum modeled design concentration in all cases, in our evaluation the inclusion of building information and associated downwash in this analysis would not change our recommended designation of nonattainment. We noted that Luminant's 2016 modeling report (which Texas also included in their response) indicated that they expected that the modeling results were not extremely sensitive to this issue because the stack heights are well above the buildings and there is considerable momentum and buoyancy rise for the stack plumes. EPA concluded that the modeling values were sufficiently above the standard and inclusion of

14

downwash often leads to higher concentrations closer to the source but, even in situations we have seen where this did not occur, any decreases in maximum modeled values from inclusion of downwash were relatively small and not expected to be enough of a decrease to resolve all modeled exceedance values near Martin Lake. The 2019 Sierra Club modeling scenario MLsc1315b includes building downwash, eliminating this identified limitation. Sierra Club's September 2019 modeling for the 2013-2015 period also included a sensitivity run where they removed the building information and downwash processing to determine what the impacts of including building downwash was on the maximum modeled design concentration. In this sensitivity run, Sierra Club only changed these specific inputs and all other inputs were unchanged from the MLsc1315b scenario. This sensitivity run indicates that the maximum modeled design concentration without including building was unchanged compared to the maximum modeled design concentration when downwash was included (393.8 $\mu g/m^3$ vs. 393.8 $\mu g/m^3$). This confirms EPA's assessment in the 2016 Final Designations Supplement TSD that including downwash in Sierra Club's March 2016 modeling analysis would not be expected to resolve all modeled exceedance values in the area because any changes in concentration or shift in location of the maximum concentration would be expected to be relatively minimal and may result in higher impacts closer to the facility.

Another technical aspect that EPA identified in the Proposed Error Correction as creating uncertainty was the elevation of flagpole receptors in Sierra Club's March 2016 modeling. In the 2016 Final Designations Supplement TSD, EPA stated that we would expect only a very slight change in the modeled concentrations and the area of exceedances and magnitude of the values would be basically equivalent, and, therefore, not change our final action. We based this conclusion on analysis of sensitivity modeling conducted by the Sierra Club for another source, which found decreases in modeled $SO_2$ between almost 0 and 0.2 percent when removing the flagpole receptors and estimating concentrations at ground level. Since Sierra Club's 2016 modeled maximum modeled designation concentration (in ambient air) at Martin Lake is at least 14 percent above the 2010 $SO_2$ NAAQS, EPA concluded that the change due to flagpole receptor heights would not decrease the value to below the standard. Sierra Club's September 2019 modeling scenario MLsc1315b does not use elevated flagpole receptors, eliminating this identified limitation. Sierra Club's September 2019 modeling for the 2013-2015 period also included a sensitivity run where they changed the receptor heights to flagpole receptor heights to evaluate potential impacts on the modeled results. In this sensitivity run, Sierra Club only changed these specific inputs and all other inputs were unchanged from the MLsc1315b scenario. This sensitivity run indicates that the maximum modeled design concentration from using flagpole receptor heights resulted in maximum modeled design concentration that was 0.05 percent higher compared to the maximum modeled design concentration using normal receptor height (394.0 $\mu g/m^3$ vs. 393.8 $\mu g/m^3$). This confirms EPA's assessment in the 2016 Final Designations Supplement TSD that using flagpole receptor height in Sierra Club's March 2016 modeling analysis may result in a very small increase in the maximum modeled design concentration, which would not have had an impact on our decision because maximum modeled concentrations were at least 14 percent above the 2010 $SO_2$ NAAQS.

Another technical aspect that EPA identified in the Proposed Error Correction as creating uncertainty was treatment of surface meteorology and hourly wind inputs. Regarding use of land surface data from 1992, EPA indicated based on Sierra Club's March 2016 modeling, which

