# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

## Case No. 17-60088

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL
QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; BIG
BROWN POWER COMPANY, L.L.C.; SANDOW POWER COMPANY,
L.L.C.; LUMINANT MINING COMPANY, L.L.C.,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
MICHAEL S. REGAN, in his Official Capacity as Administrator of the
United States Environmental Protection Agency,

*Respondents*.

---

## Consolidated with Case No. 21-60673

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL
QUALITY; LUMINANT GENERATION COMPANY, L.L.C.;
LUMINANT MINING COMPANY, L.L.C.,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
MICHAEL S. REGAN, Administrator,
United States Environmental Protection Agency,

*Respondents*.

---

Petition for Review of Final Administrative Action
of the United States Environmental Protection Agency

---

# RESPONDENT-INTERVENOR SIERRA CLUB'S RESPONSE TO
LUMINANT'S PETITION FOR REHEARING EN BANC

Lisa K. Perfetto
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(212) 845-7388
lperfetto@earthjustice.org

Joshua D. Smith
Sierra Club
2101 Webster Street
Oakland, CA 94612
(415) 977-5560 (phone)
(510) 208-3140 (facsimile)
joshua.smith@sierraclub.org

*Counsel for Sierra Club*

Filed: April 15, 2024

# CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. <u>Petitioners</u>: State of Texas, Texas Commission on Environmental Quality, Luminant Generation Company, L.L.C., Big Brown Power Company, L.L.C., Sandow Power Company, L.L.C., and Luminant Mining Company, LLC.

2. <u>Parent Companies of Petitioners</u>: Vistra Asset Company, L.L.C.; Vistra Corp.; Vistra Intermediate Company, L.L.C.; Vistra Operations Company, L.L.C.

3. <u>Counsel for Petitioners State of Texas and Texas Commission on Environmental Quality</u>: Ken Paxton, Attorney General of Texas; Brent Webster, First Assistant Attorney General of Texas; Grant Dorfman, Deputy First Assistant Attorney General; James Lloyd, Deputy Attorney General for Civil Litigation; Kellie E. Billings-Ray, Chief, Environmental Protection Division; John R. Hulme, Assistant Attorney General; Ryan Baasch, Office of the Attorney General of Texas.

4. <u>Counsel for Petitioners Luminant Generation Company LLC and Luminant Mining Company LLC</u>: Allyson N. Ho with Gibson, Dunn & Crutcher LLP; P. Stephen Gidiere III, C. Grady Moore III, and Julia B. Barber with Balch & Bingham, LLP; Stephanie Z. Moore, Daniel J. Kelly, and David W. Mitchell with Vistra Corp.

5.  <u>Respondents</u>: United States Environmental Protection Agency; Michael S. Regan, Administrator, U.S. Environmental Protection Agency; Earthea Nance, Regional Administrator, Region 6, U.S. Environmental Protection Agency.

6.  <u>Counsel for Respondents United States Environmental Protection Agency and Michael S. Regan</u>: Abi Vijayan, Mike Thrift, Jeffrey M. Prieto, Hali Kerr, Brooke Villegas, and Aaron Vargas, U.S. Environmental Protection Agency, Office of General Counsel; Merrick B. Garland, U.S. Attorney General; Todd Kim, Assistant Attorney General; Perry M. Rosen, U.S. Department of Justice, Environment & Natural Resources Division.

7.  <u>Intervenor</u>: Sierra Club is a non-profit organization that maintains an open membership invitation to organizations, businesses, individuals, and the public in general. Accordingly, Sierra Club consists of many individual members.

    Sierra Club does not have any parent companies, and no publicly-held company owns a 10% or greater interest in Sierra Club.

8.  <u>Counsel for Intervenor</u>: Lisa Perfetto with Earthjustice; Joshua Smith with Sierra Club.