included a sensitivity analysis for updated surface data/characteristics, that only a small decrease in maximum modeled design concentrations of 3.6 percent was expected from using updated surface characteristics. As explained previously, in Sierra Club's September 2019 modeling, the meteorology was reprocessed with EPA's updated AERSURFACE program and with updated land use and land cover information around the meteorological site, resolving this identified limitation. Sierra Club's September 2019 modeling for the 2013-2015 period also included a sensitivity run where they used the older surface characteristics (Land Use Land Cover from 1992 – LULC1992) instead of the new surface characteristics in processing the winds and AERMOD inputs to assess the use of the older surface characteristics on the maximum modeled design concentration. In this sensitivity run, Sierra Club only changed these specific inputs; all other inputs were unchanged from the MLsc1315b scenario. This sensitivity run indicates that the maximum modeled design concentration from the older surface characteristics resulted in a maximum modeled design concentration that was 1 percent higher compared to the maximum modeled design concentration using the newer surface characteristics (399.4.0 $\mu g/m^3$ vs. 393.8 $\mu g/m^3$). This confirms EPA's assessment in the 2016 Final Designations Supplement TSD that using the newer surface characteristics data instead of the data from 1992 in Sierra Club's March 2016 modeling analysis may result in a small decrease in the maximum modeled design concentration and when considered would only result in slightly lower maximum modeled design concentrations. The Sierra Club's September 2019 sensitivity modeling indicates that, in the 2016 Final Designations Supplement TSD, EPA actually overestimated the decrease of the maximum modeled design concentration that may occur from using newer surface characteristics (3.6 percent); the 2019 sensitivity indicates that the actual decrease was only 1 percent.

Another technical aspect that EPA identified in the Proposed Error Correction as creating uncertainty was use of a larger receptor grid than recommended and failure to include fenceline receptors. As discussed previously, Sierra Club's 2015 and March 2016 modeling used a large grid and did not include fenceline receptors or restrict receptors from parts of Luminant's property that could be non-ambient air. In the 2016 Final Designations Supplement TSD, EPA only evaluated concentrations in Sierra Club's March 2016 modeling at receptors that represented areas where it would also be feasible to place a monitor and record ambient air impacts. Luminant's 2016 modeling included areas that they considered to be non-ambient, but EPA did not have sufficient information to evaluate and concluded that all the areas Luminant was claiming as non-ambient were actually non-ambient areas. Without sufficient data to support Luminant's non-ambient area claims, EPA took the approach of only evaluating Sierra Club's March 2016 modeling results for the areas that Luminant did not claim as non-ambient, which we referred to as the uncontested area. This included evaluating concentrations at only uncontested receptors, and separately also evaluating concentrations at areas that clearly were erroneously claimed as unfeasible by Luminant. EPA also noted that we had concerns that Luminant had contested receptors (excluded in Luminant's modeling) in more areas than were appropriate and that the maximum values in the uncontested area in Sierra Club's March 2016 modeling were actually as high as 239.1 $\mu g/m^3$ near the Luminant excluded area. EPA's analysis explained that we conservatively used 224 $\mu g/m^3$ (highest at uncontested receptor) to evaluate the modeling, but the analysis could also be done based on the 239.1 $\mu g/m^3$ value, which would even more clearly demonstrate the area around Martin Lake was violating the 2010 $SO_2$ NAAQS. The 2019 Sierra Club modeling scenario MLsc1315b used the Luminant 2016 property descriptions in their location of receptors, so their new analysis only looked at receptors that

Luminant considered to be ambient (*i.e.*, the uncontested area). Sierra Club did not place receptors on areas that Luminant considered non-ambient thus, eliminating the potential concern about fenceline receptors. Sierra Club's September 2019 modeling and modeling report indicates multiple areas above 300 μg/m³ that are clearly outside the areas that Luminant considered in 2016 as their boundary for non-ambient air (Figure 1).[33] Therefore, Sierra Club's September 2019 modeling clearly demonstrates that this is not a technical limitation; the only uncertainty is that Luminant claimed large areas as non-ambient in their 2016 modeling and some of these areas could be ambient, but this uncertainty does not impact the conclusion that the area is violating the 2010 SO₂ NAAQS.

**Figure 1.** Figure Showing Maximum Modeled Design Concentrations from Sierra Club's September 2019 Modeling (Scenario MLsc1315b)



1-hour average SO2 concentrations (ug per cubic meter) - All colored areas exeed the NAAQS.

---

[33] Figure 2 from Sierra Clubs 2019 Modeling Report ("Martin Lake Generating Station TX – Evaluation of Compliance with the 1-hour NAAQS for SO2 – Final – 23Sep19.pdf").