Respectfully submitted,

<u>*s/ Lisa K. Perfetto*</u>
Lisa K. Perfetto
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(212) 845-7388
lperfetto@earthjustice.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.............................................................. iv

INTRODUCTION ........................................................................1

STATEMENT OF THE CASE .......................................................1

ARGUMENTS AND AUTHORITIES ............................................7

    I.    The Panel Decision Correctly Applied Court
        Precedent to Uphold EPA's Nonattainment
        Designation. ..................................................................7

        A.    The Panel Applied the Correct Standard of
              Review. ..................................................................7

        B.    EPA Considered Available Monitoring Data,
              Which Did Not Conflict with Sierra Club's
              Modeling. ...............................................................9

        C.    EPA Considered Luminant's Modeling in Detail,
               and Reasonably Rejected It. ................................11

        D.    Sierra Club's 2016 Modeling Clearly
               Demonstrated Nonattainment. .............................16

    II.    No Exceptionally Important Issue or Conflict with
        Court Precedent Exists to Warrant Rehearing En
        Banc. ...........................................................................19

CONCLUSION ...........................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
462 U.S. 87 (1983) ............................................................. 7, 20

*BCCA Appeal Grp. v. EPA,*
355 F.3d 817 (5th Cir. 2003) ........................................... 7, 12

*Columbia Falls Aluminum Co. v. EPA,*
139 F.3d 914 (D.C. Cir. 1998) ................................................ 8

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*
*Auto. Ins. Co.,*
463 U.S. 29 (1983) .................................................................. 19

*Sierra Club v. EPA,*
939 F.3d 649 (5th Cir. 2019) .................................................. 7

*Sw. Elec. Power Co. v. United States Env't Prot. Agency,*
920 F.3d 999 (5th Cir. 2019) ................................................ 19

*Texas Oil & Gas Ass'n v. EPA,*
161 F.3d 923 (5th Cir. 1998) ........................................... 8, 11

*Texas v. EPA,*
690 F.3d 670 (5th Cir. 2012) ................................................ 16

*Texas v. EPA,*
983 F.3d 826 (5th Cir. 2020) ......................................... 14, 16

*Union Elec. Co. v. EPA,*
427 U.S. 246 (1976) ............................................................... 20

## Statutes

42 U.S.C. § 7407(d)(1)(A)..................................................................2

42 U.S.C. § 7407(d)(3)....................................................................14

42 U.S.C. § 7409(b)(1)......................................................................2

## Federal Regulations

40 C.F.R. Part 51, App. W § 3.1.2a ..............................................12

40 C.F.R. Part 51, App. W § 3.2.2b ..............................................12

40 C.F.R. Part 51, App. W § 4.2.2.1 ..............................................12

## Federal Register

75 Fed. Reg. 35,520 (June 22, 2010) ........................................1, 2

84 Fed. Reg. 43,757 (Aug. 22, 2019) ..............................................5

86 Fed. Reg. 34,141 (June 29, 2021) ..............................................6

86 Fed. Reg. 34,187 (June 29, 2021) ..............................................6

## Rules

5th Cir. R. 35 I.O.P ........................................................................1

Fed. R. App. P. 35(a)..............................................................19, 21

## INTRODUCTION

A "petition for rehearing en banc is an extraordinary procedure that is intended to bring to the attention of the entire court an error of *exceptional* public importance or an opinion that *directly conflicts* with prior Supreme Court, Fifth Circuit, or state law precedent." 5th Cir. R. 35 I.O.P. (emphasis added). The petition filed by Luminant Petitioners fails to meet that standard.[1] Because the Panel's opinion does not conflict with opinions from the Supreme Court or this Court, and the Panel did not err on the issues presented by Luminant—let alone make an error of exceptional public importance—the petition should be denied.

## STATEMENT OF THE CASE

Exposure to sulfur dioxide ("$SO_2$"), even for just a few minutes, can have significant human health impacts, including the aggravation of asthma attacks, cardiovascular and respiratory failure, and even premature death. Primary National Ambient Air Quality Standard for Sulfur Dioxide, 75 Fed. Reg. 35,520, 35,525–26 (June 22, 2010). To address those risks, in 2010, the U.S. Environmental Protection Agency

---

[1] The State of Texas and Texas Commission on Environmental Quality ("Texas Petitioners") did not join the petition for rehearing.