Another technical aspect and potential uncertainty that EPA identified in the Proposed Error Correction was use of an older version of AERMOD. As noted previously, this uncertainty was only identified in the Sierra Club 2015 modeling, which EPA used for the basis of its intended designation, not the March 2016 modeling that EPA relied on for the final designation. Sierra Club also used the most recent version of AERMOD in their September 2019 modeling. Therefore, EPA concludes that this was not a technical aspect or potential uncertainty in the March 2016 modeling and, therefore, could not be a part of a basis for concluding that relying on that March 2016 modeling used in the final designation was in error.

Another technical aspect and potential uncertainty EPA identified in Sierra Club's modeling for the Round 2 Supplement in the Proposed Error Correction was the representation of "recent emissions, including controls after the 2011 National Emissions Inventory" and "potential to emit/allowable emissions." *See* 84 FR at 43761. As noted previously, Sierra Club's March 2016 modeling used the most recent three years of actual emissions available at that time. Sierra Club's September 2019 MLsc1315b modeling scenario also used 2013-2015 actual emissions. The use of the 2013-2015 actual emissions is strictly in accordance with the $SO_2$ Designations Modeling TAD and consistent with assessing the air quality at the time of the Round 2 Supplement. EPA provided the following assessment in the 2016 Final Designations Supplement TSD in response to Luminant's 2016 comments about controls in 2016, after the 2011 National Emissions Inventory, and how these might impact the potential to emit/allowable emissions:

> In the 2017-2019 emission modeling submission, Luminant projected future reduced emission rates were used that were based in part on future non-enforceable, voluntary operational changes at Martin Lake. However, for the purpose of determining whether the area is currently meeting the NAAQS and designating the area either actual emissions or a currently enforceable reduction in actual emissions should be used. Neither the efficiency improvements in operation of existing scrubbers or fuel switches were reflected in a permanently enforceable situation. This means that they could change and are not a certain and effective limitation on either current or future emissions. Compliance with MATS does allow for using $SO_2$ limits as surrogates for other pollutants, but how a facility meets the MATS requirements can be changed by fuel switching/blending and testing directly for the MATS pollutants. In this case the intended switching of fuel and increases in scrubber efficiency, whether they have occurred or not, are not yet enforceable through any mechanism provided by Luminant - such as a permit limit - and Luminant would be free to either not switch or, if it does switch, change back to a higher sulfur content coal in the future, depending on circumstances. Thus the modeling based on possible future changes at the facility, rather than on actual emissions, is not acceptable for this regulatory use.[34]

The $SO_2$ Designations Modeling TAD recommends using the most recent three years of actuals or using a more recent federally enforceable and in effect allowable emissions limit, which could reflect new and lower continuing emissions that may not be reflected in modeling historical actual emissions. In the case of the Texas areas, there were not any more recent lower federally enforceable allowable limits that might have better represented recent and continuing $SO_2$ emissions performance. Therefore, use of actual recent $SO_2$ emissions was not a limitation or

---

[34] 2016 Final Designations Supplement TSD, p. 55-56.

18

uncertainty in Sierra Club's March 2016 modeling and, therefore, could not be a part of a basis for concluding that relying on that March 2016 modeling was in error. Additionally, EPA has also reviewed the annual emissions since 2013. Figure 2, produced by EPA using CAMD data, shows that the annual emissions and the average $SO_2$ emissions rate varied considerably from year to year at Martin Lake over the 2013-2019 period. The lowest emissions and emissions rates were recorded for the years 2015-2017 with the years 2018 and 2019 returning to about the previous higher emissions recorded in 2013-2014. The $SO_2$ emissions rate in 2015 dropped 48 percent from the highest rate that was recorded in 2013. Figure 2 does not demonstrate a trend toward lower emissions from the Martin Lake Power Plant with time. In fact, the lowest annual $SO_2$ emissions over the entire period was recorded in 2015, which was included in the Sierra Club's March 2016 modeling. The emissions in 2015 were only 37 percent of those recorded in the highest year, 2013. Since 2015, the facility's emissions trended up through 2018. The 3-year average emissions for 2017-2019 are almost identical to the 3-year average emissions for the modeling period for the designation, 2013-2015 (0.1 percent smaller). Luminant's March 2016 comments on EPA's intended designation projected a 30-40 percent decrease in actual emissions for the 2017-2019 period compared to the 2014-2015 period, due solely to voluntary and non-enforceable scrubber optimization and anticipated fuel blending changes. In the 2016 Final Designations Supplement TSD, EPA noted that these limits were not permanently enforceable and, therefore, could not be relied upon for designations decisions. We note that Luminant's prediction did not actually occur, as reflected in the 2017-2019 actual emissions that are basically the same (0.1 percent smaller) as 2013-2015 actual emissions.