("EPA") issued a one-hour national ambient air quality standard ("NAAQS") for $SO_2$ "requisite to protect the public health," 42 U.S.C. § 7409(b)(1); 75 Fed. Reg. at 35,521.

EPA then initiated the process of designating all areas of the country as either "attainment," for areas that meet the NAAQS; "non-attainment," for areas that do not meet the standard; or "unclassifiable," for areas that cannot be classified with available information. 42 U.S.C. § 7407(d)(1)(A). Consistent with past practice and the Clean Air Act, EPA issued guidance stating that it would base $SO_2$ designations on all available data, including air quality modeling and available, representative monitoring. 75 Fed. Reg. at 35,551. EPA encouraged any states intending to rely on monitoring to promptly deploy monitors near the largest sources of $SO_2$, because determining attainment—whether with monitoring or modeling—would require three full years of data. App. 1417, 1545–47. Although Martin Lake is one of the largest sources of $SO_2$ in the nation, App. 1595, Texas declined to install a monitor near the plant.

As part of EPA's designation process, on September 11, 2015, Sierra Club submitted initial modeling for Martin Lake in accordance

with EPA's preferred modeling platform and technical guidance. That submission included separate modeling scenarios—first, using allowable emissions from 2012–2014, and then using actual emissions for the same period—for Martin Lake alone and then separately, Martin Lake in conjunction with the nearby Pirkey plant, another large source of $SO_2$. The modeling showed significant NAAQS exceedances, meaning the area surrounding the plant was not meeting the standard and should be designated as nonattainment. App. 71.

In February 2016, EPA proposed to designate the area surrounding Martin Lake as nonattainment based on Sierra Club's 2015 modeling of *actual* emissions. No other entity submitted modeling to help inform EPA's initial designations. App. 324.

EPA sought public comment on the proposed designation, and in March 2016, Sierra Club submitted updated modeling that used the latest version of AERMOD, the most recent three years of emissions data (2013–2015) as reported by Luminant, a new—and even lower—background concentration reflecting the lowest measured background concentration in the State of Texas, and hourly stack exit velocities based on Luminant's own data. *See* App. 1357–58, 1361–62.

Texas Commission on Environmental Quality ("TCEQ") and Luminant also submitted comments to EPA, critiquing Sierra Club's 2015 modeling. Luminant submitted two alternative modeling analyses: one, which relied on both hypothetical emissions reductions at the plant and unapproved modifications to EPA's standard model to decrease pollution impacts during certain wind directions and plume temperatures, App. 1290–91; and a second, which relied on the "same *current* emissions as the Sierra Club modeling," Pet. Reply at 9–10 (emphasis in original), but included a blanket 50% emission reduction to address Luminant's hypothesis that EPA's standard model overestimated impacts. App. 554–60, 1290 n.6, 1291–93.

Contrary to Petitioners' claim, EPA did consider all available information before issuing its nonattainment designation. EPA considered the available monitoring data showing concentrations below the NAAQS at a distance nineteen kilometers from Martin Lake—and where Sierra Club's 2015 modeling of actual emissions showed no exceedances—but found the monitor was too distant to be of any use in determining attainment near the plant, where the greatest $SO_2$ concentrations would be found. App. 71, 1333–34, 1336. EPA also

devoted nearly twenty pages of the record to providing a detailed, highly technical explanation for rejecting Luminant's alternative modeling. *See* App. 1289–94, 1336, 1340–45, 1351–54, 1364–65.

In contrast, EPA found that Sierra Club's 2016 modeling reliably demonstrated nonattainment, even after accounting for Petitioners' concerns—many of which were not applicable to the 2016 modeling in any event. EPA found that Sierra Club's modeling likely underestimated impacts and still showed exceedances at least fourteen percent above the NAAQS. Upon investigation, EPA determined that Petitioners' suggested corrections to Sierra Club's modeling would yield an *increase* in $SO_2$ impacts. Consequently, EPA finalized its nonattainment designation. App. 1310–12.