**Figure 2.** 2013-2019 Annual $SO_2$ Emissions (tpy) and Emissions Rate (lb/MMBTU) from the Martin Lake Power Plant



Another technical aspect and potential uncertainty that EPA identified in the Proposed Error Correction was the March 2016 modeling's approach for the estimation of background concentrations. As explained in the 2016 Final Designations Supplement TSD, the lowest monitored background concentration (the El Paso monitor) was used in the March 2016 modeling. EPA stated "Given the amount of $SO_2$ emissions in East Texas compared to El Paso area this assumption likely leads to a slight underestimation in concentrations around these facilities but is within the framework of the TAD's options for inclusion of background monitoring data."[35] Therefore, EPA concludes that this was not a limitation or uncertainty in the March 2016 modeling and could not be a part of a basis for concluding that relying on that March 2016 modeling was in error. Additionally, as explained previously, the September 2019 modeling included a new background concentration, the 99th percentile design value concentration in Travis County, Texas, which is the lowest value measured at $SO_2$ ambient monitors in the State of Texas for the 2016-2018 period. This monitor was used by Sierra Club because it is nearer to Martin Lake and because the monitor that previously had the lowest state value (El Paso in the 2013-2015 period) was decommissioned in 2017. The updated background concentration is 7.8 $\mu g/m^3$, 2.6 $\mu g/m^3$ (51 percent) higher than the background value of 5.1 $\mu g/m^3$ used in Sierra Club's March 2016 modeling and 2019 updated modeling of 2013-2015 period. Regardless of the background concentration, the maximum modeled design concentration for the September 2019 updated modeling is well above the 2010 $SO_2$ NAAQS, for this 2019 assessment of 2013-2015 period it is 388.7 $\mu g/m^3$, before any background is added.

The final technical aspect and potential uncertainty that EPA identified in the Proposed Error Correction was the failure to include source contribution in the March 2016 modeling analysis. As explained previously, the Sierra Club's 2015 modeling relied upon for EPA's intended designations included such contribution from other sources. As explained in the Intended Designations TSD, the modeling indicated that the contribution to the maximum modeled design concentration from the Pirkey Power Plant only added 0.1 $\mu g/m^3$ to increase the maximum modeled design concentration from 339.8 $\mu g/m^3$ to 339.9 $\mu g/m^3$.[36] Based on the modeling information available at the time, EPA explained in the 2016 Final Designations Supplement TSD that inclusion of only the principle $SO_2$ emissions source in the modeling was an acceptable choice in this area's circumstances, as we maintained that Martin Lake was likely contributing almost if not equal to 100 percent of the impact for the values above the 2010 $SO_2$ NAAQS. EPA also explained that Sierra Club's 2016 modeling, by not including Pirkey Power Plant, was a conservative approach (*i.e.*, potentially under-estimating the maximum modeled design concentration) to determining whether the area was violating the 2010 $SO_2$ NAAQS and to identifying the geographical boundaries of such exceedances. EPA suggested that inclusion of Pirkey Power Plant should result in either similar impacts and boundaries or slightly increased impacts and possibly slightly larger boundaries, but inclusion of Pirkey Power Plant should not result in decreased impacts or "shrinking" of boundaries from those modeled.[37] Based on the information available at the time of EPA's final nonattainment designation in 2016, EPA continues to find that it was a reasonable decision at the time based on its prior assessment of the data available from Sierra Club's modeling of the area for the 2012-2014 (December 2015 modeling) and 2013-2015 (March 2016 modeling) periods; therefore, EPA concludes that this

---

[35] 2016 Final Designations Supplement TSD, p. 65.
[36] 2016 Final Designations Supplement TSD, pp.51-52.
[37] 2016 Final Designations Supplement TSD, pp. 60-62.

was not a limitation or uncertainty in the March 2016 modeling and could not be a part of a basis for concluding that relying on that March 2016 modeling was in error.[38]