Texas and Luminant Petitioners sought judicial review and submitted requests for administrative reconsideration of the final designation. In 2017, the new administration proposed a rule that would have effectively redesignated the area as "unclassifiable," based on purported errors in the 2016 designation. 84 Fed. Reg. 43,757 (Aug. 22, 2019). In response, Sierra Club submitted additional, updated

modeling addressing each purported error. App. 1402, 1443. EPA never finalized that proposed rule.

Meanwhile, in November 2017, Texas finally installed an air quality monitor at Martin Lake. That monitor confirmed the area was in fact violating the NAAQS. App. 1596–97.

In 2021, EPA denied the requests for reconsideration, concluding that Sierra Club's 2019 modeling addressed "all" purported "limitation[s] or uncertaint[ies]" and "confirm[ed]" that Martin Lake is violating the NAAQS. 86 Fed. Reg. 34,187, 34,188 (June 29, 2021); 86 Fed. Reg. 34,141 (June 29, 2021); *see also* App. 1598. Texas and Luminant filed petitions for judicial review, which were consolidated with this case.

The Panel upheld EPA's nonattainment determination, concluding that EPA carefully considered the record "in detail," and "rationally explained" its highly technical decision designating the area around Martin Lake as nonattainment. *See* Op. at 16–17, 22, 24–25, 27, 30. Judge Elrod dissented. Luminant Petitioners now seek en banc review, claiming that the Panel majority was improperly deferential to EPA

and thus violated their constitutional duties by ceding judicial power to

an administrative agency. Rehearing Pet. at 11.

## ARGUMENTS AND AUTHORITIES

### I.    The Panel Decision Correctly Applied Court Precedent to Uphold EPA's Nonattainment Designation.

#### A.    The Panel Applied the Correct Standard of Review.

Contrary to Luminant's contentions, *id.* at 7, and the dissent, Op.

at 31, the Panel decision did not apply a "heightened" standard of

deference that excused EPA from taking a "hard-look" at all available

evidence. As the Panel correctly concluded, EPA "rationally" evaluated

the available monitoring and modeling evidence "in detail" and provided

"numerous" highly technical reasons for designating the area around

Martin Lake as nonattainment, and for concluding that Luminant's

modeling "could not be relied on." *Id.* at 16, 21–22, 25. Consistent with

binding precedent, the Panel reasonably deferred to those

determinations. *Id.* at 22 (citing *BCCA Appeal Grp. v. EPA*, 355 F.3d

817, 824 (5th Cir. 2003); *see also Baltimore Gas & Elec. Co. v. Nat. Res.

Def. Council, Inc.*, 462 U.S. 87, 103 (1983) (A court's review is "most

deferential" where the agency's decision is based on an evaluation of

complex data within its area of expertise.); *Sierra Club v. EPA*, 939 F.3d

649, 653 (5th Cir. 2019) ("We afford 'significant deference' to agency decisions involving analysis of scientific data within the agency's technical expertise. The EPA's selection of a model to measure air pollution levels is precisely that type of decision.").

Nor does the Panel decision exempt EPA from examining contrary evidence or explaining discrepancies in the record. *See* Rehearing Pet. at 7. In fact, the Panel noted that, after carefully examining all available evidence, EPA explained that "even altering Sierra Club's model" to address purported shortcomings, there was "no material change to the conclusion that $SO_2$ concentrations in Rusk/Panola counties violated the $SO_2$ NAAQS." Op. at 23. Consistent with precedent, the Panel correctly concluded that EPA's choice to proceed with "limited or imperfect" information is not arbitrary unless there is "no rational relationship" between the model chosen and the "reality it purports to represent." *Id.* (quoting *Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914, 923 (D.C. Cir. 1998)); *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 935 (5th Cir. 1998). Here, the Panel decision carefully scrutinized EPA's decision-making process, and correctly found EPA took a "hard-look" at all proffered evidence and adequately explained its

decision. Luminant fails to identify any basis for rehearing that decision en banc.