After further assessment, EPA agrees with the analyses in the 2016 Final Designations Supplement TSD referenced previously for the same reasons explained in the Round 2 Supplement. Regardless, as explained previously, Sierra Club's September 2019 modeling included refinements of their March 2016 modeling inputs for stack parameters, building dimensions and locations, and receptor grid (25 km and only uncontested receptors), which were obtained directly from Luminant's March 2016 modeling analysis. Sierra Club's September 2019 modeling analyses used these aspects of Luminant's March 2016 report since the Luminant analysis contained more refined modeling inputs based on data available to the facility owner, such as CEM measured stack and emissions parameters, and stack and building location and dimensions. These updates resolved the identified technical aspects and uncertainties in the Proposed Error Correction because they reflected the most refined information for these inputs and the strictest application of the $SO_2$ NAAQS Designations Modeling TAD while still considering only uncontested receptors where modeled concentrations were not the highest. As shown in Table 2, the maximum modeled concentration was higher in Grid #1 than Grid #2 in Sierra Club's September 2019 modeling, but both receptor grids resulted in values that violated the 2010 $SO_2$ NAAQS. The Sierra Club's 2019 modeling for the 2013-2015 period utilized more refined and accurate data for stack parameters (variable temperature and velocity) and included model inputs for building downwash, but it did not include any of the novel and unapproved modeling preprocessors (AERLIFT and AERMOIST) that Luminant had utilized in 2016, which previously concerned EPA in the designations process.

In the Proposed Error Correction, EPA stated that "while individually these deficiencies are not dispositive, collectively they are a sufficient basis for EPA to propose that we erred in relying on the Sierra Club modeling in making the initial nonattainment designations for the three Texas areas." See 84 FR at 43761. However, EPA acknowledges that, in the 2016 Final Designations Supplement TSD, EPA also evaluated the combination of all the identified aspects of the March 2016 modeling (including all potential increasing and decreasing impacts on concentrations) through a comparison analysis, using the conservative approach of 224 μg/m$^3$ as the maximum value.[39] In the 2016 Final Designations Supplement TSD regarding the area around Martin Lake, EPA ultimately concluded that, given that Sierra Club's modeled concentrations (with a low background and no nearby sources) were 14 percent above the standard using 224 μg/m$^3$ and 22 percent above the standard using 239.1 μg/m$^3$ as the maximum and that several factors were deliberately conservative in under-estimating impacts and would tend to reduce the modeled concentrations (and actual modeled concentrations with appropriate background would be higher), our technical assessment of the available information was that the differences/changes to the Sierra Club modeling when combined overall would not result in modeled values near or

---

[38] EPA's assessment does not prevent the Pirkey Power Plant from being included in any *future* modeling (*e.g.*, state implementation plan demonstrations) for the Martin Lake area as a potentially contributing $SO_2$ emissions source; this will be dependent upon whether the Pirkey Power Plant is adequately represented by the background monitoring value added to the modeled concentrations, and/or on whether the state chooses to impose any new $SO_2$ emissions limits on the Pirkey Power Plant to be credited in the Martin Lake attainment demonstration.

[39] 2016 Final Designations Supplement TSD, p. 76.

below the standard.[40] Therefore, in the 2016 Final Designations Supplement TSD, EPA concluded that we considered the final Sierra Club modeling submitted March 2016 to be relevant information that must be considered in our designation decision and found that the modeling was a sufficient basis for a determination of nonattainment and clearly demonstrated the area around Martin Lake was nonattainment.[41]

After further assessment of each individual aspect of the modeling and review of our previous analysis of the impact of the combined impact from the 2016 Final Designations Supplement TSD, EPA agrees with the assessment of the combination of all the identified aspects of the modeling explained in the 2016 Final Designations Supplement TSD for those same reasons. Regardless, as shown in Table 2, the results of this updated modeling demonstrate that use of more refined inputs for the 2013-2015 period for the aspects of the March 2016 modeling that EPA identified in the Proposed Error Correction as creating uncertainty increased the maximum modeled design concentration, before adding in background concentrations, for Martin Lake from 224 $\mu g/m^3$ (or 239.0 $\mu g/m^3$) to 388.7 $\mu g/m^3$, a 73 percent (or 63 percent) increase. This result provides the combined impact of the changes in the September 2019 updated modeling (as compared to the March 2016 modeling), and corroborates EPA's assessment of Sierra Club's March 2016 modeling for the area around Martin Lake in the Round 2 Supplement and by extension for the areas around Big Brown and Monticello, which were modeled similarly and properly assessed by EPA in the 2016 Final Designations Supplement TSD. Furthermore, Sierra Club's September 2019 modeling demonstrates that the March 2016 modeling underestimated the maximum modeled design concentrations and that more refined inputs addressing the identified limitations resulted in higher modeled concentrations, which EPA predicted in the 2016 Final Designations Supplement TSD.