### B. EPA Considered Available Monitoring Data, Which Did Not Conflict with Sierra Club's Modeling.

Contrary to Luminant's claim, EPA did not act arbitrarily and capriciously in "fail[ing]" to investigate a discrepancy between Sierra Club's modeling and available monitoring data because no such discrepancy exists. *See* Rehearing Pet. at 5, 7, 10.

In arguing otherwise, Petitioners referenced Sierra Club's 2015 modeling of *allowable* emissions. *Id.* at 5; Pet. Br. at 28 (both citing App. 70). Allowable emissions are the maximum approved emissions under a plant's operating permit—typically what would happen if the plant operated at full capacity every hour of the year. No one would expect modeling of allowable emissions to mirror $SO_2$ concentrations on the ground because, by definition, such modeling is not based on actual $SO_2$ emissions. *See* App. 67.

No Sierra Club modeling of *actual* emissions ever showed exceedances in the vicinity of the Longview monitor near the East Texas Regional Airport in Gregg County, nineteen kilometers away from the plant, and outside of the final nonattainment area. App. 71,

9

309, 1452–53; R.466, Attach. 4 at 5.[2] In other words, Sierra Club's

modeling *correctly predicted* that the Longview monitoring data would

not show any NAAQS exceedances so far away from the plant. EPA

relied on Sierra Club's modeling of *actual* emissions to designate

portions of Rusk and Panola Counties in nonattainment. App. 323,

1286.

　　EPA therefore had no reason to compare Sierra Club's modeling

against the Longview monitor and indeed was never asked to. *See*

Rehearing Pet. at 5 (citing App. 518). At the comment stage, Petitioners

flagged the monitoring data showing attainment nineteen kilometers

away from the plant, but never suggested that the monitoring data be

used to "verify" Sierra Club's modeling, and never alleged a discrepancy

with Sierra Club's modeled concentrations at the location of the monitor

in any event. App. 518, 565.[3]

---

[2] This record document is not reproduced in the Appendix, but can be
found at https://www.regulations.gov/comment/EPA-HQ-OAR-2014-
0464-0466.

[3] Sierra Club's 2015 modeling of actual emissions projected exceedances
in a separate part of Gregg County, some distance from the Longview
monitor. App. 71 (the northernmost reach of projected exceedances
extends slightly into Gregg County). Sierra Club's updated modeling,
submitted in March 2016, showed no exceedances whatsoever in Gregg

Consequently, EPA's response to comments squarely addressed Petitioners comments by explaining that the Longview monitor—nineteen kilometers away and one county over—was simply too distant to be of any use in determining attainment near the plant, where the greatest $SO_2$ concentrations would be found. App. 1333–34, 1336; *see also* App. 309.

The Panel majority correctly upheld EPA's treatment of the monitoring data because "[b]y addressing the Petitioners' concerns and explaining why they were not merited with a plausible explanation, the EPA did not 'fail[] to consider an important aspect of the problem.'" Op. at 16–17 (quoting *Texas Oil & Gas Ass'n,* 161 F.3d at 933).

## C.   EPA Considered Luminant's Modeling in Detail, and Reasonably Rejected It.

Luminant asserts that EPA "refused to conduct" the required regulatory review of its alternative modeling, and instead "simply disregarded the model." Rehearing Pet. at 5. As the Panel correctly concluded, however, EPA "assessed the validity of Luminant's model in detail," and cited "numerous" highly technical reasons for concluding

---

County, leading EPA to confine the nonattainment area to Rusk and Panola Counties. App. 1307–08, 1333–34.

that Luminant's modeling "could not be relied on." Op. at 22. Consistent with binding precedent, the Panel reasonably deferred to EPA's determination. *Id.* (citing *BCCA Appeal Grp. v. EPA*, 355 F.3d at 824.