## V.    Conclusion

Sierra Club's September 2019 modeling addressed the uncertainties in the modeling that EPA relied on in the Round 2 Supplement, which EPA identified in the Proposed Error Correction. The Sierra Club's September 2019 modeling of the area around the Martin Lake Power Plant corroborates that EPA's reliance on the Sierra Club's March 2016 modeling in the Round 2 Supplement was appropriate. EPA agrees with our previous assessment of the technical aspects and potential uncertainties related to the Sierra Club's March 2016 modeling as explained in the Round 2 Supplement. Sierra Club's September 2019 modeling further confirms that the cumulative technical aspects and identified limitations with Sierra Club's March 2016 modeling that EPA identified in the Proposed Error Correction were not merited.

---

[40] 2016 Final Designations Supplement TSD, pp. 76-77.
[41] 2016 Final Designations Supplement TSD, p. 77.

**Tab 471: 86 Fed. Reg. 34,141 (June 29, 2021)**

EPA APPROVED NONREGULATORY PROVISIONS AND QUASI-REGULATORY MEASURES IN THE TEXAS SIP

| Name of SIP provision | Applicable geographic or nonattainment area | State submittal/ effective date | EPA approval date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| 2017 Emissions Inventory for the 2015 Ozone NAAQS. | Dallas-Fort Worth, Houston Galveston-Brazoria, and Bexar County Ozone Nonattainment Areas. | June 24, 2020 | June 29, 2021 [Insert **Federal Register** citation]. | * |

* * * * *

[FR Doc. 2021–13771 Filed 6–28–21; 8:45 am]

**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 81

**[EPA–HQ–OAR–2014–0464; FRL–10024–27–OAR]**

**Air Quality Designations for the 2010 1-Hour SO₂ NAAQS: Responses to Petitions for Reconsideration and Administrative Stay of the Designations for Portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County in Texas**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notification of actions denying petitions for reconsideration and administrative stay.

---

**SUMMARY:** The Environmental Protection Agency (EPA) is providing notice that it has responded to petitions for reconsideration and/or administrative stay of a final action under the Clean Air Act (CAA) published in the **Federal Register** on December 13, 2016, titled, "Air Quality Designations for the 2010 Sulfur Dioxide (SO₂) Primary National Ambient Air Quality Standard— Supplement to Round 2 for Four Areas in Texas: Freestone and Anderson Counties, Milam County, Rusk and Panola Counties, and Titus County." The EPA has denied these petitions in letters to the petitioners for the reasons that the EPA explains in those documents.

**DATES:** The Administrator signed the associated notification letters on June 10, 2021.

**FOR FURTHER INFORMATION CONTACT:** Corey Mocka, U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, Air Quality Policy Division, 109 T.W. Alexander Drive, Mail Code C539–04, Research Triangle Park, NC 27711; phone

number: (919) 541–5142; email address: *mocka.corey@epa.gov*.

**SUPPLEMENTARY INFORMATION:**

### I. Background

The EPA is providing notice that it has responded to petitions for reconsideration and/or administrative stay of a final action under the CAA published in the **Federal Register** on December 13, 2016, titled, "Air Quality Designations for the 2010 Sulfur Dioxide (SO₂) Primary National Ambient Air Quality Standard— Supplement to Round 2 for Four Areas in Texas: Freestone and Anderson Counties, Milam County, Rusk and Panola Counties, and Titus County" (81 FR 89870). On February 13, 2017, Vistra Energy submitted a petition requesting that the EPA reconsider and stay the effective date of the EPA's nonattainment designations for portions of Freestone and Anderson Counties, Rusk and Panola Counties, and Titus County. Vistra Energy later supplemented this petition on December 19, 2017. On March 15, 2017, the Texas Commission on Environmental Quality (TCEQ) submitted a request for administrative stay of the effective date for the EPA's final designations for these areas in Texas. The TCEQ also submitted a petition for reconsideration of the nonattainment designations on December 11, 2017. The EPA has denied these petitions in letters to the petitioners for the reasons that the EPA explains in those documents.