None of Luminant's complaints warrant en banc rehearing of that conclusion. Contrary to the Company's suggestion, Rehearing Pet. at 5, it is not EPA's responsibility to conduct a complex regulatory review for every alternative model submitted during a comment period. Op. at 22. Instead, EPA's regulations establish a "common," "standardiz[ed]" air quality model—the same model used by Sierra Club. *Id.* at 18, 22; *see also* 40 C.F.R. Part 51, App. W § 4.2.2.1. And as the Panel correctly concluded, the regulations make clear that "*the user*" of any alternative modeling (here, Luminant) "*must . . . follow*" the regulatory process "*before* it is selected for use." Op. at 19, 22 (emphasis added); 40 C.F.R. Part 51, App. W §§ 3.1.2a, 3.2.2b. Consistent with those regulations, in May 2013, and again, in December 2015, EPA issued guidance reiterating the "necessity" of completing the Appendix W process and "obtain[ing] EPA approval" before any entity could use alternatives to the "default" model for evaluating $SO_2$ impacts. App. 1320–22.

12

Petitioners concede they did not follow that required process. *See* Pet. Br. at 30. Instead, they plowed ahead—at their own risk—with two unapproved modeling analyses, each of which EPA reasonably rejected after careful fact-specific consideration. *Contra* Op. at 41–42 (Elrod, J., dissenting). First, EPA reasonably concluded that Luminant failed to "substantiate[]" its modifications to the agency's standard model—i.e., the use of AERLIFT and AERMOIST to increase the model's pollution dispersion and lower $SO_2$ concentrations during times of specific wind direction or flue gas temperature—because those adjustment resulted in "very significant" changes to Martin Lake's stack temperature and flue gas velocity that were inconsistent with the Company's own reported operational data. App.1290–93. Moreover, those unapproved modeling modifications resulted in "disproportionately large," "erratic," and "drastic[]" changes in $SO_2$ concentrations during *all* operating conditions, even when wind speeds, flue gas moisture content, and temperatures would not have resulted in Luminant's "theorized" plume phenomena, thereby skewing the modeling results. App. 1290–93, 1320–21, 1340–55. In short, Luminant failed to meet the regulatory requirements for an alternative model, App. 1341, and failed to

13

demonstrate that its model provided an accurate representation of Martin Lake's actual operations or pollution impacts.

EPA correctly rejected Luminant's unapproved alternative modeling for an independent reason: It was predicated on *hypothetical* and *"future non-enforceable"* emissions reductions of up to forty percent. App. 691, 1290, 1355-56. As a result, it was "not acceptable" for determining whether the area "'meets' a NAAQS." App. 1290–91, 1355–56; *see also Texas v. EPA*, 983 F.3d 826, 838 (5th Cir. 2020) (holding that "the designation process considers *only the present tense* . . . either a county does or does not meet the NAAQS," and rejecting modeling showing attainment based on uncertain, future events (emphasis added)).[4]

_____

[4] Luminant wrongly asserts, Rehearing Pet. at 6, without any citation to the record, that "recent data shows" $SO_2$ levels now satisfy the NAAQS. In fact, the record demonstrates that rather than reducing emissions by 30–40%, as Luminant's alternative scenario assumed, Martin Lake's post-2015 emissions *doubled*, and the facility was the largest emitter of $SO_2$ in the country. App. 1595–96, 1640–41. Even if $SO_2$ levels have decreased, that post hoc data is irrelevant in this record review case. Moreover, the Clean Air Act sets out a specific process for seeking redesignation of an area to attainment, 42 U.S.C. § 7407(d)(3), which Luminant is free to pursue.

14

Furthermore, EPA reasonably rejected Luminant's "alternate" design value "estimate"—not actually modeled—which applied an across-the-board, fifty percent reduction to Sierra Club's modeling results. App. 1289–90, 1342–43. EPA explained (1) that Luminant's crude fifty percent blanket reduction was "not appropriate," App. 1343, and (2) as with the unapproved AERLIFT and AERMOIST modeling adjustments, Luminant applied its blanket fifty percent reduction to all conditions (e.g., all temperatures, wind speeds, and meteorological conditions), even during periods when Luminant's alleged overprediction phenomena would *not* be expected to occur. App. 1290–92, 1343.