### II. Where can I get copies of this document and other related information?

This **Federal Register** document, the petitions for reconsideration and administrative stay, and the response letters to the petitioners are available in the docket that the EPA established for the rulemaking, under Docket ID NO. EPA–HQ–OAR–2014–0464.

All documents in the docket are listed in the index at *http:// www.regulations.gov*. Although listed in the index, some information may not be publicly available, *i.e.,* Confidential

Business Information or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form.

Out of an abundance of caution for members of the public and our staff, the EPA is temporarily suspending the Docket Center and Reading Room for public visitors to reduce the risk of transmitting COVID–19. Our Docket Center staff will continue to provide remote customer service via email, phone, and webform. For further information and updates on EPA Docket Center services, please visit us online at *https://www.epa.gov/dockets*. The EPA continues to carefully and continuously monitor information from the Centers for Disease Control and Prevention, local area health departments, and our federal partners so we can respond rapidly as conditions change regarding COVID–19.

In addition, the EPA has established a website for SO₂ designations rulemakings at: *https://www.epa.gov/ sulfur-dioxide-designations*. This **Federal Register** notice, the petitions for reconsideration and administrative stay, and the response letters denying the petitions are also available on this website along with other information.

### III. Judicial Review

Section 307(b)(1) of the CAA governs judicial review of final actions by the EPA. This section provides, in part, that petitions for review must be filed in the Court of Appeals for the District of Columbia Circuit: (i) When the agency action consists of "nationally applicable regulations promulgated, or final actions taken, by the Administrator," or (ii) when such action is locally or regionally applicable, if "such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." For locally or regionally applicable final actions, the CAA reserves to the EPA complete discretion whether to invoke the exception in (ii).

Judicial challenges to the EPA's denials of petitions for reconsideration of CAA actions belong in the same venue as any challenge to the action that such petitions request the agency to reconsider.[1]

The D.C. Circuit is the only appropriate venue for both challenges to the final action titled, "Air Quality Designations for the 2010 Sulfur Dioxide (SO₂) Primary National Ambient Air Quality Standard— Supplement to Round 2 for Four Areas in Texas: Freestone and Anderson Counties, Milam County, Rusk and Panola Counties, and Titus County," 81 FR 89870 (December 13, 2016) ("Round 2 Supplement") and challenges to these actions denying administrative petitions on the Round 2 Supplement. The EPA made a finding in the Round 2 Supplement, that the Round 2 Supplement is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1). *See* 81 FR at 89874–75. That action is currently being challenged in the Court of Appeals for the Fifth Circuit; however, the EPA maintains that the proper venue for that action is the D.C. Circuit.[2] Thus, judicial challenges to the actions noticed here, denying administrative petitions for reconsideration and/or stay of the Round 2 Supplement, also belong in the D.C. Circuit.

To the extent a court finds these actions denying the administrative petitions on the Round 2 Supplement to be locally or regionally applicable, the Administrator is exercising the complete discretion afforded to him under the CAA to make and publish a finding that each of these actions are based on a determination of "nationwide scope or effect" within the

meaning of CAA section 307(b)(1).[3] Both the Round 2 Supplement and these final actions noticed here are finalized pursuant to a common, uniform nationwide analytical method and interpretation of CAA section 107(d). In denying the petitions for reconsideration and administrative stay of the Round 2 Supplement, these final actions apply the same common, uniform nationwide analytical method and interpretation of CAA section 107(d) that the EPA applied across the country in designations for the SO₂ Primary National Ambient Air Quality Standard (NAAQS), including the EPA's nationwide approach to and technical evaluation of air quality modeling and monitoring data within the EPA's interpretation of statutory terms under section 107(d)(1) of the CAA.[4] These final actions are based on this same common core of determinations regarding the nationwide analytical method and interpretation of CAA section 107(d), determinations that specific methodologies are appropriate or preferable for assessing sulfur dioxide levels nationwide.[5] More specifically, these final actions are based on a determination by the EPA to evaluate areas nationwide using a common five-factor analysis in determining whether areas are in violation of or contributing to an area in violation of the 2010 SO₂ NAAQS at the time of the designations final action. The actions denying the petitions for reconsideration explained, for example, that the EPA's designations and the denials for reconsideration are based on the EPA's determination to consider and assess the technical representativeness of all available information regarding then-current air quality at the time of designations *(e.g.,* to consider third party modeling submitted to the EPA of the then-most recent years of air quality and then-currently available monitoring information, and not to consider projections or intended monitoring of future years' emissions, for SO₂ designations under the CAA). For these