In sum, Luminant's assertion that EPA "disregarded" the Company's modeling is simply wrong. As the Panel correctly concluded, Op. at 22, EPA provided "numerous" detailed, highly technical, and site-specific explanations for concluding that Luminant's modeling was "not acceptable" for determining whether actual emissions from Martin Lake are "currently meeting the NAAQS." *See* App. 1290–93, 1340–45, 1364–65. Consistent with longstanding, binding precedent, the Panel

15

correctly deferred to those technical findings. Op. at 22; *see also Texas v. EPA*, 983 F.3d at 838; *Texas v. EPA*, 690 F.3d 670, 677 (5th Cir. 2012).

### D. Sierra Club's 2016 Modeling Clearly Demonstrated Nonattainment.

Unlike Luminant's modeling, Sierra Club's 2016 modeling—which EPA relied on for its nonattainment designation—"was performed in accordance with appropriate EPA modeling guidance and us[ed] generally conservative assumptions" that would "tend to reduce/underestimate" $SO_2$ concentrations. App. 1310. Specifically, the modeling excluded nearby emissions sources and used a very low estimate of background $SO_2$ based on the lowest monitor readings in Texas. App. 1310. It also assumed a high constant stack temperature, which increased plume buoyancy and dispersion, and thus yielded conservatively low concentration values. App. 1296, 1310. Additionally, it incorporated several adjustments addressing Petitioners' criticisms of Sierra Club's 2015 modeling: it used the latest version of AERMOD, the most recent three years of actual emissions data, and Luminant's own actual hourly stack exhaust flow rates. App. 1357–58, 1361–62.

EPA considered Petitioners' concerns but determined that altering Sierra Club's modeling further would actually increase $SO_2$

concentrations. App. 1310–12 ("[T]he net difference to the exceedance values due to flagpole receptor height, updated surface characteristics, and more representative background would be an overall increase to the exceedance values."). In sum, EPA concluded that because Sierra Club's modeled concentrations were already at least fourteen percent above the NAAQS, and because the modeling was "deliberately conservative in under-estimating impacts," "the differences/changes to the Sierra Club modeling suggested by industry would not result in modeled values near or below the standard; therefore, EPA . . . finds that [Sierra Club's 2016] modeling is a sufficient basis for a determination of nonattainment and clearly demonstrates the area around Martin Lake is nonattainment." App. 1311–12; *see also* App. 1337.

The subsequent Reconsideration and Error Correction process only confirmed EPA's original findings. At Petitioners' behest, EPA again reviewed several purported errors in Sierra Club's 2016 modeling and sought public comment. Sierra Club submitted additional modeling, isolating the effect of each so-called error. *See* App. 1454–55. EPA again reviewed each alleged error and found that none of the refinements materially altered its nonattainment determination.

Based on Sierra Club's updated 2019 modeling, EPA determined that Sierra Club's use of constant stack parameters in 2016 had led to a *forty percent reduction (underestimate)* in the maximum modeled concentrations—confirming EPA's 2016 findings. App. 1568–69; *see also* App. 1310. EPA likewise confirmed its 2016 findings on building downwash, flagpole receptors, and surface characteristics: contrary to Petitioners' assertions, downwash had zero effect on the modeling results; the use of flagpole receptors had increased concentrations by just 0.05%; and use of older surface characteristics increased $SO_2$ concentrations by only one percent. App. 1569–71; *cf.* App. 1311. Finally, EPA determined the remaining purported errors were either not applicable (contrary to Petitioners' complaints, the 2016 Sierra Club modeling used the most recent version of AERMOD and the most recent three years of actual emissions) or not actually limitations (Sierra Club used an appropriate receptor grid, low background estimate, and omitted nearby sources). App. 1572–76.

In both 2016 and again in 2021, EPA made the only determination it could: portions of Rusk and Panola Counties were in nonattainment. EPA thus had no need to "move[] the scientific goalposts" to designate

18

the area as in nonattainment, and the Panel majority had no need to apply a heightened standard of deference to uphold that determination. *See* Rehearing Pet. at 10 (quoting Op. at 45 (Elrod, J., dissenting)). As the Panel majority notes, "EPA acknowledged and addressed the concerns raised by the Petitioners" and "rationally explained its reliance on Sierra Club's modeling." Op. at 24–25. In other words, EPA "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## II.     No Exceptionally Important Issue or Conflict with Court Precedent Exists to Warrant Rehearing En Banc.