reasons, the Administrator is exercising the complete discretion afforded to him by the CAA and hereby finds that each of these final actions is based on a determination of nationwide scope or effect for purposes of CAA section 307(b)(1) and is hereby publishing those findings in the **Federal Register**.

Under CAA section 307(b), any petition for review of these actions denying the petitions for reconsideration and/or stay must be filed in the Court of Appeals for the District of Columbia Circuit within 60 days from the date this notice is published in the **Federal Register**. Filing a petition for reconsideration by the Administrator of these final actions does not affect the finality of the actions for the purposes of judicial review, nor does it extend the time within which a petition for judicial review must be filed, and shall not postpone the effectiveness of such actions.

**Michael S. Regan,**
*Administrator.*

[FR Doc. 2021–13938 Filed 6–28–21; 8:45 am]

BILLING CODE 6560–50–P

---

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Part 180**

**[EPA–HQ–OPP–2019–0474; FRL–10025–18]**

## Bacillus subtilis Strain RTI477; Exemption From the Requirement of a Tolerance

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** This regulation establishes an exemption from the requirement of a tolerance for residues of *Bacillus subtilis* strain RTI477 in or on all food commodities when used in accordance with label directions and good agricultural practices. FMC Corporation submitted a petition to EPA under the Federal Food, Drug, and Cosmetic Act (FFDCA), requesting an exemption from the requirement of a tolerance. This regulation eliminates the need to establish a maximum permissible level for residues of *Bacillus subtilis* strain RTI477 under FFDCA when used in accordance with this exemption.

**DATES:** This regulation is effective June 29, 2021. Objections and requests for hearings must be received on or before August 30, 2021 and must be filed in accordance with the instructions provided in 40 CFR part 178 (see also Unit I.C. of the **SUPPLEMENTARY INFORMATION**).

---

[1] *Cf. Natural Res. Def. Council, Inc.* v. *Thomas,* 838 F.2d 1224, 1249 (D.C. Cir. 1988) (the clause in CAA section 307(b) governing "nationally applicable regulations" provides jurisdiction over both the direct challenge to the regulations and the petition for reconsideration).

[2] The EPA intends to maintain this position in merits briefing in the 5th Circuit, as the 5th Circuit's venue decision denied the EPA's motion to dismiss or transfer the case to the D.C. Circuit without prejudice to reconsideration of the issue by the merits panel. Texas v. EPA, 706 Fed. Appx. 159, 161, 165 (5th Cir. 2017) ("EPA's motion therefore is denied without prejudice to reconsideration by the merits panel . . . merits briefing will provide greater clarity on what determinations lie at the [Round 2] Supplement's core, by, for example, illuminating that the key determinations in the rule are determinations that specific methodologies are appropriate or preferable for assessing sulfur dioxide levels nationwide, as opposed to fact-specific assessments of sulfur dioxide levels in the four Texas regions. In that case, the merits panel should not be constrained from revisiting the issue.").

[3] In deciding whether to invoke the exception by making and publishing a finding that this final action is based on a determination of nationwide scope or effect, the Administrator has also taken into account a number of policy considerations, including his judgment balancing the benefit of obtaining the D.C. Circuit's authoritative centralized review versus allowing development of the issue in other contexts and the best use of agency resources.

[4] In the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that the "nationwide scope or effect" exception applies would be appropriate for any action that has a scope or effect beyond a single judicial circuit. See H.R. Rep. No. 95–294 at 323, 324, reprinted in 1977 U.S.C.C.A.N. 1402–03.

[5] *See, supra,* n.2.