Petitioners fail to demonstrate that the Panel's decision conflicts with *any* authority, or raises any question of exceptional importance. Fed. R. App. P. 35(a). Instead, Petitioners mischaracterize the case law and advance two basic arguments, neither of which have merit.

First, Petitioners wrongly suggest that en banc rehearing is "necessary to restore the proper standard of judicial review under the APA." Rehearing Pet. at viii. A deferential posture in cases involving an agency's technical expertise is consistent with Fifth Circuit and Supreme Court precedent. *See*, *e.g.*, *Sw. Elec. Power Co. v. United States*

19

*Env't Prot. Agency*, 920 F.3d 999, 1013 (5th Cir. 2019) (review under the APA is "highly deferential" but "not toothless"); *Baltimore Gas*, 462 U.S. at 103 (courts are "most deferential" to agencies' "scientific determination[s]" within their technical expertise); *Union Elec. Co. v. EPA*, 427 U.S. 246, 256 (1976) (same).

Contrary to the dissent, Op. at 33 n.1 (Elrod, J., dissenting), the Panel decision does not afford EPA a heightened level of deference simply because the agency action involved a technical subject, but rather carefully considered each of EPA's actions in ultimately concluding that EPA adequately assessed all available evidence. The standard for judicial review under the APA remains unchanged—in reviewing a technical and complex matter, deference is warranted, but this Court maintains a duty of judicial review. The Panel majority fulfilled its duty here.

Second, Petitioners exaggerate the implications of the Panel's decision and wrongly contend that en banc rehearing is necessary to "prevent agency overreach" and "enforce separation of powers." Rehearing Pet. at 10. But Luminant's conclusory assertions fail to establish that the Panel's decision will result in any "significant

20

expansion" of agency deference, let alone that any "serious practical consequences" will result. *Id.* at 11. The Panel simply applied existing law to the facts of the case and changed nothing about this Court's standard of review. Moreover, Luminant improperly presumes bad faith of both the judiciary and federal agencies, suggesting that courts may afford deference "as a way to cede the judicial power to administrative agencies." *Id.*

Here, there is no need to take the extraordinary step of en banc review simply to reiterate longstanding standards of judicial review. Under Fed. R. App. P. 35(a), rehearing en banc is disfavored and reserved only for proceedings involving "a question of exceptional importance" or where it is "necessary to secure or maintain uniformity of the court's decisions." Because neither factor exists here, the Court should deny the en banc petition.

21

# CONCLUSION

The Petition for Rehearing En Banc should be denied.


Dated: April 15, 2024

Respectfully submitted,

*s/ Lisa K. Perfetto*
Lisa K. Perfetto
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(212) 845-7388
lperfetto@earthjustice.org

Joshua Smith
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5560 (phone)
joshua.smith@sierraclub.org

*Counsel for Sierra Club*

## CERTIFICATE OF SERVICE

On this 15th day of April, 2024 a true and correct copy of the foregoing Respondent-Intervenor Sierra Club's Response to Luminant's Petition for Rehearing En Banc was filed with the electronic case filing (ECF) system of the U.S. Court of Appeals for the Fifth Circuit, which will provide electronic notice to counsel of record.

*s/ Lisa K. Perfetto*
Lisa K. Perfetto
Counsel for Sierra Club

## CERTIFICATE OF COMPLIANCE WITH FILING REQUIREMENTS

The undersigned counsel states that this motion complies with Fed. R. App. P. 35(e) & 35(b)(2)(A) because it contains 3,900 words, excluding the parts of the brief that are exempt under Fed. R. App. P. 32(f), as counted by a word processing system and, therefore, is within the word limit. This motion also complies with typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Century Schoolbook font.

Dated: April 15, 2024

*s/ Lisa K. Perfetto*
Lisa K. Perfetto
Counsel for Sierra Club

24